1   THOMAS J. SCHMITZ
2   1753 Woodleaf Circle
3   Roseville, CA 95747
4   (707) 694-8158 tsfoot49@gmail.com
5   PRO SE



FILED

JAN 2 7 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

6                    UNITED STATES DISTRICT COURT
7
8                    EASTERN DISTRICT OF CALIFORNIA

Estate of WILLIAM SCHMITZ, deceased, by and
through THOMAS J. SCHMITZ and DIANNE
MALLIA, as Successors in Interest; THOMAS
SCHMITZ, Individually; and DIANNE MALLIA,
Individually,
                    Plaintiffs,
                         vs.
CDCR Correctional Officer ADAM ASMAN; CDCR
Correctional Officer ERIK BRADLEY; CDCR
Correctional Officer JAMES BURNS; CDCR
Correctional Sergeant DAVID BRUNKHORST; CDCR
Physician and Surgeon ALEX ANDALUZ, M.D;
CDCR Physician and Surgeon MARIANNA KATE
ASHE, M.D.; CDCR Physician and Surgeon JEVON
JOHNSON; CDCR Physician and Surgeon ROBERT
JOHNSON; CDCR Physician and Surgeon SUJATHA
RAMKUMAR, MD; CDCR Physician and Surgeon
MICHAEL SMITH, MD; CDCR Clinical Psychologist
JACK AAMOT, Psy. D.; CDCR Clinical psychologist
CHRISTOPHER SMITH; CDCR clinical psychology
intern REBECCA ROBINSON; CDCR Licensed
Clinical Social Worker T. CAMPBELL; CDCR
Licensed Clinical Social Worker ERIC BRANMAN;
CDCR Licensed Clinical Social Worker VIOLKA
WANIE; Mule Creek State Prison Chief Medical
Executive SCOTT A. HEATLEY, M.D.; Mental Health
Administrator of Quality Management DR. LAURA
CEBALLOS; Deputy Director of CDCR's Statewide
Mental Health Program KATHERINE TEBROCK;
Mule Creek State Prison Chief Executive Officer
(Medical) RAINBOW BROCKENBOROUGH; Mule
Creek State Prison Warden and Chief Executive Officer
JOE A. LIZARRAGA; Statewide Chief Psychiatrist
for CDCR MICHAEL GOLDING, M.D.; and Does
1 through 20.

NO. 2:20 - CV 0195 - JAM CKD PS

**PLAINTIFFS' COMPLAINT FOR**

**VIOLATIONS OF CIVIL RIGHTS**

**AND STATE LAW**

**JURY TRIAL DEMANDED**

1

Schmitz – Complaint for Damages

Defendants.

Plaintiffs complain and allege as follows:

## JURISDICTION AND VENUE

1.      This complaint seeks damages and attorneys' fees pursuant to Title 42 U.S.C. sections 1983 and 1988 for violations of decedent's and survivor's civil rights and violations of California State law. Jurisdiction is founded upon Title 28 U.S.C. sections 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

2.      Plaintiffs' claims arose in the County of Amador, California. Venue lies in the Eastern District of California pursuant to 28 U.S.C. § 1291(b)(2).

## INTRODUCTION

3.      This action arises out of the untimely and avoidable death of William Thomas Schmitz ("Schmitz") at Mule Creek State Prison ("MCSP") on January 21, 2019.  MCSP has a history of inadequate, unconstitutional treatment of mentally ill prisoners. In a 2018 report to the Governor of California, the California Department of Correction and Rehabilitation "CDCR" statewide Chief psychiatrist, Dr. Michael Golding, described a "broken system of care" that is "poorly designed and run" and "led by 'non-medically trained personnel'".  Disturbingly, he found this policy "so ingrained and pervasive in the culture and policy of CDCR that few but the psychiatrists and other medical doctors appear to find it problematic." The report of Dr. Golding is extremely damning of CDCR's care of mentally ill prisoners and Schmitz's untimely death is a

2

clear tragic example of the deliberate negligence of many employees of CDCR and highlights many of Dr. Golding's concerns. Schmitz is yet another victim of these unconstitutional practices.

4.      At the time of his death, Schmitz had been at MCSP for 9 years. Schmitz had a long history of severe mental illness of the schizophrenia spectrum. Schizophrenia is a type of psychotic disorder in which a person cannot tell what is real from what is imagined. It affects how people think, act, express emotions, and relate to others.  It commonly strikes men in their late teens or early twenties. Symptoms may include delusions and hallucinations. Delusions are false beliefs not based on reality. Hallucinations are seeing or hearing things that are not real. People with schizophrenia often abuse drugs and alcohol. People with schizophrenia can appear completely normal even while they experience hallucinations or delusions. Antipsychotic medications are a mainstay of treatment. Mental health providers play a key role in promoting medication adherence. Schmitz's symptoms were predominated by paranoid delusions and auditory hallucinations (AH). Schmitz's delusions were often of persecution, irrational beliefs that he was being cheated, harassed, poisoned, or conspired against. Schmitz's AH or chronic voices would tell him derogatory things.  His illness led to withdrawal and self–medication with illicit drugs.

5.      Due to an institutional push to lower the custody level of mentally ill prisoners, care directed by a non-medically trained psychologist and an incredible lack of continuity of care, Schmitz was removed from critical antipsychotic medications and removed from the Enhanced Outpatient Program (EOP) against his wishes. This decision was led by Dr. Rebecca

3

Schmitz – Complaint for Damages

1    Robinson, an unlicensed, non-medically trained psychology intern. Despite these drastic changes

2    in medical treatment for a severely mentally ill man, Schmitz was then housed in a cell by

3    himself with access to illicit drugs, insufficient monitoring by CDCR guards and no way to

4    reliably signal for help.

5        6.       A psychotic Schmitz was forcibly given or ingested two bindles of

6    methamphetamine. Correctional officers violated established California Department of

7    Corrections Operations Manual (CDCOM) procedures and protocols regarding mandatory counts

8    to ensure the safety of all inmates. A count conducted by Correctional Officer Eric Bradley at

9    2:15 on January 21, 2019 failed to establish the location of Schmitz. Schmitz in fact was only

10   feet from Bradley suffering from an overdose of methamphetamine. Officer Bradley only had to

11   unlock the cell door to see Schmitz in distress and in immediate need of medical care. Prison

12   officials then impeded and misled the death investigation in an effort to avoid scrutiny of

13   Schmitz's death.

14                                    **PARTIES**

15       7.       Born June 11, 1982, William Thomas Schmitz was a 36 year old citizen of the

16   United States at the time of his death.

17       8.       Plaintiff Thomas J Schmitz was decedent's father.

18       9.       Plaintiff Dianne Mallia was decedent's mother.

19       10.      California Department of Corrections and Rehabilitation Correctional Officer

20   Defendant Adam Asman was at all times mentioned herein a correctional officer working at

21   MCSP. Officer Asman was acting under color of state law.

22       11.      California Department of Corrections and Rehabilitation Correctional Officer

                                         4

Erik Bradley was at all times mentioned herein a correctional officer working at MCSP. Officer Bradley was acting under color of state law.

12. California Department of Corrections and Rehabilitation Correctional Officer James Burns was at all times mentioned herein a correctional officer working at MCSP. Officer Burns was acting under color of state law.

13. California Department of Corrections and Rehabilitation Correctional Sergeant David Brunkhorst was at all times mentioned herein a correctional sergeant working at MCSP. Sergeant Brunkhorst was acting under color of state law.

14. California Department of Corrections and Rehabilitation Physician and Surgeon Alex Andaluz, M.D. was at all times mentioned herein a physician and surgeon working at MCSP. Dr. Andaluz was acting under color of state law.

15. California Department of Corrections and Rehabilitation Physician and Surgeon Marianna Kate Ashe, M.D., was at all times mentioned herein a physician and surgeon working at MCSP. Dr. Ashe was acting under color of state law.

16. California Department of Corrections and Rehabilitation Physician and Surgeon Jevon Johnson was at all times mentioned herein a physician and surgeon working at MCSP. Dr. Johnson was acting under color of state law.

17. California Department of Corrections and Rehabilitation Physician and Surgeon Robert Johnson was at all times mentioned herein a physician and surgeon working at MCSP. Dr. Johnson was acting under color of state law.

5

1    18.    California Department of Corrections and Rehabilitation Physician and Surgeon

2    Sujatha Ramkumar, MD was at all times mentioned herein a physician and surgeon working at

3    MCSP. Dr. Ramkumar was acting under color of state law.

4    19.    California Department of Corrections and Rehabilitation Physician and Surgeon

5    Michael Smith, MD was at all times mentioned herein a physician and surgeon working at

6    MCSP. Dr. M. Smith was acting under color of state law.

7    20.    California Department of Corrections and Rehabilitation Clinical Psychologist

8    Jack Aamot Psy. D., was at all times mentioned herein a doctor of psychology and a clinical

9    psychologist working at MCSP. Dr. Aamot was acting under color

10   of state law.

11   21.    California Department of Corrections and Rehabilitation post-doctoral

12   psychology intern Rebecca Robinson was at all times mentioned herein a doctor of psychology

13   working at MCSP. Dr. Robinson was acting under color of state law.

14   22.    California Department of Corrections and Rehabilitation Clinical psychologist Dr.

15   Christopher Smith was at all times mentioned herein a doctor of psychology and a clinical

16   psychologist working at MCSP. Dr. Christopher Smith was acting under color of state law.

17   23.    California Department of Corrections and Rehabilitation Licensed Clinical Social

18   Worker (LCSW) T. Campbell. LCSW Campbell was at all times a clinical social worker working

19   at MCSP. LCSW Campbell was acting under color of state law.

20   24.    California Department of Corrections and Rehabilitation LCSW Eric Branman,

21   LCSW Campbell was at all times a clinical social worker working at MCSP. LCSW Branman

22   was acting under color of state law.

6

Schmitz – Complaint for Damages

1    25.    California Department of Corrections and Rehabilitation LCSW Violka Wanie.

2   LCSW Wanie was at all times a clinical social worker working at MCSP. LCSW Wanie was

3   acting under color of state law.

4    26.    Dr. Scott A. Heatley was at all times mentioned herein the Chief Medical Officer

5   Executive (CME) at MCSP. Dr. Heatley was acting under color of state law. As CME, Dr.

6   Heatley was responsible for overseeing the examination, diagnoses, prescriptions and treatment

7   of all inmate patients at MCSP.

8    27.    Dr. Laura Ceballos was at all times mentioned herein the Mental Health

9   Administrator of Quality Management, Inpatient Facilities, for CDCR's Statewide Mental Health

10  Program. Dr. Ceballos was acting under color of state law.   Dr. Ceballos was part of the

11  development of CDCR mental health policies and procedures and developing the Continuous

12  Quality Improvement Tool (CQIT)

13   28.    Ms. Katherine Tebrock was at all times mentioned herein the Deputy Director of

14  CDCR's Statewide Mental Health Program. Ms. Tebrock was acting under color of state law.

15   29.    Dr. Michael Golding was at all times mentioned herein the Statewide Chief

16  Psychiatrist for CDCR.  Dr. Golding was acting under color of state law.  The Chief Psychiatrist

17  is responsible for overseeing the delivery of psychiatric care throughout CDCR.

18   30.    Rainbow Brockenborough was at all times mentioned herein the Chief Executive

19  Officer (CEO) for health care at MCSP. CEO Brockenborough was acting under color of state

20  law. The CEO is the highest-ranking health care authority within an adult CDCR institution.

21  CEO Brockenborough was responsible for all aspects of delivering health care at MCSP to

22  ensure adequate medical and mental health care for all inmates at MCSP.

7

1    31.    Joe A. Lizarraga was at all times mentioned herein the Warden of MCSP. Warden

2    Lizarraga was acting under color of state law. Warden Lizarraga was responsible for the custody

3    and treatment of all inmates and for the training and discipline of all employees under his charge.

4    Warden Lizarraga was also responsible for establishing such operational plans and procedures as

5    required by MCSP to provide for the custody and treatment of inmates at MCSP.

6    32.    Upon information and belief, Defendant Does 1 through 10 were at all times

7    mentioned herein individuals working at MCSP who were acting under color of state law.

8    Defendant Does 1 through 10 were additional members of the custody staff who were

9    deliberately indifferent to Schmitz's serious medical needs by deliberately disobeying or

10    otherwise by ignoring known obvious risks to Schmitz's health and safety, or by failing to

11    investigate, supervise, and discipline other individuals or by failing to implement and/or maintain

12    constitutionally adequate policies and procedures for inmates at MCSP to obtain medical and

13    mental health care. The true names and identities of Does 1 through 10 are presently unknown to

14    Plaintiff. Plaintiff will seek to amend this complaint as soon as the true names and identities of

15    Does 1 through 10 are ascertained.

16    33.    Upon information and belief, Defendant Does 11 through 20 were at all times

17    mentioned herein individuals working at MCSP who were acting under color of state law.

18    Defendant Does 11 through 20 were additional members of the CDCR medical staff who were

19    deliberately indifferent to Schmitz's serious medical needs by ignoring known obvious risks to

20    Schmitz's health and safety, or by failing to investigate, supervise, and discipline other

21    individuals or by failing to implement and/or maintain constitutionally adequate policies and

8

Schmitz – Complaint for Damages

1   procedures for inmates at MCSP to obtain constitutionally mandated medical and mental health

2   care.

3   **COMPLIANCE WITH GOVERNMENT TORT CLAIM PROCEDURES**

4        34.    As a prerequisite to the state law claims alleged herein against State of

5   California employees/agents, Plaintiffs Thomas Schmitz, Dianne Mallia and Estate of William

6   Schmitz filed governmental claims with the Victims Compensation and Government Claims

7   Board on July 9, 2019

8        35.    By correspondence from the California Victims Compensation and

9   Government Claims Board dated July 31, 2019, these claims were rejected. This action has been

10   filed within six months of the rejection by the California Victims Compensation and Government

11   Claims Board rejection, as required by law.

12        36.    As a prerequisite to the state law claims alleged herein against the County of

13   Amador and its employees/agents, Plaintiffs Thomas Schmitz and Dianne Mallia filed

14   governmental tort claims with the County of Amador on February 26, 2019.

15        37.    By correspondence from the County of Amador dated August 19, 2019, the

16   claims were rejected.

17   **FACTUAL ALLEGATIONS**

18   **Background of CDCR Unconstitutional Mental Health Care**

19        38.    Defendants are aware of the history of unconstitutional care that persists within

20   CDCR and is documented as follows:

21        39.    In the 1990s in the Coleman vs. Brown lawsuit, federal courts found Eighth

22   Amendment violations and issued injunctions to address systemic problems with mental health

9

Schmitz – Complaint for Damages

care in all CDCR prisons. The court ordered a Special Master to monitor the mental health care at the prisons. The oversight still continues today over two decades later. Further, in 2002, in the Plata v. Davis lawsuit, CDCR admitted that the statewide prison medical care system was unconstitutionally deficient. Subsequently, the court appointed a Receiver in 2006 to take control of reforming the system.

40.    CDCR has a Statewide Mental Health Program (SMHP) which operates under the court order to address the constitutional inadequacies in mental health care. According to the CDCR website, the Mental Health Services Delivery System (MHSDS) Program Guide "provides policies and procedures that govern the delivery of these mental health missions."

41.    At MCSP specifically, inadequate care continues. **In the July 2018, Office of the Inspector General (OIG) report found that the overall quality of health care at MCSP was inadequate**. The report found "emergency care was extremely poor." "Poor assessments and misdiagnoses frequently occurred throughout the case reviews." "MCSP providers often failed to review the patients' medical records sufficiently. This was in part due to understaffing at MCSP, which created a heavier workload for providers." "The OIG clinicians identified mistakes in the document scanning process as either mislabeled, misfiled documents (filed in the wrong record) or incorrectly dated. Erroneously scanned documents can create lapses in care by hindering the providers' ability to find relevant clinical information." "The institution scored zero for the labeling and filing of electronic medical record documents." "MCSP providers demonstrated numerous problems with assessment, decision-making, documentation, review of records, and emergency services performance. During the case review period, there were multiple provider vacancies and an absence of stable medical leadership. Without stable medical leadership to

10

1    guide providers and to ensure provider accountability, patient care at MCSP was often erratic and

2    careless. A severely understaffed institution cannot be expected to provide adequate care."

3          42.      Dangerous and illegal drugs are prevalent in CDCR prisons. CDCR has an

4    overdose death rate three times higher than in all US State prisons. In a "Report on Drug

5    Treatment in CDCR" by Dr. Mike Puisis in 2018, it is reported that "death related to drug use"

6    have been the number one or two cause of death over the past decade in CDCR.  Further,

7    "incarceration therefore exposes California state prisoners to a higher risk of death from

8    overdose than either California civilians or United States state prison inmates nationwide." The

9    report expressed the opinion "therapy of drug addiction" is below community standard and "that

10    as a result of availability of illegal drugs and less effective drug treatment, overdose deaths

11    continue to rise."

12          43.      The Amador County Civil Grand Jury (ACCGJ) is mandated to inquire into the

13    condition and management of MCSP.  The ACCGJ has found serious problems with MCSP

14    during Schmitz's time there. In an effort to keep this claim as brief as possible only the last few

15    reports will be highlighted. From the 2018-2019 report, MCSP "could be more proactive in

16    contraband prevention. Other problems persist, evident by the Warden having been placed on

17    administrative leave pending an internal investigation." The ACCGJ members observed MCSP

18    employees in violation of the MCSP Operating Procedure MC 156 as "the items being carried by

19    employees were not 'thoroughly inspected'". MCSP provided written information to the ACCGJ

20    that MCSP was accredited by the American Correctional Association. However, this turned out

21    to be false and MCSP was not accredited. Among the 2019 recommendations by the ACCGJ to

22    MCSP were:

11

"Immediately enforce existing policies regarding search of all materials entering the secure areas of MCSP"

"Engage with the ACA or another similar organization by January 1, 2020 to ensure independent oversight of MCSP operations. The protection of the citizens of Amador County is a serious responsibility, and as such, should be conducted with extensive and thorough oversite."

"Maintain the focus on improving the medical program at MCSP and strive for continued improvement in OIG medical inspection results. The goal should be 'Proficient' for every inspection indicator."

44.    In the 2017-2018 report, ACCGJ report notes, that CDCR and the Receiver "continue to try to raise the level of medical care for inmates to proper constitutional standards." Similar to the 2018-2019 report that had concerns about employees not being searched which allows opportunity to bring in contraband, the ACCGJ learned "An average of five employees a year are walked off the premises for bringing in some form of contraband". Warden Lizarraga agreed with this finding. The ACCGJ recommended "Increase security checks for employee contraband." The ACCGJ also described a "'culture clash' between custody staff and medical staff" and that "not all mandatory procedures are being enforced adequately."

45.    Finally, even more concerning than the plethora of evidence regarding the decades old unconstitutional mental health care at CDCR and the bringing in of contraband by employees, are the efforts to be relieved of court monitoring by deception versus actually bringing the level of care to the minimum constitutionally required level. The deception and continued inadequate care are highlighted in Dr. Golding's report, a second whistleblower report

12

by CDCR psychiatrist Dr. Melanie Gonzalez and the testimony of a third CDCR psychiatrist, Dr. Kevin

Kuich. After a court-ordered neutral expert's investigation into the whistleblower reports, a court order on

December 17, 2019, by U.S. District Judge Kimberly Mueller found truth in the whistleblower allegations

that the defendants "knowingly presented false information to the court" and "lost sight of the remedial

purposes" that **"CDCR has been found to have violated the Constitution as to the mental health**

**program and is under a remedial order supervised by this court."** Sadly, the unconstitutional care in

Schmitz's case resulted in his death.

## **Background of the death of William Thomas Schmitz**

46.     At the time of his death, the decedent, William Thomas Schmitz ("Schmitz"), was

thirty-six years of age. He was five feet, seven inches tall and weighed approximately

one hundred and eighty pounds.

47.     Schmitz was one of five children. The Schmitz family was a typical, loving

middle class family. His family and friends called him Willie. Schmitz was an animal lover, a

good student and athlete, who was well-liked by peers. He was a college student and firefighter

when his mental health illness first manifested. His family was very close and supported Schmitz

throughout his adulthood in spite of the complications posed by Schmitz's mental health

issues. Schmitz had four siblings and 11 nieces and nephews, who would all visit him at MCSP.

His family visited with him greater than 95% of visitation days and spoke with him almost daily.

His father, mother and sister all moved their residence to be closer to Schmitz at MCSP. Schmitz

was a particular focal point in his parents' lives given his mental illness, which contrasted to

their other successful, healthy adult children.

48.     In his early twenties, Schmitz began to suffer significant mental health problems

and self-medicating with illicit drugs. He suffered from paranoid hallucinations. He was

13

Schmitz – Complaint for Damages

1  hospitalized for several days at Langley Porter Psychiatric hospital in San Francisco. Schmitz's

2  medical diagnoses included: paranoid schizophrenia, schizoaffective disorder, bipolar type, and

3  possibly psychotic disorder due to sub-arachnoid cyst with hallucinations and delusions. He

4  notably suffered from chronic auditory hallucinations and persecutory delusions.

5      49.     While psychotic, Schmitz shot and killed a man during an argument leading to his

6  incarceration. After his arrest, he was transferred from Butte County Jail to Napa Valley State

7  Hospital as multiple mental health doctors found him incompetent to stand trial due to his severe

8  mental illness. After over a year of treatment and only while taking multiple psychiatric

9  medications to treat his mental illness was he returned to competency and discharged from the

10  State hospital.

11      50.     Schmitz was under the care and custody of CDCR starting in February 2009.

12  After reception at High Desert State Prison, he transferred to MCSP until the time of his death.

13  CDCR classified Schmitz as a mentally ill inmate. Schmitz received treatment through the

14  MHSDS due his psychotic disorder. From the beginning of his incarceration until May 2018, he

15  was in the EOP program. EOP is the highest level of outpatient psychiatric care for mentally

16  disordered inmate-patients (IP).

17      51.     Schmitz's mental illness was treated with numerous antipsychotic medications.

18  While properly treated, Schmitz was a model inmate. He was even awarded 60 days of

19  extraordinary conduct credit for grabbing an inmate who was trying to seriously hurt himself or

20  commit suicide by jumping over a railing in a housing block in January of 2010.

21      52.     In April 2013, according to Eric Branman, LCSW, Schmitz admitted to

22  considering "stopping all psychotropic medications and return to a state of psychosis in order to

14

Schmitz – Complaint for Damages

escape objective reality." Schmitz "thought of it a least 100 times." There was no evidence of illicit drug use while incarcerated until the final years of his life as the psychiatric medications were inappropriately decreased and then discontinued. In June of 2014, Schmitz had a negative urine drug test.

53.     On June 11, 2014, Dr. Sam Wong cleared Schmitz for transfer to California Medical Facility (CMF) Vacaville's psychiatric inpatient program for treatment of schizophrenia with initiation of the antipsychotic clozapine. CMF Vacaville was previously known as department state hospital (DSH). Clozapine, with a brand name of Clozaril, is used to treat psychotic disorders that have not adequately responded to other safer antipsychotics. At the time of transfer, Schmitz was on two antipsychotics, Haldol and Zyprexa, a mood stabilizer, Depakote, and two antidepressants, Zoloft and Remeron.

54.     On his initial evaluation at CMF Vacaville, Schmitz reported AH with "derogatory content" and visual hallucinations. His depression was 6/10 and anxiety 8/10. He reported paranoia and the belief that people are plotting against him and talking about him. He was diagnosed with schizoaffective disorder, bipolar type and polysubstance dependence. Schmitz was "hopeful" the clozapine trial would help him.

55.     Schmitz psychosis responded well to clozapine and 12 days later Schmitz reported resolution of his hallucinations. On January 21, 2015, exactly 4 years prior to his death, Schmitz's psychiatrist at the time, Dr. Thomas Haspel, emphasized the importance of the medicine. **Clozapine "is a very important medication for this patient as he has struggled for over 9 years with AH and ideas of reference, so preservation of a therapeutic level is essential."**

15

Schmitz – Complaint for Damages

56.     On June 16, 2015, to social worker T. Campbell, Schmitz "stated he is maintaining and continues to do well." Campbell noted Schmitz diagnoses of Schizoaffective, Bipolar type, R/o psychotic and mood disorders due to subarachnoid cyst. Notably, Campbell indicates Schmitz has no axis II disorder.  In other words, Schmitz did not have a personality disorder.

57.     On June 18, 2015, Schmitz's Interdisciplinary Treatment Team (IDTT) summary emphasizes how well Schmitz has responded to clozapine.

> [Schmitz] returned to MCSP-EOP, from DSH on 7/24/14. He was referred to DSH to address unremitting auditory and visual hallucinations, episodic paranoid delusions, insomnia manic episodes.  Per previous IDTT (7/24/14): Upon [Schmitz's] return to EOP, he reported, 'I haven't felt this good in ten years.' [Schmitz] also reported hallucinations have ceased and mood + sleep disturbance has improved.

> Over the past 210 days, [Schmitz] continued to express relief from symptoms associated with, Axis I diagnosis, Schizoaffective Disorder, Bipolar type. [Schmitz] states, AH are present but manageable. I/P occasionally experiences hypo-mania and is able to recognize when symptoms + used coping mechanisms: Keeping to self, staying inside more to limit stimuli and avoid poor decision making, trying to lie down and take naps......He will remain at EOP-LOC because he is a clozaril patient."

58.     On July 28, 2015, Dr. Haspel again notes the Schmitz "Mental health issues of AV/VH are much less since taking Clozaril starting in July 2014."  After stabilization of his mental health symptoms and many months on clozapine, the medication was stopped when Schmitz developed acute hepatitis and was hospitalized in November 2015. Once it was determined the hepatitis was secondary to hepatitis C, the mental health and medical staff did not encourage and educate Schmitz on the critical need for him to resume clozapine. Schmitz was changed to the antipsychotic Paliperidone (Invega).  In March of 2016, Schmitz asked for the

16

1   Invega to be increased. In February of 2017, Dr. Karl Lace refilled the Invega for a year noting

2   Schmitz "psychotic symptoms have improved on Invega.".

3          59.     In May of 2017, Schmitz was suddenly moved from his two-man cell to

4   dormitory housing despite recommendations against dormitory housing by mental health

5   providers. This was extremely stressful for Schmitz and caused his psychosis to acutely worsen

6   and him to be placed in the administrative segregation unit for safety concerns. On May 15,

7   2017, Schmitz brother, Dr. Joseph Schmitz, sent the following E-mail to Dr. Christopher Smith,

8   Dr. Scott Heatley and Dr. Marianna Ashe at Christopher.Smith@cdcr.ca.gov,

9   Scott.Heatley@cdcr.ca.gov, and Marianna.Ashe@cdcr.ca.gov.

10          Drs.,
11          Please help. My family is very concerned about my brother. Per his cellmate's mother,
12          William was placed in a crisis bed for failing to move to level 2 yard. We have been
13          unable to get any information despite multiple calls to MCSP. William has been a very
14          good inmate and due to his mental illness particularly paranoia and mania, he has been
15          extremely anxious about moving into a cell with more than one person. Appropriately, his
16          providers told him and my father that he would be allowed to stay in his current housing.
17          Unfortunately, it seems this message was not relayed to the prison staff and the move was
18          attempted. I have a medical release and so does my father. Can someone please let us
19          know that my brother is okay and help him to be placed back in the appropriate housing ?
20          He really is a good person who would not be in there if not for being severely mentally ill
21          (which as you know I think may be helped by cyst removal).
22                  Thank you very much for your attention and care in helping him.
23                  Sincerely,
24                  Joe Schmitz, MD
25
26          60.     After calling multiple different numbers at MCSP and receiving no response from
27   Dr. Smith, Dr. Ashe or Dr. Heatley, Dr. Schmitz forwarded the same E-mail with following
28   information added to Dr. Jevon Johnson and Dr. Jack Aamot on May 17, 2017 at
29   Jevon.Johnson@cdcr.ca.gov and Jack.Aamot@cdcr.ca.gov.
30
31          Gentlemen,
32                  Can either of you please help and let me know that my brother is ok or not.
33          Please it is extremely stressful and no one will contact us back or give information both
34          myself and father have medical release on file. I believe he may be in a crisis cell but
35          don't know for sure.

17

Schmitz – Complaint for Damages

1   Thank you,
2   Joe Schmitz, MD
3
4   61.   That same day Dr. Aamot responded via E-mail:
5
6   Dr. Schmitz,
7   Please forgive the delay in getting back to you. I just got in and went through my e-mail.
8   Unfortunately I have to go through procedures to communicate with you about your
9   brother.  You will have to call the "Family Call In Line" (209) 274-4911 ext.6104. They
10  will then do what they do to give me approval to communicate about your brother.
11  Thank you,
12
13  J. Aamot, PsyD
14
15  Jack Aamot, Psy.D.
16  Clinical Psychologist
17  Mental Health Services
18  B-Yard, EOP
19  Mule Creek State Prison
20  Phone: 209-274-4911 ext. 6763
21  Fax: 209-274-5218
22
23  62.   Dr. Schmitz responded back with the following:
24
25  Dr. Aamot,
26  Thank you for your willingness to communicate with me. My brother has filled out
27  medical releases for me information to be shared with me.  My information has been left
28  with the family call in line and I have not received a response.   Given my brothers
29  mental health sometimes it is hard for him to complete paperwork or accomplish tasks.  If
30  you need some other specific paperwork signed by him to be able to talk to me can you
31  please bring to him and have him sign? I know that is asking a lot, but it is extremely
32  hard to get these things accomplished by calling in. I will call them again right now too.
33  Thank you,
34   Joe Schmitz
35
36
37  63.   On May 18, 2017 Dr. Schmitz wrote the following E-mail to Dr. Jack Aamot.
38
39  Dr. Aamot,
40
41       I apologize for filling up your E-mail box, but I hope you can sense my concern
42  for my brother.  I know that you are unable to provide information to me at this time, but
43  I would like to provide you with the details I know and hopefully you can help him.  I
44  know that the medical records and patient histories can become convoluted.   In brief,

18

Schmitz – Complaint for Damages

William was pretty normal growing up.  He has four siblings and all of us live "successful" lives as we have not had to deal with severe mental illness. I am a Navy ophthalmologist and our other brother is a Navy pilot.   William had no anti-personality disorder traits growing up. He was away at college and working as a CDF firefighter when he began developing psychotic paranoid delusions.   Unfortunately, in my opinion, he was not well managed by the primary care physicians he sought care from and not hospitalized when he should have been and stabilized.  While in prison, he has done his best to remain on medications and follow the doctors advice. I don't think he has had any major issues over the 12 years he has been in custody.  As you know, he is in EOP with many others with severe mental illness and at times he becomes very paranoid. Recently, he was told that he would be moved to level 2 yard.  While I think moving to a lower level is normally a good thing for inmates, for him it increased his stress significantly as he now would be sharing with several other EOP inmates (vs just one cellmate).  He was specifically told he would not have to move by a doctor (and my father was told the same thing by one of the doctors over the phone) as it would obviously be detrimental to his health and he may decompensate.  I believe he was attempted to be moved and either refused or got there and had a fight once there  and is now in isolation/crisis bed.   I am hoping you can help in some way to at least check on him and maybe help to figure our what happened and have him placed back into his original housing as it is absolutely best for his health and avoids so many potential problems that may arise as his mental health deteriorates due to the added stress that this situation is definitely causing for him.  In addition, if you have not already, I encourage you to review the multiple cases of psychiatric illness that have resolved with arachnoid cyst removal that I have sent in over the years asking for this surgery to be done.  If you have not seen them in his record I am happy to send them to you.  Again I know you can not tell me about his situation right now but I can send you information.   Thank you again for taking the time to read this and hopefully to help him.


Sincerely,
Joe Schmitz


64..    On June 4, 2017, Schmitz brother Dr. Joseph Schmitz wrote the following E-mail

to Dr. Jack Aamot at jack.aamot@cdcr.ca.gov.

Dear Dr Aamot,
Sorry to bother you again, but apparently MCSP ran out of Invega.  My father visited my brother today and said he did not seem to be doing well and a big reason may be he did not receive the antipsychotic because it is not available.  Hopefully, you can check in on him and make sure he receives the medication. Unfortunately, with the added stress of not having his stuff and being moved around a lot recently it's not a good time for him to not

19

Schmitz – Complaint for Damages

receive the medication. Again sorry to bother you, but there is really no good way to contact medical there in a timely manner.
Thank you,
Joe Schmitz

65.     On June 9, 2017, Dr. J Adams documented a conversation with Dr. Joseph Schmitz. Schmitz's family was concerned Schmitz had not been receiving his antipsychotic medicines and that the arachnoid cyst in his brain may be contributing to his mental illness. Over the years, the Schmitz family tried many times to advocate for Schmitz's health and ongoing treatment with antipsychotic medications. They sent many unanswered E-mails and placed many unreturned phone calls to MCSP. The only E-mail returned was the one documented above from Dr. Aamot and the following out of office response from Dr. Heatley on July 12, 2010. "I am out of the office at Mule Creek from July 10 returning July 26, 2010. Please contact Dr. Christopher Smith who is acting in my position. Thank you."

66.     The Schmitz family also sent letters documenting his medical history that rarely made it to the medical record. Despite the required medical releases being signed by Schmitz multiple times, the numerous medical record requests submitted by the Schmitz family were either unanswered, severely delayed and incomplete. The medical record even included another inmate's medical document that was altered to look like it was Schmitz's. The other inmate's typed name was crossed out and Schmitz's name was handwritten and the content made it clear that it was someone else's medical document. The Schmitz family's experience with acquiring incomplete and inaccurate medical records is consistent with the findings of the OIG.

67.     On September 1, 2017 Schmitz received a disciplinary action for possession of drug paraphernalia. Despite Schmitz history of substance abuse when undertreated for his mental

20

Schmitz – Complaint for Damages

illness and CDCR guidelines, the mental healthcare team does not know about this incident until 5 months later. MHSDS Program guide policy mandated a mental health evaluation for adjudication of the rules violation.

68 .    On January 16, 2018, Dr. Robinson, reported Schmitz had no recent substance abuse or intoxication. Schmitz did display a disturbance of mood, an increase in interpersonal isolation, hopelessness, recent negative staff interactions, but was active and motivated in his psychiatric treatment. Robinson further noted Schmitz "appears to regularly cycle between manic and depressed states. He has expressed he is 'used to it', however he shows frustration during these times. According to 7447 dated 10/19/17 [Schmitz] had Thorazine added as a PRN for his symptoms. He reported feeling some improvement, but still cycled through mania and depression." Schmitz "stated he has been isolating in his cell more recently because of increased paranoia. He indicated his voices make him think that people are talking about him, or the voices are demeaning at times." Robinson noted that Schmitz's chronic risk of suicide was high and acute risk of suicide was moderate. Robinson notes that Schmitz "has recently been experiencing AH and paranoia (with anxiety); however, he admitted being intermittently medication non-compliant. He has refused most of his medications over the last 4-5 days prior to the current assessment (stated he did not remember that he refused the medications)."

69.    On January 25, 2018, in a 5 minute cell-side, non-confidential visit. Robinson reported "[Schmitz] missed his appointment because he did not get a ducat. He stated he has not yet gotten an appointment with psychiatry to discuss adjusting his medications." He was well overdue for a psychiatry visit given his mental illness and the MHSDS Program guide policies.

Schmitz – Complaint for Damages

1    70. On January 31, 2018 Schmitz saw another new psychiatrist Dr. Sujath Ramkumar.

2 He had not seen a psychiatrist since October 31, 2017. Schmitz felt that the medicine was "not

3 working as well as he would like it to."

4    71. On February 1, 2018, Robinson further notes Schmitz has "declining percentage

5 of group attendance. He is currently on sustainable process for attending 36% of his groups.

6 [Schmitz] continues to struggle with auditory/visual hallucinations, episodic paranoid delusions,

7 and insomnia. [Schmitz] regularly experiences manic (followed by depressive) symptoms….

8 Importantly, he reduces socialization (misses groups and appointments) to limit stimuli and avoid

9 poor decision making. … [Schmitz] continues to be medication compliant and appropriate for

10 EOP" Robinson notes that Schmitz participated and contributed to the goals and plan.

11    72. On February 1, 2018, Dr. Ramkumar  wrote "spoke to dr robinson, and will order

12 an [urine drug screen], it was discovered in IDTT that inmate was caught with drugs...about 5

13 mths ago."

14    73. On February 6, 2018 and March 2, 2018 Schmitz refused urine drug screens. The

15 CDCOM discusses purpose of urine drug testing which include "to reduce drug use...and to

16 provide opportunities for long-term recovery from addiction." It goes on to describe the

17 disciplinary action that should occur for refusal. On March 7, 2018 Dr. Ramkumar sent a

18 correspondence to Dr. Robinson that Schmitz refused a urine drug screen.

19    74. On March 12, 2018 Dr. Robinson met with Schmitz to "discuss his progress in

20 EOP" and she questioned him about possible drug use while in EOP as he received an "RVR in

21 9/2017 for possession of paraphernalia". Schmitz denied drug use while in EOP. Robinson does

22 not mention his refusals to take urine drug tests. Schmitz indicated that he "needs EOP".

22

Schmitz – Complaint for Damages

1  Robinson pointed out to Schmitz his low treatment adherence and that he "appears to function

2  adequately without regular treatment adherence... [Schmitz] indicated that he will transfer to

3  CCCMS, but only if he gets a recommendation for exclusion from dorm housing." Robinson

4  concludes that Schmitz "apparently manages his mental health symptoms with minimal help

5  from mental health." Further she notes "there is uncertainty regarding the inmate's drug use

6  while in EOP."

7   Robinson makes no note of the refused urine drug screens or any other plans to address potential

8  drug use as required by the CDCOM and a minimal standard of care. Robinson was focused on

9  moving Schmitz to a lower level of care not treating his mental illness or drug dependence.

10       75.     No one ever communicated to Schmitz's family about suspected drug abuse. This

11  is despite the fact that multiple times in the medical record Schmitz's family was cited as a

12  positive force in his life. Schmitz had also consented to the release of information allowing the

13  MCSP providers to release information on suspected drug abuse. The Schmitz family could have

14  been tremendous advocates to help with his compliance with treatment recommendations.

15       76.     At some point before April 2018, a final decision was made to transfer Schmitz to

16  a lower level of psychiatric care. The reasoning indicated was Schmitz's poor attendance in EOP

17  groups. However, as clearly documented in his medical chart, his poor attendance was due to a

18  worsening mental state as indicated by increasing symptoms and desire to isolate himself. On

19  April 3, 2018, Robinson notes that Schmitz "indicated he is not coming to his appointments or

20  groups because PC indicated he was transferring to Correctional Clinical Case Management

21  System (CCCMS) during next IDTT. He stated that he 'doesn't feel well' but did not want to

23

Schmitz – Complaint for Damages

1 | talk to PC about anything at the moment." Predictably, Schmitz was decompensating as his

2 | psychiatric medications were lowered.

3 |      77.     On April 12, 2018, psychiatrist Dr. Lane Smith noted that Schmitz had stopped

4 | taking medications after years of compliance. Schmitz agreed to re-start the meds after

5 | re-education on his illness.

6 |      78.     On April 25, 2018, Schmitz sought out Robinson in attempt to remain in the EOP

7 | program. Robinson pointed out attendance less than 20% of groups as reasoning to leave EOP.

8 | Schmitz reported he did not want to be on his meds and "stuck" in his cell. Schmitz's speech

9 | was irritable and pressured. Robinson makes no mention of her previous concerns that Schmitz

10 | reduces socialization (misses groups and appointments) to limit stimuli and avoid poor

11 | decision-making. Instead, his lack of participation is used as reasoning to lower his level of

12 | mental health care.

13 |      79.     As pushed over the previous months by a non-medically trained, unlicensed intern

14 | Robinson, on April 30, 2018, the decision to transfer Schmitz to CCCMS was finalized. This was

15 | after nine years in the EOP program. According to the medical record, Schmitz was not present

16 | at the meeting and refused to participate. He was aware of the plan but did not contribute.

17 | Robinson noted that Schmitz still reported experiencing depression, mania, and rapid cycling of

18 | mood consistently even while in EOP. The change was against policy of the MHSDS program

19 | guide.

20 |      80.     According to the MHSDS Program Guide, IPs in the EOP program, may "have a

21 | serious mental illness of long duration with moderate to severe functional impairments."

22 | CCCMS is for "inmate patients that can function in the general population and do not require a

24

1    clinically structured, therapeutic environment." Their condition should be "relatively stable" and

2    "symptoms are largely controlled" "EOP will release cases that have successfully completed

3    treatment to CCCMS." At the time of his transfer, Schmitz clearly did not "successfully

4    complete treatment" nor were his symptoms largely controlled to warrant a transfer to CCCMS.

5    In fact, he was failing treatment and if anything should have had his treatment increased. So why

6    did Robinson pushing for a transfer to CCCMS?

7        81.    There was pressure to move patients from EOP to CCCMS. For Dr. Mueller's

8    court, CDCR psychiatrist, Dr. Kuich, "testified that the push 'was a systemwide push, not from

9    psychiatry but from the system, to be able to look at EOP patients specifically and to find out

10   'whether their needs were being met or could 'be met at a lower level of care.' By placing

11   inmates in lower levels of care, regardless if medically inappropriate and against the MHSDS

12   program guide, it would help CDCR look better on their healthcare monitoring metrics and give

13   the appearance of better care than actually provided.

14       82.    The unscrupulous metric chasing is described in Judge Mueller's order. CDCR

15   was so desperate to look good on the metrics that Dr. Laura Ceballos, whose testimony was

16   found "in critical respects simply not credible" by Judge Mueller, changed monitoring

17   requirements of mentally ill inmates and withheld data from the Special Master. Dr. Golding also

18   describes a push to the lowest level of care "to decrease the number of more expensive to care

19   for EOP patients" and  "the mandatory number of psychiatrists is lower if the system can get

20   more patients discharged to the lowest levels of care." Further, even Katherine Tubrock, the

21   Deputy Director of CDCR's Statewide Mental Health Program, signed misleading declarations

Schmitz – Complaint for Damages

that were presented to Judge Mueller and promoted psychiatric staffing levels that were insufficient to provide constitutionally adequate levels of care within CDCR.

83.    Once Schmitz was removed from EOP, Dr. Robert Johnson reported that **"Schmitz reports chronic AH of low level voices 'like a TV in the background'". Despite clear medical records that show Schmitz's positive response to antipsychotic meds and Dr. Smith continuing the medications just a few weeks prior, Dr. Johnson completely stopped Schmitz's antipsychotic medications.** The antipsychotics were stopped at a time while Dr. Joseph Schmitz, a military medical officer in the US Navy was deployed and unable to speak with Schmitz. Dr. Joseph Schmitz typically spoke with Schmitz every few days and encouraged him to remain on antipsychotic medications reminding Schmitz of their effectiveness for him. For the first time in 13 years, Schmitz was removed from antipsychotic medications at the same time he was removed from a higher level mental health care.

84.    Schmitz's family was extremely worried about his discontinuing antipsychotic medications and knew his psychosis would worsen. Unfortunately, they were unaware of the ease that mentally ill prisoners may obtain illicit drugs at MCSP and the poor monitoring of vulnerable mentally ill inmates. They also feared some reprisal on Schmitz for their repeated contacts to MCSP about his care or creating even more apathy from individuals at MCSP to respond to any potential future concerns.

85.    On June 4, 2018, Eric Branman notes that Schmitz has periodic auditory hallucinations and paranoia. On June 15, 2018, Schmitz had his initial eval after his transfer from EOP with Dr. Michael Smith. Dr. M Smith notes that Schmitz states "they kicked me out of EOP." Despite no prior diagnosis and a history inconsistent with a personality disorder. Dr. Smith

26

1    diagnoses Schmitz with antisocial and borderline personality disorder. He states the following

2    meds were "all noteworthy for their ineffectiveness" Invega, thorazine, Haldol, Lithium,

3    Clozaril, Zyprexa, Depakote, Wellbutrin, Topamax, and trileptal. This is contrary to the medical

4    record and Schmitz's true history. Dr. M. Smith further indicates that notes over the years are

5    absent of any mention of thought disorder, mania or depression. This is contrary to the medical

6    record and Schmitz true history. Dr. M. Smith makes no mention of the lack of serious

7    behavioral problems in Schmitz childhood, such as animal cruelty or starting fires. Schmitz's

8    history was inconsistent with this new diagnosis of antisocial personality disorder. Dr. Smith

9    makes no note that Schmitz true medical history is consistent with a primary psychiatric illness

10    like paranoid schizophrenia as Schmitz was a productive member of society as a college student

11    and firefighter when he began complaining of voices and paranoia resulting in hospitalization in

12    a psychiatric ward. Dr. Smith then discontinues his trileptal and changes vistaril to as needed. Dr.

13    M. Smith's incredible misdiagnosis poisoned Schmitz's medical record for future providers.

14    They would now view this false narrative in Schmitz record biasing their own treatment of

15    Schmitz. **Dr. M. Smith was either simply fabricating Schmitz past history or did not have**

16    **access to Schmitz accurate medical record and history.**

17        86.     Without the antipsychotic medications, Schmitz lost weight and became

18    increasingly paranoid. On July 2, 2018, Eric Branman reported Schmitz was finally able to sleep

19    after being awake for two days and that the staff suspect ongoing opiate abuse. There again was

20    absolutely no plan to address suspected substance abuse.

21        87.     On December 7, 2018, 6 weeks prior to Schmitz death, Schmitz has his initial

22    visit with yet another different provider, Dr. Alex Andaluz. Dr. Andaluz notes:

27

Schmitz – Complaint for Damages

Pt initially refused his appointment.  He then agrees to meet with writer but is limited in his engagement in the interview.  He states he was diagnosed with schizophrenia and provides a vague description of voices that 'say derogatory things'.  He reports that he thinks this is because of an arachnoid cyst but states that this has been evaluated and decided not to be removed.  He states that he has been on many different psychiatric medications and none of them help, pt is on Vistaril prn which he reports helps sometimes with his sleep… He declines to engage in further interview, stating. 'it's a pain to talk about all this every time I see a new psychiatrist. Just no that nothing helps. I am not suicidal or homicidal but nothing helps me with hearing things.

88.    Dr. Andaluz diagnosis Schmitz with anxiety and to "r/o psychotic disorder vs symptoms secondary to his personality disorder" and antisocial personality disorder. Dr. Andaluz makes no note of Schmitz previous positive response to antipsychotic medications as documented in the medical records. Dr. Andaluz makes no mention of a lack of serious behavioral problems in Schmitz childhood that would be consistent with antisocial personality disorder. Dr. Andaluz makes no note that Schmitz true medical history is much more consistent with a primary psychiatric illness like paranoid schizophrenia.

89.    On Jan 4, 2019, 17 days prior to Schmitz death, Dr. Andaluz notes [Schmitz] "appears anxious and has a disorganized thought process," and that Schmitz is worried about losing dorm exclusion. Dr. Andaluz further notes, "Patient states that he deals with a lot of paranoia and psychosis….Pt does not currently have a cell mate but is open to one… he hears voices and has paranoia." **Dr. Andaluz does not make any recommendations to increase monitoring or restart antipsychotics to address his psychosis. Worse, the medications Dr. Andaluz prescribes may actually cause hallucinations.**

28

90.    On January 17, 2019, just 4 days prior to his death, Schmitz met with yet another different social worker, Violka Wanie. Even though their visit was cut off due to a sudden power outage, she notes:

Schmitz states "When I'm under more stress the voices increase and they're louder." He currently reports distress from AH 5/10. "when I get manic it causes major problems." [Schmitz] "reports onset of AH 'when I was 19 or 20.' He denies the psychosis was substance induced, rather **"I self-medicated when I started hearing voices to help me deal with them."** "I was really anxious this morning with UCC, about where I'm going to be transferred to"

91.    Wanie notes that Schmitz also hears voices a moderate amount of time and that they are moderately distressing. In summary, Schmitz again described voices that worsen with stress and tells her he "self-medicated" in the past to treat the voices. **Wanie takes no action to have Schmitz psychosis addressed.** Wanie makes no note of the stress and further mental decompensation created the last time Schmitz was moved to a dormitory setting. Schmitz, locked in a cell alone with his voices, dies 4 days later of a methamphetamine overdose.

92.    According to the Coroner's report by Sgt Weart from Amador County, Schmitz's last known interaction was at 0635 with Officer Asman. Sgt Weart did not interview Asman, but spoke with Sgt Dave Brunkhorst from the Investigative Services Unit regarding Asman's interaction. Brunkhorst said Asman noted water was flowing out from Schmitz's cell. Asman questioned Schmitz as to what he was doing because this was uncharacteristic of Schmitz. Asman did not inspect Schmitz cell or investigate further. Brunkhorst stated this was the only time any officer interacted with Schmitz that day, but this was not unusual because inmates in this building are not subject to constant monitoring and surveillance. The guards' actions on monitoring were against policy of the CDCOM. Schmitz's body was discovered 8 hours later at

29

approximately 1430 by inmate Tod Simons. Sgt Weart did not interview Simons. Sgt Weart

interviewed Officer Erik Bradley who did not see Schmitz during his routine check at 1415.

Bradley stated there was an obstruction on the bottom half of the cell window, but did not

remove it to positively identify Schmitz. He assumed Schmitz was somewhere else like a

medical appointment. The window coverings and Officer Bradley's actions were against

CDCOM policy. Bradley stated Simons could see Schmitz because Simons was tall enough to

see over the obstruction. Bradley and Officer Burns responded to Simon's call for help and found

Schmitz stiff and cold, slumped over on the toilet. Sgt Weart's report does not discuss any other

checks by guards near Schmitz's cell. There was no reliable way for Schmitz to signal for help.

## Aftermath and Cover-Up

93.     In the aftermath of Schmitz's death, several individuals deliberately gave false or

incomplete statements. This was done in an attempt to avert or deny responsibility on the part of

the involved persons for Schmitz's death and to avoid scrutiny of another death of a mentally ill

prisoner at MCSP.

94.     Dr. Christopher Smith authored "MCSP-Initial Inmate Death Report" on January

22, 2019.  In this report, Dr. Smith failed to honestly and accurately report the events and

circumstances leading up to Schmitz's death. He states Schmitz last medical visit was in early

December excluding Schmitz's recent mental health encounters where he complains of auditory

hallucinations. He does not list any psychiatric illness in Schmitz active problems.

95.     It was the Amador County Sheriff Coroner's responsibility to determine the cause

of Schmitz's death. MCSP employees did not follow their own protocols and deliberately

reported false information to the Amador County Sheriff-Coroner's Office for use in the official

30

Schmitz – Complaint for Damages

1  reporting of Schmitz's death. Against policy, the Coroner was not contacted for over 4 hours.

2  Even more gregarious, Schmitz cell was cleaned prior to the Coroner's arrival. The Coroner was

3  also told that Schmitz had a history of smuggling drugs and likely got them from a visitor.

4  Schmitz had no history of smuggling drugs.

5        96.     The Coroner was given Schmitz's patient summary reporting Schmitz suffered

6  from viral Hepatitis C, hypertensive disorder, chronic headache disorder, and arachnid cyst. The

7  Coroner makes no mention of Schmitz's severe mental illness. Schmitz's death seemed to meet

8  CDCR definition of suicide "an intentional self-injurious behavior that causes or leads to one's

9  own death." However, the most convenient scenario for MCSP was to have Schmitz death be an

10  accident due to drug smuggling, for the drugs to be provided by an outside visitor and to avoid

11  any mention of his severe mental illness. Their actions assured minimal investigation of

12  alternatives by the Coroner and minimized the chance that the events leading up to Schmitz's

13  death would be reviewed by higher authorities within CDCR or outside investigators.

14        97.     Schmitz's death occurred at a particularly inconvenient time for MCSP and

15  CDCR. As detailed above, CDCR has an undeniable history of cruel and unusual punishment in

16  violation the Eighth Amendment for failure to provide adequate mental health care. Around the

17  time period of Schmitz's death, they were desperately trying to get out from under the court

18  injunction as a result of Coleman v. Brown lawsuit. In addition, along with Dr. Golding, a second

19  CDCR psychiatric whistleblower, Dr. Melanie Gonzalez, came forward in the months prior to

20  Schmitz death disclosing that California prison officials intentionally presented misleading data

21  to the Court and the Special Master concerning compliance with Coleman requirements for

22  adequate psychiatric care. CDCR denied the whistleblowers' claims. Schmitz's death would

Schmitz – Complaint for Damages

1  serve as another grave example of the unconstitutional level of care that persists. In addition, just

2  four days after Schmitz's death, Warden Joe Lizarraga was removed from MCSP grounds by the

3  FBI. Discovery may reveal if his removal was pertinent to Schmitz death. Regardless, the bad

4  press of the Warden's removal was one more reason to try to avoid scrutiny of Schmitz's death.

5  Schmitz's death will save CDCR millions of dollars and be one less mentally ill prisoner they

6  have to try to care for.

7      98.    Dr. Golding's entire report is relevant to Schmitz's death and the liability that

8  supervisors bare, but in an effort to keep this claim as brief as possible only a small section will

9  be cited.

10  Making mistakes even very serious mistakes is part of the human condition. The
11  question is whether the system is designed and managed in such a way that mistakes can
12  be learned from and issues corrected, or not. What is required for a system to be error
13  correcting is that information is accessible to those who could make a difference, rather
14  than restricting or denying access to the information needed to identify and correct
15  problems. Systems that deny access to vital information to those who need it thereby
16  actively prevent problems being solved. Those who may make mistakes should not be the
17  only ones to judge whether there has been an error.
18  **The tragic picture painted above is not just a hypothetical. In fact, it is the reality in**
19  **the California Department of Corrections Mental Health system.** Vital information
20  has been monopolized and its access restricted to a select group of mainly psychologists
21  at headquarters. **This group has created a biased and inaccurately positive picture of**
22  **what is actually a troubled system of care.** The [REDACTED] of Mental Health of the
23  California Department of Corrections have enforced this restriction of access to the
24  needed information. Those who most need to have access to this medical information are
25  the medical leaders in mental health the psychiatric physicians and those who review our
26  system of care. Yet the headquarters psychiatry leadership team and the Coleman
27  monitors and court have been denied access to this medical information. This has actively
28  prevented the normal medical error correction that would have prevented the very serious
29  problems we see in the field in CDCR.
30  I, Michael Golding, M.D., CDCR Statewide Chief Psychiatrist, will document how the
31  attitude that information must be hidden away, controlled and interpreted by just a few
32  **has cost the CDCR system dearly by preventing adequate care for a large majority**
33  **of CDCR mental health patients.** The needed error correction has not happened,
34  because those few running the system are the only ones allowed to judge how things are
35  going in the system.

Schmitz – Complaint for Damages

**Patients need psychiatric medical care, yet in CDCR the provision of psychiatric medical care is severely hindered by executive level decisions at headquarters and in the field.** In CDCR, psychologists and social workers are deemed to be the "primary clinicians", and despite their lack of medical training they very often ignore psychiatrists' medical judgement and sometimes override psychiatric physicians' medical orders.

99.      The entire court order of Judge Mueller, along with the information in Coleman v Brown and Brown v Plata lawsuits are relevant to Schmitz's death. In an effort to keep this claim as brief as possible only a few sections will be cited. In the introduction, Judge Mueller states:

At this critical juncture, several key legal principles, articulated by the previously assigned judge in this action, bear repeating:

'Whatever rights one may lose at the prison gates, *cf. Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prisoners have no right to unionize), . . . **Eighth amendment protections are not forfeited by one's prior acts.** Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary. **The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established.'** *Spain v. Procunier*, 600 F.2d [189] at 193–94 [(9th Cir. 1979)] (emphasis added). *Coleman v. Brown*, 28 F.Supp.3d 1068, 1077-78 (E.D.Cal. 2014) (emphasis included in 2014 order). The same judge said not so very long ago, in his 2013 order denying defendants' motion to terminate this action, "[t]he Eighth Amendment violation in this action is defendants' 'severe and unlawful mistreatment' of prisoners with 'serious mental disorders,' through 'grossly inadequate provision of ... mental health care.'" *Coleman v. Brown*, 938 F.Supp.2d 955, 969 (E.D.Cal. 2013) (quoting *Brown v. Plata*, 563 U.S. at 500, 502)). Just two years before that denial of termination, in its 2011 decision, the United States Supreme Court had observed that "[f]or years the ... mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result." *Brown v. Plata*, 563 U.S. at 501.

100.      Later Judge Mueller notes.

33

In the final analysis, inexplicably, it is apparent defendants lost complete sight of the reasons remediation is required here. **Defendants adopted a laser focus in an effort to obtain termination of court supervision, which lead to a stark "ends justify the means" approach. Their litigation tactics have wholly missed the significance of the constitutional rights of the thousands of mentally ill persons defendants have in their custody.** As the court said in its oral pronouncement following hearing, legal cases are not just words on a piece of paper and a series of jousting matches. Almost all legal cases have hearts and souls, as does this one in particular. This court's predecessor, Judge Karlton, put his heart and his soul into this case, as reflected in the care he paid and his orders which stand today. This is a case that cries out for every single player to consult their hearts daily and keep their eyes hourly on those souls who are the members of the plaintiff class: **the seriously mentally ill individuals housed behind bars in this state who have the absolute, undeniable right to constitutionally adequate treatment and care.**

101.     Schmitz was one of those souls and lost his life due to the repeatedly proven constitutionally inadequate level of care provided within the CDCR system.

## Conclusion:

102.     **"Ability to get institutions to successfully treat patients is not what we value."** This is the opinion of the **Chief Psychiatrist of CDCR**, Dr. Golding, and was part of a private E-mail released to the public as part of the Golding report.

103.     Defendants attorneys have likely defended hundreds of cases and certainly will have carefully thought out and worded legal arguments. Plaintiffs are not attorneys, simply a father and mother presenting the facts of the death of their beloved son, William Thomas Schmitz. The facts are clear! Defendants continue to provide inadequate, unconstitutional care to thousands of mentally ill inmates. William Schmitz was severely mentally ill and forced to suffer with years of psychosis and ultimately lose his life due to the unconstitutional care and deliberate indifference of the defendants.

34

Schmitz – Complaint for Damages

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Deliberate Indifference to Serious Medical Needs, Health and Safety
(Violation of the Eighth Amendment to the U.S. Constitution:
Survival Action–42 U.S.C. §1983)**
*(Against Defendants Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst, Dr.
Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R
Johnson, Dr. Andaluz, LCSW Campbell, LCSW Wanie and Does 1 through 20.)*

104.   On behalf of decedent Schmitz, plaintiffs reallege and incorporate by reference

paragraphs 1 through 105, as though fully set forth herein.

105.   Defendants  Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst,

Dr. M. Smith, Dr. Ashe, Dr. J. Johnson, Dr. R. Johnson,  Dr. Ramkumar, Dr. Aamot, Dr.

Robinson, Dr. Heatley, Dr. Andaluz, LCSW Campbell, LCSW Wanie and  Does 1 through 20

knew that decedent Schmitz was in danger of serious harm to his health and safety due to  (1) his

long history of severe mental illness that when untreated resulted in self-medicating with

inherently dangerous illicit drugs and the shooting of an unarmed man and (2) various

documentation in his medical records showing his a worsening of mental state and psychosis as

he was removed from the medications and the EOP level of care. Notably, on June 18, 2015,

Schmitz's IDTT summary emphasizes that Schmitz was started on clozapine for unremitting

auditory and visual hallucinations, episodic paranoid delusions, insomnia and manic episodes

and that the clozapine made him feel better than he had in ten years and that his hallucinations

have ceased and mood and sleep disturbances improved.

106.   Despite continuing to complain of voices, he was subsequently removed from all

antipsychotic medications by a carousel of different providers and placed in a cell by himself

with insufficient monitoring. Tragically, just four days prior to his dying of a methamphetamine

35

1  overdose, he again complained of voices to social worker, Violka Wanie. He even told her, 'I

2  self-medicated when I started hearing voices to help me deal with them.'

3     107.   The deliberate indifference to Schmitz health shocks the conscience.  His care was

4  astonishingly below the minimum standard of care.

5     108.   Despite knowing that William Schmitz was in danger of serious harm to his health

6  and safety, defendants failed to provide him with necessary evaluation and treatment or failed to

7  take action to provide him with necessary evaluation and treatment. Defendants' acts and/or

8  omissions as alleged herein, including but not limited to the failure to provide William Schmitz

9  with timely and adequate medical care, psychiatric care and/or take other measures to protect

10  him from serious harm, constituted deliberate indifference to William Schmitz's serious medical

11  needs, health and safety. As a direct and proximate result of defendants' conduct, decedent

12  William Schmitz experienced the damages alleged herein, including but not limited to physical

13  pain and suffering, emotional distress, mental anguish, and loss of his life. The aforementioned

14  acts and/or omissions of the individually named defendants were malicious, reckless and/or

15  accomplished with a conscious disregard of decedent's rights thereby entitling plaintiffs to an

16  award of exemplary and punitive damages according to proof to punish the wrongful conduct

17  alleged herein and to deter such conduct in the future.

18                    **SECOND CAUSE OF ACTION**
19          **Supervisory Liability based on Customs, Practices or Policies**
20                    **(Survival Action- 42 U.S.C. §1983)**
21      *(Against Dr. Heatley, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding,*
22                    *Katherine Tebrock and Does 11 through 20)*
23
24     109.   On behalf of decedent Schmitz, plaintiffs re-allege and incorporate by reference

25  paragraphs 1 through 110, as though fully set forth herein.

Schmitz – Complaint for Damages

110.    The aforementioned acts and/or omissions of defendants in being deliberately indifferent to William Schmitz's serious medical needs, health and safety and in violating decedent's civil rights were the direct and proximate result of customs, practices or policies, or the lack thereof, of Dr. Heatley, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding, Katherine Tebrock and Does 11 through 20. Such customs, practices, policies and/or procedures include, but are not limited to, an ongoing pattern of deliberate indifference to the serious medical needs and health and safety of MCSP inmates, including the following: a failure to ensure implementation of appropriate medical and emergency treatment plans; a failure to provide appropriate staffing and training at MCSP for providing inmates with adequate medical and psychiatric treatment; a failure to implement a policy to ensure that staff would contact and summon emergency medical and/or psychiatric treatment in a timely manner; a failure to adequately train and supervise employees and/or agents to prevent the occurrence of the constitutional violations alleged herein; and a failure to promulgate appropriate policies or procedures or take other measures to prevent the constitutional violations alleged herein.

111.    As a direct and proximate result of the aforementioned customs, practices, policies and/or procedures of said defendants, or as a result of defendants' failure to promulgate appropriate policies or procedures, decedent William Schmitz suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life. Upon commencement of discovery, plaintiffs will be better equipped to identify the specific actions (or failure to act) each individual defendant took to implement the customs, practices or policies that caused the violations of Schmitz's rights.

**THIRD CAUSE OF ACTION**
**Failure to Supervise, Investigate and Discipline**
**(Survival Action–42 U.S.C. §1983)**

37

Schmitz – Complaint for Damages

*(Against Dr. Heatley, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding, and Does 1 through 20)*

112.    On behalf of decedent Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 111, as though fully set forth herein.

113.    The constitutional violations by defendants as alleged herein occurred as a result of the failure of defendants Dr. Heatley, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding, and Does 1 through 20 to adequately supervise, investigate and discipline employee conduct. Defendants Dr. Heatley, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding, and does 1 through 20 failed to adequately supervise, investigate and discipline subordinate employees in regard to preventing deliberate indifference to the serious medical needs, health and safety of inmates at MCSP. Said defendants' failure to supervise, investigate and discipline employees amounted to deliberate indifference to inmates' right to be free of deliberate indifference to their serious medical needs, health and safety. As a direct and proximate result of the aforementioned failure to supervise, investigate and/or discipline, decedent Schmitz suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

## FOURTH CAUSE OF ACTION
**Substantive Due Process- Loss of Parent/Child Relationship**
**(Violation of the Fourteenth Amendments to the U.S. Constitution: 42 U.S.C. § 1983)**
*(Against Defendants Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Campbell, LCSW Wanie, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding and Does 1 through 20.)*

114.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 113, as though fully set forth herein.

38

Schmitz – Complaint for Damages

115.    The acts and/or omissions of defendants Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Campbell, LCSW Wanie, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding and Does 1 through 20 as alleged herein, in being deliberately indifferent to the serious medical needs of decedent Schmitz by failing to summon or provide William Schmitz with medical care, psychiatric care and/or take other measures to prevent his death after noticing his psychotic condition and/or need for medical attention, resulted in Schmitz's suicide and/or death, which deprived plaintiffs of their liberty interest in the parent-child in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

116.    Such conduct by said Defendants "shocks the conscience."

117.    As a direct and proximate result of said Defendants' conduct, Plaintiffs suffered injuries and damages as alleged herein including pain and suffering and emotional distress. The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## FIFTH CAUSE OF ACTION
### Right to Medical Care
### (Cal. Const. Art. I, § 17)
*(Against Defendants Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Campbell, LCSW Wanie and Does 1 through 20.)*

39

Schmitz – Complaint for Damages

118.     On behalf of decedent Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 117, as though fully set forth herein.

119.     The California Constitution violation by defendants as alleged herein occurred as a result of the failure of defendants Dr. Heatley, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding, and Does 1 through 20 to provide adequate medical care.  Defendants Dr. Heatley, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding, and does 1 through 20 to adequately provide medical care. At all times relevant, Schmitz had a serious medical need for treatment of his severe mental illness, Defendants were aware of Plaintiffs' serious need for medical care and acted with deliberate indifference, failed to provide the medical care or failed to direct that the medical care be provided, and as a direct result decedent Schmitz suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life. The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## SIXTH CAUSE OF ACTION
### Wrongful Death
**(Cal. Code of Civil Procedure § 377.60 et seq.)**
*(Against Defendants Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Campbell, LCSW Wanie, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding and Does 1 through 20.)*

120.     On behalf of decedent Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 119, as though fully set forth herein.

40

Schmitz – Complaint for Damages

1    121.    Plaintiffs Thomas J. Schmitz and Dianne Mallia are the parents of the

2    decedent William Schmitz, who has no surviving spouse or surviving children or issue of

3    children.  The acts and/or omissions by defendants Officer Asman, Officer Bradley, Officer

4    Burns, Sergeant Brunkhorst, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M. Smith,

5    Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Campbell, LCSW Wanie, CEO

6    Brockenborough, Warden Lizarraga, Dr. Ceballos, Dr. Golding and Does 1 through 20 as

7    detailed below directly and proximately caused the wrongful death of William Schmitz and were

8    the direct and proximate cause of plaintiffs' injuries entitling plaintiffs to recover damages

9    pursuant to code of civil procedure section 377.60 et seq.

a. **Wrongful Death: Professional Negligence/ Medical Malpractice**
**(Survival Action- Cal. Code Civ. Proc. 377.10 et seq.)**
*(Against Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M.*
*Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW*
*Campbell, LCSW Wanie and Does 11 through 20)*

16    122.    The medical and/or psychiatric care rendered by Dr. Ashe, Dr. Ramkumar, Dr.

17    Aamot, Dr. Robinson, Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz,

18    LCSW Campbell, LCSW Wanie and Does 11 through 20 was negligent and did not comply with

19    professional standards of care for such treatment, proximately causing plaintiffs' injuries.

20    123.    The acts and/or omissions by Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson,

21    Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Campbell, LCSW

22    Wanie and Does 11 through 20 as described herein directly and proximately caused decedent

23    Schmitz to suffer the damages alleged herein, including but not limited to physical pain

24    and suffering, emotional distress, mental anguish, and loss of his life.

b. **Failure to Summon Medical Care-Cal. Govt. Code § 845.6**
**(Survival Action- Cal. Code Civ. Proc. § 377.10 et seq.)**

41

Schmitz – Complaint for Damages

*(Against Defendants Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst and Does 1 through 10)*

124.    Defendants Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst owed William Schmitz a duty to summon medical care.

125.    Said Defendants breached that duty when they had actual and constructive knowledge that William Schmitz was psychotic and locked in a cell by himself and failed to conduct counts dictated by policy and common sense. If they checked on Schmitz, they would have found him in need of immediate medical care and yet said defendants failed to take reasonable action to summon care, as alleged herein, resulting in a violation of Cal. Govt. Code sections 844.6 and 845.6 and William Schmitz's loss of life.

126.    Said conduct was committed in the course and scope of said Defendants' employment.

127.    As a direct and proximate cause of said Defendants' breach, decedent William Schmitz suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

128.    The actions by Defendants Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. Robinson, Dr. M. Smith, Dr. Heatley, Dr. J. Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Campbell, LCSW Wanie, Officer Asman, Officer Bradley, Officer Burns, Sergeant Brunkhorst and Does 1 through 20 were willful, wanton, malicious and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future. Plaintiff seeks exemplary and punitive damages against all defendants as to this cause of action.

## VIII. PRAYER FOR RELIEF

42

1 | WHEREFORE, Plaintiff prays for the following relief:

2 |     1. For compensatory, general and special damages against each defendant, jointly and

3 | severally, in the amount proven at trial;

    2. For punitive and exemplary damages against each individually named defendant in

an amount appropriate to punish Defendants and deter others from engaging in similar

misconduct;

4 |     3. For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and as

5 | otherwise authorized by statute or law;

6 |     4. For such other relief, including injunctive and/or declaratory relief, as the Court

7 | may deem proper.

13 | DATED:

Respectfully submitted,

*/s/ Thomas J. Schmitz*

*/s/ Dianne Mallia.*

43

Schmitz – Complaint for Damages

1    WHEREFORE, Plaintiff prays for the following relief:

2          1. For compensatory, general and special damages against each defendant, jointly and

3    severally, in the amount proven at trial;

         2. For punitive and exemplary damages against each individually named defendant in

an amount appropriate to punish Defendants and deter others from engaging in similar

misconduct;

4          3. For costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and as

5    otherwise authorized by statute or law;

6          4. For such other relief, including injunctive and/or declaratory relief, as the Court

7    may deem proper.

8

9

10

11

12

13    DATED: *January 27, 2020*

14                                Respectfully submitted,

15

16                                */s/ Thomas J. Schmitz*

17

18                                */s/ Dianne Mallia.*

19

43

1

## <u>DEMAND FOR TRIAL BY JURY</u>

2

Plaintiffs demand trial by jury.

3

Dated: January 27, 2020

4

**Respectfully submitted,**

5

6

/s/ Thomas J. Schmitz

7

8

/s/ Dianne Mallia

9

10

44

Schmitz – Complaint for Damages