UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS SCHMITZ, et al., | No. 2:20-cv-00195-JAM-CKD PS |
| Plaintiffs, | |
| v. | ORDER |
| A. ASMAN, et al., | (ECF Nos. 22, 23, 33) |
| Defendants. | |

Presently before the court are defendants' motions to dismiss, to which plaintiffs have responded, as well as plaintiffs' motion to reconsider the Clerk's denial of plaintiffs' request to enter default against defendant Golding.[1]  (ECF Nos. 22, 23, 33.)  A hearing on these motions was held on June 17, 2020.  (ECF No. 40.)  Plaintiffs appeared at the hearing individually, and Jennifer Nygaard appeared for defendants.  As set forth below, the court GRANTS IN PART and DENIES IN PART defendants' motions to dismiss and DENIES plaintiffs' motion to reconsider.

////

////

////

---

[1] Plaintiffs are proceeding pro se, and this action is before the undersigned pursuant to Eastern District of California Local Rule 302(c)(21).

1

BACKGROUND[2]

This matter concerns the death of William Schmitz ("Decedent") while incarcerated at Mule Creek State Prison ("MCSP"). Generally, plaintiffs—Decedent's mother and father—allege that Decedent was removed from critical antipsychotic medications and the prison's Enhanced Outpatient Program (EOP)—a high-level outpatient psychiatric care program—and that these two decisions resulted in Decedent's death via methamphetamine overdose on January 21, 2019.[3] (ECF No. 6 at 3-4.)

Decedent had a long history of mental illness and schizophrenia, conditions which led him into withdrawal and to self-medicate with illicit drugs. (Id. at 3, 14.) Decedent was incarcerated for shooting and killing a man while in a psychotic state; he was in CDCR custody from February 2009 until his death. (Id. at 14.) From the start of his incarceration until May 2018 Decedent was in EOP—the highest level of outpatient psychiatric care for mentally disordered inmate-patients. (Id.) Around June 2014 Decedent was prescribed, and responded well to, Clozapine, a medication used to treat psychotic disorders that are not adequately treated with "other safer antipsychotics." (Id. at 15.) However, Decedent's prescription to Clozapine was stopped as a result of Decedent developing hepatitis. (Id. at 16.) Decedent was then prescribed Paliperidone, to which he also responded well. (Id. at 17.)

In May 2017, Decedent was transferred to dormitory housing "despite recommendations against dormitory housing by mental health providers." (Id.) This change was stressful for Decedent and caused his psychosis to worsen. (Id.)

On September 1, 2017, Decedent received a disciplinary action for possession of drug paraphernalia. (Id. at 21.) The mental healthcare team did not know of this incident until five

---

[2] Unless otherwise indicated, the factual background is taken from plaintiffs' First Amended Complaint. (ECF No. 6.)

[3] It is unclear whether plaintiffs assert Decedent's death was an accidental overdose or a suicide. (See ECF No. 6 at 31 ("[Decedent's] death seemed to meet CDCR[']s definition of suicide 'an intentional self-injurious behavior that causes or leads to one's own death.' However, the most convenient scenario for MCSP was to have [Decedent's] death be an accident due to drug smuggling, for the drugs to be provided by an outside visitor and to avoid any mention of his severe mental illness.").)

2

months later. (Id.) From plaintiffs' complaint, it appears that Decedent began treating with Dr. Robinson around January 2018, who noted that Decedent's "chronic risk of suicide was high and acute risk of suicide was moderate." (Id.) Dr. Robinson also noted that Decedent was experiencing anxiety and was non-compliant with medication. (Id.)

On January 31, 2018, Decedent was treated by psychiatrist Dr. Ramkumar. (Id. at 22.) Because Decedent was caught with drug paraphernalia, as mentioned above, Dr. Ramkumar ordered Decedent to take a drug screening, which Decedent refused. (Id.) Dr. Robinson and Decedent subsequently discussed Decedent's drug use, his continued enrollment in EOP, and his "low treatment adherence." (Id. at 22-23.) Dr. Robinson was "focused on moving [Decedent] to a lower level of care[,] not treating his mental illness or drug dependence." (Id. at 23.) Decedent was subsequently transferred "to a lower level of psychiatric care" with the stated reason being that Decedent had poor attendance in EOP groups. (Id.) However, Decedent's poor attendance was a result of him "decompressing as his psychiatric medications were lowered." (Id. at 24.)

Decedent's records reflect a notation on April 12, 2018 that Decedent stopped taking medications, although he subsequently restarted. (Id.) Although Decedent wished to remain in EOP, he was transferred from EOP to Correctional Clinical Case Management Systems ("CCCMS") because it would "help CDCR look better on their healthcare monitoring metrics and give the appearance of better care than actually provided." (Id. at 24-25.)

Following Decedent's transfer, Dr. R. Johnson "completely stopped [Decedent's] antipsychotic medications." (Id. at 26.) Dr. M. Smith diagnosed Decedent with "antisocial and borderline personality disorder," noting the medications "Invega, Thorazine, Haldol, Lithium, Clozaril, Zyprexa, Depakote, Wellbutrin, Topamax, and Trileptal" were "noteworthy for their ineffectiveness." (Id. at 26-27.) This was contrary to Decedent's medical history. (Id.) Dr. M. Smith's "misdiagnosis poisoned [Decedent's] medical record for future providers." (Id.)

On July 2, 2018, Eric Branman reported that Decedent was able to sleep after being awake for two days, and that the staff suspected Decedent was abusing drugs. (Id.) On December 7, 2018, Decedent had his first visit with Dr. Andaluz, who noted that Decedent originally refused his appointment, had limited engagement, and had been prescribed multiple psychiatric medications

but none of them were effective. (Id. at 27-28.) Subsequently, on January 4, 2019, Dr. Andaluz noted that Decedent was "worried about losing dorm exclusion" and that Decedent stated he "deals with a lot of paranoia and psychosis." (Id. at 28.) Dr. Andaluz did not make any recommendation for increased monitoring or to restart antipsychotics; rather, the medication Dr. Andaluz prescribed Decedent may cause hallucinations. (Id.)

On January 17, 2019, Decedent met with social worker Violka Wanie. (Id at 29.) Wanie noted that Decedent denied that his psychosis was substance induced, but Decedent told her that he "self-medicated when [he] started hearing voices to help [him] deal with them." (Id.) Wanie took no action as a result of these reports from Decedent. (Id.)

Decedent's last reported interaction was with Officer Asman, who questioned Decedent after Asman saw water flowing from Decedent's cell. (Id.) Asman did not inspect Decedent's cell or investigate further. (Id.) Decedent's body was found approximately eight hours later, on January 21, 2019; Decedent's apparent cause of death was methamphetamine overdose. (Id.)

Plaintiffs' First Amended Complaint ("FAC") includes various acts and omissions that plaintiffs allege demonstrate a cover-up to deflect from the true cause of Decedent's death. (See id. at 30-31.) Plaintiffs also assert that Decedent's "death occurred at a particularly inconvenient time for MCSP" as it was "desperately trying to get out from under the court injunction as a result of [the] Coleman v. Brown lawsuit." (Id. at 31.)

Plaintiffs filed the present suit on January 27, 2020 and filed their FAC on February 26, 2020. (ECF Nos. 1, 6.) Defendants filed motions to dismiss on May 4, 2020 and May 15, 2020, which are presently before the court. (ECF Nos. 22, 23.)[4]

LEGAL STANDARDS

In considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept as true the allegations of the complaint in question, Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007), and construe the pleading in the light most favorable to the plaintiff, see Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

---

[4] Also before the court is plaintiffs' motion to reconsider the denial of their motion for default against defendant Michael Golding, discussed below. (ECF No. 33.)

In order to avoid dismissal for failure to state a claim a complaint must contain more than "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-557 (2007).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Furthermore, a claim upon which the court can grant relief has facial plausibility.  Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

DISCUSSION

A.  DEFENDANTS' MOTIONS TO DISMISS

Defendants move to dismiss plaintiffs' FAC in its entirety.  (ECF Nos. 22, 23.)  Because the court grants defendants' motions as to some defendants and denies their motions as to others, and also dismisses some causes of action entirely and not others, the court will address defendants' arguments in the order presented.

1.  Deliberate Indifference

In their motions to dismiss, defendants generally assert that plaintiffs have not sufficiently pleaded that defendants' responses were deliberately indifferent, and they argue that defendants' actions did not cause Decedent's death.  Plaintiffs concede that the FAC fails to state a claim as to some defendants,[5] but argue that their complaint is sufficiently pleaded as to the remaining defendants named in this cause of action.[6]  Plaintiffs request leave to amend as to the defendants they concede they have failed to state a claim against and to the extent the court grants defendants' motions.

---

[5] "Plaintiff's concede the issue based on the FAC in regards to Dr. Aamot, Dr. Ashe, Brunkhorst, Burns, Dr. Heatley, Dr. J. Johnson, Dr. C. Smith and Campbell and request leave to amend against these Defendants."  (ECF No. 34 at 2.)

[6] The remaining defendants in this count, not voluntarily dismissed by plaintiffs, are Dr. Robinson, Dr. Ramkumar, Dr. R. Johnson, Dr. M. Smith, Dr. Andaluz, Wanie, Asman, and Bradley, which the court addresses in order.

5

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The two-part test for deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent."  Jett, 439 F.3d at 1096; Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012).

Deliberate indifference is shown where the official is aware of a serious medical need and fails to adequately respond.  Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1018 (9th Cir. 2010).  "Deliberate indifference is a high legal standard," Simmons, 609 F.3d at 1019; Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was a "purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm, Jett, 439 F.3d at 1096.  The prison official must be aware of facts from which he could make an inference that "a substantial risk of serious harm exists" and he must make the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Finally, plaintiffs alleging deliberate indifference must also demonstrate that the defendants' actions were both an actual and proximate cause of their injuries.  Lemire v. California Dep't of Corr. & Rehab., 726 F.3d 1062, 1074 (9th Cir. 2013).

*Dr. Robinson*[7]

Plaintiffs' FAC alleges that during a three-month period in early 2018 Dr. Robinson "pushed" decedent from EOP into CCCMS.  (ECF No. 6 at 24.)  Dr. Robinson noted that Decedent had "declining percentage of group attendance[,]" was informed that Decedent was caught with drug paraphernalia around September 2017, and in March 2018 was told that Decedent refused a drug screen.  (Id. at 21-22.)  Plaintiffs also note that it was improper for Dr. Robinson, and other

---

[7] Although plaintiffs refer to defendant as Dr. Robinson, they also claim she is a "non-medically trained, unlicensed intern."  (ECF No. 6 at 24.)

defendants, to not inform them of Decedent's drug use, as plaintiffs were a positive influence on Decedent and could have helped him. (Id. at 23.)

Reading the allegations in the light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently alleged that Dr. Robinson was deliberately indifferent to Decedent's medical needs and was subjectively aware of the substantial risk of his potential suicide or drug overdose. Specifically, it is clear that Dr. Robinson knew of Decedent's serious medical condition, and the FAC alleges that Dr. Robinson moved Decedent from EOP to CCCMS due to systemic pressure, not because Decedent completed the program or any medically valid reason, ignoring Decedent's paranoia and drug use. Given the stage of litigation and the allegations contained in the FAC, plaintiffs have sufficiently pleaded a claim of deliberate indifference against Dr. Robinson.

*Dr. Ramkumar*

Plaintiffs' FAC alleges that approximately five months after Decedent was caught with paraphernalia Dr. Ramkumar ordered a drug screen, and later sent a correspondence to Dr. Robinson stating that Decedent refused the screen. (ECF No. 6 at 22.) There are no allegations in the FAC that raise a plausible inference that Dr. Ramkumar knew, or should have known, of a substantial risk of harm to Decedent by ordering a drug screen and then reporting that Decedent refused the screen. Moreover, there are no allegations in the FAC demonstrating that Dr. Ramkumar denied Decedent necessary medical treatment. Plaintiffs' claims against Dr. Ramkumar are therefore subject to dismissal.

*Dr. R. Johnson*

Plaintiffs claim that Dr. R. Johnson discontinued Decedent's antipsychotic medications despite clear medical records that demonstrated Decedent's positive response to the drugs. (ECF No. 6 at 26.) Defendants claim that this is a mere difference in medical opinion which cannot be the basis for a deliberate indifference claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). However, reading the pleadings in the light most favorable to plaintiffs, it is clear that Decedent suffered from extreme psychotic episodes that were controlled only through specific medications; the cessation of those medications, plaintiffs assert, resulted in the death of Decedent.

7

Additionally, and of note, the cases cited by defendants holding that a difference in medical opinion is insufficient for a deliberate indifference claim arise in the context of a motion for summary judgment, not the present procedural posture. See Jackson, 90 F.3d at 332; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); but see Smith v. County of San Diego, 2012 WL 628307, at *5 (S.D. Cal. Feb. 27, 2012) (denying motion to dismiss where court was able to draw reasonable inference that defendants exhibited deliberate indifference by failing to provide decedent "proper medical treatment and medications to control his serious mental issues" causing decedent's violent death by choking asphyxiation by prison officers). In the present case, the record, viewed in the light most favorable to plaintiffs, does not reflect a clear difference in medical opinion. Accordingly, the court finds the plaintiffs have sufficiently pleaded a claim of deliberate indifference against Dr. R. Johnson.

*Dr. M. Smith*

Plaintiffs allege that Dr. M. Smith misdiagnosed Decedent with "antisocial and borderline personality disorder" and incorrectly noted that Decedent's record was "absent of any mention of thought disorder, mania, or depression" when in fact Decedent's record was, or should have been, replete with those disorders. (ECF No. 6 at 26-27.) Defendants argue that this is a mere misdiagnosis or a difference of medical opinion, and therefore cannot form the basis of a deliberate indifference claim. See Estelle, 429 U.S. at 106. The analysis of this claim is the same as the analysis of the claim against Dr. R. Johnson: given the allegations against Dr. M. Smith and the current procedural posture, the court finds that plaintiffs have sufficiently pleaded a claim of deliberate indifference against Dr. M. Smith.

*Dr. Andaluz*

Plaintiffs allege that Decedent met with Dr. Andaluz on December 7, 2018, and January 4, 2019, and that Dr. Andaluz took insufficient notes, misdiagnosed Decedent, and prescribed Decedent medication that caused hallucinations. (ECF No. 6 at 27-28.) As with Drs. M. Smith and R. Johnson, given Decedent's severe mental issues, Dr. Andaluz's alleged misdiagnosis and dangerous prescription, both of which exacerbated Decedent's symptoms, and the current stage of

litigation, the court finds that plaintiffs have sufficiently pleaded a claim of deliberate indifference against Dr. Andaluz.

*Defendant Wanie*

Plaintiffs allege that Decedent and defendant Wanie had a conversation in which Decedent denied that his psychosis was substance induced, but rather that he "self-medicated when [he] started hearing voices to help [him] deal with them," and that Wanie took no action as a result of these reports from Decedent. (Id. at 29.) These allegations fail to demonstrate that defendant Wanie willfully ignored Decedent's medical needs, or that Decedent was harmed by her indifference. Plaintiffs' claims against defendant Wanie are therefore subject to dismissal.

*Defendant Asman*

Plaintiffs allege that Decedent's last reported interaction was with Officer Asman, who questioned Decedent after Asman saw water flowing from Decedent's cell, and that Asman did not inspect Decedent's cell or investigate further. (Id. at 29.) These allegations fail to demonstrate that Defendant Asman willfully ignored Decedent's medical needs or that Decedent was harmed by his indifference. Plaintiffs' claims against defendant Asman are therefore subject to dismissal.

*Defendant Bradley*

Plaintiffs allege that defendant Bradley could not see Decedent when he walked past Decedent's cell approximately fifteen minutes before Decedent's body was found. (Id. at 29-30.) Plaintiffs also allege that when responding to calls for help from another inmate, Bradley found Decedent's body slumped over the toilet. (Id. at 30.) These allegations fail to demonstrate that defendant Bradley willfully ignored Decedent's medical needs or that Decedent was harmed by his indifference. Plaintiffs' claims against defendant Bradley are therefore subject to dismissal.

*Conclusion*

Plaintiffs have sufficiently pleaded deliberate indifference counts against the following defendants: Drs. Robinson, M. Smith, R. Johnson, and Andaluz. Plaintiffs have not sufficiently pleaded that the remaining defendants were deliberately indifferent and therefore those defendants are subject to dismissal. However, as discussed below, plaintiffs will be granted leave to amend as to the dismissed defendants.

      2.      Supervisory Liability

Plaintiffs' second cause of action alleges supervisory liability based on customs, practices, and policies against defendants Dr. Heatley, Brockenborough, Lizarraga, Dr. Ceballos, Dr. Golding, and Katherine Tebrock, who are the Chief Medical Officer Executive, Chief Executive Officer-Health Care, Warden, Mental Health Administrator of Quality Management, Chief Psychiatrist for CDCR, and Deputy Director of CDCR's Statewide Mental Health Program, respectively. (ECF No. 6 at 36.) Plaintiffs third cause of action asserts failure to supervise against the same defendants, excluding Tebrock.

Under § 1983, a supervisor may be liable if there exists either "(1) his or her personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Mackinney v. Nielsen, 69 F.3d 1002, 1008 (9th Cir. 1995) (internal citations and quotations omitted). Supervisory liability can exist in the present case if defendants implemented "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." Id.

Failure to train or to supervise may amount to "deliberate indifference" if the need for training or supervision was obvious and the failure to do so made a constitutional violation likely. Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011). Mere negligence in training or supervision, however, does not rise to the level of deliberate indifference. Id.

Plaintiffs allege that the supervisor defendants were aware of "systemic-wide unconstitutional mental health care that started prior to and continued to persist throughout [Decedent's] time at MCSP." (ECF No. 34 at 10.) More specifically, plaintiffs point to the Coleman case, in which testimony was given that leadership prevented "adequate care for a large majority of CDCR mental health patients." (ECF No. 6 at 32.) Plaintiffs assert that due to Decedent's clear mental illnesses he was directly affected by these policies, and that understaffing, lack of drug-control policy, and pushing mentally ill patients to the lowest levels of care were all policies implemented by defendants that were constitutionally deficient. (ECF No. 34 at 10.)

Considering plaintiffs' allegations as well as the procedural posture of this matter, the court finds that plaintiffs have sufficiently pleaded their second and third causes of action. Plaintiffs have

adequately alleged system-wide constitutional deprivations and failure to adequately train and supervise those tasked with safeguarding Decedent's constitutional rights. Additionally, although plaintiffs' allegations against specific defendants may be sparse, "[the] level of particularity and notice is sufficient where . . . it may be fairly assumed that Defendants have access to past events and to statements of policy that will either prove or disprove Plaintiffs' allegations." Estate of Duran v. Chavez, 2015 WL 8011685, at *9 (E.D. Cal. Dec. 7, 2015) (quoting Phillips v. Cnty. of Fresno 2013 WL 6243278, at *10 (E.D. Cal. Dec. 3, 2013)). Accordingly, defendants' motions to dismiss will be denied to the extent they seek dismissal of the defendants named in the second and third causes of action.

### 3. Fourteenth Amendment Familial Relations

Plaintiffs' fourth cause of action asserts a deprivation of their Fourteenth Amendment Right to familial relations against every named defendant except Branman and Tebrock.

Under the Fourteenth Amendment, "official conduct that 'shocks the conscience' in depriving [family members] of [a liberty interest in the companionship and society of a family member] is cognizable as a violation of due process." Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).

> In determining whether excessive force shocks the conscience, the court must first ask whether the circumstances are such that actual deliberation [by the officer] is practical. Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even."

Id. (internal citations omitted.)

As discussed in the previous two sections, plaintiffs have failed to plead that defendants Asman, Bradley, Burns, Brunkhorst, Campbell, Wanie, Branman, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. C. Smith, and Dr. J. Johnson were deliberately indifferent to Decedent's medical needs and therefore have insufficiently pleaded that their actions "shocked the conscience."[8] Conversely,

---

[8] Plaintiffs again concede this point as to Dr. Aamot, Dr. Ashe, Dr. J. Johnson, Dr. C. Smith, Brunkhorst, Burns, and Campbell. (ECF No. 34 at 14.)

plaintiffs have sufficiently shown that the remaining defendants[9] acted with deliberate indifference, either in their individual or supervisory capacities, and therefore have also pleaded a Fourteenth Amendment cause of action against them. Accordingly, defendants' motions will be granted to the extent they seek to dismiss the FAC's fourth cause of action against defendants Asman, Bradley, Burns, Brunkhorst, Campbell, Wanie, Branman, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. C. Smith, and Dr. J. Johnson, and will be denied as to the remaining defendants.

    4.  Right to Medical Care: California Constitution Article 1, Section 17

Plaintiffs' fifth cause of action alleges defendants violated Decedent's right to medical care under California Constitution Article 1, Section 17.

The California Court of Appeals has held that "there is no basis to recognize a claim for damages" under this constitutional provision. Giraldo v. Cal. Dep't of Corr. & Rehab., 168 Cal. App. 4th 231, 256 (2008). Federal courts have repeatedly concurred with this conclusion. See, e.g., Asberry v. Relevante, 2018 WL 4191863, at *7 (E.D. Cal. Aug. 31, 2018) (analyzing Giraldo in detail and concluding that "Article I, Section 17 provides no private right of action for damages"), adopted, 2018 WL 4616383 (Sept. 24, 2018); Hicks v. Hamkar, 2016 WL 5847011, at *8 (E.D. Cal. Oct. 6, 2016) ("[U]nder Article I, § 17 of the California Constitution, which prohibits cruel or unusual punishment, . . . no private cause of action for damages exists.").

Plaintiffs partially concede this point, agreeing to dismiss all defendants except Dr. Robinson. (ECF No. 34 at 16.) Plaintiffs, however, seek to amend this cause of action to assert a Bane Act violation against Dr. Robinson. (Id. at 17.) Given the authority cited above, plaintiffs are precluded from asserting a cause of action for money damages premised on California Constitution Article 1, Section 17. Accordingly, this cause of action will be dismissed. Plaintiffs will, however, be granted leave to amend, discussed below, and are free to assert their Bane Act claim in their amended complaint.

/////

---

[9] This includes Dr. Heatley, whom plaintiffs voluntarily dismissed as to the first cause of action but remained in the second and third causes of action.

### 5. Wrongful Death

There is some confusion about plaintiffs' final cause of action for wrongful death. In their opposition, plaintiffs attempt to clarify that this cause of action is comprised of three distinct counts: wrongful death, survival claim for negligence and medical malpractice, and survival action for failure to summon and failure to furnish medical care. (ECF No. 34 at 18-19.)

Due to plaintiffs' failure to provide defendants with fair notice of this cause of action, it too will be dismissed, but with leave to amend. Because this count will be dismissed, the court does not address defendants' request to strike plaintiffs' demand for punitive damages as to this cause of action. (ECF No. 22-1 at 32.)

### B. LEAVE TO AMEND

If the court finds that a complaint or claim should be dismissed for failure to state a claim, the court has discretion to dismiss with or without leave to amend. Leave to amend should be granted if it appears possible that the defects in the complaint could be corrected, especially if a plaintiff is pro se. Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc); Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995) ("A pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." (citing Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir. 1987))). However, if, after careful consideration, it is clear that a claim cannot be cured by amendment, the Court may dismiss without leave to amend. Cato, 70 F.3d at 1105-06.

As discussed above, plaintiffs have sufficiently pleaded claims against the following defendants in their first, second, third, fourth, and/or sixth causes of action: Brockenborough, Lizarraga, Katherine Tebrock, Dr. Robinson, Dr. M. Smith, Dr. R. Johnson, Dr. Andaluz, Dr. Heatley, Dr. Ceballos, and Dr. Golding. Plaintiffs request leave to amend as to the remaining defendants—those they concede they failed to state a claim against and those the undersigned finds subject to dismissal.[10] Considering that this is plaintiffs' first request to amend their complaint since defendants responded, plaintiffs' pro se status, and most importantly the court's uncertainty

---

[10] Plaintiffs also request leave to amend their claims against defendant Branman, who is not listed or mentioned in any cause of action. (ECF No. 34 at 18.) This request is granted.

13

as to whether plaintiffs' claims against the dismissed defendants can be cured by amendment, the court will allow plaintiffs to assert claims against the dismissed defendants in their Second Amended Complaint. However, plaintiffs are cautioned that renewed claims against the dismissed defendants that are identical or substantially similar to those contained in their FAC will likely be subject to dismissal without leave to amend. If plaintiffs find that they cannot sufficiently plead claims against *any* of the named defendants, they are instructed to follow Federal Rule of Civil Procedure 41 concerning voluntary dismissals of actions without prejudice.

Plaintiffs are additionally cautioned that the court cannot refer to a prior complaint or other filing in order to make their amended complaint complete. Local Rule 220 requires that an amended complaint be complete in itself without reference to any prior pleading. As a general rule, an amended complaint supersedes the original complaint, and once an amended complaint is filed, the prior complaint no longer serves any function in the case.

C.     MOTION TO RECONSIDER DEFAULT

Plaintiffs move for reconsideration of the Clerk's decision to deny entry of default against defendant Golding. (ECF No. 33.) Plaintiffs' return of service indicates that a copy of the complaint and summons were left at Golding's dwelling house or usual place of abode with "Cordelia" on April 8, 2020. (ECF No. 14.) Golding filed a motion to dismiss on May 15, 2020. (ECF No. 23.) On May 20, 2020, plaintiffs requested default against Golding due to his untimely motion to dismiss without any indication of good cause, which the Clerk denied. (ECF Nos. 26, 27.)

Federal law allows service of process by leaving a copy of the summons and complaint at the individual defendant's dwelling house or usual place of abode or delivery to an authorized agent. Fed R. Civ. P. 5(b). Under C.C.P. § 415.20, substituted service may be made in California by leaving a copy of the summons and complaint at the individual defendant's office, dwelling house, usual place of abode, usual place of business, or "usual mailing address other than a United States Postal Service post office box." "For substituted service to be reasonably calculated to give an interested party notice of the pendency of the action and an opportunity to be heard, service must be made upon a person whose relationship to the person to be served makes it more likely than not

that they will deliver process to the named party." Bonita Packing Co. v. O'Sullivan, 165 F.R.D. 610, 614 (C.D. Cal. 1995) (internal quotations and citation omitted). "The law does not favor defaults; therefore, any doubts as to whether a party is in default should be decided in favor of the defaulting party." Id.

Here, plaintiffs' return of service is insufficient to establish that they properly served Golding. Of note, their return does not list an address where the documents were delivered, nor does it list a last name for "Cordelia" or indicate her relationship with Golding. (See ECF No. 14.) Given these deficiencies, the court's disfavor for defaults, and Golding having already filed a motion to dismiss, the court DENIES plaintiffs' motion to reconsider.

CONCLUSION

For the reasons set forth above, it is HEREBY ORDERED that:

1. Defendants' motions to dismiss (ECF Nos. 22, 23) are GRANTED IN PART and DENIED IN PART.

2. Plaintiffs' claims against defendants Asman, Bradley, Burns, Brunkhorst, Campbell, Wanie, Branman, Dr. Ashe, Dr. Ramkumar, Dr. Aamot, Dr. C. Smith, and Dr. J. Johnson are DISMISSED from this action, but with leave to amend.

3. Within twenty-one (21) days of the date of this order plaintiffs shall file an amended complaint, which shall be captioned "Second Amended Complaint." Failure to file a second amended complaint will be construed as a voluntary dismissal of the claims and defendants listed above, and the case will proceed on the FAC.

4. Plaintiffs' motion to reconsider (ECF No. 33) is DENIED.

Dated: June 25, 2020

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

16.schm.195