1 | THOMAS J. SCHMITZ

2 | DIANNE MALLIA

3 | 1753 Woodleaf Circle

4 | Roseville, CA 95747

5 | (707) 694-8158 tsfoot49@gmail.com

6 | PRO SE

**FILED**

OCT 1 4 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

7

## UNITED STATES DISTRICT COURT

8

9

## EASTERN DISTRICT OF CALIFORNIA

10

THOMAS SCHMITZ, et al.,

Plaintiffs,

vs.

A. ASMAN, et al.,

Defendants.

NO. 2:20-cv00195-JAM-CKD

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS 12(b)(6) MOTIONS
TO DISMISS SECOND AMENDED
COMPLAINT**
**[ECF Nos. 63, 64, 65,68]**

**Date: October 28, 2020**
**Time: 10:00 a.m.**
**Courtroom: 24, 8th floor**
**Judge: The Honorable Carolyn K.
Delaney**

i

Pursuant to Local Rule 230 and the Federal Rules of Civil Procedure, Plaintiffs oppose the Federal Rule of Civil Procedure 12(b)(6) Motions to Dismiss filed by Defendants Adams, Ashe, Andaluz, Asman, Bradley, Branman, Brizendine, Brockenborough, Brunkhorst, CDCR, Ceballos, Diaz, Gipson, Heatley, J. Johnson, R. Johnson, Kernan, Leidner, Ponciano, Ramkumar, Rekart, Robinson, Rudas, C. Smith, M. Smith, Tebrock, Toche, Wanie, Kuich, Lizarraga, and DeNigris (ECF Nos. 63, 64, 65, 68) based on the attached Memorandum of Points and Authorities and any argument before the Court.

DATED:  October 14, 2020                                  Respectfully submitted,

Thomas J. Schmitz

Dianne Mallia

## POINTS AND AUTHORITIES

## LEGAL STANDARDS

Plaintiffs are proceeding Pro-Se. A self-represented litigant's complaint should be construed in a way that permits the litigant's claim to be considered within the proper legal framework "if the essence of an allegation is discernible, even though it is not pleaded with legal nicety," *Stone v. Harry,* 364 F.3d 912, 915 (8th Circuit 2004) affording a self-represented litigant the benefit of any doubt. *Klingele v. Eikenberry,* 849 F.2d 409, 413 (9th Circuit 1988).

Notably, Defendants' motion to dismiss is silent regarding the background and ongoing unconstitutional care detailed in Plaintiffs' complaint. (ECF 63-1). **CDCR Defendants function in a system of mental health care that has been found unconstitutional for over two decades. The unconstitutional care persists despite oversight by the courts and policies developed to bring CDCR to a constitutional level. (SAC p15) Despicably, there was a widespread conspiracy to be relieved of the Court monitoring to provide constitutional care for mentally ill by falsifying metrics. (SAC p 53)**

Defendants' motion claims to "briefly summarize only factual allegations that are at issue in [the] motion to dismiss." (ECF 63-1 at 1) However, in addition to avoiding all allegations of the decades of failure to correct unconstitutional care and the deception by Defendants to be relieved of Court monitoring, Defendants distort or exclude many other factual allegations "that are at issue in [the] motion to dismiss" in the SAC. For example, Defendants state "Plaintiffs allege that Defendants conspired to 'base decisions for care of mentally ill inmates' to make it appear that they were complying with court orders in the Coleman class action case." (ECF 63-1 at 5) This selectively does not capture the true context as follows:

> "[Defendants] are liable due to a conspiracy within CDCR to base decisions
> for care of mentally ill inmates on ways to best make it appear they are
> complying with the Court orders to provide a minimal constitutional level of
> care. The common objective was to be relieved of Court monitoring. These
> actions led to decisions that improved metrics but often led to the deprivation
> of constitutional rights of mentally disabled inmates. This conspiracy was
> widespread and brought to light by the Golding Report and subsequent Court

1

order of Judge Mueller. The conspiracy led to an actual deprivation of William Schmitz's right to Constitutional care as he did not receive psychiatric care at a frequency or quality mandated by the Program guide and he was inappropriately removed from the EOP level of care." (SAC at 53)

Much of Defendants' Motion to Dismiss arguments are based on alternative explanations. Though Defendants' explanations are not plausible, even if they were, they are not enough to grant the motion. *See Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).") In addition, all factual allegations in the complaint are accepted as true and the pleadings are construed in the light most favorable to the nonmoving party. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)

*Disability Rights Mont., Inc. v. Batista,* No. 15-35770 (9th Cir. July 19, 2019) is a recent Ninth Circuit decision covering topics pertinent to the current case. The Ninth Circuit called the treatment of mentally ill prisoners described in that case as "horrific" (Id at *5) Many of those same "horrific" factual allegations are similar to those suffered by William Schmitz.

The Ninth circuit also described how similar allegations to the current case state sufficient factual allegations. Specifically, it is a "well-established precedent, [Plaintiffs'] complaint states a claim and survives a motion to dismiss under Rule 12(b)(6) if it contains sufficient factual allegations to make it plausible, taking all the allegations as true, that (1) the prison policies and practices [Plaintiff] describes expose inmates with serious mental illness to a substantial risk of serious harm and (2) that the DOC defendants are deliberately indifferent to that risk." (*Disability Rights Mont., Inc. v. Batista*, No. 15-35770, at *13 (9th Cir. July 19, 2019))

**Plaintiffs' factual allegations overwhelmingly support the claims** . See *Disability Rights Mont., Inc. v. Batista*, No. 15-35770, at *15 (9th Cir. July 19, 2019) ("To require more would overstate what needs to be alleged to state a claim at the beginning of a lawsuit before discovery. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).") *Id.* at *15-16 ("Analyzing the sufficiency of a complaint is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, <u>556 U.S. at 679</u>. The complaint's

allegations that these practices and policies compromise the health and dignity of prisoners with serious mental illness are thoroughly consistent with common sense and legal experience.")

I.  **PLAINTIFFS HAVE STATED A VIABLE DELIBERATE INDIFFERENCE CLAIM TO MEDICAL NEEDS IN THE SECOND AMENDED COMPLAINT AGAINST OFFICER ASMAN, OFFICER BRADLEY, DR. ASHE, DR. C. SMITH, LCSW WANIE, DR. RUDAS, AND DR. DENIGRIS (FIRST CAUSE OF ACTION) AND FAILURE TO SUMMON MEDICAL CARE CLAIM UNDER CALIFORNIA LAW AGAINST ASMAN AND BRADLEY (ELEVENTH CAUSE OF ACTION).**

Defendants challenge Plaintiffs' deliberate indifference claim to medical needs against Officer Asman, Officer Bradley, Dr. Ashe, Dr. C. Smith, LCSW Wanie, Dr. DeNigris and Dr. Rudas.

Defendants cite *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) "A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health and safety.'"(ECF 63-1 at 8)  This holding was in support of summary judgment after discovery revealed the subjective reasoning of the defendant physician. At this point in the current case, Plaintiffs do not have discovery. Even without discovery, Plaintiffs' factual allegations do show the required deliberate indifference standard.

A.  **Officers Asman and Bradley**

Defendants **Asman** and **Bradley** argue that the claims against them in the First and Eleventh Cause of Action must be dismissed because the allegations are "devoid of any facts that Asman and Bradley knew that Schmitz had a serious medical need, that Asman and Bradley willfully ignored Schmitz's medical need, and that Schmitz was harmed by Asman's and Bradley's indifference. ( ECF 63-1 at 8).  Further, defendants state that failing to comply with policy of the CDCR Department Operations Manual "DOM" is not relevant to the deliberate-indifference inquiry citing *Jones v. Meddly*, No. 1:17-cv-00109-SAB (PC), 2019 U.S. Dist. LEXIS 122784, at *5 n.4 (E.D. Cal. July 19, 2019) ("a violation of policy would not change the Court's conclusion" in finding no deliberate indifference) (ECF 63-1 at 9).

3

A more detailed look at the Court's decision in *Jones* reveals that the circumstances of the policy broken was quite dissimilar to the DOM policies intentionally violated by Asman and Bradley.

> Plaintiff contends that Defendant violated prison policy by not maintaining a hold on Plaintiff while being transported with his hands cuffed behind his back. Plaintiff submits a copy of the Kern Valley State Prison Operational Procedure No. 200 applicable to the Administrative Segregation Unit. (ECF No. 34 at 10.) Section (E)(5) of the policy states that "[w]hen escorting ASU inmates the escorting officer(s) will have their Expandable Baton drawn and the escort will be 'hands on' at all times unless a lead chain is utilized for multiple escorts." (**Id.**) Section (E)(6) states "[d]uring all in-house escorts (e.g. yard, shower, etc.) inmates shall be attired in boxer shorts, T-shirts, and canvas shoes, orthopedic shoes or shower shoes," and "[e]scorting officer(s) shall maintain hands-on control of the inmate(s) at all times and escort to the intended destination without delay." (**Id.**) Plaintiff's suggestion that Defendant violated this policy does not change the Court's analysis in this order. First, there is no indication or evidence demonstrating that Plaintiff was kept in the Administrative Segregation Unit which this policy is applicable to. Additionally, the policy's purpose appears to be for safety of inmates and staff from violent actions, given it is applicable to the Administrative Segregation Unit, and not to prevent prisoners from falling while handcuffed." (*Jones v. Meddly*, No. 1:17-cv-00109-SAB (PC), at *4 n.4 (E.D. Cal. July 19, 2019))

Rather than the case cited by Defendants, an actual comparable case is *Rocha v. Kernan*, No EDCV 17-869-GW(FFMx) (C. D. CAL. March 13, 2019). Defendants Asman's and Bradley's failures to check on William are almost identical to the *Rocha* case in which the Defendant violated CDCR policy of checking on inmates at a specific timeline. In *Rocha*, the Court found that subjective knowledge to the individual "specifically is misguided." See *Rocha* at 19 and 20. ([Defendant's] focus on his subjective knowledge as to [Plaintiff] specifically is misguided. In *Lemire*, the Ninth Circuit held that the proper deliberate indifference inquiry is whether defendants knew that their actions posed a serious risk of substantial harm to any prisoner similarly situated to the one who ultimately ended up suffering harm. *See Lemire*, 726 F.3d at 1078-79 ("The appropriate inquiry was whether the Supervisory Defendants were aware that removing all floor officers from Building 8 for over three and a half hours would pose a substantial risk of serious harm to someone in St. Jovite's situation, not simply whether they

4

1   were subjectively aware of St. Jovite's specific medical needs."). Moreover, [Defendant] did not

2   need to know that his failure to conduct the required checks led to a substantial risk of suicide –

3   it would be enough to know that someone in [Plaintiff's] position would be "exposed to a

4   substantial risk of some range of serious harms; the harm [the inmate] actually suffered need not

5   have been the most likely result among this range of outcomes." *Id.* at 1076.

6       Further in *Rocha*, the Court concluded "that Plaintiffs have sufficiently pleaded that

7   [Defendant] ignored a substantial risk of harm when he failed to follow the CDCR policy and

8   conduct the required check...Reading the allegations in the light most favorable to Plaintiffs, it is

9   reasonable to conclude that an officer that failed to check on a specialized population of inmates

10  at the required intervals would know that he was exposing the inmates to a substantial risk. *See*

11  *Lemire*, 726 F.3d at 1069 (noting that the housing unit at issue was for "CCCMS inmates,

12  meaning they suffered from any of a variety of psychiatric illnesses. CCCMS is the lowest level

13  of care in the State's prison mental health delivery system, and is designed to provide a level of

14  care equivalent to that received by non-incarcerated patients through outpatient psychiatric

15  treatment."). *Rocha* at 20.

16      Plaintiffs allege "Defendants Asman and Bradley knew or should have known the CDCR

17  policies and their purposes. Defendants Asman and Bradley were responsible for conducting

18  counts to observe and document the safety of William on January 21, 2019." (SAC at 50)

19  Plaintiffs allege Asman and Bradley knew that William was classified as "psychotic and locked

20  in a cell by himself and failed to conduct counts dictated by policy." (SAC at 58)  Like in *Rocha*,

21  it was enough for Asman and Bradley to know that someone in William's position would be

22  "exposed to a substantial risk of some range of serious harms; the harm [William] actually

23  suffered need not have been the most likely result among this range of outcomes."

24      Further, Defendant Asman intentionally violated a policy that was specifically created to

25  identify dangerous situations. **This fact is relevant as it creates no doubt that when the clear**

26  **policy created to identify dangerous situations was ignored, Asman deliberately exposed**

27  **William "to a substantial risk of some range of serious harms".**  The DOM described

28  William's action of cell flooding as a behavior that can represent danger to self and warrants

5

1  continuous monitoring and immediate mental health referral. (SAC at 44) Specifically, section

2  91090.6 Documenting Evidentiary Factors of Danger **states inmates flooding cells is a sign of**

3  **dangerousness to self and should be immediately referred to mental health with direct**

4  **observation until the evaluation (SAC at 44) Defendant Bradley allowed a blockage of**

5  **William's cell window prohibiting observations of an actively psychotic man another**

6  **specific violation of CDCR policy. (SAC at 44 )** Clearly, Plaintiffs allegations are enough to

7  survive a motion to dismiss in both the First and Eleventh Cause of Action.

8    **B.  Defendants Ashe, C. Smith, DeNigris, and Rudas**

9    The factual allegations of plaintiffs in the SAC meet the criteria of deliberate indifference

10  against Defendants Dr. Ashe, Dr. C. Smith, Dr. DeNigris, and Dr. Rudas. Plaintiffs allege these

11  defendants fabricated a serious diagnosis of End Stage Liver Disease and performed a sedated

12  unnecessary medical procedure causing William Schmitz physical pain and severe mental harm.

13  (SAC at 49)The procedure was not performed for any medical reason but rather for financial

14  gain (SAC at 34). Choosing a course of treatment that is "medically unacceptable under the

15  circumstances" and in "conscious disregard of an excessive risk to plaintiff's health" is

16  deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).   *See Villegas v.*

17  *Cate*, No. 1:10-cv-01917-AWI-SKO PC, at *5 (E.D. Cal. Jan. 3, 2012) ("On the other hand, the

18  Eighth Amendment forbids the wanton and unnecessary infliction of pain, Estelle, 429 U.S. at

19  105-06, and prison officials may not choose a medically unacceptable course of treatment in

20  conscious disregard of an excessive risk to an inmate's health. Jackson, 90 F.3d at 332 (quotation

21  marks omitted).")

22    Despite the factual allegations of the SAC, the Defendants try to support their argument

23  that it was not deliberant-indifference to subject William to a fraudulent endoscopy by

24  fabricating a diagnosis of end stage liver disease. William's exam, lab work and imaging studies

25  definitively showed he did not have end stage liver disease. (SAC at 34)  CDCR even has a

26  medical care guideline for end stage liver disease, which shows William did not have end stage

27  liver disease and should not have had an endoscopy. (SAC at 34)  *Dr. Rudas ordered an*

28  *endoscopy on William stating William has cirrhosis/end stage liver disease. (SAC 34) Dr.*

6

1    **Rudas order for the endoscopy was literally out of nowhere.** Factual allegations that support the
2    endoscopy was for fraudulent purposes (in addition to all the medical information that
3    conclusively shows no end stage liver disease and Dr. Rudas suddenly ordering the endoscopy in
4    the face of medical information contradicting the diagnosis) include:

5            1. The type of environment within CDCR and MCSP, in particular, is one
6      where subjecting inmates to fraudulent medical procedures would be tolerated. The
7      factual allegations cite several examples that are as despicable as performing
8      fraudulent medical procedures for financial gain. These include: CDCR has for
9      decades violated constitutional rights of people under their care (SAC at 2),
10     **MCSP's former Warden Joe Lizarraga, the leader of MCSP, "was caught**
11     **stealing from a Food bank thrift store, lied to police, and attempted a bribe**
12     **using charitable funds from MCSP."** (SAC at 46)  A fraudulent claim was made
13     to the Amador County Civil Grand Jury that MCSP was accredited by the
14     American Correctional Association when it was not accredited. (SAC at 14)
15     Numerous allegations of manipulations of medical data in attempt to be relieved of
16     Court monitoring as described throughout Dr. Golding's report. (SAC at 16)  **Dr.**
17     **Ceballos was found by the *Coleman Court* to be willfully blind or reckless**
18     **indifference for altering the court-ordered requirements for psychiatry visits**
19     **and the CDCR's Deputy Director of the Statewide Mental Health Program**
20     **Defendant Tebrock knowingly presented fraudulent data to the court. (SAC at**
21     **16).** The fact that Defendant former Deputy Tebrock is still employed by the State
22     of California and that Defendant Dr. Ceballos, along with others in the CDCR
23     Mental Health headquarters, are still in their leadership positions despite the actions
24     laid out in the Golding and Dunn Gibson reports and the Court Order by Judge
25     Mueller is appalling and demonstrates the continued lack of CDCR's concern about
26     truly providing constitutional level care. (SAC at 17)

27           2. Defendant Dr. Rudas ordered the endoscopy on February 9, 2018. Dr.
28     Rudas specifically proposed an "On-site" provider and that it be completed by

5/9/18. This would assure that "Secure MD On-site Endoscopy" would complete the unnecessary procedure and subsequently receive payment. To maximize revenue, a company traveling to perform procedures on-site needs to maximize the number of procedures completed in a day. To keep the company coming to MCSP to do procedures, the providers at MCSP need to schedule enough procedures. The very specific timeline Dr. Rudas gave for the procedure assured that William would be eligible for the onsite date of 5/4/18. (SAC at 34–35)

3. Defendant Dr. Christopher Smith inappropriately approved the unnecessary fraudulent procedure twice on 2/12/18 and again on 3/16/18. (SAC at 35) He approved it the second time after Dr. Ashe saw William on 3/8/2018 and stated William "does not have known history of cirrhosis." (SAC at 35) There is no logical reason C. Smith would approve the procedure twice other than to make sure William's record reflected he needed the procedure and bury any indication William did not actually have end stage liver disease.

4. Dr. Ashe was William's primary medical provider. (SAC at 35) Dr. Ashe notes in William's history of present illness "no known history of cirrhosis." (SAC at 35) She then notes that William has an "abdominal ultrasound" pending but does not mention the endoscopy procedure.(SAC 35)  Dr. Ashe was conspiring to commit fraud by allowing the endoscopy to proceed or was deliberately indifferent for not knowing and stopping the fraudulent procedure and removing William's diagnosis of end stage liver disease from his record. (SAC at 35).

5. Dr. DeNigris was the medical specialist who performed the endoscopy. He was responsible for determining the procedure was clinically indicated and that William understood the risks, benefits, alternatives, and indications for the procedure.  (SAC at 39–40)[1] Dr. DeNigris performed the endoscopy which caused

---

[1] In Defendant Dr. DeNigris's Motion to Dismiss (ECF 64-1) he shifts responsibility for the procedure to the "primary physician at the prison" as William was referred to Dr. DeNigris for the endoscopy.  Plaintiffs completely disagree with the level of responsibility Dr. DeNigris claims he had for the procedure. Dr. DeNigris, MD, PhD, seems to see his role as a technician, similar to an X-ray tech completing a study or a lab technician drawing blood.

8

William pain and ordered another endoscopy for three years despite William not needing the original endoscopy or follow-up endoscopy. (SAC at 40)  William's endoscopy was fraudulently coded to *increase reimbursement*. (SAC at 40)

6. "Defendant Dr. Christopher Smith authored "MCSP-Initial Inmate Death Report" on January 22, 2019. Dr. Smith had previously approved the fraudulent endoscopy for the non-existent end stage liver disease of William. In this report, Defendant Dr. C. Smith failed to honestly and accurately report the events and circumstances leading up to William's death. He states William's last medical visit was in early December specifically excluding William's recent mental health encounters where he complains of auditory hallucinations. *Defendant C. Smith does not list any psychiatric illness in William's active problems. Defendant C. Smith also omits a diagnosis of cirrhosis.* Less than a year prior, Defendant Dr. C. Smith had approved a fraudulent, unnecessary procedure on William for a false diagnosis of cirrhosis. By excluding any mention of cirrhosis, and William's pending Fibro scan, Defendant C. Smith lowered the risk that any investigation into William's death would discover this false diagnosis and the unnecessary, fraudulent procedure that Defendant Dr. C Smith approved." (SAC at 45)

7. The basic fact that four different medical doctors all involved with William's medical care propagated the diagnosis of end stage liver disease in the face of incontrovertible evidence proving otherwise indicates the medical doctors actually knew William did not have end stage liver disease and the true goal was to defraud the government. Intentionally creating the diagnosis in order to complete the procedure for financial gain is just as likely as the extreme level of

Regardless at the stage of motion to dismiss Plaintiff's allegations must be considered as true and it must be accepted that Dr. DeNigris was ultimately responsible for the procedure (which is what the California Medical Board and every competent gastroenterologist will agree is the standard). Dr. DeNigris is a subspecialty-trained medical doctor. It would have taken less than 3 minutes to review William's labs and abdominal ultrasound results proving no end stage liver disease and no requirement for an endoscopy. The complete failure of Dr. DeNigris to complete such a basic fundamental step is most consistent with a deliberate decision to complete an unneeded procedure for financial gain while knowing William did not actually have end stage liver disease.

incompetence that would have been required by these four different medical doctors.

8. William Schmitz, along with other mentally ill prisoners, were ideal victims for such a fraud. Even if a mentally ill inmate who suffers from paranoid delusions tells someone about their care, they may not be believed. This happened to William. "William became increasingly paranoid and told family members he had cirrhosis. He was worried about bleeding to death and the effect medicines could have on him. William's family repeatedly reassured him that he did not have cirrhosis and that he should continue to take his medications as prescribed by his doctors. His family knew there was no way William could have cirrhosis as he only developed Hepatitis C in the past few years. Any physician would know that the time course was impossible for a cirrhosis diagnosis (**According to the Center for Disease Control cirrhosis develops in approximately 10-20% of people after 20-30 years of chronic infection with hepatitis C.** ) William's family was certain his concern about cirrhosis and bleeding to death were due to his mental illness and one of many paranoid delusions." (SAC at 33) Another reason mentally ill CDCR inmates are perfect targets is the medical record keeping is so horrible that it makes uncovering a fraud nearly impossible. "Shockingly, only after his death and most of his medical records were finally available for review was it discovered by plaintiffs that William was actually diagnosed with "Cirrhosis/ESLD" (End Stage Liver Disease). (SAC at 33). Tragically, it took William's death for his parents to finally be given the medical records only to learn their mentally ill son was actually told he had a life-threatening illness and subjected to an unneeded sedated medical procedure.

Plaintiffs do not yet have discovery which will conclusively determine whether the deliberate indifference was due to fraud. However, as the factual allegations indicate, fraud is the most likely conclusion. See *Park v. Thompson*, 851 F.3d 910, 928-29 (9th Cir. 2017) ("Park's complaint alleged facts that are "suggestive" of an agreement to engage in "illegal

10

conduct." *See Twombly* , 550 U.S. at 564 n.8, 127 S.Ct. 1955. When the entire factual context is considered, it is clear that Park has "nudged [her] claim[ ]" that Thompson conspired to orchestrate Ayala's unavailability "across the line from conceivable to plausible." *See Ashcroft v. Iqbal* , 556 U.S. 662, 680, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). "The *Twombly* plausibility standard ... does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3* , 604 F.3d 110, 120 (2d Cir. 2010) (citations and quotation marks omitted); *see also Concha v. London* , 62 F.3d 1493, 1503 (9th Cir. 1995) ("[W]e relax pleading requirements where the relevant facts are known only to the defendant."). Because many of the relevant facts here are known only to the defendant, and in light of the additional facts alleged by Park, we conclude that she has pleaded sufficient facts to state a plausible claim for civil conspiracy under Section 1983.")

Other than financial gain, the only alternative reason for performing the unnecessary procedure on a vulnerable, mentally ill man is a level of medical care that was amazingly below a minimal standard of care. **Either scenario is deliberate indifference.** In diagnosing William with end stage liver disease in the absence of any medical reason and then subjecting him to a sedated medical procedure that carries a risk of death and causes pain, Dr. Ashe, Dr. C. Smith, Dr. DeNigris and Dr. Rudas chose a course of treatment that is "medically unacceptable under the circumstances" and in "conscious disregard of an excessive risk to plaintiff's health" which is deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). "The state of mind for deliberate indifference is subjective recklessness." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), citing *Farmer*, 511 U.S. at 835-41. "[T]he standard is less stringent in cases involving a prisoner's medical needs because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), overruled on other grounds (internal quotation marks omitted) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (1992)).

Defendants try to support their argument by citing a large series of cases that all have a reasonable explanation for a medical diagnosis or treatment choice. **Unlike the case of William, not one of the cited cases show a completely fabricated diagnosis and invasive procedure that occurred in the face of medical evidence that completely disproves the alleged diagnosis.**

Defendants cite *Villegas v. Cate*, 2012 U.S. Dist. LEXIS 146899, 2012 WL 4863065 at *5 (E.D. Cal. 2012) ) ("That the [spinal] surgery was later allegedly determined to be unnecessary or that it perhaps could have been avoided is simply not enough to transform these events into a violation of Plaintiff's federal constitutional rights. The requisite mental state has not been shown . . ."). (ECF 63-1 at 10)  However, in *Villegas v. Cate*, the plaintiff suffered chronic back pain due to a spinal condition and presented to the emergency department with a "completely paralyzed" arm leading the Defendant Doctor to recommend spinal surgery. This does not come close to the factual allegations of the care given to William. If in *Villegas,* the plaintiff was mentally disabled, had no evidence of back problems (no back pain, no paralysis, and no findings on imaging studies), but was told he needed spinal surgery or risked potential death and then was subjected to spinal surgery, it would have been similar to what happened to William. **William had no evidence of end stage liver disease!**

Defendants cite *Bartholomew v. Traquina*, 2011 U.S. Dist. LEXIS 103574, 2011 WL 4085479, *3 (E.D. Cal. 2011) (plaintiff did not presently allege "sufficient facts to show that any defendant acted with the requisite intent of deliberate indifference" with the result that surgery was performed on the wrong shoulder) (ECF 63-1 at 10)  However, in *Bartholomew v. Traquina,* the Defendant Doctor's subjective reasoning was clearly indicated by an exhibit submitted with the claim. Specifically, the medical record indicated the Doctor's reasoning "that the biopsy was taken of plaintiff's right shoulder because it appeared more suspicious than the 'infrascapular lesions' on his left shoulder." If the medical record showed that the Defendant Doctor in *Bartholomew* told a mentally disabled Plaintiff his normal-appearing skin was a cancer and that he had to remove the normal skin or he risked death and then removed normal skin, it would

1   have been similar to what happened to William. **William had no evidence of end stage liver**
2   **disease!**

3       Defendants cite *Luna v. Cate*, 2010 U.S. Dist. LEXIS 119366, 2010 WL 4323025, *2 (E.D.
4   Cal. 2010) ("As alleged, the complaint fails to state more than a possible medical malpractice
5   claim against the named Defendants" that they misdiagnosed plaintiff's injury and performed
6   unnecessary surgery, causing him additional knee problems.) (ECF 63-1 at 10)  Again, unlike
7   William, the plaintiff in this case had an injury and then a claimed misdiagnosis based on the
8   injury. If the Doctor in *Luna* told a mentally disabled  Plaintiff that his normal knee with no
9   evidence of injury required a procedure or the Plaintiff risked death and then completed the
10  unnecessary procedure, it would have been similar to what happened to William.  **William had**
11  **no evidence of end stage liver disease!**

12      Defendants cite *Williams v. California*, 2008 WL 19 905418 (E.D. Cal. 2008) (denial of
13  motion for reconsideration of screening order that dismissed a claim for deliberate indifference
14  premised on allegations that the removal of plaintiff's left parotid (salivary gland), due to an
15  apparent tumor, would have proven unnecessary if plaintiff had  first obtained a biopsy)  (ECF
16  63-1 at 10)  Again, unlike William, the plaintiff in this case had an actual reason to at a minimum
17  perform a biopsy due to an abnormality. If the Doctor in *Williams* told a mentally disabled
18  plaintiff that his normal parotid gland that lacked evidence of a problem required a procedure or
19  the plaintiff risked death and then completed the unnecessary procedure, it would have been
20  similar to what happened to William. **William had no evidence of end stage liver disease!**

21      Defendants cite *Thomas v. Hickman*, 2006 U.S. Dist. LEXIS 72988, 2006 WL 2868967
22  (E.D. Cal. 2006) (court dismissed claim in which prisoner challenged the surgical removal of her
23  ovaries after being informed that she would be undergoing only a cystectomy because plaintiff
24  failed to identify the alleged alternatives to surgery, failed to state how the alleged misconduct
25  was medically unacceptable under the circumstances, and failed to demonstrate that
26  defendants pursued surgery in conscious disregard of an excessive risk to plaintiff's health.)
27  (ECF 63-1 at 10)  Review of the case shows that there was a medical indication for the
28  cystectomy and the Court found "Specifically, the complaint fails to allege that Defendant

13

[Doctor] removed Plaintiff's ovaries knowing that they did not need to be removed." *Thomas v. Hickman*, CV F 06-0215 AWI SMS, at *41 (E.D. Cal. Oct. 5, 2006). Again, unlike William, the plaintiff in this case had reasoning for surgery. If the Doctor in *Thomas* told a mentally disabled plaintiff that her normal uterus in the absence of pain or findings indicating a problem with the uterus required a procedure or the plaintiff risked death and then completed the unnecessary procedure, it would have been similar to what happened to William. **William had no evidence of end stage liver disease!**

Defendants cite that "In *Merritt v. Dang*, 2006 U.S. Dist. LEXIS 10620, 2006 WL 657125 (E.D. Cal. 2006), the plaintiff alleged that he "was wrongfully led to believe he had lung cancer which required an unnecessary surgery. Plaintiff states that the Defendants failed to order a biopsy which would have revealed that surgery was unnecessary and would have prevented Plaintiff from believing he had cancer for approximately 10 months." *Id.* at *1. The court found these allegations insufficient to state an Eighth Amendment claim, and dismissed the claim with prejudice, finding that plaintiff failed to state sufficient facts to raise a cognizable Eighth Amendment claim because plaintiff did not demonstrate that defendants knew or and disregarded a serious risk to his health. *Id.* at *2."(ECF 63-1 at 11) Once again, this case is different from William's case. In *Merritt*, the plaintiff states a biopsy could have been completed prior to surgery to establish the diagnosis which was a difference of medical opinion. If the Doctor in *Merritt* had completed the biopsy and it showed no cancer (**like William's labs, ultrasound, and physical exam showed no end stage liver disease**) but despite the negative biopsy or any other evidence of lung cancer, the Doctor told the Plaintiff he needed another procedure or he risked death and then subjected the Plaintiff to the surgery, it would have been similar to what happened to William. **William had no evidence of end stage liver disease!**

In fact, as detailed in the SAC, **"William conclusively did not have cirrhosis based on his physical examination, his laboratory values and imaging studies."** Specifically, **"William had abdominal ultrasounds on 11/2015 and 4/2018 that did not show ascites, fluid in the abdomen, or other evidence of cirrhosis. His FIB4 score was repeatedly under 1. Based on the CDCR guide, a score below 1.45 did not even require further work-up for**

14

1    cirrhosis. A score of 1.45– 3.25 required a Fibro scan or liver Biopsy to determine if

2    cirrhosis was present, and a score above 3.25 was the level adequate to diagnose cirrhosis."

3    (SAC at 34)

4           The false, life-threatening diagnosis of end-stage liver disease and being subjected to the

5    unnecessary and fraudulent medical procedure further contributed to William's suffering and

6    magnified his paranoia. (SAC at 3) Even a mentally healthy non-incarcerated person would be

7    scared to be diagnosed with end stage liver disease and all the risks that come with the diagnosis

8    and medical procedures. (SAC at 36) William, a man with paranoid delusions and chronic

9    voices, told his family about his cirrhosis and they would try to explain to him not to worry about

10   cirrhosis, as he must be misunderstanding his doctors. William's paranoia was greatly magnified

11   by this false diagnosis. He was already psychotic or out of touch with reality. (SAC at 35) As a

12   direct and proximate result of Defendants Dr. Ashe, Dr. C. Smith, Dr. DeNigris, and Dr. Rudas

13   conduct, decedent William Schmitz experienced physical pain and suffering, emotional distress,

14   mental anguish and loss of his life (SAC at 51).

15          **C.  Defendant Wanie**

16          Defendants state "Plaintiffs' allegations fail to demonstrate that Wanie willfully ignored

17   Schmitz's medical needs, or that Schmitz was harmed by her indifference." (ECF 63-1 at 12).

18   **This is simply wrong.**   Wanie was William's primary clinician and the main clinician

19   responsible for William's mental health treatment.(SAC at 13)  Just four days before his death,

20   William described worsening voices to Wanie and tells Defendant Wanie, he "self-medicated" in

21   the past to treat the voices. Wanie actually observes the voices bothering William. (SAC at 44))

22   ***Wanie's plan avoids treatment of his worsening psychosis and polysubstance dependence and***

23   ***is far below a minimum standard of care.*** Tragically, a psychotic William locked in a cell alone

24   with his voices dies just 4 days later of a methamphetamine overdose.(SAC at 44)

25          In avoiding treatment of William's worsening psychosis, Primary Clinician Wanie

26   knowingly disregarded William's serious medical need. ("[A] prisoner's Eighth Amendment

27   right is violated when prison doctors or officials are deliberately indifferent to the prisoner's

28   serious medical needs." *Comstock v. McCrary* , 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle*

                                                                                                    15

1    v. Gamble , 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ). The clearly established

2    right to be free from deliberate indifference to medical needs extends to an inmate's psychiatric

3    needs. *Id.* (citing *Waldrop v. Evans* , 871 F.2d 1030, 1033 (11th Cir. 1989) ); see also *Clark–*

4    *Murphy v. Foreback* , 439 F.3d 280, 292 (6th Cir. 2006).)

5        "The state of mind for deliberate indifference is subjective recklessness." *Snow v.*

6    *McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), citing *Farmer*, 511 U.S. at 835-41. "[T]he standard

7    is less stringent in cases involving a prisoner's medical needs because the State's responsibility

8    to provide inmates with medical care ordinarily does not conflict with competing administrative

9    concerns." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), overruled on other grounds

10   (internal quotation marks omitted) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (1992)).

11   Choosing a course of treatment that is "medically unacceptable under the circumstances" and in

12   "conscious disregard of an excessive risk to plaintiff's health" is deliberate indifference. *Jackson*

13   *v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

14       William's medical record was filled with numerous mentions of thought disorder,

15   hallucinations, mania and depression. (SAC at 19-20, 27, 31, 36-37, 40, 42). William clearly had

16   a serious mental disorder that had resulted in hospitalization at Langley Porter Psychiatric

17   Hospital, Napa Valley State Hospital, and California Medical Facility Vacaville. (SAC at 19)

18   William's mental illness required multiple antipsychotic trials including Clozapine, which is

19   reserved for treatment-resistant schizophrenia.(SAC at 19) In other words, William's mental

20   illness was more severe than typical schizophrenia. Clozapine had resolved William's auditory

21   hallucinations and psychiatrist Dr. Haspel emphasized that clozapine "is a very important

22   medication for this patient as he has struggled for over 9 years with [Auditory Hallucinations]

23   and ideas of reference, so preservation of a therapeutic level is essential." (SAC at 20).

24       Defendant LCSW Wanie was William's primary clinician. (SAC at 6, 14) She had specific

25   knowledge of William's chronic voices and paranoid delusions and had the ability to review his

26   medical records and past history. Defendant Wanie had the ability to take adequate measures to

27   prevent William's ongoing and worsening psychosis and ultimately his death. However, she

28   chose not to take these measures.  Her treatment *"substantially"* deviated from "accepted

16

1   medical practice." *Whiting v. Wexford* , 839 F.3d 658, 663 (7th Cir. 2016)." *Jordan v. Wexford*

2   *Health Sources, Inc.*, No. 3:15-cv-00105-SCW, at *8 (S.D. Ill. Sep. 22, 2017) Outside of the

3   CDCR system, every mental health provider would be shocked at the level of deliberate

4   indifference displayed by Defendant Wanie.

5          Defendant Wanie willfully ignored William's medical need and William was harmed as his

6   psychosis continued and he died four days later.  Defendant Wanie's status as William's primary

7   clinician, weighs heavily in the determination about whether she knowingly disregarded a

8   serious medical need when she failed to adequately address William's psychosis. See *Gibson v.*

9   *Cnty of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002) ("A jury could also conclude that a trained

10   nurse would know that hospitalization could have relieved Gibson's condition....")). Absent an

11   admission by defendant Wanie as to her subjective state, this determination can only be based on

12   the circumstantial evidence in this case. See *Dominguez v. Corr. Med. Serv's.*, 555 F.3d 543, 550

13   (6th Cir. 2009) ("Because government officials do not readily admit the subjective component of

14   this test, it may be demonstrated in the usual ways, including inference from circumstantial

15   evidence." (internal quotation marks omitted)); *Lolli v. County of Orange*, 351 F.3d 410, 421

16   (9th Cir. 2003) ("[D]eliberate indifference to medical needs may be shown by circumstantial

17   evidence.") (citing *Farmer*, 511 U.S. at 842).

18          Plaintiffs have clearly alleged enough to survive a motion to dismiss against Officer

19   Asman, Officer Bradley, Dr. Ashe, Dr. C. Smith, Dr. DeNigris, LCSW Wanie and Dr. Rudas.

20   **II.     IN THE FOURTH CAUSE OF ACTION PLAINTIFFS STATE VALID**

21   **FOURTEENTH AMENDMENT CLAIM AGAINST DR. ASHE, DR. RUDAS,**
     **ASMAN, BRADLEY, WANIE, C. SMITH, ADAMS, LIZARRAGA, KUICH**

22   **AND DENIGRIS**

23          "Official conduct that 'shocks the conscience' in depriving [family members] of [a liberty

24   interest in the companionship and society of a family member] is cognizable as a violation of due

25   process." *Wilkenson v. Torres*, 610 F.3d 546, 554 (9ᵗʰ Cir. 2010). "'Deliberate indifference' may

26   suffice to shock the conscience." *Id.*

27          Plaintiff's factual allegations suffice to state valid claims for deliberate indifference claims

28   in the First Cause of action against Defendants Officer Asman, Officer Bradley, Dr. Ashe,

                                                                                            17

DeNigris, Dr. Rudas, Dr. C Smith and LCSW Wanie. Plaintiff's factual allegations also suffice to state valid claims for deliberate indifference in the Second and Third Cause of actions against Defendant C. Smith, Adams, Lizarraga, and Kuich. Therefore, Plaintiffs state valid Fourteenth Amendment claims against these Defendants.

### III.   PLAINTIFFS HAVE STATED A VIABLE FOR VIOLATION OF 42 U.S.C. 1985(3)

Defendants challenge Plaintiffs' conspiracy to violate Civil rights claim against Defendants Dr. Leidner, Dr. Ceballos, Tebrock, Robinson, Dr. Heatley, Dr. C Smith, Adams, Kernan, Diaz, Toche, Gipson, Brizendine, Ponciano, Rekart, Kuich, Lizarraga, and Brockenborough.

Plaintiffs factual allegations for a conspiracy to violate civil rights are incredibly strong. **It would be nearly impossible to create a set of circumstances more consistent with the intentions of this law.** If this claim cannot survive a motion to dismiss then the law should not even exist. Plaintiffs factual allegations include all allegations contained in Dr. Golding's response Re Evidentiary Hearing for the *Coleman court* exhibit D (SAC p 15). These factual allegations are directly from Dr. Golding, CDCR's own statewide Chief Psychiatrist. They include:

> It was shocking to Dr. Golding that CDCR officials under penalty of perjury claimed in the evidentiary hearing that they had no knowledge of Dr. Golding's concerns. [2]The evidentiary record in this case is replete with instances that Dr. Golding informed CDCR, including Ms. Tebrock, attorneys for CDCR, and other high level management of CDCR of the exact issues that he raised subsequently in a report to the Receiver in the Plata case.
> Dr. Golding also repeatedly raised with CDCR his concern that CDCR was presenting misleading data that formed the basis of Staffing Proposal that would cut psychiatry staff by twenty (20) percent. **After exhaustively attempting to get CDCR to respond and being rebuffed and retaliated against, and up against the time frame that an agreement would be signed and ordered by the Court based on misleading data regarding psychiatry staffing that would have wide ranging negative impacts on patient care, Dr. Golding finally provided his report to the Receiver.**

---

[2] Plaintiffs do not believe any of the Defendants were charged with perjury despite deceiving the Court. Discovery will reveal all of the people notified by Dr. Golding allowing for identification of many of the Does included in the SAC.

18

Thus, the defense narrative and testimony by former Deputy Director Tebrock and other witnesses that Dr. Golding failed to bring forward relevant data and other concerns and if he had only done so none of these proceedings involving the Court would have been necessary is false and made up from whole cloth." (emphasis added) (SAC exhibit D at 2)

**The Expert Report detailed numerous occasions that CDCR misrepresented material information. Each of these misrepresentations favored CDCR in the presentation of data and higher compliance rates.** Similarly, CDCR's practice of (a) changing the time frame to provide mandated psychiatry appointments from thirty (30) days up to sixty (60) days without informing the Office of Special Master and the Court, (b) not informing the Office of Special Master and the Court that the "appointments seen as scheduled" identifier measured something other than appointments seen as scheduled, and (c) not informing the Court or the Office of Special Master that supervisors were regularly serving as line staff also favored CDCR in showing higher level of compliance than actually existed.

The consistent pattern of demonstrating higher compliance rates using incorrect assumptions and faulty and misleading data must be considered. **These misrepresentations were no accident. Rather, they were a pattern of conduct by CDCR that when viewed as a whole demonstrates intentionally misleading and/or false information provided to the Court and Special Master for the strategic advantage of CDCR to lower the staffing in psychiatry and to eventually cease being a party to this case.** When each part is viewed together, what appears is a tableau of intentional, material misrepresentations. Sierra Pacific Indust., Inc., 682 F. 3d 1157, 1173. (emphasis added) (SAC exhibit D at 4 and 5)

The testimony at hearing, information contained within the Expert Report and the Golding **Report serves to highlight that inaccurate, inflated compliance data metrics have real world consequences for patient care and were enacted to reach predetermined strategic goals by CDCR in this case.**

**Misleading data was utilized to determine if there could be decreases in Court mandated staffing for psychiatry overall and practices to wind down this decades-long and very expensive legal battle. Data that the Expert Report indicated was inaccurate or misleading was used to support changing psychiatry staffing levels and practice across all its prisons and to incrementally end this case. Specifically, CDCR provided to Plaintiffs for the purposes of amending current Court orders a staffing report on November 20, 2018.** (emphasis added) (SAC exhibit D at 5)

Rather than address the issues detailed in this report, the report was marked by Deputy Tebrock as "attorney client privilege." This is the case even though no attorney informed Dr. Golding to go to the institutions; no

attorney informed Dr. Golding what to look for or what to ask staff about and
no attorney took party in the writing or any other aspect of the report. This
"attorney client privilege" designation resulted in the September 2018 report
not being further distributed and Dr. Golding not including this report in his
Golding Report to the Receiver. (SAC exhibit at 8)

**The manner that CDCR approached the 2018 Staffing Report also
indicates that it intended to have a predetermined result, not based on
accurate data.** (emphasis added) (SAC exhibit at 8)

It is clear from this evidence that CDCR wanted to ensure that no one upset
the apple cart and called into question the plan to lower the amount of
psychiatry staff in order for CDCR to come into compliance with this Court's
order and ultimately review its own compliance (as opposed to Court and the
Plaintiffs class oversight).

CDCR could not provide a cohesive answer regarding why it failed to
provide Drs. Golding and Kuich a copy of the 2018 Staffing Plan and
supporting data, claiming that it did not want to burden psychiatry with
unnecessary information or tasks, while admitting it pulled Drs. Golding and
Kuich in meetings about the staffing plan while not giving them the plan at
the meeting to discuss the plan. CDCR witnesses, upon questioning by the
Court, had to admit its explanation for its actions made no sense. **These
actions speak volumes regarding whether CDCR intended to provide
truthful, transparent data in support of its 2018 Staffing Plan and not
mislead the Court, Plaintiffs' counsel and the Special Master.** (emphasis
added) (SAC exhibit D at 9)

In considering the findings of the Expert Report in its totality, if CDCR is
claiming in order to lessen Court and Plaintiffs' monitoring and oversight that
patients are receiving the constitutionally minimum level of mental health
care, including timely seeing a psychiatrist in a confidential setting and
receiving required medications, the pattern of misleading data in these areas is
critical to the Court's analysis. **It is also relevant to understand the
question of intent related to why there is a pattern of false increased
compliance metrics.** (emphasis added) (SAC exhibit D at 12)

Dr. Ceballos' testimony was particularly noteworthy… Dr. Ceballos
confirmed there were other "business rules" that she changed, similar to the
change from 30 to 45 or 60 days timeliness metric, but would not or could not
detail all those she had changed without informing the Special Master,
Plaintiffs or the Court…she did not realize or understand that the Special
Master was relying upon the data that was produced. **This is not
credible….the complete lack of interest in ensuring transparency and
that accurate data is presented to the Special Master and Court was as
astonishing as it was demoralizing. Not providing this information served
a purpose. It maintained the illusion that there was higher compliance**

20

with Program Guide mandates than actually existed, and thus that
**psychiatric staffing could be reduced...**" (emphasis added) (SAC exhibit D
at 13)

The Appointments Seen as Scheduled Metric is misleading and was
changed at a critical time when decisions regarding staffing were made...The
CDCR report of Appointments seen as scheduled said 95 percent, but a
review of actual records was 42 percent. **This is a difference of 53 percent
of what was presented and the accurate data.** (emphasis added) (SAC
exhibit D at 14)

**A.  Element requirement for a claim under 42 U.S.C. § 1985 (3)**

A claim brought for violation of section 1985(3) requires "four elements: (1) a

conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of

persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his

person or property or deprived of any right or privilege of a citizen of the United States." *Sever*

*v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992)

Plaintiffs' factual allegations meet all of these elements. The first element is met as

plaintiffs allege a conspiracy to be relieved of a federal court order to provide a minimal

constitutional level of care to mentally ill inmates by generating and reporting fraudulent metrics.

(SAC at 53 and exhibit D). Element two is met as the purpose of this conspiracy was directly

aimed at denying mentally ill CDCR inmates from having access to the number of psychiatrists

required to provide minimally adequate constitutional level of care. (SAC at 39 and exhibit D).

Element three was met by several different acts, most notable and despicable was Defendant Dr.

Ceballos altering the Court ordered requirements for psychiatry evaluations and Defendant

former Deputy Tebrock knowingly submitting the fraudulently generated data to the *Coleman*

*court* (SAC at 18 and exhibit D). Finally, element four was met as William Schmitz was directly

injured by this conspiracy. The lack of competent staff in sufficient numbers resulted in

William's ongoing psychosis and death and decreased his number of psychiatric evaluations to

far below the frequency the *Coleman court* mandated is required to even attempt to provide

constitutionally adequate care. (SAC at 11 and 21)

**B.  William Schmitz was a member of a protected class**

As Defendants cite, the Ninth Circuit requires "either that the courts have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that Congress has indicated through legislation that the class required special protections." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) Defendants then cite *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993) and *Huling v. City of Los Banos*, 869 F. Supp. 2d 1139, 1145 (E.D. Cal 2012), which relies on *Heller,* a case from 1993, to state that "federal courts do not treat mental illness as a suspect or quasi-suspect class" (ECF 63-1 at 24).

However, it is the **"or that Congress has indicated through legislation that the class required special protections" from** *Sever* **that qualifies mentally ill.** Congress has specifically identified mentally ill as a "class that required special protections" in 42 U.S.C. § 10801. Specifically, 42 U.S.C. § 10801 states "(a) The Congress finds that – (1) individuals with mental illness are vulnerable to abuse and serious injury;…(3) individuals with mental illness are subject to neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning…(b) The purposes of this chapter are- (1) to ensure that the rights of individuals with mental illness are protected…"

The most recent decision by the Ninth Circuit involving 42 U.S.C. § 10801 is in *Disability Rights Mont., Inc. v. Batista*, No. 15-35770, at *5 (9th Cir. July 19, 2019) ("The Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 et seq. ("PAIMI Act"), provides funds to maintain state level agencies for the protection of and advocacy for individuals with mental illness, and provides those designated agencies with the authority to investigate and seek legal remedies for abuse of such individuals. 42 U.S.C. § 10807(a). Plaintiff DRM is the PAIMI agency for Montana. As such, DRM is the organization tasked by Congress with "ensur[ing] that the rights of individuals with mental illness are protected" and "protect[ing] and advocat[ing] for the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes" for Montana's mentally ill individuals. 42 U.S.C. § 10801(b)(1)–(2).").

Clearly, if the Ninth Circuit has found Congress "tasked" an organization with "ensur[ing] that the rights of individuals with mental illness are protected" through 42 U.S.C. § 10801 than Congress has at a minimum "indicated" through the same legislation that mentally ill are a "class that required special protections." Thus, **the requirement set by the Ninth circuit in *Sever* "that Congress has indicated through legislation that the class required special protections" is met for mentally ill like William.**

## C. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The doctrine of qualified immunity protects government officials "from liability insofar as their conduct does not violate clearly established or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 4-5 (2013) (*per curiam*) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Whether a defendant is entitled to qualified immunity is a two-part inquiry that asks: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?" *Mackinney v. Nielsen*, 69 F.3d 1002, 1005 (9th Cir. 1995) (Quoting *Act Up! Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993)). In *Anderson v. Creighton*, the Supreme Court instructed courts to examine whether the "contours of the right" in the action were sufficiently clear so that a reasonable official would understand that he or she was violating the right. 483 U.S. 635, 640 (1987).

The SAC is replete with factual allegations that CDCR Defendants function in a system of mental health care that has been found unconstitutional for over two decades. The unconstitutional care persists despite oversight by the courts and policies developed to bring CDCR to a constitutional level.(SAC at 15) Per their own Statewide Chief Psychiatrist, "the attitude that information must be hidden away, controlled and interpreted by just a few **has cost the CDCR system dearly by preventing adequate care for a large majority of CDCR mental health patients."(SAC at 47)** The federal courts have specifically "found Eighth Amendment violations and issued injunctions to address systemic problems with mental health care in all CDCR prisons" (SAC at 10) Defendants intentionally changed Court ordered policy

23

directed at providing minimally constitutionally adequate care and then knowingly submitted fraudulent data to the Court.(SAC at 53) Clearly, these government officials' conduct violated "constitutional rights of which a reasonable person would have known" *Stanton v. Sims*, 571 U.S. 3, 4-5 (2013) (*per curiam*) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009))

Defendants also claim they are entitled to qualified immunity due to intracorporate conspiracy doctrine though "the Ninth Circuit has not weighed in on whether the intracorporate liability doctrine applies to 1985 (3) conspiracy claims." (ECF 63-1 at 16)  Any analysis of intracorporate liability doctrine requires close attention to the unique circumstances that separate this case from cases cited by Defendants, *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017) and *Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1246 (9th Cir. 2019). **Unlike those cases, Defendants in this case were already found to have violated constitutional rights and repeatedly ordered by Federal Courts to correct the Constitutional violations!**

CDCR has specifically and repeatedly been found to have violated the Constitutional rights of mentally ill, "a court order on December 17, 2019, by U.S. District Judge Kimberly Mueller found truth in the whistleblower allegations that the defendants 'knowingly presented false information to the court' and 'lost sight of the remedial purposes' that **'CDCR has been found to have violated the Constitution as to the mental health program and is under a remedial order supervised by this court.'"** (SAC at 15)

The SAC summarizes at 17, "To repeat, the leader of CDCR's Statewide Mental Health Program Defendant former Deputy Katherine Tebrock knew that CDCR was not meeting the requirements placed by the Court and Special Master, particularly the level of staffing for psychiatrists. Throughout CDCR, the mental health providers were pressured to meet metrics to make it appear as if they were complying with the Court-ordered requirements. **When they still could not meet the metrics, Defendant Dr. Ceballos altered the court-ordered requirements for psychiatry visit timelines**. This fraudulent change served its purpose of changing the metrics from red to green. **However, it made the care of psychiatric patients worse and conclusively below the minimum-level the Court had already ruled was required to even attempt to meet constitutional requirements.** Dr. Golding figured out the scheme and demanded that they

24

change requirements back to the Court-ordered levels. **Undeterred, Defendant former Deputy Tebrock still submitted the fraudulent data to the Court and despite many opportunities, never corrected the fraudulent data that was knowingly presented to the Court." (SAC 17-18)**

As Defendants cite (ECF 63-1 at 16) in *Ziglar,* it was decided that the "officers would not have known for certainty that the alleged agreements were forbidden by law" due to lack of clarity as to whether the doctrine of intracorporate liability doctrine applies to 1985 (3) and therefore they were entitled to qualified immunity. *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017) at 1868-68.  In the current case, **Defendants would "have known for certainty that their alleged agreements were forbidden by law" because the "alleged agreements" in this case was to avoid compliance with Federal Court orders to correct unconstitutional  care through deception.**

Intracorporate conspiracy doctrine has been declined for civil rights cases in the First, Third and Tenth Circuits. These circuits reason that, "the doctrine, designed to allow one corporation to take actions that two corporations could not agree to do, should not be construed to permit the same corporation and its employees to engage in civil rights violations." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994); *see also Stathos v. Bowden*, 728 F.2d 15, 20 (1st Cir. 1984); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n*, 584 F.2d 1235, 1257 (3d Cir. 1978) *vacated on other grounds, sub nom. Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979). Ninth Circuit precedence would not allow intracorporate conspiracy doctrine to shield Defendants from a criminal conspiracy.  See  *U.S. v. Hughes Aircraft Co., Inc.*, 20 F.3d 974, 979 (9th Cir. 1994) ("We decline to extend the intracorporate conspiracy doctrine to criminal activity.").

The Ninth circuit has also declined to apply intracorporate conspiracy doctrine as a defense to a **civil** Racketeer Influenced and Corrupt Organizations (RICO) action (Portman v. Cnty of Santa Clara, 995 F.2d 898, 910 (9th Cir. 1993):

> Since a subsidiary and its parent theoretically have a community of interest, a conspiracy "in restraint of trade" between them poses no threat to the goals of antitrust law — protecting competition. In contrast, intracorporate

25

conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits. *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996) (adopting the rationale of *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir.1989)) (quotations omitted).

The factual allegations in the current case do meet a criminal conspiracy. Therefore, the intracorporate conspiracy doctrine should not apply to this civil case.

Individuals within CDCR were conspiring against Court orders that mandated providing a minimal level of constitutional care to mentally ill. Per the SAC at 17 "Judge Mueller's order lays out details that meet the criteria of a conspiracy within the CDCR Mental Health team to be relieved of their need to provide constitutional level care by deception. Defendant former Deputy Tebrock knowingly presented fraudulent data to the Court to alter the number of psychiatrists required to provide Constitutional medical care!" As per the SAC footnote 6 at 18, "The Court found willful blindness or reckless indifference of Dr. Ceballos for this change that was against the requirements of the Program Guide." The factual allegations of the SAC alleged against Defendants meet the general conspiracy statute, 18 U.S.C. § 371, which creates an offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose. (emphasis added). *See* Project, *Tenth Annual Survey of White Collar Crime*, 32 Am. Crim. L. Rev. 137, 379-406 (1995)(generally discussing § 371). Specifically, the "defraud part of section 371 criminalizes any willful impairment of a legitimate function of government, whether or not the improper acts or objective are criminal under another statute." *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989).

As discussed *supra*, intracorporate conspiracy doctrine would not shield Defendants from a criminal conspiracy based on Ninth Circuit precedence. This case is relatively unique, as the same factual allegations support both a criminal conspiracy and civil conspiracy. Therefore, intracorporate conspiracy doctrine should not allow Defendants to shield themselves in this civil case. See *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034 (11th Cir. 2000) ("These allegations plainly describe … criminal conspiracy in violation of 18 U.S.C. § 371. Accordingly, we hold that just as the intracorporate conspiracy doctrine cannot shield a criminal

26

conspiracy from prosecution under the federal criminal code, the doctrine cannot shield the same conspiracy, alleging the same criminal wrongdoing, from civil liability arising under 42 U.S.C. § 1985(2).")

Further, intracorporate conspiracy doctrine should not apply to this case as Plaintiffs are not alleging a conspiracy of CDCR as an entity with all of its employees acting as one. Rather Plaintiffs' allegations are against the specific individual Defendants within CDCR named in the Cause of Action as they were the individuals involved with the conspiracy. It is abundantly clear that Dr. Golding, an individual of the same organization, was not part of the conspiracy with the other individuals. Finally, as discussed in the SAC at 17, without discovery plaintiffs do not yet know the full extent of the conspiracy and if the conspiracy was confined to only individuals within CDCR.

## IV.   PLAINTIFFS HAVE STATED A VIABLE FAILURE TO PREVENT VIOLATION OF CONSTITUTIONAL RIGHTS UNDER 42 U.S.C. § 1986 IN THE SIXTH AND SEVENTH CAUSE OF ACTION

A. Plaintiffs allege all of the named defendants in this action were aware of the violations of constitutional rights of mentally ill inmates within CDCR. To support these allegations are statements by mental health leadership within CDCR that specifically comment about the widespread pressure to improve metrics no matter what it takes (SAC at 16 and exhibit D) Many of the named defendants participated in the conspiracy. However, all of these defendants were in a position to try to prevent the constitutional violations that occurred to William Schmitz but they did not.

B. Plaintiffs also argue that the Claim is barred by the statute of limitations. Defendants relate the statute to the date of William Schmitz's death, January 21, 2019. However, the date relevant is the date that Defendants were made aware that the conspiracy affected William Schmitz. This date was only after Plaintiff's were given the medical records of William Schmitz by Defendants' attorney Nygaard on, or shortly after, 26 May 2020. The several thousand pages were diligently reviewed and the claim was brought as soon as possible.

## V.  PLAINTIFFS STATE A VALID CLAIM FOR VIOLATION OF THE ADA AND REHABILITATION ACT.

Defendant CDCR challenges the Thirteenth Cause of Action for violation of Title II of the ADA, and the Rehabilitation Act. As Defendants note: "To state a claim under Title II of the ADA, the plaintiff must allege that: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability. *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1021-22 (9th Cir. 2010) (citation omitted)."

**Defendants acknowledge that Plaintiffs have sufficiently alleged that William was a qualified individual with a disability.** Defendants challenge that Plaintiffs have failed to sufficiently allege the third and fourth *Simmons* prongs. However, Plaintiffs have sufficiently alleged the third and fourth *Simmons* prong.

Defendants further state "A plaintiff can allege disability discrimination in the provision of inmate services,  programs, or activities under the ADA or the RA by pleading either (i) discrimination based on disparate treatment or impact, or (ii) denial of reasonable modifications or accommodations. *See Fortyune v. Am. Multi—Cinema, Inc.*, 364 F.3d 1075, 1086 (9th Cir. 2004). To plead disparate treatment, a plaintiff must allege that other non-disabled individuals without plaintiff's disability were treated more favorably. *See McGary*, 386 F.3d at 1265-66 (distinguishing between disparate treatment, disparate impact, and reasonable accommodation claims under the ADA). To plead disparate impact, a plaintiff must allege that a facially neutral policy has a significantly adverse or disproportionate impact on disabled persons. *See Lawman v. City and County of San Francisco*, 159 F.Supp.3d 1130, 1148 n.11 (N.D. Cal. 2016); *see also Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) ("Congress intended to protect disabled persons from discrimination arising out of both discriminatory animus and 'thoughtlessness,' 'indifference,' or 'benign neglect.'"). Inadequate or negligent medical

28

treatment alone does not constitute an unlawful failure to accommodate under the ADA or RA. *Simmons*, 609 F.3d at 1022."

Defendants claim "Plaintiffs have not sufficiently alleged what services, programs, or activities Schmitz was denied or how he was otherwise discriminated against, and that such exclusion, denial or benefits, or discrimination was because of his disability. *Simmons*, 609 F.3d at 1021-22."

However, plaintiffs have sufficient allegations in the SAC. Notably, Defendant "Dr. Johnson indicates that he agrees with William stopping the antipsychotic medications will allow William the benefits currently being denied to him solely because of using antipsychotic medications. William would no longer be 'stuck' in his cell because of the 'heat meds'." (SAC at 39) In other words, the only way William could enjoy similar benefits, specifically not being extensively confined to his cell, as those without mental illness was to stop his antipsychotic medicines. The amount of benefits denied by taking antipsychotic medications was so great that *even the prison psychiatrist* thought it was a reasonable decision to stop taking the antipsychotic medications so William could gain the benefits denied simply by taking them. These allegations meet the third and fourth *Simmons* prongs.

Further, Plaintiffs allege "Defendant CDCR violated the ADA and Rehabilitation Act by the acts and omissions of its employees and agents in: (a) failing to provide services or reasonably accommodate William Schmitz with access to CDCR programs and services; (b) failing to properly train and supervise CDCR staff, employees and officers on how to appropriately treat, monitor, and interact with disabled persons, such as William Schmitz; (c) discriminating against William Schmitz on the basis of disability by limiting his benefits and privileges based solely on his need for antipsychotic medications and by isolating and segregating him in his cell due to his mental illness. William Schmitz was denied the benefits of the services, programs, and activities of CDCR and MCSP which deprived him of mental health and medical health programs and services which would have provided the delivery of treatment, follow-up and supervision.

This denial of programs and services was the result of his disability in that he was discriminated against because of his mental illness and his use of antipsychotic medications, in that he suffered from conditions in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs and to protect himself from self-harm. Defendants' failure to train their employees, and the denial of mental and medical health care, treatment, follow-up, training, supervision resulted in the violation of Plaintiff's constitutional rights." (SAC at 60-61)

## VI.   PLAINTIFFS HAVE COMPLIED WITH THE GOVERNMENT CLAIMS ACT

Defendants challenge the Eighth, Tenth, Eleventh, Twelfth, Fourteenth, Fifteenth, and Sixteenth Causes of Action as not complying with the Government Claims Act.

### A.  William Thomas Schmitz was listed as a claimant

In Defendants' request for Judicial notice (ECF 63-2), they include exhibit one which is the government claim with number 19006520 that includes William Schmitz as a claimant. Under **"Claimant Information"** question number 5 asks for the Claimant's **"Inmate ...number, if applicable:"** The answer is **"G35384"**. G35384 was the inmate number of William Thomas Schmitz. **This means William Thomas Schmitz was a claimant.** This inmate number is specific only to William Thomas Schmitz. William's name is included 5 times on the submitted claim. There was only one area to list claimant name in the first section and it was decided to list Thomas J Schmitz under question 1. Thomas J Schmitz did not have an inmate number to allow for his identification as a Claimant in question number 5 nor was his name listed multiple times throughout the claim as that of William Thomas Schmitz. Attachment A was then included to list the claimants that were not already identified, like William Thomas Schmitz and Thomas J Schmitz.

In fact, the inmate number is so specific that Defendants through their attorneys, Jennifer Nygaard and Michael Terhorst, insisted during a conference call that the William's inmate number be placed on discovery requests. Further, Michael Terhorst, strongly emphasized the reasoning to use the inmate number to William's mother, Plaintiff Dianne Mallia, via E-mail on September 19, 2020 at 1:11 AM. **Per Attorney Michael Terhorst, "Use of William's inmate**

30

number is necessary and mandatory in the Prison system so that we, you and Mr. Schmitz **can be assured we have the 'right' documents associated with your son and no other Schmitz".**[3] Plaintiffs strongly concur with Attorney Nygaard's and Terhorst's reasoning. In fact, it is the exact reason William T. Schmitz was listed by his inmate number on government claim 19006520. For Defendants to demand William's inmate number on discovery requests because it is a better way to identify William than name but argue that William was not listed as a claimant is perplexing and disingenuous.

The Government Claims Board did not challenge the sufficiency of the claim and Plaintiffs cannot now challenge the sufficiency of the Claim, which identified William Thomas Schmitz as one of the Claimants via inclusion of both his name throughout the claim and his unique inmate number. Per Cal. Gov. Code § 911 "Any defense as to the sufficiency of the claim based upon a defect or omission in the claim as presented is waived by failure to give notice of insufficiency with respect to the defect or omission as provided in Section 910.8, except that no notice need be given and no waiver shall result when the claim as presented fails to state either an address to which the person presenting the claim desires notices to be sent or an address of the claimant."

Plaintiffs substantially complied with the form requirements and put Defendants on sufficient notice that William Schmitz was a claimant. The claims presentation requirements are intended to "provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation." City of Stockton v. Sup. Ct., 42 Cal. 4th 730, 738 (2007). **"[T]he statute should not be applied to snare the unwary where its purpose is satisfied."** (emphasis added) Stockett v. Assoc. of Cal. Water Agencies Joint Powers Ins. Authority, 34 Cal. 4th 441, 446 (2004); Connelly v. Cty. of Fresno, 146 Cal. App. 4th 29, 37-38 (2006). Barring the Estate's claims due to an ambiguous form technicality is not in the interest of justice. See Viles v. State, 66 Cal. 2d 24, 32-33 (1967) ("the well-recognized policy of the law [is] to liberally construe remedial statutes designed to protect persons within their purview, and the modern trend of judicial decision [is] in favor of granting

---

[3] Plaintiffs can supply declarations and E-mail exhibits if necessary.

31

relief unless absolutely forbidden by statute."); accord Haines v. Kerner, 404 U.S. 519, 520 (1972) (pro se complaint must be held to less stringent standards than formal pleadings drafted by lawyers).

### B. Government Claims Board rejection

The response of the Government Claims Program (GCP) on 7/31/2019 (ECF 63-2 Exhibit B) makes the intention and reasoning to reject the claim very clear. ***"The claim involves complex matters that are beyond the scope of analysis and legal interpretation typically undertaken by the GCP. Claims involving complex issues are best determined by the courts."(emphasis added)*** The GCP had more than enough information about the circumstances of the claim regardless how the information was presented. Any changes that the Defendants state were required would not have made the claim less "complex" or changed the decision that "Claims involving complex issues are best determined by the courts."

ECF 63-2 was submitted with Exhibit 1, Declaration of A. Navarro. A. Navarro is a Senior Legal Analyst with the California Department of Justice, Office of the Attorney General. **"On August 26, 2010,** [Navarro] searched" the government claims database under various terms. Despite the government claim application specifically asking for the inmate number of Claimant, the terms Navarro searched for did not include William Schmitz's unique identifier of his inmate number G35384, which would have readily identified the submitted claim. It's perplexing that Attorney Nygaard did not require an inmate number search for the claim, which actually asks for claimant inmate number, but requests inmate number on discovery requests from Plaintiffs.

In addition, A. Navarro declared she ran the search in **2010**. Plaintiffs realize this is an inadvertent mistake and the test was run in 2020, taken as a whole we can recognize the context. We believe the Court should use the same reasoning in analyzing the Government Programs claim originally submitted. This case should be decided on merits.

### C. Claims related to Endoscopy

Defendants Rudas, Ashe, C. Smith, and DeNigris further challenge the Tenth, Twelfth, Fourteenth, and Fifteenth Causes of Action in the SAC as not satisfying the Government Claims Act due to not describing the fraudulent endoscopy and resulting harm to William. (ECF 63-1 at

21). Despite repeated unsuccessful attempts to attain complete medical records of William (SAC at 24 and 33), including when their son was alive, Plaintiffs were not able to attain the majority of the medical records until finally provided by attorney Nygaard on, or shortly after, 26 May 2020. The several thousand pages were diligently reviewed and only then did Plaintiffs learn about the fraudulent diagnosis of end-stage liver disease and fraudulent unnecessary procedure their mentally ill son, William, was subjected too. The claims were then timely presented in the SAC. Plaintiffs believe the original submitted Government Claim satisfies the requirements as the endoscopy was at a minimum medical negligence, contributed to Williams's pain and suffering, worsened William's mental illness and contributed to his death. Plaintiffs included the information known to them and needed for the claim to be investigated at the time of the original Government Claim submission.

However to placate Defendants and attempt to move this case along as expeditiously as possible, Plaintiffs presented a new Government Claim regarding the fraudulent endoscopy to the Government Claims Board on September 4, 2020, well within the required six months of the accrual of the cause of action. If the Court agrees with Defendants' argument and considers the circumstances of the fraudulent endoscopy a new claim, Plaintiffs have met the exhaustion requirements and may join the claims "pursuant to <u>Federal Rule of Civil Procedure 18(a)</u>" *Crew v. Dep't of Corr. & Rehab.*, No. 1:16-cv-00590-LJO-BAM (PC), at *7 (E.D. Cal. Mar. 28, 2018). Either way, this Court should decide the State claims on the merits.

**D. Claims in the Second Amended Complaint**

Defendants further challenge State Law claims alleged in the Eighth, Tenth, Eleventh, Twelfth, Fourteenth, Fifteenth, and Sixteenth Causes of Action as untimely as they were not alleged in the First Amended Complaint (FAC). As discussed in VI. C. *supra*, Plaintiffs did not know the very specific circumstances of the claims in regards to Defendants Rudas, Ashe, C. Smith and DeNigris, in the Tenth, Twelfth, Fourteenth and Fifteenth Causes of Action until after May 26, 2020. Plaintiffs believe the initial Government Claim submission satisfied the requirements of the Government Claims Act. However if the Court disagrees and thinks the circumstances surrounding the fraudulent end stage liver disease diagnosis and unnecessary

endoscopy are too different from the original submitted government claim, the new Causes of Action are still timely presented through the additional submitted government claim. As to the other Defendants in the Eighth, Tenth, Eleventh, and Twelfth Causes of Action, the allegations were contained in the FAC and leave to amend was granted and therefore are timely presented in the SAC.

**VII.    PLAINTIFFS HAVE PLEAD STATE LAW CLAIMS WITH PARTICULARITY AS REQUIRED UNDER GOVERNMENT CODE SECTION 951**

Defendants challenge the Eighth, Ninth, Tenth and Twelfth Causes of Action brought against Diaz, Kernan, Gipson, Tebrock, Lizarraga, Adams, Kuich, and Toche as not alleging with "particularity sufficient material facts to establish liability".(ECF 63-1 at 22) However, Defendants do not argue in their Motion that Plaintiffs failed to state valid §1983 claims against these Defendants. Defendants presented similar arguments against the Supervisory Liability §1983 Claims in their Motion to Dismiss FAC (ECF 22-1) which were denied by the Court. Nevertheless, Defendants reintroduce similar arguments to challenge the State Claims. As Plaintiffs have met the pleading requirements for the §1983 Claims, they are also met in the Eighth, Ninth, Tenth and Twelfth Causes of Action.

**VIII.   THE SUPERVISORY DEFENDANTS ARE NOT IMMUNE FROM SUIT UNDER GOVERNMENT CODE 820.8**

Defendants again try to use a similar argument the Court has already rejected in their Motion to Dismiss FAC (ECF 22-1). Defendants Brockenborough, Heatley, Brizendine, Diaz, Gipson, Kernan, Kuich, Ponciano, Rekart, Adams, Tebrock, Lizarraga, Kuich and Toche challenge that "A public employee cannot be liable for the acts or omissions of others." (ECF 63-1 at 22) As alleged in the SAC and discussed *infra,* these Defendants are not being held liable for the acts of others but for their own actions and failures. Plaintiffs' have sufficiently alleged claims in the Ninth, Tenth, and Twelfth Causes of Action and are not barred by Cal. Gov. Code § 820.8.

## IX.  PLAINTIFFS HAVE PLED A VIABLE SURVIVOR ACTION FOR NEGLIGENT SUPERVISION, TRAINING, HIRING AND RETENTION UNDER CALIFORNIA LAW IN THE EIGHTH CAUSE OF ACTION.

In its order on motion to dismiss the FAC, the Court ruled "Plaintiffs have adequately alleged system-wide constitutional deprivations and failure to adequately train and supervise those tasked with safeguarding [William's] constitutional rights" (*Schmitz v. Asman,* No. 2:20-cv-00195-JAM-CKD PS at *10-11 (E.D. Cal. June 25, 2020) This applied to Defendants Dr. Heatley, Brockenborough, Lizarraga, Dr. Ceballos, and Katherine Tebrock all named in the FAC. The allegations of the SAC are fundamentally the same with additional factual allegations added. Thus, plaintiffs allegations against all supervisory Defendants, including those added to the SAC[4], are sufficient to meet the standard of deliberate indifference in the Second and Third Causes of Action under federal law. The same conduct, or less culpable such as negligence, will support negligent supervision, training hiring and retention under state law. Therefore, the allegations suffice for a viable survivor action supervisory claim under California Law against all Defendants named in the Eighth Cause of Action.

## X.  PLAINTIFFS HAVE PLEAD VIABLE WRONGFUL DEATH ACTION IN THE NINTH CAUSE OF ACTION

Plaintiffs claim against Diaz, Kernan, Gipson, Tebrock, Toche, Lizarraga, and Kuich is not barred by the heightened pleading standard of Government Code Section 951. (see Argument VII)

Defendants Brockenborough, Heatley, Brizendine, Diaz, Gipson, Kernan, Kuich, Ponciano, Rekart, Tebrock, Lizarraga, Kuich and Toche are not immune from suit under Government Code 820.8. (see argument VIII)

As alleged in the SAC and discussed in Section I, II and IV, *supra,* Plaintiffs' allegations suffice to meet the standards of the claims under federal law. Therefore, the state law claims against all Defendants named in the Ninth Cause of Action are sufficient because the same

---

[4] Dr. C. Smith, Dr. J. Adams, Scott Kernan, Ralph Diaz, Connie Gibson, Diana Toche, Dr. Brizendine, Ponciano, Dr. J. Reckart, Dr. D Leidner, Dr. Kuich

35

conduct (or less culpable conduct such as negligence) will support a wrongful death claim under state law. See *Wright v. Yanos*, No. 2:15-cv-02671-TLN-CKD, at *10 (E.D. Cal. Dec. 5, 2017) ("California Code of Civil Procedure § 377.60 creates an action for wrongful death only when the death "is caused by the wrongful act or neglect of another." The phrase "wrongful act" is defined as a "tortious act," including either negligent or intentional wrongful conduct. *Barrett, et al., v. Super. Ct. of Riverside Cty., et al.*, 222 Cal. App. 3d 1176, 1183, 1191 (1990) (interpreting former Cal. Civ. Proc. Code § 377, now Cal. Civ. Proc. Code § 377.60). As such, the plaintiffs can prevail on a wrongful death claim by merely establishing negligence, which has been defined as "the want of such care as a person of ordinary prudence would exercise under the circumstances of the case, [and] may consist in heedlessly doing an improper thing or heedlessly refraining from doing a proper thing." *Crabbe v. Rhoades*, 101 Cal. App. 503, 510 (1929).")

## XI. CLAIMS AGAINST DEFENDANT STEPHEN DENIGRIS

Defendant DeNigris submitted a separate motion to dismiss (ECF 64-1) challenging that "Plaintiffs have failed to state a cause of action upon relief can be granted against Dr. DeNigris for Deliberate Indifference, Substantive Due Process, Coercion, Medical Battery or Assault." (Id. At 2)  First it is important to clarify the factual allegations. The severely mentally ill man that suffered and died at MCSP was "William Schmitz" not "Thomas Schmitz" as stated (Id. At 2)

### A. Defendant Stephen DeNigris was acting under the color of state law

Plaintiffs allege defendant Dr. DeNigris was working for Secure MD On-site Endoscopy (SAC at 8).  Secure MD On-site Endoscopy came to the prison to complete the procedure (SAC at 34).  Dr. DeNigris was responsible for ensuring the procedure was "clinically indicated and that [William understood] the risks, benefits, alternatives, and indications for the procedure." (SAC at 39-40). Based on Ninth circuit precedence a contract physician, like Dr. DeNigris, is considered to be acting under color of state law. See *Rawson v. Recovery Innovations, Inc.*, No. 19-35520, at *16 (9th Cir. Sep. 9, 2020) ("The Supreme Court has recognized that private parties may act under color of state law when they exercise powers traditionally held by the state. As noted above, the Supreme Court in *West v. Atkins*, 487 U.S. 42 (1988) held that a private contract

36

physician rendering treatment services for prisoners at a state prison acted under color of law. *Id.*
at 57")

### B.   Defendant Stephen DeNigris was deliberately indifferent

As discussed in the SAC and *supra* in I and VI, the fundamental allegation against Dr.
DeNigris is he performed an unnecessary procedure on William "solely for financial gain." (SAC
at 40). Therefore, the "consent was based on fraud and invalid." (SAC at 62). William was
coerced into having the procedure as "he risked death from bleeding into his throat from possible
esophageal varices if he refused the unnecessary fraudulent procedure."(SAC at 60) Although
Dr. DeNigris claims he "did not diagnose end stage liver disease" (ECF 64-1), "Dr. DeNigris
recommended another endoscopy in three years; another completely unnecessary procedure for
the made-up diagnosis of cirrhosis." (SAC at 40). This is not a conclusory recitation. As a
physician and surgeon, Defendant DeNigris, MD, PhD should know that if he "did not diagnose
end stage liver disease", he should not have recommended another endoscopy. Dr. DeNigris
ordered a repeat endoscopy in three years, which is the time period to repeat an endoscopy for
screening in someone with end stage liver disease. Regardless, as explained in I *supra*, based on
all the facts the most likely conclusion for the endoscopy was fraud. All claims against
Defendant DeNigris should survive a Motion to Dismiss.

Defendant DeNigris also argues that "If anything, Plaintiffs allegations of inadequate
consent amount to negligence, and are duplicative for their cause of action for professional
negligence."(ECF 64-1 at 9)  However, despite Defendant DeNigris's interpretation of medical
consent, **a consent based on fraud is not consent.**  (Consent may be invalidated if the act
exceeds the scope of the consent or if the consent is fraudulently induced. (*Barbara A. v. John G.*
(1983) 145 Cal.App.3d 369, 375 [193 Cal.Rptr. 422].) Liability may be found where a physician
"intentionally deceive[s] another into submitting to otherwise offensive touching to achieve a
nontherapeutic purpose known only to the physician." (*Rains v. Superior Court* (1984) 150
Cal.App.3d 933, 941 [198 Cal.Rptr. 249].)  See *Daum v. Spinecare Medical Group, Inc.*, 52
Cal.App.4th 1285, 1308 (Cal. Ct. App. 1997) ("subject is entitled to a copy of the consent form,
and his or her consent must be voluntarily and freely given, without any element of deceit,

37

1  duress, or undue influence. (Health Saf. Code, §§ 24172, subd. (i), and 24173, subds. (a), (b),

2  (c).) 21 Code of Federal Regulations, section 50.20 (1996)") Fraud can be found in making a

3  misstatement of fact, as well as in the concealment of a fact: "Actual fraud involves conscious

4  misrepresentation, or concealment, or non-disclosure of a material fact which induces the

5  innocent party to enter the contract." (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d

6  123, 128 [54 Cal.Rptr. 533].)

7      **A failure to obtain consent for a medical procedure is battery**.  See *Keehn v. La Jolla*

8  *Cosmetic Laser Clinic*, D068229, at *37 (Cal. Ct. App. July 29, 2016) ("The California Supreme

9  Court has explained that in the medical context, a battery occurs where "a doctor obtains consent

10  of the patient to perform one type of treatment and subsequently performs a substantially

11  different treatment for which consent was not obtained." (*Cobbs v. Grant*, *supra*, 8 Cal.3d 229,

12  239; see also *id.* at p. 240 ["The battery theory should be reserved for those circumstances when

13  a doctor performs an operation to which the patient has not consented"].) ") See *Daum v.*

14  *Spinecare Medical Group, Inc.*, 52 Cal.App.4th 1285, 1313 (Cal. Ct. App. 1997) ("The trial

15  court correctly refused the Daums' request for BAJI No. 6.10.5, which explains that the

16  performance of an operation without the patient's consent is a battery. "The battery theory should

17  be reserved for those circumstances when a doctor performs an operation to which the patient

18  has not consented.")

## XI.  PUNITIVE DAMAGES AGAINST THE HEALTH-CARE-PROVIDER DEFENDANTS

21      Defendants challenge punitive damages against Ashe, Andaluz, Branman, Brizendine,

22  Brockenborough, Ceballos, Heatley, J. Johnson, R. Johnson, Kuich, Leidner, Ponciano,

23  Ramkumar, Rekart, Robinson, Rudas, C. Smith, M. Smith, Toche, DeNigris, and Wanie in the

24  Eighth, Ninth, Tenth, Twelfth, Fourteenth, and Fifteenth Causes of Action should be dismissed

25  based on  Cal. Civ. Proc. Code § 425.13. (ECF 63-1 at 27-28)

26      Plaintiffs request for punitive damages should not be dismissed.  See *Scalia v. Cnty.*

27  *of Kern*, 308 F. Supp. 3d 1064, 1091 (E.D. Cal. 2018) ("California district courts have split on

28  whether Section 425.13 applies in federal court, and the Ninth Circuit has not resolved the

split. *Elias* , 2017 WL 1013122, at *5. Most courts addressing the issue have examined whether the rule is a procedural one that would not apply in federal court, or a substantive one that it would. *See Erie R.R. Co. v. Tompkins* , 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In *Jackson v. E. Bay Hosp.* , the court held that Section 425.13"is essentially a method of managing or directing a plaintiff's pleadings, rather than a determination of substantive rights" and declined to apply it, finding that the procedural hoop was not "so intimately bound up" with the substantive law that it must be applied in a diversity case. 980 F.Supp. 1341, 1352 (N.D. Cal. 1997). Relying on the California Supreme Court's explanation that the purpose of the rule was to establish a pretrial mechanism to determine whether an action for punitive damages would be allowed to proceed, the court declined to graft this requirement onto federal litigation because "federal courts readily accomplish the purposes contemplated by section 425.13through their case management procedures. Section 425.13 does not supplant those." *Id.* at 1353 (citing *Cent. Pathology Serv. Med. Clinic, Inc. v. Superior Court* , 3 Cal. 4th 181, 189, 10 Cal.Rptr.2d 208, 832 P.2d 924 (1992). *See also Burrows v. Redbud Cmty. Hosp. Dist.* , 188 F.R.D. 356, 361 (N.D. Cal. 1997) ("[S]ection 425.13 is a procedural rule for managing and directing pleadings: it does not create substantive limits on the damages a plaintiff may seek."). One district court found Section 425.13 to be a procedural rule inapplicable in federal court because it conflicts with Federal Rule of Civil Procedure 8(a)(3), which provides that "[a] pleading that states a claim for relief must contain ... a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3). The court in *Estate of Prasad ex rel. Prasad v. County of Sutter* held that "because Rule 8(a)(3) allows a plaintiff to request in her initial complaint all the relief she seeks, it says implicitly, but with unmistakable clarity[,] that a plaintiff is not required to wait until a later stage of the litigation to include a prayer for punitive damages, nor is she required to proffer evidence or obtain leave of court before doing so." 958 F.Supp.2d 1101, 1121 (E.D. Cal. 2013) (quoting *Cohen v. Office Depot, Inc.* , 184 F.3d 1292, 1298 (11th Cir. 1999) (internal quotation marks omitted) (construing similar state law requiring leave of court to plead punitive damages claim), *opinion vacated in part on other grounds on reh'g* , 204 F.3d 1069 (11th Cir. 2000) ). The Court agrees with the

logic of these cases and holds that Section 425.13 does not affect the substance of the negligence claim or burden of proof for punitive damages but merely manages the pleadings by dictating how and when a plaintiff may plead the request. The claim for punitive damages survives for now. Defendants' motion to dismiss the prayer for punitive damages is **DENIED** .")

## CONCLUSION

Plaintiffs respectfully request the court to deny the motion to dismiss. To any extent the court grants the motion, Plaintiffs request leave to amend the dismissed claims.

Dated: October 14, 2020                                    Respectfully submitted,

Thomas J. Schmitz

Dianne Mallia

# CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT

\* You must serve each document you file by sending or delivering to the opposing side. Complete this form, and include it with the document that you file and serve. \*

1. **Case Name:** _Thomas Schultz, et al_ v. _A. Asman et al._

2. **Case Number:** _2:20-cv00195 - JAM-CKD_

3. **What documents were served?**   **PLAINTIFFS' OPPOSITION TO DEFENDANTS 12(b)(6) MOTIONS TO DISMISS SECOND AMENDED COMPLAINT**

4. **How was the document served?**

   [X] Placed in U.S. Mail

   [ ] Hand-delivered

   [ ] Sent for delivery (e.g., FedEx, UPS)

   [ ] Sent by fax (if the other party has agreed to accept service by fax)

5. **Who did you send the document to?** *[Write the full name and contact information for each person you sent the document. Do NOT send Initial Disclosures to the Court.]*

   **Vanessa N. Raven**
   **Low McKinley & Salenko, LLP**
   2150 River Plaza Dr., Suite 250
   Sacramento, California 95833

6. **When were the documents sent?**   _10/14/2020_

7. **Who served the documents?** *[Whoever puts it into the mail, faxes, delivers or sends for delivery should sign, and print their name and address. You can do this yourself.]*

   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

   **Signature:** _____

   **Name:** _Rose Swift_

   **Address:** _1753 Woodleaf Circle_
   _Roseville, CA 95747_

**CERTIFICATE OF SERVICE** *[JDC TEMPLATE Rev. 05/2017]*

# CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT

*\* You must serve each document you file by sending or delivering to the opposing side. Complete this form, and include it with the document that you file and serve. \**

1. **Case Name:** _Thomas Schultz, et al_ v. _A. Asman et al._

2. **Case Number:** _2:20-cv-00195 - JAM-CKD_

3. **What documents were served?**
4. **How was the document served?**

   **PLAINTIFFS' OPPOSITION TO DEFENDANTS 12(b)(6) MOTIONS TO DISMISS SECOND AMENDED COMPLAINT**

   [X] Placed in U.S. Mail

   [ ] Hand-delivered

   [ ] Sent for delivery (e.g., FedEx, UPS)

   [ ] Sent by fax (if the other party has agreed to accept service by fax)

5. **Who did you send the document to?** *[Write the full name and contact information for each person you sent the document. Do NOT send Initial Disclosures to the Court.]*

   Jennifer J. Nygaard
   1515 Clay Street 20th Floor
   PO Box 50550
   Oakland, CA 94612

6. **When were the documents sent?** _10/14/2020_

7. **Who served the documents?** *[Whoever puts it into the mail, faxes, delivers or sends for delivery should sign, and print their name and address. You can do this yourself.]*

   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

   **Signature:** _[signature]_

   **Name:** _Rose Swift_

   **Address:** _1753 Woodleaf Circle_
   _Roseville, CA 95747_

**CERTIFICATE OF SERVICE** *[JDC TEMPLATE Rev. 05/2017]*

# CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT

*\* You must serve each document you file by sending or delivering to the opposing side. Complete this form, and include it with the document that you file and serve. \**

1. Case Name: _Thomas Schultz, et al_ v. _A. Asman et al._

2. Case Number: _2:20-cv00195 - JAM-CKD_

3. What documents were served?   **PLAINTIFFS' OPPOSITION TO DEFENDANTS 12(b)(6) MOTIONS TO DISMISS SECOND AMENDED COMPLAINT**

4. How was the document served?

   [X] Placed in U.S. Mail

   [ ] Hand-delivered

   [ ] Sent for delivery (e.g., FedEx, UPS)

   [ ] Sent by fax (if the other party has agreed to accept service by fax)

5. Who did you send the document to? *[Write the full name and contact information for each person you sent the document. Do NOT send Initial Disclosures to the Court.]*

   Michael Terrhorst
   Beeson Terhorst LLP
   510 Bercut Drive, Suite V
   Sacramento, CA 95814

6. When were the documents sent?   _10/14/2020_

7. Who served the documents? *[Whoever puts it into the mail, faxes, delivers or sends for delivery should sign, and print their name and address. You can do this yourself.]*

   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

   Signature: _____

   Name: _Rose Swift_

   Address: _1753 Woodleaf Circle_
   _Roseville, CA 95747_

**CERTIFICATE OF SERVICE** *[JDC TEMPLATE Rev. 05/2017]*