UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS SCHMITZ, et al., | No.  2:20-cv-00195-JAM-CKD PS |
| Plaintiffs, | |
| v. | ORDER AND FINDINGS AND RECOMMENDATIONS |
| A. ASMAN, et al., | (ECF Nos. 63, 64) |
| Defendants. | |

Presently before the court are defendants' motions to partially dismiss the Second Amended Complaint (ECF No. 44), to which plaintiffs have responded and defendants have replied.[1]  (ECF Nos. 63, 64, 65, 68, 70, 75, 76-79.)  These motions were taken under submission pursuant to Local Rule 230(g).  (ECF No. 82.)  As set forth below, the court DENIES IN PART and recommends GRANTING IN PART defendants' motions to dismiss.

////

////

////

////

---

[1] Plaintiffs are proceeding pro se, and this action is before the undersigned pursuant to Eastern District of California Local Rule 302(c)(21).

**BACKGROUND**[2]

This matter concerns the death of William Schmitz ("Decedent") while incarcerated at Mule Creek State Prison ("MCSP"), under the authority of the California Department of Corrections and Rehabilitation ("CDCR").  Plaintiffs Thomas Schmitz and Dianne Mallia—Decedent's father and mother—bring this action individually on their own behalves and also as successors in interest to Decedent's estate.  The Second Amended Complaint ("SAC") asserts 16 causes of action and names 32 defendants, including the CDCR and 28 CDCR employees and officials ("the CDCR defendants")[3]; two former CDCR officials, Dr. Kevin Kuich and former MCSP warden Joe Lizarraga; and Dr. Stephen DeNigris, a private doctor who contracts with the CDCR.  (ECF No. 44 at 3-9.)  The court describes in detail only the SAC allegations pertinent to resolving the present motions.

### A.   Factual Background

Generally, plaintiffs allege that Decedent was removed from critical antipsychotic medications and the prison's Enhanced Outpatient Program (EOP)—a high-level outpatient psychiatric care program—and that these two decisions resulted in Decedent's death via methamphetamine overdose on January 21, 2019.[4]  (ECF No. 44 at 3.)  Plaintiffs allege that these decisions took place against the backdrop of systemic problems with mental health care in CDCR prisons, as highlighted in the Coleman v. Brown lawsuit[5] which resulted in court-supervised

---

[2] Unless otherwise indicated, the factual background is taken from plaintiffs' Second Amended Complaint.  (ECF No. 44.)

[3] On August 31, 2020, after filing the SAC, plaintiffs voluntarily dismissed without prejudice all claims against one of the named CDCR defendants, Dr. Michael Golding, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  (ECF No. 61.)

[4] It remains unclear whether plaintiffs assert Decedent's death was an accidental overdose or a suicide.  (See ECF No. 44 at 3 ("A psychotic [Decedent] was forcibly given or ingested two bindles of methamphetamine.").)

[5] That ongoing litigation has carried the names of various California governors over the years and stems from a 1995 decision finding Eighth Amendment deliberate indifference violations due to the CDCR being "significantly and chronically understaffed in the area of mental health care services."  Coleman v. Wilson, 912 F. Supp. 1282, 1307 (E.D. Cal. 1995).  Decades of ongoing remedial efforts have followed.

1    monitoring of CDCR mental health care that continues today.  (Id. at 10-18.)  Plaintiffs also

2    emphasize a December 2019 order in that case finding that CDCR knowingly presented

3    misleading information to the court in 2017 and 2018 so as to be relieved of further court

4    monitoring.  (Id. at 15-16, 47-48.)  See Coleman v. Newsom, 424 F. Supp. 3d 925, 939-56 (E.D.

5    Cal. 2019).  Plaintiffs allege that, as part of this scheme to feign compliance, inmates who should

6    have been in EOP—like Decedent—were excluded from the program in order to show improved

7    metrics.  (Id. at 16.)  In addition, they say that between December 2016 to April 2017, the CDCR

8    changed the requirement that EOP patients be seen by a psychiatrist every 30 days, instead

9    allowing up to 60 days to "count as compliant on the metrics" reported to the court.  (Id.

10   at 16-17.)  This change was approved by defendant Dr. Laura Ceballos, the Mental Health

11   Administrator of Quality Management for CDCR's Statewide Mental Health Program ("SMHP"),

12   a program developed to comply with the Coleman monitoring.  (Id. at 7-8, 12, 16-17.)  Dr. David

13   Leidner, a Senior Psychologist Specialist on the Quality Management team, was also involved in

14   implementing the change.  (Id. at 8, 16-17, 21.)  And plaintiffs allege that, in March 2017, CDCR

15   Deputy Director of SMHP Katherine Tebrock—who was responsible for overseeing all CDCR

16   mental health care—"knowingly presented fraudulent data to the Court to alter the number of

17   psychiatrists required to provide [c]onstitutional medical care."  (Id. at 7, 17-18.)

18          Decedent had a long history of mental illness and schizophrenia, conditions which caused

19   him to experience auditory hallucinations and to self-medicate with illicit drugs.  (Id. at 2-3, 19.)

20   Decedent was incarcerated for shooting and killing a man while in a psychotic state; he was in

21   CDCR custody at MCSP from February 2009 until his death.  (Id. at 19.)  From the start of his

22   incarceration until May 2018, Decedent was in EOP—the "highest level of outpatient psychiatric

23   care for mentally disordered inmate-patients."  (Id. at 19.)  Even so, plaintiffs allege that

24   Decedent received unconstitutionally poor mental health care from as early as November 2015

25   through the time of his death in 2019.  The SAC describes a series of sporadic appointments with

26   various medical provider defendants who did not appropriately review Decedent's medical record

27   or heed his history of symptoms and responses to various psychotropic medications.  (Id.

28   at 20-31.)  Accordingly, Decedent's hallucinations, insomnia, and manic episodes continued with

3

1  only occasional periods of improvement.[6]  (Id.)

2  On February 9, 2018, defendant MCSP physician Dr. Robert Rudas filled out a "physician

3  request for services" for Decedent stating, "Patient with cirrhosis/[end stage liver cancer].  Per

4  registry protocol patient is due for esophageal varices follow-up/surveillance."  (Id. at 8, 34

5  (capitalization altered to sentence case).)  Dr. Rudas requested that an "On-site" contracting

6  medical provider complete the procedure by May 9, 2018, but Dr. Rudas left blank the section of

7  the form for "Summary of preliminary or diagnostic work up."  (Id. at 35.)  The prison's Chief

8  Medical Officer Executive, defendant Dr. Christopher Smith then "inappropriately" approved the

9  form twice, once on February 12 and again on March 16.  (Id. at 6, 35.)  At a March 8, 2018 visit,

10  Decedent's "primary medical doctor," defendant Dr. Marianna Ashe, noted that Decedent "[d]oes

11  not have a known history of cirrhosis"; and Decedent's blood work indicated a low "FIB4 score"

12  which (plaintiffs say) indicated "no need to evaluate for cirrhosis."[7]  (Id.)  Dr. Ashe noted that

13  Decedent had an upcoming abdominal ultrasound, but did not mention the endoscopy in her

14  notes, nor did she counsel Decedent regarding the accuracy of his liver disease diagnosis.  (Id.

15  at 35.)

16  On March 14, 2018, at Dr. Rudas' instruction, Decedent was educated about his upcoming

17  endoscopy.  Dr. Rudas' order was to "Explain to [Decedent] that an EGD has been scheduled for

18  him.  Records show he has advanced liver disease/cirrhosis that puts him at risk for bleeding from

19  the veins in his esophagus (esophageal varices).  With an EGD the veins can be treated."  (Id.

20  at 36.)  Decedent's paranoia was "greatly magnified" by his "false diagnosis" of cirrhosis/end

21  stage liver disease, and the risk of "bleeding to death from veins in his esophagus."  (Id. at 33,

22  35.)  His family did not believe him when he shared the diagnosis, thinking he must be delusional

23  or misunderstanding his doctors, since he had only recently developed Hepatitis C.  (Id. at 33.)

24  ////

25

26  [6] Because the defendants implicated in this portion of the SAC have not moved to dismiss the
claims against them, the court does not describe these appointments in detail.

27  [7] "Cirrhosis is a late stage of scarring (fibrosis) of the liver caused by many forms of liver
diseases and conditions, such as hepatitis and chronic alcoholism."

28  https://www.mayoclinic.org/diseases-conditions/cirrhosis/symptoms-causes/syc-20351487.

1        Around the same time, in the spring of 2018, medical staff decided to transfer Decedent to

2   a lower level of psychiatric care, known as the Correctional Clinical Case Management System

3   ("CCCMS"), citing Decedent's poor attendance in EOP group meetings.  (Id. at 36-38.)  CCCMS

4   is for "inmate patients that can function in the general population and do not require a clinically

5   structured, therapeutic environment."  (Id. at 38.)  Decedent asked to remain in EOP, as he "did

6   not want to be on his meds and 'stuck' in his cell."  (Id. at 37.)  But on April 30, 2018, after nine

7   years in EOP, Decedent was officially transferred to the CCCMS level of care.  (Id.)  According

8   to plaintiffs, he was transferred because it would "help CDCR look better on their healthcare

9   monitoring metrics and give the appearance of better care than actually provided."  (Id. at 38.)

10        Following this transfer, doctors "completely stopped [Decedent's] antipsychotic

11   medications," despite noting that Decedent reported "chronic [auditory hallucinations] of low

12   level voices," because stopping the antipsychotic medications would prevent him from being

13   "'stuck' in his cell because of the 'heat meds.'"  (Id. at 39.)

14        On May 4, 2018, Decedent underwent the "fraudulent endoscopy," from which he awoke

15   in "physical pain."  (Id.)  An on-site contracting physician, defendant Dr. DeNigris, performed the

16   procedure and found "no evidence of Portal Hypertension specifically; No esophago-gastric

17   varices . . ." but recommended another endoscopy in three years.   (Id. at 40.)  However, the

18   procedure was incorrectly coded as an "Esophagogastroduodenoscopy, flexible, transoral; with

19   band ligation of esophageal/gastric varices," making it look like Decedent had esophageal varices

20   that were treated.  (Id.)

21        Notations from Decedent's health care visits over the rest of 2018 showed that, without

22   any antipsychotic medication, Decedent experienced a resurgence in his auditory hallucinations,

23   paranoia, and insomnia—which providers still took no action to address.  (Id. at 40-44.)

24         On January 17, 2019, four days before his death, Decedent met with his new MCSP

25   social worker, defendant Violka Wanie.  (Id. at 44.)  Wanie noted that Decedent denied that his

26   psychosis was substance induced, but Decedent told her that he "self-medicated when [he] started

27   hearing voices to help [him] deal with them."  (Id.)  Upon hearing these reports from Decedent,

28   Wanie took no action other than to recommend dormitory exclusion.  (Id.)

The SAC describes a coroner's report that places Decedent's "last known interaction" at 6:35 AM on January 21, 2019 with defendant Officer Adam Asman.   (Id.)  Officer Asman reportedly "saw water was flowing out from [Decedent's] cell," but he did not inspect the cell, contrary to CDCR policy.  (Id.)  Plaintiffs further state that the report noted that fellow defendant Officer Erik Bradley "did not see [Decedent] during his routine check" that day at 2:15 PM.  (Id. at 45.)  Bradley stated there was "an obstruction on the bottom half of the cell window," which he did not remove to positively identify Decedent, also contrary to CDCR policy.  (Id.)  Decedent's body was discovered at approximately 2:30 PM by another inmate.  (Id.)  Bradley and another officer responded to the discovery and "found [Decedent] stiff and cold, slumped over on the toilet."  (Id.)

On January 22, 2019, Dr. C. Smith authored the MCSP Death Report in which he failed to accurately report the events and circumstances leading up to the death.  (Id.)  For instance, Dr. Smith omitted Decedent's recent complaints of auditory hallucinations, did not list any psychiatric illness, and mentioned no diagnosis of cirrhosis—despite having approved the unnecessary endoscopy less than a year prior.  (Id.)

Defendant Sergeant David Brunkhorst told the Coroner that Decedent "had a history of smuggling drugs and likely got them from a visitor," although Decedent had no such history.  (Id. at 5, 46.)  The coroner's report attached to the SAC reflects an accidental "massive overdose of methamphetamine" due to "leakage or rupture of bindle(s) of methamphetamine ingested for purposes of drug smuggling."  (Id. at 69.)  It makes no mention of Decedent's mental illness. Plaintiffs assert that this "convenient scenario" was adopted to ensure minimal investigation, as Decedent's "death occurred at a particularly inconvenient time for MCSP and CDCR" as they were "desperately trying to get out from under the court injunction as a result of [the] Coleman v. Brown lawsuit."  (Id. at 46.)

**B.    Procedural History**

Plaintiffs filed the present suit on January 27, 2020 and filed their First Amended Complaint ("FAC") on February 26, 2020.  (ECF Nos. 1, 6.)  The defendants named in the FAC filed motions to dismiss the case in its entirety (ECF Nos. 22, 23), which the court denied in part

6

1  and granted in part, permitting plaintiffs to file another amended complaint (ECF No. 41).  On

2  July 16, 2020, plaintiffs filed their SAC, amending certain claims and adding 11 new causes of

3  action and 14 more defendants.  (ECF No. 44.)  On August 31, 2020, the CDCR defendants and

4  Dr. DeNigris, represented by independent counsel, filed motions to partially dismiss the SAC

5  (ECF Nos. 63, 64), which are presently before the court.[8]  Dr. Kuich and former Warden

6  Lizarraga, also represented by independent counsel, have joined the CDCR defendants' motion to

7  dismiss—as has Dr. DeNigris.  (ECF Nos. 65, 70.)

8  **LEGAL STANDARDS**

9         In considering a motion to dismiss for failure to state a claim upon which relief can be

10  granted, the court must accept as true the allegations of the complaint in question, <u>Erickson v.</u>

11  <u>Pardus</u>, 127 S. Ct. 2197, 2200 (2007), and construe the pleading in the light most favorable to the

12  plaintiff, <u>see</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).

13         In order to avoid dismissal for failure to state a claim a complaint must contain more than

14  "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a cause

15  of action."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555-557 (2007).  In other words,

16  "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

17  statements do not suffice."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  Furthermore, a claim

18  upon which the court can grant relief has facial plausibility.  <u>Twombly</u>, 550 U.S. at 570.  "A

19  claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

20  the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 556 U.S.

21  at 678.

22         In ruling on a motion to dismiss pursuant to Rule 12(b), the court "may generally consider

23  only allegations contained in the pleadings, exhibits attached to the complaint, and matters

24  properly subject to judicial notice."  <u>Outdoor Media Group, Inc. v. City of Beaumont</u>, 506 F.3d

25  895, 899 (9th Cir. 2007).  Defendants have requested this court take judicial notice of certain

26  documents.  (ECF No. 63.2.)  That request will be granted.

27  ───────────────

28  [8] On September 9, 2020, through state counsel, defendant Adams also joined the CDCR defendants' motion to partially dismiss.  (ECF No. 68.)

1 **DISCUSSION**

2      Defendants move to dismiss the claims against some or all defendants in each of the

3 SAC's sixteen counts.  (ECF Nos. 63, 64.)  Because the court recommends granting dismissal as

4 to some defendants and denying dismissal as to others, the court will address defendants'

5 arguments in the order presented.

6      **A.**     **Deliberate Indifference**

7      The SAC's First Cause of Action is for deliberate indifference in violation of the Eighth

8 Amendment.  (ECF No. 44 at 49-50.)  Defendants argue that the SAC fails to state a claim for

9 deliberate indifference against (1) defendants Asman and Bradley, the officers on duty the day of

10 Decedent's death; (2) defendant Drs. Ashe, DeNigris, Rudas, and C. Smith (the "endoscopy

11 defendants"), the healthcare providers involved with Decedent's endoscopy; and (3) defendant

12 Wanie, Decedent's social worker who met with him days before his death.

13      "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

14 must show 'deliberate indifference to serious medical needs.'"  Jett v. Penner, 439 F.3d 1091,

15 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  The two-part test for

16 deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by

17 demonstrating that failure to treat a prisoner's condition could result in further significant injury

18 or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need

19 was deliberately indifferent."  Jett, 439 F.3d at 1096; Wilhelm v. Rotman, 680 F.3d 1113, 1122

20 (9th Cir. 2012).

21      Deliberate indifference is shown where the official is aware of a serious medical need and

22 fails to adequately respond.  Simmons v. Navajo Cty., 609 F.3d 1011, 1018 (9th Cir. 2010).

23 "Deliberate indifference is a high legal standard," Simmons, 609 F.3d at 1019; Toguchi v. Chung,

24 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was a "purposeful act or failure to

25 respond to a prisoner's pain or possible medical need" and the indifference caused harm, Jett, 439

26 F.3d at 1096.  The prison official must be aware of facts from which he could make an inference

27 that "a substantial risk of serious harm exists" and he must make the inference.  Farmer v.

28 Brennan, 511 U.S. 825, 837 (1994).  Finally, plaintiffs alleging deliberate indifference must also

1  demonstrate that the defendants' actions were both an actual and proximate cause of their injuries.

2  Lemire v. California Dep't of Corr. & Rehab., 726 F.3d 1062, 1074 (9th Cir. 2013).

3  *1. Defendants Asman & Bradley*

4  Plaintiffs allege that at 6:35 AM on the morning of his death, Decedent had an unspecified

5  "interaction" with Officer Asman, who saw water flowing out of Decedent's cell but did not

6  inspect the cell.  (ECF No. 44 at 44.)  Plaintiffs assert that Asman had an obligation to

7  "investigate and report on cell flooding" under section 91090.6 of the CDCR Department

8  Operations Manual ("DOM").  (Id. at 44-45.)  Then, fifteen minutes before Decedent's body was

9  found at 2:30 PM, Officer Bradley failed to positively identify Decedent during his routine check

10  because there was "an obstruction on the bottom half of the cell window," which Bradley did not

11  remove, although window coverings were against DOM policy.  (Id. at 45.)  Plaintiffs further

12  allege that Asman and Bradley "were responsible for conducting counts to observe and document

13  the safety of [Decedent]," and that by violating DOM policy and not confirming Decedent's

14  safety, they "failed to timely summon or provide emergency medical care."  (Id. at 50.)

15  The court previously dismissed similar allegations in the FAC as insufficient to

16  demonstrate Asman and Bradley's deliberate indifference to Decedent's need for medical

17  treatment.  (ECF No. 41 at 9.)  And the SAC does not cure the deficiencies that led to that

18  dismissal.  Although plaintiffs have added the allegation that Officer Asman's failure to

19  investigate the cell flooding was a DOM violation, identifying this policy violation does not

20  bolster plaintiffs' claim.  See Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009) (failure to

21  follow internal prison policies does not rise to the level of a constitutional violation).  Aside from

22  this addition, plaintiffs' allegations against Asman have, if anything, become vaguer than they

23  were in the FAC.  As best the court can discern, Decedent and Asman had some sort of

24  "interaction" early on the morning of Decedent's death, and although Asman at that time

25  observed water "flowing out" of the cell, he did not investigate further.  (ECF No. 44 at 44.)

26  These facts do not add up to Asman's deliberate indifference to Decedent's serious medical need.

27  As to Officer Bradley, even assuming his failure to affirmatively confirm that Decedent

28  was in his cell later that afternoon would satisfy the subjective indifference prong, plaintiffs have

9

1   not alleged how that failure caused Decedent harm.  See Lemire, 726 F.3d at 1074.  According to

2   the SAC, Bradley did not conduct his routine check until 2:15 PM, only fifteen minutes before

3   Decedent's body was discovered by another inmate; and when discovered, Decedent's body was

4   already "stiff and cold."  (ECF No. 44 at 45.)  It is virtually impossible, therefore, that Bradley's

5   failure to remove the window obstruction and fully check on Decedent in any way contributed to

6   Decedent's suffering or death.

7           Accordingly, plaintiffs' deliberate indifference claims against Officers Asman and

8   Bradley should be dismissed.  As this is the second time plaintiffs have tried and failed to state

9   such a claim against these defendants, the claims should be dismissed with prejudice.  See

10  Telesaurus VPC, LLC v. Power, 623 F.3d 998, 1003 (9th Cir. 2010) (permitting dismissal without

11  leave to amend if plaintiff has had several opportunities to amend and repeatedly failed to cure

12  deficiencies).

13                        *2. Defendant Wanie*

14          Plaintiffs allege that at a meeting four days before Decedent's death, Decedent told

15  defendant Wanie, his new social worker, that he was experiencing "distress from [Auditory

16  Hallucinations" at a level of 5/10.  (ECF No. 44 at 44.)  Decedent denied that his psychosis was

17  substance induced, stating that he "self-medicated when [he] started hearing voices to help [him]

18  deal with them."  (Id.)  Plaintiffs allege that despite "observ[ing] the voices bothering

19  [Decedent]," Wanie merely filled out paperwork and recommended dormitory exclusion.  (Id.)

20          The court previously dismissed the FAC's deliberate indifference claim against Wanie

21  based on allegations substantially identical to those repeated here in the SAC.  (ECF No. 41 at 9;

22  compare ECF No. 6 at 29, with ECF No. 44 at 44.)  Once again, the court concludes that these

23  allegations fail to demonstrate that defendant Wanie willfully ignored Decedent's medical needs,

24  or that Decedent was harmed by her indifference.  This claim against defendant Wanie is

25  therefore subject to dismissal without leave to amend.  (ECF No. 41 at 14 (cautioning that

26  "renewed claims against the dismissed defendants that are identical or substantially similar to

27  those contained in their FAC will likely be subject to dismissal without leave to amend").)

28  ////

                                10

### 3. The Endoscopy Defendants (Drs. Ashe, DeNigris, Rudas, and C. Smith)

Plaintiffs' deliberate indifference claims against Drs. Ashe, DeNigris, Rudas, and C. Smith arise from their alleged involvement in Decedent's purportedly unnecessary endoscopy the year before his death.  (ECF No. 44 at 49.)  These claims did not appear in plaintiffs' FAC. Plaintiffs report that after filing the FAC, they obtained medical records alerting them to the new facts alleged regarding this procedure.  (ECF Nos. 44 at 33, 75 at 35.)  Plaintiffs assert that these defendants were "deliberately indifferent by fabricating and propagating a serious diagnosis of End Stage Liver Disease."  (ECF No. 44 at 49.)  Plaintiffs allege that the false diagnosis and unnecessary procedure caused Decedent physical pain and "directly increased [his] suffering and worsened his mental state."  (Id. at 43.)

To state a claim for this sort of deliberate indifference, based on a doctor's choice of treatment, plaintiffs must plead facts showing that "the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the doctors "chose this course in conscious disregard of an excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).  To satisfy the subjective prong of the deliberate indifference analysis, the prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm. Farmer v. Brennan, 511 U.S. at 837.  A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety."  Id.

Plaintiffs assert several pieces of circumstantial evidence which they say shows that the four doctors knew Decedent did not have liver disease and pushed him into an unnecessary procedure purely for financial gain:  Decedent's medical records contained no indication that he had liver disease; Dr. Rudas specified a quick deadline for completing the procedure so that it would be done while the "on-site" provider was present; Dr. C. Smith twice approved the procedure and omitted the diagnosis from his death report; Dr. Ashe did not mention the upcoming endoscopy in her visit notes; Dr. DeNigris performed the endoscopy when Decedent's records contained no suggestion that the procedure was needed; and the procedure was

////

11

1   inaccurately coded.  (ECF No. 75 at 9-12 (citing ECF No. 44).)  From these allegations, plaintiffs

2   argue that "fraud is the most likely conclusion."  (ECF No. 75 at 12.)

3         Although plaintiffs' narrative <u>might</u> be correct, the court concludes that these assertions

4   are not enough to push the pleadings "across the line from conceivable to plausible."  <u>Ashcroft v.</u>

5   <u>Iqbal</u>, 556 U.S. 662, 680 (2009).  Even taking these allegations as true, at most they might support

6   a claim for negligence—that each doctor should have, but failed to, consult Decedent's medical

7   history more thoroughly to confirm the necessity of an endoscopy.  They do not plausibly allege

8   that any of the four doctors <u>knew</u> that liver disease was not medically indicated, notwithstanding

9   plaintiffs' contrary conclusory opinion.  Moreover, they do not show how the decision to order,

10  approve, or ultimately conduct the endoscopy presented "an excessive risk to [Decedent's] health

11  or safety" that the doctors consciously disregarded.  <u>Farmer</u>, 511 U.S. at 837.  Based on the

12  present pleadings, it is equally likely that the doctors took these actions believing that they were

13  helping Decedent—who is alleged to have had Hepatitis C—based on a good faith (albeit,

14  allegedly incorrect) understanding of Decedent's medical file.[9]

15        Accordingly, the deliberate indifference claims against Drs. Ashe, DeNigris, Rudas, and

16  C. Smith, are subject to dismissal.  Because the SAC represents plaintiffs' first attempt to state a

17  deliberate indifference claim against these defendants based on their involvement in the newly

18  discovered endoscopy, however, they may amend these claims against these defendants.

19                    ***Conclusion***

20        Because plaintiffs have twice failed to sufficiently plead a deliberate indifference claim

21  against defendants Asman, Bradley, and Wanie, those claims should be dismissed with prejudice

22  as to those defendants.  Plaintiffs have also failed to sufficiently plead deliberate indifference

23  claims against Drs. Ashe, DeNigris, Rudas, and C. Smith, but those claims are dismissed with

24  leave to amend.

25  ////

26  ////

27  _____

28  [9] Having reached this conclusion, the court need not address Dr. DeNigris' additional argument
    that he was not acting under color of state law.  (ECF No. 64.1 at 5.)

                                    12

1

### B.      Supervisory Liability & Failure to Train

2       Plaintiffs' Second and Third Causes of Action allege Eighth Amendment deliberate

3  indifference by supervisory defendants including former MCSP Warden Lizarraga and former

4  CDCR Chief Psychiatrist of Telepsychiatry Dr. Kuich.  (ECF No. 44 at 50-52.)

5       Under § 1983, a supervisor may be liable if there exists either "(1) his or her personal

6  involvement in the constitutional deprivation or (2) a sufficient causal connection between the

7  supervisor's wrongful conduct and the constitutional violation."  Mackinney v. Nielsen, 69 F.3d

8  1002, 1008 (9th Cir. 1995) (internal citations and quotations omitted).  Supervisory liability can

9  exist in the present case if defendants implemented "a policy so deficient that the policy itself is a

10  repudiation of constitutional rights and is the moving force of the constitutional violation."  Id.

11  Failure to train or to supervise may amount to "deliberate indifference" if the need for training or

12  supervision was obvious and the failure to do so made a constitutional violation likely.

13  Dougherty v. City of Covina, 654 F.3d 892, 900 (9th Cir. 2011).  Mere negligence in training or

14  supervision, however, does not rise to the level of deliberate indifference.  Id.

15       The court previously denied the CDCR defendants' motion to dismiss substantially

16  similar causes of action recited in the FAC (ECF No. 41 at 10-11), and the CDCR defendants

17  named in the SAC do not now seek dismissal of these two causes of action.  Only defendants

18  Kuich and Lizarraga apparently dispute the sufficiency of these two renewed causes of action.

19  But because defendants Kuich and Lizarraga have not properly moved to dismiss these claims,

20  those causes of action survive.

21       Kuich and Lizarraga did not file their own motion to dismiss any claims in the SAC;

22  instead, they filed a notice of joining the CDCR defendants' motion to dismiss.  (ECF No. 65).

23  The CDCR defendants' motion to dismiss notably does not challenge the sufficiency of the

24  SAC's second and third causes of action for supervisory liability and failure to train, nor does the

25  CDCR defendants' supporting brief include any argument on these topics.  (ECF Nos. 63, 63.1.)

26  Kuich and Lizarraga did not file an opening brief in support of the motion to dismiss, but they did

27  file a reply to plaintiffs' opposition arguing that the SAC's allegations fail to state a claim against

28  them for supervisory liability.  (ECF No. 79.)  Raising these arguments for the first time in a reply

13

1    brief is procedurally improper, as it denies plaintiffs the opportunity to respond.  The court

2    therefore declines to consider these arguments.  See Zamani v. Carnes, 491 F.3d 990, 997 (9th

3    Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply

4    brief.").  The court also notes that it has already denied dismissal of these causes of action against

5    defendant Lizarraga in reviewing the substantially similar allegations against him in the FAC.

6    (ECF No. 41 at 10-11 ("Plaintiffs have adequately alleged system-wide constitutional

7    deprivations and failure to adequately train and supervise those tasked with safeguarding

8    Decedent's constitutional rights.").)  To the extent defendants Lizarraga and Kuich move for

9    dismissal of the Second and Third Causes of Action against them, their motion is denied.

10            **C.     Fourteenth Amendment Familial Relations**

11           Plaintiffs' Fourth Cause of Action asserts a deprivation of their Fourteenth Amendment

12    substantive due process right to familial relations against every named defendant except Sergeant

13    Brunkhorst and the CDCR itself.

14           Under the Fourteenth Amendment, "official conduct that 'shocks the conscience' in

15    depriving [family members] of [a liberty interest in the companionship and society of a family

16    member] is cognizable as a violation of due process."  Wilkinson v. Torres, 610 F.3d 546, 554

17    (9th Cir. 2010).  "Just as the deliberate indifference of prison officials to the medical needs of

18    prisoners may support Eighth Amendment liability, such indifference may also 'rise to the

19    conscience-shocking level' required for a substantive due process violation."  Lemire, 726 F.3d at

20    1075 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998)).  "A prison official's

21    deliberately indifferent conduct will generally 'shock the conscience'" if "the prison official had

22    time to deliberate before acting or failing to act in a deliberately indifferent manner."  Lemire,

23    726 F.3d at 1075.

24           The same nine defendants who seek dismissal of the Eighth Amendment claims against

25    them, in either their individual or supervisory capacities—that is, Officers Asman and Bradley;

26    social worker Wanie; the endoscopy defendants Drs. Ashe, DeNigris, Rudas, and C. Smith; and

27    ////

28    ////

former CDCR officials Lizarraga and Kuich[10]—also move to dismiss plaintiffs' Fourteenth Amendment claims on the grounds that plaintiffs failed to state even a deliberate indifference claim, for the reasons discussed above.  (ECF Nos. 63.1 at 23; 64.1 at 7.)

As discussed in the previous two sections, plaintiffs have failed to plead that defendants Ashe, Asman, Bradley, DeNigris, Rudas, C. Smith, or Wanie were deliberately indifferent to Decedent's medical needs and therefore have insufficiently pleaded that their actions "shocked the conscience."  Further, as to the endoscopy defendants, plaintiffs have not alleged how their conduct deprived them of Decedent's companionship at all.  Plaintiffs only directly allege that the false diagnosis of end stage liver disease and the performance of the endoscopy increased Decedent's suffering and worsened his mental state, not that they caused his death some six months later.  Lastly, because the court reaches no conclusion on the sufficiency of the deliberate indifference claims against defendants Kuich and Lizarraga in their supervisory capacities (for the reasons above), the court also denies their motion to dismiss the Fourteenth Amendment cause of action against them, which also relies on inapplicable arguments asserted in the CDCR defendants' motion.

In sum, the court should grant the motion to dismiss the Fourth Cause of Action against defendants Asman, Bradley, and Wanie, and dismiss the claims against those defendants with prejudice.  Conversely, the court denies the motion to dismiss the Fourth Cause of Action against defendants Kuich, and Lizarraga; and the court grants the motion to dismiss the Fourth Cause of Action against defendants Ashe, DeNigris, Rudas, and C. Smith with leave to amend as to those defendants only.

### D.     42 U.S.C. § 1985(3) Conspiracy to Interfere with Civil Rights

Plaintiffs' Fifth Cause of Action asserts a conspiracy to interfere with Decedent's civil rights, in violation of 42 U.S.C. § 1985(3), by the following defendant health care providers and

---

[10] The same procedural problems discussed above also apply to defendants Lizarraga's and Kuich's challenge to plaintiffs' Fourteenth Amendment claims against them.  And, as with the Eighth Amendment supervisory claims, the court has already held similar pleadings in the FAC sufficiently stated a claim for deprivation of familial relations against defendant Lizarraga.  (ECF No. 41 at 11-12.)

1    supervisors:  Leidner, Ceballos, Tebrock, Robinson, Heatley, C. Smith, Kernan, Diaz, Toche,

2    Gipson,[11] Brizendine, Ponciano, Rekart, Kuich, Brockenborough, Lizarraga, and Adams.  (ECF

3    No. 44 at 53.)  Plaintiffs allege that these individuals engaged in a "conspiracy within CDCR to

4    base decisions for care of mentally ill inmates on ways to best make it appear they are complying

5    with the Court orders to provide a minimal constitutional level of care."  (ECF No. 44 at 53.)

6    Defendants allegedly carried out this conspiracy by reporting fraudulent metrics inflating their

7    appearance of compliance with mandated EOP psychiatric visits by extending the time between

8    psychiatric evaluations by 50%.  (Id. at 38-39, 53.)  All defendants named in this count move to

9    dismiss this cause of action for failure to allege that Decedent was a member of a protected class,

10   for lack of specific factual allegations of conspiracy, and because defendants are entitled to

11   qualified immunity.  (ECF Nos. 63.1 at 13; 65; 68.)

12        "Section 1985 proscribes conspiracies to interfere with certain civil rights."  Karim-Panahi

13   v. Los Angeles Police Dep't, 839 F.2d 621, 626 (9th Cir. 1988).  To state a claim under

14   § 1985(3), plaintiffs must allege four elements: "(1) a conspiracy; (2) for the purpose of

15   depriving, either directly or indirectly, any person or class of persons of the equal protection of

16   the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of

17   this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any

18   right or privilege of a citizen of the United States."  Sever v. Alaska Pulp Corp., 978 F.2d 1529,

19   1536 (9th Cir. 1992) (citation omitted).

20        For the first element, a § 1985 claim "must allege facts to support the allegation that

21   defendants conspired together.  A mere allegation of conspiracy without factual specificity is

22   insufficient."  Karim-Panahi, 839 F.2d at 626.  Under the second element, in addition to

23   identifying a legally protected right, a plaintiff must demonstrate a deprivation of that right

24   motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus

25   behind the conspirators' action."  Griffith v. Breckenridge, 403 U.S. 88, 102 (1971).  In the Ninth

26   Circuit, § 1985(3) is extended beyond race "only when the class in question can show that there

27

28   [11] The SAC misspells defendant Connie Gipson's last name as "Gibson," throughout.

1   has been a governmental determination that its members 'require and warrant special federal

2   assistance in protecting their civil rights.'" Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir.

3   1985) (citation omitted); see also McCalden v. California Library Ass'n, 955 F.2d 1214, 1223

4   (9th Cir. 1990) (plaintiff must be a member of a class that requires special federal assistance in

5   protecting its civil rights). "More specifically, we require 'either that the courts have designated

6   the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or

7   that Congress has indicated through legislation that the class required special protection.'" Sever,

8   978 F.2d at 1536 (quoting Schultz, 759 F.2d at 718). Importantly, the defendants' actions must

9   have been "motivated by invidiously discriminatory animus" against that protected class. Orin v.

10  Barclay, 272 F.3d 1207, 1217 (9th Cir. 2001) (internal quotation omitted). These limitations exist

11  to support the background rule that § 1985 "is not to be construed as a general federal tort law."

12  Gerritsen v. de la Madrid Hurtado, 819 F.2d 1511, 1518-19 (9th Cir. 1987).

13          Plaintiffs' § 1985(3) cause of action, as currently pled, is subject to dismissal for at least

14  two reasons. First, plaintiffs have not alleged that the deprivation Decedent suffered was

15  motivated by discriminatory animus against the allegedly protected class to which Decedent

16  belonged. Section 1985(3) was enacted as the Ku Klux Klan Act of 1871, and its original

17  purpose "was to enforce the rights of African Americans and their supporters." Holgate v.

18  Baldwin, 425 F.3d 671, 676 (9th Cir. 2005). Plaintiffs may be correct that § 1985(3) protection

19  nevertheless extends to Decedent because Congress "has indicated through legislation," Sever,

20  978 F.2d at 1536, that people with mental illnesses, like Decedent, require special protections.

21  (See ECF No. 75 at 24-25 (discussing the Protection and Advocacy for Individuals with Mental

22  Illness Act, 42 U.S.C. § 10801).) But the court need not resolve at this juncture whether

23  Decedent was a member of a class protected by § 1985(3) because nothing in the SAC remotely

24  implies—much less alleges—that defendants' actions were "motivated by invidiously

25  discriminatory animus" against people with mental illnesses. See Orin, 272 F.3d at 1217. The

26  only motivation plaintiffs identify for extending the time between Decedent's psychiatric visits,

27  which allegedly contributed to his declining mental health, is so that defendants might be

28  "relieved of Court monitoring." (ECF No. 44 at 53; see id. at 38-39.) The SAC nowhere

17

1  suggests that the named defendants harbored any ill will toward their inmate patients because

2  they suffered mental illnesses, or that visit frequencies were lowered in order to harm these

3  patients.  See Manistee Town Ctr. v. City of Glendale, 227 F.3d 1090, 1095 (9th Cir. 2000) ("A

4  cause of action under the first clause of § 1985(3) cannot survive a motion to dismiss absent an

5  allegation of class-based animus.").

6       Second, plaintiffs' § 1985(3) claim must be dismissed because it contains insufficient

7  specific factual allegations supporting the existence of the claimed conspiracy.  See Karim-

8  Panahi, 839 F.2d at 626.  Plaintiffs do allege certain actions by a handful of defendants, alleging,

9  for instance, that Dr. Ceballos made the decision to extend the time between visits, and that

10  Tebrock submitted fraudulent data to the court. (ECF No. 44 at 17-18.)  But the SAC contains no

11  factual allegations suggesting that there was an agreement or other "meeting of the minds"

12  between or among the named defendants to violate Decedent's rights.  See Olsen v. Idaho State

13  Bd. of Med., 363 F.3d 916, 929-30 (9th Cir. 2004) (dismissing § 1985(3) claim when plaintiff's

14  complaint was "devoid of any discussion of an agreement . . . to violate her constitutional

15  rights").[12]  And plaintiffs fail to allege facts showing how most of the defendants named in this

16  cause of action participated in the alleged conspiracy at all.

17       Accordingly, the § 1985(3) cause of action is subject to dismissal.  Plaintiffs are, however,

18  granted leave to amend this claim.

19  **E.     Failure to Prevent a Conspiracy under 42 U.S.C. § 1986**

20       Plaintiffs' Sixth and Seventh Causes of Action (which appear to be duplicates of each

21  other) assert a failure to prevent the above-described conspiracy, in violation of 42 U.S.C. § 1986,

22  by all defendants except the CDCR, Dr. DeNigris, Sergeant Brunkhorst, and Officers Asman and

23  Bradley.  (ECF No. 44 at 54-55.)

24  ////

25  _____

26  [12] "Since it is often difficult to show direct evidence of a combination or conspiracy, concerted
action may be inferred from circumstantial evidence of the defendant's conduct and course of

27  dealings." Dimidowich v. Bell & Howell, 803 F.2d 1473, 1479 (9th Cir. 1986), reh'g denied and
modified on other grounds, 810 F.2d 1517 (9th Cir. 1987).  Plaintiffs also have not provided

28  sufficient specific circumstantial evidence to supply an inference of a conspiracy.

1    "Section 1986 imposes liability on every person who knows of an impending violation of

2    section 1985 but neglects or refuses to prevent the violation."  Karim-Panahi, 839 F.2d at 626

3    (citation omitted).  A plaintiff can only state a claim under § 1986 if the plaintiff alleges a valid

4    claim under § 1985.  Id.  Because plaintiffs fail to allege a valid § 1985 claim, their § 1986 claim

5    also fails.  Trerice v. Pedersen, 769 F.2d 1398, 1403 (9th Cir. 1985) ("[The Ninth Circuit has]

6    adopted the broadly accepted principle that a cause of action is not provided under 42 U.S.C.

7    § 1986 absent a valid claim for relief under section 1985.").

8           Accordingly, plaintiffs' Sixth and Seventh Causes of Action for violation of § 1986 are

9    dismissed.  Plaintiffs are, however, granted leave to amend these claims as well.

10              **F.    Disability Discrimination under the ADA & RA**

11          Plaintiffs' Thirteenth Cause of Action is against only the CDCR for violating Title II of

12   the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA").

13   Plaintiffs allege that CDCR violated the ADA and RA by failing to provide services or reasonably

14   accommodate Decedent with access to CDCR programs and services; failing to properly train and

15   supervise its staff and officers on how to "appropriately treat, monitor, and interact with" people

16   with disabilities; and discriminating against Decedent by "limiting his benefits and privileges

17   based solely on his need for antipsychotic medications."  (ECF No. 44 at 61.)  Plaintiffs assert

18   that Decedent was "'stuck' in his cell because of the 'heat meds'" and that Decedent "was

19   discriminated against because of his mental illness and his use of antipsychotic medications, in

20   that he suffered from conditions in which a person, as a result of a mental disorder, is unable to

21   provide for his basic personal needs and to protect himself from self-harm."  (Id. at 39, 62.)

22          Title II of the ADA provides that "no qualified individual with a disability shall, by reason

23   of such disability, be excluded from participation in or be denied the benefits of the services,

24   programs, or activities of a public entity, or be subjected to discrimination by any such entity."

25   42 U.S.C. § 12132.  To state a claim under Title II of the ADA, the plaintiff must allege: "(1) he

26   is an individual with a disability; (2) he is otherwise qualified to participate in or receive the

27   benefit of some public entity's services, programs, or activities; (3) he was either excluded from

28   participation in or denied the benefits of the public entity's services, programs, or activities, or

19

1   was otherwise discriminated against by the public entity; and (4) such exclusion, denial of

2   benefits, or discrimination was by reason of [his] disability." Simmons v. Navajo Cty., 609 F.3d

3   1011, 1021 (9th Cir. 2010). The RA provides "identical remedies, procedures and rights." Vos v.

4   City of Newport Beach, 892 F.3d 1024, 1036 (9th Cir. 2018). Both the ADA and RA apply to

5   state prisons like MCSP. Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998); Pierce v. Cty.

6   of Orange, 526 F.3d 1190, 1214 (9th Cir. 2008).

7         Defendants acknowledge that Decedent satisfies the first two elements as a qualified

8   individual with a disability, but they dispute the sufficiency of plaintiffs' allegations as to the

9   third and fourth elements. (ECF No. 63.1 at 28.) The court agrees with defendants that the SAC

10  fails to allege what specific benefits Decedent was being denied, or that such denial was because

11  of his disability. Although plaintiffs sometimes plead in a conclusory fashion that Decedent was

12  deprived of the unspecified benefits at MCSP "because of his mental illness," they

13  simultaneously emphasize that the alleged discrimination was "based solely on his need for

14  antipsychotic medications." (ECF No. 44 at 61-62.) To the extent plaintiffs assert that Decedent

15  received substandard medical care which failed to lessen his psychoses or protect him from self-

16  harm, their allegations cannot support an ADA or RA claim. "The ADA prohibits discrimination

17  because of a disability, not inadequate treatment for a disability." Simmons, 609 F.3d at 1022

18  (rejecting plaintiffs' argument that defendant violated the ADA by "depriving [the deceased

19  prisoner] of 'programs or activit[ies] to lessen his depression'").

20        Accordingly, plaintiffs' Thirteenth Cause of Action is dismissed. Plaintiffs are, however,

21  granted leave to amend this claim. Because this count is being dismissed, the court has no

22  occasion to rule on defendants' request to strike plaintiffs' demand for punitive damages as to this

23  cause of action.[13] (ECF No. 63.1 at 38.)

24  ////

25  ////

26

27  [13] The court cautions plaintiffs, however, that punitive damages are not available for violations of
    the ADA or RA. Barnes v. Gorman, 536 U.S. 181, 189 (2002); Mark H. v. Lemahieu, 513 F.3d
28  922, 930 (9th Cir. 2008).

20

1

### G.     State Law Claims Against Public Officials & Employees

2        The SAC's remaining causes of action all arise under California state law.  Plaintiffs

3   assert survivorship claims on behalf of Decedent's estate for negligent supervision and training,

4   common law negligence, failure to summon medical care, violations of California Civil Code

5   § 52.1 (the "Bane Act"), medical battery, and assault; and they assert claims on their own

6   behalves for wrongful death and negligent infliction of emotional distress.[14]  (ECF No. 44

7   at 56-64.)

8                    *1.  The Survivorship Causes of Action Against Government Defendants*

9        The CDCR defendants move to dismiss each of plaintiffs' survivorship causes of action

10  on the grounds that plaintiffs have not complied with the California Government Claims Act

11  ("GCA").  (ECF No. 63.1 at 29.)

12       Under the GCA, set forth in California Government Code sections 810 et seq.,[15] a plaintiff

13  may not (subject to certain inapplicable exceptions) bring a suit for monetary damages against a

14  public employee or entity unless the plaintiff first timely presented the claim to the California

15  Victim Compensation and Government Claims Board ("Government Claims Board" or "Board"),

16  and the Board acted on the claim, or the time for doing so expired.  See Munoz v. California,

17  33 Cal. App. 4th 1767, 1776 (1995) ("The Tort Claims Act requires that any civil complaint for

18  money or damages first be presented to and rejected by the pertinent public entity.").  The

19  purpose of this requirement is "to provide the public entity sufficient information to enable it to

20  adequately investigate claims and to settle them, if appropriate, without the expense of litigation."

21  City of San Jose v. Superior Court, 12 Cal. 3d 447, 455 (1974) (citations omitted).  Compliance

22

23  [14] The SAC is somewhat ambiguous as to whether plaintiffs intend to assert their negligent
24  infliction of emotional distress claim (the Sixteenth Cause of Action) on their own behalf or on
    behalf of Decedent's estate.  The cause of action heading cites the California statute authorizing
25  survival actions, but the substantive allegations only refer to the "severe emotional distress" of the
    plaintiffs themselves.  (ECF No. 44 at 63-64.)  Going with substance over form, the court thus
26  construes this claim as belonging to plaintiffs themselves, not to their son's estate.

27  [15] Traditionally known as the California "Tort Claims Act," California courts now refer to these
    sections more broadly as the Government Claims Act.  See City of Stockton v. Superior Court, 42
28  Cal. 4th 730, 741-42 & n.7 (Cal. 2007).

1    with this "claim presentation requirement" constitutes an element of a cause of action for

2    damages against a public entity or official.  State v. Superior Court (Bodde), 32 Cal. 4th 1234,

3    1244 (2004).

4         Thus, consistent with state court practice, id. at 1239, federal courts require compliance

5    with the GCA for pendent state law claims that seek damages against California state public

6    employees or entities.  Willis v. Reddin, 418 F.2d 702, 704 (9th Cir. 1969); Mangold v.

7    California Public Utilities Commission, 67 F.3d 1470, 1477 (9th Cir. 1995).  Such state claims

8    included in a federal action may proceed only if the claims were first presented to the state in

9    compliance with the GCA's claim presentation requirement.  United States v. California, 655

10   F.2d 914, 918 (9th Cir. 1980); Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 627 (9th

11   Cir. 1988); Butler v. Los Angeles Cty., 617 F. Supp. 2d 994, 1001 (C.D. Cal. 2008).

12        Broadly speaking, to comply with the claim presentation requirement, claimants must file

13   with the Board a written claim containing specific required information, see Cal. Gov't Code

14   § 910; they must file the claim within 6 months of the "accrual of the cause of action," Cal. Gov't

15   Code § 911.2 (although there are mechanisms for permitting late claim filing); and they must then

16   file suit within 6 months of receiving notice of the Board's rejection of their claim, Cal. Gov't

17   Code § 945.6(a)(1).  See Cal. Gov't Code § 950.2 (cause of action against public employee or

18   former public employee is barred if action against employing public entity is barred).  The CDCR

19   defendants, joined by defendants Kuich and Lizarraga as to the claims against them, contest

20   plaintiffs' compliance with the GCA.  They primarily argue that, because plaintiffs failed to file a

21   separate government claim identifying Decedent or Decedent's estate as the claimant, all the

22   survivorship claims brought on behalf of his estate are barred by the GCA.  (ECF No. 63.1 at 30.)

23   The court agrees.

24        As alleged in the SAC, "Plaintiffs Thomas Schmitz, Dianne Mallia and Estate of William

25   Schmitz filed governmental claims" with the Board in July 2019.  (ECF No. 44 at 9.)  Plaintiffs

26   did not attach a copy of their government claim to the SAC, but the CDCR defendants have

27   ////

28   ////

22

1    provided a copy of both the claim and the Board's rejection notice.[16]   On July 16, 2019, the

2    Government Claims Program received plaintiffs' government claim, completed on the state's

3    standard claim form.  (ECF No. 63.2 at 10.)  The first line of the "Claimant Information" section

4    lists plaintiff Thomas J. Schmitz (Decedent's father) as the claimant, along with a reference to

5    Attachment A, which lists six people as "Intestate Heirs":  plaintiff Dianne Mallia (Decedent's

6    mother) as well as Decedent's two brothers, two sisters, and his grandmother.  (Id. at 10, 12.)

7    Decedent's name does not appear.  The fifth line of the Claimant Information section requests an

8    "Inmate or patient number, if applicable," next to which plaintiffs provided Decedent's inmate

9    number G35384.  (Id. at 10.)

10        In the section for Claim Information, plaintiffs requested $10,015,000, comprising

11   "1.5 million lost future wages, 15,000 funeral expenses, 8.5 million loss of companionship."  (Id.)

12   They indicated that the claim was being filed against numerous state employees, many of whom

13   are named as defendants in the SAC.  (Id. at 13-14.)  Plaintiffs described the injury as Decedent's

14   death while in CDCR custody.  (Id. at 11.)  Plaintiffs asserted that the state was responsible

15   because "William's death was caused by the state's gross negligence.  This negligence includes,

16   but is not limited to, medical malpractice, transferring [Decedent] to CCCMS from EOP, stopping

17   needed medications and failing to reasonably monitor and care for [Decedent's] health and well

18   being on January 21, 2019."  (Id.)  On July 31, 2019, the Government Claims Program notified

19   plaintiffs by letter that the claim was rejected.  (Id. at 15.)

20        California courts have interpreted the GCA to require that "a plaintiff must ordinarily file

21   his or her own claim, and may not sue to recover for his or her own injury in reliance on a claim

22   filed by another injured party, even if the plaintiff's injury was caused by the same transaction

23   that injured the other party."  California Rest. Mgmt. Sys. v. City of San Diego, 195 Cal. App. 4th

24   1581, 1597 (Ct. App. 2011); see Nelson v. Cty. of Los Angeles, 113 Cal. App. 4th 783, 796 (Ct.

25   App. 2003) ("Where two or more persons suffer separate and distinct injuries from the same act

26   _____

     [16] The court grants defendants' request to take judicial notice of these documents.  (ECF
27   No. 63.2.)  See Lawrence v. City of San Bernardino, No. CV04-00336 FMC SGLX, 2005 WL
     5950105, at *3 (C.D. Cal. July 27, 2005) (noting that a government claim is a public record that
28   does not convert a motion to dismiss into a motion for summary judgment).

                                        23

or omission, each person must submit a claim, and one cannot rely on a claim presented by

another.").  "Unlike a cause of action for wrongful death, a survivor cause of action is not a new

cause of action that vests in the heirs on the death of the decedent.  It is instead a separate and

distinct cause of action which belonged to the decedent before death but, by statute, survives that

event."  Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256, 1264 (Ct. App. 2006); see Cal.

Code Civ. Proc. § 377.30 (survivorship statute).  Thus, a successor in interest pleading a

survivorship cause of action in addition to her own personal tort claims acts in two separate

capacities.  Quiroz, 140 Cal. App. 4th at 1278 (because the "survivor claim, which plaintiff

pursued as the decedent's successor in interest, pleaded injury to the decedent," and plaintiff's

"wrongful death claim pleaded only injury to plaintiff, acting for herself, as the decedent's heir,"

"these distinct claims are technically asserted by different plaintiffs and they seek compensation

for different injuries").

Defendants argue that because the July 2019 government claim does not list "William

Thomas Schmitz" or the "Estate of William Thomas Schmitz" as a claimant—and no separate

claim was filed by any so-named claimant—all the survivorship causes of action are barred under

the GCA.  (ECF No. 63.1 at 30-31.)  Although defendants cite no California case prohibiting a

single government claim from encompassing both a survivor's and a decedent's claims arising

from the same course of events,[17] the court agrees that in this case the July 2019 government

claim was inadequate to notify the state that survivorship causes of action would be filed, in

addition to wrongful death claims.

California courts have proved open to the idea that a single form can sufficiently present

both survivorship and individual claims in the right set of circumstances.  See Nelson, 113 Cal.

App. 4th at 796-98 & n.10 (considering, but ultimately rejecting, the argument that decedent's

mother's government claim, alone, presented both sets of claims); White v. Moreno Valley

Unified Sch. Dist., 181 Cal. App. 3d 1024, 1031-32 (Ct. App. 1986) (concluding that claim form

---

[17] Defendants cite only Quiroz, 140 Cal. App. 4th 1256, a California Court of Appeal case which establishes that a plaintiff acts in two separate capacities when pursuing a survivor claim in addition to her own personal claims, while saying nothing about how that principle translates onto the GCA claim presentation requirement—which was not raised in that case.  Id. at 1278.

1   submitted by parents on behalf of their minor child adequately presented both the parents' claim

2   for medical expenses and the child's other damages).  In <u>Nelson</u>, the court of appeal held that the

3   survivorship causes of action had not been properly presented under the GCA because the

4   decedent's estate did not file a claim, and "since there is nothing in [decedent's representative's]

5   claim to suggest it was filed in anything other than her individual capacity, and since the damages

6   described in the claim were for 'the loss of a son' (with no mention of any damage incurred by

7   [decedent] before his death)."  113 Cal. App. 4th at 797.  The court further noted that the "claim

8   form did not identify the estate and did not identify [plaintiff] as [decedent's] personal

9   representative," nor did it "identify any damages recoverable by the estate (e.g., predeath medical

10  expenses or other expenses suffered by [the decedent] before his death)."  <u>Id.</u> at 797 n.10.

11       These same problems doom plaintiffs' government claim here, too.  Although the

12  numerous relatives listed as claimants on the claim form suggest that Thomas J. Schmitz

13  (Decedent's father) was filing in a representative capacity, there is no suggestion that he was

14  filing as a representative <u>of his son or his son's estate</u>, as opposed to some quasi-class of

15  "intestate heirs."  (ECF No. 63.2 at 10, 12.)  The appearance of Decedent's inmate number on the

16  form's Claimant Information section makes it a closer question, but the court is not persuaded

17  that this identifier alone would be sufficient to put the state on notice that it should investigate

18  survivorship causes of action.  The strongest evidence that plaintiffs' claim did not present the

19  instant survivorship causes of action is that the claim does not obviously "identify any damages

20  recoverable by the estate."  <u>Nelson</u>, 113 Cal. App. 4th at 797 n.10.  The claim simply lists three

21  general categories of damages: "1.5 million lost future wages, 15,000 funeral expenses,

22  8.5 million loss of companionship."  (ECF No. 63.2 at 10.)  Each of these types of damages are

23  recoverable in wrongful death actions in California.  None describe damages that would only be

24  recoverable by Decedent's estate, i.e., through a survivorship action.

25       This is because "[s]ection 377.34 [of the California Code of Civil Procedure] limits

26  damages in survival actions to the victim's pre-death economic losses."  <u>Chaudhry v. City of Los</u>

27  <u>Angeles</u>, 751 F.3d 1096, 1104 (9th Cir. 2014) (citing <u>People v. Runyan</u>, 54 Cal. 4th 849, 862

28  (2012)).  Damages recoverable in survival actions in California include the decedent's "lost

1     wages, medical expenses, and any other pecuniary losses <u>incurred before death</u>," as well as

2     punitive or exemplary damages. <u>Cty. of Los Angeles v. Superior Court (Schonert)</u>, 21 Cal. 4th

3     292, 304 (1999) (emphasis added). Accordingly, "[i]n cases where the victim dies quickly there

4     will often be no damage remedy at all under § 377.34." <u>Chaudhry</u>, 751 F.3d at 1104.

5          The state would have no reason to interpret the $1.5 million requested for "lost future

6     wages" as referring to the amount Decedent might have earned during the day of his death;

7     instead, that amount could most reasonably be viewed as referring to the damages Decedent's

8     designated survivors might recover in a wrongful death action. <u>See</u> <u>Garcia v. Superior Court</u>, 42

9     Cal. App. 4th 177, 186-87 (Ct. App. 1996) (under California's wrongful death statutes,

10     "designated surviving relatives or the decedent's heirs at law can recover pecuniary losses caused

11     by the death, including pecuniary support the decedent would have provided them"). And the

12     other two categories of damages—for "funeral expenses" and "loss of companionship"—certainly

13     would not arise in a survival action, since they are not injuries or expenses Decedent himself

14     suffered before his death. <u>See</u> <u>Quiroz</u>, 140 Cal. App. 4th at 1263-65 (distinguishing wrongful

15     death actions from survivor actions, and noting that the purpose of the California wrongful death

16     statute is "to compensate specified persons—heirs—for the loss of companionship and for other

17     losses suffered as a result of a decedent's death"). Thus, like the claim in <u>Nelson</u>, plaintiffs'

18     government claim here cannot be construed as presenting both their individual claims and the

19     survivorship claims of Decedent's estate.

20          Far from strictly applying the GCA to "snare the unwary," <u>Stockett v. Ass'n of Cal. Water</u>

21     <u>Agencies Joint Powers Ins. Auth.</u>, 34 Cal. 4th 441, 446 (2004) (claims statute "should not  be

22     applied to snare the unwary where its purpose has been satisfied"), the court reaches this

23     conclusion because the July 2019 government claim did not satisfy the GCA's purpose:  "to

24     provide the public entity sufficient information to enable it to adequately investigate claims and to

25     settle them, if appropriate, without the expense of litigation." <u>Connelly v. Cty. of Fresno</u>, 146

26     Cal. App. 4th 29, 37-38 (Ct. App. 2006). Plaintiffs' government claim did not adequately inform

27     the state that plaintiffs contemplated bringing not only a wrongful death action but also a

28

1   survivorship action on behalf of Decedent's estate, preventing the state from adequately assessing

2   its settlement options before plaintiffs filed this suit.

3          Plaintiffs argue that they substantially complied with the GCA, and that defendants cannot

4   now challenge the sufficiency of their claim on a ground which the Government Claims Board

5   did not raise itself.  (ECF No. 75 at 33.)  But neither argument is availing because, as just

6   discussed, no government claim has been filed for Decedent or Decedent's estate.  See Abrego v.

7   City of Los Angeles, No. CV 15-00039-BRO-JEMx, 2016 WL 9450679, at *10 (C.D. Cal.

8   Sept. 23, 2016) (concluding that GCA substantial compliance doctrine could not save

9   survivorship claims where the problem was "not that Plaintiffs' government forms were

10  defective, but rather that no government claim at all was filed by or on behalf of Decedent's

11  estate"); Garber v. City of Clovis, 698 F. Supp. 2d 1204, 1217 (E.D. Cal. 2010) ("Only a 'claim

12  presented' triggers the [Cal. Gov't Code § 911] duty to notify the claimant of defects or

13  omissions." (quoting Page v. MiraCosta Cmty. Coll. Dist., 180 Cal. App. 4th 471, 493 (Ct. App.

14  2009))).

15         Plaintiffs' failure to demonstrate compliance with the GCA's claim presentation

16  requirement with respect to their survivorship claims subjects these causes of action to dismissal

17  for failure to state a claim.  State v. Superior Court (Bodde), 32 Cal. 4th 1234, 1243 (2004).

18                              a.   Leave to Amend Certain Claims

19         The survivorship claims against most of the public employee defendants named in the

20  Eighth, Tenth, Eleventh, and Twelfth Causes of Action should be dismissed with prejudice

21  because the time for filing a claim on behalf of Decedent or Decedent's estate with respect to the

22  conduct underlying those claims has lapsed—except, as will be discussed, conduct related to the

23  newly discovered endoscopy.

24         As mentioned at the outset, the GCA requires personal injury claims to be filed with the

25  Board "not later than six months after the accrual of the cause of action."  Cal. Gov't Code

26  § 911.2.  The general rule is that a cause of action accrues when it is "complete with all of its

27  elements."  Norgart v. Upjohn Co., 21 Cal. 4th 383, 397 (1999).  January 21, 2019, the date of

28  Decedent's death, is the latest potential accrual date for the state law survivorship claims for

1   negligent supervision and training (Eighth Cause of Action), negligence (Tenth Cause of Action),

2   failure to summon medical care (Eleventh Cause of Action), and Bane Act violations (Twelfth

3   Cause of Action)—again, except as to those claims against the endoscopy defendants for reasons

4   yet to be discussed.  Because no claim on behalf of Decedent or Decedent's estate was presented

5   to the Board within 6 months of that date, plaintiffs would have to resort to the GCA's various

6   provisions for filing a late claim or being excused from claim filing.

7           Review of these provisions, however, reveals that none would apply to plaintiffs' present

8   circumstance.  Claim amendment would be of no use because amendment must occur before the

9   expiration of § 911.2's six-month deadline.  <u>See</u> Cal. Gov't Code § 910.6 (governing claim

10  amendment).  The time to apply for leave to present a late claim has long passed.  <u>See</u> Cal. Gov't

11  Code § 911.4(b) (requiring late-claim application to be filed "within a reasonable time not to

12  exceed one year after the accrual of the cause of action," subject to inapplicable provisions for not

13  counting certain periods).  And, for the same reason, the time for seeking judicial relief from the

14  claim presentation requirement has run, too.  <u>See</u> Cal. Gov't Code § 946.6 (permitting courts to

15  relieve a petitioner from claim presentation in certain specific situations, if a late-claim

16  application was made within a reasonable time not to exceed that specified in § 911.4(b), i.e.,

17  within one year of accrual); <u>Munoz v. State of California</u>, 33 Cal. App. 4th 1767, 1779 (1995)

18  ("Filing a late-claim application within one year after the accrual of a cause of action is a

19  jurisdictional prerequisite to a claim-relief petition.  When the underlying application to file a late

20  claim is filed more than one year after the accrual of the cause of action, the court is without

21  jurisdiction to grant relief under Government Code section 946.6.").  Thus, the court can see no

22  way for plaintiffs to overcome the GCA bar with respect to these claims.

23          Accordingly, the claims against all defendants—except the four endoscopy defendants

24  discussed next—set forth in the Eighth, Tenth, Eleventh, and Twelfth Causes of Action should be

25  dismissed without leave to amend.  <u>Telesaurus VPC, LLC v. Power</u>, 623 F.3d 998, 1003 (9th Cir.

26  2010) ("A district court may deny a plaintiff leave to amend if it determines that allegation of

27  other facts consistent with the challenged pleading could not possibly cure the deficiency . . . .").

28  ////

With respect to the claims against the defendants involved in the endoscopy—asserted as part of the Eighth, Tenth, Twelfth, Fourteenth, and Fifteenth Causes of Action—plaintiffs argue in their opposition that on September 4, 2020, they submitted a new government claim describing the endoscopy after discovering evidence of that procedure on or around May 26, 2020.  (ECF No. 75 at 35-36.)  Initially, asserting this argument in opposition briefing cannot cure the SAC's failure to allege an essential element of their survivorship causes of action against the public employees, i.e., adequate presentation of the estate's claims.  But, even assuming the truth of this argument, filing a new government claim after filing the SAC on July 16, 2020 still would not serve the purpose of claim presentation, as the state still had no pre-suit opportunity to consider the claims related to the endoscopy.  See Bodde, 32 Cal. 4th at 1239 ("[F]ailure to timely present a claim for money or damages to a public entity bars a plaintiff from filing a lawsuit against that entity.").  Nevertheless, it appears that plaintiffs could in a subsequent amended complaint allege timely presentation of a government claim by Decedent's estate as to the conduct surrounding the endoscopy because of their delayed discovery of those related causes of action.[18]  Therefore, the causes of action arising from the endoscopy are dismissed with leave to amend.

Accordingly, the SAC's Eighth Cause of Action should be dismissed with prejudice as to all defendants named therein, except Dr. C. Smith, against whom the claims are dismissed with

---

[18] Under California law, the "discovery rule" is the "most important" exception to the general rule that a cause of action accrues when it is complete.  Norgart, 21 Cal. 4th at 397.  The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  Id.  Taking plaintiffs at their word that they only discovered the occurrence of the "fraudulent endoscopy" on or around May 26, 2020 after receiving discovery materials from defendants, it appears that a government claim filed on September 4, 2020 would fall well within the GCA's 6-month window for claim filing.  See Cal. Gov't Code § 911.2 (requiring claim presentation within 6 months of the "accrual of the cause of action"); Garber v. City of Clovis, 698 F. Supp. 2d 1204, 1212 (E.D. Cal. 2010) (discussing Norgart in determining date of accrual of cause of action under GCA).

The undersigned expresses no opinion on the sufficiency of any state law claims plaintiffs may choose to pursue against the endoscopy defendants in a Third Amended Complaint.  The court merely observes that amendment of the causes of action against these four defendants would not necessarily be futile under the GCA.  See City of Stockton v. Superior Court, 42 Cal. 4th 730, 747-48 (2007) (modifying judgment of dismissal to provide opportunity to amend complaint to meet defendants' GCA defense where complaint did not "on its face foreclose any reasonable possibility of amendment").

1  leave to amend.  The SAC's Tenth Cause of Action should be dismissed with prejudice as to all

2  defendants named therein, except Drs. Ashe, Rudas, and C. Smith; the claims against these three

3  defendants are dismissed with leave to amend.[19]  The SAC's Eleventh Cause of Action should be

4  dismissed in its entirety with prejudice.  The SAC's Twelfth Cause of Action should be dismissed

5  with prejudice as to all defendants named therein, except Drs. Ashe, Rudas, and C. Smith; the

6  claims against these three defendants are dismissed with leave to amend.  And the claims in the

7  SAC's Fourteenth and Fifteenth Causes of Action against Drs. Ashe, Rudas, and C. Smith are

8  dismissed with leave to amend.

9          Based on this resolution, the court does not address the motion to dismiss plaintiffs'

10  prayers for punitive damages against the state health care provider defendants in these counts.

11  However, should plaintiffs reassert the Eighth, Tenth, Twelfth, Fourteenth, or Fifteenth Causes of

12  Action against the endoscopy defendants in a subsequent amended complaint, any prayer for

13  punitive damages therein will be subject to California Civil Procedure Code § 425.13 (see Section

14  I.2, *infra*).

15              ***2.  Personal Causes of Action Against Government Officials***

16          The SAC's Ninth and Sixteenth Causes of Action assert plaintiffs' personal state law

17  claims for wrongful death and negligent infliction of emotional distress.  (ECF No. 44 at 56-57,

18  63-64.)

19                      a. Negligent Infliction of Emotional Distress ("NIED")

20          The Sixteenth Cause of Action names only Sergeant Brunkhorst, asserting that he

21  negligently reported to the Coroner "a false history that [Decedent] had [a] history of drug

22  smuggling," which foreseeably caused plaintiffs severe emotional distress."  (Id. at 63-64.)

23  Defendant Brunkhorst argues this cause of action should be dismissed for failure to state a claim

24  because plaintiffs have not alleged that he owed them a duty of care.  (ECF No. 63.1 at 34-36.)

25  See Potter v. Firestone Tire & Rubber Co., 6 Cal. 4th 965, 984 (1993) (in California, there is no

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   [19] The court will separately address the sufficiency of these claims as to Dr. DeNigris, the only
28  endoscopy defendant who was not a public employee during the relevant period, and thus has not
   moved to dismiss based on the GCA.

1   independent tort of NIED, just the general tort of negligence "a cause of action in which a duty to

2   the plaintiff is an essential element").  Plaintiffs have not responded to this argument in their

3   opposition, so the court considers it conceded that Brunkhorst owed plaintiffs no legal duty

4   concerning their emotional condition or otherwise.  See Greenawalt v. Ricketts, 943 F.2d 1020,

5   1027 (9th Cir. 1991) (party conceded issue by failing to respond to it in answering brief on

6   appeal).  Because the court can envision no circumstance in which Sergeant Brunkhorst might

7   plausibly owe plaintiffs such a duty, the Sixteenth Cause of Action for NIED should be dismissed

8   with prejudice for failure to state a claim.

9                                   b. Wrongful Death

10          The SAC's Ninth Cause of Action asserts wrongful-death claims under Cal. Code Civ.

11   Proc. § 377.60 et seq. against all defendants except the CDCR and Sergeant Brunkhorst.  (ECF

12   No. 44 at 56.)  A subset of the CDCR defendants move to dismiss this cause of action based on

13   various theories which the court will address in turn.

14          First, defendants argue that the SAC fails to plead the elements of a wrongful-death claim

15   against (i) Officer Bradley; (ii) CDCR officials Ceballos and Leidner; and (iii) Drs. Ashe, Rudas,

16   and C. Smith.  California Code of Civil Procedure § 377.60 gives plaintiffs like Decedent's

17   parents standing to bring "[a] cause of action for the death of a person caused by the wrongful act

18   or neglect of another."  Thus, "[t]he elements of the cause of action for wrongful death are the tort

19   (negligence or other wrongful act), the resulting death, and the damages, consisting of the

20   pecuniary loss suffered by the heirs."  Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256,

21   1263-64 (Ct. App. 2006).  The elements of the tort of negligence are "a legal duty to use due care,

22   a breach of such legal duty, and the breach as the proximate or legal cause of the resulting

23   injury."  Vasilenko v. Grace Family Church, 3 Cal. 5th 1077, 1083 (2017).

24          The same causation element is missing from the SAC's wrongful-death claims against

25   each of these sets of defendants.  As to Officer Bradley, just as with the deliberate indifference

26   claim against him, plaintiffs have failed to plead how his allegedly wrongful act (the failure to

27   remove a cell window obstruction) caused Decedent's death which seems to have occurred hours

28   earlier.  As to defendants Ceballos and Leidner, the SAC's only allegations directed to them

                                            31

1   assert that these two CDCR officials changed the requirement that EOP patients like Decedent

2   receive psychiatric evaluations every 30 days, extending it up to 60 days between visits.  (ECF

3   No. 44 at 16-18, 21.)  According to plaintiffs, this "change was in effect from December 2016 to

4   April 2017."  (Id. at 16.)  Again, plaintiffs fail to show the causal connection between this brief

5   policy change and Decedent's death almost two years later.  Although plaintiffs assert that

6   Decedent continually did not receive frequent enough psychiatric visits, which led to his

7   worsening mental state, there is no allegation that defendants Ceballos and Leidner caused a

8   decrease in the frequency of Decedent's visits past April 2017.  And as to Drs. Ashe, Rudas, and

9   C. Smith, although the Ninth Cause of Action does not specify their particular wrongful conduct,

10  the court infers that plaintiffs include them in this count due to their involvement in Decedent's

11  May 2018 endoscopy.  Plaintiffs only directly allege that the false diagnosis of end stage liver

12  disease and the performance of the endoscopy increased Decedent's suffering and worsened his

13  mental state, not that they caused his death some six months later.  Accordingly, the wrongful-

14  death claims against defendants Ashe, Bradley, Ceballos, Leidner, Rudas, and C. Smith are

15  dismissed with leave to amend.

16         Second, the CDCR defendants urge dismissal of the wrongful-death claims (and the other

17  state law claims) against defendants Diaz, Gipson, Kernan, Tebrock, and Toche—who are all

18  publicly appointed officials—under California Government Code section 951.  Section 951

19  provides: "[A]ny complaint for damages in any civil action brought against a publicly elected or

20  appointed state or local officer, in his or her individual capacity . . . shall allege with particularity

21  sufficient material facts to establish the individual liability of the publicly elected or appointed

22  state or local officer."  Cal. Gov't Code § 951.  As defendants point out, the only allegations

23  about CDCR Secretary Scott Kernan, CDCR Acting Secretary Ralph Diaz, CDCR Director of

24  Adult Institutions Connie Gipson, and CDCR Undersecretary of Health Care Services Diana

25  Toche appear in the Parties identification section of the SAC. (ECF No. 44 at 4-5.)  Plaintiffs

26  generally recite each of these defendants' supervisory responsibilities for setting and enforcing

27  CDCR policies and ensuring adequate provision of mental health care to inmates.  (Id. at 4-5.)

28  And the only additional allegations against CDCR Deputy Director of SMHP Katherine Tebrock

1   are that she "knowingly presented fraudulent data" regarding psychiatrist staffing levels to the

2   court in March 2017.  (Id. at 7, 17-18, 39.)  These allegations do not satisfy § 951's requirement

3   to plead "with particularity" facts showing that these defendants are liable for Decedent's January

4   2019 death.  Plaintiffs must do more than simply assert that these defendants held leadership roles

5   during the time that Decedent received less than the constitutional standard of medical care.

6   Accordingly, these claims are dismissed with leave to amend.

7       Third, the CDCR defendants argue that California Government Code section 820.8 bars

8   the wrongful-death claims against both the above publicly appointed defendants and the

9   following supervisory defendants:  Adams, Brizendine, Brockenborough, Heatley, Ponciano,

10  Rekart.  (ECF Nos. 63.1 at 32, 68.)  The same argument applies to supervisory defendants Kuich

11  and Lizarraga, who join the motion.  (ECF No. 65.)

12      Section 820.8 states in relevant part: "Except as otherwise provided by statute, a public

13  employee is not liable for an injury caused by the act or omission of another person." Cal. Gov't

14  Code § 820.8.  Section 820.8 essentially immunizes public employees from vicarious liability.

15  Weaver By and Through Weaver v. State of California, 63 Cal. App. 4th 188, 203 (1998).  It does

16  not apply where a plaintiff seeks to hold a defendant "personally liable for his conduct as a

17  supervisor."  Johnson v. Baca, No. CV 13-04496 MMM (AJWx), 2014 WL 12588641, at *17

18  (C.D. Cal. Mar. 3, 2014); see also Doe v. Regents of Univ. of Cal., No. CIV. S-06-1043

19  LKK/DAD, 2006 WL 2506670, at *5 (E.D. Cal. Aug. 29, 2006) (denying motion to dismiss

20  based on § 820.8 when liability was premised on defendant supervisor's direct actions).

21      Taking the SAC as a whole, it does not seem that plaintiffs seek to hold any of these

22  supervisors liable for Decedent's wrongful death simply because they supervised others whose

23  actions harmed him.  But given the dearth of factual allegations explaining each of these

24  individuals' personal involvement in the circumstances surrounding plaintiff's care and treatment,

25  that is the distinct impression one gets.  Again, in the Parties identification section, plaintiffs

26  allege several of these supervisors' general oversight responsibilities, but most of these

27  individuals' names never appear again in the SAC—or, if they do, it is only in passing.  (See ECF

28  No. 44 at 6-8.)  For instance, the only allegations the court can identify for Dr. Jacob Adams, who

                                            33

1    was a Senior Psychiatrist Specialist on the CDCR Mental Health Quality team, is that Adams was

2    responsible for "overseeing the psychiatric care of inmate patients at MCSP" and discussed

3    Decedent's care with Decedent's brother once in June 2017.  (Id. at 6-7, 24.)  Because the SAC

4    describes no other conduct by Dr. Adams, it looks to the court like plaintiffs' theory of liability

5    must rest on Adams' mere status as a supervisor of other psychiatrists whose actions are

6    described in the SAC.  Section 820.8 forbids this.  The same issue plagues the other supervisory

7    defendants as well.

8        Based on the current pleadings, the Ninth Cause of Action are dismissed against

9    defendants Adams, Brizendine, Brockenborough, Heatley, Kuich, Lizarraga, Ponciano, and

10   Rekart.  But plaintiffs are granted leave to amend the SAC to address this deficiency.[20]

11       **H.    State Law Claims Against Dr. DeNigris**

12       The SAC's Ninth, Tenth, Twelfth, Fourteenth, and Fifteenth Causes of Action assert state

13   law personal and survivorship claims against Dr. DeNigris which are not subject to the

14   Government Claims Act because Dr. DeNigris is a private doctor, not a public employee.

15   Dr. DeNigris moves to dismiss only the Twelfth, Fourteenth, and Fifteenth Causes of Action

16   which assert violations of the Bane Act, medical battery, and assault based on the allegedly

17   unnecessary endoscopy.  (ECF Nos. 64, 64.1 at 7-9.)

18       *1.  Bane Act Violation*

19       The SAC's Twelfth Cause of Action includes a survivorship claim against Dr. DeNigris

20   for violating California Civil Code section 52.1 ("the Bane Act"), which imposes liability on a

21   person who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat,

22   intimidation, or coercion, with the exercise" of an individual's constitutional rights.  Cal. Civ.

23   Code § 52.1(b).  Plaintiffs allege that Dr. DeNigris and the three other state doctors "coerced

24   [Decedent] into a fraudulent procedure" by giving Decedent a false diagnosis of liver disease and

25

26

27   _____
     [20] The same deficiency also exists with respect to the other state law causes of action, which the
     court does not discuss substantively because they are currently barred by the Government Claims
28   Act.

1   claiming he "risked death from bleeding into his throat" if he refused the procedure.  (ECF No. 44

2   at 59-60.)

3          The allegations in the SAC do not support the conclusory statement that Dr. DeNigris

4   coerced Decedent into undergoing the endoscopy.  A plaintiff bringing a claim under the Bane

5   Act "must show (1) intentional interference or attempted interference with a state or federal

6   constitutional or legal right, and (2) the interference or attempted interference was by threats,

7   intimidation or coercion."  Allen v. City of Sacramento, 234 Cal. App. 4th 41, 67 (Ct. App.

8   2015), modified on denial of reh'g (Mar. 6, 2015).  Plaintiffs simply have not pleaded facts that

9   make it plausible that Dr. DeNigris coerced Decedent.  According to the SAC, Dr. DeNigris saw

10  Decedent on one occasion to perform the endoscopy, after plaintiff had been informed of and

11  agreed to the procedure.  (ECF No. 44 at 40.)  There is no suggestion that at that appointment

12  Dr. DeNigris threatened, intimidated, or coerced Decedent.  Therefore, the Twelfth Cause of

13  Action against Dr. DeNigris should be dismissed.  Plaintiffs are granted leave to amend this claim

14  against Dr. DeNigris, however, in case they can supplement the pleadings as to Dr. DeNigris's

15  coercive actions.

16                    *2. Medical Battery and Assault*

17         The SAC's Fourteenth and Fifteenth Causes of Action include survivorship claims against

18  Dr. DeNigris for medical battery and assault.  (ECF No. 44 at 62-63.)  Plaintiffs allege that

19  Decedent's consent to the May 4, 2018 endoscopy was "based on fraud and invalid," and that

20  Dr. DeNigris performed the endoscopy despite knowing that Decedent did not need it, in order to

21  generate medical fees.  (Id. at 39-40, 62-63.)

22         Under California law, civil assault is a demonstration of intent to inflict immediate injury

23  on the person of another then present and is based on an invasion of a person's right to live

24  without being put in fear of personal harm.  See Lowry v. Standard Oil Co. of Cal., 63 Cal.

25  App. 2d 1, 6-7 (1944); Cal. Civil Code § 43 (general personal rights).  A classic example of an

26  assault is the pointing of a gun at another in a threatening manner.  See Lowry, 63 Cal. App. 2d

27  at 7.  The SAC's allegations are insufficient to establish the tort of assault because plaintiffs have

28  not alleged any action by Dr. DeNigris that placed Decedent in fear of immediate bodily injury.

1   Plaintiffs state that Decedent only consented to the procedure because he was told his alternative

2   was "potentially dying from bleeding into his throat." (ECF No. 44 at 63.) But that is far from

3   alleging that, for instance, Dr. DeNigris put Decedent in fear that Dr. DeNigris was about to cause

4   Decedent's throat to bleed. The SAC's Fifteenth Cause of Action against Dr. DeNigris is thus

5   subject to dismissal. Plaintiffs are granted leave to amend this claim, in case they can assert

6   additional facts from the endoscopy appointment that would show some conduct by Dr. DeNigris

7   that made Decedent fear for his personal safety.

8        The court reaches the same conclusion for the Fourteenth Cause of Action for battery. In

9   California, "battery is any intentional, unlawful and harmful contact by one person with the

10  person of another." Ashcraft v. King, 228 Cal. App. 3d 604, 611 (Ct. App. 1991). In the medical

11  context, battery "occurs when a doctor performs a procedure without obtaining any consent."

12  Saxena v. Goffney, 159 Cal. App. 4th 316, 324 (Ct. App. 2008). In his motion to dismiss,

13  Dr. DeNigris relies on the California Supreme Court case Cobbs v. Grant, which holds that

14  "[w]here a doctor obtains consent of the patient to perform one type of treatment and

15  subsequently performs a substantially different treatment for which consent was not obtained,

16  there is a clear case of battery." 8 Cal. 3d 229, 239 (1972). Dr. DeNigris argues that the SAC

17  contains no facts showing that he knew Decedent did not need the endoscopy, nor does it allege

18  that the procedure he performed was substantially different from the one to which Decedent

19  consented. (ECF No. 64.1 at 9.) Plaintiffs counter that because Decedent's consent was

20  fraudulently induced, there was no valid consent to the endoscopy. (ECF No. 75 at 39-40.)

21       The court is only partially persuaded by Dr. DeNigris' arguments. Initially, "battery

22  requires no showing of 'scienter' or any intent to do wrong—only an intent to cause the harmful

23  unconsented touching," in this case the endoscopy. Freedman v. Superior Court, 214 Cal. App.

24  3d 734, 739-40, (1989) (citing Rest. 2d Torts (1965) § 13). So Dr. DeNigris' knowledge of the

25  procedure's necessity or unnecessity might seem to be irrelevant. But here the question of

26  whether plaintiffs have adequately pleaded lack of consent turns on such knowledge.

27       "The element of lack of consent to the particular contact is an essential element of

28  battery." Rains v. Superior Court, 150 Cal. App. 3d 933, 938 (1984). Dr. DeNigris argues

36

1   essentially that because plaintiff consented to an endoscopy, and an endoscopy is what he got,

2   there can be no battery.  This is an overly simplistic view of consent, as shown by the cases

3   plaintiffs cite.  California case law is clear that a doctor's fraudulent misrepresentations about the

4   therapeutic nature of a proposed procedure can vitiate a patient's consent.  Rains, 150 Cal. App.

5   3d at 936-42 (psychiatric patients agreed to beat each other up after defendants fraudulently

6   represented to them this "sluggo therapy" would have a therapeutic benefit).  As the court

7   observed in Rains, "[i]f a physician, for the sole secret purpose of generating a fee, intentionally

8   misrepresented to a patient that an unneeded operation was necessary, it is beyond question that

9   the consent so obtained would be legally ineffective."  Id. at 941.  That is precisely the scenario

10  presented in the SAC:  that, in an attempt to generate medical fees, prison doctors told Decedent

11  he required an endoscopy as part of the treatment for his supposed end stage liver disease, when

12  in fact (according to plaintiffs) he had no signs of liver disease and there was no therapeutic

13  purpose for the endoscopy.  (ECF No. 44 at 34-35, 39-40.)  These allegations place plaintiffs'

14  battery claim on par with the battery claim accepted as sufficient to defeat a motion to dismiss in

15  Rains because the "therapeutic versus nontherapeutic purpose" of the objectionable procedure

16  "goes to the 'essential character of the act itself' and thus vitiates consent obtained by fraud as to

17  that character."  150 Cal. App. 3d at 941 (quoting Prosser on Torts (4th ed. 1971) § 18).

18          But there remains a critical flaw in the SAC's pleadings on this point, nonetheless.  For

19  the same reason that the court concluded plaintiffs have failed to allege deliberate indifference by

20  Dr. DeNigris and the three prison doctors in recommending and performing the endoscopy,

21  plaintiffs have failed to assert facts supporting their theory that defendants' actions were based on

22  fraud.  As to Dr. DeNigris, specifically—the only doctor not subject to the current Government

23  Claims Act bar—the SAC includes no allegation plausibly suggesting that he knew there was no

24  medical purpose for the endoscopy, or that he performed the procedure purely for financial gain.

25  The only applicable allegations are that a more thorough review of Decedent's medical file would

26  have shown that Decedent had no history of cirrhosis, making an endoscopy unnecessary, and

27  that Dr. DeNigris later assigned an incorrect billing code for the procedure.  (ECF No. 44

28  at 39-40.)  This is not enough to support plaintiffs' position that "fraud is the most likely

37

1   conclusion" and that Dr. DeNigris therefore performed the endoscopy without Decedent's

2   consent.

3   　　　Accordingly, the Fourteenth Cause of Action against Dr. DeNigris is also subject to

4   dismissal.  Plaintiffs are granted leave to amend this claim to assert additional facts showing that

5   Decedent's consent to the endoscopy was based on fraudulent misrepresentations.  The court

6   notes that Dr. DeNigris has not challenged plaintiffs' Tenth Cause of Action against him for

7   negligence, recovery for which does not require showing a lack of consent based on fraud.

8   　　　**I.**　　　**Requests for Punitive Damages**

9   　　　Finally, the moving defendants challenge plaintiffs' requests for punitive damages in

10   certain of their state law causes of action.  (ECF Nos. 63, 64.)  Based on the court's current

11   resolution of the above causes of action, only two of the challenged punitive damages requests

12   require addressing:  (1) those sought in the Ninth Cause of Action for wrongful death, where

13   undismissed claims remain against ten defendants, and (2) those sought in the Tenth Cause of

14   Action for negligence where only the claims against Dr. DeNigris remain active.

15   　　　　　　*1. Punitive Damages for Wrongful Death Claims Are Barred*

16   　　　Punitive damages are not recoverable for the Ninth Cause of Action for Decedent's

17   wrongful death.  (See ECF No. 44 at 57.)  In California, punitive damages may only be recovered

18   for wrongful death against a person convicted of a felony homicide in the decedent's death. Cal.

19   Civ. Code § 3294(d).  Other than that statutory exception, punitive damages are not recoverable

20   in a wrongful death action.  Tarasoff v. Regents of the Univ. of Calif., 17 Cal. 3d 425, 450 (1976).

21   Because no defendant in this case has been convicted of a felony homicide, punitive damages are

22   not recoverable for Decedent's wrongful death.  Plaintiffs do not argue otherwise.  Therefore, the

23   motion to dismiss plaintiffs' wrongful-death punitive damages claims against the moving

24   defendants should be granted and the claims dismissed with prejudice.

25   　　　　　　*2. Punitive Damages for Negligence Claim Against Dr. DeNigris*

26   　　　Dr. DeNigris seeks to dismiss plaintiffs' claims for punitive damages arising from the

27   Tenth Cause of Action against him for medical negligence, on the ground that plaintiffs have not

28   complied with California Civil Procedure Code § 425.13, a state court rule requiring plaintiffs to

1   obtain leave of court to seek punitive damages from a healthcare provider on a claim for

2   professional negligence.  (ECF No. 64.1 at 9-10.)

3        Unlike the CDCR defendants who challenge the punitive damages requests under

4   Rule 12(b)(6), (ECF No. 63 at 3), Dr. DeNigris moves to strike plaintiffs' prayer for punitive

5   damages under Rule 12(f).  (ECF No. 64 at 2.)  But the Ninth Circuit has held that "Rule 12(f)

6   does not authorize a district court to strike a claim for damages on the ground that such damages

7   are precluded as a matter of law."  <u>Whittlestone, Inc. v. Handi-Craft Co.</u>, 618 F.3d 970, 971,

8   974-75 (9th Cir. 2010).  This alone is grounds to deny Dr. DeNigris' motion to strike.  <u>See</u> Fed.

9   R. Civ. Pro. 12(f) (permitting the court to strike from a pleading only "an insufficient defense or

10  any redundant, immaterial, impertinent, or scandalous matter"); <u>Estate of Prasad ex rel. Prasad v.

11  Cty. of Sutter</u>, 958 F. Supp. 2d 1101, 1128 (E.D. Cal. 2013) (denying motion to strike prayer for

12  punitive damages where defendant had not shown Rule 12(f) to be an authorized or proper

13  vehicle for such relief).  But, given that plaintiffs have briefed the substance of the punitive

14  damages challenge in their opposition, the undersigned will construe Dr. DeNigris' motion to

15  strike as a motion to dismiss, as other courts have sometimes done in similar situations.  <u>See</u>

16  <u>Rhodes v. Placer Cty.</u>, No. 2:09-CV-00489-MCE-KJN, 2011 WL 1302240, at *20 & n.18 (E.D.

17  Cal. Mar. 31, 2011) (collecting cases), <u>report and recommendation adopted</u>, 2011 WL 1739914

18  (E.D. Cal. May 4, 2011).

19       Section 425.13 provides, as relevant:

20          In any action for damages arising out of the professional negligence
            of a health care provider, no claim for punitive damages shall be
21          included in a complaint or other pleading unless the court enters an
            order allowing an amended pleading that includes a claim for
22          punitive damages to be filed.

23  Cal. Civ. Proc. Code § 425.13(a).  And before the court can permit the punitive damages request

24  the plaintiff must establish a "substantial probability that [she] will prevail on the claim pursuant

25  to Section 3294 of the Civil Code."  <u>Id.</u>  Section 3294, in turn, permits recovery of punitive

26  damages for negligence only where there is "clear and convincing evidence that the defendant has

27  been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).

28  ////

1    There is a great jurisdictional split on whether this statute applies in federal court, a

2    question which the Ninth Circuit has not addressed.  See Scalia v. Cty. of Kern, 308 F. Supp. 3d

3    1064, 1091 (E.D. Cal. 2018); Gomez v. Madden, No. 16-CV-2316-WQH(WVG), 2020 WL

4    4336094, at *11 (S.D. Cal. July 28, 2020), report and recommendation adopted, 2020 WL

5    5363301 (S.D. Cal. Sept. 8, 2020).  Even within this district, courts have drawn different

6    conclusions.  Compare Shekarlab v. Cty. of Sacramento, No. 2:18-CV-00047-JAM-EFB, 2018

7    WL 1960819, at *2-4 (E.D. Cal. Apr. 26, 2018) (finding § 425.13 applicable in federal court);

8    Elias v. Navasartian, No. 11:5-CV-01567-LJO-GSA PC, 2017 WL 1013122, at *5 (E.D. Cal. Feb.

9    17, 2017) (collecting Eastern district cases applying § 425.13), report and recommendation

10   adopted, 2017 WL 977793 (E.D. Cal. Mar. 13, 2017), with Scalia, 308 F. Supp. 3d at 1090-91

11   (finding § 425.13 procedural and inapplicable in federal court); Estate of Prasad, 958 F. Supp. 2d

12   at 1119-20 (collecting cases across California district courts and finding § 425.13 inapplicable

13   because of conflict with Fed. R. Civ. P. 8(a)(3)).

14       In resolving state law diversity claims, federal courts apply procedural rules as stated in

15   the Federal Rules of Civil Procedure, but under the Erie exception apply the substantive law of

16   the forum state.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  "Courts applying [§ 425.13]

17   either have found it to be 'intimately bound' to state substantive law and therefore a substantive,

18   rather than procedural rule, or have found the plaintiff's punitive damages claims largely arise

19   under state law and the state law should therefore apply."  Elias, 2017 WL 1013122, at *5

20   (collecting cases).  Dr. DeNigris urges the application of § 425.13 to strike plaintiffs' request for

21   punitive damages against him in the negligence count (ECF Nos. 64.1 at 9-10, 78 at 3-4), while

22   plaintiffs rely on the cases finding § 425.13 inapplicable as a procedural rule (ECF No. 75

23   at 40-42).  The undersigned agrees with Dr. DeNigris and those courts applying § 425.13 as a

24   substantive rule that should govern state law claims even when brought in federal court.

25       Section 425.13 does not simply govern the timing or order of requesting punitive damages

26   for medical negligence claims.  Instead, it requires a plaintiff to show a "substantial probability"

27   of prevailing on a claim for punitive damages under the heightened standard set forth in

28   California Civil Code § 3294(a).  See Cal. Civ. Proc. Code § 425.13(a).  Assessing whether such

1    a showing has been made necessarily requires analyzing the strength of the substance of

2    plaintiffs' claims of professional negligence.  Here, plaintiffs claim that the endoscopy performed

3    by Dr. DeNigris was unnecessary and harmful, and that his actions were "malicious, wanton, and

4    oppressive."  (ECF No. 44 at 58.)  An inquiry into the strength of such claims—as required by

5    § 425.13 and § 3294—cannot be done without inquiring into the substantive law of the cause of

6    action, the nature and extent of the endoscopy, and its medical indications.

7            Indeed, § 425.13 was enacted to establish precisely this sort of judicial screening of such

8    claims.  Cent. Pathology Serv. Med. Clinic, Inc. v. Super. Ct., 3 Cal. 4th 181, 189 (1992)

9    ("[B]ecause it was concerned that unsubstantiated claims for punitive damages were being

10   included in complaints against health care providers, the [California] Legislature sought to

11   provide additional protection by establishing a pretrial hearing mechanism by which the court

12   would determine whether an action for punitive damages could proceed.").  The § 425.13 inquiry

13   "requires courts to examine the substance of a plaintiff's claims and block unsubstantiated

14   pursuits of punitive damages early in litigation."  Shekarlab, 2018 WL 1960819, at *4.  See Allen

15   v. Woodford, No. 1:05-CV-01104-OWW-LJO, 2006 WL 1748587, at *22 (E.D. Cal. June 26,

16   2006) (granting motion to strike punitive damages and holding that, because § 425.13 is so

17   "intimately bound up" with the substantive law of the underlying state law claims arising from the

18   rendering of professional medical services, it must be applied by federal courts when addressing

19   the issue of punitive damages against medical providers for state law claims); Thomas v.

20   Hickman, No. CV F 06-0215 AWI SMS, 2006 WL 2868967, at *38-41 (E.D. Cal. Oct.6, 2006).

21           The undersigned is not persuaded by the reasoning of other sister district courts that have

22   held § 425.13 "is essentially a method of managing or directing a plaintiff's pleadings, rather than

23   a determination of substantive rights" and have declined to apply it because "federal courts

24   readily accomplish the purposes contemplated by section 425.13 through their case management

25   procedures."  Jackson v. E. Bay Hosp., 980 F. Supp. 1341, 1352-53 (N.D. Cal. 1997); see Scalia,

26   308 F. Supp. 3d at 1091 (adopting Jackson's logic and holding that § 425.13 "does not affect the

27   substance of the negligence claim or burden of proof for punitive damages but merely manages

28   the pleadings by dictating how and when a plaintiff may plead the request").  The undersigned

41

1    fails to see how "the federal courts' authority to manage their own calendars obviates the

2    propriety of respecting [the] legislative balancing" achieved through § 425.13.  Shekarlab, 2018

3    WL 1960819, at *4.

4          Plaintiffs have neither requested nor obtained an order from the court allowing for

5    recovery of punitive damages.  Therefore, the court grants the motion to dismiss plaintiffs'

6    request for punitive damages against defendant DeNigris in the Tenth Cause of Action for

7    medical negligence.  The punitive damages claim is dismissed without prejudice, however.  If

8    plaintiffs wish to pursue punitive damages from Dr. DeNigris on this count, they will have 30

9    days from the date of the district court's forthcoming resolution of  the enclosed findings and

10   recommendations to file documents attempting to make the "substantial probability" showing

11   required under California Civil Procedure Code § 425.13.

12         **J.    Leave to Amend**

13         If the court finds that a complaint or claim should be dismissed for failure to state a claim,

14   the court has discretion to dismiss with or without leave to amend.  Leave to amend should be

15   granted if it appears possible that the defects in the complaint could be corrected, especially if a

16   plaintiff is pro se.  Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc); Cato v.

17   United States, 70 F.3d 1103, 1106 (9th Cir. 1995) ("A pro se litigant must be given leave to

18   amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that

19   the deficiencies of the complaint could not be cured by amendment." (citing Noll v. Carlson, 809

20   F.2d 1446, 1448 (9th Cir. 1987))).  However, if, after careful consideration, it is clear that a claim

21   cannot be cured by amendment, the Court may dismiss without leave to amend.  Cato, 70 F.3d

22   at 1105-06.  As discussed above and detailed in the below order, the court dismisses some claims

23   with leave to amend, and recommends dismissing others without leave to amend.

24         Any Third Amended Complaint plaintiffs might choose to file **shall be limited to the**

25   **defendants named and causes of action asserted in the SAC**, unless plaintiffs first obtain leave

26   of court.  Further, plaintiffs are cautioned that renewed claims against the dismissed defendants

27   that are identical or substantially similar to those contained in their SAC will likely be subject to

28   dismissal without leave to amend.  If plaintiffs find that they cannot sufficiently plead a certain

1  claim against certain defendants, they are instructed to follow Federal Rule of Civil Procedure 41

2  concerning voluntary dismissals of actions without prejudice.

3       Plaintiffs are additionally cautioned that the court cannot refer to a prior complaint or

4  other filing in order to make their amended complaint complete.  Local Rule 220 requires that an

5  amended complaint be complete in itself without reference to any prior pleading.  As a general

6  rule, an amended complaint supersedes the original complaint, and once an amended complaint is

7  filed, the prior complaint no longer serves any function in the case.

8       **Alternatively,** should plaintiffs wish to simply proceed on the surviving claims in the

9  SAC, this action would go forward with the following claims, subject to the district court's

10  adoption of these findings and recommendations:

11       1.  Eighth Amendment claims of deliberate indifference against defendants Andaluz,

12       Branman, J. Johnson, R. Johnson, Ramkumar, Robinson, and M. Smith;

13       2.  Eighth Amendment claims of deliberate indifference against all supervisors named

14       in the Second and Third Causes of Action;

15       3.  Fourteenth Amendment claims of deprivation of familial relations against

16       defendants Adams, Andaluz, Branman, Brizendine, Brockenborough, Ceballos,

17       Diaz, Gipson, Heatley, J. Johnson, R. Johnson, Kernan, Kuich, Leidner, Lizarraga,

18       Ponciano, Ramkumar, Rekart, Robinson, M. Smith, Tebrock, and Toche;

19       4.  Wrongful death claims against defendants Andaluz, Asman, Branman, DeNigris,

20       J. Johnson, R. Johnson, Ramkumar, Robinson, M. Smith, and Wanie; and

21       5.  A negligence claim against Dr. DeNigris, without punitive damages.

22       If plaintiffs prefer to proceed on these claims, rather than file a Third Amended

23  Complaint, they should so notify the court within thirty (30) days of the date of the District

24  Judge's forthcoming order regarding the enclosed findings and recommendations.

25  ////

26  ////

27  ////

28  ////

1    **<u>CONCLUSION</u>**

2          For the reasons set forth above, it is HEREBY ORDERED that:

3    1.   Defendants' motions to dismiss (ECF Nos. 63, 64) are GRANTED IN PART and

4         DENIED IN PART:

5              a.   The motions to dismiss the First Cause of Action for deliberate indifference by

6                   Drs. Ashe, DeNigris, Rudas, and C. Smith arising from their actions related to the

7                   May 2018 endoscopy are GRANTED, and those claims are dismissed with leave

8                   to amend;

9              b.   To the extent defendants Lizarraga and Kuich move for dismissal of the Second,

10                  Third, and Fourth Causes of Action against them, their motion is DENIED;

11             c.   The motions to dismiss the Fourth Cause of Action for deprivation of familial

12                  relations by Drs. Ashe, DeNigris, Rudas, and C. Smith arising from their actions

13                  related to the May 2018 endoscopy are GRANTED, and those claims are

14                  dismissed with leave to amend;

15             d.   The motions to dismiss the Fifth, Sixth, and Seventh Causes of Action for

16                  violations of 42 U.S.C. §§ 1985(3) and 1986 are GRANTED, and those claims are

17                  dismissed in their entirety, with leave to amend;

18             e.   The motion to dismiss the Eighth Cause of Action for negligent supervision by

19                  Dr. C. Smith arising from his actions related to the May 2018 endoscopy is

20                  GRANTED, and those claims against him are dismissed with leave to amend;

21             f.   The motions to dismiss the Ninth Cause of Action for wrongful death by all

22                  defendants named therein are GRANTED, and those claims are dismissed in their

23                  entirety, with leave to amend;

24             g.   The motion to dismiss the Tenth Cause of Action for negligence by Drs. Ashe,

25                  Rudas, and C. Smith is GRANTED, and the claims against them are dismissed

26                  with leave to amend;

27   ////

28   ////

   h. The motions to dismiss the Twelfth Cause of Action for violations of California Civil Code § 52.1 by Drs. Ashe, DeNigris, Rudas, and C. Smith are GRANTED, and the claims against them are dismissed with leave to amend;

   i. The motion to dismiss the Thirteenth Cause of Action for violations of the Americans with Disabilities Act and the Rehabilitation Act is GRANTED, and those claims are dismissed in their entirety, with leave to amend;

   j. The motions to dismiss the Fourteenth Cause of Action for medical battery are GRANTED, and all claims are dismissed with leave to amend; and

   k. The motions to dismiss the Fifteenth Cause of Action for assault are GRANTED, and all claims are dismissed with leave to amend.

2. Dr. DeNigris' motion to strike plaintiffs' punitive damages claims in the Tenth Cause of Action, construed as a motion to dismiss under Rule 12(b)(6), is GRANTED.  Plaintiffs' claims and prayer for punitive damages in the Tenth Cause of Action as against Dr. DeNigris are dismissed without prejudice.  If plaintiffs wish to pursue punitive damages from Dr. DeNigris on this count, **they will have fifteen (15) days** from the date of the District Judge's forthcoming order regarding the enclosed findings and recommendations to file documents attempting to make the "substantial probability" showing required under California Civil Procedure Code § 425.13.

3. **Within thirty (30) days** of the date of the District Judge's forthcoming order regarding the enclosed findings and recommendations plaintiffs shall file an amended complaint, which shall be captioned "Third Amended Complaint," or shall notify the court that they wish to proceed on the non-dismissed causes of action asserted in their Second Amended Complaint.

////

////

////

////

////

Additionally, IT IS HEREBY RECOMMENDED that:

1. Defendants' motions to dismiss (ECF Nos. 63, 64) be GRANTED IN PART:

    a. The motion to dismiss the First Cause of Action for deliberate indifference be granted as to defendants Asman, Bradley, and Wanie, and those claims be dismissed with prejudice;

    b. The motion to dismiss the Fourth Cause of Action for deprivation of familial relations be granted as to defendants Asman, Bradley, and Wanie, and those claims be dismissed with prejudice;

    c. The motion to dismiss the Eighth Cause of Action for negligent supervision and training be granted as to all defendants named therein except Dr. C. Smith, and those claims be dismissed with prejudice;

    d. The motion to dismiss the Tenth Cause of Action for negligence be granted as to all moving defendants except Drs. Ashe, Rudas, and C. Smith, and those claims be dismissed with prejudice;

    e. The motion to dismiss the Eleventh Cause of Action be granted, and the claims be dismissed in their entirety with prejudice;

    f. The motion to dismiss the Twelfth Cause of Action for violations of California Civil Code § 52.1 be granted as to all defendants named therein except Drs. Ashe, DeNigris, Rudas, and C. Smith, and those claims be dismissed with prejudice;

    g. The motion to dismiss the Sixteenth Cause of Action for negligent infliction of emotional distress be granted, and the claims be dismissed in their entirety with prejudice; and

    h. The motion to dismiss plaintiffs' punitive damages claim in the Ninth Cause of Action for wrongful death be granted, and those claims be dismissed with prejudice.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written

1    objections with the court and serve a copy on all parties.  Such a document should be captioned

2    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

3    shall be served on all parties and filed with the court within fourteen (14) days after service of the

4    objections.  The parties are advised that failure to file objections within the specified time may

5    waive the right to appeal the District Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th

6    Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

7    Dated:  November 13, 2020

8                                                    _____
                                                     CAROLYN K. DELANEY
9                                                    UNITED STATES MAGISTRATE JUDGE

10

11

12   19.schm.195

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28