1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   THOMAS SCHMITZ, et al.,                    No.  2:20-cv-00195-JAM-CKD PS

12                Plaintiffs,

13        v.                                    FINDINGS & RECOMMENDATIONS

14   A. ASMAN, et al.,                          (ECF Nos. 138-40, 145)

15                Defendants.

16

17          Presently before the court is plaintiffs' motion for leave to file a fourth amended

18   complaint, which motion includes a request for reconsideration of the court's prior order

19   dismissing with prejudice certain claims against defendants Adam Asman and Erik Bradley.[1]

20   (ECF No. 145.)  The court set a briefing schedule for the motion, which is related to the

21   previously filed and still pending motions to dismiss the currently operative Third Amended

22   Complaint.  (ECF Nos. 138-40, 146.)  The court finds the present motion suitable for resolution

23   without oral argument.  See Local Rule 230(g).  After considering plaintiffs' motion and

24   supporting papers, the three oppositions filed by various defendants, and plaintiffs' reply and

25   request for judicial notice (ECF Nos. 145, 148, 150-53), the court recommends GRANTING IN

26   PART leave to further amend—denying leave to reassert the claims dismissed with prejudice but

27   ─────────────────────

28   [1] Plaintiffs are representing themselves in this action.  All pretrial matters are referred to the
     undersigned in accordance with Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).

                                                1

1  permitting leave to proceed on all others.  The court therefore further recommends DENYING as

2  moot the currently pending motions to dismiss, without prejudice to their renewal.

3  **BACKGROUND**

4       This action arises from the January 2019 death of William Schmitz while incarcerated at

5  Mule Creek State Prison ("MCSP"), under the authority of the California Department of

6  Corrections and Rehabilitation ("CDCR").  Plaintiffs Thomas Schmitz and Dianne Mallia—

7  William's father and mother—bring this action individually on their own behalves and also as

8  successors in interest to William's estate.

9       As relevant to these motions, William died in his cell of a methamphetamine overdose

10  after ingesting large quantities of the substance, allegedly as a result of his psychosis and

11  generally poor mental health.  Plaintiffs are suing numerous defendants for their alleged

12  contributions to William's "untimely and avoidable death."  (ECF No. 130 at 2, 4-13.)  They are

13  suing top-level CDCR officials for not addressing system-wide failures in providing adequate

14  care for prisoners, like William, with known mental health problems; MCSP medical staff for

15  providing inadequate mental health care to William from as early as June 2014 through the time

16  of his death in 2019; a subset of MCSP medical staff who allegedly misdiagnosed William with

17  liver damage, increasing his anxiety; a private contracting physician named Stephen DeNigris,

18  who allegedly performed an unnecessary endoscopy on William in late 2018 that caused him pain

19  and worsened his mental health; MCSP floor officers Adam Asman and Erik Bradley, who

20  allegedly failed to complete thorough welfare checks on William during the day of his death; and

21  the MCSP supervisors who allegedly allowed these unconstitutional practices to persist.[2]

22       **A. Procedural History**

23       Plaintiffs filed the present suit on January 27, 2020 and filed their First Amended

24  Complaint ("1AC") one month later.  (ECF Nos. 1, 6.)  The defendants named in the 1AC filed

25  motions to dismiss the case in its entirety (ECF Nos. 22, 23), which the court denied in part and

26  granted in part, permitting plaintiffs to file another amended complaint (ECF No. 41).  On

27  ───────────────

28  [2] These general allegations are consistent across the operative Third Amended Complaint and
plaintiffs' proposed Fourth Amended Complaint.

1   July 16, 2020, plaintiffs filed their Second Amended Complaint ("2AC"), amending certain

2   claims and adding many more causes of action and defendants.  (ECF No. 44.)  The defendants

3   named therein filed motions to partially dismiss the 2AC (ECF Nos. 63-65, 68, 70), which the

4   court granted in part—dismissing certain claims with prejudice and others with leave to amend

5   ("Second Dismissal").  (ECF Nos. 85 (findings & recommendations), 124 (order adopting).)

6        Plaintiffs timely filed the currently operative Third Amended Complaint ("3AC") on

7   January 21, 2021.  (ECF No. 130.)  In early February 2021, defendants again moved to partially

8   dismiss.  (ECF Nos. 138-40.)  The court approved the parties' stipulation to continue the hearing

9   on the motions to dismiss to May 5, 2021 to allow plaintiffs time to attempt to obtain defendants'

10  consent to the filing of a Fourth Amended Complaint.  (ECF No. 142.)  Apparently unable to do

11  so, on April 14, 2021 plaintiffs filed the instant motion to amend which also requests partial

12  reconsideration of the Second Dismissal order.  (ECF No. 145.)  Due to the potential for

13  plaintiffs' motion to moot the motions to dismiss, the court stayed the remainder of the briefing

14  on the motions to dismiss and set a briefing schedule for plaintiffs' motion.

15       **B.  The Present Motion**

16       Plaintiffs' single filing consists of two somewhat overlapping requests.  Plaintiffs first

17  seek reconsideration of the portion of the Second Dismissal order that dismissed with prejudice

18  their 42 U.S.C. § 1983 causes of action—for deliberate indifference in violation of the Eighth

19  Amendment and deprivation of familial relations in violation of the Fourteenth Amendment—

20  against defendants Asman and Bradley (ECF No. 124 at 2), proffering newly discovered evidence

21  in support.  Plaintiffs also seek leave to file a Fourth Amended Complaint ("Proposed 4AC") to

22  both re-assert these two dismissed causes of action, with stronger allegations inspired by the

23  newly discovered evidence, and to add further allegations to support their existing claims against

24  the supervisory defendants.  (ECF No. 145.)  Plaintiffs attach their Proposed 4AC as Exhibit F to

25  the motion to amend (ECF No. 145 at 237-344), along with Exhibits A-E which would be

26  included as attachments to the 4AC (id. at 6-236; see id. at 5 n.4).  Also attached to the motion to

27  ////

28  ////

3

1    amend are Exhibits G and H, which contain the newly discovered evidence underlying plaintiffs'

2    motion.

3            Exhibit G is a California Office of the Inspector General ("OIG") critical incident report

4    about the handling of William's death, published sometime in January 2021 ("Schmitz OIG

5    report").[3]  (ECF No. 145 at 345-46; id. at 359, Schmitz Aff.).)  Plaintiffs aver that this OIG report

6    was first made known to them sometime in February 2021, which was after they filed the 3AC in

7    January.  (Id. at 359; see ECF No. 130.)  The two-page OIG report briefly describes the incident

8    and rates the CDCR's handling of the incident as "Poor."  (ECF No. 145 at 345-46.)  The report

9    first describes the finding of William's body:

10                On January 21, 2019, an officer found an unresponsive incarcerated
                 person [(William)] in a cell.  Four officers performed life-saving
11               measures and transported [William] to the triage and treatment area,
                 where a nurse assisted with life-saving measures until a physician
12               pronounced [William] dead.

13   (Id. at 345.)  The report then describes certain findings by the CDCR's Mortality Review

14   Committee:

15               The committee identified a delay in the application of an automated
                 external defibrillator, a lack of documentation that medical staff
16               administered opiate antidote, that [William] had some signs of rigor
                 when discovered, and a lack of clarity as to when an officer
17               conducted the last security check.

18   (Id.)  As to the security check, the report explains that "[t]he housing unit log showed that an

19   officer conducted a security check 32 minutes prior to [William] being discovered, but an officer

20   told the coroner that they conducted the check 17 minutes prior to discovery."  (Id.)  The report

21   gives no further explanation of the delayed or possibly neglected life-saving measures.  However,

22   the report concludes that the CDCR performed "poorly" before, during, and after the incident.[4]

23   (Id. at 345-56.)

24   _____

25   [3] The report does not mention William by name, but the circumstances described match those
     alleged in the complaints, and defendants accept that the report is "about Schmitz's death."  (ECF
26   No. 148 at 3.)

27   [4] The low-quality black-and-white ECF scan of plaintiffs' filing makes certain words and text that
     appear in color in the OIG report illegible.  The undersigned has reviewed the physical paper
28   version of the filing in drafting these findings and recommendations.

1    Exhibit H consists of six similar OIG incident reports regarding the handling of other

2    inmate deaths occurring at undisclosed CDCR facilities, ranging from September 2018 to January

3    2020.  (ECF No. 145 at 347-58).  All six of these reports follow the same format as William's and

4    begin by stating that "life-saving measures" were performed until the incarcerated person was

5    pronounced dead.  All but one describe incidents where the decedent was found with a noose

6    around his neck; and all include critiques related to custodial staff not conducting, or misreporting

7    performance of, sufficient "counts" and welfare checks in connection with the incidents.  (Id. at

8    347, 349, 350, 352, 354, 356, 358.)

9    Plaintiffs frame these reports as newly discovered evidence warranting reconsideration of

10   the dismissal of their § 1983 claims against Asman and Bradley.  Plaintiffs rely primarily on two

11   aspects of the Schmitz OIG report:  first, its disclosure of the discrepancy regarding the timing of

12   the last welfare/security check on William, and second, its critique regarding the administration of

13   life-saving measures.

14   As to the security check timing, plaintiffs argue that defendant Bradley was the officer

15   who told the coroner that he last checked on William 17 minutes prior to finding him

16   unresponsive, and that the Schmitz OIG report "directly contradicts" that statement by noting the

17   housing unit log's record that the last security check occurred 32 minutes prior.  (ECF No. 145

18   at 3.)  Plaintiffs believe this shows that Bradley made false statements to the coroner and "calls

19   into question all of the Coroner's report," on which they relied in drafting the TAC and prior

20   complaints.  (Id.; ECF No. 152 at 3.)  The court has not been provided a copy of the full coroner's

21   report, but plaintiffs request that the court take judicial notice of page 8 of the coroner's report

22   which they submitted with their reply brief.[5]  (ECF No. 153.)  This page of the report (which

23   _____

24   [5] Defendants do not oppose plaintiffs' request for judicial notice, although that is likely because
     the request was made in conjunction with plaintiffs' reply brief.  (ECF Nos. 152, 153.)  The court
25   takes judicial notice of page 8 of the coroner's report, as a public record not subject to reasonable
     dispute.  See Walters v. CDCR, No. 2:17-cv-2393-MCE-KJN-P, 2018 WL 341792, at *4 (E.D.
26   Cal. Jan. 9, 2018) ("A death certificate and coroner's report are public records . . . .").  However,
     the undersigned does not consider its contents for the truth of the matters asserted, such as cause
27   or timing of death.  See id.; Zahau v. Shacknai, No. 13-CV-1624-W(NLS), 2014 WL 12526715,
     at *4 (S.D. Cal. Oct. 15, 2014) (noting that "it would be improper for the Court to take judicial
28   notice of the Coroner's conclusion as to [person's] death because that fact is a fact "subject to

5

1    appears to be the final page) does not contain Bradley's purported security-check statement, but it

2    does relay certain findings on the manner and cause of William's death.  The coroner's report

3    states that the pathologist who prepared the final autopsy report "ultimately certified the cause of

4    death as, 'Massive Overdose of Methamphetamine' (minutes to hours), due to 'Leakage or

5    Rupture of Bindles of Methamphetamine Ingested' (minutes to hours)." (Id. at 3.)

6         As to the life-saving measures, plaintiffs argue that the Schmitz OIG report's critique of

7    the "delay in the application of an automated external defibrillator" and the "lack of

8    documentation that medical staff administered opiate antidote" (ECF No. 145 at 345) indicates

9    that William did not die before defendant Bradley started his floor duty (id. at 3).  This is because,

10   according to plaintiffs, a defibrillator and opiate antidote are "both items that would only help a

11   person who had a chance to survive." (Id. at 3.)

12        Plaintiffs argue that this new evidence "fundamentally changes key allegations" such as

13   those regarding the timing of William's death (ECF No. 152 at 4, 13), and they seek leave to file

14   their Proposed 4AC with new allegations purportedly foreclosed to them under their prior

15   understanding of the coroner's report.  Plaintiffs primarily emphasize the Proposed 4AC's new

16   allegations regarding the timeline of events on the date of William's death (January 21, 2019).

17        The Proposed 4AC contains roughly 25 new paragraphs regarding the day of William's

18   death, and Asman and Bradley's conduct and duties that day.  (ECF No. 145 at 309-16.)

19   According to the Proposed 4AC, on January 21, 2019, Officers Asman and Bradley were assigned

20   to William's floor, and only William's floor.  (Id. at 309, ¶ 267.)  Asman's shift was from

21   6:00 am until 2:00 pm, when Bradley took over.  (Id.)  William died at 2:44 pm.  (Id. ¶¶ 267, 272,

22   284.)  Plaintiffs newly allege that William's "death took hours," based on their reading of the

23   autopsy report.  (Id. at 310, ¶ 273; see id. at 311, ¶ 274 ("The Coroner's autopsy report . . . states

24   William's death took up to 'hours.'"); see id. (stating that autopsy report shows levels of

25   amphetamine, the byproduct of metabolized methamphetamine, that indicate William's death

26   took "hours").)  On information and belief, and based on the American Correctional Association

27

28   reasonable dispute").

6

1   Standards, plaintiffs allege that floor officers caring for "mentally ill inmates" were required to

2   perform irregularly scheduled welfare checks at least every 30 minutes, with the first check to

3   occur immediately upon starting a shift (id. ¶¶ 268, 271); and that Asman and Bradley were aware

4   of these requirements and aware that they were "critically important for the safety of mentally ill

5   CCCMS inmates" (id. ¶ 269).

6          As in previous complaints, plaintiffs allege that William's last known "interaction" was at

7   6:35 am with Officer Asman, when Asman saw water flowing out of William's cell but did not

8   inspect the cell or report the "cell flooding."  (Id. at 311, ¶ 276.)  Plaintiffs continue to cite

9   section 91090.6 of the CDCR Department Operations Manual ("DOM") as requiring custody staff

10  to "note, document, and promptly report . . . behavior that could be classified as a danger to self,"

11  including "flooding of the cell."  (Id. at 311-12, ¶ 277.)  Plaintiffs allege that the cell flooding was

12  "a sign that William was in need of medical care," as he was "desperately trying to flush the

13  methamphetamine from his body"; and that "if Defendant Asman looked in the cell . . . [,]

14  William would have been saved at that time."  (Id. at 312, ¶ 278.)  Thus, Asman "deliberately

15  neglected his responsibilities to William's well-being in [their] only interaction that day," and

16  Asman "never again visually identified or assured [William's] well-being."  (Id. at 312, ¶ 279.)

17         As to Bradley, plaintiffs allege that whatever welfare check he performed at the start of

18  his shift was "completely inadequate" because he did not actually *see* William.  Contrary to

19  CDCR policy, William's cell window was partially covered, and Bradley did not exert even a

20  "minimal amount of effort" to look over the obstruction.  (Id. at 313, ¶ 282.)  Per the Schmitz

21  OIG Report, plaintiffs estimate that Bradley's purported welfare check occurred 32 minutes

22  before William was discovered.  (Id. at 314, ¶ 285.)  Whenever William's body was discovered,[6]

23  it was "stiff," which plaintiffs now allege is a sign of "toxin-induced hyperthermia" associated

24  ////

25  

26  [6] There is no allegation in the Proposed 4AC of the time when, or manner in which, William's
    body was *discovered*—only repeated allegations that William was determined to have died at

27  2:44 pm.  According to the currently operative 3AC, William's body was discovered at
    approximately 2:30 pm by another inmate, who was tall enough to see over the cell window

28  obstruction.  (ECF No. 130 at 61, ¶ 182.)

                                                      7

1   with methamphetamine toxicity, and sometimes confused with rigor mortis.  (Id. at 313 n.20,

2   ¶ 285.)

3       Plaintiffs claim that when Bradley "failed to hear William" during that welfare check, he

4   "ignored an obvious indication that William was in distress and that William was in urgent need

5   of medical care."  (Id. at 313, ¶ 283.)  Plaintiffs allege that the Schmitz OIG Report's finding of

6   fault related to life-saving measures shows that "William would have been saved had Defendant

7   Bradley done anything to confirm William's well-being" during his one inadequate welfare

8   check.  (Id. at 313-14, ¶ 285.)  In sum, plaintiffs conclude that William "would have been saved if

9   he was not completely neglected by Defendants Asman and Bradley."  (Id. at 310, ¶ 273.)

10      Plaintiffs also argue that—separate from the allegations supporting the reasserted causes

11  of action—the Proposed 4AC should be permitted because (a) it includes new allegations that

12  CDCR officials failed to maintain an adequate medical records system (based on allegedly

13  incomplete medical records recently produced to plaintiffs in discovery), and (b) it clarifies the

14  pleadings overall and breaks the allegations into more paragraphs. (ECF No. 145 at 4, 5.)

15  Plaintiffs argue (albeit in their reply brief) that even if the court denies leave to reassert the

16  § 1983 causes of action against Asman and Bradley, the court should still allow the Proposed

17  4AC to be filed with respect to all other claims.[7]  (ECF No. 152 at 12.)

18      The court received three separately filed oppositions: one from defendant Dr. Stephen

19  DeNigris opposing leave to amend without addressing the reconsideration question; one from

20  defendant Bradley opposing both the requests for reconsideration and for leave to amend; and one

21  substantively identical to Bradley's, purportedly on behalf of numerous CDCR defendants but

22  addressing the requests only as they relate to defendant Asman.  (ECF Nos. 148, 150, 151.)

23

---

24  [7] The court finds that plaintiffs adequately notified defendants of this argument in their opening
    motion by requesting both "leave to amend the [3AC] *and* to include" the causes of action
25  previously dismissed with prejudice.  (ECF No. 145 at 1, 5.)  The caption of the motion likewise
    conveyed that plaintiffs were seeking two separate—though partly interwoven—forms of relief:
26  (a) permission to file the Proposed 4AC, and (b) permission to include therein, alongside the
    many other new and modified allegations, claims that were previously dismissed with prejudice
27  against Asman and Bradley.  (Id. at 1 (captioned in part as a "motion to amend complaint and for
    relief from order").)
28

1    Bradley and Asman argue that plaintiffs should not be permitted to reassert their

2 dismissed-with-prejudice § 1983 claims because the newly discovered evidence would not have

3 prevented dismissal of those claims.  (ECF Nos. 148 at 2, 150 at 7.)  They also oppose permitting

4 amendment of the complaint as to any of the three claims against them, arguing futility (because,

5 they say, all three are subject to dismissal), prejudice, and failure to cure deficiencies in the

6 previous amended complaints.  (ECF Nos. 148 at 6, 150 at 2.)

7    Weighing in only on the subject of leave to amend, Dr. DeNigris also opposes allowing

8 plaintiffs to file the Proposed 4AC based on futility, arguing that the Proposed 4AC merely

9 restates causes of action against him that were previously dismissed (without prejudice) from the

10 2AC.  (ECF No. 151 at 8-9.)  He further argues that plaintiffs are attempting to sneak back in two

11 causes of action against him (for wrongful death and deprivation of familial relations) that were

12 included in the 2AC (and then dismissed with leave to amend) but *not* included in the 3AC—and

13 that amendment should also be denied based on this purported bad faith and the prejudice of

14 having to defend against these two claims that he believed had been dropped.  (Id. at 5-7.)

15 **DISCUSSION**

16    **A.  Legal Standards**

17       *1.  Reconsideration of an Interlocutory Order*

18    Plaintiffs invoke Rule 60(b)(2) as the basis for their request for reconsideration of the

19 dismissal of the § 1983 claims against Asman and Bradley.  (ECF No. 145 at 2.)  Rule 60(b)(2)

20 indeed authorizes requests for reconsideration based on "newly discovered evidence," but as

21 defendants point out, that rule only authorizes such requests with respect to "a final judgment,

22 order or proceeding."  Fed. R. Civ. P. 60(b)(2).  Plaintiffs readily acknowledge that the court's

23 Second Dismissal order is interlocutory, not final, as it did not terminate the action as to all claims

24 and parties.  (ECF No. 152 at 3.)  All parties agree that the motion may be properly brought under

25 Rule 54(b), however, and the undersigned construes it as such.  See Fed. R. Civ. P. 54(b) (stating

26 that interlocutory orders "may be revised at any time before the entry of a judgment").

27    So long as the court still has jurisdiction over a case and a final judgment has not been

28 entered, the court has both inherent power and authority under Rule 54(b) to modify or reconsider

9

1    its interlocutory orders.  See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper, 254

2    F.3d 882, 886-87 (9th Cir. 2001); Jadwin v. Cty. of Kern, No. 07-cv-0026-OWW-DLB, 2010 WL

3    1267264, at *9 (E.D. Cal. Mar. 31, 2010).  Rule 54(b) does not address the standards which a

4    court should apply when assessing a motion to revise an interlocutory order, and the Ninth Circuit

5    has not provided a governing standard; however, courts in this district look to the standards for

6    reconsideration under Rule 59(e) (motion to alter or amend a judgment) and Rule 60(b) (relief

7    from judgment) for guidance.  Doutherd v. Montesdeoca, No. 2:17-CV-02225-KJM-JDP, 2021

8    WL 1784917, at *2 (E.D. Cal. May 5, 2021); Jadwin, 2010 WL 1267264, at *9.

9        "Reconsideration is ordinarily appropriate only when controlling law has changed, if new

10   evidence has become available, or when necessary to correct a clear error or prevent manifest

11   injustice."[8]  Doutherd, 2021 WL 1784917, at *2.  Where the motion rests on newly discovered

12   evidence, the moving party must show that (1) "the evidence relied on in fact constitutes 'newly

13   discovered evidence' within the meaning of Rule 60(b)," (2) it "exercised due diligence to

14   discover this evidence," and (3) the newly discovered evidence is "of such magnitude that

15   production of it earlier would have been likely to change the disposition of the case."  Feature

16   Realty, Inc. v. City of Spokane, 331 F.3d 1082, 1093 (9th Cir. 2003) (quoting Coastal Transfer

17   Co. v. Toyota Motor Sales, U.S.A., 833 F.2d 208, 211 (9th Cir. 1987)).

18       While these standards provide guidance, "[a] district court may reconsider and revise a

19   previous interlocutory decision for any reason it deems sufficient, even in the absence of new

20   evidence or an intervening change in or clarification of controlling law."  Hydranautics v.

21   FilmTec Corp., 306 F. Supp. 2d 958, 968 (S.D. Cal. 2003); see also Christianson v. Colt Indus.

22   Operating Corp., 486 U.S. 800, 817 (1988) ("A court has the power to revisit prior decisions of its

23   own or of a coordinate court in any circumstance.").  And some courts apply a less rigid standard

24   for motions to revise interlocutory orders under Rule 54(b) than to motions to reconsider final

25   _____

26   [8]  This court's local rules also govern applications for reconsideration and require the moving
     party to provide "what new or different facts or circumstances are claimed to exist which did not
27   exist or were not shown" or "what other grounds exist for the motion" and "why the facts or
     circumstances were not shown at the time of the prior motion."  E.D. Cal. L.R. 230(j).

28

1   judgments under Rule 60(b).  See, e.g., Persistence Software, Inc. v. Object People, Inc., 200

2   F.R.D. 626, 627 (N.D. Cal. 2001) (citing Fed. R. Civ. P. 60(b) Advisory Committee Notes).[9]  As

3   a general rule, though, "a court should generally leave a previous decision undisturbed absent a

4   showing that it either represented clear error or would work a manifest injustice."  Id. (citing

5   Christianson, 486 U.S. at 817 (1988)); Lyons v. Baughman, No. CIV. S-01-412-LKK/KJM P,

6   2007 WL 1378022, at *3 (E.D. Cal. May 10, 2007) ("[B]ecause a previous decision constitutes

7   the law of the case, a court should generally not upset one of its previous decisions absent a

8   showing that it either represented clear error or would work a manifest injustice.").

9        2.  *Leave to Amend*

10      After a party has amended as a matter of course, further amendment is allowed only with

11   consent of the opposing parties or leave of the court.  Fed. R. Civ. P. 15(a).  A court should freely

12   grant leave to amend a pleading when justice so requires.  Id.  "However, liberality in granting

13   leave to amend is subject to several limitations."  Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys.,

14   Inc., 637 F.3d 1047, 1058 (9th Cir. 2011) (cleaned up).  In deciding whether to grant leave to

15   amend, courts consider several factors, including (1) undue delay, (2) bad faith or dilatory motive,

16   (3) repeated failure to cure deficiencies by previous amendment, (4) undue prejudice to the

17   opposing party, and (5) futility of amendment.  Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d

18   1048, 1052 (9th Cir. 2003).  Absent prejudice (the "touchstone" of the Rule 15(a) inquiry),

19   futility, or a strong showing of any of the remaining factors, a presumption in favor of granting

20   leave to amend exists.  Id.; Johnson v. Buckley, 356 F.3d 1067, 1077 (9th Cir. 2004) ("Futility

21   alone can justify the denial of a motion to amend.").

22      Still, granting leave to amend is a matter of discretion, and the court's "discretion to deny

23   leave to amend is particularly broad" in cases such as this one where the plaintiffs have

24   previously amended the complaint.  Cafasso, 637 F.3d at 1058.

25   ////

---

26   [9] See Doctor John's, Inc. v. City of Sioux City, IA, 456 F. Supp. 2d 1074, 1076 (N.D. Iowa 2006)

27   ("While the standards for reconsideration of interlocutory orders may be less 'exacting' than the standards for reconsideration of final orders under Rules 59(e) and 60(b), . . . the court should

28   'look to the kinds of consideration under those rules for guidance.'") (internal citations omitted).

**B.  Analysis**

For the reasons discussed below, the undersigned concludes that plaintiffs have not made a sufficient showing to reassert their § 1983 claims against Asman and Bradley, previously dismissed with prejudice, but that plaintiffs should be granted leave to amend as to all other claims in the Proposed 4AC that were not previously dismissed with prejudice.

*1.  The § 1983 Claims against Asman and Bradley Should Remain Dismissed*

After careful consideration of plaintiffs' arguments and the new evidence submitted, the undersigned concludes that the § 1983 claims against defendants Asman and Bradley should remain dismissed.  Asman and Bradley acknowledge that the OIG reports are "newly discovered" and that plaintiffs likely could not have discovered them earlier than they did; but they argue that discovering the reports earlier would not have been likely to change the court's disposition of the deliberate indifference and deprivation of familial relations claims.  (ECF No. 148 at 3.[10])  See Feature Realty, 331 F.3d at 1093 (movant must show (1) evidence is newly discovered, (2) despite exercising due diligence to discover it sooner, and (3) "of such magnitude that production of it earlier would have been likely to change the disposition of the case").  In determining the "magnitude" and materiality of the information contained in the OIG reports, the court considers the contents of the reports against the legal standards for the two constitutional claims plaintiffs argue should be revived against officers Asman and Bradley.  As the request for partial reconsideration is raised within the context of a motion to amend, the court simultaneously conducts a futility analysis of whether the Proposed 4AC's allegations—bolstered by the new evidence—sufficiently state either claim.

a.  Eighth Amendment Deliberate Indifference Claim

First, plaintiffs wish to reassert their § 1983 claim that Asman and Bradley were deliberately indifferent to William's "medical needs, health and safety," in violation of the Eighth Amendment.  (ECF No. 145 at 330.)  "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to

---

[10] Because Asman's opposition brief is substantively identical to Bradley's earlier filed brief, the court cites only to Bradley's brief in discussing arguments raised by both.

1   guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (internal

2   quotations omitted).  Prison officials violate the Eighth Amendment if they are "deliberately

3   indifferent" to—among other things—an inmate's "serious medical needs." Gibson v. Cty. of

4   Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002), overruled on other grounds by Castro v. Cty. of

5   Los Angeles, 833 F.3d 1060 (9th Cir. 2016).

6        The two-part test for deliberate indifference requires the plaintiff to show (1) "a 'serious

7   medical need' by demonstrating that failure to treat a prisoner's condition could result in further

8   significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) that "the

9   defendant's response to the need was deliberately indifferent." Jett v. Penner, 439 F.3d 1091,

10   1096 (9th Cir. 2006) (internal citations omitted).

11        The second prong "is satisfied by showing (a) a purposeful act or failure to respond to a

12   prisoner's pain or possible medical need and (b) harm caused by the indifference." Id.  To satisfy

13   this prong, the plaintiff must "show that prison officials knew of and disregarded [a] substantial

14   risk of harm . . . ." Lemire v. California Dep't of Corr. & Rehab., 726 F.3d 1062, 1074 (9th Cir.

15   2013).  Under the Eighth Amendment, deliberate indifference "has both subjective and objective

16   components." Labatad v. Corr. Corp. of Am., 714 F.3d 1155, 1160 (9th Cir. 2013).  That is the

17   prison official "must both be aware of facts from which the inference could be drawn that a

18   substantial risk of serious harm exists, and . . . must also draw the inference." Farmer, 511 U.S. at

19   837.  Liability then may follow only if a prison official "knows that inmates face a substantial risk

20   of serious harm and disregards that risk by failing to take reasonable measures to abate it."

21   Labatad, 714 F.3d at 1160 (quoting Farmer, 511 U.S. at 847).  Finally, plaintiffs "must also

22   demonstrate that the defendants' actions [or omissions] were both an actual and proximate cause

23   of their injuries." Lemire, 726 F.3d at 1074.

24        Plaintiffs' desire to bring the Schmitz OIG report to the court's attention is

25   understandable.  The report paints the CDCR's handling of William's death in a very poor light

26   indeed.  But the only definitive new information it contains is that there was a discrepancy of 15

27   minutes between when the housing unit log showed William's last welfare check occurred and

28   when an officer—the court is willing to presume it was Bradley based on plaintiffs' allegations—

1    told the coroner he conducted the check.  (ECF No. 145 at 345.)  Although this timing

2    discrepancy is concerning, plaintiffs exaggerate its impact—or at least fail to demonstrate how it

3    necessarily calls into question the entirety of the coroner's report.  Without the full report, it is

4    difficult to assess the degree to which plaintiffs' existing allegations were shaped by the coroner's

5    description of any statements from Bradley.  Moreover, plaintiffs continue to rely on many

6    aspects of the coroner's report in defending their proposed new pleadings, undercutting their

7    broad claim of its undependability.

8         Plaintiffs' other argument based on the Schmitz OIG report is that William must have died

9    after Bradley started his shift because, otherwise, OIG would not have faulted staff for delaying

10   and possibly failing to administer certain life-saving measures upon discovering him.  Although

11   the court understands plaintiffs' logic here, this is too thin a thread on which to hang the vacatur

12   of part of the court's prior order.  See Lyons, 2007 WL 1378022, at *3 ("[B]ecause a previous

13   decision constitutes the law of the case, a court should generally not upset one of its previous

14   decisions absent a showing that it either represented clear error or would work a manifest

15   injustice.").  The Schmitz OIG report contains no finding as to William's condition upon

16   discovery, other than to state he was found "unresponsive"—which is exactly how almost all of

17   the other OIG reports (provided in Exhibit H) describe finding their subject inmates.  (ECF

18   No. 145 at 345, 347, 352, 354, 358.)

19        The Schmitz OIG report's unexplained critique of the department's life-saving measures

20   is the only *newly discovered* evidence plaintiffs present to show that their prior allegations

21   regarding the timeline of William's death were misguided.  And, as just discussed, the court does

22   not view the OIG's opaque statement regarding life-saving measures as "evidence" of how

23   recently William died.  The only concrete basis plaintiffs provide for their new allegation that

24   William's death took "hours" is the coroner's report.  Without getting into the parties' dispute

25   over whether the records attached to the Proposed 4AC describe his death as taking "hours" or

26   "minutes," it is clear to the court that the referenced attachments are not "newly discovered"

27   evidence and therefore do not factor into the reconsideration analysis.  The coroner's report—

28   containing the toxicity analysis and "minutes to hours" timing estimation that plaintiffs

14

1   highlight—is dated April 24, 2019, and a Sheriff's Office stamp in the lower righthand corner of

2   the document indicates that a copy was released to plaintiff Thomas Schmitz (William's father)

3   on April 29, 2019, well before this suit was even filed.  (ECF No. 153 at 3.)  Plaintiffs do not

4   contend that the report is newly discovered, and neither do they adequately explain why they did

5   not assert their hours-long-death theory in one of their first three complaints given that they

6   possessed the same coroner's report from the outset.  See Bonin v. Calderon, 59 F.3d 815, 845

7   (9th Cir. 1995) (no abuse of discretion to deny amendment "where the movant presents no new

8   facts but only new theories and provides no satisfactory explanation for his failure to fully

9   develop his contentions originally").

10      The last set of new evidence plaintiffs present are the OIG reports of other inmate deaths

11   around the same period as William's.  (ECF No. 145 at 347-58).  However, the reports do not

12   indicate where—among the many CDCR facilities—these other "poorly" handled deaths

13   occurred; and even assuming they occurred at MCSP, demonstrating a pattern of inadequate

14   welfare checks by unknown officers does not help to allege that Asman and Bradley, themselves,

15   knew of a substantial risk to William from not receiving regular checks.  See Wereb v. Maui Cty.,

16   727 F. Supp. 2d 898, 914 n.10 (D. Haw. 2010) ("subjective knowledge is inherently a person-by-

17   person determination"), reconsideration granted on other grounds, 830 F. Supp. 2d 1026 (D. Haw.

18   2011).

19      Thus, the only presented bases for reconsideration that are both (1) "newly discovered"

20   and (2) "evidence" do not persuade the court that it works a "manifest injustice" for the § 1983

21   claims to remain dismissed against defendants Asman and Bradley.  See Lyons, 2007 WL

22   1378022, at *3.

23      Moreover, plaintiffs' arguments for reconsideration are focused on bolstering the

24   causation element of plaintiffs' dismissed Eighth Amendment claim.[11]  They do nothing to cure

---

[11] This makes sense, given that the undersigned recommended dismissing the 2AC's deliberate
indifference claim against Bradley for lack of a plausibly alleged causal connection, citing the
allegation in that complaint that Bradley conducted his inadequate welfare check at 2:15 pm, just
15 minutes before William was found "stiff and cold."  (See ECF No. 85 at 9-10 ("[E]ven
assuming [Bradley's] failure to affirmatively confirm that Decedent was in his cell later that
afternoon would satisfy the subjective indifference prong, plaintiffs have not alleged how that

1  the separate and continuing deficiency in failing to plead sufficient facts to suggest that either

2  Asman or Bradley knew that failing to fully check on William during their rounds exposed him to

3  a substantial risk of harm.  Although the Proposed 4AC, like those before it, contains many pages

4  of detailed allegations that the medical provider defendants were aware of William's psychoses

5  and mental health classification, there are no specific factual contentions that Asman and Bradley

6  were aware of William's dangerousness to himself.  For instance, there is no allegation that either

7  officer was informed of William's mental health history or had access to his medical records; nor

8  is there an allegation that they knew William was currently assigned to the Correctional Clinical

9  Case Management System ("CCCMS")[12] or had previously been part of the Enhanced Outpatient

10 Program ("EOP").  The Proposed 4AC indicates that MCSP inmates in the higher EOP level of

11 care were housed in designated "EOP housing" (ECF No. 145 ¶¶ 163, 237), but William was

12 transferred out of EOP and into the CCCMS category in May 2018, some six months before his

13 death (id. ¶¶ 139, 229, 233).  A careful reading of the complaint reveals no indication that at the

14 time of his death William was assigned to a floor designated only, or even primarily, for CCCMS

15 inmates.  Without such allegations, there is little reason to infer that two correctional officers—

16 with no stated prior connection to William or his medical care—would know that failing to

17 affirmatively confirm his well-being throughout their shift would expose him to substantial risk of

18 serious harm.  See Farmer, 511 U.S. at 837 ("[T]he official must both be aware of facts from

19 which the inference could be drawn that a substantial risk of serious harm exists, and he must also

20 draw the inference.").

21        The absence of allegations that William's cell was on a floor designated for inmates with

22 mental health issues makes this case distinct from the cases on which plaintiffs rely in attempting

23 to reassert their deliberate indifference claims.  In Rocha v. Kernan, the court found a deliberate

24 indifference claim adequately pleaded against a correctional officer who failed to perform safety

_____

26 failure caused Decedent harm.").)

27 [12] "CCCMS is the lowest level of care in the State's prison mental health delivery system, and is designed to provide a level of care equivalent to that received by non-incarcerated patients through outpatient psychiatric treatment."  Lemire v. California Dep't of Corr. & Rehab., 726

28 F.3d 1062, 1069 (9th Cir. 2013).

1    checks on the decedent, but there it was alleged that the decedent was housed in "the 'Support

2    Care Unit,' an EOP-level housing unit." 2019 WL 2949031, at *2, *12-13 (C.D. Cal. Mar. 13,

3    2019) (finding it "reasonable to conclude that an officer that failed to check on *a specialized*

4    *population of inmates* at the required intervals would know that he was exposing the inmates to a

5    substantial risk" (emphasis added); specifically noting allegation that the officer "knew that

6    inmates housed in the Support Care Unit were at a greater risk for suicide"). Similarly, the Ninth

7    Circuit's conclusion in <u>Lemire v. CDCR</u> that prison officials could be found (by a jury) to have

8    acted with deliberate indifference in deciding to leave a building of inmates unsupervised for 3.5

9    hours was premised on the fact that the building in question was "the designated facility" at that

10   prison for housing CCCMS inmates. 726 F.3d 1062, 1069, 1076-77 (9th Cir. 2013).

11           The only two allegations that touch on the subjective component of the deliberate

12   indifference test with respect to Asman and Bradley are too broad and conclusory to fill this gap

13   in the pleadings. (<u>See</u> ECF No. 145 at 331, ¶ 344 (alleging under the deliberate indifference

14   cause of action that Asman and Bradley "knew that mentally ill CCCMS inmates including

15   William Schmitz and other similarly situated required direct supervision to protect their physical

16   safety"); <u>id.</u> at 339-40, ¶ 372 (alleging under the wrongful death cause of action that Asman and

17   Bradley "had actual and constructive knowledge that William Schmitz was a mentally ill CCCMS

18   inmate locked in a cell by himself").) As to the former, it is easy to accept the proposition that

19   correctional officers know that CCCMS inmates in general require greater supervision, but again,

20   the Proposed 4AC gives no reason to believe that Asman or Bradley knew William was such an

21   inmate. As to the latter assertion, it merely asserts a legal conclusion (Asman and Bradley's

22   knowledge) without providing any supporting factual basis elsewhere in the complaint. <u>See</u>

23   <u>Fayer v. Vaughn</u>, 649 F.3d 1061, 1064 (9th Cir. 2011) ("Although factual allegations are taken as

24   true, [courts] do not assume the truth of legal conclusions merely because they are cast in the

25   form of factual allegations." (internal quotation omitted)).

26           Next, plaintiffs argue that the new allegations that Asman and Bradley knowingly failed to

27   complete thorough welfare/security checks on William—in Asman's case for his entire shift—

28   inherently describe knowledge of creating a substantial risk to inmate safety. (ECF No. 152 at 3,

1    11-12.)  However, "subjective knowledge that [an inmate] could have been monitored more

2    closely or more thoroughly is not commensurate with subjective knowledge that [the inmate]

3    faced a substantial risk due to a lack of close or thorough monitoring."  Wereb, 727 F. Supp. 2d at

4    910, 913 (granting summary judgment for individual defendants who did not conduct any in-

5    person visual checks on pretrial detainee during his detention).[13]  Even "deliberately avoid[ing]

6    acquiring subjective knowledge by failing to monitor" an inmate has been rejected as insufficient

7    to demonstrate deliberate indifference under the Eighth Amendment standard.  Id. at 913.  This is

8    because the subjective knowledge requirement stems from the Constitution's prohibition against

9    "cruel and unusual 'punishments,' not merely cruel and unusual conditions."  Id. (citing Farmer,

10   511 U.S. at 837).  Prison officials who lack actual knowledge of a risk "cannot be said to have

11   inflicted punishment."  Farmer, 511 U.S. at 844.  The Proposed 4AC's allegations state a claim of

12   negligence, but they do not amount to a deliberate indifference claim.  See Lemire, 726 F.3d at

13   1082 ("Even gross negligence is insufficient to establish deliberate indifference to serious

14   medical needs."); Wereb, 727 F. Supp. 2d at 914 (although officers charged with monitoring

15   decedent "were collectively negligent," deliberate indifference is distinct from negligence and

16   requires "focus on each [i]ndividual [d]efendant's subjective knowledge").

17        A useful distinction with respect to inadequate monitoring claims was drawn in Frary v.

18   Cty. of Marin, 81 F. Supp. 3d 811 (N.D. Cal. 2015).[14]  There, the court denied summary

19   judgment on a deliberate indifference claim against a deputy who was assigned to monitor the

20   decedent the day he died, and who (a) was warned that the decedent had taken two morphine pills

21

22   [13] Although Wereb involved a pretrial detainee whose right to be free of cruel and unusual
     punishment derives from the Fourteenth Amendment's Due Process Clause—rather than the
23   Eighth Amendment, which applies post-conviction—at the time the case was decided in 2010, the
     standard for deliberate indifference was the same under both.  Not until 2016 did the Ninth
24   Circuit hold that the Fourteenth Amendment deliberate indifference standard is purely objective,
     see Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc) (failure to
25   protect claims), and not until 2018 was that holding extended to the context of providing adequate
     medical care, see Gordon v. Cty. of Orange, 888 F.3d 1118, 1120 (9th Cir. 2018).
26

27   [14] Frary, too, is a pretrial detainee case decided when the Fourteenth Amendment deliberate
     indifference standard was the same as the Eighth Amendment standard.  See 81 F. Supp. 3d at
28   823-24.

                                                   18

1   and (b) knew of the decedent's drug possession.  Id. at 819, 826.  With that evidence, the court

2   held that a reasonable jury could find that the deputy "'failed adequately to respond' by providing

3   [the decedent] with additional or closer monitoring" than was possible from his vantage in an

4   internal observation tower.  Id. at 819, 825-26 (quoting Lemire, 726 F.3d at 1082).  By contrast,

5   the court in Frary granted summary judgment on the deliberate indifference claim against another

6   deputy on monitoring duty that day because there was "no indication that any other jail officials

7   ever reported any of their observations to [him] or otherwise openly expressed their belief to him

8   that [the decedent] was in need of medical assistance."  Id. at 828 ("While Plaintiffs argue that

9   Deputy McCloskey, like Deputy Johnson, failed to conduct direct, visual safety checks as

10  required by [California law applicable to local detention facilities], Plaintiffs have not shown that

11  Deputy McCloskey was subjectively aware of [the decedent's] medical need or any substantial

12  risk to him such that the checks Deputy McCloskey conducted could be found to be evidence of

13  deliberate indifference.").

14          Of course, the present case is far from the summary judgment stage, but the distinction

15  drawn in Frary applies with equal force in assessing the allegations of the Proposed 4AC.  Asman

16  and Bradley's allegedly substandard monitoring of William does not state a claim of deliberate

17  indifference because—as discussed above—there is no accompanying allegation that either

18  officer was actually aware that William was suffering an overdose, or that he was at heightened

19  risk of self-harm due to mental health issues.

20          Last, plaintiffs seek to revive their deliberate indifference claim against Asman by framing

21  his alleged failure to investigate the water flowing out of William's cell on the morning of his

22  death as an obvious sign of William's medical need. (ECF No. 145 at 312, ¶ 278.)  A prison

23  official's knowledge of substantial risk can be demonstrated "in the usual ways, including

24  inference from circumstantial evidence, . . . and a factfinder may conclude that the prison official

25  knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842.

26  Thus, allegations of an obvious risk to prisoner safety that went unabated would adequately state

27  a deliberate indifference claim.  However, again, plaintiffs have not done enough to persuade the

28  court that its prior dismissal of the deliberate indifference claim against Asman was clearly

1   erroneous or represents a manifest injustice.

2          On the subject of the early morning cell flooding, there is little substantive change

3   between the facts alleged—and dismissed as insufficient—in the 2AC (ECF No. 44 at 43-44) and

4   the allegations in the Proposed 4AC.  Both merely allege some sort of "interaction" between

5   William and Asman at 6:35 am on the day of William's death, related to water that Asman

6   observed "flowing out from William's cell," and that Asman did not inspect the cell or report the

7   flooding as required by CDCR policy.  (2AC ¶ 165; Proposed 4AC ¶¶ 276-79.)  As the court

8   noted in dismissing the deliberate indifference claim in the 2AC, the description of the

9   "interaction" between William and Asman became less detailed between the 1AC and the 2AC—

10  and remains equally unclear in the Proposed 4AC.  In the 1AC, plaintiffs described how the

11  interaction was conveyed in the coroner's report:  according to a sergeant in the Investigative

12  Services Unit, "Asman noted water was flowing out of [William]'s cell" and "Asman questioned

13  [William] as to what he was doing because this was uncharacteristic of [William]."  (ECF No. 6

14  at 29, ¶ 92.)  Asman's previously alleged questioning of William is omitted from the 2AC, the

15  3AC, and the Proposed 4AC, so the current allegations can be read as though Asman observed

16  water flowing out of William's cell and did absolutely nothing.  However, the Proposed 4AC still

17  describes whatever occurred at 6:35 am as an "interaction," and realleges that Asman found the

18  flowing water "out of character" for William.  (ECF No. 145 at 311, ¶ 276.)  The court therefore

19  reads these allegations as conveying that Asman did at least "interact" in some way with William

20  upon seeing the water.  That Asman's alleged failure to do more went against CDCR policy does

21  not suffice to show that he was aware that not inspecting the cell or reporting the flooding

22  exposed the cell's occupant to a substantial risk of serious harm.  Plaintiffs have had several

23  chances to explain Asman's conduct and awareness on that morning in more detail, but they

24  continue to fail to allege sufficient facts to satisfy the subjective component of the deliberate

25  indifference test.

26          Accordingly, the Eighth Amendment claims against Asman and Bradley should not be

27  revived.

28  ////

20

1               b.  Fourteenth Amendment Deprivation of Familial Relations Claim

2               Plaintiffs also wish to reassert against Asman and Bradley their claim under the

3    Fourteenth Amendment Substantive Due Process Clause for depriving them of their liberty

4    interest in a familial relationship with their deceased son.  Under the Fourteenth Amendment,

5    only official conduct that "shocks the conscience" in depriving parents of "the companionship

6    and society of their children" is "cognizable as a violation of due process."  Wilkinson v. Torres,

7    610 F.3d 546, 554 (9th Cir. 2010).  "Just as the deliberate indifference of prison officials to the

8    medical needs of prisoners may support Eighth Amendment liability, such indifference may also

9    'rise to the conscience-shocking level' required for a substantive due process violation."  Lemire,

10   726 F.3d at 1075 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998)).  "A prison

11   official's deliberately indifferent conduct will generally 'shock the conscience'" if "the prison

12   official had time to deliberate before acting or failing to act in a deliberately indifferent manner."

13   Lemire, 726 F.3d at 1075.

14              Plaintiffs argue only, and only in their reply brief, that because their new allegations state

15   valid claims for deliberate indifference, they also state valid claims under the Fourteenth

16   Amendment.  (ECF No. 152 at 12.)  For the same reason the undersigned rejects plaintiffs'

17   arguments for revival of their Eighth Amendment claim, the undersigned also rejects their

18   arguments to revive the Fourteenth Amendment claim.

19              The undersigned therefore recommends denying plaintiffs' motion for the court to vacate-

20   in-part and revise its prior order dismissing with prejudice the § 1983 claims against defendants

21   Asman and Bradley.  Because the § 1983 claims should remain dismissed with prejudice, and

22   because the allegations of the Proposed 4AC still do not adequately plead either claim against

23   these defendants, the undersigned further recommends denying leave to amend the complaint to

24   include an Eighth Amendment deliberate indifference or a Fourteenth Amendment familial

25   relations claim against Asman or Bradley.

26              *2.  Leave to Amend Should Otherwise Be Granted*

27              Although plaintiffs should not be permitted to proceed with their § 1983 claims against

28   Asman and Bradley, the liberal amendment standards (especially applicable to pro se litigants)

1 support allowing plaintiffs to amend the complaint as discussed below.  The court begins with the

2 claims as to which amendment is expressly opposed before considering the Proposed 4AC

3 overall.

4 a.  Claims Against Asman & Bradley

5 The Proposed 4AC asserts three causes of action against Asman and Bradley and implies

6 a request for punitive damages from them as well.  (ECF No. 145 at 330, 335-36, 343.)  For the

7 reasons discussed above, plaintiffs should not be granted leave to amend to reassert the deliberate

8 indifference and deprivation of familial relations claims against Asman and Bradley (the First and

9 Fourth Causes of Action in the Proposed 4AC).

10 That leaves a single cause of action to consider against the two floor officers:  plaintiffs'

11 Sixth Cause of Action for wrongful death, asserted under Cal. Code Civ. Proc. § 377.60.  (ECF

12 No. 145 at 336.)  Defendants oppose granting leave to amend based on three factors: futility,

13 repeated failure to cure deficiencies, and undue prejudice.  The court begins with the futility

14 argument and then turns to the other two secondary arguments.

15 *i.   The Proposed Wrongful Death Claim Is Not Futile*

16 California Code of Civil Procedure § 377.60 gives plaintiffs like William's parents

17 standing to bring "[a] cause of action for the death of a person caused by the wrongful act or

18 neglect of another."  "The elements of the cause of action for wrongful death are the tort

19 (negligence or other wrongful act), the resulting death, and the damages, consisting of the

20 pecuniary loss suffered by the heirs."  Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256,

21 1263-64 (Ct. App. 2006).  The elements of the tort of negligence are "a legal duty to use due care,

22 a breach of such legal duty, and the breach as the proximate or legal cause of the resulting

23 injury."  Vasilenko v. Grace Family Church, 3 Cal. 5th 1077, 1083 (2017).

24 In addition to the narrative allegations of the day of William's death (discussed above

25 regarding deliberate indifference), the Proposed 4AC's Sixth Cause of Action contains one

26 paragraph summarizing their wrongful death claim against Asman and Bradley:

27 Defendants Asman and Bradley failed to comply with
professional standards and CDCR policy and procedure in

28 conducting safety check of William Schmitz on the morning of

22

January 21, 2019.   Defendants Officer Asman and Officer Bradley . . . owed William Schmitz a duty to ensure his welfare. Defendants Asman and Bradley breached that duty when they had actual and constructive knowledge that William Schmitz was a mentally ill CCCMS inmate locked in a cell by himself and failed to properly conduct counts dictated by professional standards and CDCR policy resulting in William Schmitz's suffering and loss of life.

(ECF No. 145 at 339-40, ¶ 372.)

The currently operative 3AC contains the exact same paragraph.  (ECF No. 130 at 81-82, ¶ 246.)  The 2AC did not include such specific allegations; and the undersigned dismissed the wrongful death cause of action against defendant Bradley—with leave to amend—for failure to plead "how [Bradley's] allegedly wrongful act (the failure to remove a cell window obstruction) caused [William]'s death which seems to have occurred hours earlier."  (ECF No. 85 at 31, 44.) As mentioned above in the deliberate indifference discussion, the 2AC's timeline of events on the day of William's death differed significantly from the timeline alleged in the Proposed 4AC.

Notably, defendant Asman did not move to dismiss the wrongful death cause of action in the 2AC.[15]  (See ECF No. 63 (notice of motion by Asman and other State defendants) at 2 (listing failure to state wrongful death claim against many other CDCR staff).)  Accordingly, the court has never previously ruled on the sufficiency of the wrongful death claim against Asman.

In opposition to plaintiffs' motion to amend, Asman and Bradley argue that plaintiffs' wrongful death claim is futile against them (A) because they are immune under California Government Code § 845.6, and (B) because the proposed allegations do not state a claim.  (ECF No. 148 at 7-9.)

### (A)     Immunity Does Not Show Futility

California Government Code § 845.6 protects "public employee[s]" from liability "for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody."  But in the same sentence, the statute simultaneously provides a narrow exception to this immunity, making a public employee "liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take

---

[15] Nor has he moved to dismiss the wrongful death claim in the 3AC.  (See ECF No. 140.1 at 4.)

1    reasonable action to summon such medical care."  Cal. Gov't Code § 845.6.

2            This statute is "unusual" in that it both "confers a broad general immunity" on public

3    entities and their employees for failing to furnish medical care, <u>Watson v. State</u>, 21 Cal. App. 4th

4    836, 841 (Ct. App. 1993), *and* (by providing a narrow exception to that immunity) *creates* a cause

5    of action—based on an "obligation of help" not otherwise existing under the common law—

6    against public employees who possess "actual or constructive knowledge of a need for immediate

7    medical care" and fail to summon such care, <u>Johnson v. Cty. of Los Angeles</u>, 143 Cal. App. 3d

8    298, 317 (Ct. App. 1983).  <u>See</u> <u>Horton by Horton v. City of Santa Maria</u>, 915 F.3d 592, 609 (9th

9    Cir. 2019) (Bybee, J., dissenting); <u>Castaneda v. Dep't of Corr. & Rehab.</u>, 212 Cal. App. 4th 1051,

10   1070 (2013).

11           The 2AC asserted an independent § 845.6 cause of action against Asman and Bradley in

12   addition to a wrongful death cause of action.  (ECF No. 44 at 56, 58.)  Both defendants moved to

13   dismiss the § 845.6 cause of action—which was a survivorship claim, unlike the wrongful death

14   claim—based on failure to comply with the Government Claims Act, and failure to state a claim.

15   (ECF No. 63.1 at 29-31, 36-37.)  But in moving to dismiss the 2AC's wrongful death claim,

16   defendant Bradley did not assert *immunity* under § 845.6; he simply argued failure to state a claim

17   for lack of causation.  (<u>Id.</u> at 33-34.)  The undersigned—and the district judge—agreed with

18   defendants that plaintiffs' § 845.6 survivorship cause of action is barred by the California

19   Government Claims Act, for failure to present a claim on behalf of William or his estate; and that

20   cause of action was dismissed with prejudice.  (ECF Nos. 85 at 21-28, 124 at 2.)  The Proposed

21   4AC therefore does not assert a cause of action under § 845.6 for failure to summon medical care.

22           This procedural history informs the undersigned's finding that leave to amend as to the

23   wrongful death claim should not be denied as futile based on defendants Asman and Bradley's

24   newly claimed immunity.  Although Bradley (now the only CDCR defendant still represented by

25   the State Attorney General) asserts § 845.6 immunity—in addition to lack of causation—in his

26   currently pending motion to dismiss the wrongful death claim in the 3AC (ECF No. 139.1 at 6-7),

27   plaintiffs have never had the benefit of the court explaining how § 845.6 immunity works and

28   opining on potential defects in their pleadings.  Given the "unusual" nature of the statute and

24

1   defendants' failure to assert immunity in response to the 2AC, plaintiffs may not have even been

2   aware in drafting the 3AC that their wrongful death claim might face a § 845.6 immunity

3   challenge.

4           Moreover, based on the court's independent research, it appears that under California law,

5   statutory immunities like that provided in § 845.6 are generally affirmative defenses.  See

6   Cervantes v. San Diego Police Chief Shelley Zimmerman, No. 17-CV-01230-BAS-AHG, 2020

7   WL 5759752, at *20 (S.D. Cal. Sept. 28, 2020) (citing Quigley v. Garden Valley Fire Prot. Dist.,

8   7 Cal. 5th 798, 815 (2019)); Lara v. Cty. of Los Angeles, No. B149029, 2002 WL 1167433, at *1

9   (Cal. Ct. App. June 3, 2002) (mentioning § 845.6 as an affirmative defense); Keel v. Cty. of Los

10  Angeles, No. B144735, 2001 WL 1589172, at *3 (Cal. Ct. App. Dec. 13, 2001) (same).  Plaintiffs

11  are not required to "plead around affirmative defenses," and "ordinarily, affirmative defenses may

12  not be raised on a motion to dismiss," unless the complaint itself, on its face, establishes the

13  defense.  U.S. Commodity Futures Trading Comm'n v. Monex Credit Co., 931 F.3d 966, 972-73

14  (9th Cir. 2019) (alterations and internal quotation omitted).  In light of the limited briefing on the

15  immunity issue, the undersigned declines to rest a futility finding on defendants' recent assertion

16  of immunity under § 845.6.

17          The undersigned will, for the benefit of pro se plaintiffs, outline the immunity analysis

18  that might apply, should defendants reassert it in a renewed motion to dismiss any forthcoming

19  Fourth Amended Complaint.  To reiterate, the first clause of California Government Code § 845.6

20  generally protects "public employee[s]" from liability "for injury proximately caused by the

21  failure of the employee to furnish or obtain medical care for a prisoner in his custody."  The

22  second clause then provides a narrow exception to this immunity, making a public employee

23  "liable if the employee knows or has reason to know that the prisoner is in need of immediate

24  medical care and he fails to take reasonable action to summon such medical care."  Thus,

25  immunity can be both invoked under the first clause of § 845.6 and lost under the second clause.

26  See Palacios v. Cty. of San Diego, No. 20-CV-450-MMA (DEB), 2020 WL 4201686, at *18

27  (S.D. Cal. July 22, 2020) (noting the need to analyze both "(1) whether Defendants have

28  immunity and (2) whether Defendants lose immunity under § 845.6").

"The immunity provision is not written in terms of causes of action like medical malpractice or IIED," or as relevant here, wrongful death, "but rather insulates public entities and their employees from liability for injuries 'proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner.'" Steel v. Alameda Cty. Sheriff's Off., 428 F. Supp. 3d 235, 244 (N.D. Cal. 2019) (quoting § 845.6).  Therefore, the first question the court would ask is whether the entirety of plaintiffs' cause of action for wrongful death against Asman and Bradley seeks to hold them liable for an injury (such as William's death) that was caused in part by the officers' failure to "furnish or obtain medical care" for William before or during his overdose.

If the answer were No, then defendants would not be immune from liability for whatever portion of the claim might fall outside of that scope.  If the answer were Yes, then the court would ask the second question of whether that immunity is lost by virtue of the second clause.  That is, do the allegations suggest that either officer (1) knew *or had reason to know* that William was "in need" of (2) "immediate medical care" and (3) failed to take reasonable action to "summon such medical care"?  See Cal. Gov't Code § 845.6; Horton by Horton v. City of Santa Maria, 915 F.3d 592, 605 (9th Cir. 2019) (reciting the three elements of a § 845.6 claim, also applicable to the immunity-exception analysis).  The second clause—comprising these three elements—is construed narrowly.  See Castaneda v. Dep't of Corr. & Rehab., 212 Cal. App. 4th 1051, 1071 (2013) (justifying a "narrow reading of section 845.6" based on the statutory structure in which "the duty to summon is presented as the exception to the broad, general immunity for failing to furnish or provide medical care").

Unlike the test for deliberate indifference, the exception to section 845.6 immunity applies where the defendant has "actual *or constructive* knowledge of a need for immediate medical care." Johnson, 143 Cal. App. 3d at 317 (emphasis added)); see Lucas v. Cty. of Los Angeles, 47 Cal. App. 4th 277, 288 (Ct. App. 1996) (holding that in § 845.6 "the phrase 'has reason to know' is the equivalent of an objective standard" and thus differs from the federal deliberate indifference standard).  Thus, it is enough to allege facts from which it can be inferred that a defendant "reasonably should know" of the prisoner's need for immediate medical care.  See Horton, 915

26

1   F.3d at 605 ("[P]rison officials generally cannot be sued for failing to provide medical care to a

2   prisoner, unless the official knows, *or reasonably should know*, that the prisoner requires

3   immediate medical care." (emphasis added)).

4          Based on the court's preliminary research on the knowledge element of this test, when

5   actual knowledge cannot be shown (or at the pleading stage, alleged in good faith), courts

6   typically require that the medical need be "obvious" in order to satisfy the second clause of

7   § 845.6.  See Lucas v. Cty. of Los Angeles, 47 Cal. App. 4th 277, 288 (Ct. App. 1996) (§ 845.6 is

8   "limited to serious *and obvious* medical conditions requiring immediate care" (emphasis added));

9   Lucas v. City of Long Beach, 60 Cal. App. 3d 341, 349 (Ct. App. 1976) (§ 845.6 provides

10  absolute immunity "except for the situation of a failure to provide medical care [of] a prisoner in

11  *obvious* need of such care" (emphasis added)); see also Watson, 21 Cal. App. 4th at 843 (in

12  finding lack of actual or constructive notice, distinguishing prior case where "the prisoner's

13  medical problems were readily apparent").  Courts typically rely on affirmative statements and

14  direct observations of the person in need, not silence or unseen behavior.  See Palacios, 2020 WL

15  4201686, at *18 (finding allegations sufficiently demonstrated jail staff's actual or constructive

16  knowledge of need for immediate medical care where decedent *told them* "he was 'feeling sad

17  and depressed,' and he felt like 'ending his life'" and that "he was hearing voices telling him to

18  hurt and/or kill himself"); Page v. Cty. of Madera, No. 1:17-cv-0849-DAD-EPG, 2017 WL

19  5998227, at *6 (E.D. Cal. Dec. 4, 2017) (finding sufficient allegations to infer that officers had

20  "reason to know" of decedent's need for immediate medical care where the same officers moved

21  decedent from a medical intake cell and decedent made statements indicating he was suicidal);

22  Bock v. Cty. of Sutter, No. 2:11-CV-00536-MCE, 2012 WL 3778953, at *17 (E.D. Cal. Aug. 31,

23  2012) (finding sufficient allegations of actual or constructive knowledge where defendants

24  observed decedent banging himself against his cell door, yelling, engaging in acts of self-harm in

25  his cell, having delusions, and making alarming statements suggesting suicidal thoughts).

26         The present allegation that Bradley did *not* see William could therefore prove problematic.

27  See Jack v. Cty. of Stanislaus, No. 1:17-CV-0520-AWI-SAB, 2017 WL 4123930, at *13 (E.D.

28  Cal. Sept. 15, 2017) (dismissing § 845.6 cause of action where there were no allegations that the

1  officers "actually saw" the inmate's symptoms or condition; "If [the officers] did not actually see

2  these symptoms or Jack's condition, then they neither knew [ ] nor did they have reason to know

3  that Jack needed immediate medical care.").  However, at least one court has rejected a

4  section 845.6 immunity claim by finding the knowledge element satisfied where deputies on duty

5  "had reason to know of [the decedent's urgent health] condition because of their obligation to

6  perform timely safety-checks."  Medina v. Cty. of Los Angeles, No.19-CV-3808 (GHW), 2020

7  WL 3964793, at *16 (C.D. Cal. Mar. 9, 2020) (denying summary judgment for those deputies).

8  That case would seem to align with plaintiffs' theory that Asman and Bradley had a duty to check

9  on William's health status that, if carried out, would have revealed him to be in medical distress.

10      In addition, with respect to defendant Asman, the present allegations are slightly stronger

11  regarding his actual or constructive knowledge, given that the cell flooding "interaction" might

12  qualify as a "reason to know William was in need of immediate medical care." (Id. at 312,

13  ¶ 279.)  However, further details regarding the nature of this "interaction" would greatly benefit

14  all parties, as it is presently unclear how—aside from it being a CDCR policy violation to not

15  report cell flooding—Asman knew, or should have known, that any acute or otherwise obvious

16  injury to William was the cause of the flooding; and it remains unclear what plaintiffs believe

17  actually occurred during the interaction (for instance, what Asman did or said, and what William

18  did or said).

19      If the allegations of the forthcoming amended complaint meet all elements of the second

20  clause of § 845.6, Asman and Bradley's assertion of immunity to the wrongful death claim would

21  fail and the court would then proceed to the merits of the wrongful death claim (should

22  defendants again move to dismiss on the merits).[16]

23  ////

24  ////

_____

25  [16] As previously expressed, defendants would also have to satisfy the court that the Fourth

26  Amended Complaint, on its face, satisfies their § 845.6 immunity defense.  See Monex Credit, 931 F.3d at 972-73.  If not, such defense would have to be asserted in defendants' answer and

27  would then be addressed if defendants raise it on summary judgment (or later) where they will have the burden of proof.  See Cervantes, 2020 WL 5759752, at *20 (discussing defendants'

28  burden for affirmative defenses).

1

### *(B)      Not Futile on the Merits*

2      Based on the allegations in the Proposed 4AC, the undersigned cannot conclude that the

3    wrongful death claim against Asman and Bradley would be futile on the merits.  Defendants

4    argue that the Proposed 4AC fails to plead how either officer's breach of a duty caused William's

5    death.  (ECF Nos. 148 at 8-9, 150 at 4-5.)  See <u>Quiroz</u>, 140 Cal. App. at 1263 (elements of

6    wrongful death stem from underlying tort, such as negligence); <u>Vasilenko</u>, 3 Cal. 5th at 1083

7    (elements of negligence are "a legal duty to use due care, a breach of such legal duty, and the

8    breach as the proximate or legal cause of the resulting injury").

9      Accepting as true the newly alleged expanded timeline of William's overdose and death,

10    the court rejects defendants' argument.  The Proposed 4AC alleges several duties owed William

11    by Asman and Bradley, such as, a duty to "prevent injury by inmates or parolees to themselves"

12    and a duty to perform regular welfare checks where they observe "a live, breathing person."

13    (ECF No. 145 at 243, 310, 339-40; <u>see also</u> <u>id.</u> at 311 (alleging Asman's duty to investigate and

14    report on cell flooding).)  Plaintiffs further allege that Asman and Bradley breached those duties

15    by failing to "properly conduct counts," including in Bradley's case, failing to exert even "a

16    minimal amount of effort" to look over the partial cell window obstruction" (<u>id.</u> at 313, ¶ 282),

17    and in Asman's case, failing to report or investigate the cell flooding and never visually

18    identifying William (<u>id.</u> at 312, ¶¶ 278-79).  These facts are sufficient to support an inference that

19    Asman and Bradley negligently performed their duties.  And the officers' argument that this

20    negligence is not alleged to be a proximate cause of William's death is hard to square with the

21    new allegations that William was alive during both of the officers' shifts and could have been

22    saved if either had properly checked on him.

23      Defendants direct the court to a Physician/Coroner's Amendment to William's death

24    certificate, which plaintiffs offer as an attachment to the Proposed 4AC, and which lists on the

25    standardized form the word "minutes" beneath a description of the cause of death.  (ECF No. 145

26    at 8, Ex. B.)  Bradley argues that this attachment should be read to contradict plaintiffs'

27    allegations that William's death took "hours," and that unless he happened to check on William

28    "within the exact few minutes between the leakage of methamphetamine and [his] nearly

1    immediate death," conducting a proper check would not have prevented William's death.  (ECF

2    No. 148 at 9.)  Asman, whose entire opposition brief merely copies Bradley's brief while

3    substituting his own name for Bradley's throughout (and flipping the order of the overall

4    arguments), parrots the same argument which does not hold much weight for Asman since he is

5    alleged to have had a much longer period on duty in which he should and could have visually

6    checked on William.  (ECF No. 150 at 5.)

7            The court declines to override plaintiffs' allegations—presumed to be made in good

8    faith—based on this one word in the coroner's amendment to the death certificate, especially in

9    light of the judicially noticed coroner's report which describes the autopsy report as stating that

10   the overdose lasted "minutes to hours."  (ECF No. 153 at 3.)  Arguments regarding the meaning

11   of this evidence in terms of causation are better directed to the trier of fact.  For now, the

12   undersigned concludes that the Proposed 4AC contains sufficient plausible allegations to infer

13   that Asman's and Bradley's alleged inadequate safety checks were a proximate cause of

14   William's suffering and death.  Accordingly, futility does not dictate denying leave to proceed

15   with the wrongful death claim in a further amended complaint.

16                        *ii.    The Proposed Punitive Damages Request Is Futile*

17           However, futility does support denying leave to amend with respect to plaintiffs' implied

18   request for punitive damages against Asman and Bradley.  (ECF No. 145 at 343 (seeking punitive

19   damages "against each individually named Defendant").)  The only cause of action plaintiffs

20   should be permitted to plead in an amended complaint against Asman and Bradley is their

21   wrongful death cause of action.  As previously held in the Second Dismissal findings and

22   recommendations, under California law, punitive damages are not available for this wrongful

23   death cause of action because no defendant has been convicted of a felony homicide in

24   connection with William's death.  (ECF No. 85 at 38 (citing Cal. Civ. Code § 3294(d); Tarasoff

25   v. Regents of the Univ. of Calif., 17 Cal. 3d 425, 450 (1976)).)  Moreover, plaintiffs' request for

26   punitive damages in connection with their wrongful death claim was already dismissed with

27   prejudice.  (ECF No. 124 at 3.)  The implied request for punitive damages against Asman and

28   Bradley is thus futile.  See Johnson v. Buckley, 356 F.3d 1067, 1077 (9th Cir. 2004) ("Futility

30

1   alone can justify the denial of a motion to amend.").

2                        *iii.*     *Prior Amendment Opportunities & Undue Prejudice*

3           Aside from futility, defendants Asman and Bradley next argue, very briefly, that allowing

4   plaintiffs to file the Proposed 4AC would prejudice them because they "would be required to

5   defend against claims that have already been dismissed with prejudice."  (ECF No. 148 at 10-11.)

6   This argument is essentially moot in light of the undersigned's recommendation that leave to

7   amend be denied with respect to the § 1983 claims—and punitive damages request—against

8   Asman and Bradley.  Those are the only claims against Asman and Bradley that have previously

9   been dismissed with prejudice.  The wrongful death claim against Bradley was dismissed *without*

10  prejudice, and the wrongful death claim against Asman has never been dismissed at all (having

11  never been subject to a motion to dismiss).

12          Last, defendants Asman and Bradley argue that leave to amend should be denied due to

13  plaintiffs' repeated failure to cure deficiencies by previous amendment.  (Id. at 11.)  Although the

14  court agrees that the amendment-dismissal cycle must end soon,[17] the Proposed 4AC does in fact

15  address defects in plaintiffs' prior pleading of their wrongful death claim.  This factor therefore

16  does not weigh against granting leave to amend, as limited to the wrongful death claim with

17  respect to defendants Asman and Bradley.

18                        *iv.*     *Conclusion as to Amending Claims Against Asman & Bradley*

19          Accordingly, under the factors analyzed above, plaintiffs should be permitted to file a

20  Fourth Amended Complaint that complies with these findings and recommendations—that is, one

21  that asserts against defendants Asman and Bradley only a wrongful death cause of action (or

22  drops them from the complaint altogether, if plaintiffs so choose).  The previously dismissed

23  deliberate indifference, deprivation of familial relations, and punitive damages claims should

24  remain dismissed with prejudice as to Asman and Bradley.

25  ////

26  _____

27  [17] The court envisions any forthcoming amended complaint as being the last one plaintiffs will be
    granted leave to file, absent strong justification, moving forward.  The court will entertain any
    motions to dismiss filed in response and will then—after obtaining the parties' input—issue a
28  scheduling order moving this case into the evidentiary stage on whatever claims survive.

                                                 31

1          b.  Claims Against Dr. DeNigris

2          The only other defendant substantively opposing the motion to amend is Dr. Stephen

3  DeNigris, the private contracting physician who allegedly performed an unnecessary endoscopy

4  on William some seven months before William's death, thereby worsening his mental state in the

5  lead-up to his methamphetamine ingestion.  The Proposed 4AC contains seven causes of action

6  against Dr. DeNigris: (1) deliberate indifference under § 1983, (2) deprivation of familial

7  relations under § 1983, (3) wrongful death under Cal. Civ. Code § 377.60, (4) negligence,

8  (5) interference with constitutional rights by coercion under the Bane Act, Cal. Civ. Code § 52.1,

9  (6) medical battery, and (7) assault.  (ECF No. 145 at 330-43.)  Plaintiffs asserted these same

10  seven causes of action against Dr. DeNigris in the 2AC.  (ECF No. 44 at 49-63.)  Dr. DeNigris

11  moved to dismiss all but the wrongful death and negligence claims (ECF No. 64.1), and the court

12  granted the motion, with leave for plaintiffs to amend (ECF No. 85 at 12, 15, 34-38, 44-45).

13  When plaintiffs did so by filing the currently operative 3AC, they asserted only five causes of

14  action against Dr. DeNigris, omitting the previously asserted deprivation of familial relations and

15  wrongful death causes of action, and reasserting the others.  (ECF No. 130 at 74-85.)  Dr.

16  DeNigris has a currently pending motion to dismiss four of those five causes of action from the

17  3AC—all but the negligence claim.  (ECF Nos. 138, 138.1 (arguing failure to state a claim for

18  deliberate indifference, coercion under the Bane Act, medical battery, and assault).)

19          Dr. DeNigris opposes allowing plaintiffs to file the Proposed 4AC because, he argues,

20  (A) amendment would prejudice him by requiring him to incur further litigation expense by

21  defending against the wrongful death and deprivation of familial relations claims he believed had

22  been dropped against him, (B) plaintiffs demonstrated bad faith by reasserting these claims

23  without explanation, and without calling attention to their reinsertion, and (C) the proposed

24  amendment is futile in that it merely restates causes of action against him that were previously

25  dismissed (without prejudice) from the 2AC.  (ECF No. 151.)  Plaintiffs do not respond to these

26  arguments at all in their reply, focusing solely on Asman and Bradley's opposition, although all

27  three oppositions were filed on the same day.  (See ECF No. 152.)  Nevertheless, in considering

28  each argument in turn, the court finds none persuasive enough to deny leave to amend as to the

32

1    claims against Dr. DeNigris.

2          As to prejudice and delay, the court recognizes that permitting plaintiffs to amend will

3    prolong the already substantial pleadings stage of this case, but the court finds that the prejudice

4    to Dr. DeNigris in defending against the two previously omitted causes of action will not be

5    significant enough to deny leave to amend.  First, although they are of course separate causes of

6    action, both the wrongful death and the Fourteenth Amendment familial relations claims are

7    closely related to other causes of action consistently asserted against Dr. DeNigris across the

8    2AC, 3AC, and Proposed 4AC.  As discussed above, a legal element of the wrongful death claim

9    is the tort of negligence, an existing cause of action that Dr. DeNigris has been on notice of since

10   the 2AC without moving to dismiss it.  And the familial relations claim is largely tied to the

11   success or failure of the Eighth Amendment deliberate indifference claim, which Dr. DeNigris

12   has defended against in response to both the 2AC and 3AC.

13         Dr. DeNigris' objection to the reinsertion of the wrongful death cause of action in the

14   Proposed 4AC falls somewhat flat in light of his decision not to move to dismiss that cause of

15   action when it was first asserted against him in the 2AC.  And given his argument that the

16   Proposed 4AC is "identical to" the 2AC in terms of the familial relations claim (ECF No. 151

17   at 9), it seems that Dr. DeNigris could fairly easily reuse the same arguments against the familial

18   relations claim that he put forth in successfully moving to dismiss that claim from the 2AC (see

19   ECF No. 64.1 at 7).[18]

20         Next, Dr. DeNigris' protestations of bad faith in plaintiffs silently reinserting these

21   previously omitted claims are overblown.  It does appear from the order of the defendants' names

22   listed beneath the heading of each cause of action that plaintiffs may have mistakenly forgotten to

23   assert their wrongful death and familial relations claims against Dr. DeNigris in the 3AC.  There

24   is no other obvious reason that plaintiffs are only now realleging these claims against him in the

25   ////

26   ////

27
     _____

28   [18] The undersigned takes no position on whether a renewed motion to dismiss on these same
     arguments would be successful again.

33

1    Proposed 4AC.[19]  That plaintiffs are taking advantage of the opportunity to correct their potential

2    oversight via the Proposed 4AC inspired by unrelated new evidence does not necessarily amount

3    to bad faith conduct, however.  While it would have been the better course to call the court's and

4    defendants' attention to the reinsertion of these claims, the court does not view the failure to do so

5    as sufficient evidence of bad faith to deny leave to amend.

6          Finally, Dr. DeNigris argues the futility of the Proposed 4AC at a very general level.

7    (ECF No. 151 at 8-9.)  He makes no argument as to the sufficiency of the Proposed 4AC's

8    allegations with respect to the specific claims asserted against him, and the court will not

9    independently undertake a claim-by-claim futility analysis.  Rather, Dr. DeNigris argues that

10   because the language in the Proposed 4AC for the causes of action against him "is substantially

11   identical to the language used in" the 2AC and 3AC, it would be futile to permit amendment.

12   (Id.)  True, as Dr. DeNigris says, failure to cure a deficiency in a previously dismissed claim by

13   proposing to amend the claim with virtually identical language is reason to deny leave to amend.

14   Moore v. Kayport Package Exp., 885 F.2d 531, 538 (9th Cir. 1989).  But in the court's

15   estimation, the language of the Proposed 4AC's allegations against Dr. DeNigris is only virtually

16   identical to the language used in the 3AC; it is *not* "substantially identical" to the language in the

17   2AC, which is the only one of the two the court has ruled upon.  The Proposed 4AC includes far

18   more, and more detailed, allegations against Dr. DeNigris than did the 2AC—both in the narrative

19   section of the complaint and under nearly every cause of action against him.  As Dr. DeNigris has

20   not, in the present opposition, identified any specific defects in the proposed allegations, the court

21   does not opine on whether plaintiffs have cured the deficiencies that led the court to dismiss

22   (without prejudice) the same causes of action from the 2AC.  However, it is clear that the

23   Proposed 4AC's allegations are not "virtually identical to the previously dismissed . . . claim[s]."

24   Cf. Moore, 885 F.2d at 538.  Whatever resemblance the Proposed 4AC bears to the unruled-upon

25   
_____

26   [19] Plaintiffs are also reasserting the wrongful death claim against two CDCR staff doctors (Drs.
     Ashe and Rudas) who were not listed under that cause of action in the 3AC, and reasserting the
27   familial relations claim against Dr. Ashe who was not listed for that cause of action in the 3AC.
     Drs. Ashe and Rudas, who are represented by the same counsel as Officer Asman, do not argue
28   any prejudice or bad faith in their purported opposition to the motion to amend.  (ECF No. 150.)

1   3AC does not demonstrate its futility.[20]

2       Accordingly, the factors Dr. DeNigris argues in opposing amendment do not overcome

3   the general presumption in favor of granting leave to amend.  See Eminence Capital, 316 F.3d at

4   1052.  Plaintiffs should be granted leave to amend the complaint to assert all seven proposed

5   causes of action against Dr. DeNigris.

6                   c.   Remaining Claims

7       Other than the arguments regarding the claims against the three defendants addressed

8   above, no other grounds for denying leave to amend are urged in opposition to the motion to

9   amend.  Several defendants did not supply an opposition to the motion at all; and the group of

10  CDCR defendants who filed a joint opposition did not present any arguments separate from those

11  addressed above regarding the claims against Officer Asman (ECF No. 151).

12      This leaves the Proposed 4AC, on the whole, largely unopposed.  While much of the

13  changes to the portions of the Proposed 4AC not addressed above consist of non-critical (though

14  still helpful) splitting of paragraphs and the like, plaintiffs do add a significant number of

15  substantive allegations related to the supervisory defendants overall and specifically regarding a

16  failure to maintain a functioning CDCR medical records system.  The undersigned therefore

17  recommends permitting plaintiffs to file a Fourth Amended Complaint asserting all claims not

18  expressly barred above.

19  **CONCLUSION**

20      In sum, the undersigned recommends that plaintiffs' motion to amend be granted in part

21  and denied in part.  The embedded request for revision of the Second Dismissal order should be

22  denied, and therefore leave to amend should be denied with respect to the § 1983 claims against

23  Officers Asman and Bradley previously dismissed with prejudice.  Leave to amend should,

24  however, be granted overall so that plaintiffs may proceed with a Fourth Amended Complaint

25

26  _____

27  [20] That resemblance should only make easier Dr. DeNigris' task of renewing his currently
    pending motion to dismiss the 3AC (if he so desires), assuming plaintiffs' allegations in the
    forthcoming amended complaint retain that similarity.

28

1    asserting any claims not previously dismissed with prejudice.[21]

2         In granting leave for plaintiffs to file a Fourth Amended Complaint, it is recommended

3    that plaintiffs be limited to the defendants named and causes of action asserted in the Proposed

4    4AC, unless plaintiffs first obtain leave of court.  Any Fourth Amended Complaint must comply

5    with these findings and recommendations by not asserting any claims previously dismissed with

6    prejudice, such as the § 1983 claims for deliberate indifference and deprivation of familial

7    relations against defendants Asman and Bradley.  However, plaintiffs should remain at liberty to

8    alter or add to the allegations themselves, should they wish to take into consideration the

9    arguments raised in the currently pending motions to dismiss the 3AC and the discussion

10   provided in these findings and recommendations.  Any Fourth Amended Complaint would need

11   to be filed **within 30 days** of the district judge's order adopting these findings and

12   recommendations.

13        In light of these findings and recommendations, the three pending motions to partially

14   dismiss the 3AC (ECF Nos. 138-40) should be denied as moot, without prejudice to their renewal

15   in response to any forthcoming Fourth Amended Complaint.

16                          **<u>RECOMMENDATIONS</u>**

17        For the reasons discussed above, IT IS HEREBY RECOMMENDED that:

18   1.  Plaintiffs' motion to amend (ECF No. 145) be GRANTED IN PART and DENIED IN

19       PART;

20            a.  The two causes of action against defendants Asman and Bradley under 42 U.S.C.

21                § 1983 should remain dismissed with prejudice;

22            b.  Leave to amend the complaint to reassert those two § 1983 causes of action against

23                Asman and Bradley, and any other claims previously dismissed with prejudice,

24                should be DENIED;

25            c.  Leave to amend the complaint should otherwise be GRANTED;

26   ////

27   _____

[21] Plaintiffs should note that this limitation includes all prayers for punitive damages previously
28   dismissed with prejudice.

                                   36

2. Within **30 days** of the district judge's order, plaintiffs shall (A) file a Fourth Amended Complaint along with any desired exhibits attached, or (B) notify the court that no amended complaint will be filed and the action will proceed on the currently operative complaint;

    a. Any Fourth Amended Complaint (i) shall be limited to the defendants named and causes of action asserted in the Proposed Fourth Amended Complaint, unless plaintiffs first obtain leave of court, and (ii) shall not assert any claims previously dismissed with prejudice;

3. The pending motions to partially dismiss the Third Amended Complaint (ECF Nos. 138-40) should be DENIED as moot; and

4. Following the district judge's ruling on these findings and recommendations, the case should be referred again to the undersigned for further proceedings.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served on all parties and filed with the court within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated:  August 3, 2021

_Carolyn K. Delaney_
_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

19.schm.0195

37