**FILED**

DEC 17 2021

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

1  THOMAS J. SCHMITZ
2  DIANNE MALLIA
   404 Atkinson St,
3  Roseville, CA 95678
   (707) 694-8158
4  tsfoot49@gmail.com
   deedamallia@gmail.com
5  PRO SE

6

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

On behalf of Estate of WILLIAM SCHMITZ, deceased, by and
through THOMAS J. SCHMITZ and DIANNE MALLIA, as
Successors in Interest; THOMAS SCHMITZ, Individually; and
DIANNE MALLIA, Individually,

                    Plaintiffs,

vs.

CDCR Correctional Officer ADAM ASMAN; CDCR
Correctional Officer ERIK BRADLEY; CDCR; CDCR
Physician and Surgeon ALEX ANDALUZ, M.D; CDCR
Physician and Surgeon MARIANNA KATE ASHE, M.D.;
CDCR Physician and Surgeon JEVON JOHNSON; CDCR
Physician and Surgeon ROBERT JOHNSON; CDCR Physician
and Surgeon SUJATHA RAMKUMAR, MD; CDCR Physician
and Surgeon MICHAEL SMITH, MD;CDCR Physician and
Surgeon CHRISTOPHER SMITH; CDCR clinical psychology
intern REBECCA ROBINSON;CDCR Licensed Clinical Social
Worker ERIC BRANMAN; CDCR Licensed Clinical Social
Worker VIOLKA WANIE; Mule Creek State Prison Chief
Medical Executive SCOTT A. HEATLEY, M.D.; Mental Health
Administrator of Quality Management DR. LAURA
CEBALLOS; Deputy Director of CDCR's Statewide Mental
Health Program KATHERINE TEBROCK; Mule Creek State
Prison Chief Executive Officer (Medical) RAINBOW
BROCKENBOROUGH; Mule Creek State Prison Warden JOE
A. LIZARRAGA; CDCR Physician and Surgeon ROBERT
RUDAS, MD; Physician and Surgeon STEPHEN DENIGRIS,
MD, PhD; CDCR Senior Psychiatrist Specialist JACOB
ADAMS; CDCR Secretary SCOTT KERNAN; CDCR Secretary
RALPH DIAZ; CDCR Chief Psychiatrist of Telepsychiatry
KEVIN KUICH; CDCR Director of the Division of Adult
Institutions CONNIE GIPSON;CDCR Undersecretary of Health
Care Services DIANA TOCHE; CDCR Assistant Deputy
Director of the Statewide Mental Health Program BRITTANY
BRIZENDINE; CDCR Associate Director of Statewide Planning
and Policy ANGELA PONCIANO; CDCR Chief Psychologist of
Quality Management JOHN REKART; CDCR Senior
Psychologist Specialist DAVID LEIDNER;
and Does 1 through 100.

                    Defendants.

NO. 2:2020cv00195 -JAM - CkD(PS)

FOURTH AMENDED COMPLAINT:

**PLAINTIFFS' COMPLAINT FOR**

**VIOLATIONS OF CIVIL RIGHTS**

**AND STATE LAW**

**JURY TRIAL DEMANDED**

Plaintiffs complain and allege as follows:

## JURISDICTION AND VENUE

1.      This complaint seeks damages and attorneys' fees pursuant to Title 42 U.S.C. sections §§ 1983 and 1988, for violations of decedent's and survivors' civil rights and violations of California State law. Jurisdiction is founded upon Title 28 U.S.C. sections 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1376.

2.      Plaintiffs' claims arose in the County of Amador, California. Venue lies in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2).

## INTRODUCTION

3.      This action arises out of the untimely and avoidable death of William Thomas Schmitz ("William,,) at Mule Creek State Prison ("MCSP,,) on January 21, 2019.

4.      MCSP has a history of unconstitutional treatment of mentally ill prisoners.

5.      Several months before William's death, in a 2018 report to the Governor of California, the California Department of Correction and Rehabilitation ("CDCR,,) statewide Chief psychiatrist, Dr. Michael Golding, described a "broken system of care,, that is "poorly designed and run,, and "led by 'non-medically trained personnel',,. (Exhibit C) Disturbingly, Dr. Golding found this policy "so ingrained and pervasive in the culture and policy of CDCR that few but the psychiatrists and other medical doctors appear to find it problematic,,.

6.      The report of Dr. Golding, **CDCR's own Chief Psychiatrist**, is extremely damning of CDCR's care of mentally ill prisoners.

7.      William's untimely death is a clear tragic example of the deliberate indifference of many employees of CDCR and highlights many of Dr. Golding's concerns. William is yet another victim of these unconstitutional practices.

8.      At the time of his death, William had been at MCSP for 9 years. William had a long history of severe mental illness of the schizophrenia spectrum, either schizoaffective disorder or schizophrenia.

////

9.      CDCR has a schizophrenia care guide.[1] The care guide includes patient education. The care guide describes schizophrenia as "a brain disorder that keeps you from thinking clearly,,, "it can cause you to see or hear things that are not there,,, and that "most people with [schizophrenia] need to stay on antipsychotic medication for the rest of their lives.,,

10.     Schizophrenia affects how people think, act, express emotions, and relate to others. It commonly strikes men in their late teens or early twenties. Symptoms may include delusions and hallucinations. Delusions are false beliefs not based on reality. Hallucinations are seeing, feeling, smelling, tasting or hearing things that are not real. Anxiety and depression are common with schizophrenia.

11.     People with schizophrenia often abuse drugs and alcohol. Substance abuse is a sign of worsening of the disease. People with schizophrenia often have poor insight into their illness. People with schizophrenia can appear completely normal even while they experience hallucinations or delusions. Antipsychotic medications are a mainstay of treatment. Mental health providers play a key role in promoting medication adherence.

12.     William's symptoms were predominated by paranoid delusions and auditory hallucinations (AH). William's delusions were often of persecution, irrational beliefs that he was being cheated, harassed, poisoned, or conspired against. William's AH or chronic voices would tell him derogatory things. His illness led to withdrawal and self–medication with illicit drugs.

13.     Due to an institutional push to lower the custody level of mentally ill prisoners to improve quality metrics, care directed by a non-medically trained psychologist, a CDCR culture that allows psychologists and social workers to make decisions above their scope of practice, an inadequate medical records system, a culture that allowed routine violations of the Mental Health

---

[1] The CDCR Health Care Department Operations Manual health care definition for a care guide is "A care guide supports the application of proven prevention, diagnosis, and treatment strategies, and the overall practice of evidence-based medicine improving patient care and outcomes by supporting the application of evidence-based medicine; developing recommendations conforming to current evidence in clinical science in the form of treatment guidelines; and providing assistance in clinical decision-making for California Correctional Health Care Services health care staff.,,

Services Delivery System (MHSDS) Program Guide (Program Guide) and an incredible lack of continuity of care, William was removed from critical antipsychotic medications and removed from the Enhanced Outpatient Program (EOP) against his wishes. This decision was led by Defendant REBECCA ROBINSON Psy. D. an unlicensed, non-medically trained psychology intern. The flawed CDCR culture, well described by Dr. Golding, allowed Defendant ROBINSON to lead William's care, make flawed decisions above her qualification level and then have those poor decisions actually followed in violation of the Program Guide.

14.     At the same time as William's mental illness and possible substance abuse were neglected, William was given a false, life-threatening diagnosis of end-stage liver disease and subjected to unnecessary and fraudulent medical procedures. This further contributed to William's suffering and magnified his paranoia, mistrust of medical personnel and ultimately contributed to his death.

15.     Despite these drastic changes in medical treatment for a severely mentally ill man, William was then housed in a cell by himself with access to illicit drugs and insufficient monitoring by CDCR guards in violation of CDCR policy and prison standards. A psychotic William was forcibly given or ingested two bindles of methamphetamine. Correctional officers deliberately violated established CDCR Department Operations Manual (DOM) procedures and protocols to ensure the safety of all inmates. These deliberate violations resulted in a worsening of William's pain and suffering and his death. Prison officials then impeded and misled the death investigation in an effort to avoid scrutiny of William's unconstitutional mental health care, fraudulent medical procedures and death.

## PARTIES

16.     Born June 11, 1982, William Thomas Schmitz was a 36 year old citizen of the United States at the time of his death.

17.     Plaintiff Thomas J Schmitz was decedent's father.

18.     Plaintiff Dianne Mallia was decedent's mother.

19.     Defendant SCOTT KERNAN was the Secretary for CDCR from 2015 until August 31, 2018. As Secretary, Defendant KERNAN was the highest-level official in CDCR and

was responsible for administering and overseeing the operations of CDCR, including the management, safety, and security of all CDCR prisons and the prisoners and staff therein, including at MCSP. Defendant KERNAN was responsible for supervision, training, discipline, and retention of agents and employees working within CDCR. He was responsible for promulgation and implementation of policies and procedures in CDCR, including at MCSP, and was responsible for the care, custody, and control of all prisoners housed in MCSP. Defendant KERNAN was acting under color of state law. Defendant KERNAN was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of prisoners in the prisons, prison suicides, and other violations involving the housing, care, mental health care, and treatment of prisoners at MCSP. Defendant KERNAN was a named Defendant in the *Coleman* litigation in his official capacity and was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court.

20.     Defendant KERNAN had the authority and responsibility for ensuring adequate provision of mental health treatment in CDCR, and specifically at MCSP, and correcting identified deficiencies. Defendant KERNAN was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP medical, custody and mental health staff alleged herein were committed. Defendant KERNAN's affirmative conduct includes the acquiescence to the violations alleged herein. Defendant KERNAN is sued in his individual capacity

21.     Defendant RALPH DIAZ was the Acting Secretary for CDCR from September 1, 2018 through the date of William Schmitz's death on January 21, 2019. As Acting Secretary, Defendant DIAZ was the highest-level official in CDCR and responsible for administering and overseeing the operations of CDCR, including the management, safety, and security of all CDCR prisons and the prisoners and staff therein, including MCSP. Defendant DIAZ was responsible for supervision, training, discipline, and retention of agents and employees working within CDCR. He was responsible for promulgation and implementation of policies and procedures in CDCR, including at MCSP, and was responsible for the care, custody, and control of all prisoners housed in MCSP. Defendant DIAZ was acting under color of state law. Defendant

1    DIAZ was regularly provided with reports concerning the treatment of mentally ill prisoners,
2    improper classification of prisoners in the prisons, prison suicides, and other violations involving
3    the housing, care, mental health care, and treatment of prisoners at MCSP. Defendant DIAZ was
4    a named Defendant in the *Coleman* litigation in his official capacity and was regularly provided
5    and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman*
6    Court.

7        22.     Defendant DIAZ had the authority and responsibility for ensuring the adequate
8    provision of mental health treatment in CDCR, and specifically at MCSP, and correcting
9    identified deficiencies. Defendant DIAZ was responsible for the allowance of the
10   practices/customs pursuant to which the acts of the MCSP medical, custody and mental health
11   staff alleged herein were committed. Defendant DIAZ's affirmative conduct includes the
12   acquiescence to the violations alleged herein. Defendant DIAZ is sued in his individual capacity.

13       23.     Defendant DIANA TOCHE was, at all times relevant herein, the Undersecretary
14   of Health Care Services for CDCR. As Undersecretary, Defendant TOCHE was responsible for
15   supervising the day-to-day administration of all Health Care Services for the 33 CDCR adult
16   prison facilities, including MCSP, and responsible for overseeing and implementing policies,
17   procedures, and practices related to the provision of mental health care services at these facilities.

18       24.     Defendant TOCHE had responsibility for and oversight of CDCR's mental health
19   care and dental programs.

20       25.     Defendant TOCHE was familiar with the prison mental health care delivery
21   system at the statewide level, and familiar with the *Coleman* Court's intervention and
22   supervision of the system through the special master.

23       26.     Defendant TOCHE worked with the receiver appointed in *Plata v Brown*
24   including on the recruitment and hiring of mental health care staff.

25       27.     Defendant TOCHE was regularly provided with reports concerning the treatment
26   of mentally ill prisoners, improper classification of individuals in the prisons, prison suicides,
27   and other violations involving the mental health care and treatment of prisoners at MCSP.
28   Defendant TOCHE is a named official capacity Defendant in the *Coleman* litigation and is

regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court. Defendant TOCHE has signed declarations in *Coleman*.

28.     Defendant TOCHE was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP medical and mental health staff alleged herein were committed. Defendant TOCHE was also the direct supervisor of Defendant TEBROCK. Defendant TOCHE is sued in her individual capacity.

29.     Specifically, TOCHE knowingly failed to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which she knew or reasonably should have known would cause others to inflict a constitutional injury on William Schmitz. Defendant TOCHE's affirmative conduct includes the acquiescence to the violations alleged herein. Defendant TOCHE was acting under color of state law. Defendant TOCHE's affirmative conduct includes the acquiescence in the violations alleged herein.

30.     Defendant Connie GIPSON was the Acting Director of the Division of Adult Institutions ("DAI,,) for CDCR at the time of William Schmitz's death in January 2019.  As Acting Director of DAI, Defendant GIPSON was responsible for supervising the day-to-day administration of the 33 CDCR adult prison facilities, including MCSP, and was responsible for overseeing and implementing the policies, procedures, and practices related to the operations of these facilities.

31.     As the Acting Director of DAI, Defendant GIPSON responsibilities included, but were not limited to, ensuring that the needs of all inmates were met. For example, her responsibilities included ensuring that all inmates had safe and secure housing and appropriate access to healthcare, self-help, education, and rehabilitation programs. In addition, Defendant GIPSON needed to ensure that all institutions, including MCSP, had a qualified workforce available.

32.     Defendant GIPSON was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP medical, custody, and mental health staff alleged herein were committed.

33.     Defendant GIPSON was regularly provided and/or informed of the findings of the

1 | *Coleman* Special Master and the orders of the *Coleman* Court.

2 |      34.    Defendant Gipson signed declarations for the *Coleman* court.

3 |      35.    Defendant GIPSON knowingly failed to ensure enforcement of policies, rules or
4 | directives that set in motion a series of acts by others which she knew or reasonably should have
5 | known would cause others to inflict a constitutional injury on William Schmitz. Defendant
6 | GIPSON's affirmative conduct includes acquiescence in the violations alleged herein. She was
7 | acting under color of state law. Defendant GIPSON is sued in her individual capacity.

8 |      36.    California Department of Corrections and Rehabilitation Correctional Officer
9 | Defendant Adam ASMAN was at all times mentioned herein a correctional officer working at
10 | MCSP. Officer ASMAN was acting under color of state law. Defendant ASMAN is sued in his
11 | individual capacity

12 |      37.    California Department of Corrections and Rehabilitation Correctional Officer Erik
13 | BRADLEY was at all times mentioned herein a correctional officer working at MCSP. Officer
14 | BRADLEY was acting under color of state law. Defendant BRADLEY is sued in his individual
15 | capacity.

16 |      38.    California Department of Corrections and Rehabilitation Physician and Surgeon
17 | Alex ANDALUZ, M.D. was at all times mentioned herein a physician and surgeon working at
18 | MCSP. Dr. ANDALUZ was acting under color of state law. Defendant ANDALUZ is sued in his
19 | individual capacity.

20 |      39.    California Department of Corrections and Rehabilitation Physician and Surgeon
21 | Marianna Kate ASHE, M.D. was at all times mentioned herein a physician and surgeon working
22 | at MCSP. Dr. ASHE was acting under color of state law. Defendant ASHE is sued in her
23 | individual capacity.

24 |      40.    California Department of Corrections and Rehabilitation Physician and Surgeon
25 | Jevon JOHNSON was at all times mentioned herein a physician and surgeon working at MCSP.
26 | Dr. J. JOHNSON was acting under color of state law. Defendant J. JOHNSON is sued in his
27 | individual capacity

28 |      41.    California Department of Corrections and Rehabilitation Physician and Surgeon

Robert JOHNSON was at all times mentioned herein a physician and surgeon working at MCSP. Dr. R. JOHNSON was acting under color of state law. Defendant R. JOHNSON is sued in his individual capacity

42.     California Department of Corrections and Rehabilitation Physician and Surgeon Sujatha RAMKUMAR, MD was at all times mentioned herein a physician and surgeon working at MCSP. Dr. RAMKUMAR was acting under color of state law. Defendant RAMKUMAR is sued in her individual capacity

43.     California Department of Corrections and Rehabilitation Physician and Surgeon Michael SMITH, MD was at all times mentioned herein a physician and surgeon working at MCSP. Dr. M. SMITH was acting under color of state law. Defendant M. SMITH is sued in his individual capacity.

44.     California Department of Corrections and Rehabilitation Physician Dr. Christopher SMITH was at all times mentioned herein a physician working at MCSP. He was also at times the Chief Medical Officer Executive (CME). As CME, Dr. Christopher SMITH was responsible for overseeing the examination, diagnoses, prescriptions and treatment of all inmate patients at MCSP.

45.     Defendant CME C. SMITH was a member of the Institution Leadership Team which was composed of all supervisors and managers at MCSP who were responsible for the planning and provision of health care services to meet the needs of all patients.

46.     Defendant C. SMITH was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP medical and mental health staff alleged herein were committed. Defendant C. SMITH's affirmative conduct includes the acquiescence to the violations alleged herein. Dr. C. SMITH was acting under color of state law. Defendant C. SMITH is sued in his individual capacity.

47.     California Department of Corrections and Rehabilitation former staff psychiatrist, former senior psychiatrist specialist, and former Chief Psychiatrist of Telepsychiatry Dr. Kevin KUICH was at all times mentioned herein acting under color of state law.

48.     Defendant Dr. KUICH did policy work, helped with credentialing and helped

with mental health staffing of CDCR institutions including MCSP. Dr. KUICH took the lead for psychiatry in assisting with the electronic health record. Defendant KUICH reported directly to Dr. Michael Golding. Defendant KUICH is sued in his individual capacity

49.     California Department of Corrections and Rehabilitation post-doctoral psychology intern Rebecca ROBINSON was at all times mentioned herein a doctor of psychology working at MCSP. ROBINSON was acting under color of state law. Defendant ROBINSON is sued in her individual capacity

50.     California Department of Corrections and Rehabilitation Psychiatrist Dr. Jacob ADAMS was at all times mentioned herein acting under color of state law. Dr. ADAMS is currently the Senior Psychiatrist Specialist on the CDCR Mental Health Quality team. He was a staff Psychiatrist and Acting Chief Psychiatrist at MCSP. As Acting Chief Psychiatrist, Dr. ADAMS was responsible for overseeing the psychiatric care of inmate patients at MCSP.

51.     Defendant ADAMS was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP mental health staff alleged herein were committed. Defendant ADAMS' affirmative conduct includes the acquiescence to the violations alleged herein. Defendant ADAMS is sued in his individual capacity.

52.     California Department of Corrections and Rehabilitation LCSW Eric BRANMAN was at all times a clinical social worker working at MCSP. LCSW BRANMAN was acting under color of state law. Defendant BRANMAN is sued in his individual capacity.

53.     California Department of Corrections and Rehabilitation LCSW Violka WANIE. LCSW WANIE was at all times a clinical social worker working at MCSP. LCSW WANIE was acting under color of state law. Defendant LCSW WANIE is sued in her individual capacity.

54.     California Department of Corrections and Rehabilitation Dr. Scott A. HEATLEY was at all times mentioned herein the Chief Medical Officer Executive (CME) at MCSP. Dr. HEATLEY was acting under color of state law. As CME, Dr. HEATLEY was responsible for overseeing the examination, diagnoses, prescriptions and treatment of all inmate patients at MCSP.

55.     Defendant CME HEATLEY was a member of the Institution Leadership Team

which was composed of all supervisors and managers at MCSP who were responsible for the planning and provision of health care services to meet the needs of all patients.

56.    Defendant HEATLEY was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP medical and mental health staff alleged herein were committed. Defendant HEATLEY's affirmative conduct includes the acquiescence to the violations alleged herein. Defendant HEATLEY is sued in his individual capacity.

57.    California Department of Corrections and Rehabilitation Dr. Laura CEBALLOS was at all times mentioned herein the Mental Health Administrator of Quality Management, Inpatient Facilities, for CDCR's Statewide Mental Health Program. Dr. CEBALLOS was acting under color of state law. Dr. CEBALLOS was part of the development of CDCR mental health policies and procedures and developing the Continuous Quality Improvement Tool (CQIT). Dr. CEBALLOS was responsible for and supervised the mental health system's quality management and utilization management processes.

58.    Defendant Dr. CEBALLOS was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP mental health staff alleged herein were committed. Defendant CEBALLOS' affirmative conduct includes the acquiescence to the violations alleged herein. Defendant Dr. CEBALLOS reports to Assistant Deputy BRIZENDINE. Defendant CEBALLOS is sued in her individual capacity.

59.    Defendant Katherine TEBROCK was the Deputy Director of the Statewide Mental Health Program for CDCR, and was appointed to that position in or around November 2015 and remained in this role until after William's death.

60.    In this role, Defendant TEBROCK was responsible for the oversight and management of the mental health division in CDCR. Defendant TEBROCK oversaw the development implementation and evaluations of policies and procedures in the mental health division.

61.    Defendant TEBROCK was responsible for overseeing the provision of mental health care in CDCR, promulgating and implementing policies and procedures, supervision of practices, and taking corrective action when necessary to ensure provision of constitutionally

adequate care.

62.     Defendant TEBROCK had the authority and responsibility for ensuring adequate provision of mental health treatment in CDCR, and specifically at MCSP, and correcting identified deficiencies.

63.     Prior to her appointment, Defendant TEBROCK was Chief Deputy General Counsel for CDCR, where her responsibilities included the management and oversight of the health care legal team, including the *Coleman* litigation. Prior to that, Defendant TEBROCK was Chief of the CDCR court compliance legal team, where her responsibilities included active participation in and monitoring of the *Coleman* litigation. Defendant TEBROCK was aware of the *Coleman* Special Master reports, the orders of the *Coleman* Court, and the 2013 findings of the *Coleman* Court that CDCR continues to fail to provide constitutionally adequate mental health treatment to prisoners.

64.     Defendant TEBROCK was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of individuals in the prisons, prison suicides, and other violations involving the mental health care and treatment of prisoners at MCSP. Defendant TEBROCK was a named Defendant in her official capacity in the *Coleman* litigation and was regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court, including with respect to the January 2015 and January 2016 suicide audits.

65.     Defendant TEBROCK was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP mental health staff alleged herein were committed. Defendant TEBROCK's affirmative conduct includes the acquiescence to the violations alleged herein. Defendant TEBROCK was acting under color of state law. Defendant TEBROCK is sued in her individual capacity.

66.     Dr. Brittany BRIZENDINE was at all times mentioned herein the Assistant Deputy Director of the Statewide Mental Health Program for CDCR and oversees administrative functions of CDCR Mental Health. She was the Supervisor of Dr. CEBALLOS and reported directly to Katherine TEBROCK. Defendant BRIZENDINE was responsible for assisting in the

supervision and management of the mental health system's headquarters and regional operations and is familiar with the *Coleman* mandates.

67.     Defendant BRIZENDINE was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP mental health staff alleged herein were committed. Defendant BRIZENDINE's affirmative conduct includes the acquiescence to the violations alleged herein. Dr. BRIZENDINE was acting under the color of state law. Defendant BRIZENDINE is sued in her individual capacity.

68.     Angela PONCIANO was at all times mentioned herein the Associate Director of Statewide Planning and Policy and reports to Assistant Deputy BRIZENDINE. She oversees administrative functions of the Mental Health program including policy development, operations, and labor negotiations.

69.     Defendant PONCIANO was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP mental health staff alleged herein were committed. Defendant PONCIANO's affirmative conduct includes the acquiescence to the violations alleged herein. She was largely responsible for the design and development of CDCR's Staffing Proposal. Angela PONCIANO was acting under color of state law. Defendant PONCIANO is sued in her individual capacity.

70.     Dr. John REKART was at all times mentioned herein the Chief Psychologist of Quality Management at CDCR headquarters and reported to Dr. CEBALLOS. He started at CDCR Headquarters in 2014 to work on the Electronic health records system.

71.     Defendant REKART was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP mental health staff alleged herein were committed. Defendant REKART's affirmative conduct includes the acquiescence to the violations alleged herein. Dr. REKART was acting under color of state law. Defendant REKART is sued in his individual capacity.

72.     Dr. David LEIDNER was at all times mentioned herein a Senior Psychologist Specialist. He was responsible for much of the development of CDCR's statewide Quality Management systems, including the performance indicators and related business rules.

73.   Defendant LEIDNER was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP mental health staff alleged herein were committed. Defendant LEIDNER's affirmative conduct includes the acquiescence to the violations alleged herein. Dr. LEIDNER reports to Dr. REKART. Dr. LEIDNER was acting under color of state law. Defendant LEIDNER is sued in his individual capacity.

74.   Rainbow BROCKENBOROUGH was at all times mentioned herein the Chief Executive Officer (CEO) for health care at MCSP. CEO BROCKENBOROUGH was acting under color of state law. The CEO is the highest-ranking health care authority within an adult CDCR institution. CEO BROCKENBOROUGH was responsible for all aspects of delivering health care at MCSP to ensure adequate medical and mental health care for all inmates at MCSP.

75.   Defendant BROCKENBOROUGH, was responsible for the implementation, monitoring, and evaluation of and compliance of the Medication Adherence Program.

76.   Defendant BROCKENBOROUGH was also the hiring authority for all health care staff at MCSP, including medical, dental, and mental health care, and was responsible for the hiring, promotion, training, and supervision of health care staff at MCSP. Defendant BROCKENBOROUGH is sued in her individual capacity.

77.   Defendant BROCKENBOROUGH was regularly provided with reports concerning the treatment of mentally ill prisoners, improper classification of individuals in the prisons, prison suicides, and other violations involving the mental health care and treatment of prisoners at MCSP. Defendant BROCKENBOROUGH is regularly provided and/or informed of the findings of the *Coleman* Special Master and the orders of the *Coleman* Court relating to MCSP.

78.   Defendant CEO BROCKENBOROUGH was a member of the Institution Leadership Team which was composed of all supervisors and managers at MCSP who were responsible for the planning and provision of health care services to meet the needs of all patients.

79.   Defendant BROCKENBOROUGH was responsible for the allowance of the practices/customs pursuant to which the acts of the MCSP medical and mental health staff

1  alleged herein were committed. Defendant BROCKENBOROUGH's affirmative conduct
2  includes the acquiescence to the violations alleged herein. Defendant BROCKENBOROUGH is
3  sued in her individual capacity.

4      80.    Joe A. LIZARRAGA was at all times mentioned herein the Warden of MCSP.
5  Warden LIZARRAGA was acting under color of state law. As Warden of MCSP, Defendant
6  LIZARRAGA was legally responsible for oversight of operations at MCSP, implementation of
7  CDCR policy and  procedures, staff training, safety and security of prisoners housed at MCSP,
8  and the supervisor of all other individual Defendants employed at MCSP.

9      81.    Defendant LIZARRAGA was regularly provided and/or informed of the findings
10  of the *Coleman* Special Master and the orders of the *Coleman* Court relating to MCSP.

11      82.    Warden LIZARRAGA was responsible for the custody and treatment of all
12  inmates and for the training and discipline of all employees under his charge. Warden
13  LIZARRAGA was also responsible for establishing such operational plans and procedures as
14  required by MCSP to provide for the custody and treatment of inmates at MCSP.

15      83.    Defendant LIZARRAGA was responsible for the allowance of the
16  practices/customs pursuant to which the acts of the MCSP medical, custody and mental health
17  staff alleged herein were committed. Defendant LIZARRAGA's affirmative conduct includes the
18  acquiescence to the violations alleged herein. Defendant LIZARRAGA is sued in his individual
19  capacity.

20      84.    California Department of Corrections and Rehabilitation Physician and Surgeon
21  Robert RUDAS, MD was at all times mentioned herein a physician and surgeon working at
22  MCSP. Dr. RUDAS was acting under color of state law. Defendant RUDAS is sued in his
23  individual capacity.

24      85.    Stephen DENIGRIS, MD, PhD was at all times mentioned herein a Physician and
25  Surgeon working for Secure MD On-Site Endoscopy. Defendant DENIGRIS treated William
26  pursuant to agreement between MCSP and Secure MD On-site Endoscopy. Defendant
27  DENIGRIS was acting under color of state law. Defendant DENIGRIS is sued in his individual
28  capacity.

86.     Upon information and belief, Defendant Does 1 through 10 were at all times mentioned herein individuals working at MCSP or within CDCR who were acting under color of state law. Defendant Does 1 through 10 were additional members of the staff or supervisors who were deliberately indifferent to William's serious medical needs by deliberately disobeying or otherwise by ignoring known obvious risks to William's health and safety, or by failing to investigate, supervise, and discipline other individuals or by failing to implement and/or maintain constitutionally adequate policies and procedures for inmates at MCSP to obtain medical and mental health care. The true names and identities of Does 1 through 10 are presently unknown to Plaintiffs. Plaintiffs will seek to amend this complaint as soon as the true names and identities of Does 1 through 10 are ascertained.

87.     Upon information and belief, Defendant Does 11 through 20 were at all times mentioned herein individuals working at MCSP or within CDCR who were acting under color of state law.  Defendant Does 11 through 20 were additional members of the CDCR medical staff or supervisors who were deliberately indifferent to William's serious medical needs by ignoring known obvious risks to William's health and safety, or by failing to investigate, supervise, and discipline other individuals or by failing to implement and/or conspired to remove and/or maintain constitutionally adequate policies and procedures for inmates at MCSP to obtain constitutionally mandated medical and mental health care. The true names and identities of Does 11 through 20 are presently unknown to Plaintiffs. Plaintiffs will seek to amend this complaint as soon as the true names and identities of Does 11 through 20 are ascertained.

88.     Upon information and belief, Defendant Does 21 through 100 were at all times mentioned herein individuals working at or within CDCR or the State of California who were acting under color of state law. Defendant Does 21-100 alleged herein were individuals having knowledge that violations of Constitutional rights were to be committed and having power to prevent or aid in preventing the commission of the same, neglected to do so.

## COMPLIANCE WITH GOVERNMENT TORT CLAIM PROCEDURES

89.     As a prerequisite to the state law claims alleged herein against State of California employees/agents, Plaintiffs Thomas Schmitz, Dianne Mallia and Estate of William Schmitz

filed governmental claims with the Victims Compensation and Government Claims Board on July 9, 2019 and September 4, 2020. Despite repeated medical records requests both prior and in the months after their son's death, the delay in the incomplete, disorganized medical records created the need for the second governmental claim.

90. By correspondence from the California Victims Compensation and Government Claims Board dated July 31, 2019 and November 9, 2020 these claims were rejected. This action has been filed within six months of the rejections by the California Victims Compensation and Government Claims Board, as required by law. [2]

91. As a prerequisite to the state law claims alleged herein against the County of Amador and its employees/agents, Plaintiffs Thomas Schmitz and Dianne Mallia filed governmental tort claims with the County of Amador on February 26, 2019.

92. By correspondence from the County of Amador dated August 19, 2019, the claims were rejected.

## FACTUAL ALLEGATIONS

### Background of CDCR Unconstitutional Mental Health Care

93. CDCR is a large organization with a quasi-military chain of command structure. Each position higher up in the chain of command takes on more individual responsibility and is responsible for ensuring those below them are performing their duties.

94. Once they are aware of any unconstitutional practices, policies or customs, each person in the CDCR chain of command has the ability and individual duty to correct those practices, policies, or customs that fall under their responsibility or that of their subordinates. [3]

95. All Defendants are aware of the history of unconstitutional care that persists within CDCR and documented as follows:

96. In the 1990s in the *Coleman vs. Brown* lawsuit, federal courts found Eighth

---

[2] The State of California did not assert that any of Plaintiffs' claims were untimely.

[3] For example, if a federal court *specifically orders* a change to an unconstitutional practice the person(s) directly responsible for the practice along with every single person in the chain of command above them bears responsibility.

Amendment violations and issued injunctions to address systemic problems with mental health care in all CDCR prisons. William, as a mentally ill inmate incarcerated at MCSP, a facility of the CDCR, was a protected class member and regulated by the Court's orders in *Coleman*.

97.     The court ordered a Special Master to monitor the mental health care at the prisons. The oversight still continues today over two decades later. Further, in 2002, in the *Plata v. Davis* lawsuit, CDCR admitted that the statewide prison medical care system was constitutionally deficient. Subsequently, the court appointed a Receiver in 2006 to take control of reforming the system.

98.     In March of 2015, Receiver J. Clark Kelso filed a report in the United States District Court for the Northern District of California. The report found "a number of significant gaps and failures that must still be addressed.,, The report importantly commented on how systemic constitutional deficiencies affect the individuals:

> Of course, there clearly is a relationship between the system of care and the care delivered to individual patients. In particular, if one or more elements of the system of care are absent or significantly deficient, it is highly likely that care is not appropriately being delivered to a significant number, or perhaps even all, patients, thereby creating a risk of serious harm to patients. For example, if the **system of care is so grossly understaffed that it cannot see patients in a timely manner as required by their medical needs, then there would be a significant risk that the understaffing would result in serious risks of harm to inmates, significantly increasing the risk of morbidity and mortality**. Well-functioning systems are what help ensure that adequate care is actually being delivered. For purposes of prospective injunctive relief, **once prison officials are aware that understaffing is creating these risks, the constitutional violation has been established**. As the **Ninth Circuit** recently noted in Parsons v. Ryan, 754 F. 3d 657, 2014 Westlaw 2523682 (June 5, 2014), **"we have repeatedly recognized that prison officials are constitutionally prohibited from being deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm."** (Id, at M2). (emphasis added)

99.     At MCSP specifically, inadequate care continues.

100.    Notably, the Receiver report found that Court ordered medical experts found additional "serious gaps in the medical care system,, that Office of the Inspector General (OIG) reports did not reveal.

101.    Still, in July 2018, just 6 months prior to William's death, **the OIG report found**

**that the overall quality of health care at MCSP was inadequate.**

102.    The OIG report found "emergency care was extremely poor.", "Poor assessments and misdiagnoses frequently occurred throughout the case reviews.", **"MCSP providers often failed to review the patients' medical records sufficiently. This was in part due to understaffing at MCSP, which created a heavier workload for providers.",** (emphasis added) "The OIG clinicians identified mistakes in the document scanning process as either mislabeled, misfiled documents (filed in the wrong record) or incorrectly dated. **Erroneously scanned documents can create lapses in care by hindering the providers' ability to find relevant clinical information.", "The institution scored zero for the labeling and filing of electronic medical record documents."** (emphasis added) "MCSP providers demonstrated numerous problems with assessment, decision-making, documentation, review of records, and emergency services performance. During the case review period, there were multiple provider vacancies and an absence of stable medical leadership. Without stable medical leadership to guide providers and to ensure provider accountability, **patient care at MCSP was often erratic and careless. A severely understaffed institution cannot be expected to provide adequate care.",**(emphasis added)

103.    Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON, TOCHE, BRIZENDINE, PONCIANO, REKART, KUICH and LEIDNER were aware of Dr. Golding's report and/or the OIG report. Each of these defendants were individually responsible for at least one of the deficiencies identified by Dr. Golding and/or the OIG report. Despite their awareness, each of these individual Defendants propagated or failed in their individual responsibilities to correct the flawed culture, policies, inadequate staffing or flawed medical record system that Dr. Golding and the OIG report describe and directly resulted in William's suffering and ultimately his death.

104.    In the original *Coleman* case, the district court ordered defendants to develop and implement various remedial plans to remedy the constitutional violations. *Coleman v. Wilson,* 912 F. Supp. 1282 (E.D. Cal. 1995). The decision set forth five broad elements of a minimally

adequate prison mental healthcare system under the Eighth Amendment, including (1) proper screening to identify individuals with serious mental disorders both at the time of their admission to the CDCR and over the course of their incarceration, *id.* at 1305; **(2) competent staff in sufficient numbers "'to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders'"** *id.* at 1306-8 (quoting *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp 1558, 1577 (D. Idaho 1984)); (3) timely access to appropriate levels of care, including both beds and programs, and appropriate medication, *id.* at 1309-13; **(4) an adequate medical record system**, *id.* at 1314-15, and (5) suicide prevention, *id.* at 1315.

105.    William suffered from inadequacies in all of the broad elements set out by the *Coleman Court,* but element two was particularly glaring. Element two of the *Coleman Court* was violated as there was not a "competent staff in sufficient numbers 'to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders',,. The lack of competent staff in sufficient numbers is an underlying fundamental cause of the OIG report and horrendous care of William.

106.    In 2002, the *Coleman* court mandated a requirement of a maximum 10% vacancy rate for mental health providers. **It is almost 20 years later and the vacancy rate has yet to reach that court-ordered mandate.**

**107.    Even after William's avoidable death, the *Coleman* court continues to find ongoing violations of the order to provide mental health staffing at a level capable of providing a minimal constitutional level of care.**

**108.    For example, the Court found:**

Previously Recognized Implications of Longstanding Staffing Deficiencies
It has been three years since the court described the record with respect to mental health staffing as follows:
With respect to staffing, **the stark reality of the record before this court is that defendants have for fifteen years been under orders to keep their mental health staff vacancy rate below ten percent.** For most of that fifteen year period, and for several classifications of mental health staff, **defendants have been in violation of that order.** As is clear from the Special Master's most recent report, **defendants are still in violation of the court's order, particularly with respect to psychiatrists.** *See* ECF No. 5590-1 at 23. The long **history of failure to hire a sufficient number of psychiatrists**, combined with defendants' position

on the matters before the court on the Special Master's report, **raises a question about whether defendants will ever be able to hire sufficient staff to meet their constitutional obligations to members of the plaintiff class,** as long as the size of the seriously mentally ill inmate population in California's prison system remains at current levels or continues to grow. (emphasis added) (*Coleman v. Newsom*, No. 2:90-cv-0520 KJM DB P, at *7 (E.D. Cal. July 30, 2020) )

109.    Undoubtedly, if there was a "competent staff in sufficient numbers,, to provide a minimal level of constitutional care at MCSP William's suffering from his ongoing psychosis and his death would have been prevented.

110.    CDCR leadership has been on notice for decades and as long as the staffing remains below the mandated level, the unconstitutional care will persist.

111.    Defendant Dr. KUICH testified that his own CDCR interview for a psychiatry position was "bizarre at best,,, "It was very, very perfunctory in a way to say if you have a license and you have a body you have a job,,[4] (Exhibit F at page 126 line 22-24)

112.    So not only is CDCR chronically understaffed for psychiatrists, the psychiatrists that are hired and trying to cover for all the vacancies, only need to meet a bare minimum of qualification.

113.    Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON, TOCHE, BRIZENDINE, PONCIANO, REKART, KUICH and LEIDNER, were all aware of the *Coleman* court orders and each had responsibilities and ability to correct some or all of the identified deficiencies and implement the broad elements. Despite their awareness, each of these Defendants propagated or failed in their individual responsibility to correct the broad elements set out in the *Coleman* case and directly resulted in William's suffering and ultimately his death.

114.    In 2013, despite issuing ***hundreds*** or more remedial orders, the *Coleman* Court found CDCR and its officials had still not adequately addressed the deficiencies found by the Court in 1995. *Coleman v. Brown*, 938 F. Supp. 2d 955, 959 (E.D. Cal. 2013). The Court ruled,

---

[4] Defendant Dr. Kuich deposition testimony is included allowing the full context to be appreciated by the Court.

that **CDCR continues to violate the Eighth Amendment by failing to provide adequate mental health treatment to prisoners**. As a result, the *Coleman* case is still active, with regular audits conducted by the Special Master, and orders issued by the *Coleman* Court in response to findings and recommendations in these reports.

115.    The *Coleman* Court released an Order on September 2, 2020 which provides a review of the background of the Eighth Amendment violations, remedial plans, prior efforts to focus on implementation on the remedial plans, role of benchmarks in remedial plans, remedial deadlines previously set, and plans to attain future full remediation. (Exhibit G)[5]

116.    Particularly, important is the statement on staffing.

> **On October 10, 2017, the court set a one year deadline for defendants to come into compliance with the 2009 Staffing Plan and the court's June 13, 2002 order requiring a maximum ten percent vacancy rate in mental health staffing**. ECF No. 5711. Defendants are nearly two years past the deadline for compliance with the October 10, 2017 order. The court has delayed enforcement of that order in light of the whistleblower report from CDCR Chief Psychiatrist Dr. Michael Golding, which directly implicated staffing compliance, and the proceedings on that report, which culminated in an evidentiary hearing in October 2019 and extensive findings by the court memorialized in the order it filed December 17, 2019. ECF No. 6427. While the court has separately set staffing for resumption of enforcement proceedings in September 2020, ECF No. 6794, the record over the past two years gives rise to a strong inference that while the October 10, 2017 order focused minds on **the woeful shortages in staffing,** defendants have not been able to identify meaningful ways of achieving compliance with the remedial staffing requirements, **which have been clear for more than a decade.** (emphasis added) (Exhibit G at 15)

117.    The *Coleman* Court has consistently made findings and corresponding orders over the years relating to CDCR's ongoing inadequacies in staffing, self –harm and suicide prevention policies and practices that, on information and belief, are reviewed directly by the CDCR statewide chain of command responsible for oversight and implementation of mental health treatment policies, procedures, and practices. This statewide chain of command includes the Secretary of CDCR, the Undersecretary of Health Care Services, the Director of the Division of

---

[5] Only a few of the hundreds of *Coleman* court orders are included as exhibits allowing this Court to see the context of **the surreal length of time CDCR Defendants have violated the Constitution of the United States.**

1 Adult Institutions, and the Deputy Director of the Statewide Mental Health Program for CDCR.

2   118.    At the times relevant to the events described herein, there were CDCR

3 officials primarily responsible for reviewing the *Coleman* Special Master's findings and

4 recommendations and the *Coleman* Court's orders, making necessary changes in CDCR policies,

5 procedures, practices, and trainings; and ensuring that these changes were actually implemented

6 throughout CDCR, including at MCSP: (1) Defendant DIAZ, the Acting Secretary of CDCR; (2)

7 Defendant KERNAN, the prior Secretary of CDCR; (3) Defendant TOCHE, the Undersecretary

8 of Health Care Services for CDCR; (4) Defendant GIPSON, the Acting Director of the Division

9 of Adult Institutions for CDCR; and (5) Defendant TEBROCK, the Deputy Director of the

10 Statewide Mental Health Program for CDCR.

11   119.    Defendants DIAZ, KERNAN, TOCHE, and TEBROCK were named official-

12 capacity Defendants in the *Coleman* litigation.

13   120.    Defendant KUICH accompanied the *Coleman* monitors to various institutions.

14 Part of Defendant KUICH job was to be aware of whether CDCR institutions were able to

15 provide psychiatric care.

16   121.    Defendant KUICH was involved in deploying both telepsychiatrists and non-

17 telepsychiatrists to CDCR institutions.

18   122.    Defendant KUICH was exquisitely aware with how individual CDCR institutions,

19 including MCSP, performed psychiatric care.

20   123.    Defendant Dr. KUICH had to triage psychiatric resources for CDCR institutions

21 and did not provide enough psychiatric resources to MCSP to reach a vacancy rate of less than

22 10%.

23   124.    The amount of psychiatric resources that Defendant Dr. KUICH triaged to MCSP

24 directly affected the care provided to William.

25   125.    Defendant Dr. KUICH testified that CDCR **"did not have enough psychiatrists**

26 **to perform the functions that needed to be** – and it became an ongoing struggle with being

27 able to make certain institutions whole, sometimes at the detriment of another institution that was

28 fully staffed. There were times where we had to take tele psychiatrists from institutions because

there was staffing needs in other places, so it was a zero sum game.,,(Exhibit F at 29 line 5-13)

126.    Defendant Dr. KUICH was specifically asked under oath if "the number of staff psychiatrists in 2017 that were actually on the ground were a sufficient number to provide adequate care and comply with the program guide. Was that your understanding of what was actually happening in the field?,, **Defendant Dr. KUICH disagreed testifying "That was not my understanding.,,** Defendant Dr. KUICH testified "The field was having significant trouble trying to make their regular contacts.,,  (Exhibit F at 60 line 6-7)

127.    Defendants KERNAN, DIAZ, GIPSON, TEBROCK and TOCHE were all publicly appointed officials. Each of them were specifically aware of the *Coleman* findings of unconstitutional care and the specific orders needed to correct the deficiencies, such as a vacancy rate for psychiatrists of no more than 10%.

128.    Now over two years since William's tragic and avoidable death, the *Coleman* court orders still emphasize the need to provide an adequate number of mental health providers in order to meet minimal constitutional standards.

129.    Many years ago in 2009, the court described the mental health staffing levels as "longstanding constitutional deficiencies,,, yet 12 years later the deficiencies still persist and casualties, like William, continue to mount.

130.    "Additionally, as the court has repeatedly explained, defendants developed the 2009 Staffing Plan to remedy longstanding constitutional deficiencies in mental health staffing levels and, in so doing, represented to this court and to the California Legislature that **"the staffing levels in the 2009 Staffing Plan were 'appropriate' and necessary to meet constitutional standards."** ECF No. 5711 at 15; *see also Coleman v. Brown*, 938 F.Supp.2d 955, 984 (E.D.Cal. 2013) (ECF No. 4539 at 54-55).,, (emphasis added)(*Coleman v. Newsom*, 2:90-cv-0520 KJM DB P, at *1)

131.    By specifically failing to comply with the *Coleman* orders, such as failing to maintain enough psychiatrists at MCSP, these defendants knowingly and deliberately allowed the unconstitutional care to continue. William's care and treatment was directly affected by the personal actions of Defendants KUICH, KERNAN, DIAZ, GIPSON, TEBROCK and TOCHE.

William's suffering and death were a direct result of the failure by defendants KUICH,
KERNAN, DIAZ, GIPSON, TEBROCK, and TOCHE to maintain enough competent
psychiatrists at MCSP to provide a minimal constitutional level of mental health care to him.

132.    CDCR has a Statewide Mental Health Program (SMHP) which operates under the
court order to address the constitutional inadequacies in mental health care.

133.    In April 22, 2019, 3 months after William's death, the Eastern California District
court received the Gibson Dunn report, which was a report commissioned to review the claims of
the Golding report. Many topics discussed are pertinent to the unconstitutional care in William's
case.

134.    The Program Guide is the court-ordered remediation plan for correcting violations
of the constitution.

135.    The Program Guide was repeatedly violated in William's care.

136.    At page 10, the Gibson Dunn report gives the following Program Guide
background:

> In 1997, the parties agreed to an initial detailed Program Guide to govern the
> policies and procedures related to CDCR's provision of mental health services.
> **The Program Guide is the court-ordered remediation plan for CDCR's
> delivery of mental health services, and describes the constitutional
> minimum level of care that CDCR must provide to mentally ill patients in
> its custody.** *See generally Coleman v. Brown***, No. 17-17328, slip op. at 2 (9th
> Cir. Nov. 28, 2018) ("[T]he Program Guide sets out the objective standards
> that the Constitution requires in this context[.]").** Therefore, material
> deviation from the Program Guide provisions requires a court order, and would
> usually first begin with a process of dialogue between the Special Master and
> CDCR, before involving counsel for Plaintiffs and ultimately the Court. CDCR's
> provision of mental health services is also governed by a number of additional
> policies and procedures, occasionally referred to as "pocket parts.,, *See* ECF No.
> 5864-1.
>
> The Program Guide is generally organized into chapters centered around levels
> of care and levels of confinement. A number of the issues raised in the
> investigation implicate the proper measurement for timeliness of psychiatric
> evaluations for patients at the CCCMS and EOP levels of care under the
> Program Guide, which are governed by the following provisions:
>
> *12-3-11: "Each CCCMS inmate-patient on psychiatric medication shall be
> reevaluated by a psychiatrist a minimum of every 90 days regarding
> psychiatric medication issues."*

*12-4-9: "A psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues."*

137. Even in the last few months, the *Coleman* court has continued to emphasize the importance of the Program Guide compliance in providing a minimal level of constitutional care to mentally ill CDCR prisoners.

138. **A level of care not afforded to William.**

139. It is "established that the Program Guide sets out the objective standards that the Constitution requires,, for the delivery of adequate mental health care to members of the plaintiff class. *Coleman v. Brown*, 756 Fed.Appx. 677, 679 (9th Cir. 2018). Since 2006, defendants have been under court order to "immediately implement,, the Program Guide's provisions. ECF No. 6214 at 10 (quoting March 3, 2006 Order, ECF No. 1773, at 2). Durable implementation of each component of the remedy, including but not limited to the Program Guide, is essential to full remediation of the Eighth Amendment violation. *See, e.g.*, ECF No. 6214 at 6-7. *(Coleman v. Newsom*, 2:90-cv-0520 KJM DB P, at *1 (E.D. Cal. June 30, 2021)

140. Upon information and belief, violations of the Program Guide are pervasive and occurred in the majority of EOP patients at MCSP during William's time there.

141. The Program Guide policies and procedures were repeatedly violated in William's care directly contributing to his suffering and death.

142. Despite their awareness, defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON, TOCHE, Dr. KUICH, BRIZENDINE, PONCIANO, and LEIDNER each propagated or failed in their individual responsibilities to correct the culture that allows repeated Program Guide violations and directly resulted in William's suffering and ultimately his death.

143. Another one of the serious underlying problems in CDCR's mental health care is the astonishing lack of communication amongst mental health providers, medical providers and custody staff.

144. The Program Guide created and mandated policies to specifically address the communication gaps to try to bring care to a constitutional level for these vulnerable mentally ill people.

145. The Program Guide specifically states, "All levels of care include treatment

Schmitz – Complaint for Damages          26          Case NO. 2:2020cv00195

services provided by multiple clinical disciplines, and development and update of treatment plans by an Interdisciplinary Treatment Team (IDTT), which includes appropriate custody staff involvement.,,

146.    Dr. Golding, CDCR's own Chief psychiatrist, clearly expressed concern this mandated court-ordered policy was not followed. Dr. Golding's report included emails dated 7/17/2018 and labeled "EXHIBIT AA,,, roughly 6 months prior to William's death. Defendant Dr. KUICH testified that these emails were an accurate description of Defendant Dr. KUICH's and Dr. Golding's joint visit to an EOP institution.

147.    The email states the institute's psychiatrists "said that their decision making was not adequately considered…that often when they go to treatment teams, they find out that their patients are going to be discharged…**Effectively the psychiatrists opinion is not considered in making many of the decisions for discharge and both psychiatrists say that their opinion has been overruled**…. [Both psychiatrists] said that it seemed **the psychologists who made the discharge decisions were in charge and did not need to consider their medical opinions.,,** (emphasis added) Further one psychiatrist "hoped that when he does have a strong medical opinion about a particular patient (because of medication changes or instability) that at least at that point psychology leadership would hear him out. **But he says that the few times he has tried to change a level of care decision, the psychologist simply said, 'No.'"**

148.    Finally, the same email directly describes **an illegal and unethical practice of psychologists practicing medicine**. "There is not much respect for medical decision-making by physician psychiatrists, but **psychologists fill in with medically involved decisions** by determining whether the medical context is safe for patients to be admitted in crisis beds hospitals when medications are titrated sufficiently for patients to leave crisis bed hospitals, when levels of care should be changed in AdSeg, and throughout the hospital, etc.,,

149.    Defendant Dr. KUICH testified that "Psychiatrists as physicians do have the Hippocratic Oath to do the best we can for our patients.,,(Exhibit F at 33 line 8-9)

150.    The CDCR Health Care DOM health care definition for Standard of Care is as follows:

Standard Of Care: The reasonable degree of skill, knowledge, care, and conduct ordinarily possessed and exercised by members of the discipline and profession under similar circumstances. **Within correctional settings in California, the standard of care also takes into account the provisions of California Code of Regulations, Title 15,** relating to definitions of medical necessity and also exclusions from available services as contained therein. **A failure to meet the standards of care means**:

- Clinical conduct which fails to deliver care that is consistent with the degree of care, skill, or learning expected of a reasonable and prudent **licensed medical provider** acting in the same or similar circumstances.
- Clinical conduct which is disruptive and/or **unethical in nature** and which can be or is detrimental to patient care and/or safety and/or clinical operations.
- Clinical conduct which involves the licensed medical provider engaging in conduct providing care which requires skill or knowledge beyond those possessed by the licensed medical provider in willful disregard of the licensed medical provider's competencies.
- Clinical conduct which violates the Medical Board of California's Clinical Practice Act and/or which can be or is detrimental to patient care and/or safety and/or clinical operations. (emphasis added)

151.  Several CDCR psychiatrists[6] have already sworn under oath to the unethical and systemic violation of Standards of Care as defined in the DOM by allowing psychologists to practice medicine and overrule the medical doctors.

152.  Defendant Dr. KUICH knows that it is below the standard of care for a psychologist to practice medicine.

153.  Additional CDCR psychiatrists have also sworn to their concerns directly to the *Coleman* Court about not only the deficiencies caused by CDCR's understaffing of psychiatrists but also the "misleading practices that tend to cover up or under-report the deficiencies…,, They did this through an Amicus Brief (Exhibit N)

154.  Although filed after William's death, the Amicus Brief is directly relevant to the unconstitutional care inflicted on William by CDCR defendants and represents the view of CDCR's *own* psychiatrists and also helps to explain the training differences between psychiatrists and psychologists.

---

[6] As detailed in the Complaint, CDCR psychiatrists that have already sworn under oath to this specific violation of the Standard of Care include: Dr. Golding, Dr. Kuich, Dr. Schultz-Ross, Dr. Navreet Mann and Dr. Amar Mehta.

155.   Specific CDCR psychiatrists have sworn declarations that support Dr. Goldings's report.

156.   Dr. Schultz-Ross, was a CDCR Senior Psychiatrist Specialist on May 23, 2019.

157.   On May 23, 2019, four months after William's death, Dr. Shultz-Ross declared the following:

> 3. In CDCR, psychologists generally govern psychiatrists at the departmental and facility levels. Psychiatrists generally are not in charge of the treatment team and **due to psychiatrist understaffing, often cannot attend treatment team meetings**[7] due to scheduled appointments with patients or other tasks. I experienced circumstances in which I was not included in my patients' treatment team meetings, due to the way the workflow was organized.
> 4. As discussed in more detail in Dr. Golding's report, against the wishes of the psychiatry leaders, CDCR is moving toward granting psychologists the ability to order seclusion and restraint. Psychologists in CDCR already often order admission and discharge into hospital levels of psychiatric care in the prisons. **They sometimes overrule psychiatrists in these decisions, not admitting patients that psychiatrists say need more care, and discharging patients who are in the midst of medication changes best done in an inpatient setting. As psychologists have no medical training, they may make decisions involving medical risks that they may not be able to recognize or fully assess.** (Emphasis added)  (Exhibit O)

158.   Dr. Navreet Mann, M.D. was the **Chief Psychiatrist at MCSP** on May 22, 2019.

159.   On May 22, 2019, **four months after William's death**, Dr. Mann declared the following:

> The non-medical members of the Mental Health Quality Management Committee out-voted the psychiatry members. **Standard of care decisions as such were out of the non-medical leadership's scope**… the biggest flaw in our system, which is that our non-medical leadership is attempting to dictate what they think is appropriate care, without having the appropriate knowledge of the subject. … In certain responses **CDCR misuses Psychiatry understaffing, by having Psychologists take over certain services that cannot be provided by Psychiatrists due to short staffing, instead of focusing on hiring new staff. This raises some serious scope of practice issues. Psychologists and**

---

[7] The majority of William's treatment team meetings lacked a psychiatrist.

**Psychiatrists are not interchangeable. Our leadership has been made aware of the differences, but have failed to address these scope of practice issues.**

**Clinical Decision making - In CDCR non-medically trained clinicians**, with narrower scope of practice, **are not only making diagnostic decisions, but also overruling physicians when it comes to diagnosis and treatment of complicated Psychiatric issues. CDCR is the only organization allowing, and enabling non-medical staff to overrule physician's decisions**. These clinical decisions impact all levels of patient care from:
- diagnosis;
- changing treatment level of cares;
- determining whether patient requires medical attention;
- admitting patients to inpatient hospitals;
- medical interventions as putting patients in restraints;
- and discharging patients from the hospitals.
MH management is aware of this issue, and have failed to clarify policies to state that physicians should make treatment decisions, and shall not be overruled by any non-medical discipline. **In fact, CDCR has taken no serious actions where Psychologists are practicing beyond their scope.**(emphasis added) (Exhibit P)

160.    Dr. Amar Mehta, M.D. was a CDCR psychiatrist on May 20, 2019 that had worked for CDCR over 5 years.

161.    On May 20, 2019, four months after William's death, Dr. Mehta declared that the situation of psychologists supervising psychiatric physicians at CDCR is not typical and it is the only institution he knows of that this occurs. **"[Psychologists] cannot be expected to safely overrule a medical decision by a psychiatric physician with more training and education in the field of medicine**… **Psychiatric patients do not deserve to be treated as second class citizens**, as the sole group of patients that can be treated by people who have no general medical training...Psychologists are not allowed to practice neurology…An exception for psychiatry reflects a deep misunderstanding of the interconnected and complicated nature of human physiology, and **is demeaning to patients with very real suffering**. „ (emphasis added) (Exhibit Q)

162.    Despite what is well-recognized by these CDCR psychiatrists, the way the rest of the United States institutions function, the laws that prohibit non-physicians from practicing medicine, the regulations of the DOM and the numerous rulings finding CDCR in violation of

the constitution, **CDCR leadership allowed non-physicians to practice medicine** during

William's incarceration.

163.    Dr. Golding's report describes the custom of primary clinicians (PCs), normally a

social worker or psychologist, making decisions and dictating them to other members of the

IDTT including psychiatrists. This practice violates the Program Guide policy that directs the

IDTT to update treatment plans.

164.    This specific violation was a widespread practice and problem in CDCR's Chief

psychiatrist's opinion as evidenced by the following:

> In theory, level of care changes are always made by the IDTT, the patient's
> treatment team, which should include the psychiatrist. Yet Dr. [Redacted] and Dr.
> [Redacted] and Dr. [Redacted](at CHCF) directly told Dr. [Redacted] and me
> during our recent visit in July 2018 and **we hear the same from many
> psychiatrists across the state that they are frequently only told that the
> patient is being discharged (or that the level of care is being changed) when
> the psychologist tells the patient in treatment teams**. So the physician
> psychiatrist is finding out that a discharge is going to occur when the patient is
> being told. Clearly no consultation is seen as necessary with the psychiatric
> physician, except if the psychologist determines that a psychiatric medical
> opinion is needed (and often that happens). **But it is the psychologist who
> determines whether there is a relevant medical situation present which
> necessitates calling a psychiatric physician.** As our psychiatric physicians
> repeatedly say, CDCR seems to want to use them only for prescription writing.
> (emphasis added) (Exhibit C at 104-105)

165.    William's PCs were social workers, like Defendant BRANMAN and Defendant

WANIE, or even unlicensed psychology interns like Defendant ROBINSON.

166.    As described *infra*, Defendant BRANMAN and Defendant ROBINSON each

directed IDTTs that were deficient, against the Program Guide, and directly led to William's

suffering and ultimately his death.

167.    Despite their awareness, Defendants TEBROCK, KERNAN, DIAZ, GIPSON,

TOCHE, BRIZENDINE, PONCIANO, Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH,

LIZARRAGA, and Dr. ADAMS each propagated or failed in their individual responsibilities to

correct the flawed practice of allowing unlicensed psychology interns and social workers to

make poor, independent decisions above their scope of practice and this directly resulted in William's suffering and ultimately his death.

168.    Dangerous and illegal drugs are prevalent in CDCR prisons. CDCR has an overdose death rate three times higher than in all US State prisons.

169.    In a "Report on Drug Treatment in CDCR,, by Dr. Mike Puisis in 2018, it is reported "death related to drug use,, have been the number one or two cause of death over the past decade in CDCR. Further, "incarceration therefore exposes California state prisoners to a higher risk of death from overdose than either California civilians or United States state prison inmates nationwide.,, The report expressed the opinion "therapy of drug addiction,, is below community standard and "that as a result of availability of illegal drugs and less effective drug treatment, overdose deaths continue to rise.,,

170.    Despite their awareness, defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, TOCHE, BRIZENDINE, and PONCIANO each failed in their individual responsibilities to correct the below community standard therapy of drug addiction that Dr. Puisis described and directly resulted in William's suffering and ultimately his death.

171.    Despite their awareness, defendants LIZARRAGA, KERNAN, DIAZ, and GIPSON each failed in their individual responsibilities to correct the increased availability of illegal drugs that Dr. Puisis described and directly resulted in William's suffering and ultimately his death.

172.    The Amador County Civil Grand Jury (ACCGJ) is mandated to inquire into the condition and management of MCSP. The ACCGJ found serious problems with MCSP during William's time there.

173.    From the 2018-2019 ACCGJ report, MCSP "could be more proactive in contraband prevention. Other problems persist, evident by the Warden having been placed on administrative leave pending an internal investigation.,, The ACCGJ members observed MCSP employees in violation of the MCSP Operating Procedure MC 156 as "the items being carried by employees were not 'thoroughly inspected'.,,

174.    MCSP provided written information to the ACCGJ that the American Correctional Association (ACA) accredited MCSP.

175.    This was a fraudulent claim and MCSP was not accredited by the ACA.

176.    Among the 2019 recommendations by the ACCGJ to MCSP were: "Immediately enforce existing policies regarding search of all materials entering the secure areas of MCSP,, "Engage with the ACA or another similar organization by January 1, 2020 to ensure independent oversight of MCSP operations. The protection of the citizens of Amador County is a serious responsibility, and as such, should be conducted with extensive and thorough oversite.,, "Maintain the focus on improving the medical program at MCSP and strive for continued improvement in OIG medical inspection results. The goal should be 'Proficient' for every inspection indicator.,,

177.    In the 2017-2018 report, the ACCGJ notes, that CDCR and the Receiver "continue to try to raise the level of medical care for inmates to proper constitutional standards.,, Similar to the 2018-2019 report that had concerns about employees not being searched which allows opportunity to bring in contraband, the ACCGJ learned "An average of five employees a year are walked off the premises for bringing in some form of contraband,,. Defendant former warden LIZARRAGA agreed with this finding. The ACCGJ recommended "Increase security checks for employee contraband.,, The ACCGJ also described a "'culture clash' between custody staff and medical staff,, and that "not all mandatory procedures are being enforced adequately.,,

178.    Despite their awareness of these ACCGJ findings, Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH and LIZARRAGA each propagated or failed in their individual responsibilities to correct the findings described in the ACCGJ reports which directly resulted in William's suffering and ultimately his death.

179.    Defendant former warden LIZARRAGA showed complete disregard for his responsibility to the thousands of inmates under his control and care by running a business selling sports equipment while working at MCSP instead of focusing on the myriad of extremely serious deficiencies at MCSP.

180.    Defendant former warden LIZARRAGA accessed Amazon, Craigslist, Ebay, and

Yellow pages from his CDCR workstation 643 times. (Exhibit K at 7)

181.    Defendant former warden LIZARRAGA sent emails between his work and personal email accounts that did not pertain to his job as warden. (Exhibit K at 7)

182.    Defendant former warden LIZARRAGA sent an email between his work and personal account that included a tracking sales for ski equipment. (Exhibit K at 7)

183.    Defendant former warden LIZARRAGA sent an email between his work and personal account that included photographs of sports equipment. (Exhibit K at 7)

184.    Defendant former warden LIZARRAGA sent an email between his work and personal account that included a Craigslist ad for sports equipment and listed his state issued phone number as the contact number. (Exhibit K at 9)

185.    In addition to other despicable allegations, the OIG, in case number 18-0028029-DM sustained an allegation that "On August 14, 2014 the warden allegedly engaged in secondary employment without the department's prior approval and in a manner that prevented him from performing his job.,, (Exhibit J)

186.    The investigation into the Defendant former warden was a detriment and a distraction to the employees of MCSP in the months leading up to William's death.

187.    CDCR leadership was notified by "multiple emails and calls,, of the detriment of his continued leadership.

188.    One example is the following email on Oct 22, 2018, 3 months prior to William's death.

> I know I have already written to you regarding this and that email was responded to by a Senior Special Agent from OIA; however it is very evident that Warden Lizarraga has either been noticed that he is the subject of an investigation or spoken to in some form of a discussion. I say this based upon the sudden change in his demeanor and the way he now interacts with most people that coincided with that original contact.
> **In addition to my email, I am aware of multiple emails and phone calls to CDCR Headquarters from people (including the management here at MCSP) regarding this incident** as well as staff that have attempted to share their concerns with the Warden about how widespread the rumors have become. The response received was a not so polite suggesting them to mind their own business. **It's now my concern the effectiveness of his leadership and his mental stability as he leads this prison knowing that the management team here has**

**lost their trust in him.** All will continue following the direction of the department and the Warden of MCSP, but many no longer trust him.
  Please reach out to any manager/executive staff at MCSP for their unbiased opinion. (emphasis added)

189. Details of the investigation include: between August 14, 2014 and August 22, 2018 Defendant LIZARRAGA accessing Amazon, Craigslist, Ebay, and Yellow pages on 643 occasions on his CDCR workstation, 163 emails between his work and personal email accounts that did not pertain to his job as warden, including a worksheet for tracking sales of ski equipment and photographs of sports equipment, and Craigslist ad for sports equipment that listed Defendant LIZARRAGA's State issued phone number as the contact number.(Exhibit K)

190. Correcting identified deficiencies such as preventing contraband, including illicit drugs, from reaching mentally ill inmates like William was part of Defendant former warden LIZARRAGA's job.

191. Defendant former warden LIZARRAGA's failure to perform his duties directly resulted in William's suffering and death.

192. The OIG found the investigation into Defendant LIZARRAGA's wrongdoing was poorly conducted because the hiring authority delayed referral to the Office of Internal Affairs, delayed conducting the investigative and disciplinary findings conference, granted the warden a vacation request during the investigation and kept the warden on paid administrative leave for almost 8 months.(Exhibit J)

193. Despite years of defendant LIZARRAGA's poor work performance as evidenced by the reports about MCSP described *supra*, years of running a second business instead of doing his job as warden, and direct notification of Defendant LIZARRAGA's wrongdoing months prior to William's death, Defendants KERNAN, DIAZ, and GIPSON each failed to timely remove defendant LIZARRAGA from his position as Warden of MCSP and their failure directly resulted in William's suffering and death.

**Individual Lawsuits**

194. In addition to the *Coleman* court, numerous individual lawsuits have been filed against CDCR and several of the named Defendants. These lawsuits have given Defendants

further specific notice of the consequences of failing to provide a minimal constitutional level of care. **These cases often follow a pattern of failing to provide adequate care to a mentally ill inmate, failure of custody staff, like Defendants ASMAN and BRADLEY, to adequately supervise the mentally ill inmate and subsequently serious harm or death of the mentally ill inmate.** One example is *Lemire v. CAL. Dep't of Corr. & Rehab.* 726 F.3D 1062 (9th Cir. 2013).

195.    In *Lemire*, the Ninth Circuit ruling put CDCR employees on notice that factual allegations of failing to supervise CCCMS level inmates for a period up to three and a half hours was a triable issue of fact for deliberate indifference for the suicide of a mentally ill inmate.

196.    *Lemire* and similar cases have allowed CDCR supervisors and policy makers to shape policy and trainings to address these identified deficiencies.

197.    As stated in *Coleman*, "Remedies for defendants' Eighth Amendment violations in custodial practices are found in state regulations and provisions of the CDCR Department Operations Manual (D.O.M.) as well as in departmental memoranda and court orders., Coleman v. Newsom, No. 2:90-cv-0520 KJM DB P, 6 (E.D. Cal. Sep. 2, 2020) (Exhibit G at 4)

198.    It is impossible to remedy "Eighth Amendment violations in custodial practices,, if the custodial practices put in place to prevent Eighth amendment violations are deliberately ignored by custody staff.

**199.    The supervisors lack of enforcement of the policies of the DOM and the custom of permitting the policies to be routinely and deliberately ignored by frontline medical and custody staff, like Defendants ASMAN and BRADLEY,** continue to result in tragic cases like William's suffering and death. In addition to the numerous individual lawsuits, there are several cases documented in OIG incident reports and multiple *Coleman* mental health expert reports demonstrating the repeated and routine violations.

### *Metrics > Constitutional Care*

200.    Even more concerning than the plethora of evidence regarding the Decades' old unconstitutional mental health care at CDCR and the bringing in of contraband by employees, are the efforts to be relieved of court monitoring by deception versus actually bringing the level of care to the minimum constitutionally required level. The deception and continued inadequate

care are highlighted in Dr. Golding's report, Dr. Golding's response to the evidentiary hearing into his original report (Exhibit D), a second whistleblower report by CDCR psychiatrist Dr. Melanie Gonzalez and the testimony of a third CDCR psychiatrist, Defendant Dr. KUICH.

201.    Dr. Melanie Gonzalez was Senior Psychiatrist Specialist at Headquarters – Elk Grove from January 2017 through at least the time she filed her Declaration to the *Coleman Court* on October 23, 2019.

202.    Dr. Gonzalez came forward with a letter to the Receiver on October 24, 2018 entitled "RE: Whistleblower Complaint Regarding Patient Care and Safety,, because she was "concerned the mental health treatment of patients/inmates is not being accurately reported and **certain practices place patient/inmates at significant risk of injury or death.,,**(emphasis added) (Exhibit R)

203.    Dr. Gonzalez came forward three months prior to William's death, which was caused by the very practices that she reported.

204.    Defendant Dr. KUICH testified that an email written by Dr. Golding to Defendant TEBROCK on July 2nd 2018, approximately 6 months prior to William's death, contained statements Defendant Dr. KUICH wrote. Dr. Golding presented this email as exhibit U in his report.

205.    Defendant Dr. KUICH testified to the accuracy of the statement that at "**the [Mental Health Quality Management] meeting the two psychiatry members were outvoted in the agreement to disregard scheduling orders written by psychiatrists in the interest of the patient, over the interest of the program and data.,,**

206.    In other words, CDCR's statewide Chief psychiatrist and Chief Psychiatrist of Telepsychiatry both testified under oath that they witnessed **a deliberate vote by Mental health leaders to disregard medical doctors' orders that were made for the benefit of a patient in preference to data.** The information was specifically emailed to the Deputy Director of the Mental Health Program at CDCR, Defendant TEBROCK.

207.    Favoring metrics over medical care was the culture at CDCR, it started from the top and permeated to all levels.

208.    After the Dunn Gibson report, a court order on December 17, 2019, by U.S. District Judge Kimberly Mueller **found truth in the whistleblower allegations** that the defendants "knowingly presented false information to the court,, and "lost sight of the remedial purposes,, that **"CDCR has been found to have violated the Constitution as to the mental health program and is under a remedial order supervised by this court."** (Exhibit E at 46)

209.    Disturbingly, CDCR defendants' actions brought to light by the Golding report and explored by the *Coleman* court show a **culture of denial** to the fact that the level of mental health care CDCR provided was unconstitutional.

210.    Defendant WANIE knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

211.    Defendant Dr. ANDALUZ knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

212.    Defendant Dr. M. SMITH knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

213.    Defendant Dr. J. JOHNSON knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

214.    Defendant Dr. R. JOHNSON knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

215.    Defendant Dr. RAMKUMAR knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

216.    Defendant BRANMAN knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of

Constitution for cruel and unusual punishment of mentally ill inmates.

217.    Defendant Dr. LEIDNER knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

218.    Defendant Dr. CEBALLOS knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

219.    Defendant TEBROCK knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

220.    Defendant  ROBINSON knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

221.    Defendant  Dr. HEATLEY knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

222.    Defendant Dr. C SMITH knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

223.    Defendant KERNAN knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

224.    Defendant DIAZ knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

225.    Defendant TOCHE knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

226.    Defendant GIPSON knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

227.    Defendant Dr. BRIZENDINE knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

228.    Defendant PONCIANO knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

229.    Defendant Dr. REKART knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

230.    Defendant Dr. KUICH knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

231.    Defendant BROCKENBOROUGH knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

232.    Defendant LIZARRAGA knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

233.    Defendant Dr. ADAMS knew that from 2009 through 2019 the entire time William, a mentally ill inmate, was incarcerated, CDCR was in violation of the 8th amendment of Constitution for cruel and unusual punishment of mentally ill inmates.

234.    **Sadly, William paid with his life and Plaintiffs lost their son due to the failure of CDCR to correct the years of ongoing cruel and unusual punishment inflicted on mentally ill inmates.**

235.    According to the Dunn Gibson report, even the Special Master views that "CDCR

has an aggressive approach towards data bearing on compliance which may be influenced by the Governor's office and a strategy to terminate litigation.,,[8]

236.    In other words, CDCR should push to have the metrics be the way to show constitutional level care. Tragically, this has created a custom, pushed from the very top of CDCR leadership, to focus on making the metrics look good at all costs including the actual compliance with the Program Guide. Defendants Dr. CEBALLOS, TEBROCK, TOCHE, BRIZENDINE, PONCIANO, and REKART each propagated or failed in their individual responsibilities to correct the custom of promoting metrics over mental health care and this directly resulted in William's suffering and ultimately his death.

237.    From Judge Mueller's order:

> In his report, Dr. Golding describes the Mental Health Dashboard as "CDCR's self monitoring tool.,, ECF No. 5988-1 at 4. The Mental Health Dashboard uses red, yellow, and green color coding to illustrate the degree of compliance with a wide variety of measures. *See*, *e.g.*, Kuich Dep. at, *e.g.*, 109:1-20 ("institutions were very much . . . into the dashboard, very much into the metrics, very much into how they're performing. . . . Tremendous amount of pressure placed on the institutions by the regional staff to be able to get their metrics in the green. And not always did that effort to help the institution get in the green, look at the actual weeks and the details; it just involved work harder, work longer, get it done. **I don't care how you get it done. So if you need a cell side appointment, that's what you need to do. If you need to do something, that's what you need to do. We need to go from red to yellow or yellow to green.,,** (emphasis added) (Exhibit E at 14)

238.    Dr. Golding's report and exhibits contain numerous more examples of the system of unconstitutional care and the manipulations of data in an attempt to be relieved of *Coleman* Court monitoring. Plaintiffs allege all of Dr. Golding's allegations are true.

239.    For example, when describing an in-person tour at a CDCR prison in an email on July 12, 2018, 6 months prior to William's death and included as Exhibit Y in his report, Dr. Golding notes that what he observed:

---

[8] CDCR Defendants would not allow access to communications relating to the Governor's office and litigation strategy for the neutral investigator to review.

**was not even a primitive psychiatric interview nor was it psychiatric care.**
Our physicians were struggling. Their goal can only be to try to prevent the
patient from toxic reactions to meds, and try to stop suicidality, while making the
best guess they can about medications.

**No amount of QM number manipulations** (%-weeks compliance vs on-time
appointments, cancelling out appointments so they are not recorded as no-shows,
the QM team refusing to allow us to calculate % of visits that are cell-side, 30-50
IDTT's scheduled in 3-4 hours (and not allowing us to calculate how often that
occurs), making it challenging to record and calculate non-confidential visits, etc.)
**can obscure what is straightforward and easy to see.**

You can't provide medical care with no little to information standing cellside, and
virtually screaming through a cell-door, no matter how many EOP reviews we are
said to pass. **If we pass when this is occurring, passing means nothing in terms
of medical care.**

**Our number crunching is also bizarre and poorly done.** The CCC psychiatrist
was seeing patients cell-side frequently and never once (he said) recorded the
visits as in non-confidential spaces (though we would not be allowed access to the
data even if he did). The system defaults to recording visits as confidential so all
his cell-side visits were recorded as confidential (even if we were allowed to
make these calculations system-wide and investigate psychiatrist by psychiatrist,
which we are not),, (emphasis added)

240.    Defendant Dr. KUICH also testified that data "could provide **the appearance of
meeting compliance timelines and meeting all requirements with a limited number of staff**,
which could be used in a way to say the staff that we have, **although not enough,** is adequate to
complete our compliance requirements.,, (emphasis added) (Exhibit F at 32 line 19-23)

241.    Mentally ill patients throughout CDCR that should be in EOP based on their level
of mental illness and the Program Guide requirements were excluded from the EOP program
based on the common objective of improving metrics.

242.    Improving the metrics was more important than actually complying with the
Program Guide and therefore this common practice was a deliberate violation of the
constitutional rights of mentally ill inmates.

243.    The Dunn Gibson report and Dr. Golding's report show examples of this custom.
One specific example is CDCR changed the requirement that EOP patients, like William, be seen
every 30 days. The change was in effect from December 2016 to April 2017.

1    244.    Defendant Dr. CEBALLOS approved this change.

2    245.    Defendant Dr. LEIDNER knew Dr. Golding would not approve since Dr. Golding

3    had previously denied this proposed change that contradicted the Program Guide.

4    246.    Defendants Dr. CEBALLOS and Dr. LEIDNER[9] kept the change from Dr.

5    Golding.

6    247.    The change allowed psychiatry visits seen up to 60 days to count as compliant on

7    the metrics reported to the Court.

8    248.    Once alerted to this change, per the Dunn Gibson report, "the Special Master

9    found it deeply troubling, even shocking, that CDCR would unilaterally change a long-standing

10   interpretation of an important provision of the Program Guide without consulting him.,,

11   249.    This devious change, which greatly improved Program Guide compliance metrics,

12   was timed just a few months before CDCR's filing of "Defendant's Response to the Special

13   Master's Report on the Status of Mental Health Staffing and the Implementation of Defendant's

14   Staffing Plan,,.

15   250.    Dr. Golding discovered this fraudulent change and tried to change it back to the

16   Court ordered policy. However, there was a delay in returning to the appropriate 30-day monthly

17   requirement for psychiatry appointments. The delay lasted long enough for CDCR to complete

18   their report to the Court with the overly positive fraudulent data.

19   251.    Per the Dunn Gibson report, Defendant former Deputy TEBROCK noted in an

20   email on March 28, 2017, that the Governor's office had asked "to explain in more detail what

21   metrics can be used to show that the care by psychiatry is adequate.,,

22   252.    It's likely the Governor's office wanted the metrics reported by Defendant Deputy

23   TEBROCK to be true and not fraudulent.[10] However, per the Dunn Gibson report "CDCR

24   submitted to the Court or cited to data using the modified rule in two filings.,,

25

26   [9] To his credit, Judge Mueller found that Defendant LEIDNER distinguished himself, as did Dr. Golding, from the
     other witnesses by exhibiting a conscience during his testimony. Defendants CEBALLOS and Defendant
27   TEBROCK were therefore two witnesses that did not seem to exhibit a conscience during their testimony.
     [10] However, according to Judge Mueller's order Dr. Golding has a "strong belief that the Governor's Office expressly
28   directed the provision of misleading data to the court,,. Discovery may reveal if this conspiracy starts above Deputy
     Director Tebrock in the Governor's office.

253. **The neutral investigator found that the representations reported to the *Court* were misleading.**

254. On 25 April, 2019, **only 3 days after the Dunn Gibson report**, Defendant TEBROCK applied as a Special Assistant Inspector General in the Office of the Inspector General.[11] Defendant TEBROCK's letter "to support [her] candidacy,, for the OIG position explains her responsibilities.

255. Defendant TEBROCK's failures in these specific responsibilities directly led to failures within the CDCR mental health treatment that led to the suffering and death of William Schmitz.

256. Specifically, on May 29, 2019, Defendant TEBROCK wrote a letter "To Whom it may Concern,,, which includes the following: "I worked closely with every division within CDCR on high profile, complex litigation issues, and/or major policy issues…Most recently, I have worked as the Deputy Director of the Mental Health Program at CDCR. This work has provided me with the opportunity to work in the operations side of CDCR, making programatic (sic) decisions on behalf of the agency and patients. In both my current and prior roles I also have had the opportunity to participate in, and contribute to, agency decision-making…I have intimate knowledge about how the CDCR system works including the policies, practices and disciplinary systems. I have been involved as in-house counsel and as a hiring authority in high profile, often complex individual internal investigations, and individual disciplinary actions.,,

257. In her OIG application, Defendant TEBROCK described her duties performed as Deputy Director of the Statewide Mental Health Program. Defendant TEBROCK states she was "Responsible for oversight and management of the mental health division in the California Department of Corrections and Rehabilitation. Oversee the development, implementation, and evaluation of policies and procedures. Serve as liaison for the division with internal executive staff and external stakeholders including the Governor's office, the California Legislature, federal court monitors, and others.,,

---

[11] Based on six recent OIG Medical inspection reports of CDCR institutions. Defendant TEBROCK is currently "Chief Assistant Inspector General, OIG,,.

258.    Judge Mueller of the *Coleman* court found Defendant TEBROCK "failed to fully accept responsibility for her own failures, including failures in the leadership she was required to exercise given her role as Deputy Director.,,(Exhibit E at 15 line 27-28)

259.    Defendant TEBROCK's failure in oversight and management of the mental health division in the California Department of Corrections and Rehabilitation and failure in the development, implementation and evaluation of policies and procedures, in particular failure to correct the custom of providing an unconstitutional level of mental health care directly resulted in the tragic consequences of ongoing unconstitutional care for thousands of Californian citizens including William Schmitz's suffering and ultimately his death.

260.    Judge Mueller's order lays out details that meet the criteria of a conspiracy within the CDCR Mental Health team to be relieved of their need to provide constitutional level care by deception.

261.    Defendant former Deputy TEBROCK knowingly presented fraudulent data to the Court in attempt to lower the court-ordered number of CDCR psychiatrists required to provide a minimal level of constitutional mental health care!

262.    To repeat, the leader of CDCR's Statewide Mental Health Program Defendant former Deputy Katherine TEBROCK knew that CDCR was not meeting the requirements placed by the Court and Special Master to follow the Program Guide. CDCR mental health providers were pressured to meet the metrics to make it appear as if they were complying with the Court-ordered requirements. They were pressured to do whatever it took to make the metrics look good. When they still could not meet the metrics, Defendant Dr. CEBALLOS[12] altered the court-ordered requirements for psychiatry visit timelines to allow them to meet the metrics. This fraudulent change served its purpose of changing the metrics from red to green. However, the change made psychiatric patients' care worse by lowering the minimal number of psychiatric visits the Court previously ruled was required to meet the minimal constitutional requirement. Dr. Golding figured out the scheme and demanded that they change requirements back to the

---

[12] The Court found willful blindness or reckless indifference of Dr. Ceballos for this change that was against the requirements of the Program Guide.

Court-ordered levels.

263. **Defendant former Deputy TEBROCK still submitted the fraudulent data to the Court and despite many opportunities, never corrected the fraudulent data that was knowingly presented to the Court.**

264. It is heart-breaking to William's family and likely to the thousands of other relatives of mentally ill inmates within CDCR's care that the **leadership was actively trying to avoid provide a minimal constitutional level of care** as ordered by the *Coleman* court. The violations of William's constitutional rights should have been prevented, CDCR should have complied with the staffing requirements so many years ago when first ordered by the *Coleman* court. [13]

265. **Severely mentally ill men and women are suffering and dying and will continue to suffer and die** with this type of CDCR leadership that *deliberately* does not comply with the *Coleman* court's orders and acquiesces to the ongoing cruel and unusual punishment to the thousands of mentally ill under their care.

### Background of the death of William Thomas Schmitz

266. At the time of his death, the decedent, William Thomas Schmitz, was thirty-six years of age. He was five feet, seven inches tall and weighed approximately one hundred and eighty pounds.

267. William was one of five children. The Schmitz family was a typical, loving middle class family. His family and friends called him Willie. William was an animal lover, a good student[14] and athlete, who was well liked by peers. **He was a college student and firefighter when his mental health illness first manifested.** His family was very close and supported William throughout his adulthood in spite of the complications posed by William's

---

[13] Plaintiffs note that William's extended family has many healthcare providers, lawyers and other college graduates and no one that has been in prison. William's uncle was a lawyer who ended up psychiatrically hospitalized. Roughly 30% of CDCR inmates are mentally ill. Mental illness is unpredictable. Allowing CDCR's unconsitituional care to continue may directly affect **any current California's** son, daughter or grandchild that develops a severe mental illness in early adulthood and ends up in CDCR.

[14] CDCR records contain William's college transcript and show over a 3.2 GPA until Spring of 2005 when he received two F's in his final semester. This is a blunt example of his mental illness's effect.

mental health issues.

268.    William had four siblings and 11 nieces and nephews, who would all visit him at MCSP. His family visited with him greater than 95% of visitation days.[15]

269.    His father, mother and sister all moved their residence to be closer to William at MCSP. William was a particular focal point in his parents' lives given his severe mental illness, which contrasted to their other successful, healthy adult children.

270.    In his early twenties, William began to suffer significant mental health problems. He suffered from paranoid hallucinations. He was hospitalized at Langley Porter Psychiatric hospital in San Francisco. William's medical diagnoses included: paranoid schizophrenia, schizoaffective disorder, bipolar type, and possibly psychotic disorder due to sub-arachnoid cyst with hallucinations and delusions. He notably suffered from chronic auditory hallucinations and persecutory delusions.

271.    From the very first time he entered the Correctional system, the system was on notice that William had severe mental illness. In fact, William's own siblings turned him into the police. On the very first 911 call, William's sister, Rose, reported William's psychotic symptoms and schizophrenia.

272.    After William's arrest, he was transferred from Butte County Jail to Napa Valley State Hospital as multiple mental health doctors found him incompetent to stand trial due to his severe mental illness. After over a year of treatment and only while taking multiple psychiatric medications to treat his mental illness was William returned to competency and discharged from the State psychiatric hospital.

273.    William was under the care and custody of CDCR starting in February 2009. After reception at High Desert State Prison, he transferred to MCSP where he spent the vast majority of time until his death. CDCR classified William as a mentally ill inmate. William received treatment through the MHSDS due his psychotic disorder.

274.    From the beginning of his incarceration until May 2018, William was in the EOP

---

[15] Per visiting records, which are only weekends and a few holidays, over the final year of his life, William had over 200 visits by individual family members, with his father visiting him over 50 times and his mother 28 times.

program. EOP is the highest level of outpatient psychiatric care for mentally disordered inmate-patients (IP).

275.    Per 15 CCR § 3999.320, the CDCR Medical Classification System is "used to match patients' medical needs with the capabilities of facilities and programs.,, As a mentally ill inmate in the MHSDS, William was only eligible to go to select institutions, which included MCSP. At the time of William's death over 50% of inmates at MCSP were mentally ill MHSDS inmates.[16] (Exhibit M)

276.    William's mental illness was treated with numerous antipsychotic medications.

277.    While properly treated, William was a model inmate. He was able to work in a prison job as a porter.

278.    William was even awarded 60 days of extraordinary conduct credit for grabbing an inmate who was trying to seriously hurt himself or commit suicide by jumping over a railing in a housing block.

279.    In April 2013, according to Defendant ERIC BRANMAN, LCSW, William admitted to considering "stopping all psychotropic medications and return to a state of psychosis in order to escape objective reality.,, William "thought of it a least 100 times.,,

280.    There was no evidence of illicit drug use while incarcerated until the final years of his life as the psychiatric medications were inappropriately decreased and then discontinued.

281.    In June of 2014, William had a negative urine drug test.

282.    On June 11, 2014, Dr. Sam Wong cleared William for transfer to California Medical Facility (CMF) Vacaville's psychiatric inpatient program for treatment of schizophrenia with initiation of the antipsychotic clozapine.

283.    CMF Vacaville was previously known as department state hospital (DSH).

284.    Clozapine, with a brand name of Clozaril, is used to treat psychotic disorders that have not adequately responded to other safer antipsychotics.

---

[16] Exhibit M is the COMPSTAT report for MCSP showing the number of inmates at the EOP and CCCMS level. In January 2019, there were 551 EOP, 55 EOP SNY and 1442 CCCMS out of a total of 4016 total inmates. This equates to 51% of the MCSP population.

285.    At the time of transfer to CMF Vacaville, William was on two antipsychotics, Haldol and Zyprexa, a mood stabilizer, Depakote and two antidepressants, Zoloft and Remeron.

286.    On his initial evaluation at CMF Vacaville, William reported auditory hallucinations with "derogatory content,, and visual hallucinations. His depression was 6/10 and anxiety 8/10. He reported paranoia and the belief that people are plotting against him and talking about him. He was diagnosed with schizoaffective disorder, bipolar type and polysubstance dependence. William was "hopeful,, the clozapine trial would help him.

287.    William's psychosis responded well to clozapine and 12 days later William reported resolution of his hallucinations.

288.    On January 21, 2015, exactly 4 years prior to his death, William's psychiatrist at the time, Dr. Thomas Haspel, emphasized the importance of the medicine. **Clozapine "is a very important medication for this patient as he has struggled for over 9 years with AH and ideas of reference, so preservation of a therapeutic level is essential."**

289.    On June 16, 2015, to social worker T. Campbell, William "stated he is maintaining and continues to do well.,, Campbell noted William's diagnoses of Schizoaffective, Bipolar type, R/o[17] psychotic and mood disorders due to subarachnoid cyst.

290.    Notably, Campbell indicates William has no axis II disorder. In other words, William did not have a personality disorder.

291.    On June 18, 2015, William's Interdisciplinary Treatment Team (IDTT) summary emphasized how well William has responded to clozapine.

> [William] returned to MCSP-EOP, from DSH on 7/24/14. He was referred to DSH to address unremitting auditory and visual hallucinations, episodic paranoid delusions, insomnia manic episodes.  Per previous IDTT (7/24/14): Upon [William's] return to EOP, he reported, 'I haven't felt this good in ten years.' [William] also reported hallucinations have ceased and mood + sleep disturbance has improved.
>      Over the past 210 days, [William] continued to express relief from symptoms associated with, Axis I diagnosis, Schizoaffective Disorder, Bipolar type. [William] states, AH are present but manageable. I/P occasionally experiences hypo-mania and is able to recognize when symptoms + used coping

---

[17] R/O means rule out

mechanisms: Keeping to self, staying inside more to limit stimuli and avoid poor decision making, trying to lie down and take naps......He will remain at EOP-LOC because he is a clozaril patient.,,

292.    On July 28, 2015, Dr. Haspel again noted William's "Mental health issues of [auditory hallucinations and visual hallucinations] are much less since taking Clozaril starting in July 2014.,,

293.    After stabilization of his mental health symptoms and many months on clozapine, the medication was stopped when William developed acute hepatitis and was hospitalized in November 2015.

294.    Once it was determined the hepatitis was secondary to hepatitis C, the mental health and medical staff did not encourage and educate William on the critical need for him to resume clozapine. William was changed to the antipsychotic Paliperidone (Invega).

295.    William had mental health appointments with Defendant Dr. RAMKUMAR on 3/2/16, 3/16/16 and 4/15/16.

296.    During these visits, William explained he was not on antipsychotics for three months and "felt kind of ok but then had a psychotic break down and started hearing voices and became delusional ... and felt he was deteriorating like on the streets, was unable to sleep....was started on Invega...started feeling better on the invega, and came here to get it increased...just worried to find the right medication,,

297.    In summary, once William was stopped off the clozapine even though he was on the mood stabilizer Lithium, he had a worsening of psychosis requiring a return to the antipsychotic Invega. The Invega however did not fully control his symptoms, just like his previous trial of Invega prior to his hospitalization to initiate clozapine.

298.    Defendant Dr. RAMKUMAR does not remember these visits with William or review them when she again treats William in 2018.

299.    In 2018, Defendant Dr. RAMKUMAR specifically notes it's her first time seeing William.

300.    Defendant Dr. RAMKUMAR writes the exact same assessment and plan for

1  every visit in 2016.

2      301.    Shockingly, despite not reviewing her prior notes, Defendant Dr. Ramkumar

3  writes the exact same plan when she again sees William in 2018.

4      302.    To top off the complete disregard for the healthcare of vulnerable mentally ill

5  inmates, Defendant Dr. RAMKUMAR wrote the exact same assessment and plan for a

6  completely different patient. Incredibly, the other inmate's name was simply lined out and

7  replaced with William's name and added to William's record.[18]

8      303.    **Defendant Dr. RAMKUMAR was obviously using a generic template and**

9  **repeatedly adding it to patient notes without giving thought to the individual patient. She**

10 **did this for years!**

11     304.    It is well below a minimal standard of care for complex and unique mentally ill

12 patients to use the exact same generic assessment and plan.

13     305.    The negative consequences to patients of copying and pasting generic notes is

14 magnified by the incredible lack of continuity of care within MCSP.

15     306.    The common practice at MCSP of shuffling complex mentally ill patients from

16 provider to provider makes the medical record even more critical.

17     307.    Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, and Dr.

18 ADAMS, were all medical or mental health supervisors at MCSP. Each had an individual

19 responsibility to assure monitoring of the overall standard of care provided by defendant Dr.

20 RAMKUMAR. **Each of these defendants should have known that Defendant Dr.**

21 **RAMKUMAR had a routine practice of providing below the minimal standard of mental**

22 **health care when she was using the exact same plan for multiple complex mentally ill**

23 **patients for years.** Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH and Dr.

24 ADAMS each failed in their individual responsibility to supervise Defendant Dr. RAMKUMAR

25 allowing her to provide this inadequate level of care, which directly resulted in William's

26 suffering, worsening psychosis and ultimately his death.

27 _____

28 [18] One of the prior medical record releases sent to Plaintiffs by MCSP includes this note. However, Plaintiffs did not see the same note disclosed in the "full medical record,, disclosed by Defendants.

308.    On 6/22/2016, William saw another different psychiatrist, Dr. Atwood. William asked for the Invega to be increased for ongoing auditory hallucinations and irritability. William reported that the prior increase in Invega improved his symptoms. William was also concerned about the effect the medication may have on his liver. [19]

309.    On 12/29/16, William was seen by psychiatrist, Dr. Lacayo for "[psychiatric medicine] refusal,,. Dr. Lacayo writes William was seen the month before by Dr. Fernando who started William on Sertraline for depression.[20] Dr. Lacayo increases William's Invega again. On 1/12/2017, Dr. Lacayo reports that William was "doing better since Invega was adjusted.,, [21] Dr. Lacayo recommended 4 week follow-up. On 3/1/17, Dr. Lacayo saw William as William was referred for missing his mood stabilizer and antidepressant. Dr. Lacayo reports William still was improved since the increase in Invega.

310.    There are fragmented psychiatry visits for William between 6/22/2016 to 10/31/2017 that are below the Program Guide frequency mandates of monthly.

311.    At the 10/31/2017 visit, Defendant Dr. J. JOHNSON reported William was last seen by him on 6/1/2017.

312.    William should have had monthly evaluations with a psychiatrist during his time in EOP per the Court ordered Program Guide.

313.    This timeframe was during the time that Defendant CEBALLOS and Defendant Dr. LEIDNER had changed EOP psychiatry evaluation requirements. The reduced requirements directly resulted in the even greater lack of psychiatry evaluations for William during this time. Just one visit with a competent psychiatrist could have saved William from suffering.

314.    **Literally, just one visit with a competent psychiatrist to appropriately review his record or gather collateral information from a 5 minute phone call to his family and put**

---

[19] This is a new fact from prior Complaints as additional medical records were disclosed on 1/9/2021 almost two full years after Plaintiff's mentally ill son's death. This was despite multiple requests and prior releases of the supposed "full medical record,, by CDCR.

[20] Plaintiffs do not have a copy of a note from Dr. Fernando on this date. The medical note is either lost, purposefully withheld or Dr. Lacayo inaccurately reported William saw Dr. Fernando a month prior.

[21] There are two separate notes from Dr. Lacayo 1/12/17 at 8:30 and 14:00 though it seems there was only one actual visit with William and Dr. Lacayo that day.

**William back on Clozapine would have relieved his suffering from severe mental illness and ultimately prevented his death.**

315.    In May of 2017, William was suddenly moved from his two-man cell to dormitory housing despite recommendations against dormitory housing by mental health providers.

316.    This move was extremely stressful for William and caused his psychosis to acutely worsen which resulted in his placement in the administrative segregation unit for suicidal ideation.

317.    From May 12-16th, 2017, William was in the administrative segregation unit. William was then discharged to dormitory housing despite his fears.

318.    William immediately decompensated in the dormitory environment and was assaulted by an inmate on the day of his discharge.

319.    William ended up back in a two-man cell and the memories of the physical assault would only magnify his future paranoia about returning to dormitory housing.

320.    On May 15, 2017, Schmitz brother, Dr. Joseph Schmitz, sent the following E-mail to Defendants Dr. C. SMITH, Dr. HEATLEY and Dr. ASHE at Christopher.Smith@cdcr.ca.gov, Scott.Heatley@cdcr.ca.gov, and Marianna.Ashe@cdcr.ca.gov.

> Drs.,
> Please help. My family is very concerned about my brother. Per his cellmate's mother, William was placed in a crisis bed for failing to move to level 2 yard. We have been unable to get any information despite multiple calls to MCSP. William has been a very good inmate and due to his mental illness particularly paranoia and mania, he has been extremely anxious about moving into a cell with more than one person. Appropriately, his providers told him and my father that he would be allowed to stay in his current housing. Unfortunately, it seems this message was not relayed to the prison staff and the move was attempted. I have a medical release and so does my father. Can someone please let us know that my brother is okay and help him to be placed back in the appropriate housing ? He really is a good person who would not be in there if not for being severely mentally ill (which as you know I think may be helped by cyst removal).
>     Thank you very much for your attention and care in helping him.
>     Sincerely,
>     Joe Schmitz, MD

321.    No copy or summary record of this E-mail was placed in William's medical

record by Defendants Dr. C. SMITH, Dr. HEATLEY and Dr. ASHE.

322.    After calling multiple different numbers at MCSP and receiving no response from Defendants Dr. SMITH, Dr. ASHE or Dr. HEATLEY, Dr. Schmitz forwarded the same E-mail with following information added to Defendant Dr. J. JOHNSON and Dr. Jack Aamot on May 17, 2017 at Jevon.Johnson@cdcr.ca.gov and Jack.Aamot@cdcr.ca.gov.

Gentlemen,
        Can either of you please help and let me know that my brother is ok or not. Please it is extremely stressful and no one will contact us back or give information both myself and father have medical release on file. I believe he may be in a crisis cell but don't know for sure.
Thank you,
Joe Schmitz, MD

323.    That same day Dr. Aamot responded via E-mail:

Dr. Schmitz,
Please forgive the delay in getting back to you. I just got in and went through my e-mail. Unfortunately I have to go through procedures to communicate with you about your brother. You will have to call the "Family Call In Line,, (209) 274-4911 ext.6104. They will then do what they do to give me approval to communicate about your brother.
Thank you,

J. Aamot, PsyD

Jack Aamot, Psy.D.
Clinical Psychologist
Mental Health Services
B-Yard, EOP
Mule Creek State Prison
Phone: 209-274-4911 ext. 6763
Fax: 209-274-5218

324.    Dr. Schmitz responded back with the following:

Dr. Aamot,
Thank you for your willingness to communicate with me. My brother has filled out medical releases for me information to be shared with me. My information has been left with the family call in line and I have not received a response.  Given my brothers mental health sometimes it is hard for him to complete paperwork or accomplish tasks. If you need some other specific paperwork signed by him to be able to talk to me can you please bring to him and have him sign? I know that is asking a lot, but it is extremely hard to get these things accomplished by calling in. I will call them again right now too. Thank you,

Joe Schmitz

325.   On May 18, 2017 Dr. Schmitz wrote the following E-mail to Dr. Jack Aamot.

Dr. Aamot,

I apologize for filling up your E-mail box, but I hope you can sense my concern for my brother. I know that you are unable to provide information to me at this time, but I would like to provide you with the details I know and hopefully you can help him. I know that the medical records and patient histories can become convoluted. In brief, William was pretty normal growing up. He has four siblings and all of us live "successful" lives as we have not had to deal with severe mental illness. I am a Navy ophthalmologist and our other brother is a Navy pilot.   William had no anti-personality disorder traits growing up. He was away at college and working as a CDF firefighter when he began developing psychotic paranoid delusions. Unfortunately, in my opinion, he was not well managed by the primary care physicians he sought care from and not hospitalized when he should have been and stabilized. While in prison, he has done his best to remain on medications and follow the doctors advice. I don't think he has had any major issues over the 12 years he has been in custody. As you know, he is in EOP with many others with severe mental illness and at times he becomes very paranoid. Recently, he was told that he would be moved to level 2 yard. While I think moving to a lower level is normally a good thing for inmates, for him it increased his stress significantly as he now would be sharing with several other EOP inmates (vs just one cellmate). He was specifically told he would not have to move by a doctor (and my father was told the same thing by one of the doctors over the phone) as it would obviously be detrimental to his health and he may decompensate. I believe he was attempted to be moved and either refused or got there and had a fight once there and is now in isolation/crisis bed. I am hoping you can help in some way to at least check on him and maybe help to figure our what happened and have him placed back into his original housing as it is absolutely best for his health and avoids so many potential problems that may arise as his mental health deteriorates due to the added stress that this situation is definitely causing for him. In addition, if you have not already, I encourage you to review the multiple cases of psychiatric illness that have resolved with arachnoid cyst removal that I have sent in over the years asking for this surgery to be done. If you have not seen them in his record I am happy to send them to you. Again I know you can not tell me about his situation right now but I can send you information. Thank you again for taking the time to read this and hopefully to help him.

Sincerely,
Joe Schmitz

326.   No copy or summary record of any of these E-mails in May of 2017 were placed in William's medical record by Defendant Dr. J. JOHNSON.

327.   On June 4, 2017, William's brother Dr. Joseph Schmitz wrote the following E-

1  mail to Dr. Jack Aamot at jack.aamot@cdcr.ca.gov.

2    Dear Dr Aamot,
3    Sorry to bother you again, but apparently MCSP ran out of Invega. My father visited my
     brother today and said he did not seem to be doing well and a big reason may be he did
4    not receive the antipsychotic because it is not available. Hopefully, you can check in on
     him and make sure he receives the medication. Unfortunately, with the added stress of
5    not having his stuff and being moved around a lot recently it's not a good time for him to
     not receive the medication. Again sorry to bother you, but there is really no good way to
6    contact medical there in a timely manner.
7    Thank you,
     Joe Schmitz
8

9    328.    On June 9, 2017, Defendant Dr. ADAMS documented a conversation with Dr.

10  Joseph Schmitz. Defendant Dr. ADAMS notes William's family was concerned William had not

11  been receiving his antipsychotic medicines and that the arachnoid cyst in his brain may be

12  contributing to his mental illness.

13    329.    Defendant Dr. ADAMS was clear to document that he was the acting Chief

14  Psychiatrist and had not actually seen William but reviewed William's record. He wrote that he

15  relayed to Dr. Schmitz that Dr. JOHNSON had ordered Williams's refill of Invega.

16    330.    Although the medicine was refilled by Dr. JOHNSON, there was still a failure in

17  the process of providing William his antipsychotic medications. William did not actually receive

18  the Invega for a few days and Defendant Dr. ADAMS excluded this fact from the conversation.

19    331.    Defendant Dr. ADAMS also excluded the fact that they were violating William's

20  constitutional rights by neglecting the Program Guide requirements to assure William was

21  evaluated by a psychiatrist monthly.

22    332.    Over the years, the Schmitz family tried many times to advocate for William's

23  health and ongoing treatment with antipsychotic medications. They sent many unanswered E-

24  mails and placed many unreturned phone calls to MCSP. The only E-mail returned was the one

25  documented above from Dr. Aamot and the following out of office response from Defendant Dr.

26  HEATLEY on July 12, 2010. "I am out of the office at Mule Creek from July 10 returning July

27  26, 2010. Please contact Dr. Christopher Smith who is acting in my position. Thank you.,, The

28  Schmitz family also sent letters documenting William's medical history that rarely, if ever, made

it to the medical record.

333.    The standard of care is for documentation of the collateral medical information to be placed in the medical record.

334.    Despite the required medical releases being signed by William multiple times, the numerous medical record requests submitted by William and the Schmitz family were either unanswered or severely delayed and incomplete.

335.    **One medical record release even included another inmate's medical document that was altered to look like it was William's**. The other inmate's typed name was crossed out and William's name was handwritten and the content made it clear that it was someone else's medical document.

336.    The Schmitz family's experience with acquiring incomplete and inaccurate medical records was consistent with the findings of the OIG.

337.    Despite their legal obligation to maintain his medical records, William's medical records are missing vital medical documents, or portions are purposely being withheld from Plaintiffs, making it impossible for Plaintiffs to fully evaluate all of the care William received.[22]

338.    Under California Code of Regulations, Title 15, CDCR was required to maintain William's health information for ten years after discharge from CDCR.

339.    William's medical records are missing several *years* of documentation from his incarceration at MCSP.

340.    There was a custom at MCSP to inadequately maintain medical records during William's incarceration.

341.    The failure to adequately maintain William's medical record directly contributed to his unconstitutional care, suffering and death as vital psychiatric history was lost.

---

[22] Defendants claim to have produced all of William Schmitz's medical records in their possession. However, there are several missing records. Plaintiffs have medical records from prior partial medical releases that were not included in the medical records disclosed by Defendants. There must be additional records that have never been released to Plaintiffs. **It is impossible for Plaintiffs to fully explore the depth of inadequate medical care provided, to their now deceased, severely mentally ill son.** Very notable is the failure to include in their disclosures certain medical notes from Defendant Ramkumar in 2016.

342. **William's sister, Rose, actually had to resort to Facebook to try to communicate with MCSP to help her sick younger brother**. Rose's pleas reflect the inability of William's family to get help for him and the utter disregard that MCSP employees had for mentally ill inmates and their loved ones.

343. On 11/10/2015, William's sister, Rose, wrote to the now former warden Defendant LIZARRAGA.:

Hello Mr. Lizarraga,
I am sorry to reach out to you via social media but so far we have exhausted all the options we can find online and I find myself currently traveling to Mule Creek to hopefully speak to someone regarding my brothers health, or at the least be able to get a message to the correct person.
My brother, William Thomas Schmitz #G35384, located at B7 133 Up, needs to be evaluated hopefully, asap. I went to see him Saturday, and noticed that he was not behaving like himself. Unfortunately, my visit was cut short because my car was broken into in the parking lot. I was unable to discuss much with him and was sidetracked with the theft of car items.
The following day, my father noticed he was lethargic  and fell asleep twice. He complained about abdominal pain, presumably liver, as well as kidney pain.  He has been too tired to call us in a week, when he has been calling 2-3 times a day for the last few years.  We just want to make sure he does not have medicine induced hepatitis, as he is on many medications. A simple blood test would be helpful.  We have called the medical line, the ombudsman, and several other lines, but can't get a call back or ahold of anyone. The one person we did get ahold of was angered that their number was available and hung up.
It's been very discouraging.
If you could have a nurse or Dr. Pace or someone call either my brother Dr. Joseph Schmitz at (240) 498-2248, my father Thomas Schmitz at (707) 694-8158, or myself at (916) 218-5061, we would really appreciate it. (Or even just copy this message to the appropriate people.)
You are probably familiar with my family as I see you are cc'd on most of the correspondence with my family. I apologize if we are annoying/demanding, we are not trying to be, just want to help our brother as best we can.
Thanks again for any help, and sorry to bother you.
Thanks,
Rose

344. Defendant LIZARRAGA never responded to Rose nor did anyone respond on his behalf.

345. Defendant LIZARRAGA would have been more likely to respond if William's

1  sister was trying to buy a used snowboard through Craigslist than trying to help her incarcerated
2  mentally ill brother under the former warden's care.

3  346.    In fact, Rose could have found Defendant LIZARRAGA's State issued phone
4  number in a Craigslist ad for the used sports equipment. (Exhibit K at 9)

5  347.    As revealed by the investigations into his misconduct, Defendant former Warden
6  LIZARRAGA failed to complete several CDCR trainings.

7  348.    Defendant former Warden LIZARRAGA was running a second business selling
8  used sports equipment since at least 2014 instead of trying to fix the numerous major problems in
9  his prison such as unconstitutional mental healthcare. His second job prevented him from
10  performing his duties as warden and directly resulted in William's suffering and ultimately his
11  death.

12  349.    Defendants KERNAN, DIAZ and GIPSON failed to adequately supervise
13  LIZARRAGA and to timely remove Defendant LIZARRAGA from his position as Warden of
14  MCSP and their failures directly resulted in William's suffering and ultimately his death.

15  350.    On September 1, 2017, William received a disciplinary action for possession of
16  drug paraphernalia. During the incident, William was trying to inject his antipsychotic medicine,
17  paliperidone, into his arm.

18  351.    Trying to inject an oral antipsychotic medication is an indication of worsening of
19  his mental illness and an indication William needed help.

20  352.    At the time of this incident, William had not seen a psychiatrist since June 1,
21  2017. He was overdue for his mandatory 30-day psychiatric appointment by 60 days.

22  353.    It is predictable that a person with a psychotic illness and substance abuse will
23  return to substance abuse when not adequately treated for mental illness. In this case, the
24  substance was his own antipsychotic medication paliperidone. The reasoning for injecting his
25  own antipsychotic is unknown, but as William was psychotic, out of touch with reality, the
26  reason could have been anything. Did the voices tell him to? Did he think it would get rid of the
27  voices?

28  354.    There are CDCR guidelines to cover misuse of medications under the Medication

Adherence Program. Defendant BROCKENBOROUGH, was responsible for the implementation, monitoring, and evaluation of and compliance with this procedure.

355.    Dr. Golding reported many problems following the Medication Adherence Program guidelines within CDCR.

356.    In William's case, the violation leads to the continued worsening of his psychosis and eventual death from a methamphetamine overdose. Defendant BROCKENBOROUGH's failure in implementing, monitoring and evaluation of and compliance with this Program directly resulted in the worsening of William's psychosis and eventual death.

357.    According to the Medication Adherence Program, Medication Misuse "shall be referred to the Primary Care Team, mental health prescriber and the appropriate Facility Lieutenant using a CDC-128-C or other appropriate chrono.,, "Upon Notification, the prescriber shall evaluate the need for a modification to the medication regimen … and schedule an appointment with the patient as clinically appropriate.,,

358.    The Program Guide policy also mandated a mental health evaluation for adjudication of the rules violation. William was evaluated on September 13, 2017 by psychologist F. Martin. Per Dr. Martin, William stated "I was self medicating- my door was open, the guy came in – I was hearing voices, and having headaches – it was stupid.,, Dr. Martin's assessment was "paranoid schizophrenia,,.

359.    Despite this evaluation, William's mental health treatment team did not know about this incident for at least 5 months.

360.    Part of William's adjudication was placement on the mandatory drug testing program for one year until October 4, 2018.

361.    The program required monthly urine drug tests, which were not done.

362.    On October 19, 2017, a suicide risk evaluation of William was completed by Defendant ROBINSON. Due to the poor communication that was common practice within MCSP, Defendant Robinson was unaware of the RVR. She estimated William's Chronic Risk of Suicide as "High,, and acute risk as "Moderate,,.

363.    Defendant ROBINSON wrote "**Chronic risk is High given the IP has a history**

**of depressive and psychotic symptoms (paranoia, [Auditory Hallucinations], depression); chronic medical illness (Hep C, arachnoid cyst in the left temporal lobe); chronic pain (migraines from cyst); history of poor impulse control; history of substance abuse…".** **(emphasis added)**

364.    Despite this incident, and the requirements for both medication misuse and serious RVRs in EOP patients, William still was not seen by his assigned psychiatrist, Defendant Dr. J. JOHNSON, until October 31, 2017.

365.    This time period was longer than previously ordered by Defendant Dr. J. JOHNSON and, again, longer than the requirement of the Program Guide to maintain a constitutional level of care.

366.    There is no indication in the medical record for why William was not seen in the time ordered by his last psychiatrist or within the Program Guide requirements.

367.    This was another example of the frequent violations of the Program Guide during William's care, yet consistent with the pattern of unconstitutional care provided by MCSP. Despite their awareness, Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON, TOCHE, BRIZENDINE, PONCIANO and LEIDNER each propagated or failed in their individual responsibilities to correct the culture that allows the repeated Program Guide violations and directly resulted in William's suffering and ultimately his death.

368.    Establishing a relationship with a psychiatrist is a very important for people suffering with paranoid delusions, but nearly impossible for a mentally ill prisoner who rarely sees the same psychiatrist. In fact, the only psychiatrist William had a therapeutic relationship was Dr. Haspel.

369.    As documented in the records, Dr. Haspel's own appeal to continue to treat William was denied by a supervisor.

370.    CDCR's long-standing custom of not providing enough competent mental health providers made establishing any meaningful relationship impossible over the last few years of William's life. Undoubtedly, the lack of competent psychiatrists contributed to the frequent and

1    routine violations of the Program Guide and unconstitutional care in William's case- just as it

2    has done to thousands of other mentally ill patients that have suffered in CDCR.

3        371.    Defendant Dr. KUICH testified that he organized a meeting of chief psychiatrists

4    from CDCR institutions. One topic was the need for additional psychiatrists. Defendant Dr.

5    KUICH testified that the chiefs had "a constant—constant need for psychiatrists of any ilk,

6    whether they were telepsychiatrist, on-site psychiatrist or contract psychiatrist.,, (Exhibit F at 54

7    to 55) The chiefs "would take anybody.,, (Exhibit F at 55 line 3)

8        372.    Over the last 4 years of William's life, MCSP was never in full compliance with

9    mental health provider vacancy rates.

10        373.    **This was in direct violation of the *Coleman Court* and resulted in the ongoing**

11    **violation of William's constitutional rights.** Despite their awareness of the *Coleman Court*

12    findings and orders, defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH,

13    LIZARRAGA, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON, TOCHE, BRIZENDINE,

14    PONCIANO, and KUICH each propagated or failed in their individual responsibilities to comply

15    with the *Coleman* orders, including maintaining an adequate number of competent mental health

16    providers at MCSP. This directly resulted in William's suffering and ultimately his death.

17        374.    During the October 31, 2017 appointment, Defendant Dr. J JOHNSON did not

18    adequately review William's medical record. He did not review William's RVR or document a

19    history of polysubstance dependence. Defendant Dr. J. JOHNSON does not even ask William

20    about substance abuse. Worst of all, Defendant Dr. J. JOHNSON removed the previous

21    diagnosis of polysubstance dependence from William's diagnoses.

22        375.    Defendant Dr. J. JOHNSON writes "Patient has been on numerous psychotropic

23    med trials with no major shift in benefits however he appears to be responding well to addition

24    of Thorazine prn,,.

25        376.    In summary, Defendant Dr. J. JOHNSON does not adequately review William's

26    record, does not treat or even inquire about potential substance abuse, and perpetuates a false

27    narrative that the psychotropic medications have not worked for William (despite the fact that he

28    realizes the antipsychotic Thorazine that was added last visit seems to be helping William).

377.    Defendant Dr. J JOHNSON orders a psychiatrist follow-up in one month.

378.    On November 9, 2017, William had his quarterly IDTT. The IDTT was a time for the various groups of people caring for William to assure they are working with a common mindset to help him.

379.    This IDTT consisted of: Primary clinician (PC) Defendant ROBINSON, *who was absent*; psychiatrist Defendant Dr. J. JOHNSON, *who was absent*; Correctional Counselor, K Rainwater, who was present; Senior Psychologist Supervisor, Kate Keller, who was present; and Recreational Therapist, Kimberley McVey, who was present. The four members required to be at the IDTT are: treating PC, treating psychiatrist, correctional counselor and inmate. Neither the PC Defendant ROBINSON, nor the primary psychiatrist, Defendant Dr. J JOHNSON, were present. **So for the quarterly group IDTT meeting for a severely mentally ill man, neither of the required medical personnel were even present.**

380.    The most glaring concerns over the preceding months to the IDTT were William's inadequate number of visits with psychiatry, his worsening mental illness and William's RVR for drug paraphernalia and trying to inject his own oral antipsychotic medication.

381.    In an attempt to provide constitutional level care, the IDTT has required "Higher Level of Care Considerations,, questions to answer. These questions are to specifically created for the IDTT team to consider if the IP should be moved to a higher level of care. One question was whether William participated in less than the minimum number of EOP treatment groups.

382.    **William was participating in less than the minimum number of EOP groups, which should be a consideration to move him to a higher level of care.**

383.    In this section, Defendant ROBINSON notes William has "declining percentage of group attendance. He is currently on sustainable process for attending 36% of his groups. [William] continues to struggle with auditory/visual hallucinations, episodic paranoid delusions, and insomnia. [William] regularly experiences manic (followed by depressive) symptoms.... Importantly, he reduces socialization (misses groups and appointments) to limit stimuli and avoid poor decision making. ... [William] continues to be medication compliant and appropriate for EOP,,

384.    **The most concerning part of this IDTT statement is that ROBINSON was not even present at the IDTT!**

385.    **In fact, the unlicensed psychology intern who was not present at the IDTT meeting, completed all important sections of the IDTT the day prior to the actual meeting.**

386.    **Nothing, aside from Defendant former warden LIZARRAGA running a separate business and Defendant TEBROCK and CEBALLOS actively trying to deceive the *Coleman* Court, captures the complete disregard for William's well-being and the culture of inadequate care at MCSP than this IDTT.**

387.    Dr. Golding's report specifically cites the problem of non-physician primary clinicians dictating treatment plans for the IDTT.

388.    This IDTT is even more appalling because **not only does the non-medically trained unlicensed intern ROBINSON decide the plan, she does not even attend the meeting**.

389.    The only other required member of the medical staff, and the most medically qualified to handle severe mental illness, Defendant Dr. J. JOHNSON, also did not attend the meeting.

390.    Furthermore, the IDTT does not discuss William's first RVR after 12 years of incarceration. William had a history of substance abuse when his mental illness first manifested, yet the IDTT ignored his first ever RVR for possession of drug paraphernalia and that he was found trying to inject his own antipsychotic. There is no mention of the failure to perform mandatory drug-testing.

391.    This IDTT demonstrates the routine and repeated violations of the Program Guide that occur throughout the last few years of William's life. He continued to needlessly suffer due to these violations of his constitutional rights.

392.    Despite their awareness, Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, Dr. CEBALLOS, TEBROCK, Dr. ADAMS, TOCHE, BRIZENDINE, PONCIANO, LIZARRAGA, KERNAN, DIAZ and LEIDNER each propagated or failed in their individual responsibilities to correct the culture of allowing routine Program Guide violations, as

occurred in this IDTT, and directly resulted in William's preventable suffering and ultimately his preventable death.

393.    The IDTT recognized William was missing EOP therapy groups because he "continues to struggle with auditory/visual hallucinations, episodic paranoid delusions, and insomnia,,. The IDTT treatment modification is for "[William] to practice deep breathing and thought stopping if he becomes extremely paranoid and anxious. Additionally [William] will develop in cell activities (e.g. listening to music or watching tv) if he begins to isolate due to his medical condition or manic symptoms.,,

394.    So, the IDTT's treatment modification for William missing treatment groups due to his worsening serious psychiatric illness was to practice deep "breathing and thought stopping,, and to continue isolating in his cell but to develop cell activities like "listening to music or watching TV,,.

395.    William had been living in a cell for 12 years. He already knew of these in-cell activities of "listening to music and watching tv.,,

396.    A minimal standard of care for addressing a severely mentally ill man with well-established illness of the schizophrenia spectrum that "continues to struggle with auditory/visual hallucinations, episodic paranoid delusions, and insomnia,, is to modify antipsychotic medications.

397.    CDCR treatment guidelines for Schizophrenia and the psychosis article Dr. Golding testified to as standard of care in his report both demonstrate the standard. "Thought stopping,, and "deep breathing,, are notably absent from both of these resources on standard of care treatment for psychosis.

398.    The IDTT found that William's ability to "respond to work situations,, was affected as "[William] regularly experiences manic (followed by depressive) symptoms...Therefore, he reduces socialization (misses group and appointments) to limit stimuli and avoid poor decision making.,,

399.    On November 9, 2017, Defendant ROBINSON saw William in a brief cell-side visit. She documented the note as a psychiatrist evaluation.

400.    Defendant ROBINSON was not a psychiatrist.

401.    By recording her brief visit as a psychiatrist evaluation it helped improve the metrics that CDCR would be presenting to the Court within 6 months.

402.    On November 16, 2017 Defendant ROBINSON assessed William and found "he appears to be at the beginning of a manic episode.,, Defendant ROBINSON thought William may benefit from adjustment/change to medications to better control the mood instability.

403.    As an unlicensed intern psychologist, Defendant ROBINSON could not adjust medications for William.

404.    Based on the Program Guide, William should have seen a psychiatrist by November 31, 2017. William should have been seen even sooner based on his mood instability.

405.    Defendant ROBINSON did not assure William was seen by a psychiatrist at that time. William continued to suffer and was not seen for several months by a psychiatrist.

406.    Defendant ROBINSON, however, did copy the exact same plan she wrote for the IDTT that she did not attend. "[William] to practice deep breathing and thought stopping if he becomes extremely paranoid and anxious. Additionally [William] will develop in cell activities (e.g. listening to music or watching tv) if he begins to isolate due to his medical condition or manic symptoms.,,

407.    **Defendant ROBINSON simply copied and pasted the prior inadequate IDTT plan for treating severe mental illness.**

408.    On December 13, 2017, William reported to Defendant ROBINSON that "he is 'not comfortable in his own skin' lately. [William] stated he is worried about the dorm exclusion chrono that he had difficulty obtaining earlier in the year. [William] reported major anxiety that the paperwork will not be taken care of and he will lose the chrono....[William] does not think he can function in a dorm setting. [William] relayed to [ROBINSON] his extreme amount of anxiety regarding this matter. Also, [William] reported he is anxious because his military brother is being sent on a humanitarian deployment, and he is scared he will not be able to maintain contact with him. [William] mentioned he would like to meet with his psychiatrist again regarding his medications, since he feels they are not effectively treating his rapid cycling of

moods from depression to mania.,,

409.    **Once again, William was hoping to see a psychiatrist for help.** Once again, the non-licensed non-medically trained intern Defendant ROBINSON failed to have William evaluated by a psychiatrist to adjust medicines. Once again, William's serious mental illness, which is a serious medical need, was neglected.

410.    William was overdue for an appointment based on the last psychiatrist recommendation, his worsening symptoms and the Program Guide requirements.

411.    Still, William would not see a psychiatrist until January 31st, three times longer than mandated by the Program Guide.

412.    There is no indication in the medical record for why William was not seen within the time mandated by the Program Guide.

413.    Defendant ROBINSON lied to William during this December 13, 2017 visit. She explained to William that "he would still be able to have contact with his brother once deployed.,, Due to her lie, William "appeared to feel less stressed.,,

414.    In fact, William's brother, Dr. Joseph Schmitz, would be on US Navy hospital ship across the world in Asia performing surgeries and representing the United States while his own brother was having his constitutional rights violated.

415.    Dr. Schmitz would not be able to have any contact with William during this time despite Defendant ROBINSON's false assurances. Dr. Schmitz tried to prepare William for his deployment and their inability to communicate with each other. Defendant ROBINSON's lies added to William's paranoia. Like always, prior to deploying Dr. Schmitz would encourage William to listen to his doctors, remain in EOP and take his medicines.

416.    On January 16, 2018, Defendant ROBINSON, reported William had no recent substance abuse or intoxication. William did display a disturbance of mood, an increase in interpersonal isolation, hopelessness, and recent negative staff interactions, but **was active and motivated in his psychiatric treatment.**

417.    Defendant ROBINSON further noted William "appears to regularly cycle between manic and depressed states. He has expressed he is 'used to it', however he shows

frustration during these times. According to 7447 dated 10/19/17 [William] had Thorazine added as a [as needed] for his symptoms. He reported feeling some improvement, but still cycled through mania and depression.,, William "stated he has been isolating in his cell more recently because of increased paranoia. **He indicated his voices make him think that people are talking about him, or the voices are demeaning at times.**,,

418.    Defendant ROBINSON noted that William's chronic risk of suicide was high and acute risk of suicide was moderate.

419.    Defendant ROBINSON noted that William "has recently been experiencing [auditory hallucinations] and paranoia (with anxiety); however, he admitted being intermittently medication non-compliant. He has refused most of his medications over the last 4-5 days prior to the current assessment (stated he did not remember that he refused the medications).,,

420.    The medical administration record actually shows that William had refused less than a third of medications the last 5 days. Despite being factually inaccurate about the amount of medications missed, ROBINSON's note also contradicts itself, "[William] admitted to being intermittently medication non-compliant,, vs "stated he did not remember that he refused the medications.,,

421.    On January 25, 2018, in a 5 minute cell-side, non-confidential visit. Defendant ROBINSON reported "[William] missed his appointment because he did not get a ducat. He stated he has not yet gotten an appointment with psychiatry to discuss adjusting his medications.,,

422.    **Once again, William was well overdue for a psychiatry visit given his mental illness and the Program Guide policies.**

423.    On January 31, 2018, William finally was evaluated by a psychiatrist. Psychiatrist Defendant Dr. Sujatha RAMKUMAR notes William felt that the medicine was "not working as well as he would like it to.''

424.    William had not seen a psychiatrist since October 31, 2017. William was overdue by 60 days, three times the 30 days required by the Program Guide and three times longer than the order of the last psychiatrist.

425. **Overall, in the year prior to seeing Defendant Dr. RAMKUMAR, William should have seen a psychiatrist for evaluations at least 12 times per the Program Guide. He had only 4 visits and they were with 3 different psychiatrists.**

426. Undoubtedly, the fragmented, incompetent care in violation of the Program Guide was due in part to the failure of supervisory defendants to bring staffing levels to the *Coleman Court* ordered levels. Despite their awareness, Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON, TOCHE, BRIZENDINE, PONCIANO, and KUICH propagated or failed to correct the practice of routinely violating the Program Guide and/or inadequate staffing levels which directly resulted in William's preventable suffering and ultimately his preventable death.

427. It is unclear if William's four encounters with three different psychiatrists over the prior year were even evaluations. The Dunn Gibson report explains that brief, non-confidential encounters were often claimed to be confidential.

428. Only confidential visits fulfill Program Guide requirements as psychiatric evaluations.

429. CDCR created the electronic medical record to default visits as if they were confidential encounters.

430. The training to override the default was inadequate as Dr. Golding himself had "not found a single institution in which each psychiatrist knows,, how to override the default. CDCR ignored Dr. Golding's requests to change the default. The end result being metrics positively inflated.

431. Defendant Dr. KUICH testified that "in some institutions, up to 50 percent of appointments are cell side.,, Defendant KUICH was significantly concerned about the number of cell front contacts, he testified that **"the main reason why we have to do this is we don't have enough psychiatrists." (Exhibit F at 251)**

432. In 2018, Defendant Dr. RAMKUMAR documented this was her first time seeing William. It was not. Defendant Dr. RAMKUMAR had seen William several times in 2016 as described *supra*.

433.   Unfortunately for William, Defendant Dr. RAMKUMAR did not remember William or his prior history and positive response to antipsychotics. Nor did Defendant Dr. RAMKUMAR adequately review his records. If she had adequately reviewed, she would have known the clozapine was actually very effective for William and she could have helped William with his suffering.

434.   Instead of increasing medications or recommending restarting the previously successful clozapine to help William, Defendant Dr. RAMKUMAR covers diet and hydration and sleep hygiene.

435.   Defendant Dr. RAMKUMAR's plan/disposition was generic and inadequate.

436.   **Defendant Dr. RAMKUMAR wrote the exact same plan complete with the same misspelling of "verbalise" that she wrote in the William's and the other patient's note that was wrongly identified as William's in 2016.**

437.   **Defendant Dr. RAMKUMAR was obviously cutting and pasting the same assessment and plan for at least two years in multiple patient records!**

438.   On February 1, 2018, William had his quarterly IDTT. Dr. Michael Zoglio was present and apparently William's new assigned psychiatrist. William had seen psychiatrist Defendant Dr. RAMKUMAR just the day before this IDTT. Unlike the prior IDTT, in which PC Defendant ROBINSON was absent, but still directed and completed all pertinent documentation prior to the actual meeting, PC Defendant ROBINSON was present for this IDTT.

439.   Although present, PC Defendant ROBINSON's complete disregard for the Program Guide and the purpose of the IDTT is again apparent.

440.   **All pertinent sections of the IDTT note are simply a direct copy of the last IDTT from several months earlier.**

441.   In this IDTT note, there is no recorded discussion of William's worsening of symptoms or the concerns discussed with Defendant Dr. RAMKUMAR just the day before. William's EOP group attendance was not updated and claimed to be exactly 36% again.

442.   Since the sections are the exact same, both IDTTs in November 2017 and now February, 2018, note that William has "declining percentage of group attendance. He is currently

on sustainable process for attending 36% of his groups. [William] continues to struggle with auditory/visual hallucinations, episodic paranoid delusions, and insomnia. [William] regularly experiences manic (followed by depressive) symptoms…. Importantly, he reduces socialization (misses groups and appointments) to limit stimuli and avoid poor decision making. … [William] continues to be medication compliant and appropriate for EOP,, Defendant ROBINSON notes that William participated and contributed to the goals and plan.

443.   Once again, as the IDTT documentation was the exact same, the treatment modification recommended for William missing EOP groups was insufficient.

444.   The IDTT treatment modification was for "[William] to practice deep breathing and thought stopping if he becomes extremely paranoid and anxious. Additionally [William] will develop in cell activities (e.g. listening to music or watching tv) if he begins to isolate due to his medical condition or manic symptoms.,,

445.   Once again, repeating recommendations for "thought stopping,, and "deep breathing,, and developing in-cell activities like watching TV and listening to music as treatment for serious psychiatric illness is below the standard of care.

446.   **To just copy the same prior inadequate plan for a man with unstable severe mental illness is well below standard of care**.

447.   To allow William to continue to suffer was unconstitutional.

448.   Once again, if the IDTT adequately treated his psychosis, not only would William's suffering have been relieved, he would have been able to increase his participation in EOP groups and to work.

449.   The IDTT found that William's ability to "respond to work situations,, was affected as "[William] regularly experiences manic (followed by depressive) symptoms… Therefore, he reduces socialization (misses group and appointments) to limit stimuli and avoid poor decision making.,,

450.   Although the IDTT again fails to address any potential substance abuse or the RVR from September, Defendant Dr. RAMKUMAR on the same date February 1, 2018 notes "spoke to dr robinson, and will order an [urine drug screen], it was discovered in IDTT that

inmate was caught with drugs- heroin and meth about 5 mths ago.,, In fact, William was caught injecting his antipsychotic medication not caught with "heroin and meth,,.

451.    The severely late notification of an exaggerated RVR that was not mentioned in the IDTT, where the information was apparently discovered, should have finally enabled William to get the help that he needed. It did not.

452.    On February 6, 2018 and March 2, 2018, William refused urine drug screens. The CDCR DOM discusses purpose of urine drug testing which include "to reduce drug use...and to provide opportunities for long-term recovery from addiction.,, It goes on to describe the disciplinary action that should occur for refusal.

453.    Substance abuse is a sign of worsening mental illness and common in those with mental illness. By choosing not to follow the guidelines for disciplinary actions both Defendant ROBINSON and Defendant Dr. RAMKUMAR failed to provide William "opportunities for long-term recovery from addiction.,,

454.    On March 7, William saw Defendant Dr. RAMKUMAR and discussed his refusal to do the urine drug screen, William got upset and Defendant Dr. RAMKUMAR could not do a full exam.  However, despite not being able to complete the exam, Defendant Dr. RAMKUMAR claims she was able to educate William on diet and exercise, adequate hydration and sleep hygiene.

455.    Once again, Defendant Dr. RAMKUMAR's plan was the exact same as her prior visits with William, including the visits she does not remember with William 2016, except this time she planned to see him in two weeks instead of four.

456.    Defendant Dr. RAMKUMAR never saw William for a medical appointment again.

457.    William was incarcerated and Defendant DR. RAMKUMAR, along with all other mental health providers, could have located him at all times within minutes.

458.    Consistent with the prior failures to have appointments as recommended and mandated, there is no documentation from Defendant Dr. RAMKUMAR or anyone else indicating why William was not seen for a mental health appointment as planned.

459.    On March 12, 2018 Defendant ROBINSON met with William to "discuss his progress in EOP,, and she questioned him about possible drug use while in EOP as he received an "RVR in 9/2017 for possession of paraphernalia,,. William denied drug use while in EOP. Defendant ROBINSON does not document a discussion of his refusals to take urine drug tests. William indicated that he "needs EOP,,.

460.    Defendant ROBINSON pointed out to William his low treatment adherence and that he "appears to function adequately without regular treatment adherence... [William] indicated that he will transfer to CCCMS, but only if he gets a recommendation for exclusion from dorm housing.,, Defendant ROBINSON concludes that William "apparently manages his mental health symptoms with minimal help from mental health.,, Further, she notes "there is uncertainty regarding the inmate's drug use while in EOP.,,

461.    Defendant ROBINSON makes no note of the refused urine drug screens or any other plans to address potential drug use as required by the DOM and a minimal standard of care. Defendant ROBINSON was focused on moving William to a lower level of care not treating his mental illness or drug dependence. In fact, Defendant ROBINSON uses William's extreme fear and paranoia of dormitory housing to coerce him to agree to transfer to CCCMS.

462.    William had consented to the release of information allowing the MCSP providers to release information on suspected drug abuse.

463.    No one ever communicated to William's family about suspected drug abuse. This is despite the fact that multiple times in the medical record William's family was cited as a positive force in his life and repeatedly reached out to William's doctors. The Schmitz family could have been tremendous advocates to help with his compliance with treatment recommendations.

464.    On March 21, 2018, William was due to see a psychiatrist based on Defendant Dr. RAMKUMAR's last plan.

465.    **As was typical with the prior gaps in William's psychiatric care, there is no indication for failing to have a psychiatry visit as ordered by the last psychiatrist or within the Program Guide mandates.**

466.    On April 11, 2018, unlicensed Defendant ROBINSON met with William to perform a Suicide Risk and Self- Harm evaluation. [William] had "refused to come to EOP to meet with [ROBINSON].  [ROBINSON] saw PC in building dayroom.,, William's "mood was alternated between anxious and irritable,, and "his judgment appears to be impaired.,, Defendant ROBINSON notes that on 9/1/17 William "reportedly was caught injecting something into his arm. It is unknown how damaging the acute drug use was on his mental health. Therefore, staff should closely monitor IP for drug use, since this would interfere with any treatment he would be receiving at that time. ,,

467.    There is no plan for how "staff should closely monitor [William] for drug use,, or indication that she communicated with the custody staff. All Defendant ROBINSON does is state the obvious – drug use can make things worse for him.

468.    William was incarcerated and completely dependent on CDCR employees' care and protection.

469.    Defendant ROBINSON found William's chronic risk of suicide and acute risk of suicide were both Medium.

470.    At some point before April 2018, a final decision was made by Defendant ROBINSON to transfer William to a lower level of psychiatric care. The reasoning indicated was William's poor attendance in EOP groups. However, as clearly documented in his medical chart, his poor attendance was due to a worsening mental state as indicated by increasing symptoms and desire to isolate himself.

471.    **In fact, the plan in the last two IDTTs was the same and encouraged William to isolate as his treatment.**

472.    The exact planning recommendation of the IDTT on November 9, 2017 and February 1, 2018, was "[William] continues to struggle with auditory hallucinations, episodic paranoid delusions, and insomnia. [William] regularly experiences manic (followed by depressive) symptoms, but has insight around such symptoms. He is able to implement coping skills during these periods. Importantly, he reduces socialization (misses groups and appointments) to limit stimuli and avoid poor decision making.,,

473.    On April 3, 2018, Defendant ROBINSON notes that William "indicated he is not coming to his appointments or groups because PC indicated he was transferring to Correctional Clinical Case Management System (CCCMS) during next IDTT. He stated that he 'doesn't feel well' but did not want to talk to PC about anything at the moment.,,

474.    Predictably, William was decompensating as his psychiatric medications were lowered and he was struggling with a false severe diagnosis of end-stage liver disease that his family said was impossible. Despite Defendant ROBINSON's previous lie, William was unable to have contact with his brother Dr. Joseph Schmitz during this time adding to William's anxiety.

475.    On April 12, 2018, psychiatrist Dr. Lane Smith noted that William had stopped taking medications after years of compliance. William agreed to re-start the meds after re-education on his illness.

476.    On April 25, 2018, William sought out Defendant ROBINSON in attempt to remain in the EOP program. Defendant ROBINSON pointed out attendance less than 20% of groups as reasoning to leave EOP. William reported he did not want to be on his meds and "stuck,, in his cell. Defendant ROBINSON notes William's speech was irritable and pressured. Defendant ROBINSON makes no mention of her previous concerns that William reduces socialization (misses groups and appointments) to limit stimuli and avoid poor decision-making.

477.    **Instead, William's lack of participation is used as reasoning to lower his level of mental health care.**

478.    As pushed over the previous months by a non-medically trained, unlicensed intern Defendant ROBINSON, on April 30, 2018, the decision to transfer William to CCCMS was finalized. This was after nine years in the EOP program.

479.    According to the medical record, William was not present at the meeting and refused to participate. He was aware of the plan but did not contribute. Defendant ROBINSON noted that William still reported experiencing depression, mania, and rapid cycling of mood consistently even while in EOP. The IDTT planning repeats, as it did in November and February, "[William] continues to struggle with auditory hallucinations, episodic paranoid delusions, and

insomnia. [William] regularly experiences manic (followed by depressive) symptoms, but has insight around such symptoms. He is able to implement coping skills during these periods. Importantly, he reduces socialization (misses groups and appointments) to limit stimuli and avoid poor decision making.,,

480.   **The change to a reduced level of care was against the policy of the Program Guide.**

481.   According to the Program Guide, inmate patients in the EOP program, may "have a serious mental illness of long duration with moderate to severe functional impairments.,, CCCMS is for "inmate patients that can function in the general population and do not require a clinically structured, therapeutic environment.,, Their condition should be "relatively stable,, and "symptoms are largely controlled,, "EOP will release cases that have successfully completed treatment to CCCMS.,,

482.   At the time of his transfer, William clearly did not "successfully complete treatment,, nor were his symptoms largely controlled to warrant a transfer to CCCMS. In fact, he was failing treatment and should have had his treatment increased. Defendant ROBINSON decided to transfer William to CCCMS, an inappropriate level of care, because of the systemic pressure to push patients to the lowest level of care and, even though Defendant ROBINSON was not qualified to make this decision, the culture of CDCR allowed it.

483.   There was pressure to move patients from EOP to CCCMS.

484.   For Dr. Mueller's court, CDCR psychiatrist Defendant Dr. KUICH, "testified that the push 'was a systemwide push, not from psychiatry but from the system, to be able to look at EOP patients specifically and to find out' whether their needs were being met or could 'be met at a lower level of care.',, (Exhibit E at 27-28)

485.   By placing inmates in lower levels of care, regardless if medically inappropriate and against the Program Guide, it helped CDCR look better on their healthcare monitoring metrics and gave the appearance of better care than actually provided.

486.   Transferring William also opened up an EOP bed. The inability to place inmates in an appropriate level of care has consistently been identified as a problem.

487.   The Special Master's 27th Round Monitoring Report (27th report) was filed in the Eastern District of California Court in February 2018. The 27th report details "Access to mental health beds at all levels and the availability of appropriate mental health treatment space remain formidable challenges for defendants, and are prominent agenda topics for the Special Master.,,

488.   The 27th report specifically cites MCSP as non-compliant with transfers to EOP housing.

489.   Moving William, regardless if medically inappropriate, opened up one of the highly demanded EOP beds and helped improve the timelines for the metrics.

490.   The 27th report also specifically comments on out-of-level housing for inmates. William was out-of-level in EOP and moving him would also help that metric.

491.   In fact, there was a systematic removal of EOP Special Needs (SNY) inmates like William at MCSP. From May 2018 to May 2019, the SNY EOP population decreased every month. (Exhibit M)

492.   In addition, since William had low participation with EOP groups his removal benefited the EOP group participation metrics.

493.   Ironically, there would have been less incentive to move William if he was not SNY and his mental illness was better controlled allowing him to participate in the groups. In other words, if William was healthier, he would have been less detrimental to the metrics and more likely to remain in EOP.

494.   The culture of unscrupulous metric chasing is described in Judge Mueller's order. CDCR was so desperate to look good on the metrics that Defendant Dr. CEBALLOS, whose testimony was found "in critical respects simply not credible,, by Judge Mueller, changed monitoring requirements of mentally ill inmates and withheld data from the Special Master.

495.   Dr. Golding also describes a push to the lowest level of care "to decrease the number of more expensive to care for EOP patients" and "the mandatory number of psychiatrists is lower if the system can get more patients discharged to the lowest levels of care.,,

496.   Further, even Defendant TEBROCK, the Deputy Director of CDCR's Statewide Mental Health Program, signed misleading declarations that were presented to Judge Mueller

1   and promoted psychiatric staffing levels that were insufficient to provide constitutionally

2   adequate levels of care within CDCR.

3       497.    Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH,

4   LIZARRAGA, Dr. CEBALLOS, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON,

5   TOCHE, BRIZENDINE, PONCIANO, and LEIDNER each propagated or failed in their

6   individual responsibility to correct the flawed policy of inappropriately pushing inmates to the

7   lowest level of care and directly resulted in William's suffering and ultimately his death.

8       498.    In her findings on CDCR's inability to adequately staff psychiatrists, Judge

9   Mueller found:

> With respect to staffing in particular, **ten years ago** it was defendants themselves
> who submitted a staffing plan to this court followed by a budget change proposal
> to the California Legislature to "fully implement,, the staffing model described in
> that plan. Coleman v. Brown, 47 938 F.Supp.2d at 984 (quoting Ex. K to Kahn
> Decl., ECF No. 4325, at 93). The budget change proposal described the critical
> flaws in defendants' prior staffing model and represented that the 2009 staffing
> plan identifies appropriate staffing levels to meet constitutional standards. **Still
> today, however, psychiatrist staffing vacancies hover at the 30 percent mark.**
> The court has heard many times the explanation of supply and demand, that there
> is insufficient supply, given the remote locations where psychiatrists are needed,
> to meet the needs of the plaintiff class. But these hearings have provided
> additional explanations and identified other contributors to the challenge in
> identifying psychiatrists, including **an uninviting dysfunctional workplace that
> does not value the essential treatment perspectives that psychiatrists have to
> offer** and creates an atmosphere where morale is low. While a change from 30 to
> 45 days, as one example, might provide a modicum of relief to an **insufficient
> number of overburdened psychiatrists,** here it was a misguided, unthinking fix,
> applying a **very tiny bandage to a festering wound while the infection spreads
> throughout the body.** (emphasis added) (Exhibit E at 48)

        499.    Once William was removed from EOP, Defendant Dr. R. JOHNSON reported

that **"[William] reports chronic [Auditory Hallucinations] of low level voices 'like a TV in

the background'"**.

        500.    **Despite clear medical records that show William's positive response to

antipsychotic meds and Dr. Lane Smith continuing the medications just a few weeks prior,

Defendant Dr. R. JOHNSON completely stopped William's antipsychotic medications.**

        501.    The antipsychotic medications were stopped at a time while Dr. Joseph Schmitz

was deployed and unable to speak with William. Dr. Schmitz spoke with William frequently and encouraged him to remain on antipsychotic medications reminding William of their effectiveness for him.

502.    Back in 2011, Defendant Dr. BRANMAN noted that William "Discussed recent consideration to discontinue his medications. 'I've decided to keep taking them.' PI expresses the fantasy that his brain would function as it had prior to the onset of psychotic symptoms. PI reports also talking this over with his brother who urged PI to continue the medication.,,

503.    William was removed from antipsychotic medications at the same time he was removed from a higher level of mental health care, falsely diagnosed with end-stage liver disease and subjected to unnecessary medical procedures. All of these stressors contributed to the worsening mental state of William and subsequently his death.

504.    William's family was extremely worried about his discontinuing antipsychotic medications and knew his psychosis would worsen. Unfortunately, they were unaware of how incredibly poor the mental health care was at MCSP, the ease that mentally ill prisoners may obtain illicit drugs at MCSP and the custom of inadequate supervision of vulnerable mentally ill inmates. They also feared reprisal on William for their repeated attempts to contact MCSP about his care or creating even more apathy from individuals at MCSP to respond to any potential future concerns.

505.    On June 4, 2018, William's PC Defendant BRANMAN notes that William has periodic auditory hallucinations and paranoia. Defendant BRANMAN's assessment is "Psychotic Disorder NOS,,. NOS means not otherwise specified.

506.    On June 15, 2018, William had his initial psychiatrist evaluation after his transfer from EOP with Defendant Dr. M. SMITH. Defendant Dr. M. SMITH notes that William states "they kicked me out of EOP.,,

507.    Despite a history inconsistent with a personality disorder, Defendant Dr. M. SMITH diagnosed William with antisocial and borderline personality disorder.

508.    Defendant Dr. M. SMITH states the following meds were "all noteworthy for their ineffectiveness,, Invega, Thorazine, Haldol, Lithium, Clozaril, Zyprexa, Depakote,

Wellbutrin, Topamax, and Trileptal. This is contrary to the medical record and William's true history.

509.    Defendant Dr. M. SMITH further indicates that notes over the years are absent of any mention of thought disorder, mania or depression.

**510.    This is contrary to the medical record and William's true medical history.**

511.    Defendant Dr. M. SMITH makes no mention of the lack of serious behavioral problems in William's childhood, such as animal cruelty or starting fires.

512.    William's history was inconsistent with a diagnosis of antisocial personality disorder.

513.    Defendant Dr. M. SMITH makes no note that William's true medical history is consistent with a primary psychiatric illness like paranoid schizophrenia as William was a productive member of society as a college student and firefighter when he began complaining of voices and paranoia resulting in hospitalization in a psychiatric ward.

514.    Defendant Dr. M. SMITH makes no note of the numerous prior diagnoses of psychotic illness and a lack of personality disorder diagnosis by **numerous psychiatrists** both *prior* and after William's incarceration.

515.    Defendant Dr. M. SMITH discontinued William's Trileptal and changed Vistaril to as needed.

516.    Defendant Dr. M. SMITH's incredible misdiagnosis poisoned William's medical record for future providers. Defendant Dr. ANDALUZ would now view this false narrative in William's record biasing his own treatment of William. Defendant **Dr. M. SMITH was either simply fabricating William's past history or did not have access to William's accurate medical record and history.**

517.    Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK, KERNAN, DIAZ, GIPSON, TOCHE, BRIZENDINE, Dr. KUICH, PONCIANO, and REKART all individually had a responsibility to establish and maintain an adequate mental health records system.

518.    However, these defendants failed to maintain a medical records system that

1  appropriately documents and maintains critical medical and mental health information about
2  seriously mentally ill inmates – a defect which renders a prison health care system
3  constitutionally inadequate. *See Coleman v. Wilson* 912 F. Supp. 1282, 1314 (E.D. Cal. 1995)
4  (holding that correctional facilities "have a constitutional obligation to provide inmates with
5  adequate medical care,, and that "[a] necessary component of minimally adequate medical care is
6  maintenance of complete and accurate medical records,,); *Adams v. Tilton*, Case No. 1:07-cv-
7  00791-GSA PC, 2009 U.S. Dist. LEXIS 88009, at *29 (E.D. Cal. Sept. 9, 2009) (citations
8  omitted) (holding that "[a]dequate and accurate medical records are essential to a prison's
9  providing inmates with continuity of medical care,,, and that the Constitution "is violated when
10 incomplete and inaccurate medical records create a 'the possibility for disaster' arising from a
11 lack of necessary information about an inmate's medical history.,,) As a result, information
12 regarding William's severe mental illness and positive response to antipsychotic medicines was
13 lost resulting in William's ongoing suffering and eventual death, the exact type of "disaster,,
14 warned of in *Adams.*

15   519.   Without the antipsychotic medications, William lost weight and became
16 increasingly paranoid.

17   520.   On July 2, 2018, Defendant BRANMAN reported William was finally able to
18 sleep after being awake for two days. Defendant BRANMAN's assessment was "Hx of bipolar
19 mood disorder Staff suspected ongoing opiate abuse.,, There again was absolutely no plan to
20 address suspected substance abuse.

21   521.   Defendant BRANMAN's diagnoses were different than Defendant Dr. M
22 SMITH's diagnosis and from his own prior diagnoses.

23   522.   The treatment plans throughout William's record repeatedly neglected to have a
24 goal to address substance use.

25   523.   The Special Master reports routinely reviewed cases at MCSP. **The majority of**
26 **cases reviewed had inadequate care.** Notably, like in William's case, one of the cases of
27 inadequate care found that "despite a diagnosis of Polysubstance Dependence, there was no goal
28 in the treatment plan to address substance use.,,

1   524.   The inadequate health care of William was consistent with the common practice

2   of providing inadequate heatlh care at MCSP and resulted in William's ongoing suffering and

3   ultimately his death.

4   525.   On September 14, 2018, William requested an evaluation with his primary

5   clinician Defendant BRANMAN.

6   526.   William's lack of antipsychotic medications was really starting to affect him.

7   William was deteriorating and asked for Defendant BRANMAN's help.

8   527.   Defendant BRANMAN writes "I note [William's] intense presentation and he

9   reports not sleeping for the past 24 hours and expecting another 2-3 days of mania. He uses the

10   Vistaril PRN 'but it won't put [William] to sleep.' He states that only Ativan, when prescribed

11   prior to his incarceration was effective in knocking him out during the manic phase. 'None of the

12   other medications worked.' He admits to enjoying the mania, but not the aftermath. He denies

13   current psychotic symptoms, but expects [Auditory Hallucinations]., Per Defendant

14   BRANMAN, William states "You know, I get paranoid especially when I get manic and I can't

15   sleep for 2 or 3 days. Then the voices come back., Defendant BRANMAN notes William's

16   "pressured speech, intense eye contact, clenched teeth, nervous laughter and extreme anxiety

17   regarding loss of the dorm exclusion.,

18   528.   Defendant BRANMAN again switches his assessment of William back to Bipolar

19   1 disorder entering a manic phase.

20   529.   To summarize, William has been off antipsychotic medications and mood

21   stabilizers for several months and he requested to see Defendant BRANMAN for help. William

22   expressed all the symptoms of a manic episode, Defendant BRANMAN observes the physical

23   signs of mania and understands that hallucinations will follow the mania.

24   530.   Defendant BRANMAN was in a position and had an obligation to help William, a

25   mentally ill prisoner. William recognized his own mania and that voices would follow. **What**

26   **more could be expected of a mentally ill man trying to get help than to go directly to his**

27   **"primary clinician" for help**?

28   531.   William should have immediately been referred to a competent psychiatrist for

medication and a higher level of care. Defendant BRANMAN does nothing!

532.    Defendant BRANMAN's plan was simply to have William follow up in 90 days, the maximum time allowed by the Program Guide.

533.    William's serious mental needs were neglected by Defendant BRANMAN and William was forced to continue to suffer.

534.    Predictably, when William next sees Defendant BRANMAN on October 8, 2018 his voices have returned. William did not have voices for several months after stopping the antipsychotics, but they had finally returned.

535.    Defendant BRANMAN changed William's assessment once again, this time to "Psychotic disorder,,.

536.    Defendant BRANMAN's plan again is to do nothing to address William's psychosis!

537.    His plan is simply to follow-up with William at the maximum time interval allowed by the Program Guide.

538.    William's serious mental health needs are neglected by Defendant BRANMAN and William is forced to continue to suffer.

539.    On November 27, 2018, once again William saw Defendant BRANMAN and described "ongoing,, auditory hallucinations. This was Defendant BRANMAN's "termination session,, with William. Defendant BRANMAN again changed his assessment. This time Defendant BRANMAN diagnosed "Psychotic Disorder due to medical condition (if the brain tumor is the cause),,.

540.    Although Defendant BRANMAN routinely changed William diagnosis, his plan to do nothing to help William's serious mental illness was very consistent.

541.    Once again, defendant BRANMAN's plan was completely inadequate for William's auditory hallucinations that were now ongoing and persistent. William's mental needs were again neglected and William was forced to continue to suffer and lost his life within the next two months.

542.    On December 7, 2018, 6 weeks prior to William's death, William had his initial

visit with yet another different provider, Defendant Dr. ANDALUZ. Defendant Dr. ANDALUZ noted:

> Pt initially refused his appointment. He then agrees to meet with writer but is limited in his engagement in the interview. He states he was diagnosed with schizophrenia and provides a vague description of voices that 'say derogatory things'. He reports that he thinks this is because of an arachnoid cyst but states that this has been evaluated and decided not to be removed. He states that he has been on many different psychiatric medications and none of them help, pt is on Vistaril prn which he reports helps sometimes with his sleep… He declines to engage in further interview, stating. 'it's a pain to talk about all this every time I see a new psychiatrist. Just no that nothing helps. I am not suicidal or homicidal but nothing helps me with hearing things.

543.    Defendant Dr. ANDALUZ diagnosed William with anxiety and to "r/o psychotic disorder vs symptoms secondary to his personality disorder,, and antisocial personality disorder.

544.    Defendant Dr. ANDALUZ made no note of William's previous positive response to antipsychotic medications as documented in the medical records.

545.    Defendant Dr. ANDALUZ made no mention of a lack of serious behavioral problems in William's childhood that would be consistent with antisocial personality disorder.

546.    Defendant Dr. ANDALUZ makes no note of William doing well in college until he suddenly began complaining of voices.

547.    Defendant Dr. ANDALUZ made no note that William's true medical history was much more consistent with a primary psychiatric illness like paranoid schizophrenia.

548.    Defendant Dr. ANDALUZ makes no note that William's true medical history is consistent with a primary psychiatric illness like paranoid schizophrenia as William was a productive member of society as a college student and firefighter when he began complaining of voices and paranoia resulting in hospitalization in a psychiatric ward.

549.    Defendant Dr. ANDALUZ makes no note of the numerous prior diagnoses of psychotic illness and a lack of personality disorder diagnosis by **numerous psychiatrists** both *prior* and after William's incarceration.

550.    On Jan 4, 2019, 17 days prior to William's death, Defendant Dr. ANDALUZ noted William "appears anxious and has a disorganized thought process,,, and that William was

worried about losing dorm exclusion. Defendant Dr. ANDALUZ further noted, "Patient states that he deals with a lot of paranoia and psychosis....Pt does not currently have a cell mate but is open to one… he hears voices and has paranoia.,,

551.    **Defendant Dr. ANDALUZ did not make any recommendations to increase monitoring or restart antipsychotics to address William's psychosis. Worse, the medications Defendant Dr. ANDALUZ prescribed may actually cause hallucinations.**

552.    Defendant Dr. ANDALUZ does not even take the time to specify a particular follow-up time, he generically writes "Follow-up in 30 days if EOP or 90 days if CCCMS or sooner if needed.,,

553.    Since William was inappropriately in CCCMS, Defendant Dr. ANDALUZ's plan was to have an actively psychotic man with "disorganized thought process,, and not on antipsychotic medications seen in 90 days. This is well below a minimum standard of care.

554.    William would not be alive in 90 more days.

555.    On January 17, 2019, just 4 days prior to his death, William met with yet another new PC social worker, Defendant WANIE. Defendant WANIE notes:

> [William] states "When I'm under more stress the voices increase and they're louder.,, He currently reports distress from AH 5/10. "when I get manic it causes major problems.,, [William] "reports onset of AH 'when I was 19 or 20.' He denies the psychosis was substance induced, rather **"I self-medicated when I started hearing voices to help me deal with them."** (emphasis added)"I was really anxious this morning with UCC, about where I'm going to be transferred to,,

556.    Defendant WANIE further noted that William hears voices a moderate amount of time and that they are "moderately distressing,,.

557.    **Defendant WANIE clinically observed the hallucinations bothering William.**

558.    Defendant WANIE failed to immediately consult a psychiatrist.

559.    As a social worker, Defendant WANIE was not qualified to decide the medical treatment for a mentally ill patient with active auditory hallucinations.

560.    The minimal standard of care was to immediately consult a psychiatrist. Defendant WANIE's failure to consult a psychiatrist kept William in a state of psychosis and led

to William's preventable death. Tragically, just four days after Defendant's WANIE's visit, William locked in a cell alone with his voices dies from a methamphetamine overdose.

561.    The failure of social worker Defendant WANIE to immediately consult a psychiatrist is consistent with an established practice in effect at MCSP such that "primary clinician,, social workers and psychology interns make decisions that should only be made by psychiatrists. This practice and its consequences, like a psychotic patient ripping out and eating her own eye, are detailed in Dr. Golding's report.

562.    This practice also contributed to an inability to meet psychiatric staffing requirements mandated by the *Coleman Court* as many competent psychiatrists don't want to work an environment where a social worker or unlicensed psychology intern is encouraged to practice medicine, not consult them when required by law and even override their decisions.

563.    As found by Judge Mueller the insufficient psychiatric staffing is not simply a supply and demand issue but also due to "an uninviting dysfunctional workplace that does not value the essential treatment perspectives that psychiatrists have to offer and creates an atmosphere where morale is low.,, (Exhibit E at 48)

564.    Defendants Dr. HEATLEY, Dr. C. SMITH, BROCKENBOROUGH, LIZARRAGA, TEBROCK, Dr. ADAMS, KERNAN, DIAZ, GIPSON, TOCHE, BRIZENDINE, PONCIANO, and LEIDNER were aware of and propagated or tolerated this policy of allowing non-physicians to make medical decisions, knowing that it would endanger seriously mentally ill inmates like William Schmitz who required mental health care decisions by psychiatrists and led to William's ongoing suffering and preventable death.

**William's Death**

565.    On January 21, 2019, Defendants ASMAN and BRADLEY were floor officers responsible for William's safety.

566.    The MCSP duty statement for a Correctional officer includes to "prevent…injury by inmates or parolees to themselves.,,

567.    Per Cal. Code Regs. Tit. 15, § 3271 Defendants ASMAN and BRADLEY were responsible for the "safe custody,, of William.

568.   Defendant ASMAN was responsible for William from 0600-1400 and Defendant BRADLEY from 1400 until William's death at 1444.

569.   Defendants ASMAN and BRADLEY only had one floor of one building of inmates under their supervision and responsibility.

570.   The CDCR DOM mandates that **all inmates are accurately accounted for at all times** and a physical count of all inmates are performed a minimum of four times each day.

571.   These counts are performed by physical observation of each inmate and the count is entered into Strategic Offender Management System (SOMS).

572.   A positive/physical count means to count a **living, breathing person and physically see that person.**

**573.   The specific instruction that the person is physically seen as living and breathing is a mechanism to help ensure the safety of inmates.**

574.   The count total and name of the person who actually conducted the positive count must be entered at the time of submission.

575.   **In addition to the formal count, there are informal counts that must be performed hourly by all employees supervising inmates.**

576.   **Specifically, the CDCR DOM mandates, "An informal count is a physical count and positive identification of inmates... Informal counts shall be conducted by all employees supervising inmates. These informal counts shall be completed on an hourly basis.. Informal counts shall be conducted to ensure inmates are present in their assigned areas, such as housing units..."**

577.   On January 21, 2019 William was being supervised by Defendants ASMAN and BRADLEY.

578.   In addition to being designated as a CCCMS inmate, William was classified as "Medium A Custody.", **Per 15 CCR § 3377.1 supervision of a medium A custody inmate "shall be frequent and direct."** Defendants ASMAN and Defendant BRADLEY knew William was medium A custody as the custodial staff must know the classification of inmates to know what level of monitoring they require.

579.    In fact, per 15 CCR, § 3270 "Each employee must be trained to understand…degree of custody classification.,, Upon information and belief, the custody classification of inmates is labeled on a large piece of paper and attached directly in front of their cell.

580.    "Post orders,, are written, standing orders describing the duties and responsibilities of officers in a given position in the California Prison system. On information and belief, the standard for post orders[23] of floor officers caring for mentally ill inmates was for the officers to perform irregularly scheduled 30 minute checks. The first such check is to be made immediately upon coming on their shift, and then continue throughout the shift while maintaining direct supervision of all inmates in the unit at all times.

581.    **Over 50% of all inmates at MCSP in January 2019 were classified as mentally ill at either the EOP or CCCMS level.** (Exhibit M).

582.    Defendants ASMAN and BRADLEY knew that a high proportion of MCSP inmates are classified as mentally ill and it was one of the select institute that mentally ill inmates were allowed.

583.    Defendants ASMAN and BRADLEY received training that includes risk factors for inmate self-harm. Risk factors for self-harm include mental illness and single cell status.

584.    Mentally ill inmates have a Mental Health Placement Chrono (Chrono) in their central file that is available in SOMS.

585.    The Chrono provides custody staff with information about inmates.

586.    William's record in SOMS included William's level as a CCCMS inmate.

587.    SOMS was available to Defendants ASMAN and BRADLEY. [24]

---

[23] Plaintiffs do not yet know the actual post orders for Defendants ASMAN and BRADLEY just the standards.
[24] Discovery will reveal how exactly Defendants ASMAN and BRADLEY knew William was CCCMS. **The only other alternative is the supervisory Defendants failed to make a policy that made the custody staff, in this case Defendants ASMAN and BRADLEY, aware of the vital information they needed to provide adequate oversight for the safety of inmates**. Roughly 50% of inmates at MCSP were either EOP or CCCMS. Given the history of unconstitutional care and numerous Court orders, it is impossible for Plaintiffs to believe that the written policies were not satisfactorily written to comply with constitutional standards of checking on inmates. The problem was the policies were repeatedly and customarily ignored by the frontline staff and the supervisors allowed the violations.

588. Defendant's ASMAN and BRADLEY were aware of the need for direct observation by trained correctional officers in the housing of not only all inmates but, particularly, mentally ill inmates like William Schmitz.

589. Defendants ASMAN and BRADLEY were aware that inmate welfare checks of no more than 30 minute intervals are critically important for the safety of mentally-ill CCCMS inmates like William Schmitz.

590. Defendants ASMAN and BRADLEY were aware that inmate checks of no more than one hour intervals are critically important for the safety of all inmates.

591. Defendants ASMAN and BRADLEY are aware that during checks the officers should observe "a live, breathing person,,.

592. Defendant ASMAN never saw William alive and breathing on January 21, 2019.

593. Defendant ASMAN and Defendant BRADLEY had access to SOMS which contained the classification Chrono for William identifying him as a CCCMS inmate.

594. Although the claim of American Correctional Association accreditation for MCSP to the 2018-2019 Amador County Civil Grand Jury was false, it shows that MCSP leaders specifically recognized the value of the American Correctional Association.

595. The American Correctional Association Standard 4-4281 establishes a mandatory Standard of Care for prison inmates. In most basic terms, adequate institutions must comply with this required standard. Protection from Harm Standard 4-4281 (3rd Edition 3-4268) (Mandatory). Written policy, procedure and practice protect inmates from personal abuse, corporal punishment, personal injury, disease, property damage, and harassment. Correctional professionals recognize the Standard of Care for Inmate Personal Safety in the American Correctional Association Standard 4-4132 (Ref 3-4128-1) and 4-4188 (Ref3-4181).

596. American Correctional Association standard 4-4257 in the Standards for Adult Correctional Institutions (4th Edition) is quite clear: 4-4257 Written policy, procedure, and practice require that all special management inmates are personally observed by a correctional officer at least every 30 minutes on an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent observation;

suicidal inmates are under continuing observation.

597.    On January 21, 2019, William Schmitz was pronounced dead at 14:44. William died of complications from methamphetamine toxicity.

598.    William was actively psychotic with paranoid delusions and auditory hallucinations at the time of his death.

599.    William could not comprehend reality and, just like the numerous inadequately treated mentally ill inmates that commit suicide within CDCR and the psychotic CDCR inmate that ripped out and swallowed her own eye as described in Dr. Golding's report, it is impossible to know why William ingested the methamphetamine.

600.    However, unlike most of the CDCR suicides where deaths occurred quickly, William's death took hours. William's life would have been saved if his signs of distress were was not neglected by Defendants ASMAN and BRADLEY.

601.    The Coroner's autopsy report, case number C2019 -007, states William's death took up to "hours,,.

602.    The physiology of oral methamphetamine ingestion is such that in a physically healthy, young man, like William, death takes hours and there are predictable and identifiable signs of distress prior to death. William's autopsy reports show levels of amphetamine, the byproduct of his body metabolizing methamphetamine, that also indicate his death took hours.

603.    Further, in a very similar tragic death of another CCCMS level MCSP inmate less than 6 months after William's death, the coroner's autopsy report C2019-076 states the overdose of methamphetamine took "hours,,.

604.    Most convincing of their ability to summon medical care that would have saved William if they did not ignore the signs of distress, is the fact, that symptomatic methamphetamine exposures, including over 100 cases of massive ingestions, were reviewed in a **study of California Prisoners from 2011-2013 showing a greater than 99% overall survival rate and greater than 98% survival rate in massive ingestions like William's.**

605.    William's last known verbal interaction was at 0635 with Defendant Officer ASMAN.

606.    Defendant ASMAN saw water flowing out from William's cell. Defendant ASMAN knew William well enough that he recognized water flowing under his cell door as "out of character,, for William.

607.    Water flowing out of any inmate's cell is abnormal. Defendant ASMAN claims William was taking a bird bath. Defendant ASMAN knew that William had access to regularly shower and had no reason to take a bird bath.

608.    Despite his post orders and the CDCR DOM policies, which again are "Remedies for defendants' Eighth Amendment violations in custodial practices,, (Exhibit G at 4) for William, Defendant ASMAN did not inspect William's cell or visually identify William.

609.    Defendant ASMAN also failed to correctly perform the CDCR DOM mandated hourly counts to visually and positively identify William as living and breathing in his housing unit.

610.    Defendant ASMAN also failed to properly perform the "frequent and direct,, supervision required for William as a medium A custody inmate.

611.    Water flowing out of a cell is cell flooding and is a sign of danger to oneself according to the CDCR DOM.

612.    In addition to his general responsibility to personally observe William and monitor his welfare, Defendant ASMAN had an obligation to investigate and report on cell flooding.

613.    Specifically, CDCR DOM section 91090.6 Documenting Evidentiary Factors Danger to Self states "Clinical and custody staff has an obligation to observe inmates and to note, document, and promptly report to their superiors, behavior that could be classified as a danger to self…. If these signs or symptoms of dangerousness to self are observed by any employee at any time, an immediate mental health referral should be made and the patient should be observed until a clinician makes an assessment… Grave Disability Clinical and custody staff has an obligation to observe inmates and to note, document, and promptly report to their superiors, behavior that could be classified as gravely disabled…flooding of the cell,,.

614.    Clearly the flooding of his cell was a sign that William was in need of medical

care. William was desperately trying to flush the methamphetamine from his body and if Defendant ASMAN looked in the cell or maintained observation until a clinician could make an assessment William would have been saved at that time.

615.    During this security check when Defendant ASMAN failed to look into William's cell to identify the source of the cell flooding, he ignored an obvious indication that William was in distress and that William was in urgent need of medical care.

616.    Defendant ASMAN had reason to know William was in need of immediate medical care when William was flooding his cell and failed to take reasonable action to summon such medical care. Defendant ASMAN deliberately neglected his responsibilities to William's well-being in his only verbal interaction that day with William. Further, **during the rest of his entire shift, Defendant ASMAN never visually identified or assured William's well-being. He should have seen William at least 16 times!**

617.    During the rest of his shift, Defendant ASMAN's security checks were inadequate.

618.    Defendant ASMAN did not actually see William and, against policy, Defendant ASMAN allowed a cell window obstruction that impeded his view of William.

619.    However, even with the obstruction, with a minimal amount of effort, Defendant ASMAN would have been able to look over the obstruction.

620.    Inmate Simmons, who was simply trying to sign up William for a time to use the phone, made the effort to look into the cell when William was unresponsive.

621.    At some point during Defendant ASMAN's shift, William became unresponsive. Defendant ASMAN did not make the effort to look into the cell during whatever inadequate security checks he did on William during his entire shift, including while William was unresponsive. [25]

622.    At approximately 1432 inmate Todd Simmons, an inmate that was not a participant in the MHSDS, found William.

---

[25] Plaintiffs have information that Defendant ASMAN never visually saw William and discovery will allow the full details of the monitoring performed by Defendant ASMAN during those 8 hours.

623.    In the incident report, the entire description of the Witness is "SIMMONS (AE8734) (B8-235L) is not a participant in the Mental Health Services Delivery System (MHSDS),, and under Victim(s) is " SCHMITZ (G35384)(B8-202L) was a participant in the Mental Health Services Delivery System (MHSDS) at the CCCMS level of care.,,

624.    These identifiers in the incident report are name, inmate number, cell number and whether or not in the MHSDS indicating the importance and common usage of identifying inmates as mentally ill for custody staff.

625.    Simmons was taking phone sign-ups and he found it unusual that William did not respond. Simmons looked into the cell saw William and yelled "Man Down, cell 202,,. Defendant BRADLEY and Officer Burns responded. Despite the partial window covering, they were able to see William slumped on the toilet with a pool of blood on the floor. William was unresponsive to verbal commands.

626.    When he was unresponsive to verbal commands, just like when he was unresponsive during the previous security check by Defendant BRADLEY, they knew William was obviously in distress and in need of medical care.

627.    Unresponsiveness is such an obvious sign of distress that confirming unresponsiveness is an initial step in Cardiopulmonary resuscitation (CPR).

628.    The cell door was opened. William again was unresponsive to Officer Burns tapping his arm and calling his name. Officer Burns then activated 911. CPR was initiated and William was pronounced dead at 1444.

629.    In January 2021, the OIG published an incident summary of William's death. (Exhibit L) The OIG summary identified several problems and information that conflicted with the Coroner's report.

630.    The OIG report found "Overall, the department *poorly* handled the critical incident because, based on the department's Mortality Review Committee, nurses delayed in applying an automated external defibrillator and did not adequately document that they administered an opiate antidote, and because officers allowed the incarcerated person to partially cover his cell door window and the hiring authority for the officers should have taken corrective

action.", "Prior to the critical incident, the department performed poorly because custody staff allowed the incarcerated person to partially cover his cell door window.", (Exhibit L)

631.    Importantly, Defendant BRADLEY told the Coroner that he conducted a check on William 17 minutes prior to William's discovery. However, per the OIG report, the housing unit log showed the "security check", was 32 minutes prior.

632.    The failure to accurately report a key factual allegation calls into question all information reported by Defendant BRADLEY.

633.    Defendant BRADLEY's "security check", was completely inadequate, as he did not actually see William. Defendant BRADLEY intentionally violated CDCR DOM policy, which was a policy needed to remediate 8th amendment violations of custodial practices.

634.    Further Defendant BRADLEY allowed a cell window obstruction that impeded everyone's view of William and was a yet another violation of DOM policy.

635.    However, even with the obstruction, with a minimal amount of effort, Defendant BRADLEY would have been able to look over the obstruction.

636.    Inmate Simmons, who was just trying to sign up William for a time to use the phone, made the effort to look into the cell when William was unresponsive.

637.    Defendant BRADLEY who was actually responsible for William's safety, did not make the effort to look into the cell when William was unresponsive during his check.

638.    Being unresponsive is an obvious sign of distress.

639.    Instead Defendant BRADLEY admitted to simply assuming William was somewhere else instead of in his locked cell.

640.    As a prison, MCSP has numerous safety controls to ensure the location of inmates at all times. Defendant BRADLEY ignored all of them.

641.    **During his "security check" when William was unresponsive, Defendant BRADLEY ignored an obvious indication that William was in distress and that William was in urgent need of medical care**.

642.    William was in the severe distress and dying just feet away from Defendant BRADLEY and unable to respond.

643.   Defendant BRADLEY chose not to look for a "living and breathing person,, as was his duty even when William was unresponsive during the security check.

644.   William's time of death was determined to be 2:44 pm, 44 minutes after Defendant BRADLEY's shift started and 44 minutes after he had a duty to see William and confirm his well-being.

645.   William's body was stiff[26], which is a sign of toxin-induced hyperthermia, a complication of methamphetamine toxicity. The OIG report of finding fault in failing to timely apply the automated external defibrillator and to administer an opiate antidote are further evidence that William would have been saved had Defendant BRADLEY done anything to confirm William's well-being when he did not hear a response from William 32 minutes prior to William being discovered.

646.   In summary, on the day of William's death, Defendants ASMAN and BRADLEY had a duty to actively patrol and check on the welfare of CCCMS mentally ill inmates like William Schmitz.

647.   Defendants ASMAN and BRADLEY also had a duty to visually identify all inmates hourly and confirm they were living and breathing.

648.   Defendants ASMAN and BRADLEY breached their duty owed to William. Defendants ASMAN and BRADLEY knew that the failure to follow their post orders and DOM policies put William at risk of serious harm.

649.   Further, Defendant ASMAN and BRADLEY permitted a window covering over William's cell window in violation of CDCR DOM policy impeding not just their own view but everyone's view of William making it even more likely that serious harm would befall William, an actively psychotic man.

650.   The standards are to check at a 30-minute maximum interval for mentally ill inmates and at an hour for all inmates at MCSP.

**651.   Even knowing nothing about a particular inmate, there was greater than a**

---

[26] The stiffness may be confused with rigor mortis.

**50% chance for a MCSP inmate to be classified as mentally ill on the day of William's**

**death.**

652.    The longer Defendant BRADLEY and Defendant ASMAN breached their duties

to William the more likely serious harm was to come to him.

653.    After some point in time, it becomes not only negligence but deliberate

indifference to constitutional rights to leave a mentally ill, psychotic inmate locked alone and

unsupervised in a cell. At some point in time, it becomes deliberate indifference to constitutional

rights to leave any inmate at MCSP locked alone and unsupervised in their cell without

performing adequate security checks.

654.    Certainly when the provision of the DOM that states all inmates should be

visually identified hourly as living and breathing is the remedy **"for defendants' Eighth**

**Amendment violations in custodial practices", the failure to adequately check on William**

**for over 8 times the DOM policy is deliberate indifference.** [27]

655.    Certainly, leaving William, a CCCMS inmate unsupervised for over twice the

amount of time in *Lemire,* was deliberate indifference.

656.    William's death took hours and he had an over 98% chance of survival if

Defendant ASMAN or BRADLEY just once visually tried to confirm William's well-being or

did not allow a window obstruction that prevented others from seeing William in acute distress

and in need of immediate medical care. Defendants ASMAN and BRADLEY both had reason to

know that William was need in immediate medical care because of their obligation to perform

adequate checks. Further, Defendant ASMAN should have known William was in need of

immediate medical care when William was flooding his cell, which is specifically described in

the DOM as a sign of dangerousness to oneself and mandates a clinician evaluation. Defendant

BRADLEY should have known William was in need of immediate medical care when William

was unresponsive during Defendant BRADLEY's security check.

657.    Defendants KERNAN, DIAZ, GIPSON, and LIZARRAGA allowed de facto

---

[27] In *Lemire*, 3.5 hours was only 7 times the policy of checking at least every 30 minutes on CCCMS inmates.

unconstitutional practices of allowing floor officers to provide inadequate supervision of mentally ill inmates and allowing them to ignore the policies in the DOM that the federal courts ruled are the policies needed to remediate the 8th amendment violations to mentally ill inmates, like William, which directly resulted in William's death. One specific example is evidenced by the OIG incident report specifically stating, "Prior to the critical incident, the department performed poorly because custody staff allowed the incarcerated person to partially cover his cell door window,, and "the hiring authority for the officers should have taken corrective action.,,

658.    There are specific examples of cell window coverings contributing to inmate deaths in the OIG incident reports. Even after William's death, the custom of allowing cell window coverings in direct violation of DOM policy persisted.

**659.    Even though Defendants BRADLEY and ASMAN disregarded numerous duties and their violations directly resulted in William's death, there were no repercussions.**

660.    There are numerous examples demonstrating the custom of routine and repeated violations of various other DOM policy violations in the expert reports completed for the *Coleman* court and OIG reports. Several are well prior to William's death clearing establishing this unconstitutional custom.

661.    Just one example is in "REPORT ON SUICIDES COMPLETED IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION IN CALENDAR YEAR 2011,, completed for the *Coleman* court. Directly from the 2011 report*, 8 years prior to William's death:*

> Thirty-minute welfare checks for inmates newly admitted to administrative segregation units were not conducted consistently. **Mandatory custodial checks were not completed consistently in administrative segregation units or in general population.**
> In five of the suicide cases in 2011, identified as inmates G, R, X, AA, and EE, rigor mortis had already begun prior to the discovery of the inmate's body. In three of these five cases, the inmate was housed in administrative segregation at the time of the suicide. The onset of rigor mortis indicates that in these five cases, at least two to four hours had passed since the time of death before the bodies were discovered, **underscoring the importance of timely welfare checks and custodial checks.**

In 25 or 73.5 percent of the 34 CDCR suicide cases in 2011, there was at least
some degree of inadequacy in assessment, treatment, or intervention, which is
essentially unchanged since the rate of 74 percent among suicides which occurred
in 2010. **Inadequacies appeared among** conduct of suicide risk evaluations,
treatment and/or clinical interventions, **non-completion of timely custody
welfare checks,** and potential lifesaving interventions such as administration of
CPR or problems with the use of an automated external defibrillator. (emphasis
added)

662.    The custom of failing to provide adequate supervision of inmates has continued
after William's death at MCSP.

663.    For example, OIG incident number 18-0027522-CI, describes the Sep 29, 2018
death of an inmate and found "overall, the department poorly handled the critical incident
because two officers did not properly conduct incarcerated person counts, the first officer did not
require that window coverings be removed, and a psychiatric technician did not have direct
contact and a conversation with the incarcerated person.,,

664.    **There are numerous cases in the OIG incident reports of inmates deaths with
officers failing to correctly complete inmate counts.**

665.    Photographs of William's cell block taken months after William's death and
disclosed by Defendants show multiple cell windows with obstructions.

666.    Tragically, on July 6, 2019, less than 6 months after William's death, **Defendant
BRADLEY found another CCCMS inmate unresponsive at MCSP**. The coroner's report
C2019-076 indicated that upon arrival, EMS found obvious signs of death including lividity and
rigor mortis. The Coroner's report also found obstruction of the cell door and found the mentally
ill inmate to have died of an overdose of methamphetamine which took "hours,,.

667.    Rigor mortis takes many hours, so obviously this was another mentally ill
CCCMS inmate was not appropriately supervised every 30 minutes at an irregular schedule. Nor
did the inmate have an adequate proper security check even every hour, the policy that applies to
all inmates.

668.    Upon information and belief, based on the OIG incident of this death, t**here were
again no repercussions for extreme absence of supervision that allowed a mentally ill**

**CCCMS inmate to die and be discovered by Defendant BRADLEY in a state of rigor mortis.**

### False Diagnosis and Fraudulent Procedure

669.    Just as William's mental health providers were providing unconstitutional care, his medical providers were doing the same. Over the last year of his life, William became increasingly paranoid and told family members he had cirrhosis. William was worried about bleeding to death and the effect medicines could have on him and worsening his liver. William's family repeatedly reassured him that he did not have cirrhosis and that he should continue to take his medications as prescribed by his doctors. His family knew there was no way William had cirrhosis as he only developed Hepatitis C in the past few years.

670.    Physicians with experience treating hepatitis know that the time course was impossible for a cirrhosis diagnosis.

671.    According to the Center for Disease Control cirrhosis develops in **approximately 10%–20% of people after 20–30 years of chronic infection with hepatitis C.**

672.    William's family believed his concern about cirrhosis was due to his mental illness and one of many paranoid delusions.

673.    Shockingly, only after his death and most of his medical records were finally available for review was it discovered by plaintiffs that William was actually diagnosed with "Cirrhosis/ESLD,, (End Stage Liver Disease).

674.    Even worse, William was subjected to an endoscopy (EGD) to screen for esophageal varices that can arise from cirrhosis.

675.    Esophageal varices can bleed and lead to death.

676.    As documented in his medical records, William was counseled multiple times that he had cirrhosis and was at risk of bleeding to death from veins in his esophagus.

677.    William was told that an EGD was necessary to evaluate for these varices and treat them if present.

678.    **There is no reasonable explanation for the cirrhosis diagnosis initially given by Defendant Dr. RUDAS.**

679.    Defendant Dr. RUDAS claims to have Clinical expertise in viral hepatitides and as a hepatitis treatment provider.

680.    Defendant Dr. RUDAS was the author of a journal article entitled, "Family Practitioner Directed Hepatitis C therapy with Direct-acting antivirals achieves High-sustained virologic response in prison population.,,

681.    William conclusively did not have cirrhosis based on his physical examination, his laboratory values and imaging studies.

682.    Cirrhosis, which is end stage liver disease, is diagnosed through blood markers, imaging studies, or biopsy.

683.    Liver failure was a diagnosis that William feared as his own cousin had died from liver failure.

684.    In fact, per Defendant BRANMAN's medical note, William reflected on his own mental illness and incarceration and thought how his situation could be worse if he suffered like his cousin. In thinking about his own life, "I guess it could be worse,, as his "cousin just died of liver failure.,,

685.    Unfortunately, due to his incompetence Defendant Dr. RUDAS gave William a diagnosis of End Stage Liver Disease, the same disease that took William's cousin's life.

686.    On February 9, 2018, Defendant Dr. RUDAS filled out a "physician request for services,, form CDC 7243. The medical necessity cited by Defendant Dr. RUDAS was "PATIENT WITH CIRRHOSIS/ESLD. PER REGISTRY PROTOCOL PATIENT IS DUE FOR ESOPHAGEAL VARICES FOLLOW-UP/SURVEILLANCE.,,

687.    Defendant Dr. RUDAS left blank the section of "Summary of preliminary or diagnostic work up…,,

688.    There was no information in the medical record that Defendant Dr. RUDAS could enter in the section "Summary of preliminary or diagnostic work up…,, that would indicate cirrhosis.

689.    Defendant Dr. RUDAS failed to do a basic review of the labs and studies or he would have realized the misdiagnosis and been able to correct the life-threatening diagnosis of

cirrhosis in William's record.

690.    As a medical doctor, Defendant Dr. RUDAS has years of training and, therefore, takes on great responsibility for which he is very well compensated.

691.    As a medical doctor, Defendant Dr. RUDAS knows that end stage liver disease is extremely serious and that complications of end stage liver disease may be fatal.

692.    **Defendant Dr. RUDAS knows that when he, as a medical doctor, deliberately chooses not to perform his basic duties harm will occur to patients.**

693.    Based solely on Defendant Dr. RUDAS's statement that William had Cirrhosis/ESLD, Defendant Dr. C. SMITH inappropriately approved the consult for the unnecessary procedure.

694.    Defendant C. SMITH approved the form on both 2/12/18 and again on 3/16/18.

695.    Since William did not have cirrhosis, Defendant Dr. C. SMITH failed in his supervisory duties to ensure Defendant RUDAS was providing a minimal standard of care.

696.    The first time he approved the procedure on 2/12/18, Defendant Dr. C. SMITH should have learned that Defendant Dr. RUDAS was providing below the standard of care by diagnosing William with cirrhosis and ordering the procedure.

697.    Defendant Dr. C. SMITH also failed in his own duties to review William's medical record to make sure the consult for the EGD was appropriate.

698.    As a medical doctor, Defendant Dr. C. SMITH has years of training and, therefore, takes on great responsibility for which he is very well compensated.

699.    As a medical doctor, Defendant C. SMITH knows that end stage liver disease is extremely serious and that complications of end stage liver disease may be fatal.

700.    **Defendant Dr. C. SMITH knows that when he, as a medical doctor and as a supervisor of other medical doctors, deliberately chooses not to perform his duties harm will occur to patients.**

701.    In this case, Defendant Dr. C. SMITH had two opportunities to review the incompletely filled out consult and to review William's medical record to stop the EGD and correct the serious and potentially fatal diagnosis of End Stage Liver Disease.

702.     In between the two approvals by Defendant Dr. C. SMITH for the unnecessary procedure, William was seen by Defendant Dr. ASHE.

703.     During his March 8, 2018 visit with Defendant Dr. ASHE, William had no symptoms of cirrhosis and in the **History of Present Illness section, Defendant Dr. ASHE specifically noted William "Does not have a known history of cirrhosis."**

704.     Just like Defendants Dr. RUDAS and Dr. C. SMITH, Defendant Dr. ASHE should have cancelled the unnecessary pending EGD.

705.     Defendant Dr. ASHE should have reassured William that he did not have end stage liver disease.

706.     Defendant Dr. ASHE should have reassured William that he did not have to fear dying from cirrhosis like his cousin.

707.     Defendant Dr. ASHE should have reassured William that he should continue to take his psychiatric medications and not fear them further damaging his non-existent cirrhotic liver.

708.     Defendant Dr. ASHE should have explained that the cirrhosis diagnosis was a mistake. Defendant Dr. ASHE did none of these things and William was left to believe that he had a very serious and potentially fatal medical disease of end stage liver disease and needed a camera inserted into his throat to look for dangerous life-threatening blood vessels.

709.     William, a man with paranoid delusions and chronic voices, told his family about his cirrhosis and they would try to explain to him not to worry about cirrhosis as he must be misunderstanding his doctors. William was already psychotic or out of touch with reality and his paranoia was greatly magnified by this false diagnosis ultimately contributing to his death. It shocks the conscience that William's medical providers, people sworn to do no harm, would falsely tell him he had a very serious, potentially fatal, medical diagnosis and subject him to unnecessary medical procedures.

710.     It was malpractice for Defendant Dr. ASHE as the primary medical doctor caring for William to proceed with a consult for EGD for end stage liver disease.

711.     As a medical doctor, Defendant Dr. ASHE has years of training and takes on great

responsibility for which she is very well compensated.

712.    As a medical doctor, Defendant Dr. ASHE knows that end stage liver disease is extremely serious and that complications of end stage liver disease may be fatal.

713.    Defendant Dr. ASHE knows that when she, as a medical doctor, deliberately chooses not to perform her duties harm will occur to her patients.

714.    In this case, Defendant Dr. ASHE had numerous opportunities to review William's medical record, to stop the EGD and to correct the serious and potentially fatal diagnosis of end stage liver disease. Undoubtedly, the standard of care was for a physician to review the medical records, stop an unneeded procedure and correct the potentially fatal diagnosis.

715.    On March 14, 2018, RN Rory Sanders spent an entire visit dedicated to educating William about his upcoming EGD.

716.    Defendant Dr. RUDAS had ordered the patient education for the unnecessary procedure of the non-existent serious medical diagnosis.

717.    Specifically, Defendant Dr. RUDAS ordered "Explain to the patient that an EGD has been scheduled for him. **Records show he has advanced liver disease/cirrhosis that puts him at risk for bleeding from the veins in his esophagus (esophageal varices).** With an EGD the veins can be treated.,, (emphasis added)

718.    Some pain is expected with an endoscopy and it is performed under anesthesia.

719.    **Risks of an EGD as documented in William's medical record include: infection; bleeding, which may require a blood transfusion or a surgery; perforation of the esophagus, which may require surgery; difficulty breathing or not being able to breathe; instrument failure and death**.

720.    Defendant DENIGRIS knows there is a risk of death from an endoscopy.

721.    Even a mentally healthy, non-incarcerated person would be scared to be diagnosed with end stage liver disease and all the risks that come with the diagnosis and medical procedures.

722.    On May 4, 2018, William was finally subjected to the fraudulent EGD.

723.    William was referred to Defendant Dr. DENIGRIS for the EGD because cirrhosis was erroneously added to his medical record by Defendant Dr. RUDAS and Defendants Dr. C. SMITH and Defendants Dr. ASHE did not correct the diagnosis.

724.    If William actually had cirrhosis, it would have been appropriate to do the EGD.

725.    Per the Cleveland Clinic **"Patients with Hepatitis C should be initially evaluated for cirrhosis: if it is not present, there is no need to screen for esophageal varices."(emphasis added)**

726.    An EGD to screen for varices is unnecessary in the patients without cirrhosis because there is no mechanism to create the esophageal varices.

727.    The Cleveland Clinic statement is consistent with the CCHCS care guide for Hepatitis patients and consistent with the standards of care as found in multiple medical society guidelines.[28]

728.    **This is a well-known, basic concept for all gastroenterologists that perform EGDs.**

729.    Specifically Defendant DENIGRIS knows that esophageal varices develop when blood from the liver backs up, which is most common secondarily to severe liver scarring (cirrhosis). As blood backs up, it causes increased pressure in the large vein (portal vein) that drains into the liver. This is called portal hypertension. The portal hypertension causes the blood to seek other pathways such as veins in the esophagus. These esophageal veins are thin and are called esophageal varices when they balloon from the increase in blood.

730.    Upon reviewing William's medical record Defendant Dr. DENIGRIS learned that William did not have end stage liver disease..[29]

731.    **However, upon learning that William did not have the underlying disease for which he was consulted, Defendant DENIGRIS did not cancel the EGD.**

732.    **Instead, Defendant Dr. DENIGRIS still performed the EGD!**

---

[28] American Association for the Study of Liver Diseases, Infectious Diseases Society of America, (https:hcvguidelines.org), American society of Gastrointestinal Endoscopy
[29] As this is Plaintiffs Complaint and proof of the factual allegations are not yet required, Plaintiffs have not included Defendant Dr. DENIGRIS answers to interrogatories as an Exhibit.

733.    William signed an informed consent form for the EGD.

734.    William signed a consent form for the administration of anesthesia during the EGD.

735.    William was given Propofol as the anesthesia medication.

736.    As a physician, Defendant Dr. DENIGRIS knows that risks of Propofol include death.[30]

737.    On 5/4/2018 Defendant Dr. DENIGRIS signed an informed consent form for endoscopy that states he was the "Physician explaining procedure, risks, complications, and alternatives,, to William.

738.    On 5/4/2018 William signed the same informed consent form for Endoscopy.

739.    The Informed consent for Endoscopy signed by both Defendant Dr. DENIGRIS and William on 5/4/2018 includes all of the following:

"**Principal Risks and Complications of Gastrointestinal Endoscopy**…all of the following complications are possible. 1. **Perforation**: Passage of the instrument may result in an injury to the gastrointestinal tract wall with possible leakage of gastrointestinal contents into the body cavity…2. **Bleeding**…may require transfusions, repeat endoscopy to stop the bleeding or possible a surgical operation. 3. **Medication phlebitis**: Medications used for sedation may irritate the vein in which they are injected…Discomfort in the area may persist for several weeks to several months. 4. **Other Risks include but are not limited to…** Drug reactions,…Instrument failure and death…,,

740.    On 5/4/2018, William signed the Consent for Anesthesia Services which included all of the following:

"I acknowledge that my doctor has explained to me that I will have the procedure…It has been explained to me that all forms of anesthesia involve some risk…**unexpected severe complications with anesthesia** can occur and include the remote possibility of infection, bleeding, drug reactions, blood clots, loss of sensation, loss of limb function, **paralysis**, stroke,

---

[30] If William died during the procedure, the consent forms signed by William would have been used to show that William knew that there was a risk of death from the procedure.

heart attack, **or death**...,, (emphasis added)

741.   The same form explained the "expected results,, of William receiving the "Monitored Anesthesia Care (with sedation),, was "Reduced anxiety and pain, partial or total amnesia.,,

742.   Hepatitis C is common within CDCR, so its management is routine and follows a specific routine structure.

743.   Given the routine and well-known management of Hepatitis C and Defendant DENIGRIS's knowledge that William did not have cirrhosis, there is no believable explanation for the EGD except the performance of the EGD was motivated by the financial reimbursement.

744.   Defendant Dr. DENIGRIS is listed on the American Society for Gastrointestinal Endoscopy (ASGE) website. (https://www.asge.org) [31]

745.   The ASGE physician members "have highly specialized training in endoscopic procedures...,,

746.   The ASGE website has several guidelines prepared by the ASGE Standards of Practice Committee. The website states "Here you will find ASGE guidelines for standards of practice. These range from recommendations on testing and screenings to the role of EGD in managing certain diagnoses to sedation and anesthesia to adverse events and quality indicators.,,

747.   The ASGE has a specific guideline for the appropriate use of GI Endoscopy. The guideline includes over 20 specific indications for EGD. One of the indications for EGD is letter K. "Selected patients with suspected portal hypertension to document or treat esophageal varices.,,

748.   There is no indication to perform an EGD in patients without suspected portal hypertension prior to treating Hepatitis C in the ASGE guidelines.

749.   On information and belief, there is no reputable medical guideline or article that recommends an EGD for a patient with Hepatitis C in the absence of cirrhosis, just as the Cleveland clinic article bluntly states in its basic summary "**Patients with Hepatitis C should**

---

[31] As of November 12, 2021

**be initially evaluated for cirrhosis: if it is not present, there is no need to screen for esophageal varices."** (emphasis added)

750.    The ASGE guidelines are developed to cover the vast majority of indications for EGD.

751.    There may be a few unique situations where performing an EGD for an indication not listed in the ASGE guideline is warranted. Whether or not to screen for esophageal varices in a patient without cirrhosis is definitely not a unique scenario.

752.    Millions of Americans are infected with chronic Hepatitis C.

753.    Hepatitis C is common in CDCR.

754.    The treatment and evaluation for Hepatitis C is standardized in CDCR and based on standard guidelines from medical organizations.

755.    Just like the ASGE guidelines, the CDCR guidelines only discuss EGD for Hepatitis C patients **with cirrhosis.**

756.    Once a patient with Hepatitis C is determined not to have cirrhosis, like William, there is no indication to screen for esophageal varices because the mechanism to create them is not present.

757.    Defendant Dr. DENIGRIS recommended a 3 year follow-up EGD for William. Like performing the EGD, the 3 year follow-up lacked a valid medical indication.

758.    The 3 year follow-up would have made sense if William actually had cirrhosis which can cause varices to develop, but Defendant DENIGRIS knew that William did not have cirrhosis.

759.    **William would not have consented to a screening for esophageal varices if he knew he did not have a medical illness, like cirrhosis, that could cause esophageal varices.**

760.    **Any reasonable person would not have consented to a screening for esophageal varices if they knew they did not have a medical illness, like cirrhosis, that could cause esophageal varices.**

761.    William was in fear of personal safety as an endoscopy has risks of infection; bleeding, which may require a blood transfusion or a surgery; perforation of the esophagus,

which may require surgery; difficulty breathing or not being able to breathe; instrument failure and death.

762.    Obviously, some pain and anxiety are involved with the procedure and the major reasons that anesthesia is needed. William was aware the anesthesia would not relieve all of the pain or anxiety. As discussed, the consent form William signed explained the benefits of anesthesia as "Reduced anxiety and pain, partial or total amnesia.,,

763.    **Despite the fears of the EGD to his personal safety from the potential risks that were explained to him multiple times and well-documented in the medical records,** William consented to have the EGD because he feared the potential risk of bleeding to death from esophageal varices more than the risks of the EGD.

764.    **However, the risk of bleeding to death from esophageal varices was NEVER a true risk for William.**

765.    **Defendant Dr. DENIGRIS knew William did not have end stage liver disease.**

766.    **Defendant DENIGRIS coerced William's consent to the procedure by withholding the fact that the indication for the procedure was not valid because he did not actually have cirrhosis.**

767.    Defendant DENIGRIS knew William did not have end stage liver disease, so why did he fail to correct the error of the consulting doctors?

768.    Defendant Dr. DENIGRIS filled out the consult form for the results of the referral. However, he did not correct the ESLD diagnosis.

769.    Failure to correct the major misdiagnosis is further evidence of fraud. Obviously, Defendant DENIGRIS should have notified the consulting physician to remove the serious, life-threatening diagnosis of ESLD from William's record. However, if Defendant Dr. DENIGRIS notified the consulting providers, it would have notified the consulting providers that Defendant Dr. DENIGRIS did the EGD despite no valid medical indication!

770.    Current Procedural Terminology (CPT) codes of 43235 and 99204 with modifier 25 were submitted for services provided to William on 5/4/2018.

771.    The services documented in the medical notes by Dr. DENIGRIS should have

only been coded for the endoscopy (43235), which always includes the pre-operative evaluation in its allowance.

772.    However, a separate Comprehensive History & Exam (99204) was also coded with modifier 25.

773.    Very notable is the Modifier 25. **The "25" is typed into a separate box, indicating it was specifically and intentionally added.**

774.    Modifier 25 claims a significant and separate Evaluation and Management service was completed and for which the physician should be paid.

775.    Nothing in the medical documentation indicates any significant separate evaluation to a routine screening EGD.

776.    For the Endoscopy Code (43235) the charge was $1,000.00 and for the Comprehensive History and Physical (99204 with modifier 25) the charge was $340.00. The payments actually made were $491.80 for the endoscopy and $307.82 for the separate comprehensive history and physical.

777.    A comprehensive History & Exam is 99204 and typical takes 45 minutes. So to code 99204 it would typical be 45 minute history and exam that was "significant and separate,, from the EGD.

778.    The Center for Medicare and Medicaid Services has a "Global Surgery Booklet,, targeted to physicians. The booklet specifically highlights in a note on page 7 of 19 **"Note:** The initial evaluation for minor surgical procedures and endoscopies is always included in the global surgery package. Visits by the same physician on the same day as a minor surgery or endoscopy are included in the global package, unless a significant, separately identifiable service is also performed. Modifier "-25,, is used to bill a separately identifiable evaluation and management (E/M) service by the same physician on the same day of the procedure.,,

779.    Upcoding by abusing "Modifier 25,, is one of the most common medical billing frauds.

780.    In fact, the U.S. Department of Health & Human Services Office of the Inspector General has a booklet to educate new physicians on "Avoiding Medicare and Medicaid Fraud

and Abuse,, It specifically discusses upcoding and misuse of Modifier 25. **"When you submit a claim for services performed for a Medicare or Medicaid beneficiary, you are filing a bill with the Federal Government and certifying that you have earned the payment requested and complied with the billing requirements.** If you knew or should have known the submitted claim was false, then the attempt to collect unearned money constitutes a violation. A common type of false claim is 'upcoding,' which refers to using billing codes that reflect a more serious illness than actually existed…improper claims include: billing separately for services already included in a global fee,,(emphasis added)

781.    Further, in its own "CAUTION BOX,, the pamphlet warns "Another example of upcoding related to E&M codes is **misuse of Modifier 25.** Modifier 25 allows additional payment for a separate E&M service rendered on the same day as the procedure. Upcoding occurs if a provider uses Modifier 25 to claim payment for an E&M service when the patient care rendered was not significant, was not separately identifiable, and was not above and beyond the care usually associated with the procedure.,,  (emphasis added)

782.    **Defendant Dr. DENIGRIS was responsible for billing codes submitted for the medical care he provided to William.**

783.    **A physician is not able to avoid legal responsibility for billing codes by claiming someone else submitted the codes.**

784.    **Defendant Dr. DENIGRIS actions were in violation of the California False Claims Act.[32]**

785.    Although an independent contractor paid by the day, Defendant Dr. DENIGRIS still had financial motivation to commit fraud by both performing a medical procedure in the absence of a medical indication and overbilling.

786.    Defendant Dr. DENIGRIS was paid a minimum contracted rate of $3,250 per day since May1, 2014. This amount is equivalent a weekly rate of a minimum of $16,250 per week

---

[32] Plaintiffs do not allege Defendant Dr. DENGIRIS or his company have already been found to violate the act, but that his overbilling for a standard endoscopy procedure does violate the act. Defendants also do not know if this coding was isolated to William's EGD or to every single procedure done by Dr. DeNigris on CDCR inmates.

**and a minimum of $845,000 per year** (assuming a 5 day work week).

787.     Given this lucrative amount of money, there was clearly motivation for Defendant Dr. DENIGRIS to avoid jeopardizing his contract by cancelling procedures. The procedure only took 4 minutes, from 10:00-10:04 AM. **The odds were extremely low anyone would ever look into his indications for the EGD on a vulnerable mentally ill inmate with paranoid schizophrenia like William.**

788.     William awoke from anesthesia in physical pain from the EGD.

789.     More damaging to William than the actual procedure was the stress, mistrust, and paranoia created by doing this procedure and continued confusion created in his mind by the cirrhosis diagnosis. It created even more mistrust of the CDCR doctors as evidenced by William's refusal to review the EGD results with Defendant Dr. ASHE on August 30, 2018.

790.     On December 21, 2018, Defendant Dr. ASHE, who had seen William several times as his primary care provider seems to finally realize William does not have cirrhosis.

791.     Unfortunately, William had already severely suffered from the falsification of the cirrhosis diagnoses in his medical record. The lack of cirrhosis should have been obvious to any physician from the beginning; in fact even a lay person could simply read the CDCR guideline to know William never had cirrhosis. Defendant Dr. DENIGRIS should have already corrected the cirrhosis diagnosis, but it would have alerted other physicians that Defendant Dr. DENIGRIS performed the EGD in the absence of a medical indication.

792.     Defendant Dr. ASHE ordered an "[Ultrasound] Fibroscan,,. Her reason was "patient with HCV, placed [on] ESLD registry however no evidence of cirrhosis. Needs fibroscan,.,,

793.     Based on the CDCR guidelines, William did not meet the criteria for a Fibroscan because of his normal physical exam, lab findings, and low FIB4 score.

794.     Still, Defendant ASHE ordered another unnecessary procedure for William to undergo to add to William's numerous stressors. Maybe, with the reassurance of the unneeded Fibroscan, Defendant Dr. ASHE would have finally told William that he did not have cirrhosis! Maybe they would have apologized to William for worsening his suffering by making him

question his own psychotic mind more than usual and for making him question all the other

treatments and recommendations of the prison staff?

795.    William never made it to the Fibroscan.

796.    The false diagnosis of end stage liver disease and unnecessary procedures directly increased William's suffering and worsened his mental state. Unlike a few years earlier when his psychosis was controlled, William was unable to work as a porter, or make the income that came with this prison job, due to his mental state.

797.    **The false diagnosis of cirrhosis and fraudulent EGD by Defendants DENIGRIS, C. SMITH, RUDAS and ASHE were two of several CDCR failures that significantly increased William's paranoia and psychosis and proximately caused his death.**

**Aftermath and Cover-Up**

798.    In the aftermath of William's death, several individuals deliberately gave false or incomplete statements. This was done in an attempt to avert or deny responsibility on the part of the involved persons for William's suffering and death and to avoid scrutiny of another avoidable death of a mentally ill prisoner at MCSP.

799.    Defendant Dr. C. SMITH authored "MCSP-Initial Inmate Death Report,, on January 22, 2019.

800.    Defendant Dr. C. SMITH had previously approved the EGD for the non-existent end stage liver disease of William.

801.    In this report, Defendant Dr. C. SMITH failed to honestly and accurately report the events and circumstances leading up to William's death.

802.    Defendant Dr. C. Smith states William's last medical visit was in early December excluding William's recent mental health encounters where he complains of auditory hallucinations.

803.    Defendant C. SMITH does not list any psychiatric illness in William's active problems.

804.    Defendant C. SMITH omits a diagnosis of cirrhosis.

805.    Less than a year prior, Defendant Dr. C. SMITH had approved a fraudulent,

unnecessary sedated and invasive procedure on William for a false diagnosis of cirrhosis.

806.    By excluding any mention of cirrhosis, and William's pending Fibro scan, Defendant C. SMITH lowered the risk that any investigation into William's death would discover this false diagnosis and the unnecessary, fraudulent procedure that Defendant Dr. C SMITH approved.

807.    The Coroner was given William's patient summary reporting William suffered from viral Hepatitis C, hypertensive disorder, chronic headache disorder, and arachnoid cyst. The Coroner makes no mention of William's severe mental illness.

808.    William's death seemed to meet CDCR definition of suicide "an intentional self-injurious behavior that causes or leads to one's own death.,,

809.    However, the most convenient scenario for MCSP was to have William's death be an accident and to avoid any mention of his severe mental illness. Their actions ensured minimal investigation of alternatives by the Coroner and minimized the chance that the events leading up to William's death would be reviewed by higher authorities within CDCR or outside investigators. William's family was severely distraught to learn of the completely deficient investigation into his death.[33] William's father Thomas fell into a severe depression that requires multiple antidepressant medications and William's mother Dianne enrolled in an intensive outpatient grieving program because she was unable to work at all for several weeks.

810.    William's death occurred at a particularly inconvenient time for MCSP and CDCR.

811.    As detailed above, CDCR has an undeniable history of cruel and unusual punishment in violation of the Eighth Amendment for failure to provide adequate mental health care.

812.    Around the time period of William's death, CDCR was desperately trying to get out from under the court injunction as a result of *Coleman v. Brown* lawsuit.

813.    In addition, along with Dr. Golding, a second CDCR psychiatric whistleblower,

---

[33] William's family still are unaware who provided the drugs that killed their actively psychotic mentally ill son or the extent of the investigation into his death.

Dr. Melanie Gonzalez, came forward in the months prior to William's death disclosing that California prison officials intentionally presented misleading data to the Court and the Special Master concerning compliance with *Coleman* requirements for adequate psychiatric care.

814.   William's death would serve as yet another grave example of the unconstitutional level of care that persists.

815.   On January 16, 2019, just four days prior to William's death, a search warrant was served at Defendant LIZARRAGA's home address and just four days after William's death, Defendant former warden LIZARRAGA was removed from MCSP grounds by the FBI.

816.   The FBI investigation formed the opinion that "Joe Lizarraga violated California Penal Code, [REDACTED] and Section 137(a)(**Bribery of a witness**).„ (emphasis added) (Exhibit H at 39)[34]

817.   Very clearly the investigation shows an email conversation from the former warden Defendant LIZARRAGA being presented with options to donate money to a local charity. Instead of choosing one of the options given to him, Defendant former warden LIZARRAGA suggests the donation to a food bank and chooses Interfaith Food Bank. [35](Exhibit H at 23- 24 and Exhibit K at 8)

818.   On December 24, 2018 Defendant former Warden LIZARRAGA received an email from one of the MCSP employees that stated: "Hello, Merry Christmas Eve. I have a $600.30 donation from our December food sale to a charity of your choice. Do you have any place in mind or would you like any assistance with suggestions?„

819.   Defendant former Warden LIZARRAGA responded via email on December 24, 2018 "Merry Christmas. Let's go over some suggestions.„

820.   The MCSP employee then replied via email on December 28, 2018, with three options all located within Amador county. One option was to help people with mental illness, the second to help women with addictions struggling to live a sober life and the third to help native

---

[34] Exhibits with redactions about investigations pertaining to Defendant former warden LIZARRAGA were attained by Public Records Act requests with redactions in place.
[35] Plaintiffs are presenting very specific factual allegations as Defendant LIZARRAGA's answer to the TAC was difficult for pro se Plaintiffs to understand which factual allegations were actually denied or admitted.

wildlife. Defendant former Warden LIZARRAGA did not choose any of the options but suggested a completely different option.

821.    Defendant former Warden LIZARRAGA responded via email on December 28, 2018 "During the holidays people are always needing food. When was the last time we gave to the food bank?,,

822.    The MCSP employee responded via email on December 28, 2018 "I just checked the list for 2018's food sales and there was not a donation made to any food bank. I found the below listings for the Amador County area: Interfaith Food Bank, Jackson CA. Calaveras County Food Bank: San Andreas, CA. Thank you,,,

823.    Defendant former Warden LIZARRAGA responded via email on December 28, 2018  "San Andreas is that Amador County?,,

824.    The MCSP employee responded via email on December 28, 2018 "I just looked on the map and it actually falls into Calaveras County. Sorry about that. I can look for more options for you. There is a place called Amador County Foundation which is a general non-profit that supports Amador County.,,

825.    Defendant former Warden LIZARRAGA responded via email on December 28, 2018, at 1229 hours, "If we have not given to Interfaith in Jackson in the past year let's do that.,,

826.    **Interfaith food bank thrift shop is the same thrift shop that Defendant former Warden was being investigated for theft!**

827.    Subsequently, a CDCR investigation concluded Defendant former warden LIZARRAGA warranted firing for dishonesty, theft and failure of good behavior. (Exhibits I and J)

828.    The hiring authority found **defendant LIZARRAGA was caught stealing from a Food bank thrift store, lied to police, attempted a bribe using charitable funds from MCSP and ran a second business. (Exhibit I)**

829.    **The second business and the distractions created by trying to avoid responsibility for the theft by bribing a witness prevented Defendant LIZARRAGA from performing his duties as warden.**

830.    **Defendant former warden LIZARRAGA was the leader of MCSP, the man ultimately responsible for William and all other inmates at MCSP and his character was truly flawed.**

831.    The bad press of the warden's removal was one more reason to try to avoid scrutiny of William's death.

832.    Dr. Golding's, ***CDCR's own Chief Psychiatrist***, entire report is relevant to William's death and the liability that supervisors bear, but only a small section will be cited.

> Making mistakes even very serious mistakes is part of the human condition. The question is whether the system is designed and managed in such a way that mistakes can be learned from and issues corrected, or not. What is required for a system to be error correcting is that information be accessible to those who could make a difference, rather than restricting or denying access to the information needed to identify and correct problems. Systems that deny access to vital information to those who need it thereby **actively prevent problems being solved.** Those who may make mistakes should not be the only ones to judge whether there has been an error.

> **The tragic picture painted above is not just a hypothetical. In fact, it is the reality in the California Department of Corrections Mental Health system.** Vital information has been monopolized and its access restricted to a select group of mainly psychologists at headquarters. **This group has created a biased and inaccurately positive picture of what is actually a troubled system of care.** The [REDACTED] of Mental Health of the California Department of Corrections have enforced this restriction of access to the needed information. Those who most need to have access to this medical information are the medical leaders in mental health the psychiatric physicians and those who review our system of care. Yet the headquarters psychiatry leadership team and the Coleman monitors and court have been denied access to this medical information. This has actively prevented the normal medical error correction that would have prevented the very serious problems we see in the field in CDCR.

> I, Michael Golding, M.D., CDCR Statewide Chief Psychiatrist, will document how the attitude that information must be hidden away, controlled and interpreted by just a few has **cost the CDCR system dearly by preventing adequate care for a large majority of CDCR mental health patients.** The needed error correction has not happened, because those few running the system are the only ones allowed to judge how things are going in the system. **Patients need psychiatric medical care, yet in CDCR the provision of psychiatric medical care is severely hindered by executive level decisions at headquarters and in the field. In CDCR, psychologists and social workers are deemed to be the "primary clinicians", and despite their lack of medical training they very**

often ignore psychiatrists' medical judgement and sometimes override psychiatric physicians' medical orders. (emphasis added) **(Exhibit C at 12-13)**

833.    This entire court order of Judge Mueller, along with all the information in *Coleman v Brown* and *Brown v Plata* lawsuits are relevant to William's death.

834.    In the introduction of this order, Judge Mueller states:

At this critical juncture, several key legal principles, articulated by the previously assigned judge in this action, bear repeating:

'Whatever rights one may lose at the prison gates, *cf. Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (prisoners have no right to unionize), . . . **Eighth amendment protections are not forfeited by one's prior acts.** Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary. **The ultimate duty of the federal court to order that conditions of state confinement be altered where necessary to eliminate cruel and unusual punishments is well established.'** *Spain v. Procunier*, 600 F.2d [189] at 193–94 [(9th Cir. 1979)] (emphasis added). *Coleman v. Brown*, 28 F.Supp.3d 1068, 1077-78 (E.D.Cal. 2014) (emphasis included in 2014 order). The same judge said not so very long ago, in his 2013 order denying defendants' motion to terminate this action, "[t]he Eighth Amendment violation in this action is defendants' 'severe and unlawful mistreatment' of prisoners with 'serious mental disorders,' through 'grossly inadequate provision of ... mental health care.'„ *Coleman v. Brown*, 938 F.Supp.2d 955, 969 (E.D.Cal. 2013) (quoting *Brown v. Plata*, 563 U.S. at 500, 502)). Just two years before that denial of termination, in its 2011 decision, the United States Supreme Court had observed that "[f]or years the ... mental health care provided by **California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result.„**(emphasis added) *Brown v. Plata*, 563 U.S. at 501. (Exhibit E at 4)

835.    William was a tragic victim of "needless suffering and death„ that has previously been well-documented to other CDCR mentally ill inmates because the mental health care provided by California's prison's has fallen short of the minimum constitutional standards.

836.    Further, Judge Mueller's order notes the following:

In the final analysis, inexplicably, it is apparent defendants lost complete sight of the reasons remediation is required here. **Defendants adopted a laser focus in an effort to obtain termination of court supervision, which lead to a stark "ends justify the means" approach. Their litigation tactics have wholly missed the significance of the constitutional rights of the thousands of mentally ill persons defendants have in their custody.** As the court said in its oral pronouncement following hearing, legal cases are not just words on a piece of paper and a series of jousting matches. Almost all legal cases have hearts and souls, as does this one in particular. This court's predecessor, Judge Karlton, put his heart and his soul into this case, as reflected in the care he paid and his orders which stand today. This is a case that cries out for every single player to consult their hearts daily and keep their eyes hourly on those souls who are the members of the plaintiff class: **the seriously mentally ill individuals housed behind bars in this state who have the absolute, undeniable right to constitutionally adequate treatment and care.** (Exhibit E at 45)

837.    William was one of those souls that severely suffered and lost his life due to the repeatedly proven constitutionally inadequate level of care provided within the CDCR system.

### Conclusion:

838.    **"Ability to get institutions to successfully treat patients is not what we value."** This is the opinion of the **Chief Psychiatrist of CDCR**, Dr. Golding, and was part of a private E-mail released to the public as part of the Golding report.

839.    Defendants' attorneys have likely defended hundreds of cases and certainly will have carefully thought out and worded legal arguments. Plaintiffs are not attorneys, simply a father and mother presenting the facts of the death of their beloved son, William Thomas Schmitz. The facts are clear! **Defendants continue to provide inadequate, unconstitutional care to thousands of mentally ill inmates.** William Schmitz was severely mentally ill and forced to suffer with years of psychosis and ultimately lose his life due to the unconstitutional care and deliberate indifference of the defendants.

////

////

////

////

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Deliberate Indifference to Serious Medical Needs, Health and Safety
(Violation of the Eighth Amendment to the U.S. Constitution:
Survival Action-42 U.S.C. §1983)**
*(Against Defendants Dr. Ashe, Dr. Ramkumar, Robinson, Dr. M. Smith, Dr. C. Smith, Dr. J.
Johnson, Dr. R Johnson, Dr. Andaluz, LCSW Branman, Dr. DeNigris, and Does 1 through 20.)*

840.    On behalf of decedent William Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 839, as though fully set forth herein.

841.    Defendants Dr. M. SMITH, Dr. ASHE, Dr. J. JOHNSON, Dr. R. JOHNSON, Dr. RAMKUMAR, Dr. DENIGRIS, ROBINSON, Dr. C SMITH, Dr. ANDALUZ, LCSW BRANMAN, and Does 1 through 20 knew that decedent William Schmitz was in danger of serious harm to his health and safety due to (1) his long history of severe mental illness that when untreated resulted in self-medicating with inherently dangerous illicit drugs and (2) various documentation in his medical records showing his worsening of mental state and psychosis as he was removed from the medications and the EOP level of care. Notably, on June 18, 2015, William's IDTT summary emphasizes that William was started on clozapine for unremitting auditory and visual hallucinations, episodic paranoid delusions, insomnia and manic episodes and that the clozapine made him feel better than he had in ten years and that his hallucinations have ceased and mood and sleep disturbances improved.

842.    Despite continuing to complain of voices, he was subsequently removed from all antipsychotic medications by a carousel of different providers and placed in a cell by himself with insufficient monitoring. His care was replete with violations of a minimal standard of care and the Program Guide including, but not limited to: psychiatric care far below the mandated frequency, placement into an inadequate level of care, inadequate treatment plans, falsification of medical records, and inadequate IDTT meetings. Tragically, just four days prior to his dying of a methamphetamine overdose, he again complained of worsening voices to his primary clinician Violka WANIE. She observed the voices bothering him. William even told her, 'I self-medicated when I started hearing voices to help me deal with them.'

843.    Defendant Dr. DENIGRIS was deliberately indifferent by performing a sedated medical procedure in the absence of a medical indication and without valid consent to perform the procedure. Defendant ASHE and C. SMITH where deliberately indifferent for choosing not to review William's medical records on multiple occasions.  Defendants Dr. ASHE and Dr. C. SMITH are medical doctors and when they choose not to perform their basic duties they know harm will come to their patients. In this case Defendants Dr. ASHE and Dr. C. SMITH's failures propagated a false and potentially fatal diagnosis of end stage liver disease, which worsened William's paranoia and psychosis.

844.    The deliberate indifference to William Schmitz's health shocks the conscience. His care was astonishingly below the minimum standard of care.

845.    Despite knowing that William Schmitz was in danger of serious harm to his health and safety, defendants failed to provide him with necessary evaluation and treatment or failed to take action to provide him with necessary evaluation and treatment. Defendants' acts and/or omissions as alleged herein, including but not limited to the failure to provide William Schmitz with timely and adequate medical care, psychiatric care and/or take other measures to protect him from serious harm, constituted deliberate indifference to William Schmitz's serious medical needs, health and safety. As a direct and proximate result of defendants' conduct, decedent William Schmitz experienced the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life. The aforementioned acts and/or omissions of the individually named defendants were malicious, reckless and/or accomplished with a conscious disregard of decedent's rights thereby entitling plaintiffs to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

////

////

////

////

////

## SECOND CAUSE OF ACTION
**Supervisory Liability based on Customs, Practices or Policies**
**(Survival Action- 42 U.S.C. §1983)**
*(Against Dr. Heatley, Dr. C. Smith, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Katherine Tebrock, Dr. J Adams, CDCR Secretary Scott Kernan, CDCR Secretary Ralph Diaz, Dr. K. Kuich, Connie Gipson, Diana Toche, Dr. B. Brizendine, Angela Ponciano, Dr. J. Rekart, Dr. David Leidner, and Does 1 through 20)*

846.    On behalf of decedent William Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 845, as though fully set forth herein.

847.    The aforementioned acts and/or omissions of defendants in being deliberately indifferent to William Schmitz's serious medical needs, health and safety and in violating decedent's civil rights were the direct and proximate result of customs, practices or policies, or the lack thereof, of Defendants Dr. HEATLEY, Dr. C SMITH, KERNAN, DIAZ, TOCHE, GIPSON, Dr. BRIZENDINE, PONCIANO, Dr. REKART, Dr. LEIDNER, Dr. ADAMS, Dr. KUICH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK and Does 1 through 20. Such customs, practices, policies and/or procedures include, but are not limited to, an ongoing pattern of deliberate indifference to the serious medical needs and health and safety of MCSP inmates, including the following: a failure to ensure implementation of appropriate medical and emergency treatment plans; policy of promoting medical and mental health decisions that create an appearance of quality care and improve metrics over medical and mental health decisions that are in best interest of the patient; failure to ensure the Program Guide policies were adhered to; failure to ensure psychiatric medical care was managed by medical doctors; propagation of a custom of psychologists and social workers making decisions above their scope of practice; failure to maintain a medical records system that appropriately documents and maintains critical psychiatric history; failure to identify and monitor inmates with serious mental illness throughout their incarceration; a failure to provide competent mental health staff in sufficient numbers; failure to ensure timely access to appropriate antipsychotic medications; a failure to provide appropriate staffing and training at MCSP for providing inmates with adequate medical and psychiatric treatment; a failure to implement a policy to ensure that staff would contact and summon emergency medical and/or psychiatric treatment in a timely

manner; a failure to adequately train and supervise employees and/or agents to prevent the occurrence of the constitutional violations alleged herein; failure to adequately prevent introduction of illicit drugs into MCSP; failure to provide adequate substance abuse treatment and a failure to promulgate appropriate policies or procedures or take other measures to prevent the constitutional violations alleged herein.

848.    As a direct and proximate result of the aforementioned customs, practices, policies and/or procedures of said defendants, or as a result of defendants' failure to promulgate appropriate policies or procedures, decedent William Schmitz suffered the damages alleged herein, including but not limited to loss of income, physical pain and suffering, emotional distress, mental anguish, and loss of his life.

849.    The aforementioned acts and/or omissions of the individually named defendants were malicious, reckless and/or accomplished with a conscious disregard of decedent's rights thereby entitling plaintiffs to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**THIRD CAUSE OF ACTION**
**Failure to Supervise, Investigate and Discipline**
**(Survival Action-42 U.S.C. $1983)**

*(Against Dr. Heatley, Dr. C. Smith, CEO Brockenborough, Warden Lizarraga, Dr. Ceballos, Tebrock, Dr. Adams, CDCR Secretary Kernan, CDCR Secretary Diaz, Dr. Kuich, Gipson, Toche, Dr. Brizendine, Ponciano, Dr. Rekart, Dr. Leidner, and Does 1 through 20)*

850.    On behalf of decedent William Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 849, as though fully set forth herein.

851.    The constitutional violations by defendants as alleged herein occurred as a result of the failure of Defendants Dr. HEATLEY, Dr. C SMITH, KERNAN, DIAZ, TOCHE, GIPSON, Dr. BRIZENDINE, PONCIANO, Dr. REKART, Dr. LEIDNER, Dr. ADAMS, Dr. KUICH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK and Does 1 through 20 to adequately supervise, investigate and discipline employee conduct. Defendants Dr. HEATLEY, Dr. C SMITH,  KERNAN, DIAZ, TOCHE, GIPSON, Dr. BRIZENDINE, PONCIANO, Dr. REKART, Dr. LEIDNER, Dr. ADAMS, Dr. KUICH, BROCKENBOROUGH,

LIZARRAGA, Dr. CEBALLOS, TEBROCK and Does 1 through 20 failed to adequately supervise, investigate and discipline subordinate employees in regard to preventing deliberate indifference to the serious medical needs, health and safety of inmates at MCSP. Said defendants' failure to supervise, investigate and discipline employees amounted to deliberate indifference to inmates' right to be free of deliberate indifference to their serious medical needs, health and safety. As a direct and proximate result of the aforementioned failure to supervise, investigate and/or discipline, decedent William Schmitz suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish, and loss of his life.

852.    The aforementioned acts and/or omissions of the individually named defendants were malicious, reckless and/or accomplished with a conscious disregard of decedent's rights thereby entitling plaintiffs to an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## FOURTH CAUSE OF ACTION
### Substantive Due Process- Loss of Parent/Child Relationship
**(Violation of the Fourteenth Amendments to the U.S. Constitution: 42 U.S.C. § 1983)**
*(Against Defendants Dr. Ashe, Dr. DeNigris, Dr. M. Smith, Dr. J. Johnson, Dr. R. Johnson, Dr. Ramkumar, Robinson, Dr. C Smith, Dr. Andaluz, LCSW Branman, Dr. Heatley, Kernan, Diaz, Toche, Gipson, Dr. Brizendine, Ponciano, Dr. Rekart, Dr. Leidner, Dr. Adams, Dr. Kuich, Brockenborough, Lizarraga, Dr. Ceballos, Tebrock and Does 1 through 100)*

853.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 852, as though fully set forth herein.

854.    The acts and/or omissions of Defendants Dr. ASHE, Dr. DENIGRIS, Dr. M. SMITH, Dr. J. JOHNSON, Dr. R. JOHNSON, Dr. RAMKUMAR, ROBINSON, Dr. C SMITH, Dr. ANDALUZ, BRANMAN, Dr. HEATLEY, KERNAN, DIAZ, TOCHE, GIPSON, Dr. BRIZENDINE, PONCIANO, Dr. REKART, Dr. LEIDNER, Dr. ADAMS, Dr. KUICH, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK and Does 1 through 100 as alleged herein, in being deliberately indifferent to the serious medical needs of decedent William Schmitz by failing to summon or provide William Schmitz with medical care, psychiatric care and/or take other measures to prevent his death after noticing his psychotic

condition and/or need for medical attention, resulted in William Schmitz's suicide and/or death, which deprived plaintiffs of their liberty interest in the parent-child in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

855.     Such conduct by said Defendants "shocks the conscience."

856.     As a direct and proximate result of said Defendants' conduct, Plaintiffs suffered injuries and damages as alleged herein including pain and suffering and emotional distress. The aforementioned acts and/or omissions of the individually named Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**FIFTH CAUSE OF ACTION**
**Negligent Supervision, Training, Hiring, and Retention**
**(Survival Action- Cal. Code Civ. Proc. 377.10 et seq)**
*(Against Dr. C. Smith and Does 1 through 20)*

857.     Plaintiffs re-allege and incorporate by reference all paragraphs 1 through 856, as though fully set forth herein.

858.     Defendant C. SMITH and Does 1 and 20 had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrained from the conduct and/or omissions alleged herein Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

859.     As a direct and proximate result of Defendants' failure, Plaintiffs suffered injuries and damages as alleged herein.

860.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### SIXTH CAUSE OF ACTION
#### Wrongful Death
#### (Cal. Code of Civil Procedure § 377.60 et seq.)
*(Against Defendants Ashe, Rudas, DeNigris, Wanie, Asman, Bradley, Dr. Andaluz, Dr. M. Smith, Dr. J. Johnson, Dr. R. Johnson, Dr. Ramkumar, Branman, Dr. Leidner, Dr. Ceballos, Tebrock, Robinson, Dr. Heatley, Dr. C Smith, Kernan, Diaz, Toche, Gipson, Dr. Brizendine, Ponciano, Dr. Rekart,, Brockenborough, Lizarraga, Dr. Kuich, Dr. Adams and Does 1 through 100.)*

861.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 860, as though fully set forth herein.

862.    Plaintiffs Thomas J. Schmitz and Dianne Mallia are the parents of the decedent William Schmitz, who has no surviving spouse or surviving children or issue of children. Exhibit A is the declaration required by 377.11 of the California Code of Civil Procedure and Exhibit B is the death certificate.

863.    William Schmitz's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants ASHE, RUDAS, DENIGRIS, WANIE, ASMAN, BRADLEY, Dr. ANDALUZ, Dr. M. SMITH, Dr. J. JOHNSON, Dr. R. JOHNSON, Dr. RAMKUMAR, BRANMAN, Dr. LEIDNER, Dr. CEBALLOS, TEBROCK, ROBINSON, Dr. HEATLEY, Dr. C SMITH, KERNAN, DIAZ, TOCHE, GIPSON, Dr. BRIZENDINE, PONCIANO, Dr. REKART, Dr. KUICH, BROCKENBOROUGH, LIZARRAGA, Dr. ADAMS and Does 1 through 100. These Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

864.    Defendants Dr. ASHE, Dr. RAMKUMAR, ROBINSON, Dr. M. SMITH, Dr. C. SMITH, Dr. J. JOHNSON, Dr. R JOHNSON, Dr. ANDALUZ, LCSW BRANMAN, Dr. DENIGRIS, ASMAN, BRADLEY, Dr. HEATLEY, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS, TEBROCK, ADAMS, KERNAN, DIAZ, KUICH, GIPSON, TOCHE, BRIZENDINE, PONCIANO, REKART, and LEIDNER were all deliberately indifferent to William's serious medical needs in violation of the Eighth Amendment under 42 U.S.C. §1983 as detailed *supra* in the first, second and third cause of action. Their deliberate indifference resulted in the death of William Schmitz.

865.    In addition, defendants each individually failed to comply with professional

1  standards in the care and supervision of William Schmitz during his incarceration at MCSP. The
2  failures by Defendants Dr. HEATLEY, Dr. C SMITH, KERNAN, DIAZ, TOCHE, GIPSON, Dr.
3  BRIZENDINE, PONCIANO, Dr. REKART, Dr. D. LEIDNER, Dr. ADAMS, Dr. KUICH,
4  TEBROCK, BROCKENBOROUGH, LIZARRAGA, Dr. CEBALLOS and Does 1-100 include
5  but are not limited to failing to ensure the provision of timely and necessary mental health
6  treatment; failing to ensure appropriate assessment and evaluation of his serious mental needs
7  through the adoption, promulgation, and implementation of adequate policies, procedures, and
8  training; propagation or failure to correct broad elements set out in the *Coleman* case required to
9  provide constitutional care (as discussed *supra* at 15 -16); failure to provide adequate substance
10 abuse treatment; failure to maintain enough psychiatrists to provide a minimal constitutional
11 level of mental health care; failure to maintain an adequate medical records system to provide a
12 minimal constitutional level of mental health care; and creating a dysfunctional workplace where
13 medical decisions are made by non-physicians.

14     866.    In addition, Defendants DIAZ and KERNAN, as Secretaries of CDCR, and
15 Defendant GIPSON, as Director of DAI, were responsible for ensuring the safety and security of
16 CDCR prisoners, including that they receive constitutionally adequate mental health treatment.
17 Despite repeated notice of the inadequacies of CDCR's policies, procedures, and practices for
18 provision of mental health treatment at MCSP, Defendants DIAZ, KERNAN, and GIPSON were
19 negligent in their personal duties when they knowingly and deliberately failed to undertake
20 necessary corrective action to remedy these deficiencies, resulting in the death of William
21 Schmitz.

22     867.    In addition, Defendant TOCHE, as Undersecretary of Health Care Services for
23 CDCR, and Defendant TEBROCK, as Deputy Director of the Statewide Mental Health Program
24 for CDCR, were responsible for the administration of health care services to CDCR prisoners,
25 including ensuring that the mental health treatment was constitutionally adequate. Despite
26 repeated notice that CDCR's policies, procedures, and practices for provision of mental health
27 treatment at MCSP were inadequate, Defendants TOCHE and TEBROCK were negligent in their
28 personal duties when they knowingly and deliberately failed to undertake necessary corrective

action to remedy these deficiencies, resulting in the death of William Schmitz.

868.     In addition, Defendant LIZARRAGA, as Warden of MCSP, was responsible for the safety and security of MCSP prisoners, including ensuring that the mental health treatment was constitutionally adequate. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment at MCSP was inadequate, Defendant LIZARRAGA was negligent in his personal duty when he knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of William Schmitz.

869.     In addition, Defendant BROCKENBOROUGH, as Health Care CEO at MCSP, Defendant Dr. HEATLEY and Dr. C. SMITH, as CMEs at MCSP, Defendant Dr. ADAMs, as Acting Chief Psychiatrist, and Defendant Dr. KUICH, in his role Chief Psychiatrist of Telepsychiatry, were responsible for ensuring the MCSP medical staff provided constitutionally adequate mental health treatment to prisoners including William Schmitz. Despite notice that medical staff at MCSP were not providing adequate and necessary care consistent with the Constitution and CDCR's own requirements, Defendant BROCKENBOROUGH, HEATLEY, C. SMITH, ADAMS and KUICH were negligent in their personal duties when they knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of William Schmitz.

870.     Defendants KERNAN, DIAZ, GIPSON, and LIZARRAGA also allowed de facto unconstitutional practices of allowing floor officers to provide inadequate supervision of mentally ill inmates; allowed floor officers to ignore the policies that were in place to safe guard mentally ill inmates, like William, which directly resulted in William's death.

871.     Defendants KERNAN, DIAZ, GIPSON failed to comply with professional standards when they failed to monitor and remove Defendant LIZARRAGA from his position in a timely manner when they learned of his poor performance and multiple violations, which prevented him from doing his duties as warden, proximately causing William Schmitz's death.

872.     The medical and/or psychiatric care rendered by Defendants Dr. RAMKUMAR, ROBINSON, Dr. M. SMITH, Dr. J. JOHNSON, Dr. R JOHNSON, Dr. ANDALUZ,

BRANMAN, LCSW WANIE, Dr, ASHE, Dr. RUDAS, Dr. DENIGRIS and Does 11 through 20 was negligent and did not comply with professional standards of care for such treatment, proximately causing William Schmitz's death.

873.    Defendants ASMAN and BRADLEY knew that inmates including William Schmitz and others similarly situated required direct supervision to protect their physical safety since the inmate population included violent persons, suicidal persons, persons taking psychotropic medications with various serious side effects, and accordingly the population needed to be protected from each other and from themselves. Defendants ASMAN and BRADLEY disregarded the risks to William Schmitz's physical safety by leaving him unsupervised for over 8 hours when the standard was to monitor at no more than 30 minute intervals for CCCMS inmates and one hour for all inmates.

874.    Defendants ASMAN and BRADLEY failed to comply with professional standards and CDCR policy and procedure in conducting safety checks of William Schmitz on the morning of January 21, 2019. Defendants Officer ASMAN and Officer BRADLEY and Does 1 through 10 owed William Schmitz a duty to ensure his welfare. Defendants ASMAN and BRADLEY breached that duty when they had actual and constructive knowledge that William Schmitz was a mentally ill CCCMS inmate locked in a cell by himself and failed to properly conduct counts dictated by professional standards and CDCR policy resulting in William Schmitz's suffering and loss of life.

875.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs incurred expenses for funeral and burial expenses in an amount to be proved.

876.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs Thomas Schmitz and Dianne Mallia suffered injuries and damages as alleged herein, the loss of the assistance, society, companionship, comfort, affection, moral support, care, and protection of the decedent, as well as the loss of the present value of his future services to his family. Plaintiffs are further entitled to recover prejudgment interest.

////

## SEVENTH CAUSE OF ACTION
### Negligence
**(Survival Action- Cal. Code Civ. Proc. 377.10 et seq.)**
*(Defendants Dr. C. Smith, Dr. Rudas, Dr. DeNigris, Dr. Ashe, and Does 11 through 20.)*

877.    On behalf of decedent William Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 876, as though fully set forth herein.

878.    The medical care rendered by Defendants Dr. ASHE, Dr. C. SMITH, Dr. RUDAS and Dr. DENIGRIS was negligent and did not comply with professional standards of care for such treatment, proximately causing plaintiff's injuries.

879.    Together, Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, William Schmitz suffered injuries and damages as alleged herein, including but not limited to loss of income, physical pain and suffering, emotional distress, and mental anguish.

880.    The negligent conduct of Defendants was committed within the course and scope of their employment.

## EIGHTH CAUSE OF ACTION
### *Interference with Constitutional rights by Coercion*
**(Survival Action- Cal. Civ. Code § 377.10 et seq.)**
*(Against Defendant Dr. DeNigris)*

881.    On behalf of decedent William Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 880, as though fully set forth herein.

882.    Defendant Dr. DENIGRIS violated the "The Bane Act,, Cal. Civ. Code § 52.1 (If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state)

883.    Defendant Dr. DENIGRIS coerced William into a fraudulent procedure that caused pain and required anesthesia to limit the pain. Defendant Dr. DENIGRIS knew that William did not have a medical indication for the procedure and solely performed the procedure for the financial reimbursement. Defendant Dr. DENIGRIS coerced William into to the

procedure by allowing William to believe that he risked death from bleeding into his throat from potential esophageal varices if he refused the procedure. William feared for his personal safety from the risks and pain of the EGD but agreed to it solely due to his greater fear of an ***untrue*** risk of bleeding to his throat if he refused the EGD.

884.    The actions by Defendant Dr. DENIGRIS were willful, wanton, malicious and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future. Plaintiff seeks exemplary and punitive damages against Defendant Dr. DENIGRIS as to this cause of action.

**NINTH CAUSE OF ACTION**
**Medical Battery**
**(Survival Action – California State Law)**
(*Against Defendant DeNigris*)

885.    On behalf of decedent William Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 884, as though fully set forth herein.

886.    Defendant Dr. DENIGRIS owed William Schmitz a duty to provide medical care.

887.    The conduct of Defendant Dr. DENIGRIS alleged herein, including but not limited to the facts that Defendant knew that on or before May 4, 2018 William Schmitz did not need a medical procedure. William's consent was based on fraud and invalid. William, like any other reasonable person, would not have consented for a procedure that had no medical indication and was solely for the financial reimbursement. William was physically and mentally harmed by the Battery. Any reasonable person would have been offended by having the unneeded procedure. Defendant Dr. DENIGRIS violated California state law, including Cal. Civ. Code § 43.

888.    The actions by Defendant Dr. DENIGRIS were willful, wanton, malicious and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future. Plaintiff seeks exemplary and punitive damages against all Defendant Dr. DENIGRIS as to this cause of action.
////

## TENTH CAUSE OF ACTION
### Assault
### (Survival Action- Cal. Civ. Code § 377.10 et seq.)
*(Against Defendant DeNigris)*

889.     On behalf of decedent William Schmitz, plaintiffs reallege and incorporate by reference paragraphs 1 through 888, as though fully set forth herein.

890.     Defendant Dr. DENIGRIS owed William Schmitz a duty to provide medical care.

891.     The conduct of Defendant Dr. DENIGRIS alleged herein, including but not limited to the facts that Defendant Dr. DENIGRIS knew that on or before May 4, 2018 William Schmitz did not need a medical procedure that has an obvious effect of causing pain. William's consent was based on fraud and invalid. **William would not have consented for a procedure that had no medical indication and carries many risks including death.** William believed he was going to have the procedure that causes pain. William was physically and mentally harmed by the procedure. Any reasonable person would have been offended by being subjected to this unnecessary procedure. Defendant Dr. DENIGRIS violated California state law, including Cal. Civ. Code § 43.

892.     The actions by Defendant Dr. DENIGRIS were willful, wanton, malicious and oppressive, thereby justifying an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future. Plaintiff seeks exemplary and punitive damages against Defendant Dr. DENIGRIS as to this cause of action.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.     For compensatory, general and special damages against each defendant, jointly and severally, in the amount proven at trial;

2.     For damages related to loss of familial relations as to Plaintiffs Thomas Schmitz and Dianne Mallia;

3.     Funeral and burial expenses, and incidental expenses not yet fully ascertained;

4.     General damages, including damages for physical and emotional pain, emotional

distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, loss of the present value of future services and contributions, and loss of economic security;

     5. Prejudgment interest;

     6. For punitive and exemplary damages for all causes of action, except the Sixth and Seventh Causes of Actions, against each individually named Defendant in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct, in amounts according to proof;

     7. For lost wages, employment opportunities, and other losses in an amount according to proof;

     8. For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

     9. For restitution as the court deems just and proper;

     10. For such other and further relief, as the court deems just and proper.


DATED:   December 14, 2021

                     Respectfully submitted,

                     *Thomas J. Schmitz*

                     *Dianne Mallia*

1  ## DEMAND FOR TRIAL BY JURY

2  Plaintiffs demand trial by jury.

3  Dated:  December 14, 2021

4
5                                        Respectfully submitted,

6
7                                        *Thomas J. Schmitz*

8
9                                        *Dianne Mallia*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT A. DECLARATION OF THOMAS J. SCHMITZ AND DIANNE MALLIA

We, Thomas J Schmitz and Dianne Mallia, declare as follows:

1.   We are over the age of 18 years. We have personal knowledge of the facts contained in this declaration, and if called as a witness could and would testify competently to the truth of the facts stated herein.

2.   We are the parents of William Thomas Schmitz, who died on January 21, 2019 at Ione, California.

3.   No proceeding is now pending in the State of California for administration of the Estate of William Thomas Schmitz.

4.   We are the successors in interest to William Thomas Schmitz, as defined in Section 377.11 of the California Code of Civil Procedure, and succeed to their interest in the above-entitled proceeding.

5.   No other person has a superior right to commence the above-entitled proceeding or to be substituted for Thomas J Schmitz and Dianne Mallia in the above-entitled proceeding.

7.   A certified copy of the death certificate for William Thomas Schmitz is attached hereto as Exhibit "B" and incorporated herein by reference.

We declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed on December 5, 2021 at Roseville, California.

_____
Thomas J. Schmitz

_____
Dianne Mallia

# COUNTY OF AMADOR

## JACKSON, CALIFORNIA 95642

*Exhibit B*

| 3052019017040 | **CERTIFICATE OF DEATH** STATE OF CALIFORNIA USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS VS-11(REV 3/06) | 3201903000031 |
|---|---|---|
| STATE FILE NUMBER | | LOCAL REGISTRATION NUMBER |

**DECEDENT'S PERSONAL DATA**

| 1 NAME OF DECEDENT– FIRST (Given) | 2 MIDDLE | 3 LAST (Family) |
|---|---|---|
| WILLIAM | THOMAS | SCHMITZ |

| AKA, ALSO KNOWN AS – include full AKA (FIRST, MIDDLE, LAST) | 4 DATE OF BIRTH mm/dd/ccyy | 5 AGE Yrs | IF UNDER ONE YEAR Months Days | IF UNDER 24 HOURS Hours Minutes | 6 SEX |
|---|---|---|---|---|---|
| | ████1982 | 36 | | | M |

| 9 BIRTH STATE/FOREIGN COUNTRY | 10 SOCIAL SECURITY NUMBER | 11 EVER IN U.S. ARMED FORCES? | 12 MARITAL STATUS/SRDP* (at Time of Death) | 7 DATE OF DEATH mm/dd/ccyy | 8 HOUR (24 Hours) |
|---|---|---|---|---|---|
| CA | ███-██-0390 | ☐ YES ☒ NO ☐ UNK | NEVER MARRIED | 01/21/2019 | 1444 |

| 13 EDUCATION – Highest Level/Degree (see worksheet on back) | 14/15 WAS DECEDENT HISPANIC/LATINO/A/SPANISH? (if yes see worksheet on back) | 16 DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) |
|---|---|---|
| SOME COLLEGE | ☐ YES ☒ NO | WHITE |

| 17 USUAL OCCUPATION – Type of work for most of life DO NOT USE RETIRED | 18 KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) | 19 YEARS IN OCCUPATION |
|---|---|---|
| FIRE FIGHTER | FIRST RESPONDER | 6 |

**USUAL RESIDENCE**

| 20 DECEDENT'S RESIDENCE (Street and number, or location) |
|---|
| 508 GROVE STREET |

| 21 CITY | 22 COUNTY/PROVINCE | 23 ZIP CODE | 24 YEARS IN COUNTY | 25 STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| ROSEVILLE | PLACER | 95678 | 1 | CA |

**INFORMANT**

| 26 INFORMANT'S NAME, RELATIONSHIP | 27 INFORMANT'S MAILING ADDRESS (Street and number, or rural route number, city or town, state and zip) |
|---|---|
| THOMAS J. SCHMITZ, FATHER | 1753 WOODLEAF CIRCLE, ROSEVILLE, CA 95747 |

**SPOUSE/SRDP AND PARENT INFORMATION**

| 28 NAME OF SURVIVING SPOUSE/SRDP–FIRST | 29 MIDDLE | 30 LAST (BIRTH NAME) |
|---|---|---|
| – | – | – |

| 31 NAME OF FATHER/PARENT–FIRST | 32 MIDDLE | 33 LAST | 34 BIRTH STATE |
|---|---|---|---|
| THOMAS | JOSEPH | SCHMITZ | CA |

| 35 NAME OF MOTHER/PARENT–FIRST | 36 MIDDLE | 37 LAST (BIRTH NAME) | 38 BIRTH STATE |
|---|---|---|---|
| DIANNE | | MALLIA | CA |

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 39 DISPOSITION DATE mm/dd/ccyy | 40 PLACE OF FINAL DISPOSITION |
|---|---|
| 02/04/2019 | HOLY CROSS CATHOLIC CEMETERY 1500 MISSION ROAD, COLMA, CA 94014 |

| 41 TYPE OF DISPOSITION(S) | 42 SIGNATURE OF EMBALMER | 43 LICENSE NUMBER |
|---|---|---|
| CR/BU | ▶ NOT EMBALMED | |

| 44 NAME OF FUNERAL ESTABLISHMENT | 45 LICENSE NUMBER | 46 SIGNATURE OF LOCAL REGISTRAR | 47 DATE mm/dd/ccyy |
|---|---|---|---|
| EL DORADO FUNERAL & CREMATION SERVICES | FD2299 | ▶ KIMBERLY L. GRADY | 01/29/2019 |

**PLACE OF DEATH**

| 101 PLACE OF DEATH | 102 IF HOSPITAL, SPECIFY ONE | 103 IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|
| MULE CREEK STATE PRISON | ☐ IP ☐ EP/OP ☐ DOA | ☐ Hospice ☐ Nursing Home/LTC ☐ Decedent's Home ☒ Other |

| 104 COUNTY | 105 FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) | 106 CITY |
|---|---|---|
| AMADOR | 4001 HIGHWAY 104 | IONE |

**CAUSE OF DEATH**

| 107 CAUSE OF DEATH | Enter the chain of events – diseases, injuries, or complications – that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE | Time Interval Between Onset and Death | 108 DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (A) (Final disease or condition resulting in death) | PENDING | – | ☒ YES ☐ NO |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST (B) | | – | 108a CORONER'S CASE NUMBER C2019-008 |
| (C) | | | 109 BIOPSY PERFORMED? ☐ YES ☒ NO |
| (D) | | | 110 AUTOPSY PERFORMED? ☒ YES ☐ NO |
| | | | 111 USED IN DETERMINING CAUSE? ☒ YES ☐ NO |

| 112 OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| NONE |

| 113 WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (if yes, list type of operation and date) | 113a IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| NO | ☐ YES ☐ NO ☐ UNK |

**PHYSICIAN'S CERTIFICATION**

| 114 I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED | 115 SIGNATURE AND TITLE OF CERTIFIER | 116 LICENSE NUMBER | 117 DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since (A) mm/dd/ccyy — Decedent Last Seen Alive (B) mm/dd/ccyy | ▶ | | |
| | 118 TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | |

**CORONER'S USE ONLY**

| 119 I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED | 120 INJURED AT WORK? | 121 INJURY DATE mm/dd/ccyy | 122 HOUR (24 Hours) |
|---|---|---|---|
| MANNER OF DEATH ☐ Natural ☐ Accident ☐ Homicide ☐ Suicide ☒ Pending Investigation ☐ Could not be determined | ☐ YES ☐ NO ☐ UNK | | |

| 123 PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) |
|---|
| |

| 124 DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) |
|---|
| |

| 125 LOCATION OF INJURY (Street and number, or location, and city and zip) |
|---|
| |

| 126 SIGNATURE OF CORONER / DEPUTY CORONER | 127 DATE mm/dd/ccyy | 128 TYPE NAME, TITLE OF CORONER / DEPUTY CORONER |
|---|---|---|
| ▶ PATRICK R WEART | 01/28/2019 | PATRICK R WEART, DEPUTY CORONER |

| STATE REGISTRAR | A | B | C | D | E | | FAX AUTH.# | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | *010001004104846* | | |

### CERTIFIED COPY OF VITAL RECORDS
### STATE OF CALIFORNIA, COUNTY OF AMADOR

This is a true and exact reproduction of the document officially registered and placed on file in the office of the Amador County Clerk-Recorder.

DATE ISSUED 12/01/2021    1 of 2



* 0 0 0 0 9 8 1 3 3 *

Kimberly L. Grady
Kimberly L. Grady
Amador County Clerk-Recorder



This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the County Clerk-Recorder.
(RBNO2) (Rev) 11/15

**ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**

# COUNTY OF AMADOR

### JACKSON, CALIFORNIA 95642

Exhibit B

## PHYSICIAN/CORONER'S AMENDMENT

3052019017040
**STATE FILE NUMBER**

NO ERASURES, WHITEOUTS, PHOTOCOPIES,
OR ALTERATIONS

3201903000031
**LOCAL REGISTRATION NUMBER**

1 1

☐ BIRTH ☒ DEATH ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

## PART I    INFORMATION TO LOCATE RECORD

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A NAME—FIRST | 1B MIDDLE | 1C LAST | 2 SEX |
|---|---|---|---|---|
| | WILLIAM | THOMAS | SCHMITZ | M |
| | 3 DATE OF EVENT—MM/DD/CCYY | 4 CITY OF EVENT | 5 COUNTY OF EVENT | |
| | 01/21/2019 | IONE | AMADOR | |

## PART II    STATEMENT OF CORRECTIONS

| | 6 CERTIFICATE ITEM NUMBER | 7 INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 8 INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | PENDING | MASSIVE OVERDOSE OF METHAMPHETAMINE |
| | 107AT | - | MINUTES |
| | 107B | | LEAKAGE OR RUPTURE OF BINDLE(S) OF METHAMPHETAMINE INGESTED FOR PURPOSES OF DRUG SMUGGLING |
| | 107BT | | MINUTES |
| | 119 | PENDING INVESTIGATION | ACCIDENT |
| | 120 | | NO |
| | 121 | | 01/21/2019 |
| | 122 | | 1435 |
| | 123 | | CALIFORNIA STATE PRISON |
| | 124 | | ACCIDENTAL OVERDOSE |
| | 125 | | 4001 HIGHWAY 104, IONE, CA 95640 |

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. | | |
|---|---|---|---|
| | 9 SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER | 10 DATE SIGNED—MM/DD/CCYY | 11 TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER |
| | ▶ PATRICK R WEART | 04/24/2019 | DEPUTY CORONER |
| | 12 ADDRESS—STREET and NUMBER | 13 CITY | 14 STATE | 15 ZIP CODE |
| | 700 COURT STREET | JACKSON | CA | 95642 |
| STATE/LOCAL REGISTRAR USE ONLY | 16 OFFICE OF VITAL RECORDS OR LOCAL REGISTRAR | 17 DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY | |
| | ▶ STATE REGISTRAR - OFFICE OF VITAL RECORDS | 04/24/2019 | |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS    *020101004190598*    FORM VS 24Aa (REV. 1/08)

1.1

### CERTIFIED COPY OF VITAL RECORDS
STATE OF CALIFORNIA, COUNTY OF AMADOR

This is a true and exact reproduction of the document officially registered and placed on file in the office of the Amador County Clerk-Recorder.

DATE ISSUED 12/01/2021    2 of 2



* 000098128 *

Kimberly L. Grady
Amador County Clerk-Recorder

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the County Clerk-Recorder.
PBNCO (Rev) 11/15

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE



# CDCR Mental Health System Report

1

## Some key issues detailed in the report

2

### The Resetting-The-Clock Strategy

3

4 Every time a mental health patient is transferred from one institution to another, CDCR
5 resets the clock to the maximum Program Guide interval between psychiatry
6 appointments. They use this Resetting The Clock strategy to deem as compliant
7 appointments occurring later than the maximum interval the Program Guide permits
8 (such as 170 days rather than 90 days at the CCC level of care). They reset the clock every
9 time a patient is transferred, irrespective of when the patient last saw a psychiatrist. A
10 CCC patient transferred more than once might not have another psychiatry appointment
11 for eight months.

### Effect On CDCR's Reports To The Court

12

13 The 2017 and 2018 staffing reports to the court significantly overstate percent timeliness
14 of psychiatric appointments.

### Effect On The Office Of The Special Master's Analysis

15

16 The Resetting The Clock strategy may have led the Office of the Special Master to
17 conclude that psychiatry appointments are occurring in a more timely manner than is in
18 fact the case. This is likely to have led to mistaken conclusions about psychiatry staffing
19 needs.

20 See pages 4 13 of this CDCR Mental Health System Report for details.

1    **The Stretching-The-EOP-Maximum-Interval Strategy**

2    In their calculation of "timeliness" (percent patient weeks compliance), CDCR increased
3    **the EOP interval between psychiatry appointments from 30 days to 45 days. With**
4    rounding, the result was that in some cases CDCR deemed EOP psychiatry appointments
5    occurring nearly two months later to be compliant.

6    **Effect On CDCR's Reports To The Court**

7    The 2017 staffing report to the court significantly overstates percent patient weeks
8    **timeliness.**

9    Effect On The Office Of The Special Master's Analysis

10   The Stretching The EOP Maximum Interval strategy may have led the Office of the
11   Special Master to conclude that psychiatry appointments are occurring in a more timely
12   **manner than is in fact the case. This is likely to have led mistaken conclusions about**
13   psychiatry staffing needs.

14   See pages 13 16 of this CDCR Mental Health System Report for details.

15   **The Counting-On-Time-Appointments-As-Early Strategy**

16   In the 2018 staffing report to the court, to arrive at their figure of CCC appointments
17   **being on average 2.6 days overdue, CDCR took an average of what they deemed late**
18   appointments with what they deemed early appointments. If a psychiatrist ordered that a
19   CCC patient be seen a week later, and that patient was indeed seen a week later, instead
20   **of counting that appointment as having been on time, CDCR counted that appointment**
21   as having been 83 days early. If a psychiatrist ordered that a patient be seen a month later,

ii

1  but the patient did not see a psychiatrist for two months, CDCR counted that

2  appointment as one month early rather than a month late as was actually the case. The on

3  **average 2.6 days overdue figure significantly understates how late on average**

4  appointments were occurring.

5  ## Effect On CDCR's Reports To The Court

6  The on average 2.6 days overdue figure CDCR gave in the 2008 staffing report significantly

7  understates how late on average appointments were occurring.

8  ## Effect On The Office Of The Special Master's Analysis

9  The Counting On Time Appointments As Early strategy may have given the Office of the

10  Special Master a mistaken impression of the degree to which patients are being seen on

11  time, and of psychiatric staffing needs.

12  See pages 38 40 of this CDCR Mental Health System Report for details.

13  ## The Biasing-The-Sample Strategy (MAPIP)

14  In a caveat in small print in the 2017 staffing report to the court, CDCR stated that they

15  **had eliminated three of the four mandatory MAPIP blood draws (baseline, three months,**

16  **and dose change related measurements) thus leaving only the annual measurement.**

17  An "annual blood test" could mean (i) a blood test done a year after starting a medication

18  **and then at yearly intervals thereafter, or it could mean (ii) one done within the first year**

19  after starting a given medication and then at yearly intervals thereafter. But what it can't

20  reasonably be taken to mean is (iii) a blood test done within the first year after starting a

1    medication (as in (iii)) but only if the patient continued to be on the medication for a full
2    year.

3    In its calculation of compliance with mandatory annual blood draws, CDCR included the
4    data from some but not all patients who had blood tests done within a year of starting the
5    medication. It included the data from patients who remained on the medication for a full
6    year. It perversely excluded from the calculation data from those patients least likely to
7    have had the mandatory blood draw   those who had been taken off the medication
8    within a year after starting it. Such patients are less likely to have had the mandatory
9    blood draw because there was less time in which to get the blood draw done. By using a
10   biased sample, CDCR biased its measurement of whether needed measurements were
11   done or not. Thus, in its 2017 staffing report, CDCR significantly overstated the mental
12   health MAPIP compliance figure.

13   Effect On CDCR's Reports To The Court

14   In its 2017 staffing report, CDCR significantly overstated mental health MAPIP
15   compliance.

16   Effect On The Office Of The Special Master's Analysis

17   The Mental Health Dashboard (CDCR's self monitoring tool) and CDCR's report to the
18   court may have given the false impression that medication usage was being appropriately
19   monitored.

20   See pages 20  26 of this CDCR Mental Health System Report for details.

iv

1    **The Pretend-It's-All-Done-By-The-Line-Staff Strategy**

2    The staffing ratios CDCR reported to the court in the 2018 staffing report are incorrect.

3    **Sixty percent of psychiatric supervisors were seeing patients like line staff at least part**

4    **time, and in some cases full time. The work was being done by a larger ratio of**

5    psychiatrists to patients than was reported, suggesting that fewer psychiatrists are needed

6    **per patient than is in fact the case. We need our psychiatric supervisors to be organizing**

7    **care like they are supposed to be, not serving as line staff psychiatrists.**

8    Effect On CDCR's Reports To The Court

9    **CDCR's reported staffing ratios in the 2018 staffing report are misleading. The ratio of**

10   psychiatrists doing the work to patients receiving the psychiatric care is higher than was

11   **reported to the court.**

12   Effect On The Office Of The Special Master's Analysis

13   **More than the number of line staff reported would be needed to accomplish the results**

14   achieved. The Pretend It's All Done By The Line Staff strategy may have led the Office of

15   **the Special Master to conclude that there are fewer staff shortages than is actually the**

16   **case.**

17   See pages 47 48 of this CDCR Mental Health System Report for details.

18   **The Count-Every-Encounter-As-An-Appointment Strategy**

19   The average number of EOP appointments per 30 days was lower than CDCR reported to

20   **the court in the 2018 staffing report. CDCR counted as compliant appointments "wellness**

21   **checks" including brief encounters with patients in the prison yard surrounded by other**

v

1  immates, three minute non confidential cell side visits, and telepsychiatry "wellness
2  checks" in which an MA holds a laptop for a telepsychiatrist to try to talk to the patient
3  **who is behind the solid metal cell door. In misleadingly counting all these wellness**
4  checks as compliant appointments, CDCR thereby overstated its timeliness figures,
5  because without all these wellness check "appointments", intervals between
6  **appointments would be greater. No reports about EOP timeliness were given to the court**
7  in the 2018 staffing report. The average number of EOP appointments per 30 days gives no
8  measure of timeliness, including whether appointments occurred on time when
9  **scheduled. And in any case the number of EOP appointments per 30 days was overstated**
10  in the 2018 staffing report, meaning that actual appointment timeliness is even lower than
11  timeliness figures appearing on the Dashboard.

12  **Effect On CDCR's Reports To The Court**

13  The average number of EOP appointments per 30 days was lower than CDCR reported to
14  **the court in the 2018 staffing report. That wellness checks were counted as proper**
15  appointments means that the actual timeliness figures are even lower (less timely) than
16  reported.

17  **Effect On The Office Of The Special Master's Analysis**

18  The Count Every Encounter as an Appointment strategy may have led the Office of the
19  **Special Master to draw false conclusions about whether EOP patients are being seen by**
20  psychiatrists when they need to be seen.

21  See pages 45 46 of this CDCR Mental Health System Report for details.

## 1   The Pretending-"All"-Means-"Fewer-Than-All" Strategy

2   One of the best measurements of when a doctor thinks a patient should be seen is when
3   the doctor has scheduled the patient to be seen. According to the CDCR Mental Health
4   Dashboard, at the CCC level of care, statewide, an average of 95% of "all scheduled
5   appointments" were "seen as scheduled". But the word "all" did not mean all. Instead,
6   CDCR deemed fewer than all to be "all". CDCR excluded appointments not seen as
7   scheduled due to patient refusal, patient no showed, scheduling error, etc. The actual
8   percentage of appointments that occurred as scheduled was far lower than 95%. Were
9   those groups of patients not excluded from "all", the average percentage of mental health
10  appointments occurring as scheduled would have been about 46%. But the true figure is
11  actually even lower than that because scheduled appointments that don't happen are in
12  many cases simply moved to a later date as though they were never scheduled to occur
13  before that later date.

14  In a system that is failing to get more than 50% of patients to their appointments, many
15  more psychiatrists are needed than would be otherwise, because of the wasted time, the
16  enormous work needed to try to find patients who did not come to their appointment,
17  the excessive rescheduling and juggling needed, the need to try to see patients at odd
18  hours, etc.

## 19  Effect On CDCR's Reports To The Court

20  In failing to mention that fewer than 50% of patients are being seen when psychiatrists
21  schedule them to be seen, the CDCR staffing reports significantly understate how many
22  psychiatrists are needed given how grossly inefficient the system is.

1   **Effect On The Office Of The Special Master's Analysis**

2   The Pretending "All" Means "Fewer Than All" strategy may have led the Office of the

3   Special Master to the erroneous conclusion that patients were being seen when the

4   psychiatrist thought they needed to be seen. In addition, the Office of the Special Master

5   may not have taken into account the greater number of psychiatrists needed in a system

6   as grossly inefficient as the CDCR one (which is failing to get more than 50% of patients

7   to their appointments).

8   See pages 26-37 of this CDCR Mental Health System Report for details.


9   **The Crazy-Algorithm Strategy**

10   The CDCR mental health computer algorithm generating compliance figures for

11   medication non-compliant patients *seen* perversely creates the semblance of *greater*

12   compliance when *fewer* patients needing to be seen for medication non-compliance are

13   *scheduled* to be seen. It counts appointments not scheduled as not being needed, it

14   counts refused appointments as completed appointments, and it double-counts

15   appointments that occurred. In the CHCF report for August 2018, for example, the

16   Dashboard reported 100% compliance when in reality the compliance was only 3.6%.


17   Appointments for medication non-compliance are one of a number of different types of

18   consultation appointments. Were the compliance figures for that kind of consultation

19   appointment accurately recorded, the compliance figures for "timely mental health

20   referrals" would be significantly lower. The Dashboard has significantly overstated

21   compliance with respect to timely mental health referrals.

1 **Effect On CDCR's Reports To The Court**

2 The number of psychiatrists CDCR suggests are needed fails to take into account that

3 **CDCR's actual compliance with respect to needed psychiatric consultations occurring is**

4 much lower than the Dashboard figures suggest.

5 **Effect On The Office Of The Special Master's Analysis**

6 Given that the algorithm creates such grossly false compliance figures, the Office of the

7 Special Master might decide that independent analysis is needed to check all Dashboard

8 **data. The Crazy Algorithm strategy may have led the Office of the Special Master to**

9 conclude that fewer psychiatrists are needed than is in fact the case.

10 See pages 48-52 of this CDCR Mental Health System Report for details.

11 **The Psychologists-Are-Physicians-Too Strategy**

12 Regardless of platitudes about the importance of including psychiatric physicians in

13 **decision making, CDCR's actions are not consistent with such platitudes. CDCR**

14 perversely deems the non-medically trained psychologist rather than the psychiatrist (i.e.,

15 the medical doctor) to be the "primary clinician". There is not a single psychiatry

16 **executive in CDCR. Psychologists wear name badges saying "Dr." and not specifying that**

17 their doctorate is as a psychologist rather than a medical doctor. Indeed, a psychologist

18 has been listed as the "physician to call" in at least one CDCR mental health nursing

19 **station. Psychologists in CDCR very often override psychiatrists' judgement and/or**

20 medical orders, and the CDCR system effectively supports them in doing that rather than

21 discouraging it.

1   ███████████ signed a memo that gave psychologists the authority to overrule

2   psychiatric physicians' medical decisions about the medical safety of discharging

3   **medically complicated patients from licensed hospitals. The memo said that the decision**

4   to discharge is made by "the primary clinician or treatment team". The psychiatrist and

5   the psychologist are both members of the treatment team. The psychologist is the

6   **"primary clinician". It logically follows that the memo is saying that in cases where the**

7   psychiatrist and the psychologist disagree (and thus the treatment team can't reach a

8   decision), the psychologist rather than the psychiatrist makes the decision.

9   Giving psychologists the authority to overrule medical doctors' decisions with respect to

10  potentially medically complicated patients must be one of the most radical policy

11  **decisions ever. Having no medical training, psychologists have no ability to evaluate**

12  medical issues such as whether a patient's diabetes or high blood pressure is stable, or

13  whether there is toxicity from a psychiatric medication, or indeed whether psychiatric

14  **medications are increasing or decreasing suicidal risk. Psychologists overruling medical**

15  doctors even in emergency situations and about discharging medically complex patients

16  from hospitals has had a steep cost in terms of bad outcomes.

17  ## Effect On The Office Of The Special Master's Analysis

18  The Office of the Special Master may be unaware of the degree to which poor outcomes

19  **and have occurred because psychologists in CDCR overrule psychiatric medical doctors**

20  even during emergency situations and discharges.

21  See pages 88 107 of this CDCR Mental Health System Report for details.

x

# CDCR Mental Health System Report

1

2 Suppose that in the California Department of Corrections, only 45% of Mental Health
3 patients were seen by psychiatrists as scheduled. Suppose that 80% of those 45% were
4 seen in a confidential office space. That would imply that just over a third of the total
5 were seen appropriately confidentially and as scheduled. That is, they *would* have been
6 being seen appropriately *if,* between appointments, consultation occurred in the event
7 that they had stopped taking their medicines (which would have been unlikely in reality
8 in the CDCR system) and *if* those patients who were seen as scheduled and confidentially
9 were also seen *on time.* In the existing CDCR system that happens for some patients but
10 not others.

11 A system in which a large majority of patients are not getting psychiatric care when
12 scheduled or otherwise when they need it, and which is not set up in such a way that
13 patients are brought to psychiatry appointments in confidential offices, but in which
14 instead, the psychiatrist is expected to search the prison yard looking for patients or
15 trying to communicate through a crack in the cell door and unable to look at the patient
16 while speaking loudly to be heard through the crack in the door, is by no means
17 conducive to good patient care. It might not be surprising to find high rates of
18 hospitalization and suicide in such a poorly designed and run system.

19 In systems in which there is a focus on actively identifying and correcting problems, even
20 serious problems can be fixed. Such systems can find ways of getting patients to
21 confidential psychiatric medical appointments and other needed mental health
22 appointments.

23 Making mistakes — even very serious mistakes — is part of the human condition. The
24 question is whether the system is designed and managed in such a way that mistakes can

1    be learned from and issues corrected, or not. What is required for a system to be error

2    correcting is that information be accessible to those who could make a difference, rather

3    **than restricting or denying access to the information needed to identify and correct**

4    problems. Systems that deny access to vital information to those who need it thereby

5    actively prevent problems being solved. Those who may make mistakes should not be the

6    **only ones to judge whether there has been an error.**


7    The tragic picture painted above is not just a hypothetical. In fact, it is the reality in the

8    **California Department of Corrections Mental Health system. Vital information has been**

9    monopolized and its access restricted to a select group of mainly psychologists at

10   headquarters. This group has created a biased and inaccurately positive picture of what is

11   **actually a troubled system of care. The** ▮▮▮▮▮▮▮▮▮ **of Mental Health of the**

12   California Department of Corrections have enforced this restriction of access to the

13   needed information. Those who most need to have access to this medical information are

14   **the medical leaders in mental health   the psychiatric physicians   and those who review**

15   our system of care. Yet the headquarters psychiatry leadership team and the Coleman

16   monitors and court have been denied access to this medical information. This has actively

17   **prevented the normal medical error correction that would have prevented the very**

18   serious problems we see in the field in CDCR.[ii]


19   I, Michael Golding, M.D., CDCR Statewide Chief Psychiatrist, will document how the

20   **attitude that information must be hidden away, controlled and interpreted by just a few**

21   has cost the CDCR system dearly by preventing adequate care for a large majority of

22   CDCR mental health patients. The needed error correction has not happened, because

23   **those few running the system are the only ones allowed to judge how things are going in**

24   the system.


25   Patients need psychiatric medical care, yet in CDCR the provision of psychiatric medical

26   **care is severely hindered by executive level decisions at headquarters and in the field. In**

12

1   CDCR, psychologists and social workers are deemed to be the "primary clinicians", and

2   despite their lack of medical training they very often ignore psychiatrists' medical

3   **judgement and sometimes override psychiatric physicians' medical orders.**

4   Moreover, as a matter of policy at CDCR, non medically trained psychologists are

5   **deemed to have independent medical privileges including admitting, discharging and**

6   ordering restraints. *Pro forma*, there was (until very recently – see page 105) supposed to

7   be consultation and agreement from the treatment team including the psychiatric

8   **physician, but frequently not only is there no consultation, non medically trained**

9   personnel make medical decisions that override psychiatric medical doctors' orders. This

10  is so ingrained and pervasive in the culture and policy of CDCR that few but the

11  **psychiatrists and other medical doctors appear to find it problematic.**

12  In most CDCR institutions, psychiatrists are supervised by non medically trained

13  **psychologists. Ostensibly, this supervision is administrative. However, in fact it is clinical**

14  too. Psychologists and their administrative supervisors control medical information and

15  prevent it from getting to psychiatric physicians who need it to make medical decisions.

16  **They also make determinations about what is or is not a medical issue, and sometimes**

17  just boldly overrule physicians' orders, typically behaving as the clinical supervisors of

18  psychiatrists in most CDCR institutions. Our attempts to have psychiatrists report

19  **clinically through a psychiatry chain have been stymied. In these circumstances, non**

20  medically trained personnel decide what is a medical issue and consult physicians only if

21  in their own judgement a medical decision needs to be made.

22  There are perhaps about 30 executive level psychologists in CDCR, a half dozen dental

23  executives, dozens of general medical executives, regional medical executives, and dozens

24  **of nursing executives, and corresponding numbers of administrative executives. Although**

25  there are nearly 250 civil servant and contract psychiatric physicians statewide in the

26  system (more than the number of dentists and only 60 fewer than the approximately 310

1  general physicians and contractors), there is not a single psychiatry executive in all of the

2  California Department of Corrections (CDCR).

3  Those making the executive level decisions about mental health issues in the California

4  Department of Corrections Mental Health Program    psychologists and non medical

5  **administrators    have no knowledge of psychiatric medicine, and they appear often**

6  unwilling to take into account the medical knowledge of those of us who work in the

7  department. Their decisions have adversely affected patient care.

8  Whether in terms of seeming to lengthen court mandated compliance timeframes for

9  patients, not accurately reporting about measurements of court ordered psychiatric drug

10  **monitoring, or not accurately reporting about whether scheduling, confidentiality of**

11  appointments and medication consultation is occurring, there appears to be significant

12  bias in how the results are reported. The psychiatric leadership team is being denied

13  **access to this information we need to create good patient care. On the other hand, the**

14  leadership of the psychologists, mental health administrators, general medical physicians,

15  dentists, nurses, and medical administrators all have access to this information. Denying

16  **our psychiatric physicians access to this medical information about our patients is itself a**

17  medical decision, and it is being made by those with no qualification to make such

18  decisions and by those with an apparent propensity to report biased interpretations of the

19  **data to the court, the Coleman Special Master, and our psychologists and psychiatrists.**

20  **Lengthening EOP and CCC Timelines Beyond Court-Mandated Timelines**

21  If a psychiatric medical doctor writes a medical order that a given patient should have a

22  follow up appointment with a psychiatrist in a certain number of days, the CDCR medical

23  **system *should* follow the doctor's order that the patient be seen again in that number of**

24  days. Should, but doesn't. When a patient is transferred from one institution to another

25  within the CDCR system, any order for a follow up appointment with a psychiatric

14

1    medical doctor in a given number of days is automatically overridden without any
2    consultation with any medical doctor. That is how the system is designed.

3    Imagine a patient at what is called the CCC level of care, our lowest level of intensity of
4    mental health care. Assume the doctor has scheduled a follow up appointment with the
5    **patient for, say, seven days later, because the patient needs to get blood drawn and the**
6    doctor needs to review the lab test results. Suppose that the patient is then transferred to
7    a different location five days later. Were the doctor's order being followed, the patient
8    **would be being seen by a psychiatrist two days after arrival at the new institution.**
9    Nonetheless it is typical in the CDCR system for the admitting non medically trained
10   psychologist to override such a doctor's order and instead schedule the patient to see a
11   **psychiatrist 90 days later, the court ordered *maximum* interval between appointments for**
12   patients at this level of care.

13   When a psychologist overrides a physician's order, he or she is, in effect, determining
14   **from his or her own assessment, whether a patient needs medical consultation or not, for**
15   a given set of lab values and a given physical and psychological presentation. But that is
16   precisely beyond the scope of psychologists, since knowing what is a relevant medical
17   **issue is something determined by physicians.**[iii]

18   A given lab value in the normal range (yet rising) might be nothing to worry about, or in
19   **some cases it can indicate very significant danger. For example, liver function studies**
20   could go up after starting valproic acid, and while still being in the normal range when
21   rechecked, they might nevertheless be headed rapidly higher, indicating pending hepatic
22   **failure from valproic acid toxicity. Just looking at whether a lab value is in the normal**
23   range or not is insufficient. When the lab test numbers go up a bit at first, it could be a
24   lab error, or not clinically significant, or it could be dangerous. Because the medication is
25   **needed the psychiatrist will not stop the medication without more information and so**
26   orders a new blood level test and schedules a follow up appointment for seven days later.

1    But when the transferred from one institution to another the patient will typically be

2    scheduled to be seen around 90 days later by the psychologist at the CCC level of care,

3    **effectively causing the patient to be evaluated 95 days later with such a rising lab value,**

4    rather than the seven days later that the physician had ordered.

5    Note that the lab itself would not necessarily notify anyone either, because a *dangerously*

6    *increasing* lab value **can be still *within the normal range* when checked.**

7    In fact, this practice (psychologists rescheduling patients to be seen by a psychiatrist later

8    **than the previous doctor who saw the patient had ordered) has been the norm for years,**

9    and appears not to have been reported to the court. When patients switch institutions

10   within CDCR, a psychologist makes the determination of when a patient should be next

11   seen by a psychiatric physician, **not the psychiatric physician who last assessed the**

12   patient and made an independent medical determination of when the next

13   medical/psychiatric assessment should occur.

14   Suppose a psychiatrist in the CDCR system writes a medical order that a patient be seen

15   next 90 days later, the maximum interval allowed by the court for a patient at the CCC

16   **level of care. Suppose that on day 80 the patient is transferred to a different CDCR**

17   institution. The CDCR system again typically overrides the doctor's medical order that

18   the patient be seen on day 90.

19   The doctor ordered the patient to be seen back in 90 days, which would be ten days after

20   the patient has been transferred to the different CDCR institution. Instead of the patient

21   **being seen ten days after transfer in accordance with the doctor's medical order, what**

22   typically happens in CDCR is that a psychologist at the new institution creates a new

23   order, overriding the medical order of the doctor at the previous institution. Just like as

24   **discussed with the rising lab value, the patient will typically be seen by a psychiatric**

1     *physician approximately 90 days after arrival at the new institution, irrespective of what*

2     *the psychiatric medical doctor who last saw the patient has ordered.*

3     This is about 80 days later than the psychiatrist's medical order had said the patient

4     should be seen (about six months after the patient was seen last), and it is also about 80

5     **days later than the court ordered maximum time between visits, a total of 170 days later.**[iii]

6     This lengthening of intervals between psychiatric appointments allows patients to be seen

7     by a psychiatrist up to 100% later than the maximum court ordered Program Guide

8     **intervals, though the quality managers consider such appointments to be compliant with**

9     the intervals allowed by the court (e.g., 90 days at the CCC level of care).

10     This same assumption allows patients at the more intensely monitored EOP level of care

11     **to be seen up to nearly 60 days after an appointment if the patient is transferred from one**

12     institution to another, rather than just 30 days after an appointment, the court ordered

13     maximum for this level of care.

14     Actually, it can be *more than 100% later.* If a CCC patient is transferred multiple times,

15     there might well be an interval of nine months between one psychiatrist appointment and

16     **another, yet despite that being six months more than the court mandated maximum**

17     interval, CDCR counts that appointment as being compliant. They reset the clock each

18     and every time a patient is transferred from one institution to another.

19     During a recent quality management meeting that reaffirmed this stance, the

20     psychologists present plus the ███████████████████ (a psychologist administrator) [iv]

21     **and the** ████████████████ **(an additional administrator) plus several other**

22     administrators and all the psychologists present and on the phone in that committee

23     meeting voted that it is fine to violate such medical orders, and indeed that it is fine to

24     **violate the court order in that way, too. There are approximately 26 members of the**

25     Quality Management Committee and approximately 17 of whom are psychologists who

1    report in a hierarchical relationship to each other. There are only two psychiatrists on the

2    committee and both voted that physicians' medical orders should not be overridden. I

3    **asked the committee whether they thought the court monitor, Dr. Jeff Metzner, would**

4    agree with countermanding physicians' medical orders and the court order in that way.

5    They laughed and said, "No".


6    I will show that this is part of a regular pattern in which executive administrators and

7    executive psychologists and quality management psychologists in CDCR appear to

8    **discount expert medical opinion and make decisions allowing, and even mandating, non**

9    medically trained individuals to override doctors' medical orders.


10   Please see the two email exchanges for patient ⬛⬛⬛ (see 2018 07 27 1634hrs). In this

11   **case, a patient was transferred to another institution and if the psychiatrist's order had**

12   been followed rather than the psychologist's order overriding the psychiatrist's order, a

13   psychiatrist would have seen the patient before the incident in which the inmate patient

14   **attacked another inmate and seriously injured his eye.**


15   Although this patient apparently had a psychotic illness, he was refusing the medication

16   **he needed all along at the initial intake institution. It is possible that after transfer to the**

17   new institution, a psychiatrist might well have been able to convince the patient to take

18   the medicine, or perhaps would have noticed enough paranoia or other psychosis to get

19   **the patient to a crisis bed.**


20   Patients who have been taking medication outside prison, as this patient apparently was,

21   **sometimes have been doing so because of family or community support, or because they**

22   have been getting injections of long acting medications at a mental health center in their

23   community.

18

1    In this case, apparently a doctor at the jail had managed to get him to take the medicine.
2    When taking medication, a patient may well become coherent, and then, due to their
3    coherence, paradoxically gain the ability to refuse medication when they switch settings,
4    such as when they come to prison to serve a sentence. Medico legally, such patients have
5    demonstrated improved capacity to make decisions about medication taking.

6    Thus, paradoxically, as patients enter our prison system at an intake institution and lose
7    the community support that has been encouraging the medication taking, the very fact of
8    their coherence due to previous medication compliance enables them to successfully
9    argue to the admitting physician that they do not need the medication (or they have a
10   right to refuse it because of their apparent capacity, though the physician might very
11   much want the patient to take it).

12   A patient's apparent coherence, coupled with loss of information as patients transfer care
13   from outside prison to care in prison, makes these times particularly dangerous for
14   patients. Finally, the good effects of the medication often last for several months after the
15   medication has been discontinued, so *the patient in fact does well off (without) medication*
16   for months, seeming to add to the argument that the medication was actually not needed.

17   It is at these times when patients are transferred from our intake institutions to other
18   institutions that our patients are most at risk. Yet our psychologists and administrators
19   voted that even in these situations, the admitting psychologist may override the medical
20   opinion of the physician at the intake institution with respect to when the patient should
21   be seen next after he or she transfers institutions.

22   In this case of patient ▮▮▮▮, a psychologist overruled the doctor's order and ordered that
23   the patient be seen later than the doctor had ordered, so the patient was not seen when
24   the psychiatric medical doctor had ordered.

19

1  In the case mentioned here (see 2018 07 27 1634hrs) the ██████████████ at SATF,

2  unaware of many of our executive leadership's views and our two ██████████████' views

3  **that psychologists should typically override physicians' medical orders with respect to**

4  when patients should be seen after patients transfer institutions, wrote:

5  "Hello Everyone,

6  This patient has not been seen since his arrival in May (2018) by one of our psychiatrists?

7  He has had a major incident that could be related to psychosis    he is currently not on an

8  **antipsychotic. Why was the patient not seen?"**

9  I had to explain to him that, "As I suspected, this patient according to the interpretation

10  **of a quality management (QM) committee vote, did not need to be seen sooner." (see**

11  2018 07 27 1634hrs)

12  The psychologist ordered a psychiatric appointment for the patient nearly three months

13  **after his arrival in May, which would be some time in August, which had not yet passed. I**

14  had to explain to this ██████████████ that our psychiatrists want every patient who is

15  transferred from one institution to another to be assessed by a psychiatrist within 14 days

16  **of transfer (and ideally it should be within a week), but that during the quality**

17  management meeting our ██████████████ had said in front of the quality

18  management committee that that would negatively impact the workload of the

19  **psychiatrists and so would be an issue to be reported to labor (i.e., the union). She**

20  subsequently voted that CDCR should not follow physicians' orders for when patients

21  should be seen next.

1    Had the last physician's order been followed, patient ▮▮▮ would have been seen long

2    before the dangerous event (see 2018 07 30 0925hrs). But instead, a psychologist's order

3    **was followed, overriding the doctor's order.**


4    As Dr. ▮▮▮▮▮▮▮▮ says, "*if the psychiatrist's order had been followed* to see the

5    **psychotic patient, who was relatively recently off medications, the patient *would have***

6    *required an appointment by 6/24/18, about a month after transferring to SATF*" [emphasis

7    mine, MG] (and well before the incident on July 26, 2018) which itself was before the

8    **August meeting in which our non medical psychologists and executive voted that this**

9    type of patient be seen later than the psychiatrist (i.e., medical doctor) may have ordered.


10    Patient ▮▮▮ arrived at SATF on 5/29/18. Had this patient been seen within 14 days, that

11    **would have been before the middle of June. Had this patient been seen when the**

12    psychiatrist had ordered, that would have been in late June. Instead, the psychologist

13    ordered that the patient be seen in August. This August appointment violated both the

14    **psychiatrist's medical order, and also the maximum interval between appointments**

15    allowed by the court ordered mandate.


16    Dr. ▮▮▮▮▮ says, "His history.... suggest[s] a patient who requires more frequent

17    **psychiatric intervention. Also concerning is the discontinuation of Zyprexa without**

18    regular follow ups to evaluate for decompensation. He was seen by psychiatry on 3/29/18,

19    4/25/18, and 7/27/18." Only after the incident in which the patient injured another

20    **patient's eye was a psychiatrist called to see the patient on 7/27/18. (see 2018 07 30**

21    1002hrs)


22    The records made available to the Coleman court appear to me and my team to

23    **consistently overestimate our compliance with court ordered timelines for just about**

24    every mental health patient who transfers institutions. One hundred and seventy days is

25    not 90 days. Therefore, the so called "timeliness" measure of psychiatric appointments

1   overall has overstated our compliance. Furthermore, our leadership knows about this, as

2   the HQ psychiatry team has informed them.


3   This overstating of our compliance has not only occurred on the Dashboard (CDCR's self

4   monitoring tool). Compliance figures given to the Special Master, and apparently directly

5   to the court, appear to have overstated CDCR compliance in the 2018 staffing plan figures

6   (see 2018 08 23) and in the 2017 figures (see 2017 03 30).


7   The 2018 data (see 2018 08 23) says that routine CCCMS mainline patients are seen in a

8   94% "timely" way. "Timely" is not defined in this court report. If we use the percent

9   patient weeks compliant meaning of the word that our Quality Managers routinely use,

10  then "94%" refers to "94% patient weeks compliant" with routine CCCMS appointments.

11  For the 2017 (not 2018) report (case 2:90 cv 00520 KJM DB Document 5591, beginning on

12  line 4 of page 14 of 18) it says (see 2017 03 30 5591 14): "Over the past year, inmates were

13  seen timely by their primary clinician ninety percent of the time, by their psychiatrist

14  ninety percent of the time..."


15  Two of the █████████████ voted for continuing this practice of resetting the

16  appointment due date clock every time a patient is transferred from one CDCR institution

17  to another, and the other █████████████ knows about the vote and allowed it to stand (I

18  myself told her about it).


19  Our quality managers reset the clock for both of these levels of care when patients

20  transfer institutions. The 2017 staffing report combines CCC appointments and EOP

21  appointments. Thus, a patient who has been transferred from one institution to another

22  and only once, might well not have an appointment with a psychiatric medical doctor for

23  six months at the CCC level of care, and yet CDCR would report that as being a compliant

24  appointment having occurred within ninety days. Similarly, again for a patient who is

25  transferred just once at the EOP level of care, CDCR resets the clock and thus reports an

22

1  appointment happening up to two months after the patient saw a psychiatrist at the first
2  institution as being compliant with the one month court ordered maximum interval.

3  This resetting of the clock every time a patient is transferred thus misleadingly inflates
4  the compliance figures, such that it is not true that 94% of CCC appointments were
5  timely in 2018 as stated in the 2018 report (see 2018 08 23) and neither is it true that 90%
6  of CCC and EOP appointments were timely in 2017 as stated in the 2017 report (see 2017
7  03 30) to the court.

8  But CDCR does not only reset the clock every time a patient is transferred to a different
9  institution and report as compliant appointment intervals beyond the court ordered
10  maximum intervals, they also have in the recent past lengthened the maximum interval
11  they allow between appointments for patients remaining in one institution.

12  **Lengthening EOP Timelines by 50% More than Court-Ordered Maximums (even**
13  **with no transfer of institutions).**

14  The EOP level of care for mentally ill patients in our prisons is a more intense outpatient
15  level of care for those with more severe mental illness. For example, many patients with
16  schizophrenia are at the EOP level of care, not the CCC level, as are those who are more
17  frequently suicidal. As stated, the court mandates that EOP patients be seen at least every
18  month by a psychiatrist.

19  Around March and April of 2017, our headquarters psychiatry team noticed that all the
20  psychiatrists across the institutions seemed to be doing better in terms of seeing EOP
21  patients in a more timely way. (The difference between seeing patients "on time" and
22  "timely" is itself a fascinating story which I describe below.)

1    We discovered that in December 2016, our psychology QM colleagues had decided to
2    change what they would deem to be a compliant interval between appointments from the
3    court ordered one month maximum interval, to up to 45 days, without telling the
4    psychiatry leadership team or, it seems, the court. That made the psychiatrists' EOP
5    timeliness with appointments appear much more compliant than before. But it was just a
6    difference in the way the calculation was made.

7    It took the psychiatric leadership team from about December 2016 to March 2017 to figure
8    out what our executive psychologist/QM team had done or had allowed to be done. We
9    had to painstakingly look at chart after chart to discover how the reported information
10   had been changed, attempting to establish, first, if something had in fact changed, and if
11   so, how it had changed, and the implications of the change. We needed to understand
12   how the new methodology changed the medical interpretation of the compliance rates we
13   saw. Being "compliant", after the change, no longer meant the same thing it had meant
14   before the change. Please see the note from Dr. ███████ describing the full implications
15   of her and our discovery. (see 2017 04 12 1316hrs)

16   It is interesting that our QM executive and psychologists seem to have overshot the mark
17   that even they were trying to achieve. Instead of deeming appointments to be compliant
18   at one and a half months (rather than the court mandated one month), they actually
19   managed to make certain types of the EOP appointment show as being compliant even at
20   nearly two months   nearly twice the maximum interval permitted by the court   if the
21   appointments were scheduled at particular times of the month. Dr. ███████ shows how
22   an EOP patient could be seen twice in nearly four months and how our QM colleagues
23   reported that as compliant with EOP monthly time frames in which a minimum of four
24   (not two) appointments should have occurred (see 2017 04 12 1316hrs).

25   When we asked, the executive psychologist head of QM admitted that she had not told
26   the court. Her reasoning can be seen in her email from the end of March 2017 in which

1    she says, "No we don't tell them about every change. Since they use our numbers I do let

2    them know when we make a major change that has significant impact." (see 2017 03 22 x)

3    Apparently, our head of QM genuinely thought that changing an EOP time frame from

4    one month to 45 days would not have a significant impact; that is, she must have thought

5    **that increasing allowable appointment intervals to 50% more than the maximum interval**

6    permitted by the court, across a system with thousands of patients, would have no

7    significant impact on data reported to our physician psychiatrists and the courts.

8    This practice of unilaterally deciding that 45 days is the same as the court's mandated one

9    month went on from December 2016 until at least April 2017, when we discovered it and

10   **demanded that they change it back. I told our senior executive about it. Finally, I wrote a**

11   private message to her, letting her know that this was truly problematic. In fact it was

12   changed back because of this insistence.

13   Note again from CDCR's 2017 staffing report (see 2017 03 30) the column called "Timely

14   Psychiatry Contacts: (Access to Care Banner) 8/1/2016 1/31/2017". As discussed previously,

15   **these figures are very likely mistaken because they allow appointments to occur at greater**

16   intervals than Program Guide timeframes when patients transfer institutions. (Note also

17   that the figures lump together CCC and EOP. EOP timelines were included in these

18   **figures. I will explain why this is relevant later.)**

19   Given that the EOP calculation strategy was changed in December 2016 to allow

20   **appointment frequencies beyond the court ordered maximum one month interval (to 45**

21   60 days), it is very likely that the EOP appointments for December and January were

22   measured as compliant at from 45 days to 60 days, rather than the court mandated one

23   **month, and that they were reported as compliant to the court. The compliance timeframe**

24   was increased even if the patient was not transferred from one institution to another.

1    It is quite possible that the change made in December was retroactive for many months,

2    as many of these changes are, so it is entirely possible that all the EOP timeframes

3    (8/1/2016 1/31/2017) had been increased (not just 12/1/2016 01/31/2017) from the court

4    ordered maximum of one month, up to 1½ to two months. Thus, the numbers reported to

5    the court in 2017 are apparently mistaken for this reason as well. Someone should

6    carefully ask whether EOP timeframes were increased even for patients not being

7    transferred between institutions.

8    **Summary So Far**

9    I have now mentioned that in CDCR's reports to the court the percent patient weeks

10   compliance numbers appear better than the reality

11   1.   **Because our quality management colleagues reset the clock when patients transfer**

12        **institutions, so the allowable time increased up to 100% over the court ordered**

13        **maximum intervals between psychiatry appointments.**

14   2.   **And for the EOP calculation strategy, even for patients remaining in a single**

15        **institution, CDCR Mental Health QM allowed a 50% (in certain cases up to 100%)**

16        increase in timeframes they reported as being compliant for EOP patients, until the

17        **psychiatry team managed to get this change reversed later in the year.**

18   **Combining CCC And EOP Compliance Figures To Mask Poor EOP Compliance**

19   Note something else about the compliance timeframes (see 2017 03 30). Those reporting

20   to the court combined CCC and EOP patients. That is relevant because usually EOP

21   **patients are much more difficult to see in a timely way,** and CCC patients are far more

22   numerous, so the relative success with the CCC patients masks the relative lack of success

23   with the EOP patients when they are numerically combined. (See for example 2018 09 04

24   1830hrs.) Overall, for CDCR in June 2018, EOP "percent patient weeks compliance" with

26

1  timely appointments was reported to be only 83% (vs. 95% for CCC), while at CHCF, EOP

2  compliance was reported to be only 78% (vs. 85% for CCC). Combining the two thus

3  **serves to obscure the poor EOP compliance.**

4  Please also note both pages of document 2018 07 26 1053hrs. Notice that CDCR Quality

5  **Managers eliminated a simple filter option which allowed one to distinguish for**

6  **institutions between "Timely Psychiatry Contacts" between CCC and EOP. It used to be**

7  there, but sometime around May or June of 2018 (we are not sure when), this option was

8  **eliminated. So when evaluating institutional timeliness at the CCC and EOP levels of care,**

9  the report returns one timely indicator for CCC and EOP combined, the usually lower

10  EOP numbers masked by the higher CCC numbers.

11  Someone without computer skills looking for information about timeliness of EOP and

12  CCC psychiatry appointments and consults in individual institutions in 2018 would have

13  **difficulty finding such information, because CDCR did not report individual timeliness**

14  figures. Someone should ask why that filter disambiguating the timeliness of EOP and

15  CCC at institutions was removed. The question is especially relevant given that 2018 EOP

16  **timeliness figures are for unknown reasons just not reported in the CDCR staffing report,**

17  at all. Coleman monitors might have wished to directly check the Dashboard numbers to

18  see which institutions were reporting timely EOP contacts, but would have been thwarted

19  **because the filter was removed. Someone should ask why that useful filter was hidden.**

20  If one takes into account the biases already discussed, the EOP figures (2017 03 30),

21  **would likely be significantly lower.**

27

1    **More Medically-Urgent Appointments Not Counted As Being Late**

2    Finally, there is a third biasing error: CDCR won't count any appointments as being late,

3    if they are

4        1.  more medically urgent,

5    so

6        2.  scheduled more frequently than existing Program Guide timeframes to provide

7            adequate care.

8    When such an appointment is missed, as long the next appointment occurs within the

9    *maximum* Program Guide interval, the missed appointment isn't counted as missed or

10   late (see discussion of this later in this document).

11   **Misleadingly Good Numbers**

12   Utilizing

13       the reset the clock bias when transferring patients between institutions, plus

14       **the increase the EOP time frame to 45 days bias (in 2017), plus**

15       the more frequent than program guide appointment can't be late bias, plus

16       **the counting appointments that were not appointments bias (discussed later), and plus**

17       the combining more compliant and more numerous CCC patients with EOP

18   **appointments bias (in 2018), while**

19       eliminating altogether the EOP's measurement of lateness in the 2018 staffing report,

20   made the data appear reasonably good in 2017 (see 2017 03 30), and in the 2018 staffing

21   **report (see 2018 08 23). But the figures as reported are simply incorrect.**

1   The psychiatric leadership team could calculate precisely what the accurate figures would

2   be if we had access to the database, but our requests for access have been denied.[v]

3   As mentioned, there is no report of EOP timeliness in the 2018 staffing report to the

4   court, while we know that EOP "timeliness", as reported on the Dashboard but not to the

5   court, is both lower than the CCC value and itself biased for the reasons given above.

6   **The Implications For Psychiatry Staffing**

7   Whether patients are seen on time at the EOP level of care is relevant to determine

8   whether there is adequacy of psychiatric staffing. Alternatively, getting patients

9   successfully moved from their cell to the offices of psychiatrists to be seen, would also

10  enable timely contacts, even with no increase in staffing numbers.

11  If one examines the current Dashboard to try to understand the EOP timeliness, and if

12  the biases mentioned above were eliminated[vi], the 83% EOP *Dashboard* report (not

13  staffing report) for 2018 psychiatric appointment timeliness would be far lower than the

14  83% reported. For example, in June 2018 (see 2018 09 04 1830hrs), EOP timeliness was

15  reported as being 83%. The real figure would be far lower were the biases listed above

16  eliminated.

17  Low compliance figures would demonstrate either inadequate staffing or inadequate

18  organization such that patients are not being brought to their psychiatry appointments as

19  scheduled, on time and in confidential offices.

29

1   **Medication Monitoring Biases (also reported to court)**

2   Appropriate psychiatric care includes monitoring psychiatric medications, including

3   **checking patients' medication blood levels as appropriate, and measuring the potentially**

4   adverse effects of medications on organ function. The court has mandated a MAPIP

5   protocol that includes keeping track of these measurements in a particular way.

6   My HQ psychiatry team and I have concerns about how CDCR was reporting our

7   compliance with the MAPIP lab reporting metrics. We have raised these concerns with

8   **our HQ administrators (see 2018 01 16 1409hrs). These metrics report whether**

9   appropriate labs have been drawn and whether various physiological parameters (e.g.,

10  weight and blood pressure) are being obtained, so as to safely utilize medication. Before

11  July 2018, the patients appeared to be doing better than we might have expected. If CDCR

12  were reporting accurately the measuring of lab values for patients on psychotropic

13  medications, we would expect the reported compliance to be lower than it was.

14  Ultimately, we found that only those patients who had been on the same class of

15  medication for the last year were considered for inclusion in the compliance measure.

16  **And then, even if only one measurement was made in the year, as opposed to the**

17  multiple measurements actually required, CDCR Mental Health deemed that to be

18  compliant with MAPIP requirements.

19  Patients who had switched medication classes (and thus required multiple

20  measurements) were excluded from the analysis before June 2018. Those switching

21  **medication classes are precisely those most at risk of having problems with medications**

22  they are taking and so are precisely those patients who need the monitoring more.

1  Those patients who switch medications are more at risk because the explanation for the

2  switch is often that the medication was causing a side effect (so might not be at the right

3  level) or possibly the patient was not taking it or not taking it appropriately. In addition,

4  more medication switching may create more risk of toxicity because each drug class has

5  its own set of risks.

6  I have no doubt that programming at least one of the MAPIP recordings was difficult. For

7  example, measuring whether physicians checked a blood level when medication doses

8  were changed. Indeed, we are not measuring that at present because of that genuine

9  difficulty.

10  I also have no doubt that it can be very reasonable to start with something easy, so that

11  compliance can be easily achieved before moving on to something more difficult. For

12  example, as I show below, in effect, the original MAPIP measurements were considered to

13  be compliant if the physician had drawn only a single measurement in the year after the

14  medication was started.

15  For the patient to be included in the analysis, CDCR deemed that the physician *needed to*

16  *have a full 12 months* to obtain a single blood draw for analysis. (see 2018 07 03 m) If there

17  was not a full year in which to get the one blood draw done, because the medication was

18  changed to another one during in the year, then that patient's data was excluded in the

19  calculation of whether there was lab test compliance was with respect to either drug. So

20  those who needed the measurement most, and who were least likely to have the

21  measurement done, were not included in the MAPIP calculations.

22  By excluding all of these somewhat more difficult to make measurements because there

23  had been less than a full year in which to do the blood test, very high compliance rates

24  could be recorded, as reported to the court [case 2:90 cv 00520 KJM DB Document 5591

25  page 14 of 18, beginning line 7]. (see 2017 03 30 5591 14)

31

1    We appear to have been failing to report straightforwardly to the court for years that we

2    were not measuring compliance with any of the laboratory drug monitoring MAPIP

3    criteria in the case of patients statistically most likely to need it.

4    Note that from the Defendants' Response to the Special Master's Report on the Status of

5    Mental Health Staffing and the implementation of Defendants' staffing plan, from March

6    30, 2017, [case 2:90 cv 00520 KJM DB Document 5591 pg 14 of 18, beginning line 7], the

7    following:

8        To ensure medication monitoring for its patients, CDCR uses a detailed

9        monitoring tool titled "Medication Administration Process Improvement Process."

10       This tool facilitates necessary and appropriate systemic monitoring of medication

11       management, including blood levels, for the following types of medications: (1)

12       Antipsychotics; (2) Clozapine, (3) Mood Stabilizers, including Carbamazepine,

13       Depakote, and Lithium; and (4) Antidepressants. CDCR clinicians generally

14       maintain high levels of compliance, with most institutions achieving compliance

15       above the ninety fifth percentile. (Tebrock Decl. 11, Exh. 1.) CDCR's systemic,

16       statewide compliance with its medication administration measures totals ninety

17       six percent over the past twelve months.

18    In terms of using a "detailed monitoring tool" that facilitates "necessary and appropriate

19    monitoring" of medications and that "compliance with its medication administration

20    measures totals ninety six percent", it seems that this "detailed" analysis included only

21    one of the four court required blood draws, as specified earlier.

22    For many of the medications, CDCR already utilizes a lenient standard, requiring just four

23    blood draws due to difficulties in the prison population in getting compliant blood draws.

24    For example, the National Health Service of Britain suggests weekly monitoring of lithium

25    blood levels (see 2018 08 28) when a patient is being started on the medication. For

1   lithium and many other drugs, CDCR and MAPIP just require a baseline blood
2   measurement, a measurement at three months, a measurement when the dose is
3   changed, and an annual measurement ("annual" in CDCR means between three months
4   and 12 months)).

5   There is a caveat about MAPIP in small print on the exhibit provided by CDCR (see 2017
6   03 30) which says: "Percentages in this column represent the average compliance for
7   MAPIP Measures 1A 1G. These measures do not capture MAPIP Measure 1A 1G that are
8   baseline, 3 months or triggered by medication dose change."

9   For "1A 1G", each letter refers to different drugs. This statement in smaller print at the
10   bottom of the page seems to be saying that for the drugs for which the measurements
11   were recorded, of the four required MAPIP blood draw measurements when a medication
12   is started, three of the four are not included in the compliance reports. They did not
13   include the "baseline requirement", the "3 month" requirement, or the requirement for
14   checking blood draws when "triggered by medication dose change".

15   But even with these caveats it's still not right.

16   The annual measurement is the fourth measurement. It is *defined* in the MAPIP protocols
17   as a measurement that occurs 91 days to 365 days after the start date (for example see
18   2018 09 04 1700hrs). Actually, before 2018, it was defined as anytime in the year after
19   starting the medication. (see 2018 07 03 m) After reading the above caveat, it is the only
20   measurement left to enable any of the compliance calculations to be made in the table
21   presented, because the caveat eliminates the other three mandatory blood draws in this
22   "detailed monitoring tool". But actually, that measurement wasn't being followed either,
23   as explained below.

33

1    Does the fact that CDCR is not doing and reporting most of the required measurements

2    explain how CDCR overall reports such high compliance numbers in the table? Does that

3    explain the reported, "high levels of compliance, with most institutions achieving

4    compliance above the ninety fifth percentile"?

5    Not fully.

6    What is not even hinted at in the report to the court is that in addition to skipping

7    measurements of three of the four required blood draws in all of the patients, some of the

8    patient data was eliminated entirely from the reported analysis, namely, that of patients

9    who were not on a given medication for an entire year. Those who were not on a

10   medication for an entire year are precisely those who are less likely to have had even one

11   measurement done, because there was less time in which to get the blood drawn.

12   By screening out eligible patients who did not have the very highest likelihood of having

13   just a single correct measurement done (out of multiple needed), and thus only in fact

14   including in the analysis a small proportion of the population that should have been

15   included, CDCR reported "detailed monitoring" and "high levels of compliance, with most

16   institutions achieving compliance above the ninety fifth percentile".

17   The MAPIP calculations have subsequently been updated and released this July 2018 to

18   somewhat more accurately reflect the actual court ordered MAPIP rules, although the

19   rules CDCR is following are still more lenient than the court rules.

20   This change in reporting has made a dramatic difference. Since the change, virtually all

21   the court ordered blood measures (including drug monitoring for antipsychotics, valproic

22   acid, lithium, and carbamazepine) have turned "non compliant" (all red, most below 75%)

34

1  statewide. Though we were utterly non compliant, the reports to the court in previous
2  years were that we were virtually completely green (above 90%).

3  Moreover, the court needs to still be aware that we are not actually measuring
4  compliance in accordance with important parts of the MAPIP criteria. For example, when
5  we change the dose of a given drug, new drug levels and new blood measurements to
6  check for organ toxicity need to be made.

7  The MAPIP blood measurements are still not being made in one important way. We
8  encourage our psychiatrists to do what is right and good. But we are not yet measuring
9  whether psychiatrists are getting blood drawn when doses of medications are being
10 changed that require a blood draw, even now, though that is a critical part of MAPIP. So
11 whatever low level of compliance we are reporting now, our actual compliance with court
12 mandated MAPIP measurements is even lower.

13 Unfortunately, errors in reporting whether appointments are timely and whether drug
14 monitoring has occurred are not the only errors CDCR has made which seem to create
15 bias in terms of over reporting compliance. There are significant problems with the
16 Dashboard as well.

17 **Missed Scheduled Appointments**

18 Our quality management psychology team has provided an easy way of discerning
19 whether appointments at given levels of care, across levels of care, at a given institution,
20 or across institutions, are on average being seen as scheduled.

21 Please see the Appointments Seen as Scheduled report about CHCF (see CHCF 2018 07
22 ASAS). This report describes mainline CCC patients scheduled to be seen in the mental

1    health program by psychologists, psychiatrists, and other mental health providers. The

2    claim, as written in the report, can be seen below (CHCF 2018 07 ASAS)

3    **Denominator = *All scheduled appointments* [emphasis mine, MG]**

4    Numerator = All appointments from the denominator that were completed as seen.


5    The quality management psychology team (or those who direct them) would seem to be

6    claiming, based on what they are reporting and saying, that their report is calculating the

7    **percentage of "all scheduled appointments" that are seen at the entered level of care and**

8    **location. In the case illustrated (CHCF 2018 07 ASAS) it would appear that 98% of all**

9    scheduled mainline ("ML") CCC appointments were seen as scheduled at CHCF in

10   **February. That sounds pretty good.**


11   Indeed, this is what our colleagues think when I have asked them to look at the report.

12   **What should they think? That is what the report and all similar ones about different**

13   **institutions and contexts say is being measured.**


14   The report from SAC about February 2018 says that 91% of patients came to their

15   **appointments as scheduled. (see 2018 07 30 2057hrs).**


16   There is a different way of getting the information, from which one can try to calculate

17   **the same statistic. However, it requires exporting into an Excel spreadsheet the**

18   **information about each and every individual patient appointment that occurred that**

19   matches the search criteria, then checking whether the appointment is marked as having

20   **occurred as scheduled or not, grouping all those appointments (conceptually) together in**

21   **terms of which are alike and different, and then calculating what percentage of the total**

22   number of appointments the grouped appointments comprise.


36

1   Dr. ███████ writes: "There is a report called "Appointments" that allows for searching a
2   specific institution (or all of CDCR), program, date range, and appointment type, and
3   getting a list of all appointments that meet the search criteria. For example, I searched
4   CDCR, MI, CCCMS, psychiatrist contacts on 7/10/18 with all outcome types, and received
5   a table with 955 rows (954 patient appointments). I then changed the outcome type to
6   "cancelled", "refused", or "pending" (all of the outcome types except "completed"), and
7   received a table with 461 patient appointments. So on 7/10/18 in all of CDCR, the
8   percentage of scheduled psychiatry appointments that were missed was 48%, or to put it
9   in performance report terms, the percentage of Appointments seen as scheduled was 52%.
10  This doesn't include the appointments that were just rescheduled by schedulers without
11  marking them as cancelled, but there's no way to track that. However, this is definitely
12  not a quick or easy way to obtain appointment data." (see 2018 08 13 1450hrs)

13  Dr. ███████ is describing how she got a report about the percentage of psychiatry
14  appointments that had occurred (not including other mental health providers) for all
15  CCC appointments in CDCR on 7/10/18, by importing each individual appointment that
16  had occurred into an Excel spreadsheet and then making a calculation.

17  Unlike using the Appointments Seen as Scheduled Report (that is easy to use), it is
18  unlikely that Coleman monitors, Chief Psychiatrists, CEOs, etc. will be checking too
19  frequently (or at all) for whether appointments were seen as scheduled in their institution
20  using the methodology that involves exporting appointments into several thousand page
21  Excel spreadsheets, as Dr. ███████ describes.

22  But our team did. Using this complex non "quick or easy way to obtain appointment
23  data" for SAC for mainline CCC for all providers (for example psychiatrists, psychologists,
24  etc.) in February 2018, we found that only 22% of appointments were seen as scheduled.
25  For the first page of hundreds of pages of Excel Spread Sheet printed out, see page 3 of
26  2018 08 22 0900hrs. But the Dashboard report (see page 2 of 2018 08 22 0900hrs) claim

1  was that 87% of "All Scheduled Appointments" were seen as scheduled in February of

2  2018 at SAC mainline CCC.


3  Clearly, 87% is not 22% at SAC (for all mental health providers at the CCC mainline level

4  of care in February). The psychiatry team suspects that the 22% figure is the more

5  accurate one, though the 87% figure is presented on the Dashboard, because the 22%

6  figure was calculated from a table with hundreds of rows, actually listing *all* of the

7  scheduled appointments, which we could count one by one, to see which scheduled

8  appointment were marked as completed or not.


9  One can do the same type of calculation for all of CDCR Mental Health CCC mainline

10  appointments statewide, not just for SAC. The CDCR Dashboard report claims that 95%

11  of all scheduled mental health appointments at the CCC mainline level of care, for all

12  provider types, were seen as scheduled in February (see page 1 of 2018 08 22 0900hrs).

13  But we looked at each appointment that occurred individually as well. The full analysis

14  for this would be too large to physically attach to this document, as it would require an

15  attachment of many hundreds of pages to list all 84,120 appointments. But this list could

16  be provided if there were an interest. Our team could download this list into an Excel

17  Spreadsheet to make the calculations. (For the first page of our Excel download, see page

18  4 of 2018 08 22 0900hrs.)


19  Whereas at SAC, 22% of patients were coming to appointments for social workers,

20  psychologists, psychiatrists, etc., statewide it appears CDCR (for all institutions) was

21  doing better, with 42% of appointments being seen as scheduled for all mental health

22  providers at the CCC level of care (35,642 appointments seen out of 84,120 total

23  appointments). But the Dashboard calculation is that 95% of patients are being seen as

24  scheduled statewide at the CCC level of care.


38

1  Ninety five percent is very different from 42% for all providers statewide at the CCC level

2  of care. Furthermore, the 42% seems to be more accurate, though the 95% figure is the

3  one published on the Dashboard.

4  These reports of scheduled appointments that are completed seem to report greater

5  compliance than is in fact the case. These inaccurate reports are easily accessible to the

6  Coleman monitors, our psychologists, our Chiefs of Mental Health and our psychiatrists,

7  to enable them to judge our scheduling system, and they appear to be grossly inaccurate.

8  Concerning the whole process, Dr. ████████ says:

9  "It is odd, and I don't understand why Appointments seen as scheduled is so high [using

10  the *Appointments Seen as Scheduled* report, MG]. When I drill down on Appointments

11  seen as scheduled, the only options it shows are Seen, ProviderUnavailable,

12  ModifiedProgram, and TechnicalDifficulties [I have attached a screenshot (see 2018 07

13  30 2057hrs)]. There are several other options to choose from when cancelling an

14  appointment [when one uses the EHRS system, MG], including IP (inmate patient) No

15  Showed, IP Refused, Scheduling Error, etc., so it appears they do not include any

16  appointments with those outcomes in the denominator. But that is so illogical I am

17  doubting myself." (see 2018 07 31 1346hrs)

18  So the overwhelming bulk of patients who do not come to appointments as scheduled

19  somehow don't count in a measure of patients who do not come to appointments seen as

20  scheduled. Those patients who would make the appointments seen as scheduled

21  percentage lower are not included in the measure, though the reports say "All Scheduled

22  Appointments". Those inmates who, for example, "refuse" or "no show" and in which

23  there are "scheduling errors", are somehow just eliminated in measurements of whether

24  scheduled appointments occur.

39

1   And even whether patients actually "refuse" or not to come to appointments is a very

2   complicated question, since we know that different prisons are considerably better or

3   **worse at getting patients to appointments. Some patients undoubtedly do refuse, but**

4   many don't, which is a separate but also a very interesting question worthy of exploration.

5   The report of the psychiatrist Dr. █████, whom I followed at SAC, is instructive (see

6   **2018 07 18 R). He documents what we heard as we spoke to patients and it certainly**

7   appears that at least several did not refuse, though they were documented as having

8   refused or moved to a different day (discussed below). So the data very likely over

9   **estimates patient refusals as well, even if included in this measure.**

10  But there are even more oddities in how the individual appointments are tabulated, even

11  **when we evaluated each and every appointment in a tabulated form.**

12  Dr. █████ says (see 2018 08 14 1340hrs): "Per Dr. █████ write up that you attached,

13  **he had 11 patients scheduled to be seen on 7/9/18   4 came and were seen, 6 did not come**

14  and were not seen, and I was out to court and was not seen. I have attached a screen shot

15  of the Appointments report for Dr. █████ on 7/9/18, which shows he only had 5

16  **scheduled appointments, 4 of which were seen.**

17  It appears that the scheduler[vii] moved the appointments that were not seen on 7/9/18 to

18  **the schedule for 7/10/18, instead of marking them as refused on 7/9/18 and rescheduling**

19  them. This is a huge problem for two reasons: 1) Those 6 appointments were NOT seen as

20  scheduled, so the Appointments seen as scheduled percentage should be 36% (4/11), but

21  **by erasing any record of them from the 7/9/18 schedule, the Appointments seen as**

22  scheduled reported percentage is, erroneously, 80% (4/5); and 2) Those 6 appointments

23  should have been marked as No Shows/Refusals, making the appointment refusal rate

24  **55%, but since there were just moved to a different day, the reported refusal rate is 0%."**

1   Schedulers should be labelling such appointments as "cancelled", "refused" or "no show",

2   but are instead simply moving the appointments to a later date in such a way that there is

3   no indication that there ever was an appointment on the original date. Thus, the

4   appointments occurring as scheduled figures even in our own calculation are

5   inaccurately high, because we have no way to identify cases in which appointments have

6   been moved to later dates without leaving a record of the original appointment dates.

7   Indeed, when I recently visited SAC in July 2018, Dr. ███ and I listened (and I was in

8   disbelief) when the psychiatrists told us about this process and indeed explained those

9   who make appointments for them had recently been retrained to move appointments

10  exactly as described above. Obviously, this type of thing also creates questionable reports

11  to the Coleman monitors and our leadership.

12  Dr. ████ continues (see 2018 08 15 1004hrs): "The only reasonable argument for

13  excluding some of the appointments from the denominator is that the system auto

14  cancels appointments when a patient has been moved to a different institution after their

15  appointment was scheduled but before their appointment occurred. If auto cancellations

16  are removed from the denominator, then the percentage of appointments seen as

17  scheduled becomes 46% [a 4% difference from 42%, for all mainline CCC in CDCR, MG].

18  However, as we previously discussed this figure does not account for all of the

19  appointments that should have been marked cancelled/refused/ no show but are simply

20  rescheduled to a different date [discussed above, MG]. If we were able to include those

21  cases, the appointments seen as scheduled would be even lower [than 46%, MG]."

22  So it would appear that removing auto cancellations when a patient has been moved to a

23  different institution can in no way explain differences like 95% vs. 46% of CCC patients

24  seen as scheduled and 87% vs. 22% of CCC patients seen as scheduled at SAC. Likely the

25  figure is less than 46% because some of these appointments (vs. many of them?) are not

26  being recorded when they don't occur and are just being moved, as documented above.

41

1  So perhaps at the CCC level of care, conservatively, 40-45% of patients are being seen as
2  scheduled.

3  Dr. ████████ analysis of scheduled appointments that are seen vs. not seen, suggests
4  significant problems with the data portrayed on the Quality Management Dashboard as
5  well as highly significant and relevant clinical issues in getting care to patients. For
6  example, 22% of scheduled appointments were completed as scheduled at SAC in
7  February 2018. There are significant problems, even if one doesn't take into account the
8  appointments that did not occur as scheduled but of which we have no record, because
9  they were simply moved.

10  Moving patients to be seen at later time of the day, let alone another day (without
11  recording that this occurred) is itself problematic. For example, at SAC, when the patient
12  wasn't seen for a scheduled appointment in the morning, during my recent visit there, it
13  meant that the patient was not going to be seen in an office that morning.

14  Instead, in the afternoon, the psychiatrist would be roaming the yard looking for the
15  patient. The earlier appointment in the office did not occur as scheduled, or should be
16  recorded in some way as having not occurred, even if not recorded as "not seen as
17  scheduled". Yet it isn't recorded. This is a problem because failing to see the patient in the
18  morning is adding to the inefficiency of the system, because psychiatrists have to
19  reschedule patients to later in the day and then search to physically find them.

20  This is so even if the psychiatrist is ultimately able to find the patient somewhere on the
21  yard or in his cell and sees the patient on the day that he or she was originally scheduled.
22  In the case of seeing patients after a second attempt on the same day, it is true that the
23  appointment that occurs is still timely relative to when it was scheduled to occur; but the
24  appointment is nonetheless time wasting for the psychiatrist, at the least.

42

1    Taking into account that appointments are being moved and not counted as being
2    rescheduled, optimistically, then, less than 46%   perhaps 40 45% of patients   were seen
3    as scheduled, although this itself could be a major overstatement. The degree of error
4    depends on how widespread the practice is of training schedulers to move appointments
5    to a different day without recording a problem, let alone moving patients to be seen on
6    the same day without recording that any problem occurred. The latter is very common.

7    Imagine a CEO, Court officer, Special Master, Chief of Mental Health, Chief Psychiatrist
8    or anyone else who is working within our system trying to evaluate the health of our
9    system in terms of its ability to get patients seen as scheduled. Overall for CDCR,
10   according to the Dashboard, 95% of mainline scheduled CCC patient appointments are
11   said to occur as scheduled. Let's imagine an average institution that itself has the same
12   Dashboard average as the statewide average, i.e., 95% of mainline CCC patient
13   appointments are said to be occurring as scheduled.

14   Most leaders and line staff in our Department of Corrections, would guess that all is well
15   at that institution for those patients. There certainly could be improvements. But 95% is
16   pretty good.

17   In general, with a Dashboard that looks like that, people would think (and no doubt in
18   reality do think because that is the figure the Dashboard gives) that mental health
19   patients are getting seen, assuming they are being scheduled correctly. If mentally ill
20   patients are being seen as long as they are scheduled to be seen, there appears to be
21   nothing much to fix, so that leads to a lack of action to solve the problem that actually
22   does exist, of patients not actually being seen when they need to be seen. If this goes on
23   for years, with appointments appearing to be happening appropriately in the vast
24   majority of cases despite the fact that in reality, patients are not being seen when they
25   need to be seen, nothing gets fixed for years in terms of trying to get patients to
26   scheduled appointments.

43

1    Suppose, however, that we now tell the CEO, Court, Special Master, Chiefs of Mental

2    Health, Deputy Directors, Coleman psychiatrists and psychologists, CDCR Chief

3    **Psychiatrists, and others interested in improving our system, that the actual percentage of**

4    appointments occurring when scheduled is 40-45% not 95%, at the CCC level of care at

5    this institution and statewide.

6    The 40% 45% figure does appear to be a lot closer to the truth than the 95% figure

7    reported by QM, given the reports we ourselves have run. Indeed, our QM psychologists

8    **are claiming a figure that is about 100% higher than what appears to be the case.** [viii]

9    Surely about 40% 45% of all of our patients being brought to their psychologists' and

10   **psychiatrists' CCC appointments is very different from 95% of appointments occurring as**

11   scheduled. With a figure of 40% 45%, large numbers of patients are not being evaluated

12   when the psychiatrists and psychologists think they should be, enormous work has to be

13   **done trying to find the patient cell side, fewer patients can be seen in the future because**

14   the patients who have not been seen need to be rescheduled, extra work is needed,

15   patients are not getting treated when they are supposed to be and thus get worse, etc.

16   For a psychiatric physician or psychologist to be seeing patients at a given frequency

17   means that the patient has to be scheduled to be seen at least at that frequency. If only

18   **40% 45% of scheduled appointments are occurring as scheduled, that means that the**

19   clinician has to waste enormous amounts of time blocking off time in his or her schedule

20   for appointments not occurring as scheduled, and this destroys his or her efficiency.

21   **Alternatively, if he or she schedules far more than the number that will be brought to try**

22   to fill his or her schedule, in addition to the waste in resources planning for eventualities

23   that don't occur as others try to get these patients ready, when patients happen to be

24   **brought as scheduled, then custody learns that mental health patient appointments will**

25   not be occurring as scheduled, because of the unpredictability in psychologists' and

26   physicians' schedules. Officers then become less willing to bring patients in the future,

44

1    because they end up having to wait because patients are not being seen when their
2    appointments were scheduled to occur.

3    As they adapt to the fact that only 40% 45% of appointments occur as scheduled, less
4    than 50% of the resources are provided to bring patients. Furthermore, since custody
5    never knows which patient will not be available, for example because they have
6    conflicting appointments, then custody may well bring the patients in batches, since they
7    can't count on any given individual patient being seen as scheduled. Indeed, bringing
8    patients in batches happens, for example at SAC, though there is a Receiver's memo
9    saying that it shouldn't, because it discourages patients from coming.

10   And when patients are brought in batches, a far higher percentage of them don't want to
11   come, because they have to wait around to go to their appointments and to return from
12   their appointments. So the refusal rates from patients then goes up. Thus, a vicious circle
13   of inefficient patient care is created.

14   Indeed, we will see that in many environments, for example in the SAC EOP program
15   described later, the whole system has adapted to appointments not occurring as
16   scheduled, ensuring that it won't change without major effort. CDCR reports that 95% of
17   appointments are occurring as scheduled, when in fact half of that is occurring; and in
18   some environments (like SAC), less than a quarter (22%) of appointments appear to be
19   occurring as scheduled.

20   A straightforward presentation of the actual data with no over reporting of compliance
21   would enable important attention to be brought to one of the most critical psychiatric
22   issues: How do we get patients in a timely way in front of psychiatrists (and other mental
23   health professionals) in offices, so they can get treatment? How do we create psychiatric
24   and mental health clinics?

45

1    So instead of presenting biased reports of patients seen, timely or as scheduled, CDCR
2    could have been focused on knowing where the scheduled appointments were not
3    **occurring, and devoting executive and other resources to solving the problem. There**
4    could, for example, be a regional team of psychiatrists (reporting to psychiatrists so they
5    would be allowed to focus on precisely that problem) who could tour each institution to
6    **try to identify and remove obstacles to creating appropriate clinics for psychiatric patients**
7    to get care.

8    If the State does not want to hire more psychiatrists because they are expensive, or if the
9    **State would have to raise psychiatric salaries to attract more psychiatrists, then surely**
10   there should be a focus on using psychiatry resources efficiently, not least by utilizing a
11   clinic model allowing each psychiatrist to see many more patients per day, and by getting
12   **patients to their psychiatry appointments.**

13   The Statewide Dashboard combines results for Medical, Dental, and Mental Health. On
14   **the Statewide Dashboard, but not on the Mental Health Dashboard, it explicitly says (see**
15   2008 09 05 1700hrs) that the "Seen As Scheduled" measure "Excludes appointments not
16   seen as scheduled due to patient refusal or similar patient controlled factors, scheduling
17   error; patient transfer; lay in; out to court/medical; pending or "to be scheduled"
18   appointments; walk ins; and appointments scheduled to be seen during the reporting
19   period but not yet closed."

20   This seems similar to the caveat in MAPIP where virtually all of the needed
21   measurements were excluded. (see 2017 03 30)

22   **But in addition, the Mental Health Dashboard *does not even say the above*. The mental**
23   health Dashboard says that the denominator is "All Scheduled Appointments" which of
24   **course *includes scheduled appointments in which patients refused services*. So people**

1  looking at the mental health Dashboard would have no idea at all that they are in effect
2  being misled.

3  The purpose of measurement is to clarify and not obscure. Legitimate measurements of
4  whether patients are seen as scheduled are incredibly useful, because they would reveal
5  that in some of our institutions only 22% of patients are getting to mental health
6  appointments and that in most only about 40% 45% are at the CCC level of care. That
7  matters clinically and is significantly problematic (as examples later will show), but those
8  low figures have not been reported. Instead we see these rosy reports of compliance that
9  doctors and our leaders think mean that 95% of patients came to appointments and were
10  seen. But the measurements mean nothing like that at all.

11  This problem of over-reporting compliance cannot help but raise concerns. Failing to
12  address the scheduling, and therefore the timing of appointments, prevents adequate
13  psychiatric care.

14  **Appointment Timeliness Revisited**

15  According to the Program Guide, at the EOP level of care, "A psychiatrist shall evaluate
16  each inmate patient at least monthly".

17  It does not say "shall evaluate each patient *monthly*", as it would have if monthly
18  appointments were all that were required. It says "shall evaluate" (are required to be
19  evaluated) "*at least* monthly", which implies that some patients are required to be
20  evaluated more frequently than monthly – those patients who need that care.

21  Yet in its percent patient weeks compliant timeliness figures, CDCR doesn't count a
22  psychiatry appointment as having been late (non-compliant) unless it has occurred after

47

1  the maximum interval, i.e., one month at the EOP level of care. This is the case even
2  when a doctor has ordered that a patient be seen for a follow up seven days later but in
3  fact the patient has not been seen until 30 days later if an EOP patient, or 90 days later if
4  a CCC patient.

5  Therefore, all the percent patient weeks compliant numbers reported on the Dashboard
6  to our Coleman experts and CDCR leaders and clinicians and the court about timely
7  appointments appear to be inaccurate in the 2017 staffing report (see 2017 03 30 "Timely
8  Psychiatry Contacts" column) and in the 2018 staffing report (see 2018 08 23
9  "Compliance").

10  Suppose a patient is seen at the CCC level of care by a psychiatrist, and that the
11  psychiatrist orders a return visit in 30 days. Suppose that the patient is in fact seen 90
12  days after the initial appointment rather than in the 30 days ordered. That follow up
13  appointment is actually 60 days late. In its calculation of the average days overdue
14  figures, does CDCR count such an appointment as having occurred 60 days late, or does it
15  deem it not to be overdue at all? And overdue relative to what?

16  In its 2018 staffing report, CDCR claimed that appointments are an average of 2.6 days
17  overdue at the CCC level of care (see 2018 08 23). This figure is so much lower than I
18  would expect given my experience of CDCR, that it seems highly likely that CDCR is not
19  counting as overdue, appointments of the above sort, in which a CCC patient is seen even
20  60 days later than needed per the doctor's order. CDCR has never allowed psychiatric
21  physicians to analyze the data to be sure, but I am confident that this is the case.[ix]

22  When CDCR calculates its timely measure, "percent patient weeks compliant", it does
23  not take into account *when the physician ordered the patient to be seen* in determining
24  whether the appointment was late, as long as the patient was seen within the maximum
25  Program Guide interval. Given that CDCR ignored what the doctors ordered in

48

1    calculating their percent patient weeks compliant figure, it seems very likely that in their

2    calculation of how many days overdue appointments were, they were ignoring doctors'

3    **orders with respect to when patients needed to be seen. The 2.6 days figure reported by**

4    **CDCR to the court is thus very likely falsely low. (see 2018 08 23)**

5    Suppose a psychiatrist orders that a CCC patient be seen for a follow up appointment 30

6    **days later, and that that patient is indeed seen 30 days later as ordered by the doctor. Is**

7    such a follow up appointment occurring as scheduled on time, as any medical doctor

8    would argue, or can it be considered to have occurred early?

9    To arrive at such a low figure as 2.6 days overdue, CDCR must be counting as *early*,

10    appointments occurring earlier than at the court ordered *maximum* interval, including

11    **those that occur sooner than the maximum interval *because the doctor has ordered that***

12    *the follow up appointment occur earlier, i.e., because the patient needs to be seen sooner.*

13    CDCR is probably also counting as *early*, appointments that actually occur *late* relative to

14    **the doctor's medical order, if the follow up appointment occurs sooner than the court**

15    ordered *maximum* interval.

16    This 2.6 days figure was presumably obtained by counting as late only appointments

17    **occurring after the maximum court ordered interval, and counting as *early all***

18    appointments occurring before the maximum interval irrespective of when the doctor

19    ordered a follow up appointment to occur, and averaging out the figures. In reality, many

20    **appointments are late, and many are very late indeed, and this 2.6 days figure seems to be**

21    hiding that fact.

22    CDCR has argued that since psychiatrists are seeing their patients in a "timely" way, this

23    **demonstrates that the number of psychiatrists is sufficient given CDCR's organizational**

24    capacity to use a given number of psychiatrists. But in its calculations of late

25    appointments CDCR has not been counting as late many appointments occurring later

**49**

1  than the doctor had ordered, and nor has it been counting as late appointments occurring
2  after what is in some cases a very long time indeed, in cases in which the patient has been
3  transferred from one institution to another multiple times. So in fact there may be too
4  few psychiatrists given CDCR's current often inefficient use of the psychiatrists they have.

5  One can see in a simple calculation how CDCR could be counting late appointments as
6  late, even if using the exact CDCR "percent patient weeks compliant" model that our
7  psychology quality managers claim we should use. So even though the psychiatry team
8  thinks that we should (at least also) know the percentage of appointments that are seen
9  on time (though we will never be permitted to have that information unless outside
10 forces demand it), it is possible to use the CDCR method (which makes things appear
11 better) to get some information.

12 Suppose that a patient is seen at the CCC level of care and the psychiatrist orders the
13 patient to be seen four weeks later, but the patient is instead seen 11 weeks later. If CDCR
14 used the percent patient weeks compliant measure straightforwardly, they would report
15 such a patient appointment as being 4/11 weeks compliant or 36% weeks compliant,
16 because there were 11 weeks, and the first four weeks are compliant because the doctor
17 hasn't ordered the patient to be seen until 4 weeks later. So it is completely
18 mathematically possible, even using CDCR's percent patient weeks compliant
19 methodology, to take some of these lateness issues into account. It can be
20 straightforwardly done, as shown in this paragraph. But CDCR does not report such cases
21 as being late at all. The only appointments CDCR deems non compliant are those
22 occurring after the court ordered *maximum* intervals.

23 The failure to report this is therefore not due to CDCR's different way of calculating
24 lateness: they are just not applying the formula when patients are in fact seen late, in a
25 calculation of whether patients are seen late.

1  Even though the measure can be used to measure lateness, as demonstrated above, one

2  has to be careful with its use. This CDCR methodology is biased, and it is very easy for the

3  reader to misinterpret what is being reported.


4  To see why the CDCR measure of "percent patient weeks compliant" can give the

5  uninformed reader the wrong idea, consider Dr. ███████ analysis of the differences

6  between percent on time appointments (which most people understand and the

7  psychiatry team wants) and "percent patient weeks compliant" appointments (the CDCR

8  measure). Note also that percent on time appointments will always give an equal or

9  lesser value than "percent patient weeks compliant". Dr. ███████ writes:


10  "An Enhanced Outpatient Program (EOP) patient had a psychiatry appointment on

11  Monday 8/13/18, and their next appointment wasn't until Friday 9/21/18. They were due to

12  be seen by 9/12/18 (per Program Guide rules) so are 9 days late, but due to compliance

13  being measured by weeks, there are four weeks of compliance and one week of non

14  compliance, which is then reported as 80% compliant. If you have 100 patients, 50 of

15  whom are seen on time, and 50 of whom are seen late by one week, the reported Timely

16  Psychiatry Contacts compliance rate will be 90%. It would be very easy to think that the

17  90% compliance rate meant that 90% of the patients were seen on time, when in actuality

18  only 50% were." (see Appendix 1)


19  Given the example above, one can see why the mental health leadership (without external

20  pressure) will never allow calculations so we can see whether or when are patients are

21  being seen on time. The number could just be too low. Although our psychiatry team has

22  written a program elsewhere that would allow this analysis of our data, the ███████

23  ███████ has not allowed us to use it. If it were known that in many places 25% of our

24  patients were being seen on time, that would get executive level attention to fix the

25  problem (like SAC in which 22% of patients were seen as scheduled).

1   So whether one is seeing a patient on time or not has little to nothing to do with CDCR's

2   lateness measure called "percent patient weeks compliant".

3   Taking Dr. ████████ example even further, CDCR could report that psychiatrists are

4   being 90% "timely" with respect to psychiatric appointments (actually 90 percent patient

5   weeks compliant) and virtually never see a single patient on time. In fact, it is

6   mathematically possible for the report to say that appointments were "90% timely"

7   despite not a single appointment having occurred on time. And given that we are

8   reporting considerably lower than 90% "timely", in EOP patients being seen "timely", and

9   particularly given the biases in those very reports that I have previously mentioned, the

10   percentage of patients seen on time (rather than CDCR's "timely") could be very low

11   indeed.

12   Doctors will slowly increase medications in a particular time dependent way, while

13   monitoring results during pre determined time intervals. One can see, for example, that if

14   a psychiatrist sees patients to monitor medication titration on a prison ward in a "90%

15   weeks compliant" way, but only sees patients on time 15% of the time, that could, on

16   average, expose those patients to far more risk than if the patients are seen in a "90%

17   weeks compliant" way, and are seen on time 85% of the time.

18   Both of these are completely possible in our system. And our psychology quality

19   management team and the ████████████ won't let the psychiatry leadership team

20   (and apparently won't calculate themselves) which (if either) scenario applies in our

21   system. Our ████████ disparaged our desire to check whether patients are being

22   seen late as "trying to parse the data". (see page 3 of 2018 05 23 2115hrs) The problem is

23   that this refusal to determine actual lateness and this refusal to allow us to look at this

24   issue adversely affects our ability to solve problems and improve patient care.

1   In the 2018 staffing report, it appears that CDCR didn't even attempt to report on whether
2   EOP appointments were seen using CDCR's "timely" measure. Instead, there is just a
3   **report of frequency of appointments, which might appear to give a sense that CDCR is**
4   reporting about EOP timeliness, but (see below) they are not (see 2018 09 01 0900hrs)).
5   The report implicitly appears to be claiming that only 6915 EOP appointments per month
6   **were needed in order for CDCR to be compliant with the Program Guide. And the claim**
7   seems to be that 6501 contacts were occurring per 30 days (of the 6915 EOP appointments
8   that are alleged to have been needed? It is not defined). Using these figures CDCR reports
9   **a ratio of (6510/6915) and a .94 "rate". I assume this means a "rate of compliance" with**
10  (needed?) appointments, rather than a rate of time, but this is not defined.


11  Imagine for a moment that these figures are true. Indeed, imagine that CDCR is doing
12  **even better than that. So perhaps 6915 EOP psychiatry appointments per month actually**
13  occurred (an average of one every 30 days) out of 6915 appointments that were supposed
14  to have occurred.


15  According to the figure CDCR reported, 6915 appointments were needed. Hypothetically
16  assume that 6915 appointments occurred, rather than the reported 6501 appointments.
17  **CDCR would then have reported a "rate" of 100%. But note that such a seemingly perfect**
18  figure would also be perfectly consistent, mathematically, with 50% of the patients having
19  been seen within the 30 day maximum EOP interval *and 50% of patients being seen after*
20  *the 30 day maximum EOP interval,* **since there is no obvious reason why the distribution**
21  around a 30 day average period between actual appointments would not be about even.
22  And CDCR does not report whether patients are seen on time or late, and nor do they
23  **even report patient percent weeks compliant in EOP, so one can't check. So a seemingly**
24  perfect figure would also be perfectly consistent with 50% of patients being seen late.


25  If the distribution is *not* even, more than 50% of patients could have been seen late for
26  **appointments or fewer than 50% could be. So how does that demonstrate adequacy of the**

1  frequency of psychiatric appointments? It doesn't. The point is that the report says
2  nothing about that.

3  Now consider the number of EOP appointments that actually happened. According to the
4  report, that was 6501 appointments. The number of appointments CDCR claimed were
5  needed per month was 6915. But according to their report only 6501 appointments
6  actually occurred. If there are fewer appointments happening, then other things being
7  equal it follows that more appointments are occurring later than needed. So if CDCR were
8  reporting that 6915/6915 appointments had occurred, and 50% were late, then given the
9  smaller ratio CDCR reported, of 6501/6915, an even larger percentage than 50% of
10  appointments could have been late.

11  The numerator in the EOP report is that 6501 patients were seen on average per month by
12  psychiatrists. The denominator (6915) is defined as the EOP mainline population, but
13  then CDCR makes the inference (without specifying that they do) that each of those EOP
14  patients need to be seen just once a month. That would give a required number of
15  appointments per month as 6915. But in reality, many patients need to be seen earlier
16  than one month later, as the Program Guide clearly suggests, given the "at least" wording.
17  So that 6915 figure is too low. And in fact psychiatrists have often scheduled EOP patients
18  to be seen sooner than one month later.

19  Moreover, the 6501 figure is too high. CDCR was counting as fully compliant
20  appointments that we now are calling mere wellness checks. A wellness check could be,
21  for example, a three minute encounter in the prison yard surrounded by other inmates.
22  Or it could be a telepsychiatrist's MA using a laptop camera and microphone, and
23  attempting to communicate with a patient who is in the cell behind the solid metal cell
24  door, to ask a patient to come to the next appointment. And there are worse cell side
25  "appointments" in which it is just about impossible to communicate with the patient.
26  Those are not proper psychiatric medical appointments either. (see 2018 07 12 1442hrs)

54

1   If 6501 is too high, and 6915 is too low, the ratio (6501/6915 = 0.94), which is supposed to

2   be the rate of required compliance with appointments, is too high.

3   Suppose 20% of appointments were non confidential or otherwise inappropriate and

4   should be counted as "wellness checks", not psychiatric medical appointments. Then only

5   5201 compliant appointments occurred (0.8x6501). (see 2018 07 12 1442hrs)

6   The Program Guide says that EOP patients should be seen at least once per month.

7   Suppose that on average, EOP patients actually need to be seen by a psychiatrist five

8   times in four months, rather than just once a month (5/4=1.25). Then there should have

9   been 1.25 x6915 appointments, which is 8644 appointments.[x] The maximum possible ratio

10  given these generous assumptions, is 5201/8644, which is 60%. That is to say, even using

11  these generous assumptions, only 60% of required EOP appointments in fact occurred (as

12  opposed to the reported 94%). And that says nothing about whether or not any of those

13  appointments were on time.

14  Whether, as I generously assumed above, only 20% of the appointments were in fact cell

15  side "wellness checks", or 30%, or some other figure, that figure is not accurately recorded

16  or reported, as I will show later.

17  In the 2018 report to the court, no EOP timeliness figures were recorded. We know that

18  there are significant problems in terms of appointments occurring (or not) as scheduled.

19  We know that there are significant problems in terms of appointments occurring as

20  frequently as needed, and we know that many appointments are not happening in

21  confidential offices. We also know that the "timely" percent patient weeks compliant

22  figures are biased and inaccurate. Thus, CDCR has failed to provide to the court the

23  requisite information and the accurate figures needed for the court to be making an

24  assessment of the adequacy of psychiatric staffing.

55

1    Rates of suicide and 30 day readmission rates are reportedly high in CDCR. If patients are
2    not being seen when they need to be seen, that might well be a good explanation for
3    these elevated rates.

4    Note that the official Dashboard definition of "Timely Psychiatry Contacts" is "Number of
5    patient weeks included in denominator during which the patient was up to date on their
6    required Psychiatry contact. Contact requirements delineated in the Compliance Rules
7    grid." (see 2018 07 27 0926hrs)

8    But what is the meaning of *required*? As our quality management psychologists define it, a
9    required appointment has nothing to do with when the physician orders an appointment
10   to occur. Our psychologists are measuring *business* requirements, not *clinical* or Program
11   Guide requirements. So in its reports to psychiatrists and the court, CDCR's quality
12   management psychologists are not even measuring "percent patient weeks compliant"
13   with *required* psychiatry appointments, let alone whether these appointments are on
14   time. Instead our psychologists are actually measuring percent weeks compliance with
15   *maximum* court defined intervals, regardless of when physicians order patients to be
16   seen. (see 2018 07 27 0926hrs)

17   Finally, whatever "timeliness" is said to have been created by the line staff psychiatrists in
18   seeing patients, it was actually created by the line staff psychiatrists *plus the psychiatrist*
19   *supervisors*. Due to staffing shortages and/or inefficient organization and utilization of
20   psychiatry resources, 60% of supervisors in our system often see patients alongside line
21   staff. So to maintain the current timeliness of psychiatric appointments, everything else
22   being equal, a higher number of line staff psychiatrists would be required than has been
23   reported to the court as being needed.

24   Were CDCR to use psychiatrists efficiently by using a clinic model in which each
25   psychiatrist stays seated in an office and patients are brought to their appointments one

56

1    by one and on time, fewer psychiatrists would be needed than is the case in the current

2    very inefficient system in which many psychiatrists have to waste a lot of time trying to

3    find their patients.


4    A relative lack of patient access to care due to structural barriers to getting patients to

5    appointments (patients not seen as scheduled) creates a need for more physicians to try

6    to see the same patients, because they must try at odd hours, on multiple occasions, and

7    see patients in unusual and inefficient clinical situations. Given the scheduling numbers

8    seen so far, there is no reason to think that any of this is well organized in CDCR.


9    In addition to the biases previously mentioned, including:


10       1.   resetting the clock when patients transfer institutions to allow up to doubling of

11            Program Guide timeframes,

12       2.   arbitrarily increasing EOP timeframes from one month to 1.5 months in 2017 (even

13            with no patient transfers),

14       3.   not counting appointments scheduled more frequently than minimum Program

15            Guide Timelines (as appointments that could and frequently were missed and

16            late),

17       4.   counting what were actually mere wellness checks (e.g., cell side appointments

18            and cell side telepsychiatry appointments) as full appointments,


19   here are two additional sources of bias:


20       1.   Calling some mere wellness checks compliant appointments causes appointments

21            following those wellness checks to be mistakenly deemed to have been on time.

22       2.   Were the psychiatric work not being done by supervisors as well as line staff, more

23            of the appointments would be late.


57

1  **Medications Not Taken and Follow-up Appointments**

2  If a patient misses three days in a row of medication or if in a week the patient is 50%

3  **non compliant with medications, or misses one dose of a critical medication, the**

4  psychiatrist is supposed to schedule the patient to be seen for an appointment to review

5  medication or there needs to be some type of triage system in place to make sure those

6  **who need an appointment have one, and at least some documentation of why those who**

7  don't need an appointment don't need one. Patients who are medication non compliant

8  (not taking medications as prescribed) are flagged in "Huddle Reports".

9  Suppose there are 100 patients in a month who have missed their medications as defined

10  above. Now suppose that the psychiatrists schedule just ten of those 100 patients to be

11  **seen, and further, that they only see nine of the ten appointments scheduled in that**

12  month. One of the scheduled appointments does not occur for some reason.

13  What percentage of the patients who needed to be seen in consultation for medication

14  **compliance were seen?**

15  The straightforward answer is that 9/100 patients were seen and the organization is 9%

16  **compliant with getting patients seen who missed their medications, unless there was**

17  some reasonable explanation for why the other 91 patients did not need to be seen despite

18  being medication non compliant. But would the CDCR Dashboard have reported that 9%

19  **of medication non compliant patients were seen? No. In this situation, it would have**

20  reported that psychiatrists were a remarkable 90% (not 9%) compliant with seeing

21  patients who needed to be seen for medication non compliance.

22  In CDCR reports, only those mental health patients who are *scheduled* to be seen are

23  counted as *needing* to be seen. In this hypothetical example, ten patients were scheduled

1  to be seen and mine were seen. When we queried this issue, the QM leaders said that the
2  problem is with psychiatrists failing to schedule appointments for all the patients who
3  **need to be seen for medication non compliance, and that were they doing so, all would**
4  **be well.**

5  CDCR's logic is something like: if a medication non compliant patient isn't scheduled,
6  **that patient isn't medication non compliant, or something like that. Actually, it's a bit**
7  worse than that. Please see 2018 08 31 0242hrs for a precise recounting of how CDCR
8  reported 100% compliance with seeing patients at CHCF who needed to be seen given
9  **medication refusals, when in reality the compliance was 3.6%. (see page 6 of 2018 08 31**
10  0242hrs).

11  Basically, the computer algorithm that does this calculation
12      1.  **counts appointments not scheduled as not being needed**
13      2.  counts refused appointments as completed appointments
14      3.  double counts appointments that occurred

15  Apparently, there were 17 scheduled appointments, yet hundreds of patients needed some
16  type of appointment or there needed to be documentation of why the patient did not
17  **need an appointment. So even assuming, totally unrealistically, that patients who were**
18  not scheduled to see a psychiatrist were not medication non compliant, there still should
19  have been 17 appointments occurring as scheduled. Only 8 of those 17 occurred, so CDCR
20  **should have reported that 8/17 (less than 50%) had compliant appointments, even if you**
21  eliminate the hundreds of other appointments actually needed for medication non
22  compliance. But that didn't happen either.

23  They reduced the 17 scheduled appointments (using a computer algorithm) down to 12,
24  and increased the eight appointments that were actually seen, up to 12. One patient was

**59**

1   listed as needing to be seen but wasn't seen. His appointment was cancelled and there
2   was no note. So that leaves 16. Six more were cancelled, which somehow also made it so
3   **they were no longer considered medication non compliant, so that reduced the reported**
4   **number of medication non compliant patients to ten.**

5   One of the cancelled appointments was added back as a patient who needed to be seen,
6   **so that made it 11. One appointment was counted twice, so now there were 12**
7   appointments, while eight occurred.

8   Of those 12 appointments, two patients refused. They were counted as having been seen.
9   **So instead of 8/12 patients having been seen, 10/12 patients were counted as having been**
10  seen. Then one of the eight completed appointments was counted twice, so 11/12 patients
11  were counted as having been seen. Then one was counted as completed but was cancelled
12  and never seen. **That added up to 12/12 patients having been seen.**

13  So finally, though there were hundreds and hundreds of medication non compliant
14  **patients, eight were seen, 12 were counted as having been seen, 12 were counted as having**
15  needed to be seen, and the psychiatrists were then said to have been 100% compliant,
16  though actually they were less than 4% compliant. (see 2018 08 31 0242hrs)

17  An accurate report about this would give one real information. One might then conclude
18  that a complex triage system is needed to get the patients who need to be seen most,
19  seen. **I don't think it is reasonable for our psychiatrists to be seeing hundreds of extra**
20  appointments per month given their staffing. The problem is that psychiatrists don't have
21  enough hours in the day to get all the non compliant patients evaluated. How many of
22  **these patients ended up in crisis beds, or suicidal, or violent, we will never know. No**
23  doubt many of the patients could not have been seen given the psychiatric staffing that
24  we have. But that does not justify reporting less than 4% compliance as 100% compliance.

1    That argues for better triage systems, perhaps utilizing nursing staff and other

2    professional assistance.

3    A propos of this type of confusion, one Network ██████████████████, Dr. ████████████,

4    quipped, "Why are we treating the scheduling rather than the patients?"

5    What's particularly odd about the way these calculations are done is that the more errors

6    that are made, the higher the compliance appears. The lower the proportion of patients

7    needing to be seen who are scheduled to be seen, the more compliant CDCR appears to

8    be per the reports, because it's easier to see fewer patients, and only those who are

9    scheduled count as needing to be seen. So the more the errors made by not scheduling

10    appointments, the easier it is to be "compliant", with less work needed. In addition,

11    Quality Management appear to deem refusals not to be a problem either: indeed, a refusal

12    not only eliminates the patient as needing to be seen, but credits the institution with

13    getting the patient seen. Compliance falsely appears higher if the institution manages to

14    have the patients refuse.

15    Dr. ████████ wrote:

16    "These appointments are only measured if the physician puts in a scheduling order for a

17    medication non compliance appointment. The appointments that are ordered are *far

18    more* likely to be completed. To accurately capture the percentage of medication non

19    compliant appointments that are occurring when they should, the denominator needs to

20    be the number of patients who are flagged as medication non compliant, and the

21    numerator needs to be the number of medication non compliant patients who are seen

22    within the specified Program Guide timeframe." (see 2018 09 19 report)

1    Critically, note from the CHCF report, that whether patients are seen when medication

2    non compliant, is part of the overall measure of whether all needed psychiatry

3    **consultations are occurring. CDCR reported that 96% of all consultations occurred as**

4    needed at CHCF. But because medication non compliance is part of that report and was

5    reported as being 100% compliant rather than 3.6% compliant, the overall figure of 96% is

6    **too high. Indeed, Dr.** [redacted] **calculated that a more accurate (if still too optimistic)**

7    statement would be that 55% of psychiatric referral appointments occurred as needed.

8    (see page 6 of 2018 08 31 0242hrs)


9    **Refused and Cancelled Appointments**


10   **Treatment Cancelled**


11   Dr. [redacted] says, "Instead of giving a straightforward percentage of the treatment that is

12   cancelled (e.g. if there are 100 appointments and 30 were cancelled, this indicator would

13   **show 30%). The numerator is defined as "Number of patient weeks included in**

14   denominator during which the following number of hours of treatment were cancelled:

15   More than 3 for ASU EOP Hub, PSU EOP, and ML EOP; More than 1.5 for RC EOP and

16   **ASU EOP non Hub; More than 1.0 for SRH/LRH CCCMS." (see page 3 of 2018 08 15**

17   1352hrs)


18   The reader could give us any number he or she wanted between say 1% and 50% and we

19   **could subtly change numbers like "3", "1.5", and "1" to get that precise number as the**

20   percentage of cancellations recorded. Therefore, as an absolute value, the reported

21   number 19% in this context is meaningless. Arbitrary numbers like "3", "1.5", and "1", with

22   **arbitrary assignments to levels of care, could be changed to cause the "number of patient**

23   weeks included in [the] denominator" to cause any overall percentage desired.


62

1    Measurements that are arbitrary are not useful because the definition can be changed to

2    create any value at all. We know from the scheduled appointments calculations that an

3    **extremely high percentage of appointments are cancelled and refused. What CDCR**

4    should report is what proportion of 100 appointments were cancelled or refused or both.

5    **Treatment Refused**

6    If there are 100 appointments and 40 are refused, then 40% are refused. Instead, CDCR

7    created a whole new definition (see below) that seems entirely unrelated to the (also

8    **arbitrary) definition of percent treatment cancelled report above, to get the value**

9    recorded to be 24%. (see page 3 of 2018 08 15 1352hrs)

10    The numerator is defined as:

11    "Number of patient weeks included in denominator during which over 50% of all offered

12    treatment was refused AND less than the following hours of treatment were attended:

13    **less than 5 for ASU EOP Hub, PSU EOP, and ML EOP; less than 2.5 for RC EOP and ASU**

14    EOP non hub; less than 1.0 for STRH CCCMS and LTRH CCCMS."

15    Why 50%? Why less than 5? Why less than 2.5? Why less than 1.0? Those are arbitrary

16    **numbers chosen to get a particular result in terms of figures. Mathematically, if we varied**

17    those numbers, the *reported* percentage of appointments refused would be totally

18    different. We know that huge percentages of the patients are said to refuse. It would be

19    **useful to know that, and it would be useful to know where it happens, etc. But this**

20    information is obscured using these arbitrary definitions and formulas.

63

1    **Expert Psychiatrists**

2    When CDCR hired outside expert psychiatrists to take a view about CDCR staffing levels,

3    the CDCR mental health leadership did not schedule the outside expert psychiatrists to

4    speak with the psychiatric leadership of CDCR about staffing. Had the outside expert

5    psychiatrists spoken to us, we could have told them some of the information in this

6    report, and their conclusions and recommendations would have presumably been very

7    different.

8    **Confidential Spaces**

9    Patient care is highly unlikely to be good in a given system without certain absolutely

10   basic necessities. One of those is, as we've seen, whether appointments are occurring

11   when the patients need to be seen, which can be measured by looking at whether

12   appointments are occurring on time relative to doctors' orders with respect to when

13   patients should be seen next.

14   Another basic necessity for good patient care is whether psychiatry appointments are

15   occurring in appropriate, confidential spaces, i.e., in a private room. That too would be

16   easy to measure. Did a given appointment occur in an office, confidentially, or *not*?

17   There are other critical issues for patient care that are less easy to measure, but those two

18   absolutely basic things could easily be measured accurately, and yet CDCR hasn't

19   provided even its psychiatry leadership with this vital information.

20   If we were accurately measuring whether psychiatry appointments are occurring in

21   confidential settings, like a clinic office, and particularly if we could see what was

64

1    happening ward by ward in the whole system, this would immediately highlight one of
2    the major barriers to good patient care there is in CDCR.

3    Not only should we be measuring and reporting each of those two things independently,
4    we should also be measuring and reporting, ward by ward, the proportion of
5    appointments occurring both on time as above AND in a confidential office. That
6    information is critical for improving patient care in the CDCR system.

7    This information would also enable CDCR to see where expensive psychiatry resources
8    are not being used efficiently in the system. In a system like CDCR, psychiatric
9    productivity is lower than it would be were the psychiatrists staying seated in clinic
10   offices seeing patients one after another rather than having to waste time trying to *find*
11   their patients. So in CDCR, more psychiatrists are needed per population than would be
12   needed were the system less inefficiently organized.

13   In many CDCR institutions, patients having an appointment with their psychiatrist are
14   often not brought to see their psychiatrist. The psychiatrist then has to go looking for the
15   patient, and usually ends up seeing the patient cell side or having a two minute
16   conversation on the yard. (See 2018 07 12 1442hrs, middle of the page starting, "My visit at
17   SAC was interesting." Also see previous report about SAC: 2017 12 06 1748hrs.)

18   Cell side visits often mean talking to patients through a slit in a pretty much solid metal
19   cell door that usually has a tiny window (which really can't be used when speaking to the
20   patient because of the location of the doctor's head when speaking through the slit). And
21   sometimes the doctor has to speak very loudly to be heard, due to extremely noisy
22   conditions. Several other patients and custodial officers can then hear what is supposed
23   to be a confidential conversation. And the cellmate who is usually also in the cell can
24   completely hear the conversation. In the SAC EOP "segregation" unit the air conditioner
25   and TV blare, so the psychiatrist sometimes needs to yell to be heard. This prevents

1   honest and open communication about patients' psychological states, prevents
2   neurological exams, and prevents building effective relationships with patients.

3   The CDCR electronic health record system has a number of significant design flaws that
4   could be corrected were there the will to do so. One of those flaws is that the system
5   **defaults to categorizing the appointment type as being "confidential". It takes extra time**
6   and several extra keystrokes to record that a given appointment did not in fact occur in a
7   confidential space, and many psychiatrists don't even know *how* to record that an
8   **appointment did not occur in a confidential space.**

9   For example, at the CCWF crisis bed facility, 100% of psychiatric appointments in May
10  **2018 were recorded in the EHRS as having occurred in confidential spaces, yet according**
11  to the psychiatrists on the ground, actually not a single one (except when Coleman
12  monitors were present) occurred in a confidential space. (see page 5 of 2018 08 01)

13  When I visited CCWF, the physicians and the nurse practitioner were unaware that it is
14  even possible to report the appointment type as "non confidential". Indeed, in my recent
15  **tour to SAC, CHCF, Mule Creek, Valley State Prison, and CCWF, there was at least one**
16  psychiatrist (and sometimes many) at each institution who didn't know how to record the
17  appointment as having been non confidential. (When I visited SATF and Corcoran, all the
18  **psychiatrists I asked did seem to know how to record visits as having occurred in non**
19  confidential spaces.))

20  Designing a system in such a way that lack of knowledge and random errors (such as
21  **failing to take the extra time and keystrokes needed to record a visit as non confidential)**
22  create a biased, inaccurate picture of what is actually happening, is clearly a mistake. It
23  would be very easy to remove this bias by having the system not default to one or the
24  **other type but instead have the doctor simply specify which type it was as an**
25  electronically required step in the recording of an appointment.

66

1   This is similar to the situation described in the scheduling section, in which the error of
2   *failing* to schedule consults creates the *semblance* of *greater* compliance with respect to
3   **patients needing to be seen. The bigger the error in not scheduling patients for**
4   medication non compliance or the bigger the error in forgetting to record visits as non
5   confidential, the greater the *reported*   but not actual   compliance. And it is not even
6   **really psychiatrists simply forgetting: when people are in a rush, the need for extra**
7   keystrokes makes accurate recording less likely. If you make it harder to record a bad
8   thing that actually happens, but easy to report a good thing, more good things will be
9   **reported. It may be tempting to call this biased measuring and reporting of compliance a**
10  mere training issue. But it is actually an EHRS QM system design issue.

11  It is difficult to get access to the information about whether the EHRS is recording visits
12  **as occurring non confidentially. Our HQ psychiatry team recently figured out how to**
13  obtain this information, but virtually no psychiatrists in the field or Chief Psychiatrists
14  knew how to when we asked them. To figure out whether the visits were confidential in a
15  **given prison's segregation unit, for example, we had to painstakingly find and download**
16  data for the institution to an Excel Spreadsheet and then perform a calculation on the
17  correct columns.

18  **A simple Dashboard measurement in the quality management portal could**
19  straightforwardly be programmed to report this EHRS measure.

20  In the CCWF crisis bed facility, women are double celled in four of the beds, but single
21  celled in four other beds. The psychiatrists and clinicians told us that when the Coleman
22  **monitors come, the women who are double celled are individually escorted out into a**
23  private space to make sure that their reviewers know that the patient would be seen in a
24  confidential space were the resources available. They also said that if they knew how to
25  **record that they were not seeing the patient confidentially most of the time, they would**
26  do so truthfully and honestly.

67

1   Nowhere in the institution, even in less critical patient care areas, were they recording
2   any patient visits as having been non confidential, including in the segregation unit in
3   **which they told us that only 20% of the visits were confidential.**

4   They said that they cannot normally pull the women from even the double cells, as they
5   **lack the custodial resources and offices to do this. They said these women who are**
6   double celled are never seen confidentially unless Coleman reviewers are there.

7   In the CHCF crisis bed unit (see report 2018 07 17 1722hrs), it is even worse than in the
8   **CCWF crisis bed unit. Essentially *not a single follow up appointment is in a confidential***
9   *space.* At CCWF during morning rounds, the cell door is opened so the patient can be
10  seen and examined with custody present to ensure safety.

11  The issue is not just whether an appointment is confidential or not. Another issue is
12  whether or not the doctor can physically *see* the patient or not. At the CCWF crisis bed
13  **facility, the psychiatrist walks into the cell so can see the patient and do a neurological**
14  exam, but the appointments are not confidential. But at the CHCF crisis bed facility, the
15  appointments are neither confidential nor can the doctor even *see* the patient, so can't do
16  **a neurological exam, can't see the patient's facial expressions, can't see the patient's**
17  reactions to what the psychiatrist is saying, etc.

18  That the cell door is open at CCWF with appropriate custodial observation is hugely
19  **clinically beneficial at CCWF and really seems to help them provide good care, because**
20  patients can be briefly examined, their facial expressions can be immediately seen, and
21  patients are interviewed with the team able to clearly hear the patient. But at CHCF, the
22  **door is not opened for the psychiatrists to see the patients. So 100% of the follow up visits**
23  occur by communicating non confidentially through a slit in a closed cell door, the
24  doctor being unable to see the patient while talking (because to be heard the doctor has

68

1  to communicate through the crack in the door, whereas to see the patient the doctor

2  needs to look through the window, and it is not possible to do both simultaneously).

3  This dearth of custodial resources and offices for any follow up appointments has been

4  that way for years and when I myself briefly worked at CHCF nearly five years ago, I

5  encountered the same situation. Furthermore, the recreation therapists and psychologists

6  compete with the psychiatrists for common office space. Custody said that it allocates the

7  rooms on a first come first serve basis and that they give priority only to the initial

8  psychiatric visit, and essentially never for follow up appointments. Yet the CDCR QM

9  team designed the electronic system to categorize appointments as confidential by

10  default, and not to record the environment in which the care occurred[xi]. That information

11  is vital for creating an efficient, well organized system with good patient care.

12  The psychiatrists in the CHCF crisis bed unit do know how to record that a visit was non

13  confidential, and they told us that 100% of their visits are *non* confidential. Yet instead of

14  showing 0% of follow up routine appointments there as having been non confidential,

15  the QM electronic system nevertheless reported that 31% of them were confidential. This

16  inaccurately high compliance figure of 31% appears to have been caused by error

17  psychiatrists in a hurry failing to take the time to record visits as having been non

18  confidential. (see page 10 of 2018 08 01)

19  That is an example of how, in the CDCR system in several respects, more error creates the

20  false impression of more compliance. The more errors the psychiatrist makes, in not

21  doing the extra work needed to record patients as being seen in non confidential spaces,

22  or in failing to schedule patients to be seen for medication non compliance, the higher

23  the compliance *appears* to be, contrary to the reality. [xii]

24  Thus, the numbers reported by Quality Management about whether appointments were

25  timely, whether they occurred as scheduled, whether psychiatric consultations were being

**69**

1    made appropriately, or whether appointments were confidential, are inaccurate and can't
2    be replied upon.

3    To find out what was really going on, we HQ psychiatrists had to physically go to the
4    institutions, each of us following a different psychiatrist around for a whole work day to
5    see what was actually happening on the ground, in addition to talking to others there. We
6    have also tracked individual patients, and done other painstaking work to try to get the
7    information we need in order to improve the CDCR mental health system.

8    On a practical level, the psychiatrists at CHCF say that even if the office space were
9    plentiful at the crisis bed unit   which it is not at all   there would be nowhere near
10   enough custodial staff to physically bring patients to confidential office spaces given all
11   the disciplines competing to see patients at the same time. So CHCF psychiatrists,
12   essentially 100% of the time, have their crisis bed (non initial) appointments with patients
13   in a non confidential space, talking through a slit in the door and not really being able to
14   see the patient. These are not adequate medical appointments. (see 2018 07 17 1722hrs)

15   **The Importance of Recording the Environment of Care For Each Appointment**

16   If a given patient is using illicit drugs, what is the chance that, when asked by the
17   psychiatrist whether he or she is using illicit drugs, the patient is going to answer
18   truthfully, if custody is present? Currently, unless the physician states in the note the
19   environmental context in which the appointment occurred, those reviewing the chart
20   can't tell. That means that transmission of such important medical information doesn't
21   happen.

22   The recording of the environment of care is of critical importance, as we, the HQ
23   psychiatry team, have long argued. Our request that the system be made to require a

70

1  physician to select whether the appointment was behind a cell door, outside in a yard,

2  confidential, and other key variables, was denied: the psychiatry medical work flow is in

3  **CDCR designed by non medically trained psychologists. So the environment in which**

4  **care is occurring is very difficult to discern unless one physically goes to the institution**

5  and follows individual psychiatrists, as we did.


6  **Psychiatry Medical Opinion Ignored in the Design of EHRS QM**


7  When the EHRS system was being designed, we made many requests that were simply

8  **ignored or overridden by those in charge. And now our psychology executive and** ▋▋▋

9  ▋▋▋ **have added a new committee, called the Change Management Committee**

10  **(2018 07 12 1000hrs). This committee is yet another obstacle blocking our ability to get**

11  **needed changes made. (see also 2018 06 18 1359hrs.)**


12  Our psychologists and our ▋▋▋▋▋▋ who vigorously supported the psychologists

13  **in ignoring our many requests and objections with respect to the psychiatric workflow**

14  **they were designing, created a system that does not disambiguate names of the various**

15  types of medical appointments, and have thereby denied our physicians and the court the

16  **vital information needed for us to fix our CDCR mental health system.**


17  It used to be that our psychiatric physicians could sometimes appeal to our general

18  **medical and nursing colleagues on a committee called CLAC if overruled by the**

19  **psychology designers of the mental health and therefore psychiatric workflow using the**

20  EHRS. (see 2018 07 02 1508hrs and 2017 05 11 1447hrs)[xiii] But now, with the advent of the

21  **Change Management Committee, the psychologist run EHRS team (or those who direct**

22  **them) has clamped down further on our headquarters psychiatrists' ability to appeal to**

23  our general medical and nursing colleagues in CLAC to try to design appropriate medical

24  **workflows for our psychiatrists. Only if this Change Management Committee were to**

71

1  approve one of our proposals would we HQ psychiatrists be allowed to speak with our

2  colleagues at CLAC to even propose it. (see 2018 06 18 1359hrs.)


3  This new Change Management Committee is ruled by almost the same executive

4  psychology team who run the QM committee, and some of those who are on this

5  committee report to the executive and Chief QM psychologists (2018 07 12 1000hrs). On

6  this committee there are 22 non medical personnel (including 12 psychologists) but just

7  two psychiatrists. We are simply out voted. We have no hope that our requests    for

8  example, that the EHRS require the recording of information about the environment of

9  care of each appointment    will be met in the foreseeable future.


10  To improve care in our system the psychiatric medical team needs to know whether

11  patients are being seen on time, as scheduled, in confidential spaces, and whether they

12  are seen when there are consults, when they miss their medications, and if there is

13  appropriate blood monitoring.


14  CDCR's reports (as mentioned above) tend to be very inaccurate except (now) the blood

15  monitoring. Our comments and requests about these overall processes have been

16  repeatedly ignored and rejected, and now the ▮▮▮▮▮▮▮▮▮▮ have given those who

17  designed this bad EHRS QM system even more control, in the form of the Change

18  Management Committee.


19  The psychiatry leadership team needs access to the database in order to determine more

20  efficiently what is actually happening, so that we can know how to target our work in

21  trying to fix the CDCR mental health system. Although the QM psychologists have done a

22  few database searches for us, the ▮▮▮▮▮▮▮▮▮ have denied us even read only access

23  to the database, asserting that psychiatrists "don't do QM". A psychiatrist who used to

24  work for the psychiatry leadership team was not allowed access to the databases until he

25  had left our team and was then later hired by the QM psychologists. Now he is sometimes

72

1  permitted to do a search for us, but only with the permission of the psychologists who

2  have created the data biases I am mentioning in this report. And that permission is

3  **generally not forthcoming in practice despite their *saying* that they will do the searches**

4  **we want.**

5  Our ▮▮▮▮▮▮▮▮▮▮ say that our leadership psychiatric team doesn't need to be able to

6  **query the database directly to answer medical questions about care. They say we can ask**

7  the psychiatrists working on the psychologist run team. However, the psychiatrists

8  working for the psychologists are either unable to run the queries we have asked for, or

9  **they have been told not to run the database queries we have requested, for example to**

10  find real information about whether patients are being seen on time, as scheduled, in

11  confidential spaces, whether they are taking their medications as they are supposed to, or

12  **anything else of medical significance.**

13  Note that none of the discoveries of grossly biased reporting about data, violations of

14  **court mandates for timely care, etc., were discovered by the psychiatrists who report to**

15  the psychologists. There is a reason for that, and it has to do with who is supervising the

16  medical queries that they are allowed to make.

17  As I've said, our medical opinion with respect to what medical data we need to collect and

18  access is simply ignored. (see 2018 08 23 1207hrs[xiv], 2017 05 11 1447hrs, 2018 07 02

19  1508hrs) **The question is, why *don't* they welcome logical and sensible input from**

20  experienced expert medical doctors with deep knowledge of how mental health systems

21  should be organized for good patient care, and about what needs to be measured to

22  **maximize error correction and efficiency in the system?**

23  Although our non medical executives will certainly publicly *claim* that they are

24  **endeavoring to create good psychiatry workflows, their actions tell a different story. I**

25  have seen no evidence that our ▮▮▮▮▮▮▮▮▮▮ have any intention of actually changing

73

1 the status quo in which psychiatric input is rejected, and non medically trained

2 psychologists have almost full control over the psychiatric workflows and the design of

3 **the EHRS for psychiatrists (unless they run afoul of nursing or medical or dental**

4 workflows), and have the authority to decide what medical information we need.

5 I have shown that the reports with respect to whether appointments have been seen on

6 **time, whether consults are taking place, whether appointments are occurring as**

7 scheduled, etc., can't be trusted.

8 The same should also be assumed to apply to whether CDCR will allow our psychiatric

9 **physicians to create efficiencies for themselves in using the EHRS, or enable the EHRS to**

10 capture information that is medically needed. Even if, for example, we want to search the

11 old patient information in the data warehouse to figure out what medications kept a

12 **given patient out of the hospital and what did not, we are not permitted to do that, and**

13 we can't get that information at all unless the psychologists decide that we do need the

14 information and prioritize that query.

15 Unfortunately, despite my requests, the psychiatry leadership team has not been

16 permitted to search databases for the five years that I have been with CDCR; nor have we

17 **had any significant influence with respect to the input of the information into the EHRS**

18 that we need to medically evaluate the environment in which psychiatric care is

19 occurring.

20 The same individuals are creating the data analysis and running the EHRS design and

21 determining their own errors, and the ███████████ have vigorously supported their

22 **monopolizing of information, preventing medical analysis and scrutiny of critical**

23 information. This has effectively prevented appropriate error correction in the CDCR

24 mental health system.

1   As my colleague, Dr. ███, the psychiatrist in CDCR who knows most about how the
2   electronic health record is designed for psychiatrists, and most about the tactics of those
3   psychologists who created our workflows, wrote:

4   "We have surveyed the psychiatrists and know how they want to work in the EHRS. It is
5   not how they work currently. Given the continuing push for control [by psychologists and
6   administrators, MG], it would seem clear the intent is to engage psychiatrists when the
7   court is looking, but otherwise disregard as has been the case for the last 2 decades. It has
8   been very unsatisfying for psychiatry at all levels." (see pages 2 3 of 2018 07 02 1508hrs)

9   See also (2018 08 02 1232hrs) Dr. ███ description of a Change Management
10  Committee meeting in which those who vote about what our medical workflows will be
11  (many administrators) seem not even to know what they are voting about. They have no
12  medical background at all.

13  **Visits to Troubled Institutions**

14  Please see the reports on SAC and CHCF that our psychiatry team recently visited, and
15  the report from last year from the psychiatrists themselves at SAC, who were interviewed
16  by HQ psychiatrist Dr. ███. (See 2018 07 12 1442hrs, middle of the page starting "My
17  visit at SAC was interesting". Also see previous report about SAC: 2017 12 06 1748hrs; also
18  2017 11 21 1749hrs.)

19  Of interest, also see the report from SVSP where psychiatrists are essentially never able to
20  have confidential one to one (1:1) appointments. (see 2017 11 21 1749hrs). At SVSP,
21  psychiatrists have been allocated confidential office space for only three hours per week in
22  which to see all of their patients combined, for months at a time. Three hours in total, out
23  of a 40 hour work week.

1     In the schedule presented, the physician, Dr. ███████, asked for an additional hour and

2     was given three hours, up one from the previous two. (see page 4 of 2017 11 21 1749hrs)


3     To repeat, psychiatrists were allowed to see patients in a confidential setting for a total of

4     two to three hours in an entire week, rather than seeing patients for perhaps six to seven

5     hours *per day* in a confidential setting, as some other psychiatrists can in CDCR (for

6     example at VSP), and which would be considered more normal.


7     The ███████████ of the SVSP PIP has more recently told me that psychiatrists may

8     now be able to see their patients in a confidential setting there for perhaps four hours per

9     week. The rest of the appointments have to be seen cell side at the SVSP psychiatric

10     inpatient program or patients need to be seen in treatment teams.


11     We have this information from SVSP despite not being allowed to electronically search

12     the database, create reports, or create EHRS non confidential note types to try to

13     understand these situations at SVSP and statewide. We have this information because we

14     were able to obtain a hand copy of the local patient schedule documenting how much

15     confidential office time the psychiatrist is given per week to see patients.


16     As can be seen on page 4 of 2017 11 21 1749hrs, custody and the schedulers granted

17     recreation therapists ten hours per week out of cell with patients per week, but the

18     psychiatrists were granted just three hours per *week*.


19     Although our senior executives and quality management psychologists have not allowed

20     us to directly access SAC EHRS information using queries to the database, or allowed us

21     to accurately get this information by designing the note types or workflow that would

22     capture the information, we can make some guesses by visiting the prison, watching what

23     happens, and talking to psychiatrists. Thus, we try to approximate what the data is.

76

1    For example, when we were last at SAC, three of 11 patients scheduled for one psychiatrist

2    came in the morning (in the Ad Seg unit) and four of 16 came for (EOP) appointments for

3    **another psychiatrist and were thus seen in a confidential and almost appropriate space.**

4    The space lacked computers so the psychiatrist could not get information about the

5    patient while talking to him, which would be deemed serious anywhere else, but given

6    **how serious the other issues are at SAC, like access to care issues, it is, relatively**

7    speaking, one of the more minor of the difficulties at SAC.

8    The psychiatrist's account of his day with me is helpful too, as it factually details the

9    **various barriers he, Dr.** ▮▮▮▮▮▮ **, encountered (see 2018 07 18 R). If, as we estimate, overall,**

10   CCC patients were seen as scheduled by mental health care providers only 22% of the

11   time (see pages 2 and 3 of 2018 08 22 0900hrs), rather than the 87% of the time reported,

12   **that does not reflect well on the ability of the SAC MH program to organize care.**

13   The psychiatrists at SAC know that custody will not, or will not be able to, bring patients

14   **to scheduled appointments, so the psychiatrists request ahead of time that many patients**

15   be brought (like 16 for a morning) in the hope that a few arrive. The psychiatrists

16   themselves guess that 75 80% of patients in Administrative Segregation are not initially

17   **brought to clinics when the psychiatrists request that they come.**

18   The reports from SAC (not SVSP), including what we ourselves saw when we visited,

19   **allow us to estimate that custody does not bring more than 25% of patients to see**

20   psychiatrists at the SAC EOP program. (Note: some patients do refuse, and custody can't

21   force them to come, although see my suggestion.) (see page 4 of 2018 07 12 1442hrs)

22   After an unproductive morning in which three quarters of patients are not brought to

23   their appointments, SAC psychiatrists spend the afternoon trying to find their morning

24   **patients who did not make it in the morning, with no custodial help for the psychiatrist**

25   to find the patient.

1    The psychiatrist says he is getting better at guessing where on the prison yard he might
2    find a given patient. It was about 100 degrees while we were out looking. The psychiatrists
3    **run into other patients who surround them on the yard or in the buildings connecting to**
4    the yard and try to consult the psychiatrist there, but again, on the yard the doctor has no
5    access to patients' information or medical history, and some of the patients are not on the
6    **doctor's schedule for the day (so the doctor can't be prepared for these events by reading**
7    a given patient's electronic chart beforehand).

8    It would be easy enough for psychiatrists to pull patients from groups to get a few
9    **moments with them in a confidential space[xv], but headquarters administrators and local**
10   psychology leaders in general forbid this — though we have seen some psychologists
11   willing to disobey HQ by allowing such psychiatric visits. (see 2017 11 21 1749hrs)

12   These doctor-patient encounters in the yard were being counted as compliant psychiatric
13   appointments by our psychologists in charge of the QM program, or by those who
14   **directed them to do so. Thus, misinformation has been given to psychiatrists at HQ and**
15   all others who read these reports, including those who rely on these CDCR reports giving
16   the impression that patients are being appropriately cared for.

17   This type of situation is precisely why brief input of information (for example checkbox
18   input into a pop-up window to allow the note to be finished) is critically needed to
19   **understand the environmental context of appointments, rather than what happens in the**
20   current system, which by default categorizes appointments as confidential and compliant.

21   Had the EHRS QM team met our request that the system record who was seen behind
22   **closed and locked cell doors and in what other physical contexts, including appropriately**
23   measuring the timing of care, the quality of care could be more objectively evaluated. But,

1      1. by not allowing a distinction in the data reported using appropriate note types and

2          not designing or allowing the psychiatry team to design specific recording of

3          **information about the environment of care,**

4 **and**

5      2. by biasing input of data by having non confidential appointments defaulting to

6          **being categorized as being confidential,**

7 **and**

8      3. by eliminating patients who don't come to scheduled appointments in a

9          **calculation of the percentage of patients who come to scheduled appointments**

10 **and**

11      4. by varying the compliance rules for on time appointments when patients transfer

12          **institutions to prolong them and by not counting any physician's scheduled**

13          **appointments (sooner than Program Guide max timelines) as late when they are**

14          late

15 **and**

16      5. by not allowing easy access to data (biased or not) to distinguish between a

17          **confidential and non confidential appointment,**

18 **and**

19      6. by eliminating most of the patients who did not receive medication consultation

20          **for medication non compliance from calculations of who received medication**

21          **consultation for non compliance**

22 **and**

23      7. **by not allowing the leadership of our psychiatrist physicians in CDCR to utilize**

24          **queries of the database to search for this critical medical information ourselves,**

1   the quality management and electronic health record psychologists and the senior mental

2   health executives who have supported their decisions are painting a misleadingly positive

3   **picture of patient care, and deeming what is actually inadequate care and poor**

4   organization of care to be good care, and so preventing appropriate remedial action to be

5   taken to correct significant issues affecting patient care.

6   When I visited SAC recently with the headquarters psychiatrist, Dr. ████, many of the

7   patients in the cell block were standing virtually naked in their towels as the psychiatrist

8   **tried to briefly interview patients in and around the administrative segregation unit. I**

9   followed a psychiatrist wearing a stab vest out into the yard in 100 degree temperatures to

10  try to locate patients for about an hour, because he had told me he had begun to learn

11  **where patients hang out in the yard so he could be able to see them. There were no**

12  custodial officers assigned to help the psychiatrists find the patients.

13  Psychiatrists should not be wandering in 100 degree heat in a stab vest to find dangerous

14  **patients on the yard, trying to guess where patients might be, to try to prevent psychiatric**

15  morbidity, manic episodes, psychosis or often to prevent death in these patients.

16  Dr. ████, who quit working there four years ago because patients (some level 4, our most

17  **dangerous inmates) could not be seen in clinics, and because potentially dangerous**

18  patients surrounded her on the yard, often with no custody in sight, commented,

19  "Nothing has changed in four years."

20  The female psychiatrist at SAC has been allocated 15 minutes in total in which to see

21  perhaps seven patients cell side (12:45PM to 1:00PM), after which it is shower time and

22  **she can't see her patients anymore, because it is too dangerous for her to be among**

23  dangerous inmates outside their cells while they stand around wearing only a towel.

24  Custody does not bring her patients in the morning, and she can't really see them in the

25  afternoon either: fifteen minutes is not enough time in which to see seven patients. This

80

1    is incredibly dangerous for the patients since they are getting just seconds to minutes of
2    psychiatric care.

3    Needless to say, this is not how other psychiatric clinics operate virtually anywhere in the
4    United States, and certainly the general medical clinics in the prison at SAC do not
5    operate this way. Only is it deemed appropriate to manage the *psychiatric* clinics this way
6    appropriate in the sense that CDCR is not measuring conditions that are medically
7    dangerous. Thus, CDCR is failing to create or report actionable information that would
8    allow us to fix the problem.

9    There was a Quality Management meeting a week after Dr. ▆▆▆▆ and my visit to SAC
10   that illustrates how utterly uninformed the CDCR Mental Health Quality Management
11   group typically is. The 20 or so committee members literally applauded the alleged
12   psychiatry quality improvements at SAC, on the basis that the numbers looked good.
13   Perhaps few of those applauding had any idea that the so called "appointments" that they
14   were implicitly applauding included encounters in which the psychiatrist was having to
15   figure out the name of the patient while standing in a hallway surrounded by inmates.
16   Perhaps they were not aware that the good numbers they were applauding included
17   encounters in which a psychiatrist may have had one to two non confidential minutes to
18   see the patient while roaming the prison and yard trying to find his next patient in 100
19   degree heat. The majority (or all) in that room were probably also unaware that actually
20   only perhaps 22% of mental health patients were being seen as scheduled on the CCC
21   yards, since the Dashboard and those who calculate for them mislead them into thinking
22   that 90% were seen as scheduled.

23   After the round of applause, I tried to explain to those in the meeting that this was not
24   quality care worthy of applause and that the numbers they were applauding did not (to
25   put it kindly) accurately measure what they thought they measured. My strong
26   recommendation  my medical opinion  was that no new EOP patients be transferred

1  there (and many should be transferred away) until basic minimal standards of care are

2  met. They said they would record my ideas in the QM minutes. (Thursday July 26th, 2018)

3  As I wrote to the ███████████: You can't provide medical care with no little or no

4  information, standing cell side and virtually screaming through a cell door, no matter

5  how many EOP reviews we are said to pass. If we pass when this is occurring, passing

6  means nothing in terms of medical care.

7  Unfortunately, given their actions, it seems that our QM psychologists and senior

8  executives regard recording and analyzing where and when these inappropriate forms of

9  treatment occur to be unimportant, though they deny that when asked. Yet there is no

10 careful analysis of these problems at a statewide level. Moreover, their failure to do the

11 analysis themselves, and their denying us access and input into the EHRS that would

12 allow us to do this analysis, is telling. They say that the psychiatric leadership should feel

13 free to state their opinions and that information is provided to them and that their input

14 is welcome, but their *actions* tell a very different story.

15 This attitude of our psychology and administrative executives, both at HQ and in the

16 field, that psychologists and administrators can determine what is and is not actionable

17 medical information, as described above, and therefore what information psychiatric

18 physicians should be allowed to know and act upon, has direct and sometimes

19 devastating medical consequences. The psychologists' determination that SAC EOP (Seg

20 yards) were safe and good and improving for psychiatric medical practice, is particularly

21 problematic. It is concerning because conditions there are actually so dangerous.

22 Therefore, reporting that they are good and improving suggests either an inability to

23 evaluate what good care is, or deliberate indifference to woefully inadequate care.

1    **Patient X, Title 22, and the Proper Role of Psychologists**

2    Patient X is a woman who presented psychiatrically relatively well when she entered

3    prison. But upon entry into the prison system she refused to take medication that she

4    previously had been taking. The psychiatrist did not deem that he could force

5    medications upon her given how well she presented. The patient was subsequently seen

6    by another psychiatrist who also documented her apparently reasonable mental state off

7    medications.

8    Arguably, in situations like this, longer transitions for patients at higher levels of care

9    should be insisted upon when medication from the community is discontinued, even if

10   the patient appears to have the legal right to discontinue medication because of

11   presenting in a logical way.

12   The patient was transferred to a CCC level of care where she was to be followed,

13   presumably because she was doing well as she left the reception center (anti psychotic

14   medications take a while to work, but many times when they are, their good effects can

15   sometimes last for a while after stopping taking them).

16   The patient was followed off medication in the prison mental health system at a CCC

17   level of care and did well, per reports, for many weeks. But she did not stay well.

18   Four hours before a sentinel medical event in which the patient removed her eye and ate

19   it, the patient had been evaluated by a psychologist who had found her to be gravely

20   disabled and had written admission orders to the psychiatric crisis bed unit. These

21   admission orders were being followed, except for the order for the patient to go to a crisis

22   bed. At the time of the event, Patient X was in alternative housing in a non licensed TTA

23   (like an urgent medical care center) despite the order for more intensive care.

83

1  The ████████ version of events, many of which I have personally corroborated

2  by reading the record, are as follows. (see 2017 12 11 1622hrs) I summarized the events

3  both in an email to the head of medical quality management (see 2017 12 18 1934hrs) and

4  to other senior executives in mental health (see 2017 09 05 1449hrs). The ████

5  ███████████ version of events, from a medical perspective, was unfortunately not made

6  part of the report about the incident in the root cause analysis:

7  In the below text, the blue writing is ██████████ Dr. █████████, and the black

8  text in square brackets is mine:

9  "On 4/20/2017 I/P **[Inmate Patient]** X......, who was admitted to MHCB **[mental health**

10  **licensed hospital crisis bed]**, although was housed in the TTA **[a non licensed medical**

11  **acute unit]**, was involved in a sentinel event. Approximately 4 hours earlier, she had been

12  evaluated and determined to be gravely disabled by the on site psychologist who placed

13  admission, watch, and issue orders **[admitted her, ordered how frequently she should be**

14  **observed, and ordered the clothing she should wear]**.

15  She was on one to one suicide watch by an LVN **[a licensed vocational nurse. This LVN**

16  **was tasked with constantly observing her. MG]** and was to be in a strong gown, however

17  refused to comply with issue orders. It was documented that she was "psychotic" at the

18  time of admission. Documentation from the one to one observer noted "screaming" every

19  fifteen minutes for most of the four hour period. She did not receive medications during

20  the four hour period prior to the event. The psychiatrist on call was not contacted by

21  **[either]** nursing, the admitting psychologist, or custody. After touching her eye for several

22  seconds, while in the supine position on the floor, the I/P used her left hand to enucleate

23  her left eye **[take out her left eye]**. The alarm was sounded and two correctional officers

24  entered the cell. The I/P was asked to relinquish the eye, however, she put the eye in her

25  mouth and ingested it......."

84

1    Dr. ▮▮▮ was very concerned about several issues and wrote extensively about them. (see

2    2017 12 11 1622hrs) Her medical opinion was that the patient had given every indication

3    that the patient needed medications (forced if necessary); but that it was determined by

4    psychologists and nurses   including the patient safety committee which had no

5    psychiatrists on it   that there was no reason to mention the acute need for the

6    psychiatric medications (forced or otherwise) as having been a root cause of the

7    enucleation. It was determined that failure to provide medications was not a root cause of

8    the patient having removed her eye.


9    Multiple subsequent psychiatrists, including headquarters psychiatrists, who heard about

10   this event, agreed that medications and forced medications had been needed, but the

11   psychologist evaluating the patient did not call the psychiatrist. Furthermore, the

12   psychologists at CTW and the HQ psychologist evaluating the psychologist's action, and

13   the patient safety committee (with no psychiatric input), determined that failure to call

14   the psychiatrist had not been a root cause of the problem. For documentation of the

15   screaming, see 2018 08 10 1161hrs including the close up photo showing that what is

16   highlighted is the word "screaming" (page 3).


17   So failure to give emergency forced psychotropic medications in a newly hospitalized

18   patient was not a root cause of the problem, as determined by psychologists with no

19   medical training, while also ignoring the opinion of the ▮▮▮▮▮▮▮▮▮. The opinion of

20   the psychiatrist who was on call for this admission in which tragedy occurred was not

21   sought, though he had the most experience and training about the emergency need for

22   medicine in situations like this. The psychologist apparently determined that there was

23   not a medically relevant situation necessitating that the physician be called. And the

24   psychologists and administrators (and I believe nurses) at the institution determined that

25   it was reasonable not to make sure that such a patient got medications in that emergency

26   situation. And the patient safety committee at headquarters, with no psychiatrist

27   representative, agreed. (see 2017 09 05 1449hrs)

85

1    Psychiatrists on call in CDCR are called after hours to "reconcile medications" for patients
2    being admitted. This is *not* someone (such as a psychologist) who has *interviewed* the
3    patient, calling the doctor and giving the doctor information about the patient. What
4    medication "reconciliation" amounts to is merely mechanically copying over medication
5    orders from the previous unit that a patient was on. Indeed, this is now being done by
6    pharmacists instead of physicians at some locations, and it will soon be done
7    automatically by the computer system.

8    The point is that reconciling medications is routinely done as a mechanical process, with
9    no knowledge about the patient, so cannot be considered a substitute for hearing about
10   the patient in a conversation with someone who has *interviewed* the patient.

11   In this case of Patient X, formal medication reconciliation was initiated for the patient,
12   but no relevant information was given to the on call covering psychiatrist *after the patient*
13   *was interviewed by the psychologist* (or anyone else), and that was the major problem.

14   Virtually anywhere across the country, for a patient newly admitted to a hospital, if no
15   general medical or psychiatric physician is available to interact on site with the patient,
16   the social worker or nurse initially interviewing the patient will call the doctor and tell
17   him or her about the patient.

18   Medical consultation is necessary even in the absence of a significant crisis, but it is even
19   more necessary when a patient is known to be psychotic and decompensated.[xvi] This
20   medical discussion with a physician (or sometimes a non physician provider like a nurse
21   practitioner) is needed to determine whether the patient would benefit from medication
22   (or forced medication) and also in order to determine in emergencies the potential
23   medical causes of the agitation, which could involve the need to check further laboratory
24   tests or perform medical evaluations (such as head CT scans, etc.).

1   But in this case, the psychologist interviewing the patient made the decision not to

2   consult the psychiatrist. According to Dr. ███, the ███████████, the psychologist

3   gave as a reason for not having called the doctor, that he thought that the patient would

4   refuse to take medication. So with no medical training, the psychologist took it upon

5   himself to determine that there was no need for a medical work up, and he apparently

6   didn't even consider that the psychiatrist might think it necessary to force medications in

7   this case.


8   According to Dr. ████ (see page 6 of 2017 12 11 1622hrs), the psychologist did not even

9   have legal admitting privileges for the crisis bed unit. Moreover, despite this horrendous

10   event, licensing was not called, because the patient's physical location was in an

11   unlicensed TTA, though the orders (that were already being followed), specified that the

12   patient was to be admitted to a licensed facility (Mental Health Crisis Bed).


13   I am not an expert on the law. This patient had not made it to the licensed location in the

14   prison so perhaps licensing did not need to be called? Dr. ████, the ███████████,

15   thought that part of the reason the patient did not make it to the licensed bed is that the

16   patient would not change her clothes into the appropriate gown for a crisis bed. The

17   order admitted the patient to a licensed bed, but the patient was not at the time in one.


18   Regardless, for a psychologist to make the medical decision not to call the psychiatrist

19   during an admission is apparently the norm at this crisis bed hospital unit. Indeed,

20   according to the former ██████████████, when she took call, she was repeatedly not

21   called by psychologists admitting patients to licensed crisis beds, and was only called

22   when psychologists were going to deny admission to a patient (to share potential liability

23   with the psychiatrist if something bad happened from failing to admit). (see page 6 of

24   2017 12 11 1622hrs)


87

1    So at this crisis bed unit that the judgement of the psychologist (about whom a patient
2    would need medical attention during a crisis hospital admission) was deemed to be
3    **adequate, and consultation with a psychiatric physician after a history is taken was**
4    **deemed not to be needed. And the assumption was that in general, the psychiatrist did**
5    not need to be called when patients were interviewed at the crisis hospital (or in
6    **alternative housing) en route to the hospital.**

7    This again follows from the underlying assumption and contention of many of our
8    **psychologists that their license gives them the ability to determine when**
9    **medical/psychiatric consultation or information is needed, even if a patient is being**
10   admitted to a crisis hospital, is screaming (even for hours), and is gravely disabled, as
11   **determined by the psychologist himself. This is the same attitude which denies the HQ**
12   **psychiatric leadership team access to medical information about the entire CDCR mental**
13   health system.

14   The tragedy is that any competent psychiatric physician or general medical physician
15   would have medicated the patient, and likely the patient's eye would still be in her head
16   **had that happened. It is the standard of care that medical evaluation occur in the case of**
17   psychotic patients [xviii], which implies that physicians must be contacted in situations in
18   which patients are admitted to hospitals and are psychotic and agitated. Indeed, it is the
19   **standard of care that physicians (or physician extenders like nurse practitioners) be**
20   **involved any time patients are admitted to licensed crisis or hospital facilities (see below,**
21   title 22), even if patients do not appear to be psychotic and agitated. But it is clearly not
22   **the standard of care at this unit and many others across CDCR.**

23   Indeed title 22 and 15 clearly state that in licensed CTCs (which includes mental health
24   **crisis bed hospitals)**

1    1.  "Psychiatrist means a person who is a licensed physician and surgeon in the state
2         of California...." (79567)
3    2.  "Psychiatric/psychological services means consultative services to inmate patients
4         (79609) of a correctional treatment center" (79609))
5    3.  Physician Services are services provided by the licensed physician responsible for
6         the care of the inmate patient in the correctional treatment center (79599).
7         And under 79599 Physician service includes, "determination of the appropriate
8         level of care for each inmate patient."

9    Psychiatrists are the physicians (licensed physician and surgeon per title 22) taking care
10   of these patients in these mental health CTCs (hospital crisis bed units). Our general
11   medical physicians do not care for these patients, except occasionally as consultants.
12   Psychiatric physicians decide when to consult their general medical colleagues if they
13   deem that a general medical condition (like diabetes or hypertension) needs attention. So
14   it is clear from title 22 that the psychiatric physician is considered the "licensed physician"
15   (79567) and thus has overall medical responsibility to consult the right people and make
16   the right decisions to keep the patient safe, when the system works correctly. The
17   psychiatrist has the same set of responsibilities as any other type of physician would have
18   in caring for a patient in a licensed correctional treatment center, whether its focus is on
19   general medical care or on psychiatric medical care (according to title 22 and 15).

20   Thus, it seems clear from these rules that the psychologist services (79609)), per title 22
21   and 15, are consultative to the patient and therefore cannot substitute for the physician's
22   care. The physician (according to title 22) is not consultative to the patient. Instead, the
23   physician is "responsible for the care of the inmate/patient" (79599).

24   So not only should the psychologist, as a patient consultant, be checking with the
25   physician who is ultimately "responsible for the patient" (and even more so in a crisis
26   admission to a hospital) the psychologist *must* do so, whether psychologists think they

89

1  can determine what is a medical issue or not. And this is relevant for a broader discussion

2  about this patient and many other issues throughout CDCR.

3  Perhaps even worse than this tragedy, the decisions of our local psychologists are made in

4  the context of a headquarters culture that precisely encourages these types of

5  irresponsible decisions to continue. An HQ representative of the statewide patient safety

6  committee (a psychologist) was assigned to help with the root cause analysis that was

7  being done at the institution, and was said to "make suggestions".

8  The ████████████ at the institution, and I, the Statewide Chief, insisted that one of

9  the key root causes of the disaster was the decision of the psychologist not to call the

10 psychiatrist, resulting in medications not being promptly administered. HQ psychiatrists

11 who reviewed the case also do not understand why the psychologists would not be calling

12 the psychiatrists for admission routinely, but especially in a case like this. And of course,

13 the ████████████ at CIW also could not understand why the psychologist would not

14 call the psychiatric physician.

15 Further, though it was the psychologist who interviewed the patient and therefore should

16 have called the psychiatrist, HQ psychiatry was surprised, too, that nursing staff did not

17 call the psychiatrist. The ████████████ discovered that custody thought the

18 psychologist was the physician, and the psychologist is even listed as the physician to call

19 by nursing staff in certain documentation. (see page 3 of 2017 12 04 1043hrs)

20 Two HQ psychologists (one of whom visited the institution for patient X) sit on the HQ

21 patient safety committee. We have asked that a psychiatrist sit on the committee, given

22 events like this, but our request was denied. Had psychiatric physicians been represented

23 on the safety committee, that might have allowed relevant psychiatric medical

24 information, and then our vote, to make a difference. But it was clearly determined, not

25 just in the institution, but at headquarters as well, that the psychologist's opinion about

1    what was a medical issue in this case was valid (for example, that the failure to call the
2    physician was not a root cause of the disaster when a patient was admitted to a
3    **psychiatric hospital and also happened to be decompensated, psychotic, and screaming).**

4    Such problems are likely to continue happening at this institution and more widely in
5    CDCR wherever this thinking occurs. It occurs because psychologists, supported by HQ
6    administrators and non medical senior executives, continue to allow psychologists to
7    determine what is or is not a medical issue. That is particularly dangerous in emergencies,
8    for example during admissions to psychiatric hospitals.

9    The ████████████, who advocated that it be recognized that the patient should have
10   been given medications, wrote about her experience working there in an email message
11   to me (for original see <sup>xviii</sup>). (see 2018 04 30 1244hrs) [The text in black in square brackets
12   is my own]:

13   "It had come to a point where the Supervising Psychologists in each program were by
14   proxy supervising the staff psychiatrist in that program. This was not a 'team based'
15   approach in providing care. The therapist was [deemed] the 'primary clinician' (formally
16   so, as the "PC" in the electronic medical record) and made all the important decisions,
17   without needing agreement from the psychiatrist. This was even the case during IDTTs
18   [treatment teams in which major clinical decisions are made]   the 'primary clinician' was
19   the person who presented the case, spoke to the patient, and the psychiatrist was asked
20   only to speak when it was about medications. I can attest to at least a hundred IDTT's I've
21   been a part of as the psychiatrist. And this was the only role I was expected to play    the
22   prescription writer."

1    The ████████████ continues:

2    "At CIW, in the one year period that preceded my becoming the ██████████, no

3    psychiatrist had attended the pharmacy and therapeutics committee meeting. **[A**

4    **psychologist** ████████ **attended in the place of the** ██████████**]**. No

5    psychiatrist had attended Licensed Inpatient Committee meetings, Utilization

6    Management Committee, Quality Management Committee, and perhaps most

7    importantly, the Mental Health Subcommittee. This can all be confirmed via meeting

8    minutes, **[although these committees all explicitly review the medical aspects of mental**

9    **health care]**. Psychiatrists had not been involved, at all, in policy review for any of the

10    programs outside of the PIP **[Psychiatric Inpatient Program]**, even in the MHCB **[Mental**

11    **Health Crisis (hospital) Bed]**. In fact, nobody knew who the Clinical Director of the

12    MHCB was when I became ████. I asked the ████ the ████████████████, **a**

13    **non psychiatric physician]**, ████ **[**██████████████**]** and the ████ **[Psychologist**

14    ██████████████████████**]**. The ████ thought it was the previous ████████

15    ████████ of the PIP, ██████████, PsyD **[psychologist]** (it was not). Or perhaps it was the

16    new acting ██████████ I had appointed for the PIP, ██████████, MD (it was not).

17    The ████ thought it was the ██████████████████ it was not, he was the ████

18    ████████. Multiple policies in the MHCB refer to a "Clinical Director", yet lo and behold,

19    nobody knew who that person was.

20    Finally, the designated "██████████████████", ██████████ piped in and said that it

21    was the previous Supervising Psychologist, ██████████, but unofficially. And currently, I

22    asked? Radio silence. Why is this problematic? Here was a licensed inpatient psychiatric

23    hospital, being solely run by psychologists, and had been for at least three years."

1    Dr. ▮▮▮ continues, commenting on the local MHCB policy:

2    "One example is the enucleation **[eye removal]** case. A psychologist admitted the patient

3    to the MHCB, did not contact the psychiatrist on call, and for four hours, this severely

4    psychotic patient paced and was noted to be 'screaming', she refused to change into a

5    strong gown, and refused movement from the **[unlicensed]** TCU to the **[licensed]** MHCB.

6    She was not offered a single dose of an antipsychotic before enucleating her eye and

7    ingesting it. She only received a dose after the enucleation   which was when the

8    psychiatrist on call was notified.

9    To my shock and dismay, the ▮▮▮▮▮▮▮▮▮▮ did not **[note]** that the policy

10   indicated that the psychologist must contact the psychiatrist when admitting. And that

11   notion **[that nothing needed to be said to the psychiatrists]** had been passed down to all

12   the staff, including the admitting psychologists who were told that the policy was to only

13   contact the psychiatrist when sending a patient back to their housing (that is not actually

14   in the policy). See local CIW Policy **[see page 10 of 2017 12 11 1622hrs]**.

15   The ▮▮▮ also wasn't aware that the admitting psychologist did not in fact have

16   admitting privileges at the MHCB, as none of the psychologists did. They only had

17   credentials to treat patients with therapy, not admit. That application process was

18   initiated by me after two years of psychologists admitting patients in a licensed

19   psychiatric hospital.

20   As a physician, I am well aware of what credentials and privileges are required for

21   admitting and treating and would not place a physician in a role without those being in

22   place. I know this because I have spent years training in hospitals. I am positive that the

23   psychologist who is the ▮▮▮▮▮▮▮▮ has never worked in a free standing

24   hospital, psychiatric or otherwise. Nor has the other ▮▮▮▮▮▮. This matters. As

**93**

1    physicians, we are trained largely in hospitals—we admit and discharge thousands of

2    times and we learn UM **[utilization management]** and QM via that process.

3    Yet this valuable skill set is completely disregarded at CDCR. Instead, there is a fiefdom of

4    power held together by a group who has been given more responsibility than their scope

5    would designate. The psychiatrists who encompass the broadest scope—all the

6    therapeutic modalities and the medical aspects of care—are relegated to being

7    prescription writers.

8    This is of course, related to CDCR's difficulty in maintaining psychiatrists—none of us

9    went to medical school and completed four to five years of residency to be a prescription

10   writer. Yet, perhaps more importantly, it affects the care provided to patients, as

11   evidenced by the one case illustrated in this letter (there are many more examples). All

12   patients, in particular inmates who are mentally ill, deserve the community standard of

13   care, which is a physician psychiatrist overseeing a department that provides psychiatric

14   care (which includes behavioral health). That standard is based on years of training and

15   licensure scope, not on hoarding of power." **(see 2018 04 30 1244hrs)**

16   **In this CDCR culture that relegates psychiatric medical doctors to mere prescription**

17   **writing, perhaps it is not surprising that it was deemed unnecessary to get a medical**

18   **opinion in a case in which a psychotic patient was screaming for four hours. And it is not**

19   **surprising that a headquarters culture that allows psychologists to vote to allow**

20   **themselves to override physicians' orders (for when a patient should be seen next) and**

21   **has QM committee meetings applauding excellent quality care at SAC (without**

22   **recognizing that it was disastrous care) would also send a psychologist down to review**

23   **the process, and he and the committee (with no psychiatrists), would find it perfectly**

24   **acceptable for a psychologist to decide that failure to call the psychiatrist was not a root**

25   **cause of the problem, despite the opinion of the local** ▮▮▮▮▮▮▮ **, the Statewide**

26   **Chief Psychiatrist and the entire HQ psychiatry team.**

1  The case of Patient X is tragic because the emulation was likely preventable. This case
2  should be reopened and reviewed by the Coleman Special Master team or their designees,
3  as CDCR has not as yet developed the cultural knowledge (in many of its institutions or at
4  headquarters) needed to understand that medical decisions about acutely hospitalized
5  patients should be made by psychiatrists rather than non medically trained personnel,
6  and that clinicians should call the psychiatrist on call in such cases rather than failing to
7  consult the psychiatrist. It is important to learn from these tragedies and we will not do
8  so given the dangerous, medically inappropriate constraints CDCR imposes on
9  psychiatrists' access to information and analysis of psychiatric medical contexts in CDCR.

10  **Psychiatry Undermined and Sidelined**

11  For comparison with the case above, it is helpful to read the comments of a line staff
12  psychiatrist at a different institution (CHCF). Dr. ▇▇▇▇▇ comments are relevant to the
13  previous case (see 2018 07 17 1703hrs):

14  "It seems that certain types of decisions, including level of care changes, are made by the
15  supervising psychologist in consult with the clinician (psychologist or social worker). In a
16  setting like this, you must choose your battles, so I don't say anything. On a few occasions
17  I did get frustrated because I felt strongly about certain cases and spoke up, expecting
18  people to respect my view, but certain staff just argued against me. If I really felt I wasn't
19  being heard, I could have just contacted the other facility involved to say that I disagreed
20  with the team, but I would never do that. Even weirder is when they ask questions for
21  custody regarding whether mental illness played a role in some infraction when going in
22  front of a disciplinary board. This question almost always seems to involve a deep
23  understanding of the role of medications in relation to their illness, and I am trained in
24  forensics and have been involved in answering questions like these for courts in several
25  locations and internationally."

95

1   He continues:

2   "I've just gotten very good at biting my tongue for 90% of our meetings that are

3   dominated by psychologists. It helps keep me humble, because in reality I'm trained in

4   Johns Hopkins and Yale and have often had high level experiences or been directly

5   involved in research related to the matter at hand. So if a social worker with no real

6   mental health training is asked their opinion over mine, it just tells me that the system is

7   more interested in other things than truth. Hope that's not too cynical or going to get me

8   into trouble. I'm always interested in big picture and systems level thinking, so please let

9   me know if I can be of service or if there are any unique opportunities in the future."

10   Dr. ▓▓▓▓▓▓; ▓▓▓▓▓▓▓ at SATF, similarly describes how the psychologist who

11   supervised him (a former Chief of Mental Health) made an apparently incorrect clinical

12   determination and used her disagreement with his good judgement as part of her

13   argument to get him removed as a Probationary ▓▓▓▓▓▓▓▓. (see 2018 04 26

14   1257hrs)

15   Dr. ▓▓▓, the excellent ▓▓▓▓▓▓▓ at CIW when the enucleation case above

16   happened, stepped down from her position as probationary ▓▓▓▓▓▓ before her

17   reputation could be tarnished as her preliminary probationary report did not reflect her

18   excellent skills, hard work and commitment to excellent patient care. Neither the

19   Statewide Chief Psychiatrist nor any other psychiatrist has any input into decisions about

20   whether chief psychiatrists are deemed to be doing a good job. Dr. ▓▓▓ did not want to

21   have to report to subsequent employers that she had failed probation so she quit before

22   that happened. Please see my letter to our ▓▓▓▓▓▓ (see 2017 10 25 1156hrs) and

23   Dr. ▓▓▓ note to me (see page 2+ of 2017 10 25 1156hrs).

24   But ▓▓▓▓▓▓ at SATF, Dr. ▓▓, stayed and was failed on probation and forced out

25   of his position. He was demoted. But he fought the charges against him in court, and

1   won, and was then reinstated as the ███████████, with no need to report any failures

2   to future employers, because he had been exonerated in court.

3   He says in a message to me about evaluations of his clinical care:

4   "....I had another patient in crisis bed that I saw at the request of the staff who making a

5   gesture of putting something around his neck and trying to pull the ends with his hands

6   without completely encircling the neck. He wanted custody to go in. He had a law suit

7   going on charging excessive force and had a detached retina because of that. He was

8   hoping for custody to go in and get physical so that he could get the injury aggravated

9   and have a further case against CDCR. I told the custody and staff that there was no acute

10   danger to the patient and for custody not to go in but for staff to just keep a visual 1:1 on

11   him. The patient calmed down after custody did not go in and was ok and an aggravation

12   of his detached retina was avoided. An additional lawsuit on CDCR was also avoided. This

13   was the case you [[Dr. Golding]] were consulted on and you sided with me but these guys

14   nevertheless used it against me.

15   I was written up by the █████ [[...]] and told that I had not followed the rules. She also did

16   not like some of the views I had expressed earlier that a psychiatrist should weigh in

17   before a patient is discharged. She failed me on probation because of this and other

18   trumped up lies and fabrications. I sought a Skully hearing and won the case and retained

19   my ███████████ position." **(see 2018 04 26 1257hrs)**

20   **Psychologists Shouldn't Be Making Medical Decisions**

21   Note also Dr. ████ mention of discharges from (presumably) crisis beds. Crisis beds are

22   **licensed mental health facilities which are designed to be short term crisis psychiatric**

23   **hospitals (stays are often less than ten days). In virtually every hospital across the country**

1   and throughout California, patients do not leave hospitals without a medical doctor (such
2   as a psychiatric physician) determining that from a medical perspective, the patient is
3   safe to leave.

4   For example, a patient might have diabetes or hypertension as well as mental illness and
5   it is the psychiatric physician's job to either determine that these medical conditions are
6   stable prior to the patient leaving, or to get them stable, for example by consulting a
7   general medical physician. Moreover, psychiatric medications are frequently being
8   adjusted, medication levels need to be checked, and physical and certain predictable
9   mental side effects may need to be evaluated before a patient leaves hospital. Patients
10  should not leave a hospital unless some kind of medical clearance is given.

11  In California, unlike in most states, psychologists are apparently allowed by law to
12  discharge patients from hospitals. Our ███████████ has affirmed that, and is working
13  to extend the CDCR system of psychologists admitting and discharging to the
14  Department of State Hospital Programs inpatient programs for inmate patients that
15  CDCR recently took over. Psychiatrists currently admit and discharge patients from these
16  formerly DSH hospitals. It is particularly crucial that physicians (including psychiatric
17  physicians) at least medically determine that it is safe for a patient to leave the acute and
18  long term psychiatric hospital, as psychologists have no medical training at all and will
19  soon be making discharge decisions in formerly state psychiatric facilities about our
20  sickest psychiatrically ill patients who are also often medically sick. Getting
21  medical/psychiatric clearance before patients leave hospitals or some type of medical risk
22  benefit analysis is the standard of care in every hospital across the country. That is why it
23  is particularly poignant when Dr. ███ was attacked for saying, "a psychiatrist should
24  weigh in before a patient is discharged".

25  Given these issues, the HQ psychiatry team has argued that custody and transportation
26  should not be contacted (and the patient prepared to leave the hospital) unless the

**98**

1    psychiatric physician (at a minimum) has affirmatively medically/psychiatrically cleared
2    the patient.

3    ███ ████████████████ denied that request. The ███████████ did not allow it
4    in practice, arguing at one point that it was a local institutional issue.

5    In reviewing 32 records (see 2017 08 32R), the HQ psychiatry team found that in about
6    50% of cases, there was neither an order in the chart for discharge by a psychiatrist nor an
7    explanation for why the patient should leave. This would be unheard of anywhere in the
8    country, where physicians (including psychiatric physicians) are involved with decisions
9    to discharge patients from psychiatric hospitals. They discharge and write notes. But in
10   these 50% of cases, neither was occurring.

11   In reviewing some of these discharges, we found that a psychologist had discharged the
12   patient without any documented agreement by a psychiatrist or any other medical doctor.
13   The lack of any medical explanation for why a patient should leave a crisis hospital occurs
14   in no other hospital outside CDCR that any of our HQ psychiatrists have ever heard of.
15   (see 2018 07 06 1016hrs)

16   Although not documented in the above list, at CCWF, a psychiatrist clearly states in a
17   note on the day of a patient's discharge (see page 15 and the last page of 2018 08 14
18   1000hrs) that the patient should not be discharged. But the unlicensed psychology intern
19   discharged the patient anyway (after documenting that she spoke with her supervisor,
20   another psychologist).

21   The psychiatrist involved explained in an interview with me that it is considered
22   imperative to get patients out of crisis beds in ten days given directives (I tried to change
23   his mind and asked that he fight that perception, though he feels the pressure can be

1  intense from headquarters[xix]). The psychiatrist told me that to properly plan to send a
2  patient for long term hospital care at a psychiatric inpatient unit hospital (rather than the
3  **current crisis hospital), a plan has to be started perhaps on day three of the crisis hospital**
4  **stay, at the first treatment team. So a decision has to made to get the patient to long term**
5  care then, before virtually any treatment has occurred. If the team guesses wrongly about
6  **the need for long term care early on in the crisis hospital admission, as the psychiatrist**
7  **says happened in this case, day ten approaches and something must be done. His**
8  preference was to wait and send the patient nonetheless to long term care, but the
9  **psychology intern overruled his decision. The issue of not being late for transfer seemed**
10  **absolutely imperative.**

11  The psychiatrist said that the team might be accused of mismanaging the patient if the
12  **patient stays beyond the strongly suggested maximum amount of time the patient should**
13  **be there (ten days) to wait for a long term bed. The argument is that, had the referral**
14  been made earlier, for example, at day three, it would have been easier to get the patient
15  **to the long term bed by day ten, not after day ten. If one can't get the patient to the long**
16  **term bed by day ten, the reasoning goes in this crisis bed unit, the only alternative is to**
17  discharge the patient to no hospital at all, which is what the psychiatrist says occurred in
18  **this situation.**

19  He reports that many psychologists seem to be intensely focused and pressured to get
20  **patients out of the crisis bed by day ten, even if good discharge plans have not been**
21  **made. Finally, there is additional pressure to discharge the patient to the lowest level of**
22  care possible, the CCC level of care, not the EOP level of care.

23  **So the psychiatrist wrote in his note that the patient should not leave a protected hospital**
24  setting (see pages 8 and 15 of 2018 08 14 1100hrs), but the unlicensed psychology intern
25  **discharged the patient to the lowest level of care mental health care (CCC) possible, not**
26  **even the EOP level of care in which the patient would have got enhanced services.[xx]**

1    Of interest, about a week before the hospital admission described above, the patient had
2    also been discharged from a crisis bed and was similarly sent to a CCC level of care.
3    **Consistent with the policy that when patients transfer levels of care (and institutions) the**
4    **psychologist (or social worker) writes orders for the psychiatrist to see the patient back at**
5    the latest court allowable date, the non medical clinician scheduled the patient to see the
6    **psychiatrist 90 days later    this was a patient just discharged from the hospital    with the**
7    **lowest level of supportive care possible.**

8    Put simply, a patient was just discharged from a psychiatric hospital and put at the lowest
9    **level of follow up care, and orders were written on 7/13/18 by a psychiatric *social worker*,**
10    for the patient to be seen 90 days after just being released from a psychiatric hospital (the
11    community standard is one *week*).

12    The social worker determined when the next medical intervention was needed and
13    determined that the psychiatric visit should occur 90 days later. There was no physician
14    **involved because the social worker or psychologist determines when the patient should**
15    be seen next, hospitalization or not, medication adjustment or not, and the maximum
16    time is chosen.

17    And then the patient bounced back almost immediately into the hospital from CCC and
18    then was discharged by the psychology intern who met the patient once. This was against
19    **the will of the psychiatrist who had seen the patient essentially every day for a week. The**
20    **psychology intern who saw the patient once and overruled the physician sent the patient**
21    to the CCC level of care again with the rationale for lower level of care
22    **("MHLowerRationale") being, "Patient is assign(e [sic] to CCCMS."**

23    After the second hospitalization and discharge to a CCC level of care a second time, the
24    **patient was finally sent to EOP on 8/9. (see 2018 08 15 1333hrs)**

1    One wonders how a psychology intern could really understand that when one rapidly

2    lowers a very powerful medication like olanzapine (which occurred), then starts an

3    antidepressant, that could be profoundly destabilizing in terms of increasing short term

4    risk of suicide, which is no doubt why the psychiatrist Dr. ■■■ wanted to make sure the

5    patient did not become agitated then suicidal in making those changes. So it is hard to

6    fathom how the psychology intern could make the medical decision that Dr. ■■■■

7    knowledge and information just wasn't relevant or at least not relevant enough, and that

8    it was fine to overrule the physician and his judgement.


9    The psychiatrist saw the patient 7/23/18, 7/24, 7/25, 7/26, 7/27, 7/29, 7/30, 7/31, 8/1 and the

10   psychology post doc intern saw the patient once on 8/1/18 and discharged the patient,

11   against the explicit and documented advice of the psychiatric physician.


12   The psychiatrist wrote:


13   "As per team IP [inmate patient, MG] will be discharged back today to his yard. This

14   psychiatrist is recommending additional observation in view of his long Hx, long

15   sentence, residual depressive Sxs [symptoms] and the recent initiation of AD

16   [antidepressant] medication however this opinion *was felt to be unnecessary* [emphasis

17   mine, MG] by the other team members...." (see page 2 of 2018 08 14 1100hrs)


18   In contrast, the post doc psychology intern wrote:


19   "Met with patient for IDTT [the patient's treatment team, MG]. Introduced myself as

20   covering for his primary PC [PC= "Primary Clinician" which is almost always defined to be

21   the psychologist or social worker in CDCR]. Informed patient that after reviewing his

22   chart notes, emailing yard PC and speaking today with primary PC, there does not appear

1  to be a reason to continue to keep him after 1 days [sic]." (see page 2 of 2018 08 14

2  1100hrs)[xxi]

3  To summarize, (see 2018 08 14 1100hrs), the patient was admitted to the mental health

4  crisis bed (a licensed correctional treatment center) for suicidal thinking with plan. He

5  was clinically discharged on 8/1/18, despite the psychiatrist's strong objections.

6  Dr. ███████ says:

7  "Two significant issues to note: 1) The psychiatrist saw the patient every day of his

8  admission, with the exception of 7/28/18, whereas the patient was seen by 7 different

9  psychologists or social workers during his stay. The psychiatrist was the staff member

10  with the most knowledge and familiarity with the patient, but he was overruled regarding

11  the discharge; 2) The patient was discharged by a post doc psychology intern, on the day

12  she met the patient. The psychiatrist strongly disagreed with discharging the patient, but

13  the patient was still discharged. This clearly demonstrates that the unlicensed psychology

14  intern, and not the psychiatric physician, was the primary clinical decision maker." (see

15  page 1 of 2018 08 14 1100hrs)

16  Please now see 2018 07 26 0948hrs, which relates to a different case. In this situation, the

17  psychiatric physician finds out that her non hospitalized patient was not taking

18  medications and writes that the patient should be admitted to a crisis bed for evaluation

19  for 2602 (forced) medications, as she thought forced medications may well be

20  appropriate.

21  "I informed her (the psychologist) that this pt needed to be sent immediately to the Crisis

22  Bed for safety, stabilization and consideration for an emergent PC 2602, which cannot be

1    accomplished in ASU [administrative segregation unit]." (see page 4 of 2018 07 26

2    0948hrs)


3    The above quote means that the psychiatrist told the psychologist that the patient needed

4    to be sent from an outpatient prison housing unit to an inpatient unit for consideration of

5    emergency forced medications ("emergent PC2602"). The psychiatrist also says that this

6    emergency forced medications cannot be safely done in the patient's current outpatient

7    housing arrangement (an administrative segregation unit) and indeed forced medications

8    are essentially never done in CDCR in outpatient units.


9    But the psychology supervisor of the ASU deemed that this evaluation for forced

10    medications in a crisis bed was unnecessary. Thus, this psychologist supervisor made the

11    medical determination that forced medications were not needed and should not occur,

12    though a psychology supervisor has no medical training whatsoever to be making these

13    medical decisions about whether consideration of forced medication is relevant or the

14    consequences of not forcing medication. This decision by the psychologist is eerily similar

15    to the case of patient X, described earlier, in which the psychologist determined that

16    calling the psychiatrist for a possible forced medication order was not needed   but that

17    time, failure to call the psychiatrist had disastrous consequences. So the above is a case

18    where a psychiatrist clearly documents the need for immediate hospitalization for

19    medication related reasons, and the non medical psychologist overrules her, making the

20    medical decision that medication evaluation in a crisis bed is not needed.


21    In theory, level of care changes are always made by the IDTT, the patient's treatment

22    team, which should include the psychiatrist. Yet Dr. ████ and Dr. ████ and Dr.

23    ████████ (at CHCF) directly told Dr. ████ and me during our recent visit in July 2018

24    and we hear the same from many psychiatrists across the state   that they are frequently

25    only told that the patient is being discharged (or that the level of care is being changed)

26    when the psychologist tells the patient in treatment teams. So the physician psychiatrist

1  is finding out that a discharge is going to occur when the patient is being told. Clearly no
2  consultation is seen as necessary with the psychiatric physician, except if the psychologist
3  determines that a psychiatric medical opinion is needed (and often that happens). But it
4  is the psychologist who determines whether there is a relevant medical situation present
5  which necessitates calling a psychiatric physician. As our psychiatric physicians
6  repeatedly say, CDCR seems to want to use them only for prescription writing.

7  At headquarters, while our psychologists and administrators have asked our psychiatrists
8  to interpret certain sorts of data, we are typically denied any kind of comprehensive
9  system level information about the quality of care that we are providing.

10  So strong is the culture of psychologists ignoring and even overruling psychiatric/medical
11  decision making in the California system that, as illustrated above in the case of the
12  patient who removed her eye and swallowed it, and in the discharge and admission
13  decisions illustrated, psychologists are willing to put in writing their decisions to overrule
14  the medical decisions of the psychiatric physician. As our head of Quality Management
15  puts it, "We have a referral based system to psychiatry."

16  This can now be clearly seen to be interpreted to mean that psychologists determine
17  when there are medical scenarios in which psychiatric physicians are needed.

18  This means that psychologists ask for the opinion of psychiatrists only if they deem it
19  necessary. Dr. ███, overruled by the psychology intern, phrases it this way in his
20  discharge note:

21  "This psychiatrist is recommending additional observation in view of his long Hx, long
22  sentence, residual depressive Sxs [symptoms] and the recent initiation of AD

1    [antidepressant] medication; however, this opinion was felt to be unnecessary [emphasis
2    mine, MG] by the other team members...." (see page 2 of 2018 08 14 1100hrs)

3    But the physician's medical opinion can only be unnecessary if the psychologist (or
4    psychology intern) determines which medical opinions *are* necessary. Which is to say, the
5    CDCR culture allows psychologists to determine what is a medical issue or not and to
6    consult a psychiatrist only when they deem a psychiatrist's medical opinion necessary. A
7    referral based system means that psychiatrists in CDCR are considered mere consultants
8    to psychologists. This occurs at HQ in which psychologists and our ██████████
9    determine that it is

10    1.  fine to overrule the medical opinion of the psychiatrist about when a patient
11        should be seen next when patients transfer institutions, as a matter of policy

12    and

13    2.  fine to determine that it is unnecessary to allow physicians to have access to
14        needed medical information for patient care from databases or fine to fail to
15        provide the information if they determine the physician does not need it to care
16        for the patients

17    and

18    3.  fine to determine the psychiatric medical workflow in the EHRS and what will be
19        needed information by psychiatrists to make good decisions (for example,
20        reasonably detailed information about the environment of care is not deemed
21        relevant based on what they have allowed to be designed)

22    And in the field it is

23    1.  fine for the psychologist in the crisis bed unit to determine that medical
24        consultation is not needed with newly admitted and screaming and psychotic
25        patients

106

1    and

2    2.  fine for the psychologist (even just a psychology intern) to determine that
3        changing medications are not relevant in assessing risk for suicidality while
4        discharging the patient, while the psychiatrist disagrees

5    and

6    3.  fine for the psychologist to determine that there is no need for consideration of
7        forced medication in the crisis bed in a medication non compliant outpatient
8        though the psychiatrist insists on it

9    and

10   4.  fine to make a decision that in a licensed hospital it is fine for a psychologist to
11       order an aspirating patient into restraints, rather than calling a psychiatrist who
12       might give forced medication instead, and that it's fine for the psychologist to
13       write a restraints order without getting agreement from anyone with medical
14       knowledge beforehand (discussed later).

15   When I (a psychiatric medical doctor) worked very briefly at CHCF in the crisis bed unit
16   nearly five years ago, a psychologist (the patient's "primary clinician") said to me: "I am
17   discharging patient X. I need you to write his medicines."

18   But when I asked about the condition of the patient, whom I had actually never seen
19   before as I had just arrived at the institution, the psychologist could not or *would not* tell
20   me why the patient was there, or how long he had been there, or what his diagnosis was,
21   or what medical conditions he had, or what medications he was on, etc.

22   The psychologist told me merely that the patient seemed better and was not suicidal.

1    Needless to say, I could not agree to write the patient's discharge medications, because
2    neither the psychologist insisting that I do so, nor I, knew enough about the patient to
3    make such a decision at that time.

4    Having just moved to CDCR from a more standard correctional system elsewhere, in
5    which medical decision making mattered in situations like discharging medically and
6    psychiatrically ill patients from hospitals and in which it was not deemed to be the
7    psychologist's decision when a medical opinion is or is not necessary before discharging a
8    medically and psychiatrically sick patient from a hospital, I was surprised.

9    I was fully prepared to disobey the psychology supervisors who were telling me what to
10   do and to accept whatever consequences there would be. But they had so few
11   psychiatrists that they had to let me stay.

12   CDCR *says* that psychiatrists report to psychologists only *administratively*, not clinically.
13   However, in situations like I experienced above, in which your supervisor may be telling
14   you that a patient is going to discharged, it is very clear that the supervision is definitely
15   not just administrative. It is clinical.

16   The psychologists in many of our institutions are the *de facto* clinical supervisors of the
17   psychiatrists despite having no medical training to be supervising what a physician does
18   medically. But as illustrated in the above examples, they do it anyway. The conversation
19   detailed above, about me writing medications for a patient the psychologist was
20   discharging, was witnessed by fellow HQ psychiatrist Dr. ███████████.

21   When patients leave an inpatient/crisis hospital setting in environments in which
22   psychologists are ordering the discharges, I have argued that psychiatrists should
23   complete an order medically/psychiatrically clearing the patient, which then becomes the

108

1   precipitant to transportation being called to move the patient. Thus, the psychologist

2   could make the decision to discharge the patient — hopefully in consultation with the

3   treatment team — but no order for transport should occur unless and until the

4   psychiatric/medical clearance precipitates it. Then a discharge (usually written by the

5   psychologist) and the psychiatrist's medical clearance would enable the patient to leave. I

6   also believe that in definitively establishing this very important medical/psychiatric

7   clearance policy, it would help our non medical colleagues understand that they need to

8   include the psychiatric physician not just in these discharge decisions but also in other

9   decisions on a day to day basis.


10   Our psychologist ███████████████ has blocked this mandatory consideration of

11   medical issues by physicians when patients leave hospitals and her boss opined that it was

12   a local decision if institutions want to do this. She has in practice prevented this from

13   occurring, thus implicitly leaving many of our psychologists to be medically in charge of

14   many aspects of patients' care, though they have no training to do that.


15   To repeat:


16   Title 22 and 15 clearly state that in licensed CTC's (which includes mental health crisis

17   bed hospitals)


18       1.  "Psychiatrist means a person who is a *licensed physician and surgeon* in the state of

19          California...." (79567)

20       2.  "Psychiatric/psychological services means *consultative services* to inmate patients

21          (79609) of a correctional treatment center" (79609)[xxiii]

22       3.  Physician Services are services provided by the licensed physician responsible for

23          the care of the inmate patient in the correctional treatment center (79599).

24          And under 79599 *Physician service includes, "determination of the appropriate level*

25          *of care* for each inmate patient."

1    As stated previously, it is clear from title 22 that the psychiatric physician is considered

2    the "licensed physician" (79567) and as the licensed physician is said to have overall

3    medical responsibility to consult the right people and make the right decisions to keep

4    the patient safe, when the system works correctly.

5    Thus, it should be clear from these rules that since psychologist services (79609), per title

6    22, are consultative to the patient but the physician is "responsible" for the care of the

7    patient, psychologists cannot substitute their judgement for the physician's, because the

8    decision making capacity of the physician (according to title 22) enables him or her to be

9    "responsible for the care of the inmate/patient" (79599).

10   The appropriate "level of care", the determination of which is assigned to the physician,

11   includes whether patients should leave licensed crisis hospital beds, and go to the EOP

12   level of care or the CCC level of care. Title 22 is thus explicit that the physician must be

13   responsible for the patient to make sure he or she is at the right level of care.

14   Not only should the psychologist, as a patient consultant, be consulting the physician, the

15   psychologist must do so, whether psychologists think they can determine what is a

16   medical issue or not. Indeed, when a physician affirmatively denies that clearance and

17   argues that the patient must say, it would seem to be legally problematic for the

18   psychologist to overrule the physician's decisions in licensed hospitals, given title 22, yet

19   this happens frequently in CDCR.

20   Mandatory physician involvement with each discharge decision from a hospital would

21   seem not only to be straightforward and commonsense (and occurs in just about every

22   hospital any physician has ever been a part of), it also seems to be mandated by law. So it

23   is hard to figure out why our psychology executive directors and senior mental health

24   executives (all non medical) at HQ will simply not allow a medical/psychiatric clearance

1    order prior to transportation being called to enable the patient to leave the hospital and
2    be consistent with the law.

3    It strikes our psychiatry team as indifferent to patient medical care to not have a system
4    in place in which a physician (for example a psychiatric physician) makes sure the patient
5    is physically/medically/psychiatrically safe when a patient first enters and before the
6    patient leaves a licensed crisis hospital, when patients are frequently both medically and
7    psychologically sick in hospitals. And during discharge, mandatory orders for
8    medical/psychiatric clearance should be tied to transport orders, to prevent the patient
9    from physically leaving when the psychologist writes the discharge order as happened in
10   the example given above. The psychiatrist said no. The psychology intern said yes. And
11   the patient left.

12   When one of our senior administrative mental health executives asked me what I hoped
13   to accomplish by insisting that physicians provide medical/psychiatric clearance before
14   patients leave hospitals, I responded as follows:

15       "When a patient is leaving the hospital to go to somewhere other than another
16       hospital, someone medically qualified (a psychiatrist or other Medical Doctor) is
17       taking a view about and legally and ethically signing off on a number of issues: that
18       the medical situation including medical meds, psych meds, psychological condition,
19       physical condition, housing and social situation, are such that the patient can safely
20       leave hospital.

21       In CDCR mental health hospitals, discharge orders are currently typically being
22       written only by psychologists, not psychiatrists or other medical doctors.

111

1   Psychologists are not medically qualified to address all the relevant issues that must
2   be considered.

3   Therefore, if psychologists can discharge patients from hospitals, then the physician
4   giving "medical clearance" in our system must therefore be taking on the
5   responsibility for signing off on all the relevant issues mentioned above.

6   Either the phrase "medical clearance" must take into account all the relevant issues,
7   or the word "discharge" must. If in our CDCR system neither does, we are neither
8   following the law, nor behaving ethically.

9   By requiring psychiatric or other MD involvement in discharge decisions, I am hoping
10  to achieve legal and ethical discharges rather than illegal and unethical ones with all
11  their associated consequences."

12  Our non medical ▮▮▮▮▮▮▮▮ wrote:

13  "I am going to change the duties of the psychologists in the PIPS [psychiatric inpatient
14  programs] to allow them, with the IDTT, to make admissions and discharge
15  decisions.....There is considerable concern from the psychiatry team at the new PIPs that
16  they will be exposed to liability when a psychologist makes a poor decision". (see 2017 11
17  15 1143hrs)

18  She ignored the need for medical clearance in this message when medically sick patients
19  leave the hospital (seemingly required by title 22 since level of care changes are supposed
20  to be made by the physician, not the psychologist), and ignored that physicians might
21  need input into these "decisions" to make them safe, both in terms of writing policy about
22  them and in terms of trying to protect our patients. Indeed, what if a patient's diabetes

1 were not under control when psychologists make these "decisions" (79599)   that it is
2 important for her that psychologists make.


3 Until recently, it was a mantra that discharges are "treatment team decisions" by the
4 "IDTT"; that is, that decisions about discharge were in theory made by the psychologist
5 and psychiatrist and other members of the treatment team, together.


6 In addition, if it is really always a joint decision, then no one should have any objection to
7 a physician psychiatrist merely psychiatrically/medically clearing the patient (as an order
8 in the treatment team meeting just prior to discharge) before transportation is called to
9 enable the patient to leave the hospital. No one should have any objection to a mandatory
10 physician's clearance order, because surely the treatment team leading and primary
11 clinician psychologist already obtained agreement from the psychiatric physician during
12 treatment team prior to discharge of the patient, if it really were a joint "treatment team
13 decision", as our executive psychology leadership asserts with the ████████████.


14 If the psychiatric physician agreed (in a treatment team meeting) to a discharge, as
15 claimed, why can it be wrong for transport to only be enabled to come if a psychiatrist
16 takes one minute to write a medical/psychiatric clearance allowing transportation to
17 come, in that same treatment team meeting in which that psychiatrist's agreement
18 allegedly occurred?


19 This is logically true and thus our executive psychologists and non medical ████
20 ████████ should have no trouble at all with psychiatric physicians
21 medically/psychiatrically clearing patients to leave hospitals, unless having a physician do
22 that is actually not what is wanted by the psychologists doing the discharges and unless
23 that is not what is wanted by our ████████████ and those executive psychologists who
24 support the current process and thus will not allow mandatory medical clearances.

1   Please see my e-mail to our ████████████ 2018 07 06 ██████.

2   Recently, our Senior ████████, ████████████, released a memo saying the

3   following (see page 2, section c of 2018 09 18 memo):

4   "c. When patients are clinically discharged from crisis beds or inpatient beds, they shall

5   be moved from the bed to their assigned institution in an expeditious manner to ensure

6   bed availability for patients awaiting MHCB placement........"

7   Under "c", discharge is defined: "Clinical discharge means the primary clinician or

8   treatment team has determined that a patient requires a different level of care and

9   discharge orders are placed and the inmate/patient can be moved."

10  The primary clinician is deemed to be the psychologist in a short term (crisis bed)

11  hospital or an acute or intermediate hospital in CDCR.[xxiii] Moreover, the psychologist and

12  the psychiatrist are members of the treatment team as are others. Therefore, the language

13  that in hospitals and crisis beds discharges are authorized if the "primary clinician or the

14  treatment team has determined that a patient requires a different level of care and

15  discharge orders are placed and the inmate/patient can be moved" means:

16  1. The Psychologist (the primary clinician)

17  *or*

18  2. The psychologist and psychiatrist and others on the "treatment team"

19  *determine*

20  3. That a patient requires a different level of care and discharge orders are placed and the

21  inmate patient can be moved.

1  If the psychologist and psychiatrist disagree about discharge, it follows that the treatment

2  team haven't reached agreement so can't make the decision. Given that decision is to be

3  **made by the treatment team *or the psychologist*, it follows that in the event that the**

4  **psychologist and the psychiatrist disagree, the person authorized to make the decision is**

5  the psychologist rather than the psychiatrist. The psychiatrist is not authorized to make

6  **the decision alone, whereas the psychologist is authorized to make the decision**

7  independently of the treatment team.

8  **Thus, logically, our** ███████████ **has determined that in the event that the**

9  **psychologist and psychiatrist disagree about, for example, whether it is safe to discharge a**

10  patient, it is the psychologist, not the psychiatrist, who is authorized to determine

11  whether or not a discharge should occur.

12  Thus, as a matter of logic and policy (by memo), our ███████████ codified that non

13  medically trained clinicians in hospitals are permitted to overrule the medical decisions

14  **of physicians.**

15  This memo came out after more than a year of discussions with this ███████████

16  **about the importance of physicians being able to medically clear patients when they leave**

17  hospitals (and also after a year of discussion about the importance of accepting physicians

18  making sure the unit is safe medically for a patient). Psychologists don't have the training

19  **to understand when a mental status change may be due to lithium toxicity or even**

20  recognize it, let alone when the patient has begun to aspirate so a further work up is

21  needed. Nor do they understand the medical and mental status effects of infections and

22  **the myriad complex medical issues that plague our patients and change their mentation.**

23  Yet in one bold stroke, she has determined that the non medical psychologist, not the

24  **physician with years of medical training, is to determine whether a medical opinion is**

25  needed before discharging a patient.

1    No doubt if asked about this, she will be say    and indeed has said (see 2018 09 18
2    1619hrs)   that it does not mean what has been said above. And that "the language in the
3    ... memo is not a change of the policy."

4    If it is indeed not a change of policy, that explains why psychologists in our system so
5    often override medical orders and appear to see no problem with discharging patients
6    from hospital beds against medical doctors' judgement.

7    **Creating Policy Obstacles to Clinical Decision-Making Has Consequences**

8    Increasingly, patients are committing suicide or attempting suicide as soon as they leave
9    CDCR mental health crisis beds.

10    This increase has occurred because there is increasing pressure to get patients out of
11    crisis beds to lower levels of care or to the inpatient hospital within ten days. If clinicians
12    have not filled out the requisite documentation for a prolonged higher level hospital stay
13    by day three of ten of the crisis bed stay, they fail to make the ten day limit for acceptance
14    and transfer into the higher level of hospital care, and thus have to discharge the patient
15    to a lower level of care prematurely, even if the patient is not ready. Dr. _____ case
16    earlier in this report is an example of this. (see pages 92 95 of this report)

17    In point of fact, a stay is allowed to go beyond ten days, but time consuming conferences
18    and paperwork must be completed to get approval, and time is short, so this policy is an
19    obstacle to good patient care, clinicians taking increased risks with patients and on day
20    nine or ten discharging them to a lower level of care because they did not correctly
21    anticipate a patient's needs on day three and get the necessary approval.

1  Furthermore, if the patient came from the lowest level of outpatient mental health care
2  (CCC), these patients are being returned to CCC, even after the hospitalization, rather
3  **than the EOP level of care, to decrease the number of more expensive to care for EOP**
4  patients. For example, the number of psychiatrists required per patient is higher at the
5  EOP level of care, so the mandatory number of psychiatrists is lower if the system can get
6  **more patients discharged to the lowest levels of care.**

7  The increasing suicidality could be corrected in the current system by:

8  **1. encouraging more frequent referrals to higher levels of care at day three of crisis bed**
9  **admittance**

10  2. insisting on psychiatric clearance of patients for discharge to lower levels care before
11  **transport is contacted**

12  3. making the paperwork far easier to fill out with less consultation needed to be allowed
13  to keep patients beyond day 10 in the crisis bed.

14  **4. Detailed analysis needs to be done about suicidality coming out of crisis beds and**
15  **inpatient hospitals (attempts and completions) and data compiled. I have discussed crisis**
16  **beds. But since CDCR took over DSH, the DSH units are no longer full. They have**
17  **become more like segregation units because patients cannot get out of their cell.**
18  Continuing analysis of 30 day readmission rates from these hospitals and from the crisis
19  beds, as well as rates of attempted suicide need to be done by unbiased reviewers, as the
20  **current purveyors of this information have been demonstrated to give false reports.**

21  # Conclusion

22  CDCR has a broken system of care because information is not accurately reported upon,
23  **and reliable commonsensical action has not been taken. I have documented that patients**
24  **are not getting to appointments on schedule and in confidential spaces, that appropriate**

1   consultation is not occurring, and worse, appropriate medical decision making by

2   psychiatric physicians has been overridden. I have documented that CDCR has prevented

3   **errors from being fixed, and worse, CDCR has not allowed anyone to know that there has**

4   been inaccurate reporting to the courts and to our leadership. Such knowledge would

5   allow problems to be identified so they can be fixed.


6   A prison mental health system needs to ensure that patients see their psychiatrists and

7   other mental health providers on schedule, on time and confidentially, in an office. CDCR

8   **is not doing that, as has been demonstrated in this report.**


9   If a mentally competent patient refuses to go to his or her appointment with the

10  **psychiatrist, then, as happens with medical and dental appointment refusals in CDCR, the**

11  patient should be ordered to walk to the psychiatrist and tell the doctor that he or she

12  doesn't want the appointment.


13  Failing that, a custodial representative should be required to carefully and to the best of

14  his or her ability document the patient's reason for refusing to go to the appointment,

15  **and any other possible reasons that might be behind the refusal. The custodial**

16  representative should also document the condition of the cell. The custodial

17  representative should then immediately go to talk to the physician him  or herself, and

18  **have a personal conversation with the psychiatrist, in which together they create an**

19  individual plan of action to make sure the patient does get to subsequent appointments.

20  It should be required that all of this be documented.


21  **Cell side encounters should not be counted as appointments. They are at best wellness**

22  checks. For proper medical care, patients need proper confidential medical appointments

23  **in offices, when they need them, on time relative to doctors' medical scheduling orders.**

24  Outcomes will continue to be poor (high numbers of suicides, suicide attempts,

25  rehospitalizations, patients' symptoms failing to improve, etc.) unless we have a mental

1    health system in which patients are actually seen, and unless we have a mental health
2    system in which there is accountability for actually getting patients seen properly.

3    If patients were being seen as scheduled, on time, in offices, and for an appropriate
4    amount of time, that would be evidence of adequacy of staffing, but only if the data is not
5    being distorted.

6    If a seriously mentally ill patient cannot or will not come out of his cell for an
7    appointment, the team responsible for that patient (see below), with a custodial officer,
8    should visit these very difficult patients together, like Assertive Community Treatment
9    (ACT) Teams do. The custodial officer is critical so that the door to the cell can be opened
10   safely if needed.

11   QM should focus on basic, straightforward measurements that are accurately and
12   straightforwardly calculated. The approach should be that we measure those things that
13   actually determine good care, and the QM system should be transparent and open to
14   ideas for improvement, both in terms of what is measured, and in terms of how to
15   improve the system of mental health care itself. A good QM system is one that facilitates
16   error correction rather than hiding errors. Our approach should be more like that of
17   airline and air traffic control systems, which focus on actively identifying and learning
18   from mistakes without blaming or shaming anyone.

19   The EHRS needs to be programmed so that the psychiatrist and other clinicians can enter
20   into the chart the environment of care in which the appointment took place. A combined
21   measure of both whether appointments occurred on time, in an office, and for an
22   appropriate amount of time, should qualify an appointment as occurring in a compliant
23   way.

1  Low 30 day readmission rates and suicide rates in a population are in fact legitimate hard

2  outcome measurements demonstrating good quality care. Those institutions that do this

3  better (for a given mental health level and custodial level) should be studied and

4  emulated.


5  Rates of cancellation and refusal should be recorded as a simple percentage (for example,

6  number of cancelled appointments per patient per time). When a patient is scheduled to

7  be seen within a certain number of days and that appointment does not happen, that

8  appointment is late, and should be recorded as such. Labs and blood levels either

9  occurred when they were supposed to or they didn't, and need to be recorded that way.


10  The number of consultations requested, and the number of consults that occur as

11  scheduled, should be recorded straightforwardly. A simple triage system needs to be

12  established to deal with situations in which there are more consultations scheduled than

13  can occur at that time. For example, a nurse and a Supervising Psychiatrist could spend

14  one hour twice a week going through the list of medication non compliant patients

15  together, determining which patients should be seen first and which can wait (or in

16  which cases it would be appropriate for a nurse or psychologist to provide education,

17  rather than the psychiatrist).


18  None of the above QM measurements should be obscured from those who wish to

19  understand them. Thus, many people within and outside the mental health system within

20  CDCR should be able to run simple read only queries to assess the accuracy of what is

21  being reported. All queries being made should document both the query and the purpose

22  of that query: what question does the person running the query think the query might

23  help the person answer? The results of the query including an explanation of what was or

24  was not found should also be recorded. To facilitate error correction in the system, it

25  should be mandated that all this information about every query be easily available for

26  anyone in CDCR to read.

1    Continuity of care is key. Mentally ill patients more reliably get better when they are
2    under the care of the same reliable, caring doctor and treatment team over time, for the
3    following reasons. Doctors improve their care by learning how to treat patients. The first
4    choice of medicine is often suboptimal. Psychiatrists iteratively figure out which medicine
5    or combination of medications to give, by judging responses to preceding medications. A
6    single treatment team should take care of a given patient wherever the patient is in a
7    given institution, and transfers between institutions should be minimized.

8    Making a single team responsible for a given inmate would eliminate the patient
9    dumping that tends to happen in any system in which patient dumping can happen.
10   Systems in which it is possible to reduce one's workload or legal risk by transferring a
11   difficult patient from one's own care to someone else's thereby encourage a lot of
12   transferring (patient dumping). Such systems also tend to result in those looking after
13   patients at higher levels of care holding on to easy patients who don't really need to be
14   there, to avoid having to care for the new and potentially tougher patient that will replace
15   that easy patient. Systems having this flaw (like CDCR) tend to be very expensive both
16   financially and in terms of the care provided.

17   Both patient dumping and inappropriately keeping easy patients in higher levels of care
18   would be solved by a given inmate being assigned to a given treatment team, that
19   treatment team being responsible for the inmate's care irrespective of level of care
20   needed, or even if the inmate doesn't need treatment for mental health problems. That
21   would very quickly result in a reduction of the number of prisoners inappropriately
22   diagnosed as needing treatment, and it would very quickly result in those who do really
23   need treatment actually getting effective treatment. That is, it would do so if clinical staff
24   numbers in the institution were not cut as patients improve.

25   When you are responsible, and dumping is not an option, you get your patients better.
26   The way CDCR is currently set up, more and more inmates will be deemed to have mental

1  health issues, because staff naturally err on the side of referring inmates for mental health

2  diagnosis, not wanting to be blamed for failing to refer when it was needed. This is why,

3  **no matter how hard we try to do better in the current system, the number of patients**

4  **needing higher levels of care never seems to diminish. Take away the incentives to refer**

5  unnecessarily, to dump difficult patients, to hold on to easy patients, and make a given

6  **team responsible for and accountable for a given set of inmates, and that will solve many**

7  **of the problems of the current system. Mental health teams will learn to treat patients**

8  effectively, as happens outside CDCR, and the whole system will be vastly cheaper to run.

9  The other thing this would do would be to create real teams, with real teamwork. It

10  would create camaraderie. People work much more effectively and efficiently when they

11  **feel valued and appreciated as they would in such teams.**

12  In CDCR, I'm told we need armies of expensive therapists (do take a look at the ratio of

13  **the number of psychologists to the number of patients in the CDCR system    it is**

14  **remarkably high). But in the real world outside CDCR, excellent patient care can be**

15  achieved with fewer resources. Less expensive but still professional individuals like

16  **vocational nurses, social workers and "qualified professionals", for example, can make**

17  **regular checks on patients (and report to psychiatrists regularly who are covering a panel**

18  of patients throughout a prison). With regular reports about the health of patients by

19  **professionals who are checking on them, the frequency and need for psychiatric visits can**

20  **be diminished as well.**

21  Treatment and therapy should be practical (facilitating work, education, exercise, etc.) in

22  **most settings, and only when patients have acquired the basic ability to function, should**

23  **therapy move on to exploring psychological issues like past relationships with parents,**

24  etc. Excellent patient care is not necessarily expensive.

1    Large numbers of responsible adults from outside prison should (after having been
2    carefully oriented to prison rules and to boundaries and the strict limits of relationships
3    **with prisoners) be able to visit and check on mentally ill patients. Senior citizens or**
4    **students of social work and psychology are excellent for this. Such a program could be**
5    either on a voluntary basis or very inexpensive. The individuals checking on prisoners
6    **should be given clear instructions with respect to what they should do (informing the**
7    **right person on staff) in the event that they think a given prisoner needs help. Such a**
8    program would ease stretched resources.

9    **Suicidal patients should not be isolated and should usually be able to stay in the same**
10   institution and transported to the institution's own crisis bed unit, the same team taking
11   **care of them at the outpatient level of care and when hospitalized.**

12   Until we have a culture of excellence in which all or most psychiatrists in our system are
13   **comfortable prescribing clozapine when it is indicated, for example, for patients with**
14   **dangerous life threatening suicidality/self mutilation/self injury associated with**
15   personality compensation into psychosis, consultative pharmacologists (for example from
16   **the Department of State Hospitals, called "PRN" psychiatrists) should be utilized for**
17   **consideration of the anti suicidal drug clozapine, with mandatory blood draws, to save**
18   such patients' lives. There must be a statewide focus on getting our sickest patients on
19   **clozapine with its demonstrated, proven ability to stop hospitalization rates (with proof**
20   **from Dr. ▮▮▮▮▮▮▮ team even in CDCR). Clozapine is well known to decrease**
21   suicidality in even the sickest mentally ill patients. Aggressive support for clozapine
22   **clinics should be mandatory throughout CDCR to support those psychiatrists who**
23   **prescribe this often life saving medication for our sickest patients.**

24   It is reported that in CDCR more than 100,000 inmates move more than 1,000,000 times
25   **in a year. Mental health patients can't get better if they keep moving. Moving mentally ill**
26   **patients from one institution to another, or from one provider or treatment team to**

1   another, is unsettling for them. All such moves mean the loss of their familiar

2   environment of care. It's a bit like moving a child to a different set of foster parents every

3   month. No matter how great each home and set of foster parents is, there is likely to be

4   trouble. Moving is stressful enough when it is voluntary and the person is mentally

5   healthy and not in the prison system, let alone when there are mental health problems

6   and it's involuntary and the person is in prison.

7   All this moving of mentally ill patients has been disastrous in CDCR, because, unlike in

8   the world outside CDCR, in CDCR information about the patient is in effect lost when a

9   patient is transferred from one institution to another. Outside CDCR, the patient's

10   existing doctor and the doctor at the hospital to which the patient is being transferred

11   talk to each other about the patient, so that the receiving psychiatrist knows about the

12   patient and can take into account what the previous psychiatrist has tried in terms of

13   treating the patient. Such conversations should be mandatory whenever there is a

14   transfer, whether from one institution to another, or from one psychiatrist and treatment

15   team to another.

16   Admissions should be done by psychiatric physicians and mental hospital units should be

17   cleared medically by psychiatrists as happens outside the CDCR system, and the

18   psychiatrist or treatment team sending the patient should call the psychiatrist who will be

19   admitting the patient to tell the receiving psychiatrist about the patient *before sending* the

20   patient. The psychiatrist poten tially admitting the patient needs to be sure that it would

21   be an appropriate admission before the patient is sent. When a nurse, psychologist or

22   social worker has interviewed an incoming patient, he or she should tell the psychiatrist

23   about the patient as happens outside CDCR.

24   Discharges from psychiatric hospitals should be done by psychiatrists, or at least should

25   never occur without a psychiatrist or other medical doctor having first medically cleared

26   the patient for discharge. The CDCR system would be medically much safer for patients if

124

1   transportation were not called unless and until the patient has been medically cleared for

2   discharge or transfer. And the psychiatrist must order the follow up care, for example

3   with a psychiatrist in a certain number of days, for a blood draw to occur in a certain

4   number of days, and with a therapist and nurse in a certain number of days.

5   Before a mentally ill patient leaves prison, there should be a video call connecting the

6   inmate patient and the clinicians from the prison with the clinicians the patient will be

7   being cared for in the community after leaving prison, so that the patient will feel

8   comfortable with his or her new providers.

9   Psychiatrists should be reporting to psychiatrists. Just as is the case for Medical, Dental

10   and Nursing reporting structures in CDCR, psychiatrists in the field should be reporting

11   to regional psychiatrists, who themselves should be reporting to the headquarters

12   psychiatry team.

13   Psychiatrists should play a significant role in the leadership of the mental health

14   department, given their greater knowledge and broader expertise. The current situation

15   with psychologists being in charge has clearly been a disaster. CDCR mental health must

16   have psychiatry executives. Currently there are zero, and none are considered eligible.

17   This is perverse and harmful.

18   Psychiatrists in the system should be hired by psychiatrists rather than by psychologists

19   who, in CDCR, appear to literally choose the candidates who will defer to them rather

20   than those who are the best. In CDCR (though not in other systems I have worked),

21   psychiatrists and other medical doctors are more likely to pick the best candidate than

22   psychologists are.

1  Psychiatrists should be clinically in charge of patient care individually and globally in

2  accordance with their legal obligations and greater clinical knowledge.

3  Psychiatry is a medical field and should be treated as such.

4  Hospitals should be run by doctors and those who listen to doctors' clinical opinions

5  about how things should be run. Reinventing the wheel with spokes missing and strange

6  additions, as CDCR has done, hasn't proved successful.

7  Basics before frills. Without the basics, frills are the icing on a mud pie. First get the

8  basics of safe patient care in place. Nothing works without that. Patients need to see their

9  doctor when the doctor says he or she needs to see them. Medical orders must be

10  followed. Medications, etc., must be administered as ordered. There must be handoffs.

11  There must be communication. Medical orders must not be given by psychologists.

12  Medical orders must not be overridden by custody or anyone else other than another

13  medical doctor. More vocational nurses, social workers and custody officers, fewer

14  psychologists.

15  The EHRS needs to be a lot easier and less time consuming to use. This won't happen

16  unless psychiatric physicians are involved in designing the workflow they use. There need

17  to be clinics where general medical physicians, psychiatric physicians, doctors, nurses,

18  and therapists comingle when they see patients. If that cannot exist given the current

19  physical structure of our institutions, at the very least psychiatric physicians should have

20  assigned offices in which they can see their patients, like other physicians do in CDCR.

21  The CDCR Department of Mental Health should offer regular psychiatric continuing

22  medical education and be staffed to do that, so that psychiatric continuing medical

126

1    education is offered at least monthly. These conferences should be for psychiatrists, but
2    they could be open for all too.

3    Telepsychiatry is a useful method of care. The telepsychiatrist must have the authority to
4    insist that care be provided by an onsite psychiatrist if in the telepsychiatrist's medical
5    judgement a given patient needs onsite care. For example, some patients need regular
6    physical exams to judge a neurological condition, and unless someone onsite is reliably
7    available to do those exams for the telepsychiatrist, the case may not be a good candidate
8    for telepsychiatry. Telepsychiatrists' medical judgement about whether or not particular
9    cases are appropriate for telepsychiatry must not be overruled. Telepsychiatrists should
10   operate from regional hubs in California so that appropriate supervision and training can
11   occur. Psychiatrists from, for example, Pensacola, Florida or somewhere in the United
12   States, have no idea the conditions in our prisons and it would have been disastrous for
13   that to have been allowed to proceed, as was attempted with even advertisements placed.

14   Enough telepsychiatry staff psychiatrists should work at night to fully cover all of our
15   institutions every night throughout the year. This cannot be done with the ten proposed
16   to the court. At least 25 are required.

17   When, following a doctor's medical judgement, a judge orders that a patient needs forced
18   medications, that should happen without delay. The current situation in CDCR in which
19   custodial officers sometimes refuse to facilitate the judge ordered forcing of the
20   medications on the grounds that to them the patient seems calm, is absolutely
21   unacceptable, medically dangerous, and should never happen. Medication forcing isn't
22   necessarily anything to do with a patient's visible level of agitation. Custody should be
23   mandated to facilitate such orders without delay.

24   We need to work to create a collaborative culture in which the different disciplines work
25   together rather than in opposition. When there is good collaboration between clinicians

1    and custody for example, patients get to their appointments, and thus get treated, and

2    thus get better, which makes life better not just for the patients themselves but for

3    clinicians and custody. Inmate patients left suffering, untreated, are much more likely to

4    act out than when they are being treated and stable. Having custodial officers individually

5    speak with the psychiatric physician when a patient won't come to an appointment is a

6    good way of beginning to create collaboration between those ultimately working together

7    to keep the public safe.

8    To combat illicit drug use in our system, instead of spending a fortune on medications

9    aimed at combatting such drug use, CDCR should take much more care to prevent illicit

10   drugs entering the prison system, and to prevent medication diversion. Careful drug

11   interdiction programs are needed and more of them. When patients are leaving prison,

12   there is an increased risk of narcotic overdose. Only at those times (and when patients in

13   prison frequently overdose), injectable (and very expensive) medications should be used

14   to decrease the risk of overdose. Moreover, self help drug recovery programs such as NA

15   and AA, and non religiously based programs such as SMART recovery, are virtually free,

16   are effective, and should be far more aggressively encouraged than they are in CDCR

17   currently. The absence of several varieties of self help groups for drug and alcohol abuse

18   in a prison is nearly an emergency.

19   None of CDCR's challenges are insurmountable.

20   I close with Dr. ▮▮▮▮▮▮ comments about his experiences working for CDCR. He is the

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮ of the Salinas Valley Psychiatric Inpatient Program    formerly the

22   Department of State Hospital program that has now been taken over by the Department

23   of Corrections in the "Lift and Shift":

128

1  "Dear Dr. Golding,

2  I am writing to you in order to consolidate my thoughts about the
3  psychiatry/psychology problem in CDCR and to communicate them to you so that
4  you can best be informed in your position of great responsibility. In my experience
5  you have always been strongly supportive of a civilized, dignified and respectful
6  relationship with psychology. In writing this problem and even speaking of it, I find
7  myself not feeling completely comfortable doing so. Having worked with
8  psychologists for the 30 years since graduating from medical school in multiple
9  settings has given me quite an appreciation for the specialty as well as most of the
10 people in it.

11 However the culture I have discovered and experienced since the "Lift and Shift" has
12 rattled me and given me pause when I consider my future career if such an
13 environment is allowed to continue. I have always valued my collegial relationships
14 with psychologists over the years and continue to in the PIP. What causes me
15 significant dysphoria is the apparent attempt to have psychology be in a position of,
16 frankly, medical equality with psychiatrists as well as clinical authority over
17 psychiatry. This is anathema to me.

18 While psychologists receive a wide variety of training they fail to meet the standard of
19 medical training by a long shot of what physicians and psychiatrists receive. In fact,
20 psychiatrists have received far more widespread and in depth training overall than
21 psychologists particularly when you consider that very few if any of them would even
22 have the necessary prerequisites to take the MCAT, much less to go to medical
23 school. Despite this I have experienced and continue to experience them as valuable
24 members of the treatment teams as well as leadership. In the "real world" outside of
25 CDCR you will barely find one psychologist on staff of inpatient psychiatric programs
26 which is a reflection of their ability to perform in the setting.

129

1    Since the "Lift and Shift" was announced I have been apprehensive as a result of

2    knowing from both a personal as well as professional level that "things are different in

3    CDCR. Psychologists are in charge and using psychiatrists as mere consultants.

4    Psychologists run the teams, make the diagnoses and determine the direction of care

5    for the patients." These are things I have heard repeatedly from psychiatrists

6    numbered in the double digits over the years many of whom had previously worked

7    in CDCR and left for that very reason. Since the "Lift and Shift" we in SVSP PIP have

8    lost a total of 9 psychiatrists and each and every one of them has listed this

9    eventuality as one of the reasons for their departure from CDCR. I personally

10   experienced this 4 years ago when I applied, interviewed and was offered the position

11   of ███████████ for SVSP CDCR. I accepted but prior to a walk though tour I was

12   baited and switched.

13   Initially I was told during the interview that I would report to the CEO. Later an

14   administrative psychologist told me that I would report to the Chief Psychologist,

15   that psychiatrists were consultants, psychologists ran the teams, made the diagnosis

16   of the patients and we were expected to follow that. I was also told that psychiatrists

17   would have to get over the "sibling rivalry" with psychology in order to work in that

18   model. I was shocked but maintained my composure and began to query how that

19   might work as well as wondering out loud how they had managed to subvert the

20   community standard medical model as well as the rationale for it. Instead of being

21   given a professional answer to a reasonable question, the psychologist with whom I

22   was speaking became angry and told me I would just have to decide if I could do it or

23   not. I said okay and planned to take the tour the next day. The next morning I went

24   to my front door after the bell had rung and was handed a certified letter stating that

25   the offer had been rescinded because I had said that I could never work under a

26   psychologist. I had never said that or even implied it. I then tried to contact the

27   administrative psychologist and the ███ but was unprofessionally treated with no

1    response whatsoever. I then proceeded to apply here in SVSP DSH and remain here 4

2    years and 2 months until now.

3    I chose to stay here once the Lift and Shift occurred despite my apprehension

4    ignoring the advice of all of my psychiatrist colleagues because I love the work, the

5    challenge, the patients and the employees. However recent events have proven me

6    wrong as the further and constant creep of micromanagement particularly from

7    psychologists via policy meetings, CCATs for no good reason as well as important

8    meetings that occur that make and create important changes in the system not only

9    without my presence but also without the presence of any psychiatrist. I even had the

10   displeasure to have to participate in 3 CCATs over a 2 week period on one of our

11   patients who was in dire straits medically before I could get the proper physicians on

12   the phone in order to give direction about the proper LOC as well as care. Once that

13   happened we followed their direction and the patient suffered a perforated bowel

14   that very day. He could have easily died had that happened in the PIP while he was

15   sleeping.

16   My biggest fear is that this will/has become the new normal. A system of mental

17   health dominated by unqualified persons who do not know what they don't know,

18   cannot be told that as they perceive it as insulting and continue to make critical

19   decisions in that state of ignorance. I fear a disaster coming if this is allowed to come

20   to fruition. One wonders if psychologists in administration question whether this

21   structure and culture might be one huge part of why CDCR has not been able to get

22   out from under the Special Master. Frankly, since the Lift and Shift I believe that is

23   the exactly the reason why it has not occurred. Irrational, misinformed and ignorant

24   decisions are made one after another in rapid succession in a bullying manner.

25   Most recently there has arisen the issue of psychologists "scope of practice" including

26   admission, discharge, seclusion and even restraints, which it turns out is completely

1    de novo.[xxiv] It does not exist in their training or licensure requirements. There is no
2    basis for it in law, precedent or the wishes of stakeholders other than psychology.
3    **This is all made up out of nothing by psychology to assist them in their economic**
4    **survival and hoped for ongoing dominance in CDCR. This has nothing to do with**
5    what is best for patient care. Society and the law have over millennia decided that 3
6    **classes of persons are allowed to take control over another human being's body under**
7    **certain circumstances. Those are law enforcement, nurses and physicians. That does**
8    not included psychologists.

9    I had an occasion to talk with an administrative psychologist recently and informed
10   her of my thoughts and feelings about all of this. I told her that I would never take
11   **clinical direction from a psychologist ever because they are not qualified to do so. She**
12   became visibly angry and told me that basically I was wrong, psychologists and
13   psychiatrists are the same. In addition she said that psychiatrists should be beneath
14   **psychologists because we are lazy, don't work as hard as psychologists, are not willing**
15   to do the dirty work that psychologists are willing to do, behave poorly and are not
16   willing to discipline ourselves.

17   Stunned, I thought "this is prejudice...bigotry." I couldn't believe it and decided in the
18   moment that I would leave CDCR. Since then I have cooled and received sage advice
19   **from multiple corners and have struggled to stay. This is important. It is a huge**
20   problem. This culture is wrong and to run away is to flee doing the right thing. I
21   realize that staying and fighting involves risk for me. I was told by this same
22   **psychologist that I should not think this way or express it otherwise I would not rise**
23   in the system and people would not like me.

24   What she didn't know is that this is not important to me. What is important is the
25   **right thing. I do not believe that psychologists have taken the Hippocratic Oath or**
26   anything like it. This is very important to me and I take it very seriously. Above all, do

1   no harm. Allowing psychologists to succeed in this purely selfish and unnecessary

2   endeavor is to do real harm to the system and patients. It is highly likely that the

3   **catastrophic patient outcomes will make the Coleman Commission stay longer not**

4   **leave sooner. There will be more conflict between the disciplines, not less. CDCR will**

5   continue to have a psychiatrist retention problem, even worse than we do now.

6   I sincerely appreciate and support your efforts to improve the system for the benefit

7   of the patients we serve.

8   ▮▮▮▮▮▮▮, M.D.

9   ▮▮▮▮▮▮▮,

10   **Psychiatric Inpatient Program**

11   **Salinas Valley State Prison**

12   California Department of Corrections & Rehabilitation"

# 1  **Appendix 1**

2    See 2018 08 15 1352hrs (screenshots of the Dashboard, with explanation of the errors).

1    # Appendix 2

2    (For this report including screenshots and other evidence, see 2018 09 04 1600hrs)

3    **Psychiatry Indicators and Biases**

4    **Timely Psychiatry Contacts**

5    1.  Biases due to measurement:

6        a.  Measured in weeks, rather than on time versus late. This causes significant
7            bias towards inflating compliance.

8            i.  E.g. an Enhanced Outpatient Program (EOP) patient had a
9                psychiatry appointment on Monday, 8/13/18, and their next
10               appointment wasn't until Friday, 9/21/18. They were due to be seen
11               by 9/12/18 (per Program Guide rules), so are 9 days late, but due to
12               compliance being measured by weeks, there are four weeks of
13               compliance and one week of non compliance, which is then reported
14               as 80% compliant. If you have 100 patients, 50 of whom are seen on
15               time, and 50 of whom are seen late by one week, the reported Timely
16               Psychiatry Contacts compliance rate will be 90%. It would be very
17               easy to think that the 90% compliance rate meant that 90% of the
18               patients were seen on time, when in actuality only 50% were.

19       b.  The clock resets when patients transfer.

20           i.  E.g. a Correctional Clinical Case Management System (CCCMS)
21               patient had a psychiatry appointment on 3/5/18, and was due to been
22               seen again by 6/3/18 (90 days later). However, the patient transferred
23               to a different CCCMS institution on 5/25/18. Instead of requiring that
24               the patient still be seen by 6/3/18 (to comply with the Program Guide

rules)), and reporting it as late if it occurs after 6/3/18, this indicator resets the clock to the date of transfer, and only reports the **appointment as late if it occurs more than 90 days after transfer. In this example, the patient could go 172 days (from 3/5/18 to 8/23/18)** without seeing a psychiatrist, and still be counted as compliant.

    c.  **Physician orders for follow ups prior to maximum time per Program Guide are ignored by this indicator.**

        i.  E.g. a CCCMS patient has a psychiatry appointment on 3/5/18, and **the psychiatrist is concerned about him, so orders a follow up appointment for three weeks later. This appointment was scheduled** but cancelled due to custody, or was refused, or did not occur for any **number of reasons, and the patient was not seen again until 6/2/18. This indicator counts that appointment as compliant, because it** occurred within 90 days, despite the appointment being 68 days late **based on the psychiatrist's clinical judgment, and order, that the patient needed follow up within three weeks.**

    d.  Sixty percent of psychiatry supervisors see patients (per our polling data), **due to staffing shortages. The compliance numbers in this indicator are presented as having been obtained by line staff alone, and are used to** determine psychiatry staffing needs. This both results in an underestimate **of staffing needs, and in supervisors being unable to do necessary supervisory work due to having to compensate for the line staff shortage.**

    e.  In December 2016 the indicator was inexplicably changed to count EOP **appointments as timely if they occurred within 45 days of the prior appointment, despite the Program Guide rule that EOP psychiatry** appointments must occur at least monthly. This significantly inflated the **compliance percentages statewide, and allowed for an inaccurately favorable report to the court in March 2017. The indicator was not fixed** until this change was discovered by the psychiatry team in March 2017.

1  **Appointments seen as scheduled**

2    1.  Biases due to measurement:

3        a.  The definition of this indicator states that it measures "All scheduled
4            appointments", but in actuality it only includes appointments that are
5            coded as Seen, Cancelled due to ProviderUnavailable, Cancelled due to
6            ModifiedProgram, or Cancelled due to TechnicalDifficulties (see snip titled
7            Appointments seen as scheduled). It excludes Refusals, No Shows, and all
8            other cancelled appointments, which account for approximately half of all
9            scheduled appointments.

10               i.  E.g. the Appointments seen as scheduled indicator reports that 95%
11                   of mainline CCCMS appointments in CDCR in February 2018 were
12                   seen as scheduled. (see attachment CDCR CCCMS appointments
13                   seen as scheduled) However, per the Appointments report, in
14                   February 2018 in mainline CCCMS, there were 84,120 mental health
15                   appointments, 35,642 of which were seen (see Excel spreadsheets
16                   titled CDCR CCCMS all appointments in February 2018 and CDCR
17                   CCCMS completed appointments in February 2018). Thus the
18                   percentage of appointments that were seen as scheduled was 42%,
19                   not 95%.

20  **Timely MH Referrals**

21    1.  Biases due to measurement:
22        a.  Only measures the referrals that were ordered, not all of the referrals that
23            occurred, *or should have occurred*. Ordered referrals are much more likely
24            to be completed and done on time than are referrals that should have been
25            ordered but weren't.

137

ii. E.g. on 8/3/18 at CHCF, 225 patients were flagged as non compliant with their psychiatric medication (meaning they refused 50% or more of their psychiatric medication in a week, or refused three consecutive days of psychiatric medication, or refused one dose of a critical psychiatric medication). Each of these patients is supposed to be seen by a psychiatrist to discuss their medication non compliance within seven days, or within one day for refusal of a critical medication. However, during the entire month of August, there were only 17 medication non compliance appointments scheduled at CHCF   10 were seen, 7 were cancelled. The cancelled appointments were excluded from the Timely MH Referrals measurement, with the exception of one cancelled appointment that was counted as completed, despite never having occurred. Additionally, two refused appointments were counted as completed, and one seen appointment was counted twice, so the compliance was recorded as 12/12, or 100% for the month of August (see CHCF August Timely MH referrals screenshot). In actuality, 225 patients required follow up for medication non compliance on a single day in August, and only 8 patients (12 minus the appointment that was counted twice, minus the cancelled appointment that was counted as completed, and minus the two refused appointments) in the whole month of August had a completed medication non compliance consult. If we use these numbers (8 out of 225), the compliance percentage is 3.6%. However, if the entire month of August is included   not just a single day   this compliance percentage would be much lower.

ii. E.g. for the month of July at CSP Sacramento, there was one urgent MHMD consult, two emergent MHMD consults, and three routine MHMD consults (see snip titled SAC Timely MH referrals). It is unlikely that there were truly only three routine MHMD consults in

138

1     a month at an institution with such a large mental health
2     population. The far more likely scenario is that most routine MHMD
3     consults were "ordered" by psychologists or social workers via
4     stopping by the psychiatrist's desk, calling them on the phone, or
5     emailing them, rather than placing an official order (see email from
6     Dr. Golding titled "FW: MHMD emergent consults"). This prevents
7     an institution from having a low compliance rate despite insufficient
8     psychiatry staffing to complete these consults, because these
9     consults will not be measured by the indicator. Compare this to an
10     institution with sufficient psychiatry staffing    at San Quentin during
11     the same month there were 32 routine, 11 urgent, and one emergent
12     MHMD consults (see snip titled SQ Timely MH Referrals).
13    b. Excludes most cancelled appointments, and counts refusals as "completed".
14     As described in "Appointments seen as scheduled 1 a" above, all cancelled
15     appointments, except those coded as ProviderUnavailable,
16     TechnicalDifficulties, and ModifiedProgram are also excluded from this
17     indicator's calculations.
18  2. **Biases due to lack of knowledge:**
19    a. Many psychiatrists appear to not know about the medication non
20     compliance appointment order in EHRS, or are not aware of the
21     requirement to see patients who have been flagged for medication non
22     compliance. If all psychiatrists had this knowledge, and placed a medication
23     non compliance appointment order for every patient flagged as non
24     compliant, there would be thousands of medication non compliance
25     appointments statewide per month. Psychiatry staffing is not sufficient to
26     complete all, or even most, of these appointments, so the percentage of MH
27     referrals completed on time would significantly decrease.

3.  Biases due to random error:

     a.  Medication non compliance appointments may be ordered erroneously as a psychiatry follow up appointment, and thus not captured by this indicator. Also, as mentioned above, mental health referrals may be communicated to the requested provider verbally and an order never placed in EHRS, despite knowledge of the process and intention to place an order. In both of these examples the appointment is less likely to occur when there is no official order, due to a number of factors, including the increased likelihood of the provider forgetting, the provider having limited time and triaging some of these appointments as less important, and there being less pressure from supervisors on the provider to complete the appointment in a timely manner to improve the indicator results.

## Appointment confidentiality

There is an indicator for "Group treatment in a confidential setting", but not for psychiatry appointment in a confidential setting. However, this is an important indicator of quality care, and should be one of the measured indicators. Currently, there is no easy way to determine the percentage of psychiatry appointments at a given institution or level of care that were confidential, but it is possible to use the Appointments report to check on whether individual appointments were recorded as confidential or non confidential, count all of the confidential appointments in the population of interest, then divide by the total number of appointments in order to get a percentage. This is time consuming, but more importantly it is inaccurate, due to the following biases.

1.  Biases due to measurement: In the Electronic Health Record System (EHRS), confidentiality is recorded in a drop down menu on the appointment check out screen. The default value is "Confidential", thus if the provider does not change this selection, all appointments are recorded as confidential. If an accurate

140

measure of confidentiality was desired, this drop down menu would default to

NULL (no selection), and it would require the provider to change the selection to

**either confidential or non confidential.**

2. **Biases due to lack of knowledge: If a provider does not know how to record an** appointment as non confidential, it is recorded as confidential (due to #1 above).

   a. **E.g. in the MHCB at CCWF, the psychiatrists reported that all routine psychiatry appointments are conducted in the patient's cell, not in a** confidential treatment room, thus 100% of the routine appointments are **non confidential. All of the psychiatrists stated they did not know how to record an appointment as non confidential. Per the Appointments report,** there were 96 completed psychiatry appointments in CCWF MHCB in May **2018, 100% of which were recorded as confidential.**

3. **Biases due to random error: Even if a provider knows how to record an** appointment as non confidential, if they forget, or are in too much of a hurry, to **change the drop down menu to non confidential, it is recorded as confidential.**

   a. **E.g. in the MHCB at CHCF, the psychiatrists reported that all routine** psychiatry appointments are conducted cell front, not in a confidential **treatment room, so 100% of the routine appointments are non confidential. All of the psychiatrists stated they knew how to record an appointment as** non confidential. Per the Appointments report, there were 289 completed **routine psychiatry appointments in CHCF MHCB in May 2018, 31% of which were recorded as confidential.**

## Diagnostic Monitoring (Medication Administration Process Improvement Program)

1. Biases due to measurement:

   a. **Until June 2018, this indicator ONLY measured whether annual labs and tests were done. MAPIP guidelines mandate obtaining baseline, 3 month,**

141

and annual labs for antipsychotics (except Clozapine) and mood stabilizers, obtaining labs within 14 days of increasing the dose of mood stabilizers, and **obtaining baseline, 3 month, and annual weight/height and blood pressure for antipsychotics and Clozapine. However, until June 2018, the indicator** monitoring compliance with these guidelines did not even measure **whether baseline, 3 month, or dose increase labs and tests were done. It only checked to see if annual labs and tests were done, and reported 100%** compliance if the annual lab draw and tests occurred (see Memorandum **dated 7/3/2018).**

 i. **E.g. A patient is prescribed an antipsychotic, and has labs, a blood** pressure measurement, and his weight obtained 8 months after **starting the medication, but had no tests or labs done at baseline or 3 months. This indicator reports that this patient is 100% compliant** with MAPIP, despite being only 33% compliant. This is very **misleading, but more importantly it is *dangerous* and poor care. If his blood pressure is elevated, he is morbidly obese, and his fasting** lipid levels are critically high at 8 months, we have no idea whether **those problems were all present prior to starting the antipsychotic in which case we likely would not have started the medication** — or occurred within the first few months after starting the medication **in which case we would likely have stopped it after obtaining the 3 month test results. Failing to obtain these labs and tests can lead to** permanent organ damage or death.

b. **Until June 2018, it counted annual labs and tests as completed if the patient had the relevant labs and tests done at any point within a year of starting** the medication. Since June 2018, it still counts annual labs and tests as **completed if the patient had the relevant labs and tests done between 91 and 365 days after starting the medication. The baseline, 3 month, annual,** and after dose increase criteria for obtaining labs and tests is not arbitrary.

142

1    It was created by physicians, per their clinical judgment of the minimum

2    monitoring necessary to maximize patient safety. Therefore, measuring

3    **whether the required tests were done at any point within a year or at any**

4    **point from 91 to 365 days after starting the medication—not within limited**

5    periods around the baseline, 3 month, annual, and dose increase time

6    **points—is inappropriate, and leads to falsely elevated compliance.**

7    c.  **Until June 2018, it excluded patients who were not on the same medication**

8    class for the whole year. This inflated MAPIP compliance, because these

9    **patients were less likely to have had the required labs and tests, due to the**

10   **provider not having had an entire year during which to have ordered labs**

11   and tests.

143

# Appendix 3

2    **Summary of Performance Report Errors**

3    Please see the CDCR Mental Health Performance Report from 5/1/18 to 5/31/18. (2018 08
4    15 1352hrs)

5    Timely MH Referrals "92%" (see page 1 of 2018 08 15 1352hrs)

6    This report is biased and reports over compliance. It only measures those referrals that
7    are ordered and skips all referrals that are not ordered, but occurred, or *should have*
8    *occurred* within a timeframe. "Timely Mental Health referrals" is a composite measure
9    that includes multiple referral types, including referrals for consultations with
10   psychiatrists when patients were non compliant with a certain percentage of their
11   medications. At large institutions like CHCF there are hundreds of medication referrals
12   that don't get seen in a month (see page 2 of 2018 09 04 1500hrs), though meet the policy
13   criteria for needing to be seen (see Appendix 2 and also 2018 09 04 1600hrs).

14   If the referrals that were supposed to be seen as mandated by policy, and not just those
15   referrals that were turned into orders were counted, the compliance percentages recorded
16   would be dramatically lower for the composite measure of timely mental health referrals.
17   Extremely conservatively estimating at CHCF, the timely MH referrals would be 55% (see
18   page 2 of 2018 09 04 1500hrs), not 100% as reported. At other institutions, the overall
19   performance percentage would also be significantly reduced and so would be nowhere
20   near the markedly exaggerated 92% figure reported above. It's just an incorrect figure
21   (with all of these, the psychiatry leadership team is not allowed to search the databases to
22   report precisely, so we do what we can to determine whether our patients are getting the
23   care they need). Psychiatrists are not seeing the consults they are supposed to see in the

144

1  timeframe they are supposed to see them, though it is falsely reported that they are ("92%

2  compliance"). It is very likely less than 50%. This report is grossly biased.


3  **Appointment Cancelled Due to Custody "2%" (see page 1 of 2018 08 15 1352hrs)**


4  In general, providers don't know why patients don't come to appointments and figuring

5  out whether custody was busy doing other important activities, rather than bringing

6  patients, is not something that is known by the provider when the patient does not come.

7  Arguably, many of the patients that did not make it to Dr. ▮▮▮▮   (see 2018 07 18 R) at

8  SAC were cancelled due to custody, but recorded as patient refusals or no shows. The

9  patients were brought in batches and when patients missed what is called the "train"

10  (custody bringing a group over), the patient missed his appointment. Most appointments

11  are listed as "CancelledUnspecified", because the provider does not know or does not

12  select an outcome, which likely means this report very much underestimates the

13  appointments that did not come due to custodial reasons.


14  In fairness, it would be tough to design a measure which captures this, which is why it

15  does not make sense to have it on the Performance Report. It is not easily or accurately

16  measured, except that the default (not selecting it because of no knowledge of it) leads to

17  low reports of appointments being cancelled by custody, but the measurement actually

18  doesn't mean much unless there is a way to figure out the far higher percentage of

19  patients who were not brought because of custodial competing obligations. Our

20  scheduling system in the CDCR mental health system is so broken (only 40% 45% of

21  appointments occurring as scheduled   see the section beginning on page 35 about this),

22  that it is very inefficient for custody to devote large numbers of resources to get patients

23  to appointments, because often they can't determine which patients will be coming or not

24  or at which time (because patients are not seen as scheduled).

1    Diagnostic Monitoring "95%" (see page 1 of 2018 08 15 1352hrs)

2    That is not accurate, as explained in the section on drug monitoring. The MAPIP
3    methodology changed in July 2018, after this 95% was recorded in May 2018. The new
4    measure more accurately captures current MAPIP results for compliance in the 70% to
5    85% range, but doesn't measure whether psychiatrists are checking blood levels when
6    they change the dose of medications, which is the most difficult of the measurements to
7    get. Consequently, the figures being reported now are still likely reporting overly high
8    values. These values were wrong for years and falsely reported to the court in 2017.

9    Timely PC contacts "97%" (see page 1 of 2018 08 15 1352hrs)

10    This is too high because the clock resets when patients transfer institutions. It also is
11    potentially misleading for those who don't understand this calculation, if it is thought to
12    be a measure of whether patients are seen on time (zero percent of patients could be seen
13    on time for a 97% patient weeks compliant report). 97% is a "percent patient weeks
14    compliant" measure, which overestimates whether patients are seen on time. See 2018 09
15    04 1600hrs for a description of why that is so.

16    Timely Psychiatry Contacts "93%" (see page 1 of 2018 08 15 1352hrs)

17    This is incorrect for many reasons:

18    A. The clock resets when patients transfer institutions, so up to six months between
19    patient visits could be a compliant time frame in CCC (rather than three months) and up
20    to two months becomes a compliant time frame in EOP, rather than one month. If a
21    patient transferred institutions more than once, appointments up to nine months later
22    could be considered compliant. This bias led to false reports to the court in 2017 and 2018
23    in the staffing plan.

146

1   B. It measures percent patient weeks compliant (see above) which is an overestimate of
2   whether patients are seen on time.
3   C. It conflates business rules with patient need for timely care. If the patient needs to be
4   seen (say at the CCC level of care) and the physician orders the patient to return back
5   urgently in one week   because the Program Guide and professional ethics require that
6   patients be seen when they need to be seen   yet that patient is then seen eleven weeks
7   late, the QM report will not count this appointment as even one day late. If the patient is
8   seen more frequently than a mathematical minimum frequency, any patients who need to
9   be seen more frequently than that to get at least adequate care will not be thought to
10  have any late appointments, even if the needed appointment is critical. So this measure
11  reports on whether patients are being seen on time, except if they urgently/more
12  frequently need to be seen. Since all of these late appointments aren't counted for our
13  thousands of patients, this measure is biased and falsely elevated. (This bias also inflated
14  the numbers sent to the court in 2017 and 2018 in the staffing report.)

15  Note that both the measure of whether psychiatrists are seeing patients in consultation
16  ("Timely Referrals" from others) and when they are supposed to medically (Timely
17  Psychiatry Contacts)   within a minimal Program Guide determined frequency   are
18  reported in a potentially significantly biased way. To the extent that there is inadequate
19  psychiatry staffing (or inadequate ability to get patients to psychiatric clinics) these
20  measures will be low and we don't know how low they are. The psychiatry team is not
21  authorized to calculate these measures, so we can't precisely know where and when
22  patients are getting inadequate care because they are not being seen when they need to
23  be. To the extent that patients being seen when they need is a determinant of adequate
24  psychiatric staffing and program organization, at the very best whether this is occurring is
25  not known.

1  Appointments Seen as Scheduled "92%" (see page 2 of 2018 08 15 1352hrs)

2  Quoting Dr. ███████:

3  "The denominator is defined as "All scheduled appointments", however QM excludes all
4  cancelled appointments, except those cancelled due to ProviderUnavailable,
5  TechnicalDifficulties, or ModifiedProgram. Approximately half of all scheduled
6  appointments are cancelled due to a reason that is not included by this indicator (see
7  section on Appointments Seen as Scheduled in the body of this), which makes the true
8  Appointments Seen as scheduled percentage closer to 50%, not 90+%"

9  So to make this indicator right, approximately cut it in half or a bit more. So the indicator
10 is also grossly wrong. These values falsely report to our Coleman monitors about 2x the
11 actual value. We could actually fix institutions if knew that at SAC for example 22% of
12 patients were being seen as scheduled. We could focus on the problem, rather than doing
13 nothing because of the high reports.

14 Group Treatment (see page 3 of 2018 08 15 1352hrs)

15 This is an indicator for group treatment being conducted in a confidential setting, but not
16 for psychiatry appointments. Had they reported on that, the report would be biased. The
17 system defaults to counting appointments as confidential and thus when psychiatrists
18 don't know how to record the appointment as confidential (and even when they do and
19 are hurried) we have documented repeated biases and elevations. For example, in the
20 CCWF crisis bed, 100% of appointments are reported as being seen confidentially, but
21 actually none (0%) are.

148

1    Treatment Cancelled (page 3 of 2018 08 15 1352hrs)

2    Dr. ▮▮▮▮▮ says: "Instead of giving a straightforward percentage of the treatment that is

3    cancelled (e.g. if there are 100 appointments and 30 were cancelled, this indicator would

4    show 30%.) The numerator is defined as "Number of patient weeks included in the

5    denominator during which the following number of hours of treatment were cancelled.

6    More than 3 for ASU EOP Hub, PSU EOP, and ML EOP. More than 1.5 for RC EOP and

7    ASU EOP non Hub. More than 1.0 for SRH/LRH CCCMS."

8    With a sufficient number of convolutions in one's calculations one can make any number

9    become any other. As an absolute value, the number 19% in this context is absolutely

10   meaningless. The reason is that arbitrary numbers like "3", "1.5", and "1", with arbitrary

11   assignments to levels of care, could be changed to cause the "Number of Patient weeks

12   included during the denominator" to cause any overall percentage that is desired.

13   Measurements that are arbitrary are meaningless because the definition can be changed

14   to create any value at all. We know from the scheduled appointments that an extremely

15   high percentage of appointments are cancelled and refused. That answer (what number of

16   100 appointments were cancelled or refused or both) needs to be in the Treatment

17   Cancelled part of the Mental Health Performance Report.

18   Treatment Refused (page 3 of 2018 08 15 1352hrs)

19   If there are 100 appointments and 40 are refused, then 40% are refused. Instead, we get a

20   whole new set of arbitrary numbers (relative to the cancellation report above) to get the

21   value recorded to be "24%". There is more "Number of patient weeks" verbiage included,

22   but unlike the cancelled appointments, we get the new words, "50% of all offered

23   treatment was refused AND less than the following hours of treatment were attended. "5"

24   for ASU EOP Hub, PSU EOP, and ML EOP, less than "2.5" for RC EOP and ASU EOP non

25   hub, and "less than 1" for STRH CCCMS and LTRH CCCMS." With access to the

149

1  databases, our psychiatry team could make these percentages be anything by slightly

2  varying numbers like "50%", "2.5", "less than 1". We know that huge percentages of the

3  patients refuse. It would be good to know where that happens more and where less, etc.

4  But all of this is utterly obscured by a creative measurement system that allows any

5  number to be created as the so called measured result.


6  Our QM psychologists are creating the semblance of scientific measurement, but doing

7  nothing of the kind, with false, misleading, and arbitrary reports of numbers that

8  allegedly mean something in these reports.

_____

[ii] Note that the court has never been given a report as to whether our patients are seen on time. The court may be told about "patient percent weeks timeliness", but never the percent of patients who are seen on time. There is a reason for that which will be explained later in the report.

Suffice for now to say that our psychiatrists have developed an algorithm on a different platform for determining whether our patients are being seen on time. Were we permitted access to the database we could easily determine whether our patients are being seen for their appointments on time, etc., but unless an external reviewer with considerable power mandates that we be given that access, this information will continue to be denied us. We think the results would be quite helpful. But our psychologists and ▮▮▮▮▮▮▮▮▮▮ determine what we are allowed to know. Underlying that problem is the fact that in CDCR psychologists with no medical training determine what is or is not medically relevant. This is a theme mentioned throughout this report.

ii Physicians determine what is a medial issue or not (and so do judges, after hearing relevant testimony from medical experts). Psychologists can't determine whether a set of labs or physical findings creates a relevant medical issue that requires attention, as they have no medical training.

iiii There is a brief 15 minute "treatment team meeting" 14 days after a patient arrives at a new institution (which would nonetheless be late in the hypothetical situation in the body of this report, even if the treatment team visit counted as a psychiatric visit, which it doesn't). A group meets and a psychiatrist should be present, a psychologist or social worker is present, representatives who understand the custodial issues are present, and others come. This occurs so that the team (including the psychologist and other participants) can help to make plans for the patient. At this time the psychologist will have done a psychological assessment of the patient, but the patient will not have been seen by a psychiatrist.

The reason a psychiatrist should do an assessment before the day 14 treatment team or at least when the last physician who saw the patient ordered the patient to be seen, is precisely to figure out what the patient needs medically. During the physician ordered subsequent assessment (say because a lab is rising), the psychiatric physician should be reviewing the labs and medications, interviewing the patient, physically/neurologically examining the patient when necessary, and figuring out medically what the patient needs. None of that occurs in a 15 minute treatment team.

When a patient is transferred from one institution to another, the physician at the receiving institution doesn't know the patient. The point of a psychiatric intake assessment is not to get the kind of non specific, non medical assessment that a psychologist does when presenting the patient to a treatment team for a few minutes, otherwise psychological assessment and psychiatric medical assessment would be identical.

151

No general medical physician would consider a psychologist's assessment in a treatment team meeting to be relevant in determining whether there are medical issues. Nor does a psychiatrist, because psychologists cannot evaluate medical parameters like increasing liver function tests. But it is even harder for a psychiatric physician than it is for other medical doctors. The psychiatrist has to understand how changing medical parameters can affect psychological states. For example, initiation of lithium can damage the kidney, which can cause the lithium level to rise higher and higher because the lithium isn't being excreted by the kidney, which can damage the kidney even more. The ever higher lithium level can then cause mental status changes which may prevent a patient from hydrating properly and seeking medical attention to deal with the lithium toxicity. But to understand any of this, the psychiatrist needs to check the lab value and interview the patient. That's what a psychiatric assessment is.

The reason physicians should do assessments before treatment teams is so that they can know enough about the patient's medical condition *to participate* in the team to guide future treatment. A physician is not going to glean from a psychologist's psychosocial assessment (with the patient not even necessarily present at the treatment team) when a patient might need to be seen, which is why it is dangerous for psychologists to overrule medical doctors' orders with respect to when patients should not be assessed by a psychiatric physician.

Finally, as just mentioned, quite frequently *patients don't even come to treatment teams*. So the psychiatrist won't see the patient at all and thus *no assessment could possibly be made*.

If treatment teams substituted for psychiatric assessments, then we wouldn't need the psychiatric assessments, which the physician specifically ordered to occur at the time he or she ordered it to occur.

---

[iv] This same ██████████████ told me that psychiatric physicians are not qualified ("in CDCR") to say that a psychiatric patient is medically OK for discharge from a crisis bed or acute psychiatric hospital. (Then who is?) Often a general medical physician will not see a patient for months in a long term hospital. If not the psychiatric physician, which physician *is* saying the patient is medically and psychiatrically safe to leave when he or she does? No one? In a sense the ████████████ appeared to be saying that neither psychiatric physicians nor psychologists can determine when a patient is medically appropriate for discharge, except that psychiatrists are physicians and make that decision every day in hospitals across the country.

[v] And we need this data to determine where institutions are having trouble getting patients seen on time so we can move, or advocate moving, additional organizational or staff resources to solve the medical problems of getting patients seen when they need to be.

[vi] The EOP extra bias   in which they increased the compliance timeframe from one month to 45 days   is no longer present in any calculations because the psychiatry team was able to get that change reversed.

[vii] In some institutions the psychiatrist always "closes" his or her appointments. But in institutions in which patient care is particularly difficult (see later report about my team's visit there), an OT or MA administratively helps to close out an appointment. Dr. ████████ is referring to that.

[viii] No doubt those defending this would claim that there is no problem. All that is being reported is shown in how the calculation is done. For example, they could say that they implicitly stated (in how the number was calculated) that refused appointments would not be counted in the measurement of those who miss appointments, because it was not

153

included in the items said to be included in the calculation (in the screenshot, see 2018 07 30 2057hrs). But how many observers who have seen this Dashboard would think that a calculation that is said to report about whether "ALL" scheduled appointments occur, does not include multiple types of appointment that are in fact scheduled but don't occur. Using this reasoning, somehow, the refused but scheduled appointments are not the right type of "ALL scheduled appointments" to be counted.

The very best interpretation is that the report is very misleading. Whatever the explanation, one can be sure that virtually no one seeing a Dashboard report claiming that 95% of patients scheduled for appointments come to their appointments, would know that actually about 40 45% do. Since the purpose of measurement is to help people gain understanding of reality, the measurement reported fails in that domain, because it causes people to draw mistaken conclusions about what is occurring.

[ix] CDCR has never allowed psychiatric physicians to analyze the data to be sure, but I am confident that this is the case, because CDCR has never counted an appointment as late if it is ordered by a psychiatric physician to occur at a certain time and occurs late, but within the maximum CDCR court defined interval. Thus, in the situation of reporting "overdue" days to the court, CDCR would also very likely not allow such a physician ordered appointment to be considered to have occurred a certain number of days late, even when it was.

[x] Saying that on average an EOP patient needs to be seen five times in four months may seem arbitrary. But we could, given access to the database, make a better estimate by noting the interval that psychiatric physicians order for certain patients to be seen, when they are writing for patients to be seen more frequently than minimum Program Guide intervals. For example, patients who may have suicidal thinking, but with no intent or plan, are often scheduled by psychiatrists to be seen once or twice a week for several

154

weeks at the EOP level of care. Psychiatrists may be checking in on their patients while adjusting a medication or waiting for a medication to work, for example.

There is arbitrariness in my guess that an EOP patient may on average need to been 5 times over 4 months. But the CDCR assumption that patients require appointments only once a month at the EOP level of care is clearly mistaken given that some patients do need to be seen more frequently.

[xii] We, the psychiatry leadership team, wanted psychiatrists in the field to have to enter information about the context of a given appointment in a pop up note, but we were overruled by the psychology designers of the psychiatry workflows. Psychologists control both QM for psychiatrists and the design of the EHRS psychiatric workflow, and have not in general allowed psychiatric participation.

[xiii] There are a few exceptions to this. When nurses schedule emergency consults at night, the psychiatrist may actually complete the work in the evening, but do not have access to the EHRS to document it. Also, routine appointments with psychiatrists need to be "opened" and "closed" which can be tedious. So more recurrent appointments occur than are said to have occurred. QM's assessment of psychiatric productivity has suggested, inaccurately, that psychiatrists were seeing only about 3.2 patients per day. (see 2018 09 24 productivity)) The productivity measurement was thus biased and under reported psychiatric productivity. When counting treatment teams, our manual calculations show a very different number (around nine per day for our telepsychiatrists).

Overall the effect of the QM biases is such that it appears that psychiatrists are getting more work done than they are (better MAPIP compliance with monitoring meds, more confidential appointments, higher percentage of routine contacts seen timely, etc.)) but are seeing very few patients per day, like 3.2 according to the Dashboard (see 2018 09 24 [155] productivity). This creates the false impression that the system has more psychiatrists

than are needed, as psychiatrists *appear* to see very few patients per day, and also *appear* to be fully compliant, especially with "timely" appointments. But as I have pointed out in a previous section, many actually late appointments are just not counted as late. For a discussion of late appointments due to prioritizing recreation therapy groups over psychiatry appointments, see 2017 11 21 r749hrs.

xiii Our psychology colleagues have insisted for years that psychiatrists use powerplans. Powerplans schedule recurring psychiatry appointments at a preset interval (approximately the maximum time allowed by the court). They thus discourage physicians from making appointments with patients any time sooner than the maximum court mandated intervals: see our ███████████████ comment disparaging medical scheduling orders sooner than the maximum intervals as "workarounds". Our ████████████████████ responded that the Prisoner Law Office might not approve of "OTs [the schedulers] deciding when to schedule the patients." Our psychiatrists think these powerplans make them less likely to see patients on time because instead of scheduling an appointment after each visit, the psychiatrist has to remember when the powerplan is expiring on each individual patient (or find that information, which takes time). Also, appointments often need to occur sooner than the maximum Program Guide intervals. Powerplans are also very time consuming to use, requiring many more clicks. Our psychiatrists in fact use them less than 1% of the time for follow up appointments. We have sent surveys to our psychiatrists, and they very much dislike them because of their inefficiency.

Very recently, it was decided that CDCR will utilize a unified scheduling system for all disciplines, which caused our ████████████ to finally call a halt to our psychologists' insistence that we use a scheduling tool that essentially is supposed to cause inflexible scheduling of our patients, usually at maximum Program Guide intervals for months in advance. Insisting on this seems most consistent with trying to force psychiatrists to follow business rules rather than the clinical needs of the patient, as our psychiatrists

156

think it makes them less likely to see patients on time, because one can't tell when the powerplan scheduling has expired, unless by checking through orders.

[xiv] Our team notes that only very recently, as court hearings about staffing are about to happen, have there been some moves to change procedures in line with some of the many requests we have made that have been denied or ignored in some cases for years. All of our leadership team worries, however, that after the staffing decision (when there is less need to worry about vocal psychiatrists), things will return to normal (for example, lack of access of psychiatrists to quality management tools or electronic health record tools).

[xv] Patients get credits off their prison sentence by attending groups, but just a fraction off for attending psychiatry appointments, so they attend groups. Our team tried to prevent that asymmetry, but failed.

[xvi] See for example *How to stabilize an acutely psychotic patient*, Current Psychiatry, 2012 December; 11(12):10 16 Hannah E. Brown, MD

[xvii] Current Psychiatry, 2012 December; 11(12):10 16 Hannah E. Brown, MD

[xviii] [xviii] "It had come to a point where the Supervising Psychologists in each program were by proxy supervising the staff psychiatrist in that program. There was not a 'team based' approach in providing care. The therapist was donned the 'primary clinician' (formally so, as the "PC" in the EMR)   and made all the important decisions, without needing agreement from the psychiatrist. This was even the case during IDTTs   the 'primary clinician' was the person who presented the case, spoke to the patient, and the psychiatrist was asked only to speak when it was about medications. I can attest to at least a hundred IDTTS I've been a part of as the psychiatrist and this was the only role I was expected to play   the prescription writer.

157

At CIW, in the one year period that preceded by becoming becoming ███████████, no psychiatrist had attended the pharmacy and therapeutics committee (a psychologist ███████ attended in the place of the ███████████), no psychiatrist had attended Licensed Inpatient committee, UM, QM, and perhaps most importantly, the Mental Health Subcommittee. This can all be confirmed via meeting minutes. Psychiatrists had not been involved, at all, in policy review for any of the programs outside of the PIP (psychiatric inpatient program), even in the MHCB. In fact, nobody knew who the Clinical Director of the MHCB was when I became ████. I asked the ████, the ████ (████████████, a non [psychiatric physician], ████ (████████████████) and the ████ (Psychologist Executive [████████████]). The ████ thought it was the previous ████████████, of the PIP, ██████████, PsyD [psychologist] (it was not) or perhaps the new acting ██████████ I had appointed for the PIP, ██████████, MD (it was not). The ████ thought it was the ████████████ it was not, he was the ████████ ████████. Multiple policies in the MHCB refer to a "Clinical Director", yet lo and behold, nobody knew who that person was.

Finally, the designated "████████████", ██████████ piped in and said that it was the previous Supervising Psychologist, ██████████, but unofficially. And currently, I asked? Radio silence. Why is this problematic? Here was a licensed inpatient psychiatric hospital, being solely run by psychologists, and has been for at least three years."

[xlix] HQ psychologists adamantly deny that they have insisted that patients leave after ten days or that the patients must go to particular levels of care.

[l] Although the local psychiatrists and clinicians seem convinced that HQ psychologist reviewers are pressuring them, those HQ reviewers who would be responsible for such pressure deny it. Nonetheless as we tour the institutions, for whatever reason, the psychiatrists, psychologists and social workers feel intense pressure to discharge patients [158] to the lowest levels of care at or before ten days.

---

[xxi] Psychiatric physicians can make mistakes, just as psychologists and others can, and they can make rational decisions that nonetheless lead to bad outcomes. If psychologists disagree with the psychiatric physician, they need to approach a psychiatrist's medical supervisor. This psychiatrist can then make the decision, write the medical/psychiatric clearance and document in the chart why the decision was made, if the supervisor disagrees. Though psychologists (no medical training) should be able to discharge patients apparently, given California law, a physician must clear the patient medically/psychiatrically for there to be appropriate discharges that take into account all of the relevant medical issues that patients have (Appropriate drug levels? Is the diabetes under control?, etc.)

[xxii] Title 22: 79609: "Psychiatrist/psychologist services means consultative services to inmate patients of a correctional treatment center including diagnostic psychological assessment and treatment. Primary services may also be provided to inmates not requiring admission to a licensed bed."

[xxiii] Some psychologists will claim that the psychiatric physician can be the "primary clinician" in CDCR. But the primary clinician has case management responsibilities and there are far more psychologists (and social workers) who take on this role in CDCR. The ratios of psychiatrist to patient would have to be radically adjusted to be equivalent to the high ratios of psychologists plus social workers to patients for psychiatrists to be able to take on the case management responsibilities of the "primary clinician". In the vast majority of cases in CDCR (and maybe all cases), it is the psychologist or social worker who is deemed the "primary clinician" and essentially never the psychiatrist.

[xxiv] Dr. ████ is referring to the push by our psychologists to be able to place patients in restraints without needing medical clearance prior to doing so, though the patient is in a licensed facility with 24 hour nursing coverage. Psychologists currently are allowed to do 159 this in CDCR crisis beds, but not the former state psychiatric hospitals. Normally if no

physician is available, the nurse (who certainly has some medical training) can initiate the restraints and then call the physician, usually the psychiatric physician. Patients die frequently because of restraints. A person who has a tendency to aspirate (bring stomach contents into his lungs, for example) can die in restraints from this, and so there needs to be some type of medical assessment, even briefly by a nurse, that restraints would be better and safer than (for example) medication or forced medication.

But these are medical decisions. Currently in CDCR, as our policy works, psychologists with no medical training are allowed to overrule nurses who object to patients being placed in restraints. Dr. ███████ is pointing out that psychologists have no training in this at all, or even any medical understanding of the implications of doing so in hospital settings with medically sick and vulnerable patients. Yet many are fighting to be able to do so without a physician determining that it is medically safe for them to order it. Dr. ███████ appropriately finds this dangerous and absurd.

A final issue is that if psychologists can initiate restraints, the policy calls for the written order of the psychiatric physician (or psychiatric nurse practitioner) to cosign the emergency order of the psychologist. But if the physician disagrees with the emergency order of the psychologist, then he or she can't sign it, which thus violates the policy. Nurses, on the other hand can make a quick decision whether forced medications might be more appropriate in a patient who is aspirating (high risk of death in restraints because of bringing stomach contents into the lung), whereas psychologists have no training at all even to notice when patients are aspirating to take that into account. Making a quick decision whether shots or restraints is a better option is a medical decision. Restraints are a physical procedure that frequently kills patients and so requires utmost care in assessing medical risks and benefits. Psychologists have no training for that, yet in CDCR they have the authority to order restraints right now and the leadership is fighting to continue to allow psychologists to order patients to be put in restraints in [160]

the licensed crisis beds prior to medical clearance, and to extend that into the licensed inpatient facilities that CDCR recently took over.

A particular problem is that physicians don't want to be forced to sign a restraint order initiated by a psychologist, whether in an "emergency" or not. If CDCR deems that psychologists in hospital settings are medically qualified to decide that sometimes desperately medically ill patients should be in restraints, then physicians should not be forced to legitimize these decisions. Their orders should be unsigned by physicians. (see 2018 06 01 1459hrs)

Wendy Musell, SBN 203507
STEWART & MUSELL, LLP
2200 Powell Street, Suite 440
Emeryville, CA 94608
415-593-0083
Fax: 415-520-0920
E-mail: wmusell@stewartandmusell.com

Attorneys for Non-party Witness
Michael Golding, M.D.
Melanie Gonzalez, M.D.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAPLH COLEMAN, et. al., | Case No.: 2:90-CV-0520 KMJ DB P |
| Plaintiffs, | **RESPONSE OF DR. MICHAEL GOLDING RE EVIDENTIARY HEARING** |
| v. | |
| GAVIN NEWSOM, et. al., | |
| Defendants. | |

### A. CDCR's Blame the Whistleblower Defense Ignores the Evidence In this Case and Further Attempts to Mislead the Court

It appeared from the evidentiary hearing that the defense themes related to whether CDCR misrepresented information or committed fraud upon the Court and Office of Special Master were (1) Dr. Golding never told CDCR of his concerns and if he had, CDCR would have addressed the problems identified promptly; (2) Dr. Golding is wrong; there are no material issues that Dr. Golding raised and the Court ought to ignore each of Dr. Golding's concerns as immaterial or irrelevant; and (3) Dr. Golding's reports that CDCR presented false or misleading data to the Court and reports of patient safety concerns made life personally difficult for certain staff and that should somehow be taken into account to lessen the legal burdens upon CDCR.

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

1

1    This well-trod trope of "blame the victim" defense should be disregarded by the Court. The

2    evidence presented in the evidentiary hearing, as well as the Neutral Expert's Report demonstrates that

3    these "blame the whistleblower" defense themes are nothing more than further false and misleading

4    narratives to the Court in a transparent effort to evade responsibility and to avoid enacting any real

5    change to ensure a minimum level of mental health care that is constitutionally mandated.

6    First, it is demonstrably false that CDCR was not informed by Dr. Golding of each and every

7    issue in the Golding Report, including each subject area of the evidentiary hearing. It was shocking to

8    Dr. Golding that CDCR officials under penalty of perjury claimed in the evidentiary hearing that they

9    had no knowledge of Dr. Golding's concerns. The evidentiary record in this case is replete with

10    instances that Dr. Golding informed CDCR, including Ms. Tebrock, attorneys for CDCR, and other high

11    level management of CDCR of the exact issues that he raised subsequently in a report to the Receiver in

12    the Plata case.

13    Dr. Golding has provided to the Court and the Court designated investigators emails of these

14    exchanges, a declaration detailing his reports, as well as days of testimony with court appointed

15    investigators detailing that he attempted to get CDCR to do the right thing and correct false or

16    misleading data presented to the Office of Special Master and the Court, but CDCR refused and failed to

17    do so.

18    Dr. Golding also repeatedly raised with CDCR his concern that CDCR was presenting

19    misleading data that formed the basis of Staffing Proposal that would cut psychiatry staff by twenty (20)

20    percent. After exhaustively attempting to get CDCR to respond and being rebuffed and retaliated

21    against, and up against the time frame that an agreement would be signed and ordered by the Court

22    based on misleading data regarding psychiatry staffing that would have wide ranging negative impacts

23    on patient care, Dr. Golding finally provided his report to the Receiver. Thus, the defense narrative and

24    testimony by former Deputy Director Tebrock and other witnesses that Dr. Golding failed to bring

25    forward relevant data and other concerns and if he had only done so none of these proceedings involving

26    the Court would have been necessary is false and made up from whole cloth.

27    It is also belies Deputy Tebrock's testimony, given that she testified that the only data presented

28    to the Court that she would retract as in error, if given another chance, was data Dr. Golding did not give

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2-90-CV-0520 KMJ DB P

2

1  her — data about Administrative Segregation Hubs that was shown to her by the Plaintiffs' counsel Lisa
2  Ells. Thus, Deputy Tebrock's testimony demonstrates that regardless of the false or misleading data
3  presented to the Court as outlined in the Neutral Expert's Report, Deputy Tebrock did not feel any
4  action was necessary to correct these representations made to the Court, Special Master and Plaintiff
5  regardless of whether and when Dr. Golding raised with her the data and other concerns or not.

6  Also refuting a lack of knowledge to the issues before the Court in the evidentiary hearing was
7  Deputy Tebrock's admission to signing documents in 2017 specifying that the psychiatry EOP time
8  compliance interval had been increased to 45 days in CDCR's Administrative Segregation Hubs, yet she
9  reportedly took no actions to correct the data or to determine how widespread the 45 day increased
10  interval was to other institutions. These documents clearly demonstrated her knowledge of the problem
11  in 2017. However, no action was taken to retract data and correct it in reports provided to the Special
12  Master and the Court.

13  Second, CDCR's attempted to minimize the importance of CDCR's practice of (a) changing the
14  time frame to provide mandated psychiatry appointments from thirty (30) days to up to sixty (60) days
15  without informing the Office of Special Master and the Court, (b) not informing the Office of Special
16  Master and the Court that the "appointments seen as scheduled" identifier measured something other
17  than appointments seen as scheduled, and (c) not informing the Court or the Office of Special Master
18  that supervisors were regularly serving as line staff, often with supervisors carrying a regular case load.
    Even after the Neutral Expert's Report, this Court's orders requiring CDCR to correct false or
19  misleading pleadings filed in Court and this evidentiary hearing, CDCR's defense narrative was that
20  these issues are not material or important.  One witness characterized issues raised as not a big deal.
21  This laissez faire approach is deeply disturbing and demonstrates that even after nearly a year of
22  proceedings related to these issues, CDCR either fails to understand the importance of these issues or is
23  strategically feigning ignorance to avoid taking responsibility.

24  Third, counsel for CDCR sought to elicit testimony from multiple witnesses that it was
25  personally difficult for CDCR personnel to have to address the issues set forth in Dr. Golding's report to
26  the Receiver.  One can only surmise that the strategic reason for this was to attempt to cast Dr. Golding
27  in a bad light as the perpetrator of some imagined wrong upon CDCR staff  for making a whistleblower
28

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

3

1    complaint and to seek absolution from the Court for any manner in which CDCR mislead the Court or

2    Special Master.

3         However, as was clear from the testimony of Dr. Ceballos, it was not Dr. Golding who was

4    raising the specter of adverse legal consequences for individuals involved in the decisions set forth in

5    Dr. Golding's Report, but CDCR management staff. Dr. Leidner and Dr. Ceballos' testimony made

6    clear that Dr. Ceballos suggested to Dr. Leidner that he could be subjected to legal consequences

7    because of Dr. Golding's Report. This lead Dr. Leidner to step down from his position. If anything, this

8    suggests a retaliatory smear campaign was underway against Dr. Golding, a whistleblower. It also

9    demonstrates that Dr. Golding was not the person threatening that CDCR staff would face some sort of

10   legal consequences. Rather, Dr. Golding was focused on patient care and safety and truthful

11   representations to the Court and Special Master.

**B.   The Totality of the Circumstances Must Be Considered in Determining if There was**
12   **Fraud or Misrepresentation Upon the Court and Special Master**

13        In order to make a determination whether CDCR had provided misleading data or sought,

14   successfully or not, to mislead the Court, Special Master, the totality of the circumstances must be

15   considered. In *US v. Sierra Pacific Indust., Inc.* (9th Cir. 2017) 682 F.3d 1157, 1173, the Ninth Circuit

16   observed the following when considering if there has been a fraud on the Court:

17        Contrary to the district court's assertion that "the whole can be no greater than the sum of its
     parts," a long trail of small misrepresentations—none of which constitutes fraud on the court in
18   isolation—could theoretically paint a picture of intentional, material deception when viewed
     together.

19   *Id. See also Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944) (consideration of

20   totality of the circumstances required to determine whether there has been a fraud on court); *Pumphrey*

21   *v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1132 (9th Cir. 1995) (appellant, through its in-house counsel,

22   engaged in a scheme to defraud the jury, the district court, and appellee through the use of misleading,

23   inaccurate, and incomplete discovery responses and the presentation of fraudulent evidence).

24        The Expert Report detailed numerous occasions that CDCR misrepresented material information.

25   Each of these misrepresentations favored CDCR in the presentation of data and higher compliance rates.

26   Similarly, CDCR's practice of (a) changing the time frame to provide mandated psychiatry

27   appointments from thirty (30) days to up to sixty (60) days without informing the Office of Special

28   Master and the Court, (b) not informing the Office of Special Master and the Court that the

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

4

1    "appointments seen as scheduled" identifier measured something other than appointments seen as

2    scheduled, and (c) not informing the Court or the Office of Special Master that supervisors were

3    regularly serving as line staff also favored CDCR in showing higher level of compliance than actually

4    existed.

5        The consistent pattern of demonstrating higher compliance rates using incorrect assumptions and

6    faulty and misleading data must be considered. These misrepresentations were no accident. Rather,

7    they were a pattern of conduct by CDCR that when viewed as a whole demonstrates intentionally

8    misleading and /or false information provided to the Court and Special Master for the strategic

9    advantage of CDCR to lower the staffing in psychiatry and to eventually cease being a party to this case.

10    When each part is viewed together, what appears is a tableau of intentional, material misrepresentations.

11    *Sierra Pacific Indust., Inc.,* 682 F.3d 1157, 1173.

12          **1.  Testimony and Findings of the Expert Report and CDCR's November 20, 2018**
    **Staffing Proposal Demonstrate that CDCR Mislead the Court and Special**
13          **Master**

14        In order to properly evaluate whether there was the requisite level of intent to commit fraud on

15    the Court and/or Special Master, or whether there was intentional misrepresentation by CDCR, any

16    reasonable inquiry must inquire who would benefit from such misrepresentations, how and why. The

17    testimony at hearing, information contained within the Expert Report and the Golding Report serves to

18    highlight that inaccurate, inflated compliance data metrics have real world consequences for patient care

19    and were enacted to reach predetermined strategic goals by CDCR in this case.

20        Misleading data was utilized to determine if there could be decreases in Court mandated staffing

21    for psychiatry overall and practices to wind down this decades-long and very expensive legal battle.

22    Data that the Expert Report indicated was inaccurate or misleading was used to support changing

23    psychiatry staffing levels and practices across all its prisons and to incrementally end this case.

24    Specifically, CDCR provided to Plaintiffs for the purposes of amending current Court orders a staffing

25    report on November 20, 2018. *See* Decl. of Marc Shinnkrantz in Support of Plaintiff's Response to

26    November 13, 2018 Order to Show Cause, Ex. A (Docket No. 6010) (hereinafter "Staffing Report").[1]

27

28    [1]    Page numbers referred to herein to the Staffing Report are those set forth in Docket No. 6010.
**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

1  Data and reported practices relied upon in the Staffing Report, according to the Expert Report, are

2  inaccurate and/or misleading.[2]

3        The Staffing Report proposed decreasing psychiatry staffing generally and expected frequency of

4  psychiatric care contacts based, in part, on reported psychiatry caseloads. *See, e.g.* Staffing Report, p.

5  12-13. The Expert Report, however, found that "[t]he evidence confirms that at certain institutions

6  psychiatric supervisors maintain an active caseload comparable to line staff." Expert Report, p. 77. "A

7  senior supervising psychiatrist said it was expected that supervisors perform the same duties as line staff

8  when there are staffing shortages—the culture of leadership was that psychiatrists should be utilized.

9  That psychiatrist explained that when [s]he took on the senior supervisor position [s]he was doing line

10  staff work at least 50% of the time, and [s]he currently still covers IDTTs and other line work when

11  other psychiatrists are not available...The anecdotal evidence from multiple psychiatrists suggests that

12  [the Associate Deputy Director] Ms. Ponciano's data analysis undercounts the amount of patient care

13  being provided by supervisors." *Id.* at 81.

14        The Staffing Report also proposed reducing psychiatric staffing allocations to desert institutions.

15  Staffing Report, p. 7. ("The 2009 Staffing Model allocates 0.5 psychiatrists to each of the desert

16  institutions. 2009 Staffing Model at 20. However, the total number of psychiatry contacts for all five

17  desert institutions, including urgent, emergent, and routine contacts, was only 403 over a six-month

18  period, meaning an average of 16.8 contacts per week. Attachment A– Desert Psychiatry Contacts.

19  Therefore, the workload, which takes into account the average contacts and contact duration for all five

20  desert institutions, could easily be accomplished by half of a psychiatrist allocation.").

21        According to the Expert Report, however, Dashboard measurements of psychiatric contacts per

22  day are inaccurate. Expert Report, p. 67-68. The Expert Report states "[t]he anecdotal evidence from

23  multiple psychiatrists suggests that Ms. Ponciano's data analysis undercounts the amount of patient care

24  being provided by supervisors." Expert Report, p. 81. Thus, data relied upon to propose cuts to

25  psychiatry personnel in desert institutions was inaccurate.

26

27  ――――――――――
   [2]     Drs. Golding and Gonzalez offer these observations to illustrate the need to examine the totality
28  of the circumstances and how the misleading data and practices was used, not as a comprehensive
   substitution for further investigation, discovery or evidentiary hearings on these questions.

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2-90-CV-0520 KMJ DB P

1        As detailed in Court's Order Docket No. 6242, p.10, there are transparency and intent issues

2   implicated regarding CDCR's presentation of data and the representations made in support of CDCR's

3   2018 Staffing Proposal.  This was also clear from testimony at the evidentiary hearing, where the

4   practice of not disclosing whether supervisors are serving as line staff carrying a case load could mask

5   serious staffing shortages over time.  Further, while Dr. Brizendine admitted the Office of Special

6   Master should be involved in the discussion of the amount of work that supervisors should perform in

7   direct patient treatment as it relates to staffing level decisions, this never occurred, likely because

8   accurate data was not presented to the Special Master and Plaintiffs regarding how profound of a

9   problem existed concerning supervisors serving as line staff.

10       In October 2017, this Court ordered CDCR to come into compliance with their staffing ratios

11  with a 10 percent court ordered maximum vacancy requirement per year.  *See* ECF Docket No. 5711.

12  CDCR, in the position of being past the Court's deadline and non-compliant with the Court's Order

13  found itself in a pickle.  Unless the number of psychiatrists required and vacancy rate was changed and

14  there was a new Court order, CDCR was not going to come into compliance with the Court's October

15  2017 Order, either in the near term, or it appeared ever.   It is in this context that the negotiations to

16  lessen the legal requirements for psychiatry staffing and 2018 Staffing Report came into play.

17       Dr. Golding testified that he was informed on a nearly daily basis from psychiatrists at various

18  institutions that supervisors were serving as line staff and in many cases, were carrying a patient case

19  load. These supervisors were complaining of a lack of staff to cover their patient loads and were

20  requesting additional staff or help to address the problem.

21       Dr. Golding, in turn, informed CDCR management of these facts in multiple ways.  He provided

22  a monthly report (copies of which were provided to the Court) that detailed that supervisors were

23  serving as line staff.  These were provided to Deputy Tebrock, Deputy Brizendine, Ms. Ponciano and

24  others multiple times per year when discussing staffing related issues and the allocation of

25  telepsychiatric resources to help institutions in which supervisors were performing line staff work. With

26  Deputy Tebrock's knowledge, Dr. Golding went to multiple institutions in July and August of 2018 and

27  spoke to the psychiatry supervisors there and inspected the institution for certain variables.  He wrote up

28  a report and provided it to Deputy Tebrock.  The report detailed which institutions where supervisors

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

1  were serving as line staff and carrying a patient load, which institutions did not appear to have this

2  problem, as well as other concerns that were ultimately detailed in Dr. Golding's Report to the Receiver.

3         Rather than address the issues detailed in this report, the report was marked by Deputy Tebrock

4  as "attorney client privilege." This is the case even though no attorney informed Dr. Golding to go to

5  the institutions; no attorney informed Dr. Golding what to look for or what to ask staff about and no

6  attorney took party in the writing or any other aspect of the report. This "attorney client privilege"

7  designation resulted in the September 2018 report not being further distributed and Dr. Golding not

8  including this report in his Golding Report to the Receiver.

9         At the time that the 2018 Staffing Report was being developed, Dr. Golding also informed Ms.

10  Tebrock and other CDCR management who testified that psychiatry supervisors were serving as line

11  staff with a patient load, and if psychiatry staff were cut in the manner that appeared to be proposed by

12  CDCR, this would result in very bad patient care outcomes. Indeed, Deputy Tebrock admitted that she

13  and Dr. Golding had long talks about the issue of supervisors seeing patients as linestaff. Dr. Golding

14  testified (and it was not disputed by CDCR), that supervisors are necessary to manage patient care and

15  without supervisors more, not fewer, psychiatrists would be required to provide constitutionally

16  minimum levels of mental health care to patients.

17         Despite these disclosures, CDCR appeared to take two directly contradictory positions at

18  hearing: (1) Dr. Golding never told them of the problem of supervisors serving as line staff with a

19  regular patient load; and (2) everyone already knew of the problem of supervisors serving as line staff,

20  so CDCR did not have to explicitly tell the Court, Plaintiffs or Special Master that its data supporting the

21  2018 Staffing Plan was predicated on supervisors continuing to serve as line staff with a patient load.

22         The manner that CDCR approached the 2018 Staffing Report also indicates that it intended to

23  have a predetermined result, not based on accurate data. Testimony at hearing confirmed that both Dr.

24  Golding and Dr. Kuich were excluded from receiving a copy the 2018 Staffing Proposal while it was

25  being developed and presented to Plaintiffs and the Office of Special Master. Instead of simply

26  providing a copy, witnesses testified that Dr. Golding and Dr. Kuich were pulled into meetings, with no

27  advance review of the data or proposal and asked to support the Staffing Plan's staffing ratios. Each was

28

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

1    talked at (not with), the staffing plan psychiatry ratios without providing any of the written data or the

2    2018 Staffing Plan itself.

3        Dr. Golding was even asked to sign a declaration to be filed before this Court without CDCR

4    providing to him any data or a copy of the Staffing Report, essentially asking that Dr. Golding serve as a

5    rubber stamp for pleadings filed before this Court. Dr. Golding refused. He testified that he stated he

6    could not sign a declaration in support of the 2018 Staffing Plan without actually being provided the

7    staffing plan and data supporting it. Rather than provide Dr. Golding the requested information so that

8    he could provide a truthful declaration before this Court regarding the proposed 2018 Staffing Plan,

9    CDCR forwent getting a declaration from Dr. Golding, electing to keep him in the dark about the 2018

10   Staffing Plan. It is clear from this evidence that CDCR wanted to ensure that no one upset the apple cart

11   and called into question the plan to lower the amount of psychiatry staff in order for CDCR to come into

12   compliance with this Court's order and ultimately review its own compliance (as opposed to Court and

13   the Plaintiffs class oversight).

14       CDCR could not provide a cohesive answer regarding why it failed to provide Drs. Golding and

15   Kuich a copy of the 2018 Staffing Plan and supporting data, claiming that it did not want to burden

16   psychiatry with unnecessary information or tasks, while admitting it pulled Drs. Golding and Kuich in

17   meetings about the staffing plan while not giving them the plan at the meeting to discuss the plan.

18   CDCR witnesses, upon questioning by the Court, had to admit its explanation for its actions made no

19   sense. These actions speaks volumes regarding whether CDCR intended to provide truthful, transparent

20   data in support of its 2018 Staffing Plan and not mislead the Court, Plaintiffs' counsel and the Special

     Master.

21       It is undisputed that CDCR did not disclose to the Court or the Special Master (1) to what extent

22   the reporting of average frequency of patient contacts relied on supervisory psychiatrist to complete

23   caseloads contacts with patients; and (2) to what extent CDCR relied on active participation of

24   supervisory psychiatrists in performing the duties of line psychiatrics both in CDCR's 2018 Staffing

25   Proposal and in supporting their representation that, if adopted, the 2018 Staffing Proposal would bring

26   CDCR into compliance with the October 2017 staffing order.

27

28
     **DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
     Case No. 2-90-CV-0520 KMJ DB P

1    Ms. Ponciano testified that Dr. Golding said there were "too many" psychiatrists, suggesting he
2    supported the psychiatry staffing ratios proposed in the 2018 Staffing Proposal. This testimony was
3    misleading and omitted key facts that Dr. Golding was referring to the ability of CDCR to cut psychiatry
4    staffing if it implemented a clinic based model.

5    As detailed in the Golding Report, many CDCR psychiatrists waste most of their time searching
6    the prison for their patients because CDCR has failed to create psychiatric clinics in which patients are
7    brought one after the other to their appointments with a psychiatrist who stays seated in one place – a
8    clinic office. *See* Golding Report, pp. 77-81. Having found a patient in the yard, the showers, cell
9    blocks or other areas of the prison, the psychiatrist then must attempt to provide adequate medical care
10   to that patient in a non-confidential setting. Due to the time taken to find the patient, the psychiatrist has
11   less time in which to evaluate and medically treat the patient. There are also reported institutional
12   barriers to locating patients, as at times some correctional officer staff are less helpful in locating
13   patients.

14   There are obvious medical implications of these practices: (1) patients are not reliably seen for
15   psychiatric appointments; and (2) these brief medical evaluations in inappropriate conditions do not
16   constitute proper psychiatric medical care. One simply has to visualize patients actually having to
17   answer if they are suicidal and taking their medications while stepping out of a shower surrounded by
18   other inmates and prison staff to understand that this is an absurd approach to patient care, would not
19   lead to truthful medical disclosures and would discourage patients from electing to receive medical care
20   in the future. In these circumstances, it is understandable why patients would refuse care if they are
21   asked to disclose highly personal confidential medical information in this setting.

22   Dr. Golding's Report also detailed there are no executive psychiatrists in institutions or in the
23   regions. These medical implications could be addressed by a team of regional psychiatrists, supervised
24   by Headquarters Psychiatry staff, who could travel to the institutions to implement a clinic model where
25   patients are brought to psychiatrists. *See* Golding Report p. 45, 46, 56, 65, 66, 126. Dr. Golding
26   testified, and informed CDCR management staff that if CDCR implemented a clinic model (as exists in
27   virtually all other health care systems), it could safely cut psychiatry staff. He did not say, as testified by
     Ms. Ponciano, that there were "too many" psychiatrists.

28

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2-90-CV-0520 KMJ DB P

10

1    Additionally, testimony by Ms. Ponciano and Dr. Brizendine indicated that CDCR did not,

2    would not and could not track the supervisors who served as line staff.  However, this is again not

3    accurate.  Dr. Golding and Dr. Gonzalez provided CDCR methodologies to track this metric, and did in

4    fact provide reports tracking this metric.  Dr. Golding provided this information on a monthly basis from

5    information provided from each institution and regularly shared this information in staffing meetings

6    with Deputy Tebrock, Ms. Ponciano, and Dr. Brizendine.  It is a simple computer fix for the clinician

7    who sees the patient to input who s/he is and whether that psychiatrist is a supervisor or not.  CDCR is

8    the third largest law enforcement agency in the United States with the largest state run prison system in

9    the United States, according to its own publications.  The representation that it cannot figure out a way

10   to identify when psychiatry supervisors provide medical care to patients and cannot tell the Court

11   whether it was a supervisor or not that gave medical care to a patient is not credible.

12              **2.   CDCR's Changing of the 30 Day Indicator and Conflating EOP and CCC**

13          The Neutral Expert Report, page 43 indicated that the change from 30 to 45 days of psychiatric

14   contacts for EOP was misleading and included in two filings with the court.  This Court found these

15   actions of changing the timeframe from thirty days to a longer period of time to be a significant

16   alternation of the Program Guide.

17          The Expert Report described that psychiatric evaluation contact compliance numbers are further

18   biased and misleading.  "[For] Program Guide timeline requirements for EOP and CCCMS psychiatric

19   evaluations, the "Timely Psychiatry Contacts" indicator is biased towards compliance by some non-

20   trivial percentage.  Second, the data is biased towards compliance as a result of CDCR's decision to

21   default the appointments in EHRS to confidential, combined with insufficient training and oversight

22   relating to this mechanism." *Id.*, at 67-68.  The Expert Report did not evaluate the adequacy of medical

23   care that can be provided in non-confidential cell-side visits of short duration, although witnesses stated

24   that adequate medical care cannot be provided in that setting.  In considering the findings of the Expert

25   Report in its totality, if CDCR is claiming in order to lessen Court and Plaintiffs' monitoring and

26   oversight that patients are receiving the constitutionally minimum level of mental health care, including

27   timely seeing a psychiatrist in a confidential setting and receiving required medications, the pattern of

28

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

1  misleading data in these areas is critical to the Court's analysis. It is also relevant to understand the

2  question of intent related to why there is a pattern of false increased compliance metrics.

3      The testimony at hearing supported the conclusion that CDCR's actions of changing the timely

4  psychiatry contacts from thirty days to 45 or 60 days, and then not correcting this data after presenting it

5  to the Court, was intentional and misleading.

6      The Golding Report at page 27 details a filter option to separate out EOP and CCC that was

7  removed on or about May or June 2018 so that when evaluating patient care at EOP and CCC levels of

8  care, the report returns one timely indicator. As testified by Dr Golding, this masks that the EOP levels

9  of compliance are lower than is reported with the data mixed with CCC levels of care. EOP timeliness

10 metrics are not reported at all in the Staffing report, where these figures would have been significantly

11 lower. *See* Golding Report, pp. 47-57, 135-137.

12     The Court ordered at Docket No. 6242, p. 5, CDCR must rerun these Performance Reports and

13 file amended documents. As noted on page 8 of Court's Order, Docket No. 6242, Timely Psychiatry

    Contacts was included in documents provided to the Special Master.

14     The testimony at hearing was astonishing in this area of inquiry. Despite a Court Order requiring

15 CDCR to rerun these Performance Reports, it was clear from the testimony of Ponciano, Rekard and

16 Leidner, CDCR had not complied with this order. Based on the testimony, it appeared CDCR had no

17 particular plans to ever rerun these Performance Reports and provide them to the Court and Special

18 Master. It also appeared that while some analysis was performed by CDCR to determine what the EOP

19 data would show regarding level of compliance, though admitting discussions occurred with Dr.

20 Golding regarding this indicator, it had not provided that data to anyone other than its own legal counsel

21 and defense team and had no intention of sharing this data or correcting its representations to the Court

22 that were inaccurate.

23     This is confirmed by Plaintiffs' Response to Defendants' Response to Paragraph 5 of the Court's

24 September 17, 2019 Order, filed October 21, 2019, where Plaintiffs detailed that CDCR admitted it

25 provided false information to the Court, yet failed to provide the Court ordered corrections to filings

26 before this Court.

27

28
**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

1    Dr. Ceballos' testimony was particularly noteworthy. She testified that her sole audience was

2    her own chain of command, appeared to take no responsibility for representations to the Court or Special

3    Master relating to data presented that was maintained by her department under her direction and even

4    claimed she did not know her data was used by the Special Master for monitoring in this case. Dr.

5    Ceballos testified that there are numerous ways in which the program Guide was vague and therefore

6    could be interpreted by CDCR. Upon questioning by the Court, she would not or could not detail any

7    manner in which there is a determination that the ambiguity should be raised with the Special Master to

8    raise the issue of the Program Guide being not clearly written or subject to multiple interpretations. Dr.

9    Ceballos confirmed there were other "business rules" that she changed, similar to the change from 30 to

10   45 or 60 days timeliness metric, but would not or could not detail all those she had changed without

11   informing the Special Master, Plaintiffs or the Court. Dr. Ceballos testified it was still not clear to her

12   whether she had any duty at all to inform the Special Master of rule changes before she implemented the

13   rule changes.

14       Related to the Appointments Seen as Scheduled Indicator, Dr. Ceballos testified she took no

15   steps and did not think she was required to or should have to take any steps to inform the Special Master

16   that this change occurred. Dr. Ceballos testified that while the Special Master requests documents, and

17   Dr. Ceballos responds to these requests, she did not realize or understand that the Special Master was

18   relying upon the data that was produced. This is not credible. It also demonstrates a keen lack of

19   interest in providing accurate information to the Court and Special Master and lack of interest in

20   ensuring that when "business rules" are changed, leading to a change in the data that are relied upon by

21   the Special Master and the Court, that there are proper disclosures of the change to ensure accurate

22   information is provided and the Court and Special Master. After the Golding Report, the Court's Orders

23   following the Golding Report revelations, the court-ordered investigation, Neutral Expert Report and

24   evidentiary hearing, the complete lack of interest in ensuring transparency and that accurate data is

25   presented to the Special Master and Court was as astonishing as it was demoralizing. Not providing

26   this information served a purpose. It maintained the illusion that there was higher compliance with

27   Program Guide mandates than actually existed, and thus that psychiatric staffing could be reduced, as set

28   forth in Dr. Golding's testimony.

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

### 3.   The Appointments Seen as Scheduled Metric was Misleading

At Docket 6242, page 9, the Court indicated the focus of the evidentiary hearing was on why appointments seen as scheduled indicator was developed incorrectly, and in the absence of consultation with Dr. Golding or other quality control measures, and what steps CDCR plans to take to ensure indicators and definitions are developed with appropriate consultation and quality control in the future.

The testimony at hearing demonstrated that there are no meaningful plans to include Dr. Golding or his staff in consultation regarding developing these metrics. It is also clear there was no meaningful quality control measures in place at the time and no meaningful plans to create quality control measures to ensure that the same issues that were detailed in the development of the changed Appointments Seen as Scheduled metric do not occur in the future.

The Appointments Seen as Scheduled Metric is misleading and was changed at a critical time when decisions regarding staffing were made. Drs. Golding and Gonzalez analyzed the data by importing each individual appointment that had occurred into an Excel spreadsheet and then calculating those appointments for CCC level of care for all of CDCR that actually occurred as scheduled on 7/10/18. The CDCR report of Appointments seen as scheduled said 95 percent, but a review of actual records was 42 percent.  This is a difference of 53 percent of what was presented and the accurate data.

Similarly, at the SAC CCC level of care, on 2/2018 said CDCR claimed there was 91% compliant appointments seen as scheduled, where actual numbers were 22 percent. This is a difference of 69 percent.  *See* Golding Report, pp. 36-47, 136.

Moreover, there was the issue of disappearing appointments. This occurs when patients do not come to scheduled appointments, with no entry made on that date.  When psychiatrists subsequently see the patient on a later date, these initial appointments neither count as not seen as scheduled on the original date, nor do these appointments even count as cancelled or refused on that initial date, though they count as completed as scheduled on the subsequent date.  It is as if these initial missed appointments never were scheduled at all. The initial appointments disappear.  This also has the effect of increasing the compliance numbers for CDCR.

CDCR continued to maintain at the evidentiary hearing that the appointments seen as scheduled criteria was correct and excluded issues outside of CDCR's control. This is not accurate. As Dr.

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2-90-CV-0520 KMJ DB P

14

1  Golding testified that the most common reasons that psychiatrists list when patients do not come to
2  appointments are "Cancelled Unspecified" or "No Show" and when these are checked the patient is not
3  counted as not seen as scheduled. These options are checked because usually the psychiatrist has no idea
4  why the patient did not come. When there are patient no shows or cancellations for unspecified reasons,
5  these reasons are very much within CDCR's control.  Certain institutions are better than others at getting
6  patients to appointment.  The coding in the system as no show or refused treatment, when checked on by
7  treating psychiatrists, is often incorrect. Even rates of so-called "refused" appointments vary greatly
8  between institutions, indicating that certain institutions are better than others at getting patients to
9  consent to coming to appointments. So, "factors outside of CDCR's control" are not in fact out of their
10  control at all.

11         If this data were accurately reported, CDCR, the Court, the Special Master and Plaintiffs could
12  pinpoint which institutions are a problem and target those for remediation, and use those institutions
13  doing it well as an example in order to ensure patients received the constitutionally required level of
14  mental health care.  Thus, contrary to the argument put forth by witnesses at the evidentiary hearing that
15  this metric is not important or relevant, it strikes at the heart of whether patients are actually getting to
16  mental health appointments, receiving health cate and, and whether the whole system is working
17  efficiently, without patients having to be rescheduled repeatedly. When patients are not being seen as
18  scheduled, they have to be rescheduled to be seen, which means more work for psychiatrists and more
   psychiatrists that are needed.

19         Furthermore, the Court's Order, Docket 6242, p. 9, the Appointments Seen as Scheduled and
20  missed appointments data was found by the Court to be incorrect from the time period of 2016 through
21  October 2018.  While CDCR agreed to modify this data, it was unclear from the testimony of Dr.
22  Rekard and Ms. Ponciano if CDCR actually corrected this data and/or had any intention of doing so.
23
24         **4.  Psychiatry Access to Patient Data and Reports Has Been Curtailed or Not
            Allowed**
25
26         The Golding Report detailed Headquarters psychiatry staff's great difficulties in obtaining
27  permission to access databases containing patient data. *See, e.g.* Golding Report, pp. 29, 72-74, 95, 105,
28  119-120.  Headquarters Psychiatry staff require data in order to determine if there are factors adversely

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

1  affecting patient care, and how those factors can be solved. It also creates transparency. For example, in
2  1.5 years after CDCR took over the psychiatric inpatient program and changed the model of care, there
3  were nine (9) successful suicides within 90 days of discharge. In the same locations prior to CDCR
4  takeover in a period of 2.5 years and with a larger population, there was only one suicide within 90 days
5  of discharge. Possible reasons for the increased suicide rate should be statistically explored and
6  obviously is an important issue regarding constitutionally required level of patient care. But Dr. Golding
7  and his team are denied permission to do this kind of analysis.

8      There were serious findings in the Neutral Expert Report in this area. Yet, testimony of certain
9  CDCR staff at the evidentiary hearing and to the court appointed experts was the lack of access to data
10  and the concerns set forth in Drs. Golding and Dr. Gonzalez's reports was "not a big deal." This is
11  alarming to Dr. Golding and should alarm the Court and Office of Special Master. The totality of the
12  circumstances demonstrates that there must continue to be external oversight of the data, and access to
13  the data for Dr. Golding and Leadership Psychiatry staff to determine if there are barriers to patient care
   and how to address such barriers, as well as to ensure meaningful quality control measures.
14          5.  **There are No Meaningful Controls In Place to Ensure Data Reported to the**
15              **Special Master and the Court are Accurate**
16      Even after all the proceedings that have occurred after the issuance of the Golding Report, it did
17  not appear from testimony at the hearing that meaningful controls with specific oversight is being
18  employed to ensure that data that is reported to the Special Master and the Court is accurate and past
19  data reported was corrected. While Dr. Brizendine and Undersecretary Toche testified that while there
20  was a change committee that is on hold, this committee's purpose was not to verify the accuracy of data.
21  It also did not meaningfully include Psychiatry Leadership or provide any voting rights to Psychiatry
   Leadership.
22      There also appeared to be no methodology to ensure the integrity of the Coleman data separate
23  and apart from the data that may be required in Plata. Testimony verified that certain changes to data to
24  address indicators in Plata (because the data is same source data used in both Plata and Coleman), were
25  changed to the Coleman data. There was no method or tracking of what those changes to the source data
26  were for the Coleman case, when the changes occurred and how and to what extent the changes to the
27  source data affected the indicators required for this case (as opposed to Plata).
28

DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING
Case No. 2:90-CV-0520 KMJ DB P

1    There did not appear to be a staff person at CDCR who considered herself or himself ultimately

2    responsible to ensure that collection of data and reporting of data to the Court and Special Master team

3    was accurate, or in the words used by the Court, "the buck stops" with him or her.  Without such a

4    delineation, incorrect and misleading information will continue to be created, as there are no effective

5    controls to ensure the problem does not continue.

6        It also appeared there was no understanding that the point people to communicate with the

7    Special Master were required to accurately communicate with the Special Master, including disclosing

8    concerns raised by staff (including Dr. Golding and other psychiatrists), methodology, disclosing

9    changes made to data and business rules that implicate patient safety and care and required Court

10    disclosures.

11        It was not clear from the testimony that there was a means employed to ensure reliability and

12    transparency for correction of *all* data that was false and/or misleading that had been previously filed in

13    this case.

14        Lastly, Dr. Golding's entire effort in first raising concerns within CDCR and then finally raising

15    concerns set forth in the Golding Report to the Receiver is to ensure there is safe, effective and

16    constitutionally required mental health care for CDCR patients.  This has not been an easy road for him.

17    As was clear by the testimony of CDCR witnesses, both in their words used, tone and body language,

18    certain CDCR staff are not happy that Dr. Golding aired CDCR's dirty laundry in public and feel

19    (rightly or wrongly) personally attacked.

20        It was not Dr. Golding's intent to personally attack anyone, hurt their feelings or make their

21    professional lives more difficult.  Rather, Dr. Golding has seen acute human suffering of CDCR patients

22    that is preventable.  He has detailed severe patient injury and preventable deaths.  He objected to false

23    and/or misleading data being used to make decisions that will impact patient care.  Dr. Golding's entire

24    effort has been to raise concerns that would alleviate this human suffering and allow CDCR to better and

25    more accurately perform its job related to providing mental health care. As with many whistleblowers,

26    Dr. Golding cared more about alleviating this human suffering than the personal cost to him for coming

27    forward, which has included detrimental effects to his career, ongoing personal attacks, and ostracizing

28    that he has experienced for having had the bravery to come forward and to tell the truth.

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

17

1      It is Dr. Golding's hope that real sustained change will be made as a result of his reports and

2   personal sacrifice.

3

4                              Respectfully submitted,

5

6                              WENDY MUSELL

7                              STEWART & MUSELL, LLP
                               Attorneys for Michael Golding, M.D. and Melanie Gonzalez, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DR. MICHAEL GOLDING'S RESPONSE RE EVIDENTIARY HEARING**
Case No. 2:90-CV-0520 KMJ DB P

                                      18

Exhibit E

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | **ORDER** |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

As set by court order, the court held a focused evidentiary hearing on October 15 and 16, 2019, to address unresolved issues the court identified after reviewing Dr. Golding's whistleblower report and the court's neutral expert's investigation into Dr. Golding's allegations. *See* ECF Nos. 6242, 6288. The court heard closing arguments from the parties on October 22, 2019. In addition, as authorized by the court, Dr. Golding filed a written closing argument. ECF No. 6362. On October 23, 2019, the court provided an oral pronouncement of its findings and conclusions in open court. Reporter's Transcript of Proceedings (10/23/19 RT), ECF No. 6380. Those findings and conclusions, with record support, are memorialized in this order.

1

1    I.    **INTRODUCTION**

2              In 1995, the court found "the California Department of Corrections . . .

3    significantly and chronically understaffed in the area of mental health care services. . . . [It] does

4    not have sufficient staff to treat large numbers of mentally ill inmates in its custody." *Coleman v.*

5    *Wilson*, 912 F.Supp. 1282, 1307 (E.D. Cal. 1995). In 2011, the United States Supreme Court

6    observed that the record before that Court supported the conclusion "that the prison system

7    remained chronically understaffed through trial [before a three-judge court] in 2008." *Brown v.*

8    *Plata*, 563 U.S. 493, 528 (2011).[1] In October 2017, after more than two decades of remedial

9    effort, this court issued an order requiring defendants to come into complete compliance with the

10   staffing ratios in their 2009 Staffing Plan, ECF No. 3693, and the maximum ten percent staffing

11   vacancy rate required by the court's June 13, 2002 order, ECF No. 1383, with compliance to be

12   achieved by October 2018. ECF No. 5711 at 30.[2]

13             In its October 2017 order, the court included a lengthy discussion of defendants'

14   request, made in a March 30, 2017 filing, *see* ECF No. 5591 at 4, for the court "to revisit the

15   existing staffing ratios for psychiatrists." *Id.* at 12-20.[3] The court made clear  defendants faced a

16            [1] *Brown v. Plata* is a decision by the United States Supreme court "on appeal . . . from a
17   three-judge District Court order . . . applicable to both" this action and to *Plata v. Brown*, Case
     No. C01-1351 JST (N.D.Cal.). *Brown*, 563 U.S. at 499-500.

18            [2] With the exception of citations to page numbers in Reporter's Transcripts of Proceedings
19   and the deposition transcript of Dr. Kevin Kuich, references to page numbers in documents filed
     in the court's Electronic Case Filing (ECF) system are to the page number assigned by the ECF
20   system and located in the upper right hand corner of the page.

21            [3] Defendants' March 30, 2017 filing, ECF No. 5591, was in response to the Special
     Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants'
22   Staffing Plan (hereafter Special Master's Staffing Report). As noted, the court discussed it
23   extensively in its October 10, 2017 order, ECF No. 5711. It is one of the filings that has now,
     belatedly, been corrected by defendants as a result of the proceedings occasioned by the Golding
24   Report. *See* ECF No. 6302. Although the Golding Report was issued in October 2018, and the
     Neutral Expert Report on issues raised by the Golding Report, ECF No. 6147, was issued in April
25   2019, defendants did not agree to correct this pleading until a meet and confer process required by
     court order and conducted by the parties in June and July 2019. *see* ECF No. 6187 at 2; the joint
26   status report that followed that meet and confer process included defendants' agreement to correct
27   the pleading. *see* ECF No. 6302 at 2 (citing ECF No. 6226 at 30). Moreover, although the court
     does not in this order make specific findings about the adequacy of defendants' corrections, it

28
                                                    2

1    "heavy burden" in attempting to persuade the court those ratios should be revisited. *Id.* at 14, 18-

2    19. The court noted defendants' request could "only be construed as a request to increase the

3    existing caseload of prison psychiatrists" and that there was "scant evidence in the record to

4    suggest this change would advance remediation of the Eighth Amendment violation in this case;

5    rather there is strong evidence that such a change would slow progress toward the end of federal

6    court oversight." *Id.* at 19. Nonetheless, the court granted defendants limited leave to explore its

7    request, deciding "not to preclude defendants from raising with the Special Master the issue of

8    whether full implementation of the PMA [psychiatric medical assistant] program supports a

9    change in the staffing ratios for psychiatrists." *Id.* The court limited its permission because the

10   record did not support a more extensive revisiting of the 2009 Staffing Plan and the time for

11   defendants' compliance with the Plan was past due. As of this writing, the record still does not

12   support a more extensive review, and the time for compliance is even more seriously past due.

13           For the year following the court's October 2017 order, the parties, supervised by

14   the Special Master, engaged in extensive negotiations over issues related to staffing compliance.

15   Ultimately, defendants presented to plaintiffs and the Special Master a staffing proposal that

16   would have cut by approximately twenty percent the total number of line psychiatry staff

17   positions allocated throughout the prison system. *See* Reporter's Transcript of Proceedings,

18   October 15, 2019 (10/15/19 RT), ECF No. 6377, at 52:9-18.[1] Plaintiffs were poised to accept the

19   proposal. Before they did, however, on October 3, 2018, Dr. Michael Golding, Chief Psychiatrist

20   _____

21   does note that defendants have replaced a chart attached as Exhibit 2 to the Tebrock Declaration,
     ECF No. 5591-2, and have corrected two lines of ECF No. 5591. *See* ECF No. 6302 at 2-3.

22   They have not, however, revised the statements in the Tebrock Declaration that describe Exhibit
     2, *see* ECF No. 5591-2 ¶ 8, nor have they revisited the more general conclusion in the Tebrock

23   Declaration that relied on the now-corrected chart, asserted in their response to the Special
     Master's Staffing Report, that "CDCR clinicians, and particularly its psychiatrists, provide quality

24   treatment at very high compliance rates despite the current staffing vacancies." ECF No. 5591 at
     14 (citing Tebrock Decl. ¶ 8). The court is still reviewing the adequacy of defendants'

25   corrections, generally.

26           [1] At 52:10, the question as transcribed refers to a "2008 staffing proposal." The reference

27   is actually to a 2018 staffing proposal. *See* 10/15/19 RT at 52:15-17.

28
                                                3

1    for the California Department of Corrections and Rehabilitation (CDCR), sent a whistleblower

2    report to the *Plata*[5] Receiver. *Id.* at 54:23-55:6. The parties brought the report to this court's

3    attention on October 5, 2018, and it is that report that has led to the proceedings culminating in

4    this order. As the findings in this order make clear, and contrary to defendants' initial position --

5    maintained through the evidentiary hearing -- that no independent investigation of Dr. Golding's

6    allegations was necessary, those allegations in significant part justified the independent

7    investigation and factfinding the court has undertaken.

8            At this critical juncture, several key legal principles, articulated by the previously-

9    assigned judge in this action, bear repeating:

10           'Whatever rights one may lose at the prison gates, *cf. Jones v. North
             Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d
11           629 (1977) (prisoners have no right to unionize), . . . **Eighth
             amendment protections are not forfeited by one's prior acts.**
12           Mechanical deference to the findings of state prison officials in the
             context of the eighth amendment would reduce that provision to a
13           nullity in precisely the context where it is most necessary. **The
             ultimate duty of the federal court to order that conditions of state
14           confinement be altered where necessary to eliminate cruel and
             unusual punishments is well established.'** *Spain v. Procunier*, 600
15           F.2d [189] at 193–94 [(9th Cir. 1979)] (emphasis added).

16   *Coleman v. Brown*, 28 F.Supp.3d 1068, 1077-78 (E.D.Cal. 2014) (emphasis included in 2014

17   order). The same judge said not so very long ago, in his 2013 order denying defendants' motion

18   to terminate this action, "[t]he Eighth Amendment violation in this action is defendants' 'severe

19   and unlawful mistreatment' of prisoners with 'serious mental disorders,' through 'grossly

20   inadequate provision of ... mental health care.'" *Coleman v. Brown*, 938 F.Supp.2d 955, 969

21   (E.D.Cal. 2013) (quoting *Brown v. Plata*, 563 U.S. at 500, 502)). Just two years before that

22   denial of termination, in its 2011 decision, the United States Supreme Court had observed that

23   "[f]or years the ... mental health care provided by California's prisons has fallen short of

24   minimum constitutional requirements and has failed to meet prisoners' basic health needs.

25   Needless suffering and death have been the well-documented result." *Brown v. Plata*, 563 U.S. at

26   501.

27   _____

28       [5] *Plata v. Newsom*, Case No. C01-1351-JST (N.D.Cal.).

                                    4

Case 2:90-cv-00520-KJM-DB   Document 6427   Filed 12/17/19   Page 5 of 49

1    As the prior presiding judge also noted,

2    once an Eighth Amendment violation is found and injunctive relief
3    ordered, the focus shifts to remediation of the serious deprivations
     that formed the objective component of the identified Eighth
4    Amendment violation. *See Coleman v. Brown*, 938 F.Supp.2d at 988.
     Remediation can be accomplished by compliance with targeted
5    orders for relief or by establishing that the 'violation has been
     remedied in another way.' *Id.*

6    *Coleman v. Brown*, 28 F.Supp.3d at 1077. Under no circumstances may remediation be

7    accomplished by end runs and hiding the ball to create a false picture for the court, as has

8    happened here.

9    Given the constitutional deprivations underlying this case, and the court's

10   monitoring by way of a Special Master, defendants' expenditure of so much time and effort to

11   create records designed to advance litigation as the primary way to achieve a complete remedy or

12   termination by other means is confounding. This court's predecessor carefully constructed a

13   process supervised by a Special Master that was intended to moderate court intrusion into

14   defendants' own remedial efforts. Such a process is arguably more respectful of defendants'

15   knowledge of their operations and their management prerogatives than a process whereby

16   oversight is transferred to a receivership; it also is more hopeful that defendants can best

17   determine how to meet their constitutional obligations to the seriously mentally ill inmates in

18   their custody. At the same time, given the authority that here remains vested in defendants

19   themselves, the importance of defendants' transparent and accurate reporting is paramount: the

20   court and the Special Master must be able to rely fully on defendants' representations. As

21   explained in this order, the court has concluded the reliability of those representations at multiple

22   levels of the *Coleman* case structure is in serious doubt. If the approach of monitoring by a

23   Special Master has contributed to play in the joints allowing for those misrepresentations, the

24   court may need to revisit that structure in future proceedings. For now, that is a question for

25   another day.

26   Before detailing its findings and conclusions, the court sets forth in greater detail

27   the background leading up to the evidentiary proceedings, which are now concluded.

28

II.    **BACKGROUND**

    A.    Matters Leading Up to Evidentiary Hearing

        As noted, on October 10, 2017, this court issued its order requiring defendants, within one year, to come into complete compliance with the staffing ratios in their 2009 Staffing Plan, ECF No. 3693, and also with the maximum ten percent staffing vacancy rate required by the court's June 13, 2002 order, ECF No. 1383. ECF No. 5711 at 30. The court set a further status conference for October 11, 2018 and directed the parties to file a joint status report thirty days prior to the status conference; the status report was to address, as necessary, issues pertaining to enforcement of the order and the durability of the staffing remedy. *Id.* at 31. The court later continued the hearing to October 15, 2018, and expanded it to include an evidentiary hearing on the use of telepsychiatry to give defendants an opportunity to "prove that the changes they have effected, moving from limited use of telepsychiatry as a supplement to on-site psychiatry in the face of short-term staffing shortages, to the further expansion they appear to be implementing is consistent with the requirements of the Eighth Amendment." ECF No. 5928 at 12; *see also* ECF No. 5933.

        On October 5, 2018, ten days before the scheduled hearing, the court received requests from both parties; plaintiffs requested a status conference, ECF No. 5936, and defendants requested a stay of proceedings, ECF No. 5938. The requests were based on the whistleblower report from Dr. Golding (hereafter Golding Report). Following a special status conference on October 10, 2018, the court vacated the original status conference set to consider enforcement of the October 10, 2017 order and the evidentiary hearing on the use of telepsychiatry. ECF No. 5949 at 5; ECF No. 5980. After hearing from the parties and Dr. Golding's counsel both orally and in writing, ECF Nos. 5967, 5969, 5976-5978, on October 25, 2018, the court ordered the Golding Report filed on the public docket in redacted form.[6] ECF

---

[6] The redactions approved by the court were relatively minor, and made to protect "(1) current and former employees' names; (2) current and former employees' employment titles, but only where an employment title is expressly linked to a name or a specific prison so as to disclose a person's identity; and (3) any other information that serves to identify an individual

Nos. 5986-5988.  A complete unredacted copy of the Golding Report is filed under seal.  ECF No

5990.

B.    Appointment of Neutral Expert

The court held a series of hearings, ECF Nos. 5964, 5980, 5995, issued an order to

show cause why the court could not appoint its own neutral expert, ECF No. 6002, and

considered the parties' responses, ECF Nos. 6009-6012, 6015.  On December 14, 2018, the court

appointed Charles J. Stevens, Esq. of Gibson Dunn & Crutcher LLP as the court's neutral expert

under Federal Rule of Evidence 706, "to assist the court in investigating allegations raised in [the

verified Golding Report] to determine whether defendants have committed any fraud on the court

or the Special Master, or have intentionally provided false or misleading information to the court

or the Special Master."  ECF No. 6033 at 1-2.  The court filed an amended appointment order on

January 8, 2019.  ECF No. 6064.  The amended order modified paragraphs A(2) and B(4) of the

original appointment order, as requested by the neutral expert, and modified the first paragraph of

that order to reflect events since the December 14, 2018 order was filed.  *Id.* at 1 n.1.

The court tasked the neutral expert with conducting an independent investigation

to identify facts, if any, that raised a question whether defendants committed fraud on the court or

intentionally misled the court or Special Master regarding seven issues the court specifically

identified in its appointment order, as follows:

> a. Lengthening the intervals between psychiatric appointments beyond court-mandated timelines for inmate-patients at the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) levels of care who are transferred to new institutions by resetting the clock for such appointments from the time of transfer rather than from the last completed appointment, rescheduling such appointments at the maximum time allowed in the Program Guide, and reporting compliance with Program Guide requirements using the reset timelines. *See* Golding Report, ECF No. 5988-1 at 1, 14-23.
>
> b. Lengthening the interval between psychiatrist appointments for EOP inmate-patients and reporting compliance based on the extended intervals. *See id.* at 2, 23-26.

other than Dr. Golding, including government telephone numbers and email addresses."  ECF No. 5986 at 9.

7

c. Combining CCCMS and EOP appointment compliance numbers into one reporting category. *See id.* at 26-27.

d. Inflating compliance numbers by counting every encounter between a psychiatrist and an inmate-patient as an appointment for purposes of measuring Program Guide timeline compliance, without regard to whether the encounter was a psychiatry appointment or, e.g., a wellness check or a cell-front attempt to communicate with an inmate patient. *See id.* at 5-6, 54-57.

e. The manner of reporting of scheduled appointments and missed appointments. *See id.* at 7-8, 35-47, 62-63.

f. Failing to report that psychiatric supervisors were also performing some or all the functions of staff psychiatrists. *See id.* at 5, 56-57.

g. The way in which medication non-compliance is measured. *See id.* at 8, 58-62.

*Id.* at 2-3. The court did not delegate any ultimate fact-finding authority to the neutral expert, but reserved that critical role to itself. *See* ECF No. 6187 at 2.

   C.   The Neutral Expert Report

The neutral expert conducted a four-month investigation, and on April 22, 2019, submitted a report to the court. *See* ECF No. 6135 at 1. Without objection, on May 3, 2019, the court filed the unredacted Neutral Expert Report on the public docket. ECF Nos. 6146, 6147.

The Neutral Expert Report points to substantial indications of defendants' presenting misleading information to the court and/or the Special Master, including:

1. Defendants' making the December 2016 business rule change to redefine "monthly" to lengthen the intervals between Enhanced Outpatient (EOP) appointments from 30 days to up to 45 days. While in effect, this business rule generated misleading data about defendants' compliance with Program Guide requirements for routine EOP evaluations. ECF No. 6147 at 42, 48.

2. Defendants' reporting of "Timely Psychiatry Contacts," overstating compliance with Program Guide timeline requirements. *Id.* at 67. Specifically, California Department of Corrections and Rehabilitation (CDCR) data presented to the court and Special Master was inconsistent with Program Guide requirements and made defendants' reports in this area appear more compliant with Program Guide timeline requirements than defendants actually were. *Id.*

8

3.  Defendants' reporting of psychiatric evaluations, erroneously skewed toward confidential evaluations. *Id.* at 68. "EHRS [Electronic Health Records System] data on compliance with Program Guide timelines for compliance with psychiatric evaluations is potentially misleading because it includes non-confidential encounters. . . ." *Id.*

4.  Between 2016 and October 2018, defendants' use of an incorrect and potentially misleading definition of the Appointments Seen as Scheduled performance indicator, resulting in data being provided to the court in June 2018 and to the Special Master as part of the Continuous Quality Improvement (CQI) evaluations in a "misleading manner." *Id.* at 75-76.

5.  Defendants' submitting misleading data on "Timely Psychiatric Contacts" in support of their 2018 Staffing Proposal in that the data did not accurately reflect the extent to which appointments were seen by supervisors rather than line psychiatrists. *Id.* at 82.

6.  Defendants' submitting misleading data on the timeliness of mental health referrals, "because for medication noncompliant patients it only counted those patients for whom a psychiatrist ordered a medication noncompliance counseling appointment as a matter of discretion," not all patients who require medication noncompliance appointments. *Id.* at 84. As a result, the performance indicator overstated compliance. *Id.* at 91.

7.  Due to a bug in software, defendants counting cancelled noncompliance appointments as completed; however, "this inaccurate data was less favorable to CDCR than the corrected data." *Id.*

The court provided the parties an opportunity to file substantive responses to the Neutral Expert Report and then set the matter for a special status conference on June 10, 2019 to discuss issues raised in the briefing. ECF No. 6135 at 2.

D.    Review of Materials Defendants Claimed as Privileged

During the course of the neutral expert's investigation, defendants filed a motion for protective order, seeking to avoid producing to the neutral expert documents he requested but for which defendants asserted claims of attorney-client privilege and/or work product protection. ECF No. 6086. The court denied the motion for protective order, specifically noting the court had already provided those claims would not be waived by disclosure of "potentially privileged material . . . to the court's neutral expert during the investigation and then to the court subject to the claims of privilege." ECF No. 6096 at 6. Despite the court's order, defendants still did not produce the documents to the neutral expert. *See* ECF No. 6147 at 14. The neutral expert

9

1    declined to litigate the issues, concluding he "could make the findings requested by the Court

2    without" doing so. *Id.* His findings were, therefore, "subject to the qualification that [he] did not

3    review information claimed by Defendants to be protected by attorney-client or work product

4    privileges." *Id.*

5            At the June 10, 2019 status conference, the court signaled it would require

6    defendants to produce the privileged documents to the court for *in camera* review, and the court

7    confirmed its tentative ruling by minute order the same day.  ECF No. 6180.  On June 14, 2019,

8    defendants filed both a motion for reconsideration by this court, ECF No. 6188, and an

9    emergency petition for writ of mandamus in the United States Court of Appeals for the Ninth

10   Circuit.  *See Newsom v. USDC-SAC*, CAD # 19-71493 (9th Cir. filed Jun. 14, 2019).  On June 18,

11   2019, this court denied the request for reconsideration, ECF No. 6200, and the appellate court

12   denied the mandamus request the next day.  ECF No. 6202.  Thereafter, defendants produced the

13   documents, which the court itself reviewed *in camera*; during its review, the court discussed

14   certain documents *in camera* on a few occasions with defendants.  *See, e.g.,* ECF Nos. 6270,

15   6323.[7]

16           As the procedural history reflects, defendants have resisted at every turn any

17   reliance by the court on any portion of any document for which they have asserted a claim of

18   privilege.  The court's general impression from its review of these documents is that defendants

19   have overreached in a number of their privilege claims, although some claims of privilege would

20   be sustained if not waived by reason of defense positions taken previously in these proceedings.

21   Nonetheless, the court has determined that to venture further into the thicket of these privilege

22   claims would waste valuable court time and resources and distract from the important, indeed

23   imperative, tasks that remain to achieve delivery of constitutionally adequate mental health care

24   to the plaintiff class.  The court therefore has not prolonged these proceedings by issuing further

25

---

26          [7] The court is maintaining as lodged documents those documents it reviewed *in camera*
     and has made a record of all *in camera* proceedings, which is being maintained under seal until
27   further order of court.

28

Case 2:90-cv-00520-KJM-DB    Document 6427    Filed 12/17/19    Page 11 of 49

1    orders defendants are likely to appeal. Ultimately on the merits, after careful consideration, the

2    court has determined it need not rely on any of the privileged documents.[8]

3            For purposes of these proceedings, it is enough to say that nothing in the privileged

4    documents reviewed by the court supports a different conclusion than reached below. That is to

5    say, nothing before the court indicates, directly or by way of inference, that anyone involved in

6    presenting misleading information to the court committed intentional fraud. Rather, the picture

7    that emerges from the documents reviewed *in camera* is consistent with the picture that emerges

8    from the public record created over the course of the proceedings prompted by the Golding

9    Report. It is this public record on which the court relies in making its findings and conclusions.

10   III.    EVIDENTIARY HEARING

11           A.    Orders Narrowing Issues for Hearing

12           In its June 14, 2019 order following the June 10, 2019 status conference, the court

13   found that in five of the seven areas referred to the neutral expert for investigation, he had

14   identified evidence that, "if confirmed through further proceedings and accepted by the court,

15   could establish that misleading data has been presented to the court and/or the Special Master."

16   ECF No. 6187 at 2. These areas included Issues B, D, E, F and G as described in the court's

17   appointment orders. *Id.* The court set an evidentiary hearing to probe those five issues, "to take

18   evidence, as necessary, to determine (a) whether misleading data was presented to the court

19   and/or the Special Master; (b) if misleading data was presented, how and why that happened; and

20   (c) what action is required to correct the record and avoid future submission of misleading data."

21   *Id.* The court also directed the parties to meet and confer in an effort to determine whether they

22   could "stipulate to one or more of the underlying facts suggested by the results of the neutral

23   expert's investigation." *Id.*

24           On August 8, 2019, the court held a telephonic prehearing conference. ECF No.

25   6236. The court then filed an order on August 14, 2019, confirming and clarifying several

26   _____

27           [8] In open court on October 23, 2019, the court ordered defendants to file the non-privileged portion of the document identified as CDCR-PRIV 0000408-412. *See* 10/23/19 RT at 443:18-23. Defendants have complied with that order. ECF No. 6370.

28                                    11

matters covered at that conference. ECF No. 6242. In particular, the court found the parties had

stipulated to several key facts suggested by the Neutral Expert Report and defendants had

admitted that misleading information was provided to the court. *See id.* at 5-11; *see also*

10/23/19 RT at 444:67. As a result, the court narrowed the scope of the evidentiary hearing,

identifying the issues remaining for hearing as follows:

> • Why neither Dr. Leidner nor Dr. Ceballos consulted with Dr. Golding in connection with the decision to change the definition of "monthly" in the relevant business rule, and why no one from CDCR informed the Special Master or any member of his team about this change;

> • How the Appointments Seen as Scheduled indicator was developed incorrectly and in the absence of consultation with Dr. Golding or other quality control measures, and what steps defendants plan to take to ensure indicators and definitions are developed with appropriate consultation and quality control in the future; and

> • Why defendants did not disclose in their 2018 Staffing Proposal whether, and to what extent, the reporting of data related to average frequency of patient contacts did not disclose the use of supervisory psychiatrists to complete caseload contacts with patients; and to what extent defendants knowingly relied on active participation of supervisory psychiatrists in performing the duties of line psychiatrists both in defendants' 2018 Staffing Proposal and in supporting their representation that, if adopted, the 2018 Staffing Proposal would bring defendants into compliance with the October 2017 staffing order.[9]

ECF No. 6242 at 5, 9-10; *see also* ECF No. 6288 at 2.

    B.    Evidentiary Hearing Schedule

        The court convened the evidentiary hearing commencing on October 15, 2019.

ECF No. 6345. The court heard testimony from eight witnesses over two days, asking its

questions first and then allowing the parties to ask questions; the court admitted several exhibits

into evidence as moved by the parties. ECF Nos. 6345, 6350. In addition, the court received

deposition testimony from Dr. Kevin Kuich, a psychiatrist, in lieu of his live testimony. *See*

---

[9] The court accepted several other factual stipulations of the parties, drawn from evidence reported by the neutral expert, and referred issues related to those factual matters to the Special Master. *See* ECF No. 6242. *passim.*

12

1    Annotated Deposition Transcript of Kevin Kuich, dated 9/19/2019 (Kuich Dep.), ECF No. 6406;

2    *see also* ECF No. 6357 (resolving objections to parts of Kuich Testimony).[10]  Additionally, in

3    accordance with the parties' stipulation, the court accepted declarations from defendants'

4    attorneys Rae Onishi, Esq., Nicholas Weber, Esq. and Melissa Bentz, Esq. in lieu of their live

5    testimony.  *See* ECF No. 6337; *see also* 10/23/19 RT at 444:2-7.

6            Following hearing, on October 22, 2019, the court heard closing argument from

7    plaintiffs and defendants.  ECF No. 6364; *see also* Reporter's Transcript of Proceedings

8    (10/22/19 RT), ECF No. 6379.  The court also received a written statement regarding the

9    evidence presented at hearing from Dr. Golding's counsel.  ECF No. 6362.  On October 23, 2019,

10   the court pronounced oral findings and conclusions in open court.  ECF No. 6365.  It is those

11   findings and conclusions that are memorialized in this order.

12       C.    Witnesses

13           As discussed above, the court heard live testimony from eight witnesses and

14   received the deposition testimony of a ninth witness.  The record memorializes the testimony of

15   all the witnesses and ultimately their testimony speaks for itself.  The court has considered all of

16   the testimony and exhibits.  The court's assessment of certain witnesses in particular, including

17   their credibility and the substance of their testimony, is central to the court's findings and

18

19

20           [10] The court reviewed the annotated Kuich deposition transcript and ruled on the parties'
     objections prior to the time the annotated deposition transcript was filed on the docket.  *Compare*
21   ECF No. 6357 (filed 10/21/19) *with* ECF No. 6406 (filed 12/5/19).  The texts of the two
     transcripts are identical.  For technical reasons not clear to the court at this time, the annotated
22   version used by the court to rule on the parties' objections contained signals that suggested
     objections were one page later in the transcript than the actual pagination, which did not show in
23   this version after page 7.  For this reason, the page numbers cited in the court's October 21, 2019
     order ruling on objections, ECF No. 6357, do not match the page numbers in the annotated Kuich
24   deposition transcript filed on the docket at ECF No. 6406.  Accordingly, the court's October 21,
     2019 order is deemed amended to change each page number cited in that order by subtracting one
25   from the cited page number.  For example, the first objection cited in the order is at **24**:25 to a
     question at 24:22-24, and the answer at **25**:1 is disregarded.  There is no suggestion in the record
26   that this change has prejudiced or will prejudice any party.

27

28

                                            13

1    conclusions, and to the clarification, cleansing and purging necessary to move this case forward.

2    The court therefore reviews its assessments of these selected witnesses below.

3                    1.    Dr. Michael Golding

4            The court first heard from Dr. Golding.  Based on the substance of his testimony

5    and his demeanor on the witness stand, the court finds Dr. Golding credible.  His observations

6    and conclusions overall are well-founded.  When he learned that the psychiatrist compliance

7    indicator for timeliness of EOP appointments on the Mental Health Dashboard[11] "had turned

8    green," he asked a Senior Psychiatrist Specialist member of his headquarters team, Dr. Melanie

9    Gonzalez,[12] to "look at the data to see what was going on."  10/15/19 RT at 45:2-7; 76:6-11.

10    Working with Dr. Kuich,[13] see Kuich Dep. at 89:25-94:11, Dr. Gonzalez performed the requested

11    analysis, and that analysis informs the conclusions in Dr. Golding's Report as well as in her

12    report. The defendants' contentions articulated in their closing, that Dr. Golding "just about

13    disagrees with everyone," 10/22/09 RT at 426:4, and that he has a pro-psychiatry bias, are not

14    well-founded and even if they contain a grain of truth do not undermine the doctor's credibility.

15    Whether or not Dr. Golding has a disagreeable side, which was not evident during his testimony,

16    is irrelevant to whether he testified credibly and knowledgeably.  And it would be understandable

17    ───────────────

18            [11] In his report, Dr. Golding describes the Mental Health Dashboard as "CDCR's self
    monitoring tool."  ECF No. 5988-1 at 4.  The Mental Health Dashboard uses red, yellow, and
19    green color coding to illustrate the degree of compliance with a wide variety of measures. See,
    e.g., Kuich Dep. at, e.g., 109:1-20 ("institutions were very much . . . into the dashboard, very
20    much into the metrics, very much into how they're performing. . . .  Tremendous amount of
    pressure placed on the institutions by the regional staff to be able to get their metrics in the green.
21    And not always did that effort to help the institution get in the green, look at the actual weeks and
    the details; it just involved work harder, work longer, get it done.  I don't care how you get it
22    done.  So if you need a cell side appointment, that's what you need to do.  If you need to do
    something, that's what you need to do.  We need to go from red to yellow or yellow to green.").
23
            [12] Dr. Gonzalez sent a whistleblower report to the Plata Receiver on or about October 24,
24    2018, three weeks after Dr. Golding delivered his whistleblower report. See ECF No. 6363 at 1;
    10/15/19 RT at, e.g., 54:23 (Golding Report issued October 3, 2018).
25
            [13] Dr. Kuich worked for CDCR from August 1, 2013 to mid-January 2019, first as a staff
26    psychiatrist at California Health Care Facility (CHCF) in Stockton, then as a senior psychiatrist
27    specialist at CDCR headquarters, and finally as the chief telepsychiatrist. Kuich Dep. at 8:7-9:5.
    He now works in Hawaii, in the same profession. Id. at 8:7.
28

                                    14

1    if he has a pro-psychiatry bias. He is, after all, a chief psychiatrist with CDCR, and it is hard to

2    see how advocating for his professional counterparts and the integrity of the mental health care

3    delivery system in CDCR displays a bias that undermines his credibility.

4        Finally, contrary to defendants' attempt to paint Dr. Golding as a solo outlier, his

5    testimony and his report on the serious matters at issue here do not stand alone. Both Dr.

6    Gonzalez's report and Dr. Kuich's deposition testimony corroborate Dr. Golding's position in

7    substantial and significant ways. Dr. Kuich's deposition, in particular, provides a very helpful

8    narrative, placing essential pieces of evidence into context in a way that brings the considerable

9    bureaucratic dysfunction within defendants' operations into clearer focus.

10        Dr. Golding's explanation for why he was not able to satisfactorily resolve the

11    issues he raised internally and for why he provided his report to the *Plata* Receiver rather than the

12    *Coleman* Special Master also are both credible and evidence of the dysfunction illuminated by

13    these proceedings.

14        In one respect, the court does not find other evidence in the record to support Dr.

15    Golding's strong belief that the Governor's Office expressly directed the provision of misleading

16    data to the court. Additionally, the court cannot on the present record and does not resolve

17    whether then-Deputy Director Tebrock told Dr. Golding that by telling her about fraud he had

18    "unburdened [him]self," 10/15/19 RT at 26:19-27:1, because she is an officer of the court, a

19    statement Ms. Tebrock denies making, *see id.* at 98:8-18.

20            2.    Katherine Tebrock

21        At times relevant to the events that gave rise to the Golding Report, Ms. Tebrock

22    was Deputy Director of CDCR's Statewide Mental Health Program. 10/15/19 RT at 82:13-20.

23    She left that position voluntarily on July 12, 2019. *Id.* at 82:18-22. She is still employed by the

24    State of California, though she does not work for CDCR and is not a gubernatorial appointee. *Id.*

25    at 105:1-9. Ms. Tebrock is a person of obvious intelligence and significant abilities. While the

26    court found her testimony credible, that testimony was also disappointing given the overall

27    message it sent. Ms. Tebrock failed to fully accept responsibility for her own failures, including

28    failures in the leadership she was required to exercise given her role as Deputy Director. Perhaps

1    she too was a victim of the bureaucratic dysfunction so plainly evidenced by the record here, and

2    not provided adequate leadership training and support to manage the demands of the complex

3    environment in which she was working.  That said, Ms. Tebrock signed at least one key

4    declaration in this case during the relevant time frame and that declaration, which contained

5    misleading information, was filed with the court.  *See* 10/15/19 RT at 103:19-104:6 (discussing

6    ECF No. 5591-2, March 30, 2017 declaration of Ms. Tebrock containing data based on changed

7    business rule that extended timelines between EOP appointments from 30 to 45 days).  And she

8    did not ask anyone to correct the data in that declaration even after she became aware of Dr.

9    Golding's report.  10/15/19 RT at 103:19-104:26.[11]  She also signed at least five EOP

10   Administrative Segregation Unit (ASU) Hub certification letters[15] tendered to the Special Master

11   between January 2017 and May 2017, which contained data created with the changed business

12   rule.  *See* 10/15/19 RT at 105:20-25 (Tebrock testimony that she signed EOP ASU Hub

13   certification letters monthly); *see also* ECF No. 6330 at 4 (correcting EOP ASU Hub certification

14   letters submitted to the Special Master between January 2017 and May 2017).  Although

15   defendants initially took the position they did not have to correct these letters, *see* ECF No. 6257

16   at 26-27, on October 10, 2019, defendants did send a letter to the Special Master containing

17   corrected data for these letters.[16]  *See* ECF No. 6330.  Although Ms. Tebrock testified at hearing

18   that she would, if given the chance, correct any pleadings containing erroneous data, 10/15/19 RT

19   at 123:22-124:2, this offer comes too late and rings hollow.  Defendants have been given many

20   ───────────────

        [11] *But see* note 3 *supra.*

21

        [15] Since August 1, 2014, defendants have been required to "provide to the court and the
22   Special Master monthly reports on whether each EOP ASU hub meets Program Guide
     requirements for an EOP ASU level of care."  ECF No. 5150 at 2-3 (revising ¶ 2c of ECF No.
23   5131 at 73:19-74:3).  Defendants are prohibited from admitting any *Coleman* class member
     receiving mental health treatment at the EOP level of care "to any EOP ASU hub that has failed
24   to meet or exceed Program Guide requirements for a period of more than two consecutive
     months."  *Id.*
25

        [16] Plaintiffs object that these corrections "do not go far enough."  ECF No. 6360 at 2.  The
26   court is in the process of reviewing corrections filed by defendants to date, as well as plaintiffs'
     responses thereto and makes no findings at this time concerning the thoroughness or the accuracy
27   of defendants' corrections to the record.

28

1  months since Dr. Golding filed his report to correct the record, including during the time Ms.

2  Tebrock remained at CDCR.  For reasons that are unclear to the court, Ms. Tebrock never availed

3  herself of those opportunities.

4          Ms. Tebrock's handling of the defendants' misguided 2018 staffing proposal was

5  also inexplicably constrained, as if carefully curated to preclude meaningful input from

6  psychiatry. Her explanation for her failure to give Dr. Golding a written draft of the staffing

7  proposal before it was finalized – that the proposal was a court document to be wordsmithed by

8  lawyers and therefore its substantive content tightly controlled by lawyers – is wholly

9  unsatisfactory, given lawyers' unbending obligation to ensure information submitted to the court

10  is, among other requirements, "not being presented for any improper purpose" and "factual

11  contentions have evidentiary support."  See 10/15/19 RT at 99:25-100:22; Fed. R. Civ. P. 11(b).

12  When Dr. Toche later was asked what she made of Ms. Tebrock's explanation in this respect, Dr.

13  Toche declined to defend it, which speaks volumes.  Reporter's Transcript of Proceedings

14  (10/16/19 RT), ECF No. 6378, at 351:19-352:10.

15                      3.  Dr. Laura Ceballos

16          Dr. Ceballos is a psychologist who serves as Mental Health Administrator of

17  Quality Management, Inpatient Facilities, for CDCR's Statewide Mental Health Program and was

18  appointed as Chief of Quality Management in 2009. ECF No. 6012-2 at 1-2.  As plaintiffs

19  elicited in their questioning during hearing and pointed out in their closing, Dr. Ceballos designed

20  the Continuous Quality Improvement Tool (CQIT).  10/16/19 RT at 305:4-5; 10/22/19 RT at

21  402:17-24.  The CQIT is the measurement tool identified in this case as key to demonstrating

22  defendants' progress toward and ultimate compliance with a durable remedy.  See ECF No. 5477

23  at 3-4 (quoting ECF No. 4232 at 4-5).  Despite her central role, Dr. Ceballos's testimony betrayed

24  little to no appreciation for the letter or the spirit of the court orders underlying the development

25  of CQIT.  Rather, for most of her testimony Dr. Ceballos maintained a false distinction between

26  "internal" data she said defendants use without implicating any Coleman court orders, and

27  "external" data formally reported to the court.  See, e.g., 10/16/19 RT at 255:14-25, 260:19-261:3.

28

1  In maintaining this distinction she consistently characterized her role as "a clinician . . . not an

2  attorney." *See, e.g.,* 10/16/19 RT at 304:25.

3        The Special Master has, in the past, considered Dr. Ceballos a key contact and

4  relied on her to tell him or members of his team about significant developments related to this

5  case. Yet Dr. Ceballos testified that she viewed the business rule change that lengthened the

6  interval between EOP appointments from 30 to 45 days as insignificant such that she did not have

7  to report that change to the Special Master or the court. She was consistent in saying she thought

8  the change fell within the Program Guide requirement of "monthly" appointments for EOP

9  patients and was made simply to help psychiatrists improve "continuity of care."[17] *See, e.g.,*

10 10/16/19 RT at 278:23-280:10, 282:10-19. But her position does not withstand scrutiny in light

11 of the record as a whole. Of particular significance, in late 2015 when the request to change the

12 business rule was first raised, it was not approved by Dr. Golding and it went nowhere, yet when

13 the request was made again a year later during a time when defendants were attempting to

14 develop a staffing proposal to address the ongoing psychiatrist shortage the request was granted

15 almost instantly, bypassing Dr. Golding altogether. *See* Section IV(B)(2)(a) *infra.*

16       In sum, Dr. Ceballos's testimony was in critical respects simply not credible.

17 Whether the trust the Special Master previously placed in Dr. Ceballos can be maintained will be

18 up to him, but in the court's view it would be entirely reasonable for him to conclude that trust

19 has been irreparably undermined.

20                     4.  Dr. David Leidner

21       Despite plaintiff's arguments to the contrary, the court found Dr. Leidner's

22 testimony credible. Fundamentally, Dr. Leidner distinguished himself from the witnesses other

23 than Dr. Golding as someone who exhibited a conscience during his testimony. He understands

24 he made mistakes, did not shrink from explaining that he had and worried about the

25 consequences. Overall, the record suggests Dr. Leidner was working at the direction of others

26

---

27    [17] In this context, "continuity of care" means allowing individual psychiatrists to follow
their own patients on a continuous basis. *See, e.g.,* 10/15/19 RT at 191:1-8.

28

1   and working diligently in a dysfunctional system. *See, e.g.,* 10/15/19 RT at 189:20-190:7,

2   195:15-16 (Leidner "took [his] marching orders from Dr. Ceballos and [his managers].") While

3   he should have been more aware of the results of his actions at the time, and in particular the

4   change in the coding to effect the 30 to 45 day change in intervals between EOP appointments, he

5   was not the key decision-maker on the issues now before the court.

6          The court is not persuaded that Dr. Leidner's appearance as a witness in

7   proceedings in this case in 2013, *see* Reporter's Transcript of Proceedings (12/4/13 RT), ECF No.

8   5013, at 2582-2643, undermines the credibility of his testimony during his second appearance at

9   the October 2019 evidentiary hearing. *Cf.* 10/22/19 RT at 402:25-403:17.

10          During the time relevant to these proceedings, Dr. Leidner worked at CDCR

11  Headquarters. 10/15/19 RT at, *e.g.,* 207:18-19. Relatively recently, he opted to return to a former

12  position he held at California Men's Colony. *Id.* at 207:18-21. It is evident that Dr. Leidner's

13  colleagues and managers at CDCR Headquarters view his departure as a significant loss. Their

14  assessment makes sense to the court. In a properly designed system, with proper supervision, it

15  appears Dr. Leidner's significant skills could continue to play an important role both in these

16  remedial proceedings and at CDCR Headquarters more generally.

17          With these observations, the court turns to its broader findings and conclusions.

18  IV.   FINDINGS AND CONCLUSIONS

19       A.   Fraud on the Court

20          As the court has reviewed in earlier orders, the current proceedings are grounded

21  in this court's "authority . . . [and] duty, to protect the integrity of the judicial process," including

22  the court's "'power to conduct an independent investigation in order to determine whether [the

23  court] has been the victim of fraud.'" ECF No. 6002 at 4 (internal citations omitted); *see also*

24  ECF No. 5786 at 2. The court has identified the standards applicable to a determination of

25  whether there has been fraud on the court, as follows:

26          "In determining whether fraud constitutes fraud on the court, the
27          relevant inquiry is not whether fraudulent conduct 'prejudiced the
            opposing party,' but whether it '"harm[ed]" the integrity of the
            judicial process.'" *United States v. Estate of Stonehill,* 660 F.3d 415,
28          555 (9th Cir. 2011) (internal citations omitted). "Most fraud on the

                                        19

1        court cases involve a scheme by one party to hide a key fact from the
        court and the opposing party." *Id.* Fraud on the court is shown only

2        "by clear and convincing evidence" that a party tried "to prevent the
        judicial process from functioning 'in the usual manner'"; it requires

3        a showing of "more than perjury or nondisclosure of evidence, unless
        that perjury or nondisclosure was so fundamental that it undermined

4        the workings of the adversary process itself." *Id.* at 445.

5  ECF No. 6002 at 4-5.

6        The standard for a finding of fraud on the court is a high one and, as the court

7  found from the bench, is one not met here.  In particular, the court does not find the kind of

8  "'scheme . . . to hide a key fact from the court and the opposing party,'" with an emphasis on the

9  word "scheme," that is at the core of fraud on the court.

10      B.    Knowing Presentation of Misleading Information

11            1.  Undisputed that Misleading Information Presented

12        On the other hand, it is clear defendants have presented misleading information to

13  the court.  Defendants have admitted that several filings need to be corrected, *see, e.g.*, ECF No.

14  6242 at, *e.g.*, 5, 8, 9 (citing ECF No. 6226 at 3-4, 12-13, 16), and although they do not

15  specifically concede that the necessary corrections are to misleading data, they have begun the

16  process of correcting the record, which continues.  *See* ECF Nos. 6302, 6330.[18] As set forth in

17  section IIC, *supra*, the neutral expert pointed to evidence suggesting defendants had presented

18  misleading information to the court or the Special Master in several areas.  The neutral expert's

19  key suggestions concerning the defendants' presentation of misleading data are fully borne out,

20  and then some, by the more developed record now before the court.

21        Beyond the three issues set for hearing, discussed below, the record also shows, as

22  the neutral expert's report suggested, that defendants' reporting on "Timely Psychiatry Contacts"

23  resulted in reporting of misleading data by overstating Program Guide timeline requirements in

24  two ways: (a) by counting all "non-confidential psychiatry contacts entered into EHRS toward

25  Program Guide timeline requirements for EOP and CCCMS psychiatric evaluations" and (b) by

26

27        [18] As noted, *see* note 3 *supra*, the court is in the process of review all of the pleadings
relevant to a determination of the adequacy of defendants' corrections to the record.

28

Case 2:90-cv-00520-KJM-DB    Document 6427    Filed 12/17/19    Page 21 of 49

1   defaulting appointments in EHRS to "confidential" without sufficient training and oversight to

2   ensure proper use of this mechanism. ECF No. 6147 at 67-68. Defendants do not dispute the

3   underlying facts, arguing instead that the Program Guide is insufficiently clear that these

4   evaluations need to be confidential. *See* ECF No. 6242 at 7. But the court resolved that question

5   in August 2019, concluding that an April 18, 2007 memorandum attached to the Program Guide

6   "and a plain reading of the Program Guide support the conclusion these psychiatric evaluations

7   must be confidential." *Id.* Defendants stipulated that they have provided, to the court and/or the

8   Special Master, data on Timely Psychiatry Contacts based on the interpretation the court found to

9   be erroneous , and the court directed defendants to provide a date certain by which corrected data

10  would be provided. *Id.* at 8 (citing ECF No. 6226 at 12-13, ¶¶ 9-10). Defendants' responses to

11  that order, ECF Nos. 6257 and 6330, and plaintiffs' responses thereto, ECF No. 6301and 6360,

12  are under submission.

13          The neutral expert also pointed to evidence that defendants submitted misleading

14  data on the timeliness of mental health referrals, "because for medication noncompliant patients it

15  only counted those patients for whom a psychiatrist ordered a medication noncompliance

16  counseling appointment as a matter of discretion," not all patients who require medication

17  noncompliance appointments. ECF No. 6147 at 84. As a result, the defendants' performance

18  indicator overstated compliance. *Id.* at 91. Based on representations of the parties, the court in its

19  August 14, 2019 order found this issue attributable at least in part to a dispute in the

20  "interpretation of how and why medication non-compliant patients are scheduled for follow-up

21  under the CCHCS Medication Adherence Procedure policy" and, perhaps, to a dispute over

22  "whether all medication non-compliance in fact must be captured." ECF No. 6242 at 11. The

23  parties' stipulation and for approval of a memorandum clarifying this policy is pending before the

24  court. See ECF No. 6393.

25          The ultimate question for the court to decide, as it does below, is whether

26  defendants' presentation of misleading information was knowing and if so why.

27  ////

28  ////

2.  Presentation of Misleading Information Was Knowing

Plaintiffs urge the court to find defendants knowingly presented misleading information to the court and the Special Master. *See, e.g.*, 10/22/19 RT at 390:21-391:6. Defendants respond by saying the court took no action on any misleading data, suggesting that it is only when a court takes action that reliance on misleading data creates a problem. *Id.* at 427:23-428:3.

Given defendants' argument with respect to the 2018 staffing proposal, it must be stressed there was no court action on that proposal because the then-impending agreement between the parties failed to materialize after Drs. Golding and Gonzalez issued their reports. Thus, the absence of court action on the proposal is because the whistleblower reports blocked the proposal's presentation to the court in the first place, and not because defendants recognized that aspects of the proposal were based on flawed data and took action to correct the flaws.

More broadly, as explained below, the weight of the evidence and the reasonable inferences to be drawn from the totality of the record before the court fully supports the finding that as to the first and third issues covered at hearing, defendants have engaged in knowing presentation of misleading information to the court and to the Special Master.  With respect to the second issue, the record shows that the descriptor for "Appointments Seen As Scheduled" indicator did not accurately reflect the components of the indicator.  While the court does not find defendants knowingly presented erroneous data created using this indicator, the failure to include an accurate descriptor should have been caught before any data was generated as part of a properly functioning quality management system.

As noted above, there were four other areas in which the neutral expert identified evidence suggesting misleading information had been referred to the court and/or the Special Master. *See* Section IIC *supra*.  In its August 14, 2019 order, ECF No. 6242, the court determined those four issues did not require an evidentiary hearing.  As to the second and third items, defendants' reporting of "Timely Psychiatry Contacts," which overstates compliance with the timeliness requirements for psychiatry evaluations at the EOP and CCCMS levels of care, the court found a material dispute centered on conflicting interpretations of the Program Guide and

22

Case 2:90-cv-00520-KJM-DB   Document 6427   Filed 12/17/19   Page 23 of 49

1    whether psychiatry contacts must be confidential.  *See* ECF No. 6242 at 6-7.  The court resolved

2    that issue, rejecting defendants' interpretation of the Program Guide and concluding "that

3    psychiatric evaluations must be 'confidential' to satisfy the 30 and 90 day Program Guide

4    requirements."  *Id.* at 7.  The court concluded it was "not necessary to examine the intent behind

5    defendants' erroneous interpretation" and has referred this matter to the All-Parties Workgroup

6    for development of protocols consistent with the court's clarifications.  *Id.* at 8. As to the sixth and

7    seventh items, involving submission of misleading data related to timeliness of referrals for

8    medication non-compliant patients, the court determined no evidentiary hearing was required

9    because it was not disputed that a software bug caused one of the errors and the other arose from

10   a dispute over "interpretation of how and why medication non-compliant patients are scheduled

11   for follow-up under the CCHCS Medication Adherence Procedure policy."  *Id.* at 11.  That matter

12   was referred to the All-Parties Workgroup, *id.*, and a stipulation and proposed order with a

13   proposed clarifying memorandum has been submitted to the court for review.  *See* ECF No. 6393.

14          Regarding the four matters before the court, without a full understanding of why

15   defendants knowingly submitted misleading information to the court and Special Master, a proper

16   solution cannot be identified.  Therefore, the court has undertaken its own effort to determine why

17   the misleading data was presented, as an essential step on the path to identifying appropriate

18   remedies for this serious roadblock impeding meaningful progress toward full global remediation.

19                              a.   Changing of EOP Business Rule from 30 to 45 Days

20                                   i.   Background

21          The remedial plan for this action, the Mental Health Services Delivery System

22   Program Guide (Program Guide) requires that a psychiatrist "evaluate each EOP inmate-patient at

23   least monthly to address psychiatric medication issues."  Program Guide, ECF No. 5864-1 at 58.

24   This requirement has been part of the remedial plan at least since 2006, when the court gave final

25   approval to all but a limited number of provisions of the Program Guide that remained in dispute

26   and then ordered the Guide's immediate implementation.  ECF No. 1753-4 at 8; ECF No. 1773.

27   As the neutral expert reported, "[i]t is undisputed that the Program Guide does not define

28

                                            23

1   'monthly.'" ECF No. 6147 at 44. However, the Special Master[19] informed the neutral expert that

2   he "has consistently interpreted 'monthly' to be '30 days,' since he began monitoring EOP

3   routine appointments in the late 1990s . . ." ECF No. 6147 at 43. He provided the neutral expert

4   with record support for his position, *see id.*, which he has consistently articulated with the court.

5   The neutral expert also noted documentary evidence showing that prior to the business rule

6   change at issue defendants had also interpreted "monthly" in this context to mean 30 days. *See,*

7   *e.g., id.* at 45 ("documents show that CDCR used 30 days to measure compliance with the

8   Program Guide requirement that EOP patients have 'monthly' psychiatric evaluations. In 2016,

9   for example, in connection with the production of data for the Special Master for the 27th Round

10  of monitoring, CDCR used a definition of 'every 30 calendar days after previous psychiatry

11  contact' to measure compliance with the 'monthly' requirement for EOP psychiatric

12  appointments. ECF No. 6012-2 at 154 (Ceballos Decl. at Ex. 3).").

13              "A business rule is, at the most basic level, a specific directive that constrains or

14  defines a business activity. . . Business rules can be applied to computing systems and are

15  designed to help an organization achieve its goals. Software is used to automate business rules

16  using business logic." *https://www.techopedia.com/definition/28018/business-rule.* As relevant

17  here, CDCR applies business rules to its computing systems to manage and report data. *See, e.g.,*

18  ECF No. 6012-3 at 2-4 (Leidner Decl.); 10/15/19 RT at 86:21-23 (testimony of Katherine

19  Tebrock). As Dr. Leidner explains, "[f]rom 2010 to 2017, CDCR collected data regarding mental

20  health treatment through the Mental Health Tracking System (MHTS), a web-based tool

21  developed to track clinical contacts, referrals, and other data related to the provision of mental

22  health services." ECF No. 6012-3 at 2. Former Deputy Director Tebrock testified that MHTS

23  "had been negotiated and discussed with the Special Master and his team over the course of many

24  years" and that CDCR "had preserved or attempted to preserve, to the extent possible, all of those

25  rules to maintain fidelity." 10/15/19 RT at 87:3-7.

26

27              [19] The Special Master has served in that capacity since November 1, 2007 and served as
    Deputy Special Master from February 15, 1996 until November 1, 2007. ECF Nos. 664, 2453.
28

1          "Beginning in 2016, CDCR implemented an electronic health record called the

2    Electronic Health Record System (EHRS) which replaced MHTS." ECF No. 6012-3 at 2. Data

3    collected in the EHRS is stored in the Health Care Data Warehouse, "a group of high-capacity

4    computer servers into which data from numerous sources, including EHRS, CDCR's Strategic

5    Offender Management System (SOMS), and the Department of State Hospitals, are routed and

6    stored. Historical data, such as MHTS data, are also stored in the Data Warehouse." *Id.* at 2-3.

7    Data in the system are used, among other things, to generate management reports, which "are

8    designed to help staff provide timely patient care, manage resources, and give feedback on

9    compliance with guidelines, including various requirements imposed by orders in this case." *Id.*

10   at 3. One such report is the Mental Health Performance Report, "which displays a set of

11   indicators measuring performance in numerous areas, including compliance with mental health

12   treatment required by the Program Guide, by health care regulations, and by CDCR health care

13   policies and procedures." *Id.* at 3. This report is comprised of "over 150 active indicators

14   summarizing about 4,000,000 individual measurements each month. The logic underlying the

15   indicators relies on over 230 business rules that stipulate a required action, the population it

16   applies to, what triggers that requirement, and how much time is allowed to complete that

17   requirement. All of these parameters are determined by the managers of the Statewide Mental

18   Health Program." *Id.* at 4.

19                          ii.      Review of Evidence

20          Until December 2016, the relevant business rule for the Program Guide

21   requirement that a psychiatrist "evaluate each EOP inmate-patient at least monthly to address

22   psychiatric medication issues" used a period of 30 days to measure compliance. *See, e.g.,*

23   10/15/09 RT at 195:5-12 (testimony of David Leidner); 10/16/19 RT at 250:14-16 (testimony of

24   Laura Ceballos); Neutral Expert Report, ECF No. 6147 at 45 (documents cited therein). Certain

25   persons working within CDCR raised questions about changes to this business rule, initially in

26   late 2015. The Neutral Expert Report points to evidence suggesting two psychiatrists who were

27

28

                                        25

1    working at CHCF,[20] Drs. Jahangiri and Anand, raised the issue, which was then presented to

2    CDCR headquarters in an email from Julie Kirkman, "a Medication Court Administrator and Pre-

3    Release Coordinator at CHCF." *Id.* At hearing, Dr. Leidner testified Dr. Jahangiri first raised the

4    issue with him at a weekly state-wide webinar Dr. Leidner conducted in November 2015.

5    10/15/19 RT at 189:10-17. Dr. Leidner told Dr. Jahangiri it was "technically possible" to change

6    the business rule and told him to raise the issue with Dr. Golding. *Id.* at 189:24-190:4. The

7    neutral expert found evidence that Dr. Anand emailed Dr. Golding in February 2016, requesting

8    to change the business rule from "30 days" to "monthly" "so as to help ease psychiatrists'

9    tracking issues, reduce staffing needs, help psychiatrists manage their own outpatient caseloads,

10   and other issues." ECF No. 6147 at 45–46. No action was taken on the request at that time, *id.* at

11   46, and it is undisputed that Dr. Golding did not approve the request.

12              In December 2016, Ms. Kirkman raised the request again in a phone call with Dr.

13   Leidner. 10/15/19 RT at 191:1-13. The same day, Dr. Leidner discussed the request in a

14   telephone call with Dr. Ceballos. *Id.* at 192:6-193:5. During the call, Dr. Ceballos approved the

15   request and told Dr. Leidner to make the change. *Id.* at 193:22-194:4. Dr. Ceballos also did not

16   consult with Dr. Golding about the renewed request before she approved it. She testified that she

17   "forgot" to consult him about the change even though she sent him an email on December 5, 2016

18   about other EOP-related matters. 10/16/19 RT at 283:15-284:5. Dr. Ceballos also did not discuss

19   the request with then-Deputy Director Tebrock before approving it or, apparently, at any time.

20   *See* 10/15/19 RT at 86:3-20. As noted above, Dr. Ceballos did not report the change to the

21   Special Master or the court because she did not view it as "significant." 10/16/19 RT at 249:19-

22   250:11.

23              The Neutral Expert Report points to evidence that "[a]t some of the

24   psychiatry team was notified of the rule change in January 2017. *See* CDCR0016721-22. An

25   email discussing the modified rule was forwarded to Dr. Golding by psychiatrists Dr. Mann and

26   _____

27   [20] CHCF is a medical and mental health care facility for inmate-patients in CDCR. It
     "provides medical care and mental health treatment to inmates who have the most severe and long
28   term needs." https://www.cdcr.ca.gov/facility-locator/chcf/.

1   Dr. Lindgren, but it is unclear whether Dr. Golding read it. CDCR0016719-21." ECF No. 6147 at

2   46. In his whistleblower report, Dr. Golding averred he first became aware of the change in

3   March or April 2017, when the "headquarters psychiatry team noticed that all the 20 psychiatrists

4   across the institutions seemed to be doing better in terms of seeing EOP patients in a more timely

5   way." ECF No. 5988-1 at 23. At hearing, he testified he was certain the business rule change

6   would affect data provided to the court "because the dashboard for EOP had turned green, and

7   people were contacting us. Psychiatrists were contacting us across the state and laughing about

8   how much easier it was to be compliant at the EOP level of care, . . ." 10/15/19 RT at 44:12-45:6;

9   *see also id.* at 76:6-11 (Golding testimony that he learned about the business rule change because

10   Dr. Gonzalez told him "that the dashboard was looking greener than you expected it to be. . . .").

11   Dr. Golding first reported problems with the rule change to Drs. Ceballos and Leidner, who

12   agreed to change it back. *See id.* at 16:20-21, 195:13-19. Specifically, Dr. Golding raised the

13   issue with them on or about March 21, 2017, *id.* at 16:20-21, and Dr. Leidner changed the rule

14   back on or about April 14, 2017, *id.* at 195:19.

15       In her whistleblower complaint, Dr. Gonzalez avers that in December 2016, when

16   she was working as a staff telepsychiatrist at CDCR headquarters, she noticed that her EOP

17   patients "were suddenly due for follow-up appointments every 45 days or by the end of the next

18   calendar month (whichever was sooner), rather than every 30 days." ECF No. 6363 at 6. When

19   she learned there had been no policy change regarding the required frequency of EOP psychiatry

20   appointments, she reported the change in the Current Due Dates report to Dr. Golding and he

21   "asked [her] to look into it further." *Id.* She discovered that the change could actually permit a

22   gap of 8 weeks between appointments to be reported as 75 percent compliant. *Id.* She reported

23   her findings to Dr. Golding, who "followed up" with quality management staff regarding the rule

24   change, which was "reverted back to 30 days shortly thereafter." *Id.*

25       At his deposition, Dr. Kuich testified that during the time frame the 30-day rule

26   was changed "[t]here was a tremendous focus on EOP" to see if individuals at this level of care

27   were properly placed. Kuich Dep. at 91:17-93:8. He testified that the push "was a systemwide

28   push, not from psychiatry but from the system, to be able to look at EOP patients specifically and

1    to find out" whether their needs were being met or could "be met at a lower level of care." *Id.* at

2    91:21-24. He also noticed a "significant improvement" in compliance in this area, which he

3    "liken[ed] to an improvement he noticed during a quality management meeting having to do with,

4    . . . , use of nonformulary medications, that suddenly everyone who was noncompliant became

5    compliant, and we couldn't quite figure out what happened. And tracing it back, they had

6    changed the formula for that, and that resulted in a better value, . . ." *Id.* at 93:5-13. Dr. Kuich

7    believed that the change in the business rule from 30 to 45 days was not consistent with Program

8    Guide requirements. *Id.* at 94:12-24.

9          There is no dispute that defendants "submitted data using the modified [business]

10    rule to the [c]ourt in" at least two court filings. *See* ECF No. 6242 at 5 (citing ECF No. 6226 at 3-

11    4, Issue B(A)(4), (11), (12)); *see also* ECF No. 6147 at 48 (citing ECF No. 5591 at 14

12    (Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing

13    and the Implementation of Defendants' Staffing Plan); ECF No. 5591-2 at 4, 9 (Tebrock Decl.

14    ¶ 10, Ex. 2); ECF No. 5601 at 8-9 (Defendants' Reply to Plaintiffs' Objections and Request for

15    Additional Relief)). The Neutral Expert Report cites evidence that "CDCR also reported

16    compliance figures from the "Timely Psychiatry Contacts" indicator during this time frame on at

17    least one ASU EOP HUB certification. This report was not filed with the Court, but was

18    submitted to the Special Master. *See* PLTF005299 (RJD)." ECF No. 6147 at 44.

19          As noted, Dr. Golding made his request that the rule be changed back to 30 days

20    on or about March 21, 2017. The Neutral Expert Report cites evidence that before the rule was

21    changed back on April 14, 2017, "on March 28, 2017, Deputy Tebrock sent an email noting that

22    the Governor's office had asked 'to explain in more detail what metrics can be used to show that

23    the care by psychiatry is adequate.' CDCR0016999," and that "[o]n March 30, 2017, CDCR filed

24    Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and

25    the Implementation of Defendants' Staffing Plan, ECF No. 5591, relying upon data under the 45-

26    day rule. ECF No. 6012 at 13." ECF No. 6147 at 48.

27    ////

28    ////

Case 2:90-cv-00520-KJM-DB    Document 6427    Filed 12/17/19    Page 29 of 49

iii.    Findings

The change in the business rule from 30 to 45 days was a material change that was inconsistent with implementation of the relevant Program Guide requirement as established through more than a decade of practice. The change should have been thoroughly vetted before it was implemented; thorough vetting would have included, at a minimum, consultation with Deputy Director Tebrock and Dr. Golding and reporting to the Special Master in advance of the change.

Defendants' argument that the change was prompted by a request from the field to improve continuity of care does not go far enough to explain why it was accomplished without the proper vetting. The request does appear to have come from a medication administrator at CHCF, and while implemented it apparently provided some relief to psychiatrists in the field by, for example, allowing them to go on vacation and still see the same patients in what Dr. Ceballos saw as a reasonable time frame. But the first time the request was made, in 2015, it went nowhere because Dr. Golding did not approve it. The second time the request was made, during a critical juncture when the Special Master was preparing a court-ordered "stand-alone report on the status of mental health staffing and implementation of defendants' staffing plan," *see* ECF No. 5564 at 6-7 (citing ECF No. 5477 at 8-9), no one checked with psychiatry and the change sailed through. Drs. Golding, Gonzalez and Kuich all learned of the change only after relevant "dashboards" designed to measure compliance with remedial requirements of this court changed from red to green overnight and then undertook an investigation to try to understand the reasons behind the change, which was not at all transparent. Given its timing, the rule change affected a period when the Special Master had been tasked with receiving monthly updates on the status of defendants' implementation of their January 10, 2017 updated staffing plan and filing a stand-alone report on the status of mental health staffing and defendants' implementation of that plan. *See, e.g.,* ECF Nos. 5477, 5564. The context supports the clear inference of willful blindness at least, or reckless indifference to defendants' obligations in this action. And, in specific answer to the questions posed for hearing on this issue in the August 14, 2019 order, this willful blindness or reckless indifference is attributable to Dr. Ceballos, the individual who authorized the change

29

1    in December 2016. To a lesser extent, it is also attributable to systemic failures of CDCR

2    management to ensure that all staff, including those tasked with developing key software codes,

3    have a complete understanding of the remedial requirements of this action so that they can, to the

4    extent possible, make sure the data reports produced to support defendants' provision of

5    constitutionally adequate mental health care will accurately measure the remedial requirements

6    for this action.

7         As noted above, defendants have undertaken to correct at least some of the

8    misleading information in the record uncovered as a result of the Golding Report. *See, e.g.*, ECF

9    Nos. 6302, 6330. But they have undertaken that effort only after the court set this matter for

10   evidentiary hearing and directed the parties to meet and confer in an effort to narrow the scope of

11   issues for hearing. As noted, the court is currently in the process of reviewing the parties' filings

12   to determine whether in fact the record has been completely corrected and will address that

13   question in a subsequent order.

14                        b.  "Appointments Seen As Scheduled" Indicator

15                              i.  Background

16        The *Plata* Receiver initially developed the "Appointments Seen As Scheduled"

17   indicator, 10/15/19 RT at 197:21-24, apparently for use as a metric to assess efficiency in

18   scheduling and completing medical appointments. Annette Lambert, Deputy Director of Quality

19   Management, Informatics and Improvement for California Correctional Health Care Services

20   (CCCHS), run by the Receiver, told the neutral expert

21              the "Appointments Seen as Scheduled" indicator was developed
               independently from the Program Guide by the medical unit, and
22              adopted by Mental Health around 2016. She stated, "[F]rom the
               medical perspective we introduced seen as scheduled as an efficiency
23              metric. And what we were primarily looking at is how much are we
               seeing cancellations of clinics based on factors that arguably are
24              under our control." Lambert Tr. at 82:16-20.

25   ECF No. 6147 at 73. Similarly, Dr. Ceballos told the neutral expert

26              that CDCR Mental Health updated its "Appointments Seen as
               Scheduled" indicator sometime in 2016 to match the CCHCS Health
27              Care Dashboard indicator, and thereby include only those

28
                                        30

1         appointments that were missed due to a factor within CDCR's
        control. Ceballos Tr. at 147:8-16, 148:9-10, 148:22-149:3.

2

3   *Id.*

4                 ii.    <u>Review of Evidence</u>

5         At hearing, Dr. Leidner testified that "[a]t some point" he "was asked to replicate

6 that" indicator on a performance report for mental health appointments. 10/15/19 RT at 197:25-

7 198:2. Witnesses told both the neutral expert and this court that the indicator was not directly

8 connected to any Program Guide requirement or *Coleman* court order. *See id.* at 198:18-25

9 (Leidner testimony); *see also* ECF No. 6147 at 73 ("CDCR witnesses generally reported that the

10 "Appointments Seen as Scheduled" . . . indicator[] [was] developed for internal use only for

11 measuring the performance of the institutions. . . ."). Dr. Leidner testified that the criteria used in

12 creating the indicator were the *Plata* Receiver's criteria developed for medical appointments, and

13 that while he had to recode the indicator to make it applicable to mental health appointments he

14 did not make any substantive changes and tried "to just replicate their [the *Plata*] methodology."

15 10/15/19 RT at 198:5-17. Dr. Rekart testified that after the Golding Report came out he heard the

16 description of the indicator had not been updated to reflect certain changes that had been made to

17 the indicator itself. 10/15/19 RT at 166:16-167:6. Dr. Leidner testified to the same

18 understanding. *Id.* at 201:14-16. He also testified he thought "perhaps" the description matched

19 the indicator initially, but he "failed to update" the description of the indicator when the

20 Receiver's staff changed some criteria in the indicator sometime before February 2016. *Id.* at

21 202:5-10, 208:7-10. Dr. Leidner testified that he learned of the error from Dr. Ceballos

22 "sometime around October 9th, before [he] had any knowledge of the Golding report . . . and

23 [he] basically changed it that day to match what it was really doing." 10/15/19 RT at 224:20-

24 225:11. "At some point during the neutral expert's investigation," after the neutral expert's

25 investigation was over and before Dr. Leidner left CDCR headquarters he reported it to Dr.

26 Ceballos and also discussed it during a telephone conference call. *Id.* at 206:13-207:9. Dr.

27

28

1   Leidner left CDCR headquarters at the end of July 2019 and has not been involved in correcting

2   the descriptor to match the indicator. *Id.* at 207:15-19.[21]

3          Most testimony suggested that, substantively, the indicator was developed as a

4   means of determining how many appointments were cancelled for reasons within CDCR's

5   control. The day after Dr. Leidner's testimony, in lieu of recalling him to the stand, defense

6   counsel made an offer of proof in lieu of further testimony from Dr. Leidner, explaining that Dr.

7   Leidner had, subsequent to testifying, clarified that

> the indicator is a ratio where the denominator is all mental health
> appointments that were either seen or canceled and not rescheduled
> for one of the four controllable cancellation reasons: Technical
> difficulties, modified program, lack of transport or provider
> unavailable. The numerator is all appointments from the
> denominator that were seen.

12  10/16/19 RT at 247:20-248:1.[22] Despite this stated purpose, and although there seems to be

13  general agreement that the "Appointments Seen As Scheduled" indicator was not directly related

14  to any specific provision of the Program Guide, Dr. Golding testified he thinks "many aspects" of

15  the Program Guide make measuring appointments seen as scheduled quite relevant. 10/15/19 RT

16  at 68:9-69:7. It is undisputed that data generated using this indicator were provided to the court

17  and to the Special Master. The neutral expert identified these specific ways in which these data

18  were transmitted:

- Defendants' May 17, 2018 Staffing Proposal, ECF No. 5841-
  2 at 4 n.5 (stating "[a]ppointments occurred as scheduled
  98% to 100% of the time" over the prior 12 months to support

[21] Dr. Leidner also testified that "at some point during . . . the neutral expert's investigation" he learned that the criteria for the *Plata* Receiver's Appointments Seen As Scheduled indicator and the criteria for the mental health Appointments Seen As Scheduled indicator did not match, even though the original instruction to him had been to replicate the *Plata* indicator for mental health. 10/15/19 RT at 205:13-206:20. He did not know "when they diverged . . . [or] if they ever exactly matched, but the intent was that they were supposed to." *Id.* at 206:17-20. After the neutral expert's investigation was over and before leaving CDCR headquarters he reported this to Dr. Ceballos and also discussed it during a telephone conference call. *Id.* at 206:13-207:9. Here as well, he does not know what has happened to the indicator since. *Id.* at 207:15-19.

[22] Plaintiffs accepted this offer of proof as a correction of the record. *Id.* at 248:4-7.

1    the assertion that "CDCR is meeting the needs of class
members in the desert institutions").

2

3    • CQI data provided to the Special Master. *See, e.g.,*
PLTF000894, "CEN Mental Health Performance Report for
4/1/16 to 10/24/16" (reporting 100% of "Appointments Seen

4    as Scheduled"); PLTF000896, "LAC Mental Health
Performance Report for 3/1/16 to 9/26/16" (reporting 91% of

5    "Appointments Seen as Scheduled").

6    • At least one CQI Report to the Special Master. *See*
CDCR0019053, Regional Continuous Quality Improvement

7    Review for RJD, October 10-14, 2016 at 12 ("ML EOP had
94% of appointments seen as scheduled" and "ML CCCMS

8    had 94% (n=16,333) of their appointments seen as
scheduled").

9

10   ECF No. 6147 at 73.

11                             iii.    Findings

12         Even accepting that the "Appointments Seen As Scheduled" indicator was created

13   originally for "internal" measurement purposes and is not required by the Program Guide, Dr.

14   Golding is correct that the Special Master relies on information generated using the indicator in

15   conducting his monitoring. And even if the court credits Dr. Ceballos' testimony that Dr.

16   Golding does not understand the data, *see* 10/16/19 RT at 294:19-295:25, that testimony only

17   highlights a more significant issue: defendants have not adopted processes necessary to make

18   their data methodology fully transparent and understandable to all key stakeholders, including the

19   chief psychiatrist. *See also* 10/15/19 RT at 36:1-21 (Golding testimony concerning psychiatrists'

20   lack of access to data for independent evaluation and that psychiatry leadership "can't organize

21   and program data to look across institutions to be able to see whether there are errors being made

22   in medical care.").

23         As for the flawed descriptor, the error appears to have been unintentional, and Dr.

24   Leidner brought it to the attention of Dr. Ceballos and others soon after he became aware of it.

25   10/15/19 RT at 207:2-5 At the same time, because the descriptor is the public-facing information

26   about the code, it is critical to transparency that the descriptor be accurate. This is the type of

27   error that a system needs to catch quickly, if not avoid altogether. Thus, Dr. Leidner's testimony

28

                                        33

1   that he does not know whether the descriptor has been corrected since he left CDCR headquarters

2   at the end of July 2019, *id.* at 207:13-19, is troubling.

3       Moreover, defendants are not correct in believing that missed appointments are not

4   relevant to patient care. Dr. Kuich's deposition testimony is very instructive as to why properly

5   tracking missed appointments is relevant. Such tracking contributes to qualitative analysis,

6   including identification of trends and patterns at local institutions that is not available otherwise,

7   absent a very detailed manual tracking. The court credits Dr. Toche's testimony concerning

8   remedial measures to be explored, which sounds promising assuming there is transparency and

9   full communication with the Special Master and the court going forward. The court will address

10  this issue further, as appropriate in its forthcoming remedial order.

11      Finally, one of the specific questions posed in the court's August 14, 2019 order

12  with respect to this issue is how the Appointments Seen As Scheduled indicator was developed

13  incorrectly and in the absence of consultation with Dr. Golding or other quality control measures,

14  and what steps defendants plan to take to ensure indicators and definitions are developed with

15  appropriate consultation and quality control in the future. The answer is found largely in one of

16  the most significant issues surfaced through the hearing: the extent to which court-ordered

17  coordination between this action and the *Plata* action, as well as defendants' obligation to work

18  with the Special Master in this case, appear to have gone off track. As the discussion in Section

19  IV(C)(2) demonstrates, the boundaries between *Plata* and *Coleman* appear to have blurred in key

20  respects. A return to robust and transparent coordination between the efforts in this action to

21  remediate constitutionally inadequate mental health care and the efforts in *Plata* to remedy

22  constitutionally inadequate medical care must be a key focus and priority going forward.

23                  c.   Supervisors Acting As Line Staff

24                       i.    Background

25      In 2009, the court ordered defendants to "take all steps necessary to resolve all

26  outstanding [mental health] staffing allocation issues" and "[t]o that end, . . . complete a staffing

27  plan by the end of August 2009." ECF No. 3613 at 2. After receiving an extension of time,

28  defendants filed the required plan on September 30, 2009. ECF No. 3693. Defendants' 2009

34

1   Staffing Plan is the controlling plan prescribing necessary levels of mental health care staffing in

2   CDCR's Mental Health Care Delivery System (MHSDS). "The plan provides staffing ratios for

3   the programs at each level of defendants' MHSDS and other ancillary programs. *See* ECF No.

4   3693 at 12-33. These ratios are expressed as one mental health staff person per x number of

5   inmate patients. *See id.*" ECF No. 5711 at 3.

6           The 2009 Staffing Plan contains ratios for staff psychiatrists at each level of the

7   MHSDS, with the exception of intermediate and acute levels of inpatient care. *See id.* at 17-18

8   (citing ECF No. 3693 at 12-24). The 2009 Staffing Plan also provides ratios for supervising

9   senior psychiatrists only in mental health crisis bed (MHCB) units and in mental health outpatient

10   housing units (MH-OHUs). *Id.* at 18. Those ratios are extremely high relative to those for staff

11   psychiatrists in the same units: in MHCB units, the ratio of staff psychiatrists to patients is 2.5 to

12   25, while the ratio of supervising senior psychiatrists to patients is 1:50, and in MH-OHUs, the

13   ratio of staff psychiatrists to patients is 1:9 and the ratio for supervising senior psychiatrists to

14   patients is 1:150. *Id.* at 18. The job description of Senior Psychiatrist, Supervisor in the 2009

15   Staffing Plan is as follows:

16         Approximately one third of CDCR prisons will have a Senior
         Psychiatrist, Supervisor. Senior Psychiatrist, Supervisor positions
17         will be allocated to prisons that do not have a Chief Psychiatrist but
         have a significant number of staff psychiatrists providing services to
18         a largely stable inmate-patient population. Senior Psychiatrist,
         Supervisor positions will also be allocated to several prisons that
19         have a Chief Psychiatrist and that have large and complex mental
         health services. Senior Psychiatrist, Supervisors will provide clinical
20         supervision of staff psychiatrists, as well as various administrative
         tasks related to formulary, medication management, and continuity
21         of psychiatric medications. Senior Psychiatrist, Supervisors are
         responsible for the generation and periodic reviews of LOPs
22         pertaining to the practice of psychiatry and for ensuring that practices
         are consistent with the most recent departmental policies. Further,
23         Senior Psychiatrist, Supervisors share responsibility for quality
         improvement activities including peer professional review
24         processes.

25   ECF No. 3693 at 32.

26                     ii.    Review of Evidence

27           The neutral expert provided evidence that supervising psychiatrists see inmate

28   patients for clinical appointments, that some level of participation by supervising psychiatrists in

1  clinical patient care is appropriate, that the EHRS does not track the extent to which supervising

2  psychiatrists see patients, and that "it does not appear that CDCR had ready access to a data set

3  based on supervisor-only appointments." *See* ECF No. 6147 at 80-82 and evidence cited therein.

4  These facts were all confirmed in testimony at hearing.

5         There is no dispute that CDCR supervising psychiatrists see inmate patients for

6  clinical appointments, or that some level of participation in clinical care by supervising

7  psychiatrists is appropriate. *See, e.g.,* 10/15/19 RT at 74:9-14; Kuich Dep. at 206:21-207:5. At

8  hearing, Angela Ponciano, Associate Director for CDCR's Statewide Mental Health Program,

9  testified that CDCR has not "tracked specifically" "how the number of patients seen by

10 psychiatric supervisors providing direct patient care affects staffing ratios." 10/15/19 RT at

11 134:19-22, that the EHRS does not include a performance report "that allows accurate reporting"

12 of when supervisors act as line staff, 10/15/19 at 147:15-19, and that because of this the analysis

13 of supervising psychiatrist patient contacts she conducted after the Golding Report came out was

14 a multi-step process. *Id.* at 147:17-25. Dr. Golding contends this information can be tracked; at

15 hearing he described two different methods for tracking the extent to which clinical services are

16 provided by supervising psychiatrists. 10/15/19 RT at 50:3-51:21. Both methods involved

17 running a caseload report using supervising psychiatrists' names and generating a list of patients;

18 these reports were then analyzed under two different methodologies, one controlling for caseload

19 ratios at each level of care and the other by comparing the frequency of supervising psychiatrists'

20 patient visits with those of line psychiatrists. *Id.* Dr. Golding also testified that at least since

21 2018 his staff has called each institution monthly to determine the level of psychiatric coverage at

22 the institution and "whether supervisors are providing coverage." 10/15/19 RT at 48:17-20. He

23 further testified that "[on numerous occasions" the reports generated by these calls "have been in

24 the hands of Deputy Tebrock, Ms. Ponciano and Ms. Brizendine" and that "[at] one point they

25 tried to get" Dr. Golding and his team to stop this monthly tracking, but the team continued to

26 conduct the tracking. 10/15/19 RT at 48:17-24.

27 ////

28 ////

36

1    In his report, Dr. Golding avers that

2      [t]he staffing ratios CDCR reported to the court in the 2018 staffing
      report are incorrect. Sixty percent of psychiatric supervisors were
3      seeing patients like line staff at least part time, and in some cases full
      time. The work was being done by a larger ratio of psychiatrists to
4      patient that was reported, suggesting that fewer psychiatrists are
      needed per patient than is in fact the case.
5

6 ECF No. 5988-1 at 5. At hearing, he testified that psychiatric supervisors spend about fifty

7 percent of their time conducting line visits. 10/15/19 RT at 51:9-21. At his deposition, Dr. Kuich

8 estimated that psychiatric supervisors have performed line duties more than a third but less than

9 fifty percent of the time. Kuich Dep. at 30:14-31:1.

10    After Dr. Golding issued his report, Ms. Ponciano conducted an analysis "on the

11 number of CCCMS and EOP psychiatry appointments involving supervisors and chiefs at each

12 institution." ECF No. 6147 at 80; *see also* 10/15/19 RT at 135:1-15. She testified she "found that

13 there were not 60 percent of supervisors carrying a full line staff caseload for those levels of

14 care." 10/15/19 RT at 136:3-5. She later performed a second analysis, which showed that if

15 supervisors' clinical contacts were removed from the "frequency of contacts" report on which

16 defendants' 2018 staffing proposal was based, the frequency of psychiatrist contacts for both

17 CCCMS and EOP patients decreased. 10/15/19 RT at 138:13-139:6; *see also* ECF No. 6242 at 10

18 (citing ECF No. 6226 at 20 ¶ 6).

19    The neutral expert conducted interviews in the field with psychiatrists who report

20 variation in responsibilities from institution to institution, supporting the inference that Ms.

21 Ponciano's analysis underrepresents the actual amount of time psychiatrist supervisors spend

22 performing the duties of line psychiatrists:

23      Psychiatrists agreed that this issue varied significantly by institution,
      but all acknowledged that it was not uncommon for psychiatry
24      supervisors to see patients. One psychiatrist noted that at some
      institutions, a single psychiatrist (sometimes a supervisor or chief)
25      handles all IDTT appointments. Another psychiatrist noted that as a
      supervisor, she was assigned the case load of three line staff. One
26      Chief Psychiatrist described that [s]he provides a lot of the care, but
      could not provide a specific volume. [S]he commented that if [s]he
27      did not provide direct care, the institution would be out of
      compliance. Another Chief Psychiatrist reported that [s]he did not
28      routinely see patients or have a set patient load.

1

A senior supervising psychiatrist said it was expected that supervisors perform the same duties as line staff when there are staffing shortages—the culture of leadership was that psychiatrists should be utilized. That psychiatrist explained that when [s]he took on the senior supervisor position [s]he was doing line staff work at least 50% of the time, and [s]he currently still covers IDTTs and other line work when other psychiatrists are not available.

The anecdotal evidence from multiple psychiatrists suggests that Ms. Ponciano's data analysis undercounts the amount of patient care being provided by supervisors. It is clear, however, that the degree to which supervisors provide direct care varies widely by institution and over time, and so we were unable to more precisely quantify this activity.

ECF No. 6147 at 81-82.

As the court discussed in its August 14, 2019 order, the parties have stipulated "that the data on timely psychiatric contacts prepared in support of CDCR's 2018 Staffing Proposal to reduce the number of psychiatrists was 'potentially misleading' because the proposal did not disclose that appointments with psychiatric supervisors were included in the data." ECF No. 6242 at 10. The neutral expert also suggested other documents contain representations about staffing without accounting for "contributions from psychiatrist supervisors, including:

• Monthly reports on staff psychiatrist vacancy rates. *See, e.g.,* PLTF005201, PLTF005207.

• Defendants' Response to the Special Master's Report. ECF No. 5591 at 14 ("Over the past year, inmates were seen timely . . . by their psychiatrist ninety percent of the time.") (emphasis added), 15 (reporting 74% average fill rate for psychiatrists).

• 27th Round Monitoring Data, Tab B: Staffing. *See* ECF No. 6012-2 at 69.

• Other representations CDCR made to the Special Master and the Court regarding the adequacy of their current staff psychiatry staffing levels. *See, e.g.,* Joint Status Report RE: October 11, 2018 Status Conference (Sept. 15, 2018), ECF No. 5922 at 4 ("CDCR expects that implementation of the proposed staffing plan will immediately lead to CDCR being at or above the staffing levels required in the Court's June 13,

1                              2002 Order (ECF No. 1383), and therefore immediately bring

2                              CDCR into compliance with the October 10, 2017 Order
[ECF No. 5711 at 30].").”

3 ECF No. 6147 at 79-80. Again, the court is in the process of reviewing all relevant parts of the

4 record to determine the scope and adequacy of necessary corrections.

5                         iii.     Findings

6          Taken together, all of the information in the record makes clear that psychiatry

7 supervisors carry a significantly higher caseload than is contemplated by the 2009 Staffing Plan

8 governing the remedy in this action. Defendants contend that the first analysis performed by Ms.

9 Ponciano was not intended to show how much supervisor time was required, but, instead, to

10 determine how much clinical time was necessary in the field, 10/22/19 RT at 422:14-25, but this

11 argument misses the relevant point. Ms. Ponciano's first analysis, conducted to support the ill-

12 fated 2018 staffing proposal, masked the time supervisors spend providing line care and yielded

13 numbers that overstated appointment timeliness compliance. At hearing, she testified to a second

14 analysis she conducted subsequently, which showed that if supervisor contacts were removed

15 from timely CCCMS contacts, the report would have showed CCCMS patients being seen on

16 average .98 times every 90 days, rather than 1.07 times every 90 days. 10/15/19 RT at 137:21-

17 139:6. The latter analysis was not shared with the court or the Special Master before these

18 proceedings. Ms. Ponciano also testified that discussions with the Special Master about CDCR's

19 use of psychiatric supervisors to perform line psychiatrist clinical duties have not begun but are

20 planned for the "near future." 10/15/09 RT at 139:14-23.

21          Dr. Golding tried, apparently unsuccessfully, to surface the issue of supervisors

22 serving as line staff in CDCR meetings he attended as a representative for psychiatry. *See, e.g.,*

23 10/15/19 RT at 54:5-20. While Dr. Golding and Dr. Kuich disagree on the exact percentage of

24 time supervisors have spent providing line care, with Dr. Golding estimating fifty percent and Dr.

25 Kuich estimating from thirty-three to fifty percent, the difference is not material here. Regardless

26 of which range the court credits, supervisors have clinical responsibilities far in excess of those

27 contemplated in the 2009 Staffing Plan and defendants misleadingly withheld this information in

28

1    an effort to make compliance numbers look better and to support significant reductions in

2    psychiatrist staffing levels.

3            Here the specific questions posed for hearing on this issue are why defendants did

4    not disclose in their 2018 Staffing Proposal whether, and to what extent, the reporting of data

5    related to average frequency of patient contacts did not disclose the use of supervisory

6    psychiatrists to complete caseload contacts with patients; and to what extent defendants

7    knowingly relied on active participation of supervisory psychiatrists in performing the duties of

8    line psychiatrists, both in defendants' 2018 Staffing Proposal and in supporting their

9    representation that, if adopted, the 2018 Staffing Proposal would bring defendants into

10   compliance with the October 2017 staffing order?  The answers are found in the actions of critical

11   players including Ms. Ponciano, in an environment of pervasive bureaucratic dysfunction as the

12   hearing here revealed.  Defendants failed either to consult key headquarters psychiatrists or to

13   heed the clearly relevant information those psychiatrists attempted to provide concerning the

14   overuse of supervising psychiatrists in performing clinical duties.  Defendants thus failed to

15   acknowledge the many negative consequences of the failure to either understand the extent of this

16   overuse or its ramifications for the field.  Dr. Golding testified that at one point he was even

17   instructed to stop collecting institutional data on the extent to which supervising psychiatrists

18   were performing line duties.  This instruction appears to have come at a time in 2018, when

19   defendants were under a court order to come into compliance with their Staffing Plan and the

20   court-ordered vacancy rate and when they were engaged in their misguided attempt to artificially

21   reduce the number of psychiatrists required to deliver constitutionally adequate mental health care

22   to the plaintiff class.

23            3.   Overall Summary

24            All of the foregoing compels the conclusion that two of the issues discussed above,

25   the change in the EOP timeline business rule and the failure to properly quantify and identify the

26   extent to which supervising psychiatrists perform the duties of line staff psychiatrists, involved

27   the knowing presentation of misleading information to the court.  With respect to the

28   Appointments Seen As Scheduled indicator, the court finds no knowing presentation of

1    misleading information but, instead, a public-facing error in the descriptor that should have been

2    caught sooner and that caused misunderstanding of the nature of the information presented.

3         Taken together with defendants' admissions prior to hearing, defendants have

4    knowingly presented misleading information to the court in numerous areas critical to the remedy

5    in this case and measuring compliance with that remedy.

6         C.    Other Concerns Identified Through Hearing

7                   1. Marginalization of Psychiatry

8         On a broader level, the record created through the evidentiary hearing

9    demonstrates a marginalization of psychiatry that impedes defendants' ability to achieve full

10   compliance with the constitutional requirements embodied in the court-approved remedy.

11        Dr. Kuich's testimony explains the pressures and disincentives created by reliance

12   on automation and electronic data: Psychiatrists are being made to practice in an environment

13   that, among other things, "causes data to have to be massaged in certain ways to allow

14   information to be more presentable to say we don't need psychiatrists so we can get out of the

15   lawsuit." Kuich Dep. at 162:22-25. "And the more you automate this process to make sure that

16   compliance happens, the more you take control out of the clinician to be able to determine what's

17   clinically relevant for the patient." Id. at 167:14-18.

18        In critical policy decisions affecting this case, psychiatry's ability to provide

19   substantive input also was severely constrained. As noted above, in preparing the 2018 staffing

20   proposal, Deputy Director Tebrock declined to provide a copy of the proposal to Dr. Golding

21   before it was finalized, and instead only read bullet points to him and then asked him to sign off.

22   This process for incorporating the views of a psychiatric professional, given the stakes, is

23   completely inadequate. Moreover, in addition to not being fully involved in discussions and

24   development of the 2018 staffing proposal, Dr. Golding testified he was told to wait to talk about

25   his staffing concerns until after that proposal was to have been filed with the court. 10/15/19 RT

26   at 27:2-29:22.

27        Non-psychiatrist members of the CDCR Mental Health management team also

28   asked Dr. Golding and his team to stop their monthly tracking of staffing at various institutions, at

1  a time when the team was tracking information CDCR officially said could not be tracked. Dr.

2  Kuich's access to data compiled by Ms. Ponciano and her team was extremely limited. *See* Kuich

3  Dep. at 38:24-39:11. And Ms. Ponciano pulled Dr. Kuich out of one meeting for "about five

4  minutes" to run some numbers by him for providing on-call services through telepsychiatry

5  without giving him context, full information or time to evaluate the information she was putting

6  together to support the staffing proposal. *Id.* at 65:3-21; 68:21-70:6. This exchange too is not the

7  kind of meaningful discussion required under the circumstances, even if it enabled Ms. Ponciano

8  to say honestly she had talked with D. Kuich. While Ms. Ponciano came across as credible in her

9  testimony, she is an administrator who oversees operations and labor negotiations, who was

10  tasked with coming up with the number of psychiatrists to hire and to cut. She did not have the

11  full knowledge base to develop proposals on her own that would satisfy the requirements of this

12  case.

13          The headquarters environment described by Dr. Golding, led by former Deputy

14  Director Tebrock, is also concerning. Dr. Golding had the impression, which he testified to

15  credibly, that he was not able to speak to the Special Master. 10/15/19 RT at 21:14-23. Dr.

16  Golding testified he now understands he can contact the Special Master directly as necessary. *See*

17  10/15/19 RT at 21:24-22:1. But his reasons for submitting his report to the Receiver instead of the

18  Special Master were clearly articulated, consistent with his sense that he was not supposed to

19  communicate with the Special Master directly; they also reflected his concern about reporting

20  issues up the *Coleman* chain of command. 10/15/19 RT at 40:14-41:3. Dr. Kuich described

21  multiple instances where he just gave up trying to report problems or make necessary changes,

22  because his voice was never heard. *See.* Kuich Dep. at, *e.g.,* 163:14-25.

23          The actions reviewed above run counter to a key principle articulated in this case

24  since the very beginning: "In order to provide inmates with access to constitutionally adequate

25  mental health care, defendants must employ mental health staff in 'sufficient numbers to identify

26  and treat, in an individualized manner, those treatable inmates suffering from serious mental

27  disorders.'" *Coleman v. Wilson,* 912 F.Supp. at 1306 (internal citation omitted). Psychiatrists are

28  critical to appropriate mental health staffing, given that they are medical doctors bound by the

1   Hippocratic Oath. *See* Kuich Dep. at 33:8-9 ("Psychiatrists as physicians do have the Hippocratic

2   Oath to do the best we can for our patients."). This does not mean psychiatrists must always

3   prevail in internal policy- and decision-making processes. But they must be meaningfully

4   consulted; their professional views must be heard, considered and accounted for. Defendants'

5   marginalization of psychiatry and their clumsiness in the process reflects a significant lack of

6   good judgment and bureaucratic dysfunction that, if allowed to continue, presents a major

7   obstacle to successful remediation in this action.

8                  2. Boundaries Between *Plata* and *Coleman*

9            While there are areas of overlap between the *Plata* class action and this one, the

10  two cases are distinct and it is clear defendants were not policing the boundaries between the two

11  to protect and advance the remedies required in this case.

12           For example, the Appointments Seen as Scheduled indicator, developed by the

13  *Plata* Receiver, was simply adopted by CDCR Mental Health staff without any tailoring, as Dr.

14  Leidner testified. More generally, the Receiver's team is making changes to healthcare business

15  rules that affect mental healthcare indicators, and it is the Receiver's team running validation

16  processes to check that code. *See, e.g.,* 10/16/19 RT at 269:17-270:2. It appears defendants have

17  tasked no one with a systemic review of changes to business rules to ensure compatibility with

18  this *Coleman* case. Regardless of how the current practices have developed, all practices and

19  procedures related to *Coleman* data collection and reporting must be made fully transparent

20  immediately.

21           Additionally, defendants' Mental Health quality management team was heavily

22  involved in the *Plata* Receiver's development of the EHRS. As the record developed through the

23  evidentiary hearing disclosed, many of psychiatry's requests for a solution to critical scheduling

24  problems linked to diagnosis and prescriptions have not been incorporated into EHRS. *See* Kuich

25  Dep. at 174:15-175:7 Psychiatry's requests for changes to EHRS "languished and were not

26  addressed." *Id.* at 146:7-10; *see also id.* at, *e.g.,* 147:17-148:1. More broadly, EHRS is not

27  tailored, as far as the court can tell, to take account of specific mental health issues implicated by

28  this case. *See, e.g.,* Golding Report, ECF No. 5988-1 at 71-75. A person entering data using

                                     43

1    EHRS can self-select his or her own title, *see* 10/15/19 RT at 148:10-20, a feature developed,

2    according to Ms. Ponciano, to allow psychiatrists to change their title to supervisor in order to

3    prescribe nonformulary medication. *Id.* at 161:15-19. It also appears that the training of

4    psychiatrists, who defendants rely on for data entry, regarding the use of EHRS has been uneven

5    and incomplete. *See* Kuich Dep. at 48:1-4 (regular training was "made available" but not

6    mandatory); *id.* at 47:17-22 (training manual was "bare bones", with refinements not transmitted

7    to line staff level); *id.* at 23:17-20 (supervising psychiatrists' acting as line staff impaired the

8    needed "unobstructed time and undivided attention to train their psychiatrists in the ways of

9    EHRS."). Defendants acknowledge a need for more training; they must act on this

10    acknowledgment and promptly initiate a robust training process to address all the deficiencies

11    identified through the hearing.

12           On a parallel track, this court will closely manage renewed coordination effort

13    involving the Special Master in this case and the *Plata* Receiver, with the presiding judges at the

14    table as appropriate.

15           In the meantime, as the court cautioned from the bench, no one should rush into

16    the breach to cement any new plan for improved data collection analysis and reporting, without

17    obtaining this court's advance approval.

18    D.    <u>Reasons Defendants Knowingly Presented Misleading Information</u>

19           In the final analysis, inexplicably, it is apparent defendants lost complete sight of

20    the reasons remediation is required here. Defendants adopted a laser focus in an effort to obtain

21    termination of court supervision, which lead to a stark "ends justify the means" approach. Their

22    litigation tactics have wholly missed the significance of the constitutional rights of the thousands

23    of mentally ill persons defendants have in their custody.

24           As the court said in its oral pronouncement following hearing, legal cases are not

25    just words on a piece of paper and a series of jousting matches. Almost all legal cases have hearts

26    and souls, as does this one in particular. This court's predecessor, Judge Karlton, put his heart

27    and his soul into this case, as reflected in the care he paid and his orders which stand today. This

28    is a case that cries out for every single player to consult their hearts daily and keep their eyes

1   hourly on those souls who are the members of the plaintiff class:  the seriously mentally ill

2   individuals housed behind bars in this state who have the absolute, undeniable right to

3   constitutionally adequate treatment and care.

4          The question of how and why defendants lost sight of this case's touchstone is at

5   once complicated and straightforward.  Timing played a role, with awareness of the schedule of

6   the Special Master's monitoring rounds.  The end of the prior Governor's term does appear to

7   have contributed to a pressure cooker environment.  While no evidence has emerged of anyone in

8   the Governor's Office ever instructing any player to mislead the court, the Neutral Expert Report

9   does capture a telling interaction.  In March 2017, Ms. Tebrock sent an email noting that the

10  Governor's Office had asked for an explanation in more detail of what metrics could be used to

11  show that the care by psychiatry is adequate.  *See* ECF No. 6147 (citing CDCR0016999).  This

12  missive signaled an attention to data and a focus on compiling data to show that care was

13  adequate, with the court as the audience.  In the same general time frame, Ms. Tebrock's

14  explanation of the need for lawyers to wordsmith the court documents, as a reason for not

15  showing the staffing proposal to Dr. Golding, also exposes that "ends justifying the means"

16  approach, as opposed to one of engaging in responsible problem solving.

17         The push to get dashboards from red to green is another marker.  As Dr. Kuich, as

18  someone who has left the department, explains:  "[M]ental health felt that they were performing

19  very well in many areas, that they could police themselves with data, that they were a structure.

20  That they were sustainable. And the only piece that was the problem was that there weren't

21  enough psychiatrists. And so if there was some way to show that with fewer psychiatrists we were

22  meeting the metrics, that final block would tumble, and there would be no basis for the lawsuit."

23  Kuich Dep. at 122:15-23. In approving the change from 30 to 45 days, Dr. Ceballos facilitated

24  dashboards turning to green overnight.  A dashboard that's green, makes it look as if a remedy is

25  complete.

26         In sum, litigation once again has trumped substantive compliance, a path

27  defendants have taken repeatedly.  It is not for this court to tell a party how to litigate its case, if it

28

                                    45

Case 2:90-cv-00520-KJM-DB    Document 6427    Filed 12/17/19    Page 46 of 49

1   chooses litigation, believes it has that right and plays within bounds. The litigation efforts in this

2   case, however, have exacted a steep, steep price at the expense of the plaintiff class.

3          Despite defendants' knowing presentation of misleading information to the court

4   and the Special Master, and their having lost sight of the remedial purposes of this action, there

5   are some hopeful signs. Dr. Toche has signaled that she has concrete plans going forward. She

6   appears to have an ability to listen and to hear what others are saying. The court expects that she

7   is thinking deeply about a proper response to plaintiffs' counsel's question about how she can

8   work to make clear to those who work for and with her that "CDCR has been found to have

9   violated the Constitution as to the mental health program and is under a remedial order supervised

10  by this court" and that "*Coleman* is not just a word" but signifies a federal court order, "upheld by

11  the United States Supreme Court[,] that governs a remedial process." 10/16/19 RT at 359:12-

12  360:4. The court will direct that Dr. Toche provide a report on her answer to that question at its

13  next status conference with the parties in early 2020.

14         There also is a relatively new administration and with any new administration

15  comes the chance to turn over a new leaf. The Deputy Legal Affairs Secretary for Criminal

16  Justice in Governor Newsom's office, Kelli Evans, has been present in the courtroom for the

17  evidentiary proceedings. She also has attended settlement discussions convened by another judge

18  of this court. Ms. Evans and her boss have an opportunity to step into the breach, to take the

19  lessons from what has occurred and move forward in a way that can bring this case to a proper

20  conclusion, if defendants can learn the lessons of their past mistakes, internalize the reasons

21  behind those mistakes and identify meaningful solutions.

22         The court will play its part by convening regular status conferences, resolving

23  disputes as necessary and guiding the Special Master as appropriate.

24  V.    REMEDIES

25         These proceedings have made clear the need for appropriate remedies. As noted

26  above, defendants have been given an opportunity to fully cleanse and purge the record of

27  misleading information. To some extent, they have availed themselves of that opportunity, and

28  the court acknowledges those efforts. *See, e.g.*, ECF Nos. 6302, 6330. Defendants have not,

1    however, come forward to provide their own cogent, believable, supported and complete

2    explanation as to why they presented misleading information.  Rather, they have offered only

3    partial excuses that do not fully acknowledge the totality of the record, pointing to inadvertent

4    errors, absence of course correctors and vagueness in the Program Guide.  *See, e.g.*, 10/22/19 RT

5    at 420:10-423:8.  Moreover, this is the second time in less than ten years that defendants have

6    embarked on a litigation strategy that delayed and frustrated compliance with staffing

7    requirements, *see, e.g., Coleman v. Brown*, 938 F.Supp.2d at 984-989 (discussing ongoing

8    significant staffing vacancies in order denying defendants' motion to terminate this action),

9    giving the court great pause.  Against that backdrop, in the absence of defendants' full acceptance

10   of responsibility, the court has reached its own conclusions and any corresponding remedies must

11   address the court's findings.

12          The parties are in apparent general agreement on the need for data certification.

13   As required by the court's bench order, they have now presented their individual views on proper

14   approaches to such certification and that matter is submitted.  *See* ECF Nos. 6383, 6384.

15          Prior to hearing, plaintiffs identified a series of remedies, and they have now filed

16   a brief setting forth their proposed remedies post-hearing, *see* ECF No. 6374, to which defendants

17   have responded, ECF No. 6388.  The court is prepared to seriously consider plaintiffs' proposed

18   remedies because fundamentally they are correct that this is the time to effect a sea change.  This

19   court must ensure no court is called upon again in the future to consider whether and how

20   misleading information has been presented to it.

21          The remediation called for by these proceedings will allow a long-delayed return

22   to the big picture and the proper laser focus on quality of care for California's seriously mentally

23   ill prison inmates.  Nothing has prevented work on that overarching goal during these

24   proceedings, and it must be abundantly clear that focus on the quality of care for this class of

25   prisoners is what will guide defendants' true relief from court oversight.

26          With respect to staffing in particular, ten years ago it was defendants themselves

27   who submitted a staffing plan to this court followed by a budget change proposal to the California

28   Legislature to "'fully implement'" the staffing model described in that plan.  *Coleman v. Brown*,

1    938 F.Supp.2d at 984 (quoting Ex. K to Kahn Decl., ECF No. 4325, at 93). The budget change

2    proposal described the critical flaws in defendants' prior staffing model and represented that the

3    2009 staffing plan identifies appropriate staffing levels to meet constitutional standards. Still

4    today, however, psychiatrist staffing vacancies hover at the 30 percent mark. The court has heard

5    many times the explanation of supply and demand, that there is insufficient supply, given the

6    remote locations where psychiatrists are needed, to meet the needs of the plaintiff class. But these

7    hearings have provided additional explanations and identified other contributors to the challenge

8    in identifying psychiatrists, including an uninviting dysfunctional workplace that does not value

9    the essential treatment perspectives that psychiatrists have to offer and creates an atmosphere

10   where morale is low. While a change from 30 to 45 days, as one example, might provide a

11   modicum of relief to an insufficient number of overburdened psychiatrists, here it was a

12   misguided, unthinking fix, applying a very tiny bandage to a festering wound while the infection

13   spreads throughout the body.

14           Defendants simply must come to terms with the substance of the staffing plan and

15   involve all key stakeholders in working with the proper focus to satisfy it. If, after addressing the

16   problems these hearings have exposed, defendants honestly believe that their staffing plan,

17   embodied in court orders, needs to be modified, they have the option, as they always have had, of

18   seeking a modification from the court. Any such request would need to be properly justified and

19   honestly supported, of course. In any event, defendants must acknowledge and account for the

20   substantial findings in this court's October 11, 2017 order, describing the heavy burden that must

21   be met to support any increase in psychiatrists' caseloads.

22           In closing, the court repeats its observation from the bench, that nothing prevents

23   the defendants coming forward with a more transformational option. In 2014, Judge Karlton

24   observed, "California is not alone in 'criminalizing mental illness,'" adopting the perspective of

25   the sheriff of Cook County, Illinois quoted in a published article. *Coleman v. Brown*, 28

26   F.Supp.3d at 1073 n.5. "'We've systematically shut down all of the mental health facilities, so

27   the mentally ill have nowhere else to go. [The prison system has] become the de facto mental

28   health hospital.'" *Id.* (internal citation omitted).

1          Since the time this court assumed responsibility for this case, the mental health

2    prison population numbers have risen.  *See* ECF No. 5213 (August 29, 2014 Order reassigning

3    case to undersigned).  Given its experience with the case so far, the court agrees "that many of the

4    problems giving rise to this suit and ongoing efforts at remediation arise from the inevitable

5    tensions created by the distinct needs of custody supervision and the distinct need for mental

6    healthcare." *Coleman v. Brown*, 28 F.Supp.3d at 1073 n.5.  If there is a transformational and

7    pragmatic alternative to the prison as de facto mental health hospital, as a way to address a root

8    contributor to the constitutional violation in this case, this court would entertain such a proposal.

9    Unless or until such a constructive reform is possible, the staffing remedy in this case calls for

10   defendants' staffing plan in the context of the Program Guide to chart the way forward and be put

11   front and center. Relatedly, *Coleman* data collection and reporting must be fixed, and it must be

12   fixed to serve the policies and orders in this case, not the other way around. The policies and

13   orders must not be drained of meaning in an effort to squeeze a square peg into a round hole. And

14   the data must be fixed with all the key stakeholders at the table. It must be, as Dr. Toche appears

15   to recognize, checked and double checked. All with an eye toward allowing the defendants

16   ultimately, when they truly can, to accurately demonstrate to the court that the Constitution is

17   finally satisfied.

18          A remedial order will issue in the near future.  A hearing will be set if the court

19   needs to hear more from the parties before that order issues.

20          IT IS SO ORDERED.

21   DATED:  December 17, 2019.

23   UNITED STATES DISTRICT JUDGE

49



LITIVATE
REPORTING + TRIAL SERVICES

## Transcript of the Testimony of:

# Kevin Kuich, M.D.

### Coleman

### v.

### Newsom

### September 19, 2019

### Volume I

Kevin Kuich, M.D.                                    September 19, 2019

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                            ---oOo---

4    RALPH COLEMAN, et al.,          )
                                     )
5                    Plaintiffs,     )
                                     )
6              vs.                   ) CASE NO.
                                     ) 2:90-CV-00520-KJM-DB
7                                    )
     GAVIN NEWSOM, et al.,           )
8                                    )
                     Defendants.     )
9    _____)

10

11

                     DEPOSITION PROCEEDINGS OF
12
                        KEVIN KUICH, M.D.
13
                  Thursday, September 19, 2019
14

15

16

17

18

19

20

21

22

23

24

25   Reported by Angie Diner, RMR, CRR, CSR 9581

                                                        Page 1

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A P P E A R A N C E S:

 2

 3    FOR Plaintiffs:

 4    ROSEN BIEN GALVAN & GRUNFELD LLP
      BY:   LISA ELLS, Attorney at Law
 5          CARA TRAPANI, Attorney at Law
      101 Mission Street, 6th Floor
 6    San Francisco, California 94105
      415.433.6830
 7    Lells@rbgg.com

 8

 9

10    FOR Defendants:

11    OFFICE OF THE ATTORNEY GENERAL
      BY: ELISE OWENS THORN, Attorney at Law
12          KYLE LEWIS, Attorney at Law
      455 Golden Gate Avenue, Suite 11000
13    San Francisco, California 94102-7020
      (415) 510-3585
14    Elise.Thorn@doj.gov
      Kyle.lewis@doj.ca.gov
15

16

17

18

19

20

21

22

23

24

25
```

Kevin Kuich, M.D.                                     September 19, 2019

```
 1                          INDEX

 2

 3   DEPONENT:                                    PAGE:

 4    KEVIN KUICH, M.D.

 5    EXAMINATION BY MS. ELLS.........................5

 6    EXAMINATION BY MS. THORN.......................193

 7    FURTHER EXAMINATION BY MS. ELLS...............236

 8    FURTHER EXAMINATION BY MS. THORN..............251

 9    FURTHER EXAMINATION BY MS. ELLS...............253

10    FURTHER EXAMINATION BY MS. THORN .............254

11                          *****

12

13                   PLAINTIFF'S EXHIBITS

14   NO.              DESCRIPTION                MARKED

15
     Exhibit 1        DIVISION OF HEALTHCARE SERVICES   16
16                    MENTAL HEALTH PROGRAM
                      MANAGEMENT OVERVIEW UPDATED
17                    REVIEWED ON 6/29/18

18   Exhibit 2        ORDER FROM THE COLEMAN V.         19
                      NEWSOM CASE DATED
19                    SEPTEMBER 17TH, 2019

20   Exhibit 3        E-MAIL STRING OF TWO E-MAILS      50
                      DR. GOLDING ATTACHED AS EXHIBIT
21                    AA TO HIS REPORT FILED IN
                      FEDERAL COURT DATED TUESDAY,
22                    JULY 17TH, 2018 SUBJECT: CHCF
                      CLINIC MODEL
23
     Exhibit 4        DECLARATION OF KATHERINE          54
24                    TEBROCK IN SUPPORT OF
                      DEFENDANTS' RESPONSE TO THE
25                    SPECIAL MASTER'S REPORT ON THE
```

Kevin Kuich, M.D.                                      September 19, 2019

```
1                         STAFFING AND THE IMPLEMENTATION
                          OF DEFENDANTS' STAFFING PLAN
2
      Exhibit 5          E-MAIL FROM MELISSA BENTZ DATED   62
3                        MAY 17TH, 2018 WITH ATTACHMENT
                         ENTITLED "CDCR PSYCHIATRY
4                        STAFFING PROPOSAL"

5     Exhibit 6          E-MAIL FROM MELISSA BENTZ DATED   62
                         SEPTEMBER 17TH, 2018 ENTITLED
6                        "COLEMAN REVISED PSYCHIATRY
                         STAFFING REDUCTIONS"
7
      Exhibit 7          DEFENDANTS' MONTHLY PSYCHIATRY   62
8                        VACANCY REPORT FILED IN THE
                         DISTRICT COURT ON 10/31/18
9
      Exhibit 8          E-MAIL FROM MELANIE GONZALEZ AT  89
10                       CDCR TO MICHAEL GOLDING AT CDCR
                         DATED WEDNESDAY, MARCH 22ND,
11                       2017

12    Exhibit 9          E-MAIL FROM DR. GOLDING TO       144
                         KATHERINE TEBROCK DATED
13                       JULY 2ND, 2018

14    Exhibit 10         E-MAIL FROM LAURA CEBALLOS AT    152
                         CDCR TO KEVIN KUICH, M.D. AND
15                       OTHERS, DATED JUNE 18TH, 2018

16    Exhibit 11         E-MAIL FROM DR. MICHAEL GOLDING  160
                         AT CDCR TO KEVIN KUICH AT CDCR
17                       DATED AUGUST 2ND, 2018,
                         ENTITLED "RE: MENTAL HEALTH
18                       CHANGE MANAGEMENT COMMITTEE"

19    Exhibit 12         E-MAIL FROM DR. GOLDING TO       183
                         KATHERINE TEBROCK DATED
20                       OCTOBER 24TH, 2017

21
                              *****
22
                        DEFENDANT'S EXHIBITS
23
      NO.                    DESCRIPTION            MARKED
24
                             (NONE)
25
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1        BE IT REMEMBERED that on Thursday, September 19, 2019

 2   commencing at the hour of 10:24 A.M. in the offices of

 3   ROSEN BIEN GALVAN & GRUNFELD LLP, 101 Mission Street, 6th

 4   Floor, San Francisco, California before me, ANGIE DINER,

 5   a Certified Shorthand Reporter in and for the State of

 6   California, personally appeared

 7                      KEVIN KUICH, M.D.,

 8   called as a witness herein, who, having been duly sworn,

 9   was thereupon examined and interrogated as hereinafter

10   set forth.

11                         --o0o--

12              EXAMINATION BY MS. ELLS

13   BY MS. ELLS:

14    Q.    Good morning, Dr. Kuich.  I'm Lisa Ells.  I'm an

15   attorney for the plaintiff class in the Coleman v. Brown

16   case.

17        Would everyone in the room please state their

18   name for the record?

19            MS. TRAPANI:  Cara Trapani for plaintiff.

20            MR. LEWIS:  Kyle Lewis, Office of the Attorney

21   General, for defendants.

22            MS. THORN:  Elise Thorn, Office of the

23   Attorney General, for defendants.

24            THE WITNESS:  Dr. Kevin Kuich.

25   BY MS. ELLS:
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    Q.     I want to run through a few ground rules about
 2   depositions with you before we start so we understand
 3   what we're doing here.  The first is that it's very
 4   important that you answer every question verbally.  The
 5   court reporter is accurately writing down what you say
 6   and what I say, and if you nod your head or you point or
 7   something, the court reporter isn't going to be able to
 8   reflect that in the written record.
 9          I'm also confirming that you're not represented
10   by counsel today.  Is that correct?
11    A.     Correct.
12    Q.     Okay.  And counsel for CDCR here may make
13   objections to the form of questions that I'm asking you.
14   They're not your counsel, so you should answer the
15   questions anyway.  I may rephrase the questions and have
16   you answer that, but you should nonetheless answer the
17   questions that are asked.  If I ask you a question that
18   you don't understand, please let me know.  I'd be happy
19   to rephrase it, provide you additional context, whatever
20   you need in order to answer.  Will you do that?
21    A.     Yes, I will.
22    Q.     Thank you.  If at any time you want to change an
23   answer or give detail on something you forgot on an
24   earlier answer, just let me know and we'll take the
25   opportunity to do that.  Is that understood?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.     Yes.

 2    Q.     Thank you.  Now, you've taken an oath to testify

 3  under penalty of perjury today.  That means this

 4  testimony is the same thing as if you were in a live

 5  courtroom.  Do you understand that?

 6    A.     Yes, I do.

 7    Q.     And is there any reason, such as being on

 8  medication or having poor sleep or not feeling well,

 9  that you wouldn't be able to give your best testimony

10  here today?

11    A.     No.

12    Q.     Thank you.  We're going to be talking for a long

13  time.  There's an opportunity for breaks.  If you feel

14  like you need a break to gather your thoughts or because

15  you need to use the restroom, whatever it is, please let

16  me know and we'll accommodate you.  And obviously we'll

17  take a lunch break as well.  Is that okay with you?

18    A.     Yes, it is.

19    Q.     Thank you.  So I'd like to run through some

20  background information with you.  Could you state for

21  the record the name of your current employer and what

22  your title is?

23    A.     Sutter Healthcare, and my title is chief medical

24  officer.

25    Q.     Where is that located?
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.      Kahi Mohala, K-a-h-i M-o-h-a-l-a.  It's in Ewa

 2   Beach in Hawaii.

 3    Q.      In Hawaii.  Thank you.  Before that, you worked

 4   for the California Department of Corrections And

 5   Rehabilitation?

 6    A.      Correct.

 7    Q.      How long did you work there?

 8    A.      My time on the books was six -- I believe six

 9   years.  I had left sometime in January of 2019, mid

10   January 2019, and started on August 1st, 2013.

11    Q.      Could you tell me what the positions you held

12   were, starting with the first one you held for CDCR?

13    A.      I was a staff psychiatrist working for

14   California Health Correction Facility, CHCF, in

15   Stockton.  Then I became a senior psychiatrist

16   specialist.

17    Q.      Could I interrupt for a moment?  Can you tell me

18   how long that first position was for?

19    A.      Approximately six months.

20    Q.      Go ahead.

21    A.      Then I transferred up to headquarters and I was

22   a senior psychiatrist specialist.

23    Q.      How long was that for?

24    A.      Probably about three years.

25    Q.      Do you remember approximately when you moved
```

Kevin Kuich, M.D.                                September 19, 2019

```
 1   into your next role with CDCR?
 2   A.    Somewhere around February of 2014 was the senior
 3   psychiatrist specialist.
 4   Q.    What was your role after that?
 5   A.    Then I was the chief tele psychiatrist.
 6   Q.    When did you start that role?
 7   A.    It was after rollouts after the EHRS finished,
 8   so it was -- so it was November 2017, I believe.
 9   Q.    Could you describe for me what your duties were
10   as staff psychiatrist at CHCF?
11   A.    Certainly.  As a staff psychiatrist, I had
12   direct patient care.  I would see patients in the
13   inpatient unit, which was at MHCB; I would see patients
14   in the outpatient housing units; and I also did
15   consultation work as requested.
16   Q.    And could you then describe for me what you
17   did -- what your job duties were as a senior
18   psychiatrist specialist?
19   A.    Yes.  As a senior psychiatrist specialist, my
20   duties were quite varied.  They involved various work on
21   various committees, policy work, helping with
22   credentialing, and also helping with staffing.
23   Q.    Could you describe a little bit to me about what
24   you mean by helping with staffing?
25   A.    Helping with staffing was working to bring
```

Kevin Kuich, M.D.                                        September 19, 2019

1   people on board to CDCR, and that could be permanent

2   employees through interviews, that could be engaging in

3   the H-1B visa program, and that could also be working

4   with Management Solution, which was the staffing

5   company, local staffing company at that time.

6   Q.    And that would be a contracting type of --

7   A.    Contracting.

8   Q.    Did you have any insight into -- or scratch

9   that.

10        Did you have any role in determining what

11  resources individual institutions needed for psychiatry

12  in that position?

13  A.    In the specialist position, no.  I was more

14  responding to what the field was requesting.

15  Q.    And what do you mean by that?

16  A.    If the field indicated that they were short,

17  they maybe had resignations, terminations, vacations,

18  they would reach out and say, We're short, can you help

19  us out in some way.

20  Q.    So by that, when you say "the field," do you

21  mean individual institutions?

22  A.    Correct.  Individual institutions would reach

23  out and indicate that they have a shortage or they have

24  a need.

25  Q.    Was it typical for a particular person at that

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   institution to contact you about these issues?
 2    A.     It would be varied.  Sometimes it could be the
 3   chief of mental health.  Sometimes it could be the chief
 4   psychiatrist.  Sometimes it could be someone in the
 5   administration there.  It just depends on what their
 6   relationship was and comfort level with interacting with
 7   headquarter staff.
 8    Q.     And when they contacted you about these issues,
 9   what could you do in response?
10    A.     First I would want to get a sense of what's
11   going on, try to get a sense of why the resignation or
12   termination, how long the vacation, how long the
13   disability, so I knew what the need was; and then tried
14   to get a sense where the need was, whether it was
15   inpatient or outpatient.  And then I would be able to
16   make a more informed decision about what's the best
17   direction to try and help fill their need.
18    Q.     What things could you do to help fill their
19   need?
20          MS. THORN:  I'm going to object right now.
21   Beyond the scope of the issues identified in the
22   Court's September 17th order.  I mean, this is not by
23   way of background.  He can explain what his position
24   was.  You're getting into his day-to-day and stuff
25   like that, especially with respect to this position,
```

Kevin Kuich, M.D.                                      September 19, 2019

1    I think he testified on the dates, and that would

2    fall outside of the scope of the Court's inquiry.

3    BY MS. ELLS:

4    Q.    Go ahead, please.

5    A.    Could you repeat the question?

6    Q.    What could you do to address the issues that the

7    institutions were calling you with regarding psychiatry

8    staffing needs?

9    A.    If I knew that there was a permanent candidate

10   who either presented themselves through job fair or APA

11   convention booth or directly contacted us and I knew

12   that they had an interest in a certain region, I would

13   try to steer that candidate or provide information to

14   that candidate about that location.  If there wasn't a

15   permanent candidate that was available, I would look

16   into Management Solution, let them know what the need

17   was and what the time frame was.  Sometimes I would

18   interface with tele psychiatry, which I wasn't dealing

19   with at the time, to see if they had necessity resources

20   as well.

21   Q.    When you say Management Solution, you're talking

22   about the contractor that provided contract staff to

23   CDCR?

24   A.    Correct.  That is correct.

25   Q.    Did you have any involvement during this time

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   period in the design or rollout of the electronics --
 2   the Electronic Health Records System?  And the acronym
 3   that we discuss that is EHRS.  Is that right?
 4    A.     That is accurate.
 5    Q.     Okay.  Could you describe your role during this
 6   time frame in deploying EHRS?
 7    A.     My role with the EHRS was to help design the
 8   psychiatry portion in collaboration with the rest of the
 9   system.  That role was -- it was interrupted on multiple
10   occasions because there was an active Coleman around at
11   the time, so I needed to go with the monitors to various
12   institutions.  So I would do a few weeks on the design
13   and then leave for a week or two and then come back, so
14   it was a process.
15          My involvement with the EHRS was when Cerner had
16   specific associates that were right at CDCR who were
17   engaging with us in discussions and actually building
18   certain parts of the system.  So there would be times
19   where I would work on the documentation piece.  There
20   would be other times where I would work on the power
21   forms, which are a series of orders.  And there were
22   other times that I would be dealing with bringing
23   everything together after they've built out modules and
24   ports.
25    Q.     Was anybody else from headquarters psychiatry
```

Kevin Kuich, M.D.                                      September 19, 2019

```
 1    involved in this process at that point?

 2    A.      No.

 3    Q.      Were other clinical staff from headquarters

 4    involved?

 5    A.      Yes.

 6    Q.      How many would you say were, approximately?

 7    A.      Five or six, probably, for mental health.

 8    Q.      And were those all clinicians?

 9    A.      Yes.

10    Q.      But none of them were psychiatrists except for

11    you?

12    A.      Correct.

13    Q.      Your next position you said was statewide chief

14    of tele psychiatry?

15    A.      (Nods head affirmatively.)

16    Q.      I believe you said you started that in October

17    or November of 2017; is that correct?

18    A.      Around that time.  It was when rollouts ended,

19    EHRS rollouts ended.

20    Q.      Can you describe your duties as the chief of

21    statewide tele psychiatry?

22    A.      They encompassed everything I was doing before

23    and then added tele psychiatry services.  The tele

24    psychiatry piece was managing the three tele psychiatry

25    hubs; it was recruiting and retaining tele
```

```
 1    psychiatrists; it was providing tele psychiatry services
 2    to all the institutions and managing the technological
 3    aspect of the system.  Also within that time frame I was
 4    able to bring an additional hub on board at Fresno to be
 5    able to provide more resources.
 6    Q.    And while you were doing all of those tasks
 7    related to tele psychiatry, you were continuing to do
 8    the other tasks that you had previously performed as the
 9    senior psychiatrist specialist?
10    A.    Correct.  And in addition, there were tasks on a
11    statewide level that were focused on trying to help make
12    the psychiatry systemwide more effective, more efficient
13    in what they do, and more collaborative amongst
14    themselves and the organization as well.
15    Q.    Part of your job was to manage where the tele
16    psychiatrists went and deploy the resources on the
17    ground, right?
18    A.    That is correct.
19    Q.    And was it part of your job to be aware of
20    whether institutions were able to provide psychiatry
21    care?
22    A.    Yes.
23    Q.    Were you also involved in deploying non-tele
24    psychiatrists within the institutions at this time?
25    A.    Yes, I was still involved with that.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    Q.    And that continued from when you started your

 2   previous position in 2014 through your role as the

 3   statewide chief of psychiatry?

 4    A.    Correct.

 5    Q.    What was your level within the department when

 6   you were a statewide chief of psychiatry?  Who did you

 7   report to --

 8    A.    I reported to Dr. Golding.

 9    Q.    When you were the chief of psychiatry?

10    A.    Correct.

11    Q.    Did you ever report to anybody other than

12   Dr. Golding when you worked at headquarters?

13    A.    I reported to Greg Tarosoff, T-a-r-o-s-o-f-f.

14    Q.    And was Dr. Tarosoff a psychiatrist?

15    A.    Yes, he was.

16    Q.    I would like to introduce an exhibit.

17                     (Plaintiff's Exhibit No. 1 was marked for

18                     identification.)

19   BY MS. ELLS:

20    Q.    Dr. Kuich, this is a document that's entitled

21   "Division of Healthcare Services Mental Health Program

22   Management Overview," and you'll see on the bottom right

23   that says "updated reviewed on 6/29/18."  Do you see

24   yourself in the left-hand column in this organizational

25   chart?
```

Kevin Kuich, M.D.                                     September 19, 2019

```
 1    A.    I do.
 2    Q.    What is your title on this organizational chart?
 3    A.    Chief psychiatrist tele psychiatry north.
 4    Q.    Is there a separate position for tele psychiatry
 5    south?
 6    A.    There had been a second position from -- that
 7    was -- let me rephrase that.  That was the original
 8    position of the chief tele psychiatrist who was located
 9    in Rancho Cucamonga.  There was a decision made by
10    administration staff to have a northern chief and a
11    southern chief.  I don't know why there was that
12    decision, but there was a decision made.
13    Q.    Did anyone ever fill that role, to your
14    knowledge?
15    A.    No.
16    Q.    Were you essentially performing the functions of
17    both a tele psychiatry north and tele psychiatry south?
18    A.    Yes.
19    Q.    Chief tele psychiatrist?
20    A.    Yes.
21    Q.    Is that true for the entire time you were chief
22    psychiatrist of tele psychiatry?
23    A.    Yes.
24    Q.    This organizational chart has you reporting to
25    the deputy director of statewide mental health program,
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   Katherine Tebrock.  Is this accurate?
 2    A.    Deputy Tebrock would sign my timecard after I
 3   would hand ir in to Dr. Golding.  Deputy Tebrock did not
 4   provide any supervision services for me, nor direction
 5   specifically with regard to how I perform my tasks.
 6    Q.    Did anyone ever tell you directly who you
 7   reported to in the organization?
 8    A.    No.  There was a tremendous -- there was many
 9   discussions about the organizational chart and
10   organizational changes, and there was a proposed
11   organizational revision that was to happen, and it was
12   on hold.  And I don't know if it was changed or if it
13   was ever formally enacted in the time I was there.
14    Q.    So am I correct that you're inferring that you
15   were reporting to Dr. Golding because he's the person
16   who supervised you on a daily basis?
17    A.    Correct.
18    Q.    But organizationally you're not sure who you had
19   actually formally reported to?
20    A.    Correct.
21    Q.    Were there any psychiatrists at the department
22   at your same level?
23    A.    In -- when you speak of the department, I will
24   take that to mean at headquarters.
25    Q.    That's correct.  Were there any other chiefs of
```

Kevin Kuich, M.D.                                        September 19, 2019

1   any form of psychiatry at the headquarter level besides

2   you and Dr. Golding?

3    A.    No.

4    Q.    Am I understanding you correctly that part of

5   your job was to understand the staffing needs of

6   individual institutions and do your best to deploy

7   resources to provide psychiatry staffing at those

8   institutions?

9    A.    That is accurate.

10   Q.    Dr. Kuich, did you review anything in

11  preparation for this deposition today?

12   A.    I reviewed the executive summary of the neutral

13  expert; I reviewed my own deposition request indicating

14  what things would be available; and I reviewed what

15  documents I did have available to me that may or may not

16  be relevant to the issues at hand.

17   Q.    Did you review any court orders regarding the

18  purpose of this deposition today?

19   A.    I did.

20   Q.    I would like to mark this as Exhibit 2.

21              (Plaintiff's Exhibit No. 2 was marked for

22              identification.)

23  BY MS. ELLS:

24   Q.    Dr. Kuich, this document is an order from the

25  Coleman v. Newsom case, and the date at the top says

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    September 17th, 2019.  Have you reviewed this order?
 2     A.     I have reviewed this order.
 3     Q.     Dr. Kuich, this order indicates that the Court
 4    would like to hear your views on three topics that were
 5    discussed in the neutral expert report that you
 6    referenced that you have reviewed the executive summary
 7    of.  You'll see at the top of page 2, the Court has
 8    defined those topics as -- I'm quoting -- "Issue B:
 9    Redefining 'monthly' to lengthen the intervals between
10    enhanced outpatient (EOP) appointments; Issue E:
11    Reporting of scheduled and missed appointments; and
12    Issue F:  Psychiatric supervisors acting as line staff."
13           I would like to ask you first about Issue F, and
14    that's the issue that the Court has defined "psychiatric
15    supervisors acting as line staff."  How familiar are you
16    with how individual -- were you -- let me start that
17    over.
18           How familiar were you, when you worked for CDCR
19    at the headquarters level, with how individual
20    institutions performed psychiatric patient care?
21     A.     Exquisitely.
22     Q.     Could you expand?
23     A.     In my role of training -- designing and training
24    and rolling out the EHRS, I visited almost every
25    institution in CDCR.  If I hadn't stepped foot on the
```

Kevin Kuich, M.D.                                    September 19, 2019

1    institution, I was on the phone with them or other means

2    of communication as part of their training and continued

3    support as they adapted this new EHRS system.

4    Q.    Did that involve discussing staffing needs with

5    psychiatrists at institutions?

6    A.    The training was focused on the EHRS training,

7    but the training was elbow, so there was plenty of time

8    to have all kinds of discussions with respect to the

9    EHRS there -- because of its complexity and because of

10   its significant changes of work flow, there were

11   conversations that came up with concerns about having

12   enough staff to complete these tasks in a timely manner.

13   Q.    How often would those issues come up?

14   A.    At least 50 percent of the time.

15   Q.    Were you ever contacted, separately from the

16   times when you were sitting with staff as part of the

17   EHRS rollout, about staffing needs at individual

18   institutions?

19   A.    Yes.  One of the benefits of doing the EHRS

20   rollout was having a personal relationship with my

21   colleagues.  One of the downsides was they knew who I

22   was and they felt very free to be able to reach out and

23   discuss their concerns or issues.

24   Q.    How free did they feel about that?  How often

25   did they contact you?

Kevin Kuich, M.D.                                    September 19, 2019

1     A.      Some quite free.  It could be weekly.  Others it

2   could be monthly.  It varied on the institution and it

3   varied on the individual.

4     Q.      But it was common, from what I understand your

5   testimony to be, for institutions to contact you with

6   staffing requests --

7     A.      Correct.

8     Q.      -- is that correct?

9     A.      That is correct.

10    Q.      Are you familiar with how individual

11  institutions performed psychiatric care and staffed that

12  care?  Were you familiar during this time frame?

13          MS. THORN:  So I'm going to lodge an objection

14  here.  This line of questioning goes beyond the scope

15  of the Court's direction under Issue F as set forth

16  in the Court's order, Exhibit 2.

17          MS. ELLS:  Foundational.

18  BY MS. ELLS:

19    Q.      Go ahead and answer.

20    A.      Would you please repeat the question.

21    Q.      Yes.  Would you have been familiar, from your

22  experiences that you just described, with whether

23  psychiatric supervisors ever performed patient care in

24  CDCR?

25    A.      Yes.

Kevin Kuich, M.D.                                September 19, 2019

```
 1    Q.     Could you describe how you became familiar with
 2   that?
 3    A.     I would see it happen during the EHRS rollouts
 4   in the time I was there.  They were either -- it wasn't
 5   at every institution, but it was quite a few of them
 6   where they needed to be excused because they were taking
 7   care of patients or they had a patient line to run.
 8    Q.     And when you answered that question, you were
 9   referring specifically to psychiatric supervisors; is
10   that correct?
11    A.     Correct.
12    Q.     So those supervisors when you were with them
13   would be interrupted from your training to perform
14   individual patient care?
15    A.     Correct.  It was one of the issues that made
16   some of the training difficult to roll out, because the
17   supervisors weren't as available as their counterparts
18   in mental health to be able to have unobstructed and --
19   unobstructed time and undivided attention to be able to
20   train their psychiatrists in the ways of the EHRS.
21    Q.     Is that because of their need to perform
22   individual patient care?
23    A.     In many instances, yes.
24    Q.     What kind of individual patient care did
25   psychiatric supervisors perform, to your knowledge?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1          MS. THORN:  Objection.  Goes beyond the scope
 2   of the order.  Also, the defendants have stipulated
 3   that supervising psychiatrists perform, on occasion,
 4   the functions and duties of line staff psychiatrists.
 5          MS. ELLS:  These questions are meant to elicit
 6   how often they occurred and the deponent's knowledge
 7   of them.
 8   BY MS. ELLS:
 9    Q.     Go ahead and answer.
10    A.     Could you restate the question?
11          MS. ELLS:  Could you read the question back,
12   please.
13          (Whereupon, pending question read back.)
14          THE WITNESS:  They performed new patient,
15   inpatient, and outpatient consultations.  There were
16   some that would fill in for an absent psychiatrist
17   who was gone for sick reasons or what have you, and
18   there were others that, due to the lack of
19   psychiatrists, would have a more substantive role on
20   a daily basis.
21   BY MS. ELLS:
22    Q.     It sounds like you're describing some of these
23   psychiatrists having individual case loads.  Is that
24   correct?
25          MS. THORN:  Objection.  Leading.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1            THE WITNESS:  I would say that is correct.
 2    BY MS. ELLS:
 3      Q.      Did supervisory staff, that you're aware of,
 4    ever have patient loads that were assigned to them?
 5      A.      There is.  There's one individual, actually, who
 6    had that, was in Central Valley, and I'm blanking on the
 7    name.  I apologize.  But this might, to help identify
 8    the person, has -- had left CDCR because of the
 9    tremendous amount of patient care that the supervisor
10    needed to do.  It was actually chief psychiatrist, and
11    eventually did return back to CDCR, but that was one of
12    the -- one of the issues that caused him to leave,
13    because it was just too much to manage.
14      Q.      You mentioned before that the way that you knew
15    that psychiatric supervisors were performing patient
16    care was because you were sitting with them at the
17    institutions and saw it happening; is that correct?
18      A.      That is correct.
19      Q.      You also mentioned earlier that sometimes
20    individual institutions would contact you asking for
21    additional resources.  Did anyone raise with you at that
22    point any notion that existing psychiatric supervisors
23    were performing line staff duties?
24      A.      There would be instances of times where, if the
25    chief or senior psychiatric supervising psychiatrist was
```

1    talking with me, would indicate what they are doing to

2    try to mitigate the issue.  I can't quantify how often

3    that would happen, but it was frequent enough that I

4    recall it one year later.

5    Q.    And was it also frequent in your interactions

6    with staff on the ground during the EHRS rollout?

7    A.    Could you restate that?

8    Q.    Yes.  You said just now, I believe -- and

9    correct me if I'm wrong -- that it was relatively common

10   for you to hear from psychiatric supervisors, when they

11   contacted you, about the fact that they were also

12   performing individual patient care.  Is that accurate?

13   A.    That is accurate.

14   Q.    You've also testified earlier that when you went

15   to institutions and sat with staff, you saw psychiatric

16   supervisors being pulled away for the purpose of you

17   being there, in order to conduct individual patient

18   care.  Is that accurate?

19   A.    That is accurate.

20   Q.    Was that relatively common when you were on the

21   ground?

22   A.    It was relatively common.

23   Q.    Do you know if headquarters tracks how often

24   supervisors perform individual patient care in CDCR

25   prisons?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.    I'm not aware of that.

 2    Q.    Do you know if they do or not?

 3    A.    I do not know if CDCR does.  What I can say is

 4  as the chief of tele psychiatry, in trying to manage and

 5  allocate resources in the most judicious and fair way,

 6  we would reach out to the institutions on a monthly

 7  basis and we would find out what psychiatrists are

 8  there, what psychiatrists are not, and even if chiefs or

 9  seniors were having any kind of patient load as well.

10    Q.    What time frame would you say you were

11  contacting the institutions about that during?

12    A.    This had been a process that predated me, and I

13  continued that when I had taken on the role as chief

14  tele psychiatrist.  So I can't say when it started, but

15  certainly during my time as chief tele psychiatrist,

16  that was a continued process where we would have a

17  dedicated person from tele psychiatry reaching out to

18  each individual person by phone to be able to get an

19  accurate assessment because we found that the

20  information coming from human resources was delayed or

21  flawed and we could not get realtime information

22  adequate enough to be able to make a fair decision of an

23  allocation of a resource that is scarce.

24    Q.    So during your time as statewide chief of tele

25  psychiatry, you are aware that you or -- could you
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   clarify if somebody in your office did that task or if
 2   you did that task of calling the institutions monthly?
 3    A.    Somebody in my office did that task.
 4    Q.    And would they report that to you?
 5    A.    Yes.  It would be reported to me and it would be
 6   reported to all the senior psychiatrists' supervisors in
 7   tele psychiatry as well.  It was part of our regular
 8   discussion that we would look at this, and as it changed
 9   every month and as more institutions resource need, it
10   would be stratified and we would be able to utilize that
11   information to determine the best use of that resource
12   in terms of the highest need and the highest priority.
13    Q.    That sounds like triaging.  Is that correct?
14    A.    That would be accurate.
15    Q.    Could you describe for me why you needed to
16   triage resources?
17         MS. THORN:  Objection.  Vague as to the word
18   "triaging."  I don't know if you want to define that.
19   BY MS. ELLS:
20    Q.    Dr. Kuich, do you understand what I mean by
21   that?
22    A.    Triaging, I do understand that.  Would you like
23   me to --
24    Q.    You can answer the question.  If you need more
25   clarification, I'd be happy to provide it, though.
```

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    I understand triaging -- as a medical physician

2    having trained at times in the emergency department,

3    there are a number of resources, and priorities need to

4    be chosen.  And that's actually what happened with

5    psychiatry staffing.  It occurred because we did not

6    have enough psychiatrists to perform the functions that

7    needed to be -- and it became an ongoing struggle with

8    being able to make certain institutions whole, sometimes

9    at the detriment of another institution that was fully

10   staffed.  There were times where we had to take tele

11   psychiatrists from institutions because there was

12   staffing needs in other places, so it was a zero sum

13   game.

14   Q.    And when these calls to the individual

15   institutions occurred on a monthly basis, was that at

16   your direction?

17   A.    That was something that, as I mentioned, had

18   preceded me, so I allowed that process to continue to

19   move forward.

20   Q.    And how confident were you in the results of

21   that process on a monthly basis?

22   A.    Quite.  The person that was calling had a very

23   good relationship and rapport with the people that were

24   there.  They also needed to report up -- the

25   institutions knew that -- how we were triaging things,

Kevin Kuich, M.D.                                    September 19, 2019

1    how we were prioritizing things.  So they wanted to make

2    sure that things were represented accurately so they

3    would be able to be in the mix in an appropriate way.

4    Q.    When you were involved in that process, was the

5    inquiry around all psychiatric need at the institutional

6    level or tele psychiatry need?

7    A.    It was all psychiatric need.  Tele psychiatry

8    was the way that gaps were filled.  Tele psychiatry

9    would serve functions where we couldn't recruit

10   psychiatrists to be able to work on site, and tele

11   psychiatry would often be requested in an emergency

12   situations to provide services at institutions where

13   there were limited to no psychiatrists.

14   Q.    Based on your knowledge, do you have an estimate

15   of how often supervisors performed line staff duties in

16   CDCR?

17   A.    This is a guesstimate, but I would say --

18         MS. THORN:  Objection.  Calls for speculation.

19   BY MS. ELLS:

20   Q.    Go ahead and answer.  You understand what an

21   estimate is, as opposed to something you don't actually

22   know about?

23   A.    Correct.

24   Q.    Please give me your best estimate.

25   A.    I would say less than 50 percent but more than a

1   third.

2       Q.      Did you ever study how common it was for

3   supervisory psychiatrists to perform line staff duties?

4       A.      I did not take that study on.

5       Q.      And to your knowledge, nobody else studied that

6   at the headquarters level either?

7       A.      To my knowledge, correct, no one had looked into

8   it.  At the point at which it became more concerning,

9   when we realized it was fairly common and we knew that

10  the numerator and denominator of the data had

11  specifically excluded those people from providing

12  services, that's at which there was more internal

13  discussion amongst the psychiatry team about what is

14  being presented versus what is actually happening.

15      Q.      What numerator and denominator are you referring

16  to?

17      A.      This is in the productivity reports, performance

18  reports.

19      Q.      And the performance reports, did you look at

20  them?

21      A.      Yes.

22      Q.      What did you think about them?  Were they useful

23  to you?

24      A.      They were useful.  I think quality management

25  provides information to be able to enhance performance

Kevin Kuich, M.D.                                    September 19, 2019

1    and move the ball forward.   Quality management in mental

2    health not only provided the information, but mandated

3    the solution so it became a problem.

4    Q.     So it sounds to me you looked at that data out

5    of necessity.   Is that correct?

6    A.     Correct.

7    Q.     Could you describe to me your concern that you

8    articulated earlier about how the numerator and

9    denominator were utilized with that data?

10   A.      In terms of appointments seen and those kinds of

11   measures, there were certain data points that would be

12   brought in, and so those data points were specifically

13   looking at staff psychiatrists for completion.  And we

14   knew that there was senior psychiatrists and chief

15   psychiatrists that were also providing services, so the

16   concern was that there was a -- could be an appearance

17   that we were being highly productive but not including

18   everybody in there in terms of the numerator and

19   denominator.  It could provide the appearance of meeting

20   compliance timelines and meeting all requirements with a

21   limited number of staff, which could be used in a way to

22   say the staff that we have, although not enough, is

23   adequate to complete our compliance requirements.

24   Q.     And you're referring there to the number of line

25   staff that were being reflected in this data point and

Kevin Kuich, M.D.                                      September 19, 2019

```
 1    triggering compliance data from the line staff numbers;
 2    is that accurate?
 3           MS. THORN:  Objection.  Leading.
 4           THE WITNESS:  That is accurate.
 5    BY MS. ELLS:
 6     Q.    In your experience, why do supervising
 7    psychiatrists perform direct patient care duties?
 8     A.    Psychiatrists as physicians do have the
 9    Hippocratic Oath to do the best we can for our patients.
10    There also are the mandates and the agreements that we
11    have as an organization in terms of the frequency of
12    visits and the content of the visits and other things
13    that we measure, such as MAPIP, that are relevant and
14    that are regularly evaluated at the local level and the
15    system level.
16     Q.    And why would supervisory psychiatrists need to
17    do that work?
18     A.    If there were -- I don't know how much you've
19    seen of the dashboard, and perhaps it's changed in the
20    time I've been away -- red, green and yellow.  You never
21    want it to be red.  And there were certain institutions,
22    if you were red, it was a problem.  And it was not the
23    sense of solving an organizational problem of why is it
24    red, do we have adequate custody resources to bring
25    patients out, do we have adequate office space to see
```

Kevin Kuich, M.D.                                    September 19, 2019

1   these patients in, do we have adequate schedulers and

2   all kinds of things, but more this is red and it's your

3   fault, so you better fix it by next month.

4           So it was less than a collaborative approach,

5   looking at the system issues that were causing a measure

6   to be red.  So someone in a leadership position is

7   always squeezed in that middle management, and they'll

8   do the best they can to try and change that red to a

9   yellow, or ideally to a green.  And in many instances,

10  that would be doing the task themselves.

11   Q.    Do supervisory staff perform important functions

12  in their roles as managers?

13   A.    Yes.

14   Q.    What are those tasks?

15   A.    Those tasks should be varied.  Obviously they

16  want to be a role model, first and foremost.  They want

17  to be supportive of their staff.  They want to ensure

18  there's appropriate training for the staff.  They want

19  to be able to provide appropriate feedback and

20  supervision about how a task is being done.  They're

21  also responsible for the deployment of resources at the

22  institution and managing any emergencies or other things

23  with respect to how staff can be utilized.  They're also

24  responsible for making processes efficient and

25  streamlined so that at least for the psychiatrists, that

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    their time is well spent on the right tasks to be able
 2    to deliver the care that's needed.
 3     Q.    Do supervisory psychiatrists perform any
 4    mentoring or quality assurance tasks for the line staff
 5    that they supervise?
 6     A.    They should, yes.
 7     Q.    And is that a core function of what they do?
 8     A.    It should be a core function of what they do.
 9    In some instances, because they had other duties to take
10    care of patients themselves, it was something that was
11    relegated to a chief of mental health or someone else
12    because they couldn't perform that task.
13     Q.    Are chiefs of mental health typically
14    psychiatrists?
15     A.    No.
16     Q.    In the circumstance you just described, you said
17    that sometimes the chiefs of the mental health, who are
18    not psychiatrists, would be evaluating the work and
19    mentoring psychiatrists; is that correct?
20          MS. THORN:  Objection.  This goes way beyond
21    the scope of the September 17, 2019, order under
22    Issue F or under any of the other issues.
23    BY MS. ELLS:
24     Q.    Go ahead and answer.
25     A.    There were some instances where the chief of
```

Kevin Kuich, M.D.                                    September 19, 2019

1   mental health would provide explicit direction to

2   psychiatrists.  There would not be, to my knowledge,

3   specific directives to use a specific medication or

4   those kinds of things, but the general allocation of

5   psychiatrists, the general support of psychiatrists

6   oftentimes did fall on the chief of mental health.

7    Q.    In your experience, was that caused by

8   supervisory psychiatrists having to perform other types

9   of work that took away their ability to do that task?

10        MS. THORN:  Objection.  Leading.

11        THE WITNESS:  It could be related to the

12  psychiatrists having to do other tasks.  It could be

13  related to the absence of a leader at that

14  institution.  Those are probably the two most common

15  instances.

16  BY MS. ELLS:

17   Q.    Should supervisory psychiatrists perform

18  mentoring and quality assurance duties for the people

19  they manage?

20   A.    Absolutely.

21   Q.    If supervisors are required to perform line

22  staff duties, in your experience, would that affect

23  their ability to do the rest of their supervisory job?

24   A.    Yes, it would.

25   Q.    You testified earlier that the human resources

Kevin Kuich, M.D.                                September 19, 2019

```
 1   data about staffing needs at individual institution was,
 2   in your experience, delayed and flawed.  Could you
 3   explain what you mean by that?
 4    A.      Depending on how things were coded in human
 5   resources would determine -- let me rephrase that.
 6           Depending on how things were reported from human
 7   resources could leave a question whether there was a
 8   person physically there to perform services or not.  For
 9   instance, if someone was disabled or on a temporary
10   medical leave, we may not know if they're able to
11   provide certain services at all, if they're totally
12   unavailable.  The time frame to get that data back from
13   human resources back down, it was not realtime in any
14   way, shape, or form.  When we did the tele psychiatry
15   phone calls, it was to get, realtime, how many boots do
16   you have on the ground, regardless of what their status
17   is.  How many people are seeing patients, that was the
18   basic question.  And that level of realtime accuracy was
19   not routinely -- I would say not even routine.  It was
20   not available through the HR data.
21    Q.      Do you know who was in charge of producing that
22   HR data that you looked at?
23    A.      I would get the data -- if it was available to
24   me, would be from Ms. Ponciano.
25    Q.      It sounds like you didn't routinely use that
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    data in your job.  Is that accurate?

 2     A.    Correct.

 3     Q.    Did you ever complain to anyone about that data

 4    and its inability to serve the purposes that you needed?

 5     A.    Yes.

 6     Q.    What did they tell you?

 7     A.    I was reassured that the data was accurate and

 8    it was realtime and there was nothing wrong with it.

 9     Q.    Did they -- did they know that you were making

10    monthly phone calls -- pardon me.  Strike that.

11          Did anyone outside of psychiatry know that you

12    were making phone calls to find out about realtime

13    psychiatric need at the institutions?

14     A.    These reports were provided to Ms. Ponciano, and

15    as they preceded me, I don't know what her understanding

16    would have been how these reports were produced.

17     Q.    So it sounds like Ms. Ponciano knew that you

18    were conducting these monthly phone calls.

19     A.    Correct.  She at one point had instructed us to

20    stop doing those phone calls and assured us that her

21    group would be able to perform those phone calls.  It

22    sounded like a wonderful opportunity to be able to

23    utilize my at then tele psychiatry staff in a different

24    manner.  However, when we -- when Ms. Ponciano and

25    myself collaborated on another similar type of data,
```

Kevin Kuich, M.D.                                    September 19, 2019

1    specifically for the PIPs, to determine staffing need

2    for the PIPs, I was assured that her team would be able

3    to take that on and that data would be readily

4    available.  I saw perhaps maybe two reports in the time

5    I was there.  That data was not readily available to me,

6    although her team was doing it.

7          So there was a concern, given that precedent,

8    that having this information, which is much more crucial

9    than the circumscribed PIP data, be available and

10   accurate.  I had no assurances that that would be the

11   case based on past behavior.

12   Q.    Did headquarters -- so you've testified that it

13   was relatively common for supervisors to be performing

14   line staff duties; is that accurate?

15   A.    That is accurate.

16   Q.    Did you tell headquarters staff about your

17   perception of how common that was?

18   A.    Could you define headquarter staff?

19   Q.    Anyone outside of the psychiatry department.

20   Katherine Tebrock; did you ever talk to her about how

21   common you thought it was, based on your understanding

22   and what was happening in the field, for supervisors to

23   be performing line staff duties?

24   A.    I'm sure at some point with Ms. Tebrock there

25   was that discussion.  I don't recall exactly when.

Kevin Kuich, M.D.                                       September 19, 2019

1    Q.    Are you confident that conversation occurred?

2    A.    I'm confident that that conversation occurred in

3    some context, likely in a group meeting, not necessarily

4    a one-on-one context.

5    Q.    Anybody else from headquarter staff that you

6    might have conveyed that message to?  I mean somebody

7    outside of psychiatry.

8    A.    Likely Dr. Brizendine, as she would also be

9    involved with that.  And likely Ms. Ponciano as well.

10   Q.    Are you confident that those conversations

11   occurred at some point, even if you don't remember the

12   date?

13   A.    I'm confident in some group somewhere, those

14   were discussed that that had happened.

15   Q.    Were those topics that you ever raised with

16   them?

17   A.    That, I can't speak to.

18   Q.    But you -- you're confident you were in meetings

19   when this issue was raised?

20   A.    Those would be common issues that Dr. Golding

21   would raise.  And I generally was in meetings which

22   involved Dr. Golding as well.

23   Q.    Could you say what time frames those meetings

24   occurred in?  Would it have been in the time frame where

25   you were chief of tele psychiatry?

1   A.      Most likely chief of tele psychiatry and perhaps

2   maybe six months before that, that time frame.

3   Q.      Okay.

4   A.      I was just going to say there were many things

5   that, you know -- those were many concerns that were --

6   that were brought up, and likely they were brought up

7   also in the context of tele psychiatry.  I apologize for

8   bringing that in.  You know, as we looked at cell side

9   tele psychiatry and how frequently it was occurring,

10  that also became kind of one of these big, large issues

11  of do you realize how frequently this is happening,

12  because it's not captured accurately in any data that's

13  available.

14  Q.      Could you explain what you're talking about

15  there a little bit more?

16  A.      These types of conversations where there would

17  be questions about supervisors doing tasks and other

18  people -- other psychiatrists doing tasks in ways that

19  are unexpected or people aren't particularly aware of,

20  that -- those types of conversations would usually be

21  hand in glove.  And so my role as a chief tele

22  psychiatry -- those are discussions that would happen,

23  as well, to be able to provide information about how

24  frequently these types of things are happening and why,

25  usually brought up in the larger context of why are we

Kevin Kuich, M.D.                                    September 19, 2019

1    having to do cell side tele psychiatry, why does someone

2    on the ground have to be going to the cells, why aren't

3    these patients being brought out, is there an access

4    issue, there's a physical space issue, what's happening.

5    And those kind of discussions would be more of the, we

6    need information to know why is this happening so we can

7    address it and fix the choke point, if it's a particular

8    yard and a particular institution, maybe involving

9    particular staff that need retraining or some ability to

10   help organize their resources in a different way.

11   Q.     If you had more psychiatric staff on the ground,

12   would those problems have been lessened?

13   A.     Yes.

14   Q.     The neutral expert reviewed an analysis provided

15   by Angela Ponciano, who you referenced already.  She

16   provided analysis of five months of data from 2017 and

17   2018 that showed a very low number of EOP and CCCMS

18   appointments being conducted by supervisors.  She

19   calculated that it was only equivalent to 1.75 FTEs

20   systemwide for that entire five-month period.  Does that

21   seem accurate to you?

22           MS. THORN:  Objection.  Lack of foundation.

23   You have not established any personal knowledge from

24   this witness with respect to the report you're

25   referencing or the analysis you're referencing.

Kevin Kuich, M.D.                                    September 19, 2019

1    BY MS. ELLS:

2      Q.    Go ahead and answer that based on my

3    representation.

4      A.    Based on my experience of being with the people

5    in the field and also talking with them through the EHRS

6    and staffing matters, that number does seem rather low.

7      Q.    How low would you estimate that it is?

8    Significantly low?  A little bit low?  Do you have any

9    estimate?

10     A.    I would say significantly low.  Certain

11   institutions are very well staffed, and I wouldn't

12   expect those supervisors or chiefs to be able to provide

13   any patient care services.  I can count them on one

14   hand.  The other institutions are the ones that are more

15   -- more need to be able to -- because they weren't the

16   bodies on the ground to be able to provide the services.

17           I don't know what time frame that data was

18   coming from, but I would make mention that prior to the

19   EHRS, all of that information about appointments and who

20   did it and all that was manually entered, so it was a

21   paper process.  So it would be interesting to me in an

22   academic sense to know what time frame were those

23   numbers pulled from, whether it was the EHRS or the

24   non-EHRS era.

25     Q.    The time frame was late 2017 through 2018, five

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   months of data in that time frame.  Would that change
 2   anything about your testimony?
 3          MS. THORN:  Objection.  Lack of foundation.
 4          THE WITNESS:  So that would be the EHRS --
 5   that would be the EHRS data, which would require the
 6   psychiatrist to put that information in the system to
 7   have it recorded.  The other thing that I would
 8   mention in keeping with the paper system is there's
 9   no one-to-one correlation between an appointment
10   order and a note actually documented, so.
11   BY MS. ELLS:
12    Q.    But just restating my question with respect to
13   this five months of data from 2017 -- late 2017, through
14   2018, which you've testified after rollout of EHRS,
15   Ms. Ponciano estimated that the total number of EOP and
16   CCCMS appointments conducted by supervisors for that
17   entire five-month period systemwide was 1.75 FTEs.
18    A.    Again, I would say that would be significantly
19   low.
20          And let me expand on the point I was trying to
21   make that I did not make.  Apologies.  In the EHRS, to
22   get that data would be coming from the check-in and
23   check-out information.  If a psychiatrist put a note in
24   the system and saw a patient but didn't put that in
25   there, it would show a significantly lower number than
```

Kevin Kuich, M.D.                                    September 19, 2019

 1   what's actually happening.  If you look at the

 2   complicated work flow of the EHRS, to put in ad hoc or

 3   other orders so they show up in the EHRS scheduling

 4   system -- and that is exactly what is counted.  It's not

 5   counted one to one for an actual note.  It would be -- I

 6   would suspect that there are more people that placed a

 7   note in the system just to be able to take care of the

 8   patient but did not place a scheduling order in the

 9   system, thereby having the numbers skewed to the lower

10   end because it's an extra workload and extra burden, but

11   there's a note in the system to indicate that the

12   patient was seen by a supervisor.

13    Q.    You testified earlier that it was common during

14   your EHRS training rollout for supervisors to be taken

15   out of the training in order to provide line staff

16   functions.  Would that affect whether or not they -- the

17   supervisors understand how to use EHRS properly?

18         MS. THORN:  Objection.  Beyond the scope of

19   the September 17th order.

20   BY MS. ELLS:

21    Q.    Go ahead and answer.

22    A.    Yes.  There were several institutions where the

23   supervisors provided absolutely no training, despite

24   being provided extensive T for T training at

25   headquarters, which required me to go to those

Kevin Kuich, M.D.                                  September 19, 2019

```
 1   institutions and provide that training to the staff
 2   psychiatrist because it was not provided accurately.
 3     Q.    Were those -- in your experience, were the
 4   supervising psychiatrists provided adequate training on
 5   how to use EHRS?
 6           MS. THORN:  Objection.  Beyond the scope of
 7   the order.
 8           THE WITNESS:  The training was providing them
 9   with all the requirements that they needed to perform
10   their tasks.
11   BY MS. ELLS:
12     Q.    Are those tasks supervisory tasks or all
13   psychiatric tasks, including line staff tasks?
14     A.    They're, I would say, 95 percent all line tasks,
15   and 5 percent have to do with supervisory tasks.  In
16   that 5 percent, that would involve cosigning orders or
17   approving non-formulary medications or someone -- that
18   would require someone at a higher level to move that
19   process forward.
20     Q.    Do you feel that psychiatrists during the EHRS
21   rollout received adequate training on how to perform
22   this function of checking patients in and out that
23   reflects what appointments are actually captured in the
24   system?
25           MS. THORN:  I'm going to object that the
```

Kevin Kuich, M.D.                                     September 19, 2019

```
 1   entire line of questioning regarding the training
 2   under the EHRS that was done or not done does not in
 3   any way address the questions the Court asked of this
 4   witness under Issue F.
 5           MS. ELLS:  Goes to the accuracy of
 6   Ms. Ponciano's data according to how he knows.
 7           MS. THORN:  Training does not go to
 8   Ms. Ponciano's data.  Okay.  I've lodged my
 9   objection.
10           THE WITNESS:  The scheduling portion of the
11   EHRS was -- throughout the rollout still was having
12   many refinements happening.  Scheduling orders
13   weren't going to certain places.  Things weren't
14   happening in a timely manner.  So there was ongoing
15   updates and other kinds of things -- excuse me --
16   that needed to occur with respect to the scheduling.
17   So what was originally placed in training manuals and
18   other things were definitely the bare bones, but then
19   as more scheduling components were added and
20   continued problems with scheduling, those refinements
21   might not have always made it to the line staff
22   level.
23   BY MS. ELLS:
24    Q.    And what about to the supervisory staff level?
25   Would it have made it to them?
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.     It should have made it to them.  We did have

 2    regular trainings that were made available.  They

 3    weren't mandatory.  So if they attended the training,

 4    they would know what updates are happening in the EHRS.

 5    Q.     Let's take a short break.  Maybe ten minutes.

 6           (Whereupon, a break was taken.)

 7    BY MS. ELLS:

 8    Q.     Doctor, you testified earlier that you received

 9    phone calls from individual institutions asking for

10    additional psychiatric resources.  Is that accurate?

11    A.     That is accurate.

12    Q.     How commonly did you get those phone calls?

13    A.     Several times a month.

14    Q.     Were there certain institutions that called you

15    more frequently than others?

16    A.     Yes.

17    Q.     Did you receive phone calls like that from most

18    of the institutions?

19    A.     Certainly the central valley institutions were

20    very common, Pelican Bay was very common.  Sometimes I

21    would receive requests from the CEO of the organization

22    or the Chief of Mental Health as well.

23    Q.     And they were always calling you asking for more

24    psychiatric resources specifically?

25    A.     Correct.
```

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    And did you receive e-mails about things like

2    that as well or just phone calls?

3    A.    Mostly phone calls, but there were some e-mails.

4    Q.    And would you say those were happening at about

5    the same frequency or less frequent?

6    A.    E-mails were probably less frequent.  I think

7    people preferred to have the telephone call to be able

8    to hear the angst in their voice to move the ball

9    somewhat.

10   Q.    What type of angst were they expressing to you?

11   A.    Concern about being able to meet the needs of

12   the patient in a timely manner.  Concern for how they

13   would cover a particular yard or a particular level of

14   care given the absence.  And oftentimes it might also

15   involve a discussion about the dashboard numbers, kind

16   of where they are and why they're struggling.

17   Q.    Do you recall going with Dr. Golding to CHCF in

18   July of 2018?

19   A.    Yes, I do.

20   Q.    What was the purpose of that visit?

21   A.    Ms. Tebrock had tasked psychiatric -- well,

22   there were two times.  I believe the one that you're

23   referring to had to do with the EOP evaluation.

24        MS. ELLS:  I'll provide you with an exhibit

25   that may help you recall.

Kevin Kuich, M.D.                                    September 19, 2019

```
 1                    (Plaintiff's Exhibit No. 3 was marked for

 2                    identification.)

 3    BY MS. ELLS:

 4     Q.    This is an e-mail string of two e-mails that

 5    Dr. Golding attached as Exhibit AA to his report that

 6    was filed in federal court.  These are e-mails dated

 7    Tuesday, July 17th, 2018, both of them.  They are both

 8    from Dr. Golding to you, and the subject for both is

 9    "CHCF clinic model."

10          Go ahead and review this e-mail, and then I'd

11    like to ask you a couple questions about it.

12     A.    Yes.  The -- this -- this is helpful.  We had

13    also been there for the -- for the PIPs, as well, so

14    that's why I wanted to be sure which visit we were

15    talking about.

16     Q.    Great.  You recall this visit?

17     A.    I do recall the visit, yes.

18     Q.    And is Dr. Golding's e-mail an accurate

19    depiction of your visit?

20     A.    It is an accurate depiction.

21     Q.    Doctor, could you explain to me the purpose of

22    this visit?

23     A.    This was part of the clinic model tour that was

24    requested by Ms. Tebrock to specifically look at EOP

25    institutions and evaluate whether they currently have a
```

Defendants object that 51:1-20 & Exhibit 3 are outside the scope of the September 17 Order.

Plaintiffs respond that these are relevant to supervisors acting as line staff issue, per 51:7-52:21.

Kevin Kuich, M.D.                                    September 19, 2019

```
1   clinic model or what are the barriers to implementing a
2   clinic model.
3         MS. THORN:  Objection.  This exhibit and line
4   of questioning does not appear to be within the scope
5   of the September 17 order.
6   BY MS. ELLS:
7    Q.    Doctor, I would like to refer you to the final
8   -- second-to-the-final page of the exhibit, the last
9   page that has narrative text.  In the second-to-last
10  paragraph, this e-mail says "Dr. Atkins," who I
11  understand is the -- was at that point the chief
12  psychiatrist at this facility.  Is that your memory?
13   A.    That is my memory, yes.
14   Q.    This says "Dr. Atkins fills in for her
15         psychiatrists and sees patients, like more than
16         half, about 60 percent of the chiefs and senior
17         supervisors across the state."
18         Do you recall speaking with Dr. Atkins about
19  whether she sees line staff -- or I mean, sorry, whether
20  she sees individual patients as a psychiatrist?
21   A.    Yes.
22   Q.    Was it her estimate that more than 50 percent,
23  about 60 percent, of the chiefs and senior supervisors
24  across the state also saw individual patients?
25   A.    That wouldn't -- Dr. Atkins likely wouldn't be
```

Kevin Kuich, M.D.                                    September 19, 2019

1    in a position to speak to across the state.  At that

2    time, I believe we were just starting to have the chief

3    psychiatry -- I forgot what we called it, but kind of a

4    gathering of all of the chief psychiatrists across the

5    state.  That hadn't happened ever.  So that was just in

6    its gestation, to be able to have an ability to have all

7    the chief psychiatrists talk and find out what they're

8    doing.  So I don't think Dr. Atkins at that time would

9    have had that ability to speak with authority to state

10   -- at a statewide level, that that would be accurate.

11    Q.    Does this appear -- this appears to be

12   Dr. Golding's estimate, then.  Is that your read as

13   well?

14    A.    That's my read; correct.

15    Q.    Do you agree with his estimate that more than

16   half, about 60 percent, of the chiefs and senior

17   supervisors across the state fill in for their staff

18   psychiatrists and see patients?

19    A.    In my earlier estimate, I said about a third to

20   a half somewhere around there.  That would be about my

21   estimate.

22    Q.    Okay.  You mentioned that there was a summit of

23   sorts of chief psychiatrists.  Did that occur while you

24   were still at CDCR?

25    A.    Yes.

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    Q.    Did you attend that?

 2    A.    I attended it and organized it.

 3    Q.    At that meeting, did the chiefs of psychiatry

 4   express anything about whether they and their

 5   supervisors were seeing patients?

 6    A.    I don't recall in that meeting, but that was the

 7   discussion.  In that meeting, there was more of it being

 8   the first time to be able to kind of have everyone come

 9   together, recognize what the concerns are, what the

10   issues are, and use that as a forward -- format to be

11   able to have further discussions.

12    Q.    Was the need for additional psychiatrists one of

13   the topics at that?

14    A.    Yes.

15    Q.    And what did the chiefs generally say about

16   their need for psychiatrists?

17          MS. THORN:  Objection.  This is beyond the

18   scope of the September 17 order.

19   BY MS. ELLS:

20    Q.    Go ahead.

21    A.    Similar to their contacts that they've -- that I

22   had with them in the EHRS rollout and when they would

23   contact me, that there's a constant -- constant need for

24   psychiatrists of any ilk, whether they were

25   telepsychiatrist, on-site psychiatrist or contract
```

Kevin Kuich, M.D.

Defendants object to 54:6-20 & Exhibit 4 as calling for speculation and lacking foundation.

Plaintiffs respond that witness is testifying within personal knowledge of CDCR data reporting and familiarity with psychiatry practices and compliance efforts within the scope of Chief of Telepsychiatry position. Foundation established at 54:21-55:10; 104:6-105:25; 242:16-244:20; 252:4-253:9.

1    psychiatrist.

2    Q.    So they would take anybody?

3    A.    They would take anybody.

4    Q.    I'd like to provide you with three more

5    documents.

6                    (Plaintiff's Exhibit No. 4 was marked for

7                    identification.)

8    BY MS. ELLS:

9    Q.    This is a document that was filed in the

10   district court on March 30th, 2017.  It's entitled

11   "Declaration of Katherine Tebrock in Support of

12   Defendants' Response to the Special Master's Report On

13   the Status of Mental Health Staffing and the

14   Implementation of Defendants' Staffing Plan."

15          Could you please turn to page 9 of this, using

16   the pagination at the top of the document.  This is a

17   chart that's entitled "Mental health staff psychiatrist,

18   staffing versus compliance," and it's dated 2/23/2017."

19   Is that what you're looking at?

20   A.    Yes.

21   Q.    This document shows each institution's number of

22   allocated staff positions -- staff psychiatrist

23   positions -- excuse me -- what percentage of those

24   positions are vacant, and then reports on various

25   compliance indicators and their results.  Is that what

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   it appears to you?

 2   A.      Yes.

 3   Q.      Are you familiar with these metrics that are

 4   reported here?

 5          MS. THORN:  So, objection.  Lack of

 6   foundation.

 7   BY MS. ELLS:

 8   Q.      Are you familiar with the metrics that appear

 9   here?

10   A.      I'm familiar with the metrics, yes.

11   Q.      Have you ever seen this document?

12   A.      No.

13   Q.      Now, in your terminology within CDCR, a staff

14   psychiatrist would be the same as a line psychiatrist,

15   right?

16   A.      Correct.

17   Q.      So you just testified that you've never seen

18   this chart, correct?

19   A.      Correct.

20   Q.      So you didn't review it before it was filed?

21   A.      Correct.

22   Q.      You didn't confirm that it was accurate,

23   according to your understanding of the institutions?

24   A.      Correct.

25          MS. THORN:  Objection.  Lack of foundation.
```

Kevin Kuich, M.D.                                September 19, 2019

```
 1   BY MS. ELLS:
 2    Q.    And do you know if any headquarters psychiatrist
 3   looked at this charge, to your knowledge?
 4          MS. TRAPANI:  Objection.  Lack of foundation.
 5   BY MS. ELLS:
 6    Q.    To your knowledge.
 7    A.    I have no knowledge of a psychiatrist seeing
 8   this and approving it.
 9    Q.    So this document shows the number of staff
10   psychiatrists, the percentage of vacant staff
11   psychiatrist positions, and then shows a metric called
12   "timely psychiatry contacts" in the fifth column.  Does
13   the data on this chart, particularly in the "timely
14   psychiatric contacts" column, appear to be an accurate
15   depiction of the care that was being provided by the
16   number of staff psychiatrists reported in this chart in
17   January 2017?
18          MS. THORN:  Objection.  Lack of foundation.
19          THE WITNESS:  For the institutions that are
20   not heavily staffed, it seems higher than I would
21   expect.
22   BY MS. ELLS:
23    Q.    This chart's title says that it includes only
24   staff psychiatrists.  Is it your understanding that
25   assuming that these indicators are accurate, the
```

Kevin Kuich, M.D.                                    September 19, 2019

1    compliance numbers here reflect work done only by staff

2    psychiatrists?

3         MS. THORN:  Objection.  Lack of foundation.

4         THE WITNESS:  Given that there are seniors and

5    chiefs that provided work, I would say that it does

6    not solely represent staff psychiatrists.

7    BY MS. ELLS:

8    Q.    In the state's April 13th, 2017, brief about

9    staffing, that brief relies on this chart, and it

10   highlights a prison called SVSP.  Are you familiar with

11   that prison?

12   A.    Yes, I am.

13   Q.    The state said that this chart proves that SVSP

14   is performing well with only 5.8 staff psychiatrists and

15   with only 55 percent of the -- pardon me, and only

16   45 percent of their psychiatry positions unfilled.  To

17   your knowledge, does the 5.8 number accurately represent

18   the number of psychiatrists who were performing line

19   staff function at SVSP at the time?

20        MS. THORN:  Objection.  Lack of foundation.

21   Mischaracterizes the data and the evidence submitted

22   in support of both the filing and the statements in

23   the filing itself.

24   BY MS. ELLS:

25   Q.    Did you understand the question?

```
 1    A.    Yes.  SVSP was always requesting additional
 2    staff.  They, I believe, had utilized telepsychiatry
 3    services, and it was -- because of their mission, it was
 4    always difficult for them to complete tasks that needed
 5    to be done.
 6    BY MS. ELLS:
 7    Q.    So does this data look accurate as to the
 8    performance of SVSP's 5.8 staff psychiatrists?
 9          MS. THORN:  Objection.  Lacks foundation.
10          THE WITNESS:  It seems to me to be on the high
11    side.
12    BY MS. ELLS:
13    Q.    As in overstating?
14    A.    As in overstating, correct.
15    Q.    Did SVSP, to your knowledge, ever request
16    additional resources because -- strike that.
17          Are you aware of as to whether SVSP's
18    supervisors ever performed line function duties?
19    A.    Yes.  I believe Dr. Gill who is the -- at least
20    was at the time, would do consultations on patients and
21    would see -- would see patients.  I don't know the
22    frequency, but I know that he was seeing patients.
23    Q.    And would that have been in the 2017 time frame,
24    do you know?
25    A.    I'd say it's highly likely.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    Q.    The state also asserted in its briefs that rely

 2   on this same chart and with Katherine Tebrock's

 3   declaration about this chart, CDCR did not need any more

 4   psychiatrists to comply with the program guide and

 5   provide adequate care.  Would that have been your view

 6   at the time?

 7         MS. THORN:  Objection.  Lack of foundation.

 8         THE WITNESS:  No.  They certainly had reached

 9   out on multiple occasions, requesting additional

10   psychiatrists.  They did have several tele

11   psychiatrists.  I don't know if they were in that

12   time frame, but I know somewhere around that

13   time frame there was tele psychiatrists that were

14   working there as well.  And they did have

15   difficulties trying to kind of manage all of their --

16   all of their needs.

17   BY MS. ELLS:

18    Q.    Could I restate the question?

19    A.    Uh-huh.

20    Q.    I believe that you were talking just about SVSP.

21   Is that correct?

22    A.    That is correct.

23    Q.    Okay.  So the state's brief actually said that

24   overall in the system, the number of staff psychiatrists

25   in 2017 that were actually on the ground were a
```

Kevin Kuich, M.D.                                        September 19, 2019

1    sufficient number to provide adequate care and comply

2    with the program guide.  Was that your understanding of

3    what was actually happening in the field?

4     A.     That was not my understanding.

5     Q.     Could you explain a little more about that?

6     A.     The field was having significant trouble trying

7    to make their regular contacts.  Some institutions,

8    again, did better than others, depending on -- San

9    Quentin, fully staffed.  That wasn't an issue.  Some of

10   the CCC institutions, very easy, fully staffed, not a

11   problem.  The other institutions that had MHCBs, PIPs or

12   EOPs had routinely had difficulties, especially those

13   with ad segs, had difficulties being able to make their

14   contacts in a regular manner.  Many of the contacts were

15   not made in a confidential office setting.  They were

16   cell side.  They were ad hoc.  So these numbers seem

17   rather high.

18          In terms of MAPIP, which is also on the chart,

19   this certainly was reflecting a point -- the MAPIP at

20   that time was reflecting a point in time.  It hadn't

21   rolled out to the larger, more detailed MAPIP.  So -- so

22   MAPIP is a series of measures that occur at -- baseline

23   at three months and annually.  These measures for MAPIP

24   were basically recorded within one year, did anything

25   happen.  And so it really did not hold to the true MAPIP

Kevin Kuich, M.D.                                    September 19, 2019

 1   requirements or obligations, so I'm not surprised to see

 2   those as significantly high as they are.

 3     Q.     You discussed earlier a little bit about SVSP,

 4   and you mentioned specifically a psychiatrist that you

 5   recall or estimate his name to be Dr. Gill.  Is that

 6   right?

 7     A.     Correct.

 8     Q.     Dr. Gill was a supervisor?

 9     A.     He was -- I'm not sure if his title was senior

10   psychiatrist, supervisor or chief psychiatrist, but he

11   was --

12     Q.     A supervisor?

13     A.     -- a supervisor.

14     Q.     And, Doctor, MAPIP is a medication management

15   tool; is that right?

16     A.     Correct.

17     Q.     Just for the record.

18     A.     That's -- it addresses the required monitoring

19   to have a safe use of medications and medication

20   therapy.

21     Q.     And that's -- can a nondoctor perform that

22   function?

23          MS. THORN:  Objection.  Vague and ambiguous as

24   to "function."

25   BY MS. ELLS:

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    Can a nondoctor adequately assess medication

2    compliance and management for patients?

3    A.    No.    There were -- in the auditing of MAPIP,

4    there were nondoctors that would be able to count how

5    many widgets were completed, but that isn't the actual

6    clinical determination of what's needed.    MAPIP is a

7    bare minimum that's required to be able to ensure a

8    modicum of safety.    The clinical decision-making of a

9    psychiatrist involves encompassing that bare minimum,

10   but also going beyond that, based on individual patient

11   characteristics and needs.

12          MS. ELLS:    I would like to provide three more

13   documents at this point.

14                    (Plaintiff's Exhibit No. 5 was marked for

15                    identification.)

16                    (Plaintiff's Exhibit No. 6 was marked for

17                    identification.)

18                    (Plaintiff's Exhibit No. 7 was marked for

19                    identification.)

20   BY MS. ELLS:

21   Q.    So the court reporter has handed you three

22   documents.    Exhibit 5 is an e-mail from Melissa Bentz

23   dated May 17th, 2018, and it has a number of enclosures.

24   Is that accurate?

25   A.    That is accurate.

Case 2:90-cv-00520-KJM-DB Document 6430 is Filed 12/05/19 Page 64 of 80

Kevin Kuich, M.D.

Plaintiffs respond that foundation is established by staffing orders governing psychiatry staffing vacancies and 2018 staffing proposal. 73:18–74:5. Further, testimony is offered to establish that CDCR did not include Dr. Kuich or other headquarters psychiatry staff this document, which is established by the face of the document. 73:4-15.

1    Q.    And it's entitled "CDCR Psychiatry Staffing

2    Proposal," correct?

3    A.    Correct.

4    Q.    Exhibit 6 is another e-mail from Melissa Bentz.

5    This one is dated September 17th, 2018, and this is

6    entitled "Coleman Revised Psychiatry Staffing

7    Reductions."  Is that what you're seeing?

8    A.    That is what I'm seeing, yes.

9    Q.    And Exhibit 7 is a document filed in the

10    district court on 10/31/18, and it is entitled

11    "Defendants' Monthly Psychiatry Vacancy Report."

12        And I would like you to flip to the second page

13    of that.  Do you see where it reflects -- where it

14    states that "the enclosed document is CDCR's Division of

15    Healthcare Services systemwide mental health program

16    allocated and filled psychiatry positions for

17    September 2018."  Do you see that?

18    A.    I do see that.

19    Q.    I'd like to talk to you first about Exhibit 5,

20    which is an e-mail from Melissa Bentz, attaching the

21    CDCR psychiatry staffing proposal.  Do you see your name

22    on this e-mail?

23    A.    I do not see my name.

24    Q.    Do you see the name of any headquarters

25    psychiatrist on this e-mail?

Defendants object to 63:9-18 & Exhibit 7 as lacking foundation.

Plaintiffs respond that foundation is established by familiarity with CDCR's reported staffing data. 36:25-37:24; 63:9-18.

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.     I do not see the name of any headquarters

 2   psychiatrist on the e-mail.

 3    Q.     Do you see any CDCR headquarters mental health

 4   people that are not psychiatrists on this e-mail?

 5    A.     Yes, I do.

 6    Q.     Did you receive this e-mail by blind carbon copy

 7   or any other mechanism that you're aware of?

 8    A.     No.

 9    Q.     The second page begins the enclosures, and it's

10   entitled "Proposals to achieve a more efficient and

11   effective mental health services delivery system, with

12   adjustments to unneeded psychiatry positions."

13          Go ahead and take a moment and then tell me if

14   you have seen this proposal before.

15    A.     I don't believe that I've ever received a copy

16   of this directly to me.

17    Q.     Did you have any role in developing this

18   proposal?

19    A.     Some of these subtitles, I would have

20   contributed or could have contributed to, such as

21   standardize the scheduling module -- model, rather,

22   implementing a clinical model.  Those were active

23   discussions among psychiatry to try and help use --

24   better use our resources.

25    Q.     There are a number of elements of this proposal
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   that recommend reducing what CDCR called "unneeded
 2   psychiatry positions."  Go ahead and take a look.  Take
 3   your time.  Do you recall being consulted in the
 4   development of the numbers of positions being -- that
 5   CDCR recommended could be cut?
 6    A.     There was a discussion that Ms. Ponciano had
 7   with me about the eight positions for on-call coverage
 8   because it involved telepsychiatry.  That was a
 9   discussion that I was taken out of the chief of mental
10   health annual meeting, to be able to discuss what would
11   be -- what's being proposed.  A number was mentioned,
12   and I had concern that that number would be adequate in
13   terms of providing coverage for the entire state and
14   allowing for adequate redundancies for sick and those
15   kinds of things.  And I recall in that conversation I
16   was reassured that we just need to make a decision and
17   start here, and if it was determined that that wasn't
18   sufficient staffing, that we would be able to obtain
19   additional staffing to be able to provide that
20   telepsychiatry need.  So I do recall that discussion,
21   yes.
22    Q.     I'm going to return to that in a moment.
23           Do you recall being consulted about any of the
24   other reductions that are proposed in this document?
25   And, again, take your time, since you've never seen it
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    before.

 2     A.      Our meetings were generally not clear meetings

 3    with preplanned agendas.  We would have meetings where

 4    we would be called into and we would be instructed on

 5    what the plan was that was in place.

 6     Q.      And are you talking about internal meetings?

 7     A.      Internal meetings.

 8     Q.      And when you say "we," who do you mean?

 9     A.      Dr. Golding and myself.

10     Q.      So the two headquarters' chief psychiatrists?

11     A.      Correct.

12     Q.      And you described a series of meetings.  Who

13    were at those meetings, generally?

14     A.      Those would generally be Ms. Tebrock,

15    Ms. Ponciano, and Dr. Brizendine.

16     Q.      And correct me if I'm misstating this, but you

17    said that you were generally not provided with

18    documentation that was being discussed at that meeting,

19    in advance of that meeting.  Is that what you said?

20            MS. THORN:  Objection.  Misstates the

21    testimony.

22            MS. ELLS:  I'm asking him if that is what he

23    said.

24            MS. THORN:  Okay.  Objection.  Leading.

25            THE WITNESS:  Many -- it is not uncommon in
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    our meetings to have a -- perhaps a topic, but there
 2    wasn't any clear agenda about what was to be
 3    discussed, what decisions needed to be made, any
 4    pre-work or pre-information to be able to kind of
 5    review it before the meeting, especially when there
 6    became issues with such high merit, such as staffing
 7    or budgetary things or other kinds of more
 8    complicated issues.
 9    BY MS. ELLS:
10     Q.    So I'm going to rephrase the question in
11    deference to my colleague here.
12          Were you commonly provided with topics that were
13    going to be discussed, in advance of meetings with the
14    other headquarters leadership that you described?
15     A.    Not commonly.
16     Q.    Were you commonly provided with agendas for
17    those meetings?
18     A.    Not commonly.
19     Q.    Were you commonly provided with documents that
20    would be discussed during those meetings, in advance of
21    walking into the room?
22     A.    Not commonly.
23     Q.    Did you commonly receive the documents -- did
24    you commonly receive documents in the room at those
25    meetings, that you were expected to comment on?
```

Kevin Kuich, M.D.                                      September 19, 2019

1    A.    Yes.

2    Q.    Were some of those meetings about staffing

3    reductions?

4    A.    Yes.

5    Q.    But you were not provided with this proposal in

6    any of those meetings; is that correct?

7    A.    Not that I can recall.

8    Q.    Do you recall staffing meetings with those

9    members of the mental health leadership team where you

10   were asked to sign off on reductions of psychiatric

11   staffing on the spot?

12   A.    I don't recall those kinds of meetings.

13   Q.    Now let's circle back to the one topic that you

14   said from this proposal that you were consulted on,

15   which was the proposal to reduce overnight and weekend

16   crisis care allocations for staff psychiatrists

17   systemwide, and replace them with a telepsychiatrist

18   that would provide coverage for the entire state.   Is

19   that an accurate depiction of what the proposal was?

20   A.    That's accurate.

21   Q.    Could you tell me a little bit more about this

22   conversation with Ms. Ponciano where she discussed this

23   topic with you?

24   A.    There -- I was informed that there were these

25   positions that we wanted to be able to retain and allow

Kevin Kuich, M.D.                                September 19, 2019

```
 1   telepsychiatry to provide on-call services systemwide.
 2   We had already had one on-call night psychiatrist, so we
 3   had proof of concept that it was feasible and workable.
 4   And so in whatever decisions were made in terms of staff
 5   that didn't need to be made, there was a discussion that
 6   there should be a certain number of staff retained so
 7   that they could be in these on-call positions through
 8   telepsychiatry.
 9   Q.    And I believe you mentioned that Ms. Ponciano
10   raised this proposal with you by pulling you out of
11   another meeting.  Is that accurate?
12   A.    Correct.
13   Q.    Did Ms. Ponciano provide you with any
14   documentation about why eight was, in her opinion, the
15   correct number of tele psychiatrists?
16   A.    No.
17   Q.    Did Ms. Ponciano tell you what the basis for
18   that number was orally?
19   A.    There was -- there wasn't any mathematics in
20   terms of what that number was.  There was -- it seemed
21   more "back of a napkin" of here's an estimate.  And
22   certainly I knew what the one telepsychiatrist was doing
23   on call, and so I would have preferred to have an
24   ability to look at what that need would be, because
25   certain institutions are quite busy and other
```

Kevin Kuich, M.D.                                    September 19, 2019

1   institutions aren't, and so there would need to be some

2   ability to pair these individuals up so that they would

3   be able to complete the task appropriately and be

4   available to all the institutions that they're serving.

5   So there wasn't the ability to have that discussion nor

6   that reflection on whether eight is the accurate number.

7   Q.    Did you ask Ms. Ponciano for time to consider

8   this number?

9   A.    I said I had some concerns about the number.

10  And when I -- when I voiced the concerns, the response

11  back was that if this is not the correct number, we'll

12  be able to make it right in the end.

13  Q.    And did -- did Ms. Ponciano want your response

14  on the spot to whether or not this was an appropriate

15  number?

16  A.    Yes.

17  Q.    Were you given any time to think about it?

18  A.    No.

19  Q.    How long was this conversation, would you

20  estimate?

21  A.    Less than ten minutes, more than five.

22  Q.    What was your concern about whether or not eight

23  was a sufficient number of tele psychiatrists based on?

24  A.    The tele psychiatrists would be performing their

25  function in an office and they would have a number of

Kevin Kuich, M.D.                                September 19, 2019

```
 1   institutions that they would be receiving calls from.
 2   The function of the telepsychiatrist is to be able to
 3   physically see that patient, to have the patient brought
 4   in to them and to be able to see that patient and to be
 5   able to provide a mere equivalent of an in-person
 6   evaluation.
 7         Certain institutions have tremendous high needs
 8   and have a -- would have a tremendous amount of time
 9   required to be able to service that institution.  So
10   part of the larger discussion would be able to see --
11   excuse me -- what would be the institutions that a
12   particular person would serve that would allow them to
13   adequately respond to all of the calls that they would
14   be getting at the same time, because in this model, you
15   would be responding -- the telepsychiatrist that was on
16   call, as a prototype, was responding to six or seven
17   institutions.  So if you're getting three institutions
18   calling at the same time with an emergency, that one
19   psychiatrist would not be able to timely address the
20   emergencies in an appropriate way.
21         So there needed to be a detailed evaluation of,
22   could we pair up so that institutions that don't
23   typically have that many calls could be paired up with
24   an institution that has more calls.  And to that end,
25   you know, we were trying in telepsychiatry to elicit how
```

Kevin Kuich, M.D.                                    September 19, 2019

1    many calls do you get a night so we could be able to
2    come up with an estimate to be able to have a sense of,
3    you know, how busy is the telepsychiatrist going to be.
4      Q.    Could you have performed the analysis to
5    determine if, in your opinion, eight telepsychiatrists
6    was sufficient, if you had had time to do that analysis?
7      A.    Yes.
8      Q.    You said that Ms. Ponciano asked you or --
9    strike that.
10           You said that Ms. Ponciano told you that if
11   eight was an insufficient number of telepsychiatrists,
12   that you could get more; is that accurate?
13     A.    That is accurate.
14     Q.    Have you ever had an experience where you asked
15   Ms. Ponciano or anyone in mental health leadership to
16   add psychiatric positions, and they did so in a timely
17   fashion?
18     A.    I can think of no instances.
19     Q.    Can you think of any instances where you asked
20   for additional psychiatric staff, and eventually they
21   got around to it and added those allocations?
22     A.    We did have additional senior psychiatric
23   specialist added to headquarters psychiatry.
24     Q.    But not line psychiatrists?
25     A.    Not line psychiatrists.

Kevin Kuich, M.D.                                    September 19, 2019

 1    Q.    Not psychiatrists that would see patients in the

 2   field?

 3    A.    Correct.

 4    Q.    I'd like to ask you to turn to Exhibits 6 and 7

 5   at this point.  So as discussed, Exhibit 6 is a e-mail

 6   from Melissa Bentz dated September 17, 2018.  Could you

 7   please review this document?

 8          Are you copied on this document?

 9    A.    I'm not copied on this document.

10    Q.    Are any other headquarters psychiatrists for

11   CDCR copied on this document?

12    A.    No.

13    Q.    Do you see other members of mental health

14   leadership that are not psychiatrists copied on this?

15    A.    Yes.

16    Q.    This document from Ms. Bentz requests -- strike

17   that.

18          This document from Ms. Bentz adds up the

19   reductions that CDCR was proposing in their 2018

20   staffing proposal, which you testified you did not see

21   before it was sent to plaintiffs and the special master.

22   Her last paragraph says there was a total reduction of

23   79 positions.  And you understand that to mean line

24   psychiatric positions?

25          MS. THORN:  Objection.  Lack of foundation.

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   BY MS. ELLS:
 2    Q.    What do you understand that 79 positions to be?
 3    A.    Line positions.  The court -- my understanding
 4   is -- of the staffing requirements have to do with line
 5   staff positions, not seniors or chief positions.
 6    Q.    Please turn to Exhibit 7, the last page.  That's
 7   ECF Page No. 5.  This is a chart titled "Division of
 8   Healthcare Services, statewide mental health program
 9   allocated and filled psychiatric" -- or "psychiatry
10   positions, September 2018."
11         That's the same month that Ms. Bentz sent her
12   e-mail; is that correct?
13    A.    I believe so, yes.
14    Q.    I'd like you to look at the column under the
15   header "allocated July 2018 "and "total."  At the
16   bottom, the number is 405.3.  Do you see that?
17    A.    I do.
18    Q.    And is your read of this chart that that number
19   includes both on-the-ground psychiatrists and
20   telepsychiatrists?
21    A.    It looks like that number does include both of
22   those classifications.
23    Q.    So in September 2018, when defendants were
24   proposing to cut 79 psychiatry positions, that was out
25   of a number of 405.3 that were allocated?
```

```
 1              MS. THORN:  Objection.  Lack of foundation.
 2    BY MS. ELLS:
 3      Q.    Is that accurate --
 4      A.    It does --
 5              MS. THORN:  Objection.  Lacks foundation.
 6    BY MS. ELLS:
 7      Q.    Is that accurate according to what you see in
 8    Exhibits 6 and 7?
 9              MS. THORN:  Objection.  Lack of foundation.
10              THE WITNESS:  It does appear -- that's a
11    complicated question.  Can you --
12    BY MS. ELLS:
13      Q.    Sure.  So Ms. Bentz's e-mail, Exhibit 6,
14    announces that CDCR's proposal is to reduce 79
15    psychiatry positions, and you understand that to be line
16    psychiatry positions, correct?
17      A.    Correct.
18      Q.    And this monthly vacancy report, which covers
19    the same time frame as Ms. Bentz's e-mail, shows that at
20    that time, there were 405.3 total allocated psychiatry
21    positions; is that correct?
22      A.    Yes, that is correct.
23      Q.    Okay.  So I will represent to you that that is
24    about -- that 79 is about 20 percent of 405.3.  Does
25    that seem reasonable to you?
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1      A.     Yes, that seems reasonable.
 2      Q.     Did anyone ever ask you if it would be
 3   appropriate to cut 20 percent of the allocated
 4   psychiatry positions?
 5      A.     No.
 6      Q.     In your communications with psychiatrists at the
 7   institutions, did they ever tell you that they were
 8   overstaffed with psychiatrists?
 9      A.     No institution would ever say they were
10   overstaffed.  They would be quite quiet.  Folsom was
11   amazingly quiet, as was San Quentin.
12      Q.     Was it more typical that the institutions would
13   call you, telling you that they didn't have enough
14   psychiatrists?
15      A.     Yes.
16      Q.     Did any institution ever tell you that it would
17   be appropriate to cut unfilled but allocated psychiatric
18   positions, that they just didn't need them?
19      A.     No -- no institution.
20      Q.     Do you ever recall speaking with Ms. Tebrock
21   about -- well, strike that.
22             Did you ever become aware that CDCR was
23   proposing to cut a significant number of psychiatric
24   staff?
25      A.     Not until it was essentially a fait accompli.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    Q.    When would you say that was?
 2    A.    Probably around September, because it was -- the
 3   planning was October court date that we knew that there
 4   needed to be things filed, so it was shortly before the
 5   court date.
 6    Q.    Okay.  So nobody prior to that in mental health
 7   leadership asked you if it would be appropriate to
 8   provide clinical care statewide with 20 percent fewer
 9   allocated psychiatric positions?
10    A.    No.  And we generally weren't in those
11   discussions.  They were presented to us after they have
12   been discussed and completed.
13    Q.    Do you ever recall speaking with -- after you
14   became aware of this proposal to cut psychiatric staff,
15   do you ever recall speaking with anyone in mental health
16   leadership about concerns that that proposed cut did not
17   accurately reflect the role of supervising psychiatrists
18   in the performance of patient care in the institutions?
19    A.    I don't recall any individual meetings I had.
20   But, again, in the context of the larger meeting with
21   Dr. Golding that -- there were several occasions that
22   there were concerns mentioned of the dramaticness [sic]
23   of the cut.
24    Q.    And do you recall specifically discussing the
25   role of supervising psychiatrists and what they were
```

Kevin Kuich, M.D.                                    September 19, 2019

1  performing in terms of patient care, when you were also

2  discussing those cuts?

3   A.    I don't believe so.  I think the cuts were so

4  significant that they caused a pivot to that number

5  rather than the details of the numerator and denominator

6  and all those other kinds of things.

7   Q.    So correct me if I'm wrong:  Your testimony is

8  that you had on multiple occasions been in meetings

9  where the issue of supervisors performing line staff

10  psychiatry functions was raised to leadership.  And do

11  you recall expressing concerns that the reductions in

12  psychiatry staff didn't take sufficient account of how

13  often supervisors were doing that work?

14        MS. THORN:  Objection.  Lack of foundation.

15        THE WITNESS:  Yes.  I think once we saw the

16  cuts, it put in sharper contrast the data that was

17  behind representing these as reasonable cuts, and

18  that was one slice of the conversation, among many.

19  BY MS. ELLS:

20   Q.    I'd like to discuss with you a couple of pieces

21  of this proposal.  Now, unfortunately, much of it is

22  unpaginated, so you'll see that about halfway through

23  this document there is a chart that is entitled -- I'm

24  sorry.  I'm referring to Exhibit 5 here.  There is a

25  chart entitled "Timely psychiatry contacts, 10/1/17

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    through 3/31/18," and it's further titled "CCCMS and EOP

 2    from performance report last six months."

 3           Do you see that?

 4    A.    I do see that.

 5    Q.    Are you familiar with the performance report

 6    indicator called "Timely psychiatry contacts"?

 7    A.    Yes.

 8    Q.    What is it supposed to show?

 9    A.    According to the program guide, certain levels

10    of care need to have contacts within a certain

11    time frame.  And so for CCCMS, that would be, I believe,

12    if my memory serves me correctly, within 90 days, that

13    there would be a regular -- a regular contact.  And so

14    any contact that happened from the last contact that's

15    within 90 days would be considered a timely psychiatry

16    contact for CCCMS.

17    Q.    Do you know if psychiatry contacts performed by

18    supervisors are included in this indicator?

19    A.    I don't know, but I would say that they would,

20    because, again, we're not looking at who performed the

21    service; we're just looking at was the widget performed,

22    was the task performed.  So -- and because we're just

23    looking at the ambulatory organizer in the EHRS, which

24    is the scheduling aspect, if that was a task that was

25    completed and it gets sent to scheduling, it shows that
```

Kevin Kuich, M.D.                                    September 19, 2019

1   was a task completed.

2     Q.    This chart shows that 100 percent of CCCMS

3   contacts at -- with psychiatrists at four prisons were

4   completed on time for six months.  Is it your

5   understanding that it's generally possible for an

6   institution to achieve 100 percent timeliness without

7   using any psychiatric staff?

8     A.    They wouldn't be able to have 100 percent

9   timeliness without psychiatric staff.

10    Q.    I'm sorry.  Excuse me.  Without supervisory

11  psychiatric staff contributing.

12    A.    For these institutions, it would be reasonable,

13  as they are small institutions with very small demand.

14    Q.    Okay.  Could you please turn to a chart that is

15  the third-from-the-last page.  It's called "Timely

16  psychiatry contacts from 10/1/17 through 3/31/18,

17  mainline CCCMS."  This chart shows systemwide data.  Is

18  that your understanding of this chart?

19          MS. THORN:  Objection.  Lack of foundation.

20          THE WITNESS:  Based on the number, if I'm

21  assuming measurements mean that -- the number of

22  contacts, a number in the hundreds of thousands would

23  indicate systemwide data, yes.

24  BY MS. ELLS:

25    Q.    So it's your understanding that the line that's

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   called "timely psychiatry contacts" captures all
 2   psychiatry contacts occurring in this time frame for
 3   mainline CCCMS class members?
 4           MS. TRAPANI:  Objection.  Lack of foundation.
 5           THE WITNESS:  That would be my understanding,
 6   yes.
 7   BY MS. ELLS:
 8    Q.    This chart shows that 95 percent -- excuse me,
 9   94 percent of all psychiatry contacts systemwide for
10   mainline CCCMS class members are occurring on time.  In
11   your experience, could that number on a systemwide basis
12   be achieved without supervisory staff performing some of
13   those contacts?
14           MS. THORN:  Objection.  Lack of foundation.
15           THE WITNESS:  Unlikely.
16   BY MS. ELLS:
17    Q.    Okay.  How unlikely would you say that is, based
18   on --
19           MS. THORN:  Objection.  Calls for speculation.
20   BY MS. ELLS:
21    Q.    -- based on your understanding of what
22   institutions were telling you about their staffing needs
23   and the role of supervisors in performing patient care?
24           MS. THORN:  Objection.  Lack of foundation and
25   calls for speculation.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1            THE WITNESS:  I think it would be unlikely

 2    without additional resources, given the known

 3    resources on the ground.  And, again, the EHRS is not

 4    looking at what documentation was placed in the

 5    chart; it's just looking at, was a scheduling order

 6    checked in and checked out.  And so my point being is

 7    that you could have high compliance and actually have

 8    nothing done for the patient.

 9    BY MS. ELLS:

10     Q.    Do you think --

11     A.    Which likely goes against what we're trying to

12    accomplish.

13     Q.    All right.  If no psychiatry contacts that were

14    performed by supervisors were included in this measure,

15    do you think that compliance, based on your

16    understanding of what was happening in the institutions,

17    would be this high?

18     A.    No.

19     Q.    With the timeliness factor?

20            MS. THORN:  Objection.  Lack of foundation.

21    Calls for speculation.

22    BY MS. ELLS:

23     Q.    Could you repeat your answer?

24     A.    No.  I can repeat my answer.  My answer is no.

25     Q.    Thank you.  I appreciate that.
```

Kevin Kuich, M.D.                                      September 19, 2019

```
 1          This chart also says that the average number of
 2    days overdue for timely psychiatry contacts systemwide
 3    was 2.6 days late.  So I read that to mean for the
 4    6 percent that did not make it within the time frame,
 5    they were 2.6 days late.  Is that your understanding as
 6    well?
 7          MS. THORN:  Objection.  Lack of foundation.
 8    Calls for speculation.
 9          THE WITNESS:  I don't know how that number was
10    calculated, so I -- it's hard for me to say.  It
11    does -- it is conceivable that it would be for the
12    6 percent, but, again, without trying to understand
13    where that comes from, to me, you know, an overdue
14    appointment should be very clear.  Average number
15    days overdue, if it was for the 6 percent, it should
16    indicate 6 percent.  I think there's ambiguity in how
17    this is presented, and I'm somewhat -- if I were a
18    manager looking at this, I'm not quite sure how I
19    would interpret it and how I would operationalize
20    reducing that average number of days overdue.
21    BY MS. ELLS:
22    Q.    Okay.  But nobody ever showed you this chart?
23    A.    No.
24    Q.    And you were not consulted about the data that
25    was provided to the special master in support of the
```

Kevin Kuich, M.D.                                    September 19, 2019

1   reduction in psychiatric positions that was being

2   proposed?

3    A.    Correct.

4         This data is, I would say, typical of some of

5   the data that gets presented, that it -- you glance at

6   it, it looks green, it looks great, but what actually

7   does it mean?  And so to me as an observer, it would be

8   great to say average days overdue which, what is in the

9   numerator, what is in the denom- -- what does that

10  number mean.  There is no context.  And this is similar

11  to how performance data is presented and this is similar

12  to how MAPIP data is presented, that oftentimes there's

13  no context and there's numbers and there's colors.  And

14  our reptilian brain responds to that, but it really is

15  much more meaningful and it just is -- sometimes things

16  are provided without context and it's puzzling.

17   Q.    The court reporter can correct me if I'm wrong,

18  but the first exhibit marked was the Court's

19  September 17th, 2019, order.  Is that correct?

20        THE REPORTER:  I would have to look at it.

21  BY MS. ELLS:

22   Q.    Could you turn to Exhibit 2, please.  Could you

23  turn to page 3.  So we've been discussing the Court's

24  concern articulated as Issue F, psychiatric supervisors

25  acting as line staff.  In lines 17 through 19 of this

Kevin Kuich, M.D.                                  September 19, 2019

```
 1    document on page 3, using the numbering at the top -- I
 2    guess it's the same as at the bottom -- the Court asks
 3    your views, if any, about why the issue of supervisory
 4    staff acting as line staff could not be resolved
 5    successfully internally and prior to presentation of
 6    misleading information to the Court and/or special
 7    master.  What are your views on that?
 8              MS. THORN:  Objection.  Lack of foundation.
 9    And calls for speculation.
10              MS. ELLS:  And the Court's order speaks for
11    itself.
12              MS. THORN:  Well, if this witness -- it hasn't
13    been established that this witness has foundation,
14    has any personal knowledge regarding the data that
15    was submitted to the special master in connection
16    with the staffing proposals.
17              THE WITNESS:  I would think -- again, it is
18    not atypical that psychiatry would be presented with
19    information or a pathway or, this is what we're going
20    to do after it's been fully vetted by multiple people
21    and then final presents -- presents itself to us.  So
22    that would not be atypical in any way.
23              I think given the significance of the cuts
24    proposed, one would want to be very circumspect and
25    ensure that all the information is presented.  There
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                September 19, 2019

```
 1    seemed to be, for whatever reason, a very hurried
 2    approach to get this to the Court in a certain
 3    time frame.  I don't know what was beyond that, but
 4    it did seem that this was rather accelerated in terms
 5    of how court preparation and court documents would go
 6    prior to my -- prior to this instance.
 7    BY MS. ELLS:
 8     Q.    So if people had consulted with you about the
 9    information and the proposal in the psychiatric staffing
10    reduction proposal that CDCR was presenting and
11    discussing with plaintiffs and the special master over
12    the summer of 2018, would you have told them that you
13    thought it was inappropriate?
14          MS. THORN:  Objection.  Calls for speculation.
15          THE WITNESS:  I would have.  It's a tremendous
16    reduction, and I would have been much more -- wanted
17    a much more detailed dive to look at what is it being
18    based on, is that factually correct, and is this the
19    right way to move forward.
20          We were also looking at ways to improve
21    psychiatry efficiency and all kinds of other things
22    to prevent the constant retention issues that we
23    have, to improve the culture, to make it a more
24    positive culture, to have psychiatrists want to be
25    here.  And unless this was founded on rock solid
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   information, which I would never have access to
 2   because I didn't have any access to any of the
 3   databases to do queries or anything -- it's all
 4   provided, you know, after the fact.  I tend to be
 5   somewhat detailed and circumspect when it involves
 6   people's lives, whether they're going to have a job
 7   or not.  And this seemed to be moving at a very rapid
 8   pace and emerged, to my awareness, very quickly
 9   before its timeline to be able to have it filed for
10   the Court.
11   BY MS. ELLS:
12    Q.    If you had had time and access to the
13   appropriate data, could you have raised your concerns to
14   the internal mental health leadership team before they
15   turned it over to the special master and the plaintiffs?
16   And by turned it over, I mean proposed these staffing
17   reductions and presented this particular plan with the
18   attached data.
19    A.    Having time and information, I would have gladly
20   provided input.  If that input would be received and
21   acted upon is another matter.
22    Q.    Do you have reason to think it wouldn't have
23   been if you had been provided the opportunity to give
24   input on this proposal?
25    A.    There have been many instances where I've
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    expressed concerns about various things, whether it's
 2    conflicts of interest or the use of remote tele
 3    psychiatrists, that took a tremendous amount of effort
 4    to either get a hearing on and get resolution on, or it
 5    just evaporated.
 6    Q.    And when you say "get a hearing on," you mean be
 7    able to discuss it internally?  Is that what you mean?
 8    A.    Correct.  I apologize.  In the context of what
 9    we're doing today, that was --
10    Q.    We're lawyers here.
11    A.    -- ambiguous.  I apologize.
12          MS. ELLS:  I think we can take a lunch break,
13    if that timing works for people.
14                (Whereupon, a lunch break was taken at
15                12:50 p.m.).
16    BY MS. ELLS:
17    Q.    Doctor, I'd like to talk to you now about the
18    second issue that the Court has identified as you
19    potentially having information about, which is -- she
20    calls it Issue B:  Redefining monthly to lengthen the
21    intervals between enhanced outpatient EOP appointments.
22          The program guide requires that a psychiatrist
23    shall evaluate enhanced EOP -- or enhanced outpatient
24    program inmates "at least monthly to address psychiatric
25    medication issues."  Is that consistent with your
```

Kevin Kuich, M.D.                                    September 19, 2019

```
1    understanding of the obligation?

2     A.     It is.

3     Q.     CDCR has admitted that prior to December 2016,

4    it used to use 30 days as the interval to measure that

5    monthly time period.  Is that your understanding of what

6    the program guide requirement means in practice, that

7    the monthly is 30 days?

8     A.     Correct.

9     Q.     In December 2016, CDCR admits that it changed

10   the business rule to allow for periods of longer than

11   30 days to pass between EOP psychiatric appointments

12   while still being counted as timely.  Were you aware of

13   that change?

14    A.     I was not aware of that change.

15    Q.     Did at some point you become aware of that

16   change?

17    A.     Yes, I did.

18    Q.     When did you become aware of that change?

19    A.     Probably summer to fall of 2018, maybe.

20           MS. ELLS:  Okay.  Here's a new exhibit.  This

21   is going to be marked as Exhibit 8.

22                  (Plaintiff's Exhibit No. 8 was marked for

23                  identification.)

24   BY MS. ELLS:

25    Q.     This is an e-mail from Melanie Gonzalez at CDCR
```

Kevin Kuich, M.D.                                        September 19, 2019

```
 1    to Michael Golding at CDCR, and you are CC'd, along with
 2    John Lindgren.
 3    A.    (Nods head affirmatively.)
 4    Q.    It's dated Wednesday, March 22nd, 2017.
 5    A.    I guess it was earlier.  I apologize.
 6    Q.    The subject is "Re: EOP compliance change from
 7    30 days to 45 days."  Do you want to go ahead and take a
 8    look at this e-mail.
 9    A.    Uh-huh.
10    Q.    Have you had a chance to review?
11    A.    Yes, I have.
12    Q.    This e-mails says that you and Melanie
13    Gonzalez -- who is a psychiatrist in the headquarters of
14    CDCR as well; is that right?
15    A.    Currently a senior psychiatrist specialist.
16    Q.    And do you know if she was at the time, in March
17    of 2017?
18    A.    Yes, she was.
19    Q.    So the -- and that's headquarters level?
20    A.    (Nods head affirmatively.)
21    Q.    So the second paragraph here says that "Kevin
22    and I did look at the psychiatric contract rule
23    parameters last week and both agreed that 'then
24    routinely within one month, or 45 calendar days if that
25    is sooner, of the prior completion' does not make
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   sense."
 2           Is that approximately when you discovered that
 3   the parameter had been changed, about a week before this
 4   March 22nd e-mail was sent?
 5   A.      That would be consistent.  Dr. Gonzalez had done
 6   some data analysis.  Part of helping with quality
 7   management was to be able to look at these various
 8   program reports, and so that was something that I had
 9   been working with Dr. Gonzalez in -- in general, where
10   the program reports are, how do you pull the program
11   reports, you know, how do you review them, those kinds
12   of things.  So this is much, much sooner than my
13   recollection, but this is accurate.
14   Q.      How did you -- what made you think to look at
15   this particular psychiatric timeliness parameter in this
16   time frame?
17   A.      There was a tremendous focus on EOP at the time,
18   and there was also a push at -- I believe around that
19   time, to look at EOP individuals and see if they are
20   really in the right level of care.  And so that was a
21   systemwide push, not from psychiatry but from the
22   system, to be able to look at EOP patients specifically
23   and to find out, are we meeting their needs, can their
24   needs be met at a lower level of care.
25           There was also training at the same time that
```

Kevin Kuich, M.D.                                    September 19, 2019

1   Dr. John -- Dr. Jim Vess, psychologist, was doing as

2   well to be able to kind of help people understand levels

3   of care and which -- which would be the appropriate

4   level of care for a particular patient and how to

5   determine that.

6     Q.    And so what led you to look at this indicator?

7     A.    Because it had to do with EOP, it was looking at

8   all things related to EOP.  So that was certainly a

9   large focus at that time, so we were curious.

10    Q.    Was there something about it that made you want

11  to look at it more closely?  The indicator as you saw

12  it.

13    A.    There wasn't anything I recall inherently unique

14  about it, other than it was an indicator.  And typically

15  when I would work with Dr. Gonzalez with these types of

16  reports, it was my habit of going back and tracing the

17  reports back month by month to be able to kind of see

18  what changes has happened, because if there's something

19  drastic that has changed, then you want to know what

20  happened and be able to pinpoint it and track it back.

21          So there was this ability to look at the -- look

22  at the due dates, but we also -- it was also a fairly

23  common practice to be able to take that data and save it

24  in a PDF format or Excel or something so we had it.

25  Just if there was a change in data or we couldn't access

Kevin Kuich, M.D.                                    September 19, 2019

1    the database, there was something happening, we would

2    have a copy of it ourselves.

3    Q.    Did the -- in this time frame, did that indicate

4    or look strange to you at all?

5    A.    There did seem to be a significant improvement

6    in that time frame, and it was interesting why.  I liken

7    it to an improvement I noticed during a quality

8    management meeting having to do with, I believe, use of

9    nonformulary medications, that suddenly everyone who was

10   noncompliant became compliant, and we couldn't quite

11   figure out what happened.  And tracing it back, they had

12   changed the formula for that, and that resulted in a

13   better value, so.

14   Q.    How did you discover that the business rule had

15   been changed?

16   A.    The business rules -- there was a portion of the

17   program reports where the business rules were all laid

18   out, so we were in the habit of being able to understand

19   numerator and denominator and truly understand what it

20   represents.  And Dr. Gonzalez fortunately was very

21   gifted in the ability to look at that detail level and

22   realize the importance of that.

23   Q.    So did she sort of flag the issue for you and

24   then you looked as well, or how -- this e-mail says that

25   you both looked at the parameter -- or both looked at

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   the data.  Is that accurate?
 2    A.     It is accurate.  I believe she did the first
 3   pass.  At that time, I was still doing -- wearing
 4   multiple hats, so -- and I wanted to encourage her to
 5   look at those -- those metrics and measures and be
 6   comfortable with it.  And so that was something that she
 7   was not necessarily tasked with but had taken on, to be
 8   able to kind of review those on a regular basis.  And
 9   when she found something, she checked and said, Is
10   this -- you've done this.  Is this normal, not normal,
11   what is this.  And we sat and looked at it at that time.
12    Q.     What did you think about the change?  Is it
13   consistent with your understanding of what the program
14   guide requires?
15    A.     It is not consistent with what the program guide
16   requires.  And I think, you know, at most, a month would
17   have 31 days, so 45 seems to be a significant stretch
18   beyond that.  So the program guide is quite clear that
19   it needs to happen within a month, and so this seemed to
20   be a non-explainable change to the accounting that --
21   and we were never apprised of those kinds of changes as
22   they happened in the back end.  They just happened and
23   they show up.  And we just happened to be looking in the
24   right place when this showed up.
25    Q.     So no one notified you in advance of this
```

Kevin Kuich, M.D.                                        September 19, 2019

1  change?

2    A.    Correct.

3    Q.    And nobody told you after it had been changed,

4  that it had been changed either, right?

5    A.    Not to me.  I believe there was understanding --

6  and I don't know if it's in this -- in these documents,

7  but it looks like the rule -- it looks like Dr. Leidner

8  stated the rule changed in December.

9    Q.    And Dr. Leidner, is he a psychiatrist?

10   A.    He's a psychologist.

11   Q.    And what is his role?

12   A.    His role at the time was, he was basically the

13  keeper of the data.  So he would make sure that the data

14  flowed into the various databases correctly, and would

15  also run queries that would then pop up as the program

16  reports and various kinds of other reports.

17   Q.    So before, I believe it was Ms. Gonzalez

18  contacted Dr. Leidner -- confirm that here.  Excuse me.

19  On page 3 of this e-mail string, it looks like

20  Dr. Golding contacted Dr. Leidner on March 21st, 2017,

21  asking if something had changed.  Before that e-mail and

22  Dr. Leidner's response, had anyone told you that there

23  had been a change?

24   A.    No.  That wasn't a common practice.

25   Q.    So it would not be typical for you to know when

```
 1   a psychiatry measure was being changed in terms of how
 2   it was being reported?
 3   A.    That would be accurate.
 4   Q.    When you found out about this change, you've
 5   testified that you thought it was an inappropriate
 6   change; is that accurate?
 7   A.    That is accurate.
 8   Q.    Did you say anything to anyone inside CDCR about
 9   your views about the change?
10   A.    I spoke within the psychiatry team that I had
11   concern about it.  And similar, in the larger meetings
12   that I mentioned where Dr. Golding would be in and we
13   would be in with other leadership, I'm sure there was an
14   opportunity there to say that as well.  But I don't
15   recall specifically the date or the context.
16   Q.    So you've testified that you told Dr. Golding --
17   is that right?  Excuse me.  That you told Dr. Golding
18   that you thought this was an inappropriate change?
19   A.    Yes.
20   Q.    Do you explicitly recall telling anyone outside
21   of the psychiatry team at headquarters that you thought
22   this change was wrong?
23   A.    I don't recall that I did.  I believe it was
24   more Dr. Golding and Dr. Gonzalez who moved it forward.
25   Not because I didn't think it was relevant or important
```

Kevin Kuich, M.D.                                September 19, 2019

1    issue, but I was just tasked with other things.

2     Q.     Is there any other reason why you may have not

3    said anything about it to the mental health leadership?

4     A.     Generally, there has not been a positive

5    response.  Certainly when it comes to data, there is not

6    an open transparency about the data, being able to

7    access the data.  I had several instances before where I

8    requested data and I didn't get data; and even trying to

9    elicit Dr. Brizendine to help, still received no data.

10   So I think there wasn't really that -- history did not

11   dictate that spending that energy was useful.

12    Q.     Did you feel like if you had concerns about the

13   data and what it was showing, that you didn't have an

14   avenue outside of psychiatry to voice those concerns?

15    A.     I would say that's accurate, yes.

16    Q.     Did you ever ask anybody to change it back to

17   30 days?

18    A.     I did not ask anyone, but I believe it was asked

19   by either Dr. Golding and/or Dr. Gonzalez.

20    Q.     And did you agree that it should be changed

21   back?

22    A.     Absolutely.

23    Q.     Did you review individual patient-level data

24   about timeliness for EOP contacts in spring of 2017,

25   after the business rule had changed and before it was

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   changed back?
 2    A.     It would have been in concert with working with
 3   Dr. Gonzalez, so --
 4    Q.     In that process, were you looking at individual
 5   appointment time frames?
 6    A.     That, I don't recall.  I know Dr. Gonzalez was
 7   doing a pretty deep dive, and I don't know at what level
 8   -- if it went to specific individual patients or if it
 9   was still kind of in an aggregate.
10    Q.     Do you recall ever seeing -- let me step back.
11           Drs. Golding and Gonzalez told the neutral
12   expert that they saw data showing that some patients'
13   psychiatry appointments in this time frame were marked
14   as compliant when their next appointment was beyond
15   45 days and up to 60 days.  Do you ever recall seeing
16   anything like that?
17    A.     I don't recall seeing anything like that, but
18   that wouldn't surprise me.
19    Q.     Do you know why the business rule was changed in
20   December 2016?
21    A.     I don't.  We don't have a sense of when the
22   business rule was changed.  There's not a systemwide
23   notification that there's a change and this is the
24   reason why that particular rule was changed.  It's
25   certainly concerning, number one, having to do with
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

 1  psychiatry.  So you would hope that psychiatrists would

 2  have some input or ability to reflect on it.

 3       But also, number two, given -- in my entire time

 4  at CDCR, data and doctors have been the most

 5  important -- most important discussions all the time,

 6  and so I think it would be very concerning because it

 7  does impact on what a staffing model could be or how

 8  many doctors we have to perform the tasks.  So it's

 9  highly concerning.

10  Q.    Dr. Ceballos told the neutral expert that the

11  rule change was announced at a webinar, along with other

12  business rule changes.  Do you recall attending any such

13  webinar or other meeting where the rule change was

14  announced?

15  A.    No, but I probably know what she's referring to,

16  that there was a -- Dr. Leidner would have a weekly kind

17  of bugs and -- and -- discussion about things, and so

18  there would be various things he would do on that, and

19  so that's where those changes would be mentioned.

20       The people on that call are not necessarily all

21  the chiefs of mental health and people that would really

22  be able to appreciate that.  The people on that call

23  were more the data management people at the

24  institutions.  So wonderful to have it announced there,

25  but that's not the place where that information would

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   freely flow, for such a large change, to the larger
 2   organization.
 3   Q.    It sounds like that phone call was between
 4   Dr. Leidner and institution staff.  Is that right?
 5   A.    Yes.  The quality -- each institution would have
 6   their quality management.  It would usually be a senior
 7   psychologist specialist who would be involved with that.
 8   It wouldn't be a psychiatrist.  They would be people
 9   that would be managing quality management metrics and
10   data for their institution.  So that would be the
11   audience, so it would be very self-selected and very
12   well-defined audience for that particular change, had it
13   been announced there.
14   Q.    It sounds that meeting typically did not include
15   psychiatry.  Is that correct?
16         MS. THORN:  Objection.  Lack of foundation.
17   Calls for speculation by this witness.
18   BY MS. ELLS:
19   Q.    Were you ever on any of those phone calls?
20   A.    I have been on one or two of those phone calls
21   when I had a particular issue with regard to psychiatry.
22   So have I been?  Yes.  But that was not a regular call
23   that I had been on, for lack of time and lack of ability
24   to be present in several places at once.
25   Q.    To your knowledge, were any headquarter
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1    psychiatrists routinely on those phone calls?

2            MS. THORN:  Objection.  Lack of foundation.

3    BY MS. ELLS:

4     Q.    To your knowledge?

5     A.    To my knowledge, no.

6     Q.    When you were on those phone calls in those

7    couple instances you mentioned, was -- do you recall if

8    there were significant numbers of institutional-level

9    psychiatrists on the phone?

10           MS. THORN:  Objection.  Lack of foundation and

11   calls for speculation.

12           THE WITNESS:  There were not.  The people on

13   the phone calls were people that were heavily

14   involved in data and data management at the

15   institutional level, and that would not include

16   psychiatrists.

17   BY MS. ELLS:

18    Q.    But it would typically be psychologists,

19   according to your testimony?

20    A.    Correct.

21           MS. THORN:  Same objection.

22   BY MS. ELLS:

23    Q.    And when -- those couple occasions where you did

24   attend those phone calls, were you invited to attend?

25   How did you attend?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.     There was an issue that I needed to discuss or
2    could contribute to, and so I would be on those phone
3    calls, so I knew that was part of the discussion there.
4    The -- because I had the connection with, again, wearing
5    so many hats, I did have the ability to be on those
6    calls when they occurred.  Most of them involved data
7    management at a minutia level, sometimes involved SQL
8    programming, which did not really fit my particular
9    talents or interests at that time.
10   Q.     And just to be clear, you stated that you did
11   attend those calls on a few occasions.  On the occasions
12   that you did attend, you don't recall an announcement
13   that this rule had been changed?
14   A.     Correct.
15   Q.     And you were -- do you recall ever being invited
16   to one of those phone calls or informed that psychiatry
17   business rules were going to be discussed?
18   A.     No.
19   Q.     What is your -- go ahead.
20   A.     I was going to say, nor was I aware of any
21   meeting minutes or other things like that, that might
22   typically be sent out if someone is in absentia and
23   couldn't attend.
24   Q.     So you didn't routinely receive minutes about
25   those calls?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.      Correct.

 2    Q.      Do you know if anybody in headquarter psychiatry

 3    received similar types of minutes?

 4    A.      Not to my knowledge, no.

 5    Q.      Are you aware if minutes like that ever existed?

 6    A.      I've never seen minutes existing like that.

 7    Q.      What's your understanding of the rationale for

 8    the change?

 9    A.      It's hard to understand the rationale for the

10    change, because the business rule is quite clear, within

11    one month, meaning any time within 30 to 31 days or

12    less.  EOP patients may require several visits, but

13    that's at minimum.  So I couldn't make quite heads or

14    tails -- even if someone was moving from an institution

15    that they were in transmit, they still could be seen.

16    So I was puzzled by that.

17            I think there likely was something having to do

18    with EHRS and maybe the encounter strategies that

19    created problems, but regardless, we were noncompliant

20    if that was how we were accounting for things.  So since

21    I can't speculate as to the reason why the change

22    happened, you know, it -- it does bear concern that I

23    don't know when these other documents, in terms of the

24    staffing plan, were in the progress of being made at

25    that time, but certainly it would be concerning that
```

Kevin Kuich, M.D.                                        September 19, 2019

1   that would create basis for an argument that would be

2   used later.

3    Q.     So speaking of that, I'd like you to turn to

4   Exhibit 5, which is the Tebrock of Katherine -- sorry,

5   the declaration of Katherine Tebrock.   Pardon me.   It's

6   Exhibit 4.   The declaration of Katherine Tebrock that

7   was filed with the court on 3/30/2017.   Could you please

8   flip again to page 9?   This is the same chart that we

9   were discussing earlier, entitled "Mental Health Staff

10  Psychiatric Staffing Versus Compliance."   And the date

11  on that is 2/23/2017.

12         Is it your understanding that this was the time

13  period in which the business rule lengthening the amount

14  of time between EOP contacts was in place?

15         MS. THORN:   Objection.   Calls for speculation.

16  And lack of foundation.

17  BY MS. ELLS:

18   Q.    I will tell you that defendants have stipulated

19  that this chart is within the time period and contains

20  the data that relied on the 45-day time period as

21  opposed to the 30-day time period for the EOP

22  psychiatric contacts.

23   A.    And I will say, based on the information that

24  was provided in one of the exhibits, where Dr. Leidner

25  had indicated that it changed in December, and that

Kevin Kuich, M.D.                                    September 19, 2019

1   e-mail was in March of 2017, that is consistent with --

2   that change would be consistent and be reflected in this

3   exhibit, so I would agree with you.

4    Q.    Were you aware that the timely psychiatric

5   contact data using this longer time frame was being

6   presented to the Court?

7    A.    No.

8    Q.    And once again, you've already testified to

9   this.  I just want to confirm.  Nobody ever asked you to

10  look at this chart?

11   A.    (Shaking head in the negative.)

12   Q.    Nobody ever asked you to give any input as --

13  I'm sorry.  Could you answer that last question?

14   A.    I was not provided with this chart nor asked to

15  provide input on this chart.

16   Q.    And looking at it right now and knowing what you

17  know about what this timely psychiatric contacts column

18  reflects, is this an accurate picture of reality in the

19  institutions about how timely those contacts were

20  occurring?

21       MS. THORN:  Objection.  Calls for speculation.

22  Lack of foundation.

23       THE WITNESS:  Neither with regard to the

24  timely psychiatry contacts or to what MAPIP was

25  currently measuring at that time.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1  │  BY MS. ELLS:
 2  │    Q.     So you would say that neither of those were
 3  │  accurate with respect to compliance?
 4  │    A.     Correct.
 5  │    Q.     Do you know if Ms. Tebrock was aware at the time
 6  │  when she filed this that the timely psychiatric contacts
 7  │  metric had been changed to lengthen the time between EOP
 8  │  contacts while still counting them as compliant?
 9  │    A.     I don't know that she was aware of that.  Mental
10  │  Health Quality Management certainly was a very -- in my
11  │  time was a very large, well-staffed operation which held
12  │  the data very close and was not very transparent on
13  │  their engagement and how they're presenting information.
14  │    Q.     And from that, do I understand correctly that
15  │  you're not sure if that information filtered up to
16  │  Ms. Tebrock in addition to not filtering down to you?
17  │    A.     Correct.
18  │    Q.     Okay.  Now, we've looked at the organizational
19  │  chart that's marked as Exhibit 1, and it shows you as
20  │  reporting directly to Ms. Tebrock; is that accurate?
21  │    A.     It does seem to show that, yes.
22  │    Q.     Did you ever have interactions with Ms. Tebrock
23  │  on a one-on-one basis in conducting your job as chief of
24  │  statewide telepsychiatry?
25  │    A.     The only time that there would be a one-on-one
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1   was when I specifically requested that audience for a

2   particular issue that I had a concern about, whether it

3   was data related or telepsychiatry related.  But there

4   was no routine supervision or any kind of interaction

5   that would suggest that -- that Ms. Tebrock was my

6   direct supervisor.

7   Q.     And, in fact, you didn't understand before today

8   that she was your direct supervisor; is that correct?

9   A.     That is correct.

10   Q.     Now, you just said that you did have the

11   possibility of contacting Ms. Tebrock to set up a time

12   to discuss things with her one-on-one if you were

13   concerned about it.  Why did you not do that here?

14   A.     In this instance, Dr. Golding and Dr. Gonzalez

15   were very involved in all the level of detail, and

16   although I could add my voice to it, I didn't have the

17   level of detail that they were working on.  I was

18   working on other projects.

19   Q.     Are you aware of any pressures at the

20   institutional level that may have precipitated the

21   change in the data reporting?

22           MS. THORN:  Objection.  Calls for speculation.

23   And vague as to the data reporting.  It's vague,

24   data.  Reporting what data?  Specifically you're

25   still on Exhibit 4?

Kevin Kuich, M.D.                                    September 19, 2019

1            MS. ELLS:  Thank you.  I will clarify.

2            MS. THORN:  Thank you.

3    BY MS. ELLS:

4     Q.     Are you aware of any pressures at the

5    institutional level that may have precipitated the

6    change in the business rule between December 2016 and

7    April 2017, when it was changed to be longer and then

8    changed back to be 30 days again?

9     A.     I wouldn't say anything out of the ordinary for

10   CDCR in the sense that EOP is constantly difficult to

11   manage and staff, EOP is difficult to provide service --

12   services to.  And certainly when EOP folks move from

13   institution to institution, it is very complicated to

14   try and keep them on track with their required

15   appointments.

16            So I don't know when the EOP training came on

17   that -- I don't recall that with Dr. Vess, if that was

18   around that time.  We also certainly have had our rash

19   of untoward patient events and suicides, and whether

20   there was something in there that might have sparked

21   something, I don't know.  But, again, that's not unusual

22   for CDCR to have a variety of issues to contend with.

23    Q.     Did the institutions pay attention to this

24   timely psychiatric contact metric and whether their

25   institutions showed compliant or not in this time frame?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.      The institutions were very much -- again, I use
 2   the term red, green, yellow.  They were very much into
 3   the dashboard, very much into the metrics, very much
 4   into how they're performing.  As quality management
 5   started to take on even larger and larger proportions,
 6   there were meetings that I attended where -- this was
 7   beyond this time frame, but it gives you a sense of what
 8   the -- what the feel of the institution, of the
 9   organization was, that there would be blaming and
10   shaming that would happen when institutions didn't
11   comply.  Tremendous amount of pressure placed on the
12   institutions by the regional staff to be able to get
13   their metrics in the green.  And not always did that
14   effort to help the institution get in the green, look at
15   the actual weeds and the details; it just involved work
16   harder, work longer, get it done, I don't care how you
17   get it done.  So if you need a cell side appointment,
18   that's what you need to do.  If you need to do
19   something, that's what you need to do.  We need to go
20   from red to yellow or yellow to green.
21    Q.      And when you refer to a cell side -- did you say
22   a cell side appointment?
23    A.      Cell side appointment.
24    Q.      When you're using that phrase, are you referring
25   to a psychiatric evaluation that would be counted in
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   this metric, in the timely psychiatric contacts metric?
 2   A.      Correct.
 3   Q.      And so you mentioned a number of pressures the
 4   institutions were under to increase their green levels
 5   on these metrics.  Are you aware of any pressures at the
 6   headquarters level that would have precipitated the
 7   change between December 2016 to make this metric more
 8   generous and back again in April of 2017?
 9   A.      The only thing I can think of within that
10   time frame, that would be in the EHRS -- the EHRS paused
11   in November -- after the rollout in October of 2015 and
12   then they reinstituted somewhere in January or August.
13   So if there was a change in this rule affecting EOP, it
14   would be when there are new institutions coming online
15   with the EHRS and not as savvy or capable of handling
16   the scheduling system at that time.  So I -- that just
17   seems coincidental because that would be that
18   time frame, and I do know that institutions had a
19   tremendous amount of difficulty adapting to the EHRS in
20   every discipline, be it medical, nursing, dental --
21   dental not so much.  They have their own system, but --
22   and mental health.
23           And concerningly enough, the same people that
24   were involved in Mental Health Quality Management
25   metrics were heavily involved in the EHRS design,
```

Kevin Kuich, M.D.                                            September 19, 2019

1    rollout, and implementation.

2     Q.    Why is that concerning to you?

3     A.    Quality Management should inform and it

4    shouldn't drive.  And I think in CDCR's instance,

5    Quality Management drove information and drove change.

6    As opposed to saying this is what's happening, let's

7    you, institution, look and find out why this is not

8    happening in a way that should, but it's -- it's -- you

9    can play both sides of -- both sides of the fence.  And

10   when you can do that, you can come out with a relatively

11   favorable answer 100 percent of the time.

12    Q.    Did you receive any pressure to turn psychiatric

13   metrics, quote/unquote, yellow or red to green in this

14   time frame, at the headquarters psychiatric level?

15         MS. THORN:  Objection.  Exceeds the scope of

16   the September 17th order.

17         THE WITNESS:  There weren't any things at the

18   headquarter level that were specifically -- that I

19   recall that were specifically looking at that.  There

20   was an issue with consultation responses, I believe

21   it was, and that was an issue that I brought up

22   numerous times with Quality Management and the EHRS

23   folks, to say psychiatrists are actually performing

24   this function, but because of how the EHRS is

25   designed, we're not able to acknowledge that.  And so

Kevin Kuich, M.D.                                        September 19, 2019

```
 1   multiple times of talking with Dr. Rekart and, I
 2   believe, Dr. Ceballos on perhaps at least one
 3   occasion, that this -- this is an issue that we can
 4   resolve.  And eventually Dr. -- with Dr. Brizendine's
 5   assistance, after we went through and interviewed
 6   basically all institutions about why are you red,
 7   they all said the same thing, that -- excuse me, that
 8   they were completing it, but the system wasn't
 9   recognizing it.  And that allowed a change to happen
10   at that point.
11        So undercounting did seem to get a response.
12   Overcounting did not seem to get a response.
13   BY MS. ELLS:
14    Q.    Can you think of any other instances of
15   overcounting that you raised concerns about to
16   headquarters leadership about these metrics?
17        MS. THORN:  Objection.  Exceeds the scope of
18   the 9/17 order.
19        THE WITNESS:  MAPIP certainly was one that --
20   MAPIP at that time on the dashboard was looking at
21   one measure happening within a year, so it was not
22   true to what MAPIP was.  And as we moved into the
23   EHRS era, we did have the ability to get realtime
24   data and be able to capture exactly so that we can
25   show that we are -- how well aligned we are with our
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   obligations and the expectations of the Coleman

 2   monitors.  So I did bring up concerns with MAPIP and

 3   how this was presented.  And when I was asked to

 4   present that data, I would always place a footnote or

 5   something to that effect to indicate that this is not

 6   accurately representing what MAPIP is.

 7   BY MS. ELLS:

 8    Q.    Do you recall how long it took to -- first of

 9   all, was that the -- was your concern about accuracy in

10   the MAPIP context that it was overrepresenting

11   compliance -- was that ever addressed?

12    A.    Eventually.

13    Q.    How long did it take?

14    A.    I would say a year to maybe 18 months.  The

15   information was presented, and I had mapped out every

16   field of where this information could come from, and

17   that was put in Excel spreadsheet and that was left with

18   Mental Health Quality Management.  And the overall

19   Quality Management for CDCR, which is different from

20   Mental Health Quality Management, they had other

21   priorities to get to.  And then they did eventually get

22   to it, and it was -- I believe, to the best of my

23   knowledge, it's representing nearly 100 percent

24   accurately now.

25    Q.    And when -- so you testified that that took
```

Kevin Kuich, M.D.                                   September 19, 2019

 1   about a year before -- between when you identified this
 2   issue with a different aspect of data and when it got
 3   fixed.  For the time period when it was not fixed to
 4   accurately reflect what was happening, did it show more
 5   compliance than what was really happening on the ground?
 6   A.    Yes.
 7   Q.    And did you make that clear to the people you
 8   were complaining to, that you felt it was
 9   overrepresenting compliance, when you raised this issue?
10   A.    Yes.  And when I was asked to present the data
11   for a Coleman report by Ms. Ponciano, I did specifically
12   put that in a footnote, to indicate that this is not
13   representing MAPIP accurately; this is representing one
14   facet of MAPIP and should not be taken as indicative of
15   how well we're performing MAPIP.
16   Q.    Did you ever urge anybody to be more -- to more
17   clearly state that the MAPIP data was not reflective of
18   the true medication adherence requirements than a
19   footnote?
20   A.    There's footnote.  There were also discussions
21   about it and discussions in context of this larger group
22   that I mentioned, when we would bring up issues having
23   to do with how psychiatrists are performing and are
24   those measures accurate.  That was one of the ones that
25   I would always bring up, to say this isn't accurate, so

Kevin Kuich, M.D.                                    September 19, 2019

1    we can't -- we cannot make decisions that are going to

2    impact a system and an organization and individuals

3    based on data that is not accurate.

4     Q.    Did anyone -- returning back to this timely

5    psychiatric contact parameter and the time period when

6    it was changed in December 2016 to be more -- to allow

7    for a longer time frame between contacts, and when it

8    was changed back in April 2017.  You've already

9    testified that no one told you in advance or even

10   afterwards that the change in December 2016 was being

11   made.  Is that accurate?

12    A.    That is accurate.

13    Q.    Did anyone tell you in April 2017 that it had

14   been changed back?

15    A.    I -- when it was changed back, whenever it was,

16   I heard that from either Dr. Golding or Dr. Gonzalez,

17   because they remained kind of the focal points for that

18   particular issue.

19    Q.    But nobody beyond the QM team, for instance,

20   told you that the business rule had been changed back?

21    A.    Not that I'm aware of.

22    Q.    Do you recall anybody else in the mental health

23   leadership, outside of the psychiatric team at

24   headquarters, telling you that the rule had been changed

25   back?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1      A.     No.  And that would be unusual outside of the

 2   headquarters or mental health team because that's --

 3   Mental Health Quality Management is a tightly run and

 4   tight-lipped portion of mental health.

 5      Q.     Who runs that team?

 6      A.     That's Dr. Laura Ceballos, also co-run by

 7   Dr. John Rekart.  So Dr. Ceballos is kind of the

 8   ultimate decider, and then Dr. Rekart, once he finished

 9   his EHRS duties, then transitioned into more of the

10   Quality Management person.

11      Q.     Neither of those people are psychiatrists; is

12   that right?

13      A.     That's correct.

14      Q.     Are there psychiatrists on the headquarters QM

15   team?

16      A.     They are two.

17      Q.     And what role do they play, to your knowledge?

18      A.     Currently, one of them is making EHRS changes

19   for the system.  The other provides various -- does

20   various tasks.

21      Q.     Do you have any sense of how large the QM team

22   is total?

23           MS. THORN:  Objection.  Vague as to time.

24           THE WITNESS:  It's significantly larger than

25   psychiatry.
```

Kevin Kuich, M.D.                                          September 19, 2019

1    BY MS. ELLS:

2      Q.    And has that always been true?

3      A.    It's always been true.  And they've grown when

4    Dr. Golding has implored on multiple occasions to get

5    more psychiatry resources so that we can provide better

6    service and feedback to the field.  We would not get

7    those resources, but Mental Health Quality Management

8    would continue to add additional physicians.  So I would

9    say --

10     Q.    And you mean nonpsychiatric physicians?

11     A.    Nonpsychiatric physicians.  So I would say

12   there's probably more than 20 people that are involved

13   in QM at the various different levels.

14     Q.    And would you -- from what you just said, is

15   your testimony that the psychiatry voice on that group

16   got diluted over time as more people were added that

17   were not psychiatrists?

18           MS. THORN:  Objection.  Vague as to time.

19           THE WITNESS:  It was always a complicated

20   matter with psychiatry and Quality Management because

21   the psychiatrist and Quality Management report to

22   psychologists.  They didn't report to Dr. Golding or

23   myself.  So it became complicated at times and

24   conflictual at times for them to fulfill their roles.

25           I can speak to that because there was a

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   psychiatrist who -- Dr. Andrew Shultz-Ross, who
 2   originally started as a Quality Management
 3   psychiatrist and then moved over with the EHRS to
 4   help me with the EHRS and moved over to psychiatry.
 5   And the stories I -- that he would tell and the
 6   experiences he would have made it very clear that
 7   their allegiances were to and needed to be to
 8   psychologists rather than psychiatrists.
 9   BY MS. ELLS:
10    Q.    Meaning the allegiance was to the internal QM
11   team, which was headed by a psychologist?
12    A.    Correct.
13    Q.    Now, we've discussed this time period between
14   December 2016 and April 2017, when this timely
15   psychiatry contact indicator was lengthened and then
16   returned back to being 30 days.  Are you aware of any
17   quality control measures that were implemented
18   afterwards that would have prevented something like that
19   from happening in the first place?
20    A.    Any rule changes were programmed by Dr. Leidner
21   at the direction of somebody, and that somebody
22   generally would be either Dr. Rekart or Dr. Ceballos.
23   Dr. Leidner, I'm not aware would unilaterally make these
24   changes.  So there would have been some -- some
25   instruction or some direction to be able to make that
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    change at that time, from someone that wasn't the person
 2    making the change.
 3     Q.    And since that time, since this metric was
 4    changed and then changed back at Dr. Golding's urging,
 5    are you aware whether the QM team has instituted any
 6    quality control measures to prevent data from being
 7    changed without -- to prevent data -- excuse me, to
 8    prevent business rules from being changed without wider
 9    distribution of that information?
10           MS. THORN:  Objection.  Calls for speculation.
11    Lack of foundation.
12           THE WITNESS:  I'm not aware of any oversight
13    changes.  In my exit interview with Deputy Tebrock, I
14    had made clear that it would be in the organization's
15    best interest to disband Mental Health Quality
16    Management due to its multiple conflicts and problems
17    and have the data managed by a third party that can
18    neutrally manage the data and already has oversight
19    and other kinds of things in process, meaning a party
20    that is not party to this suit, is just brokering
21    information.
22    BY MS. ELLS:
23     Q.    And during -- so you said that that was
24    conveyed -- that you conveyed that to Dr. Tebrock at
25    your exit.  So at the time that you left, that had not
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   occurred; is that correct?
 2   A.      Correct.
 3           MS. THORN:  Objection.  Lack of foundation.
 4           THE WITNESS:  That is correct.  They remained
 5   intact as of the day that I left.
 6   BY MS. ELLS:
 7   Q.      And you testified that you left in January of
 8   2019; is that correct?
 9   A.      Correct, middle of January 2019.
10   Q.      Do you have any reason -- do you have any
11   knowledge that that change has occurred since you left?
12   A.      I have heard that there have been some changes
13   in Quality Management, that some people are no longer
14   with Quality Management, which was a -- in my
15   estimation, a positive change.  That -- I don't know if
16   mental health still is the keeper of the data or if that
17   has been shifted to another department similarly skilled
18   within CDCR proper -- or CHC -- CCHES proper.  Sorry.
19   Q.      And by that, you mean the group that administers
20   the healthcare data, the CCHES?
21   A.      Yes.
22   Q.      So you said you have heard that people have left
23   the Quality Management group since you departed in
24   January of 2019, that you consider that a positive
25   change?
```

Kevin Kuich, M.D.                                    September 19, 2019

```
1    A.    Correct.
2    Q.    Why?  And by that, I mean, why do you consider
3    that a positive change?
4    A.    The Quality Management group was creating --
5    instead of informing, it was driving.  And Quality
6    Management informs; it doesn't drive.  And its dual role
7    with the EHRS and its role with reporting data up to the
8    monitors was problematic from day one.  And to be able
9    to have some chain of custody, some ability to be able
10   to verify that the data actually does represent what it
11   represents and everything can be transparently tracked
12   back and everyone is quite clear what the numerator and
13   denominator is, I feel that Mental Health Quality
14   Management has failed in that task.  And another portion
15   of CCHES that has done something similar should have the
16   ability to attempt to provide a bit of a separation from
17   that data and clinical things.
18          The data -- inaccurate data prevents the ability
19   to look at where the actual problems are and it prevents
20   the ability to get needed resources, not only in terms
21   of human resources, but also physical resources to be
22   able to address why things aren't happening on a regular
23   basis.  And so to have data that is over-representative
24   prevents that ability to look at what are the true
25   system issues, and it creates an unsustainable, false
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1    premise that is problematic for the organization and for

2    the patients alike.

3     Q.    So the same court order that we were discussing

4    earlier, which is from September 17th, 2019 -- yes,

5    Exhibit 2.  So the same question that I asked you about

6    this issue about the time period where CDCR was

7    measuring psychiatry contacts within a 45-day frequency

8    rather than a 30-day frequency as they previously had,

9    as to that issue, do you have any additional views about

10   why this issue could not be resolved successfully

11   internally and prior to presentation of misleading data

12   to the Court in the forms of this chart that was filed

13   that we've discussed -- filed with the Court on

14   March 30th, 2017?

15    A.    My personal view is that mental health felt that

16   they were performing very well in many areas, that they

17   could police themselves with data, that they were a

18   structure, that they were sustainable, and the only

19   piece that was the problem was that there weren't enough

20   psychiatrists.  And so if there was some way to show

21   that with fewer psychiatrists we were meeting the

22   metrics, that final block would tumble and there would

23   be no basis for the lawsuit.

24          In -- I was going to --

25    Q.    Please continue.

```
 1    A.      I was going to say, in my time, there were
 2   various ways to try -- in my time at CDCR, there are
 3   various ways to try and help engage psychiatrists.
 4   Having MAs was a great option to see if some extra
 5   support would help.  There was the misguided attempt at
 6   trying to get telepsychiatrists remotely, who aren't
 7   within the CDCR system, to be able to provide services.
 8    Q.      When you say "remotely," all telepsychiatrists
 9   are remote, so can you explain what you mean by that?
10    A.      These would be from a non-CDCR hub.  So they may
11   be functioning from a -- maybe a separate building
12   that's run by a separate contractor, or they could be
13   service -- providing services from their own physical
14   home.  So misguided in the sense that there isn't the
15   ability of monitoring the technology, monitoring the
16   integrity of the equipment, just monitoring in general.
17   So it creates a supervisory nightmare.
18           So there are all different ways of trying to
19   kind of address this, use of the .25 additional staffing
20   psychiatrists was -- you know, was an additional way.
21   Use of --
22    Q.      Did you have concerns about that?
23    A.      I did.
24    Q.      Could you explain what that proposal is?
25    A.      I did have concerns about that.  That was --
```

```
 1   historically, from what I had understood, that there had
 2   been these .25 positions, meaning that someone would be
 3   working for CDCR in a full-time position and then would
 4   provide .25, or one day extra, to be working at another
 5   institution.  So it's leveraging one body to basically
 6   do 1.25 of an FTE, full time equivalent.
 7          There were concerns and abuses in the past of
 8   that happening, and that was -- practice was disbanded.
 9   It was heavily lobbied for and it was re-implemented.
10   And in the implementation, I think the concern was -- is
11   that originally it was designed that these people doing
12   that additional work at a different institution would
13   provide services in an inpatient setting, meaning that
14   they wouldn't have other obligations to that .25
15   population in their regular workday.  But what had
16   rolled out was, they were seeing EOPs or they were
17   seeing other -- other populations in addition to the
18   inpatients, which impacted their day work.  And so there
19   was no ability to be able to put that conflict of
20   interest in front of the supervisor, that particular
21   individual.  So it can impact their work that they
22   normally should do on their -- usually four-day-a-week,
23   ten-hour job, working on that particular yard or that
24   particular place wherever they're working, because
25   they're managing an outpatient caseload.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1            And so bringing that up on multiple occasions
 2    with Ms. Ponciano, with Dr. Brizendine, and eventually
 3    Deputy Tebrock, concerns that I had with the conflicts
 4    of interest, that it wasn't managed in the same way that
 5    outside employment is managed, with very clear
 6    memorandum, with very clear, distinct roles and
 7    responsibilities, clear contact for who that other job
 8    person is, so if there needed to be any kind of
 9    discussion and formal signature to be able to make that
10    happen.  None of those things were in place, and
11    consequently the .25 ended up being somewhat of a
12    boondoggle for certain institutions that were able to
13    lobby well and other things.  So it -- I was frustrated
14    by the misallocation of resources that were there.
15            We were fortunate and grateful to have visa
16    candidates as well to be able to come in.  Not all the
17    visa candidates ended up in positions and in
18    institutions that were most sorely needed of those
19    services.  So, again, there was kind of a misallocation
20    and a -- not utilizing individuals where they could be
21    best used and/or having conflicts in place that could
22    impact their -- their job.
23            So although I laud all the opportunities and
24    ability to think outside the box to provide this finite
25    resource, which is psychiatry, even the ways that it was
```

Kevin Kuich, M.D.                                      September 19, 2019

```
 1   done, it just wasn't done well and it wasn't executed
 2   well, so.
 3    Q.    And do you feel like the change in the timely
 4   psychiatry contact was reflective of pressures related
 5   to that need to fill psychiatry positions and treat
 6   patients?
 7          MS. THORN:  Objection.  Lack of foundation.
 8   And calls for speculation.
 9          THE WITNESS:  I think we had -- I will speak
10   as -- in my role as chief telepsychiatrist.  We
11   heavily vetted the people that we employed, and we
12   made sure that they knew -- that they knew what to do
13   and they had appropriate skill level.  Other -- my
14   own interview when I came on to CDCR was bizarre at
15   best and really didn't --
16   BY MS. ELLS:
17    Q.    In what way?
18    A.    In what way?  I was asked to compare and
19   contrast SSRIs.  The toolbox of a psychiatrist is much
20   broader than that, and there weren't the ability to, you
21   know, ask questions about how are you going to manage
22   these situations.  It was very, very perfunctory in a
23   way to say if you have a license and you have a body,
24   you have a job.
25          Telepsychiatry was different because it was
```

Kevin Kuich, M.D.                                September 19, 2019

```
 1   beyond that and we were able to create comradery, we
 2   were able to create collaboration, we were able to a
 3   create a cohesive group that was able to recruit and
 4   retain psychiatrists.  So although the machinations of
 5   using .25s or other kinds of things, you know, are
 6   novel, they don't address the true state of affairs, as
 7   the environment is not a positive environment for
 8   psychiatrists, and the psychiatrists that are selected
 9   are done so in a very haphazard manner.
10   Q.    Okay.  Thank you.
11         Let's take a ten-minute break.
12         (Whereupon, a break was taken.)
13   BY MS. ELLS:
14   Q.    The third issue that the Court identified that
15   she wanted to hear your views about was what she called
16   Issue E, which is reporting of scheduled and missed
17   appointments.  From what you testified already, you have
18   extensive knowledge of the electronic health record
19   system based on your role as the psychiatrist involved
20   in its development and rollout; is that accurate?
21   A.    That is accurate.
22   Q.    Were you the primary psychiatrist involved in
23   that?
24   A.    Yes.
25   Q.    Could you describe your role in designing EHRS,
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   as a psychiatrist?
 2    A.     My role is twofold:  One, to help create a work
 3   flow that was acceptable to psychiatrists and conducive
 4   to their ability to quickly and efficiently see
 5   patients.  The second role was -- is to integrate that
 6   flow in a collaborative manner with mental health in
 7   general, given that it's one system and one type of
 8   documentation to try and create the ability to have the
 9   different work flows communicate with each other.  So in
10   that, there would be designing of power forms, which is
11   a note type that is a checkbox and a little more
12   confined; and creating template notes, which are a
13   little more freeform, like a blank piece of paper;
14   creating order sets, which are called power forms and --
15   I'm sorry, power plans, rather; and also creating just
16   different elements of the work flow in general to try
17   and help people get through from point A to point B as
18   efficiently and effectively as possible.
19    Q.     So is it accurate to say that your role in
20   designing EHRS was, on the one hand, as a psychiatrist,
21   to make sure that the pieces of EHRS that psychiatrists
22   would be using were workable to them; and the second
23   piece was to make sure that that piece regarding
24   psychiatry fit in with the overall system and worked
25   together?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1          MS. THORN:  Objection.  Information regarding

2    development of the EHRS is actually outside the scope

3    of the September 17th order.

4    BY MS. ELLS:

5    Q.     Go ahead.  Is that accurate?

6    A.     Yes, that would be accurate.

7    Q.     Dr. Ceballos told the neutral expert in the

8    neutral expert's -- as reported in the neutral expert's

9    report, that whenever a patient does not see a provider

10   as scheduled, the provider is supposed to mark in EHRS

11   that the appointment was not completed and then ask a

12   scheduler to reschedule the patient for a different

13   time.  Is that how EHRS was designed to work?

14   A.     The scheduling work flow was always moving and

15   changing, but that would be accurate.  What actually

16   happened on the actual realtime would be a variety of

17   things.  There would be instances where people would be

18   told by a scheduler or by someone else at the local

19   level, Just give us the names and then we'll just move

20   that appointment to another day.

21   Q.     So along those lines, Dr. Ceballos also told the

22   neutral expert, as reported in his report, that if the

23   provider just checks the patient in and out in EHRS,

24   whenever the patient is finally seen without requesting

25   that the original appointment be rescheduled, then the

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   original appointment will show as having been completed
 2   as scheduled.  Is that right?
 3    A.    Yes.  If the -- when you check in and out in the
 4   -- what's called the ambulatory organizer, which is the
 5   schedule, for all intents and purposes, that defaults to
 6   the time that you check that box and check them in,
 7   which would be today, now.  And then when you check them
 8   out, it would default to that time you check them out,
 9   which would be that time and now.  So unless someone
10   physically went in there and made changes to it, which
11   they can -- somewhat of a cumbersome process, but it can
12   be done -- it would reflect that date, whether that was
13   an accurate date or not.
14    Q.    So do you have any sense of how common this
15   practice of providers checking patients in and out
16   rather than formally requesting that the original
17   appointment be rescheduled -- do you have any sense of
18   how commonly that occurs in the field?
19    A.    It would be -- I would say it would be very
20   common to happen in the field.  The way that schedulers
21   are engaged in the EHRS is very different than it was on
22   paper.  What it was on paper, it could be an e-mail, it
23   could be a -- hey, here's a list, can you do this.  In
24   EHRS, everything has to be in order, and the schedulers
25   were basically told by mental health that they can't
```

Kevin Kuich, M.D.                                    September 19, 2019

1   order anything themselves; they have to have orders come

2   to them.  So the order would have to come with formatted

3   details and other kinds of things to instruct the

4   scheduler to do something, and the amount of time that

5   that takes and the amount of effort and clicks that that

6   takes to do that, for most people, they say, look, you

7   were seen, but let someone else figure it out.

8   Q.    The provider is the one who controls whether the

9   patient is checked in or out and/or who can request that

10  the original appointment can be rescheduled?  That's all

11  the provider's function, is that right, in EHRS?

12  A.    Correct.

13  Q.    In those instances when the patient has just

14  checked in and out whenever they were actually seen, the

15  data would reflect that they were seen at the original

16  appointment time even if they were actually seen later;

17  is that right?

18  A.    The time that they -- so if their appointment

19  time was 10 o'clock but they checked them in at 11

20  o'clock on that that day, it would show that checked in

21  at 11 and checked out at whatever time.

22  Q.    Okay.  And if they were checked in -- so I'm

23  going to read this to you again because I want to make

24  sure that I understand what you're saying --

25          MS. THORN:  Counsel, can you give me the page

Kevin Kuich, M.D.                                September 19, 2019

```
 1    where you're reading from in your report?
 2            MS. ELLS:  Yes.  It's neutral expert report at
 3    page 74, using the ECF terminology.
 4            MS. THORN:  Thank you.
 5            MS. ELLS:  Numbering, I mean.  I'll show this
 6    to you as well because -- let me see.  Do you --
 7            MS. TRAPANI:  Do you want to introduce it?
 8            MS. ELLS:  I don't think we need to introduce
 9    it as an exhibit because it's so lengthy.
10    BY MS. ELLS:
11     Q.    But I will provide you a copy, Doctor, so that
12    you can look at what I'm referring to.  This is not the
13    ECF paginated.  Hold on.
14            Okay.  So the paragraph that I'm wondering about
15    is this top paragraph.  In the internal pagination of
16    the report, it is on page 69.  The ECF pagination for
17    the version that was filed, it's at page 74.  And it's
18    -- the ECF number -- the filed document is 6147.  And
19    the -- it's the first paragraph on the page.  It says
20    "Dr. Ceballos also stated" and then continues from
21    there.
22            Actually, I'll just read it in.  "Dr. Ceballos
23    also stated that when a patient does not show up for his
24    or her appointment and the provider does not ultimately
25    see the patient, the provider is supposed to enter into
```

Kevin Kuich, M.D.                                    September 19, 2019

1    EHRS that the appointment was not completed and then

2    request that the scheduler reschedule the patient for

3    another time."

4           And you've already testified that that is how

5    EHRS is designed to work; is that accurate?

6    A.    Yes.

7    Q.    Okay.  And then two sentences later there's a

8    sentence that begins "But if the provider instead simply

9    checks the patients in and out whenever the patient is

10   actually seen -- e.g., when the provider sees the

11   patient on the next day -- without requesting that the

12   original appointment be rescheduled, that original

13   appointment may be reflected as having been completed as

14   scheduled."

15          Is that accurate?

16   A.    That would be accurate.

17   Q.    And I -- do you agree -- I would characterize

18   that as a workaround.  Is that an accurate way of

19   talking about this second process?

20          MS. THORN:  Objection.  Vague and ambiguous.

21   Calls for speculation.

22   BY MS. ELLS:

23   Q.    Given your knowledge of how EHRS actually

24   functions and how it was designed to function, this

25   seems different from how it was designed to function,

Kevin Kuich, M.D.                                          September 19, 2019

```
 1   this -- the sentence that begins "But if the provider
 2   simply checks the patient in and out"?
 3    A.    I -- I don't know from the background where
 4   they're pulling the information from, because they could
 5   pull out that date and the time that they were checked
 6   in and checked out and -- even if it was on another day.
 7   But if in fact it's been programmed in that they're only
 8   looking for that appointment, then that would be
 9   problematic because the provider is not going to say,
10   Hey, I actually saw them today, but the appointment was
11   left on my calendar and no one did anything with it and
12   I checked him in and checked him out.  And so that
13   wouldn't be a flaw in the system; that would be a flaw
14   in look at what data are you pulling.
15    Q.    Okay.
16    A.    If that makes sense.
17    Q.    Yes.
18          Would it be problematic to you as an
19   administrator if -- if this occurred, if that second
20   process that Dr. Ceballos describes is occurring?
21    A.    Yes.
22    Q.    Why would that be problematic?
23    A.    It would -- if -- all you would need to do is
24   make sure that the person was scheduled within the time
25   frames, and whenever you saw them it would show that
```

Kevin Kuich, M.D.                                        September 19, 2019

1   they were seen within time frames, and so that would be

2   inaccurate.

3     Q.    And would -- are you familiar with a performance

4   indicator called "appointments seen as scheduled?"

5     A.    Yes.

6     Q.    Do you know how that indicator functions, what

7   data it looks at?

8           MS. THORN:  Objection.  Lack of foundation.

9   Calls for speculation.

10          THE WITNESS:  I don't -- they -- everything is

11  contingent on the scheduling order.  So the

12  scheduling orders are very complicated and not user

13  friendly.  Instead of an appointment that says -- let

14  me give you an example.  If any of us go to the

15  doctor and we have our visit and the doctor says, I

16  want to see you back in three weeks, we go to the

17  receptionist when we pay our bill and we say the

18  doctor says he or she wants to see me in three weeks;

19  so they just do a three-week appointment.

20          In the EHRS, how it's billed, the receptionist

21  would have to say, are you CCC or are you EOP?  Are

22  you EOP ad seg?  are you EOP ad seg short-term

23  restricted -- right?

24  BY MS. ELLS:

25    Q.    Yeah.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

```
 1   A.    I am familiar, having discussed that issue with
 2   Dr. Golding, yes.
 3   Q.    Could you tell me what that issue is?  Am I
 4   correct that this is an EHRS -- this happens in EHRS?
 5   A.    Correct.  But this is a unique EHRS issue.
 6   Because the schedules -- because the scheduling orders
 7   are so specific, that's apparently what has been built
 8   in the background to determine compliance.  And so if
 9   that order and -- and the -- the compliance is basically
10   done as kind of just-in-time compliance in a sense.  So
11   if they're supposed to be seen in 30 days, then it will
12   be scheduled within -- very close to within that 30-day
13   mark.  So if you miss it by a day or several days, you
14   could well be out of compliance.
15          And that's where this issue becomes a problem.
16   Instead of saying we -- we were supposed to have this
17   appointment within 30 -- within a month, so say 30 or
18   31 days, it happened at day 35.  If that first
19   appointment wasn't missed and then that second
20   appointment occurred, you're going to have that
21   time frame where it's somewhat squishy that, well, it
22   was kind of the same appointment, but it didn't happen
23   in the time frame.  And 30 days or 31 days seems very
24   clear, and I think how the scheduling system was
25   designed makes it very convoluted to the end user and --
```

Kevin Kuich, M.D.                                    September 19, 2019

 1  and complicated to the scheduler as well.

 2          The schedulers had multiple meetings on a

 3  regular basis -- I wasn't involved in them -- about

 4  scheduling and how to do scheduling and how not to do

 5  scheduling.  And scheduling was a constant topic

 6  throughout all the institutions with mental health.

 7  Specifically, medical chose a different scheduling model

 8  and something that was a little broader, little more

 9  general, and that seemed to be adapted in a way that has

10  not been nearly as problematic as mental health's choice

11  to move in their scheduling process.

12  Q.    So in this example that Dr. Golding gives where

13  a CDCR schedule has moved a miss appointment -- a missed

14  appointment, excuse me, to a later date but did not mark

15  that appointment as missed and then rescheduled it, do

16  you know, would that initial appointment -- excuse me.

17  Would that appointment be tallied in EHRS as having

18  occurred on the date it was originally scheduled or the

19  date it actually occurred?

20  A.    It would have been the date -- that's a good

21  question.  I -- how -- what they're pulling from that

22  is -- I'm not privy to all the details, and there's so

23  many changes and so many things happening with

24  scheduling.  Scheduling, in fact, was one of the things

25  that mental health -- because our mental health

Kevin Kuich, M.D.                                          September 19, 2019

1  scheduling was designed to be so complicated that they

2  needed to hold back updates to the Cerner system for

3  CDCR because of our scheduling difficulties.

4   Q.    And so in this same example where the scheduler

5  moved the appointment but did not ever mark it as missed

6  and then reschedule it, would that appointment show as

7  being missed at all?

8         MS. THORN:  Objection.  Vague and ambiguous.

9  Calls for speculation.

10         THE WITNESS:  There would have -- so I cannot

11  answer that directly because I would need to know

12  what it's pulling and what the code is looking at.

13  If the code was looking at, here was the last

14  appointment and here was this appointment and it was

15  too long, and they had some kind of calendar in the

16  background that was running, they would be able to

17  indicate that in fact it was past compliance.  If

18  there's not that --

19  BY MS. ELLS:

20   Q.    Setting aside whether or not it is within a

21  compliance period, would it show -- would that

22  appointment that is missed, that did not happen but that

23  is not formally marked as missed and then rescheduled --

24  if the provider sees that person anyway, will that

25  appointment ever be marked as missed?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    No.

2          MS. THORN:    Same objection.

3    BY MS. ELLS:

4    Q.    Is it problematic that that appointment in that

5    context would not be marked as missed?

6    A.    Yes.

7    Q.    Why?

8    A.    An appointment missed provides information and

9    allows the ability to ask the question why was it

10   missed, and that allows us to ask questions about

11   staffing, that allows us to ask questions about physical

12   space to do the appointment.  That allows us to ask

13   questions about access.  That allows us even to ask

14   questions about a particular staff member on a

15   particular yard on a particular day having a mental

16   health bias which might prevent or discourage someone

17   from showing up to an appointment or being brought out

18   of their cell to come to an appointment.  So on many

19   reasons, it would discourage the ability for the system

20   to self-reflect and self-correct and create a more

21   sustainable solution.

22   Q.    So that -- as an administrator, that is

23   something that you would care about?  It would matter to

24   you if you knew the total number of missed appointments?

25   A.    Absolutely.  I would be -- that would be a level

Kevin Kuich, M.D.                                    September 19, 2019

1   of granularity that I would welcome because it would

2   tell me is it a provider issue, it is a system issue,

3   where is the issue.  And maybe it's all the things, but

4   it would at least give me information to hunt in the

5   right field.

6    Q.    And would it matter to you if the system --

7   strike that.

8           When did you become aware of this issue that

9   appointments that are missed and held at a later time,

10  but never formally marked in EHRS as missed and

11  rescheduled, don't show up as being missed at all?  When

12  did you become aware of that issue?

13   A.    I can't think of a specific time when I became

14  aware of it.  I was aware of scheduling problem from the

15  get-go, from the beginning, because the scheduling

16  module is incredibly complicated, and how mental health

17  designed it makes it much more complicated.  I think in

18  the context of looking at some of the timelines and

19  those kinds of things, it started to bring larger

20  questions of where did this data come from and what's

21  the process.  And so that allowed us to ask -- begin to

22  ask questions.  When that time frame was, I can't say.

23   Q.    Is it possible to fix this problem in EHRS?

24   A.    In my opinion, yes.  What I had advocated for --

25  and it got somewhat of a reception, but it didn't seem

Kevin Kuich, M.D.                                  September 19, 2019

```
 1   like it was a high priority.  And given that psychiatry
 2   is somewhat of a motley crew with limited resources, we
 3   couldn't always follow through on everything.  But it
 4   was proposed -- actually, my proposal -- to have a
 5   note -- the signing of a note trigger a popup box, which
 6   would allow all the boxes to be checked in terms of what
 7   kind of appointment, the length of time of the
 8   appointment, all those kinds of things, so that it
 9   actually is linked to a document as opposed to just a
10   scheduling order, and that we can actually go to
11   something and say this happened.  Because until they
12   signed -- as it was envisioned, until they signed the
13   note, they wouldn't be able to get that popup box which
14   would have all that information that would be pulled
15   from to say what appointment was it, when did it happen,
16   and all the level of detail that we need.
17   Q.    So that fix would have allowed for the system to
18   capture when the appointment actually happened, no
19   matter whether or not somebody formally marked an
20   initial appointment as being missed and rescheduled it,
21   or just moved it?
22        MS. THORN:  Objection.  Calls for speculation.
23   Lack of foundation.
24        THE WITNESS:  As -- and we -- yes, it would.
25   And as we worked through with Cerner to look at
```

Kevin Kuich, M.D.                                        September 19, 2019

```
 1   various options, it seemed like that was the most
 2   reasonable option.  They had a billing component in
 3   there that we tried to use that was -- just wasn't
 4   meeting our particular needs, but that would be a
 5   way.  And that is a way that's already working in the
 6   system and is functioning in a way to allow popup
 7   boxes to occur to allow things to happen immediately.
 8   So it wasn't some hypothesized process; it was
 9   something that we actually have done in some, way,
10   shape or form.  It just would contain different
11   information.
12   BY MS. ELLS:
13    Q.    You've mentioned that you made that proposal to
14   address this issue and other problems with the
15   scheduling in EHRS.  Who did you make that proposal to?
16    A.    I believe that proposal was made to Dr. Rekart,
17   Dr. Ceballos.  I believe that proposal was at the time
18   when mental health changed committee, came into
19   fruition, came into being, which presented its own
20   separate set of challenges to have something like that
21   move on to actually be put into use.
22    Q.    It sounds like you've expressed your feeling
23   that it was difficult to get changes in EHRS actually
24   implemented that you were recommending.  Is that
25   accurate?
```

Kevin Kuich, M.D.                                                           2019

Defendants object to Exhibit 9 & 144:2-145:19 as
outside scope of September 17, 2019 Order (ECF
6288).

Plaintiffs respond this pertains to Dr. Kuich's answer,
in part, to the Court's questions at 3:16-19 of
September 17, 2019 Order.

1    A.     That is accurate.

2    Q.     Okay.  I'd like to hand you an exhibit this is

3    Exhibit 9.

4                   (Plaintiff's Exhibit No. 9 was marked for

5                   identification.)

6    BY MS. ELLS:

7    Q.     So this document is an e-mail from Dr. Golding

8    to Katherine Tebrock dated July 2nd, 2018.  It is called

9    "Power plans EHRS," and Dr. Golding filed this as part

10   of his report to the Court and to the Plata receiver.

11   It's Exhibit U to that report.

12          So I'd like you to turn to page 2.  Does this

13   look like Dr. Golding's handwriting, to you, on this

14   document?

15   A.     Yes, it does.

16          MS. THORN:  I would just like to lodge an

17   objection that this exhibit and the questions

18   concerning the EHRS power plans as reflected in the

19   exhibit are beyond the scope of the September 17th

20   order.

21   BY MS. ELLS:

22   Q.     So, Doctor, on page 2, towards the top, it says

23   "Kevin Kuich says the following," and then there's a lot

24   of text after that.  Do you recognize this text as

25   something that you wrote?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.      Yes, I do.  It is something that I wrote.

 2    Q.      And where does the portion of the text that you

 3  wrote begin and end?

 4    A.      Items 1 through 7-A appear to be my writing.  I

 5  can't speak for the "we have surveyed."

 6    Q.      Okay.  But you're confident that --

 7    A.      1 through 7-A is, yes.

 8    Q.      That -- and what about the sentence at the very

 9  beginning following the phrase Dr. -- sorry, "Kevin

10  Kuich says the following:"?  What about this phrase:

11  "We've had many instances of things not getting done or

12  occurring in a poor manner.  This is nothing new."  Is

13  that yours?

14    A.      That could very well be.  In a moment of

15  exacerbation, being frustrated by the situation, yes.

16    Q.      But are you confident that -- that the

17  enumerated items here, 1 through 7-A, are your

18  statements?

19    A.      Yes.

20    Q.      I'd like to direct you to Item 6.  Could you

21  please review that, as well as Item 7?

22    A.      Uh-huh.  We --

23    Q.      Okay.  Tell me when you're done.

24    A.      Okay.  Can I do Item 6 first and then --

25    Q.      Yes.
```

Kevin Kuich, M.D.                                    September 19, 2019

1      A.      Well, I guess it goes with -- into 7.

2      Q.      Let's go to Item 6.  First of all, could you

3    summarize what you're saying in Item 6, for the record?

4      A.      Certainly.  Would you like me to read that into

5    the record.

6      Q.      Sure.

7      A.      "When psychiatry change requests were placed in

8    the MH solution center ticket queue, they languished and

9    were not addressed.  It was promised they would be built

10   by MH," mental health, "but that never happened.

11   Finally, in around late fall 2017, mental health

12   released the change request to Cerner, who has been

13   building them out, this in the context of mental health

14   somehow able to build items that were of interest and

15   important to them."

16     Q.      And is the request that you describe -- or the

17   proposal that you described to modify the EHRS

18   scheduling component, including to address this issue of

19   missed appointments that aren't formally marked as

20   missed and rescheduled -- was that -- would that have

21   been something that you would have submitted to the

22   mental health solution center ticket queue?

23     A.      Those types of requests would be things that I

24   would submit to mental health solution center ticket

25   queue.  This particular instance did that not have that,

Kevin Kuich, M.D.                                September 19, 2019

```
 1    but that would be the -- these were other items, but
 2    that would be the process by which it would be
 3    presented.
 4    Q.    Okay.  So you don't recall requesting this
 5    particular modification to EHRS through this mental
 6    health solution center ticket queue?
 7    A.    Correct.
 8    Q.    Did you formally propose it in any other way?
 9    A.    In writing, to be able to -- these are the
10    possible solutions of things that we could do, that was
11    presented to mental health leadership.  And it did move
12    into discussions with a Cerner associate, Dr. Liedner.
13    I think Dr. Rekart may have been on a phone call now and
14    then.  And so it was a long, drawn-out process to get
15    Cerner's involvement and engagement to know which
16    direction we go in.
17    Q.    Did you feel like, as a psychiatrist who
18    intimately understood EHRS, that the changes that you
19    were recommending were treated as a priority by the
20    department?
21    A.    They were not treated as a priority.
22    Q.    Could you describe what you mean by that?
23    A.    These particular changes that were released in
24    late fall of 2017 had to do with known -- known bugs,
25    known problems, known issues with orders, other kinds of
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                    September 19, 2019

```
 1    things.  When you build the system out, you don't know
 2    what it's going to look like until it hits the end user,
 3    and then you get feedback and you realize, oh, that's
 4    not working, or there's an upgrade or update to the
 5    system and now that isn't working.  So these are changes
 6    that were important to help with MAPIP compliance and
 7    other things.
 8           So those were approved by the larger committee
 9    that was referred to as CLAC.  And CLAC, C-L-A-C, was
10    the multidisciplinary committee that change requests
11    were brought to.  And so once they're brought to that
12    committee and approved, then they either move internally
13    to have the change happen amongst -- with internal
14    resources, or it moves externally to Cerner, to be able
15    to have Cerner provide those resources.  These
16    particular changes, not all of them but a good number of
17    them, we did have the internal resources within mental
18    health to be able to make those changes.
19           Those changes sat in the mental health queue,
20    and sat and sat and sat and sat.  Psychiatry had no
21    resources to be able to build this out ourselves.
22    Again, we didn't have enough people, enough staff do
23    that.  Mental health proper had a tremendous number of
24    resources to be able to address things.  So these
25    psychiatry changes were apparently not prioritized
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1    because there were other things that were being built by
2    mental health proper before this.  And it wasn't until
3    IT -- system IT, CDCR IT, got involved, in addition to
4    -- I believe Cerner got involved as well as, hey, what
5    is up with this.  I mean, this is just hanging out here.
6    Why is this happening?  They had various times where
7    they would clean up to make sure that things are moving
8    forward.
9          That brought it to the attention, and when that
10   brought it to the attention, it brought sufficient
11   momentum behind it to be able to have it relinquished
12   from mental health and the mental health BHRS team --
13   which, again, is not psychiatry -- then released that to
14   Cerner, and we were able to have it finally built.
15   Q.    Who was in charge of prioritizing those
16   projects?
17   A.    Dr. Rekart.
18   Q.    And, again, Dr. Rekart is a psychologist; is
19   that correct?
20   A.    Correct.
21   Q.    Did -- was there any oversight of Dr. Rekart's
22   prioritization decisions that you're aware of?
23   A.    No.  There eventually got to be some meetings
24   where there would be some very splashy kind of
25   PowerPoints and those kinds of things, where we would

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    look at priorities.  But early on in this time, there
 2    weren't this kind of well-detailed and laid-out process
 3    by which we determined what needs to get built and what
 4    doesn't.
 5     Q.    In the same time frame that you were discussing
 6    in this e-mail and that we're just discussing right now,
 7    where Dr. Leidner was in charge of sort of prioritizing
 8    all the competing requests about EHRS, were either
 9    issues raised by psychologists being addressed more
10    quickly?
11         MS. THORN:  Objection.  Lacks foundation.
12    Calls for speculation.
13         THE WITNESS:  It did seem that there were
14    other things that were being built out for psychology
15    sooner than the requests for psychiatry.
16    BY MS. ELLS:
17     Q.    And did you express any frustration about this
18    failure to prioritize what you believed to be important
19    changes to EHRS for psychiatrists?
20     A.    Regularly.
21     Q.    Who did you say that to?
22     A.    Dr. Rekart, Dr. Golding, probably Dr. Ceballos,
23    certainly Dr. Brizendine and Ms. Tebrock.
24     Q.    And you mentioned CLAC, which I believe you
25    described to be multidisciplinary committee that
```

1    determined what changes were to be made to EHRS.   Is

2    that accurate?

3    A.      That is accurate.

4    Q.      And is that committee outside of the mental

5    health department?   Was it?

6    A.      It is -- well, I speak of the time I was there.

7    It is and was.   It was composed of all the different

8    disciplines that interact in the EHRS:   Nursing, dental,

9    IT, pharmacy, mental health.   Originally mental health

10   had one representative, and that was Dr. Rekart.

11   Psychiatry didn't have its own seat at the table, so to

12   speak, so Dr. Rekart would make decisions on all mental

13   health issues, including psychiatry issues, whether to

14   advance them forward or support them.

15           The -- after some push, we were able to have

16   psychiatry recognized as a bona fide voting member,

17   because our issues and concerns weren't always brought

18   forward, and so that did help.   But interestingly, it

19   was shortly after that time when we became a bona fide

20   voting member and had the ability to present issues to

21   the larger system that -- it was shortly thereafter that

22   there was memo placed saying that mental health is

23   now -- it was from Dr. Ceballos, apparently under the

24   direction of Ms. Tebrock, that mental health will be

25   having a change -- their own internal change management

Kevin Kuich, M.D.                                    September 19, 2019

 1   committee so that changes to the EHRS would be brought
 2   to that internal committee first before presented to the
 3   larger committee, which is the ultimate committee to
 4   determine if it -- if that change can occur in the
 5   system and how it would occur.
 6   Q.    Okay.  Introduce another exhibit here.
 7               (Plaintiff's Exhibit No. 10 was marked for
 8               identification.)
 9   BY MS. ELLS:
10   Q.    This document is an e-mail from Laura Ceballos
11   at CDCR to a number of people, and you are listed as one
12   of the recipients on the first line.  It's dated
13   June 18th, 2018.  This document was attached to
14   Dr. Golding's report as Exhibit S.  Is this the memo
15   that you're referring to from Dr. Ceballos at the
16   direction of Katherine Tebrock?
17   A.    This is the memo.  And it, at the time, felt so
18   heavy handed and egregious that I actually hung it in my
19   office so I could see it every single day.
20   Q.    Why did it feel egregious to you?
21   A.    It minimized the role of psychiatry.  There
22   weren't any discussions about how that could have any
23   impact.  There weren't any discussions about the
24   composition of the committee, how the committee would
25   run, what the prioritization was.  It was just

Kevin Kuich, M.D.                                September 19, 2019

1    determined by edict that this is what was going to

2    happen, and it was shocking, to say the least.

3       Q.    And I believe it -- go ahead.

4       A.    And not shocking at the same time.

5       Q.    I believe you said that this memo came

6    relatively shortly after psychiatry got its own vote on

7    CLAC about what changes to EHRS would be made.  Is that

8    right?

9       A.    I believe it was around that time frame.

10      Q.    Okay.  So going back to CLAC and Drs. Rekart and

11   Leidner.  You testified that Dr. Leidner in this time

12   period was the person -- by the time period, I'm

13   referring back to your e-mail dated July 2nd, 2018,

14   which is Exhibit 9.  In this time frame that you're

15   discussing at Point 6 here, I believe that you said that

16   Dr. Leidner is the one who controlled all

17   prioritization.  Is that right?

18      A.    Dr. Leidner dealt with the data, and so he would

19   deal with data, data management, and those kinds of

20   inquiries.  Prioritization for the EHRS, which is

21   similar but different, it was done by Dr. Rekart.

22      Q.    And this mental health solutions center ticket

23   queue, who controlled that?  Is that something that

24   Dr. Rekart controlled, or what is that?

25      A.    It is -- when people in the field have an issue

Kevin Kuich, M.D.                                        September 19, 2019

```
 1    with EHRS, they would submit a ticket and say this is
 2    happening.  And so it may be a legitimate issue, may be
 3    user error, but for whatever reason, they experienced a
 4    difficulty, and so they present it.  And those -- there
 5    was a -- just a general mental health queue that
 6    everything went to, and then his team would kind of make
 7    determinations about, you know, how we're going to
 8    address it.
 9    Q.    And when you say "his team," whose team do you
10    mean?
11    A.    That would be his team of psychologists.
12    Q.    Who is "he"?
13    A.    Dr. Rekart.
14    Q.    Dr. Rekart?
15    A.    Apologies.
16    Q.    Thank you.
17          And so Dr. Rekart would then determine which
18    resources to allocate to which change?
19    A.    The -- so there's two -- this is kind of
20    confusing.
21    Q.    Thank you.
22    A.    So the solution center queue is people in the
23    field that can have a request or say something is broken
24    or something is wrong.  And so -- so he and his team
25    would manage that queue.  Eventually we had our own
```

Kevin Kuich, M.D.                                    September 19, 2019

1    queue, at least when we started managing it, so it did

2    get separated, which --

3     Q.     And when you say "we," who do you mean?

4     A.     Psychiatry.  So that was fine.  So that's one

5    step.  The larger step is changes that need to be made

6    in the system.

7     Q.     Okay.

8     A.     And that is this -- what they call an RFC or

9    request for change process.  That is this larger CLAC

10   committee.  That involves physical changes to the system

11   that will impact every user.

12    Q.     Got it.

13    A.     And so that prioritization and the -- bringing

14   that up to that committee, once mental health had that

15   memo in -- what was it, June?  Yeah.  Then it had to go

16   through the mental health subcommittee first before it

17   could get to that larger committee.  So there are two

18   separate issues.  I hope that's clear.

19    Q.     Yes.  That's very helpful.

20           So the types of fixes that you were interested

21   in and pushing for would have gone initially to this

22   CLAC; is that right?

23    A.     Correct.

24    Q.     And it would be systemwide changes, including

25   changing the scheduling portion of EHRS to work better

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   and be more accurate; is that correct?

 2    A.    That's correct.

 3    Q.    And initially you said that Dr. Rekart was the

 4   only one from mental health on that CLAC committee, but

 5   then psychiatry got its own vote?

 6    A.    Right.  I would be on -- be there, but I'm not a

 7   voting member.  And so eventually I did become a voting

 8   member.

 9    Q.    And did you find that when Dr. Rekart was --

10   well, let me step back.  How would that committee decide

11   which changes got made?

12          MS. THORN:  Objection.  Vague and ambiguous.

13   Which committee, the larger --

14          MS. ELLS:  The CLAC.

15          MS. THORN:  Thank you.

16          THE WITNESS:  So CLAC committee, there would

17   be requests that would be put up through known

18   channels to say this is the problem and this is the

19   proposed solution.  And so that would then be brought

20   up in the committee -- I believe it was every Monday

21   -- and we would talk -- the person that would like

22   that change would -- would basically stump for it and

23   say, this is a change, this is the reason, this is

24   why.

25          All the disciplines would have input to be
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   able to kind of indicate, you know, that sounds good
 2   or I'm concerned about that or, Hey, you know, we do
 3   it this way and that could impact us if we do this.
 4   So if there were any things that were a dead stop,
 5   then it would be taken back and then there would be a
 6   smaller committee to kind of look at it and see what
 7   impact is this going to have.  If it was something as
 8   simple as mental health needs a new order that no one
 9   is going to see except mental health, it's like,
10   fine, have a new order, everyone is okay with it.
11           So it -- there would be varied levels of
12   discussion based on, you know, what the issue was.
13   BY MS. ELLS:
14    Q.     When Dr. Rekart was the only person from mental
15   health on CLAC, did he serve as a gatekeeper for
16   initiatives that you wanted to happen?
17    A.     Yes.
18    Q.     Did your ability to get changes before CLAC
19   improve once psychiatry got a vote on that committee?
20    A.     Yes.
21    Q.     Did you find that it was easier for the changes
22   that psychiatry wanted to be approved by CLAC once you
23   got -- once psychiatry got a vote on that committee?
24    A.     Yes.
25    Q.     And then relatively shortly thereafter, after
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1   the period in which psychiatry had a vote on CLAC,

2   you've testified -- and this memo from June 18, 2018,

3   Exhibit 10, shows -- that the process for getting

4   changes put before CLAC was brought in house to an

5   internal subcommittee within mental health; is that

6   right?

7   A.    That is correct.

8   Q.    Who was on that mental health subcommittee?

9   A.    The mental health subcommittee had a variety of

10  people.  So it was Michael and myself as a psychiatrist.

11  Q.    How many non-psychiatrists would you say are on

12  that committee?

13  A.    There's two psychiatrists and everybody else was

14  a non-psychiatrist.  And there were probably 15 people

15  maybe on the committee.

16  Q.    Was there ever a period where psychiatry had

17  more than two people on the committee?

18  A.    No.

19  Q.    Is the committee membership relatively static in

20  terms of the sheer number of committee members in your

21  time?

22  A.    It -- there wasn't a real well-defined -- it was

23  more of, what are the parliamentary rules, what are the

24  rules of engagement, you know, how many votes does it

25  take.  It was just more of kind of this seemingly ad hoc

1    thing to be making sure that changes were approved

2    before they went up in the larger direction.  So I can't

3    say if that membership changed or not, but what I can

4    say is that there were people on there that -- many that

5    were managers of nonclinical services, who were deciding

6    clinical issues and whether clinical change should

7    occur.

8     Q.    Could you look at the numbered Item 7 of what

9    you wrote in Exhibit 9.  I'll just read it for the

10   record:  "The consolidation of power continues with the

11   MH," mental health, "change management committee."

12   That's the committee that we've been discussing, right,

13   Doctor?

14    A.    Yes, correct.

15    Q.    And I'm quoting again:  "Which has moved from a

16   place to discuss changes to the MH EHRS process to a

17   group that votes whether to allow changes to move

18   forward to be heard at CLAC in the form of an RFC."  And

19   that is the request for change, the formal document that

20   would be put through for a vote; is that correct,

21   Doctor?

22    A.    Yes.

23    Q.    That's what RFC is.

24         Quoting again:  "It is a committee that has a

25   deficit of voting psychiatrists relative to

Kevin Kuich, M.D.                                    September 19, 2019

1    psychologists.  It is now impossible for psychiatry to

2    advance something to CLAC and heard by all the CCHCS

3    disciplines that would be unpopular with psychology."

4           Was that your experience with the mental health

5    change management committee?

6     A.    Yes.  It became very clear that issues that were

7    very important to psychiatry were of less priority to

8    the larger system.  And it was -- it just became

9    codified and institutionalized in this committee, a

10   process that had already been going on for years before.

11   That was just kind of the way things were, but now it

12   was now institutionalized and allowed.

13          MS. ELLS:  I would like to introduce another

14   exhibit.  This is Exhibit 11.

15                 (Plaintiff's Exhibit No. 11 was marked for

16                 identification.)

17   BY MS. ELLS:

18    Q.    This is an e-mail from Dr. Michael Golding at

19   CDCR to you, Kevin Kuich at CDCR -- Kuich, excuse me --

20   from August 2nd, 2018, entitled "Re: Mental health

21   change management committee."  And let me clarify:  The

22   top e-mail is from Dr. Golding to you, but it includes

23   an e-mail from you to him on the same date, August 2nd,

24   2018.  I'd like you to look at the portion of this that

25   you wrote.

Defendants
object to
160:13-161:16 &
Exhibit 11 as
outside scope of
September 17,
2019 Order
(ECF 6288).

Plaintiffs
respond this
pertains to Dr.
Kuich's answer,
in part, to the
Court's questions
at 3:16-19 of
September 17,
2019 Order.

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Uh-huh.

2    Q.    Which you sent at 11:12 a.m. on August 2nd,

3    2018.  Would you take a look at that?

4    A.    Yeah.  I remember writing this, and I remember

5    that --

6          MS. THORN:  Just a second, Doctor.  I'd like

7    to lodge an objection.  It's beyond the scope of the

8    September 17th order, the subject matter of the

9    e-mail as well any questions related and any

10   testimony related to the e-mail.  Thank you.

11   BY MS. ELLS:

12   Q.    Does this document, this e-mail that you wrote,

13   accurately exchange -- or accurately reflect your

14   experience attempting to get EHRS changes through the

15   mental health subcommittee?

16   A.    Yes.  And I remember this particular instance.

17   Q.    Could you talk about it a little bit?

18   A.    The change was to an IPOC, or an

19   Interdisciplinary Plan of Care, I-P-O-C, for one of our

20   inpatient settings, and it -- I didn't have any

21   particular issue with it.  It was certainly reasonable,

22   and psychiatrists don't have tremendous amount of

23   dealings with IPOC, so it's -- was a nonissue.  But what

24   was interesting to me is when it came to voting, there

25   were people, nonclinical people, who were voting for

Kevin Kuich, M.D.                                September 19, 2019

1    this, and so I took the opportunity to ask one

2    individual, who is wonderfully kind and just a fabulous

3    human being -- wasn't singling them out in any way, but

4    just happened to be in my line of sight, and said, Can

5    you explain to me what an IPOC is, what it does, and why

6    this change is important.  And I just got stone silence.

7    And other people that were voting similarly had no

8    clinical skills or clinical acumen, but yet they were

9    voting on these things.

10           So it made me concerned that things are being

11   presented in front of these committees, that people are

12   voting on, and they had no idea what they're voting for.

13   So that made concern about the integrity of the

14   committee and the committee to really perform its

15   function, which is to be, you know, a reasonable

16   gatekeeper for things that, you know, can benefit staff

17   and patients alike.  And I think this kind of behavior

18   is relevant in the sense that this is the type of

19   environment that psychiatrists practice in day in and

20   day out, which affects retention, which affects

21   recruitment, which affects the ability to get

22   psychiatrists, which causes data to have to be massaged

23   in certain ways to allow information to be more

24   presentable to say we don't need psychiatrists so we can

25   get out of the lawsuit.  So it's part of the larger

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    iceberg.

 2     Q.    Was it your experience in presenting psychiatry

 3    changes that you or the psychiatry headquarters people

 4    wanted -- was it your experience that people on this

 5    committee who were not medically trained did not

 6    understand some of the things that they were voting on?

 7     A.    Correct.

 8     Q.    Did they nonetheless vote on them?

 9     A.    Yes, they did.

10     Q.    Did you find that things that you wanted done,

11    as a psychiatrist, and thought should be done in EHRS to

12    fix problems for psychiatry were not prioritized in that

13    committee?

14     A.    At this point, when the committee was done

15    without any input from psychiatry or discussion about

16    how this could work, it became so disheartening and

17    discouraging, that here we are again, we're doing the

18    same thing, it's the same pig but different lipstick, it

19    was -- it just got frustrating.  It was probably around

20    that time when my looking at -- I got -- I cannot

21    effectuate change in this organization.  I'm not heard,

22    I don't have a voice, and so why am I here.  And so I

23    looked elsewhere for employment.

24     Q.    So you also describe a couple of other issues in

25    this e-mail about this committee.  You reference that
```

Kevin Kuich, M.D.                                        September 19, 2019

1    there is no quorum requirement and that it's a loose
2    committee with unclear rules.  Can you describe what you
3    mean by those things?
4     A.     Yeah.  There is -- other committees are run very
5    tightly, there's a certain percentage of voting members
6    that have to be there, and there's kind of rules of
7    decorum and there's a process.  And this didn't seem to
8    have any process other than, these are the things we're
9    looking at and these are the things voting on, and let's
10   vote on them and move through.  So there wasn't a whole
11   lot of discussion, other kinds of things, and it was --
12   it was clear that changes that psychiatry would wish to
13   make are not going to get their hearing.
14    Q.     And was that your experience, that they did not
15   -- that changes that psychiatry wanted did not get a
16   fair hearing?
17    A.     There many changes that I did not bring to that
18   committee just because of what I saw happen and how I
19   saw them operate, that the amount of time it would take
20   to be able to present things relative to the time that
21   it would take to present to CLAC was -- it was -- it
22   just wasn't worth it.  I had other things to do and so I
23   did other things.
24    Q.     So you effectively gave up?
25    A.     I was highly discouraged and hopeless.

Kevin Kuich, M.D.                                        September 19, 2019

```
 1    Q.    Do you recall if -- we talked about some of the
 2   problems with the scheduling module, including this
 3   problem where appointments that are missed and held on a
 4   later date, but never formally marked as missed and
 5   rescheduled, are nonetheless counted as not being
 6   missed.  Was that -- do you recall when you proposed to
 7   fix that problem?  Do you recall if it would have been
 8   in the period where CLAC had only representation by the
 9   psychologist Dr. Rekart, or during the period where you
10   had a vote, or during the period where there was this
11   mental health subcommittee in house that vetted things
12   before they could go to CLAC?
13    A.    I would say it's probably in the middle time,
14   where there was CLAC involvement with separate roles.
15    Q.    Okay.  And do you recall if it was in the period
16   where psychiatry had a vote on that committee?
17    A.    I would imagine it was in that time frame.
18    Q.    But you're not sure?
19    A.    I'm -- yeah.
20    Q.    Okay.  The changes that you were recommending
21   for the scheduling portion of EHRS, did they ever get
22   made?
23    A.    Not that I'm aware of.  So there was discussion,
24   it seemed like there was buy-in and an understanding
25   that it could be helpful for all parties.  So -- but,
```

> Dr. Kuich has corrected his testimony at 165:13-14, in his October 8, 2019 corrections.

1    again, there just wasn't the psychiatry bandwidth to be
2    able to move them through.
3        This was also -- I don't know if it was at the
4    same time or before, but there was a push to -- because,
5    again, scheduling orders are sacrosanct.  They're
6    sacred.  The -- there was a push, because of scheduling
7    and how scheduling works and how important compliance
8    is, to mandate that everyone use power plans to use
9    scheduling orders.  Scheduling orders and power plans
10   are designed to fire, you know, within -- every 30 days,
11   for certain length of time for EOP and what have you,
12   and the problem with that --
13   Q.    Can I interrupt you for one minute?
14   A.    Absolutely.
15   Q.    When you say that they're designed to fire, do
16   you mean they are designed to create an appointment?
17   A.    Sorry.  Yes, apologies.  Designed to create an
18   appointment, to send fire to the scheduler, to send
19   something to the scheduler to say please schedule this
20   appointment.
21       And so because people weren't using the
22   scheduling -- not just psychiatry but mental health all
23   over the place, because it was so complicated, we're not
24   using scheduling appropriately, there was a huge push to
25   say, well, if you just do it right and you follow the

1    work flow and you do the power plans and you do the

2    scheduling orders, then everything would be fine and we

3    wouldn't have any problems.  And the problem -- and that

4    became quite a mantra and was quite a -- quite a

5    mountain to climb to help people to realize there's

6    another side to the story.  Power plans are very

7    complicated with the ways that the orders are sent,

8    based on where the patient is, and they also fire a

9    series of orders out.

10        The problem where that occurs is, as the

11   provider, you want to be able to see that patient in

12   front of you and say, you know what, I know I need to

13   see you in 30 days, but I'm worried about you, so I want

14   to see you in two weeks.  And the more you automate this

15   process to be able to make sure that compliance happens,

16   the more you take that control out of the clinician to

17   be able to determine what's clinically relevant for that

18   patient.  Program guidelines are the minimum

19   requirements.  And so if we're just following the

20   minimum standard, okay, maybe that's a way to do it, but

21   you would hope that we would looking at the patient's

22   best interest and finding that maybe they need an

23   appointment in three weeks rather than four.

24        So by using these power plans and the scheduling

25   orders and trying to mandate it -- which it never

Kevin Kuich, M.D.                                    September 19, 2019

1    happened, thank goodness -- it would create a whole

2    cascade of orders that patients may or may not need.

3    They may have seen -- the -- they might have seen me the

4    day before on an emergency situation, and now there's an

5    appointment that automatically got scheduled for next

6    Monday, and so I would sit with the patient and say, Why

7    are you here?  And they would say, I don't know, why are

8    you here.  And I'd say, I don't know.  The scheduling

9    order said we had to.

10          So it created this automation, which was

11   complicated.  And it was heavily lobbied for, I think

12   for now various reasons that are becoming more apparent.

13   But we were able to successfully say that that is not an

14   appropriately -- clinically appropriate work flow to

15   follow.

16    Q.    And when you say that it was -- your

17   understanding is it was proposed for reasons that are

18   now apparent, are you referring to the push to be

19   compliant that we've discussed today?

20    A.    Exactly.  That's exactly what I'm referring to.

21    Q.    One more question about the relationship between

22   the approval process for getting a change to EHRS that

23   affects psychiatry approved and then having it built.

24   Am I correct that the first step is to make it through

25   the gatekeeper; and then even if you make it through the

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   gatekeeper, there is no -- it is not guaranteed that

 2   that will be built quickly?  Is that correct?

 3    A.     That is correct.

 4    Q.     So they're two separate queues, kind of; is that

 5   right?

 6    A.     (Nods head affirmatively.)

 7    Q.     And so we've discussed this problem with getting

 8   through the gatekeeper, various types of gatekeeper for

 9   psychiatry or EHRS changes.  Once you made it through

10   that gatekeeper, was it your experience that your

11   psychiatry changes that had been approved were not

12   prioritized to get done?

13    A.     Once they're approved from CLAC or that

14   gatekeeper to say this is a change that is now

15   authorized, it goes one of two ways.  One way is it goes

16   internally and the other way is externally.  If it goes

17   externally, it goes into Cerner's -- C-e-r-n-e-r, their

18   queue for building.  If it goes internally, then it goes

19   into whatever department's queue that is in.

20           So the things that went into mental health's

21   queue for build, for psychiatry, languished.  And I

22   started to work with nursing and medical to see if they

23   would be willing to build out CLAC-approved changes

24   because they could do so in a more timely manager.  So

25   alliances were built to be able to try to get our
```

Kevin Kuich, M.D.                                    September 19, 2019

1    changes moved through as quickly as possible, outside of

2    mental health.

3      Q.      And for the projects that were put in the mental

4    health queue for psychiatry, was it your experience that

5    they were prioritized less than changes coming from

6    psychologists, for example?

7      A.      Yes.

8              MS. THORN:   Objection.   Lack of foundation.

9    Calls for speculation.

10   BY MS. ELLS:

11     Q.      And was it your experience that changes in this

12   mental health queue from psychiatry were prioritized

13   less than administrative changes in EHRS?

14             MS. THORN:   Same objection.

15             THE WITNESS:   Administrative changes?

16   BY MS. ELLS:

17     Q.      So correct me if I'm wrong that -- who were the

18   people that were asking for changes?   Psychologists,

19   we've discussed.   They wanted certain changes to EHRS.

20   Were there any other clinical disciplines that wanted

21   changes to EHRS, besides psychologists and

22   psychiatrists?

23     A.      Yes.   Medical, nursing, pharmacy.

24     Q.      But the ones that were within the mental health

25   queue?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                September 19, 2019

```
 1    A.    They would just be mental health, so would
 2   either be psychiatry, psychology.
 3    Q.    Okay.  Then that's -- you've answered my
 4   question, then.
 5          So turning back to this document, which we have
 6   not marked as an exhibit but we've referred to numerous
 7   times, the neutral expert report, ECF No. 6147.  On
 8   page 74, which, Doctor, on your pagination is page 69,
 9   Dr. Ceballos says that she was already aware, before
10   Dr. Golding's report, of the problem of appointments
11   being counted as having occurred as scheduled when
12   providers informally moved the appointments rather than
13   following the formal EHRS process.  Did you tell her
14   about this problem?
15    A.    No.
16    Q.    Okay.  So the same problem that we've been
17   discussing; Dr. Ceballos also said that this problem was
18   already being addressed through training.  Were you told
19   of any training like that?
20    A.    There was endless training.  So instead of
21   recognizing that a work flow is inefficient or a
22   particular form of documentation is cumbersome, there
23   was more of the, it's not our problem, it's your
24   problem.  And so there were letters of reprimand at
25   times written for people because they didn't do it in
```

Kevin Kuich, M.D.                                    September 19, 2019

1   the way that it was done.

2          So instead of looking at -- in any system you

3   build, there's always going to be things that are

4   complicated and problematic, but I think because there

5   was so much effort and time and so much of -- apparently

6   put into scheduling, it became something that couldn't

7   be changed, and people's behavior had to change to adapt

8   to that.  So it was very unique and interesting, because

9   other things, there seemed to be a flexibility of

10  saying, you know, maybe we could do it this way or that

11  way, but scheduling had a tremendous inflexibility, so

12  much so that near the end of my time, there was a

13  meeting with -- I'm blanking on the medical receiver.

14  Q.    Clark Kelso?

15  A.    Yes, thank you.  Clark Kelso.  And -- and I'm

16  blanking on the dentist's name.

17  Q.    I can't help you with that.

18         MS. THORN:  I am too.

19         THE WITNESS:  Okay.  So -- but to basically

20  say we're -- all disciplines were brought in to say

21  scheduling is an issue, scheduling is a problem, and

22  scheduling needs to be unified scheduling, and we

23  can't have disciplines doing their own thing.

24         And so there was a coming together meeting

25  held by nursing -- chaired by nursing to be able to

Kevin Kuich, M.D.                                    September 19, 2019

 1   find that a scheduling process that was reasonable.

 2   And in that meeting, mental health seemed to be quite

 3   -- quite, initially, quiet and then very eager to

 4   propose the solution that everyone would be willing

 5   to accept.  So it was a very strange meeting for

 6   anyone that was in it.

 7   BY MS. ELLS:

 8    Q.    And what was the proposal?

 9    A.    The proposal is acknowledging that scheduling

10   wasn't working well, so because mental health has such

11   experience and depth and breadth of knowledge in mental

12   -- in scheduling, mental health will come up with a

13   solution for the system, and we'll be happy to present

14   it to everyone when it's ready.  And that was not met

15   with squeals of joy by the other disciplines.

16    Q.    So that proposal was not adopted?

17    A.    That proposal was not adopted.

18    Q.    Am I understanding your testimony correctly

19   that -- so Dr. Ceballos said that this scheduling

20   problem that we've been talking about, where

21   appointments that are missed but held later, but are

22   never formally canceled and rescheduled are nonetheless

23   counted as having -- are not counted as being missed,

24   she -- Dr. Ceballos says that CDCR was training people

25   about that.  Is it your understanding that the preferred

Kevin Kuich, M.D.                                        September 19, 2019

1    approach was to retrain people rather than fixing the

2    problem?

3     A.    Yes.

4     Q.    And was that something that you feel like was

5    specific to psychiatry changes, or was that a universal

6    kind of approach?

7     A.    Universal.  There was a lack of flexibility to

8    see that certain initial design elements or

9    anticipations of how something would work weren't

10   working and we needed to come up with a different way.

11   So the solution -- instead of coming up with an

12   alternative or something that would work better, it

13   would be just to train people more and more and more and

14   harder and harder and harder.

15        And where the rubber hit the road is, Cerner is

16   a software package, and as software packages upgrade, as

17   we know from our iPhones and various kinds of things,

18   suddenly there's things that you can't do.  And so this

19   tremendous inflexibility to look at the original design

20   created many issues and problems along the way that were

21   unanticipated and were hard to adapt to.

22        One example was the implementation of DSM-5

23   terminology.  So there was a huge push to use DSM-5

24   terminology for mental health.  The person that tested

25   that out was not a psychiatrist, and the end result of

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   that, once that change was rolled out, was that
 2   psychiatrists could no longer associate a medicine with
 3   the diagnoses and so they effectively couldn't
 4   prescribe.  And that was actually found out during a
 5   Coleman meeting, when I got -- my phone blew up and
 6   said, "I can't write a prescription anymore.  What's
 7   going on?"
 8          I have no idea what's going on.  You tell me.
 9          So multiple conversations back and forth, back
10   and forth, found out that this change was put forward.
11   It wasn't validated by a psychiatrist.  It wasn't tested
12   by a psychiatrist.  And the system became un --
13   dysfunctional, and the whole thing needed to be rolled
14   back until some ability to be able to find a way to have
15   DSM-5 diagnoses put in there, that didn't impact
16   psychiatry's work flow, could be implemented.  It was a
17   rather dramatic example right in front of the Coleman
18   monitors.
19          MS. ELLS:  Let's take a ten-minute break.
20          (Whereupon, a break was taken.)
21   BY MS. ELLS:
22    Q.    Doctor, I want to continue asking you some
23   questions about Issue E, which is reporting of scheduled
24   and missed appointments.  Are you familiar with the
25   performance report indicator called "appointments seen
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   as scheduled"?
 2   A.    Yes.
 3   Q.    What is it supposed to show, according to your
 4   understanding of what that is?
 5   A.    My understanding is if the appointment was
 6   scheduled at a particular time, was -- were they seen at
 7   that particular time.
 8   Q.    Did you ever use that indicator in your work?
 9   A.    I did, but it wasn't the indicator; it was one
10   of several.
11   Q.    So you would use it sometimes, though?
12   A.    Yes.
13   Q.    Do you know if other psychiatrists at the
14   headquarters level did as well?
15   A.    Dr. Gonzalez would.  I don't believe other
16   psychiatrists at the headquarters level would.
17   Sometimes there would be a field psychiatrist
18   supervisor, institutional supervisor or senior or chief,
19   that would be using that, but it's -- I think they were
20   much more focused on MAPIP and those kinds of things,
21   maybe, than other measures.
22   Q.    What did you use that for, that indicator?
23   A.    For me, it was more a measure of why -- are we
24   scheduling people for the appointments; and if they're
25   not being seen within that scheduled time frame, why.
```

1   So it was more of a point of question to say why is this

2   institution having more trouble than another

3   institution, and piecing that together with my numerous

4   and varied trips to all the institutions and talking to

5   people to try to kind of understand their physical plant

6   and their psychiatry staff and other elements that would

7   be required to make sure that that appointment happens.

8   Q.      So it sounds like it was a helpful management

9   tool to you.

10  A.      Uh-huh.

11  Q.      CCR has admitted that in 2016 it changed the

12  methodology for the "appointments seen as scheduled"

13  indicator, which had been -- which was defined on its

14  face as including all scheduled appointments.  It was

15  changed behind the scenes in the methodology to include

16  only appointments missed due to factors within CDCR's

17  control, and they did not update the definition that was

18  posted about what that indicator meant.  Because of

19  that, the indicator in this time period, in 2016 and

20  later, did not include any appointments that didn't

21  occur because a patient refused, because a patient

22  didn't show up for whatever reason, or due to a

23  scheduling error.  Were you aware of this issue?

24  A.      I was not.

25  Q.      Did anyone ever tell you that this had happened?

Kevin Kuich, M.D.                                September 19, 2019

```
 1    A.    No.   This is the first I believe I'm hearing it.

 2    Q.    Are patient refusals common?

 3    A.    Yes.

 4    Q.    Are patient no shows common?

 5    A.    Yes.

 6    Q.    Would the data reported in the "appointments

 7   seen as scheduled" indicator be materially different if

 8   those occurrences were included in the denominator?

 9         MS. THORN:  Objection.  Lack of foundation.

10   Calls for speculation.

11         THE WITNESS:  Yes.

12   BY MS. ELLS:

13    Q.    Would the data appear to be more or less

14   favorable to the department if they were included?  And

15   by "they," I'm referring to patient refusals and patient

16   no shows.

17         MS. THORN:  Objection.  Calls for speculation.

18   And lack of foundation.

19         THE WITNESS:  Less favorable.

20   BY MS. ELLS:

21    Q.    Dr. Golding estimated that CDCR's exclusion of

22   no shows, refusals, and scheduling errors from this

23   metric resulted in inaccurate reporting of approximately

24   95 percent of scheduled appointments having been seen as

25   scheduled when, in fact, it was really closer to
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   46 percent if all appointments had been included,
 2   including the no shows, refusals, and scheduling errors.
 3   Does that seem reasonably accurate to you?
 4    A.     It would --
 5           MS. THORN:  Objection.  Lack of foundation.
 6   And calls for speculation.
 7           THE WITNESS:  It would be a sizable number, I
 8   would say.  Whether it's a 50 percent reduction, I
 9   couldn't say, but it would be a significant number.
10   BY MS. ELLS:
11    Q.     So you've already stated that you were not
12   generally provided with notice or an opportunity to give
13   input when data reporting changes were made at the
14   headquarter's level; is that accurate?
15    A.     Yes.
16    Q.     Did the department's approach to data reporting
17   change in the years that you were with CDCR?
18    A.     It did.  One thing that I noticed is -- was with
19   the Coleman rounds.  So when I started doing the Coleman
20   tours, they -- each institution would be providing data,
21   their data, and that would be what was in the binders
22   for the monitors to review.  It changed in the way that
23   the institutions were no longer allowed to supply their
24   own data, that the data was supplied from headquarters.
25   And I remember it specifically because when I was on a
```

Kevin Kuich, M.D.                                    September 19, 2019

1    Coleman tours and that happened, several of the

2    institutions I was at expressed frustration that they

3    were having to speak to data or address data that they

4    weren't familiar with or otherwise it wasn't as -- they

5    weren't as close to the knowledge about that particular

6    information, but yet they were held accountable for it.

7     Q.    Did the staff at those institutions you're

8    referring to ever say that the data from headquarters

9    wasn't accurate according to their experience of what

10   was happening at that institution?

11    A.    I believe, if my memory does serve me correctly,

12   Corcoran did make that statement or something to that

13   effect, that they were concerned.

14    Q.    Did you have any concerns about this shift from

15   data at the institutional level to an increasing

16   reliance on headquarters' data?

17          MS. THORN:  Objection.  This goes beyond the

18   scope of the order.  Calls for speculation.

19          THE WITNESS:  Initial -- initially I embraced

20   it because it seemed like the monitors would be able

21   to see one standard and it would be easier for them

22   to kind of review things.  So on the face of it, it

23   makes sense to me.  But given what I've understood in

24   terms of what can happen to data when it's in a fewer

25   number of people's hands, it gives me great pause.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                September 19, 2019

1   BY MS. ELLS:

2    Q.    Who was in charge of developing the performance

3   report data that -- are you talking about performance

4   report data in this -- the headquarters data, or is this

5   a broader category of headquarters data that you're

6   talking about?

7    A.    It encompasses performance data, but there's

8   other data elements that -- there's multiple binders

9   that are always sitting at the table when the Coleman

10  team comes through, so.

11   Q.    Who was in charge of developing performance

12  report data, including this appointment seen as

13  scheduled indicator, which is from the performance

14  report?

15        MS. THORN:  Objection.  Lacks foundation.

16        THE WITNESS:  My -- my assumption would be

17  that it would be --

18  BY MS. ELLS:

19   Q.    If you don't know the answer, feel free to say

20  you don't know the answer.

21   A.    I don't know.  I would say that it would be

22  people in mental health QM, and there's only three

23  people in there that would be involved in that.

24   Q.    And how confident are you that mental health QM

25  is in charge of the performance report indicators?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.      Quite confident.

 2    Q.      Is there anyone from psychiatry on that

 3  three-person team that you described?

 4    A.    No.

 5    Q.      Do you have access, as a managing psychiatrist,

 6  to mental health data about psychiatry?

 7    A.    No.

 8    Q.    Do you have any level of access?

 9    A.    I have some level of access.

10    Q.      What is your level of access -- or what was?

11  Excuse me.

12    A.    Was, yes.  Now, none.

13          What were in the regular program reports that

14  managers would have available to them, I would have

15  access to.  So specific detailed information that I

16  really needed to know to help a particular institution

17  or a particular situation, I didn't have that ready

18  access to be able to pull something that wasn't already

19  pre-formatted.

20    Q.    Would additional access have helped you do your

21  job?

22    A.    Yes.

23    Q.    Why?

24    A.      It would enable me to look at the current

25  performance indicators, find a red flag or find an
```

Page 182

Kevin Kuich, M.D.                                    September 19, 2019

1    anomaly, and to be able to track it down into its

2    various components so that I could be able to help the

3    institution address the change because I could identify

4    if it was a psychiatry performance issue, a physical

5    building issue, an access issue, what is it, and be able

6    to create a solution that would work for that particular

7    institution.  It's -- CCR is wonderfully homogenous and

8    not at the same time.  So each institution, based on

9    their patient population, the staff, even just the

10   attitudes and the personalities of the people working

11   there, required different solutions.  And so being able

12   to see a flag and have access to data to be able to

13   define all the variables related to that, for that

14   unique institution's situation, would be hugely

15   beneficial.

16    Q.    Did you ever ask mental health leadership for

17   more access to mental health data to help you do your

18   job?

19    A.    Yes.

20    Q.    This will be Exhibit 12.

21              (Plaintiff's Exhibit No. 12 was marked for

22              identification.)

23   BY MS. ELLS:

24    Q.    This is an e-mail from Dr. Golding to Katherine

25   Tebrock dated October 24th, 2017.  This document was

Defendants
object to Exhibit
12 &
183:20-184:17
as outside scope
of September
17, 2019 Order
(ECF 6288).

Plaintiffs
respond this
pertains to Dr.
Kuich's answer,
in part, to the
Court's
questions at
3:16-19 of
September 17,
2019 Order.

1   provided as part of Exhibit III to Dr. Golding's report

2   that he filed with the Coleman court and provided to the

3   Quada court.

4          You'll see at some point midway down the first

5   page, it says "Kevin said," and then there are a number

6   of things listed -- I'm sorry -- yeah.  And then there

7   are a number of things listed, and you'll see on the

8   next page, there's an e-mail from you that same day,

9   October 24th, 2017, to Dr. Golding.  Could you take a

10  look at those items, please, as well as the rest of the

11  e-mail string underneath your e-mail that was forwarded

12  to Dr. Golding.

13         MS. THORN:  I'm going to object to the

14  questioning on this exhibit and the issue of --

15  that's addressed in this e-mail as beyond the scope

16  of the September 17th order.

17         THE WITNESS:  Yes, I remember writing this.

18  BY MS. ELLS:

19  Q.    Can you describe the concerns that you were

20  expressing in this e-mail to Dr. Golding that was then

21  forwarded by Dr. Golding to Katherine Tebrock on October

22  24th, 2017?

23  A.    In the -- once the EHRS was rolled out, there's

24  always people that adapt quickly to it and other people

25  that struggle with it.  And in -- out of both of those

1   groups, there's some commonalities that I would keep
2   hearing, that they're struggling, that they're spending
3   a lot of time doing this or this is taking too much time
4   or this seems error prone.  And so I wanted to get a
5   sense of how long are these things taking.  If you have
6   a ten-hour day, you should be able to at least ten
7   patients.  Why -- why five?  You know, or why more?  Why
8   15?  I mean, what's -- what is one person doing that
9   another person isn't?

10       So I needed to get a sense of some of the things
11  of what psychiatrists are being asked to do in the
12  system and outside the system so I could get a sense of
13  how much time do things take and then use that large
14  block of time to say, okay, this seems to be taking an
15  inordinate amount of time; what can we do in terms of
16  design of the system to create something that's more
17  efficient and works better for them.

18       So I wanted to get a sense of what psychiatrists
19  are doing.  And all of that information, everything is
20  encoded.  Every keystroke is encoded in the Cerner
21  system.  So I needed to get a sense of how are they
22  spending their time in this system.  It would help
23  inform training and other things.  So this was
24  information that wasn't accessed to be able to find out,
25  because this level of detail is not what's covered in

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   our performance reports.  Our performance reports are,
 2   did you make the appointment, did you do MAPIP, those
 3   kinds of things.  So it's not the day-to-day, granular
 4   what is this psychiatrist doing.
 5     Q.    So the information that you were requesting here
 6   is not information that you would have had access to
 7   from your level of access to the performance reports?
 8     A.    Correct.
 9     Q.    And in your e-mail that's embedded in
10   Dr. Golding's e-mail, which was, again, forwarded to
11   Katherine Tebrock, you say "Hi, Michael.  Back in June."
12   Do you mean June 2017?
13     A.    Yes.
14     Q.    And is that -- you say that you met with Britt.
15   Do you mean Dr. Brizendine?
16     A.    Dr. Brizendine, yes.
17     Q.    And John Rekart, Dr. Rekart, and Steven
18   Cartwright, about accessing additional data that would
19   be helpful to you in your management of psychiatrists;
20   is that accurate?
21     A.    Yes, that's accurate.
22     Q.    And does e-mail string, which the initiating
23   e-mail is, at the very bottom on the last page,
24   June 21st, 2017, addressed to Steven Cartwright,
25   Brittany Brizendine, and John Rekart -- is that
```

1    reflective of your initial attempts to get data to help
2    you do your job?
3      A.    Yes.   This was -- the June 21st meeting was a
4    follow-up to the meeting in which I was told I could use
5    Lighthouse, which is a Cerner product, to get this
6    information, and I couldn't.   So it was -- it was a bit
7    of a red herring in that sense.   There was not -- that
8    could not give me that information, so.
9      Q.    So is this June 21st e-mail intended to say,
10   Hey, we talked about my request for data, you told me I
11   could use Lighthouse, it's not working?   Is that
12   accurate?
13     A.    Right.   It's -- that -- in that discussion, when
14   I talked with Dr. Brizendine to say, Hey, you know,
15   I'm -- I need this -- I need this information and
16   Lighthouse isn't going to be working, she came in, had a
17   meeting with all of us and said, you know, what am I
18   looking for and these are the kind of elements.   So this
19   is a follow-up to that meeting, to basically say, Hey,
20   you know, although Lighthouse is useful, you know, these
21   are the things that I need to know, so what can I --
22   what can I do?   Because Dr. Brizendine had indicated
23   that that data would be available -- or could be made
24   available to me.
25     Q.    Okay.   And so by October 24, 2017, when you sent

Kevin Kuich, M.D.                                    September 19, 2019

1    this -- when you forwarded this string of requests about

2    your attempts to get data from Dr. Brizendine,

3    Dr. Rekart, and Mr. -- or Dr. Cartwright, is it safe to

4    assume that you had not yet received the data that you

5    were requesting -- the data access, excuse me, by

6    October 24th, 2017?

7     A.    Correct.  And then it was -- the suggestion was

8    made to add it into the QM data request queue, which was

9    a way to manage requests and those kinds of things.

10   But, again, it's just another way to -- another way to

11   put something someplace else.

12    Q.    And were you aware that Dr. Golding had elevated

13   your request to Katherine Tebrock for this information

14   in October of 2017?

15    A.    I -- he might have said that he had sent it.  We

16   would talk about various different things and he would

17   send off various different things, so it may have

18   happened, but I don't distinctly recall having that

19   conversation.

20    Q.    But were you aware that he was planning to

21   essentially elevate the issue and try and get you

22   access?

23    A.    Yes.

24    Q.    Okay.  And why did you not contact Katherine

25   Tebrock about this issue by yourself?

```
 1    A.      It seemed Dr. Brizendine was involved in it, and
 2    she was the -- maybe still is, the associate deputy.
 3    Q.      Meaning second in command?
 4    A.      Second in command.  So I -- if the second in --
 5    I think Ms. Tebrock had other things on her plate, and
 6    this didn't seem -- it seemed relevant to me, but not
 7    worthy in the scope of her obligations and
 8    responsibilities.  And I would think the second in
 9    command would be able to make this happen.
10    Q.      And although you reported to Dr. Tebrock, you
11    now know, this wasn't the type of relationship where you
12    could ask her for things like this; is that accurate?
13    A.      Yes.
14            MS. THORN:  Objection.
15    BY MS. ELLS:
16    Q.      Was your concern about not having sufficient
17    access to data to do your job addressed after --
18    promptly after October 2017?
19    A.      I still didn't get the data.
20    Q.      Okay.  Could you turn to Exhibit 9 again.  And
21    this is the e-mail in which Dr. Golding has clipped in
22    information that you wrote to him, and sent it on to
23    Katherine Tebrock on July 2nd, 2018, so the year after
24    you initially requested access to this data.  Item No. 3
25    in the portion that you wrote on page 2, could you take
```

Kevin Kuich, M.D.                                    September 19, 2019

1    a look at that?

2     A.    Uh-huh.

3     Q.    Is this an accurate reflection of what happened

4    to your request for data that you needed to do your job?

5     A.    Yes.

6     Q.    And at any point before you left the department

7    in July -- I'm sorry, in January of 2019, did you

8    receive access to the data that you were requesting?

9     A.    I did not.

10     Q.    CDCR has stated that it corrected the definition

11    for the "appointment seen as scheduled" indicator to

12    accurately reflect the indicator's methodology, which

13    excludes certain appointments, including no shows,

14    patient refusals, and scheduling errors."  They say that

15    they corrected that methodology -- the definition to

16    accurately reflect that methodology on October 3rd,

17    2018, after reviewing Dr. Golding's allegations.  Is it

18    safe to say that you never heard that that change had

19    been made?

20     A.    Correct.

21     Q.    So as to this topic again about the -- take the

22    Court's phrasing again -- Issue E, reporting of

23    scheduled and missed appointments and the things that

24    we've been discussing on that topic, the Court again

25    wants to know your views about why this issue could not

Kevin Kuich, M.D.                                      September 19, 2019

1    be resolved successfully internally and prior to

2    presentation of misleading data, namely this

3    "appointment seen as scheduled" indicator, to the

4    special master and the Court.  Do you have any views on

5    that?

6          MS. THORN:  Objection.  Lack of foundation.

7    And calls for speculation as to any testimony by this

8    witness on that subject.

9          THE WITNESS:  The data was an underpinning

10   rationale, from my perspective, of the staffing

11   proposal that was put forward, so it was not going to

12   be addressed.  And I would -- in my perception, I

13   think the hope was -- is that this would just move

14   through and everything would be fine, and everyone

15   was in agreement up until there were questions that

16   were raised.  And so I -- I can't imagine that it

17   would have been taken seriously or would have been

18   responded to in an expedient fashion, given the

19   matters before the Court.

20   BY MS. ELLS:

21    Q.    Doctor, were you aware that the "appointment

22   seen as scheduled" indicator, which was not clearly

23   defined to exclude many common reasons for appointments

24   being missed -- would it be surprising to you that that

25   was provided by defendants in support of their request

Kevin Kuich, M.D.                                    September 19, 2019

1    to reduce line psychiatry by 20 percent?

2         MS. THORN:  Objection.  Lack of foundation.

3    Calls for speculation.

4         THE WITNESS:  It would not surprise me and it

5    would in line with precedent.

6    BY MS. ELLS:

7    Q.    Doctor, do any of the issues that we've been

8    discussing today have anything to do with your decision

9    to leave CDCR?

10   A.    Almost all of them.  CDCR provided me a

11   wonderful opportunity to do many things, to interface

12   with many people, to learn a electronic medical records

13   system, to expand tele psychiatry, to be able to engage

14   psychiatrists in a meaningful way throughout an entire

15   system; also to be able to provide services to a

16   population that oftentimes is there because of mental

17   health.  And I thoroughly enjoyed my interactions with

18   medical, with nursing, with dental, with IT, with

19   pharmacy.  And I was continually frustrated by mental

20   health.  I think I would love to see mental health be

21   able to change, it's amazing that we've been in this

22   lawsuit for over 20 years, and I -- I just don't see

23   change on the horizon.

24         I would be happy to return had -- if there was

25   the ability to have a psychiatry voice.  There's many

Kevin Kuich, M.D.                                      September 19, 2019

```
 1   things that I know I had already started that I would
 2   love to finish, and I feel I've got a good rapport and
 3   relationship with the majority of people in mental
 4   health, in psychiatry, and in the organization itself.
 5   So I think I could be a positive agent for change, but,
 6   unfortunately, I think the change that I would like to
 7   bring about is not the change that prior
 8   administrations, nor likely the current administration,
 9   wishes to have occur.  So I will remain where I am for
10   this moment.
11          MS. ELLS:  Okay.  We don't have any more
12   questions for Dr. Kuich.
13                  EXAMINATION BY MS. THORN
14   BY MS. THORN:
15    Q.    Okay.  Dr. Kuich, I'm Elise Thorn.  We've worked
16   together in the past.
17    A.    Yes.
18    Q.    I have a few follow-questions to clarify some of
19   your statements that you made in response to Ms. Ells'
20   questions.
21          First of all, let's just talk about your access
22   to data.  Over the course of today, you talked about
23   different data sources and reports, whatnot.  A little
24   bit jumbled, but you talked about EHRS and your
25   involvement with the EHRS, and then also recently this
```

Kevin Kuich, M.D.                                        September 19, 2019

```
 1    afternoon about your access to the performance reports.

 2    And you mentioned that you used the performance reports,

 3    along with other data, in doing your job.

 4          Do you have you -- is that a yes?

 5    A.    Sorry.  Yes.

 6    Q.    Your access to the performance reports, how --

 7    how do you access the performance reports and -- just

 8    physically, technically?

 9    A.    So that would be a link.  It was bookmarked on

10    my computer, so I would go into the bookmark, and there

11    would be all the performance reports that were there.

12    Q.    And isn't it true that you could drill down for

13    any performance report to the individual institution on

14    any indicator as well as patient-level data on any

15    indicator?

16    A.    You can.

17    Q.    And did you do that on occasion?

18    A.    On occasion I did.

19    Q.    Okay.  So when you were talking earlier about

20    not having access to data, was that specific to the

21    ability to run queries on the data, for example, through

22    Dr. Leidner, as he would run queries?  I'm just trying

23    to get a sense for what data you didn't have access to.

24    A.    Yes.  It's -- those datas, that -- those data

25    sets that would require a query to be able to access.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   Also, there are other -- the performance reports were
 2   pre-formatted, so they already were pulling in certain
 3   bits of information.  I needed additional information
 4   other than that.
 5          So the only way that I could get them was to
 6   query the database, which is a whole bunch of ones and
 7   zeros, and if someone could -- and it's all out there,
 8   and if someone could just put a query together and put
 9   those things through, then I would be fine.
10   Q.    Did you ever submit a request for a data query
11   to Dr. Leidner that was refused?
12   A.    I don't believe I submitted a request to
13   Dr. Leidner.
14   Q.    Ever?
15   A.    I don't believe I did.  Given the context of not
16   having data that I'd already requested not come back, I
17   didn't see the point.
18   Q.    Were you a regular attendee at the monthly
19   Mental Health Quality Management meetings CDCR held?
20   A.    The monthly meetings that were in the conference
21   room?
22   Q.    I don't know.
23   A.    Yeah, not --
24   Q.    Are you familiar with something such as the
25   monthly Mental Health Quality Management meetings?
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.    I would present at those meetings.

 2    Q.    Okay.  And who attended those meetings?

 3    A.    Those were the Quality Management team, some

 4  members of administration.  The regional staff would

 5  generally be on the phone.  There might be invited

 6  guests that are there.  Dr. Golding may or may not be

 7  there.

 8    Q.    And you said you presented at those meetings?

 9    A.    Correct.

10    Q.    For example, on what types of information?

11    A.    The information that I was requested to present

12  on, and that that had to do MAPIP-related things,

13  non-formulary things.  Those were elements that were

14  determined within that year or within a certain

15  time frame that these are the targets or the focus that

16  would be discussed.

17    Q.    In the context of those meetings, would you --

18  if you had any question regarding what was happening at

19  a given institution, were you free to ask that question?

20    A.    And I did.

21    Q.    And would you get responses from those in

22  attendance?

23    A.    Sometimes.

24    Q.    With respect to the third issue Ms. Ells showed

25  you from the Court's order, the issue regarding
```

Kevin Kuich, M.D.                                          September 19, 2019

```
 1   appointments seen as scheduled, we talked about your
 2   familiarity with that -- that term and that performance
 3   report indicator.  Are you familiar with how that data
 4   is complied and then assimilated into the performance
 5   report?
 6    A.    No.   That is a level that only Dr. Leidner or
 7   Dr. Ceballos would know.
 8    Q.    And with respect to any data pulled from the
 9   performance report and presented to the special master
10   and -- or the Court in connection with the staffing
11   proposals, were you familiar with data that was compiled
12   in order to submit that report?
13    A.    I was familiar with the reports themselves, but
14   I didn't --
15    Q.    Specifically for the staffing proposals?
16    A.    No.   I did not see that specific data.
17    Q.    In connection with the staffing proposals, I
18   think you mentioned that you never saw an actual copy of
19   the staffing proposals.  Is that correct?
20    A.    There was -- when it was close to being
21   presented and it was in its basic final form, I believe
22   Dr. Golding had shown me a copy.
23    Q.    And when was that?
24    A.    It was probably days before it was presented.
25    Q.    And I believe you testified that you only were
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

 1   involved with respect to the staffing proposals for
 2   addressing the reduction in the level of psychiatry
 3   needed for the crisis intervention teams.  Is that
 4   correct?
 5   A.    The -- the on -- what would be the on call --
 6   using tele psychiatry for on call.
 7   Q.    And you talked about a meeting with Ms. Ponciano
 8   with respect to that?
 9   A.    Yes.
10   Q.    Prior to your meeting with Ms. Ponciano, did you
11   have any meetings with anyone at mental health about the
12   staffing proposals?  Any of them.
13   A.    Not that I recall.
14   Q.    Did you ever have a meeting with Katherine
15   Tebrock and Dr. Golding regarding the staffing
16   proposals?
17   A.    There could have been a meeting about discussing
18   that there will be staffing proposals that will be
19   forthcoming and more information will be provided at the
20   appropriate time.
21   Q.    So you don't recall meeting with Katherine
22   Tebrock and walking through each of those staffing
23   proposals before they were submitted to the special
24   master and plaintiffs?
25   A.    I don't recall that.

Kevin Kuich, M.D.                                        September 19, 2019

```
 1    Q.    But it could have happened?

 2    A.    It's possible.  At some point in time, there

 3   would have had to have been a question about what the

 4   staffing proposals are and what it's based on, to be

 5   able to assemble information.  So I don't know the

 6   specific date or if that happened in that combined

 7   format.

 8    Q.    So it's possible, but you can't remember one way

 9   or the other, an additional meeting other than the one

10   that was with Ms. Ponciano?

11    A.    Ms. Ponciano's, I remember explicitly because

12   that had to do with tele psychiatry and tele psychiatry

13   services, and I had to operationalize that.  Anything

14   else beyond that was not as -- wouldn't stick in my

15   memory as much because I wouldn't necessarily

16   operationalize it.

17    Q.    Okay.  Do you remember providing information or

18   some presentation at a "all-parties work group" with the

19   plaintiffs and the special master regarding the staffing

20   proposals in June of 2018?  Do you have any recollection

21   about that?

22    A.    I was in those meetings.  There's many things

23   that were discussed at various times, whether it was EOP

24   hub certs or other kinds of things.  And so could I have

25   been in a meeting where something was discussed?  It's
```

Kevin Kuich, M.D.                                    September 19, 2019

1   possible.

2   Q.    I would like to know if you recall it.

3   A.    I don't recall it.

4   Q.    So after your meeting with Ms. Ponciano where I

5   believe you testified that you met with her to talk

6   about the number of positions that would be needed.

7   A.    Uh-huh.

8   Q.    And you came up with eight; is that correct?

9         MS. ELLS:  Objection.  Misstates testimony.

10  BY MS. THORN:

11  Q.    Okay.  So it's been a while, so just -- as I

12  recollect, you said that Ms. Ponciano pulled you out of

13  another meeting and said, We've got to come up with a

14  number.  And can you describe how you came up with that

15  number?

16        MS. ELLS:  Objection.  Misstates testimony.

17        THE WITNESS:  I didn't come up with a number.

18  I would have rather had time to --

19  BY MS. THORN:

20  Q.    So that's not my question.  The number is eight,

21  correct?

22  A.    That is the number that's in the staffing report

23  that I saw, yes.

24  Q.    Okay.  And after your meeting with Angela

25  Ponciano, you never saw that have staffing proposal?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    That piece of it even?  Did you have any discussion with
 2    anyone about that piece of the staffing proposals.
 3     A.     I had a discussion with Dr. Golding to say
 4    what -- what Ms. Ponciano is proposing seems somewhat
 5    concerning, that I don't think we're going to be able to
 6    -- if that's the number she's choosing, I see a
 7    potential problem with that.
 8     Q.     So it's your testimony that you had no input on
 9    determining that number?
10     A.     She wanted a number and she had a number in her
11    head, and I wanted to have time to have input, real
12    input, not an ambush input.  And so I would say no.
13     Q.     Did you have any discussions with anyone at
14    mental health, including Katherine Tebrock or
15    Dr. Golding, about that number of psychiatrist positions
16    that would be needed for the -- I guess it's the after
17    hours?
18            MS. ELLS:  Objection.  Vague.
19            THE WITNESS:  No.  The number was determined,
20    and there was concern for what the number was.  And
21    since this proposal was already being put forward, it
22    didn't seem that there was time to find out all the
23    details needed to provide an accurate and responsible
24    number.
25    BY MS. THORN:
```

Kevin Kuich, M.D.                                    September 19, 2019

1   Q.    Were you involved in any meetings where the

2   staffing proposals were discussed after your meeting

3   with Ms. Ponciano, at any time between the -- the time

4   you met with Ms. Ponciano and, let's say, October 2018?

5          MS. ELLS:  Objection.  Asked and answered.

6          THE WITNESS:  I don't recall.

7   BY MS. THORN:

8   Q.    Do you recall any other details about your

9   discussions with Ms. Ponciano at that meeting?

10  A.    The discussions that I related, they are my

11  recollection of the discussion we had in that chief of

12  mental health meeting, when it was pulled out and asked

13  to -- here's the situation and the number was

14  determined.

15  Q.    And do you know the basis for that number?

16  A.    It seemed like it was pulled out of a hat.

17  Q.    So Angela Ponciano presented you with the

18  number eight, and you said sure?

19          MS. ELLS:  Objection.  Misstates testimony.

20          THE WITNESS:  It was apparent that a number

21  needed to be determined.  I don't know what the

22  urgency was or the priority was, but it seemed that

23  something Ms. Ponciano needed immediate decision on,

24  based on perhaps some report or filing that needed to

25  occur.  And I expressed my concern that that number

Kevin Kuich, M.D.                                          September 19, 2019

1   being proposed was not -- potentially was not

2   adequate, and I was reassured that if it wasn't, that

3   there would be additional resources that could be

4   found.  Given the presentation of the urgency of

5   making that decision, I had to take Ms. Ponciano at

6   her word.

7   BY MS. THORN:

8    Q.    When this deposition or prior to getting this --

9   strike that.

10        Did you speak with anyone to prepare for your

11  deposition today?

12   A.    We had a discussion about the elements of what

13  this would entail and how the deposition would go.  So,

14  yes, I did speak with Ms. Ells.

15   Q.    And when did you speak with Ms. Ells?

16   A.    Monday at 3:00 p.m.

17   Q.    This past Monday?

18   A.    Yes.

19   Q.    Prior to this Monday have you had any other

20  conversations with Ms. Ells or anyone from her law firm?

21   A.    No.

22   Q.    How long did your call last with Ms. Ells --

23  strike that.

24        Was that a telephone call?

25   A.    Telephone call.

Kevin Kuich, M.D.                                    September 19, 2019

1   Q.     Okay.  How long did the call last?

2   A.     90 minutes.  I was in the Home Depot parking

3   lot, so I was a bit distracted.

4   Q.     And did Ms. Ells ask you or inform you the

5   topics she would be asking you about at the deposition

6   today?

7   A.     Mentioned the three areas of concern, and also

8   generalities about the deposition and how, procedurally,

9   they occur.

10  Q.     Did she cover any specifics on the issues; for

11  example, the plaintiffs' positions and your positions

12  with respect to the issues raised today in the

13  deposition?

14  A.     No.

15  Q.     So you spoke for 90 minutes.  Did she ask you to

16  review any specific documents?

17  A.     No.

18  Q.     So you, I believe, testified this morning that

19  you reviewed some documents including the order that

20  we've been talking about today, the order that's been

21  marked as Exhibit 2.  Also, you stated that you reviewed

22  the executive summary of the Gibson Dunn report?

23  A.     Yes.

24  Q.     Did you review any other parts of the Gibson

25  Dunn report?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    No.   That's all I had time for.

2    Q.    Have you ever reviewed other parts of the Gibson

3    Dunn report?

4    A.    No.

5    Q.    Why not?

6    A.    Time.   I have a full-time job running a

7    hospital.   This lawsuit is not my full-time job anymore.

8    But I'm happy to contribute what I know if it helps to

9    move this process forward and help patients get care.

10   Q.    I believe you testified earlier that with

11   respect to who you reported to within CDCR mental

12   health, that no one ever told you who you were supposed

13   to report to, and so I'm just wondering if -- you just

14   inferred that you would report to Dr. Golding.   So at

15   the -- first of all, as the chief of telepsychiatry, did

16   you ever ask that question?

17   A.    No.   Doctor -- my predecessor, Dr. Captherian,

18   worked with Dr. Golding, reported to Dr. Golding.

19   Dr. Golding signed his time card.   Dr. Golding approved

20   time off.   So I was essentially moving into

21   Dr. Captherian's position, so.

22   Q.    You never asked?

23   A.    Never asked.   You would think someone who is

24   supervising would inform me and be able to do reports.

25   I believe there would be a 90-day assessment of my

1    performance.  So I would hope if someone was supervising

2    me, they would do that and identify themselves, but

3    apparently that didn't happen in this instance.

4    Q.    You testified earlier about your experience in

5    the institutions and your observations about supervising

6    psychiatrists and the work they undertook, including the

7    work of line staff psychiatrists.  And I just wonder if

8    you ever looked at any published data or available data

9    to actually confirm your suspicions and your

10   observations in the institutions.

11        MS. ELLS:  Objection.  He testified that there

12   was no such data to review.

13   BY MS. THORN:

14   Q.    Did you ever look at any data?

15   A.    There was not data to review.

16        And I would say, if I spent my time tracking all

17   these things down, it would have prevented me from

18   engaging the telepsychiatrists, coordinating with the

19   psychiatrists out in the field, and also working on the

20   EHRS, because that would have been a full-time job.

21   Q.    So do you agree, though, that part of the role

22   in the job duties, the official duties of supervising

23   psychiatrist, is to actually backfill those positions,

24   you know, to cover when they've got vacancies in their

25   institutions?  If that person is out sick or something,

Kevin Kuich, M.D.                                    September 19, 2019

1   you know, a clinician gets pulled off of doing one thing

2   and a supervisor is available, that that's actually part

3   of their -- their formal duties in the institutions?

4   A.      For managing unplanned absences, yes.  For

5   absences that are extensive and chronic, no.

6   Q.      So did you personally do any studies to

7   determine the percentage of the reasons for the coverage

8   that you observed in the field?

9   A.      If I had resources available to me, I certainly

10  could have called each institution and found that out.

11  Q.      But you didn't do that?

12  A.      I did not do that because I did not have

13  resources to do that.

14  Q.      Did you ask anyone at headquarters to do that

15  work?

16  A.      Who would I ask?

17  Q.      I'm just asking, did you ask anyone?

18  A.      There's no -- resources are not psychiatry's

19  resources.  Psychiatry shared an administrative

20  assistant -- headquarters psychiatry shared an

21  administrative assistant with telepsychiatry, so

22  headquarter psychiatry had half a person and

23  telepsychiatry had the other half of a person.  That is

24  the amount of staffing and support that psychiatry had

25  in headquarters.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                      September 19, 2019

1    Q.    Okay.  You testified earlier about HR data, that

2    it's delayed and flawed and something about coding.  And

3    I just want to know what HR data you were talking about.

4    That wasn't clear from your testimony.

5    A.    Data about why someone wouldn't be physically

6    working, so if they're on disability, if they're on

7    vacation, if they're on a leave of absence, those kinds

8    of things.  If they are on a work reassignment so they

9    could do some work but not other work, that data took a

10   long time to get to HR, it was not always accurate and

11   couldn't be relied upon.

12   Q.    And who at HR would you -- or who within CDCR

13   would provide that HR data to you?

14   A.    You would have to ask Ms. Ponciano.

15   Q.    So you would send her a request for that data?

16   A.    Yeah.  I wouldn't get it myself on any regular

17   basis.

18   Q.    But if you wanted that type of data, you would

19   send, what, an e-mail to Ms. Ponciano or call her?

20   A.    Right --

21   Q.    How would that work?

22   A.    -- would call or just ask or request.  Sometimes

23   I could have -- if it involved telepsychiatry, I could

24   have my telepsychiatry staff try to track it down

25   through their resource.

Kevin Kuich, M.D.                                September 19, 2019

```
 1    Q.    And so did you personally ever make a comparison
 2   between human resources data and what was going on in
 3   the field?
 4    A.    I don't believe I personally did.  But the
 5   staff, I believe, had looked at what data we were
 6   presented with and what we knew was factual.
 7    Q.    And when you say "staff," who are you referring
 8   to?
 9    A.    Telepsychiatry administrative staff.  So we had
10   administrative support for the telepsychiatry system.
11   So because, again, I wore many hats, there weren't --
12   there weren't resources at headquarter psychiatry, so I
13   would -- I would utilize my telepsychiatrist to do
14   headquarters work at times because that's all I had
15   available to me.  So I would -- I would have to direct
16   them off of her own work to be able to do work that I
17   would need for a system, which I did not like to do, but
18   that was the only recourse that I had.
19    Q.    Earlier today Ms. Ells asked you about an
20   analysis that Ms. Ponciano did for the time period 2017
21   to 2018 reported in the neutral expert's report.  I
22   didn't ask for that page cite, but you stated that the
23   number of psychiatrists appeared rather low and that
24   some institutions are well staffed and others aren't.
25   And I just wondered what document you were referring to
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    with respect to the analysis.
 2            MS. ELLS:  Objection.  Vague.  Which analysis
 3    are you asking about, the one that I was referencing
 4    or the one that he was referencing?
 5            MS. THORN:  You referenced -- you referenced
 6    from the neutral report -- neutral expert report an
 7    analysis of psychiatry staffing from 2017 to 2018.
 8            MS. ELLS:  Right.
 9            MS. THORN:  And you said, Don't you think
10    that's a low number of psychiatrists?
11            And he said, It seems rather low.
12            MS. ELLS:  To correct the record, I also said
13    the analysis concluded that for the six-month period
14    in question, Ms. Ponciano concluded that all of the
15    psychiatry participation and patient care during the
16    six-month period in question resulted to only 1.25
17    FTEs total.  So that was the question that was
18    presented.
19            MS. THORN:  All right.
20    BY MS. THORN:
21     Q.    So do you -- are you aware of any analysis that
22    was done for psychiatry numbers for that time period?
23     A.    No.
24     Q.    Did you ever review any analysis?
25     A.    I would have loved to have seen it.
```

1   Q.    So your testimony today is based on just
2   Ms. Ells' statements?
3   A.    It's based on my -- my experience of what
4   seniors and chiefs are doing.  It's based on my personal
5   experience when I rolled out the EHRS and visited
6   multiple institutions.  It is based on my experience of
7   having them request staffing, whether that staffing is
8   contract registry staff or whether it's telepsychiatry
9   staff.  So in those multiple layers of interactions of
10  multiple different times, that forms the basis of my
11  assessment of work that they're doing as a staff
12  psychiatrist.
13  Q.    Okay.  So you weren't specifically today
14  referring to any certain document?
15  A.    No.
16  Q.    Do you have Exhibit 4 in front of you?
17  A.    Yes.
18  Q.    And I see that you've turned to page 9 of that
19  exhibit, which is the table you reviewed earlier today
20  in your testimony.  Up at the top it says "mental health
21  psychiatry staffing versus compliance."  Do you see
22  that?
23  A.    Yes.
24  Q.    All right.  Do you know who prepared this table
25  that's at page 9 of Exhibit 4?

1    A.    I do not.

2    Q.    Did you see it before today?

3          MS. ELLS:  Objection.  Asked and answered.

4          THE WITNESS:  I have not.

5    BY MS. THORN:

6    Q.    And do you know what data was pulled to or

7    compiled to create the information set forth on this

8    table?

9    A.    I have suspicions of where this information came

10   from.

11   Q.    But do you know?

12   A.    I don't know.

13   Q.    Earlier you said that, I believe, in meetings

14   regarding data specifically regarding MAPIP issues, that

15   you would indicate in your presentations with a footnote

16   some limitations on MAPIP.  Is that consistent with what

17   you said earlier today?

18   A.    That's correct.

19   Q.    So if you could just look at footnote 3 on

20   page 9 of Exhibit 4 and read that.  If you could just

21   read it to yourself.

22   A.    That looks similar to a footnote that I would

23   provide.

24   Q.    Is that the same type of issue with MAPIP that

25   you were describing earlier today?

```
 1    A.    Yes.
 2    Q.    Let's go back to this table on page 9.  I
 3    believe you also provided some information regarding
 4    staffing at Salinas Valley State Prison, specifically
 5    your conversation or observation of Dr. Gills'
 6    performing consultations at Salinas Valley.
 7    A.    Yeah, I believe -- I believe -- it is his
 8    institution, and I believe that's the institution he was
 9    at.
10    Q.    And so what type of consultation was he
11    performing when you were observing his work at Salinas
12    Valley?
13    A.    He would perform medication evaluations, second
14    opinions.
15    Q.    And how many times did you observe him
16    performing those duties?
17    A.    In the week that I was there for EHRS.  And,
18    actually, he's -- actually, he is at SATF, not Salinas
19    Valley.  So I would like the record to correct that.
20    Q.    Okay.  All right.
21          You've seen exhibits today from -- represented
22    to be from Dr. Golding's report.  Are you familiar with
23    Dr. Golding's report?
24    A.    I am --
25    Q.    When I say that, do you know what I'm talking
```

1    about?

2    A.    I know what you're talking about, yes.

3    Q.    And did you review his report?

4    A.    Did I review his report?  I did look at -- I

5    reviewed an early draft of his report.

6    Q.    When you say "early draft," does that mean

7    before the -- before the version he submitted to the

8    receiver in October?

9    A.    Yes.

10   Q.    When did you first review a draft of his report?

11   A.    I don't recall.

12   Q.    How many times did you review a draft of his

13   report?

14   A.    Once.

15   Q.    Did you provide him any feedback?

16   A.    Grammatical, which was my -- what I generally

17   served -- the purpose I served for Dr. Golding.

18   Q.    Did you recall when the first time you reviewed

19   his report or any --

20         MS. ELLS:  Objection.  He stated he only

21   reviewed it once.

22   BY MS. THORN:

23   Q.    Do you recall when?

24   A.    I don't recall when.

25   Q.    Did you -- before you saw a version of his

Kevin Kuich, M.D.                                    September 19, 2019

```
1    report, a draft of his report, did you have any

2    discussion with him about his preparation of the report?

3     A.    No.  He would tell me that there's various

4    information that he's collecting and various information

5    that he is curious about trying to learn more about.

6     Q.    Okay.  So I just -- because you saw the exhibits

7    from the reports, had you seen those exhibits before

8    today?

9     A.    Some of the exhibit, I wrote, so yes.  So -- and

10   yeah, so...

11    Q.    If I could draw your attention to Exhibit 5,

12   please.

13          MS. ELLS:  Are you referring to the staffing

14   proposal?

15          MS. THORN:  It is the staffing proposal, yes.

16   It's an e-mail from Ms. Bentz with the staffing

17   proposal attached.

18   BY MS. THORN:

19    Q.    And I would just like to have you look at one of

20   the pages Ms. Ells had you look at earlier today.  I

21   think it was page 13.  It has the table that's called

22   "Timely psychiatry contacts, October 1."  That's it,

23   yes.

24    A.    Okay.

25    Q.    So you're looking at the table Timely Psychiatry
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    Contacts, 10/1/17 to 3/31/18 for CCCMS and EOP, correct?
 2     A.    Correct.
 3           MS. ELLS:  Can I just clarify the record --
 4    because these are unpaginated -- that this is the one
 5    that lists four institutions.  Is that right?
 6           MS. THORN:  That's correct.
 7    BY MS. THORN:
 8     Q.    It's got Calipatria, Centinela -- Centinela,
 9    CVSP, and ISP; is that correct?  Do you see that?
10     A.    I do see that, yes.
11     Q.    Had you seen this table before today?
12     A.    No.
13     Q.    Do you know what data was compiled in order to
14    create this table?
15     A.    I assume they use the timely psychiatry contact
16    report, stratified it by CMS and the institutions, and
17    pulled a number out of there.  But I was not involved in
18    its creation, but that would be my assumption.
19     Q.    Okay.  Thank you.
20           And turning now to the third page from the end,
21    which is also a table, "Timely psychiatry contacts" for
22    the same period of time, "Mainline CCCMS."
23           Again, do you know who created this table?
24     A.    I do not.
25     Q.    Do you know what data was pulled or compiled to
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1   present the data in this table?

2   A.    I do not.

3   Q.    Do you know the context in which this table was

4   presented?

5         MS. ELLS:   Objection.   He's testified he's

6   never read this report.

7   BY MS. THORN:

8   Q.    So you don't have any context for this -- these

9   numbers or this data set forth on this table?

10  A.    I would say, given that they're in a staffing

11  report, the context is, hey, we're great, we're green,

12  we don't need psychiatrists.

13  Q.    But -- that's what --

14  A.    But that would --

15  Q.    -- I was going to ask.

16  A.    -- be my assumption.

17  Q.    Okay.   Thank you.

18        If you could just look at Exhibit 6, please.

19  A.    Of course it's almost the last one.

20  Q.    Same thing happened to me.

21        Again, I just want to know -- I understand you

22  did not see this exhibit before today.   Is that correct?

23  A.    That's correct.

24  Q.    And so with respect to the information contained

25  in this e-mail that -- you don't know where it came from

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    or the data it's based on?
 2            MS. ELLS:  Objection.  It's from Melissa
 3    Bentz.  It's not data.
 4    BY MS. THORN:
 5    Q.    The -- the -- there are staffing ratio numbers
 6    and information contained in this e-mail.  Do you know
 7    the basis or the origin of the information used to
 8    present this, those staffing ratio numbers?
 9    A.    My understanding is that they were original
10    staffing ratios presented by the monitors or whomever.
11    And these may or may not be different from what those
12    contacts are.  These may in fact be keeping to those
13    ratios or may be proposing new ratios.  I don't know.
14    Q.    Assuming it says "ratio change," I suspect that
15    there's a request to change the ratio.
16            Looking at Exhibit 7, please.
17    A.    Uh-huh.
18    Q.    And if you could turn again to the last page of
19    Exhibit 7, page 5 of the -- at the top.  You see the
20    number?
21    A.    I'm sorry.  Which page?
22    Q.    The last page of the document.
23    A.    Okay.
24    Q.    Again, are you familiar with this document?
25    A.    From seeing it today, yes.
```

Kevin Kuich, M.D.                                        September 19, 2019

1    Q.    Did you review any report like this while you

2    were working for CDCR?

3    A.    No.   This is similar to a report that tele psych

4    would generate, but it would be somewhat different --

5    somewhat of a different format and have some different

6    numbers.   But this is a format similar to what tele

7    psych would provide.

8    Q.    And so you had no role in preparing this

9    document?

10   A.    No.   If there was telepsychiatry numbers, my

11   staff might have provided current telepsychiatry

12   numbers.   We would be asked at various times for

13   information and we do not look for, but we would comply

14   and we would provide information as requested.

15         One such example was looking at cell side

16   telepsychiatry and how often those visits actually

17   occurred.   And so we were asked to perform a survey to

18   find out how frequently that happened, so we did provide

19   that information as requested by Ms. Tebrock, to

20   Ms. Tebrock, so she had a good understanding of how

21   frequently it was occurring.   That would be a typical

22   example of how we would be providing data at -- at

23   request only.

24   Q.    I would like you to look at Exhibit 8, please,

25   which is the e-mail from Melanie Gonzalez to Dr. Golding

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    dated March 22, 2017.  At any time -- let's see.  So

 2    prior to coming to headquarters, you testified that you

 3    were a staff psychiatrist at CHCF?

 4     A.     Correct.

 5     Q.     And at any time while you were at CHCF, did you

 6    have any discussion with psychiatrists regarding the

 7    30-day requirement for contacts with EOP patients?

 8     A.     When I was a staff psychiatrist there?

 9     Q.     Correct, or when you were a supervising

10    psychiatrist.

11     A.     So I was never a supervising psychiatrist, but I

12    was a senior psychiatrist specialist.

13            When I was at Stockton, Stockton was lucky to

14    make it through the day and they were just grateful that

15    a patient could be seen.  So in terms of meeting metrics

16    and requirements, that really wasn't able to come into

17    play at Stockton for probably a year until after they

18    were open.

19     Q.     And so were you aware that the request to change

20    the 30-day -- every 30-day contact for EOP patients,

21    that that request came from psychiatrists at CHCF?

22            MS. ELLS:  Objection.  That's not a fact in

23    evidence.

24    BY MS. THORN:

25     Q.     Were you aware of that?
```

Kevin Kuich, M.D.                                    September 19, 2019

 1   A.     I was not aware of that.

 2   Q.     Okay.  And you didn't read the Gibson Dunn

 3   report except for the executive summary, so you wouldn't

 4   have read the section about that rule change in the

 5   report, correct?

 6   A.     Correct.

 7          I wouldn't find it surprise -- I'm not surprised

 8   to hear that if that request did in fact come from CHCF,

 9   given their limited number of psychiatrists, their

10   inability to retain staff, and their inability to ever

11   be compliant, so change the rule and they might make it.

12   So I'm not surprised.  CHCF has had -- CHCF was one

13   institution where, for instance, visa candidates were

14   taken from their much-needed institution and placed into

15   another division that was easy to recruit and easy to

16   retain psychiatrists.  So CHCF has its own storied

17   history, yet still has a fond place in my heart.

18   Q.     Earlier you -- when you were talking about this

19   same issue, this change in the rule, I believe you

20   testified that when you were asked how did you discover

21   that there was a change in the business rules, and you

22   said all the rules were laid out for us.  And so I'm

23   wondering when you -- for -- when you said "us," do you

24   mean psychiatry or all CDCR staff?  What were you

25   referring to?

Kevin Kuich, M.D.                                    September 19, 2019

1          MS. ELLS:  Quickly, when you refer to a rule

2    change, we talked about a lot of those today.  Which

3    one are you talking about?

4          MS. THORN:  So particularly the 30-day rule

5    change that is reflected in Exhibit 8.

6          THE WITNESS:  So I would often use -- there

7    was a part in the program reports that would be

8    compliance rules.  And so because they were -- they

9    did have a tendency to change and move, and sometimes

10   people would ask questions of me and I needed to be

11   able to answer what is the current rule, I would

12   reference that grid and be able to drill down and

13   find out if we're talking about MHCBs or PIPs or CCC

14   or ad seg or what have you and be able to provide

15   some guidance to the institutions to help improve the

16   measure based on what the current definition is.

17   BY MS. THORN:

18   Q.    And where were those rules?  You said they were

19   laid out, so I just want to know --

20   A.    Yeah.  They were in the -- I believe they were

21   in the program -- the program reports.  It was one in --

22   I believe it was list of compliance rules.  And so

23   anything -- any numerator and denominator was listed

24   there.

25          I'm still taken that CHCF psychiatrists would

Kevin Kuich, M.D.                                    September 19, 2019

1   get a rule changed that would affect everybody and that

2   would go through -- I -- I -- I'm gobsmacked with this.

3   I'm -- I'm -- I'm actually shocked at how porous the

4   system is, that something so major could be brought by

5   folks that are obviously struggling and have such a

6   tremendous impact.  That says quite a bit about the

7   organization's sustainability and procedures.

8    Q.    Earlier you talked about the webinars that

9   Dr. Leidner held, and I believe you said that you

10  attended them twice.

11   A.    A few times.

12   Q.    A few times, okay.

13         In all of your time with CDCR, you only attended

14  them twice?

15   A.    Right.

16   Q.    And those are the weekly webinars?

17   A.    Weekly webinars.  They were usually scheduled at

18  other times that I had other meetings.

19   Q.    But you or one of your colleagues or someone

20  from your office could have attended -- if you had

21  wanted to ask a question and were available to go, you

22  certainly could have asked questions during those

23  webinars, correct?

24   A.    The webinars, yes.  The webinars were more

25  geared toward data, writing a query, data management,

Kevin Kuich, M.D.                                        September 19, 2019

1    those kinds of things.  So it wasn't at the level of

2    compliance rules or those kinds of things.  It was more

3    -- more operational, more functional, in the meetings

4    that I had been in and had experienced.

5      Q.    And so when you testified today about the nature

6    of the data issues that were resolved during those

7    webinars, you were only speaking to the two -- the

8    several that you attended?

9      A.    Correct.

10     Q.    And I believe your testimony was also that you

11   weren't aware of any -- any reports or information that

12   followed from those webinars, any notices to CDCR staff

13   regarding changes as a result of those webinars.

14     A.    No.  I don't --

15     Q.    Am I -- am I misunderstanding?

16     A.    No.  That's correct.  I don't remem- -- recall

17   seeing on today's webinars these were the things

18   discussed, these were the things resolved, something

19   like that, a minutes per se.

20     Q.    You're not aware of a website where the notes

21   regarding changes in the data -- data issues were

22   available to CDCR staff?

23     A.    No.  The -- all the intranet was never easy to

24   navigate and it -- there were always questions that

25   institutions had about where is something, because it

 1   was never clear -- in a way that was very easy to access
 2   and clear.

 3   Q.    How about updates to the EHRS?  How would you
 4   get notice of that?

 5   A.    Those -- those -- there would be updates on an
 6   update page.  And most of those updates, I would be
 7   aware of because I was part of the decision to make that
 8   change.  If there were any updates that weren't part of
 9   a formal process, I wouldn't know whether they made the
10   page or not, so...

11         Also, when CLAC would close out an issue, CLAC
12   would have their own organization-wide -- not mental
13   health specific, but organization-wide -- what do they
14   call them?  Not end notes but something like that, that
15   basically said this is the change and this is what
16   happened.  So there was the larger organizational piece
17   that went out to everybody in CDCR.

18   Q.    Including yourself?

19   A.    Correct.  Correct.

20   Q.    And was that with respect to EHRS only or all
21   data issues that were fixed?

22   A.    EHRS.

23   Q.    I think earlier you testified that the -- you
24   believe that the rule change, the 30 days to monthly or
25   not to exceed 45 days with respect to psychiatry

```
 1   contacts, was a result of pressures to make the metrics
 2   more generous.  And just wondering what you based that
 3   on, if that's speculation, since you weren't aware of
 4   the change.
 5   A.    I don't know what constituted the change, but --
 6   and what the requests were and whether it had any direct
 7   impact on the staffing proposal, but I -- I'm still
 8   shocked that a change that is an obvious
 9   contraindication to what is laid out in the program
10   guide was allowed to go through without vetting.
11   Q.    Are you familiar with Drs. Anand and Jahangiri
12   at CHCF?
13   A.    Yes.
14         THE REPORTER:  Can you spell those?  I'm
15   sorry.
16         MS. ELLS:  A-n-a-n-d, and Jahangiri is
17   J-a-h-a-n-g-i-r-i.
18         THE WITNESS:  Do you have Dr. Anand's first --
19   BY MS. THORN:
20   Q.    Karuna.  Dr. Karuna Anand.
21   A.    Karuna, okay.
22   Q.    K-a-r-u-n-a.
23   A.    I believe she was terminated from CDCR.  Okay.
24   I am familiar, yes.
25   Q.    I'm going to ask you questions now about the
```

Kevin Kuich, M.D.                          September 19, 2019

1   discussion you had with Ms. Ells about CLAC.  And I

2   believe you testified that regarding the -- there was

3   the memo regarding the internal change committee that

4   was brought about and -- and can you clarify when that

5   happened?

6    A.    When the memo?

7    Q.    No, when the -- okay.  Strike that.  Let me just

8   get my thoughts.

9          All right.  So with respect to the mental health

10  internal change committee, do you know when that was

11  first initiated?

12   A.    The internal mental health change committee?

13   Q.    Right.  And I believe Ms. Ells called it a

14  subcommittee we were referring to.

15   A.    So the memo that is one of the exhibits here was

16  when it was -- it was a small --

17   Q.    It's an e-mail from Laura Ceballos dated

18  June 2018.

19          MS. THORN:  Exhibit 10.

20          MS. ELLS:  Exhibit 10, yes.

21          THE WITNESS:  So it -- I don't know the exact

22  date of when they started, but it was -- it was

23  shortly after this memo when those subcommittee

24  meetings began to occur.

25  BY MS. ELLS:

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.     But you can't pin it down more closely than

2    that?

3    A.     I would have to access my CDC schedule, which is

4    longer.

5    Q.     Did CLAC originate in mental health or was it a

6    process from CHCCS?

7    A.     It was a CCHCS process, so it was a

8    multidisciplinary process that was begun by Dr. Peterson

9    prior to his retirement.  So it'd been around for quite

10   some time.

11   Q.     Exhibit 11, Exhibit MM from the Golding report.

12   A.     Okay.

13   Q.     I just want to ask you -- I believe you

14   testified earlier that requiring requested changes to go

15   through the subcommittee before it went on to CLAC

16   allowed the massaging of data to show compliance, so I

17   just need to follow up with that statement.

18          MS. ELLS:  Objection.  Misstates the

19   testimony.

20          THE WITNESS:  Yeah, I don't --

21   BY MS. THORN:

22   Q.     You don't recall saying that earlier today?

23   A.     No.

24          It's two different -- the subcommittee addresses

25   changes.  It doesn't address data.  So it's its own

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    separate beast, and they need to be -- although changes
 2    to the EHRS affects what data can be pulled, that
 3    subcommittee doesn't determine data.
 4    BY MS. THORN:
 5    Q.    Okay.  So how would the -- then maybe I was
 6    confused.  Maybe you could clarify how -- I think maybe
 7    you said the EHRS allows massaging of data.  I just want
 8    to understand that.  You said -- you used that term, and
 9    I want to understand what you meant by that.
10    A.    I would need to understand -- it would be great
11    if I could see what I said.
12    Q.    I'm sorry --
13    A.    I apologize.
14    Q.    I know.  So in your opinion, does the way in
15    which data is entered into EHRS or the way in which data
16    is pulled out and reported allow for the massaging of
17    data?
18    A.    Input equals output.  And so if you design an
19    interface, that's going to give some sense of what you
20    can get out of it.  But beyond that, the -- the ability
21    to -- I mean data is data.  It's just a point.  It's a
22    one.  It's a zero.  It's very discrete.  And so when
23    that data gets put into a database and a query is run
24    based on a rule, that's when there can be unusual
25    interpretations of something that's very discrete and
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    clear.

 2    Q.    Is it your testimony that no psychiatrists were

 3    part of the subcommittee, the mental health subcommittee

 4    for the EHRS changes?

 5    A.    No.  Myself and Dr. Golding were on that

 6    subcommittee.

 7    Q.    Okay.  Were there any other psychiatrists

 8    involved in data issues for mental health?

 9          MS. ELLS:  Just to clarify the record, I think

10    you may be talking about two separate concepts.  He

11    testified as to the mental health change committee,

12    which he's just clarified is about EHRS.  There is a

13    separate process about data that's not governed by

14    that committee.  Is that your testimony?

15          MS. THORN:  Okay.

16    BY MS. THORN:

17    Q.    So let's talk about resources, psychiatrists who

18    would be involved in looking at data issues for the

19    mental health program.  Was there any dedicated

20    psychiatrist in that role while you were with CDCR?

21    A.    No.  On this -- on the psychiatry -- on the

22    psychiatry side of the house, Dr. Gonzalez and myself

23    would look at data in the reports and those kinds of

24    things that were there.  So we weren't dedicated to

25    that.  We had plenty of other things to do.  But we had
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   an interest in that, and so we did explore the data in

 2   that spirit of interest.

 3        On the quality management side, there's two

 4   psychiatrists that are there.  What they did, I do not

 5   know, because they were directed by psychology.  To the

 6   best of my knowledge, the one, at least when I left, was

 7   working on making changes to the EHRS on behalf of

 8   mental health, and the other one had helped with some of

 9   the EHRS rollouts.  And then I have no idea what he was

10   tasked to do with that.

11   Q.    Who was that?

12   A.    Dr. Jack Gills was the one that helped with the

13   rollout briefly and then continued his role in quality

14   management.  What he does there, I don't know.  The

15   other is Dr. Jake Adams.  Dr. Adams has an affinity for

16   programming and those kinds of things.  And so when

17   Dr. Cartwright left, Dr. Adams was conscripted to be

18   able to have that higher level of knowledge to create

19   the mental health changes that have passed through the

20   change request process.

21   Q.    And Dr. Cartwright, that's Steven Cartwright?

22   A.    Steven Cartwright, correct, yes, who is now at

23   the juvenile -- whatever that division is.  Department

24   of Juvenile Justice?  I'm not sure.

25   Q.    With respect to the third issue, looking at
```

Kevin Kuich, M.D.                                    September 19, 2019

1    Exhibit 2, which is the Court's order, Ms. Ells asked

2    what your views were about -- let's see.  Your views

3    about the presentation about the staffing proposals.  I

4    believe you testified that the data was the underpinning

5    rationale of the staffing proposal, so was not going to

6    be addressed.  And so I just wanted to follow up on that

7    and just confirm that you did not see the data that was

8    the underpinning rationale of the staffing proposal.

9    Correct?

10    A.     Correct.

11           As we both experienced with CDCR, there tends to

12    be a flurry of activity and all kinds of things

13    happening, and then -- and then once that issue passes,

14    then we have a moment of calm until the next issue hits.

15    So...

16    Q.    Right.  So that just -- as far as the foundation

17    for your knowledge about the staffing proposals, you

18    weren't -- you didn't have that knowledge.  You weren't

19    involved in the creation of the staffing proposals --

20    A.     Right.

21    Q.    -- so you can't really speak to the data or the

22    reason for the data and the reason for the proposal?

23           MS. ELLS:  Objection.

24           THE WITNESS:  I can speak to my almost six

25    years in CDCR and the constant and relentless ability

Kevin Kuich, M.D.                                September 19, 2019

```
 1    to try and either hire enough psychiatrists or find a
 2    way to not have enough psychiatrists, because they
 3    would routinely indicate that that is the last leg of
 4    this stool to be able to move out from under this
 5    lawsuit.
 6    BY MS. ELLS:
 7     Q.    Sure.  So I -- I -- I -- that's fine.  I've
 8    actually -- so I probably need to clarify my question.
 9    I just want to know what your personal knowledge was
10    with the presentation of data for the staffing proposal.
11    So the fact that you didn't even see the staffing
12    proposal.  You said you didn't see the data for the
13    staffing proposal.  You had some input as to that one
14    issue with respect to the after hours staffing piece.
15    And so I'm just trying to clarify, you know, that the
16    statements you made regarding the staffing proposal or
17    the data for the staffing proposal are based on
18    something other than the actual proposal itself.
19           MS. ELLS:  Objection.  I showed him the
20    proposal and asked him to opine on it.
21    BY MS. THORN:
22     Q.    And you didn't see it before today?
23     A.    That was the whole -- I mean, that was the
24    proposal that was there.  I might have seen it before it
25    went out, a week before it went out to the Court, when
```

Kevin Kuich, M.D.                                    September 19, 2019

1   it was all a fait accompli and it was done.  But in its

2   creation, did I have a significant hand and role in its

3   creation and pulling the data and understanding what the

4   data sources are, absolutely not.

5    Q.    And I think you said earlier today that you saw

6   it in October of 2018.

7    A.    Which would have been right before it was

8   presented or close to the time before it was presented.

9   I believe I had a -- I believe Dr. Golding had a copy of

10   it or a portion of it or something that was basically,

11   here it is and this is what's going to be presented, so

12   it was done by that time.

13    Q.    And are you aware that the copy you saw today

14   was not the final version of the staffing proposals that

15   were ultimately negotiated between parties?

16    A.    We never see what goes beyond -- it is a

17   mystery, and we oftentimes read about it in the court

18   documents, whatever happened.  So it's -- it is a

19   process that remains cloaked in darkness for psychiatry.

20    Q.    So you don't have the details regarding the

21   staffing proposal or the data underlying the staffing

22   proposal?

23    A.    Correct.

24    Q.    You don't have any information regarding how

25   CDCR submitted the data -- the staffing proposal to the

Kevin Kuich, M.D.                                    September 19, 2019

1    special master or the Court?

2     A.     No.

3            MS. ELLS:  Objection.  The evidence shows that

4    Melissa Bentz sent it to the special master team.

5            MS. THORN:  I'm only asking about Dr. Kuich's

6    personal knowledge, not Melissa Bentz's knowledge or

7    what she did; just Dr. Kuich's.  That's why we're

8    here today, so --

9            MS. ELLS:  Right.

10           MS. THORN:  -- that's all I want to know.

11           MS. ELLS:  His personal knowledge is based on

12   today, me showing it to him for the first time.

13           MS. THORN:  Okay.

14   BY MS. THORN:

15    Q.     With respect to the submission of any data

16   regarding the EOP site contacts submitted to the special

17   master or the Court in 2017, specifically the Katherine

18   Tebrock declaration you looked at earlier, I think your

19   testimony was that you had not seen that before today.

20   Is that correct?

21    A.     Correct.

22    Q.     So you don't know and didn't have any

23   involvement with the preparation of the data provided in

24   that declaration or the submission of the data to the

25   Court or the special master?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1      A.      Never.
 2      Q.      You testified about that you're familiar with
 3   the performance report indicator appointment seen as
 4   scheduled.  Did you have any information or were you
 5   involved with the submission of the appointment seen as
 6   scheduled data to the special master or the Court in
 7   connection with the staffing proposals?
 8      A.      No.  I don't know the data.
 9      Q.      Okay.
10              MS. THORN:  That's all I have.
11              MS. ELLS:  I have a couple of wrap-up
12   questions to clarify some questions that Ms. Thorn
13   presented.
14                      FURTHER EXAMINATION BY MS. ELLS
15   BY MS. ELLS:
16      Q.      Ms. Thorn asked you if you had access to the
17   business rules for the performance reports, and you
18   testified that you could access that information through
19   a document; is that accurate?
20              MS. THORN:  Objection.  I was talking about
21   the actual performance reports themselves, not the
22   business ones.
23              MS. ELLS:  At one point you asked if he could
24   find the numerator or denominator for those rules
25   anywhere.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1            MS. THORN:  I think I -- okay, I didn't use
 2      that terminology, but it was regarding your access
 3      to -- it wasn't specifically the business rules, but
 4      correct.
 5            MS. ELLS:  Okay.
 6            MS. THORN:  That's fine.
 7      BY MS. ELLS:
 8      Q.    Okay.  Do you ever recall seeing in that
 9      document that you referenced where you said you could
10      look at what those performance reports were based on --
11      do you recall ever seeing in that document anything
12      showing that the timely psychiatry contact metric had
13      been extended to 45 days?
14      A.    It was not something that I would follow on such
15      a regular basis to see it.  And my connection with those
16      compliance rules were really on an ad hoc basis when
17      institutions had a question.
18      Q.    Ms. Thorn asked you if you ever submitted a
19      request for the enhanced data that you testified you
20      needed to do your job properly, if you ever submitted
21      that kind of request to Dr. Leidner.  And you testified
22      that you did not; is that correct?
23      A.    The request of the information that I was
24      looking for to enhance the EHRS psychiatry experience,
25      that was not a -- that request was put forward to
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1    Drs. Brizendine, Rekart, and Cartwright.  I don't
2    believe that that's the type of data that Dr. Leidner
3    runs, because it really doesn't serve a business purpose
4    in terms of complying with the court order.  He -- his
5    expertise was making sure that we were in compliance
6    with the court order and the program guide.  What I was
7    requesting was almost more of a work study.  And so that
8    would be more something from Cerner or someone that had
9    access to that kind of thing.  So it -- it wouldn't fall
10   in his typical purview, what kind of data he would pull.
11       Q.    And in any event, Dr. Rekart supervises
12   Dr. Leidner, correct?
13       A.    I believe Dr. Ceballos supervises Dr. Leidner,
14   but I -- I...
15       Q.    Let's look at the organizational chart.
16       A.    That, I don't know.
17       Q.    The print is so small, I can't find anything.
18             MS. TRAPANI:  I don't think he's on here.
19   BY MS. ELLS:
20       Q.    Dr. Leidner is below Brittany Brizendine in the
21   organizational chart, correct?
22             Dr. Leidner is not higher than Brittany
23   Brizendine, who is second in command of this department,
24   correct?
25       A.    That would be correct.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1    Q.    Okay.  Yeah.  Actually, could you turn to

2    Exhibit 1.  My colleague here has helped me and found

3    this.  You'll see in the fourth column, second down,

4    "Dr. Leidner."  Do you see him?

5    A.    This is the last page?

6    Q.    Yes, the last, 7 of 7.

7          If I may?

8    A.    Oh, here he is, yes.  Yes, I do see him.

9    Q.    And do you see above him John Rekart --

10   A.    Who he reports --

11   Q.    -- in terms of who he reports to?

12   A.    Yes, you would be correct.  He reports to John

13   Rekart according to this.

14   Q.    And John Rekart then reports to Laura Ceballos,

15   who reports to Dr. Brizendine, according to this

16   organizational chart, right?

17   A.    That's what I see as well.

18   Q.    So Ms. Thorn was asking you a series of

19   questions of when you became familiar with the staffing

20   proposal that was negotiated between the parties in

21   2018.  And you testified, and correct me if I'm wrong,

22   that the first time you recall ever seeing the document

23   that is Exhibit No. 5 was from Dr. Golding right before

24   you understood it was set to be finalized.  Is that

25   accurate?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Yes.

2    Q.    And do you recall ever seeing a prior version

3    that was substantially similar to this before that?

4    A.    I couldn't -- these are similar headers, so I

5    couldn't tell what would have been changed if I saw a

6    prior version and how different it was.

7    Q.    Okay.  Do you recall seeing -- let's turn to

8    Exhibit 6, which is the e-mail from Melissa Bentz,

9    September 17th, 2018.  In this e-mail, Ms. Bentz says

10   "Please see the estimated reductions for the revised

11   psychiatry staffing proposals."

12         That's the first line of the e-mail.

13         And then the first line of the last paragraph

14   says "Thus there is a total reduction of 79.0

15   positions."

16         Before -- had you seen this e-mail before today?

17   A.    I don't believe so, no.

18   Q.    Were you aware that CDCR was preparing to cut 79

19   psychiatric positions before you saw this e-mail?

20         MS. THORN:  Asked and answered.  That's what

21   he testified earlier.

22         MS. ELLS:  That he wasn't aware?

23         MS. THORN:  That's right.

24         MS. ELLS:  I don't recall.

25         MS. THORN:  That's what he testified to.

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   BY MS. ELLS:

 2    Q.    Were you aware that the department was proposing

 3   to cut 79 total position?

 4    A.    I was aware that the department was proposing to

 5   cut positions, but I can't specifically say if I was

 6   aware that they we were going to cut 79.0 positions.

 7   But I was aware that the staffing proposal would have

 8   significant psychiatry cuts.

 9    Q.    Is this a higher impact in terms of cuts than

10   you had understood?

11          MS. THORN:  Objection.  Speculation.

12          THE WITNESS:  There -- we were told there

13   would be cuts.  We didn't know what the cuts would

14   be.  And this is a significant -- a significant

15   number.  And it could be a number that puts us at the

16   magical 90 percent mark.  I don't know.  I'm not able

17   to do the math at this time for what our positions

18   were then and what 79 positions less would have put

19   us at, and if we would meet the bar or not.

20   BY MS. ELLS:

21    Q.    I'll represent to you that defendants, in their

22   filing that attached this document, represented to the

23   Court that it would do exactly that, that it would put

24   the department in compliance with that 90 percent

25   marker.  Does that surprise you?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

```
 1    A.      That does not surprise me.
 2    Q.      And in terms of this staffing proposal that
 3    we've been discussing, is it correct to say that you
 4    have no recollection of asking -- anyone asking you for
 5    input on the numbers of reductions of staff in that
 6    proposal, except for that conversation with Angela
 7    Ponciano about the eight telepsychiatrists?
 8    A.      That was -- that eight telepsychiatrists, that
 9    was the one that stuck in my head.  And I don't recall
10    any specific meeting about should be this number or that
11    number.  Generally, meetings were, this is what -- you
12    know, this is what's -- this is what we're going to do.
13    Q.      So nobody asked you what you thought, except for
14    that one conversation from Ms. Ponciano?
15    A.      Right, for that particular telepsychiatry.
16    Q.      Now I would like to turn your attention to
17    Exhibit 4, which is the declaration of Katherine
18    Tebrock.  So Ms. Thorn asked you a number of questions
19    about page 9, the chart that we discussed a number of
20    times.  She asked you if you had any idea what the
21    source of the data for this chart was, since you hadn't
22    seen it before.  Do you remember that testimony?
23    A.      I do remember.
24    Q.      Could you flip to page 3 of this same document
25    and look at paragraph 8.  I'll read to you what it says.
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   "CDCR's recent data on treatment to provide to the
 2   Coleman class members shows that in many cases, despite
 3   an institution staffing vacancy rate, inmates are
 4   provided quality treatment at very high compliance
 5   rates.  Exhibit 2, attached hereto, sets forth the
 6   psychiatry staffing levels by institution for the period
 7   August 1, 2016, through January 31, 2017, as well as
 8   compliance percentages from the mental health
 9   performance report for timely psychiatry contacts,
10   psychiatry continuity of care, and the medication
11   administration process improvement project."
12        Do you understand where the data on Exhibit 2
13   comes from that's page 9 in this chart?  Do you
14   understand where it comes from based on Ms. Tebrock's
15   statement here?
16   A.    Based on that information, yes, I think the
17   assertion of quality of care -- if quality of care means
18   providing an appointment, that certainly could be one
19   interpretation.  Quality of care, I would say is, are
20   you getting better, and our data does not measure that.
21   Q.    In terms of the data that's represented on this
22   chart on page 9 and based on the statement from
23   Ms. Tebrock's declaration here, is it your understanding
24   that the data in this chart, timely psychiatry contacts,
25   psychiatrist continuity of care, and MAPIP measures,
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    come from the mental health performance report?
 2             MS. THORN:  Objection.  Lack of foundation.
 3    Calls for speculation.  This witness has already
 4    testified he hasn't seen this report, this chart, and
 5    doesn't know where the data came from or who compiled
 6    it.
 7    BY MS. ELLS:
 8     Q.    You're -- you are familiar with the mental
 9    health performance report?
10     A.    Yes.
11     Q.    And you're familiar with the fact that it
12    contains metrics for timely psychiatry contacts?
13     A.    Yes.
14     Q.    Psychiatrist continuity of care?
15     A.    Yes.
16     Q.    And medication administration process
17    improvement project --
18     A.    Yes.
19     Q.    -- data?
20     A.    From the dashboard, yes.
21     Q.    Ms. Thorn had some questions for you about the
22    portion of your testimony where I was asking you about
23    Ms. Ponciano's estimate provided to the neutral expert
24    about how often supervising psychiatrists were providing
25    line staff treatment.  I would like to direct your
```

Kevin Kuich, M.D.                                        September 19, 2019

1    attention to page 75 of the neutral expert report.

2    That's the internal pagination.  The ECF pagination is

3    80; again, ECF No. 6147.  The last paragraph on this

4    page says that "her chart" -- and that's referring to

5    Ms. Ponciano -- "set forth below, tended to show a very

6    low number of appointments conducted by supervisors,

7    about 149 appointments per week, for the equivalent of

8    1.75 FTE systemwide, assuming 30-minute appointments."

9         And the chart on the following page is entitled

10   "November 2017 through March 2018 psychiatry

11   appointments for CCCMS and EOP."

12        And based on the context of this report, the

13   neutral expert is referring to that data in his

14   discussion about her estimate that 149 appointments per

15   week were conducted by psychiatrists for the time period

16   from November 2017 through March 2018.  149 appointments

17   systemwide in CDCR for all EOPs and CCCs is a low

18   number, right?

19   A.    It is a low number, yes.

20   Q.    Do you have any estimate of how many psychiatry

21   appointments are conducted for EOPs and CCCMS every week

22   total?

23   A.    I don't have an estimate.

24   Q.    Okay.  I'll direct your attention back to

25   Exhibit 4, page 3.  In this exhibit, which is

Kevin Kuich, M.D.                                    September 19, 2019

1    Ms. Tebrock's testimony to the Court in the form of a

2    declaration, at paragraph 6 she provides a chart that is

3    monthly psychiatry to patient contact.  And you'll see

4    on the right-hand column "total appointments 2016."  And

5    the total there is 27- -- or, sorry, 277,877.  Is it

6    your understanding that that -- does that seem about

7    right in terms of the number of appointments that

8    psychiatrists might have performed in 2016, based on

9    your experience?  Does that seem like a reasonable

10   estimate?

11    A.    What I can say is in 2016 is when the EHRS was

12   widely rolled out.  The EHRS rollout was significantly

13   complicated.  And as we know, the scheduling process to

14   be able to pull those appointments was flawed.  And so I

15   suspect that is a lower number than what I would expect,

16   just based on the people not doing the work flow and the

17   scheduling process not working.

18    Q.    So, if anything, this seems like it might be a

19   low number to you?

20    A.    To me, yes.

21    Q.    I'll represent to you that 277,877 appointments

22   divided by 52 for the number of weeks in the month would

23   equate to 5,343, rounding down, appointments with

24   psychiatrists per month in the system -- so per week.

25   About 53,000 per month.  In your experience, does it

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   seem likely to you that only 149 of those appointments,
 2   of those 5,300 per week, were provided by supervisors?
 3   A.     No, I think that's a low number.
 4   Q.     Does it seem very low to you?
 5   A.     It does seem quite low.  The -- this was also a
 6   time where the inpatient units -- inpatients units are
 7   not scheduled, so they had to provide scheduling --
 8   what's called scheduling in arrears.  So after they
 9   would see the patient, they would have to send a
10   schedule to the scheduler to say they saw them.  Because
11   an inpatient unit, you don't know what you're getting
12   into, you can't plan what your day is like.  It's very
13   variable.  And so that's a huge amount of appointments
14   that didn't get -- that occurred but didn't get into the
15   system because they didn't use the -- how the system
16   wants that entry point to occur.
17          And I know that because that was one of the main
18   reasons why I went down to CHCF PIP, because they
19   weren't entering appointments.  But I know they were
20   seeing patients and I know patients were getting taken
21   care of.  So, again, the system is creating problems
22   with showing what the reality is happening, and that was
23   particularly with scheduling.
24   Q.     And is that in the time frame of 2016 that that
25   chart from Ms. Tebrock's declaration is discussing?
```

```
 1    A.    2016 -- it would be sometime in July or August
 2   when we started the new 2016 rollouts for new
 3   institutions.  So as those institutions went online,
 4   there were more issues with trying to figure out what's
 5   actually happening here.
 6    Q.    And so the 2016 numbers in that declaration may
 7   not have included a number of inpatient psychiatric
 8   appointments in that --
 9          MS. THORN:  Objection.  Lack of foundation.
10   Calls for speculation.
11          THE WITNESS:  I would say, based on my
12   knowledge of all the problems that there were in
13   using the scheduling and -- and the -- and my being
14   mandated to personally go down to CHCF PIP to be able
15   to enforce scheduling, I would say yes, that's a low
16   number, definitely, based on inpatient.  And
17   outpatient suffered similar problems, although
18   somewhat less so; but similar problems because you
19   had to use the correct order and the correct place at
20   the correct time to make the correct thing happen,
21   and human beings are less than precise.
22   BY MS. ELLS:
23    Q.    And is that something that -- is that a problem
24   that continued in EHRS after the 2016 time frame that
25   you were discussing?
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1          MS. THORN:  Objection.  Calls for speculation.
 2   Lack of foundation.
 3          THE WITNESS:  Yes.  The scheduling system was
 4   an ongoing problem to get people to check people in,
 5   check people out, make sure that they were there,
 6   communicate appropriately to the scheduler.  So it
 7   was an ongoing issue, as evidenced by the training
 8   that was mentioned and all the other kinds of support
 9   to make sure that people comply with the scheduling
10   work flow.
11   BY MS. ELLS:
12    Q.    So does it seem likely to you that that problem
13   may have caused an under-accounting of the contacts in
14   Ms. Ponciano's chart that was provided to the neutral
15   expert?
16          MS. THORN:  Objection.  Lack of foundation.
17   And calls for speculation.
18          THE WITNESS:  That certainly sounds reasonable
19   based on my understanding of the EHRS.
20   BY MS. ELLS:
21    Q.    You testified earlier, in response to a question
22   from Ms. Thorn, that Ms. Tebrock asked you to provide
23   data on the frequency of cell side psychiatry contact
24   systemwide.  What did that data show?
25    A.    The request was to look at telepsychiatry cell
```

Kevin Kuich, M.D.                                    September 19, 2019

1   side.   And that data showed, in some institutions, up to

2   50 percent of appointments are cell side.   Because of

3   such a high number of cell side appointments, that was

4   the reason why the new equipment was demoed at Stockton

5   CHCF, because if we had to provide care in that

6   environment, we at least wanted to do it in a

7   HIPAA-compliant and as private of a way as possible.

8     Q.     Were you concerned about the frequency of the

9   cell side psychiatry contacts by telepsychiatrists that

10  you saw?

11    A.     Significantly so, to try and create a new

12  mechanism to be able to have it as a -- a better

13  experience.

14    Q.     And is it fair to say that if you had more

15  psychiatric -- psychiatrists, that that number of cell

16  front contacts with patients would have been fewer?

17         MS. THORN:   Objection.   Calls for speculation.

18  Lack of foundation.

19         THE WITNESS:   I would say the number of

20  on-site psychiatrists would make a difference, in

21  addition to custody access factors, in addition to

22  physical space, so all of those three things.   But

23  first and foremost would be the number of

24  psychiatrists, because the main reason why we have to

25  do this is we don't have enough psychiatrists.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

```
 1              MS. ELLS:  Thank you.  I don't have anything
 2       more.
 3              MS. THORN:  Just two more.
 4                   FURTHER EXAMINATION BY MS. THORN
 5       BY MS. THORN:
 6       Q.    Just going right back to Gibson Dunn report at
 7       page 75 and 76.  You just answered some questions
 8       regarding Ms. Ponciano's analysis that she conducted
 9       after Dr. Golding submitted his report.  Were you
10       involved or did you discuss this analysis with anyone?
11       A.    No.
12       Q.    Have you ever seen this before today?
13       A.    No.
14       Q.    And do you have any information regarding the
15       nature of the data that was compiled to and that's
16       presented in the Figure 11 on page 81 of this report?
17       A.    I'm sorry.  Could you please restate that last
18       question?
19       Q.    Sure.  Do you have any information -- personal
20       knowledge or information about the nature of the data
21       that was compiled to create the table shown at
22       Figure 11?
23       A.    I have no information about how this particular
24       data was pulled.  Understanding the EHRS, I have a sense
25       of how it would have gotten pulled, which allows me to
```

Kevin Kuich, M.D.                          September 19, 2019

1   be able to provide some concern about that there was

2   data there actually to pull, and so it would create an

3   artificially low number.

4   Q.    Okay.  But you don't know actually the request

5   that was made to create the report?

6   A.    No.

7   Q.    And you understand that CDCR has the ability to

8   run ad hoc reports?

9   A.    Yes.

10  Q.    Okay.  And so that would depend on the nature of

11  the query that went in to pull the data, correct?

12  A.    Correct.

13  Q.    And so you don't know what that query was or the

14  underlying data that was pulled to present in this

15  report?

16  A.    That is correct.

17  Q.    You don't know the parameters or whether data

18  was excluded or included, for example, from different

19  levels of care or different programs?

20  A.    That is correct.

21  Q.    Okay.  And then also directing your attention

22  back to Exhibit 4, Ms. Tebrock's declaration.  I just

23  want to confirm -- Ms. Ells showed you a table 3 at

24  page 3 of the declaration, regarding psychiatry -- the

25  number of psychiatry appointments.  And, again, you

Kevin Kuich, M.D.                                September 19, 2019

```
 1   only -- you didn't have any involvement in compiling
 2   this data or presenting this data to the Court in 2017?
 3    A.    That is correct.
 4    Q.    So you only know from what you're reading in
 5   this document?
 6    A.    I know from what I'm reading in this document,
 7   and I also know what happened in that time frame in
 8   2016, which would impact the data provided in this
 9   document.
10         MS. THORN:  Okay.  Nothing further.
11         MS. ELLS:  One final question.
12              FURTHER EXAMINATION BY MS. ELLS
13   BY MS. ELLS:
14    Q.   I'm sorry.  This literally is the final
15   question.
16         Turning back to the Gibson Dunn report, internal
17   pagination page 75, ECF pagination 80.  Ms. Thorn asked
18   you if you had any idea what the data query used to
19   produce the data at Figure 11 and discussed in this
20   report was.  In the second-to-last paragraph on page 75,
21   the report says "She compiled the data by manually
22   searching in the system for appointments associated with
23   the name of each supervisor and chief."
24         Is that the kind of ad hoc query that Ms. Thorn
25   was discussing with you?
```

Kevin Kuich, M.D.                                    September 19, 2019

1    A.      That sounds like that would be an ad hoc query.

2    So that would be --

3    Q.      The problems that you discussed about not all

4    appointments being captured in the system, would that

5    affect the type of query that is run here?

6    A.      Significantly.

7    Q.      Thank you.

8              FURTHER EXAMINATION BY MS. THORN

9    BY MS. THORN:

10   Q.      Again, Dr. Kuich, you only have information

11   regarding this analysis on page 80 of the Gibson Dunn

12   report based on your reading of this today, correct?

13   A.      Page 80?

14   Q.      Right.  What Ms. Ells just read to you -- I'm

15   sorry.  Page 75.  That's from reading this as you sit

16   here today?

17   A.      Correct.

18   Q.      Okay.  Thank you.

19              (Proceedings concluded at 6:35 p.m.).

20

21

22

23

24

25

```
 1   US DISTRICT COURT OF CALIFORNIA

 2   EASTERN DISTRICT

 3

 4                   REPORTER'S CERTIFICATE

 5

 6        I, Angie Diner, CSR No. 9581, Certified

 7   Shorthand Reporter, certify:

 8        That the foregoing proceedings were taken before me

 9   at the time and place therein set forth, at which time

10   the witness was put under oath by me;

11        That the testimony of the witness, the questions

12   propounded, and all objections and statements made at the

13   time of the examination were recorded stenographically by

14   me and were thereafter transcribed;

15        That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17        Further, that a review of the transcript by the

18   deponent was requested;

19        I further certify that I am not a relative or

20   employee of any attorney of the parties, nor financially

21   interested in the action.

22        I declare under penalty of perjury under the laws

23   of the state of California that the foregoing is true

24   and correct.     Dated this 26th day of September, 2019

25        _____
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1          DECLARATION UNDER PENALTY OF PERJURY

 2          I, KEVIN KUICH, M.D., do hereby certify under

 3     penalty of perjury that I have read the foregoing

 4     transcript of my deposition taken on September 19, 2019;

 5     that I have made such corrections as appear noted on the

 6     Deposition Errata Page, attached hereto, signed by me;

 7     that my testimony as contained herein, as corrected, is

 8     true and correct.

 9      Dated this _____day of_____, 20____, at

10     _____, California.

11

12     _____

13      KEVIN KUICH, M.D.

14

15

16

17

18

19

20

21

22

23

24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____ Line No._____

 3    Change:_____

 4    Reason for change:_____

 5    Page No._____ Line No._____

 6    Change:_____

 7    Reason for change:_____

 8    Page No._____ Line No._____

 9    Change:_____

10    Reason for change:_____

11    Page No._____ Line No._____

12    Change:_____

13    Reason for change:_____

14    Page No._____ Line No._____

15    Change:_____

16    Reason for change:_____

17    Page No._____ Line No._____

18    Change:_____

19    Reason for change:_____

20    Page No._____ Line No._____

21    Change:_____

22    Reason for change:_____

23    _____      _____

24    KEVIN KUICH, M.D.                         Dated

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                    September 19, 2019

| | | | |
|---|---|---|---|
| **Exhibits** - | | 215:21 | 8:10 | 5:1 8:9,10 20:1 |

**Exhibits**                -

**001 - KK**
  3:15 16:17
  106:19 239:2

**002 - KK**
  3:18 19:20,21
  22:16 84:22
  122:5 204:21
  232:1 243:5,12

**003 - KK**
  3:20 50:1

**004 - KK**
  3:23 54:6 104:6
  107:25 211:16,
  25 212:20
  242:17 245:25
  252:22

**005 - KK**
  4:2 62:14,22
  63:19 78:24
  104:4 215:11
  239:23

**006 - KK**
  4:5 62:16 63:4
  73:5 75:13
  217:18 240:8

**007 - KK**
  4:7 62:18 63:9
  74:6 218:16,19

**008 - KK**
  4:9 89:21,22
  219:24 222:5

**009 - KK**
  4:12 144:3,4
  153:14 159:9
  189:20

**010 - KK**
  4:14 152:7
  158:3 227:19,20

**011 - KK**
  4:16 160:14,15
  228:11

**012 - KK**
  4:19 183:20,21

—o0o—
  5:11

**1**
  16:17 106:19
  145:4,7,17
  215:22 239:2
  243:7

**1.25**
  124:6 210:16

**1.75**
  42:19 44:17
  245:8

**10**
  131:19 152:7
  158:3 227:19,20

**10/1/17**
  78:25 80:16
  216:1

**10/31/18**
  63:10

**100**
  80:2,6,8 111:11
  113:23

**101**
  5:3

**10:24**
  5:2

**11**
  131:19,21
  160:14,15
  228:11 251:16,
  22 253:19

**11:12**
  161:2

**12**
  183:20,21

**12:50**
  88:15

**13**

215:21

**13th**
  57:8

**149**
  245:7,14,16
  247:1

**15**
  158:14 185:8

**17**
  35:21 51:5
  53:18 73:6
  84:25

**17th**
  11:22 20:1
  45:19 50:7
  62:23 63:5
  84:19 111:16
  122:4 129:3
  144:19 161:8
  184:16 240:9

**18**
  113:14 158:2

**18th**
  152:13

**19**
  5:1 84:25

**1st**
  8:10

**2**

**2**
  19:20,21 20:7
  22:16 84:22
  122:5 144:12,22
  189:25 204:21
  232:1 243:5,12

**2.6**
  83:3,5

**2/23/2017**
  54:18 104:11

**20**
  75:24 76:3 77:8
  117:12 192:1,22

**2013**

8:10

**2014**
  9:2 16:2

**2015**
  110:11

**2016**
  89:3,9 98:20
  108:6 110:7
  115:6,10 118:14
  177:11,19 243:7
  246:4,8,11
  247:24 248:1,2,
  6,24 253:8

**2017**
  9:8 14:17 42:16
  43:25 44:13
  54:10 56:17
  57:8 58:23
  59:25 90:4,17
  95:20 97:24
  105:1 108:7
  110:8 115:8,13
  118:14 122:14
  146:11 147:24
  183:25 184:9,22
  186:12,24
  187:25 188:6,14
  189:18 209:20
  210:7 220:1
  235:17 243:7
  245:10,16 253:2

**2018**
  42:17 43:25
  44:14 49:18
  50:7 62:23 63:5,
  17 73:6,19
  74:10,15,23
  86:12 89:19
  144:8 152:13
  153:13 158:2
  160:20,24 161:3
  189:23 190:17
  199:20 202:4
  209:21 210:7
  227:18 234:6
  239:21 240:9
  245:10,16

**2019**

5:1 8:9,10 20:1
  35:21 84:19
  120:8,9,24
  122:4 190:7

**21st**
  95:20 186:24
  187:3,9

**22**
  220:1

**22nd**
  90:4 91:4

**24**
  187:25

**24th**
  183:25 184:9,22
  188:6

**25**
  123:19 124:2,4,
  14 125:11

**25s**
  127:5

**27-**
  246:5

**277,877**
  246:5,21

**2nd**
  144:8 153:13
  160:20,23 161:2
  189:23

**3**

**3**
  50:1 84:23 85:1
  95:19 189:24
  212:19 242:24
  245:25 252:23,
  24

**3/30/2017**
  104:7

**3/31/18**
  79:1 80:16
  216:1

**30**
  89:4,7,11 90:7

Kevin Kuich, M.D.                                                         September 19, 2019

97:17 103:11
108:8 118:16
137:11,17,23
166:10 167:13
225:24

**30-day**
104:21 122:8
137:12 220:7,20
222:4

**30-minute**
245:8

**30th**
54:10 122:14

**31**
94:17 103:11
137:18,23 243:7

**35**
137:18

**3:00**
203:16

**3rd**
190:16

**4**

**4**
54:6 104:6
107:25 211:16,
25 212:20
242:17 245:25
252:22

**405.3**
74:16,25 75:20,
24

**45**
57:16 90:7,24
94:17 98:15
225:25 237:13

**45-day**
104:20 122:7

**46**
179:1

**5**

**5**

46:15,16 62:14,
22 63:19 74:7
78:24 104:4
215:11 218:19
239:23

**5,300**
247:2

**5,343**
246:23

**5.8**
57:14,17 58:8

**50**
21:14 30:25
51:22 179:8
250:2

**52**
246:22

**53,000**
246:25

**55**
57:15

**6**

**6**
62:16 63:4 73:4,
5 75:8,13 83:4,
12,15,16
145:20,24
146:2,3 153:15
217:18 240:8
246:2

**6/29/18**
16:23

**60**
51:16,23 52:16
98:15

**6147**
132:18 171:7
245:3

**65**
136:17

**69**
132:16 171:8

**6:35**

254:19

**6th**
5:3

**7**

**7**
62:18 63:9 73:4
74:6 75:8
145:21 146:1
159:8 218:16,19
239:6

**7-A**
145:4,7,17

**70**
136:17

**74**
132:3,17 171:8

**75**
245:1 251:7
253:17,20
254:15

**76**
251:7

**79**
73:23 74:2,24
75:14,24 240:18
241:3,18

**79.0**
240:14 241:6

**8**

**8**
89:21,22 219:24
222:5 242:25

**80**
245:3 253:17
254:11,13

**81**
251:16

**9**

**9**
54:15 104:8
144:3,4 153:14

159:9 189:20
211:18,25
212:20 213:2
242:19 243:13,
22

**9/17**
112:18

**90**
79:12,15 204:2,
15 241:16,24

**90-day**
205:25

**94**
81:9

**95**
46:14 81:8
178:24

**A**

**A-N-A-N-D**
226:16

**a.m.**
5:2 161:2

**AA**
50:5

**ability**
36:9,23 42:9
52:6,9 69:24
70:2,5 92:21
93:21 99:2
100:23 102:5
112:23 121:9,
16,18,20,24
123:15 124:19
125:24 126:20
128:4,8 140:9,
19 151:20
157:18 162:21
175:14 192:25
194:21 229:20
232:25 252:7

**absence**
36:13 49:14
208:7

**absences**

207:4,5

**absent**
24:16

**absentia**
102:22

**absolutely**
36:20 45:23
97:22 140:25
166:14 234:4

**abuses**
124:7

**academic**
43:22

**accelerated**
86:4

**accept**
173:5

**acceptable**
128:3

**access**
42:3 87:1,2,12
92:25 97:7
140:13 182:5,8,
9,10,15,18,20
183:5,12,17
186:6,7 188:5,
22 189:17,24
190:8 193:21
194:1,6,7,20,23,
25 225:1 228:3
236:16,18 237:2
238:9 250:21

**accessed**
185:24

**accessing**
186:18

**accommodate**
7:16

**accompli**
76:25 234:1

**accomplish**
82:12

**account**

Kevin Kuich, M.D.    September 19, 2019

| | | | | |
|---|---|---|---|---|
| 78:12 | achieved | 14:23 47:19 | adjustments | afternoon |
| **accountable** | 81:12 | 72:21,23 117:16 | 64:12 | 194:1 |
| 180:6 | acknowledge | addition | administers | agenda |
| **accounting** | 111:25 | 15:10 106:16 | 120:19 | 67:2 |
| 94:20 103:20 | acknowledging | 124:17 149:3 | administration | agendas |
| **accuracy** | 173:9 | 250:21 | 11:5 17:10 | 66:3 67:16 |
| 37:18 47:5 | acronym | additional | 193:8 196:4 | agent |
| 113:9 | 13:2 | 6:19 15:4 25:21 | 243:11 244:16 | 193:5 |
| **accurate** | acted | 48:10 53:12 | administrations | aggregate |
| 13:4 18:1 19:9 | 87:21 | 58:1,16 59:9 | 193:8 | 98:9 |
| 26:12,13,18,19 | acting | 65:19 72:20,22 | administrative | agree |
| 27:19 28:14 | 20:12,15 84:25 | 82:2 117:8 | 170:13,15 | 52:15 97:20 |
| 33:2,4 38:1,7 | 85:4 | 122:9 123:19,20 | 207:19,21 | 105:3 133:17 |
| 39:10,14,15 | active | 124:12 182:20 | 209:9,10 | 206:21 |
| 42:21 48:10,11 | 13:10 64:22 | 186:18 195:3 | administrator | agreed |
| 50:18,20 52:10 | activity | 199:9 203:3 | 134:19 140:22 | 90:23 |
| 55:22 56:14,25 | 232:12 | address | admits | agreement |
| 58:7 62:24,25 | actual | 12:6 42:7 47:3 | 89:9 | 191:15 |
| 68:19,20 69:11 | 45:5 62:5 | 71:19 88:24 | admitted | agreements |
| 70:6 72:12,13 | 109:15 121:19 | 121:22 123:19 | 89:3 177:11 | 33:10 |
| 75:3,7 91:13 | 129:16 197:18 | 127:6 143:14 | adopted | ahead |
| 94:1,2 96:3,6,7 | 233:18 236:21 | 146:18 148:24 | 173:16,17 | 8:20 12:4 22:19 |
| 97:15 105:18 | acumen | 154:8 180:3 | advance | 24:9 30:20 |
| 106:3,20 | 162:8 | 183:3 228:25 | 66:19 67:13,20 | 35:24 43:2 |
| 114:24,25 | ad | addressed | 94:25 115:9 | 45:21 50:10 |
| 115:3,11,12 | 45:2 60:13,16 | 113:11 146:9 | 151:14 160:2 | 53:20 64:13 |
| 127:20,21 | 135:22 158:25 | 150:9 171:18 | advocated | 65:2 90:7 |
| 128:19 129:5,6, | 222:14 237:16 | 184:15 186:24 | 141:24 | 102:19 129:5 |
| 15 130:13 | 254:1 | 189:17 191:12 | affairs | 153:3 |
| 133:5,15,16,18 | Adams | 232:6 | 127:6 | aligned |
| 143:25 144:1 | 231:15,17 | addresses | affect | 112:25 |
| 151:2,3 156:1 | adapt | 61:18 228:24 | 36:22 45:16 | alike |
| 179:3,14 180:9 | 172:7 174:21 | addressing | 223:1 254:5 | 122:2 162:17 |
| 186:20,21 | 184:24 | 198:2 | affecting | all-parties |
| 187:12 189:12 | adapted | adds | 110:13 | 199:18 |
| 190:3 201:23 | 21:3 138:9 | 73:18 | affects | allegations |
| 208:10 236:19 | adapting | adequate | 162:20,21 | 190:17 |
| 239:25 | 110:19 | 27:22 32:23 | 168:23 229:2 | allegiance |
| **accurately** | add | 33:24,25 34:1 | affinity | 118:10 |
| 6:5 30:2 41:12 | 72:16 107:16 | 46:4,21 59:5 | 231:15 | allegiances |
| 46:2 57:17 | 117:8 188:8 | 60:1 65:12,14 | affirmatively | 118:7 |
| 77:17 113:6,24 | added | 203:2 | 14:15 90:3,20 | alliances |
| 114:4,13 136:4 | | adequately | 169:6 | 169:25 |
| 161:13 190:12, | | 62:1 71:13 | | |
| 16 | | adherence | | |
| **achieve** | | 114:18 | | |
| 64:10 80:6 | | | | |

Kevin Kuich, M.D.                                        September 19, 2019

**allocate**
27:5 154:18

**allocated**
54:22 63:16
74:9,15,25
75:20 76:3,17
77:9

**allocation**
27:23 36:4

**allocations**
68:16 72:21

**allowed**
29:18 112:9
141:21 142:17
160:12 179:23
226:10 228:16

**allowing**
65:14

**alternative**
174:12

**amazing**
192:21

**amazingly**
76:11

**ambiguity**
83:16

**ambiguous**
61:23 88:11
133:20 139:8
156:12

**ambulatory**
79:23 130:4

**ambush**
201:12

**amount**
25:9 71:8 88:3
104:13 109:11
110:19 131:4,5
136:13,14
161:22 164:19
185:15 207:24
247:13

**analysis**
42:14,16,25

72:4,6 91:6
209:20 210:1,2,
7,13,21,24
251:8,10 254:11

**Anand**
226:11,20

**Anand's**
226:18

**and/or**
85:6 97:19
125:21 131:9

**Andrew**
118:1

**Angela**
42:15 200:24
202:17 242:6

**ANGIE**
5:4

**angst**
49:8,10

**announced**
99:11,14,24
100:13

**announcement**
102:12

**announces**
75:14

**annual**
65:10

**annually**
60:23

**anomaly**
183:1

**anticipations**
174:9

**anymore**
175:6 205:7

**APA**
12:10

**apologies**
44:21 154:15
166:17

**apologize**
25:7 41:7 88:8,
11 90:5 229:13

**apparent**
168:12,18
202:20

**apparently**
137:7 148:25
151:23 172:5
206:3

**appearance**
32:16,19 136:23

**appeared**
5:6 209:23

**appears**
52:11 55:1

**appointment**
44:9 83:14 98:5,
14 109:17,22,23
129:11,20,25
130:1,17
131:10,16,18
132:24 133:1,
12,13 134:8,10
135:13,19
136:5,6 137:17,
19,20,22
138:13,14,15,
16,17 139:5,6,
14,22,25 140:4,
8,12,17,18
142:7,8,15,18,
20 166:16,18,20
167:23 168:5
176:5 177:7
181:12 186:2
190:11 191:3,21
236:3,5 243:18

**appointments**
20:10,11 32:10
42:18 43:19
44:16 46:23
88:21 89:11
98:13 108:15
127:17 135:4
136:20,21,24
140:24 141:9

146:19 165:3
171:10,12
173:21 175:24,
25 176:24
177:12,14,16,20
178:6,24 179:1
190:13,23
191:23 197:1
245:6,7,8,11,14,
16,21 246:4,7,
14,21,23 247:1,
13,19 248:8
250:2,3 252:25
253:22 254:4

**apprised**
94:21

**approach**
34:4 86:2 174:1,
6 179:16

**appropriately**
70:3 166:24
168:14 249:6

**approval**
168:22

**approved**
148:8,12 157:22
159:1 168:23
169:11,13
205:19

**approving**
46:17 56:8

**approximately**
8:19,25 14:6
91:2 178:23

**April**
57:8 108:7
110:8 115:8,13
118:14

**areas**
122:16 204:7

**argument**
104:1

**arrears**
247:8

**articulated**

32:8 84:24

**artificially**
252:3

**asks**
85:2

**aspect**
15:3 79:24
114:2

**assemble**
199:5

**asserted**
59:1

**assertion**
243:17

**assess**
62:1

**assessment**
27:19 205:25
211:11

**assigned**
25:4

**assimilated**
197:4

**assistance**
112:5

**assistant**
207:20,21

**associate**
147:12 175:2
189:2

**associates**
13:16

**assume**
188:4 216:15

**assuming**
56:25 80:21
218:14 245:8

**assumption**
181:16 216:18
217:16

**assurance**
35:4 36:18

Kevin Kuich, M.D.                                                      September 19, 2019

| | | | | |
|---|---|---|---|---|
| **assurances** | **audience** | | 4,6 218:1 | 134:1 |
| 39:10 | 100:11,12 107:1 | **B** | 222:16 226:2 | **begun** |
| | | **back** | 229:24 233:17 | 228:8 |
| **assured** | **auditing** | 13:13 24:11,13 | 235:11 237:10 | |
| 38:20 39:2 | 62:3 | 25:11 37:12,13 | 243:14,16,22 | **behalf** |
| | | 68:13 69:21 | 245:12 246:8,16 | 231:7 |
| **Atkins** | **August** | 70:11 92:16,17, | 248:11,16 | |
| 51:10,14,18,25 | 8:10 110:12 | 20 93:11 94:22 | 249:19 254:12 | **behavior** |
| 52:8 | 160:20,23 161:2 | 97:16,21 98:1, | | 39:11 162:17 |
| | 243:7 248:1 | 10 108:8 110:8 | **baseline** | 172:7 |
| **attached** | | 115:4,8,14,15, | 60:22 | |
| 50:5 87:18 | **authority** | 20,25 118:16 | | **beings** |
| 152:13 215:17 | 52:9 | 119:4 121:12 | **basic** | 248:21 |
| 241:22 243:5 | | 135:16 139:2 | 37:18 197:21 | |
| | **authorized** | 153:10,13 | | **believed** |
| **attaching** | 169:15 | 156:10 157:5 | **basically** | 150:18 |
| 63:20 | | 171:5 175:9,14 | 60:24 95:12 | |
| | **automate** | 186:11 195:16 | 112:6 124:5 | **beneficial** |
| **attempt** | 167:14 | 213:2 245:24 | 130:25 137:9 | 183:15 |
| 121:16 123:5 | | 251:6 252:22 | 156:22 172:19 | |
| | **automatically** | 253:16 | 187:19 225:15 | **benefit** |
| **attempting** | 168:5 | | 234:10 | 162:16 |
| 161:14 | | **backfill** | | |
| | **automation** | 206:23 | **basis** | **benefits** |
| **attempts** | 168:10 | | 18:16 24:20 | 21:19 |
| 187:1 188:2 | | **background** | 27:7 29:15,21 | **Bentz** |
| | **avenue** | 7:20 11:23 | 69:17 81:11 | 62:22 63:4,20 |
| **attend** | 97:14 | 134:3 137:8 | 94:8 104:1 | 73:6,16,18 |
| 53:1 101:24,25 | | 139:16 | 106:23 121:23 | 74:11 215:16 |
| 102:11,12,23 | **average** | | 122:23 138:3 | 218:3 235:4 |
| | 83:1,14,20 84:8 | **ball** | 202:15 208:17 | 240:8,9 |
| **attendance** | | 32:1 49:8 | 211:10 218:7 | |
| 196:22 | **aware** | | 237:15,16 | **Bentz's** |
| | 15:19 25:3 27:1, | **bandwidth** | | 75:13,19 235:6 |
| **attended** | 25 41:19 58:17 | 166:1 | **Bay** | |
| 48:3 53:2 109:6 | 64:7 76:22 | | 48:20 | **BHRS** |
| 196:2 223:10, | 77:14 89:12,14, | **bar** | | 149:12 |
| 13,20 224:8 | 15,18 102:20 | 241:19 | **Beach** | |
| | 103:5 105:4 | | 8:2 | **bias** |
| **attendee** | 106:5,9 107:19 | **bare** | | 140:16 |
| 195:18 | 108:4 110:5 | 47:18 62:7,9 | **bear** | |
| | 115:21 118:16, | | 103:22 | **BIEN** |
| **attending** | 23 119:5,12 | **barriers** | | 5:3 |
| 99:12 | 141:8,12,14 | 51:1 | **beast** | |
| | 149:22 165:23 | | 229:1 | **big** |
| **attention** | 171:9 177:23 | **based** | | 41:10 |
| 23:19 108:23 | 188:12,20 | 30:14 39:11,21 | **began** | |
| 149:9,10 215:11 | 191:21 210:21 | 43:2,4 62:10 | 227:24 | **bill** |
| 242:16 245:1,24 | 220:19,25 221:1 | 70:23 80:20 | | 135:17 |
| 252:21 | 224:11,20 225:7 | 81:17,21 82:15 | **begin** | |
| | 226:3 234:13 | 86:18 104:23 | 141:21 145:3 | **billed** |
| **attitudes** | 240:18,22 | 115:3 127:19 | | 135:20 |
| 183:10 | 241:2,4,6,7 | 157:12 167:8 | **beginning** | |
| | | 183:8 199:4 | 141:15 145:9 | **billing** |
| **attorney** | **awareness** | 202:24 211:1,3, | | 143:2 |
| 5:15,20,23 | 87:8 | | **begins** | |
| | | | 64:9 133:8 | **binders** |
| **atypical** | | | | 179:21 181:8 |
| 85:18,22 | | | | |

Kevin Kuich, M.D.                                                    September 19, 2019

bit
9:23 41:15 43:8
61:3 68:21
121:16 161:17
187:6 193:24
204:3 223:6

bits
195:3

bizarre
126:14

blaming
109:9

blank
128:13

blanking
25:6 172:13,16

blew
175:5

blind
64:6

block
122:22 185:14

board
10:1 15:4

bodies
43:16

body
124:5 126:23

bona
151:16,19

bones
47:18

bookmark
194:10

bookmarked
194:9

books
8:8

boondoggle
125:12

booth
12:11

boots
37:15

bottom
16:22 74:16
85:2 136:19
186:23

box
125:24 130:6
142:5,13

boxes
142:6 143:7

brain
84:14

breadth
173:11

break
7:14,17 48:5,6
88:12,14
127:11,12
175:19,20

breaks
7:13

briefly
231:13

briefs
59:1

bring
9:25 15:4 33:24
113:2 114:22,25
141:19 164:17
193:7

bringing
13:22 41:8
125:1 155:13

Britt
186:14

Brittany
186:25 238:20,
22

Brizendine
40:8 66:15 97:9
125:2 150:23
186:15,16,25
187:14,22 188:2

189:1 238:1,20,
23 239:15

Brizendine's
112:4

broader
126:20 138:8
181:5

broken
154:23

brokering
119:20

brought
32:12 41:6,25
42:3 71:3
111:21 140:17
148:11 149:9,10
151:17 152:1
156:19 158:4
172:20 223:4
227:4

Brown
5:15

budgetary
67:7

bugs
99:17 147:24

build
146:14 148:1,21
169:21,23 172:3

building
13:17 123:11
146:13 169:18
183:5

built
13:23 137:7
146:9 149:1,14
150:3,14 168:23
169:2,25

bunch
195:6

burden
45:10

business
89:10 93:14,16,

17 97:25 98:19,
22 99:12 102:17
103:10 104:13
108:6 115:20
119:8 221:21
236:17,22 237:3
238:3

busy
69:25 72:3

buy-in
165:24

C

C-E-R-N-E-R
169:17

C-L-A-C
148:9

calculated
42:19 83:10

calendar
90:24 134:11
139:15

California
5:4,6 8:4,14

Calipatria
216:8

call
49:7 69:23
71:16 76:13
99:20,22 100:3,
22 147:13 155:8
198:5,6 203:22,
24,25 204:1
208:19,22
225:14

called
5:8 48:14 52:3
56:11 57:10
65:1 66:4 79:6
80:15 81:1
127:15 128:14
130:4 135:4
144:8 175:25
207:10 215:21
227:13 247:8

calling
12:7 28:2 29:22
48:23 71:18

calls
29:14 30:18
37:15 38:10,12,
18,20,21 48:9,
12,17 49:2,3
71:1,13,23,24
72:1 81:19,25
82:21 83:8 85:9
86:14 88:20
100:17,19,20
101:1,6,11,13,
24 102:3,6,11,
16,25 104:15
105:21 107:22
119:10 126:8
133:21 135:9
139:9 142:22
150:12 170:9
178:10,17 179:6
180:18 191:7
192:3 244:3
248:10 249:1,17
250:17

calm
232:14

canceled
173:22

candidate
12:9,13,14,15

candidates
125:16,17
221:13

capable
110:15

Captherian
205:17

Captherian's
205:21

capture
112:24 142:18

captured
41:12 46:23
254:4

Kevin Kuich, M.D.                                    September 19, 2019

captures
  81:1

Cara
  5:19

carbon
  64:6

card
  205:19

care
  9:12 15:21
  20:20 22:11,12,
  23 23:7,14,22,
  24 25:9,16
  26:12,18,24
  33:7 35:2,10
  43:13 45:7
  49:14 56:15
  59:5 60:1 68:16
  77:8,18 78:1
  79:10 81:23
  91:20,24 92:3,4
  109:16 140:23
  161:19 205:9
  210:15 243:10,
  17,19,25 244:14
  247:21 250:5
  252:19

Cartwright
  186:18,24 188:3
  231:17,21,22
  238:1

cascade
  168:2

case
  5:16 19:25
  24:23 39:11

caseload
  124:25

cases
  243:2

category
  181:5

caused
  25:12 36:7 78:4
  249:13

causing
  34:5

CC'D
  90:1

CCC
  60:10 135:21
  222:13

CCCMS
  42:17 44:16
  79:1,11,16 80:2,
  17 81:3,10
  216:1,22
  245:11,21

CCCS
  245:17

CCHCS
  160:2 228:7

CCHES
  120:18,20
  121:15

CCR
  177:11 183:7

CDC
  228:3

CDCR
  6:12 8:12 9:1
  10:1 12:23
  13:16 20:18,25
  22:24 25:8,11
  26:24 27:3
  30:16 52:24
  55:13 59:3 63:1,
  21 64:3 65:1,5
  73:11,19 76:22
  86:10 89:3,9,25
  90:1,14 96:8
  99:4 108:10,22
  113:19 120:18
  122:6 123:2,7
  124:3 126:14
  136:19 138:13
  139:3 149:3
  152:11 160:19
  173:24 179:17
  190:10 192:9,10
  195:19 205:11

208:12 219:2
221:24 223:13
224:12,22
225:17 226:23
230:20 232:11,
25 234:25
240:18 245:17
252:7

CDCR's
  63:14 75:14
  111:4 177:16
  178:21 243:1

Ceballos
  99:10 112:2
  116:6,7 118:22
  129:7,21
  132:20,22
  134:20 143:17
  150:22 151:23
  152:10,15
  171:9,17
  173:19,24 197:7
  227:17 238:13
  239:14

cell
  41:8 42:1 60:16
  109:17,21,22,23
  140:18 219:15
  249:23,25
  250:2,3,9,15

cells
  42:2

center
  146:8,22,24
  147:6 153:22
  154:22

Centinela
  216:8

central
  25:6 48:19

CEO
  48:21

Cerner
  13:15 139:2
  142:25 146:12
  147:12 148:14,

15 149:4,14
174:15 185:20
187:5 238:8

Cerner's
  147:15 169:17

Certified
  5:5

certs
  199:24

chain
  121:9

chaired
  172:25

challenges
  143:20

chance
  90:10

change
  6:22 34:8 44:1
  89:13,14,16,18
  90:6 92:25
  94:12,20 95:1,
  23 96:4,6,9,18,
  22 97:16 98:23
  99:11,13 100:1,
  12 103:8,10,21
  105:2 107:21
  108:6 110:7,13
  111:5 112:9
  115:10 119:1,2
  120:11,15,25
  121:3 126:3
  146:7,12
  148:10,13
  151:25 152:4
  154:18 155:9
  156:22,23
  159:6,11,19
  160:5,21 161:18
  162:6 163:21
  168:22 169:14
  172:7 175:1,10
  179:17 183:3
  190:18 192:21,
  23 193:5,6,7
  218:14,15
  220:19 221:4,

11,19,21 222:2,
5,9 225:8,15,24
226:4,5,8 227:3,
10,12 230:11
231:20

changed
  18:12 28:8
  33:19 89:9 91:3
  92:19 93:12,15
  95:3,4,8,21 96:1
  97:20,25 98:1,
  19,22,24 102:13
  104:25 106:7
  108:7,8 115:6,8,
  14,15,20,24
  119:4,7,8
  143:18 159:3
  172:7 177:11,15
  179:22 223:1
  240:5

changing
  129:15 155:25

channels
  156:18

characteristics
  62:11

characterize
  133:17

charge
  37:21 56:3
  149:15 150:7
  181:2,11,25

chart
  16:25 17:2,24
  18:9 54:17
  55:18 56:13,16
  57:9,13 59:2,3
  60:18 74:7,18
  78:23,25 80:2,
  14,17,18 81:8
  82:5 83:1,22
  104:8,19
  105:10,14,15
  106:19 122:12
  238:15,21
  239:16 242:19,
  21 243:13,22,24

Kevin Kuich, M.D.                                                        September 19, 2019

244:4 245:4,9
246:2 247:25
249:14

**chart's**
56:23

**CHC**
120:18

**CHCCS**
228:6

**CHCF**
8:14 9:10 49:17
50:9 220:3,5,21
221:8,12,16
222:25 226:12
247:18 248:14
250:5

**check**
130:3,6,7,8
249:4,5

**check-in**
44:22 136:10

**check-out**
44:23 136:10

**checkbox**
128:11

**checked**
82:6 94:9 131:9,
14,19,20,21,22
134:5,6,12
142:6

**checking**
46:22 130:15

**checks**
129:23 133:9
134:2

**chief**
7:23 9:5 11:3
14:13,20 16:3,6,
9 17:3,8,10,11,
19,21 25:10,25
27:4,13,15,24
32:14 35:11,25
36:6 40:25 41:1,
21 48:22 51:11
52:2,4,7,23

61:10 65:9
66:10 74:5
106:23 126:10
176:18 202:11
205:15 253:23

**chiefs**
18:25 27:8
35:13,17 43:12
51:16,23 52:16
53:3,15 57:5
99:21 211:4

**choice**
138:10

**choke**
42:7

**choosing**
201:6

**chose**
138:7

**chosen**
29:4

**chronic**
207:5

**circle**
68:13

**circumscribed**
39:9

**circumspect**
85:24 87:5

**circumstance**
35:16

**cite**
209:22

**CLAC**
148:9 150:24
153:7,10 155:9,
22 156:4,14,16
157:15,18,22
158:1,4 159:18
160:2 164:21
165:8,12,14
169:13 225:11
227:1 228:5,15

**CLAC-APPROVED**

169:23

**clarification**
28:25

**clarified**
230:12

**clarify**
28:1 108:1
160:21 193:18
216:3 227:4
229:6 230:9
233:8,15 236:12

**Clark**
172:14,15

**class**
5:15 81:3,10
243:2

**classifications**
74:22

**clean**
149:7

**clear**
66:2 67:2 83:14
94:18 102:10
103:10 114:7
118:6 119:14
121:12 125:5,6,
7 137:24 155:18
160:6 164:12
208:4 225:1,2
230:1

**clicks**
131:5

**climb**
167:5

**clinic**
50:9,23 51:1,2

**clinical**
14:3 62:6,8
64:22 77:8
121:17 159:6
162:8 170:20

**clinically**
167:17 168:14

**clinician**

167:16 207:1

**clinicians**
14:8

**clipped**
189:21

**cloaked**
234:19

**close**
106:12 137:12
180:5 197:20
225:11 234:8

**closely**
92:11 228:1

**closer**
178:25

**CMS**
216:16

**co-run**
116:6

**code**
139:12,13

**coded**
37:4

**codified**
160:9

**coding**
208:2

**cohesive**
127:3

**coincidental**
110:17

**Coleman**
5:15 13:10
19:25 63:6
113:1 114:11
175:5,17 179:19
180:1 181:9
184:2 243:2

**collaborated**
38:25

**collaboration**
13:8 127:2

**collaborative**
15:13 34:4
128:6

**colleague**
67:11 239:2

**colleagues**
21:21 223:19

**collecting**
215:4

**colors**
84:13

**column**
16:24 56:12,14
74:14 105:17
239:3 246:4

**combined**
199:6

**comfort**
11:6

**comfortable**
94:6

**command**
189:3,4,9
238:23

**commencing**
5:2

**comment**
67:25

**committee**
143:18 148:8,
10,12 150:25
151:4 152:1,2,3,
24 155:10,14,17
156:4,10,13,16,
20 157:6,19,23
158:12,15,17,
19,20 159:11,
12,24 160:5,9,
21 162:14
163:5,13,14,25
164:2,18 165:16
227:3,10,12
230:11,14

**committees**

Kevin Kuich, M.D.                                                September 19, 2019

9:21 162:11
164:4

common
22:4 26:9,20,22
31:2,9 36:14
39:13,17,21
40:20 45:13
48:20 92:23
95:24 130:14,20
178:2,4 191:23

commonalities
185:1

commonly
48:12 67:12,15,
16,18,19,22,23,
24 130:18

communicate
128:9 249:6

communication
21:2

communications
76:6

company
10:5

compare
126:18

comparison
209:1

competing
150:8

compiled
197:11 212:7
216:13,25 244:5
251:15,21
253:21

compiling
253:1

complain
38:3

complaining
114:8

complete
21:12 32:23

58:4 70:3

completed
62:5 77:12
79:25 80:1,4
129:11 130:1
133:1,13

completing
112:8

completion
32:13

completion'
90:25

complexity
21:9

compliance
32:20,23 33:1
54:18,25 57:1
62:2 82:7,15
90:6 104:10
106:3 113:11
114:5,9 136:14,
23 137:8,9,10,
14 139:17,21
148:6 166:7
167:15 211:21
222:8,22 224:2
228:16 237:16
238:5 241:24
243:4,8

compliant
93:10 98:14
106:8 108:25
168:19 221:11

complicated
45:2 67:8 75:11
108:13 117:19,
23 135:12 136:1
138:1 139:1
141:16,17
166:23 167:7
168:11 172:4
246:13

complied
197:4

comply
59:4 60:1

109:11 219:13
249:9

complying
238:4

component
143:2 146:18

components
47:19 183:2

composed
151:7

composition
152:24

computer
194:10

comradery
127:1

conceivable
83:11

concept
69:3

concepts
230:10

concern
32:7,16 39:7
49:11,12 65:12
70:22 84:24
96:11 103:22
107:2 113:9
124:10 162:13
189:16 201:20
202:25 204:7
252:1

concerned
107:13 157:2
162:10 180:13
250:8

concerningly
110:23

concerns
21:11,23 41:5
53:9 70:9,10
77:16,22 78:11
87:13 88:1
97:12,14 112:15

113:2 123:22,25
124:7 125:3
151:17 180:14
184:19

concert
98:2

concluded
210:13,14
254:19

conducive
128:3

conduct
26:17

conducted
42:18 44:16
245:6,15,21
251:8

conducting
38:18 106:23

conference
195:20

confident
29:20 40:1,2,10,
13,18 145:6,16
181:24 182:1

confidential
60:15

confined
128:12

confirm
55:22 95:18
105:9 206:9
232:7 252:23

confirming
6:9

conflict
124:19

conflicts
88:2 119:16
125:3,21

conflictual
117:24

confused

229:6

confusing
154:20

connection
85:15 102:4
197:10,17 236:7
237:15

conscripted
231:17

considered
79:15

consistent
88:25 91:5
94:13,15 105:1,
2 212:16

consolidation
159:10

constant
53:23 86:22
138:5 232:25

constantly
108:10

constituted
226:5

consultation
9:15 111:20
213:10

consultations
24:15 58:20
213:6

consulted
65:3,23 68:14
83:24 86:8

contact
11:1 21:25 22:5
25:20 53:23
79:13,14,16
105:5 108:24
115:5 118:15
125:7 126:4
188:24 216:15
220:20 237:12
246:3 249:23

contacted

Kevin Kuich, M.D.                                                September 19, 2019

11:8 12:11
21:15 26:11
95:18,20

**contacting**
27:11 107:11

**contacts**
53:21 56:12,14
60:7,14 78:25
79:6,10,17 80:3,
16,22 81:1,2,9,
13 82:13 83:2
97:24 104:14,22
105:17,19,24
106:6,8 110:1
115:7 122:7
215:22 216:1,21
218:12 220:7
226:1 235:16
243:9,24 244:12
249:13 250:9,16

**contained**
217:24 218:6

**contend**
108:22

**contends**
136:19

**content**
33:12

**context**
6:19 40:3,4
41:7,25 77:20
84:10,13,16
88:8 96:15
113:10 114:21
140:5 141:18
146:13 195:15
196:17 217:3,8,
11 245:12

**contingent**
135:11

**continually**
192:19

**continue**
29:18 117:8
122:25 175:22

continued
16:1 21:2 27:13,
16 47:20 231:13
248:24

**continues**
132:20 159:10

**continuing**
15:7

**continuity**
243:10,25
244:14

**contract**
12:22 53:25
90:22 211:8

**contracting**
10:6,7

**contractor**
12:22 123:12

**contraindication**
226:9

**contrast**
78:16 126:19

**contribute**
102:2 205:8

**contributed**
64:20

**contributing**
80:11

**control**
118:17 119:6
167:16 177:17

**controlled**
153:16,23,24

**controls**
131:8

**convention**
12:11

**conversation**
40:1,2 65:15
68:22 70:19
78:18 188:19
213:5 242:6,14

**conversations**
21:11 40:10
41:16,20 175:9
203:20

**conveyed**
40:6 119:24

**convoluted**
137:25

**coordinating**
206:18

**copied**
73:8,9,11,14

**copy**
64:6,15 93:2
132:11 197:18,
22 234:9,13

**Corcoran**
180:12

**core**
35:7,8

**correct**
6:10,11 8:6
10:22 12:24
14:12,17 15:10,
18 16:4,10
18:14,17,20,25
22:7,8,9 23:10,
11,15 24:24
25:1,17,18 26:9
28:13 30:23
31:7 32:5,6
35:19 38:2,19
48:25 52:14
55:16,18,19,21,
24 58:14 59:21,
22 61:7,16 63:2,
3 66:11,16 68:6
69:12,15 70:11
73:3 74:12
75:16,17,21,22
78:7 84:3,17,19
86:18 88:8 89:8
95:2 100:15
101:20 102:14
103:1 106:4,17
107:8,9 110:2
116:13 118:12

120:1,2,4,8,9
121:1 131:12
137:4,5 147:7
149:19,20
155:23 156:1,2
158:7 159:14,20
163:7 168:24
169:2,3 170:17
186:8 188:7
190:20 196:9
197:19 198:4
200:8,21 210:12
212:18 213:19
216:1,2,6,9
217:22,23
220:4,9 221:5,6
223:23 224:9,16
225:19 231:22
232:9,10 234:23
235:20,21
237:4,22
238:12,21,24,25
239:12,21 242:3
248:19,20
252:11,12,16,20
253:3 254:12,17

**corrected**
190:10,15

**Correction**
8:14

**Corrections**
8:4

**correctly**
19:4 79:12
95:14 106:14
173:18 180:11

**correlation**
44:9

**cosigning**
46:16

**count**
43:13 62:4

**counted**

45:4,5 89:12
109:25 165:5
171:11 173:23

**counterparts**
23:17

**counting**
106:8

**couple**
50:11 78:20
101:7,23 163:24
236:11

**court**
6:5,7 19:17
20:3,7,14 47:3
50:6 54:10
62:21 63:10
74:3 77:3,5
84:17 85:2,6
86:2,5 87:10
88:18 104:7
105:6 122:3,12,
13 127:14
144:10 184:2,3
190:24 191:4,19
197:10 233:25
234:17 235:1,
17,25 236:6
238:4,6 241:23
246:1 253:2

**Court's**
11:22 12:2
22:15,16 84:18,
23 85:10 190:22
196:25 232:1

**courtroom**
7:5

**cover**
49:13 204:10
206:24

**coverage**
65:7,13 68:18
207:7

**covered**
185:25

**covers**
75:18

Kevin Kuich, M.D.                                        September 19, 2019

**create**
104:1 127:1,2,3
128:2,8 140:20
166:16,17 168:1
183:6 185:16
212:7 216:14
231:18 250:11
251:21 252:2,5

**created**
103:19 168:10
174:20 216:23

**creates**
121:25 123:17

**creating**
121:4 128:12,
14,15 247:21

**creation**
216:18 232:19
234:2,3

**credentialing**
9:22

**crew**
142:2

**crisis**
68:16 198:3

**crucial**
39:8

**Cucamonga**
17:9

**culture**
86:23,24

**cumbersome**
130:11 171:22

**curious**
92:9 215:5

**current**
7:21 182:24
193:8 219:11
222:11,16

**custody**
33:24 121:9
250:21

**cut**

65:5 74:24 76:3,
17,23 77:14,16,
23 240:18
241:3,5,6

**cuts**
78:2,3,16,17
85:23 241:8,9,
13

**CVSP**
216:9

— **D** —

**daily**
18:16 24:20

**darkness**
234:19

**dashboard**
33:19 49:15
109:3 112:20
244:20

**data**
31:10 32:4,9,11,
12,25 33:1 37:1,
12,20,22,23
38:1,3,7,25
39:3,5,9 41:12
42:16 43:17
44:1,5,13,22
47:6,8 56:13
57:21 58:7
78:16 80:17,23
83:24 84:4,5,11,
12 85:14 87:13,
18 91:6 92:23,
25 94:1 95:13
97:5,6,7,8,9,13,
23 98:12 99:4,
23 100:10
101:14 102:6
104:20 105:5
106:12 107:3,
21,23,24 112:24
113:4 114:2,10,
17 115:3 119:6,
7,17,18 120:16,
20 121:7,10,17,
18,23 122:11,17
131:15 134:14

135:7 141:20
153:18,19
162:22 178:6,13
179:13,16,20,
21,24 180:3,8,
15,16,24 181:3,
4,5,7,8,12 182:6
183:12,17
186:18 187:1,
10,23 188:2,4,5,
8 189:17,19,24
190:4,8 191:2,9
193:22,23
194:3,14,20,21,
23,24 195:10,16
197:3,8,11,16
206:8,12,14,15
208:1,3,5,9,13,
15,18 209:2,5
212:6,14
216:13,25
217:1,9 218:1,3
219:22 223:25
224:6,21 225:21
228:16,25
229:2,3,7,15,17,
21,23 230:8,13,
18,23 231:1
232:4,7,21,22
233:10,12,17
234:3,4,21,25
235:15,23,24
236:6,8 237:19
238:2,10 242:21
243:1,12,20,21,
24 244:5,19
245:13 249:23,
24 250:1
251:15,20,24
252:2,11,14,17
253:2,8,18,19,
21

**database**
93:1 195:6
229:23

**databases**
87:3 95:14

**datas**
194:24

**date**
19:25 40:12
77:3,5 96:15
104:10 130:12,
13 134:5
138:14,18,19,20
160:23 165:4
199:6 227:22

**dated**
50:6 54:18
62:23 63:5 73:6
90:4 144:8
152:12 153:13
183:25 220:1
227:17

**dates**
12:1 92:22
136:20

**day**
120:5 121:8
124:4,18 129:20
131:20 133:11
134:6 137:13,18
140:15 152:19
162:19,20 168:4
184:8 185:6
220:14 247:12

**day-to-day**
11:24 186:3

**days**
79:12,15 83:2,3,
5,15,20 84:8
89:4,7,11 90:7,
24 94:17 97:17
98:15 103:11
108:8 118:16
137:11,13,18,23
166:10 167:13
197:24 225:24,
25 237:13

**dead**
157:4

**deal**
153:19

**dealing**
12:18 13:22

**dealings**
161:23

**dealt**
153:18

**December**
89:3,9 95:8
98:20 104:25
108:6 110:7
115:6,10 118:14

**decide**
156:10

**decider**
116:8

**deciding**
159:5

**decision**
11:16 17:9,12
27:22 65:16
192:8 202:23
203:5 225:7

**decision-making**
62:8

**decisions**
67:3 69:4 115:1
149:22 151:12

**declaration**
54:11 59:3
104:5,6 235:18,
24 242:17
243:23 246:2
247:25 248:6
252:22,24

**decorum**
164:7

**decreasing**
136:23

**dedicated**
27:17 230:19,24

**deep**
98:7

**default**
130:8

**defaults**

11

Kevin Kuich, M.D.                                              September 19, 2019

130:5

defendants
5:21,23 24:2
74:23 104:18
191:25 241:21

Defendants'
54:12,14 63:11

deference
67:11

deficit
159:25

define
28:18 39:18
183:13

defined
20:8,14 177:13
191:23

definition
177:17 190:10,
15 222:16

delayed
27:20 37:2
208:2

deliver
35:2

delivery
64:11

demand
80:13

demoed
250:4

denom-
84:9

denominator
31:10,15 32:9,
19 78:5 93:19
121:13 178:8
222:23 236:24

dental
110:20,21 151:8
192:18

dentist's
172:16

departed
120:23

department
8:4 16:5 18:21,
23 29:2 39:19
120:17 147:20
151:5 178:14
190:6 231:23
238:23 241:2,4,
24

department's
169:19 179:16

depend
252:10

depending
37:4,6 60:8

depends
11:5

depiction
50:19,20 56:15
68:19

deploy
15:16 19:6

deploying
13:6 15:23

deployment
34:21

deponent's
24:6

deposition
19:11,13,18
203:8,11,13
204:5,8,13

depositions
6:2

Depot
204:2

depth
173:11

deputy
17:25 18:2,3
119:13 125:3
189:2

describe
9:9,16,23 13:5
14:20 23:1
28:15 32:7
127:25 146:16
147:22 163:24
164:2 184:19
200:14

describes
134:20

describing
24:22 212:25

design
13:1,7,12
110:25 174:8,19
185:16 229:18

designed
111:25 124:11
129:13 133:5,
24,25 137:25
139:1 141:17
166:10,15,16,17

designing
20:23 127:25
128:10,20

detail
6:23 93:21
107:15,17 136:8
142:16 185:25

detailed
60:21 71:21
86:17 87:5
182:15

details
78:5 109:15
131:3 138:22
201:23 202:8
234:20

determination
62:6

determinations
154:7

determine
28:11 37:5 39:1
72:5 92:5 137:8

152:4 154:17
167:17 207:7
229:3

determined
65:17 150:3
151:1 153:1
196:14 201:19
202:14,21

determining
10:10 201:9

detriment
29:9

developing
64:17 181:2,11

development
65:4 127:20
129:2

diagnoses
175:3,15

dictate
97:11

difference
250:20

difficult
23:16 58:4
108:10,11
143:23

difficulties
59:15 60:12,13
139:3

difficulty
110:19 154:4

diluted
117:16

DINER
5:4

direct
9:12 33:7 107:6,
8 145:20 209:15
226:6 244:25
245:24

directed
231:5

directing
252:21

direction
11:17 18:4
22:15 29:16
36:1 118:21,25
147:16 151:24
152:16 159:2

directives
36:3

directly
12:11 18:6
64:16 106:20
139:11

director
17:25

disability
11:13 208:6

disabled
37:9

disband
119:15

disbanded
124:8

discipline
110:20

disciplines
151:8 156:25
160:3 170:20
172:20,23
173:15

discourage
140:16,19

discouraged
164:25

discouraging
163:17

discover
93:14 221:20

discovered
91:2

discrete
229:22,25

Kevin Kuich, M.D.                                           September 19, 2019

discuss
13:3 21:23
65:10 78:20
88:7 102:1
107:12 159:16
251:10

discussed
20:5 40:14 61:3
66:18 67:3,13,
20 68:22 73:5
77:12 102:17
118:13 122:13
137:1 168:19
169:7 170:19
196:16 199:23,
25 202:2 224:18
242:19 253:19
254:3

discussing
21:4 77:24 78:2
84:23 86:11
104:9 122:3
150:5,6 153:15
159:12 171:17
190:24 192:8
198:17 242:3
247:25 248:25
253:25

discussion
28:8 31:13
39:25 49:15
53:7 65:6,9,20
69:5 70:5 71:10
99:17 102:3
125:9 157:12
163:15 164:11
165:23 187:13
201:1,3 202:11
203:12 215:2
220:6 227:1
245:14

discussions
13:17 18:9 21:8
41:22 42:5
53:11 64:23
77:11 99:5
114:20,21
147:12 152:22,
23 201:13

202:9,10

disheartening
163:16

distinct
125:6

distinctly
188:18

distracted
204:3

distribution
119:9

district
54:10 63:10

dive
86:17 98:7

divided
246:22

division
16:21 63:14
74:7 221:15
231:23

doctor
48:8 50:21 51:7
61:14 88:17
132:11 135:15,
18 136:17
144:22 159:13,
21 161:6 171:8
175:22 191:21
192:7 205:17

doctors
99:4,8

document
16:20 19:24
54:9,16,21
55:11 56:9 63:9,
14 65:24 73:7,8,
9,11,16,18
78:23 85:1
132:18 136:17
142:9 144:7,14
152:10,13
159:19 161:12
171:5 183:25
209:25 211:14

218:22,24 219:9
236:19 237:9,11
239:22 241:22
242:24 253:5,6,
9

documentation
13:19 66:18
69:14 82:4
128:8 171:22

documented
44:10

documents
19:15 54:5
62:13,22 67:19,
23,24 86:5 95:6
103:23 204:16,
19 234:18

downsides
21:21

draft
214:5,6,10,12
215:1

dramatic
175:17

dramaticness
77:22

drastic
92:19

draw
215:11

drawn-out
147:14

drill
194:12 222:12

drive
111:4 121:6

driving
121:5

drove
111:5

Drs
98:11 153:10
226:11 238:1

DSM-5
174:22,23
175:15

dual
121:6

due
24:18 92:22
119:16 177:16,
22

duly
5:8

Dunn
204:22,25 205:3
221:2 251:6
253:16 254:11

duties
9:9,17,20 14:20
24:4 25:23
30:15 31:3 33:7
35:9 36:18,22
39:14,23 58:18
116:9 206:22
207:3 213:16

dysfunctional
175:13

E

e-mail
50:4,10,18
51:10 62:22
63:4,20,22,25
64:2,4,6 73:5
74:12 75:13,19
89:25 90:8 91:4
93:24 95:19,21
105:1 130:22
144:7 150:6
152:10 153:13
160:18,22,23
161:9,10,12
163:25 183:24
184:8,11,15,20
186:9,10,22,23
187:9 189:21
208:19 215:16
217:25 218:6
219:25 227:17

240:8,9,12,16,
19

e-mails
49:1,3,6 50:4,6
90:12

e.g.
133:10

eager
173:3

earlier
6:24 25:19
26:14 32:8
36:25 45:13
48:8 52:19 61:3
90:5 104:9
122:4 194:19
205:10 206:4
208:1 209:19
211:19 212:13,
17,25 215:20
221:18 223:8
225:23 228:14,
22 234:5 235:18
240:21 249:21

early
150:1 214:5,6

easier
157:21 180:21

easy
60:10 221:15
224:23 225:1

ECF
74:7 132:3,13,
16,18 136:16
171:7 245:2,3
253:17

edict
153:1

effect
113:5 180:13

effective
15:12 64:11

effectively
128:18 164:24
175:3

Kevin Kuich, M.D.                                                September 19, 2019

| | | | | |
|---|---|---|---|---|
| effectuate | 206:20 211:5 | 6,12 78:19 | Ells' | end |
| 163:21 | 213:17 225:3, | 80:24 81:7,16, | 193:19 211:2 | 45:10 70:12 |
| | 20,22 229:2,7, | 20 82:9,22 | | 71:24 94:22 |
| efficiency | 15 230:4,12 | 83:21 84:21 | embedded | 137:25 145:3 |
| 86:21 | 231:7,9 237:24 | 85:10 86:7 | 186:9 | 148:2 172:12 |
| | 246:11,12 | 87:11 88:12,16 | | 174:25 216:20 |
| efficient | 248:24 249:19 | 89:20,24 100:18 | embraced | 225:14 |
| 15:12 34:24 | 251:24 | 101:3,17,22 | 180:19 | |
| 64:10 185:17 | | 104:17 106:1 | | ended |
| | elbow | 108:1,3 112:13 | emerged | 14:18,19 |
| efficiently | 21:7 | 113:7 117:1 | 87:8 | 125:11,17 |
| 128:4,18 | | 118:9 119:22 | | |
| | electronic | 120:6 126:16 | emergencies | endless |
| effort | 13:2 127:18 | 127:13 129:4 | 34:22 71:20 | 171:20 |
| 88:3 109:14 | 192:12 | 132:2,5,8,10 | | |
| 131:5 172:5 | | 133:22 135:24 | emergency | energy |
| | electronics | 139:19 140:3 | 29:2 30:11 | 97:11 |
| egregious | 13:1 | 143:12 144:6,21 | 71:18 168:4 | |
| 152:18,20 | | 150:16 152:9 | | enforce |
| | elements | 156:14 157:13 | employed | 248:15 |
| EHRS | 64:25 128:16 | 160:13,17 | 126:11 | |
| 9:7 13:3,6,7,15 | 174:8 177:6 | 161:11 170:10, | | engage |
| 14:19 20:24 | 181:8 187:18 | 16 173:7 | employees | 123:3 192:13 |
| 21:3,6,9,17,19 | 196:13 203:12 | 175:19,21 | 10:2 | |
| 23:3,20 26:6 | | 178:12,20 | | engaged |
| 43:5,19,23 44:4, | elevate | 179:10 181:1,18 | employer | 130:21 |
| 5,14,21 45:2,3, | 188:21 | 183:23 184:18 | 7:21 | |
| 14,17 46:5,20 | | 189:15 191:20 | | engagement |
| 47:2,11 48:4 | elevated | 192:6 193:11 | employment | 106:13 147:15 |
| 53:22 79:23 | 188:12 | 196:24 200:9,16 | 125:5 163:23 | 158:24 |
| 82:3 103:18 | | 201:18 202:5,19 | | |
| 110:10,15,19,25 | elicit | 203:14,15,20,22 | enable | engaging |
| 111:22,24 | 24:5 71:25 97:9 | 204:4 206:11 | 182:24 | 10:2 13:17 |
| 112:23 116:9,18 | | 209:19 210:2,8, | | 206:18 |
| 118:3,4 121:7 | Elise | 12 212:3 214:20 | enacted | |
| 127:25 128:20, | 5:22 193:15 | 215:13,20 216:3 | 18:13 | enhance |
| 21 129:2,10,13, | | 217:5 218:2 | | 31:25 237:24 |
| 23 130:21,24 | Ells | 220:22 222:1 | enclosed | |
| 131:11 133:1,5, | 5:12,13,14,25 | 226:16 227:1, | 63:14 | enhanced |
| 23 135:20 | 12:3 16:19 | 13,20,25 228:18 | | 20:10 88:21,23 |
| 137:4,5 138:17 | 19:23 22:17,18 | 230:9 232:1,23 | enclosures | 237:19 |
| 141:10,23 | 24:5,8,11,21 | 233:6,19 235:3, | 62:23 64:9 | |
| 143:15,23 | 25:2 28:19 | 9,11 236:11,14, | | enjoyed |
| 144:9,18 146:17 | 30:19 33:5 | 15,23 237:5,7 | encoded | 192:17 |
| 147:5,18 150:8, | 35:23 36:16 | 238:19 240:22, | 185:20 | |
| 19 151:1,8 | 43:1 44:11 | 24 241:1,20 | | ensure |
| 152:1 153:7,20 | 45:20 46:11 | 244:7 248:22 | encompassed | 34:17 62:7 |
| 154:1 155:25 | 47:5,23 48:7 | 249:11,20 251:1 | 14:22 | 85:25 |
| 159:16 161:14 | 49:24 50:3 51:6 | 252:23 253:11, | | |
| 163:11 165:21 | 53:19 54:8 55:7 | 12,13 254:14 | encompasses | entail |
| 168:22 169:9 | 56:1,5,22 57:7, | | 181:7 | 203:13 |
| 170:13,19,21 | 24 58:6,12 | | | |
| 171:13 184:23 | 59:17 61:25 | | encompassing | enter |
| 193:24,25 | 62:12,20 66:22 | | 62:9 | 132:25 |
| | 67:9 74:1 75:2, | | | |
| | | | encounter | entered |
| | | | 103:18 | 43:20 229:15 |
| | | | | |
| | | | encourage | entering |
| | | | 94:4 | |

14

Kevin Kuich, M.D.                                                      September 19, 2019

247:19

**entire**
17:21 42:20
44:17 47:1
65:13 68:18
99:3 192:14

**entitled**
16:20 54:10,17
63:1,6,10 64:10
78:23,25 104:9
160:20 245:9

**entry**
247:16

**enumerated**
145:17

**environment**
127:7 162:19
250:6

**envisioned**
142:12

**EOP**
20:10 42:17
44:15 49:23
50:24 79:1
88:21,23 89:11
90:6 91:17,19,
22 92:7,8 97:24
103:12 104:14,
21 106:7
108:10,11,12,16
110:13 135:21,
22 166:11
199:23 216:1
220:7,20 235:16
245:11

**EOPS**
60:12 124:16
245:17,21

**equals**
229:18

**equate**
246:23

**equipment**
123:16 250:4

**equivalent**

42:19 71:5
124:6 245:7

**era**
43:24 112:23

**error**
154:3 177:23
185:4

**errors**
178:22 179:2
190:14

**essentially**
17:16 76:25
188:21 205:20

**established**
42:23 85:13

**estimate**
30:14,21,24
43:7,9 51:22
52:12,15,19,21
61:5 69:21
70:20 72:2
244:23 245:14,
20,23 246:10

**estimated**
44:15 178:21
240:10

**estimation**
120:15

**evaluate**
50:25 88:23

**evaluated**
33:14

**evaluating**
35:18

**evaluation**
49:23 71:6,21
109:25

**evaluations**
213:13

**evaporated**
88:5

**event**
136:11 238:11

**events**
108:19

**eventually**
25:11 72:20
112:4 113:12,21
125:2 149:23
154:25 156:7

**evidence**
57:21 220:23
235:3

**evidenced**
249:7

**Ewa**
8:1

**exacerbation**
145:15

**exact**
227:21

**EXAMINATION**
5:12 193:13
236:14 251:4
253:12 254:8

**examined**
5:9

**exceed**
225:25

**Exceeds**
111:15 112:17

**Excel**
92:24 113:17

**excessively**
136:1

**exchange**
161:13

**exclude**
191:23

**excluded**
31:11 252:18

**excludes**
190:13

**exclusion**
178:21

**excuse**
47:15 54:23
71:11 80:10
81:8 95:18
96:17 112:7
119:7 138:14,16
160:19 182:11
188:5

**excused**
23:6

**executed**
126:1

**executive**
19:12 20:6
204:22 221:3

**exhibit**
16:16,17 19:20,
21 22:16 49:24
50:1,5 51:3,8
54:6 62:14,16,
18,22 63:4,9,19
73:5 74:6 75:13
78:24 84:18,22
89:20,21,22
104:4,6 105:3
106:19 107:25
122:5 132:9
144:2,3,4,11,17,
19 152:6,7,14
153:14 158:3
159:9 160:14,15
171:6 183:20,21
184:1,14 189:20
204:21 211:16,
19,25 212:20
215:9,11
217:18,22
218:16,19
219:24 222:5
227:19,20
228:11 232:1
239:2,23 240:8
242:17 243:5,12
245:25 252:22

**exhibits**
73:4 75:8
104:24 213:21
215:6,7 227:15

**existed**
103:5

**existing**
25:22 103:6

**exit**
119:13,25

**expand**
20:22 44:20
192:13

**expect**
43:12 56:21
246:15

**expectations**
113:1

**expected**
67:25

**expedient**
191:18

**experience**
33:6 36:7,22
37:2 43:4 46:3
72:14 81:11
160:4 161:14
163:2,4 164:14
169:10 170:4,11
173:11 180:9
206:4 211:3,5,6
237:24 246:9,25
250:13

**experienced**
154:3 224:4
232:11

**experiences**
22:22 118:6

**expert**
19:13 20:5
42:14 98:12
99:10 129:7,22
132:2 136:15,16
171:7 210:6
244:23 245:1,13
249:15

**expert's**
129:8 209:21

Kevin Kuich, M.D.                                          September 19, 2019

| | | | | |
|---|---|---|---|---|
| **expertise** | 8:14 51:12 | 239:19 244:8,11 | 141:5 153:25 | 175:14 182:25 |
| 238:5 | | | 154:23 176:17 | 185:24 201:22 |
| | **fact** | **familiarity** | 206:19 207:8 | 219:18 221:7 |
| **explain** | 26:11 87:4 | 197:2 | 209:3 | 222:13 233:1 |
| 11:23 37:3 | 107:7 134:7 | | | 236:24 238:17 |
| 41:14 50:21 | 136:9 138:24 | **fashion** | **figure** | |
| 60:5 123:9,24 | 139:17 178:25 | 72:17 191:18 | 93:11 131:7 | **finding** |
| 162:5 | 218:12 220:22 | | 248:4 251:16,22 | 167:22 |
| | 221:8 233:11 | **fault** | 253:19 | |
| **explicit** | 244:11 | 34:3 | | **fine** |
| 36:1 | | | **filed** | 155:4 157:10 |
| | **factor** | **favorable** | 50:6 54:9 55:20 | 167:2 191:14 |
| **explicitly** | 82:19 | 111:11 178:14, | 63:9 77:4 87:9 | 195:9 233:7 |
| 96:20 199:11 | | 19 | 104:7 106:6 | 237:6 |
| | **factors** | | 122:12,13 | |
| **explore** | 177:16 250:21 | **feasible** | 132:17,18 144:9 | **finish** |
| 231:1 | | 69:3 | 184:2 | 193:2 |
| | **factual** | | | |
| **express** | 209:6 | **February** | **filing** | **finished** |
| 53:4 150:17 | | 9:2 | 57:22,23 202:24 | 9:7 116:8 |
| | **factually** | | 241:22 | |
| **expressed** | 86:18 | **federal** | | **finite** |
| 88:1 143:22 | | 50:6 | **fill** | 125:24 |
| 180:2 202:25 | **failed** | | 11:17,18 17:13 | |
| | 121:14 | **feedback** | 24:16 52:17 | **fire** |
| **expressing** | | 34:19 117:6 | 126:5 | 166:10,15,18 |
| 49:10 78:11 | **failure** | 148:3 214:15 | | 167:8 |
| 184:20 | 150:18 | | **filled** | |
| | | **feel** | 30:8 63:16 74:9 | **firm** |
| **Exquisitely** | **fair** | 7:13 21:24 | | 203:20 |
| 20:21 | 12:10 27:5,22 | 46:20 97:12 | **fills** | |
| | 164:16 250:14 | 109:8 121:13 | 51:14 | **fit** |
| **extended** | | 126:3 147:17 | | 102:8 128:24 |
| 237:13 | **fairly** | 152:20 174:4 | **filtered** | |
| | 31:9 92:22 | 181:19 193:2 | 106:15 | **five-month** |
| **extensive** | | | | 42:20 44:17 |
| 45:24 127:18 | **fait** | **feeling** | **filtering** | |
| 207:5 | 76:25 234:1 | 7:8 143:22 | 106:16 | **fix** |
| | | | | 34:3 42:7 |
| **externally** | **fall** | **felt** | **final** | 141:23 142:17 |
| 148:14 169:16, | 12:2 36:6 89:19 | 21:22 114:8 | 51:7 85:21 | 163:12 165:7 |
| 17 | 146:11 147:24 | 122:15 152:17 | 122:22 197:21 | |
| | 238:9 | | 234:14 253:11, | **fixed** |
| **extra** | | **fence** | 14 | 114:3 225:21 |
| 45:10 123:4 | **false** | 111:9 | | |
| 124:4 | 121:25 | | **finalized** | **fixes** |
| | | **fewer** | 239:24 | 155:20 |
| | **familiar** | 77:8 122:21 | | |
| **F** | 20:15,18 22:10, | 180:24 250:16 | **finally** | **fixing** |
| | 12,21 23:1 55:3, | | 129:24 146:11 | 174:1 |
| **fabulous** | 8,10 57:10 79:5 | **fide** | 149:14 | |
| 162:2 | 135:3 136:25 | 151:16,19 | | **flag** |
| | 137:1 175:24 | | **find** | 93:23 182:25 |
| **face** | 180:4 195:24 | **field** | 27:7 38:12 52:7 | 183:12 |
| 177:14 180:22 | 197:3,11,13 | 10:14,16,20 | 91:23 111:7 | |
| | 213:22 218:24 | 39:22 43:5 60:3, | 156:9 157:21 | **flaw** |
| **facet** | 226:11,24 236:2 | 6 73:2 113:16 | 163:10 173:1 | 134:13 |
| 114:14 | | 117:6 130:18,20 | | |
| | | | | **flawed** |
| **facility** | | | | |

Kevin Kuich, M.D.                                                    September 19, 2019

| | | | | |
|---|---|---|---|---|
| 27:21 37:2 208:2 246:14 | **fond** 221:17 | **forward** 29:19 32:1 46:19 53:10 86:19 96:24 149:8 151:14,18 159:18 175:10 191:11 201:21 205:9 237:25 | 25 44:1 58:23 59:12,13 75:19 79:11 81:2 83:4 86:3 91:16 93:3, 6 98:13 105:5 108:25 109:7 110:10,18 111:14 115:7 137:21,23 141:22 150:5 153:9,14 165:17 176:25 196:15 247:24 248:24 253:7 | **frustrated** 125:13 145:15 192:19 |
| **flexibility** 172:9 174:7 | **foot** 20:25 | | | **frustrating** 163:19 |
| **flip** 63:12 104:8 242:24 | **footnote** 113:4 114:12, 19,20 212:15, 19,22 | | | **frustration** 150:17 180:2 |
| **Floor** 5:4 | **foremost** 34:16 250:23 | **forwarded** 184:11,21 186:10 188:1 | | **FTE** 124:6 245:8 |
| **flow** 21:10 45:2 100:1 128:3,6, 16 129:14 167:1 168:14 171:21 175:16 246:16 249:10 | **forgot** 6:23 52:3 | **found** 27:19 94:9 96:4 175:4,10 203:4 207:10 239:2 | | **FTES** 42:19 44:17 210:17 |
| | **form** 6:13 19:1 37:14 143:10 159:18 171:22 197:21 246:1 | **foundation** 42:22 44:3 55:6, 25 56:4,18 57:3, 20 58:9 59:7 73:25 75:1,5,9 78:14 80:19 81:4,14,24 82:20 83:7 85:8, 13 100:16 101:2,10 104:16 105:22 119:11 120:3 126:7 135:8 142:23 150:11 170:8 178:9,18 179:5 181:15 191:6 192:2 232:16 244:2 248:9 249:2,16 250:18 | | **fulfill** 117:24 |
| **flowed** 95:14 | **formal** 125:9 159:19 171:13 207:3 225:9 | | **Francisco** 5:4 | **full** 124:6 |
| **flows** 128:9 | | | **free** 21:22,24 22:1 181:19 196:19 | **full-time** 124:3 205:6,7 206:20 |
| **flurry** 232:12 | **formally** 18:13,19 130:16 139:23 141:10 142:19 146:19 147:8 165:4 173:22 | | **freeform** 128:13 | **fully** 29:9 60:9,10 85:20 |
| **focal** 115:17 | | | **freely** 100:1 | **function** 35:7,8 46:22 57:19 58:18 61:22,24 70:25 71:2 111:24 131:11 133:24, 25 162:15 |
| **focus** 91:17 92:9 196:15 | **format** 53:10 92:24 199:7 219:5,6 | | **frequency** 33:11 49:5 58:22 122:7,8 249:23 250:8 | |
| **focused** 15:11 21:6 176:20 | **formatted** 131:2 | | **frequent** 26:3,5 49:5,6 | **functional** 224:3 |
| **folks** 108:12 111:23 136:2 223:5 | **forms** 13:21 122:12 128:10,14 211:10 | **Foundational** 22:17 | **frequently** 41:9,11,24 48:15 219:18,21 | **functioning** 123:11 143:6 |
| **follow** 142:3 166:25 168:15 228:17 232:6 237:14 | **formula** 93:12 | **founded** 86:25 | **Fresno** 15:4 | **functions** 17:16 24:4 29:6 30:9 34:11 45:16 78:10 133:24 135:6 |
| **follow-questions** 193:18 | **forthcoming** 198:19 | **four-day-a-week** 124:22 | **friendly** 135:13 | |
| | | **fourth** 239:3 | **front** 124:20 162:11 167:12 175:17 211:16 250:16 | **G** |
| **follow-up** 187:4,19 | **fortunate** 125:15 | **frame** 12:17 13:6 15:3 22:12 27:10 37:12 40:24 41:2 43:17,22, | | **GALVAN** 5:3 |
| **Folsom** 76:10 | **fortunately** 93:20 | | **fruition** 143:19 | **game** 29:13 |

Kevin Kuich, M.D.                                        September 19, 2019

| | | | | |
|---|---|---|---|---|
| **gaps** | 58:19 61:5,8 | 152:14 171:10 | 6:1 15:17 26:6, | **halfway** |
| 30:8 | **Gills** | 184:1 186:10 | 21 37:16 42:2, | 78:22 |
| **gatekeeper** | 231:12 | 190:17 213:22, | 11 43:16 59:25 | **hand** |
| 157:15 162:16 | **Gills'** | 23 | 82:3 114:5 | 18:3 19:16 |
| 168:25 169:1,8, | 213:5 | **Gonzalez** | **group** | 41:21 43:14 |
| 10,14 | **give** | 89:25 90:13 | 38:21 40:3,13 | 128:20 144:2 |
| **gather** | 6:23 7:9 30:24 | 91:5,9 92:15 | 114:21 117:15 | 234:2 |
| 7:14 | 87:23 105:12 | 93:20 95:17 | 120:19,23 121:4 | **handed** |
| **gathering** | 129:19 131:25 | 96:24 97:19 | 127:3 159:17 | 62:21 152:18 |
| 52:4 | 135:14 141:4 | 98:3,6,11 | 199:18 | **handling** |
| **gave** | 179:12 187:8 | 107:14 115:16 | **groups** | 110:15 |
| 164:24 | 229:19 | 176:15 219:25 | 185:1 | **hands** |
| **geared** | **gladly** | 230:22 | **grown** | 180:25 |
| 223:25 | 87:19 | **good** | 117:3 | **handwriting** |
| **general** | **glance** | 5:14 29:23 | **GRUNFELD** | 144:13 |
| 5:21,23 36:4,5 | 84:5 | 138:20 148:16 | 5:3 | **hanging** |
| 91:9 123:16 | **glove** | 157:1 193:2 | **guaranteed** | 149:5 |
| 128:7,16 138:9 | 41:21 | 219:20 | 169:1 | **haphazard** |
| 154:5 | **gobsmacked** | **goodness** | **guess** | 127:9 |
| **generalities** | 223:2 | 168:1 | 85:2 90:5 146:1 | **happen** |
| 204:8 | **Golding** | **governed** | 201:16 | 18:11 23:3 26:3 |
| **generally** | 16:8,12 18:3,15 | 230:13 | **guesstimate** | 41:22 60:25 |
| 40:21 53:15 | 19:2 40:20,22 | **Grammatical** | 30:17 | 94:19 109:10 |
| 66:2,13,14,17 | 49:17 50:5,8 | 214:16 | **guests** | 112:9 125:10 |
| 77:10 80:5 97:4 | 66:9 77:21 90:1 | **granular** | 196:6 | 130:20 137:22 |
| 118:22 179:12 | 95:20 96:12,16, | 186:3 | **guidance** | 139:22 142:15 |
| 196:5 214:16 | 17,24 97:19 | **granularity** | 222:15 | 143:7 148:13 |
| 242:11 | 98:11 107:14 | 141:1 | **guide** | 153:2 157:16 |
| **generate** | 115:16 117:4,22 | **grateful** | 59:4 60:2 79:9 | 164:18 180:24 |
| 219:4 | 136:15,19 137:2 | 125:15 220:14 | 88:22 89:6 | 189:9 206:3 |
| **generous** | 138:12 144:7,9 | **great** | 94:14,15,18 | 248:20 |
| 110:8 226:2 | 150:22 160:18, | 50:16 84:6,8 | 226:10 238:6 | **happened** |
| **gestation** | 22 178:21 | 123:4 180:25 | **guidelines** | 29:4 40:14 52:5 |
| 52:6 | 183:24 184:9, | 217:11 229:10 | 167:18 | 79:14 92:18,20 |
| **get-go** | 12,20,21 188:12 | **green** | | 93:11 94:22,23 |
| 141:15 | 189:21 196:6 | 33:20 34:9 84:6 | **H** | 103:22 129:16 |
| **Gibson** | 197:22 198:15 | 109:2,13,14,20 | | 136:11 137:18 |
| 204:22,24 205:2 | 201:3,15 | 110:4 111:13 | **H-1B** | 142:11,18 |
| 221:2 251:6 | 205:14,18,19 | 217:11 | 10:3 | 146:10 162:4 |
| 253:16 254:11 | 214:17 219:25 | **Greg** | **habit** | 168:1 177:25 |
| **gifted** | 228:11 230:5 | 16:13 | 92:16 93:18 | 180:1 188:18 |
| 93:21 | 234:9 239:23 | **grid** | **half** | 190:3 199:1,6 |
| **Gill** | 251:9 | 222:12 | 51:16 52:16,20 | 217:20 219:18 |
| | **Golding's** | **ground** | 207:22,23 | 225:16 227:5 |
| | 50:18 52:12 | | | 234:18 253:7 |
| | 119:4 144:13 | | | **happening** |

Kevin Kuich, M.D.                                    September 19, 2019

25:17 31:14
39:22 41:11,24
42:4,6 45:1
47:12,14 48:4
49:4 60:3 82:16
93:1 111:6,8
112:21 114:4,5
118:19 121:22
124:8 138:23
149:6 154:2
180:10 196:18
232:13 247:22
248:5

happy
6:18 28:25
136:6 173:13
192:24 205:8

hard
83:10 103:9
174:21

harder
109:16 174:14

hat
202:16

hats
94:4 102:5
209:11

Hawaii
8:2,3

head
6:6 14:15 90:3,
20 105:11 169:6
201:11 242:9

headed
118:11

header
74:15

headers
240:4

headquarter
11:7 19:1 39:18
40:5 100:25
103:2 111:18
207:22 209:12

headquarter's

179:14

headquarters
8:21 13:25 14:3
16:12 18:24
20:19 26:23
31:6 39:12,16
45:25 56:2
63:24 64:1,3
67:14 72:23
73:10 90:13,19
96:21 110:6
111:14 112:16
115:24 116:2,14
163:3 176:14,16
179:24 180:8
181:4,5 207:14,
20,25 209:14
220:2

headquarters'
66:10 180:16

heads
103:13

health
8:14 11:3 13:2
14:7 16:21
17:25 23:18
32:2 35:11,13,
17 36:1,6 48:22
54:13,17 63:15
64:3,11 65:10
68:9 72:15
73:13 74:8 77:6,
15 87:14 97:3
99:21 104:9
106:10 110:22,
24 113:18,20
115:22 116:2,3,
4 117:7 119:15
120:16 121:13
122:15 127:18
128:6 130:25
138:6,25 140:16
141:16 143:18
146:10,11,13,
22,24 147:6,11
148:18,19,23
149:2,12 151:5,
9,13,22,24
153:22 154:5

155:14,16 156:4
157:8,9,15
158:5,8,9
159:11 160:4,20
161:15 165:11
166:22 170:2,4,
12,24 171:1
173:2,10,12
174:24 181:22,
24 182:6
183:16,17
192:17,20 193:4
195:19,25
198:11 201:14
202:12 205:12
211:20 225:13
227:9,12 228:5
230:3,8,11,19
231:8,19 243:8
244:1,9

health's
138:10 169:20

healthcare
7:23 16:21
63:15 74:8
120:20

hear
20:4 26:10 49:8
127:15 221:8

heard
115:16 120:12,
22 159:18 160:2
163:21 190:18

hearing
88:4,6 164:13,
16 178:1 185:2

heart
221:17

heavily
56:20 101:13
110:25 124:9
126:11 168:11

heavy
152:18

held
8:11,12 106:11

141:9 165:3
172:25 173:21
180:6 195:19
223:9

helped
182:20 231:8,12
239:2

helpful
50:12 155:19
165:25 177:8
186:19

helping
9:21,22,24,25
91:6

helps
205:8

hereinafter
5:9

hereto
243:5

herring
187:7

hey
130:23 134:10
149:4 157:2
187:10,14,19
217:11

He's
95:10

high
58:10 60:17
61:2 67:6 71:7
82:7,17 142:1
243:4 250:3

higher
46:18 56:20
231:18 238:22
241:9

highest
28:12

highlights
57:10

highly
32:17 58:25

99:9 164:25

HIPAA-COMPLIANT
250:7

Hippocratic
33:9

hire
233:1

historically
124:1

history
97:10 221:17

hit
174:15

hits
148:2 232:14

hoc
45:2 60:16
158:25 237:16
252:8 253:24
254:1

hold
18:12 60:25
132:13 139:2

home
123:14 204:2

homogenous
183:7

hope
99:1 155:18
167:21 191:13
206:1

hopeless
164:25

horizon
192:23

hospital
205:7

hour
5:2

hours
201:17 233:14

house

Kevin Kuich, M.D.                                            September 19, 2019

| | | | | |
|---|---|---|---|---|
| 158:4 165:11 230:22 | 34:9 | 6:4 34:11 96:25 99:5 146:15 148:6 150:18 160:7 162:6 166:7 | 136:22 | 18:14 |
| **housing** 9:14 | **identification** 16:18 19:22 50:2 54:7 62:15, 17,19 89:23 144:5 152:8 160:16 183:22 | | **increasing** 180:15 | **inflexibility** 172:11 174:19 |
| **HR** 37:20,22 208:1, 3,10,12,13 | | **impossible** 160:1 | **incredibly** 141:16 | **inform** 111:3 185:23 204:4 205:24 |
| **hub** 15:4 123:10 199:24 | **identified** 11:21 88:18 114:1 127:14 | **improve** 86:20,23 157:19 222:15 | **indicating** 19:13 | **informally** 171:12 |
| | | | **indicative** 114:14 | **information** 7:20 12:13 27:20,21 28:11 31:25 32:2 39:8 41:23 42:6 43:19 44:6,23 85:6,19,25 86:9 87:1,19 88:19 99:25 104:23 106:13,15 111:5 113:15,16 119:9,21 129:1 134:4 140:8 141:4 142:14 143:11 162:23 180:6 182:15 185:19,24 186:5,6 187:6,8, 15 188:13 189:22 195:3 196:10,11 198:19 199:5,17 212:7,9 213:3 215:4 217:24 218:6,7 219:13, 14,19 224:11 234:24 236:4,18 237:23 243:16 251:14,19,20,23 254:10 |
| **hubs** 14:25 | **identify** 25:7 183:3 206:2 | **improvement** 93:5,7 243:11 244:17 | **indicator** 79:6,18 92:6,11, 14 118:15 135:4,6 175:25 176:8,9,22 177:13,18,19 178:7 181:13 190:11 191:3,22 194:14,15 197:3 236:3 | |
| **huge** 166:24 174:23 247:13 | **ill** 184:1 | **in-person** 71:5 | | |
| **hugely** 183:14 | **ilk** 53:24 | **inability** 38:4 221:10 | | |
| **human** 27:20 36:25 37:4,6,13 121:21 162:3 209:2 248:21 | **imagine** 165:17 191:16 | **inaccurate** 121:18 135:2 178:23 | **indicator's** 190:12 | |
| | **immediately** 143:7 | **inappropriate** 86:13 96:5,18 | **indicators** 54:25 56:25 181:25 182:25 | |
| **hundreds** 80:22 | **impact** 99:7 115:2 124:21 125:22 152:23 155:11 157:3,7 175:15 223:6 226:7 241:9 253:8 | **include** 74:21 100:14 101:15 177:15, 20 | | |
| **hung** 152:18 | | **included** 79:18 82:14 178:8,14 179:1 248:7 252:18 | **individual** 10:11,21,22 19:6 20:16,19 21:17 22:3,10 23:14,22,24 24:23 25:5,20 26:12,17,24 27:18 29:14 37:1 48:9 51:20, 24 62:10 77:19 97:23 98:4,8 124:21 162:2 194:13 | |
| **hunt** 141:4 | | | | |
| **hurried** 86:1 | **impacted** 124:18 | | | |
| **hypothesized** 143:8 | **implementation** 54:14 111:1 124:10 174:22 | **includes** 56:23 74:19 160:22 | | |
| ' | **implemented** 118:17 143:24 175:16 | **including** 32:17 46:13 146:18 151:13 155:24 165:2 177:14 179:2 181:12 190:13 201:14 204:19 206:6 225:18 | | **informed** 11:16 68:24 102:16 |
| **I-P-O-C** 161:19 | | | **individuals** 70:2 91:19 115:2 125:20 | **informing** 121:5 |
| **iceberg** 163:1 | **implementing** 51:1 64:22 | | | |
| **idea** 162:12 175:8 231:9 242:20 253:18 | **implored** 117:4 | | **inefficient** 171:21 | **informs** 121:6 |
| | **importance** 93:22 | **increase** 110:4 | **inferred** 205:14 | **inherently** 92:13 |
| **ideally** | **important** | **increases** | **inferring** | |

Kevin Kuich, M.D.                                    September 19, 2019

initial
138:16 142:20
174:8 180:19
187:1

initially
155:21 156:3
173:3 180:19
189:24

initiated
227:11

initiating
186:22

initiatives
157:16

inmates
88:24 243:3

inordinate
185:15

inpatient
9:13 11:15
24:15 124:13
161:20 247:6,11
248:7,16

inpatients
124:18 247:6

input
87:20,24 99:2
105:12,15
156:25 163:15
179:13 201:8,
11,12 229:18
233:13 242:5

inquiries
153:20

inquiry
12:2 30:5

inside
96:8

insight
10:8

instance
37:9 86:6
107:14 111:4
115:19 146:25

161:16 206:3
221:13

instances
23:23 25:24
34:9 35:9,25
36:15 72:18,19
87:25 97:7
101:7 112:14
129:17 131:13
145:11

instituted
119:5

institution
11:1 20:25 21:1
22:2 23:5 29:9
34:22 36:14
37:1 42:8 71:9,
24 76:9,16,19
80:6 100:4,5,10
103:14 108:13
109:8,14 111:7
124:5,12 177:2,
3 179:20 180:10
182:16 183:3,7,
8 194:13 196:19
207:10 213:8
221:13,14
243:3,6

institution's
54:21 183:14

institutional
30:5 101:15
107:20 108:5
176:18 180:15

institutional-level
101:8

institutionalized
160:9,12

institutions
10:11,21,22
12:7 13:12 15:2,
20,24 19:6,8
20:20 21:5,18
22:5,11 25:17,
20 26:15 27:6,
11 28:2,9 29:8,
11,15,25 30:12

33:21 38:13
43:11,14 45:22
46:1 48:9,14,18,
19 50:25 55:23
56:19 60:7,10,
11 69:25 70:1,4
71:1,7,11,17,22
76:7,12 77:18
80:12,13 81:22
82:16 99:24
105:19 108:23,
25 109:1,10,12
110:4,14,18
112:6 125:12,18
138:6 177:4
179:23 180:2,7
206:5,10,25
207:3 209:24
211:6 216:5,16
222:15 224:25
237:17 248:3
250:1

instruct
131:3

instructed
38:19 66:4

instruction
118:25

insufficient
72:11

intact
120:5

integrate
128:5

integrity
123:16 162:13

intended
187:9

intents
130:5

interact
151:8

interacting
11:6

interaction

107:4

interactions
26:5 106:22
192:17 211:9

Interdisciplinary
161:19

interest
12:12 88:2
119:15 124:20
125:4 146:14
167:22 231:1,2

interested
155:20

interesting
43:21 93:6
161:24 172:8

interestingly
151:18

interests
102:9

interface
12:18 192:11
229:19

internal
31:12 66:6,7
87:14 118:10
132:15 136:18
148:13,17
151:25 152:2
158:5 227:3,10,
12 245:2 253:16

internally
85:5 88:7
122:11 148:12
169:16,18 191:1

interpret
83:19

interpretation
243:19

interpretations
229:25

interrogated
5:9

interrupt
8:17 166:13

interrupted
13:9 23:13

interval
89:4

intervals
20:9 88:21

intervention
198:3

interview
119:13 126:14

interviewed
112:5

interviews
10:2

intimately
147:18

intranet
224:23

introduce
16:16 132:7,8
152:6 160:13

invited
101:24 102:15
196:5

involve
21:4 46:16
49:15

involved
9:20 14:1,4
15:23,25 30:4
40:9,22 65:8
100:7 101:14
102:6,7 107:15
109:15 110:24,
25 117:12
127:19,22 138:3
149:3,4 181:23
189:1 198:1
202:1 208:23
216:17 230:8,18
232:19 236:5
251:10

Kevin Kuich, M.D.                                                September 19, 2019

involvement
  12:25 13:15
  147:15 165:14
  193:25 235:23
  253:1

involves
  62:9 87:5
  155:10

involving
  42:8

iphones
  174:17

IPOC
  161:18,23 162:5

ir
  18:3

ISP
  216:9

issue
  20:8,10,12,13,
  14 22:15 26:2
  35:22 40:19
  42:4 47:4 60:9
  78:9 84:24 85:3
  88:18,20 93:23
  97:1 100:21
  102:1 107:2
  111:20,21 112:3
  114:2,9 115:18
  122:6,9,10
  127:14,16
  136:25 137:1,3,
  5,15 141:2,3,8,
  12 143:14
  146:18 153:25
  154:2 157:12
  161:21 172:21
  175:23 177:23
  183:4,5 184:14
  188:21,25
  190:22,25
  196:24,25
  212:24 221:19
  225:11 231:25
  232:13,14
  233:14 249:7

issues

11:1,8,21 12:6
19:16 21:13,23
23:15 25:12
34:5 35:22
40:20 41:10
53:10 67:6,8
86:22 88:25
108:22 114:22
121:25 147:25
150:9 151:13,
17,20 155:18
159:6 160:6
163:24 174:20
192:7 204:10,12
212:14 224:6,21
225:21 230:8,18
248:4

Item
  145:20,21,24
  146:2,3 159:8
  189:24

items
  145:4,17 146:14
  147:1 184:10

it's
  6:3 8:1 33:19
  34:2 41:12 42:7
  45:4,10 54:10,
  18 58:25 63:1
  64:9 79:1 80:5,
  15,25 82:5
  83:10 84:16
  85:20 86:15
  87:3 88:1 90:4
  95:6 98:24 99:8
  103:9 104:5
  107:23 111:8
  113:23 116:24
  117:3 124:5
  128:7 132:9,17,
  19 134:7 135:20
  137:21 139:12
  141:3 144:11
  148:2 163:18
  171:23 173:14
  179:8 180:24
  186:3 187:11,13
  188:10 192:21
  199:2,4,8

200:11 201:8,16
208:2 211:3
215:16 216:8
217:19 218:1,2,
3 228:24,25
229:21,22
234:18 247:12

                J

J-A-H-A-N-G-I-R-I
  226:17

Jack
  231:12

Jahangiri
  226:11,16

Jake
  231:15

January
  8:9,10 56:17
  110:12 120:7,9,
  24 190:7 243:7

Jim
  92:1

job
  9:17 12:10
  15:15,19 19:5
  36:23 38:1 87:6
  106:23 124:23
  125:7,22 126:24
  182:21 183:18
  187:2 189:17
  190:4 194:3
  205:6,7 206:20,
  22 237:20

John
  90:2 92:1 116:7
  186:17,25
  239:9,12,14

joy
  173:15

judicious
  27:5

July
  49:18 50:7
  74:15 144:8

153:13 189:23
190:7 248:1

jumbled
  193:24

June
  152:13 155:15
  158:2 186:11,
  12,24 187:3,9
  199:20 227:18

just-in-time
  137:10

Justice
  231:24

juvenile
  231:23,24

                K

K-A-H-I
  8:1

K-A-R-U-N-A
  226:22

Kahi
  8:1

Karuna
  226:20,21

Katherine
  18:1 39:20
  54:11 59:2
  104:4,5,6 144:8
  152:16 183:24
  184:21 186:11
  188:13,24
  189:23 198:14,
  21 201:14
  235:17 242:17

keeper
  95:13 120:16

keeping
  44:8 218:12

Kelso
  172:14,15

Kevin
  5:7,24 90:21
  144:23 145:9

160:19 184:5

keystroke
  185:20

kind
  23:24 27:9
  41:10 42:5
  49:15 52:3 53:8
  59:15 67:4 92:2,
  17 94:8 98:9
  99:16 107:4
  115:17 116:7
  123:19 125:8,19
  137:10,22
  139:15 142:7
  149:24 150:2
  154:6,19 157:1,
  6 158:25 160:11
  162:2,17 164:6
  169:4 174:6
  177:5 180:22
  187:18 237:21
  238:9,10 253:24

kinds
  21:8 32:10 34:2
  36:4 47:15
  65:15 67:7
  68:12 78:6
  86:21 91:11
  94:21 95:16
  119:19 127:5
  131:3 141:19
  142:8 147:25
  149:25 153:19
  164:11 174:17
  176:20 186:3
  188:9 199:24
  208:7 224:1,2
  230:23 231:16
  232:12 249:8

knew
  11:13 12:9,11
  21:21 25:14
  29:25 31:9
  32:14 38:17
  69:22 77:3
  102:3 126:12
  140:24 209:6

knowing

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                        September 19, 2019

105:16

**knowledge**
17:14 23:25
24:6 30:14 31:5,
7 36:2 42:23
56:3,6,7 57:17
58:15 85:14
100:25 101:4,5
103:4 113:23
116:17 120:11
127:18 133:23
173:11 180:5
231:6,18
232:17,18 233:9
235:6,11 248:12
251:20

**Kuich**
5:7,14,24 16:20
19:10,24 20:3
28:20 144:23
145:10 160:19
193:12,15
254:10

**Kuich's**
235:5,7

**Kyle**
5:20

**L**

**lack**
24:18 42:22
44:3 55:5,25
56:4,18 57:3,20
59:7 73:25 75:1,
9 78:14 80:19
81:4,14,24
82:20 83:7 85:8
100:16,23
101:2,10 104:16
105:22 119:11
120:3 126:7
135:8 142:23
170:8 174:7
178:9,18 179:5
191:6 192:2
244:2 248:9
249:2,16 250:18

**Lacks**

58:9 75:5
150:11 181:15

**laid**
93:17 221:22
222:19 226:9

**laid-out**
150:2

**languished**
146:8 169:21

**large**
41:10 92:9
100:1 106:11
116:21 185:13

**larger**
41:25 60:21
71:10 77:20
96:11 100:1
109:5 114:21
116:24 141:19
148:8 151:21
152:3 155:5,9,
17 156:13 159:2
160:8 162:25
225:16

**late**
43:25 44:13
83:3,5 146:11
147:24

**laud**
125:23

**Laura**
116:6 152:10
227:17 239:14

**law**
203:20

**lawsuit**
122:23 162:25
192:22 205:7
233:5

**lawyers**
88:10

**layers**
211:9

**leader**

36:13

**leadership**
34:6 67:14 68:9
72:15 73:14
77:7,16 78:10
87:14 96:13
97:3 112:16
115:23 147:11
183:16

**Leading**
24:25 33:3
36:10 66:24

**learn**
192:12 215:5

**leave**
13:13 25:12
37:7,10 192:9
208:7

**led**
92:6

**left**
8:9 25:8 113:17
119:25 120:5,7,
11,22 134:11
190:6 231:6,17

**left-hand**
16:24

**leg**
233:3

**legitimate**
154:2

**Leidner**
95:7,9,18,20
99:16 100:4
104:24 118:20,
23 150:7
153:11,16,18
194:22 195:11,
13 197:6 223:9
237:21 238:2,
12,13,20,22
239:4

**Leidner's**
95:22

**length**

142:7 166:11

**lengthen**
20:9 88:20
106:7

**lengthened**
118:15

**lengthening**
104:13

**lengthy**
132:9

**lessened**
42:12

**letters**
171:24

**let's**
68:13 111:6
127:11 146:2
164:9 175:19
193:21 213:2
220:1 230:17
232:2 238:15
240:7

**level**
11:6 15:11 16:5
18:22 19:1
20:19 30:6 31:6
33:14,15 37:18
46:18 47:22,24
49:13 52:10
90:19 91:20,24
92:4 93:21 98:7
101:15 102:7
107:15,17,20
108:5 110:6
111:14,18
126:13 129:19
136:8 140:25
142:16 176:14,
16 179:14
180:15 182:8,9,
10 185:25 186:7
197:6 198:2
224:1 231:18

**levels**
79:9 92:2 110:4
117:13 157:11

243:6 252:19

**leveraging**
124:5

**Lewis**
5:20

**license**
126:23

**Liedner**
147:12

**Lighthouse**
187:5,11,16,20

**liken**
93:6

**limitations**
212:16

**limited**
30:13 32:21
142:2 221:9

**Lindgren**
90:2

**lines**
84:25 129:21

**link**
194:9

**linked**
142:9

**lipstick**
163:18

**Lisa**
5:14

**list**
130:23 222:22

**listed**
152:11 184:6,7
222:23

**lists**
216:5

**literally**
253:14

**live**
7:4

Kevin Kuich, M.D.                                                    September 19, 2019

**lives**
87:6

**LLP**
5:3

**load**
27:9

**loads**
24:23 25:4

**lobbied**
124:9 168:11

**lobby**
125:13

**local**
10:5 33:14
129:18

**located**
7:25 17:8

**location**
12:14

**lodge**
22:13 144:16
161:7

**lodged**
47:8

**long**
7:12 8:7,18,23
11:12 70:19
113:8,13 139:15
147:14 185:5
203:22 204:1
208:10

**longer**
89:10 105:5
108:7 109:16
115:7 120:13
175:2 179:23
228:4

**looked**
31:7 32:4 37:22
41:8 56:3 93:24,
25 94:11 106:18
163:23 206:8
209:5 235:18

**loose**

164:1

**lot**
144:23 164:11
185:3 204:3
222:2

**love**
192:20 193:2

**loved**
210:25

**low**
42:17 43:6,7,8,
10 44:19 209:23
210:10,11
245:6,17,19
246:19 247:3,4,
5 248:15 252:3

**lower**
44:25 45:9
91:24 246:15

**lucky**
220:13

**lunch**
7:17 88:12,14

**M**

**M-O-H-A-L-A**
8:1

**M.D.**
5:7

**machinations**
127:4

**made**
17:9,12 23:15
47:21,25 48:1,2
60:15 67:3 69:4,
5 91:14 92:10
103:24 115:11
118:6 119:14
126:12 130:10
143:13,16 151:1
153:7 155:5
156:11 162:10,
13 165:22 169:9
179:13 187:23
188:8 190:19

193:19 225:9
233:16 252:5

**magical**
241:16

**main**
247:17 250:24

**mainline**
80:17 81:3,10
216:22

**major**
223:4

**majority**
193:3

**make**
6:12 11:16
15:11 27:22
29:8 30:1 43:18
44:21 60:7,13
65:16 70:12
83:4 86:23
90:25 95:13
103:13 110:7
114:7 115:1
118:23,25 125:9
128:21,23
131:23 134:24
136:9 143:15
148:18 149:7
151:12 154:6
164:13 167:15
168:24,25 177:7
180:12 186:2
189:9 209:1
220:14 221:11
225:7 226:1
248:20 249:5,9
250:20

**makes**
134:16 137:25
141:17 180:23

**making**
34:24 38:9,12
116:18 119:2
159:1 203:5
231:7 238:5

**manage**

15:15 25:13
27:4 36:19
59:15 108:11
119:18 126:21
154:25 188:9

**managed**
119:17 125:4,5

**management**
10:4 12:16,21
16:22 31:24
32:1 34:7 61:14
62:2 91:7 93:8
99:23 100:6,9
101:14 102:7
106:10 109:4
110:24 111:3,5,
22 113:18,19,20
116:3,10 117:7,
20,21 118:2
119:16 120:13,
14,23 121:4,6,
14 151:25
153:19 159:11
160:5,21 177:8
186:19 195:19,
25 196:3 223:25
231:3,14

**manager**
83:18 169:24

**managers**
34:12 159:5
182:14

**managing**
14:24 15:2
34:22 100:9
124:25 155:1
182:5 207:4

**mandate**
166:8 167:25

**mandated**
32:2 248:14

**mandates**
33:10

**mandatory**
48:3

**manner**

21:12 38:24
47:14 49:12
60:14 127:9
128:6 145:12

**mantra**
167:4

**manually**
43:20 253:21

**manuals**
47:17

**MAPIP**
33:13 60:18,19,
21,22,23,25
61:14 62:3,6
84:12 105:24
112:19,20,22
113:2,6,10
114:13,14,15,17
148:6 176:20
186:2 212:14,
16,24 243:25

**MAPIP-RELATED**
196:12

**mapped**
113:15

**March**
54:10 90:4,16
91:4 95:20
105:1 122:14
220:1 245:10,16

**mark**
19:20 129:10
137:13 138:14
139:5 241:16

**marked**
16:17 19:21
50:1 54:6 62:14,
16,18 84:18
89:21,22 98:13
106:19 139:23,
25 140:5 141:10
142:19 144:4
146:19 152:7
160:15 165:4
171:6 183:21
204:21

Kevin Kuich, M.D.                                                    September 19, 2019

**marker**
241:25

**marking**
136:21

**MAS**
123:4

**massaged**
162:22

**massaging**
228:16 229:7,16

**master**
73:21 83:25
85:7,15 86:11
87:15 191:4
197:9 198:24
199:19 235:1,4,
17,25 236:6

**Master's**
54:12

**materially**
178:7

**math**
241:17

**mathematics**
69:19

**matter**
87:21 117:20
140:23 141:6
142:19 161:8

**matters**
43:6 191:19

**meaning**
103:11 118:10
119:19 124:2,13
189:3

**meaningful**
84:15 192:14

**means**
7:3 21:1 89:6
243:17

**meant**
24:5 177:18
229:9

**measure**
33:13 34:5
82:14 89:4 96:1
112:21 176:23
222:16 243:20

**measurements**
80:21

**measures**
32:11 60:22,23
94:5 114:24
118:17 119:6
176:21 243:25

**measuring**
105:25 122:7

**mechanism**
64:7 250:12

**medical**
7:23 29:1 37:10
110:20 138:7
169:22 170:23
172:13 192:12,
18

**medically**
163:5

**medication**
7:8 36:3 61:14,
19 62:1 88:25
114:18 213:13
243:10 244:16

**medications**
46:17 61:19
93:9

**medicine**
175:2

**meet**
49:11 241:19

**meeting**
32:19,20 40:3
53:3,6,7 65:10
66:18,19 67:5
69:11 77:20
91:23 93:8
99:13 100:14
102:21 122:21
143:4 172:13,24

173:2,5 175:5
187:3,4,17,19
198:7,10,14,17,
21 199:9,25
200:4,13,24
202:2,9,12
220:15 242:10

**meetings**
40:18,21,23
66:2,3,6,7,12,13
67:1,13,17,20,
25 68:2,6,8,12
77:19 78:8
96:11 109:6
138:2 149:23
195:19,20,25
196:1,2,8,17
198:11 199:22
202:1 212:13
223:18 224:3
227:24 242:11

**Melanie**
89:25 90:12
219:25

**Melissa**
62:22 63:4,20
73:6 218:2
235:4,6 240:8

**member**
140:14 151:16,
20 156:7,8

**members**
68:9 73:13 81:3,
10 158:20 164:5
196:4 243:2

**membership**
158:19 159:3

**memo**
151:22 152:14,
17 153:5 155:15
158:2 227:3,6,
15,23

**memorandum**
125:6

**memory**
51:12,13 79:12

180:11 199:15

**mental**
11:3 14:7 16:21
17:25 23:18
32:1 35:11,13,
17 36:1,6 48:22
54:13,17 63:15
64:3,11 65:9
68:9 72:15
73:13 74:8 77:6,
15 87:14 97:3
99:21 104:9
106:9 110:22,24
113:18,20
115:22 116:2,3,
4 117:7 119:15
120:16 121:13
122:15 128:6
130:25 138:6,
10,25 140:15
141:16 143:18
146:10,11,13,
22,24 147:5,11
148:17,19,23
149:2,12 151:4,
9,12,22,24
153:22 154:5
155:14,16 156:4
157:8,9,14
158:5,8,9
159:11 160:4,20
161:15 165:11
166:22 169:20
170:2,3,12,24
171:1 173:2,10,
11,12 174:24
181:22,24 182:6
183:16,17
192:16,19,20
193:3 195:19,25
198:11 201:14
202:12 205:11
211:20 225:12
227:9,12 228:5
230:3,8,11,19
231:8,19 243:8
244:1,8

**mention**
43:18 44:8

**mentioned**
25:14,19 29:17
52:22 61:4
65:11 69:9
77:22 96:12
99:19 101:7
110:3 114:22
143:13 150:24
194:2 197:18
204:7 249:8

**mentoring**
35:4,19 36:18

**mere**
71:5

**merit**
67:6

**message**
40:6

**met**
91:24 173:14
186:14 200:5
202:4

**methodology**
177:12,15
190:12,15,16

**metric**
56:11 106:7
108:24 110:1,7
119:3 178:23
237:12

**metrics**
55:3,8,10 94:5
100:9 109:3,13
110:5,25 111:13
112:16 122:22
220:15 226:1
244:12

**MH**
146:8,10
159:11,16

**MHCB**
9:13

**MHCBS**
60:11 222:13

**Michael**

Kevin Kuich, M.D.                                            September 19, 2019

| | | | | |
|---|---|---|---|---|
| 90:1 158:10 160:18 186:11 | 190:23 191:24 | 203:16,17,19 | 112:22 118:3,4 138:13 139:5 142:21 159:15 170:1 171:12 | 10:11 13:11 23:6 25:10 28:15 29:7,24 35:2 38:4 46:9 |
| mid 8:9 | mission 5:3 58:3 | monitoring 61:18 123:15,16 | | 47:16 58:4 62:6 |
| middle 34:7 120:9 165:13 | Misstates 66:20 200:9,16 202:19 228:18 | monitors 13:11 113:2 121:8 175:18 179:22 180:20 218:10 | moves 148:14 | 67:3 71:21 77:4 102:1 118:7 121:20 125:8,18 139:2 174:10 |
| midway 184:4 | misstating 66:16 | | moving 87:7 103:14 129:14 136:3 | 175:13 182:16 185:10,21 190:4 195:3 198:3 |
| minimized 152:21 | misunderstanding 224:15 | month 28:9 34:3 48:13 74:11 90:24 | 149:7 205:20 | 200:6 201:16,23 202:21,23,24 222:10 237:20 |
| minimum 62:7,9 103:13 167:18,20 | mitigate 26:2 | 92:17 94:16,19 103:11 137:17 246:22,24,25 | much-needed 221:14 | |
| minute 166:13 | mix 30:3 | monthly 20:9 22:2 27:6 | multidisciplinary 148:10 150:25 228:8 | negative 105:11 |
| minutes 48:5 70:21 102:21,24 | MM 228:11 | 28:2 29:15,21 38:10,18 63:11 75:18 88:20,24 | multiple 13:9 59:9 78:8 | negotiated 234:15 239:20 |
| 103:3,5,6 204:2, 15 224:19 | model 34:16 50:9,23 51:1,2 64:21,22 | 89:5,7 195:18, 20,25 225:24 246:3 | 85:20 94:4 112:1 117:4 119:16 125:1 | neutral 19:12 20:5 42:14 98:11 |
| minutia 102:7 | 71:14 99:7 138:7 | months 8:19 41:2 42:16 | 138:2 175:9 181:8 211:6,9, 10 | 99:10 129:7,8, 22 132:2 136:15,16 171:7 |
| misallocation 125:14,19 | modicum 62:8 | 44:1,13 60:23 79:2 80:4 113:14 | mystery 234:17 | 209:21 210:6 244:23 245:1,13 249:14 |
| Mischaracterizes 57:21 | modification 147:5 | morning 5:14 204:18 | N | neutrally 119:18 |
| misguided 123:5,14 | modify 146:17 | motley 142:2 | names 129:19 | Newsom 19:25 |
| misleading 85:6 122:11 191:2 | module 64:21 141:16 165:2 | mountain 167:5 | napkin 69:21 | night 69:2 72:1 |
| missed 20:11 127:16 | modules 13:23 | move 29:19 32:1 | narrative 51:9 | nightmare 123:17 |
| 136:20,21,24 137:19 138:13, | Mohala 8:1 | 46:18 49:8 86:19 108:12 | nature 224:5 251:15,20 252:10 | nod 6:6 |
| 15 139:5,7,22, 23,25 140:5,8, 10,24 141:9,10, | moment 8:17 64:13 65:22 145:14 | 129:19 136:20 138:11 143:21 147:11 148:12 | navigate 224:24 | nods 14:15 90:3,20 169:6 |
| 11 142:20 146:19,20 | 193:10 232:14 | 159:17 164:10 166:2 191:13 | necessarily 40:3 94:7 99:20 | non-cdcr 123:10 |
| 165:3,4,6 173:21,23 | momentum 149:11 | 205:9 222:9 233:4 | 199:15 | non-ehrs 43:24 |
| 175:24 177:16 | Monday 156:20 168:6 | moved 8:25 96:24 | necessity 12:19 32:5 | |
| | | | needed | |

Kevin Kuich, M.D.                                          September 19, 2019

non-explainable
94:20

non-formulary
46:17 196:13

non-psychiatrist
158:14

non-psychiatrists
158:11

non-tele
15:23

nonclinical
159:5 161:25

noncompliant
93:10 103:19

nondoctor
61:21 62:1

nondoctors
62:4

nonetheless
6:16 163:8
165:5 173:22

nonformulary
93:9

nonissue
161:23

nonpsychiatric
117:10,11

normal
94:10

north
17:3,17

northern
17:10

note
44:10,23 45:5,7,
11 128:11
142:5,13

notes
128:12 224:20
225:14

notice
179:12 225:4

noticed
93:7 179:18

notices
224:12

notification
98:23

notified
94:25

notion
25:22

November
9:8 14:17
110:11 245:10,
16

number
29:3 32:21,24
42:17 43:6
44:15,25 54:21
56:9,16 57:17,
18 59:24 60:1
62:23 64:25
65:11,12 69:6,
15,18,20 70:6,8,
9,11,15,23,25
72:11 74:16,18,
21,25 76:23
78:4 80:20,21,
22 81:11 83:1,9,
14,20 84:10
98:25 99:3
110:3 132:18
136:23 140:24
148:16,23
152:11 158:20
179:7,9 180:25
184:5,7 200:6,
14,15,17,20,22
201:6,9,10,15,
19,20,24
202:13,15,18,
20,25 209:23
210:10 216:17
218:20 221:9
241:15 242:10,
11,18,19 245:6,
18,19 246:7,15,
19,22 247:3
248:7,16 250:3,

15,19,23 252:3,
25

numbered
159:8

numbering
85:1 132:5

numbers
33:1 43:23 45:9
49:15 57:1
60:16 65:4
84:13 101:8
210:22 217:9
218:5,8 219:6,
10,12 242:5
248:6

numerator
31:10,15 32:8,
18 78:5 84:9
93:19 121:12
222:23 236:24

numerous
111:22 171:6
177:3

nursing
110:20 151:8
169:22 170:23
172:25 192:18

## O

oath
7:2 33:9

object
11:20 46:25
184:13

objection
22:13 24:1,25
28:17 30:18
33:3 35:20
36:10 42:22
44:3 45:18 46:6
47:9 51:3 53:17
55:5,25 56:4,18
57:3,20 58:9
59:7 61:23
66:20,24 73:25
75:1,5,9 78:14

80:19 81:4,14,
19,24 82:20
83:7 85:8 86:14
100:16 101:2,
10,21 104:15
105:21 107:22
111:15 112:17
116:23 117:18
119:10 120:3
126:7 129:1
133:20 135:8
139:8 140:2
142:22 144:17
150:11 156:12
161:7 170:8,14
178:9,17 179:5
180:17 181:15
189:14 191:6
192:2 200:9,16
201:18 202:5,19
206:11 210:2
212:3 214:20
217:5 218:2
220:22 228:18
232:23 233:19
235:3 236:20
241:11 244:2
248:9 249:1,16
250:17

objections
6:13

obligation
89:1

obligations
61:1 113:1
124:14 189:7

observation
213:5

observations
206:5,10

observe
213:15

observed
207:8

observer
84:7

observing
213:11

obtain
65:18

obvious
226:8

occasion
24:3 112:3
194:17,18

occasions
13:10 59:9
77:21 78:8
101:23 102:11
117:4 125:1

occur
47:16 52:23
60:22 143:7
152:4,5 159:7
177:21 193:9
202:25 204:9
227:24 247:16

occurred
24:6 29:5,15
40:1,2,11,24
102:6 120:1,11
134:19 137:20
138:18,19
171:11 219:17
247:14

occurrences
178:8

occurring
41:9 81:2,10
105:20 134:20
145:12 219:21

occurs
130:18 167:10

October
14:16 77:3
110:11 183:25
184:9,21 187:25
188:6,14 189:18
190:16 202:4
214:8 215:22
234:6

Kevin Kuich, M.D.                                        September 19, 2019

| | | | |
|---|---|---|---|
| **office**<br>5:20,22 28:1,3<br>33:25 60:15<br>70:25 152:19<br>223:20 | 233:20<br><br>**opinion**<br>69:14 72:5<br>141:24 229:14 | 47:12 131:1<br>135:12 137:6<br>147:25 166:5,9<br>167:2,7,9,25<br>168:2 | 228:5<br><br>**outpatient**<br>9:14 11:15<br>20:10 24:15<br>88:21,23 124:25 | **pages**<br>215:20 |
| **officer**<br>7:24 | **opinions**<br>213:14 | **ordinary**<br>108:9 | 248:17<br><br>**output** | **paginated**<br>132:13 |
| **offices**<br>5:2 | **opportunities**<br>125:23 | **organization**<br>15:14 18:7 | 229:18<br><br>**over-representative** | **pagination**<br>54:16 132:15,16<br>136:18 171:8<br>245:2 253:17 |
| **official**<br>206:22 | **opportunity**<br>6:25 7:13 38:22<br>87:23 96:14 | 33:11 48:21<br>100:2 109:9<br>115:2 122:1 | 121:23<br><br>**overcounting** | **pair**<br>70:2 71:22 |
| **oftentimes**<br>36:6 49:14<br>84:12 192:16<br>234:17 | 162:1 179:12<br>192:11<br><br>**opposed** | 163:21 193:4<br><br>**organization's**<br>119:14 223:7 | 112:12,15<br><br>**overdue**<br>83:2,13,15,20 | **paired**<br>71:23<br><br>**paper**<br>43:21 44:8<br>128:13 130:22 |
| **on-call**<br>65:7 69:1,2,7 | 30:21 104:21<br>111:6 142:9 | **organization-wide**<br>225:12,13 | 84:8<br><br>**overnight** | **paragraph**<br>51:10 73:22 |
| **on-site**<br>53:25 250:20 | **option**<br>123:4 143:2 | **organizational**<br>16:24 17:2,24 | 68:15<br><br>**overrepresenting** | 90:21 132:14,<br>15,19 136:18<br>240:13 242:25 |
| **on-the-ground**<br>74:19 | **options**<br>143:1 | 18:9,10,11<br>33:23 106:18<br>225:16 238:15, | 113:10 114:9<br><br>**oversight** | 245:3 246:2<br>253:20 |
| **one-on-one**<br>40:4 106:23,25<br>107:12 | **orally**<br>69:18 | 21 239:16<br><br>**organizationally**<br>18:18 | 119:12,18<br>149:21<br><br>**overstaffed** | **parameter**<br>91:3,15 93:25<br>115:5 |
| **one-to-one**<br>44:9 | **order**<br>6:20 11:22<br>19:24 20:1,2,3 | **organize**<br>42:10 | 76:8,10<br><br>**overstate** | **parameters**<br>90:23 252:17 |
| **ongoing**<br>29:7 47:14<br>249:4,7 | 22:16 24:2<br>26:17 35:21<br>44:10 45:8,15,<br>19 46:7 51:5 | **organized**<br>53:2<br><br>**organizer** | 136:14<br><br>**overstating**<br>58:13,14 | **pardon**<br>38:10 57:15<br>104:5 |
| **online**<br>110:14 248:3 | 53:18 82:5<br>84:19 85:10 | 79:23 130:4 | **Overview**<br>16:22 | **parking**<br>204:2 |
| **open**<br>97:6 220:18 | 111:16 112:18<br>122:3 128:14<br>129:3 130:24 | **origin**<br>218:7 | **P** | **parliamentary**<br>158:23 |
| **operate**<br>164:19 | 131:1,2 135:11<br>136:9,12 137:9<br>142:10 144:20 | **original**<br>17:7 129:25<br>130:1,16 | **p.m**<br>88:15 254:19 | **part**<br>15:15,19 19:4<br>21:2,16 28:7 |
| **operation**<br>106:11 | 157:8,10 161:8<br>168:9 180:18<br>184:16 196:25 | 131:10,15<br>133:12 174:19<br>218:9 | **p.m.**<br>203:16<br><br>**pace** | 50:23 71:10<br>91:6 102:3<br>144:9 162:25 |
| **operational**<br>224:3 | 197:12 204:19,<br>20 216:13 232:1<br>238:4,6 248:19 | **originally**<br>47:17 118:2<br>124:11 136:12 | 87:8<br><br>**package**<br>174:16 | 184:1 206:21<br>207:2 222:7<br>225:7,8 230:3 |
| **operationalize**<br>83:19 199:13,16 | **orders**<br>13:21 19:17 | 138:18 151:9 | **packages**<br>174:16 | **participation** |
| **opine** | 45:3 46:16 | **originate** | | |

Kevin Kuich, M.D.                                    September 19, 2019

210:15

**parties**
165:25 234:15
239:20

**parts**
13:18 204:24
205:2

**party**
119:17,19,20

**pass**
89:11 94:3

**passed**
231:19

**passes**
232:13

**past**
39:11 124:7
139:17 193:16
203:17

**pathway**
85:19

**patient**
9:12 20:20
22:23 23:7,14,
22,24 24:14
25:4,9,15 26:12,
17,24 27:9 33:7
43:13 44:24
45:8,12 49:12
62:10 71:3,4
77:18 78:1
81:23 82:8 92:4
108:19 129:9,
12,23,24 131:9,
13 132:23,25
133:2,9,11
134:2 167:8,11,
18 168:6 177:21
178:2,4,15
183:9 190:14
210:15 220:15
246:3 247:9

**patient's**
167:21

**patient-level**

97:23 194:14

**patients**
9:12,13 23:7
33:9,25 34:1
35:10 37:17
42:3 46:22
51:15,20,24
52:18 53:5
58:20,21,22
62:2 73:1 91:22
98:8 103:12
122:2 126:6
128:5 130:15
133:9 162:17
168:2 185:7
205:9 220:7,20
247:20 250:16

**patients'**
98:12

**pause**
180:25

**paused**
110:10

**pay**
108:23 135:17

**PDF**
92:24

**Pelican**
48:20

**penalty**
7:3

**pending**
24:13

**people**
10:1 29:23
31:11 36:18
37:17 41:18,19
43:4 45:6 49:7
64:4 85:20 86:8
88:13 92:2
99:20,21,22,23
100:8 101:12,13
110:23 114:7
116:11 117:12,
16 120:13,22
124:11 126:11

128:17 129:17
131:6 148:22
152:11 153:25
154:22 158:10,
14,17 159:4
161:25 162:7,11
163:3,4 166:21
167:5 170:18
171:25 173:24
174:1,13 176:24
177:5 181:22,23
183:10 184:24
192:12 193:3
222:10 246:16
249:4,5,9

**people's**
87:6 172:7
180:25

**percent**
21:14 30:25
46:14,15,16
51:16,22,23
52:16 57:15,16
75:24 76:3 77:8
80:2,6,8 81:8,9
83:4,12,15,16
111:11 113:23
178:24 179:1,8
192:1 241:16,24
250:2

**percentage**
54:23 56:10
164:5 207:7

**percentages**
243:8

**perception**
39:17 191:12

**perform**
18:5 23:13,21,
25 24:3 26:24
29:6 31:3 33:7
34:11 35:3,12
36:8,17,21 37:8
38:21 46:9,21
61:21 99:8
162:14 213:13
219:17

**performance**
31:17,19,25
58:8 77:18 79:2,
5 84:11 135:3
175:25 181:2,3,
7,11,13,25
182:25 183:4
186:1,7 194:1,2,
6,7,11,13 195:1
197:2,4,9 206:1
236:3,17,21
237:10 243:9
244:1,9

**performed**
15:8 20:20
22:11,23 24:14
30:15 58:18
72:4 79:17,20,
21,22 82:14
246:8

**performing**
17:16 25:15,23
26:12 39:13,23
57:14,18 70:24
78:1,9 81:12,23
109:4 111:23
114:15,23
122:16 213:6,
11,16

**perfunctory**
126:22

**period**
13:1 42:20
44:17 89:5
104:13,19,20,21
114:3 115:5
118:13 122:6
139:21 153:12
158:1,16 165:8,
9,10,15 177:19
209:20 210:13,
16,22 216:22
243:6 245:15

**periods**
89:10

**perjury**
7:3

**permanent**
10:1 12:9,15

**person**
10:25 18:15
25:8 27:17,18
29:22 37:8
71:12 116:10
119:1 125:8
134:24 139:24
153:12 156:21
157:14 174:24
185:8,9 206:25
207:22,23

**personal**
21:20 42:23
85:14 122:15
211:4 233:9
235:6,11 251:19

**personalities**
183:10

**personally**
5:6 207:6 209:1,
4 248:14

**perspective**
191:10

**Peterson**
228:8

**pharmacy**
151:9 170:23
192:19

**phone**
21:1 27:18
37:15 38:10,12,
18,20,21 48:9,
12,17 49:2,3
100:3,19,20
101:1,6,9,13,24
102:2,16 147:13
175:5 196:5

**phrase**
109:24 145:9,10

**phrasing**
190:22

**physical**
42:4 121:21

Kevin Kuich, M.D.                                                    September 19, 2019

123:13 140:11
155:10 177:5
183:4 250:22

**physically**
37:8 71:3
130:10 194:8
208:5

**physician**
29:1

**physicians**
33:8 117:8,10,
11

**picture**
105:18

**piece**
13:19 14:24
122:19 128:13,
23 201:1,2
225:16 233:14

**pieces**
78:20 128:21

**piecing**
177:3

**pig**
163:18

**pin**
228:1

**pinpoint**
92:20

**PIP**
39:9 247:18
248:14

**PIPS**
39:1,2 50:13
60:11 222:13

**pivot**
78:4

**place**
45:8 66:5 94:24
99:25 104:14
113:4 118:19
124:24 125:10,
21 159:16
166:23 221:17

248:19

**places**
29:12 47:13
100:24

**plaintiff**
5:15,19

**plaintiff's**
16:17 19:21
50:1 54:6 62:14,
16,18 89:22
144:4 152:7
160:15 183:21

**plaintiffs**
73:21 86:11
87:15 198:24
199:19

**plaintiffs'**
204:11

**plan**
54:14 66:5
87:17 103:24
161:19 247:12

**planning**
77:3 188:20

**plans**
128:15 144:9,18
166:8,9 167:1,6,
24

**plant**
177:5

**Plata**
144:10

**plate**
189:5

**play**
111:9 116:17
220:17

**plenty**
21:7 230:25

**point**
6:6 14:1 25:22
31:8 32:25
38:19 39:24
40:11 42:7

44:20 51:11
60:19,20 62:13
73:5 82:6 89:15
112:10 128:17
153:15 163:14
177:1 184:4
190:6 195:17
199:2 229:21
236:23 247:16

**points**
32:11,12 115:17

**police**
122:17

**policy**
9:21

**Ponciano**
37:24 38:14,17,
24 40:9 42:15
44:15 65:6
66:15 68:22
69:9,13,17 70:7,
13 72:8,10,15
114:11 125:2
198:7,10 199:10
200:4,12,25
201:4 202:3,4,9,
17,23 203:5
208:14,19
209:20 210:14
242:7,14 245:5

**Ponciano's**
47:6,8 199:11
244:23 249:14
251:8

**poor**
7:8 145:12

**pop**
95:15

**population**
124:15 183:9
192:16

**populations**
124:17

**popup**
142:5,13 143:6

**porous**
223:3

**portion**
13:8 47:10
93:16 116:4
121:14 145:2
155:25 160:24
165:21 189:25
234:10 244:22

**ports**
13:24

**position**
8:18 10:12,13
11:23,25 14:13
16:2 17:4,6,8
34:6 52:1 124:3
205:21 241:3

**positions**
8:11 54:22,23,
24 56:11 57:16
63:16 64:12
65:2,4,7 68:25
69:7 72:16
73:23,24 74:2,3,
5,10,24 75:15,
16,21 76:4,18
77:9 84:1 124:2
125:17 126:5
200:6 201:15
204:11 206:23
240:15,19
241:5,6,17,18

**positive**
86:24 97:4
120:15,24 121:3
127:7 193:5

**possibility**
107:11

**posted**
177:18

**potential**
201:7

**potentially**
88:19 203:1

**power**
13:20 128:10,

14,15 144:9,18
159:10 166:8,9
167:1,6,24

**Powerpoints**
149:25

**practice**
89:6 92:23
95:24 124:8
130:15 162:19

**pre-formatted**
182:19 195:2

**pre-information**
67:4

**pre-work**
67:4

**preceded**
29:18 38:15

**precedent**
39:7 192:5

**precipitated**
107:20 108:5
110:6

**precise**
248:21

**predated**
27:12

**predecessor**
205:17

**preferred**
49:7 69:23
173:25

**premise**
122:1

**preparation**
19:11 86:5
215:2 235:23

**prepare**
203:10

**prepared**
211:24

**preparing**
219:8 240:18

Kevin Kuich, M.D.                                                September 19, 2019

preplanned
  66:3

prescribe
  175:4

prescription
  175:6

present
  100:24 113:4
  114:10 151:20
  154:4 164:20,21
  173:13 196:1,11
  217:1 218:8
  252:14

presentable
  162:24

presentation
  85:5 122:11
  191:2 199:18
  203:4 232:3
  233:10

presentations
  212:15

presented
  12:10 31:14
  77:11 83:17
  84:5,11,12
  85:18,25 87:17
  105:6 113:3,15
  143:19 147:3,11
  152:2 162:11
  196:8 197:9,21,
  24 202:17 209:6
  210:18 217:4
  218:10 234:8,11
  236:13 251:16

presenting
  86:10 106:13
  163:2 253:2

presents
  85:21

pressure
  109:11 111:12

pressures
  107:19 108:4
  110:3,5 126:4

226:1

pretty
  98:7

prevent
  86:22 119:6,7,8
  140:16

prevented
  118:18 206:17

prevents
  121:18,19,24

previous
  16:2

previously
  15:8 122:8

primary
  127:22

print
  238:17

prior
  43:18 77:6 85:5
  86:6 89:3 90:25
  122:11 191:1
  193:7 198:10
  203:8,19 220:2
  228:9 240:2,6

priorities
  29:3 113:21
  150:1

prioritization
  149:22 152:25
  153:17,20
  155:13

prioritize
  150:18

prioritized
  148:25 163:12
  169:12 170:5,12

prioritizing
  30:1 149:15
  150:7

priority
  28:12 142:1
  147:19,21 160:7

202:22

prison
  57:10,11 213:4

prisons
  26:25 80:3

private
  250:7

privy
  138:22

problem
  32:3 33:22,23
  60:11 122:19
  137:15 141:14,
  23 156:18
  165:3,7 166:12
  167:3,10 169:7
  171:10,14,16,
  17,23,24 172:21
  173:20 174:2
  201:7 248:23
  249:4,12

problematic
  121:8 122:1
  134:9,18,22
  138:10 140:4
  172:4

problems
  42:12 47:20
  103:19 119:16
  121:19 136:13
  143:14 147:25
  163:12 165:2
  167:3 174:20
  247:21 248:12,
  17,18 254:3

procedurally
  204:8

procedures
  223:7

proceedings
  254:19

process
  13:14 14:1
  27:12,16 29:18,
  21 30:4 43:21

46:19 98:4
119:19 130:11
133:19 134:20
138:11 141:21
143:8 147:2,14
150:2 155:9
158:3 159:16
160:10 164:7,8
167:15 168:22
171:13 173:1
205:9 225:9
228:6,7,8
230:13 231:20
234:19 243:11
244:16 246:13,
17

processes
  34:24

produce
  253:19

produced
  38:16

producing
  37:21

product
  187:5

productive
  32:17

productivity
  31:17

program
  10:3 16:21
  17:25 59:4 60:2
  63:15 74:8 79:9
  88:22,24 89:6
  91:8,10 93:17
  94:13,15,18
  95:15 167:18
  182:13 222:7,21
  226:9 230:19
  238:6

programmed
  118:20 134:7

programming
  102:8 231:16

programs
  252:19

progress
  103:24

project
  243:11 244:17

projects
  107:18 149:16
  170:3

promised
  146:9

promptly
  189:18

prone
  185:4

proof
  69:3

proper
  120:18 148:23
  149:2

properly
  45:17 237:20

proportions
  109:5

proposal
  63:2,21 64:14,
  18,25 68:5,14,
  15,19 69:10
  73:20 75:14
  77:14 78:21
  86:9,10 87:24
  123:24 142:4
  143:13,15,16,17
  146:17 173:8,9,
  16,17 191:11
  200:25 201:21
  215:14,15,17
  226:7 232:5,8,
  22 233:10,12,
  13,16,17,18,20,
  24 234:21,22,25
  239:20 241:7
  242:2,6

proposals
  64:10 85:16

Kevin Kuich, M.D.                                          September 19, 2019

197:11,15,17,19
198:1,12,16,18,
23 199:4,20
201:2 202:2
232:3,17,19
234:14 236:7
240:11

**propose**
147:8 173:4

**proposed**
18:10 65:11,24
77:16 84:2
85:24 87:16
142:4 156:19
165:6 168:17
203:1

**proposing**
73:19 74:24
76:23 201:4
218:13 241:2,4

**prototype**
71:16

**proves**
57:13

**provide**
6:19 12:13 15:5,
20 18:4 19:7
28:25 30:12
32:19 34:19
36:1 37:11
41:23 43:12,16
45:15 46:1
49:24 54:4 59:5
60:1 62:12
65:19 68:18
69:1,13 71:5
77:8 105:15
108:11 117:5
121:16 123:7
124:4,13 125:24
132:11 148:15
192:15 201:23
208:13 212:23
214:15 219:7,
14,18 222:14
243:1 247:7
249:22 250:5
252:1

**provided**
12:22 32:2
38:14 42:14,16
45:23,24 46:2,4
56:15 57:5
66:17 67:12,16,
19 68:5 83:25
84:16 87:4,20,
23 104:24
105:14 179:12
184:1,2 191:25
192:10 198:19
213:3 219:11
235:23 243:4
244:23 247:2
249:14 253:8

**provider**
129:9,10,23
131:8 132:24,25
133:8,10 134:1,
9 139:24 141:2
167:11

**provider's**
131:11

**providers**
130:15 171:12

**providing**
15:1 31:11
32:15 46:8
65:13 123:13
179:20 199:17
219:22 243:18
244:24

**psych**
219:3,7

**psychiatric**
20:12,14,20
22:11,23 23:9,
25 25:15,22,25
26:10,15 30:5,7
38:13 42:11
46:13 48:10,24
49:21 56:14
68:10 72:16,20,
22 73:24 74:9
76:17,23 77:9,
14 80:7,9,11
84:1,24 86:9

88:24 89:11
90:22 91:15
104:10,22
105:4,17 106:6
108:24 109:25
110:1 111:12,14
115:5,23 240:19
248:7 250:15

**psychiatrist**
8:13,15,22 9:3,
5,10,11,18,19
11:4 15:9 16:14
17:3,8,19,22
24:16 25:10,25
27:14,15 44:6,
23 46:2 51:12,
20 53:25 54:1,
17,22 55:14
56:2,7,11 61:4,
10 62:9 63:25
64:2 69:2 71:19
88:22 90:13,15
95:9 100:8
117:21 118:1,3
126:19 127:19,
22 128:1,20
147:17 158:10
163:11 174:25
175:11,12
176:17 182:5
186:4 201:15
206:23 211:12
220:3,8,10,11,
12 230:20
243:25 244:14

**psychiatrists**
14:10 15:1,16,
24 18:21 21:5
23:20 24:3,4,19,
23 27:7,8 29:6,
11 30:10,13
31:3 32:13,14,
15 33:7,8,16
34:25 35:3,14,
18,19 36:2,5,8,
12,17 41:18
46:4,20 51:15
52:4,7,18,23
53:12,16,24
56:10,16,24

57:2,6,14,18
58:8 59:4,10,11,
13,24 64:4
66:10 68:16
69:15 70:23,24
72:24,25 73:1,
10,14 74:19
76:6,8,14 77:17,
25 80:3 86:24
88:3 99:1 101:1,
9,16 111:23
114:23 116:11,
14 117:17 118:8
122:20,21
123:3,20 127:4,
8 128:3,21
150:19 158:13
159:25 161:22
162:19,22,24
170:22 175:2
176:13,16
185:11,18
186:19 192:14
206:6,7,19
209:23 210:10
217:12 220:6,21
221:9,16 222:25
230:2,7,17
231:4 233:1,2
244:24 245:15
246:8,24
250:15,20,24,25

**psychiatrists'**
28:6

**psychiatry**
10:11 12:7,18
13:8,25 14:14,
21,23,24 15:1,7,
12,20 16:3,6,9
17:3,4,17,22
19:1,7 27:4,17,
25 28:7 29:5
30:6,7,8,11
31:13 37:14
38:11,23 39:19
40:7,25 41:1,7,
9,22 42:1 52:3
53:3 56:12
57:16 63:1,6,11,
16,21 64:12,23

65:2 72:23 74:9,
24 75:15,16,20
76:4 78:10,12,
25 79:6,15,17
80:16 81:1,2,9
82:13 83:2
85:18 86:21
91:21 96:1,10,
21 97:14 98:13
99:1 100:15,21
102:16 103:2
105:24 116:25
117:5,15,20
118:4,15 122:7
125:25 126:4,5
128:24 142:1
146:7 148:20,25
149:13 150:15
151:11,13,16
152:21 153:6
155:4 156:5
157:19,22,23
158:1,16 160:1,
7 163:2,3,12,15
164:12,15
165:16 166:1,22
168:23 169:9,
11,21 170:4,12
171:2 174:5
177:6 182:2,6
183:4 192:1,13,
25 193:4 198:2,
6 199:12
207:19,20,22,24
209:12 210:7,
15,22 211:21
215:22,25
216:15,21
221:24 225:25
230:21,22
234:19 237:12,
24 240:11 241:8
243:6,9,10,24
244:12 245:10,
20 246:3 249:23
250:9 252:24,25

**psychiatry's**
175:16 207:18

**psychologist**
92:1 95:10

Kevin Kuich, M.D.                                            September 19, 2019

| | | | | |
|---|---|---|---|---|
| 100:7 118:11 149:18 165:9 | 78:16 113:17 114:12 124:19 136:8 143:21 | 194:21,22 | 170:4,12,25 188:8 | 232:5,8 |

**psychologists**
101:18 117:22
118:8 150:9
154:11 160:1
170:6,18,21

**psychology**
150:14 160:3
171:2 231:5

**published**
206:8

**pull**
91:10 134:5
182:18 238:10
246:14 252:2,11

**pulled**
26:16 43:23
142:14 197:8
200:12 202:12,
16 207:1 212:6
216:17,25
229:2,16
251:24,25
252:14

**pulling**
69:10 134:4,14
138:21 139:12
195:2 234:3

**purpose**
19:18 26:16
49:20 50:21
214:17 238:3

**purposes**
38:4 130:5

**purview**
238:10

**push**
91:18,21 151:15
166:4,6,24
168:18 174:23

**pushing**
155:21

**put**
44:6,23,24 45:2

**query**
194:25 195:6,8,
10 223:25
229:23 252:11,
13 253:18,24
254:1,5

**question**
6:4,17 12:5
22:20 23:8
24:10,11,13
28:24 37:7,18
44:12 57:25
59:18 67:10
75:11 105:13
122:5 138:21
140:9 168:21
171:4 177:1
196:18,19 199:3
200:20 205:16
210:14,16,17
223:21 233:8
237:17 249:21
251:18 253:11,
15

**questioning**
22:14 47:1 51:4
184:14

**questions**
6:13,15,17 24:5
41:17 47:3
50:11 126:21
140:10,13,14
141:20,22
144:17 161:9
175:23 191:15
193:12,20
222:10 223:22
224:24 226:25
236:12 239:19
242:18 244:21
251:7

**queue**
146:8,22,25
147:6 148:19
153:23 154:5,
22,25 155:1
169:18,19,21

136:8 143:21
156:17 158:4
159:20 170:3
172:6 175:10,15
188:11 191:11
195:8 201:21
229:23 237:25
241:18,23

**puts**
241:15

**puzzled**
103:16

**puzzling**
84:16

**Q**

**QM**
115:19 116:14,
21 117:13
118:10 119:5
181:22,24 188:8

**Quada**
184:3

**quality**
31:24 32:1 35:4
36:18 91:6 93:7
100:5,6,9
106:10 109:4
110:24 111:3,5,
22 113:18,19,20
116:3,10 117:7,
20,21 118:2,17
119:6,15
120:13,14,23
121:4,5,13
195:19,25 196:3
231:3,13 243:4,
17,19

**quantify**
26:2

**Quentin**
60:9 76:11

**queries**
87:3 95:15

**queues**
169:4

**quickly**
87:8 128:4
150:10 169:2
170:1 184:24
222:1

**quiet**
76:10,11 173:3

**quorum**
164:1

**quote/unquote**
111:13

**quoting**
20:8 159:15,24

**R**

**raise**
25:21 40:21

**raised**
40:15,19 69:10
78:10 87:13
112:15 114:9
150:9 191:16
204:12

**Rancho**
17:9

**rapid**
87:7

**rapport**
29:23 193:2

**rash**
108:18

**rate**
243:3

**rates**
243:5

**ratio**
218:5,8,14,15

**rationale**
103:7,9 191:10

**ratios**
218:10,13

**re-implemented**
124:9

**reach**
10:18,22 21:22
27:6

**reached**
59:8

**reaching**
27:17

**read**
24:11,13 52:12,
14 74:18 83:3
131:23 132:22
146:4 159:9
212:20,21 217:6
221:2,4 234:17
242:25 254:14

**readily**
39:3,5

**reading**
132:1 253:4,6
254:12,15

**ready**
173:14 182:17

**real**
158:22 201:11

**reality**
105:18 247:22

**realize**
41:11 93:22
148:3 167:5

**realized**
31:9

**realtime**
27:21 37:13,15,
18 38:8,12
112:23 129:16

**reason**
7:7 86:1 87:22
97:2 98:24

33

Kevin Kuich, M.D.                                                    September 19, 2019

103:21 120:10
154:3 156:23
177:22 232:22
250:4,24

reasonable
75:25 76:1
78:17 80:12
143:2 161:21
162:15 173:1
246:9 249:18

reasons
24:17 140:19
168:12,17
191:23 207:7
247:18

reassignment
208:8

reassured
38:7 65:16
203:2

recall
26:4 39:25
49:17,25 50:16,
17 51:18 53:6
61:5 65:3,15,20,
23 68:7,8,12
76:20 77:13,15,
19,24 78:11
92:13 96:15,20,
23 98:6,10,15,
17 99:12 101:7
102:12,15
108:17 111:19
113:8 115:22
147:4 165:1,6,7,
15 188:18
198:13,21,25
200:2,3 202:6,8
214:11,18,23,24
224:16 228:22
237:8,11 239:22
240:2,7,24
242:9

receive
48:17,21 49:1
64:6 67:23,24
102:24 111:12
190:8

received
46:21 48:8
64:15 87:20
97:9 103:3
188:4

receiver
144:10 172:13
214:8

receiving
71:1

recent
243:1

recently
193:25

reception
141:25

receptionist
135:17,20

recipients
152:12

recognize
53:9 144:24

recognized
151:16

recognizing
112:9 171:21

recollect
200:12

recollection
91:13 199:20
202:11 242:4

recommend
65:1

recommended
65:5

recommending
143:24 147:19
165:20

record
5:18 6:8 7:21
61:17 127:18
146:3,5 159:10
210:12 213:19

216:3 230:9

recorded
44:7 60:24

records
13:2 192:12

recourse
209:18

recruit
30:9 127:3
221:15

recruiting
14:25

recruitment
162:21

red
33:20,21,22,24
34:2,6,8 109:2,
20 111:13 112:6
182:25 187:7

Redefining
20:9 88:20

reduce
68:15 75:14
192:1

reducing
65:1 83:20

reduction
73:22 84:1
86:10,16 179:8
198:2 240:14

reductions
63:7 65:24 68:3,
10 73:19 78:11
87:17 240:10
242:5

redundancies
65:14

refer
51:7 109:21
222:1

reference
163:25 222:12

referenced

20:6 42:15
210:5 237:9

referencing
42:25 210:3,4

referred
148:9 171:6

referring
23:9 31:15
32:24 49:23
78:24 99:15
109:24 132:12
152:15 153:13
168:18,20
178:15 180:8
209:7,25 211:14
215:13 221:25
227:14 245:4,13

refinements
47:12,20

reflect
6:8 57:1 77:17
99:2 114:4
130:12 131:15
161:13 190:12,
16

reflected
32:25 105:2
133:13 144:18
222:5

reflecting
60:19,20

reflection
70:6 190:3

reflective
114:17 126:4
187:1

reflects
46:23 63:13
105:18

refusals
178:2,15,22
179:2 190:14

refused
177:21 195:11

regard
18:5 100:21
105:23

region
12:12

regional
109:12 196:4

registry
211:8

regular
28:7 48:2 60:7,
14 79:13 94:8
100:22 121:22
124:15 138:3
182:13 195:18
208:16 237:15

regularly
33:14 150:20

Rehabilitation
8:5

reinstituted
110:12

Rekart
112:1 116:7,8
118:22 143:16
147:13 149:17,
18 150:22
151:10,12
153:10,21,24
154:13,14,17
156:3,9 157:14
165:9 186:17,25
188:3 238:1,11
239:9,13,14

Rekart's
149:21

related
15:7 36:11,13
92:8 107:3
126:4 161:9,10
183:13 202:10

relationship
11:6 21:20
29:23 168:21
189:11 193:3

Kevin Kuich, M.D.                                    September 19, 2019

relative
   159:25 164:20

released
   146:12 147:23
   149:13

relegated
   35:11

relentless
   232:25

relevant
   19:16 33:13
   96:25 162:18
   167:17 189:6

reliance
   180:16

refied
   104:20 208:11

relies
   57:9

relinquished
   149:11

rely
   59:1

remain
   193:9

remained
   115:17 120:4

remains
   234:19

remem-
   224:16

remember
   8:25 40:11
   161:4,16 179:25
   184:17 199:8,
   11,17 242:22,23

REMEMBERED
   5:1

remote
   88:2 123:9

remotely
   123:6,8

repeat
   12:5 22:20
   82:23,24

rephrase
   6:15,19 17:7
   37:5 67:10

replace
   68:17

report
   16:7,11 20:5
   28:4 29:24
   42:24 50:5
   54:12 63:11
   75:18 79:2,5
   114:11 117:21,
   22 129:9,22
   132:1,2,16
   136:16 144:10,
   11 152:14
   171:7,10 175:25
   181:3,4,12,14,
   25 184:1 194:13
   197:3,5,9,12
   200:22 202:24
   204:22,25
   205:3,13,14
   209:21 210:6
   213:22,23
   214:3,4,5,10,13,
   19 215:1,2
   216:16 217:6,11
   219:1,3 221:3,5
   228:11 236:3
   243:9 244:1,4,9
   245:1,12 251:6,
   9,16 252:5,15
   253:16,20,21
   254:12

reported
   16:8,13 18:7,19
   28:5,6 37:6 55:4
   56:16 96:2
   129:8,22
   136:16,24 178:6
   189:10 205:11,
   18 209:21
   229:16

reporter
   84:14

5:5 6:5,7 62:21
   84:17,20 226:14

reporting
   17:24 18:15
   20:11 106:20
   107:21,23,24
   121:7 127:16
   175:23 178:23
   179:13,16
   190:22

reports
   31:17,18,19
   38:14,16 39:4
   54:24 91:8,10,
   11 92:16,17
   93:17 95:16
   182:13 186:1,7
   193:23 194:1,2,
   6,7,11 195:1
   197:13 205:24
   215:7 222:7,21
   224:11 230:23
   236:17,21
   237:10 239:10,
   11,12,14,15
   252:8

represent
   57:6,17 75:23
   121:10 241:21
   246:21

representation
   43:3 165:8

representative
   151:10

represented
   6:9 30:2 213:21
   241:22 243:21

representing
   78:17 113:6,23
   114:13

represents
   93:20 121:11

reprimand
   171:24

reptilian
   84:14

request
   19:13 58:15
   131:9 133:2
   146:12,16
   154:23 155:9
   159:19 187:10
   188:8,13 190:4
   191:25 195:10,
   12 208:15,22
   211:7 218:15
   219:23 220:19,
   21 221:8 231:20
   237:19,21,23,25
   249:25 252:4

requested
   9:15 30:11
   50:24 97:8
   107:1 189:24
   195:16 196:11
   219:14,19
   228:14

requesting
   10:14 58:1 59:9
   129:24 130:16
   133:11 147:4
   186:5 188:5
   190:8 238:7

requests
   22:6 48:21
   73:16 146:7,23
   148:10 150:8,15
   156:17 188:1,9
   226:6

require
   44:5 46:18
   103:12 194:25

required
   36:21 45:25
   61:18 62:7 71:9
   108:14 177:7
   183:11

requirement
   89:6 164:1
   220:7

requirements
   32:20,23 46:9
   61:1 74:4

114:18 167:19
   220:16

requires
   88:22 94:14,16

requiring
   228:14

reschedule
   129:12 133:2
   139:6

rescheduled
   129:25 130:17
   131:10 133:12
   138:15 139:23
   141:11 142:20
   146:20 165:5
   173:22

rescheduling
   136:22

resignation
   11:11

resignations
   10:17

resolution
   88:4

resolve
   112:4

resolved
   85:4 122:10
   191:1 224:6,18

resource
   27:23 28:9,11
   125:25 208:25

resources
   10:11 12:19
   15:5,16 19:7
   25:21 27:5,20
   28:16 29:3
   33:24 34:21
   36:25 37:5,7,13
   42:10 48:10,24
   58:16 64:24
   82:2,3 117:5,7
   121:20,21
   125:14 142:2
   148:14,15,17,

Kevin Kuich, M.D.                                                    September 19, 2019

21,24 154:18
203:3 207:9,13,
18,19 209:2,12
230:17

respect
11:25 21:8
34:23 42:24
44:12 47:16
106:3 196:24
197:8 198:1,8
204:12 205:11
210:1 217:24
225:20,25 227:9
231:25 233:14
235:15

respond
71:13

responded
191:18

responding
10:14 71:15,16

responds
84:14

response
11:9 54:12
70:10,13 95:22
97:5 112:11,12
193:19 249:21

responses
111:20 196:21

responsibilities
125:7 189:8

responsible
34:21,24 201:23

rest
13:8 36:23
184:10

restate
24:10 26:7
59:18 251:17

restating
44:12

restricted
135:23

restroom
7:15

result
174:25 224:13
226:1

resulted
93:12 178:23
210:16

results
29:20 54:25

retain
68:25 127:4
221:10,16

retained
69:6

retaining
14:25

retention
86:22 162:20

retirement
228:9

retrain
174:1

retraining
42:9

return
25:11 65:22
192:24

returned
118:16

returning
115:4

review
19:10,17 50:10
55:20 67:5 73:7
90:10 91:11
94:8 97:23
145:21 179:22
180:22 204:16,
24 206:12,15
210:24 214:3,4,
10,12 219:1

reviewed

16:23 19:12,13,
14 20:1,2,6
42:14 204:19,21
205:2 211:19
214:5,18,21

reviewing
190:17

revised
63:6 240:10

revision
18:11

RFC
155:8 159:18,23

right-hand
246:4

road
174:15

rock
86:25

role
9:1,4,6 10:10
13:5,7,9 16:2
17:13 20:23
24:19 27:13
34:16 41:21
64:17 77:17,25
81:23 95:11,12
116:17 121:6,7
126:10 127:19,
25 128:2,5,19
152:21 206:21
219:8 230:20
231:13 234:2

roles
34:12 117:24
125:6 165:14

roll
23:16

rolled
60:21 124:16
175:1,13 184:23
211:5 246:12

rolling
20:24

rollout
13:1 21:17,20
26:6 44:14
45:14 46:21
47:11 53:22
110:11 111:1
127:20 231:13
246:12

rollouts
9:7 14:18,19
23:3 231:9
248:2

room
5:17 67:21,24
195:21

ROSEN
5:3

rounding
246:23

rounds
179:19

routine
37:19 107:4

routinely
37:19,25 60:12
90:24 101:1
102:24 233:3

rubber
174:15

rule
89:10 90:22
93:14 95:7,8
97:25 98:19,22,
24 99:11,12,13
102:13 103:10
104:13 108:6
110:13 115:20,
24 118:20
221:4,11,19
222:1,4,11
223:1 225:24
229:24

rules
6:1 93:16,17
102:17 119:8
158:23,24

164:2,6 221:21,
22 222:8,18,22
224:2 236:17,24
237:3,16

run
6:1 7:19 23:7
95:15 116:3
123:12 152:25
164:4 194:21,22
229:23 252:8
254:5

running
139:16 205:6

runs
116:5 238:3

S

sacred
166:6

sacrosanct
166:5

safe
61:19 188:3
190:18

safety
62:8

Salinas
213:4,6,11,18

San
5:4 60:8 76:11

sat
26:15 94:11
148:19,20

SATF
213:18

save
92:23

savvy
110:15

scarce
27:23

scenes
177:15

Kevin Kuich, M.D.                                                    September 19, 2019

schedule
  130:5 138:13
  166:19 228:3
  247:10

scheduled
  20:11 127:16
  129:10 130:2
  133:14 134:24
  135:4 136:12
  137:12 138:18
  168:5 171:11
  175:23 176:1,6,
  25 177:12,14
  178:7,24,25
  181:13 190:11,
  23 191:3,22
  197:1 223:17
  236:4,6 247:7

scheduler
  129:12,18 131:4
  133:2 138:1
  139:4 166:18,19
  247:10 249:6

schedulers
  34:1 130:20,24
  136:20 138:2

schedules
  137:6

scheduling
  45:3,8 47:10,12,
  16,19,20 64:21
  79:24,25 82:5
  110:16 129:14
  135:11,12
  137:6,24 138:4,
  5,7,11,24 139:1,
  3 141:14,15
  142:10 143:15
  146:18 155:25
  165:2,21 166:5,
  6,7,9,22,24
  167:2,24 168:8
  172:6,11,21,22
  173:1,9,12,19
  176:24 177:23
  178:22 179:2
  190:14 246:13,
  17 247:7,8,23

248:13,15
249:3,9

scope
  11:21 12:2
  22:14 24:1
  35:21 45:18
  46:6 51:4 53:18
  111:15 112:17
  129:2 144:19
  161:7 180:18
  184:15 189:7

scratch
  10:8

searching
  253:22

seat
  151:11

second-to-last
  51:9 253:20

second-to-the-final
  51:8

section
  221:4

seemingly
  158:25

sees
  51:15,19,20
  133:10 139:24

seg
  135:22 222:14

segs
  60:13

selected
  127:8

self-correct
  140:20

self-reflect
  140:20

self-selected
  100:11

send
  166:18 188:17
  208:15,19 247:9

senior
  8:15,22 9:2,17,
  19 15:9 25:25
  28:6 32:14
  51:16,23 52:16
  61:9 72:22
  90:15 100:6
  176:18 220:12

seniors
  27:9 57:4 74:5
  211:4

sense
  11:10,11,14
  33:23 43:22
  72:2 91:1 98:21
  108:10 109:7
  116:21 123:14
  130:14,17
  134:16 136:9
  137:10 162:18
  180:23 185:5,
  10,12,18,21
  187:7 194:23
  229:19 251:24

sentence
  133:8 134:1
  145:8

sentences
  133:7

separate
  17:4 123:11,12
  143:20 155:18
  165:14 169:4
  229:1 230:10,13

separated
  155:2

separately
  21:15

separation
  121:16

September
  5:1 11:22 20:1
  35:21 45:19
  51:5 53:18 63:5,
  17 73:6 74:10,
  23 77:2 84:19

111:16 122:4
129:3 144:19
161:8 184:16
240:9

series
  13:21 60:22
  66:12 167:9
  239:18

serve
  30:9 38:4 71:12
  157:15 180:11
  238:3

served
  214:17

serves
  79:12

service
  71:9 79:21
  108:11 117:6
  123:13

services
  14:23 15:1
  16:21 18:4
  30:12 31:12
  32:15 37:8,11
  43:13,16 58:3
  63:15 64:11
  69:1 74:8
  108:12 123:7,13
  124:13 125:19
  159:5 192:15
  199:13

serving
  70:4

set
  5:10 22:15
  107:11 143:20
  212:7 217:9
  239:24 245:5

sets
  128:14 194:25
  243:5

setting
  60:15 124:13
  139:20

settings
  161:20

shaking
  105:11

shaming
  109:10

shape
  37:14 143:10

shared
  207:19,20

sharper
  78:16

sheer
  158:20

she's
  99:15 201:6

shift
  180:14

shifted
  120:17

shocked
  223:3 226:8

shocking
  153:2,4

short
  10:16,18 48:5

short-term
  135:22

shortage
  10:23 136:2

Shorthand
  5:5

shortly
  77:4 151:19,21
  153:6 157:25
  227:23

show
  44:25 45:3 79:8
  94:23 106:21
  112:25 114:4
  122:20 130:1
  131:20 132:5,23

Kevin Kuich, M.D.                                                    September 19, 2019

| | | | | |
|---|---|---|---|---|
| 134:25 139:6,21 | signed | situation | solving | 51:18 76:20 |
| 141:11 176:3 | 142:12 205:19 | 145:15 168:4 | 33:23 | 77:13,15 104:3 |
| 177:22 228:16 | | 182:17 183:14 | someplace | 224:7 |
| 245:5 249:24 | significance | 202:13 | 188:11 | |
| | 85:23 | | | speaks |
| showed | | situations | sooner | 85:10 |
| 42:17 83:22 | significant | 30:12 126:22 | 90:25 91:12 | |
| 94:24 108:25 | 21:10 60:6 | | 150:15 | special |
| 196:24 233:19 | 76:23 78:4 93:5 | six-month | | 54:12 73:21 |
| 250:1 252:23 | 94:17 101:8 | 210:13,16 | sorely | 83:25 85:6,15 |
| | 136:14 179:9 | | 125:18 | 86:11 87:15 |
| showing | 234:2 241:8,14 | sizable | | 191:4 197:9 |
| 97:13 98:12 | | 179:7 | sort | 198:23 199:19 |
| 140:17 235:12 | significantly | | 93:23 150:7 | 235:1,4,16,25 |
| 237:12 247:22 | 43:8,10 44:18, | skewed | | 236:6 |
| | 25 61:2 116:24 | 45:9 | sorts | |
| shown | 246:12 250:11 | | 52:23 | specialist |
| 197:22 251:21 | 254:6 | skill | | 8:16,22 9:3,18, |
| | | 126:13 | sounded | 19 10:13 15:9 |
| shows | signing | | 38:22 | 72:23 90:15 |
| 54:21 56:9,11 | 142:5 | skilled | | 100:7 220:12 |
| 75:19 79:25 | | 120:17 | sounds | |
| 80:2,17 81:8 | silence | | 24:22 28:13 | specific |
| 106:19 158:3 | 162:6 | skills | 32:4 37:25 | 13:16 36:3 98:8 |
| 178:4,16,22 | | 162:8 | 38:17 100:3,14 | 137:7 141:13 |
| 179:2 190:13 | similar | | 143:22 157:1 | 174:5 182:15 |
| 235:3 243:2 | 38:25 53:21 | sleep | 177:8 249:18 | 194:20 197:16 |
| | 84:10,11 96:11 | 7:8 | 254:1 | 199:6 204:16 |
| Shultz-ross | 103:3 121:15 | slice | | 225:13 242:10 |
| 118:1 | 153:21 212:22 | 78:18 | source | |
| | 219:3,6 240:3,4 | | 242:21 | specifically |
| sic | 248:17,18 | small | | 18:5 23:9 31:11 |
| 77:22 | | 80:13 227:16 | sources | 32:12 39:1 |
| | similarly | 238:17 | 193:23 234:4 | 48:24 50:24 |
| sick | 120:17 162:7 | | | 61:4 77:24 |
| 24:17 65:14 | | smaller | south | 91:22 96:15 |
| 206:25 | simple | 157:6 | 17:5,17 | 107:1,24 |
| | 157:8 | | | 111:18,19 |
| side | | software | southern | 114:11 138:7 |
| 41:8 42:1 58:11 | simply | 174:16 | 17:11 | 179:25 197:15 |
| 60:16 109:17, | 133:8 134:2 | | | 211:13 212:14 |
| 21,22,23 167:6 | | solely | space | 213:4 235:17 |
| 219:15 230:22 | single | 57:6 | 33:25 42:4 | 237:3 241:5 |
| 231:3 249:23 | 152:19 | | 140:12 250:22 | |
| 250:1,2,3,9 | | solid | | specifics |
| | singling | 86:25 | sparked | 204:10 |
| sides | 162:3 | | 108:20 | |
| 111:9 | | solution | | speculate |
| | sit | 10:4 12:16,21 | speak | 103:21 |
| sight | 168:6 254:15 | 32:3 140:21 | 18:23 40:17 | |
| 162:4 | | 146:8,22,24 | 52:1,9 117:25 | speculation |
| | site | 147:6 154:22 | 126:9 145:5 | 30:18 81:19,25 |
| sign | 30:10 235:16 | 156:19 173:4,13 | 151:6,12 180:3 | 82:21 83:8 85:9 |
| 18:2 68:10 | | 174:11 183:6 | 203:10,14,15 | 86:14 100:17 |
| | sitting | | 232:21,24 | 101:11 104:15 |
| signature | 21:16 25:16 | solutions | | |
| 125:9 | 181:9 | 147:10 153:22 | speaking | |
| | | 183:11 | | |

38

Kevin Kuich, M.D.                                    September 19, 2019

105:21 107:22
119:10 126:8
133:21 135:9
139:9 142:22
150:12 170:9
178:10,17 179:6
180:18 191:7
192:3 226:3
241:11 244:3
248:10 249:1,17
250:17

**spell**
  226:14

**spending**
  97:11 185:2,22

**spent**
  35:1 206:16

**spirit**
  231:2

**splashy**
  149:24

**spoke**
  96:10 204:15

**spot**
  68:11 70:14

**spreadsheet**
  113:17

**spring**
  97:24

**SQL**
  102:7

**squeals**
  173:15

**squeezed**
  34:7

**squishy**
  137:21

**SSRIS**
  126:19

**staff**
  8:13 9:10,11
  11:7 12:22 14:3
  17:10 20:12,15

21:12,16 24:4
25:3,23 26:6,15
30:15 31:3
32:13,21,22,25
33:1 34:11,17,
18,23 35:4
36:22 38:23
39:14,16,18,23
40:5 42:9,11
45:15 46:1,13
47:21,24 51:19
52:17 54:17,22
55:13 56:9,10,
16,24 57:1,6,14,
19 58:2,8 59:24
68:16 69:4,6
72:20 74:5
76:24 77:14
78:9,12 80:7,9,
11 81:12 84:25
85:4 100:4
104:9 108:11
109:12 140:14
148:22 162:16
177:6 180:7
183:9 196:4
206:7 208:24
209:5,7,9 211:8,
9,11 219:11
220:3,8 221:10,
24 224:12,22
242:5 244:25

**staffed**
  22:11 29:10
  43:11 56:20
  60:9,10 209:24

**staffing**
  9:22,24,25 10:4,
  5 12:8 19:5,7
  21:4,17 22:6
  29:5,12 37:1
  39:1 43:6 54:13,
  14,18 57:9 63:1,
  6,21 65:18,19
  67:6 68:2,8,11
  73:20 74:4
  81:22 85:16
  86:9 87:16 99:7
  103:24 104:10
  123:19 140:11

191:10 197:10,
15,17,19 198:1,
12,15,18,22
199:4,19
200:22,25 201:2
202:2 207:24
210:7 211:7,21
213:4 215:13,
15,16 217:10
218:5,8,10
226:7 232:3,5,8,
17,19 233:10,
11,13,14,16,17
234:14,21,25
236:7 239:19
240:11 241:7
242:2 243:3,6

**standard**
  167:20 180:21

**standardize**
  64:21

**start**
  6:2 9:6 20:16
  65:17

**started**
  8:10 14:16 16:1
  27:14 109:5
  118:2 141:19
  155:1 169:22
  179:19 193:1
  227:22 248:2

**starting**
  8:12 52:2

**state**
  5:5,17 7:20
  51:17,24 52:1,5,
  9,17 57:13 59:1
  65:13 68:18
  114:17 127:6
  213:4

**state's**
  57:8 59:23

**stated**
  95:8 102:10
  132:20,23
  179:11 190:10
  204:21 209:22

214:20

**statement**
  180:12 228:17
  243:15,22

**statements**
  57:22 145:18
  193:19 211:2
  233:16

**states**
  63:14

**statewide**
  14:13,21 15:11
  16:3,6 17:25
  27:24 52:10
  74:8 77:8
  106:24

**static**
  158:19

**status**
  37:16 54:13

**steer**
  12:13

**step**
  98:10 155:5
  156:10 168:24

**stepped**
  20:25

**Steven**
  186:17,24
  231:21,22

**stick**
  199:14

**stipulated**
  24:2 104:18

**Stockton**
  8:15 220:13,17
  250:4

**stone**
  162:6

**stool**
  233:4

**stop**
  38:20 157:4

**storied**
  221:16

**stories**
  118:5

**story**
  167:6

**strange**
  93:4 173:5

**strategies**
  103:18

**stratified**
  28:10 216:16

**streamlined**
  34:25

**Street**
  5:3

**stretch**
  94:17

**strike**
  38:10 58:16
  72:9 73:16
  76:21 141:7
  203:9,23 227:7

**string**
  50:4 95:19
  184:11 186:22
  188:1

**structure**
  122:18

**struggle**
  29:7 184:25

**struggling**
  49:16 185:2
  223:5

**stuck**
  242:9

**studied**
  31:5

**studies**
  207:6

**study**
  31:2,4 238:7

Kevin Kuich, M.D.

September 19, 2019

stuff
11:24

stump
156:22

subcommittee
155:16 158:5,8,
9 161:15 165:11
227:14,23
228:15,24 229:3
230:3,6

subject
50:8 90:6 161:8
191:8

submission
235:15,24 236:5

submit
146:24 154:1
195:10 197:12

submitted
57:21 85:15
146:21 195:12
198:23 214:7
234:25 235:16
237:18,20 251:9

substantially
240:3

substantive
24:19

subtitles
64:19

successfully
85:5 122:10
168:13 191:1

suddenly
93:9 174:18

suffered
248:17

sufficient
60:1 65:18
70:23 72:6
78:12 149:10
189:16

suggest
107:5

suggestion
188:7

suicides
108:19

suit
119:20

sum
29:12

summarize
146:3

summary
19:12 20:6
204:22 221:3

summer
86:12 89:19

summit
52:22

supervise
35:5

supervised
18:16

supervises
238:11,13

supervising
24:3 25:25 33:6
46:4 77:17,25
205:24 206:1,5,
22 220:9,11
244:24

supervision
18:4 34:20
107:4

supervisor
25:9 45:12 61:8,
10,12,13 107:6,
8 124:20 176:18
207:2 253:23

supervisors
20:12,15 22:23
23:9,12,17,25
25:15,22 26:10,
16,24 28:6
30:15 36:21
39:13,22 41:17

42:18 43:12
44:16 45:14,17,
23 51:17,23
52:17 53:5
58:18 78:9,13
79:18 81:23
82:14 84:24
245:6 247:2

supervisory
25:3 31:3 33:16
34:11 35:3 36:8,
17,23 46:12,15
47:24 80:10
81:12 85:3
123:17

supplied
179:24

supply
179:23

support
21:3 36:5 54:11
57:22 83:25
123:5 151:14
191:25 207:24
209:10 249:8

supportive
34:17

supposed
79:8 129:10
132:25 137:11,
16 176:3 205:12

surprise
98:18 192:4
221:7 241:25
242:1

surprised
61:1 221:7,12

surprising
191:24

survey
219:17

surveyed
145:5

suspect
45:6 218:14

246:15

suspicions
206:9 212:9

sustainability
223:7

sustainable
122:18 140:21

Sutter
7:23

SVSP
57:10,13,19
58:1,15 59:20
61:3

SVSP's
58:8,17

sworn
5:8

system
13:2,9,18 15:3
21:3 33:15 34:5
44:6,8,24 45:4,
7,9,11 46:24
59:24 64:11
91:22 110:16,21
112:8 115:2
116:19 121:25
123:7 127:19
128:7,24 134:13
137:24 139:2
140:19 141:2,6
142:17 143:6
148:1,5 149:3
151:21 152:5
155:6,10 160:8
172:2 173:13
175:12 185:12,
16,21,22
192:13,15
209:10,17 223:4
246:24 247:15,
21 249:3 253:22
254:4

systemwide
15:12 42:20
44:17 63:15
68:17 69:1

80:17,23 81:9,
11 83:2 91:21
98:22 155:24
245:8,17 249:24

T

T-A-R-O-S-O-F-F
16:13

table
151:11 181:9
211:19,24 212:8
213:2 215:21,25
216:11,14,21,23
217:1,3,9
251:21 252:23

tails
103:14

takes
131:5,6

taking
23:6 185:3,5,14

talents
102:9

talk
39:20 52:7
63:19 88:17
156:21 161:17
188:16 193:21
200:5 230:17

talked
165:1 187:10,14
193:22,24 197:1
198:7 222:2
223:8

talking
7:12 12:21 26:1
41:14 43:5
50:15 59:20
66:6 112:1
133:19 173:20
177:4 181:3,6
194:19 204:20
208:3 213:25
214:2 221:18
222:3,13 230:10
236:20

Kevin Kuich, M.D.                                           September 19, 2019

tallied
138:17

targets
196:15

Tarosoff
16:13,14

task
28:1,2,3 34:10,
20 35:12 36:9
70:3 79:22,24
80:1 121:14

tasked
49:21 94:7 97:1
231:10

tasks
15:6,8,10 18:5
21:12 34:14,15
35:1,4 36:12
41:17,18 46:10,
12,13,14,15
58:4 99:8
116:20

team
31:13 39:2,6
68:9 87:14
96:10,21
115:19,23
116:2,5,15,21
118:11 119:5
149:12 154:6,9,
11,24 181:10
182:3 196:3
235:4

teams
198:3

Tebrock
18:1,2,3 39:20,
24 49:21 50:24
54:11 66:14
76:20 104:4,5,6
106:5,16,20,22
107:5,11
119:13,24 125:3
144:8 150:23
151:24 152:16
183:25 184:21
186:11 188:13,

25 189:5,10,23
198:15,22
201:14 219:19,
20 235:18
242:18 249:22

Tebrock's
59:2 243:14,23
246:1 247:25
252:22

technically
194:8

technological
15:2

technology
123:15

tele
9:5 12:18 14:14,
21,23,24,25
15:1,7,15 17:3,
4,8,17,19,22
27:4,14,15,17,
24 28:7 29:10
30:6,7,8,10
37:14 38:23
40:25 41:1,7,9,
21 42:1 59:10,
13 69:15 70:23,
24 88:2 192:13
196:6 199:12
219:3,6

telephone
49:7 203:24,25

telepsychiatrist
53:25 68:17
69:22 71:2,15
72:3 126:10
209:13

telepsychiatrists
72:5,11 74:20
123:6,8 206:18
242:7,8 250:9

telepsychiatry
58:2 65:8,20
69:1,8 71:25
106:24 107:3
126:25 205:15

207:21,23
208:23,24
209:9,10 211:8
219:10,11,16
242:15 249:25

telling
76:13 81:22
96:20 115:24

template
128:12

temporary
37:9

ten
48:5 70:21
185:6

ten-hour
124:23 185:6

ten-minute
127:11 175:19

tend
87:4

tended
245:5

tendency
222:9

term
109:2 197:2
229:8

terminated
226:23

termination
11:12

terminations
10:17

terminology
55:13 132:3
174:23,24 237:2

terms
28:12 32:10,18
33:11 60:18
65:13 69:4,20
78:1 86:4 96:1
103:23 121:20

142:6 158:20
180:24 185:15
220:15 238:4
239:11 241:9
242:2 243:21
246:7

tested
174:24 175:11

testified
12:1 26:14
36:25 39:12
44:14 45:13
48:8 55:17
73:20 96:5,16
105:8 113:25
115:9 120:7
127:17 133:4
153:11 158:2
197:25 200:5
204:18 205:10
206:4,11 208:1
217:5 220:2
221:20 224:5
225:23 227:2
228:14 230:11
232:4 236:2,18
237:19,21
239:21 240:21,
25 244:4 249:21

testify
7:2

testimony
7:4,9 22:5 44:2
66:21 78:7
101:19 117:15
161:10 173:18
191:7 200:9,16
201:8 202:19
208:4 211:1,20
224:10 228:19
230:2,14 235:19
242:22 244:22
246:1

text
51:9 144:24
145:2

therapy
61:20

thing
7:4 44:7 110:9
112:7 136:3
159:1 163:18
172:23 175:13
179:18 207:1
217:20 238:9
248:20

things
11:18 19:14
29:25 30:1,2
33:12 34:2,22
36:4 37:4,6
41:4,24 47:13,
15,18 49:1
65:15 67:7 77:4
78:6 84:15
86:21 88:1
91:12 92:8 97:1
99:17,18 102:21
103:20 107:12
111:17 119:19
121:17,22
125:10,13 127:5
129:17 131:3
138:23,24
141:3,19 142:8
143:7 145:11
146:23 147:10
148:1,7,24
149:1,7,25
150:14 157:4
160:11 162:9,
10,16 163:6,10
164:3,8,9,11,20,
22,23 165:11
169:20 172:3,9
174:17,18
176:20 180:22
184:6,7 185:5,
10,13,23 186:3
187:21 188:9,
16,17 189:5,12
190:23 192:11
193:1 195:9
196:12,13
199:22,24
206:17 208:8
224:1,2,17,18
230:24,25

Kevin Kuich, M.D.                                    September 19, 2019

231:16 232:12
250:22

third-from-the-last
80:15

Thorn
5:22 11:20
22:13 24:1,25
28:17 30:18
33:3 35:20
36:10 42:22
44:3 45:18 46:6,
25 47:7 51:3
53:17 55:5,25
56:18 57:3,20
58:9 59:7 61:23
66:20,24 73:25
75:1,5,9 78:14
80:19 81:14,19,
24 82:20 83:7
85:8,12 86:14
100:16 101:2,
10,21 104:15
105:21 107:22
108:2 111:15
112:17 116:23
117:18 119:10
120:3 126:7
129:1 131:25
132:4 133:20
135:8 139:8
140:2 142:22
144:16 150:11
156:12,15 161:6
170:8,14 172:18
178:9,17 179:5
180:17 181:15
184:13 189:14
191:6 192:2
193:13,14,15
200:10,19
201:25 202:7
203:7 206:13
210:5,9,19,20
212:5 214:22
215:15,18
216:6,7 217:7
218:4 220:24
222:4,17 226:19
227:19 228:21
229:4 230:15,16

233:21 235:5,
10,13,14
236:10,12,16,20
237:1,6,18
239:18 240:20,
23,25 241:11
242:18 244:2,21
248:9 249:1,16,
22 250:17
251:3,4,5
253:10,17,24
254:8,9

thought
39:21 86:13
96:5,18,21
163:11 242:13

thoughts
7:14 227:8

thousands
80:22

three-person
182:3

three-week
135:19

Thursday
5:1

ticket
146:8,22,24
147:6 153:22
154:1

tight-lipped
116:4

tightly
116:3 164:5

time
6:22 7:13 8:8
10:5 12:17,19,
25 13:6,11
14:18 15:3,24
17:21 18:13
21:7,14 22:12
23:4,19 27:10,
15,24 33:20
35:1 37:12 39:4
40:23,24 41:2
43:17,22,25

44:1 52:2,8 53:8
57:19 58:20,23
59:6,12,13
60:20 65:3,25
70:7,17 71:8,14,
18 72:6 75:19,
20 79:11 80:4
81:2,10 83:4
86:3 87:12,19
89:5 90:16
91:16,17,19,25
92:9 93:3,6
94:3,11 95:12
98:5,13 99:3,5
100:23 102:9
103:11,25
104:12,14,19,
20,21 105:5,25
106:5,7,11,25
107:11 108:18,
25 109:7
110:10,16,18
111:11,14
112:20 114:3
115:5,7 116:23
117:16,18
118:13 119:1,3,
25 122:6 123:1,
2 124:6 129:13
130:6,8,9 131:4,
16,18,19,21
133:3 134:5,24
135:1 136:10
137:21,23
141:9,13,22
142:7 143:17
150:1,5 151:6,
19 152:17
153:4,9,11,12,
14 158:21
163:20 164:19,
20 165:13,17
166:4,11 172:5,
12 176:6,7,25
177:19 183:8
185:3,13,14,15,
22 196:15
198:20 199:2
200:18 201:11,
22 202:3 205:1,
6,19,20 206:16

208:10 209:20
210:22 214:18
216:22 220:1,5
223:13 228:10
234:8,12 235:12
239:22 241:17
245:15 247:6,24
248:20,24 253:7

timecard
18:2

timeline
87:9

timelines
32:20 141:18

timeliness
80:6,9 82:19
91:15 97:24

timely
21:12 47:14
49:12 56:12,13
71:19 72:16
78:25 79:6,15
80:15 81:3 83:2
89:12 105:4,17,
19,24 106:6
108:24 110:1
115:4 118:14
126:3 169:24
215:22,25
216:15,21
237:12 243:9,24
244:12

times
13:18,20,22
21:16 25:24
29:2,10 48:13
49:22 111:22
112:1 117:23,24
149:6 171:7,25
199:23 209:14
211:10 213:15
214:12 219:12
223:11,12,18
242:20

timing
88:13

title

7:22,23 17:2
56:23 61:9

titled
74:7 79:1

today
6:10 7:3,10
19:11,18 88:9
107:7 130:7
134:10 168:19
192:8 193:22
203:11 204:6,
12,20 209:19
211:1,13,19
212:2,17,25
213:21 215:8,20
216:11 217:22
218:25 222:2
224:5 228:22
233:22 234:5,13
235:8,12,19
240:16 251:12
254:12,16

today's
224:17

told
72:10 86:12
95:3,22 96:16,
17 98:11 99:10
115:9,20 129:7,
18,21 130:25
136:15 171:18
187:4,10 205:12
241:12

tool
61:15 177:9

toolbox
126:19

top
19:25 20:7
54:16 85:1
132:15 144:22
160:22 211:20
218:19

topic
67:1 68:13,23
138:5 190:21,24

topics
20:4,8 40:15
53:13 67:12
204:5

total
44:15 73:22
74:15 75:20
116:22 140:24
210:17 240:14
241:3 245:22
246:4,5

totally
37:11

tour
50:23

tours
179:20 180:1

tracing
92:16 93:11

track
92:20 108:14
183:1 208:24

tracked
121:11

tracking
206:16

tracks
26:23

train
23:20 174:13

trained
29:2 163:5

training
20:23 21:2,6,7
23:13,16 34:18
45:14,15,23,24
46:1,4,8,21
47:1,7,17 48:3
91:25 108:16
171:18,19,20
173:24 185:23
249:7

trainings
48:2

transferred
8:21

transitioned
116:9

transmit
103:15

transparency
97:6

transparent
106:12

transparently
121:11

Trapani
5:19 56:4 81:4
132:7 238:18

treat
126:5

treated
147:19,21

treatment
243:1,4 244:25

tremendous
18:8 25:9 71:7,8
86:15 88:3
91:17 109:11
110:19 136:13
148:23 161:22
172:11 174:19
223:6

triage
28:16

triaging
28:13,18,22
29:1,25

trigger
142:5

triggering
33:1

trips
177:4

trouble
60:6 177:2

true
17:21 60:25
112:22 114:18
117:2,3 121:24
127:6 194:12

Tuesday
50:7

tumble
122:22

turn
54:15 73:4 74:6
80:14 84:22,23
104:3 111:12
136:22 144:12
189:20 218:18
239:1 240:7
242:16

turned
87:15,16 211:18

turning
171:5 216:20
253:16

twofold
128:2

type
10:6 38:25
49:10 128:7,11
162:18 189:11
208:18 212:24
213:10 238:2
254:5

types
36:8 41:16,20,
24 92:15 103:3
146:23 155:20
169:8 196:10

typical
10:25 76:12
84:4 95:25
219:21 238:10

typically
35:13 71:23
92:14 100:14
101:18 102:22

**U**

Uh-huh
59:19 90:9
145:22 161:1
177:10 190:2
200:7 218:17

ultimate
116:8 152:3

ultimately
132:24 234:15

un
175:12

unanticipated
174:21

unavailable
37:12

unclear
164:2

uncommon
66:25

under-accounting
249:13

undercounting
112:11

underlying
234:21 252:14

underneath
184:11

underpinning
191:9 232:4,8

understand
6:2,18 7:5 19:5
22:4 28:20,22
29:1 30:20
45:17 51:11
57:25 73:23
74:2 75:15
83:12 92:2
93:18,19 103:9
106:14 107:7
131:24 136:7
163:6 177:5
217:21 229:8,9,

10 243:12,14
252:7

understanding
19:4 38:15
39:21 55:23
56:24 60:2,4
74:3 80:5,18,25
81:5,21 82:16
83:5 89:1,5
94:13 95:5
103:7 104:12
165:24 168:17
173:18,25
176:4,5 218:9
219:20 234:3
243:23 246:6
249:19 251:24

understood
6:25 124:1
147:18 180:23
239:24 241:10

undertook
206:6

undivided
23:19

unexpected
41:19

unfilled
57:16 76:17

unified
172:22

unilaterally
118:23

unique
92:13 137:5
172:8 183:14

unit
9:13 247:11

units
9:14 247:6

universal
174:5,7

unneeded
64:12 65:1

Kevin Kuich, M.D.                                                September 19, 2019

unobstructed
  23:18,19

unpaginated
  78:22 216:4

unplanned
  207:4

unpopular
  160:3

unsustainable
  121:25

untoward
  108:19

unusual
  108:21 116:1
  229:24

update
  148:4 177:17
  225:6

updated
  16:23

updates
  47:15 48:4
  139:2 225:3,5,6,
  8

upgrade
  148:4 174:16

urge
  114:16

urgency
  202:22 203:4

urging
  119:4

user
  135:12 137:25
  148:2 154:3
  155:11

utilize
  28:10 38:23
  209:13

utilized
  32:9 34:23 58:2

utilizing

125:20

**V**

vacancies
  206:24

vacancy
  63:11 75:18
  243:3

vacant
  54:24 56:10

vacation
  11:12 208:7

vacations
  10:17

vague
  28:17 61:23
  107:23 116:23
  117:18 133:20
  139:8 156:12
  201:18 210:2

validated
  175:11

valley
  25:6 48:19
  213:4,6,12,19

variable
  247:13

variables
  183:13

varied
  9:20 11:2 22:2,3
  34:15 157:11
  177:4

variety
  108:22 129:16
  158:9

verbally
  6:4

verify
  121:10

version
  132:17 214:7,25
  234:14 240:2,6

versus
  31:14 54:18
  104:10 211:21

Vess
  92:1 108:17

vetted
  85:20 126:11
  165:11

vetting
  226:10

view
  59:5 122:15

views
  20:4 85:3,7 96:9
  122:9 127:15
  190:25 191:4
  232:2

visa
  10:3 125:15,17
  221:13

visit
  49:20 50:14,16,
  17,19,22 135:15

visited
  20:24 211:5

visits
  33:12 103:12
  219:16

voice
  49:8 97:14
  107:16 117:15
  163:22 192:25

voiced
  70:10

vote
  153:6 156:5
  157:19,23 158:1
  159:20 163:8
  164:10 165:10,
  16

votes
  158:24 159:17

voting
  151:16,20 156:7

159:25 161:24,
  25 162:7,9,12
  163:6 164:5,9

**W**

walking
  67:21 198:22

wanted
  30:1 50:14
  68:25 86:16
  94:4 127:15
  157:16,22
  163:4,10 164:15
  170:19,20
  185:4,18
  201:10,11
  208:18 223:21
  232:6 250:6

ways
  23:20 41:18
  86:20 123:2,3,
  18 125:25
  162:23 167:7
  169:15

wearing
  94:3 102:4

webinar
  99:11,13

webinars
  223:8,16,17,23,
  24 224:7,12,13,
  17

website
  224:20

Wednesday
  90:4

weeds
  109:15

week
  13:13 90:23
  91:3 213:17
  233:25 245:7,
  15,21 246:24
  247:2

weekend

68:15

weekly
  22:1 99:16
  223:16,17

weeks
  13:12 135:16,18
  167:14,23
  246:22

well-defined
  100:12 158:22

well-detailed
  150:2

well-staffed
  106:11

whatnot
  193:23

whomever
  218:10

widely
  246:12

wider
  119:8

widget
  79:21

widgets
  62:5

wishes
  193:9

wondered
  209:25

wonderful
  38:22 99:24
  192:11

wonderfully
  162:2 183:7

wondering
  132:14 205:13
  221:23 226:2

word
  28:17 203:6

wore
  209:11

44

Kevin Kuich, M.D.                                                    September 19, 2019

| | | |
|---|---|---|
| **work** | **worried** | **z** |
| 8:7 9:15,20,21 | 167:13 | |
| 13:19,20 21:10 | | **zeros** |
| 30:10 33:17 | **worth** | 195:7 |
| 35:18 36:9 45:2 | 164:22 | |
| 57:1,5 78:13 | **worthy** | |
| 92:15 109:15,16 | 189:7 | |
| 124:12,18,21 | | |
| 128:2,9,16 | **wrap-up** | |
| 129:13,14 133:5 | 236:11 | |
| 155:25 163:16 | **write** | |
| 167:1 168:14 | 175:6 | |
| 169:22 171:21 | | |
| 174:9,12 175:16 | **writing** | |
| 176:8 183:6 | 6:5 145:4 147:9 | |
| 199:18 206:6,7 | 161:4 184:17 | |
| 207:15 208:8,9, | 223:25 | |
| 21 209:14,16 | **written** | |
| 211:11 213:11 | 6:8 171:25 | |
| 238:7 246:16 | | |
| 249:10 | **wrong** | |
| | 26:9 38:8 78:7 | |
| **workable** | 84:17 96:22 | |
| 69:3 128:22 | 154:24 170:17 | |
| | 239:21 | |
| **workaround** | | |
| 133:18 | **wrote** | |
| | 144:25 145:1,3 | |
| **workday** | 159:9 160:25 | |
| 124:15 | 161:12 189:22, | |
| | 25 215:9 | |
| **worked** | | |
| 8:3 16:12 20:18 | **Y** | |
| 128:24 142:25 | | |
| 193:15 205:18 | **yard** | |
| | 42:8 49:13 | |
| **working** | 124:23 136:3 | |
| 8:13 9:25 10:3 | 140:15 | |
| 59:14 91:9 98:2 | | |
| 107:17,18 | **year** | |
| 124:3,4,23,24 | 26:4 60:24 | |
| 143:5 148:4,5 | 112:21 113:14 | |
| 173:10 174:10 | 114:1 189:23 | |
| 183:10 187:11, | 196:14 220:17 | |
| 16 206:19 208:6 | | |
| 219:2 231:7 | **years** | |
| 246:17 | 8:9,24 160:10 | |
| | 179:17 192:22 | |
| **workload** | 232:25 | |
| 45:10 | | |
| | **yellow** | |
| **works** | 33:20 34:9 | |
| 88:13 166:7 | 109:2,20 111:13 | |
| 185:17 | | |

45

No. 2:90-cv-0520 KJM DB P

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

# Coleman v. Newsom

Decided Sep 2, 2020

No. 2:90-cv-0520 KJM DB P

09-02-2020

RALPH COLEMAN, et al., Plaintiffs, v. GAVIN NEWSOM, et al., Defendants.

## ORDER

In an order filed July 12, 2018, this court directed the Special Master to begin recommending "specific benchmarks that, when met, signal constitutional compliance" and to "include, as appropriate, specific recommended compliance percentage requirements for each benchmark," starting with the Twenty-Eighth Round Monitoring Report. July 12, 2018 Order, ECF No. 5852 at 3.[1] Subsequently, the court signaled it was "contemplating setting its own process for establishing benchmarks." March 17, 2020 Order, ECF No. 6509, at 2. The court discussed its proposed process with the parties at the second quarterly status conference for this year, held on July 17, 2020. *See* Reporter's Transcript of Proceedings (July 17 RT), ECF No. 6781, at 11-16.

2    Specifically, the court proposed directing the parties to address why the *2 "benchmarks" the Special Master has in fact been using for years in his monitoring should not be confirmed by the court. *Id*. at 11. Defendants proposed an alternative, namely, that within one hundred twenty days they propose benchmarks to the Special Master and the plaintiffs to start the discussion. *Id*. at 13. Plaintiffs opposed the defense proposal as a "delaying tactic." *Id*. at 15. The defendants demurred, and the court accepted in good faith defendants' representation that their proposal was not made for purposes of delay, *id*. at 16, noting their agreement to wait for the court's clarification. As explained below, the court now confirms the framework developed over the past twenty-five years for the requirements defendants must satisfy to achieve compliance with the Constitution and against which their progress toward constitutional compliance is being measured. In the context of that framework, the court also clarifies the proper role of "benchmarks" going forward. The court also directs the parties to file briefing addressed to certain discreet matters.

[1] References to page numbers in documents filed in the Court's Electronic Case Filing System (ECF) are to the page numbers assigned by ECF and located in the upper right hand corner of the page.

## I. DEVELOPMENT OF REMEDIAL FRAMEWORK

### A. Eighth Amendment Violations

As the court explained in 2013, "[t]he Eighth Amendment violations in this case predate 1994, when they were found by the magistrate judge after a lengthy trial." February 28, 2013 Order, ECF No. 4361, at 3. More recently, approximately one year ago, the court again reviewed the district court's 1995 order confirming those findings and calling out twelve areas of deficiency after consideration of numerous defense objections:

To review again, in 1995 the court found defendants in violation of their Eighth Amendment duty to provide California's seriously mentally ill prison inmates with access to adequate mental health care. *Coleman v. Wilson*, 912 F.Supp. 1282. Specifically, the court found (1) defendants lacked "a systematic program for screening and evaluating inmates for mental illness," *id.* at 1305; (2) California's prison system was "significantly and chronically understaffed in the area of mental health care services "and defendants did "not have sufficient staff to treat large numbers of mentally ill inmates" in prison, *id.* at 1307; (3) defendants had no quality assurance program to ensure competence of staff, *id.* at 1308; (4) there were significant delays in access to mental health care throughout the system that "result[ed] in exacerbation of illness and patient suffering," *id.* at 1309; (5) "'defendants' supervision of the use of medication [was] completely inadequate; prescriptions [were] not timely refilled, there [was] no adequate system to prevent hoarding of medication, there [was] no adequate system to ensure continuity of medication,

3      *3

inmates on psychotropic medication [were] not adequately monitored, and . . . some very useful medications [were] not available because there is not enough staff to do necessary post-medication monitoring,'" *id.* (quoting June 6, 1994 Findings and Recommendations at 50); (6) several deficiencies in the availability and utilization of involuntary medication, *id.* at 1311-13; (7) the absence of any adequate systemwide procedures for use of mechanical restraints on seriously mentally disordered inmates, *id.* at 1313-14; (8) an "'extremely deficient'" medical records system, *id.* at 1314 (quoting Findings and Recommendations at 61); (9) inadequate implementation of defendants' suicide prevention program, *id.* at 1315; (10) inadequate training of custodial staff "in the identification of signs and symptoms of mental illness," *id.* at 1320; (11) placement of seriously mentally ill inmates in administrative segregation and segregated housing units "without any evaluation of their mental status" and without access to necessary mental health care while housed in such units, *id.*; and (12) use of tasers and 37mm guns against class members without considering whether the behavior leading to use of the weapon was caused by mental illness, or the impact of such weapon's use on that illness, *id.* at 1321.

July 9, 2019 Order, ECF No. 6214, at 5-6. In late 1995, the court appointed a Special Master to "monitor compliance with the court-ordered injunctive relief," *Coleman v. Wilson*, 912 F. Supp. 1282, 1324 (E.D. Cal. 1995); *see* ECF Nos. 639 (Order Appointing Special Master), 640 (Order of Reference setting out powers and duties of Special Master); *see also* ECF No. 6214 at 6 ("To remedy these violations, the court 'directed defendants to work with the Special Master to develop and implement' remedial plans. *Coleman v. Brown*, 938 F. Supp. 2d 955, 972 (E.D. Cal. 2013).").

Since 1995, the full development of a comprehensive remedy has taken up more than two decades. Implementation of the remedy is ongoing, some interim deadlines have been set, and as reviewed here the court has identified the mechanism by which, ultimately, the durability of the remedy will be assessed.

B. Remedial Plans

In the July 9, 2019 order, the court "clarifie[d] for the record that remedial planning for this action is substantially complete." ECF No. 6214, at 4. The court explained that

[t]he remedial phase of this action has been shaped by the court's early recognition that in a case of this magnitude and complexity "the standards for compliance with the Eighth Amendment must and indeed 'can only be developed contextually.'" *Coleman v. Brown,* 938 F.Supp.2d at 971 (quoting *Coleman v. Wilson,* 912 F.Supp. at

4    *4

1301). Thus, the complete remedy for the Eighth Amendment violations identified by the court has continued to evolve over the past two decades while implementation of court-approved and court-ordered components of the remedy has been ongoing.

*Id.* at 6-7. The court also laid out the history of remedial planning in this action. That history shows that over the course of twenty-three years the court has given first provisional and then final approval to a comprehensive set of plans for remediation of the identified constitutional violations. *See id.* at 8-14. In its order filed August 3, 2020, the court clarified that the primary court-approved remedial documents in this action are the California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guide (Program Guide) and the Compendium of Custody Related Remedial Measures (Compendium). August 3, 2020 Order, ECF No. 6806, at, *e.g.,* 9. These two remedial documents and the court-approved plans in aid of the remedies they contain are reviewed below.

1. Program Guide

The Program Guide is defendants' plan, approved by the court, to remedy identified violations in the delivery of mental health care to the plaintiff class. *See* ECF No. 4361 at 2-6 (discussing history of development of Program Guide as remedial plan for identified constitutional violations); *see also Coleman v. Brown,* 756 Fed. Appx. 677, 679 (9th Cir. 2018) (it is "established that the Program Guide sets out the objective standards that the Constitution requires in this context. . . ."). The operative edition of the Program Guide is the 2018 Program Guide Revision, ECF No. 5864-1, which the court approved in July 2019. *See* ECF No. 6214.

The 2018 Program Guide Revision consists of: Chapters 1 through 10 of the Program Guide 2009 Revision; Appendix A, a glossary of terms; Appendix B, a list of 68 policies that the Special Master and the parties agree should be included in the current consolidated Program Guide . . . ; Appendix C, an index to the same policies listed in Appendix B and a complete copy of each policy, . . .; Appendix D,5 a memo clarifying "several changes to Chapter 6 of the Program Guide (2009 Revision) concerning inpatient care,"; and Appendix E,6 which contains "policies that are currently in flux and by agreement will be reviewed by the parties and the Special Master at a later time to determine whether they are appropriate for inclusion in the Program Guide." (citation omitted).

5    *Id.* at 2-3. *5

The court has ordered development of several additional remedial measures in aid of full implementation of the Program Guide, including (1) semi-annual mental health population projection plans, *see* October 20, 2006 Order, ECF No. 1998 & July 9, 2009 Order, ECF No. 3629; (2) short-term, intermediate, and long-range bed plans, *see, e.g.,* March 31, 2009 Order, ECF No. 355; and (3) a staffing plan, *see* June 18, 2009 Order, ECF No. 3613, at 2, *see also* Defendants' Staffing Plan, ECF No. 3693.[2]

[2] The Program Guide provides the structure for delivery of mental health care in CDCR's MHSDS, including but not limited to diagnostic criteria and treatment requirements at each level of care. The population projections, bed planning and staffing plan are all key to implementation of the Program Guide, but are not directly incorporated in the Program

Guide. The population projections forecast the size of the mental health population for five year periods and support planning for future bed and treatment space needs as well as staffing requirements.

In addition, in February 2015 the court ordered defendants to adopt specific measures recommended by the Special Master, ECF No. 5258 at 5-9, following an audit report by his suicide prevention expert, Lindsay Hayes, ECF No. 5259. February 3, 2015 Order, ECF No. 5271, at 3.[3] On January 25, 2018, the court adopted the Special Master's recommendation to withdraw three of the measures, items 14, 15, and 16 on the list, included as Attachment A to this order. January 25, 2018 Order, ECF No. 5762, at 3. Defendants' work on full implementation of the remaining action items is ongoing, *see, e.g.*, Special Master's Report on His Expert's Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation, ECF No. 5993, at 8-9, and the court has signaled a deadline for their completion, July 3, 2019 Order, ECF No. 6212, at 12-14. By this order, the court confirms that defendants must complete any and all remaining work so that Mr. Hayes can report full compliance in his fifth re-audit report. As noted below, the court anticipates reviewing with defendants, as necessary, the steps remaining to full
6      compliance after the Special Master files *6 Mr. Hayes' fourth re-audit report. The Special Master has circulated that report in draft form and currently anticipates filing it soon.

     [3] The complete list of recommendations contained in the Special Master's Report, ECF No. 5258, is set out in
       Attachment A to this order. One of those recommendations, identified as number 30 on the list in Attachment A, was
       subsequently identified as redundant of number 14 and Mr. Hayes has not separately re-audited it. *See, e.g.*, ECF No.
       5396 at 22.

## 2. Compendium

Remedies for defendants' Eighth Amendment violations in custodial practices are found in state regulations and provisions of the CDCR Department Operations Manual (D.O.M.) as well as in departmental memoranda and court orders. The custody remedies are set out in a list styled "Negotiated Court-Ordered Remedial Measures Related to Custodial Issues Not Included in the 2018 Program Guide," Appendix A to Parties' Supplemental Joint Submission of Custody-Related Policies and Orders Required by July 9, 2018 Order , ECF No. 6431, and now referred to as the Compendium; the court approved the Compendium on February 11, 2020, as the complete list of custodial remedies. February 11, 2020 Order, ECF No. 6460, at 2.

The court also has required development of a Custody and Mental Health Partnership Plan (CMHPP) in aid of attaining a "collaborative culture between custody and mental health staff in each prison institution that houses mentally ill inmates," a necessary component of a constitutionally adequate prison mental health care delivery system. August 9, 2016 Order, ECF No. 5477, at 6. The initial CMHPP was filed September 10, 2018, ECF No. 5916, and the court approved it in February 2019, requiring that it be "expanded to provide for training focused at the CCCMS (Correctional Clinical Case Management System) programs and the custody staff who interact with inmates and mental health staff in those programs," February 20, 2019 Order, ECF No. 6095, at 6. Defendants filed the required update on September 12, 2019, ECF No. 6278. In October 2019, the court approved the update and ordered its implementation under the timelines specified in the update. October 8,
7      2019 Order, ECF No. 6314.[4] *7

     [4] Currently only the court's February 20, 2019 order is included in the Compendium. The initial and updated CMHPP
       and the court's October 8, 2019 order will be added to the Compendium in the update to the Program Guide and the
       Compendium due September 1, 2021.

## II. PRIOR EFFORTS TO FOCUS IMPLEMENTATION



As the court reviewed in its February 28, 2013 order, on June 27, 1997, the court ordered defendants to start implementing the first set of provisionally-approved remedial plans[5] and "directed the Special Master to begin monitoring defendants' implementation of and compliance with those plans, and to file quarterly monitoring reports." ECF No. 4361 at 5. As of this date, the Special Master has filed twenty-seven monitoring reports, which the court has adopted in full or in part after review of any objections made by the parties. In this section, the court recaps the last decade of effort to focus implementation efforts in aid of completion of a durable remedy and the end of federal court oversight.[6] *8

---

[5] The first set of plans comprised "six volumes of materials, including program guides, policies, plans, policy and procedure manuals, forms, training materials and memoranda." Special Master's Report on Plans, Dkt. No. 850, at 1. Volume I was identified as "California Department of Corrections (CDC) Mental Health Services Delivery System Program Guides"; Volume II was identified as "Mental Health Services Delivery Systems Training Materials"; Volume III was identified as "*Coleman* Documents, the so-called Blue Book, which contains a miscellany of materials including memoranda, reports, bulletins, procedures, etc., keyed to the *Coleman* court order; Volume IV contained the prison system's drug formulary; Volume V was identified as the "Mental Health Services Delivery System Mental Health Forms Orientation Handbook"; and Volume VI was identified as the "Correctional Treatment Center Policy and Procedure Manual: Health Records Service; Pharmacy; and Mental Health Volumes." *Id.* at 2. In the June 6, 1997 Report on Plans, the Special Master reported on the status of remedial efforts in all twelve areas identified in the court's original order. *Id.* at 2-20. The Special Master reported the parties had agreed that policies adopted "for the use of force against seriously mentally disordered inmates" would be integrated into CDCR's "general policies governing use of force." *Id.* at 2. The Special Master also reported that, while defendants did not agree mental health clinicians should "influence decisions on institutional, staff and inmate safety, unless, of course, the accused inmate is undergoing some sort of mental health crisis and in need of acute inpatient care," there was general agreement that input from mental health clinicians "into the subsequent disposition of disciplinary adjudications is both critical and appropriate." *Id.* at 14-15. The Special Master also reported he and the parties had "reviewed and discussed the defendants' policy on the use of mechanical restraints and agreed to a mutually acceptable version of that policy" in spite of a legal question about whether the September 13, 1995 order required such relief, and that questions existed about "the extent to which defendants' suicide prevention plan, policies and practices are subject to the remedial order and the master's review." *Id.* at 20. "Suicide prevention and policy became an issue subject to monitoring by the special master in late 1998 when the court approved the parties' agreement for the merger of *Gates v. Deukmejian*, No. CIV S-87-1636 LKK JFM P (*Gates*) into this action and for dismissal of the *Gates* action." December 22, 2000 Order, ECF No. 1229, at 1 n.1.

[6] The decade covered by this section began after the court's July 23, 2007 order recommending a three-judge court be convened to address overcrowding as the primary cause of ongoing violations in the delivery of mental health care to California's prisons. July 23, 2007 Order, ECF No. 2320. That order found "ongoing violations includ[ing] delays in access to mental health crisis beds, acute inpatient care, and intermediate inpatient care; inadequate capture, collection, and analysis of data necessary to long-range planning for adequate delivery of mental health care; unacceptably high staffing vacancies; insufficient program space; and insufficient beds for mentally ill inmates." *Coleman v. Brown*, 938 F. Supp. 2d at 970 (citing ECF No. 2320 at 6).

## A. The Seven General Goals

In his Twenty-Second Round Monitoring Report, filed in March 2011, the Special Master identified seven "projects" to be completed by defendants as part of a "comprehensive" effort in aid of full implementation of the two primary remedial plans in this action, the Program Guide and the Compendium:

(1) re-evaluate and update CDCR suicide prevention policies and practices; (2) make sure that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from [the Department of State Hospitals (DSH)]; (3) review and comply with all elements of their Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days; (4) complete the construction of mental health treatment space and beds for inmates at varying levels of care; (5) implement fully their new mental health staffing plan; (6) train staff for greater collaboration between custody and mental health; and (7) refine and implement MHTS.net to its fullest extent and benefit.

ECF No. 3990 at 474-75.

As reviewed in Section I(A) above, the court identified twelve areas of major deficiency in its 1995 order: (1) the absence of a systematic mental health screening and evaluation program; (2) significant and chronic understaffing; (3) the absence of a quality assurance program; (4) significant delays in access to necessary mental health care throughout the system; (5) inadequate medication management; (6) several deficiencies in the availability and utilization of involuntary medication; (7) no systemwide procedures for use of mechanical restraints on class members; (8) completely inadequate medical records system; (9) inadequate implementation

9 of defendants' suicide prevention program; (10) inadequate training of custodial \*9 staff "in the identification of signs and symptoms of mental illness," *Coleman v. Wilson*, 912 F. Supp. at 1320; (11) placement of seriously mentally ill inmates in administrative segregation and segregated housing units "without any evaluation of their mental status" and without access to necessary mental health care while housed in such units, *id.*; and (12) use of tasers and 37mm guns against class members without considering whether the behavior leading to use of the weapon was caused by mental illness, or the impact of such weapon's use on that illness, *id.* at 1321.

The seven projects the Special Master identified in 2011 were directly connected to and focused attention on several of those twelve areas. The Special Master reported that these "system-wide projects . . . promise to result in improved institutional capability to treat and manage mentally ill inmates," ECF No. 3990 at 17, and that "[t]he scale of these projects is matched only by the enormity of improvement that is promised upon their successful completion." *Id.* at 475. In his Twenty-Third Monitoring Report, the Special Master referred to these projects as "seven general goals" and found "progress toward some of" them. ECF No. 4214 at 85.

In its August 30, 2012 order adopting the findings and recommendations of the next Twenty-Fourth Monitoring Report in full, the court held that "[m]eeting each of these goals is critically important." August 30, 2012 Order, ECF No. 4232, at 5 n.3. And in its April 5, 2013 order denying defendants' motion to terminate these proceedings, the court noted "[t]he specific goals track ongoing violations identified by this court in its July 23, 2007 order recommending that a three-judge court be convened to consider a prisoner release order"; the court observed that several of the goals "are tied to constitutional deficiencies described by the United States Supreme Court in its 2011 Opinion affirming the three-judge court's population reduction order." *Coleman v. Brown*, 938 F. Supp. 2d at 970 (quoting *Brown v. Plata*, 563 U.S. 493 (2011)). In other words, progress toward these seven goals has informed the court's assessment of defendants' remedial efforts for more than a decade.

10    ///// ///// \*10

## B. The Continuous Quality Improvement Tool (CQIT)

The continuous quality improvement tool, known as CQIT, is a comprehensive tool that, once finalized, defendants will ultimately use as part of a process to "self-monitor" the key components of the remedy in this action. *See* ECF No. 5439 at 108. Work on CQIT started in late 2012, and by early January 2013 "key

indicators" for the tool "had been identified and a prototype of the audit tool had been developed." *Id.* After the court's 2013 denial of defendants' termination motion as well as a summer pilot of CQIT and its associated auditing process, it became clear "that CQIT's capacity to accommodate and utilize information on the quality of mental health care needed expansion in order for the tool" to encompass measures to assess the need for and accomplishment of improvements in quality of care. *Id.* at 110.

In early 2014, the court declined to set additional deadlines for completion of the continuous quality improvement process, and instead reiterated

> that defendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action. It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have implemented a durable remedy for the Eighth Amendment violations in the delivery of that care. A key component of a durable remedy is the development and implementation of an adequate quality improvement process by which defendants will self-monitor, and as necessary, self-correct inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons. Defendants are required to work under the guidance of the Special Master, with input from plaintiffs' counsel, on this task until it is completed.

February 27, 2014 Order, ECF No. 5092, at 4-5. In his Twenty-Sixth Round Monitoring Report, filed in May 2016, the Special Master reported that CQIT had been updated and vetted with all stakeholders and that CDCR would "conduct a trial implementation of the tool at ten selected institutions during the upcoming Twenty-Seventh Monitoring Round." ECF No. 5439 at 113.

In his Twenty-Seventh Round Monitoring Report, the Special Master reported that developments in the use of CQIT "were promising," ECF No. 5779 at 17, and that work to improve the audit process and report writing was ongoing, *id.* at 55-64. As discussed below in Section III(B)(1), during this initial pilot period, defendants attempted to unilaterally change the *11 compliance monitoring standard from 90 percent to 85 percent. The court disapproved this change in its July 12, 2018 order adopting the Twenty-Seventh Round Monitoring Report and required defendants to report "all degrees of compliance with monitored Program Guide requirements, from zero percent to 100 percent." ECF No. 5852 at 2.

C. Order on Defendants' January 2013 Termination Motion.

On January 7, 2013, defendants filed the motion to terminate this action under 18 U.S.C. § 3626(b), referenced above. ECF No. 4275. In denying the motion, the court articulated an important principle that remains relevant today: it reiterated the need for contextual development of Eighth Amendment standards in this case and reminded all stakeholders that

> [a]s the history of this "complex and intractable constitutional violation" shows, the prospective relief required for the delivery of constitutionally adequate mental health care to over 32,000 mentally ill prison inmates is not "susceptible of simple or straightforward solutions." *Brown v. Plata*, 131 S. Ct. at 1936. *See also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010) ("Prospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law.")

*Coleman v. Brown*, 938 F. Supp. 2d at 971-72. The court found ongoing constitutional violations in multiple areas covered by the Program Guide, including suicide prevention, treatment of mentally ill inmates in administrative segregation units, inadequate numbers of mental health crisis beds, insufficient treatment space

and program beds, and inadequate staffing levels which, as the court observed, "has plagued the delivery mental health care in CDCR prisons for decades." *Id.* at 973-88.

At the same time, the court found "new" "gains in timely and adequate access to inpatient care." *Id.* at 982. While the court observed that these gains represented "significant progress in remedying one of the most tragic failures in the delivery of mental health care," more work remained. *Id.* The gains did not in fact hold and, as discussed below, in 2017 the court issued an enforcement order to address slippage in the timeliness of transfer to inpatient care.

In denying the termination motion, the court found outstanding orders for prospective relief, that it had issued in the preceding four years, "remain necessary to correct current and ongoing violations in the delivery of
12  adequate mental health care to plaintiff class *12 members." *Id.* at 990 (citing ECF No. 4409 (plaintiffs' separate statement of court orders issued over four years preceding termination motion)[7]).

> [7]  These orders covered availability of necessary mental health beds and program treatment space, access to inpatient care, suicide prevention, and the quality improvement/assurance process. *See* ECF No. 4409, *passim*.

D. Litigation in 2013 and 2014

The court denied defendants' termination motion on April 5, 2013. *Coleman v. Brown*, 938 F. Supp. 2d at 990. On April 11, 2013, plaintiffs filed the first of three motion for enforcement of existing orders and additional relief, a motion regarding inpatient mental health treatment. ECF No. 4543. The second, filed May 6, 2013, focused on "improper housing and treatment of seriously mentally ill prisoners in segregation," ECF No. 4580, and the third, filed May 29, 2013, focused on the use of force and disciplinary measures on class members, ECF No.4638.

From June 19, 2013 through June 24, 2013, the court held evidentiary proceedings on seven issues raised in the first motion concerning care and treatment of class members at inpatient mental health programs operated by DSH. *See* ECF Nos. 4663, 4664, 4670, 4671. Approximately two weeks later, on July 11, 2013, the court issued an order granting in part and denying in part this aspect of the first motion. July 11, 2013 Order, ECF No. 4688. The court directed the Special Master to "report to the court on the adequacy of staffing levels at the Salinas Valley Psychiatric Program SVPP; and on whether the so-called cuff or orientation status, either as designed or as implemented, unduly interferes with or delays the provision of necessary care to class members at SVPP" and to "complete one round of monitoring the adequacy of all inpatient programs and report to the court thereon not later than March 31, 2014." *Id.* at 13-14.

Over two separate periods, the first between October 1, 2013 and November 7, 2013, and the second between November 19, 2013 and December 19, 2013, the court held twenty-eight days of evidentiary proceedings on the remaining part of the first motion and the issues raised by plaintiff's second and third motions. *See, e.g.*, ECF Nos. 4855, 4916, 4942, 4972. On December 10, 2013, the court granted in part and denied in part the
13  issues that *13 remained from the first motion; the court ordered defendants, under the supervision of the Special Master, to conduct a study of unmet needs for inpatient mental health care on San Quentin's death row and develop a durable remedy to provide these class members with access to necessary inpatient care. December 10, 2013 Order, ECF No. 4951, at 27-28. On April 10, 2014, the court granted in part and denied in part the other two motions. *Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014). The court made extensive findings and ultimately made the following orders:[8]

8  The court made a series of orders in the April 10, 2014, *see* 28 F. Supp. 3d at 1108-09. By order filed May 13, 2014,
ECF No. 5150, some of those orders were modified and deadlines were extended and another order was modified in an
August 29, 2014 order, ECF No. 5212. In addition, in orders filed July 25, 2014, ECF No. 5189, August 15, 2014, ECF
No. 5195, and August 27, 2014, ECF No. 5207, the court granted additional extensions of some of the deadlines
originally set in the April 10, 2014 order and extended by the May 13, 2014 order. The list provided in the body of the
order here is the ultimate list of orders that followed the proceedings on plaintiffs' May 6, 2013 and May 29, 2013
motions, incorporating all amendments, modifications, and ultimate deadlines.

(1) Defendants were directed to work under the Guidance of the Special Master to revise their use of force policies and procedures and to complete the required revisions by August 1, 2014.

(2) The Special Master was directed to report to the court within six months of the April 10, 2014 order whether defendants had adequately implemented the RVR policies and procedures agreed to in 2011.

(3) Defendants were directed to work with the Special Master on a timeline for completion of their review of the use of management status so that this practice could be reviewed by the Special Master as part of his review of the implementation of defendants' RVR policies and procedures.

(4) Defendants were required to file, not later than August 1, 2014, a plan to limit or eliminate altogether placement of class members removed from the general population for non-disciplinary reasons in administrative segregation units that house inmates removed from the general population for disciplinary reasons and to be prepared to fully implement the plan not later than September 1, 2014. Defendants were also direct to, if feasible, commence forthwith to reduce the number of Coleman class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates; feasibility shall be determined by the Special Master. Starting September 1, 2014, defendants were prohibited from placing any class members removed from the general population for non-disciplinary reasons for more than seventy-two hours in administrative segregation units that

14  *14

house inmates removed from the general population for disciplinary reasons.

(5) Defendants were required to work under the guidance of the Special Master to develop by August 29, 2014 a protocol for administrative segregation decisions, including, as appropriate, a plan for alternative housing, that would preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

(6) Beginning August 1, 2014, defendants were required to provide to the court and the Special Master monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care. Commencing October 1, 2014, defendants were prohibited from admitting any Coleman class member at the EOP level of care to any EOP ASU hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months. Commencing October 1, 2014, defendants were prohibited from placing any class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP Ad Seg Hub beds available unless failure to remove the inmate from the general population presents an imminent threat to life or safety.

(7) Defendants were required to filed by August 1, 2014 a revised policy concerning strip searches in EOP ASU hubs.

(8) Beginning August 29, 2014, defendants were required to follow their court-approved CCCMS-Long Term Restricted Housing (CCCMSLTRH) plan instead of placing class members in security housing units (SHUs).

### E. Road Map to End of Federal Court Oversight

In 2016, in yet another effort to focus remaining work and achieve "complete remediation . . . in the foreseeable future," the court laid out a "road map to the end of federal court oversight." ECF No. 5477 at 2. As the court described in that order, it included in the road map as key markers completion of the seven goals first identified by the Special Master in 2011, and additional duties added by the December 2013 and April 2014 court orders described in Section II(D) above. *See* ECF No. 5477 at 3. The court also required durable implementation of the provisions of the "final settlement in *Hecker v. CDCR*, No. 2:05-cv-2441 KJM DAD, a class action brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), which merged over remaining ADA and RA issues into this action and its monitoring process. *See* ECF No. 5439 at 67-75." *Id.* The

15 remedial requirements the court referenced in the *15 2016 order were nothing new; they all are consolidated in the two primary remedial documents, the Program Guide and the Compendium, and the accompanying plans described in Section I(B) above.[9]

> [9] The court is currently updating the chart filed by plaintiffs in March 2013, *see* ECF No. 4409 at 3-13, to identify in one document all outstanding orders for prospective relief. While this order is intended as a complete description of the established framework for remediation of the identified Eighth Amendment violations, it is subject to supplementation to whatever extent necessary to ensure it comprehensively captures the totality of the remedy in this complex case.

Finally, and significantly for purposes of this order, the road map contemplates full development and implementation of the robust continuous quality improvement process described in Section II(B), *supra*. Reiterating prior orders, the court in its August 9, 2016 order again emphasized the importance of the

continuous quality improvement process:

> [I]n adopting the Special Master's Twenty-Fourth Round Monitoring Report in 2012, the court
> "emphasize[d] in particular its complete concurrence with the Special Master's finding that '[a]n
> important goal of the remedial phase of this case is, . . ., for CDCR itself to assume the mantle of
> ultimate responsibility for diagnosing of its own problems, i.e., conduct its own 'qualitative analysis,'
> and create a quality improvement process that it can use to achieve and maintain compliance, and *move
> on to eventual removal from federal court oversight*." ECF No. 4232 at 4-5 (quoting Twenty-Fourth
> Round Monitoring Report at 65) (emphasis in order).

ECF No. 5477 at 3. The court also emphasized defendants' recognition that "the successful implementation of
CQIT is a key marker of success on the road to ultimate termination of this court's oversight." *Id*. at 8.

## III. THE ROLE OF "BENCHMARKS" IN THIS REMEDIAL PROCEEDING

As the United States Supreme Court observed, the "complex and intractable" Eighth Amendment violations in
this action are not "susceptible of simple or straightforward solutions." *Brown v. Plata*, 536 U.S. at 525-26.
While the court has adopted the term "benchmark" in certain orders, upon reflection and review of the record of
this case, the court clarifies that improper use of the term "benchmark" risks an oversimplification that obscures
the full scope of required remediation. On the other hand, a clearly identified framework accompanied by well-
16  defined compliance measures that have been developed and defined *16 contextually provides defendants with
the notice and information they need to achieve full and durable remediation. Along the way, some interim
deadlines have aided and may continue to aid ultimate full remediation. The purpose of this order, then, is to
confirm the framework that exists and the interim deadlines that have been set. As necessary for clarity and
transparency, the court also identifies remaining, though not redundant, steps to define the compliance
measures against which remediation has been and will be measured.

A. Prior Use of "Benchmarks"

1. Three Judge Court and Supreme Court

The three-judge court convened to address prison overcrowding used the term "benchmark" to refer to the
remedy ordered in those proceedings, namely a systemwide institutional population cap of 137.5 percent of
design capacity. *See, e.g., Coleman v. Brown*, 960 F. Supp. 2d 1057, 1060-61 (E.D. Cal./N.D. Cal. 2013). The
three judge court used four specific benchmarks to guide implementation of that order; specifically, it set four
sequential six-month "benchmarks": reduction of population "[t]o no more than 167% of design capacity" in
the first six months; to no more than 155 percent of design capacity in the second six month period; to no more
than 147.5 percent of design capacity in the next six month period; and, finally, to no more than 137.5 percent
of design capacity within the final six month period, i.e., within two years from the order. January 12, 2010
Order of Three-Judge Court, ECF No. 3767, at 4; *see also Coleman v. Brown*, 922 F. Supp. 2d 1004 (E.D.
Cal./N.D. Cal. 2013). The United States Supreme Court also used the term "benchmark" in its decision
affirming the three judge court, suggesting that if the state sought modification of the order to extend the time
for compliance, the three-judge court might "condition an extension of time on the State's ability to meet
interim benchmarks in the provision of medical and mental health care." *Brown v. Plata*, 563 U.S. 493, 544
(2011).

2. This Court

In the proceedings in this court, most of the discussion about "benchmarks" has centered on identification of measures necessary to achieve full compliance with the Program Guide. In 2012, defendants presented the

17   Special Master with objections to his draft Twenty- *17 Fourth Round Monitoring Report in which they contended, among other things, "the report 'lacks clear benchmarks and qualitative analysis designed to assist Defendants in achieving Program Guide requirements.'" ECF No. 4205 at 73 (internal citation omitted). The Special Master rejected this objection:

> This criticism is somewhat difficult to reconcile with the record of defendants' tepid implementation of past feedback and recommendations from the special master. On the one hand, defendants complain that they do not know what is required of them in clear and practicable terms, and that the special master is not giving them the kind of analysis which can show them why they are falling short of benchmarks. Yet, year after year, they continue to resist implementation of the practices recommended by the special master and his staff which are geared to bring them into compliance. Simply stated, defendants cannot have it both ways.

> Insofar as "clear benchmarks," defendants need not await the issuance of the special master's compliance reports to learn the standards of mental health care which they are required to meet. These benchmarks are well-known to them, as they are found in the Program Guide and in relevant orders of the Coleman court. If the Program Guide and the orders are not enough by themselves to set the benchmarks, the record of 4,204 docket entries in this case, including 302 orders, and 107 reports by the special master, certainly provide a wealth of information by which defendants can be guided. Thus, what defendants mean by their complaint of a "lack of clear benchmarks" is mystifying.

*Id.* (emphases omitted). Defendants raised three objections to the final Twenty-Fourth Round Monitoring Report filed with the court. As the court noted in its order fully adopting the Twenty-Fourth Monitoring Round Report's findings and recommendations, defendants had made a series of "Overall Objections" to the draft Twenty-Fourth Round Monitoring Report, including one to the alleged "lack of clear benchmarks and qualitative analysis designed to assist Defendants in achieving program guide requirements," that were not included in the objections they raised with the court. August 30, 2012 Order, ECF No. 4232, at 4 n.2. After explaining that the Special Master had responded to the "Overall Objections" "in detail," the court stated

> [t]he Special Master's time is a resource that going forward need not be spent on objections that have been raised and, as evidenced by defendants' decision not to tender them to this court, he has resolved. While the parties are required to raise before the Special Master any objection they intend to raise here, the Special Master is not required

18   *18

> to respond to any objections that are frivolous or repetitive of objections that were previously resolved or withdrawn.

*Id.* The Twenty-Fourth Round Monitoring Report and the order adopting it sent a clear message: what is required to remedy the Eighth Amendment violation in this action has been repeatedly identified in court orders and monitoring reports and neither the Special Master's time nor the court's will be spent relitigating settled matters.

In 2014, this court used the term "benchmark" to refer to a specific requirement in the Program Guide. *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1103 (E.D. Cal. 2014) (describing as "benchmark" requirement to provide "at least ten hours per week of structured therapeutic activity" in Enhanced Outpatient Program-

Administrative Segregation Unit (EOP-ASU) hubs, a "critical part of EOP care in general" and "particularly true in segregation units"). For the reasons explained below the court finds this most recent use of the term signals its proper use in these proceedings: as a synonym for the "key indicators" that have been and are being developed in CQIT.[10]

[10] In the August 9, 2016 order, the court described "the successful implementation of CQIT" as "a key marker of success on the road to ultimate termination of this court's oversight." ECF No. 5477 at 8.

## B. Prior Decisions Regarding Compliance Standard for Program Guide Requirements

On December 28, 2012, the Special Master circulated his Twenty-Fifth Round Monitoring Report to the parties. *See* ECF No. 4361 at 1. As noted above, on January 7, 2013, defendants filed a motion "to terminate this action and vacate the judgment and orders of this court, . . . ." *Id.* at 1 n.1. Consequently, on the same day the court directed the Special Master to file his Twenty-Fifth Round Monitoring Report "forthwith" and directed any objections be filed with the court "on or before thirty days from December 28, 2012." *Id.* at 1. Defendants' primary objection to the Twenty-Fifth Round Monitoring Report was "that the Special Master 'has not even attempted to assess' defendants' mental health care delivery system against a constitutional standard." *Id.* at 2 (internal citation omitted). Defendants also objected to the Special Master's use of the term "compliance" as (1) not tied to constitutional requirements; and (2) generally *19 failing to include specific explanations of what led to a finding of non-compliance. *Id.* at 8. Defendants also asserted that the Special Master's operative definition of "compliance" as requiring "'a minimal score of 90% against Program Guide requirements is one of the primary reasons the reports are not useful in determining whether the mental health system is constitutionally adequate.'" *Id.* at 9.

The court rejected all three objections. As to the general objection that the Special Master was not monitoring to a constitutional standard, the court observed the objection "betray[ed] a fundamental misunderstanding of the history of this action and its remedial process." *Id.* at 2. As the court explained, the Program Guide "is defendants' plan, approved by this court, to remedy the Eighth Amendment violations identified in this court's 1995 order. . . . Because the . . . Program Guide is the operative remedial plan in this action, the degree to which defendants have implemented the requirements of the . . . Program Guide is extremely relevant and useful to assessment of whether they are meeting their constitutional obligations.'" *Id.* at 6, 9.

On February 13, 2018, the Special Master filed his Twenty-Seventh Round Monitoring Report. ECF No. 5779. Among other items, the Special Master reported defendants had submitted "their own draft monitoring reports for the first ten institutions monitored using the continuous quality improvement tool (CQIT). . . . " ECF No. 5852 at 2. Despite the court's February 28, 2013 order overruling defendants' objection to the established 90 percent compliance measure, as noted above defendants had in these draft monitoring reports decided to "unilaterally adjust the compliance monitoring standard to 85 percent from the 90 percent standard that has been used consistently throughout the remedial phase of this litigation." *Id.* The court, noting it had "expressly approved the 90 percent standard over defendants' objection recently," held that "[d]efendants' unilateral adjustment of the monitoring standard, if accepted, would deprive the court of information that is 'extremely relevant and useful' to the court's assessment of their constitutional compliance." *Id.* The court therefore ordered defendants "[i]n preparing their [self-monitoring] reports, . . . to follow the standard practice, set by the Special *20 Master and approved by the court, and . . . report all degrees of compliance with monitored Program Guide requirements, from zero percent to 100 percent." *Id.*

The court also provided the direction to the Special Master noted at the beginning of this order, to "begin recommending specific benchmarks that, when met, signal constitutional compliance." *Id.* at 3. The court explained, "As a means of projecting when the sun might reasonably set on this case, the court will require the Special Master to include in his Twenty-Eighth Round Monitoring Report recommendations for development of a process for determining when constitutional compliance has been durably achieved in the areas subject to monitoring, as well as whether partial termination may be appropriate if certain benchmarks are achieved before total compliance is reached." *Id.* By this time, the court had in fact already begun a process to enforce key remedial requirements with specific compliance standards for each, as reviewed below.

## IV. REMEDIAL DEADLINES SET TO DATE

This court has never set a firm deadline by which defendants must complete all remediation in this complex action. Particularly in view of the recent detours occasioned by the Golding proceedings, which exposed the need to ensure the quality and accuracy of defendants' data, and the onset of the COVID-19 pandemic, it would be premature to set an overall deadline. Since 2017, the court has, however, set several deadlines by which certain remedial requirements must be met.

### A. Transfer Timelines to Inpatient Care

On April 19, 2017, the court set a deadline of May 15, 2017 for defendants to achieve compliance with Program Guide requirements for transfer to inpatient care. ECF No. 5610. In the April 19, 2017 order, the court specifically required "full and complete" compliance with Program Guide timelines for transfer to inpatient care, while allowing modifications to the Program Guide by way of specific exceptions to the transfer timeline requirements. *Id.* at 13. The April 19, 2017 order included a provision for enforcement through civil contempt proceedings and, if necessary, monetary sanctions. *Id.* After approximately six months and the accumulation of over $445,000 in unpaid sanctions defendants achieved substantial compliance *21 with that order by September 2017, and they have remained consistently in compliance, at least until the onset of the COVID-19 pandemic, when CDCR's efforts to comply with public health measures have directly impacted inmate transfers. Also in the April 19, 2017 order, the court signaled it will, at an appropriate time, "issue an enforcement order requiring 100 percent compliance with the twenty-four hour timeline for transfers to MHCBs [Mental Health Crisis Beds], subject to exceptions." *Id.* at 11-12. On September 27, 2019, the court approved an addendum to the Program Guide that specifically identifies exceptions to the MHCB transfer timeline. ECF No. 6295. The court has not yet issued an enforcement order for compliance with the MHCB transfer timeline and will revisit the question of the timing of such an order at the first quarterly status conference in 2021, to be set by subsequent order.

### B. Staffing

On October 10, 2017, the court set a one year deadline for defendants to come into compliance with the 2009 Staffing Plan and the court's June 13, 2002 order requiring a maximum ten percent vacancy rate in mental health staffing. ECF No. 5711. Defendants are nearly two years past the deadline for compliance with the October 10, 2017 order. The court has delayed enforcement of that order in light of the whistleblower report from CDCR Chief Psychiatrist Dr. Michael Golding, which directly implicated staffing compliance, and the proceedings on that report, which culminated in an evidentiary hearing in October 2019 and extensive findings by the court memorialized in the order it filed December 17, 2019. ECF No. 6427. While the court has separately set staffing for resumption of enforcement proceedings in September 2020, ECF No. 6794, the

record over the past two years gives rise to a strong inference that while the October 10, 2017 order focused minds on the woeful shortages in staffing, defendants have not been able to identify meaningful ways of achieving compliance with the remedial staffing requirements, which have been clear for more than a decade.

C. Suicide Prevention Measures

For over twenty years, the Special Master has had "responsibility for monitoring suicide prevention and policy in California's prisons." ECF No. 6212 at 12. His first suicide prevention expert, Dr. Raymond Patterson, 22 resigned after almost fifteen years on the Special *22 Master's team "'because of his frustration arising from the defendants' repeated failure to implement his recommendations.'" *Id.* at 13 (*quoting Coleman v. Brown*, 938 F. Supp. 2d at 971 n.26). Between November 2013 and July 2014, the Special Master's current suicide prevention expert, Mr. Lindsey Hayes, "conducted a comprehensive audit 'of suicide prevention practices and individual suicide case files in all 34 CDCR institutions.' ECF No. 5258 at 1." *Id.* As discussed in Section I(B)(1) above, in early 2015 the Special Master filed a report of that audit, which contained a series of recommendations "aimed at addressing the ongoing problem of a disproportionately high rate of inmate suicide in California's prisons. *Id.* at 2, 5-9. Neither party objected to the report or its recommendations." *Id.* For over five years, defendants have been under court order to adopt and implement the twenty-nine recommendations that remained after Mr. Hayes' second re-audit. *Id.* (citing ECF No. 5271).

On July 3, 2019, the court signaled its intention to set a long overdue deadline for compliance with court-ordered suicide prevention measures. ECF No. 6212 at 14. Specifically, "the court anticipates reviewing with defendants at a future status conference the specific steps necessary to enable Mr. Hayes to report no later than after his fifth re-audit that all recommendations have by then been implemented." *Id.* The court anticipates this review will take place as soon as practicable after the Special Master files Mr. Hayes' fourth re-audit report, currently estimated for September 2020. Moreover, while no specific timetable has been set for the fifth re-audit the court now confirms defendants must complete any outstanding work on these recommendations before that auditing round begins. In aid of this order, the Special Master is directed to keep defendants informed of his plans for scheduling the fifth re-audit.

The twenty-nine recommendations must be completely and durably implemented to allow comprehensive assessment of their efficacy in reducing the ongoing number of foreseeable and/or preventable inmate suicides in California's prison system. Ultimately, defendants will assume full responsibility for quality management of their suicide prevention program as well as the review and reporting requirements currently provided by the Special Master. The time is not yet ripe to determine when defendants should assume those particular 23 responsibilities. *23

D. Desert Institutions

On September 27, 2019, the court approved a policy for expedited transfer of class members from six desert prison institutions. ECF No. 6296. The policy was implemented on December 16, 2019. ECF No. 6678 at 1 n.1. In accordance with the agreement of the parties that led to that stipulation, the Special Master now monitors these institutions using monthly reports filed by defendants setting out "census and tracking information for [class members] housed in one of the six desert institutions for the prior calendar month" rather than by onsite visits. *See* ECF No. 6678.

E. Custody and Mental Health Partnership Plan

On October 8, 2019, the court approved defendants' court-ordered Update to CDCR's Custody and Mental Health Partnership Plan (CMHPP), directing its implementation "in accordance with the timelines set forth in the Update," and requiring certification to the Special Master by April 30, 2020. ECF No. 6314. Defendants timely complied with the April 30, 2020 certification required by the October 8, 2019 order. *Id.* at 2. At the court's request, the Special Master has provided a copy of defendants' certification letter to the court. That letter shows that defendants have met five deadlines set in the CMHPP, that several others have been reset due to the COVID-19 pandemic and that defendants have committed to filing monthly reports with the Special Master until the CMHPP is fully implemented.

In light of defendants' specific commitment to monthly updates and their apparent commitment to resetting specific deadlines as necessary, the court finds no need for additional orders to further progress toward this goal at this time.

F. Context Remains Key to Overall Systemic Remedy

Taken together, these orders illustrate the care required to set proper compliance standards for all components of the multi-faceted remedy in this case. In a prison system where the size of the mentally ill inmate population is approximately 30,000 inmates, even a 90 percent compliance standard risks leaving thousands of mentally ill inmates without access to one or more components of a constitutionally adequate mental health delivery system

24  or receiving custodial treatment that falls below constitutional minimum requirements. Even if separate *24 components of the remedy can be addressed through focused orders, the remedy remains one that is systemic, requiring (1) plans for a constitutionally adequate mental health care delivery system and constitutionally adequate custody practices; (2) adequate implementation of those plans/or completion of "tasks essential to full implementation of those component parts of their mental health delivery system," *Coleman v. Brown*, 938 F. Supp. 2d at 989; and (3) a showing that the implemented remedy is durable.

## V. TOWARD FULL REMEDIATION

A. The Continuous Quality Improvement Tool (CQIT)

As discussed above, CQIT is a comprehensive tool, which, once it is finalized and fully implemented, defendants will ultimately use as part of a process to "self-monitor" the key components of the remedy in this action. *See* Section II(B) *supra*. In particular, it will be used to monitor compliance with the material provisions of the Program Guide and the Compendium

As discussed above, CQIT includes a list of "key indicators" developed in 2012 and 2013 for use in monitoring institutional compliance with the Program Guide. The Program Guide was updated in 2018; as a consequence, the key indicators may require immediate updating.[11] As noted, the court has already determined that defendants must report compliance with each indicator from zero to 100 percent; the court ultimately will use the CQIT reports as part of an overall determination of compliance with constitutional standards and durability of the remedy. Consequently, the court must confirm the percentage of compliance with each key indicator that

25  must be achieved to meet constitutional requirements.[12] In the briefs required by *25 this order, the parties shall address why the court should not require the following as interim steps toward full and durable implementation of the Program Guide:

[11]  The "key indicators" in CQIT are likely equivalent to the material provisions of the Program Guide and the Compendium that may not be modified without court approval. *See* ECF No. 6806. In their briefing provided for by this order, the parties shall address whether the CQIT tool, once finalized, should be subject to annual updates when the Program Guide and the Compendium are updated.

12  Ultimately the entire continuous quality improvement process must be fully implemented and durably used for some remaining period of court supervision. Full deployment and durable use of CQIT cannot be completed before full remediation of the accuracy and reliability of defendants' data reporting is finished. That process is underway; currently, the Special Master's newly hired data expert is obtaining and evaluating relevant data to assist in guiding the necessary corrective action. Therefore, it is premature to set a deadline for full implementation and durability of the continuous quality improvement process or by extension the Program Guide overall at this time.

¦ First, allow a period of six months for defendants, under the supervision of the Special Master who may seek input from plaintiffs as appropriate, to update the key indicators in CQIT to reflect any changes required by the 2018 Update to the Program Guide;

¦ Second, confirm that the updated list of key indicators in CQIT that pertain to Program Guide requirements may properly be considered a comprehensive list of the material provisions of the Program Guide, that, taken as a whole and met at the requisite degree of compliance, signal constitutionally adequate compliance with the Program Guide; and

¦ Third, confirm that a 90 percent compliance rate for each key indicator for which the court has not previously expressly established a different compliance requirement will indicate, as to that key indicator, the constitutional minimum has been met.

In directing this briefing, the court reminds all parties that a substantial amount of time and effort has gone into development of all of the remedies in this action, including the all-important CQIT and, more generally, the entire continuous quality improvement process. The Special Master has provided extensive guidance in his many monitoring and other reports. The parties are responsible for understanding the complete history of and record in this action. The direction contained in this order is neither an invitation nor an opportunity to reinvent the wheel, including through revisiting the set of key indicators agreed to in 2012 and 2013, except as minimally necessary to bring them current with the 2018 Update to the Program Guide; nor is it an invitation to 26 depart from the law of the case. Rather, the court's present order provides *26 direction to complete a necessary task, the seeds of which are firmly embedded in the work that began nearly a quarter of a century ago.

As a comprehensive tool for monitoring the key remedies in this case, CQIT is also appropriate for use in measuring institutional compliance with the court-approved custody remedies. In the briefs required by this order, the parties shall also address why the court should not require the following as interim steps toward full and durable implementation of the Compendium:

¦ First, allow a period of six months for defendants, under the supervision of the Special Master who may seek input from plaintiffs as appropriate, to identify key indicators for CQIT to reflect the material provisions of the Compendium;

¦ Second, confirm that the updated list of key indicators in CQIT that pertain to the Compendium may properly be considered a comprehensive list of the material provisions of the Compendium, that, taken as a whole and met at the requisite degree of compliance, signal constitutionally adequate compliance with the Compendium; and

¦ Third, confirm that a 90 percent compliance rate for each key indicator, for which the court has not previously expressly established a different compliance requirement will indicate, as to that key indicator, the constitutional minimum has been met.

 casetext

B. The Seven General Goals

As discussed above, the seven general goals are significant projects in aid of full implementation of the two primary remedial plans in this action, the Program Guide and the Compendium. Two of the goals, staffing and transfer to inpatient care, are already the subject of the court's enforcement orders and deadlines have been set for completion of two others, suicide prevention and custody collaboration. The status of the remaining three is addressed below. *27

27

1. Review of and compliance with all elements of defendants' Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days.

The parties should address why the compliance rate for this goal should not be confirmed at 90 percent, consistent with the court's August 30, 2012 order. Further deadlines must await completion of data and quality assurance remediation. The court anticipates discussing the schedule for completion of this remediation at the final quarterly status conference of this year, which the court now sets for Friday, December 18, 2020, at 10:00 a.m.

2. Complete the construction of mental health treatment space and beds for inmates at varying levels of care

The Program Guide sets out four distinct levels of mental health care provided in CDCR's mental health services delivery system. See ECF No. 5864-1 at 9-11. The three higher levels of care, Enhanced Outpatient Program (EOP), MHCB and inpatient care, have for more than a decade been the subject of focused planning and construction efforts. See, e.g., Defendants' Court-Ordered Detailed Long-Range Bed Plan, ECF No. 3724-1. Defendants use mental health population projection reports prepared twice a year to forecast future need for necessary mental health treatment space and beds. See, e.g., July 9, 2009 Order, ECF No. 3629 (requiring defendants to renew contract with mental health program population consultant).

In July 2019, the court identified a key remedial task remaining in this action as completion of "a sufficient number of licensed MHCBs so that defendants can take [all] remaining temporary MHCBs offline and accomplish the required timely transfers to regional MHCBs" operating, as required, in licensed facilities. ECF No. 6212 at 11. As the court has indicated to the parties, it anticipates issuing an order shortly requiring defendants to conduct an unmet bed need study, under the guidance and supervision of the Special Master, as an essential component of determining whether defendants have a sufficient number of inpatient hospital beds and MHCBs. This unmet bed need study will also be an essential first step in assessing the durability of defendants' bed planning process. ///// *28

28

3. Refine and implement MHTS.net to its fullest extent and benefit.

The Mental Health Tracking System (MHTS.net) was the name previously given to defendants' electronic mental health information tracking system; it has been replaced by the Electronic Health Records System (EHRS). See ECF No. 5864-1 at 575-79 (March 26, 2018 Memorandum updating all Program Guide references to MHTS.net to refer to EHRS). Going forward, all discussion of this goal shall refer to progress on refinement and implementation of EHRS. As noted above, proceedings on the Golding Report called into question the accuracy and reliability of defendants' data management and quality assurance programs. Although work is ongoing, defendants' completion of this goal must await complete remediation of those data management and quality assurance issues. The court also will review the status of this goal at the last quarterly status conference for this year, on the date set in this order.



## VI. CONCLUSION

In this order, the court reviews and confirms the remedial framework for this action and the road map to the end of federal court oversight. It identifies and confirms those areas in which compliance standards have been set and, in some instances, enforcement ordered. It identifies CQIT's "key indicators" as the functional equivalent of "benchmarks" that, as used in this order, signify the material provisions of the Program Guide and the Compendium that must be durably implemented at a degree of compliance the court will confirm in a subsequent order. It invites narrow briefing on whether additional remedial measures are ripe for establishment of compliance standards or deadlines for completion.

The Eighth Amendment violation here is undeniably "complex and intractable." And "'many of the problems giving rise to this suit and ongoing efforts at remediation arise from the inevitable tensions created by the distinct needs of custody supervision and the distinct need for mental health care.'" *Coleman v. Newsom*, 424 F. Supp. 3d 925, 958 (E.D. Cal. 2019) (quoting *Coleman v. Brown*, 28 F. Supp. 3d at 1073 n.5). In moving toward full and durable implementation of and compliance with the remedies in this action it is important to bear in mind that the Eighth Amendment remedies in this case have been developed in the context of California's 29 prison system. For most of the remedial phase of this action, at least, California's *29 prisons have been overcrowded and the number of seriously mentally ill inmates has climbed. While the overall prison population has declined,[13] seriously mentally ill inmates continue to comprise approximately thirty-one percent of the total prison population,[14] and serious questions remain about whether the number of seriously mentally ill inmates exceeds the resources the prison system can bring to the daunting task of providing adequate mental health care in a prison context.

[13]  In the wake of the COVID-19 pandemic, defendants voluntarily undertook additional measures to reduce the general prison population. It is unclear whether the population reductions caused by these additional measures will be permanent.

[14]  As of Tuesday, September 1, 2020, defendants reported to the Special Master a total of 30,490 inmates in the MSHDS.
--------

Because of the significant ongoing implementation tasks that remain, the court is not in a position to consider how long a fully implemented remedy must be sustained for the court to find the remedy, once achieved, is durable. Such a determination must await a future date, once all the trend lines demonstrate compliance is reliably taking hold.

Finally, the court emphasizes this order merely reviews what the court has previously decided, providing a compilation and synthesis in order to avoid the need for revisiting the contours of the established and comprehensive remedy in this case. This review demonstrates there are relatively few remaining areas where the remedial requirements may need clarifying, following the parties' input. Even as the court elicits that input, it is implementation of the remedy that must remain defendants' primary focus.

In accordance with the above, IT IS HEREBY ORDERED that:

  1. The parties shall file the briefs directed by this order within sixty days; and

  2. The fourth quarterly status conference for 2020 is set for videoconference on Friday, December 18, 2020 at 10:00 a.m.

DATED: September 2, 2020.



/s/

30  CHIEF UNITED STATES DISTRICT JUDGE *30

## ATTACHMENT A

31  *31

# ORIGINAL LIST OF SUICIDE PREVENTION MEASURES
# ORDERED BY COURT ON FEBRUARY 3, 2015

I. Suicide Prevention Training (1) Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.] (2) Expand the length and content of the annual "Crisis Intervention and Suicide Prevention" training workshop to include the topics described above; (3) Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training, and (4) Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel. II. Initial Health Screening and Receiving and Release Unit Environment (5) The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?"; (6) Intake screening should be conducted only in the nurse's office within a reception and receiving (R&R) unit; (7) The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and (8) Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a 32 safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality III. Suicide Risk Evaluations (SREs) (9) CDCR should revise its SRE Mentoring Program to ¦ eliminate its "graduation" component after completion of two adequate assessments, ¦ conduct ongoing mentoring throughout the year, and ¦ audit clinicians' SREs on a regularly scheduled basis. (10) Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis. IV. 30-Minute Welfare Checks in Administrative Segregation, Security Housing Units (SHUs), and Condemned Units (11) Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at Pelican Bay State Prison and at the California Health Care Facility (Phase 3, per the directive). V. Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units (12) CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status). (13) CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours. (14) Any inmate discharged from suicide observation status and arriving in administrative segregation from either a Mental Health Crisis Bed or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan. 33 (15) Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled. They should be placed in suicide-resistant, retrofitted cells. (16) Based on current data indicating that risk of suicide in administrative segregation extends well beyond the

first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates. VI. Treatment Planning for Suicidal Inmates (17) CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning contained in the SREs section above; and (18) CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above. VII. Perception of Suicidal Inmates as Manipulative (19) The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar. VIII. Psych Tech Practices (20) CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs. 34 IX. Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates (21) CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch. (22) CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure. X. Use of "Alternative Housing Cells" and Outpatient Housing Units (OHUs) for Suicidal Inmates (23) The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide-resistant. (24) Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB. (25) Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk. (26) Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed. XI. Outpatient Housing Unit/Mental Health Crisis Bed Discharge and Efficacy of Five-Day Clinical Follow-Up and 60-Minute Custody Welfare Checks (27) The "Interdisciplinary Progress Note - 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the 35 "Interdisciplinary Progress Note" utilized at the California Training Facility (CTF) that allows clinicians to use a separate sheet for each day of follow-up. (28) All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. (29) The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan. No other frequency of observation should be authorized. (30) All inmates discharged from an MHCB or alternative housing and immediately re-housed in an administrative segregation unit should only be placed in a suicide-resistant, retrofitted cell for a period to be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan. (31) Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing suicidal ideation and/or engaging in self-injurious behavior. XII. Local Suicide Prevention and Response Focused Improvement Teams (32) CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool. XIII. Corrective Actions to Address

Additional Miscellaneous Issues (33) CDCR, under the guidance of the Special Master within the Suicide Prevention Management Workgroup, should examine and consider taking corrective actions to address the problems identified in the attached Report in the following areas: ¦ Forms for Documentation of Observation ¦ Non-Suicide-Resistant Mental Health Crisis Beds ¦ Privileges for Inmates in Mental Health Crisis Beds ¦ Informal Recommendations Within CDCR Suicide Reports 36 ¦ Frosted Exterior Cell Windows and Sensory Deprivation ¦ High Refusal Rates for New Admit Screens in Administrative Segregation

 casetext

**CRIMINAL REPORT**

| | **FBI Task Force Officer / Investigator** | |
|---|---|---|
| To: Todd Riebe<br>District Attorney<br>County of Amador | Name:        **Chuck King**<br>Title:         **Special Agent**<br>Location:    **Internal Affairs –Northern Region** | |
| | **Case Number:**<br><br>282-SC-3010584 | **Date:**<br><br>**August 8, 2019** |

**SUSPECT:**     Name:                  Joe Alberto LIZARRAGA
Classification:    Warden
Location:            Mule Creek State Prison
Date of Birth:
SSN:
Address:
CII:

## SUMMARY:

On September 14, 2018, a well-dressed male with dark hair went to the Interfaith Food Bank (IFB) Thrift Shop located at 460 Hwy 49, Sutter Creek, CA. While there the man purchased a number of winter snow sports items. Later, upon examining the sales receipts, Store Manager ████ ████ learned the sale to the man was seriously under charged.

████ reviewed the sales receipt, and credit card transaction receipt associated with the sale and determined the sale resulted in the payment of approximately $127.00 by Joe LIZARRAGA for what she identified as approximately $1100.00 worth of merchandise.

████ then reviewed the video tape which revealed LIZARRAGA loading the snow sports equipment into a shopping cart and taking the items to the cash register.

While watching the video replay, ████ noted the man purchased three snowboards, three pair of Ski boots, two sets of ski poles, three sets of skis. ████ also noticed the man took one snow board out of a snow board protective bag, thus removing the affixed price tag. The man discarded the bag in the immediate area, leaving the snow board without a price tag.

Store employee ████ ████ processed the man's purchase and processed his payment via credit card. ████ said she did not see price tags on the items. ████ said LIZARRAGA told her other snow boards like the snow boards he was purchasing were priced at $25.00 each so she sold them to him for $25.00 each. ████ said LIZARRAGA told her what to charge him for each item.

On September 17, 2018, ████ and ████ reported the crime to the Amador County Sheriff's Department who referred them to the Sutter Creek Police Department (SCPD). SCPD Officer M. Brewer, along with Sergeant W. Glaister and Chief J. O'Connell completed the investigation

(SCPD report # 18-438) and referred an "Information Only" report to the Amador County District Attorney's office who ultimately rejected prosecuting the criminal act. At some point, after the crime had been reported, ▇ and ▇ discovered LIZARRAGA was the Warden of Mule Creek State Prison (MCSP).

**CHARGES:**



1.

2.

3. It is alleged that on, or about, January 10, 2019, Joe LIZARRAGA directed a payment of $660.30 to the Interfaith Food Bank Thrift Shop, a violation of California Penal Code, Section 137(a) (Bribery of a witness) (Felony).

**INVESTIGATION:**

*Investigator's Note: The information contained within this report is a summary of this investigation. For specifics and full details, refer to the actual exhibits and other case related information.*

**REVIEW OF ANONYMOUS EMAIL LETTER**

I reviewed an email authored by an anonymous individual, dated September 28, 2018 (Exhibit 1). The following is my synopsis of the information provided:

On or about September 28, 2018, California Department of Corrections and Rehabilitation (CDCR), Office of Internal Affairs (OIA) received an anonymous email letter informing CDCR OIA of alleged criminal misconduct by MCSP Warden J. LIZARRAGA. The email indicated it was sent by ▇ via ▇ on September 28, 2018, at 08:56 hours.

The letter indicated MCSP Warden J. LIZARRAGA went to the IFB Thrift Shop on September 14, 2018, and removed price tags from merchandise, or did not pay for merchandise. The email states the owner put the surveillance video of the incident of Facebook then was removed when the store owner discovered the perpetrator (LIZARRAGA) was the Warden of MCSP. The document further states the prosecution of LIZARRAGA was not pursued by the store owner for fear of losing business in that a large number of the MCSP employees are local patrons.

Criminal Report Number 282-SC-3010584
Page 3 of 39

Refer to the letter for complete detail.

**INQUIRY ASSIGNMENT**

In response to the letter, OIA Special Investigations Unit (SIU) Senior Special Agent (SSA) R. Ivicevich began conducting an inquiry into the allegations that included attempting to collect the thrift shop surveillance video as evidence and any other relevant information.

**MEMORANDUM AUTHORED BY SENIOR SPECIAL AGENT R. IVICEICH**

I reviewed a memorandum authored by OIA Senior Special Agent R. Ivicevich, dated January 24, 2019 (Exhibit 2). The following is my synopsis of the information provided:

On September 28, 2018, SSA (A) Kyle Clanton sent an email to SCPD Chief Jim O'Connell requesting a copy of the video evidence as soon as possible. O'Connell did not respond to the request. Clanton spoke with a Sergeant from SCPD, and learned the investigation into the matter had been concluded. The Sergeant would not provide any additional details about the investigation, other than to state the evidence had been secured. Clanton also left a voice message for O'Connell which was not responded to.

On October 1, 2018, Ivicevich sent an email to O'Connell requesting copies of any information, including a copy of the store video. O'Connell did not respond to the request.

On October 2, 2018 Ivicevich drove to SCPD and requested to speak with O'Connell. Ivicevich and O'Connell spoke alone in the SCPD building. O'Connell stated the report would be sent to the Amador County District Attorney's (DA) Office, specifically Chief Deputy District Attorney (CDDA) Rob Trudgen. O'Connell declined to provide Ivicevich with a contact number for Trudgen. Ivicevich asked O'Connell if LIZARRAGA had been interviewed by his agency, and was informed that O'Connell conducted the interview himself. Ivicevich asked to see the store video but O'Connell said that he could not show him the video because he did not know how to retrieve it from the system. O'Connell said he would only share the report with Ivicevich if he received permission from Trudgen to do so. O'Connell wanted to know how the matter came to the attention of OIA. Ivicevich did not disclose the source of the information.

On October 10, 2018, Ivicevich emailed O'Connell and asked if the matter had been referred to the DA, and again requested a copy of the police report and the store video. Ivicevich asked if a more formal request was necessary.

On October 11, 2018, O'Connell responded to Ivicevich, verifying the report was completed and sent to the DA. O'Connell stated he would not release the documents until the DA had completed their review. O'Connell said he would process the request for the report at that time (with no mention of the video).

On October 12, 2018, Ivicevich emailed O'Connell and informed him that he had spoken with CDDA Trudgen, and that Trudgen had no issue with SCPD providing copies of the report and

store video to CDCR OIA at that time.

On October 17, 2018, Ivicevich emailed O'Connell, again asking if had considered Ivicevich's request dated October 12, 2018. O'Connell responded, stating he would not release the report until he received notification from the DA as to the adjudication of the case, and stated the same applied to the release of the store video. O'Connell stated he would arrange for OIA to review the report, but would not provide a copy. O'Connell asked which of Ivicevich's superiors tasked him with this investigation.

Also on October 17, 2018, Ivicevich emailed O'Connell and reminded O'Connell that he initially agreed to release the information if Ivicevich received permission from the DA. Ivicevich informed O'Connell that he would be at Cal-Fire on October 18, 2018 for range training (close proximity to the SCPD) and would like to review the report and store video while in the area. O'Connell did not respond.

On October 18, 2018, Ivicevich drove to SCPD at approximately 1025 hours and requested to speak to O'Connell. O'Connell told Ivicevich he didn't have time to show him the report, and would get back to him with a time to do so. O'Connell said he had not decided if he would allow Ivicevich to view the video, which was a decision he made of his own authority, because he considered the video as evidence. Ivicevich explained to O'Connell that CDCR is obligated by statute to conduct the inquiry, and the matter would require CDCR to adhere to a mandatory confidentiality policy. Ivicevich also expressed that he had never encountered this level of difficulty in obtaining information from another law enforcement agency. O'Connell did not contact Ivicevich to set up a time to review the report.

On October 23, 2018, Ivicevich prepared an administrative subpoena addressed to SCPD requesting they provide the report and video by October 30, 2018, at 0900 hours. Ivicevich drove to SCPD to deliver the subpoena. O'Connell was busy with a serious incident and was not available. Instead, Ivicevich spoke with City Manager Amy Gedney and served her with the subpoena, and also explained the unusual difficulty OIA was experiencing with obtaining the information.

On October 29, 2018, O'Connell sent an email to Special Agent In-Charge (SAC)(A) Sergio Calvillo, stating he was expecting written notice from the DA within a few days regarding their decision on whether to prosecute or not. O'Connell informed OIA that Ivicevich could come to SCPD on October 31, 2018, at 0900 to review the report. O'Connell clarified that if he received a decline to prosecute notice from the DA prior to October 31, 2018 that he would provide me with a redacted copy of the police report.

On October 29, 2018, Calvillo responded via email to O'Connell thanking him for allowing OIA to review the report. Calvillo asked for clarification, specifically, if the offer would include allowing Ivicevich to review the video. Calvillo explained the decision to only allow Ivicevich to receive a redacted copy of the report was out of the ordinary since CDCR is a law enforcement agency, and has always received the entire un-redacted report. Calvillo also stated that the DA's decision to accept the case for prosecution did not address CDCR's legal obligation to investigate

Criminal Report Number 282-SC-3010584
Page 5 of 39

the alleged illegal activity of an employee.

Refer to the memorandum for complete detail.

## REVIEW OF ANONYMOUS EMAIL LETTER

I reviewed an email authored by an anonymous individual, dated October 22, 2018 (Exhibit 3). The following is my synopsis of the information provided:

On or about October 22, 2018, CDCR OIA received an anonymous email letter informing CDCR of alleged criminal misconduct of MCSP Warden J. LIZARRAGA. The email indicated it was sent by ████ via ████████████ on October 22, 2018, at 13:24 hours.

The letter's author indicated they had written previously, then stated Warden LIZARRAGA's demeanor had changed for the worse, causing the author to speculate LIZARRAGA had been notified of an investigation. The author went on to say multiple forms of communication had been used by individuals attempting to notify CDCR Administration of LIZARRAGA's alleged criminal misconduct.

Refer to the email for complete detail.

## CASE ASSIGNMENT

On October 30, 2018, Federal Bureau of Investigations (FBI) Special Agent (SA) Sean Lister and I, OIA SA / FBI Task Force Officer (TFO / SA) Chuck King were asked by CDCR OIA to attempt to acquire a copy of the store video and a copy of the SCPD report.

## INTERVIEW OF STORE MANAGER ██ █████████

On October 30, 2018, SA Lister and I went to the IFB Thrift Shop with the intent of requesting a copy of the thrift shop surveillance video data which to that point had not been acquired through the SCPD, as requested of them. Upon making contact with store manager █████ █████ she offered to provide us her account of the issue. The following is my synopsis of the information provided by ████ (Exhibit 4):

According to ████ her son █████████ acquired several snow boards and some other nice snow sports equipment for the thrift shop. ████ son is an avid winter sports athlete and marked the sale price on each of the items. ████ recalled three snow boards were priced $350.00, $250.00 and $150.00 respectively. Kepler also recalled snow boots being priced at $107.00 and $104.00 per pair, ski poles to be sold for $20.00 per pair and used skis to be sold for $25.00 per pair. ████ stated she reviewed the items sold and indicated they should have sold for just short of $1200.00. ████ said she knew this because her and her son took great time researching the price of these specific items before pricing them, trying to make as much money as they could for the thrift shop and ultimately the food bank. The new snow board had plastic wrapped



around it and the price tag was affixed to the plastic. ▇▇▇ had conversations with the thrift store vice president named ▇▇▇▇▇. ▇▇▇▇ told ▇▇▇ the items were priced too high to sell. ▇▇▇▇ disagreed, having faith in her son's knowledge of the items' worth.

▇▇▇▇ continued by saying a well-dressed man came into the thrift shop approximately one week prior to the incident date and looked at the winter snow sports equipment. The man complained to the store employees that the prices were too high on the snow sports equipment. The man left without purchasing anything. ▇▇▇ later indicated she believed that man to be LIZARRAGA.

On or about September 17, 2018, ▇▇▇ was told the snow sports items had all sold. ▇▇▇▇ said in their excitement they looked at the sales receipts for the day the items were purchased and then were concerned because the day's sales receipts barely covered what they should have received for the snow sports equipment by itself. A review of the credit card receipts revealed the items were sold for a total sale price of $147.00 to Joe Lizarraga. ▇▇▇▇ recalled the sales receipt indicated the snow boards were sold for $25.00, $25.00, and $20.00 respectively, the ski poles for $10.00 each, and the ski boots for $20.00 per pair. Kepler reiterated the items should have sold for in excess of $1100.00 as marked on the price tags.

▇▇▇▇ stated she and Chief Executive Officer (CEO) ▇▇▇ ▇▇▇ reviewed the video surveillance tape and watched the events. ▇▇▇ recalled the same man had come in previously, complaining about the pricing of the snow boards and other snow sports items. He came back wearing a dress shirt and vest on September 14, 2018, at about 1 pm. He looked throughout the store and eventually looked at the snow sports equipment again. He retrieved a shopping cart and returned to the sports equipment. He looked at quite a few items, most of which were winter snow sports related, and began placing some of the items in the shopping cart.

At one point the man looked at a snow board that was new, and wrapped in a plastic sleeve. The price tag was affixed to the plastic. The man took the plastic sleeve off of the snow board thus removing the price tag. The man wadded the plastic sleeve up and threw the plastic in a barrel near the snow sports equipment. The man took the shopping cart to the front of the store and checked out through cashier ▇▇▇ ▇▇▇ ▇▇▇ said ▇▇▇▇ did not check the items price tags, but charged what the man said the price was. LIZARRAGA paid using a credit card and left the store.

▇▇▇▇ said ▇▇▇ called the SCPD and filed a report which was taken by a young police officer. The same officer returned and collected the credit card receipt, the plastic removed from the snow board, and a copy of the surveillance video tape. ▇▇▇ said ▇▇▇▇ chose to post a picture of the suspect on the front counter by the cash register, the same as she does every time someone writes a bad check. ▇▇▇ said someone took a photo of the photo and posted it on Facebook, asking the identity of the individual. People coming in the store understood what this photograph meant and someone

eventually identified the suspect as MCSP Warden Joe LIZARRAGA. ▮▮▮▮ said ▮▮▮▮ was very upset at the loss of profit but eventually chose to decline to prosecute the suspect for fear that support of the Warden would impair their ability to collect donations and ultimately hurt the thrift shops income. ▮▮▮▮ said the employees and citizens learned of this and became even more upset.

▮▮▮▮ went on to say three men came to inquire about the crime after it occurred. ▮▮▮▮ said the Sutter Creek officer came in two times then the chief of police came in with a well-dressed, tall gentleman who identified himself as an Internal Affairs Investigator.

I tried to attempt to clarify with ▮▮▮▮ the identity of the internal affairs investigators but was unable. ▮▮▮▮ was adamant it was not a DA investigator, and was certain the man said he was an internal affairs investigator.

Refer to the digital recording for complete detail.

## INTERVIEW OF INTERFAITH FOOD BANK THRIFT SHOP CASHIER ▮▮▮▮

On October 31, 2018, SA Lister and I went to the residence of cashier ▮▮▮▮ ▮▮▮▮ and conducted a digital audio recorded interview of her (Exhibit 5). The following is my synopsis of the information provided by ▮▮▮▮

▮▮▮▮ said the store policy is no items can be sold without the price tag and a colored dot on it. The colored dot represents the age of inventory.

▮▮▮▮ recalled LIZARRAGA as wearing a white shirt and vest. ▮▮▮▮ said LIZARRAGA came to the cash register with a shopping cart full of items. ▮▮▮▮ said LIZARRAGA should have removed all of the items from the cart for her to ring them up. In this case he did not remove all of the items from the cart. ▮▮▮▮ said she did not see price tags on the items. ▮▮▮▮ said LIZARRAGA told her other snow boards like the snow boards he was purchasing were priced at $25.00 each so she sold them to him for $25.00 each. ▮▮▮▮ said LIZARRAGA told her what to charge him for each item.

▮▮▮▮ said she listened to LIZARRAGA about the pricing knowing she shouldn't be selling the items without price tags, and knowing it is the store's policy to not sell anything that is not priced, but she did so anyway.

▮▮▮▮ said she has not been interviewed by any other law enforcement officers.

Refer to the digital recording for complete detail.

## INTERVIEW OF INTERFAITH FOOD BANK THRIFT SHOP CHIEF EXECUTIVE OFFICER ███

On October 31, 2018, SA Lister and I conducted a digital audio recorded interview of IFB CEO ███ ███ (Exhibit 6). The following is my synopsis of the information provided by ███



███ said she reviewed the video upon learning the receipts were short of what they should have been for September 14, 2018. Upon reviewing the video she determined ███ ███ processed LIZARRAGA's sales transaction. When ███ learned what had occurred, she called the Amador County Sheriff's Office (ACSO) to report the incident. The ACSO referred her to the SCPD.

███ said SCPD took a report to document the incident. ███ said the SCPD also took the receipt tape which displayed the transaction itemization. ███ said she told them she did not want to pursue the case at that time but the officer told her she had no choice, that the DA wanted it.

███ said she also received a call from the Sacramento Bee inquiring about the issue. ███ said she did not discuss the incident with them, denying their allegation of a theft occurring at the IFB Thrift Shop.

███ said LIZARRAGA called her on several occasions to try to get ahold of her. When she did talk to LIZARRAGA, ███ apologized to him for posting his picture. LIZARRAGA asked her who posted his picture on the computer or on Facebook. LIZARRAGA asked if ███ posted it. ███ responded no. LIZARRAGA then asked how ███ knew ███ didn't do it. ███ told him she had asked her and ███ does not lie.

LIZARRAGA told ███ he felt bad and asked what he could do. ███ told him he could pay for the snowboards, meaning pay the shortage. Lizarraga offered to pay for the difference in the snowboard that was priced at $150.00 but did not offer to pay for the rest. ███ said she was flustered and did not speak up, but later was upset he did not offer to pay for everything. Stanton said she just wanted it be over with. ███ said she has never prosecuted anybody that has stolen from the IFB or bounced a check to the IFB because she figured they must need it or they would not have done it. ███ then said, "Who steals from a food bank? My God! That's crappy."

███ said their policy is to not sell any item unless it is marked with a price and that ███ made a huge mistake by selling the items to him without price tags.

After completing the digitally recorded interview of ███ she indicated she wanted to amend her statement. I told her I needed to reactivate the digital audio recorder. ███ told me she did not want what she had to say to be recorded. ███ indicated she was very apprehensive about trusting us, and that she did not want what she said to show up in the newspaper or on social media.



████ said she talked to LIZARRAGA on the phone. ████ indicated to LIZARRAGA her concern for the public view of the thrift shop, and that she felt a financial loss as a result of what had occurred. LIZARRAGA told her he would pay for the difference in the lesser expensive snow boards. ████ suggested to him that he could make a donation to the thrift shop or food bank to offset the losses incurred by the transaction. Lizarraga told her he could not do that at this point because it would look bad for him. ████ was upset at LIZARRAGA's "selfishness," looking out for his self rather than truly trying to make amends. ████ took whatever money she could get to help ease the loss but said she felt as though LIZARRAGA was stealing the rest from them.

████ said a check from LIZARRAGA arrived several days after their phone conversation, that she did not cash the check. ████ voluntarily relinquished the check and envelope to me as evidence. The check was in an envelope addressed from LIZARRAGA, to ████ at the IFB. The check was made out to the Interfaith Food Bank Thrift, in the amount of $125.00. The check is dated September 29, 2018, and was mailed on October 1, 2018. The items were later placed into evidence at CDCR Evidence.

████ said the police chief came in and saw ████ by himself, but she understood the Police Chief also came in with someone else on another occasion.

Refer to the digital recording for complete detail.

## RECEIPT OF A REDACTED COPY OF SUTTER CREEK POLICE DEPARTMENT REPORT # 18-438

On October 31, 2018, SSA Ivicevich met with Chief O'Connell. Chief O'Connell allowed SSA Ivicevich to view the store video and provided Ivicevich with a redacted copy of SCPD Report # 18-438. Chief O'Connell refused to provide a copy of the store video to SSA Ivicevich.

Refer to the report for complete detail.

## COLLECTION OF VIDEO EVIDENCE

Per my request, due to questions about the timing of specific events relevant to the theft, Special Agent / FBI Task Force Officer Gary Viegas went to the IFB Thrift Shop and acquired to entirety of the store video with the proprietor's consent on November 1, 2018, (Exhibit 7).

Refer to the report for complete detail.

## REVIEW OF ANONYMOUS EMAIL LETTER

I reviewed an email authored by an anonymous individual, dated November 8, 2018 (Exhibit 8). The following is my synopsis of the information provided:

Criminal Report Number 282-SC-3010584
Page 10 of 39

On or about November 8, 2018, CDCR OIA received an anonymous email letter informing CDCR of alleged criminal misconduct of MCSP Warden J. LIZARRAGA. The email indicated it was sent by ▮▮▮▮ via ▮▮▮▮▮▮▮▮ on November 8, 2018, at 13:39 hours.

The letter's author indicated they had written multiple letters and other communications and relayed an alleged growing attitude of concern, dissatisfaction, and dismay over LIZARRAGA's alleged criminal misconduct and a general belief that not enough was being done to satisfy the management staff working at the prison, to resolve the issue.

Refer to the email for complete detail.

## TELEPHONE CONVERSATION WITH AMADOR COUNTY DISTRICT ATTORNEY T. RIEBE

On November 15, 2018, I contacted Amador County DA Todd Riebe via telephone. I requested an update on the DA's review of the referral from SCPD. Mr. Riebe told me CDDA R. Trudgen had reviewed the case and recommended the case not be filed against LIZARRAGA.

Mr. Riebe indicated this case was all about a $150.00 snow board and that he understood the victim had been "made whole" with a payment of $125.00 from LIZARRAGA. Mr. Riebe further stated that he understood LIZARRAGA was going to resign on November 30, 2018. Mr. Riebe asked me if I had any information to support or refute that information. I indicated I had heard no such report, and suggested LIZARRAGA would not resign, rather retire if anything. Mr. Riebe stated, "That is bad enough."

Mr. Riebe further stated that his office had been advised that the victim (IFB) had been "made whole" by the Warden and that the IFB did not desire prosecution. As a result, Amador County DA's office declined to prosecute at this time. I requested DA Riebe send me an email stating such. The email arrived at approximately 14:33 hours on that same date.

## REVIEW OF EMAIL AUTHORED BY AMADOR COUNTY DISTRICT ATTORNEY T. RIEBE

I reviewed an email authored by Amador County District Attorney Todd Riebe (Exhibit 9). The following is the verbiage sent, verbatim:

*Mr. King,*

*I spoke with Sutter Creek Police Chief O'Connell, who informed me that 2 weeks ago he gave a copy of the police reports to Rich Ivicevich, Senior Special Agent, Special Investigations Unit, with the CDCR Office of Internal Affairs. Agent Ivicevich was also allowed to view the video filmed by a customer at the thrift store who saw what the Warden was doing and recognized the Warden.*

*Our office has been advised that the victim has been made whole by the Warden and does not*

*desire prosecution. As a result, we have declined to prosecute at this time.*

*Todd Riebe*
*District Attorney*

Refer to the email for complete detail.

### REVIEW OF SUTTER CREEK POLICE DEPARTMENT REPORT # 18-438

On November 15, 2018, I received a copy of the redacted SCPD Misdemeanor
Report #18-438, relevant to suspect J. LIZARRAGA, from SSA Ivicevich (Exhibit 10). ▮▮▮▮

1. Page #3, Evidence list - Itemizes one (1) Burton Snow Board as stolen. The board is valued at
   $150.00.
   a) It is not noted as to whether the snow board is in evidence or is an item stolen and
      unrecovered.
   b) None of the other items involved in this incident are noted or valued.

2. Page #3, Evidence List – Does not include the cash register receipt which is displayed as
   evidence on Page #2 of the Images section.
   a) The receipt clearly documents eleven items were transacted, all of which were reported
      stolen by ▮▮▮ and ▮▮▮ to SCPD on multiple occasions as listed.

3. Page #6, The report written by Glaister states he confirmed with ▮▮▮ that "the store did not
   wish for prosecution and that ▮▮▮ told him, "No, that the store did not want him
   prosecuted but did want him shamed for stealing, especially since he is a law enforcement
   officer. Glaister also wrote, "It should be noted that in my previous dealings with ▮▮▮ she
   had the authority to not only provide me with any and all video footage from crimes but also
   to make the decision on whether they wished for prosecution for the incident. Nothing in our
   conversation led me believe that she no longer had this authority."

4. Page #8, A statement made by LIZARRAGA to SCPD Chief J. O'Connell which indicates
   LIZARRAGA did not tell the cashier what to charge, that she charged what she wanted was
   not verified or refuted through interview of the cashier.

5. According to the SCPD report, the video data was provided to the SCPD and reportedly
   viewed immediately before they interviewed LIZARRAGA. SCPD asked LIZARRAGA if he
   told ▮▮▮ what to charge but he denied doing so. SCPD did not question him as to why the

Criminal Report Number 282-SC-3010584
Page 12 of 39

video shows him touching the boards and speaking while touching each one, nor did they report it in their report to the DA. SCPD also failed to interview the cashier to confirm or deny LIZARRAGA's assertion and the video evidence.

6. It is stated within the report that it was sent to the District Attorney's office as an "Informational report," not a crime report, yet it is represented as a criminal referral to CDCR OIA.

Refer to the report for complete detail.

## SECOND INTERVIEW OF INTERFAITH FOOD BANK THRIFT SHOP MANAGER ▮▮▮▮

On November 19, 2018, SA Lister and I returned to the IFB Thrift Shop and conducted digital audio recorded interview of ▮▮▮ (Exhibit 11). The following is my synopsis of the information provided:

▮▮▮ was asked to clarify whether she made contact with SCPD to file the theft report. ▮▮▮ confirmed she and ▮▮▮ did make contact with the SCPD. ▮▮▮ said she discussed the transaction as a third party in that she was not present during the theft. ▮▮▮ said she reviewed the video of the incident on the store surveillance system with the SCPD officer and discussed the number of items taken (▮▮▮ stated eleven but video evidence proves twelve items), as well as the marked price of the items. ▮▮▮ said she told the officer the total loss of profit was approximately $1100.00.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ said the officer took a photocopy of the receipt that detailed the items taken.

▮▮▮ was asked if she had the authority to make the decision to prosecute someone who had stolen from the store. ▮▮▮ stated, "No," but added that she thinks the suspect should be prosecuted. Kepner was asked if she had ever asked the police department to prosecute a customer for any reason. ▮▮▮ stated, "No." ▮▮▮ was asked if the food bank had ever prosecuted any offender. ▮▮▮ stated, "No." ▮▮▮ was asked if SCPD asked her to make a decision to prosecute this offender. ▮▮▮ stated "No." ▮▮▮ then clarified the only people authorized to make a decision to prosecute were ▮▮▮ and the food bank board of directors.

Refer to the digital recording for complete detail.

Criminal Report Number 282-SC-3010584
Page 13 of 39

## INTERVIEW OF INTERFAITH FOOD BANK THRIFT SHOP EMPLOYEE█

On November 19, 2018, FBI SA Lister and I conducted a digital audio recorded interview of IFB Thrift Shop employee ████████ (Exhibit 12). The following is my synopsis of the information provided:

████ said he had a hard time remembering the pricing of the snow sports equipment due to the length of time since the incident, but primarily because of other people's recall of the pricing which he described as inaccurate in his mind. ████ said he recalled the items stolen totaled just short of $1,100.00, but his recollection of the specific pricing varied from that of his mother Store Manager████

████ said one of the snow boards was an Avalanche, Sean White Special Edition that retailed new for approximately $1,200.00, another was an Avalanche brand but could not recall any brands of the other items.

████ said he arrived at the pricing by conducting a query of the items on the internet for what they were selling for through other outlets.

Refer to the digital recording for complete detail.

*Investigator's Note: On November 21, 2018, SCPD Chief O'Connell contacted me via cell phone and told me I could have a copy of the report. I arranged to meet with him on November 26, 2018, at his office.*

## REVIEW OF INTERFAITH FOOD BANK THRIFT SHOP VIDEO SURVEILLANCE DATA

On Nov. 24, 2018 I reviewed a portion of the store video data (previously identified as Exhibit 7). LIZARRAGA is seen entering the store at approximately 1310 hours. He wandered around the store a few minutes looking at various items for sale, and eventually made his way to the sports equipment area. Upon arriving at the snow sports equipment, LIZARRAGA used his cell phone and put it in his pocket. LIZARRAGA then began looking at the condition of items and on several occasions is seen grasping the price tags, presumably to determine the price of the item. LIZARRAGA touched the price tag on several items including the tag on the cover on the Burton snow board.

*Investigator's Note: LIZARRAGA touched multiple price tags which indicated he knew what the IFB price tags looked like.*

LIZARRAGA went to the front of the store and retrieved a shopping cart and returned to the snow sports equipment. Upon his return to the sports area he positioned the cart in front of the ski and snow board inventory, between the camera and the merchandise he was looking at. He began surveying equipment and checking price tags. LIZARRAGA placed three snow boards in the cart, two sets of ski poles, a punching bag, three pair of snow ski boots, two of which were in

their original box, three sets of snow skis. LIZARRAGA is seen on video touching and manipulating price tags on the items in several instances. LIZARRAGA removed the cover from one snow board that had the price tag affixed to the cover. LIZARRAGA discarded the cover in the sports room and presented the snow board and other merchandise to the cashier without the cover and price tag. LIZARRAGA appeared to remove a price tag off of a pair of ski poles in video camera view as well. LIZARRAGA took the cart of merchandise to the cashier and waited to check out. He looked at the surveillance camera multiple times while waiting. LIZARRAGA used his cell phone while waiting in line. LIZARRAGA placed the boxes containing ski boots on the counter and left the remainder of the items in the cart. The cashier ( is seen moving to the cart and LIZARRAGA touches several of the snow boards and is seen saying something each time he touches one leading King to believe LIZARRAGA told     what to charge him for those items.

Refer to the video for complete detail.

## RECEIPT OF EVIDENCE FROM SUTTER CREEK POLICE DEPARTMENT CHIEF J. O'CONNELL

On Nov. 26, 2018, upon meeting with O'Connell he took me into City Hall and retrieved a compact disc (CD) from a female employee. O'Connell handed me the CD (Exhibit 13) and stated "Here you go." I asked if he had any other evidence. O'Connell stated he had the video but was not going to give me a copy because it was the property of the thrift shop, and that was all the evidence they had. I asked if O'Connell had any recorded witness statements. O'Connell said he did not. I asked if he had the plastic bag from the snowboard. O'Connell said he did but was not going to give it to me, that it was possible the DA may want to charge LIZARRAGA in the future so he needed to keep it. I asked O'Connell if he had the sales receipt and credit card receipt from the transaction. O'Connell said they did not, that they only received a photocopy of the receipt.

Refer to the compact disc for complete detail.

## CONVERSATION WITH AMADOR COUNTY CHIEF DEPUTY DISTRICT ATTORNEY R. TRUDGEN

On Nov. 26, 2018, after meeting with O'Connell, I went to the Amador County DA office to speak with DA Riebe. Riebe was said to be on vacation. Instead I spoke with CDDA R. Trudgen.

Trudgen went on to explain he made the decision to decline prosecution of LIZARRAGA based upon his review of the SCPD report and the interviews of LIZARRAGA conducted by SCPD.

Criminal Report Number 282-SC-3010584
Page 15 of 39

## REVIEW OF DATA ON COMPACT DISC PROVIDED BY SUTTER CREEK POLICE DEPARTMENT CHIEF J. O'CONNELL

I reviewed the data contained on the CD provided to me by SCPD Chief O'Connell (previously identified as Exhibit 13). The following is my synopsis of the information provided:

Upon returning to my office, I copied the disc provided to me by O'Connell onto my agency computer. The original was later placed into evidence. I reviewed the content of the disc which along with the interviews of LIZARRAGA, also contained a file titled "Thrift Shop." I listened to the audio file titled "Thrift Shop" and heard what appeared to be a surreptitious recording of ▮▮▮▮ (I recognized her voice from previous contact) with Glaister (believed to be) and O'Connell (I recognized his voice from previous contact and other interview audio) also present, and asking questions relevant to the LIZARRAGA case (The following is based upon memory of voice recognition and other evidence. Parentheses are placed in the conversation to identify for clarity):

The recording did not have an official opening stating date, time, or individuals present. The recording started as if the recorder was activated mid conversation. ▮▮▮▮ was immediately asked ▮▮▮▮ question with O'Connell stating, So he paid what he was told?. ▮▮▮ replied, He tells her…she (▮ said he (LIZARRAGA) told her (▮ "This, This, So and So…Her name is ▮▮▮ He (LIZARRAGA) told her (▮ that this is 20 (Dollars), this is 30 (Dollars), this is 25 (Dollars).

Glaister said, "What about the one he (LIZARRAGA) pulled out. How much did he (LIZARRAGA) tell her (▮ that was?" ▮▮ replied, "25 (Dollars)."

Glaister clarified, "So he (LIZARRAGA) told her (▮ it was 25 (Dollars)?" ▮▮ again said, "Yes."

O'Connell then said, "So ▮ (▮ told the officer that she did not want prosecution so we always respect that." Glaister then stated, "But to confirm, as far as you know, the company does not want anything done about this." ▮▮ replied, "That's what she (▮ said, yah. She does not want it so…I got mad at her…I don't like…we are the food bank…we feed a lot of people. It makes me upset that he (LIZARRAGA) would do that. ▮▮ is…(Unintelligible whisper)…but she is a great cashier. He knew. He knew the right cashier to see.

▮▮▮▮ later described the stolen ski boots involved in the incident by saying, "the boots were in the actual box and they were 109 (Dollars) a piece." The price of boots which were three of the items stolen were not listed in the police report forwarded to the DA.

Upon reviewing the LIZARRAGA interviews, I heard LIZARRAGA say many times that he thought the price tag on the snowboard cover was an original price tag, not the price tag from

Criminal Report Number 282-SC-3010584
Page 16 of 39

IFB.

LIZARRAGA also said he purchased the snow equipment for his family to use, that he thought it was still in his possession but could not describe any of it.

LIZARRAGA stated several times the price on the price tags was outrageous (expensive), that the merchandise was not worth those prices, and he would not have purchased it for what they were priced at.

At the end of the recording LIZARRAGA asked what he could do to help clear things up. LIZARRAGA offered to pay the difference of "the" snowboard (only the one costing $150.00) or return "the" snowboard to the store. O'Connell told LIZARRAGA he wanted him to bring "the" snowboard to him to hold until the matter was cleared up.

Refer to the exhibit for complete detail.

## SECOND INTERVIEW OF INTERFAITH FOOD BANK CHIEF EXECUTIVE OFFICER ▮▮▮▮

On Nov. 26, 2018, FBI SA Lister and I met with ▮▮▮▮ at the IFB Thrift Shop (Exhibit 14). The following is my synopsis of the information she provided:

▮▮▮▮ indicated she spoke to a responding SCPD officer, name unknown, who took the original report. Days later, ▮▮▮▮ spoke with the SCPD Chief and an Internal Affairs Investigator, and then the Police Chief came back alone to speak with ▮▮▮▮

On the last visit with the Police Chief, ▮▮▮▮ told him she had been contacted by the Sacramento Bee about the incident involving Warden Joe Lizarraga. ▮▮▮▮ said she did not provide information to the reporter because she did not want negative publicity on the Thrift Store.

Chief O'Connell advised her that she did not have to speak the media, reaffirmed her position not to want to pursue charges against the Warden, but also advised ▮▮▮▮ he would be obligated to discuss the case with the media due to public information act should an investigation occur.

▮▮▮▮ indicated she discussed the price of each item as marked with the responding SCPD Officer, Chief O'Connell, and the Internal Affairs Investigator. ▮▮▮▮ indicated she was angry about the total loss of the transaction, not just the one item, and that there would have been no reason for SCPD to perceive this case being about one snowboard, that it was always about the full eleven items. ▮▮▮▮ recalled the total of the items purchased by Lizarraga was between $1,150.00 and $1,500.00. ▮▮▮▮ knew this because employee ▮▮▮▮ priced the items then had to re-price them after someone had removed the price tags from these specific items. The new price tags were marked with the same prices as the original price tags. ▮▮▮▮ indicated Store Manager

██████ gave the Internal Affairs Investigator (Later determined to be SCPD Sergeant W. Glaister) a copy of the video, the original receipts, and the snowboard cover. ██████ also remembered being told several times another individual she believed to be an unknown Internal Affairs Investigator was trying to get a hold of her but never did.

Refer to the digital recording for complete detail.

## THIRD INTERVIEW OF INTERFAITH FOOD BANK THRIFT SHOP MANAGER ██████

On Nov. 26, 2018, FBI SA Lister and I met with ████ at the IFB Thrift Shop (Exhibit 15). The following is my synopsis of the information provided:

When asked, ████ said she was not told she was being recorded by Chief O'Connell and Glaister when they were talking to her. ████ said she gave the Internal Affairs Investigator (Glaister) a copy of the video, and the snowboard cover. ████ said the report writing officer, O'Connell and the Investigator (Glaister), and other IA officer are the only people she has talked to.

Refer to the digital recording for complete detail.

## RECEIPT OF EVIDENCE FROM AMADOR COUNTY DISTRICT ATTORNEY'S OFFICE

On Dec. 3, 2018, Julie from Amador County DA's office called and reported the Amador County DA had received new evidence and wanted to provide a copy of it to me. I drove to Amador County DA's office and received an envelope containing a compact disc (Exhibit 16) and two color photographs (identified as Images for case 18-438 and contained in the original report) (Exhibits 17 and 18), which were printed on standard sized paper.

Upon review of the disc content I discovered it contained the two interviews of LIZARRAGA conducted by O'Connell and Glaister, the surreptitious recording of ████ by Glaister and O'Connell, and the IFB store video captured on September 14, 2018, and September 19, 2018.

Refer to each of the listed items for complete detail.

## MEMORANDUM AUTHORED BY SENIOR SPECIAL AGENT J. ESTEN

I reviewed a memorandum authored by Senior Special Agent J. Esten, dated November 9, 2018 (Exhibit 19).

On, or about, November 9, 2018, SSA J. Esten (Esten) reported he purchased winter sports equipment from LIZARRAGA last winter. Esten said he was looking for boots for his son and discovered a pair he liked on Craig's List. Esten responded to the ad and went to the seller's residence to look at the boots. Upon his arrival he recognized LIZARRAGA as the Warden of

Criminal Report Number 282-SC-3010584
Page 18 of 39

MCSP. LIZARRAGA took Esten to his garage where he maintained a large amount of winter sports equipment, all of which LIZARRAGA told Esten was for sale. Esten purchased the boots from LIZARRAGGA and went about his business.

Refer to the memorandum for complete detail.

**QUERY OF CRAIGSLIST**

As a result of the aforementioned information, a search of the Craig's List website was conducted. The search revealed a merchandise sale consisting of a large number of sets of ski's, snowboards, boots and other winter sports equipment. There is a picture displaying various winter sports items for sale in large storage racks (Exhibits 20). Esten reviewed the photo and confirmed the racks appear to be those in the garage of LIZARRAGA. The ad's attached phone number to contact the seller was identified through CDCR records as the personal cell phone of LIZARRAGA.

Refer to the photographs for complete detail.

**QUERY AS TO THE DISPOSITION OF EVIDENCE POSSESSED BY LIZARRAGA**

On December 4, 2018, I called O'Connell and left a voicemail message on his phone asking if the initial snow board was in their evidence or was still possessed by LIZARRAGA. No response was given.

On December 5, 2018, I called O'Connell and left a voicemail message on his phone asking if the initial snow board was in their evidence or was still possessed by LIZARRAGA. No response was given.

On Dec. 6, 2018, O'Connell emailed me (Exhibit 21) and replied, "Our agency does not have, nor did we ever have, the snowboard in question. That was in the possession of the person that is the subject of the investigation."

Refer to the email for complete detail.

**INTERVIEW OF MULE CREEK STATE PRISON** ███████████████

On November 29, 2018, FBI SA Lister and I conducted a digital audio recorded interview of ████████████████████████ (Exhibit 22). The following is my synopsis of the information provided:

████████ admitted he wrote the anonymous emails sent to CDCR Headquarters and OIA (previously identified as Exhibit 1).

████████ said he saw a picture posted on Facebook displaying LIZARRAGA that

Criminal Report Number 282-SC-3010584
Page 19 of 39

was alleged to have been taken in the IFB Thrift Shop during the theft. ▓▓▓▓▓ said he could not recall who showed him the picture but believed it may have been ▓▓▓▓▓▓▓▓

▓▓▓▓▓ said he was not certain if the video has been posted to Facebook but said if it was, he has not viewed it.

▓▓▓▓▓ said ▓▓▓▓▓▓▓▓▓▓▓ made an anonymous phone call reporting the alleged misconduct to Deputy Director F. Vasquez.

▓▓▓▓▓ said LIZARRAGA is known to purchase winter snow sports equipment from thrift shops and sell the equipment on Craigslist or Ebay.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Refer to the digital recording for complete detail.

**INTERVIEW OF MULE CREEK STATE PRISON** ▓▓▓▓▓▓▓▓▓▓▓

On December 12, 2018, FBI SA Lister and I conducted a digital audio recorded interview of ▓▓▓▓▓▓▓▓▓▓▓ (Exhibit 23). The following is my synopsis of the information provided:

▓▓▓ told us he had third hand knowledge of LIZARRAGA's activities as it relates to the alleged September 14, 2018, theft of snow sports equipment from the Interfaith Food Bank IFB Thrift Shop in Sutter Creek, CA.

▓▓▓ said he knows through personal relationships with others at MCSP that LIZARRAGA has a secondary business, selling snow sports equipment out of his garage, and that he buys snow sports equipment to maintain his inventory.

▓▓▓ said he has a romantic relationship with LIZARRAGA's secretary and that he has discussed the alleged theft of snow sports equipment from the IFB with her.

▓▓▓ said his girlfriend, whom he wished to keep unnamed / uninvolved, received a text message from another employee, a MCSP correctional officer. ▓▓▓ said the text message contained what appeared to be a photograph of a closed circuit television

screen wherein LIZARRAGA is inside of the IFB on the date of incident. ■ said the photo was sent with a text message but that he did not know what the text message said verbatim.

■ said he could get the text message and photograph from his girlfriend and provide it to us. ■ said he preferred to not identify the correctional officer to us, but would contact him personally and request he contact us for a witness interview. ■ also said the unnamed correctional officer is very good friends with an IFB employee.

Refer to the digital recording for complete detail.

## RECEIPT OF EVIDENCE PHOTOGRAPH

On December 13, 2018, ■ sent me the photograph and text message alleged to have been sent to his girlfriend by the unnamed correctional officer (Exhibit 24). The photograph depicts LIZARRAGA in a vest, white shirt and tie, and appears to be in a retail shop. The photo appears to be a photo of another photo, or of a closed circuit TV monitor.

The associated text message has no origination information but states, "Want to hear a very interesting story?? You know Warden Joe at Mile Creek? Mule not Mile. We caught him removing tags and stealing snowboard/ski equipment from the food bank thrift store. The cop were called and we will see if Sutter Creek cops prosecute him. Got his name from his credit card. He got away with 1100 dollars of snowboards and ski equipment. We have him removing price tags and hiding the original tags.. Yeah and now if the cops go after him, he's gonna get shamed. The CEO wants to embarrass the shit out of him and prosecute him."

Refer to the photograph for complete detail.

## INTERVIEW OF CORRECTIONAL OFFICER ■

On December 13, 2018, King received a call from Correctional Officer ■
identified himself as the source of the photo and text message which was sent to the warden's secretary. ■ agreed to a witness interview on December 17, 2018.

On December 17, 2018, SA S. Lister and I conducted a digitally recorded witness interview of Correctional Officer ■ (Exhibit 25). ■ is assigned to MCSP.

■ indicated he is long-time friends of IFB Thrift Shop employee ■
said he was told of the LIZARRAGA's alleged theft of snow board equipment
by ■ said the conversations we held via electronic communications on their cell phones.

■ said ■ was very upset and needed / wanted to tell ■ because he knew ■ worked at the prison. ■ said ■ told him he was given permission to spread the word about LIZARRAGA's conduct by IFB CEO ■

Criminal Report Number 282-SC-3010584
Page 21 of 39

██████ said the information from ████ was all saved on Facebook Instant Messenger and that he would provide a copy of it to us.

On December 18, 2018, I received the aforementioned text from ██████ The text contained messaging between ████ and an account titled ██████ The messages contained a large amount of negative reaction and opinion but also contained significant timeline dates and times which will help pinpoint activity of interest.

Refer to the digital recording for complete detail.

## SEARCH WARRANTS

On January 16, 2018, Sacramento County Superior Court Search Warrants 19SW00235, 19SW00241, 19SW00246, and 19SW00249 were served upon Lizarraga, his vehicles, work office, cell phone, and residence. During the search of LIZARRAGA's person, the following items were seized as evidence:

1. CDCR cell phone, IMEI # ██████ (Exhibit 26).
2. Personal iPhone, IMEI # ██████ (Exhibit 27).

During the search of LIZARRAGA's office at MCSP, the following items were discovered and confiscated as evidence:

1. Blackberry cell phone (Exhibit 28).
2. External Hard Drive, CDCR Property # 16483 (Exhibit 29).
3. Memorandum dated September 28, 2018, authored by Warden LIZARRAGA   (Exhibit 30).
4. Chase Bank Statement, Account # ██████ (Inside his brief case) (Exhibit 31).
5. Computer, MacBook Laptop (Exhibit 32).
6. Miscellaneous handwritten documents, receipts, notes, and letters.
7. Computer, CDCR Desktop, Serial # 2UA4201Y5M (Exhibit 33).

During the search of LIZARRAGA's residence, the following items were discovered and confiscated as evidence:

1. Computer, MacBook Laptop (Exhibit 34).
2. iPad, Serial # ██████ (Exhibit 35).
3. Gateway Laptop Computer, Serial # ██████ (Exhibit 36).
4. Dell Desktop Computer, Serial # ██████ (Exhibit 37).
5. External Hard Drive, Serial # ██████ (Exhibit 38).
6. External Hard Drive, Serial # ██████ (Exhibit 39).
7. Flash Drive (Exhibit 40)
8. Flash Drive (Exhibit 41)
9. Flash Drive (Exhibit 42)
10. Flash Drive (Exhibit 43).
11. iPhone, IMEI: ██████ (Exhibit 44).

Criminal Report Number 282-SC-3010584
Page 22 of 39

12. Consignment Documents (Exhibit 45).
13. Play It Again Documents (Exhibit 46).
14. HP Laptop, Serial #CDCR■■■ (Exhibit 47).
15. iPad, Serial #■■■■■■ (Exhibit 48).
16. Apple iMac, Serial #■■■■■■■ (Exhibit 49).

Refer to the items for complete detail.

## EXAMINATION OF DOCUMENTS

The items listed below were discovered during the search of LIZARRAGA and his office, were confiscated as evidence, and listed as miscellaneous handwritten documents, receipts, notes, and letters on the Evidence/Property Sheet:

1. A hand written document, written on yellow sticky notes, which appears to have been written by LIZARRAGA (Exhibit 50). The document states the following:

A. Rumor – Arrest Not True (FB Post).
B. Union President told ■■■ (Text).
C. Not able to locate issue.
D. Allegation with store in SC – Purchase at TS.
E. Alleged I did not pay the full price of SB.
F. Gave SCPD a statement yesterday evening.
G. No Police Rept. Call it an Incident Review.
H. They told me my statements are consistent with the video – The case will not be filed.
I. Police Rpt will outline events – Submit it to you.

2. A handwritten document that appears to be addressed to a discussion with IFB CEO ■■■■ (Exhibit 51) which states:

A. ■■■ Director
B. Apologize for the incident.
C. No intent to deceive or cheat.
D. I understand from talking to the Chief how that became a concern.
E. I want to make you whole. I feel really bad.
F. Want to pay the diff. between what I paid and what the store price was.

3. A hand written document, written on a sticky note, found in LIZARRAGA's brief case (Exhibit 52). The note had the phone number ■■■■■■■" on it, followed by "25" then "$125"

4. A hand written document, written on a sticky note, found in LIZARRAGA's brief case (Exhibit 53). The note stated "Thrift- 460 – Hwy 49 Sutter Creek 95685."

Criminal Report Number 282-SC-3010584
Page 23 of 39

5. A photocopy of Cashier's Check # ▮▮▮▮▮, dated September 29, 2018, from Chase Bank (Exhibit 54). The check memo area states, "Balance SB 9/14/18." The check amount is $125.00. Also contained on the photocopy is a copy of the envelope which states, "▮▮▮▮▮, Director. Interfaith Food Bank, 460 State Highway 49, Sutter Creek CA 95685."

6. A copy of a note (Exhibit 55) that appears to be associated with the check states: "Mrs. ▮▮▮▮▮: My apologies for the incident of 9/14/18. $125.00 enclosed as we discussed."

7. An email conversation with LIZARRAGA, initiated by Community Resource Manager, Correctional Lieutenant F. Jacobo (Exhibit 56). The email was initiated on December 24, 2018 and was completed on December 28, 2018:

**Jacobo** – Hello, Merry Christmas Eve. I have a $600.30 donation from our December food sale to a charity of your choice. Do you have any place in mind or would you like any assistance with suggestions?

**LIZARRAGA** – Merry Christmas. Let's go over some suggestions.

**Jacobo** – Hello, Here are some of the places I found:
1. NAMI: – Helping people suffering with severe mental illness.
2. New Hope Home: -Providing a safe place for women struggling with addictions to live a sober healthy life, find employment, and become productive individuals in our community.
3. Tri-County Wildlife Care: It is the mission of Tri County Wildlife Care to improve quality of life in our region through education and public awareness of our native wildlife and by giving the sick, injured and orphaned Wildlife a second chance to be free.

All of these are located in Amador County.

**LIZARRAGA** – During the holidays people are always needing food. When was the last time we gave to the food bank?

**Jacobo** – I just checked the list for 2018's food sales and there was not a donation made to any food bank. I found the below listings for the Amador County area:

Interfaith Food Bank, Jackson CA.
Calaveras County Food Bank: San Andreas, CA.
Thank you,

**LIZARRAGA** – San Andreas is that Amador County?

**Jacobo** - I just looked on the map and it actually falls into Calaveras County. Sorry about that. I can look for some more options for you. There is a place called Amador County Foundation which is a general non-profit that supports Amador County.

**LIZARRAGA** – If we have not given to Interfaith in Jackson in the past year let's do that.

**Jacobo** – OK. I will bring the letter down to your office for your signature.

Refer to the evidence items for complete detail.

### REVIEW OF CELL PHONE DATA / CDCR CELL PHONE

I reviewed the data content from LIZARRAGA's work cell phone (assigned number ████████, which was confiscated during the service of the search warrant (previously identified as Exhibit 27). The following is my synopsis of the information provided:

#### Communication

*Investigator's Note: The cell phone data is translated in Coordinated Universal Time (UTC), a worldwide time standard by which other time zones are coordinated. The Pacific Standard Time (PST) zone is eight hours less than UTC time; however, when in daylight savings, the time difference is only seven hours, and is identified as Pacific Daylight Time (PDT). The time noted on the following data will reflect UTC time then is converted to daylight saving time PDT which was in effect on the dates of note.*

I discovered the following text messages to / from cell phone number ████████ which is identified as the cell phone number of SCPD Chief J. O'Connell:

(Exhibit 57) Text message from ████████ (identified as Joe LIZARRAGA in the phone contacts) to ████████. ████████ is not assigned to a contact in this phone. The text message was sent on September 27, 2018, at 17:59 hours UTC / 10:59 hours PDT. The text message states: "Chief. Was hoping to lock in a time to review the video if that is still an option. Please let me know. Joe LIZARRAGA."

(Exhibit 58) Text message from ████████ to ████████ (identified as Joe LIZARRAGA in the phone contacts). The text message was sent on September 27, 2018, at 18:55 hours UTC / 11:55 hours PDT. The text message states: "Hello, I am not going to coordinate that today. I will reach out to you tomorrow. Take care, Jim."

(Exhibit 59) Text message from ████████ to ████████. The text message was sent on September 27, 2018, at 20:06 hours UTC / 13:06 hours PDT. The text message states: "Thank you."

(Exhibit 60) Telephone call from ▮▮▮▮▮▮ to ▮▮▮▮▮▮. The call was made on September 28, 2018, at 00:55 hours UTC / 17:55 hours PDT. The call duration was noted as 5m22s.

(Exhibit 61) Text message from ▮▮▮▮▮▮ to ▮▮▮▮▮▮. The text message was sent on October 15, 2018, at 19:22 hours UTC / 12:22 hours PDT. The text message states: "Chief I am thinking that by now you have your report completed and I would like to swing by and obtain a copy. Let me know if this is acceptable. Joe LIZARRAGA.

Recordings

Located in the recordings section of the data extracted from the cell phone was a file identified as 20180928123012.m4a. The recording was timestamped September 28, 2018, at 19:30 hours UTC / 12:30 hours PDT. The recording duration is noted as 31m33s (Exhibit 62).

In reviewing the recording I can identify two voices, that of a male and a female. I recognized both voices on the recording from past conversations with each person. The male voice is identified as Joe LIZARRAGA. The female voice is that of IFB CEO ▮▮▮▮▮ There is no indication ▮▮▮ knows the phone call is being recorded.

LIZARRAGA started the conversation by saying "no worries" then explains the reason he is calling was to apologize to her and to "Make the store whole." The conversation between the two individuals goes back and forth with both parties making concessions about how the situation could be handled differently. After a minute of conversation, LIZARRAGA placed his phone on speaker so he could record both ends of the conversation.

LIZARRAGA made statements to confirm he made the transaction in question. LIZARRAGA claimed no ill will or criminal intent and eventually started asking questions as to how his face was posted to Facebook, suggested one of her employees took the photo and put it on Facebook.

LIZARRAGA asked who brought the theft to her attention. ▮▮▮ told him they specifically looked on the video to see what happened to the snow sports equipment because they did not have the $1100.00 day they should have had when they sold that equipment.

LIZARRAGA explained he was disturbed by the Chief telling him that the cashier said LIZARRAGA priced the items. LIZARRAGA went back to asking if it was possible the cashier was upset and was the one who put his photo on Facebook.

Refer to the compact disc for complete detail.

## REVIEW OF CELL PHONE DATA / PERSONAL CELL PHONE

I reviewed the data content from the personal cell phone ▮▮▮▮▮, confiscated during the service of the search warrant (previously identified as Exhibit 28). The following is my synopsis of the information provided:

Criminal Report Number 282-SC-3010584
Page 26 of 39

I discovered the call data from approximately July 14, 2018, to October 1, 2018, was missing. I did not find any evidence of the theft of property from the IFB.

Refer to the compact disc for complete detail.

## REVIEW OF CELL PHONE RECORDS / PERSONAL CELL PHONE

I reviewed the cell phone records for cell phone ███████, IMEI # ████████████, (Exhibit 63) received on January 22, 2019, resultant of Sacramento Superior Court Search Warrant # 19SW00235. The following is my synopsis of the information provided:

████████ (LIZARRAGA's personal cell phone) called ████████ (████ telephone number) on September 28, 2018, at 16:56 hours UTC / 09:56 hours PDT. The call duration was 00:00.

████████ (LIZARRAGA's personal cell phone) called ████████ (████ telephone number) on September 28, 2018, at 17:03 hours UTC / 10:03 hours PDT. The call duration was 00:00.

████████ (LIZARRAGA's personal cell phone) called ████████ telephone number) on September 28, 2018, at 17:04 hours UTC / 10:04 hours PDT. The call duration was 00:00.

████████ (LIZARRAGA's personal cell phone) called ████████ telephone number) on September 28, 2018, at 17:05 hours UTC / 10:05 hours PDT. The call duration was 01:29.

████████ ████ telephone number) called ████████ (LIZARRAGA's personal cell phone) on September 28, 2018, at 19:29 hours UTC / 12:29 hours PDT. The call duration was 31:54.

No other communication has occurred that has been identified as evidence.

Refer to the reports for complete detail.

## THIRD INTERVIEW OF INTERFAITH FOOD BANK CEO ████████

On January 18, 2019, FBI SA Lister and I conducted an interview of IFB CEO ████████ (Exhibit 64). The following is my synopsis of the information provided:

████ indicated she has not had contact with LIZARRAGA and has not discussed this investigation with anybody since our last contact.

████ offered that she received a check in the mail from LIZARRAGA the week prior, estimating the receipt date to be January 10, 2019. ████ said the check was for

$600.30. ███ said there was a letter signed by LIZARRAGA enclosed in the envelope with the check.

███ discussed how it seemed to be ironic that LIZARRAGA refused to make a donation to the IFB, citing its appearance in the aftermath of the allegations he stole merchandise from the IFB, but now money arrives for no explained reason a few short months later.

███ provided a copy of the check, letter, and envelope to us (Exhibits 65).

Refer to the digital recording for complete detail.

### INTERVIEW OF INTERFAITH FOOD BANK CEO ███

On January 28, 2019, SA Lister and I conducted an interview of IFB CEO ███ (Exhibit 66). The following is my synopsis of the information provided:

███ said she received numerous calls at the IFB Thrift Shop, telephone number ███, from LIZARRAGA one afternoon. ███ did not recall the date. LIZARRAGA called. LIZARRAGA left at least one phone message requesting a return call from ███

███ said she called LIZARRAGA back at the phone number left on the message. ███ said they talked at length about the incident wherein LIZARRAGA stole the snows sports equipment from the IFB Thrift Shop.

███ was asked if any other law enforcement officer had requested to record her voice during their interview of conversation. ███ said no, other than SA Lister and I, nobody had requested to record her voice. ███ was asked if LIZARRAGA asked her for her consent to record their conversation on the day she returned his phone call. ███ said no, he did not ask for her consent. ███ was asked if she was aware her voice was recorded during the majority of her telephone conversation with LIZARRAGA. ███ said she was not aware the phone call was being recorded by LIZARRAGA.

Refer to the report for complete detail.

### PHOTOGRAPHS OF PRICE TAGS AT THE INTERFAITH FOOD BANK THRIFT SHOP

On January 28, 2019, FBI SA Lister and I returned to the IFB Thrift Shop. Upon arrival I entered the shop and took eight photographs of price tags on various merchandise items. Most items were marked with paper tags measuring approximately 2 inches by 1 ½ inches. I also noted small colored dots are infrequently used on smaller items that do not have a large mounting surface:

(Exhibit 67) Photograph of a snowboard with standard price tag.

Criminal Report Number 282-SC-3010584
Page 28 of 39

(Exhibit 68) Photograph of a baseball glove with a standard price tag.
(Exhibit 69) Photograph of a bicycle with a standard price tag.
(Exhibit 710) Photograph of a table with a standard price tag.
(Exhibit 71) Photograph of a table with a standard price tag.
(Exhibit 72) Photograph of a glass table with a standard price tag.
(Exhibit 73) Photograph of a jump rope with a dot price tag.
(Exhibit 74) Photograph of a trophy with a dot price tag.

Refer to the photographs for complete detail.



Criminal Report Number 282-SC-3010584
Page 29 of 39



Criminal Report Number 282-SC-3010584
Page 30 of 39



Criminal Report Number 282-SC-3010584
Page 31 of 39





Criminal Report Number 282-SC-3010584
Page 33 of 39

Criminal Report Number 282-SC-3010584
Page 34 of 39



## INTERVIEW OF SUTTER CREEK POLICE OFFICER M. BREWER

On February 12, 2019, FBI SA Lister and I conducted a digital audio recorded interview of Sutter Creek Police Department Officer M. Brewer (Exhibit 82). The following is my synopsis of the information provided:

Brewer said he received a phone call at the SCPD wherein ███ ███ reported a theft at the IFB Thrift Shop. Brewer went to the thrift shop and conducted an interview of ███ and another unidentified female simultaneously.

███ told Brewer a male, subsequently identified by IFB staff as Joe LIZARRAGA, removed at least one price tag on a burton snowboard and ended up paying $25.00 for a snowboard that was priced at $150.00. Brewer said ███ thought he may have removed other price tags but was not certain at that time. Brewer said he thought ███ told him LIZARRAGA told the cashier that all of the snowboards were $25.00, but he was not sure.

Brewer said ███ did not specifically want to prosecute LIZARRAGA but wanted all law enforcement agencies to know what he did. Brewer said he did not specifically recall ever having a case where he asked the IFB if they wanted to prosecute an individual for shoplifting or theft.

Brewer said he watched the video and collected a copy of the credit card receipt and transaction receipt before leaving. Brewer did not recall interviewing the cashier involved in the transaction, and does not know why he did not. Brewer indicated all of the individuals he interviewed were documented in his report.

Brewer could not recall if he made a second trip to the IFB, but thought it was possible. Brewer could not recall what the purpose of a second trip would have been.

Brewer said he contacted SCPD Chief O'Connell and briefed him on the crime. O'Connell told Brewer he would handle the interaction with LIZARRAGA personally.

Brewer said someone else went to the IFB Thrift Shop and collected the snowboard cover and a copy of the video data.

Brewer said if a case is sent to the DA's office for criminal referral the case report would have a "Charging Sheet" attached to it, typically requesting the specific charges or addressing the issue.

Brewer said in this case, he believed he initiated the case as a Misdemeanor by clicking a drop down box on the report template. Brewer said any other officer with access to the report database could alter that to, "information only" or other options (i.e. felony or unfounded).

Brewer said he does not recall having any interaction with the DA's office relevant to this case.

Refer to the interview for complete detail.

## INTERVIEW OF AMADOR COUNTY CHIEF DEPUTY DISTRICT ATTORNEY R. TRUDGEN

On February 13, 2019, FBI SA Lister and I conducted an unrecorded interview of Amador County Chief Deputy District Attorney R. Trudgen. The following is my synopsis of the information provided (Exhibit 83):

CDDA Robert Trudgen was interviewed at The Amador County DA's Office located at 700 Court Street, Jackson, California. After being advised of the identities of the interviewing Agents and the nature of the interview, TRUDGEN provided the following information:

Trudgen was aware of a case involving Mule Creek Warden Joe LIZARRAGA. His office was provided a misdemeanor information report from Sutter Creek Police Chief James O'Connell. He could not remember if the DA's office requested the report or if Chief O'Connell requested a review. However, he surmised the DA's office requested a report since the misdemeanor information report did not have a District Attorney's Office charging sheet attached to it.

Trudgen heard about the incident involving LIZARRAGA and the Interfaith Thrift Store Food Bank from a friend of his who is a correctional officer at MCSP. Trudgen's

Criminal Report Number 282-SC-3010584
Page 36 of 39

friend had seen something on Facebook outlining the incident and contacted Trudgen to find out if he was aware of the incident.

Trudgen dealt only with Chief O'Connell regarding the incident. It was Trudgen's impression the investigation was regarding one snowboard which was priced at $150 and LIZARRAGA paid $25 because he had removed the price tag. The DA's office was not interested in the case because IFB CEO ███████ was adamant she did not want charges filed against LIZARRAGA and Trudgen felt she would be a poor witness in front of a jury.

There was no discussion of giving LIZARRAGA a pass on the incident. There was discussion of having LIZARRAGA giving the snowboard back or paying for the difference. However, it was Trudgen's understanding LIZARRAGA may have sold the snowboard and he was unaware if LIZARRAGA paid the difference back to the store.

Trudgen only requested a copy of the audio interview of LIZARRAGA from Chief O'Connell after I made him aware it existed.

**SUSPECTS:**

1. LIZARRAGA, Joe – Warden

**WITNESS:**

1. ██████████ – IFB Thrift Shop Manager
2. ██████████ – IFB Thrift Shop Employee
3. ██████████ – IFB Chief Executive Officer
4. ██████████ – IFB Thrift Shop Employee
5. ██████████ – Correctional Captain
6. ██████████ Correctional Officer
7. ██████████ Associate Warden
8. O'Connell, James – SCPD Chief
9. Brewer, Matthew – SCPD Officer
10. Trudgen, Robert – Amador County Chief Deputy District Attorney

Criminal Report Number 282-SC-3010584
Page 37 of 39

**EXHIBITS:**

1.  Email, Authored by an Anonymous Individual, Dated September 28, 2018.
2.  Memorandum, Authored by Senior Special Agent R. Ivicevich, Dated January 24, 2019.
3.  Email, Authored by an Anonymous Individual, Dated October 22, 2018.
4.  Memorandum, Interview of Witness ███████ Dated October 30, 2018.
5.  Compact Disc, Interview of Witness ███████ Dated October 31, 2018.
6.  Compact Disc, Interview of Witness ███████ Dated October 31, 2018.
7.  Electronic Storage Device, Store Video Surveillance Data.
8.  Email, Authored by Anonymous Individual, Dated November 8, 2018.
9.  Email, Authored by Amador County District Attorney T. Riebe, Dated November 15, 2018.
10. Report, Sutter Creek Police Department # 18-438, Dated October 5, 2018.
11. Compact Disc, Interview of Witness ███████ Dated November 19, 2018.
12. Compact Disc, Interview of Witness ███████ Dated November 19, 2018.
13. Compact Disc, Evidence submitted by SCPD Chief O'Connell.
14. Memorandum, Interview of Witness ███████ Dated November 26, 2018.
15. Report, Interview of Witness ███████ Dated November 26, 2018.
16. Compact Disc, Evidence, Received from Amador County.
17. Photograph, Evidence, Received from Amador County.
18. Photograph, Evidence, Received from Amador County.
19. Memorandum, Authored by Senior Special Agent J. Esten, Dated November 9, 2018.
20. Photograph, Storage rack, CraigsList, Dated December 6, 2018.
21. Email, Authored by Chief J. O'Connell, Dated December 6, 2018.
22. Compact Disc, Interview of Witness ███████ Dated November 29, 2018.
23. Compact Disc, Interview of Witness ███████████████ Dated December 12, 2018.
24. Photograph, LIZARRAGA in the IFB.
25. Compact Disc, Interview of Witness ███████ Dated December 13, 2018.
26. CDCR Cell Phone, iPhone, IMEI # ███████
27. Personal Cell Phone, iPhone, IMEI # ███████.
28. Blackberry cell phone, Inoperative.
29. External Hard Drive, CDCR Property Tag # 16483.
30. Memorandum, Authored by J. LIZARRAGA, Dated September 28, 2018.
31. Chase Bank Statement, Account # ███████
32. Computer, MacBook Laptop.
33. Computer, CDCR Desktop, Serial # ███████
34. Computer, MacBook Laptop.
35. iPad, Serial # ███████
36. Computer, Gateway Laptop, Serial # ███████
37. Computer, Dell Desktop, Serial # ███████.
38. External Hard Drive, Serial # ███████.
39. External Hard Drive, Serial # ███████.
40. External Flash Drive
41. External Flash Drive
42. External Flash Drive
43. External Flash Drive

Criminal Report Number 282-SC-3010584
Page 38 of 39

44. iPhone, IMEI # █████████
45. Documents, Consignment.
46. Documents, Consignment at Play it Again Sports.
47. Computer, HP Laptop, Serial # CDCR 13302.
48. iPad, Serial # █████████.
49. Computer, iMac, Serial # █████████.
50. Document, Sticky Notes taped together, Hand Written.
51. Document, Standard Sized Paper, Hand Written.
52. Document, Sticky Note, Hand Written.
53. Document, Sticky Note, Hand Written.
54. Cashier's Check, Chase Bank, Check # █████████
55. Document, Hand Written, Addressed to Mrs. Statton.
56. Email, Authored F. Jacobo, Dated December 24, 2018.
57. Text Message, Sent by LIZARRAGA, Dated September 27, 2018.
58. Text Message, Sent by O'Connell, Dated September 27, 2018.
59. Text Message, Sent by LIZARRAGA, Dated September 27, 2018.
60. Telephone call, Initiated by O'Connell, Dated September 28, 2018.
61. Text Message, Sent by LIZARRAGA, Dated October 15, 2018.
62. Compact Disc, Digital Recording, phone conversation, Dated September 28, 2018.
63. Records, AT&T Wireless, Cell Phone IMEI # █████████.
64. Document, Interview of Witness █████████ Dated January 18, 2019.
65. Photocopy, Check from LIZARAGGA, Dated September 29, 2018.
66. Document, Interview of Witness █████████ Dated January 28, 2019.
67. Photograph, Snowboard with standard price tag.
68. Photograph, Baseball glove with a standard price tag.
69. Photograph, Bicycle with a standard price tag.
70. Photograph, Table with a standard price tag.
71. Photograph, Table with a standard price tag.
72. Photograph, Glass table with a standard price tag.
73. Photograph, Jump rope with a dot price tag.
74. Photograph, Trophy with a dot price tag.
75. ███████████████████.
76. ███████████████████████
77. █████████████████████████
78. █████████████████████
79. ██████████ ██ █████
80. ██████████ ██ ███
81. ██████████ ██ ███████████
82. Compact Disc, Witness Interview, SCPD Officer M. Brewer, Dated February 12, 2019.
83. Document, Interview of Witness, Robert Trudgen, February 13, 2019.

Criminal Report Number 282-SC-3010584
Page 39 of 39

## CASE STATUS:

The information received in the investigation is sufficient for me to form the opinion that Joe LIZARRAGA violated California Penal Code, ███████████████████████████████████ ███████████████████████████, and Section 137(a) (Bribery of a witness). I recommend this investigation be referred to the California Department of Justice for their consideration of criminal prosecution.

Date:_____

**CHUCK KING**
Task Force Officer
Sacramento Regional Public Corruption Task Force
Federal Bureau of Investigations

REVIEW OF INVESTIGATION
CDCR 402 (Rev. 08/05)

## HIRING AUTHORITY REVIEW OF INVESTIGATION

| EMPLOYEE: | CLASSIFICATION: |
|---|---|
| Joe Lizarraga | Warden |
| CASE NUMBER: | STATUTE OF LIMITATIONS EXPIRATION DATE |
| N-ADM-S04-18-A | 08 21 2020 |

The Hiring Authority shall review the final investigative report and complete the following including specific details regarding an insufficient investigation and/or if further investigation is requested. The completed and signed original form shall be forwarded to the ERO Disciplinary Officer. The ERO/Disciplinary Officer shall coordinate with the Office of Internal Affairs, Central Intake Unit, for any requests for further investigation. The ERO Disciplinary Officer shall forward a copy to the Vertical Advocate for designated cases. The Vertical Advocate shall ensure the SAIG is provided a copy of the completed and signed form, for all cases monitored by the Bureau of Independent Review.

☐ **Investigation is insufficient**
(Please provide comments below)

☐ **Further investigation requested**
(Please provide comments below)

☑ **Investigation is sufficient**

☐ **Corrective action ordered**

☐ **Disciplinary action ordered**

**Indicate findings for each allegation:**

**Allegation 1:** ▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 2:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 3:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 4:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 5:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 6:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 7:** ▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 8:** SUSTAINED - Dishonesty. Making false or intentionally misleading statements during a criminal or administrative investigation or inquiry by any agency

**Allegation 9:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Allegation 10:** SUSTAINED - Dishonesty. Making false or intentionally misleading statements during a criminal or administrative investigation or inquiry by any agency

**Allegation 11:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

-- CONFIDENTIAL WORK PRODUCT --

**Allegation 12:**   SUSTAINED - Theft. Grand Theft

**Allegation 13:**   ████████████████████████████████████

**Allegation 14:**   ████████████████████████████████████████

**Allegation 15:**   SUSTAINED - Other Failure of Good Behavior. Undetermined/Other

**Allegation 16:**   SUSTAINED - Other Failure of Good Behavior. Undetermined/Other

**Comments:**

Allegation 1: ████████████████████████████████████████████

Allegation 2: ████████████████████████████████████████████

Allegation 3: ████████████████████████████████████████████

Allegation 4: ████████████████████████████████████████████

Allegation 5: ████████████████████████████████████████████

Allegation 6: ████████████████████████████████████████████

Allegation 7: ████████████████████████████████████████████

Allegation 8: It is alleged that on or about September 26, 2018, Warden Joe Lizarraga told Sutter Creek Police Chief James O'Connell that he (LIZARRAGA) purchased winter sports equipment from the Interfaith Food Bank Thrift Store for his family, when it was actually for his personal financial gain.

Allegation 9: ████████████████████████████████████████████

Allegation 10: It is alleged that on or about September 26, 2018, Warden Joe Lizarraga was dishonest when he told Sutter Creek Police Chief James O'Connell that he did not suggest prices for the items in his shopping cart to the Interfaith Food Bank Thrift Store cashier.

Allegation 11: ████████████████████████████████████████████

Allegation 12: It is alleged that on or about September 14, 2018, Warden Joe Lizarraga removed price tags from sports equipment while shopping at the Interfaith Food Bank Thrift Store in order to purchase the items at a reduced cost.

Allegation 13: ████████████████████████████████████████████

Allegation 14: ████████████████████████████████████████████

**— CONFIDENTIAL WORK PRODUCT —**

Allegation 15: It is alleged that on or about September 29, 2018, Warden Joe Lizarraga wrote a personal money order for $125.00 to Interfaith Food Bank Thrift to dissuade a witness from participating in his criminal prosecution.

Allegation 16: It is alleged that on or about December 24, 2018, Warden Joe Lizarraga authorized the use of Mule Creek State Prison charitable funds to "bribe" Interfaith Food Bank Thrift Store ▓▓▓▓▓▓▓ in an attempt to dissuade her from pursuing theft charges against him.

*Please note: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

_____

HIRING AUTHORITY SIGNATURE/TITLE

DATE 12/5/19

— CONFIDENTIAL WORK PRODUCT —

JUSTIFICATION OF PENALTY
CDCR 403 (Rev. 12/05)

# JUSTIFICATION OF PENALTY

| EMPLOYEE | CLASSIFICATION: |
|---|---|
| Joe Lizarraga | Warden |
| CASE NUMBER: | STATUTE OF LIMITATIONS EXPIRATION DATE: |
| N-ADM-804-18-A | 08 21 2020 |

The Hiring Authority shall refer to all investigation documentation and the Employee Disciplinary Matrix when determining the level of discipline to impose. The Hiring Authority shall immediately forward the completed and signed original version of this form to the ERO Disciplinary Officer. The ERO Disciplinary Officer shall forward a copy to the Vertical Advocate for designated cases. The Vertical Advocate shall ensure the SAIG is provided a copy of the completed and signed form for all cases monitored by the Bureau of Independent Review.

**Adverse Action to be imposed:**

☐ **Yes** (Select penalty level and detail the reasoning below)      ☑ **No** (Provide reasons below)

## LEGEND FOR PENALTY

| | | | | | |
|---|---|---|---|---|---|
| 1 | Official Reprimand | 4 | Salary Reduction 10% for 3-12 months or Suspension w/o pay for 6-24 work days | 7 | Suspension w/o pay for 49-60 work days |
| 2 | Suspension w/o pay for 1-2 work days | 5 | Salary Reduction 5% for 13-36 months or Suspension w/o pay for 13-36 work days | 8 | Demotion to a lower class |
| 3 | Salary Reduction 5% for 3-12 months or Suspension w/o pay for 3-12 work days | 6 | Salary Reduction 10% for 13-24 months or Suspension w/o pay for 26-48 work days | 9 | Dismissal |

**Work Week Group E and SE employees shall not receive a suspension of less than five (5) work days, unless the union contract provides otherwise.**

| PENALTY LEVEL (check one):<br>1☐  2☐  3☐  4☐<br>5☐  6☐  7☐  8☐  9☐ | SPECIFIC PENALTY TO BE IMPOSED<br>Dismissal** |
|---|---|

Indicate each Matrix category and describe all aggravating and mitigating factors considered in determining the penalty. If no aggravating or mitigating factors are considered, please explain:

Disciplinary Matrix Categories Considered: B3, D1, D4, D10, D22, D26, E1, E4, F1, G1, G3

Mitigating Factors: None.

Aggravating Factors: The misconduct was intentional and willful. The misconduct was premeditated. The employee had a primary and/or leadership role in the misconduct. Based upon length of service, experience, policy directives, inherent nature of the act, the employee knew or should have known that his actions were inappropriate. Serious consequences occurred or may have occurred from the misconduct. The misconduct was committed with malicious intent or for personal gain. The misconduct result in serious injury. More than one act of misconduct forms the basis for disciplinary action being taken. The employee was evasive, dishonest, or intentionally misleading during the investigation. The employee does not accept responsibility for his actions. The employee did not report the harm caused and/or attempted to conceal the hard through action or inaction.

*Please note: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**Subject Joe Lizarraga retired effective 09 04 2019. As such, no action will be taken as CDCR no longer has authority jurisdiction to impose discipline upon Lizarraga.**

## – CONFIDENTIAL WORK PRODUCT –

**HIRING AUTHORITY SIGNATURETITLE**

**DATE**

-- CONFIDENTIAL WORK PRODUCT --

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : December 5, 2019

To : Joe Lizarraga
**Retired**

Subject: **INVESTIGATIVE CLOSURE MEMORANDUM, CASE NO. N-ADM-804-18-A**

You are hereby notified that the Office of Internal Affairs has completed its investigation into allegations of misconduct against you while employed by the California Department of Corrections and Rehabilitation. I have reviewed the investigative report and have reached the conclusions indicated below:



1.

2.

3.

4.

5.

Joe Lizarraga. Warden
Investigative Closure Memorandum
N-ADM-804-18-A

6.



7.



8. It is alleged that on or about September 26. 2018. you told Sutter Creek
Police Chief James O'Connell that you purchased winter sports equipment
from the Interfaith Food Bank Thrift Store for your family. when it was
actually for your personal financial gain. Finding: <u>Sustained.</u>

9.



10. It is alleged that on or about September 26, 2018. you were dishonest when
you told Sutter Creek Police Chief James O'Connell that you did not suggest
prices for the items in your shopping cart to the Interfaith Food Bank Thrift
Store cashier. Finding: <u>Sustained.</u>

11.



12. It is alleged that on or about September 14. 2018. you removed price tags
from sports equipment while shopping at the Interfaith Food Bank Thrift
Store in order to purchase the items at a reduced cost. Finding: <u>Sustained.</u>

13.

14.



Joe Lizarraga, Warden
Investigative Closure Memorandum
N-ADM-804-18-A

15. It is alleged that on or about September 29, 2018, you wrote a personal money order for $125.00 to Interfaith Food Bank Thrift to dissuade a witness from participating in your criminal prosecution. Finding: <u>Sustained.</u>

16. It is alleged that on or about December 24, 2018, you authorized the use of Mule Creek State Prison charitable funds to "bribe" Interfaith Food Bank Thrift Store ████████████ in an attempt to dissuade her from pursuing theft charges against you. Finding: <u>Sustained.</u>

If you have questions relative to this matter, please contact my office at (916) 323-4093.

CONNIE GIPSON
**Director**
**Division of Adult Institutions**

cc: **Vertical Advocate – EAPT, Office of Legal Affairs**
    **Special Assistant Inspector General – Office of the Inspector General**
    **Employee Relations Officer**

Exhibit J

**Incident Date**
August 14, 2014

**OIG Case Number**
18-0028029-DM

**Allegations**

Dishonesty

Failure to Report

Theft

Confidential Information

Insubordination

Neglect of Duty

Other Failure of Good Behavior

Misuse of State Equipment or Property

**Case Type**
Administrative Investigation

**Indicator Ratings**



**Show Indicator Subquestions**

**Incident Summary**

Between August 14, 2014, and October 15, 2018, a warden allegedly transmitted and disclosed confidential information using his state email account, sent and received personal email and text messages from his state computer and mobile device, and accessed unauthorized websites on his state computer. On August 14, 2014, the warden allegedly engaged in secondary employment without the department's prior approval and in a manner that prevented him from performing his job. On April 1, 2018, the warden allegedly filed false state and federal tax returns. On September 14, 2018, while shopping in a thrift store, the warden allegedly removed price tags from several items in order to purchase them at a reduced cost and on September 26, 2018, allegedly lied to outside law enforcement regarding his purchases. On September 28, 2018, the warden allegedly used his mobile phone to secretly record a witness and on September 29, 2018, allegedly paid a witness in an effort to dissuade the witness from cooperating in a criminal investigation and on August 30, 2019, allegedly disobeyed an order to appear for an Office of Internal Affairs interview. On December 24, 2018, the warden allegedly directed employees to donate money in an attempt to bribe a witness to not cooperate in the criminal investigation.

**Disposition**

The hiring authority sustained the allegations, except that the warden filed false tax returns and one of three allegations that he lied to outside law enforcement, and determined dismissal was the appropriate penalty. The OIG concurred. However, the warden retired before disciplinary action could be served.

**Case Rating**

The department's performance was *poor* because the hiring authority delayed referring the matter to the Office of Internal Affairs, delayed conducting the investigative and disciplinary findings conference, and during the course of the investigation, the hiring authority also granted the warden's vacation request, thereby removing any obligation for the warden to be available during that time. Furthermore, excluding the period of vacation, the hiring authority kept the warden on paid administrative leave for almost eight months.

Indicator 1: How well did the department discover and refer allegations of employee misconduct?
The hiring authority's performance in discovering and referring allegations of employee misconduct to the Office of Internal Affairs was *poor* because the hiring authority did not refer the matter to the Office of Internal Affairs until 64 days after discovery and 19 days after policy requires.

Indicator 2: How well did the Office of Internal Affairs process and analyze allegations from the hiring authorities?
The OIG found no major deficiencies, resulting in a *satisfactory* assessment.

Indicator 3: How well did the department investigate allegations of employee misconduct?
The OIG found no major deficiencies, resulting in a *satisfactory* assessment.

Indicator 4: How well did the department determine its findings for alleged misconduct and process the case?
The hiring authority's performance in determining its findings for alleged misconduct was *poor* because the hiring authority delayed conducting the investigative and disciplinary findings conference 41 days after the Office of Internal Affairs returned the matter and 27 days after policy requires. During the course of the investigation, the hiring authority also granted the warden's vacation request, thereby removing any obligation for the warden to be available during that time. Furthermore, excluding the period of vacation, the hiring authority kept the warden on paid administrative leave for almost eight months.

Indicator 5: How well did the department attorney provide legal advice during the Office of Internal Affairs Central Intake Panel meeting and the investigative process?
The OIG found no major deficiencies, resulting in a *satisfactory* assessment.

Exhibit 15

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

## INTERNAL AFFAIRS INVESTIGATION REPORT

|  | Office of Internal Affairs - Investigator |  |
|---|---|---|
| To:  Connie Gipson, Director Division of Adult Institutions 1515 S Street #351N Sacramento, CA 95811 | **Name:** | Adam Cunningham |
|  | **Title:** | Special Agent |
|  | **Location:** | Office of Internal Affairs - Headquarters |
|  | **Case Number:** (H)N-ADM-804-18-A | **Date:** September 17, 2019 |

## CONFIDENTIAL

**SUBJECT:**

| Name: | LIZARRAGA, Joe |
|---|---|
| Classification: | Warden |
| Location: | Mule Creek State Prison |
| Date of Birth: | ▇▇▇▇ |
| CDCR Hire Date: | January 20, 1986 |

**SYNOPSIS:**

On September 14, 2018, Warden Joe LIZARRAGA purchased 12 items of sporting goods equipment (merchandise), including snowboards, for $127.00 at the Interfaith Food Bank (IFB) Thrift Shop located at 460 Hwy 49, Sutter Creek, CA.

On September 17, 2018, Store Manager ▇▇▇▇ learned the merchandise had been sold and reviewed the sales receipts, as she expected the merchandise's value would exceed $1100.00. ▇▇▇▇ discovered the merchandise had been sold to LIZARRAGA for $127.00, as documented on the credit card receipt (Exhibit 1, page 13).

▇▇▇▇ reviewed the IFB video surveillance (Exhibit 2) and observed LIZARRAGA remove one of the snowboards from its protective cover, which effectively removed the price tag (Exhibit 1, page 12). LIZARRAGA discarded the protective cover in a barrel in the immediate vicinity. LIZARRAGA proceeded to purchase the equipment from IFB Clerk ▇▇▇▇ reported the merchandise did not have price tags and LIZARRAGA suggested the prices which ▇▇▇▇ ultimately charged.

On September 18, 2018, ▇▇▇▇ and IFB Chief Executive Officer (CEO) ▇▇▇▇ reported the theft to Sutter Creek Police Department (SCPD) Officer Matthew Brewer (SCPD Report #18-438) (Exhibit 1). SCPD Sergeant Weston Glaister and SCPD Chief James O'Connell conducted a follow-up investigation, also documented in SCPD Report #18-438.

On September 26, 2018, O'Connell conducted a recorded interview of LIZARRAGA (Exhibits 23 and 24). SCPD referred the report (Exhibit 1) to the Amador County District Attorney's Office, who declined to prosecute LIZARRAGA.

## CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 2 of 18

## CONFIDENTIAL

On or about September 28, 2018, the California Department of Corrections and Rehabilitations (CDCR) Secretary Ralph Diaz), Undersecretary Kathleen Allison, Undersecretary Jeffrey Macomber, Director Connie Gipson, and Associate Director (Retired) Felix Vasquez received an email from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Exhibit 3) which alleged LIZARRAGA engaged in criminal misconduct during his September 14, 2018, transaction at the IFB Thrift Store. The email was forwarded to the CDCR Office of Internal Affairs (OIA).

On September 28, 2018, OIA Senior Special Agent (SSA) Rick Ivicevich was assigned to conduct an inquiry into the alleged misconduct of LIZARRAGA (OIA-2082-2019) (Exhibit 7). During the course of the inquiry, Ivicevich identified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

On September 28, 2018, LIZARRAGA contacted ▮▮▮▮ by telephone (Exhibit 4). LIZARRAGA offered to pay the difference of $125.00 for the snowboard he purchased on September 14, 2018.

On or about October 1, 2018, LIZARRAGA sent ▮▮▮▮ a Chase Bank Money Order for $125.00 (Exhibit 5).

On October 30, 2018, CDCR Special Agent (SA) Charles King initiated a Criminal Investigation (282-SC-3010584) (Exhibit 6), as a Task Force Officer with the Federal Bureau of Investigation (FBI) Sacramento Regional Public Corruption Task Force.

On November 9, 2018, SSA Jordan Esten authored a memorandum (Exhibit 19) regarding Esten's off-duty contact with LIZARRAGA at LIZARRAGA's residence. Esten's memorandum (Exhibit 19) and CDCR computer records (Exhibits 10, 12, 13, and 14) indicated LIZARRAGA may have been running a de-facto business of selling used sporting goods, which was not reported to, nor authorized by, CDCR management, nor was the de-facto business reported on LIZARRAGA's taxes (Exhibit 30).

On November 14, 2018, Ivicevich authored a memorandum titled, "Allegations of Misconduct Against Mule Creek State Prison Warden Joe Lizarraga (OIA-2082-2019)," to OIA Deputy Director Joseph Galvan (Exhibit 7).

On November 27, 2018, CDCR Division of Adult Institutions (DAI) Director (A) Jeff Macomber submitted a Confidential Request for Internal Affairs Investigation form (CDCR 989) regarding allegations of on and off-duty misconduct by LIZARRAGA.

On December 4, 2018, CDCR OIA - Central Intake Unit (CIU) approved the request for Administrative Investigation.

On January 15, 2019, I, SA Adam Cunningham was assigned case responsibility of the Administrative Investigation which was tolled due to the ongoing Criminal Investigation by the FBI (282-SC-3010584).

## CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 3 of 18

# CONFIDENTIAL

On January 16, 2019, search warrants were served at LIZARRAGA's residence and LIZARRAGA's office at Mule Creek State Prison (MCSP), in conjunction with the FBI Task Force Criminal Investigation (282-SC-3010584). A subsequent search of LIZARRAGA's State issued cellular telephone revealed a surreptitious digital recording (Exhibit 4) of LIZARRAGA's telephone call with ▋▋▋ on September 28, 2018. Also located during the search was an email exchange between CDCR Correctional Lieutenant Francesca Jacobo and LIZARRAGA discussing a donation of $600.30 of MCSP fundraising monies to the IFB (Exhibit 16).

On January 18, 2019, ▋▋▋ provided King with a copy of the $600.30 donation check issued to the IFB from MCSP (Exhibit 15) from ▋▋▋

**ALLEGATIONS:**

The investigation into this matter gathered information to examine the following:

1. It is alleged that on or about September 14, 2018, Warden Joe LIZARRAGA removed price tags from several pieces of sports equipment while shopping at the Interfaith Food Bank Thrift Store in order to purchase the items at a reduced cost.

2. It is alleged that on or about September 26, 2018, Warden Joe LIZARRAGA told Sutter Creek Police Chief James O'Connell that he (LIZARRAGA) purchased winter sports equipment from the Interfaith Food Bank Thrift Store for his family, when it was actually for his personal financial gain.

3. ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋

4. It is alleged that on or about September 26, 2018, Warden Joe LIZARRAGA was dishonest when he told Sutter Creek Police Chief James O'Connell that he did not suggest prices for the items in his shopping cart to the Interfaith Food Bank Thrift Store cashier.

5. It is alleged that on or about September 29, 2018, Warden Joe Lizarraga wrote a personal money order for $125.00 to Interfaith Food Bank Thrift, to dissuade a witness from participating in his criminal prosecution.

6. It is alleged that on or about December 24, 2018, Warden Joe Lizarraga authorized the use of Mule Creek State Prison charitable funds to "bribe" Interfaith Food Bank Thrift Store CEO ▋▋▋ ▋▋▋ in an attempt to dissuade her from pursuing theft charges against him.

# CONFIDENTIAL

**CONFIDENTIAL**



7.

8.

9.

10.

11.

12.

13.

INVESTIGATION:

*Investigator's Note: The information contained within this report is a summary of this investigation. For specifics and full details, refer to the actual exhibits and other case related information.*

### REVIEW OF THE INTERFAITH FOOD BANK THRIFT STORE SURVEILLANCE VIDEO FROM SEPTEMBER 14, 2018

I reviewed the surveillance video from the IFB Thrift Store on September 14, 2018 (Exhibit 2).  I observed the following notable events:

On Friday, September 14, 2018, at approximately 1310 hours, LIZARRAGA entered the store.

**CONFIDENTIAL**

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 5 of **18**

# CONFIDENTIAL

At approximately 1314 hours, LIZARRAGA started to view the sports equipment. LIZARRAGA touched the attached price tag on a snowboard in a plastic cover and then inspected multiple other items. At approximately 1316 hours, LIZARRAGA retrieved a shopping cart and returned to the sports equipment area. LIZARRAGA placed two snowboards that were not in a plastic cover in the basket, three sets of skis, two sets of ski poles, and what appears to be a pair of ski boots, into the shopping cart.

At approximately 1321 hours, LIZARRAGA picked up a snowboard in a plastic cover and removed it from the plastic cover and discarded the cover out of view of the camera. LIZARRAGA placed the snowboard in the shopping cart underneath the other snowboards. LIZARRAGA continued to inspect items and placed several more in the shopping cart.

At approximately 1325 hours LIZARRAGA proceeded to the checkout counter.

At approximately 1329 hours, LIZARRAGA touched the two top snowboards with his index finger and said something to the clerk. The snowboard that was removed from the plastic cover was underneath the two snowboards LIZARRAGA pointed to. LIZARRAGA handed the clerk a credit card, completed the transaction and left the store.

***Investigator's Note:*** *The date and time of this video was during a state work day during normal business hours.*

*Refer to the digital video for complete details.*

## REVIEW OF EMAIL SENT TO RALPH DIAZ, KATHLEEN ALLISON, JEFFREY MACOMBER, CONNIE GIPSON, AND FELIX VASQUEZ FROM ▓▓▓▓▓▓▓▓ DATED SEPTEMBER 28, 2018

I reviewed an email sent to Diaz, Allison, Macomber, Gipson, and Vasquez, dated September 28, 2018 (Exhibit 3). The subject of the email was "Warden Joe Lizarraga." The email stated the following in summary:

> The email indicated LIZARRAGA allegedly changed price tags or failed to pay for merchandise at the IFB Thrift Shore on September 14, 2018. The email stated the owner posted LIZARRAGA's photo taken from the store surveillance video on Facebook to identify him. The Facebook posting was removed after the owner discovered the perpetrator (LIZARRAGA) was the Warden of MCSP. The email alleged the owner was not going to pursue the incident for fear of losing business because many of the store's patrons are MCSP employees. The writer of the email explained the purpose of their email was to ensure this incident had been reported.

*Refer to the email for complete details*

# CONFIDENTIAL

# CONFIDENTIAL

*Investigator's Note:   A check of CDCR controlled email accounts revealed the email account,* ████████████, *had been associated with* ████████████████ ████ ████████ *confirmed he authored the email during his November 29, 2018, interview with King (Exhibit 40).*

## REVIEW OF THE DIGITALLY RECORDED TELEPHONE CONVERSATION BETWEEN JOE LIZARRAGA AND ████████████ ON SEPTEMBER 28, 2018

I reviewed the digital audio recording of the telephone conversation between LIZARRAGA and ████ from September 28, 2018 (Exhibit 4). The audio recording was obtained from LIZARRAGA's state issued cellular telephone pursuant a search warrant executed on January 16, 2019. The digital file is 31 minutes and 33 seconds in length. The following conversation between LIZARRAGA and ████ was of note:

> At timestamp 00:32, it appears LIZARRAGA placed the telephone call on speaker phone. LIZARRAGA apologized for the "incident" and wanted to "make the store whole." LIZARRAGA explained that MCSP donates to IFB. LIZARRAGA wanted to know how his picture was taken from the surveillance video, ████ did not know how. LIZARRAGA told ████ he did not suggest the prices. LIZARRAGA offered to pay the $125.00 balance of the one snowboard's value. LIZARRAGA told ████ MCSP was behind the IFB's programs, and that it was not intended to influence her.

*Investigator's Note:   At no point during the audio is there any notification that the telephone conversation was being recorded, nor was there any indication that* ████ *was aware the telephone call was being recorded.*

*Investigator's Note:   On January 16, 2019, OIA Agents seized a handwritten note from LIZARRAGA's office at MCSP (Exhibit 15). The note contains similar statements to those made by LIZARRAGA in the surreptitiously recorded telephone call with* ████ *on September 28, 2018.*

*Investigator's Note:   Following the conversation with* ████ *on September 28, 2018, LIZARRAGA sent* ████ *a Chase Bank Money Order for $125.00 (Exhibit 5).*

*Refer to the digital audio file for complete details.*

## REVIEW OF PERSONAL EMAILS SENT TO AND FROM JOE LIZARRAGA'S CDCR EMAIL ACCOUNT

On October 9, 2018, the OIA Forensic Analysis and Support Team (FAST) SA Gary Viegas searched the CDCR controlled email account of LIZARRAGA ████████████████ for all available emails sent and received between said account and ████████████ (Exhibit 8), LIZARRAGA's personal email account.

# CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 7 of **18**

# CONFIDENTIAL

On May 8, 2019, Viegas searched the CDCR controlled email account for LIZARRAGA ████████████ for all available emails sent and received between October 19, 2015, and May 8, 2018 (Exhibit 9).

I reviewed the collected emails and located 163 emails sent from or received in LIZARRAGA's CDCR email account which were not related to CDCR business. The 163 emails were consolidated into one digital file, "Lizarraga Personal Emails.pdf" (Exhibit 10).

The 163 emails contained information unrelated to LIZARRAGA's position as Warden, to include, ████████████ ████████████ worksheet for tracking sales associated with ski equipment (Exhibit 27), ████████████ and photographs of sports equipment.
*Refer to the emails for complete details.*

## REVIEW OF INTERNET HISTORY FROM JOE LIZARRAGA'S CDCR COMPUTER

On November 8, 2018, the Viegas searched LIZARRAGA's CDCR workstation computer for any images or Internet history consistent with buying or selling aftermarket sporting goods, or any other general non-work related use (Exhibit 11).

Viegas' search revealed, between August 14, 2014, and August 22, 2108, LIZARRAGA accessed Amazon, Craigslist, Ebay, and Yellow Pages on 643 occasions (Exhibit 12).



On January 30, 2018, LIZARRAGA conducted Internet searches for thrift stores in Livermore, Dublin, Stockton, San Francisco, Davis, Vacaville, and Pleasanton. On August 16, 2018, LIZARRAGA conducted an Internet search for a thrift store in Placerville, CA (Exhibit 14).

*Refer to the digital files for complete details.*

## REVIEW OF EMAIL EXCHANGE BETWEEN JOE LIZARRAGA AND CORRECTIONAL LIEUTENANT FRANCESCA JACOBO DATED DECEMBER 24, 2018

I reviewed an email exchange between LIZARRAGA and Jacobo, originating on December 24, 2018 (Exhibit 16). The subject of the email was "Warden Portion." The email exchange stated the following in summary:

# CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 8 of 18

# CONFIDENTIAL

On December 24, 2018, at 1113 hours, Jacobo sent an email to LIZARRAGA advising him that there was $600.30 from a December food sale available to be donated to a charity of LIZARRAGA's choice.

On December 24, 2018, at 1237 hours, LIZARRAGA replied to Jacobo, "Merry Christmas. Let's go over some suggestions."

On December 28, 2018, at 1105 hours, Jacobo replied to LIZARRAGA with three suggestions for charities: NAMI, New Hope Home, and Tri-County Wildlife Care. Jacobo specified that the charities were located in Amador County.

On December 28, 2018, at 1149 hours, LIZARRAGA replied to Jacobo, "During the holidays people are always needing food. When was the last time we gave to the Food Bank?"

On December 28, 2018, at 1218 hours, Jacobo replied to LIZARRAGA that she checked the 2018 food sales and no donations were made to any food banks. Jacobo provided the Interfaith Food Bank and the Calaveras County Food Bank as local food bank listings.

On December 28, 2018, at 1220 hours, LIZARRAGA replied to Jacobo, "San Andreas is that Amador County?"

On December 28, 2018, at 1224 hours, Jacobo replied to LIZARRAGA that San Andreas was located in Calaveras County and Jacobo provided the Amador County Foundation as an alternative.

On December 28, 2018, at 1229 hours, LIZARRAGA replied to Jacobo, "If we have not given to Interfaith in Jackson in the past year let's do that."

On December 28, 2018, at 1237 hours, Jacobo replied to LIZARRAGA that she would bring him the letter for his signature.

***Investigator's Note:*** ▮▮▮▮▮ *provided King a copy of the state issued check for $600.30 to the IFB and the accompanying letter signed by LIZARRAGA (Exhibit 17).*

***Investigator's Note:*** *Jacobo authored a memorandum titled "Meeting Held on 03/21/19 to Discuss CRM Fundraising Duties," dated March 25, 2019 (Exhibit 18).*

*Refer to the email exchange and related exhibits for complete details.*

# CONFIDENTIAL

# CONFIDENTIAL

## REVIEW OF MEMORANDUM AUTHORED BY SENIOR SPECIAL AGENT JORDAN ESTEN DATED NOVEMBER 9, 2018

I reviewed the memorandum authored by SSA Jordan Esten titled "Contact with Joe Lizarraga," dated November 9, 2018 (Exhibit 19). Esten documented a non-work related encounter with LIZARRAGA. The memorandum stated the following in summary:

Esten reported that in early 2018, he responded to a Craigslist advertisement for used snow sports equipment. Esten went to the private residence near the Fair Oaks area to purchase ski equipment. Esten recalled there were multiple racks containing a "large amount" of snow ski equipment. The seller told Esten that he stays busy buying and selling ski equipment, or words that that effect. At the conclusion of the purchase, Esten learned the seller of the items purchased was LIZARRAGA.

*Investigator's Note: A query of Craigslist revealed advertisements for sports equipment (Exhibits 20 and 21). One Craigslist advertisement (#6762117218) listed LIZARRAGA's personal phone number, _____, as the contact number (Exhibit 20). The other advertisement (#5925026799) listed LIZARRAGA's State issued phone number, _____, as the contact number (Exhibit 21). On March 20, 2016, LIZARRAGA sent an email from his CDCR email account to his personal email account (Exhibit 22) containing a photograph of skis, which appeared in the Craigslist advertisement (Exhibit 21).*

*During the execution of the search warrant on January 16, 2019, Agents confirmed the photographs in Exhibit 20 depicted LIZARRAGA's garage and the equipment contained within.*

*Refer to the memorandum and related exhibits for complete details.*

**INTERVIEWS:**

## INTERVIEW OF WARDEN JOE LIZARRAGA BY CHIEF JAMES O'CONNELL

On September 26, 2018, O'Connell interviewed LIZARRAGA at SCPD. O'Connell recorded the interview with LIZARRAGA (Exhibits 23 and 24).

During the interview with O'Connell (Exhibit 23), LIZARRAGA made the following notable statements related to the allegations associated with this investigation:

- Exhibit 23, beginning timestamp 05:25, LIZARRAGA described the price tag on the snowboard he removed from the plastic packaging as having an "original sticker."

*Investigator's Note: Exhibit 1, page 12, is a photograph of the plastic packaging on the snowboard. Exhibit 25 is an example of an IFB price tag on another snowboard.*

# CONFIDENTIAL

## CONFIDENTIAL

- Exhibit 23, beginning timestamp 09:48, LIZZARAGA stated he bought the snowboard "for the family, several of us can use it."

***Investigator's Note:*** *The search warrant at LIZARRAGA's residence on January 16, 2019, failed to produce the snowboard in question.*

*At LIZARRAGA's residence, a binder was seized containing 94 records, totaling $18,941.00, from November 24, 2018, to January 24, 2019, which appeared to document the sales of snow sports equipment (Exhibit 26). The records consisted of hand written entries on a printed form. The seized records were scanned into the digital file, "LIZZARAGA Seized Records.pdf" (Exhibit 26). On December 26, 2018, LIZARRAGA sent an email from his CDCR email account to his personal email account which contained a blank records form as an attachment (Exhibit 27).*

*Seized from LIZARRAGA's residence were eight consignment contracts with Play It Again Sports from December 20, 2017, through November 28, 2018, totaling $17,412.91 (Exhibit 28). The seized contracts were scanned into the digital file, "LIZZARAGA Consignment Contracts.pdf" (Exhibit 28).*

*Seized from LIZARRAGA's briefcase was page one of a Chase Bank Statement for Joe LIZARRAGA, Account #* ███████ *for October 24, 2018, through November 26, 2018 (Exhibit 29). The Chase Bank Statement showed 10 purchases made at thrift stores in a nine day period.*

███████████████████

███████████████████

*Refer to digitally recorded interview and related exhibits for complete details.*

**INTERVIEWS OF INTERFAITH FOOD BANK THRIFT STORE CLERK** ███████

On October 31, 2018, King conducted a digitally recorded interview with ███████ at her residence (Exhibit 32). ███████ told King the following of note:

███████ told King some of the equipment did not have price tags. ███████ admitted she should not have sold the items without price tags, as it was against store policy. ███████ said LIZARRAGA suggested the prices of the equipment and that was she charged for the equipment.

## CONFIDENTIAL

# CONFIDENTIAL

███████████████████████████████████████████████████████

*Refer to digitally recorded interview for complete details.*

## INTERVIEW OF INTERFAITH FOOD BANK THRIFT STORE CHIEF EXECUTIVE OFFICER ██████

On October 31, 2018, King conducted a digitally recorded interview with ████ at the IFB Thrift Store (Exhibit 33). ████ told King the following of note:

> ████ told King that they (IFB) reported the theft to SCPD and they did not want to pursue charges against LIZARRAGA. ████ recalled speaking with LIZARRAGA over the telephone and she apologized to him for his picture being posted to Facebook. ████ told LIZARRAGA that he could pay the difference for the merchandise. LIZARRAGA sent ████ a check (Exhibit 5). ████ explained that ████ violated policy by selling the merchandise to LIZARRAGA without price tags.

On November 26, 2018, King interviewed ████ at the IFB Thrift Store. The interview was not recorded. King documented the interview in an Activity Report (Exhibit 34).

On January 18, 2019, King interviewed ████ at the IFB Thrift Store. The interview was not recorded. King documented the interview in an Activity Report (Exhibit 35).

On January 28, 2019, King interviewed ████ at the IFB Thrift Store. The interview was not recorded. King documented the interview in an Activity Report (Exhibit 36).

*Refer to digitally recorded interview and Activity Reports for complete details.*

## INTERVIEWS OF INTERFAITH FOOD BANK THRIFT STORE MANAGER ██████████

On October 30, 2018, King interviewed ████ at the IFB Thrift Store. The interview was not recorded. King documented the interview in an Activity Report (Exhibit 37).

On November 19, 2018, King conducted a digitally recorded interview with ████ at the IFB Thrift Store (Exhibit 38). ████ told King the following of note:

> ████ believed she told SCPD that there was more than one item which was sold at a lesser value. ████ said the loss was about $1000.00. As the manager, ████ did not have the authority to press charges, and she believed LIZARRAGA should have been prosecuted.

# CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 12 of 18

# CONFIDENTIAL

On November 26, 2018, King interviewed ███████ at the IFB Thrift Store.   The interview was not recorded.  King documented the interview in an Activity Report (Exhibit 39).

*Refer to digitally recorded interview and Activity Reports for complete details.*

## INTERVIEW WITH ████████████████████████████████████

On November 29, 2018, King conducted a digitally recorded interview with ███████ (Exhibit 40). ███████ told King the following of note:

███████ confirmed he wrote email (Exhibit 3) to CDCR upper management ███████ elaborated on the information he provided in his email. ███████ did not have firsthand knowledge of LIZARRAGA's alleged misconduct. ███████ said the rumor was that LIZARRAGA bought items at second-hand stores and sold the items through Ebay and Craigslist.  ███████ said there was a rumor someone paid IFB, but had no personal knowledge.

*Refer to digitally recorded interview for complete details.*

## INTERVIEW WITH ████████████████████████████

On December 12, 2018, King conducted a digitally recorded interview with ████████████ ██ (Exhibit 41). ██ told King the following of note:

██ contacted the Whistleblower Hotline to report the allegations against LIZARRAGA. ██ explained that staff was concerned about retaliation from LIZARRAGA. ██ did not have firsthand knowledge of LIZARRAGA's alleged misconduct. ██ said LIZARRAGA was rumored to sell equipment on Craigslist from his home.

*Refer to digitally recorded interview for complete details.*

## INTERVIEW WITH ████████████████████████

On December 13, 2018, King conducted a digitally recorded interview with ████████████ ██ (Exhibit 42). ███████ told King the following of note:

███████ spoke with ████████ son and an employee at IFB. ██ told ██ that LIZARRAGA removed price tags and suggested lower prices to the clerk ██ ██ said ███████ wanted to prosecute LIZARRGA initially, but recanted a few days later. ██ and ██ speculated that someone from the prison may have not ██ explained that he later saw the allegation about LIZARRAGA on a Facebook group. ██ heard

# CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 13 of 18

# CONFIDENTIAL

from rumors circulating at the prison that LIZARRAGA sells sports equipment outside of work. ▊▊▊▊ did not have firsthand knowledge of LIZARRAGA's alleged misconduct.

*Refer to digitally recorded interview for complete details.*

## ATTEMPTED INTERVIEW OF WARDEN JOE LIZARRAGA

On August 29, 2019, at 0838 hours, LIZARRAGA was served with an Investigatory Interview Administrative – Subject memorandum (Attachment 43). OIA Special Agent-In-Charge (SAC) John McFadyen and OIA SSA Kurtis Aronsen contacted LIZARRAGA at his residence and served LIZARRAGA the notice of interview. LIZARRAGA signed the notice of interview.

On August 29, 2019, at 1645 hours, LIZARRAGA contacted me by telephone, as I was the assigned case agent. The telephone call was 5 minutes and 29 seconds in duration. The following is my synopsis of the telephone call:

LIZARRAGA asked me if I was the agent responsible for the investigation. Upon confirmation, LIZARRAGA immediately told me he wanted to talk about the scheduling for his interview. LIZARRAGA wanted the date of the interview changed. I advised LIZARRAGA that the interview was scheduled for August 30, 2019, at 0900 hours. LIZARRAGA said this was unreasonable notice and cited the need to get a representative. LIZARRAGA explained this was the first time he heard of this (presumably the content of the interview notice). LIZARRAGA informed me he was seeking representation from an attorney in Los Angeles, but due to the upcoming holiday weekend they were unavailable. LIZARRAGA contested the reasonableness of the notice, stating that 24 hours was insufficient. I explained I was directed to conduct the interview on Friday, August 30, 2019. LIZARRAGA wanted to "appeal" that directive with my superior.

*Investigator's Note:*     *At this point in the conversation, LIZARRAGA's tone became more confrontational.*

I provided LIZARRAGA with the name and telephone number for Galvan. LIZARRAGA reiterated he felt 24 hours was not a reasonable notice period. LIZARRAGA stated we should not treat our employees like "shit," or words to that effect. LIZARRAGA indicated he intended to call Galvan immediately. LIZARRAGA advised his attorney would contact me prior to 0900 hours on August 30, 2019.

I told LIZARRAGA, "To be clear, you are directed to appear for your interview tomorrow, August 30, 2019 at 0900 hours." LIZARRAGA responded, "To be crystal clear, I will not be there tomorrow." LIZARRAGA continued to say that it would be a waste our (OIA and stakeholders) time to be at the interview or words to that effect. LIZARRAGA said,

# CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 14 of 18

## CONFIDENTIAL

"Charge me with AWOL [Absent Without Leave]." Following that statement, the telephone call with LIZARRAGA ended.

On August 30, 2019, at 0900 hours, LIZARRAGA failed to appear for his interview as directed. To date, neither LIZARRAGA, nor his representative has made contact with me.

*Investigator's Note:* In a memorandum titled, "Law Enforcement Contact," dated September 27, 2018, (Exhibit 44) LIZARRAGA provided Vasquez with an account of the purchase at the IFB Thrift Store, the subsequent contact with O'Connell, and the telephone call with ▇▇▇ on September 28, 2018.

*Investigator's Note:* I conducted a review of LIZARRAGA's Official Personnel File (OPF) and training record (Exhibit 45). I located an Ethics Orientation for State Officials Certificate of Completion dated March 26, 2014, for LIZARRAGA (Exhibit 46). I also located an Ethics Training for State Officials Certificate of Completion dated November 26, 2018, for LIZARRAGA (Exhibit 47).



## CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 15 of 18

# CONFIDENTIAL

████████████████████████████████████████████████

## REVIEW OF RELEVANT RULES/POLICIES:

The following policies and regulations were reviewed and identified as being pertinent to this investigation. The excerpts are found in the January 1, 2018, revisions of the California Code of Regulations (CCR) Title 15, California Penal Code (PC), California Government Code (GOV), and the CDCR, Department Operations Manual (DOM):

1.  Title 15, §3391, Employee Conduct (Exhibit 50).
2.  Title 15, §3413, Incompatible Activity (Exhibit 51).
3.  PC, §137(a), Bribery of a Witness (Exhibit 52).
4.  PC, §487, Grand Theft (Exhibit 53).
5.  PC, §532, Theft by False Pretenses (Exhibit 54).
█  ████████████████████████████████████████
8.  DOM, §31140.5.1, Employee Duty to Cooperate (Exhibit 57).
9.  DOM, §33030.3.1, Code of Conduct (Exhibit 58).
10. DOM, §33030.3.2, General Qualifications (Exhibit 59).
11. DOM, §33030.3.3, Law Enforcement Code of Ethics (Exhibit 60).

████████████████████████████████████████████
████████████████████████████████████████████

*Refer to the policies for complete details.*

## LIST OF WITNESSES:



1.  ███████████████ Interfaith Food Bank Thrift Store Clerk.
2.  ███████ Interfaith Food Bank Chief Executive Officer.
3.  ███████████ Interfaith Food Bank Thrift Store Manager.



4.  ████████████████
5.  ████████████
6.  ████████
7.  Joe LIZARRAGA, Warden.

## EXHIBITS:

1.  Sutter Creek Police Report #18-438 printed on October 29, 2018.
2.  Digital file of the IFB Surveillance Video on September 14, 2018.
3.  Email from ███████████████ to Ralph Diaz, et al., dated September 28, 2018.

# CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 16 of 18

# CONFIDENTIAL

4.  Digital recording of telephone conversation between Joe LIZARRAGA and ▓▓▓ ▓▓▓ on September 28, 2018.
5.  Copy of Money Order #1148707865, envelope, and correspondence mailed October 1, 2018.
6.  Criminal Investigation Report #282-SC-3010584 authored by Charles King.
7.  Memorandum authored by Rick Ivicevich dated November 14, 2018.
8.  OIA FAST Forensic Report authored by Gary Viegas on October 9, 2018.
9.  OIA FAST Forensic Report authored by Gary Viegas on May 8, 2019.
10. Digital file, "Lizarraga Personal Emails.pdf."
11. OIA FAST Forensic Report authored by Gary Viegas on November 8, 2018.
12. Digital file, "Classifieds URLs.xlsx."
13. Digital file, "Internet Explorer 10-11 Content.xlsx."
14. Digital file, "Internet Explorer 10-11 Main History.xlsx."
15. Copy of Handwritten Note seized from LIZARRAGA's office on January 16, 2019.
16. Email exchange between Joe LIZARRAGA and Francesca Jacobo dated December 24, 2018.
17. Copy of State Issued Check #198-906212 to Interfaith Food Bank and correspondence dated December 28, 2018.
18. Memorandum authored by Francesca Jacobo dated March 25, 2019.
19. Memorandum authored by Jordan Esten dated November 9, 2018.
20. Craigslist Advertisement #6762117218
21. Craigslist Advertisement #5925026799
22. Email from ▓▓▓▓▓▓▓ to ▓▓▓▓▓▓▓▓▓▓ dated March 28, 2018 with Photograph attachment.
23. Recorded interview of Joe LIZARRAGA by James O'Connell on September 26, 2018.
24. Recorded interview of Joe LIZARRAGA by James O'Connell on September 26, 2018.
25. Photograph of example IFB price tag.
26. Digital file, "LIZARRAGA Seized Records.pdf."
27. Email from ▓▓▓▓▓▓▓ to ▓▓▓▓▓▓▓ dated December 26, 2018 with Records Form attachment.
28. Digital file, "LIZARRAGA Consignment Contracts.pdf."
29. Chase Bank Statement for Joe LIZARRAGA, Account # ▓▓▓▓▓ for October 24, 2018 through November 26, 2018.
30. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
31. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
32. Recorded interview with ▓▓▓▓▓ on October 31, 2018.
33. Recorded interview with ▓▓▓▓▓ on October 31, 2018.
34. Documented interview ▓▓▓▓▓ on November 26, 2018.
35. Documented interview of ▓▓▓▓▓ on January 18, 2019.
36. Documented interview of ▓▓▓▓▓ on January 28, 2019.
37. Documented interview of ▓▓▓▓▓ on October 30, 2018.
38. Recorded interview of ▓▓▓▓▓ on November 19, 2018.
39. Documented interview of ▓▓▓▓▓ on November 26, 2018.

# CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 17 of 18

## CONFIDENTIAL

40. Recorded interview of ▮▮▮▮▮▮ on November 29, 2018.
41. Recorded interview of ▮▮▮▮▮ on December 12, 2018.
42. Recorded interview of ▮▮▮▮▮ on December 13, 2018.
43. Investigatory Interview Administrative – Subject memorandum for Joe LIZARRAGA.
44. Memorandum authored by Joe LIZARRAGA dated September 27, 2018.
45. Training record for Joe LIZARRAGA.
46. Ethics Orientation for State Officials Certificate for Joe LIZARRAGA dated March 26, 2014.
47. Ethics Training for State Officials Certificate for Joe LIZARRAGA dated November 26, 2018.
48. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
49. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

50. Title 15, §3391, Employee Conduct.
51. Title 15, §3413, Incompatible Activity.
52. PC, §137(a), Bribery of a Witness.
53. PC, §487, Grand Theft.
54. PC, §532, Theft by False Pretenses.
55. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
56. ▮▮▮▮▮▮
57. DOM, §31140.5.1, Employee Duty to Cooperate.
58. DOM, §33030.3.1, Code of Conduct.
59. DOM, §33030.3.2, General Qualifications.
60. DOM, §33030.3.3, Law Enforcement Code of Ethics.
61. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
62. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
63. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## CONFIDENTIAL

Office of Internal Affairs
Report Number: (H)N-ADM-804-18-A
Page 18 of 18

# CONFIDENTIAL

**CASE STATUS:**

The Office of Internal Affairs' investigation is closed. This investigative report is referred to Hiring
Authority, Director Connie Gipson, Division of Adult Institutions for disposition.


Date: 9/12/2019

**ADAM CUNNINGHAM**
Special Agent
Office of Internal Affairs - Headquarters


Date: 9/17/2019

**KURTIS ARONSEN**
Senior Special Agent
Office of Internal Affairs - Headquarters


Date: 9/17/19

**JOHN MCFADYEN**
Special Agent-In-Charge
Office of Internal Affairs - Headquarters

# CONFIDENTIAL

**Incident Date**

January 21, 2019    **19-0028435-CI**

**Incident Type**

Inmate Death by
Overdose

On January 21, 2019, an officer found an unresponsive incarcerated person in a cell. Four officers performed life-saving measures and transported the incarcerated person to the triage and treatment area, where a nurse assisted with life-saving measures until a physician pronounced the incarcerated person dead.

**Indicator
Ratings***

*Indicators 1-3*

**Poor**

*Ratings
subject to
change*

The coroner determined that the cause of death was a massive overdose of methamphetamine due to leakage or rupture of bindles ingested for the purposes of drug smuggling. The department's Mortality Review Committee determined that the cause of death was methamphetamine overdose and that the death was unintentional. The committee identified a delay in the application of an automated external defibrillator, a lack of documentation that medical staff administered opiate antidote, that the incarcerated person had some signs of rigor when discovered, and a lack of clarity as to when an officer conducted the last security check. The housing unit log showed that an officer conducted a security check 32 minutes prior to inmate being discovered, but an officer told the coroner that they conducted the check 17 minutes prior to discovery. The hiring authority for medical staff provided training to nurses. The investigative services unit sufficiently investigated the source of the drugs but did not determine the source or locate additional drugs.

Overall, the department . . . . ly handled the critical incident because, based on the department's Mortality Review Committee, nurses delayed in applying an automated external defibrillator and did not adequately document that they administered an opiate antidote, and because officers allowed the incarcerated person to partially cover his cell door window and the hiring authority for the officers should have taken corrective action.

Prior to the critical incident, the department performed . . . . ly because custody staff allowed the incarcerated person to partially cover his cell door window.

**Did the inmate have a visitor within one week of the overdose?**
The institution advised that the incarcerated person had visitors the weekend before the incident.

**Except for a deficiency noted in the answer to another question in this indicator, prior to the incident, did the department violate policy or procedure or not comply with best practice?**
Custody staff allowed the incarcerated person to partially cover his cell door window.

During the critical incident, the department . . . . ly handled the critical incident because, based on the department's Mortality Review Committee, nurses delayed in applying an automated external defibrillator and did not document that they administered an opiate antidote.

**Except for any deficiency noted in the answer to another question in this indicator, during the incident, did the department violate policy or procedure or not comply with best practices?**
Based on the findings of the department's Death Review Committee, there was a delay in the application of an automated external defibrillator and a lack of documentation that medical staff administered a opiate antidote to the incarcerated person.

After the critical incident, the department performed _____ly because the hiring authority should have provided corrective action after officers allowed the incarcerated person to partially cover his cell door window.

### Did the OIG independently identify an operational issue or policy violation that resulted in, or should have resulted in, corrective action?

The OIG identified a covering that partially obstructed the view into the incarcerated person's cell.

### Did the hiring authority conduct an appropriate inquiry into potential staff misconduct?

Officers allowed the incarcerated person to partially cover his cell door window, which should have resulted in corrective action.

### As a result of the critical incident, did the department provide corrective action to any employee?

The hiring authority provided training to nurses.

# COMPSTAT DAI Statistical Report - 13 Month

Data Analysis 13 Month as of 07-11-2019
Location(s): ASP, CAL, CEN, CTF, CVSP, ISP, MCSP, PVSP, SOL, VSPW



| | 2018 | | | | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
| **ISP** | | | | | | | | | | | | | |
| Per 100 Staff | 0.44 | 0.34 | 0.00 | 0.34 | 0.46 | 0.23 | 0.34 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Dismissals (Non-Medical) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Adverse Actions Total (Medical) | 1 | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Per 100 Staff | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 |
| Dismissals (Medical) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **MCSP Custody Operations** | | | | | | | | | | | | | |
| **Total Bed Capacity** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 | 4,009 |
| Maximum Capacity | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 | 4,986 |
| Design Beds | 3,384 | 3,384 | 3,284 | 3,384 | 3,384 | 3,384 | 3,284 | 3,384 | 3,384 | 3,384 | 3,284 | 3,384 | 3,384 |
| Inmate Count | 4,280 | 4,324 | 4,229 | 4,186 | 4,149 | 4,051 | 4,022 | 3,968 | 4,016 | 4,046 | 4,078 | 4,113 | 4,078 |
| % Institution Filled to Blueprint Crowding Capacity | 107 % | 108 % | 105 % | 104 % | 103 % | 101 % | 100 % | 99 % | 100 % | 101 % | 99 % | 100 % | 99 % |
| **Inmate Security Level** | | | | | | | | | | | | | |
| Inmate Level I (Classification Score of 0-18) | 185 | 206 | 183 | 189 | 182 | 182 | 182 | 174 | 170 | 177 | 190 | 201 | 214 |
| Out of Bed Level I Assignments | 2 | 24 | 15 | 29 | 20 | 20 | 23 | 24 | 21 | 25 | 27 | 29 | 29 |
| % of Out of Level I Assignments | 1 % | 12 % | 8 % | 15 % | 11 % | 11 % | 13 % | 14 % | 12 % | 14 % | 14 % | 14 % | 14 % |
| Inmate Level II (Classification Score of 19-35) | 1,990 | 1,998 | 1,981 | 1,862 | 1,957 | 1,971 | 1,947 | 1,935 | 1,882 | 1,872 | 1,993 | 1,994 | 1,961 |
| Out of Bed Level II Assignments | 90 | 53 | 88 | 66 | 64 | 66 | 62 | 79 | 79 | 80 | 89 | 88 | 83 |
| % of Out of Level II Assignments | 3 % | 3 % | 3 % | 3 % | 3 % | 3 % | 3 % | 4 % | 4 % | 4 % | 4 % | 4 % | 4 % |
| Inmate Level III (Classification Score of 36-59) | 1,016 | 1,019 | 1,027 | 1,005 | 1,030 | 968 | 954 | 924 | 939 | 933 | 948 | 953 | 935 |
| Out of Bed Level III Assignments | 12 | 15 | 18 | 13 | 15 | 15 | 16 | 12 | 13 | 11 | 13 | 13 | 13 |
| % of Out of Level III Assignments | 1 % | 1 % | 2 % | 1 % | 1 % | 2 % | 2 % | 1 % | 1 % | 1 % | 1 % | 1 % | 1 % |
| Inmate Level IV (Classification Score of 60+) | 1,089 | 1,099 | 1,038 | 930 | 960 | 930 | 939 | 532 | 535 | 944 | 947 | 885 | 968 |
| Out of Bed Level IV Assignments | 26 | 34 | 31 | 36 | 34 | 28 | 28 | 27 | 26 | 29 | 28 | 33 | 41 |

# COMPSTAT DAI Statistical Report - 13 Month

Data Analysis 13 Month as of 07-11-2019
Location(s): ASP, CAL, CEN, CTF, CVSP, ISP, MCSP, PVSP, SOL, VSPW

| MCSP | 2018 | | | | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
| **% of Out of Level IV Assignments** | 2 % | 3 % | 3 % | 4 % | 4 % | 3 % | 3 % | 3 % | 3 % | 3 % | 3 % | 3 % | 4 % |
| **Camps** | | | | | | | | | | | | | |
| Camps (CMC, CRC only) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Camps | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pipeline | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Reception Center** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Actual Population | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Reception Center with S-Suffix | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **General Population (GP)** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 0 | 0 | 0 | 0 | 0 | 0 | 1,320 | 1,320 | 1,320 | 1,320 | 1,320 | 1,320 | 1,320 |
| Actual Population | 0 | 0 | 0 | 0 | 0 | 0 | 120 | 317 | 286 | 396 | 412 | 451 | 596 |
| GP with S-Suffix | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Enhanced Outpatient Program (EOP)** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 | 714 |
| Total EOP Population | 499 | 525 | 520 | 544 | 568 | 548 | 544 | 524 | 551 | 562 | 563 | 600 | 598 |
| Actual Population (In EOP Designated Bed Use) | 499 | 525 | 520 | 544 | 568 | 548 | 544 | 524 | 551 | 562 | 563 | 600 | 598 |
| Actual Population (In Non-EOP Designated Bed Use) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| EOP with S-Suffix | 48 | 44 | 39 | 41 | 48 | 52 | 46 | 44 | 52 | 47 | 49 | 53 | 53 |
| **SNY-EOP** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total SNY EOP Population | 204 | 175 | 144 | 111 | 93 | 81 | 69 | 59 | 55 | 50 | 43 | 35 | 30 |
| Actual Population (In SNY-EOP Designated Bed Use) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Actual Population (In Non SNY-EOP Designated Bed Use) | 204 | 175 | 144 | 111 | 93 | 81 | 69 | 59 | 55 | 50 | 43 | 35 | 30 |



# COMPSTAT DAI Statistical Report – 13 Month

Data Analysis 13 Month as of 07-11-2019
Location(s): ASP, CAL, CEN, CTF, CVSP, ISP, MCSP, PVSP, SOL, VSPW



| | 2018 | | | | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **MCSP** | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
| SNY EOP with S-Suffix | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Correctional Clinical Case Management Services (CCCMS)** | | | | | | | | | | | | | |
| Treatment Capacity | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 | 1,755 |
| Actual Population | 1,547 | 1,534 | 1,531 | 1,591 | 1,464 | 1,459 | 1,426 | 1,441 | 1,442 | 1,473 | 1,486 | 1,469 | 1,434 |
| **Work Crews (WC/MWB/FH/BFH)** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 296 | 296 | 296 |
| Actual Population | 174 | 190 | 160 | 153 | 153 | 146 | 132 | 133 | 141 | 137 | 152 | 164 | 176 |
| **Administrative Segregation (ASU)** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Actual Population | 112 | 121 | 108 | 124 | 107 | 118 | 117 | 113 | 123 | 116 | 106 | 110 | 123 |
| EOP Endorsed for Transfer | 12 | 30 | 13 | 16 | 14 | 17 | 16 | 13 | 20 | 15 | 18 | 11 | 19 |
| Stays Exceeding 150 Days | 3 | 8 | 8 | 9 | 8 | 12 | 11 | 10 | 10 | 15 | 9 | 7 | 2 |
| Stays Exceeding 400 Days | 1 | 2 | 3 | 3 | 3 | 1 | 1 | 2 | 1 | 1 | 1 | 1 | 3 |
| Stays Exceeding 800 Days | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **ASU EOP Hub** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Actual Population | 43 | 48 | 48 | 43 | 37 | 37 | 38 | 31 | 38 | 29 | 31 | 36 | 42 |
| **Restricted Housing** | | | | | | | | | | | | | |
| Blueprint Crowding Capacity | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Actual Population | 117 | 121 | 108 | 124 | 107 | 118 | 117 | 113 | 123 | 116 | 106 | 110 | 123 |
| Total Restricted Housing Endorsed Inmates | 8 | 18 | 8 | 11 | 9 | 8 | 10 | 5 | 14 | 13 | 10 | 9 | 15 |
| **Restricted Custody General Population (RCGP)** | | | | | | | | | | | | | |
| Actual Population | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Short Term Restricted Housing (STRH)** | | | | | | | | | | | | | |



1  ANNE I. YEN, Bar No. 187291
   WEINBERG, ROGER & ROSENFELD
2  A Professional Corporation
   1001 Marina Village Parkway, Suite 200
3  Alameda, California 94501
   Telephone  (510) 337-1001
4  Fax  (510) 337-1023
   E-Mail:  ayen@unioncounsel.net
5          courtnotices@unioncounsel.net

6  Attorneys for Union of American Physicians and Dentists

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  RALPH COLEMAN, et al.,                    No. 2:90-cv-00520-KJM-DB

12                         Plaintiffs,
                                             **AMICUS BRIEF OF UNION OF**
13         v.                                **AMERICAN PHYSICIANS AND**
                                             **DENTISTS**
14  GAVIN NEWSOM, et al.,

15                         Defendants.

16                                           Judge:     Hon. Kimberly J. Mueller

17

18

19

20

21

22

23

24

25

26

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

## I.    INTRODUCTION

In the Court's 1995 decision, the Court ordered the appointment of a Special Master to oversee corrective measures, because of the California Department of Corrections and Rehabilitation (CDCR)'s failure to provide adequate psychiatric care.  Psychiatry at CDCR was and still is severely understaffed.  The constitutional standard requires ready access to competent *medical* staff – that is, psychiatrists.  (See, e.g., *Coleman v. Wilson*, 912 F.Supp.1282, 1307, 1308 (E.D.Cal. 1995).  Unfortunately, as the reports of Dr. Michael Golding and the Neutral Expert have shown, CDCR has engaged in misleading practices in reporting to the Special Master and the Court – misleading practices which tend to cover up or under-report the deficiencies caused by CDCR's understaffing of psychiatrists.

The Union of American Physicians and Dentists (UAPD) submits this amicus brief in part to support ordering CDCR to correct misleading practices that were identified and substantiated in the Neutral Expert.  UAPD contends that the misleading practices undermine both patient care and working conditions for the psychiatrists that UAPD represents.

In addition, although the Neutral Expert does not recommend holding a hearing regarding whether CDCR has presented misleading information, UAPD supports holding a hearing.  Unfortunately, the psychiatrists represented by UAPD have found that the non-medical leadership of CDCR have increasingly sought to eliminate psychiatric oversight of patient care.  CDCR leadership, which is dominated by psychologists, has been shifting authority and functions to psychologists, beyond the proper scope of practice for non-physicians.  Therefore, the CDCR's misleading practices are quite deliberate, being designed to cover up the dangers of understaffing – and undermining – psychiatrists.

Likewise, UAPD urges the Court to consider this amicus brief, and the supporting declarations of psychiatrists, when considering any and all proposals by CDCR that would involve decreasing psychiatry positions or psychiatry supervisor positions, or which would affect the authority of non-medical staff to make decisions affecting patient care – including, but not limited to, CDCR's Staffing Proposal and revisions thereto, and the CDCR's Custody and Mental Health Partnership Plan ("CMHPP") to be filed by June 7, 2019 (Dkt. 6126).

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1
AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

## II.  **REVIEW OF RELEVANT LEGAL STANDARDS**

### A.  **THE NEED FOR TIMELY EVALUATIONS AND TREATMENT BY COMPETENT *MEDICAL* STAFF**

In the 1995 decision, the Court found, *inter alia*, "in order to provide necessary mental health care to prisoners with serious mental disorders, there must be a system in place to identify those individuals, both at the time they are admitted to the Department of Corrections and during their incarceration." 912 F.Supp. at 1305. Some inmates with serious mental disorders are, by virtue of their condition, incapable of making their needs for mental health care known to staff. Delivery of adequate mental health care to such inmates requires their identification. *Id.* The Court found, "evidence before the court plainly shows that thousands of inmates suffering from mental illness are either undetected, untreated, or both... The federal Constitution does not tolerate such a lack of medical care." *Id.* at 1305–1306.

In order to provide inmates with access to constitutionally adequate mental health care, defendants must employ mental health staff in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders. *Id.* at 1306. This requires "ready access to competent *medical staff*." *Id.* at 1307, emphasis supplied; see also the Court's determination that the required access to adequate medical care means ready access to "physicians," at 1308. Monitoring was ordered in part to address the "unacceptably long delays in access to every level of care... a critical sign of understaffing." *Id.* at 1307. The understaffing-related delays "result in exacerbation of illness and patient suffering, a violation of the objective facet of the test for violation of the Eighth Amendment." *Id.* at 1309.

Monitoring was ordered in part because the Court found that "defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring." *Coleman v. Wilson*, 912 F.Supp. at 1309.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1  The Court summarized, "due to a systemic failure to provide adequate mental health care,

2  thousands of class members suffer present injury and are threatened with great injury in the

3  future." *Coleman v. Wilson*, 912 F.Supp. at 1315.

4  **B.    CONSTITUTIONAL STANDARDS SET FORTH IN PROGRAM GUIDE**

5  The Program Guide is the court-ordered remediation plan designed to provide the

6  constitutionally required standards in the context of CDCR mental health services. *Coleman v.*

7  *Brown*, 756 Fed.Appx. 677, 679 (9th Cir. 2018). The Program Guide requires, *inter alia*, that

8  each Correctional Clinical Case Management System ("CCCMS") patient on psychiatric

9  medication be reevaluated by a psychiatrist a minimum of every 90 days; and that a psychiatrist

10  shall evaluate each Enhanced Outpatient Program ("EOP") patient at least monthly. (See Neutral

11  Expert report at p. 10.)

12  **C.    RELEVANT REGULATORY STANDARDS**

13  Licensed physicians are responsible for the care of inmate-patients in a correctional

14  treatment center. All inmates admitted to or accepted for medical care by a correctional treatment

15  center shall be under the care of a physician. 22 CCR § 79599. By contrast, psychologist services

16  are only consultative to the patient. 22 CCR § 79609.

17  **III.    SUMMARY OF FACTS**

18  **A.    CDCR ENGAGES IN MISLEADING PRACTICES, CREATING A FALSE**
    **APPEARANCE OF COMPLIANCE**
19

20  **1.    Falsely Reporting Compliance as to Transferred Patients Who Have Not**
    **Received Timely Psychiatric Evaluation**

21  When a mental health patient is transferred from one institution to another, CDCR resets

22  the clock to the maximum interval between psychiatry appointments (30 days for some patients

23  and 90 days for others), which causes the time during that re-set interval in which the patient does

24  not receive an evaluation to falsely appear compliant. (Dkt. 5988-1, p. 1.) Dr. Golding explains

25  that the strategy of resetting the clock overstates timeliness of psychiatric appointments and

26  thereby leads to mistaken conclusions about psychiatry staffing needs. (*Id.*) The non-medical

27  CDCR leadership seeks to defend the practice on the basis that the Special Master knows about

28  "resetting the clock." (Neutral Expert Report, p. 27.) However, the Neutral Expert reports that

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
3600 Marca Village Parkway, Suite 200
Alameda, California 94502
(510) 337-1001

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

1    the Special Master agrees with the psychiatrists that a psychiatry evaluation necessarily must be

2    done before the initial Interdisciplinary Treatment Team ("IDTT") meeting, which in turn is

3    supposed to occur within 14 working days of the patient's arrival.  (Neutral Expert Report, pp. 26,

4    28, 36.)  The Special Master indicates that it is misleading to count initial psychiatry evaluations

5    that occur after the IDTT as compliant — as CDCR leadership knows or should know, because it

6    is in the written guidebook developed by CDCR and the Special Master, and the Special Master

7    has made his understanding clear.  (*Id.*, p. 28.)  The Neutral Expert finds "a disconnect between

8    CDCR and the Special Master concerning CDCR's interpretation of the Program Guide relating

9    to transferred patients that could have important clinical ramifications" — that is, CDCR is

10   reporting itself compliant during the re-set time a transferred patient is not receiving a psychiatric

11   evaluation, even if the patient has not received a pre-IDTT evaluation.  (*Id.* at p. 36.)

12           2.      **Unilaterally Redefining "Monthly" Without Consulting the Special Master**

13          Between December 2016 and April 2017, CDCR modified its business rule for measuring

14   the timeliness of psychiatry appointments from 30 days up to 45 days without consulting the

15   Special Master.  The Special Master found it shocking that CDCR unilaterally changed a long-

16   standing interpretation of the Program Guide without consulting him.  (Neutral Expert Report, p.

17   39.)

18           3.      **Counting All Encounters as "Evaluations" for Compliance Purposes**

19          Dr. Golding demonstrates, and the Neutral Expert agrees, that by counting every

20   encounter as a "psychiatric appointment," CDCR does not correctly report the extent that patients

21   are receiving timely psychiatric appointments (reporting more timely psychiatric appointments

22   than the reality).  (Dkt. 5988-1, p. 6.)  Dr. Golding has raised the issue with CDCR Mental Health

23   Leadership numerous times and requested CDCR correct the problem, but the non-medical

24   CDCR leadership refuses to acknowledge that a psychiatric evaluation, as required by the

25   Program Guide, must be confidential.  (Neutral Expert Report, p. 49.)  Moreover, the Special

26   Master advises that he has regularly told CDCR that non-confidential contacts should not qualify

27   as evaluations under the Program Guide.  (*Id.* p. 52.)

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

4

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

As CDCR Senior Psychiatrist Specialist Dr. Navreet Mann explains, psychiatrists have been trying to get executive leadership to address the need for confidential appointments, but nothing has been done; and non-confidential encounters, such as cell-front contacts, are a rampant problem at CDCR, not just a minor aberration. (See Dr. Mann's declaration at paragraph 4.d.)

4. **Refusing to Report the Extent that Psychiatric Supervisors Are Carrying Caseloads**

The 2009 Staffing Plan includes staffing ratios for Staff Psychiatrists, but not Psychiatry Supervisors. Some Psychiatry Supervisors are carrying caseloads like Staff Psychiatrists, which impacts the representations CDCR makes regarding staffing ratios when making staffing proposals. However, CDCR did not disclose the fact that Psychiatry Supervisors have been providing direct services, some carrying full caseloads, when CDCR has proposed psychiatrist reductions. (See Neutral Expert Report, p. 72.) The Special Master asserts that CDCR has not provided sufficient information regarding this issue; such as how many full-time equivalents are actually used for direct services and the duration. (*Id.*, p. 74.) The "Timely Psychiatry Contacts" reported by CDCR does not disclose that some portion of the data reflects appointments seen by supervisors. (*Id.*, p. 77.) Although the Neutral Expert does not make a finding that the misleading data has necessarily impacted the Special Master or the Court, that is because CDCR has failed and refused to provide sufficient data to quantify this activity. (*Id.* pp. 76-77.)

As Dr. Navreet Mann explains in the accompanying declaration:

> CDCR's practice of using psychiatry supervisors as caseload-carrying line staff is material. Carrying full or partial caseloads not only impacts the compliance data, but also keeps Psychiatrists from running successful programs. By overloading Psychiatry supervisors with disproportionate direct care duties, CDCR excludes us from the planning and oversight functions that should be the Psychiatry supervisors' primary focus. Though Psychiatrists are not involved in how their programs should be run, they are held accountable when the plans start to fail.

(See Dr. Mann's declaration at paragraph 4.e.)

5. **Refusing to Count All Medication Non-Compliance Appointment Requirements**

Dr. Golding demonstrates, and the Neutral Expert agrees, that CDCR's system for reporting compliance is misleading, because it does not capture all patients who require a

5

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1    medication noncompliance appointment – and therefore overstates compliance (see, e.g., Neutral

2    Expert report, pp. 5, 79, 86-87). The psychiatrists and the Special Master believe that

3    medication-noncompliant patients must be seen by a psychiatrist; however, patients are frequently

4    not referred to a psychiatric appointment for medication noncompliance and are therefore not

5    counted in the reporting to the Special Master. The administrators and psychologists who

6    "dominate CDCR Mental Health's policy and data analysis apparatus" (Neutral Expert Report, p.

7    84) have refused to comply with the mandate for medication non-adherence counseling by the

8    prescriber, which in the case of mental health patients is the psychiatrist. (*Id.*, pp. 81, 82.) All

9    psychiatrists interviewed by the Neutral Expert consider medication non-compliance counseling

10   by a psychiatrist to be mandatory, and the Special Master believes all patients must be referred to

11   a psychiatrist unless the noncompliance issue is quickly resolved. (*Id.*, pp. 86-87.) However, the

12   non-medical leadership deliberately refuses to acknowledge the requirement. (*Id.*, p. 82.)

13       Dr. Mann attests:

14  
15  
16  
17  
18  
> Over the past few years questions have been raised from the field regarding the process of involuntary treatment of patients, as allowed under Penal Code 2602. The most pressing issue currently raised by Psychiatry is that patients are not receiving involuntary treatment ordered by the physician, and there is a substantial delay in patients getting their medications after the court has granted an order to involuntarily treat the patient. Patients under a court order need to be medicated as ordered by the court, which is not always happening.

19   (See Dr. Mann's declaration, paragraph 5.)

20       **6.**    **Exclusion of EOP Patients Who Are Not on Psychiatric Medications from**
                **Compliance Metrics**

21  
22       The psychiatrists and the Special Master confirm that timely psychiatric evaluations must

23   apply to all EOP patients under the Program Guide, yet CDCR and its counsel refuse to

24   acknowledge this requirement. CDCR only counts EOP patients who are on psychiatric

25   medications as requiring psychiatric evaluations for the purpose of reporting whether CDCR is in

26   compliance. Before the Neutral Expert investigation, this issue had been unknown to the Special

27   Master, Plaintiffs, and psychiatry staff. (Neutral Expert Report pp. 89-90.) While the Neutral

28   Expert did not investigate, nor make any findings, whether the non-medical CDCR Mental Health

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

6

1    Leadership intentionally concealed this misleading practice, non-medical leadership have "long

2    been aware" that it was an issue under the Program Guide, and the privately discussed it amongst

3    themselves (*Id.*, fn. 61). The inference is clear that the Special Master, Plaintiffs, and psychiatry

4    staff were unaware of the issue, while non-medical leadership were aware of it, *because* non-

5    medical leadership deliberately failed and refused to disclose it.

6           7.  **Exclusion of EOP Overflow Patients from Compliance Metrics**

7         EOP Overflow patients have been assigned to the EOP level of care, but are not yet in an

8    institution where there is an EOP program or space in that program. CDCR has excluded those

9    patients from reporting whether CDCR is providing patients with timely psychiatry contacts.

10   Psychiatry leadership raised this issue with the psychologist leadership at least as early as 2016;

11   the psychology leadership then falsely assured Dr. Golding that Overflow patients would be

12   included. However, it has not been done. (Neutral Expert Report, pp. 90-91.)

13   **B.    NON-MEDICAL LEADERSHIP UNDERMINES PSYCHIATRIC CARE**

14        Dr. Golding reports that psychiatry is under-represented in the leadership structure. The

15   Neutral Expert finds that the psychiatrists his firm interviewed corroborate that concern, and that

16   they express psychiatry concerns are ignored or marginalized, with negative impacts upon patient

17   care. (Neutral Expert report, p. 23.) Headquarters committees, including the Mental Health

18   Change Management and Mental Health Quality Management Committees, are led primarily by

19   psychologists, with psychiatrists being in the minority. (*Id.* at p. 22 and fn. 21.) While CDCR

20   makes many decisions on a regional level, it staffs no psychiatrists at the regional offices; and at

21   the local level, most Chief Psychiatrists report to psychologists. (Dr. Schultz-Ross' declaration,

22   para. 10-11.) Moreover, CDCR reduced psychiatrists in its Staffing Proposal without psychiatry

23   leadership's agreement (see Neutral Expert Report, pp. 19-20). As Dr. Mann notes:

24           In certain responses CDCR misuses Psychiatry understaffing, by
        having Psychologists take over certain services that cannot be

25           provided by Psychiatrists due to short staffing, instead of focusing
        on hiring new staff. This raises some serious scope of practice

26           issues. Psychologists and Psychiatrists are not interchangeable. Our
        leadership has been made aware of the differences, but have failed

27           to address these scope of practice issues.

28   (See Dr. Mann's declaration at paragraph 4.g.)

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
3330 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

7

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

1       As CDCR Psychiatrists Dr. Navreet Mann and Dr. Amar Mehta explain in the

2 accompanying declarations, psychologists do not have the training to safely manage, supervise

3 and overrule psychiatrists.  The decisions psychiatrists make regarding patient care are informed

4 by the standardized, extensive medical training they receive as physicians, enabling them to care

5 for the health of the whole patient and to understand the risks and benefits of different medical

6 treatment options (see Dr. Mann's declaration at paragraph 2, and Dr. Mehta's declaration at

7 paragraph 2).  Psychologists, on the other hand, are not trained as physicians, and they cannot be

8 expected to fully understand the medical issues and treatments handled by the psychiatrists (see

9 Dr. Mann's declaration at paragraph 3, and Dr. Mehta's declaration at paragraph 2).

10       Dr. Mehta's statement is consistent with the concern other members express:

11
> I understand that there is a critical psychiatrist shortage in this
> country, and a larger physician shortage in general. That is a real
12 > problem, with real consequences. However, simply handing that
> responsibility to other professions without adequate training is not a
13 > solution. Psychiatric patients do not deserve to be treated as second
> class citizens, as the sole group of patients that can be treated by
14 > people who have no general medical training…An exception for
> psychiatry reflects a deep misunderstanding of the interconnected
15 > and complicated nature of human physiology, and is demeaning to
> patients with very real suffering.

16 (Dr. Mehta's declaration at paragraph 3.)

17       CDCR Psychiatrist Dr. Andrew Schultz-Ross attests in his declaration:

18
> In CDCR, psychologists generally govern psychiatrists at the
19 > departmental and facility levels. Psychiatrists generally are not in
> charge of the treatment team and due to psychiatrist understaffing,
20 > often cannot attend treatment team meetings due to scheduled
> appointments with patients or other tasks.  I experienced
21 > circumstances in which I was not included in my patients' treatment
> team meetings, due to the way the workflow was organized.

22
> As discussed in more detail in Dr. Golding's report, against the
23 > wishes of the psychiatry leaders, CDCR is moving toward granting
> psychologists the ability to order seclusion and restraint.
24 > Psychologists in CDCR already often order admission and
> discharge into hospital levels of psychiatric care in the prisons.
25 > They sometimes overrule psychiatrists in these decisions, not
> admitting patients that psychiatrists say need more care, and
26 > discharging patients who are in the midst of medication changes
> best done in an inpatient setting. As psychologists have no medical
27 > training, they may make decisions involving medical risks that they
> may not be able to recognize or fully assess.

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

8

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

1     (Dr. Schultz-Ross' declaration at paragraphs 3-4.)

2         Accordingly, UAPD stresses that CDCR's unusual working conditions, in which

3 psychologists manage and overrule psychiatrists, are unsafe for the patients and deeply

4 concerning to the psychiatrists in carrying out their responsibilities as licensed physicians.

5         Dr. Golding's report shows numerous ways the non-medical leadership undermine

6 psychiatric care:

- Authorizing psychologists to overrule psychiatrists' orders (including incidents in which untreated patients harmed themselves as the result) (Golding Report, Dkt. 5988-1, e.g. pp. 18, 21, 84, 99, 103);

- Making policy decisions to lengthen "compliant" intervals between appointments without including psychiatry leadership (*Id.*, p. 24);

- Providing no organizational support to ensure psychiatric appointments are met in a timely fashion, forcing the psychiatrists to spend time wandering the institutions searching for their patients, and forcing the psychiatrists to have non-confidential, inadequate visits with the patients once they are found (*Id.*, pp. 42, 57, 65-66);

- Excluding from the data of "required" appointments those that have been ordered by psychiatrists, so that those appointments are not counted for the purpose of reporting whether "required" appointments have been complied with (*Id.*, p. 56);

- Excluding psychiatry's requests from the design of the Electronic Health Records System (*Id.*, p. 71);

- Establishing a psychologist-run Change Management Committee to decide mental health workflow, where the two psychiatrists are always out-voted by the 22 non-medical personnel, including 12 psychologists (*Id.* pp. 71-72);

- Excluding psychiatrists when admitting patients to crisis bed hospital units (*Id.* p. 87);

- Misinforming custody staff that psychologists are the physicians to call (*Id.* p. 90; see also Dr. Mann's declaration at paragraph 4f);

- Authorizing psychologists to determine whether psychiatrists complete their probationary periods (*Id.* p. 96);

- Excluding psychiatrists from treatment "team" decisionmaking, so that the psychiatrist does not know of a decision to discharge a patient or a decision to change the level of care until the psychologist is telling the patient (*Id.* p. 104);

- Expanding psychologists' authority to admissions and discharge (*Id.* p. 112).

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

9

## IV.    ANALYSIS

### A.    UAPD SUPPORTS ORDERING CDCR TO CORRECT THE FIVE MISLEADING PRACTICES IDENTIFIED IN THE NEUTRAL EXPERT'S REPORT

The Neutral Expert's report identified a need to correct at least five CDCR practices which help CDCR under-report noncompliance: setting an incorrect extended timeline for psychiatric evaluation upon patient transfer, counting all encounters as evaluations, refusing to count all medication non-compliance appointments that are required, excluding EOP patients not on psychiatric medications from compliance metrics, and excluding EOP overflow patients from compliance metrics. These practices all conceal psychiatry appointments that are required but either are not provided or are delayed, so that the data reported to the Special Master does not reveal that those appointments are untimely or missed entirely.

From UAPD's perspective, these practices must be corrected. They are some of the mechanisms CDCR uses to conceal the true scope of its failure to provide at least a minimum level of psychiatric care. Until CDCR hires sufficient psychiatrists and restores authority to psychiatrists to care for their patients, CDCR will continue to fail to meet minimum constitutional standards. But instead of devoting its resources to meeting those standards, CDCR is trying to cut psychiatrists and hide its shortcomings from the Special Master and the Court. Although there are likely other misleading practices that the Neutral Expert did not uncover, the Neutral Expert's investigation substantiated these five misleading practices, and these at least must be rectified. The Neutral Expert recommends ordering CDCR to meet and confer with the Special Master and Plaintiffs regarding resolution of these issues; UAPD urges the Court to do so, but also to require CDCR to report back to the Court and to demonstrate corrective measures are taken, with prompt deadlines.

### B.    UAPD SUPPORTS HOLDING A HEARING REGARDING WHETHER CDCR HAS PRESENTED MISLEADING INFORMATION

The Court's Order appointing the Neutral Expert indicates that the Court is considering whether to hold a hearing; more specifically, whether facts exist raising a question about whether CDCR has intentionally presented misleading information to the Court and Special Master.

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1004 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

10

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

1  While the Neutral Expert does not recommend a hearing, UAPD believes the facts in the record

2  do support holding a hearing, and UAPD urges the Court to do so.

3       As the Court held in the 1995 decision which began the monitoring process, it is not

4  plausible for CDCR officials to deny the subjective component of an Eighth Amendment

5  violation – "deliberate indifference" – while they oppose taking reasonable corrective measures to

6  abate deficiencies of which they are aware.  912 F.Supp. at 1299, *citing Farmer v. Brennan*, 114

7  S. Ct. 1970, 1984 n.9 (1994).

8       Similarly, here there is evidence that CDCR has been on notice that the acts and omissions

9  that CDCR conceals or under-reports are either non-compliant in the Special Master's view, or

10  (with respect to acts and omissions unknown to the Special Master) could be considered non-

11  compliant if discovered.  With that knowledge, CDCR leadership have deliberately engaged in

12  the misleading practices anyway, on the basis that they disagree that the underlying acts or

13  omissions violate the Program Guide.  But assuming *arguendo* that they disagree with the Special

14  Master's interpretation, such disagreement would not refute the evidence that they have acted

15  knowingly and intentionally in concealing or under-reporting it.

16       The non-medical CDCR Mental Health Leadership have long been aware of the issues

17  identified by Dr. Golding or uncovered by the investigation; but they refuse to acknowledge that

18  their practices violate the minimum standards required in the Program Guide.  In the first example

19  discussed in the Neutral Expert's investigation, the report reflects that according to the Special

20  Master, CDCR leadership is amply on notice that it is misleading to count initial psychiatry

21  evaluations that occur after the IDTT as if they are compliant.  (Neutral Expert report, p. 28.)  But

22  nevertheless, CDCR has falsely reported compliance for each week a transferred patient's "re-set"

23  deadline has not expired, even though the patient has not had a pre-IDTT evaluation.  (*Id.* p. 36.)

24  CDCR therefore should be imputed with knowledge that it has been representing compliance

25  when (in the Special Master's view as well as the psychiatrists' understanding) it is not

26  compliant.

27       In the next example, for a period of time CDCR had extended the deadline for psychiatry

28  appointments from 30 to 45 days, without consulting the Special Master.  The Special Master

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

11

1  rightfully found this shocking.  (*Id.* p. 39.)  The Program Guide was developed as the minimum

2  constitutional standards in the CDCR mental health care context; to unilaterally extend the

3  minimum intervals between psychiatry appointments clearly shows "deliberate indifference" to

4  providing at least the constitutionally-required care.

5         The evidence also reflects that CDCR's practice of counting non-confidential encounters,

6  such as cell-front visits, as compliant psychiatric evaluations is deliberately incorrect.  Both

7  psychiatry leadership and the Special Master have advised the non-medical CDCR Mental Health

8  Leadership that non-confidential contacts should not qualify as evaluations, yet the non-medical

9  leadership simply refuses to acknowledge that a psychiatric evaluation has to be confidential.  (*Id.*

10  pp. 49, 52.)  The Neutral Expert agrees that a fair reading of the Program Guide requires a

11  confidential visit.  While the Neutral Expert considers CDCR's mis-reporting to constitute an

12  unintentional technical problem, UAPD respectfully disagrees, as psychiatrists have long been

13  urging executive leadership to correct the rampant use of non-confidential contacts.  (*Id.* p. 50;

14  Dr. Mann's declaration at paragraph 4.d.)  CDCR has consciously failed and refused to do

15  anything about it.

16         With respect to the issue of Psychiatry Supervisors providing direct services, which

17  CDCR has not disclosed while reporting staffing ratios — and while requesting reductions in

18  psychiatrist positions -- again, it is significant that CDCR has failed and refused to provide the

19  Special Master and Neutral Expert with sufficient data to quantify this activity.  (*Id.* pp. 74, 76-

20  77.)  From UAPD's perspective, this is clearly an important issue and reflects a) CDCR

21  leadership's deliberate effort to conceal the extent of psychiatrist understaffing and b) the

22  spiraling trend of marginalizing psychiatrists while dangerously supplanting them with

23  psychologists acting beyond their scope.  When the Psychiatrist Supervisors are busy carrying

24  caseloads, they are unable to devote their primary activities to the planning and oversight that

25  they should be doing.

26         Next, CDCR's failure to count all medication non-compliant patients as requiring a

27  psychiatric evaluation should be deemed deliberate.  Again, despite being on notice of the views

28  of both the Special Master and the psychiatrists, CDCR's non-medical leadership wrongly denies

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
5001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

12

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

1    that each medication non-compliant patient requires a psychiatric evaluation. (*Id.*, p. 82.)

2    Therefore, the inference is clear that CDCR's refusal to count each such patient for the purpose of

3    the non-compliance data when the patient is not seen is deliberately misleading.

4         Regarding the exclusion of EOP Patients not on psychiatric medications from compliance

5    metrics, again, non-medical leadership have long been privately discussing among themselves

6    that it was an issue under the Program Guide (*Id.*, fn. 61), but they did not disclose it to the

7    Special Master, Plaintiffs, and psychiatry staff. (*Id.*, pp. 89-90.) The inference is clear that

8    leadership deliberately concealed it until the Neutral Expert's investigation uncovered it.

9         CDCR is also excluding EOP "overflow" patients from the compliance metrics that are

10    used to report whether CDCR is providing patients with timely psychiatry contacts. Despite

11    knowing of the problem and assuring psychiatry leadership that it would be corrected in 2016,

12    CDCR is still not including those patients in the data. (*Id.* pp. 90-91.) Accordingly, CDCR is

13    clearly on notice that it is a misleading practice which fails to fully report non-compliance, and

14    CDCR is deliberately persisting in the practice anyway.

15         Based on the above facts, there is ample basis for a hearing regarding whether CDCR has

16    intentionally presented misleading information to the Court and Special Master.

17    **C.    CDCR SHOULD NOT BE ALLOWED TO CONTINUE REDUCING**
             **PSYCHIATRY POSITIONS AND SUPPLANTING THEIR SERVICES WITH**
18         **PSYCHOLOGISTS**

19         The constitutional standard requires ready access to competent medical staff, in sufficient

20    numbers to identify and treat in an individualized manner inmates suffering from serious mental

21    disorders. 912 F.Supp. at 1306-1308. The Program Guide requires that CCCMS patients must be

22    reevaluated by a psychiatrist at least every 90 days, and EOP patients must be reevaluated by a

23    psychiatrist at least monthly.

24         CDCR's under-reporting of noncompliance demonstrates that the Court and the Special

25    Master cannot rely upon CDCR's representations regarding the frequency that the psychiatry

26    appointment timelines are met. Instead, CDCR is failing to meet the minimum standards in the

27    Program Guide, and the full extent of its noncompliance is hidden by the deceptive practices

28    reported by Dr. Golding. Based upon the information available, at a minimum it is known that:

**WEINBERG, ROGER &**
**ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

13

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

1  CDCR is not meeting the requirement that transferred patients receive a psychiatric evaluation

2  before the IDTT within 14 days of transfer; patients who require a psychiatric appointment are

3  instead receiving non-confidential contacts that are not suitable for psychiatric evaluation and

4  treatment; psychiatric supervisors are supplementing the understaffed line psychiatrists by

5  carrying caseloads themselves; CDCR is failing to refer all medication non-compliant patients to

6  psychiatric evaluation; CDCR is not applying the psychiatric evaluations requirement to all EOP

7  patients; and CDCR is not applying the psychiatric evaluations requirement to EOP patients when

8  they are not at an institution with an EOP program or space in that program.  CDCR's attempts to

9  reduce psychiatry positions cannot be approved, in light of CDCR's failure to provide full

10  reporting to the Special Master of the quantity of psychiatric care appointments that are required,

11  and the quantity that are either missed or delayed beyond the minimum constitutional timelines.

12      As shown in Dr. Golding's report and the psychiatrist declarations submitted herewith,

13  CDCR is improperly trying to avoid complying with the minimum constitutional standards for

14  psychiatric services by shifting authority and functions to non-medical staff, primarily

15  psychologists.  For example, CDCR authorizes psychologists to decide whether or not to involve

16  a psychiatrist when admitting patients to crisis bed hospital units, although psychologists are not

17  trained to make such medical decisions.  (See Golding Report, Dkt. 5988-1, e.g. pp. 86-88.)

18  Similarly, CDCR misinforms custody staff that psychologists are the physicians to call, and

19  authorizes psychologists to make decisions to discharge a patient or change the level of care

20  without including the psychiatrist in the decision.  (*Id.*, pp. 90, 104, 112.)  And at CDCR, unlike

21  other psychiatric service providers, psychologists are given management authority and overruling

22  authority over psychiatrists, which is unsafe because psychologists do not have the medical

23  training to do so.  The trend has already proven harmful to patients, most graphically when

24  untreated patients injure themselves.  (*Id.*, pp. 18, 21, 84, 99, 103.)

25      CDCR psychiatrists are caught in a downward spiral.  The shortage of psychiatrists is

26  misused as an excuse to increase psychologists' authority and marginalize the psychiatrists, which

27  in turn adversely affects psychiatrists' working conditions and deprives psychiatrists of the ability

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

14

to provide adequate care to patients, which in turn undermines recruitment and retention of

psychiatrists, exacerbating the understaffing problem. As Dr. Schultz-Ross attests:

> Psychiatrists working in the prisons have asked me if the
> department has determined that we are solely medication
> consultants, and if psychology has assumed all responsibility and
> liability for everything else. In fact, psychiatrists remain liable for
> the care of their patients, but they often are not given authority
> commensurate with that responsibility. Emotionally, I often felt
> frightened when I cared for patients in this system in which I was
> committed to patients improving, but I was held back from
> managing their care as I had in other settings.

> The department has created a negative feedback loop, meaning that
> the results of negative action are used as justification for more
> negative action. By decreasing our scope of practice and autonomy,
> the department contributes to poorer recruitment and retention,
> which leads to understaffing, which is used as justification for
> expanding the scope of practice of the psychologists.

(Dr. Schultz-Ross' declaration, paragraphs 8-9.)

The Court and Special Master should not approve any proposals or requests by CDCR to

reduce any psychiatry positions, nor to shift any authority affecting patient care or supervision of

psychiatrists from psychiatrists to non-medical psychologists.

## V.    CONCLUSION

In sum, UAPD supports ordering CDCR to correct the five misleading practices identified

in the Neutral Expert's report and holding a hearing regarding whether CDCR has presented

misleading information to the Special Master and/or the Court. UAPD further urges the Court

and Special Master not to approve any requests by CDCR to reduce psychiatry positions at any

level, nor to shift any authority affecting patient care or supervision of psychiatrists from

psychiatrists to non-medical psychologists.

Dated:                                WEINBERG, ROGER & ROSENFELD
                                      A Professional Corporation


                              By:    _____
                                      **ANNE I. YEN**
                                      Attorneys for Union of American Physicians and
                                      Dentists

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

15
AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

Exhibit C

1   ANNE I. YEN, Bar No. 187291
    WEINBERG, ROGER & ROSENFELD
2   A Professional Corporation
    1001 Marina Village Parkway, Suite 200
3   Alameda, California 94501
    Telephone  (510) 337-1001
4   Fax  (510) 337-1023
    E-Mail:  ayen@unioncounsel.net
5            courtnotices@unioncounsel.net

6   Attorneys for Union of American Physicians and Dentists

7

8                      UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                     No. 2:90-cv-00520-KJM-DB

12                          Plaintiffs,         **DECLARATION OF DR. R. ANDREW**
                                                **SCHULTZ-ROSS, M.D. IN SUPPORT**
13           v.                                 **OF AMICUS BRIEF OF UNION OF**
                                                **AMERICAN PHYSICIANS AND**
14   GAVIN NEWSOM, et al.,                      **DENTISTS**

15                          Defendants.

16                                              Judge:       Hon. Kimberly J. Mueller
17

18

19

20       I, Dr. R. Andrew Schultz-Ross, M.D., hereby declare and state as follows:

21       1.      I am a Senior Psychiatrist Specialist, and I have been employed with the California

22   Department of Corrections and Rehabilitation (CDCR) for a little under five years.  I work at

23   Health Care Headquarters in Elk Grove.

24       2.      I write to express serious concerns about the behavior of CDCR with regard to

25   psychiatrists. CDCR employs many psychiatrists, but the department is in a toxic cycle of

26   diminishing the role of psychiatrists and marginalizing them, while expanding the clinical and

27   administrative role of non-physicians. Dr. Michael Golding's report provides facts and exhibits

28                                              1

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

DECLARATION OF DR. R. ANDREW SCHULTZ-ROSS, M.D. IN SUPPORT OF AMICUS BRIEF
OF UAPD
Case No. 2:90-cv-00520-KJM-DB

1    substantiating this problem.[1]

2        3.    In CDCR, psychologists generally govern psychiatrists at the departmental and

3    facility levels. Psychiatrists generally are not in charge of the treatment team and due to

4    psychiatrist understaffing, often cannot attend treatment team meetings due to scheduled

5    appointments with patients or other tasks. I experienced circumstances in which I was not

6    included in my patients' treatment team meetings, due to the way the workflow was organized.

7        4.    As discussed in more detail in Dr. Golding's report, against the wishes of the

8    psychiatry leaders, CDCR is moving toward granting psychologists the ability to order seclusion

9    and restraint. Psychologists in CDCR already often order admission and discharge into hospital

10   levels of psychiatric care in the prisons. They sometimes overrule psychiatrists in these decisions,

11   not admitting patients that psychiatrists say need more care, and discharging patients who are in

12   the midst of medication changes best done in an inpatient setting. As psychologists have no

13   medical training, they may make decisions involving medical risks that they may not be able to

14   recognize or fully assess.

15       5.    At the outpatient level, a quirk of the electronic health record undermines

16   psychiatrists' authority to order the next visit for the patient. If a psychiatrist orders a patient to be

17   seen in ten days due to clinical instability, but the patient is moved to another prison (a decision

18   made by custody, often with no clinical input), the order for the next visit is canceled and a

19   psychologist or social worker at the new prison often schedules the patient to be seen by the

20   psychiatrist at the interval considered to be the minimally adequate duration for that level of

21   care.[2] Under pressure from psychiatrists, the department may be finally addressing this issue.

22       6.    I have worked collaboratively and amicably with psychologists in other settings,

23   and I believe that a reasonable distribution of duties and scope of practice can help patients.

24       7.    The lack of psychiatric clinical decision-making, which we believe to be

25   unmatched in large healthcare systems in the US, leads many psychiatrists to feel that they cannot

26   _____

27   [1] See Dr. Golding's report filed October 31, 2018, Document 5988-1, pp. ix-x and 88-107.
     [2] See Dr. Golding's report, pp. i, 4-13.

28                                          2

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

**DECLARATION OF DR. R. ANDREW SCHULTZ-ROSS, M.D. IN SUPPORT OF AMICUS BRIEF
OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

1  meet a community standard of care due to circumstances beyond their control.

2       8.    Psychiatrists working in the prisons have asked me if the department has

3  determined that we are solely medication consultants, and if psychology has assumed all

4  responsibility and liability for everything else. In fact, psychiatrists remain liable for the care of

5  their patients, but they often are not given authority commensurate with that responsibility.

6  Emotionally, I often felt frightened when I cared for patients in this system in which I was

7  committed to patients improving, but I was held back from managing their care as I had in other

8  settings.

9       9.    The department has created a negative feedback loop, meaning that the results of

10  negative action are used as justification for more negative action. By decreasing our scope of

11  practice and autonomy, the department contributes to poorer recruitment and retention, which

12  leads to understaffing, which is used as justification for expanding the scope of practice of the

13  psychologists.

14       10.    The department has mentioned the understaffing and need for psychiatrists in the

15  prisons as justification for understaffing headquarters psychiatry. The department makes many

16  decisions on a regional level, but has not staffed the regional offices with psychiatrists. When we

17  stressed the importance of having regional psychiatrists, the department threatened that if

18  psychiatrists are added to the regional offices, they may report to psychologists. They already

19  have two psychiatrists at headquarters who report to psychologists and complete tasks for them.

20       11.    In CDCR, most chief psychiatrists report to chiefs of mental health, who are

21  almost all psychologists.

22       12.    We live in a confusing time when non-physicians are being given an expanded

23  scope of practice faster than reasonable care might dictate. We hope that you will see that a large

24  prison system is no place to experiment with the expansion of non-physician control when many

25  patients' lives and well-being are at risk.

26  ///

27  ///

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

3

**DECLARATION OF DR. R. ANDREW SCHULTZ-ROSS, M.D. IN SUPPORT OF AMICUS BRIEF
OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

1    ///

2        I declare under penalty of perjury, pursuant to the laws of the State of California, that the

3    foregoing is true and correct of my own personal knowledge.

4        Executed this __23rd___ day of ____May_____, 2019, in _____Elk Grove_____,

5    California.

6    _____

7              DR. R. ANDREW SCHULTZ-ROSS

8

9

10

11    147620\1027908

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

**DECLARATION OF DR. R. ANDREW SCHULTZ-ROSS, M.D. IN SUPPORT OF AMICUS BRIEF
OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

1  ANNE I. YEN, Bar No. 187291
   WEINBERG, ROGER & ROSENFELD
2  A Professional Corporation
   1001 Marina Village Parkway, Suite 200
3  Alameda, California 94501
   Telephone (510) 337-1001
4  Fax (510) 337-1023
   E-Mail: ayen@unioncounsel.net
5         courtnotices@unioncounsel.net

6  Attorneys for Union of American Physicians and Dentists

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  RALPH COLEMAN, et al.,                    No. 2:90-cv-00520-KJM-DB

12                        Plaintiffs,
                                              **DECLARATION OF DR. NAVREET**
13       v.                                   **MANN, M.D. IN SUPPORT OF**
                                              **AMICUS BRIEF OF UNION OF**
14  GAVIN NEWSOM, et al.,                     **AMERICAN PHYSICIANS AND**
                                              **DENTISTS**
15                        Defendants.

16                                            Judge:     Hon. Kimberly J. Mueller
17

18

19

20       I, Dr. Navreet Mann, M.D., hereby declare and state as follows:

21       1.      I am a Psychiatrist working for California Department of Corrections and

22  Rehabilitation (CDCR) since April 2011. I am currently a Senior Psychiatrist Specialist at

23  headquarters. My previous positions in the state have been of a Staff Psychiatrist (SQSP[1], CSP-

24  Sac[2]), Supervising Psychiatrist (CHCF[3]), and most recently Chief Psychiatrist (MCSP[4]).

25  _____
    [1] San Quentin State Prison
26  [2] California State Prison, Sacramento
27  [3] California Health Care Facility, Stockton
28  [4] Mule Creek State Prison

                                              1
WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001
**DECLARATION OF DR. NAVREET MANN, M.D. IN SUPPORT OF AMICUS BRIEF OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

1        2.      To put things in perspective, I will start by clarifying the differences between

2   Psychiatrists and Psychologists. **Psychiatrists** are physicians. We have around 20,000 hours of

3   structured, standardized medical education prior to practicing medicine. Medical education is

4   required to help us understand complicated medical issues and treatments. After completion of

5   medical school, Psychiatrists complete a minimum of 4 years of post-graduate training in the field

6   of Psychiatry. Psychiatrists' scope of practice is broader than other Mental Health professionals,

7   who lack the medical education. We provide direct Psychiatric care in various inpatient and

8   outpatient settings, and act as consultants for medical patients exhibiting psychiatric symptoms.

9   Our medical education and extensive training enables us to: 1. distinguish between primary

10   psychiatric disorders, and medical conditions presenting as psychiatric symptoms; 2. treat these

11   disorders utilizing Psychotherapeutic (talk therapy) as well as Psychopharmacological

12   (medications) treatment options; 3. understand the risks vs benefits of different treatment

13   modalities, and the risks and benefits to patients of the treatment options they choose.

14   Psychiatrists are required to have completed their post-graduate training, and be independently

15   licensed prior to practicing medicine independently in the United States of America.

16        3.     **Psychologists** have a narrower scope of practice, with no training in medicine.

17   Psychologists either have Ph.D in Psychology, or a Psy.D (Doctor of Psychology). Their

18   education and training is not standardized, with courses available in person at universities, as well

19   as some available online. In CDCR, Psychologists do not need to be independently licensed to be

20   the "Primary Clinician."

21        4.      I have read the Neutral Expert's report, and I wanted to explain a few issues that I

22   thought are of importance.

23       **a)** Since the report mentions compliance with the program guide and policies, the Court

24   needs to be aware that Psychiatrists have very little say in edits to the program guide, or policies.

25   Our opinions count only if we agree with what leadership wants; otherwise our opinions fall on

26   deaf ears.

27       **b)** Figure 4 on page 33 of the expert's report provides a clear example of how physicians

28   were overruled by management in regards to Psychiatry contact rules. MH HQ Psychiatry and

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501
(510) 337-1001

2

**DECLARATION OF DR. NAVREET MANN, M.D. IN SUPPORT OF AMICUS BRIEF OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

1    Tele-Psychiatry advocated for a 14-day policy for a psychiatry contact. The non-medical
2    members of the Mental Health Quality Management Committee out-voted the psychiatry
3    members. Standard of care decisions as such were out of the non-medical leadership's scope.

4         c) On page 51, CDCR claims that Dr. Golding's allegation is flawed since there is no
5    program guide rule or court order that defines "Psychiatry contact." There is no rule or court
6    order because the Office of Special Master (OSM) and the court expect that subject matter experts
7    in these areas, Psychiatrists, will be making the determination of what is a Psychiatry contact.
8    This points to the biggest flaw in our system, which is that our non-medical leadership is
9    attempting to dictate what they think is appropriate care, without having the appropriate
10   knowledge of the subject. "Psychiatry contacts" should have always been determined by HQ
11   Psychiatrists, or Psychiatry administrator, if CDCR had one.

12        d) On page 55 of the report, Deputy Director Tebrock admits that psychiatry appointments
13   must be confidential, yet she seeks to cloak CDCR's failure to provide such care based on her
14   own opinion that "you can have a meaningful interaction in a lot of different environments." The
15   reality is that Ms. Tebrock was aware of institutions like CSP-Sac where a majority of the
16   Psychiatry contacts were non-confidential. I visited CSP-Sac in July and 2018, and raised the
17   concerns about non-confidential/cell front contacts at that institution. This issue was discussed
18   with their executive leadership that was aware of the issues, but had failed to make any changes.
19   CDCR MH Leadership was aware that this was not a small issue, but in fact a rampant problem in
20   CDCR. It is unfortunate that the leader of our department states that appointments should be
21   confidential, but has failed to take action to make that happen. Deputy Director Tebrock's
22   statement proves that she is unable or unwilling to differentiate an "interaction" from a
23   Psychiatric (medical) evaluation.

24        e) Regarding the issue of "Psychiatry supervisors acting as line staff," starting on page 72
25   of the neutral expert report, CDCR's practice of using psychiatry supervisors as caseload-carrying
26   line staff is material. Carrying full or partial caseloads not only impacts the compliance data, but
27   also keeps Psychiatrists from running successful programs. By overloading Psychiatry
28   supervisors with disproportionate direct care duties, CDCR excludes us from the planning and

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

3

DECLARATION OF DR. NAVREET MANN, M.D. IN SUPPORT OF AMICUS BRIEF OF UAPD
Case No. 2:90-cv-00520-KJM-DB

1  oversight functions that should be the Psychiatry supervisors' primary focus.   Though
2  Psychiatrists are not involved in how their programs should be run, they are held accountable
3  when the plans start to fail.

4      f) CDCR MH leadership has failed to correct the misunderstanding amongst other medical
5  (Primary Care, and Nursing) staff who seem to think that Psychology and Psychiatry are
6  interchangeable. This has led to nursing staff contacting non-medical clinicians in psychiatric
7  emergencies. Our current environment impinges upon the rights of Psychiatric Physicians in
8  CDCR to practice medicine, and should be corrected.

9      g) In certain responses CDCR misuses Psychiatry understaffing, by having Psychologists
10  take over certain services that cannot be provided by Psychiatrists due to short staffing, instead of
11  focusing on hiring new staff.  This raises some serious scope of practice issues. Psychologists and
12  Psychiatrists are not interchangeable. Our leadership has been made aware of the differences, but
13  have failed to address these scope of practice issues.

14      5.     **Current Disagreement about Involuntary Psychiatric treatment in CDCR** –
15  Over the past few years questions have been raised from the field regarding the process of
16  involuntary treatment of patients, as allowed under Penal Code 2602. The most pressing issue
17  currently raised by Psychiatry is that patients are not receiving involuntary treatment ordered by
18  the physician, and there is a substantial delay in patients getting their medications after the court
19  has granted an order to involuntarily treat the patient. Patients under a court order need to be
20  medicated as ordered by the court, which is not always happening.

21      6.     **Clinical Decision making** - In CDCR non-medically trained clinicians, with
22  narrower scope of practice, are not only making diagnostic decisions, but also overruling
23  physicians when it comes to diagnosis and treatment of complicated Psychiatric issues. CDCR is
24  the only organization allowing, and enabling non-medical staff to overrule physician's decisions.
25  These clinical decisions impact all levels of patient care from:

26      - diagnosis;

27      - changing treatment level of cares;

28      - determining whether patient requires medical attention;

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

4

**DECLARATION OF DR. NAVREET MANN, M.D. IN SUPPORT OF AMICUS BRIEF OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

1      - admitting patients to inpatient hospitals;

2      - medical interventions as putting patients in restraints;

3      - and discharging patients from the hospitals.

4      MH management is aware of this issue, and have failed to clarify policies to state that

5  physicians should make treatment decisions, and shall not be overruled by any non-medical

6  discipline. In fact, CDCR has taken no serious actions where Psychologists are practicing beyond

7  their scope.

8      I declare under penalty of perjury, pursuant to the laws of the State of California, that the

9  foregoing is true and correct of my own personal knowledge.

10      Executed this **22 nd** day of _____**May**_____, 2019, in __**Sacramento**____,

11  California.

12  _____

13             DR. NAVREET MANN, M.D.

14

15

16  147620\1026080

17

18

19

20

21

22

23

24

25

26

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

5

**DECLARATION OF DR. NAVREET MANN, M.D. IN SUPPORT OF AMICUS BRIEF OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

exhibit Q

1 | ANNE I. YEN, Bar No. 187291
WEINBERG, ROGER & ROSENFELD
2 | A Professional Corporation
1001 Marina Village Parkway, Suite 200
3 | Alameda, California 94501
Telephone (510) 337-1001
4 | Fax (510) 337-1023
E-Mail: ayen@unioncounsel.net
5 |    courtnotices@unioncounsel.net

6 | Attorneys for Union of American Physicians and Dentists

7

8 |                    UNITED STATES DISTRICT COURT

9 |                    EASTERN DISTRICT OF CALIFORNIA

10

11 | RALPH COLEMAN, et al.,                    No. 2:90-cv-00520-KJM-DB

12 |                    Plaintiffs,
                                              **DECLARATION OF DR. AMAR**
13 |        v.                                 **MEHTA, M.D. IN SUPPORT OF**
                                              **AMICUS BRIEF OF UNION OF**
14 | GAVIN NEWSOM, et al.,                     **AMERICAN PHYSICIANS AND**
                                              **DENTISTS**
15 |                    Defendants.

16 |                                           Judge:    Hon. Hon. Kimberly J. Mueller
17

18

19

20 |        I, Dr. Amar Mehta, M.D., hereby declare and state as follows:

21 |        1.    I have been working as a psychiatrist at the California Department of Corrections

22 | and Rehabilitation (CDCR) for over 5 years. Prior to that, I completed medical school, residency,

23 | and two fellowships. I'm Board-certified in 3 specialties, and I have taught at over five different

24 | schools and training programs from New York to California. I have testified in court as an expert

25 | witness, and worked in a wide variety of environments including Corrections in other states.

26 |        2.    I would like to make clear that the situation physicians currently face in CDCR is

27 | not typical. At every other institution I know of, psychiatrists are supervised only by other

28 | psychiatrists. The "Chief" of a service must be able to understand the clinical implications of the

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501

1

**DECLARATION OF DR. AMAR MEHTA, M.D. IN SUPPORT OF AMICUS BRIEF OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

1    actions performed by those they supervise. Psychiatrists are physicians with an MD degree; we

2    learn psychological skills, but we first have to go through the same full medical training as any

3    other doctor. We dissect human cadavers, perform surgeries, deliver babies, work overnight in the

4    Emergency Department, and everything else that goes along with that. Psychologists receive

5    excellent training in therapeutic skills, administering standardized tests, and many other important

6    areas. They do not, however, receive medical training at a medical school. They cannot be

7    expected to safely overrule a medical decision by a psychiatric physician with more training and

8    education in the field of medicine.

9        3.    I understand that there is a critical psychiatrist shortage in this country, and a

10   larger physician shortage in general. That is a real problem, with real consequences. However,

11   simply handing that responsibility to other professions without adequate training is not a solution.

12   Psychiatric patients do not deserve to be treated as second class citizens, as the sole group of

13   patients that can be treated by people who have no general medical training. Studying the brain

14   alone is not sufficient to practice medicine; cardiologists do not neglect the rest of the body, nor

15   pulmonologists, nor nephrologists. Psychologists are also not allowed to practice neurology, no

16   matter what expertise they claim (short of an actual medical degree). An exception for psychiatry

17   reflects a deep misunderstanding of the interconnected and complicated nature of human

18   physiology, and is demeaning to patients with very real suffering.

19       I declare under penalty of perjury, pursuant to the laws of the State of California, that the

20   foregoing is true and correct of my own personal knowledge.

21       Executed this _20th_ day of ___May___, 2019, in _Elk Grove_,

22   California.

23       _____

24       DR. AMAR MEHTA, M.D.

25

26

27

28   147620\1026128

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

2

**DECLARATION OF DR. AMAR MEHTA, M.D. IN SUPPORT OF AMICUS BRIEF OF UAPD**
Case No. 2:90-cv-00520-KJM-DB

Wendy Musell, SBN 203507
Stewart & Musell, LLP
2200 Powell Street, Suite 440
Emeryville, CA 94608
415-593-0083
Fax: 415-520-0920
E-mail: wmusell@stewartandmusell.com

Attorneys for Non-party Witness
Dr. Melanie Gonzalez

*Exhibit R*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et.al., | ) Case No.: **2:90-CV-0520 KMJ DB P** |
| | ) |
| Plaintiffs, | ) **DECLARATION OF MELANIE GONZALEZ,** |
| | ) **M.D.** |
| v. | ) |
| | ) |
| | ) |
| EDMUND G. BROWN, JR. et. al., | ) |
| | ) |
| Defendants. | ) |

I, Melanie Gonzalez, M.D., declare:

1.      I hold the position of Senior Psychiatrist Specialist at Headquarters – Elk Grove, with the California Department of Corrections and Rehabilitation. I have held this position since January 2017. I have worked for the California Department of Corrections and Rehabilitation since July 2014, first as a Staff Psychiatrist at California Health Care Facility in Stockton from July 2014 until January 2015, then as a Staff Psychiatrist (telepsychiatrist) at Headquarters – Elk Grove from February 2015 through December 2016.

2.      In relation to the Court's Minute Orders, Docket Nos. 6053 and 6055; as well as the ongoing evidentiary hearing in the above captioned matter, I hereby submit this declaration along with the Whistleblower Complaint Regarding Patient Care and Safety, dated October 24, 2018, that I sent to J. Clark Kelso, Receiver, State of California, Prison Health Services on that date.

**DECLARATION OF MELANIE GONZALEZ, M.D.**
Case No. 2:90-CV-0520 KMJ DB P

1

3. With this declaration I seek to authenticate the Whistleblower Complaint Regarding Patient Care and Safety and the attachments therein, and do so herein by reference to the page numbers located in the lower right corner of the document.

4. Attached hereto as Exhibit A is a true and correct copy of my 50 page whistleblower complaint that I drafted entitled "Whistleblower Complaint Regarding Patient Care and Safety." I submitted this complaint to Mr. J. Clark Kelson, Receiver for the State of California on October 24, 2018. The whistleblower complaints consists of my four page letter, marked as PL-165, Page 001-004 and subsequent attachments designated as PL-165 Page 005-Page 050, which are discussed in detail within my complaint and authenticated herein.

5. To the best of my knowledge and based on a review of my work records, review of data available to me, my own expert analysis and materials referred to in the Whistleblower Complaint Regarding Patient Care and Safety (Exhibit A) is true and accurate, with the following exceptions:

6. In the document entitled "Psychiatry Indicators and Biases" at PL-164, Page 005, subsection 1.e. I wrote, "In December 2016 the indicator was inexplicably changed to count EOP appointments as timely if they occurred within 45 days of the prior appointment, despite the Program Guide rule that EOP psychiatry appointments must occur at least monthly." That passage should read as follows: "In December 2016 the indicator was inexplicably changed to count EOP appointments as timely **if they occurred within 45 days of the prior appointment, or by the end of the next calendar month, whichever is sooner,** despite the Program Guide rule that EOP psychiatry appointments must occur at least monthly."

7. I mention several times in my complaint that refused appointments are counted as completed. I believed that statement to be true at the time, because the few appointments I saw that were marked as refused were counted as completed. I have since learned that those refused appointments I found were incorrectly counted as completed, and that the vast majority of refused appointments were not actually counted as completed.

8. I also want to clarify that on PL-164, Page 006, (Timely MH Referrals, 1.a.i) I wrote "to discuss their medication non-compliance within seven days" and on PL-164, Page 010, (Medication Non-Compliance Appointments as CHCF, second full paragraph) I wrote "and require an appointment with a psychiatrist within 7 days, per policy." The policy does not specify the timeframe, it just states that the patient is required to have a medication non-adherence appointment with a psychiatrist.

9. PL-165, Page 005-Page 009, entitled "Psychiatry Indicators and Biases", is a true and correct copy of a document that I created and provided to Dr. Golding on September 4, 2018.

**DECLARATION OF MELANIE GONZALEZ, M.D.**
Case No. 2:90-CV-0520 KMJ DB P

2

10.     PL-165, Page 010-Page 013, entitled "Medication Non-Compliance Appointments at CHCF" is a true and correct copy of a document that I created. The document discusses issues with the Timely MH referrals indicator, as fully described in my whistleblower complaint. I gave a draft of this document to Dr. Golding on August 3, 2018, and an updated version at the end of August.

11.     PL-164, Page 014-Page 019, entitled "CDCR Mental Health Performance Report for 5/1/18 to 5/31/18" is a true and correct copy of the Performance Report indicators, with footnotes that I added briefly explaining my issues with some of the indicators.

12.     PL-164, Page 020-Page 026, entitled "Psychiatrist Continuity of Care" is a true and correct copy of a document that I created based on my review of the Psychiatrist continuity of care indicators. I reviewed the definitions and the reported compliance numbers statewide for January 2018 through August 2018 and put my findings in this document.

13.     PI-164, Page 027-Page 030 is a true and correct copy of an email I sent to Dr. Golding on November 16, 2017. It is a summary of my findings from interviews I conducted of psychiatrists at California State Prison Sacramento during the month of November 2017.

14.     PL-164, Page 031 is a true and correct copy of a screenshot of the Appointments Seen As Scheduled description and definitions, showing the description ("Percentage of all scheduled appointments that were seen") and the definition of the denominator ("All scheduled appointments"), both of which were incorrect and misleading. I took the screenshot myself on the date noted in the bottom right corner of the image.

15.     PL-164, Page 032- Page 035 is a true and correct copy of an email I sent to Dr. Golding, on July 31, 2018, including spreadsheet attachments that I created showing the percentage of appointments coded as confidential during the month of May 2018.

16.     PL-164, Page 036-Page 050, are true and correct copies of emails I sent and received utilizing CDCR email to the persons stated in the email. The dates set forth on the face of the email are accurate.

I declare under penalty of perjury under the laws of the State of California and federal law that the foregoing is true and correct.

Respectfully Submitted,

Melanie Gonzalez, M.D.

**DECLARATION OF MELANIE GONZALEZ, M.D.**
Case No. 2:90-CV-0520 KMJ DB P

3

# Exhibit A

October 24, 2018

**Via USPS Certified Mail and Email (Clark.Kelso@cdcr.ca.gov)**

J. Clark Kelso
Receiver
State of California
Prison Health Care Services
P.O. Box 4038
Sacramento, CA 95812-4038



> **Re:   Whistleblower Complaint Regarding Patient Care and Safety**
> *Coleman v. Brown, Case No.* **2:90-CV-0520 KMJ DB P**

Dear Mr. Kelso:

I am writing to you in order to bring to your attention matters that I think implicate very serious health and safety concerns for patient/inmates statewide, as well as concerns I have regarding the accuracy of reporting of patient/inmate data for the purposes of monitoring required patient care and outcomes in the *Coleman v. Brown, Case No.* 2:90-CV-0520 KMJ DB P, currently pending before the United States District Court for the Eastern District of California.

I am coming forward at this time, at significant risk to my career, because I am concerned that mental health treatment of patient/inmates is not being accurately reported and certain practices place patient/inmates at significant risk of injury or death. These issues are preventable, in my medical opinion, with accurate monitoring, reporting and policy changes with implementation of such changes. I am also concerned about retaliation for my whistleblowing, but feel that my oath to patients and my profession require me to come forward at this time.

I have worked for the California Department of Corrections and Rehabilitation since July 2014, first as a Staff Psychiatrist at California Health Care Facility in Stockton from July 2014 until January 2015, then as a Staff Psychiatrist (telepsychiatrist) at Headquarters - Elk Grove from February 2015 through December 2016, and most recently as a Senior Psychiatrist Specialist at Headquarters - Elk Grove since January 2017.

My job duties currently include representing psychiatry on numerous committees, writing statewide policies and procedures, performing thorough chart investigations of cases of interest, assisting psychiatrists with electronic health record system (EHRS) problems, working with IT and Cerner to update EHRS, training psychiatrists on EHRS, and reviewing and analyzing quality management data related to psychiatry.

I received my Medical Doctorate from Keck School of Medicine at the University of Southern California in 2010, and completed Psychiatry Residency at California Pacific Medical Center in San Francisco in 2014. My undergraduate degree is a Bachelor of Science in Psychology with a Mathematics emphasis from the University of California at Davis.

J. Clerk Kelso, Receiver
October 24, 2018
Page 2

While working as a telepsychiatrist, I frequently checked the Current Due Dates report, and noticed in December 2016 that my patients were suddenly due for follow-up appointments every 45 days or by the end of the next calendar month (whichever was sooner), rather than every 30 days. At the time, I had thought it was likely due to a policy change.

Shortly after starting my new position as a Senior Psychiatrist, Specialist, I learned that there had been no policy change regarding how frequently Enhanced Outpatient (EOP) patients required psychiatry appointments. I informed my supervisor, Dr. Golding, of the change in the Current Due Dates report, and he asked me to look into it further.

I ran Current Due Dates reports for psychiatrists at multiple institutions, and then sent an email to him and Dr. Lindgren dated 3/21/17 explaining my findings. Attached was a copy of my Current Due Dates report from October 2016, showing the correct 30 day due dates for my patients, and a Current Due Dates report from 3/21/17 for a colleague's patients, showing the incorrect 45 day due dates. In a follow-up email, I also explained how due to Quality Management's methodology of measuring whether appointments occurred on time by using patient-weeks, an EOP patient could be seen on 2/2/17 and not have a follow-up appointment until 8 weeks later on 3/29/17, and yet be counted as 75% compliant with timeliness (due to having 6 weeks of compliance, and 2 weeks of non-compliance). Dr. Golding followed up with QM regarding this change, and the rule was subsequently reverted back to 30 days shortly thereafter. My emails to Dr. Golding regarding this topic are attached. I have not included the Current Due Dates reports, as they contain patient information, but can submit redacted copies if requested. However, I believe that the reporting of the prior data was not amended to demonstrate the correct percentages of compliance.

In September 2017, Dr. Golding asked me to review how often patients are discharged from crisis beds without evidence that the psychiatrist agreed with the plan to discharge the patient. I reviewed 32 cases from four institutions via checking each patient's chart for documentation or orders that showed that the psychiatrist had been consulted and agreed with discharge. I found that in half of all patient discharges, there was no evidence of psychiatric involvement in the discharge process. This was concerning to me, given that we have received feedback from psychiatrists in the field that they are sometimes not consulted about whether their patient is ready for discharge, and are told of the patient's discharge after the discharge has been ordered and custody has been called to pick up the patient. Further, a few psychiatrists have also informed me that they have had cases in which they stated the patient was not ready for discharge and required further medical care, but the patient was still discharged by the treatment team against the psychiatrists medical advice. I believe one example of the latter scenario was included in the Golding Report, with details I obtained from a review of the patient's chart.

In November 2017, Dr. Golding asked me to speak with the psychiatrists at California State Prison Sacramento, to determine whether they had barriers to seeing patients and engaging in a clinic-style model. I created a template of questions to ask, and asked all of their psychiatrists over the phone, with the exception of one I was unable to get ahold of, the questions

J. Clerk Kelso, Receiver
October 24, 2018
Page 3

in my template and recorded the answers contemporaneously in writing. I saved each psychiatrist's responses and comments in a separate document. I then emailed Dr. Golding a summary of my findings on November 16, 2017. These documents and a copy of the email are attached. The communications with the psychiatrists disclosed numerous and significant barriers to seeing patients, seeing patients timely and engaging in a clinic-style model.

I was on maternity leave from December 29, 2017 until July 16, 2018. When I returned to work in July, Dr. Golding asked me to look into the Timely Psychiatry Contact indicator again, as the reported compliance numbers seemed too high.

On July 25, 2018, Dr. Golding received an email from a senior psychiatrist in the field stating the timely mental health referrals indicator only tracks the ordered medication non-compliance appointments, rather than tracking *all* of the patients who required medication non-compliance appointments and ensuring that each patient's required appointment occurred in a timely fashion.

Dr. Golding asked me to look into this issue and evaluate the data to determine if the information received from the psychiatrist was accurate. I found that not only does the indicator only look at ordered appointments, but it also excludes almost all cancelled appointments from the calculation, and counts refused appointments as completed. This leads to a significant and false over-reporting of the percentage of compliance, meaning the data would show levels of compliance that were not accurate and much higher than the actual level of compliance.

Due to discovering several issues with the way data was being analyzed and reported, Dr. Golding asked me to review all of the quality management indicators that are relevant to psychiatry, to see if there were any other oddities. Over the next month, whenever I was not busy with other tasks, I reviewed the indicators included in the Performance Report and the Dashboard, using data from other indicators or from talking to psychiatrists in the field to check the indicators' accuracy. I also checked the indicators' definitions, and learned that some indicators, such as 'Appointments seen as scheduled' and 'Diagnostic monitoring', were excluding a large portion of data points, in a manner that led to the appearance of greatly improved compliance that was inaccurate. I updated Dr. Golding whenever I discovered anything of note, and compiled my findings in the document titled 'Psychiatry Indicators and Biases', which I submitted to him on September 4, 2018. Prior to completing this document, I also gave Dr. Golding a print-out of the Performance Report indicators, with footnotes briefly explaining my issues with some of the indicators.

One of the indicators I reviewed was the 'Timely MH referrals', which I cross-checked against the 'Appointments' indicator, and the 8/3/18 'Huddle report' (the Huddle report is updated daily, and it is not possible to review old Huddle reports, thus the date of the Huddle report I included is simply the date that I checked the report). I created a document titled 'Medication Non-Compliance Appointments at CHCF' that discusses issues with the 'Timely MH referrals' indicator, and gave a draft of this document to Dr. Golding on August 3, 2018 and

J. Clerk Kelso, Receiver
October 24, 2018
Page 4

an updated version at the end of August. I also referred to this information in 'Psychiatry Indicators and Biases'.

On 10/13/18, I reviewed the 'Psychiatrist continuity of care' indicator. I reviewed the definitions and the reported compliance numbers statewide from January 2018 through August 2018. I put my findings in a document titled 'Psychiatrist Continuity of Care.' I found there were significant problems related to accurately reporting continuity of care, as set forth in my document.

Approximately one week prior to Dr. Golding submitting his report "CDCR Mental Health System Report" to the State Receiver, I read a draft version of the document, and can attest to my agreement with the statements it contained, including the systemic issues it reveals relating to patient health and safety and the misreporting of data resulting in inaccurate inflating of compliance.

I can be contacted through my attorneys Wendy Musell, Stewart & Musell, LLP 2200 Powell Street, Suite 440 Emeryville, CA 94608, 415-593-0083.

Sincerely,

Melanie Gonzalez, M.D.

Cc: KJMOrders@caed.uscourts.gov;

cschultz@caed.uscourts.gov

Encl.

## Psychiatry Indicators and Biases

<u>Timely Psychiatry Contacts</u>

1. Biases due to measurement:
   a. Measured in weeks, rather than on-time versus late. This causes significant bias towards inflating compliance.
      i. E.g. an Enhanced Outpatient Program (EOP) patient had a psychiatry appointment on Monday, 8/13/18, and their next appointment wasn't until Friday, 9/21/18. They were due to be seen by 9/12/18 (per Program Guide rules), so are 9 days late, but due to compliance being measured by weeks, there are four weeks of compliance and one week of non-compliance, which is then reported as 80% compliant. If you have 100 patients, 50 of whom are seen on time, and 50 of whom are seen late by one week, the reported Timely Psychiatry Contacts compliance rate will be 90%. It would be very easy to think that the 90% compliance rate meant that 90% of the patients were seen on time, when in actuality only 50% were.
   b. The clock resets when patients transfer.
      i. E.g. a Correctional Clinical Case Management System (CCCMS) patient had a psychiatry appointment on 3/5/18, and was due to been seen again by 6/3/18 (90 days later). However, the patient transferred to a different CCCMS institution on 5/25/18. Instead of requiring that the patient still be seen by 6/3/18 (to comply with the Program Guide rules), and reporting it as late if it occurs after 6/3/18, this indicator resets the clock to the date of transfer, and only reports the appointment as late if it occurs more than 90 days after transfer. In this example, the patient could go 172 days (from 3/5/18 to 8/23/18) without seeing a psychiatrist, and still be counted as compliant.
   c. Physician orders for follow-ups prior to maximum time per Program Guide are ignored by this indicator.
      i. E.g. a CCCMS patient has a psychiatry appointment on 3/5/18, and the psychiatrist is concerned about him, so orders a follow-up appointment for three weeks later. This appointment was scheduled but cancelled due to custody, or was refused, or did not occur for any number of reasons, and the patient was not seen again until 6/2/18. This indicator counts that appointment as compliant, because it occurred within 90 days, despite the appointment being 68 days late based on the psychiatrist's clinical judgment, and order, that the patient needed follow-up within three weeks.
   d. Sixty percent of psychiatry supervisors see patients (per our polling data), due to staffing shortages. The compliance numbers in this indicator are presented as having been obtained by line staff alone, and are used to determine psychiatry staffing needs. This both results in an underestimate of staffing needs, and in supervisors being unable to do necessary supervisory work due to having to compensate for the line staff shortage.
   e. In December 2016 the indicator was inexplicably changed to count EOP appointments as timely if they occurred within 45 days of the prior appointment, despite the Program Guide rule that EOP psychiatry appointments must occur at least monthly. This

significantly inflated the compliance percentages statewide, and allowed for an inaccurately favorable report to the court in March 2017. The indicator was not fixed until this change was discovered by the psychiatry team in March 2017.

Appointments seen as scheduled

1. Biases due to measurement:
   a. The definition of this indicator states that it measures "All scheduled appointments", but in actuality it only includes appointments that are coded as Seen, Cancelled due to ProviderUnavailable, Cancelled due to ModifiedProgram, or Cancelled due to TechnicalDifficulties (see snip titled Appointments seen as scheduled). It excludes Refusals, No Shows, and all other cancelled appointments, which account for approximately half of all scheduled appointments.
      i. E.g. the Appointments seen as scheduled indicator reports that 95% of mainline CCCMS appointments in CDCR in February 2018 were seen as scheduled. (see attachment CDCR CCCMS appointments seen as scheduled) However, per the Appointments report, in February 2018 in mainline CCCMS, there were 84,120 mental health appointments, 35,642 of which were seen (see Excel spreadsheets titled CDCR CCCMS all appointments in February 2018 and CDCR CCCMS completed appointments in February 2018). Thus the percentage of appointments that were seen as scheduled was 42%, not 95%.

Timely MH Referrals

1. Biases due to measurement:
   a. Only measures the referrals that were ordered, not all of the referrals that occurred, *or should have occurred*. Ordered referrals are much more likely to be completed and done on time than are referrals that should have been ordered but weren't.
      i. E.g. on 8/3/18 at CHCF, 225 patients were flagged as non-compliant with their psychiatric medication (meaning they refused 50% or more of their psychiatric medication in a week, or refused three consecutive days of psychiatric medication, or refused one dose of a critical psychiatric medication). Each of these patients is supposed to be seen by a psychiatrist to discuss their medication non-compliance within seven days, or within one day for refusal of a critical medication. However, during the entire month of August, there were only 17 medication non-compliance appointments scheduled at CHCF – 10 were seen, 7 were cancelled. The cancelled appointments were excluded from the Timely MH Referrals measurement, with the exception of one cancelled appointment that was counted as completed, despite never having occurred. Additionally, two refused appointments were counted as completed, and one seen appointment was counted twice, so the compliance was recorded as 12/12, or 100% for the month of August (see CHCF August Timely MH referrals screenshot). In actuality, 225 patients required follow-up for medication non-

compliance on a single day in August, and only 8 patients (12 minus the appointment that was counted twice, minus the cancelled appointment that was counted as completed, and minus the two refused appointments) in the whole month of August had a completed medication non-compliance consult. If we use these numbers (8 out of 225), the compliance percentage is 3.6%. However, if the entire month of August is included – not just a single day – this compliance percentage would be much lower.

   ii.  E.g. for the month of July at CSP-Sacramento, there was one urgent MHMD consult, two emergent MHMD consults, and three routine MHMD consults (see snip titled SAC Timely MH referrals). It is unlikely that there were truly only three routine MHMD consults in a month at an institution with such a large mental health population. The far more likely scenario is that most routine MHMD consults were "ordered" by psychologists or social workers via stopping by the psychiatrist's desk, calling them on the phone, or emailing them, rather than placing an official order (see email from Dr. Golding titled "FW: MHMD emergent consults"). This prevents an institution from having a low compliance rate despite insufficient psychiatry staffing to complete these consults, because these consults will not be measured by the indicator. Compare this to an institution with sufficient psychiatry staffing – at San Quentin during the same month there were 32 routine, 11 urgent, and one emergent MHMD consults (see snip titled SQ Timely MH Referrals).

  b.  Excludes most cancelled appointments, and counts refusals as "completed". As described in "Appointments seen as scheduled 1 a" above, all cancelled appointments, except those coded as ProviderUnavailable, TechnicalDifficulties, and ModifiedProgram are also excluded from this indicator's calculations.

2.  Biases due to lack of knowledge:

  a.  Many psychiatrists appear to not know about the medication non-compliance appointment order in EHRS, or are not aware of the requirement to see patients who have been flagged for medication non-compliance. If all psychiatrists had this knowledge, and placed a medication non-compliance appointment order for every patient flagged as non-compliant, there would be thousands of medication non-compliance appointments statewide per month. Psychiatry staffing is not sufficient to complete all, or even most, of these appointments; so the percentage of MH referrals completed on time would significantly decrease.

3.  Biases due to random error:

  a.  Medication non-compliance appointments may be ordered erroneously as a psychiatry follow-up appointment, and thus not captured by this indicator. Also, as mentioned above, mental health referrals may be communicated to the requested provider verbally and an order never placed in EHRS, despite knowledge of the process and intention to place an order. In both of these examples the appointment is less likely to occur when there is no official order, due to a number of factors, including the increased likelihood of the provider forgetting, the provider having limited time and triaging some of these appointments as less important, and there being less pressure from supervisors on the

provider to complete the appointment in a timely manner to improve the indicator results.

Appointment confidentiality: There is an indicator for "Group treatment in a confidential setting", but not for psychiatry appointment in a confidential setting. However, this is an important indicator of quality care, and should be one of the measured indicators. Currently, there is no easy way to determine the percentage of psychiatry appointments at a given institution or level of care that were confidential, but it is possible to use the Appointments report to check on whether individual appointments were recorded as confidential or non-confidential, count all of the confidential appointments in the population of interest, then divide by the total number of appointments in order to get a percentage. This is time-consuming, but more importantly it is inaccurate, due to the following biases.

1. Biases due to measurement: In the Electronic Health Record System (EHRS), confidentiality is recorded in a drop-down menu on the appointment check-out screen. The default value is "Confidential", thus if the provider does not change this selection, all appointments are recorded as confidential. If an accurate measure of confidentiality was desired, this drop-down menu would default to NULL (no selection), and it would require the provider to change the selection to either confidential or non-confidential.

2. Biases due to lack of knowledge: If a provider does not know how to record an appointment as non-confidential, it is recorded as confidential (due to #1 above).
   a. E.g. in the MHCB at CCWF, the psychiatrists reported that all routine psychiatry appointments are conducted in the patient's cell, not in a confidential treatment room, thus 100% of the routine appointments are non-confidential. All of the psychiatrists stated they did not know how to record an appointment as non-confidential. Per the Appointments report, there were 96 completed psychiatry appointments in CCWF MHCB in May 2018, 100% of which were recorded as confidential.

3. Biases due to random error: Even if a provider knows how to record an appointment as non-confidential, if they forget, or are in too much of a hurry, to change the drop-down menu to non-confidential, it is recorded as confidential.
   a. E.g. in the MHCB at CHCF, the psychiatrists reported that all routine psychiatry appointments are conducted cell-front, not in a confidential treatment room, so 100% of the routine appointments are non-confidential. All of the psychiatrists stated they knew how to record an appointment as non-confidential. Per the Appointments report, there were 289 completed routine psychiatry appointments in CHCF MHCB in May 2018, 31% of which were recorded as confidential.

Diagnostic Monitoring (Medication Administration Process Improvement Program)

1. Biases due to measurement:
   a. Until June 2018, this indicator ONLY measured whether annual labs and tests were done. MAPIP guidelines mandate obtaining baseline, 3 month, and annual labs for antipsychotics (except Clozapine) and mood stabilizers, obtaining labs within 14 days of increasing the dose of mood stabilizers, and obtaining baseline, 3 month, and annual

weight/height and blood pressure for antipsychotics and Clozapine. However, until June 2018, the indicator monitoring compliance with these guidelines did not even measure whether baseline, 3 month, or dose increase labs and tests were done. It only checked to see if annual labs and tests were done, and reported 100% compliance if the annual lab draw and tests occurred (see Memorandum dated 7/3/2018).

    i. E.g. A patient is prescribed an antipsychotic, and has labs, a blood pressure measurement, and his weight obtained 8 months after starting the medication, but had no tests or labs done at baseline or 3 months. This indicator reports that this patient is 100% compliant with MAPIP, despite being only 33% compliant. This is very misleading, but more importantly it is *dangerous* and poor care. If his blood pressure is elevated, he is morbidly obese, and his fasting lipid levels are critically high at 8 months, we have no idea whether those problems were all present prior to starting the antipsychotic – in which case we likely would not have started the medication – or occurred within the first few months after starting the medication – in which case we would likely have stopped it after obtaining the 3 month test results. Failing to obtain these labs and tests can lead to permanent organ damage or death.

b. Until June 2018, it counted annual labs and tests as completed if the patient had the relevant labs and tests done at any point within a year of starting the medication. Since June 2018, it still counts annual labs and tests as completed if the patient had the relevant labs and tests done between 91 and 365 days after starting the medication. The baseline, 3 month, annual, and after dose increase criteria for obtaining labs and tests is not arbitrary. It was created by physicians, per their clinical judgment of the minimum monitoring necessary to maximize patient safety. Therefore, measuring whether the required tests were done at any point within a year or at any point from 91 to 365 days after starting the medication – not within limited periods around the baseline, 3 month, annual, and dose increase time points – is inappropriate, and leads to falsely elevated compliance.

c. Until June 2018, it excluded patients who were not on the same medication class for the whole year. This inflated MAPIP compliance, because these patients were less likely to have had the required labs and tests, due to the provider not having had an entire year during which to have ordered labs and tests.

## Medication Non-Compliance Appointments at CHCF

There were 17 medication non-compliance appointments scheduled at CHCF for the month of August.

10 were "completed": 8 on-time, 2 refused

7 were cancelled: 5 as CancelledUnspecified, 1 as SchedulingError, 1 as SchedulingConflict

Thus CHCF appears to be 59% compliant with completing medication non-compliance appointments, since refused appointments are counted as completed. The percentage of scheduled medication non-compliance appointments that were seen on time was 47% (8 divided by 17). The Performance Report shows 100% compliance for medication non-compliance consults completed within 7 days. [1]

It is important to note that the Timely MH Referrals report excludes cancelled appointments. Appointments are frequently cancelled on the day of the appointment, often due to the patient refusing to attend or not showing up, and these are sometimes coded as CancelledUnspecified due to the provider not giving an appointment cancellation reason. In the case of the medication non-compliance appointments, these are patients who have been flagged as medication non-compliant and require an appointment with a psychiatrist within 7 days, per policy. Many, but not all, of these cancelled appointments are rescheduled, but the patients who do not have their appointment rescheduled do not receive their required medication non-compliance appointment. By removing cancelled appointments from the calculations, this indicator ignores these patients, and reports a falsely elevated timely completion rate.

One might argue that this is an indicator for *timeliness* of referrals, and thus should only include referrals that were completed. However, if a referral is required by policy, but is never done, that required referral is not timely, and this deficiency needs to be recorded. An indicator that only reports on the timeliness of completed consults, and excludes all consults that were cancelled or never occurred despite being required, is not very helpful, and is incredibly misleading. Plus, the definition of the Timely MH Referrals denominator is "Number of Routine, Urgent, Emergent, Med Refusal, and RVR MHA referrals that either came due or were completed during the reporting period." Thus even though these cancelled appointments were not completed, they *came due* during the reporting period and should be included in the compliance statistics.

More concerning, per the Huddle Report on 8/3/18, for that ONE day, 225 patients were flagged as psychiatric medication non-compliant (had refused 50+% of their psychiatric medication doses in a week, or refused three consecutive days of psychiatric medication, or refused one dose of a critical psychiatric medication). To get this number I had to open the Huddle Report for each Care Team (e.g. D5B, D6A – each entry with a number listed below is a separate Care Team), scroll down to the section titled "EHRS Institutions Only: Patients with Medication Administration Policy Alerts (All Medication Admin Alerts):", and sort through to find the psychiatric medication refusals. Many of the patients only had medical medications listed, so those patients were excluded. Additionally, many patients had medications listed that could have been prescribed by either Medical or Psychiatry – if there were no other psychiatric medications listed for that patient, I excluded the patient and assumed the medication was prescribed by Medical, thus 225 is likely lower than the real total.

1. This number was obtained by excluding the cancelled appointments from the denominator, counting the refusals as timely completions, including one of the cancelled appointments as completed, and counting one of the completed appointments twice.

Although it would have taken minutes to get the above data if I had access to the database and could run a query for CHCF patients who were flagged as non-compliant with psychiatric medication, compiling this information manually took me over 3 hours.

Please note, 225 is the number of patients flagged on one day. If we were to extremely conservatively estimate that those 225 patients are the only patients at CHCF who were flagged as psychiatric medication non-compliant for the whole month of August, then 8 of the 225 (3.6%) patients actually received their required appointment. It is highly likely that there were more patients flagged as psychiatric medication non-compliant if the whole month of August were included, not just a single day, in which case this percentage would be lower.

Additionally, the Timely MH Referrals indicator reported 291 MH referrals at CHCF during the month of August. This figure only includes the 12 previously mentioned medication non-compliance appointments. If every patient who required a medication non-compliance appointment had one scheduled for them, at the very least there would be 213 (225 minus 12) additional MH referrals, for a total of 504 MH referrals during the month of August. Using this more accurate, but still extremely conservative, figure, the percentage of MH referrals completed on-time would be 55%, not 96% as is reported in the Performance Report.

Number of patients who were flagged as psychiatric medication non-compliant on 8/3/2018 in the CHCF Mental Health Huddle Report, listed by Care Team:

| | |
|---|---|
| A1A | 5 |
| A1B | 3 |
| A2A | 5 |
| A2B | 4 |
| B1A | 2 |
| B1B | 3 |
| B2A | 0 |
| B3A | 1 |
| B3B | 2 |
| B4A | 5 |
| B4B | 1 |
| B5A | 6 |
| B5B | 4 |
| B6A | 4 |
| B6B | 3 |

| | |
|-----|---|
| B7A | 2 |
| B7B | 4 |
| B8A | 0 |
| B8B | 3 |
| C1A | 1 |
| C1B | 1 |
| C2A | 0 |
| C2B | 1 |
| C3A | 0 |
| C3B | 1 |
| C4A | 0 |
| C4B | 2 |
| C5A | 1 |
| C5B | 0 |
| C6A | 1 |
| C6B | 1 |
| D1A | 1 |
| D1B | 2 |
| D2A | 0 |
| D2B | 1 |
| D3A | 1 |
| D3B | 1 |
| D4A | 0 |
| D4B | 1 |
| D5A | 0 |
| D5B | 0 |
| D6A | 1 |
| D6B | 0 |
| D7A | 0 |

| | |
|---|---|
| D7B | 1 |
| E 01-25 | 32 |
| E 26-50 | 23 |
| E 51-75 | 42 |
| E 76-00 | 34 |
| E1A 01-25 | 2 |
| E1A 26-50 | 1 |
| E1A 51-75 | 3 |
| E1A 76-00 | 2 |
| Work Crew | 11 |

Total = 225 patients (not medications) were flagged as non-compliant with their psychiatric medication at CHCF on 8/3/18. This only includes the patients who: 1) refused 3 consecutive days of psychiatric medication; or 2) refused 50% or more of their psychiatric medication doses in a week; or 3) refused one dose of a critical psychiatric medication.

CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18

## Performance Improvement Priorities

| Timely MH Referrals [1] | Appointments Cancelled Due to Custody [2] | Primary clinician continuity of care | Psychiatrist continuity of care |
|---|---|---|---|
| **92%** (15,724) | **2%** (461,238) | **83%** (1,589,344) | **85%** (344,552) |

| Treatment plans with satisfactory documentation | Discharges from MHCB with clinician review of d/c summary | Diagnostic Monitoring [3] | Polypharmacy Medication Review |
|---|---|---|---|
| **67%** (33) | **100%** (5) | **95%** (126) | **97%** (6,120) |

| Effective Communication Achieved | Discharge FollowUps | Timely PC Contacts [4] | Timely Psychiatry Contacts [5] |
|---|---|---|---|
| **96%** (148,106) | **93%** (5,397) | **97%** (294,708) | **93%** (257,390) |

## Mental Health Crisis Bed

| DSH/PIP physical discharges within timeframes | Timely admission to MHCB | MHCB clinical stays within timeframes | MHCB physical discharges within timeframes |
|---|---|---|---|
| **77%** (176) | **86%** (845) | **90%** (803) | **95%** (674) |

## Suicide Prevention

| Suicide Risk Evaluation | Discharge FollowUps | SREs that met all audit criteria | Suicide Count |
|---|---|---|---|
| **92%** (5,557) | **93%** (5,397) | **79%** (34) | **1** (1) |

## Access to Care

| Timely MH Referrals | Timely IDTTs | Timely PC Contacts | Timely Psychiatry Contacts |
|---|---|---|---|
| **92%** (15,724) | **98%** (130,055) | **97%** (294,708) | **93%** (257,390) |

| Treatment Scheduled | Effective Communication Achieved | all IDTTs observed in which a health record and C-file are available | Adequate IDTT space |
|---|---|---|---|
| **92%** (25,973) | **96%** (148,106) | **100%** (22) | **100%** (3) |

| Mental Health Screens |
|---|
| **93%** (7,412) |

1. Timely MH Referrals only measures the percentage of *ordered* referrals that were completed on time. Ordered referrals are much more likely to be completed than referrals that should have been ordered but weren't. (e.g. most med refusal referrals), thus leading to inflated compliance.
2. For an appointment to be measured as "Cancelled due to custody" the provider must first choose "cancelled", and then give custody as the reason. Most cancelled appointments are labeled as "CancelledUnspecified", because the provider did not choose a cancellation reason.
3. Diagnostic monitoring appears to be measuring MAPIP compliance, but it is unclear how they achieved the above percentage. as MAPIP compliance is nowhere near that value.
4. Timely PC Contacts are measured in patient-weeks, and when a patient transfers institutions the clock resets.
5. Timely Psychiatry Contacts are measured in patient-weeks, when a patient transfers institutions the clock resets, and the indicator only looks at whether an appointment occurred within the maximum allowed period per the Program Guide rules, not whether it occurred within the period ordered by the psychiatrist, per their clinical judgment.

# CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18

**MCB and DSH discharges not readmitted within 30 days**

**79%** ←→
(14,851)

**SREs that met all audit criteria**

**79%** ←→
(34)

**Non-Formulary by Psychiatrist**

**4%** ←→
(58,470)

**Appointments seen as scheduled 6**

**92%** ←→
(10,592,35 3)

**Timely IDTTs**

**98%** ←→
(130,055)



**5 day follow-ups with documentation of current suicidality**

**93%** ▲
(14)

**Treatment Offered**

**87%** ▲
(25,973)

**Treatment Attended**

**58%** ←→
(25,973)

**MHSDS patient transfers out of desert institutions**

**82%** ▼
(11)

**Timely transfers to CCCMS/EOP**

**61%** ←→
(1,868)



6. The denominator is defined as "All scheduled appointments", however QM excludes all cancelled appointments, except those cancelled due to ProviderUnavailable, TechnicalDifficulties, or ModifiedProgram. Approximately half of all scheduled appointments are cancelled due to a reason that is not included by this indicator, which makes the true Appointments seen as scheduled percentage closer to 50%, not 90+%.

CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18

## Quality of Care

| IDTT Staffing | IDTTS in which PC intake evals were completed prior to initial | IDTTS in which psychiatry intake evals were completed prior to initial | Psychiatrist continuity of care |
|---|---|---|---|
| **87%** (11,985) → | **100%** (18) ▲ | **95%** (22) ▲ | **85%** (344,552) ↔ |

| MH documentation of consultation from medical staff | Discharges from MHCB with clinician review of d/c summary | IDTTs meeting all audit criteria | Treatment plans with satisfactory documentation |
|---|---|---|---|
| **100%** (1) ▲ | **100%** (3) ↔ | **68%** (22) ▼ | **67%** (33) ↔ |

| Group treatment in a confidential setting 7 | Inmate-patients without conflicting diagnoses | Treatment plans with reason for refusal and intervention documented for high refusers | Treatment plans with documented and implemented pre-release plans |
|---|---|---|---|
| **97%** (160,153) ↔ | **77%** (13) ▼ | **100%** (6) ▲ | **0%** (4) ▼ |

| RVR MH assessments where the patient was informed of the limits of confidentiality. (Beta) | Average PHQ-9 Score (Beta) | | |
|---|---|---|---|
| **80%** (20) ▲ | **10.9** (270) ▲ | | |

## Utilization and Resource Management

| Treatment Cancelled 8 | Treatment Refused 9 | Appointments Cancelled Due to Custody | Appointments seen as scheduled |
|---|---|---|---|
| **19%** (25,973) ▼ | **24%** (25,973) ↔ | **2%** (461,238) ↔ | **92%** (10,592,35 3) ↔ |

| DSH/PIP physical discharges within timeframes | MHCB clinical stays within timeframes | MHCB physical discharges within timeframes | |
|---|---|---|---|
| **77%** (176) ↔ | **90%** (803) ↔ | **95%** (674) ↔ | |

## Segregated Housing

| ICCS with MH clinican presence and relevant information provided | Placement of ASU EOPs in appropriate housing within timeframes | Placement of ASU/SHU CCCMS in STRH/LTRH within timeframes | Timely transfer of MHSDS out Standalone ASU |
|---|---|---|---|
| **60%** (5) ▼ | **90%** (144) → | **67%** (181) ▲ | **63%** (16) ▲ |

7. There is an indicator for group treatment being conducted in a confidential setting, but not for psychiatry appointments being conducted in a confidential setting.

8. Instead of giving a straight-forward percentage of the treatment that is cancelled (e.g. if there are 100 appointments, and 30 were cancelled, this indicator would show 30%), the numerator is defined as "Number of patient-weeks included in denominator during which the following number of hours of treatment were cancelled: More than 3 for ASU EOP Hub, PSU-EOP, and ML-EOP; More than 1.5 for RC-EOP and ASU EOP non hub; More than 1.0 for SRH/LRH CCCMS."

9. Instead of giving a straight-forward percentage of the treatment that is refused (e.g. if there are 100 appointments, and 40 were refused, this indicator would show 40%), the numerator is defined as "Number of patient-weeks included in denominator during which over 50% of all offered treatment was refused AND less than the following hours of treatment were attended: less than 5 for ASU EOP Hub, PSU-EOP, and ML-EOP; less than 2.5 for RC-EOP and ASU EOP non hub; less than 1.0 for STRH CCCMS and LTRH CCCMS.

CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18



**DSH Discharges with Clinican to Clinician Contact within 5 days**



**MHPS meeting audit criteria**



**EOP IDTTs discussion of clinical appropriateness for work, educ, accommodation addressed**



**Primary clinician continuity of care**

83% ↦
1,589,344)

**Interventions for high utilizers tailored to decrease risk**



**RVR assessments where all documentation requirements were met (Beta)**



**Alternative Housing Stays**



**MCB and DSH discharges not readmitted within 30 days**

79% ↦
(14,851)



of

CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18



**Data Entry**

| Appointment Closure Lag | MH referral resolved before it was received | Seen/Refused MH appointment duration greater than 4 hours | MHI change during in-transit/temp departure |
|---|---|---|---|
| 1% (2,166,876) — | 1,977 ▲ (1,977) | 542 (542) ▲ | 56 (56) ▲ |

| Patients in CDCR over 30 days with no MHI entry since admission | MH referral date(s) in the future | MH referral received date later than data entry date | Unresolved pending appointments |
|---|---|---|---|
| 3 (3) ▲ | 13 (13) ▲ | 1,267 (1,267) ▲ | 195 (195) ▲ |

CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18

**Program/subprogram change during in-transit/temp departure**

6
(6)

**Use of DSH MHI**

10
(10)

**Inpatient MHI errors**

40
(40)

**MH Milestones Over/Under Awarded**

92%
(291,011)

PL-164, Page 019

## Psychiatrist Continuity of Care

Definition:



Per the definition, the indicator ONLY includes patients who have been in EOP, at the same institution, in the same housing program, without interruption (so likely no MHCB or outside hospital stay) for six months.

Interestingly, the Dashboard definition differs from the Performance Report definition in a very important way. The Dashboard definition does not include the requirement of being at the same institution, and explicitly states that patients who transferred to a different institution were still included, as long as their housing program did not change.



The denominator should give a good understanding of how many patients are included/excluded. Oddly, the denominator for mainline EOP has changed a lot during the past year (see image below). In January 2018 it was 169, and it has rapidly increased each month since. In August 2018 the denominator was 17,881. From the definition, we know that 17,881 is the total number of psychiatry contacts during the past 6 months for any patient who meets the inclusion criteria. If we use 7 as the average number of psychiatry appointments during a 6 month period for an EOP patient, this means approximately 2,500 patients were included. The approximate mainline EOP census on 7/23/2018 was 6,660, so roughly 62% of ML EOP patients are excluded from (or alternately, roughly 38% are included in) the August 2018 psychiatry continuity of care indicator.



How did the denominator go from 169 in January 2018 to 17,881 in August 2018?



The image above shows how this indicator is calculated. E.g. Lindgren is listed as having 138 measurements. This number was obtained by counting the number of "Total MHTS Encounters Within Last 6 Months" for each patient for whom he was the "Most Frequently Visited Psychiatrist", excluding any patient who changed LOC, institution, or housing unit within the past 6 months (see below image).



Interestingly, every single ML EOP psychiatrist in January 2018 had a continuity of care percentage of 100%. There were only 34 psychiatrists listed in the measurement.



In February 2018, there wasn't a single psychiatrist for ML EOP who had a continuity of care percentage less than 80%. 68 of the 85 psychiatrists (80%) listed had a continuity of care percentage of 100%. Somehow the number of psychiatrists increased from 34 in January 2018 to 85 in February 2018.



In March 2018, 61 of 80 (76%) ML EOP psychiatrists had a reported continuity of care of 100%.





In April 2018, only 34 of 89 (38%) psychiatrists had a reported continuity of care of 100%.

In May 2018, only 14 of 95 (15%) psychiatrists had a reported continuity of care of 100%.

In June 2018, only 11 of 94 (12%) psychiatrists had a reported continuity of care of 100%.



There is definitely something very wrong with this indicator. Clearly they are severely limiting the patients included in the measurements to only the patients most likely to have had continuity of care. But even throwing out 60% of the patients doesn't account for how they were able to get 100% continuity of care for the month of January 2018, and why the compliance steadily decreased, and the number of measurements steadily increased, over several months.

| From: | Gonzalez, Melanie@CDCR |
| To: | Golding, Michael@CDCR |
| Subject: | SAC Information |
| Date: | Thursday, November 16, 2017 1:03:00 PM |

Hi Michael,

Here's a synopsis of what I've found:

CTC: Rare custody barriers; there are a couple COs who push back when asked to bring patients they feel will be a lot of work, but overall custody is very helpful. Office space is limited, and the times available for seeing patients are short (due to breakfast, pill line, lunch, change of shift – usually they can see patients from 7:30 – 10:30, and 11 – 1:30), but the psychiatrists denied any significant problems with office availability thanks to COs bringing patients promptly and the psychiatrists and psychologists working well together. There are lots of PC 2602s to do, which somewhat decreases ability to see many patients. Biggest complaint from two of the psychiatrists was how many trainings (SRE, Columbia scale, etc) they have to do. Overall the CTC psychiatrists feel things run smoothly.

MHCBU: "All 3 or 4 custody officers will put on their sunglasses and sleep. If you ask them for patients to be pulled they'll say 'oh, he won't come out'" without even attempting to get the patient. He stated the psychologist has an office, but the psychiatrist does not have an office and has to sit in the hallway to see patients or do any work. He reported it's really noisy in the hallway, there is no privacy, and other prisoners can listen to the appointments and even see his computer/notes if they are in a nearby cell. There are lots of PC 2602s.

PSU A1: Approximately 70% of patients do not show up for their scheduled appointment – 50-60% of those say that they did not attend their appointment because custody never came to pick them up. Custody is mostly helpful when directly asked to do something, although a few are resistant to helping out the psychiatrist. Dr. Pleshchuk has forbidden patients from being taken out of groups to see the psychiatrist. The psychiatrist ends up seeing most patients cell-front, which can be time-consuming due to the psychiatrist needing to find them (the patient may be on the yard, in the law library, out to court, in group, or at a medical appointment). There are lots of PC 2602s. MAs come and go frequently – he has had 5 MAs since February – so he has to spend time to train them on expectations each time he gets a new one. Medical had priority over Psychiatry for MAs, so two of the five left because they were re-assigned to Medical.

PSU A2: Custody will pull patients when requested, unless the patient is in a group. He said Dr. Renata Pleshchuk informed custody that groups take precedence over psychiatry appointments, and that patients are never to be taken out of a group for a psychiatry appointment. Overall custody is helpful. Patients frequently (~50%+) refuse to attend appointments, and must be seen cell-front, which can result in time spent tracking them down.

PSU B: They were 50% staffed in PSU B until October. No custody issues. The psychology supervisor, Dr. Pleshchuk, did not allow psychiatrists to pull patients from groups, but she was transferred to PSU A recently, so psychiatrists are now able to pull patients from groups. 90+% of the psychiatrist's patients refuse their 1:1 appointments, largely "because they don't want to be stuck in there for an

PL-164, Page 027

hour or two" (custody transports patients in groups, so although the appointment with the psychiatrist may only be 10-15 minutes, they have to sit in the treatment center for 1-2 hours before or after the appointment waiting until custody transports the group back). The psychiatrist sees about 50% of her patients cell-side, due to them refusing both their 1:1 with her and their group. She no longer schedules appointments in advance, due to 90+% of them not coming, so all scheduling orders are placed in arrears by the MA, who places the order, schedules the appointment, and checks them in and out.

A3 EOP: Over 50% of patients do not show up for their scheduled appointments, which the psychiatrist believes is mostly due to them refusing, but could also be due to custody failing to bring them. He said custody is pleasant and helpful overall. He is able to pull patients out of groups without any push-back. He goes cell-front to see the patients that are not in group and that refuse their appointment, and has some difficulty tracking these patients down. There are a fair number of PC 2602s to do, which takes away from direct patient care time.

A5 Ad Seg EOP: One psychiatrist said "Custody won't bring any patients". He clarified that he has patients scheduled, they are ducated, but custody refuses to bring patients for any psychiatry appointments. He stated custody will bring patients for psychology 1:1 appointments, and for groups. He reported he tries to see his patients with the psychologist during the psychology appointment whenever possible, or pull them from group, but frequently ends up having to see patients cell-side. Often the patients aren't in their cell, and "custody says they don't know where [the inmate] is", so he has to go all over the yard trying to find his patients, which takes a significant amount of time. He noted that although he does pull patients from groups, it is "frowned on" to do so, and he has heard other psychiatrists have been told they are not allowed to do that by Dr. Pleshchuk. Another psychiatrist stated "I cannot see the patients in a confidential setting on the block", and explained that custody will not pull patients out of their cell for a psychiatry appointment, only for groups and psychology appointments. He noted he can only see patients in a confidential setting if he pulls them out of group to see him, and said that custody is cooperative with pulling patients out of groups for him. He sees most of his patients cell-front, and denied significant problems with tracking them down, as they are usually either in their cell or on the yard.

A6 EOP: "Custody is very rude and there are lots of problems. When I try to see my patients they tell me they cannot bring the patient because it's yard time, shower time, they're not in their cells yet, or 'we have a shortage of staff and can't'. If you schedule 6 patients, 1 or 2 will be brought, but the others won't because custody refuses." "Two psychiatrists have left SAC because of working in A6." He reported he ends up having to see most of his patients cell-side, but this takes a lot of time because there are 3 blocks, and "custody will often refuse to even open the block for you". If he is eventually let in to the block, often the patient isn't in his cell, so he then has to try to find out where the patient is.

A7 EOP: 75+% of patients refuse their appointment, especially if they are scheduled for yard at the same time. He tries to see the patients who refuse cell-side, but often can't find them, and spends a lot of time checking their cells, work, yard, groups, etc, which decreases the amount of time he has available for patient care. He reported there are lots of PC 2602s to do, and in order to complete the paperwork and hearings he often has to devote one full day per week to PC 2602s.

Scheduling:

Most of the psychiatrists had more notes than scheduling orders, meaning they are forgetting to place the scheduling order in arrears or not communicating to the MA to place the scheduling order in arrears. On average, the psychiatrists had 5.7 more notes than scheduled appointments in September. I am assuming that scheduled appointments all had a note, and that all notes signified a face-to-face contact – both of which could be false assumptions (Andres Murillo is looking into this for me, but I don't have the results back yet).

Dr. Barbara Smith appears to have only seen 2 patients in September (based on scheduling orders), because her MA checks all cell-front appointments in and out for her. Because of this, the MA got credit for all of those appointments (n = 36), not Dr. Smith.

Overall thoughts:

1. Psychiatrists' ability to see patients is significantly impeded by the priority hierarchy of Medical appointments > Groups > Psychiatry appointments.
2. The patient refusal rate is very high on most yards, and the psychiatrists appear to not have much (if any) help locating the patient, so the psychiatrists spend a lot of time just trying to find their patients.
3. Custody transporting many patients at once and making them wait for 1-2 hours while the psychiatrist quickly tries to see each of them, and then transporting them all back at the same time, likely leads to a much higher appointment refusal rate.
4. SAC has a lot of PC 2602s (currently 216), which significantly impacts SAC psychiatrists' time. This is not accounted for when looking at productivity data.
5. Custody is a very significant barrier to patient care on several yards.
6. Psychiatrists are unable to pull patients from groups on several yards. Many of the psychiatrists expressed that psychiatry appointments are often brief (10-15 minutes), and groups are often long (90-120 minutes), so the patient would still be able to participate in most of the group and receive credit for attending the group, even if they were pulled partway through for a psychiatry appointment. Not allowing psychiatrists to pull patients from groups often results in the psychiatry appointment not happening, due to barriers with custody, high patient refusal rates, and difficulty tracking patients down.

Recommendations:

1. Speak with the warden regarding the above custody issues.
2. Speak with relevant parties at HQ regarding the appointment priority hierarchy, and the need for psychiatry appointments to take precedence over groups (just like medical appointments do).
3. Educate psychiatrists and MAs on the importance of making sure there is a scheduling order placed for every appointment. This could be directed just at the psychiatrists who had the biggest difference between number of notes and number of appointments (Dr. Halloran at 21, Dr. Jackson at 13, Dr. Sanchez at 15, and Dr. Curren at 12), or at all psychiatrists. Likewise the MAs could be spoken to as a group, or the MA supervisor could be spoken with and asked to make sure the MAs all place scheduling orders appropriately.

PL-164, Page 029

4.  Educate Dr. Barbara Smith and MA Katrina Garcia that the psychiatrist must be the one to
    check patients in and out on the ambulatory organizer, or the MA will get credit for the
    appointment.

5.  From the September data (which could potentially paint a misleading picture, given that it's
    just one month), it appears these psychiatrists should be instructed to see more patients:



I hope this helps. Let me know if you need any more details.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864



## Gonzalez, Melanie@CDCR

| | |
|---|---|
| **From:** | Gonzalez, Melanie@CDCR |
| **Sent:** | Tuesday, July 31, 2018 12:30 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | Confidential appointments |
| **Attachments:** | CCWF MHCB.docx; CCWF MHCB Appointments May 2018.xlsx; SAC AdSeg EOP.docx; CHCF MHCB.docx; CHCF MHCB Appointments May 2018.xlsx; SAC AdSeg EOP Appointments May 2018.xlsx |

Hi Michael,

I have attached documents and spreadsheets for CCWF MHCB, CHCF MHCB, and SAC AdSeg EOP looking at the percentage of appointments coded as confidential during the month of May. None appear accurate, although CCWF is glaringly inaccurate, at 100% confidential.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

CCWF MHCB

May 1 to May 31

104 scheduled appointments

8 cancelled

96 completed

    100% confidential

There were no non-confidential appointments.

(See Excel spreadsheet CCWF MHCB Appointments May 2018)

SAC AdSeg EOP (includes ASU and ASUHub)

May 1 to May 31

168 scheduled appointments

64 cancelled

104 completed

     41 non-confidential (39%)

     63 confidential (61%)

If broken down by initial and routine appointments:

     66 initial appointments – 26 non-confidential, 40 confidential (**61% confidential**)

     38 routine appointments – 15 non-confidential, 23 confidential (**61% confidential**)

(See Excel spreadsheet SAC AdSeg EOP Appointments May 2018)

CHCF MHCB

May 1 to May 31

459 scheduled appointments

24 cancelled

435 completed

     242 non-confidential (56%)

     193 confidential (44%)

If broken down by initial and routine appointments:

     146 initial appointments – 42 non-confidential, 104 confidential (71% confidential)

     289 routine appointments – 200 non-confidential, 89 confidential (31% confidential)

(See Excel spreadsheet CHCF MHCB Appointments May 2018)

Gonzalez, Melanie@CDCR

| | |
|---|---|
| **From:** | Gonzalez, Melanie@CDCR |
| **Sent:** | Wednesday, March 22, 2017 12:27 PM |
| **To:** | Golding, Michael@CDCR |
| **Cc:** | Kuich, Kevin@CDCR; Lindgren, John@CDCR |
| **Subject:** | RE: EOP compliance changed from 30 days to 45 days |
| **Attachments:** | Current_Due_Dates EOP CHCF.pdf |

Yes, but his explanation makes it sound like this is only impacting Initial appointments. EOP routine follow-ups are now due 45 days after their last appointment, not 30, so it is impacting both initial appointments and routine appointments. I have attached another Current Due Dates report for a different provider – if you check the "Contact DT", "Rule", and "Due DT" columns it will tell you when their last appointment was, whether this is a Routine or Initial appointment, and when Current Due Dates thinks the next appointment is due. You can see that the Routine appointments are due 45 days after their last appointment.

Kevin and I did look at the psychiatry contact rule parameters last week, and both agreed that "Then Routinely within 1 Month, or 45 Calendar Days if that is sooner, of the prior completion." does not make sense. 1 month should mean a calendar month, and the longest calendar month is 31 days, so 45 calendar days would never be sooner. If you define 1 month as 30 business days (which would be odd), 45 calendar days is still never sooner – only in November, when there are 3 holidays, is 30 business days ever equivalent to 45 calendar days. And per the above rule, you're supposed to go with whichever is sooner, so I really don't see how this rule change means all EOP routine follow-up appointments are now due in 45 days (as you can see demonstrated in the attached Current Due Dates) instead of 30 days.

From: Golding, Michael@CDCR
Sent: Wednesday, March 22, 2017 8:55 AM
To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>
Subject: FW: EOP compliance changed from 30 days to 45 days

Dave usually has an explanation!
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

1



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, March 22, 2017 8:55 AM
**To:** Leidner, David@CDCR
**Cc:** Ceballos, Laura@CDCR
**Subject:** RE: EOP compliance changed from 30 days to 45 days

Thanks Dave. Yea. Missed that.
So an overly creative psychiatrist could first see his patient within 45-days of arrival, not 30 days of arrival, if for example
he gave the patient his meds 14 days after and then interviewed him 30 days later.
Got it.
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** Leidner, David@CDCR
**Sent:** Tuesday, March 21, 2017 11:27 PM
**To:** Golding, Michael@CDCR
**Cc:** Ceballos, Laura@CDCR
**Subject:** RE: EOP compliance changed from 30 days to 45 days

You can always check the current Psychiatry Contact rule parameters (as well as all other contact rules) on the
Compliance Rules grid.  Here's the rule for EOP and EOPMod:

2

First Psychiatrist Contact required no later than 30 Calendar Days after the Arrival Date or Program Start or MHI Start or Psychotropic Start, whichever happened last. Then Routinely within 1 Month, or 45 Calendar Days if that is sooner, of the prior completion.

The rule was changed to the above in December. If you and Laura feel it should be otherwise, let me know and I will modify.

-Dave

From: Golding, Michael@CDCR
Sent: Tuesday, March 21, 2017 4:45 PM
To: Leidner, David@CDCR
Cc: Ceballos, Laura@CDCR
Subject: FW: EOP compliance changed from 30 days to 45 days

Hi Dave,
Has something changed? What are we missing?
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

From: Gonzalez, Melanie@CDCR
Sent: Tuesday, March 21, 2017 2:37 PM
To: Golding, Michael@CDCR; Lindgren, John@CDCR
Subject: EOP compliance changed from 30 days to 45 days

Hi Michael and John,

I have attached a copy of Current Due Dates that my OT sent me in October 2016, which correctly shows my EOP patients' appointments were due 30 days after their last appointment.

Also attached is a copy of Current Due Dates for EOP patients from today, which shows the EOP patients' appointments are not due until 45 days after their last appointment. I ran Current Due Dates at multiple institutions, and all show a 45 day window for EOP Psychiatry appointments.

Melanie

3

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

4

**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| **From:** | Gonzalez, Melanie@CDCR |
| **Sent:** | Wednesday, April 12, 2017 1:16 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | New EOP compliance rules |
| **Attachments:** | CHCF January 2017 compliance EOP.pdf |

Hi Dr. Golding,

I have been reviewing Dashboard Psychiatrist Contact Timeframes compliance data, and ran across something that I thought would be of interest. As previously discussed, the EOP follow-up appointment timeframe was changed in December to "within 45 days or within one calendar month of the previous contact, whichever is shorter", rather than 30 days. I discovered in Dashboard that this means if someone is seen by the end of the following month, they are considered compliant. For example:

Patient A is seen 12/2/16 for a routine EOP psychiatry appointment. Current Due Dates states his next appointment is due by 1/16/17 (45 days later). The compliance checks are done every Sunday, so on 1/1/17, 1/8/17, 1/15/17, 1/22/17, and 1/29/17 the program checks to see if the psychiatry contact timeframe is still within compliance. Since the next appointment is due 1/16/17, the compliance checks on 1/1, 1/8, and 1/15 all state "Yes" for compliance. However, the compliance checks on 1/22 and 1/29 also state "Yes" for compliance, because it is not yet the end of "one calendar month", if you interpret that to mean the entire month of January. This means the compliance for this EOP patient would be 100%, despite going almost 2 months (from 12/2/16 to 1/31/17) without being seen by psychiatry.

Further, let's say this patient was seen on 12/2/16, and his next appointment was not until 2/3/17. The weekly compliance checks in December and January would all state "Yes" for compliance. The first compliance check in February is on Sunday, 2/5/17, so all of the weekly compliance checks in February and March will state "Yes" for compliance because they'll see he was seen on 2/3/17. This EOP patient was seen twice in four months, yet is listed as 100% compliant for all of those months.

Last note, since compliance is checked weekly, the longer you can stretch that compliance interval, the less impact being out of compliance will have. If you use a strict 30 day deadline, and are late in seeing the patient by 1 week, your compliance percentage will be 4/5 = **80%** (because you have 4 weeks of compliance, and 1 of non-compliance). If you stretch the interval of compliance to almost two months (e.g. from 12/2/16 to 1/31/17) like the compliance reports are currently doing, and again are late in seeing the patient by 1 week, your compliance percentage is now 9/10 = **90%** (because you have 9 weeks of compliance, and 1 of non-compliance).

Hopefully this all makes sense. I attached a compliance report for one of the yards at CHCF for the month of January, and highlighted the relevant entries to help clarify the above. Let me know if you have any questions.

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| From: | Gonzalez, Melanie@CDCR |
| Sent: | Tuesday, March 21, 2017 1:27 PM |
| To: | Golding, Michael@CDCR; Lindgren, John@CDCR |
| Subject: | Dashboard compliance numbers |
| Attachments: | CHCF dashboard January compliance.PNG; Dashboard audit.pdf |

Hi Michael and John,

I think it would be very much worth our time to try to get a statistician to run some compliance numbers for us asap. I did a manual comparison of the dashboard numbers to actual numbers for psychiatry appointments (checking eUHR for each patient and using psychiatry notes as proof of an appointment) for one unit that I thought would be fairly representative of CHCF (chosen based on their dashboard compliance percentage being close to CHCF's overall percentage, and because there were enough patients to make it worthwhile yet not so many that a manual check would take days). This is what I found:

CHCF C3A (houses EOP and CCCMS patients)
January dashboard compliance: 66%
January actual compliance: 0%
N = 13

For my audit, I only included the patients who were due or overdue for an appointment in the month of January, which eliminated 11 of the 25 patients. One patient was removed due to being transferred to another facility during January prior to being seen, and another was removed due to not taking medication. 13 patients met criteria and were included. Interestingly, of the 10 patients removed due to not being due or overdue for an appointment in January, all are in CCCMS, and 9 of the 10 were due to be seen in early or mid-February but still haven't been seen as of 3/21/17 (meaning they were all last seen in November 2016). I realize my N is small, but I'm willing to bet there would be major differences between the dashboard numbers and the statistician's numbers.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

## Gonzalez, Melanie@CDCR

| | |
|---|---|
| **From:** | Gonzalez, Melanie@CDCR |
| **Sent:** | Friday, September 29, 2017 3:42 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | MHCB Discharges |
| **Attachments:** | MHCB discharges.xlsx |

Hi Michael,

I have attached a revised spreadsheet of MHCB Discharges. I reviewed 32 cases total (8 from each of the 4 institutions), and 16 of these showed no evidence of psychiatric involvement in the discharge process. The items I looked at to determine this were: the PC Discharge Summary; Psychiatry Discharge Summary (if present); Master Treatment Plan (the IDTT documentation); the last Psychiatry progress note prior to the discharge IDTT/PC Discharge Summary; and the actual discharge order. Arianna has printouts of the PC Discharge Summary, Master Treatment Plan, and last Psychiatry progress note for each of the 16 cases, as well as a copy of the excel spreadsheet.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

**Gonzalez, Melanie@CDCR**

| From: | Gonzalez, Melanie@CDCR |
|---|---|
| Sent: | Tuesday, July 31, 2018 1:46 PM |
| To: | Golding, Michael@CDCR |
| Subject: | RE: SAC scheduling |
| Attachments: | Appointments seen as scheduled.JPG |

It is odd, and I don't understand why Appointments seen as scheduled is so high. When I drill down on Appointments seen as scheduled, the only options it shows are Seen, ProviderUnavailable, ModifiedProgram, and TechnicalDifficulties (I have attached a screenshot). There are several other options to choose from when cancelling an appointment, including IP No Showed, IP Refused, Scheduling Error, etc, so it appears they do not include any appointments with those outcomes in the denominator. But that is so illogical that I'm doubting myself.

From: Golding, Michael@CDCR
Sent: Tuesday, July 31, 2018 12:32 PM
To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>
Subject: RE: SAC scheduling

So if I am understanding you correctly, it is good that appointments are being cancelled, because it allows us to see what a problem there is?

But that seems strange to me, since 75% to 80% of patients (manifestly) are not coming? How come the indicator does not say that and suggests a higher % are coming?

Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

From: Gonzalez, Melanie@CDCR
Sent: Tuesday, July 31, 2018 12:28 PM
To: Golding, Michael@CDCR
Subject: RE: SAC scheduling

1



**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| **From:** | Gonzalez, Melanie@CDCR |
| **Sent:** | Wednesday, August 22, 2018 11:45 AM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | Appointments seen as scheduled versus Appointments reports February 2018 |
| **Attachments:** | Appointments seen as scheduled SAC CCCMS February.PNG; SAC CCCMS appointments February 2018.xlsx; CDCR CCCMS appointments seen as scheduled.PNG; CDCR CCCMS all appointments in February 2018.xlsm |

Hi Michael,

Per Appointments seen as scheduled, in SAC ML CCCMS in February 2018 87% of appointments were seen as scheduled. Per Appointments, in SAC ML CCCMS in February 2018, 22% of appointments were seen as scheduled, 74% were cancelled, and 4% were refused. I have attached the screenshot of Appointments seen as scheduled, and the excel spreadsheet for Appointments.

I have also attached the screenshot for CDCR ML CCCMS in February 2018 that shows 95% of appointments were seen as scheduled (I previously sent this same screenshot on 8/15/18), and the excel spreadsheet for Appointments for CDCR ML CCCMS in February 2018 that shows 42% (35,642 out of 84,120) of appointments were seen as scheduled.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove – Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1



PL-164, Page 046



PL-164, Page 047

## Gonzalez, Melanie@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Tuesday, August 14, 2018 9:27 AM |
| **To:** | Gonzalez, Melanie@CDCR |
| **Subject:** | Re: Appointments Seen as Scheduled |

Hi Melanie,

Thank you for the information.
The scheduling issue that led to this was the report from SAC, in which we, quite implausibly, report 91% compliance with coming to scheduled appointments.

You also report about 48% statewide cancellation rate or I think 52% scheduled appointments being made.

I would like to compare, if possible, either the 91% to a measure you calculate, for "not cancelled" at SAC.

Or compare the 52% figure, statewide,  to a statewide scheduled percentage figure, like the 91% figure, but statewide.

Michael


Sent from my iPhone

> On Aug 14, 2018, at 8:04 AM, Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov> wrote:
>
> Definitely. And unfortunately I have no idea how much higher - it might be negligible, but it could also be significant.
>
>
> Melanie Gonzalez, MD
> Senior Psychiatrist, Specialist
> Elk Grove - Headquarters
> California Department of Corrections and Rehabilitation
> 916-691-0637
> Cell phone: 916-823-2864
>
> -----Original Message-----
> From: Golding, Michael@CDCR
> Sent: Monday, August 13, 2018 5:51 PM
> To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>
> Subject: Re: Appointments Seen as Scheduled
>
> Hi Melanie, if it doesn't include the appointments that were rescheduled, the actual percentage of missed appointments would be higher, right?
> Michael
>
>
> Sent from my iPhone
>
>> On Aug 13, 2018, at 2:50 PM, Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov> wrote:

1

PL-164, Page 048

>>

>> I can't find anything that combines all scheduled and missed appointments. I asked Lisa Holcomb (she works with Susie Sim and Dave Leidner), and she said she doesn't know of any indicator or report that shows all scheduled and missed appointments, or even one just for refused appointments.

>>

>> There is a report called "Appointments" that allows for searching a specific institution (or all of CDCR), program, date range, and appointment type, and getting a list of all appointments that meet the search criteria. For example, I searched CDCR, ML CCCMS, psychiatrist contacts on 7/10/18 with all outcome types, and received a table with 955 rows (954 patient appointments). I then changed the outcome type to "cancelled", "refused", or "pending" (all of the outcome types except "completed"), and received a table with 461 patient appointments. So on 7/10/18 in all of CDCR, the percentage of scheduled psychiatry appointments that were missed was 48%, or to put it in performance report terms, the percentage of Appointments seen as scheduled was 52%. This doesn't include the appointments that were just rescheduled by schedulers without marking them as cancelled, but there's no way to track that. However, this is definitely not a quick or easy way to obtain appointment data.

>>

>> Melanie Gonzalez, MD

>> Senior Psychiatrist, Specialist

>> Elk Grove - Headquarters

>> California Department of Corrections and Rehabilitation

>> 916-691-0637

>> Cell phone: 916-823-2864

>>

>>

>> -----Original Message-----

>> From: Golding, Michael@CDCR

>> Sent: Saturday, August 11, 2018 6:21 PM

>> To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>

>> Subject: Appointments Seen as Scheduled

>>

>> Hi,

>>

>> Could you make sure there is not something that looks at all scheduled and missed appointments, rather than just some of them?

>> I am still astounded by the table you provided for SAC.

>>

>> Specifically also look for appointments seen as scheduled that were "refused". I would like to see those numbers as well.

>>

>> So they basically have two ways of reporting this, the ones that include provider unavailable, modified program, technical difficulties and a separate calculation for patient refusal?

>>

>> And they have nothing that combines all of the reasons for someone missing a scheduled appointment, to see the overall percentage who missed scheduled appointment?

>> Michael

>>

>> Sent from my iPhone

2

**From:** Ceballos, Laura@CDCR
**Sent:** Thursday, August 16, 2018 4:17 PM
**To:** Shahbazian, Randy@CDCR
**Cc:** Nikkel, Nancy @CDCR; Golding, Michael@CDCR; Kuich, Kevin@CDCR; Rekart, John@CDCR
**Subject:** RE: MHMD emergent consults

That is fantastic news!
Thank you so much.

Laura Ceballos, cchp, Ph.D.
Mental Health Administrator, Inpatient Facilities, Quality Improvement
Statewide Mental Health Program
916-691-0308

**From:** Shahbazian, Randy@CDCR
**Sent:** Tuesday, August 07, 2018 2:24 PM
**To:** Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>
**Cc:** Nikkel, Nancy @CDCR <Nancy.Nikkel@cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; Kuich, Kevin@CDCR <Kevin.Kuich@cdcr.ca.gov>; Rekart, John@CDCR <John.Rekart@cdcr.ca.gov>
**Subject:** RE: MHMD emergent consults

Good Afternoon, Dr. Ceballos-

I believe that your emergent MHMD consult statistic for NKSP is accurate.

One likely reason for this is that inmate-patients requiring Mental Health Alternative Housing very rarely receive an emergent MHMD consult; the process is mostly handled by the primary clinicians on the Crisis Team. While true that after-hours placements of inmate-patients into MHAH usually involve a nurse calling the on-call psychiatrist, our process here at NKSP does not generate an emergent MHMD consult since technically that would require the on-call psychiatrist to complete a face-to-face examination of the patient within the emergent four-hour window (possibly in the middle of the night).

Another reason for our low number of emergent MHMD consults is that we encourage health care staff members to communicate their patient care concerns directly to our psychiatrists who are very responsive overall. For example, if a patient is experiencing a side effect from a medication, the primary clinician, nurse, medical provider, etc. may directly contact the treating psychiatrist who will triage each problem to determine whether this matter can wait until next week; wait until tomorrow; or need to be addressed immediately. This is much preferred to the practice of reflexively ordering an emergent MHMD consult for "side effects."

Finally, I would hope that the relatively low number of emergent MHMD consults at NKSP is an indication that we have things running fairly smoothly here; I certainly am not hoping for more psychiatric emergencies at NKSP!

Please contact me if you have further questions/concerns about this matter.

RANDY SHAHBAZIAN, MD
SENIOR PSYCHIATRIST SUPERVISOR
NORTH KERN STATE PRISON
(661)721-2345 x4000