1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11     THOMAS SCHMITZ, et al.,                     No.  2:20-cv-00195-JAM-CKD PS

12                    Plaintiffs,                   FINDINGS AND RECOMMENDATIONS ON
                                                    MOTIONS TO DISMISS &
13            v.                                    MOTION TO STRIKE

14     A. ASMAN, et al.,                            (ECF Nos. 179, 181, 182)

15                    Defendants.

16

17            Presently before the court are several defendants' fully briefed motions to partially

18     dismiss the Fourth Amended Complaint (ECF Nos. 179, 181), as well as plaintiffs' motion to

19     strike the answer filed by two other defendants (ECF No. 182).[1]  These motions were taken under

20     submission pursuant to Local Rule 230(g).  (ECF Nos 186.)  As set forth below, the undersigned

21     recommends DENYING IN PART and GRANTING IN PART all three motions.

22     **BACKGROUND**

23            This action arises from the January 2019 death of William Schmitz while incarcerated at

24     Mule Creek State Prison ("MCSP"), under the authority of the California Department of

25     Corrections and Rehabilitation ("CDCR").  Plaintiffs Thomas Schmitz and Dianne Mallia—

26     William's father and mother—bring this action individually for themselves and also as successors

27

28     [1] Plaintiffs are proceeding pro se, and this action is before the undersigned pursuant to Eastern
       District of California Local Rule 302(c)(21).

                                                        1

1    in interest to William's estate.

2          As relevant to these motions, William died in his prison cell of a methamphetamine

3    overdose after ingesting large quantities of the substance, allegedly as a result of his psychosis

4    and generally poor mental health.  Plaintiffs are suing 30 defendants for their alleged

5    contributions to William's "untimely and avoidable death."  (ECF No. 173 at 2-4.)  They are

6    suing top-level CDCR officials for not addressing system-wide failures in providing adequate

7    care for prisoners, like William, with known mental health problems; MCSP medical staff for

8    providing inadequate mental healthcare to William from as early as June 2014 through the time of

9    his death in 2019; a subset of MCSP medical staff who allegedly misdiagnosed William with liver

10   disease, thereby increasing his anxiety; a private contracting physician named Stephen DeNigris,

11   who allegedly performed an unnecessary endoscopy on William in late 2018 that caused him pain

12   and worsened his mental state; MCSP floor officers who allegedly failed to complete thorough

13   welfare checks on William during the day of his death; and the MCSP supervisors who allegedly

14   allowed these unconstitutional practices to persist.  Because the court and the parties are well

15   acquainted with the pleadings, the court describes the detailed allegations only where relevant in

16   addressing the arguments for dismissal below.

17         Since its original filing in January 2020, plaintiffs' complaint has endured multiple rounds

18   of motions to dismiss, with the court dismissing certain claims and granting leave to amend

19   certain claims at each juncture.  Most recently, with leave of court, plaintiffs filed a Fourth

20   Amended Complaint ("4AC") on December 17, 2021.  (ECF No. 173.)  Three defendants filed

21   answers, instead of motions to dismiss—among them, Dr. Kevin Kuich and Warden Joe

22   Lizarraga.[2]  (ECF Nos. 177, 178.)  Most of the CDCR defendants, however, filed another motion

23   to partially dismiss, as did Dr. Stephen DeNigris (through separate counsel).  (ECF Nos. 179,

24   181.)  Plaintiffs oppose both motions to dismiss (ECF Nos. 184, 185), and they move to strike

25   Dr. Kuich and Warden Lizarraga's answer (ECF No. 182).  All three motions were fully briefed

26   and are now before the court.

27   _____

28   [2] The court follows plaintiffs' convention of referring to Warden Lizarraga by his title at the time
     of the events giving rise to suit, although he is no longer the warden of MCSP.

**MOTIONS TO DISMISS**

    **A.  Legal Standard**

      In considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept as true the allegations of the complaint in question, Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007), and construe the pleading in the light most favorable to the plaintiff, see Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

      In order to avoid dismissal for failure to state a claim a complaint must contain more than "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-557 (2007).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Furthermore, a claim upon which the court can grant relief has facial plausibility.  Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

      In ruling on a motion to dismiss pursuant to Rule 12(b), the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."  Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899 (9th Cir. 2007).

    **B.  Discussion**

      The operative 4AC asserts 10 causes of action against various subsets of the 30 named defendants.  It asserts federal causes of action under § 1983 for deliberate indifference in violation of the Eighth Amendment (COA #1), supervisory liability and failure to train (COA #2-3), and deprivation of familial relationship in violation of the Fourteenth Amendment (COA #4).  It also asserts state-law causes of action for wrongful death against all defendants (COA #6); negligent supervision against Dr. Christopher Smith (COA #5); medical negligence against Dr. DeNigris, Dr. Smith, and two other MCSP doctors (COA #7); and claims of medical battery,

////

1  assault, and violation of the Bane Act against Dr. DeNigris alone (COA #8-10).  (ECF No. 173 at

2  119-31.)

3      The present motions seek to dismiss the claims against select defendants within each

4  cause of action except for the Second and Third Causes of Action (for § 1983 supervisory liability

5  and failure to train).  The court addresses in turn each argument for dismissal.

6                    *1.  Unenumerated Claims against the CDCR*

7      The 4AC lists the CDCR itself as a defendant in the caption, without naming it as a

8  defendant for any of the specific causes of action.  (4AC at 1.)  Defendants move to dismiss any

9  claims against the CDCR as barred by virtue of Eleventh Amendment sovereign immunity.  (ECF

10  No. 179.2 at 16-17.)

11      The Eleventh Amendment serves as a jurisdictional bar to suits brought by private parties

12  against a state or state agency absent an abrogation or waiver of sovereign immunity for such suit.

13  See Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 54 (1996); Edelman v. Jordan, 415 U.S. 651, 94

14  (1974) ("There can be no doubt, however, that suit against the State and its Board of Corrections

15  is barred by the Eleventh Amendment, unless [the State] has consented to the filing of such a

16  suit.").  Neither California nor the CDCR have consented to suit, and there has been no

17  congressional abrogation of sovereign immunity for § 1983 claims.  See Quern v. Jordan, 440

18  U.S. 332, 342-45 (1979); Dittman v. California, 191 F.3d 1020, 1025-26 (9th Cir. 1999) ("The

19  State of California has not waived its Eleventh Amendment immunity with respect to claims

20  brought under § 1983 in federal court.")  The same is true of plaintiffs' claims under state law.

21  See Ashker v. Cal. Dep't of Corrs., 112 F.3d 392, 394 (9th Cir. 1997) (noting that a suit against

22  CDCR arising under state law would be barred by the Eleventh Amendment).

23      The Ninth Circuit routinely recognizes the CDCR's immunity in similar cases.  See, e.g.,

24  Brown v. Cal. Dep't of Corrs., 554 F.3d 747, 752 (9th Cir. 2009) ("The district court correctly

25  held that the California Department of Corrections and the California Board of Prison Terms were

26  entitled to Eleventh Amendment immunity."); Lucas v. Dep't of Corrs., 66 F.3d 245, 248 (9th

27  Cir. 1995) (per curiam) (holding that Eighth Amendment claims against CDCR for damages and

28  injunctive relief were barred by Eleventh Amendment immunity).

Plaintiffs do not contest that the CDCR is a state agency entitled to Eleventh Amendment immunity, instead arguing that the court should liberally construe the complaint to proceed with any plausible claims against the CDCR.  (ECF No. 184 at 3-4.)  However, no amount of liberal construction can provide plaintiffs with a cause of action against an immune entity.  Accordingly, all claims against the CDCR should be dismissed with prejudice.  See Cato v. United States, 70 F.3d 1103, 1105-06 (9th Cir. 1995) (if it is clear that a claim cannot be cured by amendment, the court may dismiss without leave to amend).

### 2.   *Deliberate Indifference*

The 4AC's First Cause of Action is for deliberate indifference in violation of the Eighth Amendment.  (4AC at 119-20.)  In these motions, defendants seek to dismiss the deliberate indifference claims against Dr. DeNigris, Dr. C. Smith, and Dr. Marianna Ashe, all of which arise from William's May 2018 endoscopy.  (ECF No. 179.2 at 17-20; ECF No. 181.1 at 5-10.)  The claims against these doctors are based on allegations that they failed to recognize William had been misdiagnosed with cirrhosis / end stage liver disease,[3] and proceeded to have him undergo a non-indicated endoscopy ("EGD") performed by contracting specialist Dr. DeNigris.  (4AC at 99-112, 120.)  In summary, plaintiffs allege that Dr. DeNigris was "deliberately indifferent by performing a sedated medical procedure in the absence of a medical indication and without valid consent to perform the procedure"; and that Drs. Ashe and C. Smith were "deliberately indifferent for choosing not to review William's medical records on multiple occasions," which would have shown he did not have cirrhosis.  (Id. ¶ 843.)  Plaintiffs allege that the "false diagnosis of cirrhosis and fraudulent EGD . . . significantly increased William's paranoia and psychosis and proximately caused his death," which followed about eight months later.  (Id. ¶ 797; see id. ¶¶ 597, 722.)

To state a claim for this sort of deliberate indifference, based on a doctor's choice of treatment, plaintiffs must plead facts showing (1) that "the course of treatment the doctors chose

---

[3] "Cirrhosis is a late stage of scarring (fibrosis) of the liver caused by many forms of liver diseases and conditions, such as hepatitis and chronic alcoholism."
https://www.mayoclinic.org/diseases-conditions/cirrhosis/symptoms-causes/syc-20351487.

1   was medically unacceptable under the circumstances" and (2) that the doctors "chose this course

2   in conscious disregard of an excessive risk to [the inmate]'s health." Jackson v. McIntosh, 90

3   F.3d 330, 332 (9th Cir. 1996); see Hamby v. Hammond, 821 F.3d 1085, 1092 (9th Cir. 2016).  To

4   satisfy the subjective (second) prong of the deliberate indifference analysis, the doctor must act

5   with a "sufficiently culpable state of mind," which entails more than mere negligence, but less

6   than conduct undertaken for the very purpose of causing harm.  Farmer v. Brennan, 511 U.S. 825,

7   837 (1994).  A prison official does not act in a deliberately indifferent manner unless the official

8   "knows of and disregards an excessive risk to inmate health or safety."  Id.  Finally, plaintiffs

9   alleging deliberate indifference must also demonstrate that the defendants' actions were both an

10  actual and proximate cause of their injuries.  Lemire v. California Dep't of Corr. & Rehab., 726

11  F.3d 1062, 1074 (9th Cir. 2013).

12      The court previously, in reviewing the Second Amended Complaint ("2AC"), dismissed

13  the deliberate indifference claims against these defendants with leave to amend.  (ECF No. 85 at

14  11-12.)  The court found that (1) the 2AC's allegations "that each doctor should have, but failed

15  to, consult Decedent's medical history more thoroughly to confirm the necessity of an

16  endoscopy" "do not plausibly allege that any of the [] doctors knew that liver disease was not

17  medically indicated"; and (2) they did not show how the decision to order, approve, or ultimately

18  conduct the endoscopy presented an excessive risk to William's health or safety that the doctors

19  consciously disregarded.  (Id. at 12.)  Defendants argue that the 4AC does not cure these twin

20  deficiencies.[4]

21              a.   The Endoscopy Allegations

22      According to the 4AC, MCSP physician Dr. Robert Rudas (who is no longer named as a

23  defendant in the First Cause of Action) at some point misdiagnosed William with cirrhosis / end

24  stage liver disease ("ESLD").  (4AC ¶¶ 673, 678.)  William "conclusively did not have cirrhosis,"

25  based on his blood work and imaging, and there was no reasonable explanation for Dr. Rudas'

26  _____

27  [4] These findings and recommendations compare the 4AC to the 2AC because the court did not
    have occasion to rule on the sufficiency of the intervening 3AC.  The court granted plaintiffs'
    motion to amend the 3AC, thereby mooting defendants' then-pending motions to dismiss.  (ECF
28  No. 156.)

diagnosis.  (Id. ¶¶ 678, 681.)  Although William had contracted hepatitis C a few years prior, it had been nowhere near the 20-30 years it typically takes a person with hepatitis C to develop cirrhosis.  (Id. ¶¶ 669-671.)

Still, on February 9, 2018, Dr. Rudas filled out a "physician request for services" form for William to receive a consultation for an endoscopy / EGD to screen for esophageal varices[5] which can arise from cirrhosis/ESLD.  (Id. ¶¶ 674, 686, 717.)  The reason Dr. Rudas cited was "Patient with cirrhosis/ESLD.  Per registry protocol patient is due for esophageal varices follow-up/surveillance."  (Id. ¶ 686 (capitalization altered to sentence case).)  Dr. Rudas left blank the section for "Summary of preliminary or diagnostic work up," and plaintiffs allege there was nothing he could have entered from William's medical history that would indicate cirrhosis.  (Id. ¶¶ 687-88.)

Nevertheless, Dr. Christopher Smith—the prison's Chief Medical Officer Executive—on February 12 and again on March 16, 2018, approved the incomplete consultation request without ensuring that an EGD consultation was appropriate.  (Id. ¶¶ 44, 694, 697.)  In between these approvals, on March 8, 2018, William was seen by his "primary medical doctor," Dr. Marianna Ashe.  (Id. ¶¶ 703, 710.)  Dr. Ashe's notes from the visit stated that William "[d]oes not have a known history of cirrhosis."  (Id. ¶ 703.)  However, she did not alert William that his cirrhosis diagnosis was a mistake, and she did not cancel the pending EGD screening.  (Id. ¶¶ 704-711.)

On May 4, 2018, William had the referral consultation and EGD with Dr. Stephen DeNigris, a physician employed by Secure MD On-Site Endoscopy, which contracts with MCSP.  (Id. ¶¶ 85, 722.)  Plaintiffs maintain that the EGD was unnecessary because it is common medical knowledge that, if a patient does not have cirrhosis, there is no need to screen for esophageal varices.  (Id. ¶¶ 724-29, 745-56.)  Plaintiffs allege that "[u]pon reviewing William's medical record [Dr. DeNigris] learned that William did not have end stage liver disease," but he did not inform William of the misdiagnosis and proceeded with the EGD as scheduled—"motivated by

---

[5] "Esophageal varices are abnormal, enlarged veins" in the esophagus, which can cause life-threatening bleeding if they rupture.  https://www.mayoclinic.org/diseases-conditions/esophageal-varices/symptoms-causes/syc-20351538.  (4AC ¶¶ 717, 729.)

1    the financial reimbursement." (Id. ¶¶ 730-732, 743, 765-766, 785-87.)  William did sign an

2    informed consent form for the EGD and the administration of anesthesia, which informed him of

3    various significant risks accompanying the sedated procedure. (Id. ¶¶ 733-741.)

4          William experienced "physical pain" from the EGD as well as "stress, mistrust, and

5    paranoia" from both the procedure and the uncorrected diagnosis of a potentially fatal disease

6    which he did not have.  (Id. ¶¶ 788-89.)  William—who was already receiving "unconstitutional

7    care" for his psychosis—was particularly afraid of dying of liver failure like his cousin recently

8    had.  (Id. ¶¶ 669, 683-84.)  Owing to the false diagnosis and unnecessary procedure, William

9    "became increasingly paranoid" and worried about "bleeding to death," having been repeatedly

10   counseled that the EGD was necessary to treat esophageal varices that could burst—a condition

11   which he in fact did not have.  (Id. ¶¶ 669, 676, 715-717, 721, 756, 763-764.)  At the same time

12   that he was being scheduled for and undergoing the EGD, William was also being transferred to a

13   lower level of psychiatric care—allegedly to boost the CDCR's healthcare monitoring metrics—

14   and in the process, William's antipsychotic medications were stopped.  (Id. ¶¶ 475-478, 500,

15   503.)  Although it is unclear whether the medications were stopped at William's request,

16   plaintiffs suggest that he may have wanted to stop taking medications out of concern that they

17   might worsen his (non-existent) liver condition.  (Id. ¶¶ 669.)

18         William's mental state continued to deteriorate due to lack of appropriate intervention or

19   care by the prison's mental health providers.  (Id. ¶¶ 526-560 (describing appointments with

20   defendants Andaluz, Branman, and Wanie).)  On December 21, 2018, one month before

21   William's death, Dr. Ashe ordered ultrasound imaging for William, noting that he had been

22   "placed [on] ESLD registry however no evidence of cirrhosis."  (Id. ¶¶ 790, 792 (alteration in

23   original).)  William died before the ultrasound could be performed, however, still believing he

24   had cirrhosis.  (Id. ¶¶ 794-96.)

25         Plaintiffs allege that the false ESLD diagnosis and unnecessary EGD—combined with

26   William's decreased level of mental healthcare—"significantly increased [his] paranoia and

27   psychosis and proximately caused his death."  (Id. ¶¶ 503, 709, 797.)

28   ////

1

b.  Drs. Ashe and C. Smith

2      The undersigned finds that the 4AC still fails to plausibly allege that Drs. Ashe and Smith

3  deliberately chose to subject William to an EGD procedure they knew to be unnecessary, or

4  deliberately chose to let stand the underlying misdiagnosis.[6]  See Jackson v. McIntosh, 90 F.3d at

5  332 (requiring plaintiff to plead (1) that "the course of treatment the doctors chose was medically

6  unacceptable under the circumstances" and (2) that the doctors "chose this course in conscious

7  disregard of an excessive risk to [the inmate]'s health").

8      The deliberate indifference claims against Drs. Ashe and Smith still rest entirely on their

9  failure to sufficiently review William's medical record to discover and correct Dr. Rudas'

10  misdiagnosis and failure to prevent the EGD consultation with Dr. DeNigris.  Although plaintiffs

11  repeatedly allege that both doctors "deliberately" chose not to substantively review William's

12  medical record before the EGD, that conclusory addition does not plausibly suggest that either

13  acted with a "sufficiently culpable state of mind."  Farmer, 511 U.S. at 837.  (See 4AC ¶¶ 700,

14  713, 843, asserting that each doctor "knows that when she . . . deliberately chooses not to perform

15  her duties harm will occur to her patients").  These allegations merely parrot the standard of

16  "deliberate" indifference without providing any facts to suggest a "purposeful act or failure to

17  respond to [William]'s pain or possible medical need."  Jett v. Penner, 439 F.3d 1091, 1096 (9th

18  Cir. 2006).

19      In fact, the majority of plaintiffs' allegations against Drs. Ashe and Smith sound in

20  negligence, which all agree is not actionable under the Eighth Amendment.  (4AC ¶ 696

21  (Dr. Smith "should have learned" that Dr. Rudas was providing sub-standard care by diagnosing

22  William with cirrhosis); ¶ 697 (Dr. Smith "failed in his own duties" to review William's medical

23  record and make sure EGD consult was appropriate); ¶¶ 703-708 (Dr. Ashe "should have"

24  reassured William he did not have cirrhosis); ¶ 710 ("It was malpractice" for Dr. Ashe to let

25  William proceed with an EGD).)  See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992)

26

27  ─────────────
   [6] At this stage, the court assumes the truth of all non-conclusory factual allegations and views
   them in the light most favorable to plaintiff.  Soo Park v. Thompson, 851 F.3d 910, 918 (9th Cir.
28  2017).

9

1   ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a

2   prisoner's Eighth Amendment rights."; "Medical malpractice does not become a constitutional

3   violation merely because the victim is a prisoner."), overruled on other grounds by WMX Techs.,

4   Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

5          Like the 2AC, the 4AC still does not plausibly allege that either Dr. Smith or Dr. Ashe

6   "knew that liver disease was not medically indicated" when they approved the EGD consult (in

7   Dr. Smith's case) or failed to intervene (in Dr. Ashe's case).  (See ECF No. 85 at 12.)  Dr. Smith

8   at most negligently approved the EGD consult based on Dr. Rudas' statement.  Plaintiffs do not

9   allege that Dr. Smith knew William did not have cirrhosis and approved the consult in a

10  deliberate effort to subject him to an unnecessary sedated procedure.  (See 4AC ¶ 693, alleging

11  that "Based solely on Defendant Dr. Rudas' statement that William had Cirrhosis/ESLD,

12  Defendant Dr. C. Smith inappropriately approved the consult for the unnecessary procedure.").

13         As to Dr. Ashe, the court already found insufficient her March 8, 2018, notation that

14  William "[d]oes not have a known history of cirrhosis."  (4AC ¶ 703; see ECF No. 85 at 4, 12.)

15  Plaintiffs provide little context for this notation, and in addition, they expressly allege that it was

16  not until December 21, 2018—some eight months after the EGD was performed—that Dr. Ashe

17  "seem[ed] to finally realize William [did] not have cirrhosis."  (4AC ¶ 790.)

18         Plaintiffs' opposition obliquely recognizes this lack of knowledge by characterizing the

19  4AC as now alleging that "only Defendant Dr. DeNigris performed the Endoscopy for fraudulent

20  reasons," whereas Drs. Ashe and Smith were simply "deliberately indifferent . . . by repeatedly

21  and deliberately failing to review William's medical records."  (ECF No. 184 at 4.)  Plaintiffs

22  argue that the doctors' deliberate neglect was in keeping with a common practice at MCSP and

23  that their failure to review William's record on multiple occasions shows the purposefulness of

24  their inaction.  (Id. at 5-6.)  The frequency with which others at MCSP insufficiently reviewed

25  prisoners' medical records does not show that these two doctors acted with a sufficiently culpable

26  state of mind in William's case.  And the undersigned is not persuaded that the two instances of

27  negligence alleged for each doctor add up to deliberate conduct.

28

1    Accordingly, the deliberate indifference claims against Dr. Ashe and Dr. C. Smith should

2    be dismissed.  Because plaintiffs have had several chances to state a deliberate indifference claim

3    against these defendants, the undersigned recommends dismissing these claims with prejudice.

4    See Telesaurus VPC, LLC v. Power, 623 F.3d 998, 1003 (9th Cir. 2010) (permitting dismissal

5    without leave to amend after repeated failure to cure deficiencies).

6                    c.   Dr. DeNigris

7    Dr. DeNigris moves to dismiss the deliberate indifference claim against him because

8    plaintiffs (1) fail to allege that he acted under color of state law, and (2) fail to plead the elements

9    of the claim.  (ECF No. 181.1 at 5-10.)

10                    i.   *State Action*

11   The court previously dismissed with leave to amend plaintiffs' deliberate indifference

12   claim against Dr. DeNigris without reaching the question of whether he was acting under color of

13   state law—because the 2AC failed to plead the elements of such a claim.  (ECF No. 85 at 12 n.9.)

14   With the 4AC's more fulsome allegations against Dr. DeNigris, the court must now address the

15   renewed arguments on this point.

16   A defendant may be liable under § 1983 for a constitutional violation "only if the

17   defendant committed the alleged deprivation while acting under color of state law."  Rawson v.

18   Recovery Innovations, Inc., 975 F.3d 742, 747 (9th Cir. 2020), cert. denied, 142 S. Ct. 69 (2021).

19   The "color of law" or "state actor" requirement is "a jurisdictional requisite for a § 1983 action."

20   Gritchen v. Collier, 254 F.3d 807, 812 (9th Cir. 2001).

21   Generally, private persons are not state actors subject to § 1983 liability.  However,

22   private actors' conduct may qualify as state action for purposes of § 1983 when "(1) the private

23   actor performs a public function; (2) the private actor engages in joint activity with a state actor;

24   (3) the private actor is subject to governmental compulsion or coercion; or (4) there is a

25   governmental nexus with the private actor."  George v. Sonoma Cty. Sheriff's Dep't, 732 F.

26   Supp. 2d 922, 933 (N. D. Cal.2010); see Rawson, 975 F.3d at 747 (listing these as four tests that

27   aid in identifying state action).  Regardless which test applies, "the inquiry is always whether the

28   defendant has exercised power possessed by virtue of state law and made possible only because

                                           11

1   the wrongdoer is clothed with the authority of state law."  Rawson, 975 F.3d at 748 (quoting West

2   v. Atkins, 487 U.S. 42, 49 (1988)).

3           Dr. DeNigris argues that the 4AC fails to satisfy any of the four tests for state action,

4   without substantively discussing any of them.  (ECF No. 181.1 at 6, arguing only that there can be

5   no allegation that he was "a willful participant in joint action with the State.")  Plaintiffs argue

6   that Dr. DeNigris' performance of the endoscopy qualifies as state action under the "public

7   function" test.  (ECF No. 185 at 4.)  See Rawson, 975 F.3d at 748 (public function test applies

8   where "the function at issue is both traditionally and exclusively governmental" (quotations

9   omitted)).

10          At this motion to dismiss stage, the court finds that—regardless which test applies—

11  plaintiffs sufficiently plead that Dr. DeNigris acted under color of state law in performing the

12  EGD because they allege that (1) prison doctors initiated and approved the EGD consultation

13  request (4AC ¶¶ 686, 694, 723); (2) prison doctors referred William to Dr. DeNigris for the EGD

14  (id. ¶ 723); (3) Dr. DeNigris "treated William pursuant to an agreement between MCSP and

15  Secure MD On-Site Endoscopy," Dr. DeNigris's employer (id. ¶ 85); (4) the EGD took place at

16  the prison, inferable from the "on-site" name of Dr. DeNigris' employer (id.); and

17  (5) Dr. DeNigris informed the prison doctors of the results of the referral (id. ¶ 768).[7]

18           These allegations mirror those found sufficient by courts in this district, due to their

19  similarity to the facts the Supreme Court held satisfied state action in West v. Atkins.  See Sykes

20  v. Athannasious, No. 2:12-cv-02570-TLN-KJN, 2015 WL 4662736, at *7 (E.D. Cal. Aug. 5,

21  2015) (concluding that a private physician acted under color of state law where CDCR contacted

22  the physician, approved the prisoner's treatment, determined when and where the prisoner would

23  be treated, paid the physician, and received and reviewed the physician's report regarding the

24  prisoner's case), findings and recommendations adopted, 2015 WL 5399491 (E.D. Cal. Sept. 14,

25  2015); Ayala v. Andreasen, No. CIV S-04-0903-RRB-CMK-P, 2007 WL 1395093, at *3 (E.D.

26  Cal. May 10, 2007) (state action sufficiently pleaded where physician's employer "was under a

27  _____

28  [7] In addition, Dr. DeNigris' motion states that his services "were charged to the prison pursuant to
     the contract his employer had with the Department of Corrections."  (ECF No. 181.1 at 15.)

1  contract with state prison authorities for inmate referrals" and physician performed surgery

2  pursuant to that contract and a referral approved by state prison officials), findings and

3  recommendation adopted, 2007 WL 4239813 (E.D. Cal. Nov. 29, 2007).

4         As plaintiffs aptly argue, in West v. Atkins the Supreme Court held a private contract

5  physician was acting under color of state law when he treated inmates at a state prison.  487 U.S.

6  at 43, 57.  Dr. DeNigris unpersuasively attempts to distinguish himself from the physician in

7  West on the basis that he (Dr. DeNigris) did not contract directly with the State and was under no

8  obligation to treat prisoners, only providing services "when necessary and requested."  (ECF

9  No. 192 at 2.)   However, as in Ayala, "[w]hat matters is that defendant [DeNigris] performed

10  medical services on an inmate and that he did so pursuant to a contract between the state prison

11  system and his employer . . . ."  2007 WL 1395093, at *3.  (See 4AC ¶ 85.)

12        There is no indication from the face of the complaint that William's EGD was the sort of

13  noncontractual "one-off medical treatment" for which private doctors do not assume § 1983

14  liability.  See Calloway v. Youssee, No. 1:21-CV-01450-JLT-BAM-PC, 2022 WL 1409838, at *7

15  (E.D. Cal. May 4, 2022) (in contrast to physicians who treat inmates under contract with prisons,

16  "private doctors, nurses, and hospitals who have not assumed the State's obligation to provide

17  medical care to inmates, are not state actors just because they provide one-off medical treatment

18  to an inmate.").  Rather, the factors the Supreme Court found persuasive in West squarely apply

19  here.  See Rawson, 975 F.3d at 749 (describing West as having "looked to factors such as the

20  State's constitutional duty to provide adequate medical care to those it has incarcerated, [West] at

21  54, the physician's reliance on state authority to treat the plaintiff, id. at 55, the necessity of the

22  physician cooperating with prison management, id. at 51, and the inability of the incarcerated

23  plaintiff to access other medical care of his own choosing").  Therefore, the undersigned likewise

24  finds Dr. DeNigris' performance of the EGD consultation and procedure to be conduct "fairly

25  attributable to the State."  West, 487 U.S. at 54.

26                              ii.   Elements of the Claim

27        As the undersigned previously noted, the 4AC contains "far more, and more detailed,

28  allegations against Dr. DeNigris than did the 2AC—both in the narrative section of the complaint

1    and under nearly every cause of action against him."  (ECF No. 156 at 34.)  Based on the new

2    factual allegations, the 4AC now sufficiently pleads the first prong of the deliberate indifference

3    standard—that it was "medically unacceptable under the circumstances" for Dr. DeNigris to

4    perform the EGD.  Jackson v. McIntosh, 90 F.3d at 332.  Plaintiffs cite and quote numerous well-

5    known medical sources to support their allegation that "there is no reputable medical guideline or

6    article that recommends an EGD for a patient with Hepatitis C in the absence of cirrhosis."  (4AC

7    ¶ 749; see id. ¶¶ 724-28, 747-56.)  Although Dr. DeNigris is correct that these sources do not

8    prove the acceptable standard of care (ECF No. 192 at 4), they still support the allegation that

9    performing the EGD was medically unacceptable because there was no underlying condition that

10    required this invasive procedure.  While Dr. DeNigris ultimately may be able to show that "a

11    routine screening endoscopy on a patient with hepatitis C" is medically acceptable (id. at 3), at

12    this stage, plaintiffs adequately plead that it was not.

13        Whether plaintiffs sufficiently allege that Dr. DeNigris chose to perform the EGD "in

14    conscious disregard of an excessive risk to [William]'s health" is a closer question.  Jackson, 90

15    F.3d at 332.  This second prong requires alleging that Dr. DeNigris both knew that an EGD was

16    not medically indicated for William and knew that performing it presented an excessive risk.

17    Because the undersigned concludes that plaintiffs adequately—if only barely—plead the former,

18    they necessarily also accomplish the latter.

19        The allegation that "[u]pon reviewing William's medical record [Dr. DeNigris] learned

20    that William did not have end stage liver disease" (4AC ¶ 730) is sufficient to plead that

21    Dr. DeNigris knew performing the EGD was a departure from the general standard of care (which

22    allegedly, as just discussed, dictated only using an EGD to screen for esophageal varices when the

23    patient has liver disease).  Dr. DeNigris objects that plaintiffs are misconstruing one or more of

24    his interrogatory answers to impute prior awareness of William's lack of liver disease (ECF

25    No. 181 at 8), but that objection is better reserved for the evidentiary stage of the case.  Although

26    the 4AC does not give any further explanation of how Dr. DeNigris "learned" or "knew" that

27    William did not have cirrhosis / ESLD before performing the EGD, the court finds it plausible to

28

14

1  infer that Dr. DeNigris' review of William's medical record revealed tests or other notes that

2  indicated to him William did not have cirrhosis.

3      Having accepted the allegations that Dr. DeNigris knew there was no need for an EGD,

4  the court finds it difficult not to then also accept the sufficiency of the allegations that he knew

5  that proceeding with the EGD presented an excessive risk to William's health.  Although the

6  EGD was but a 4-minute procedure (4AC ¶ 787), plaintiffs allege in detail the many risks

7  inherent in the administration of anesthesia for the sedated insertion of a scope down one's

8  esophagus.  (Id. ¶¶ 739-740, quoting informed consent forms describing risks including

9  perforation of gastrointestinal tract wall, bleeding, paralysis, or death.)  They also allege that

10  Dr. DeNigris knew of these risks, both because they are commonly known to specialists like him

11  and because he and William discussed those risks when they both signed the consent forms for

12  the procedure.  (Id. ¶¶ 735-740, 744.)  Such risks are necessarily "excessive" risks when the

13  patient has no pre-existing medical need for an EGD/endoscopy in the first place—as plaintiffs

14  allege was the case for William.  Accordingly, without opining on whether these allegation will

15  be borne out, the court finds that the 4AC sufficiently pleads that Dr. DeNigris performed the

16  EGD in conscious disregard of the excessive risks it posed to William's health.  See Jackson v.

17  Carey, 353 F.3d 750, 755 (9th Cir. 2003) (on a motion to dismiss, "[t]he issue is not whether a

18  plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

19  the claims. Indeed, it may appear on the face of the pleadings that a recovery is very remote and

20  unlikely but that is not the test.").[8]

21      Accordingly, Dr. DeNigris' motion should be denied as to the deliberate indifference

22  claim asserted against him in the First Cause of Action.

23  ////

24  ////

25

26  [8] Because Dr. DeNigris's opening brief does not argue for dismissal of the deliberate indifference
   claim based on lack of causation, the court does not address that element.  See Lemire, 726 F.3d
27  at 1074 (requiring that defendant's actions be an actual and proximate cause of prisoner's
   injuries).  Nevertheless, as discussed in relation to other causes of action, the court is generally
28  disinclined to dismiss the current claims for lack of causation at the pleadings stage.

### 3. *Fourteenth Amendment Deprivation of Familial Relationship*

The 4AC's Fourth Cause of Action asserts a deprivation of plaintiffs' Fourteenth Amendment substantive due process right to a familial relationship with their son.  (4AC at 123-24.)  Defendants argue to dismiss the due process claims against the same three defendants:  Dr. DeNigris, Dr. C. Smith, and Dr. Ashe.  (ECF No. 179.2 at 20-21; ECF No. 181.1 at 10-11.)

Under the Fourteenth Amendment, "official conduct that 'shocks the conscience' in depriving [family members] of [a liberty interest in the companionship and society of a family member] is cognizable as a violation of due process."  Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).  "Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also 'rise to the conscience-shocking level' required for a substantive due process violation."  Lemire, 726 F.3d at 1075 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 849-50 (1998)).  "A prison official's deliberately indifferent conduct will generally 'shock the conscience'" if "the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner."  Lemire, 726 F.3d at 1075.

As discussed in the previous section, plaintiffs have failed to plead that defendants Ashe, and C. Smith were deliberately indifferent regarding William's medical care.[9]  Therefore, the

---

[9] Plaintiffs argue that the Fourteenth Amendment claim against Dr. C. Smith should survive based on an incorrect belief that the court already held that an Eighth Amendment supervisory liability claim should proceed against Dr. C. Smith.  (ECF No. 184 at 7, citing F&Rs ECF No. 85 at 43.)  The court's findings and recommendations on the motion to dismiss the 2AC did not address the Eighth Amendment supervisory liability claims (the Second and Third Causes of Action) because no defendant moved to dismiss those claims.  The court invited plaintiffs to proceed on all claims that were not dismissed from the 2AC, which included the unchallenged Second and Third Causes of Action, rather than further amending the complaint.  (ECF No. 85 at 43.)  However, that was not an affirmative ruling that the Second and Third Causes of Action adequately stated a claim for relief; it was simply an acknowledgement that those claims were not dismissed.

The court did, however, previously rule (on the very first motion to dismiss) that the supervisory liability claims in the Second and Third Cause of Action in the First Amended Complaint were sufficiently pleaded against the defendants named therein.  (ECF No. 41 at 10-11.)  Importantly, the First Amended Complaint did not name Dr. C. Smith as a defendant for the Second and Third Causes of Action, though.  (ECF No. 6 at 36-38.)

16

1   complaint necessarily fails to plead that their conduct met the higher due process standard of

2   having "shocked the conscience."

3          As for Dr. DeNigris, the undersigned recommends allowing the due process claim to

4   proceed against him alongside the deliberate indifference claim found minimally sufficient above.

5   Although the EGD procedure occurred some eight months before William's death, plaintiffs'

6   additional allegations demonstrate that his cirrhosis diagnosis—seemingly confirmed by having

7   had to undergo the endoscopy—was still a factor in his medical care as late as December 21,

8   2018, one month before he died from ingesting multiple bindles of methamphetamine.  (4AC

9   at 136, Ex. B.; id. ¶¶ 597, 790-96.)  Thus, the undersigned likewise concludes that plaintiffs have

10  minimally alleged that the EGD contributed to their loss of William's companionship.  See

11  Thompson, 851 F.3d at 922 n.12 (in reversing dismissal of complaint, noting that causation is

12  ultimately a question for factfinder to decide; citing Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S.

13  830, 840–41 (1996), for proposition that "issues of proximate causation and superseding cause"

14  are left to factfinder).[10]

15         Accordingly, the Fourth Cause of Action should be dismissed with prejudice as to

16  defendants Ashe and C. Smith.  See Telesaurus VPC, 623 F.3d at 1003 (no further leave to

17  amend).  However, Dr. DeNigris' motion to dismiss the Fourth Cause of Action should be denied.

### 4.  Survivorship Claims against Drs. Ashe, Rudas, and C. Smith.

19         The court previously dismissed with prejudice all but one set of plaintiffs' state-law

20  survivorship claims against the CDCR employee defendants (including Drs. Ashe, Rudas, and

21  C. Smith) for failure to comply with the California Government Claims Act ("GCA").  (ECF

22  No. 85 at 21-28, adopted by ECF No. 124.)  The court granted leave to amend, however, as to the

23  set of survivorship claims arising from William's endoscopy because plaintiffs appeared able to

24  allege compliance with the GCA for those claims under the "discovery rule."  (Id. at 29-30.)

25         Accordingly, in the 4AC, plaintiffs replead two survivorship causes of action against

26  Drs. Ashe, Rudas, and C. Smith, arising from William's cirrhosis diagnosis and resulting

27  ───────────────

28  [10] Of course, where a pleading fails to show any causal link, or where allegations contradict a
    finding of causation, dismissal for failure to plead causation is appropriate.

1    endoscopy, namely: the Fifth Cause of Action for "negligent supervision, training, hiring, and

2    retention" against Dr. C. Smith only; and the Seventh Cause of Action for general negligence by

3    all three CDCR doctors.  (4AC at 124, 129.)

4                         a.   Dismissal Is Not Warranted for Failure to Plead Delayed Discovery

5             Defendants seek dismissal of both the Fifth and Seventh Causes of Action for, among

6    other things, failure to adequately plead delayed discovery of those claims so as to toll the six-

7    month claim presentation requirement of the GCA.  (ECF No. 179.2 at 22, 30.)  Although

8    defendants are technically correct, the court does not recommend dismissing these claims on that

9    basis.

10            "[A] plaintiff whose complaint shows on its face that his claim would be barred without

11   the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of

12   discovery and (2) the inability to have made earlier discovery despite reasonable diligence."

13   Grisham v. Philip Morris U.S.A., Inc., 40 Cal. 4th 623, 638 (2007) (cleaned up, emphasis

14   original); see Plumlee v. Pfizer, Inc., 664 F. App'x 651, 653-54 (9th Cir. 2016) (applying

15   Grisham).  Plaintiffs' brief in opposition to the defendants' prior motion to dismiss the 2AC

16   explained that they only learned of William's alleged misdiagnosis and unnecessary endoscopy

17   after reviewing the "several thousand pages" of medical records produced to them by defense

18   counsel on or around May 26, 2020—after repeated prior unsuccessful attempts to obtain

19   William's medical records—and then filed a second Government Claim on September 4, 2020

20   regarding the misdiagnosis and unnecessary procedure.  (ECF No. 75 at 35.)

21            The court takes judicial notice of the Government Claim filed on September 4, 2020,

22   which states that plaintiffs made their discovery on June 30, 2020.  (ECF No. 190.1 at 5 ("On 30

23   June 2020, it was discovered by his intestate heirs that [William] had been fraudulently diagnosed

24   with [ESLD]" and "then subjected to a medical procedure that caused pain . . . .").)  See Marder

25   v. Lopez, 450 F.3d 445, 448 (9th Cir. 2006) (court may consider evidence not attached to

26   complaint but on which complaint "necessarily relies" if "(1) the complaint refers to the

27   document; (2) the document is central to the plaintiff's claim; and (3) no party questions the

28   authenticity of the document").

                                            18

1    Plaintiffs' fulsome explanation from their prior briefing is not repeated in the 4AC, which

2    only alleges that plaintiffs filed a second Government Claim on September 4, 2020, necessitated

3    by the delayed production of medical records; and that this production (received at some

4    unspecified point after William's death) is how they discovered William's misdiagnosis and

5    endoscopy.  (4AC ¶¶ 89, 673-674.)  With no mention <u>in the complaint</u> of even an approximated

6    date of discovery, it cannot be said that the 4AC alleges "(1) the time and manner of discovery

7    and (2) the inability to have made earlier discovery despite reasonable diligence." <u>See</u> <u>Grisham</u>,

8    40 Cal. 4th at 638 (burden is on plaintiff to show diligence); <u>Schneider v. California Dep't of</u>

9    <u>Corr.</u>, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (court may not look beyond complaint to facts

10   contained in plaintiff's moving papers to overcome motion to dismiss).  While mindful of

11   <u>Schneider</u>'s admonition, the court does not recommend dismissing these survivorship claims

12   based on the 4AC's omission of the date of discovery[11] because of the need to move this case

13   beyond the pleadings stage without further rounds of amendment and motions to dismiss.

14        The court did not previously explain to plaintiffs the rather stringent standard for pleading

15   delayed discovery, nor did it cite cases that conveyed this standard in granting leave for plaintiffs

16   to amend their survivorship claims.  (<u>See</u> ECF No. 85 at 29 & n.18.)  Thus, plaintiffs have not

17   previously tried and failed to plead the required elements.  To the contrary, as seen from the

18   above contents of plaintiffs' prior briefing—and reinforced by plaintiffs' present offer to simply

19   amend the 4AC to add the date of discovery—plaintiffs could cure this pleading defect by further

20   amendment.  (ECF Nos. 75 at 35, 184 at 8 n.4.)  Therefore, it would be inappropriate to dismiss

21   the survivorship claims with prejudice.  <u>See</u> <u>Broam v. Bogan</u>, 320 F.3d 1023, 1026 n.2 (9th Cir.

22   2003) (courts should consider facts raised in a plaintiff's opposition papers when deciding

23   whether leave to amend is warranted); <u>Akhtar v. Mesa</u>, 698 F.3d 1202, 1213 (9th Cir. 2012) (for

24   pro se plaintiffs, district court must explain deficiencies in a complaint and only dismiss with

25   prejudice if it is absolutely clear amendment cannot cure the deficiencies).

26

27   [11] There appears to be no dispute that a discovery of the claims on June 30, 2020 would make
     plaintiffs' September 4, 2020 Government Claim timely presented.  <u>See</u> Cal. Gov't Code § 911.2
28   (requiring claim presentation within 6 months of "accrual of the cause of action").

1    The normal solution would be to grant the motion to dismiss with leave to amend the

2    survivorship claims to adequately plead delayed discovery.  However, this case (like too many

3    other pro se actions) has already been stuck in a cycle of amendment and dismissal for over two

4    years.  See Jackson v. Cty. of Sacramento Dep't of Health & Hum. Servs., No. 2:16-CV-00920-

5    MCE-GGH-PS, 2017 WL 4923297, at *1 (E.D. Cal. Oct. 31, 2017) (lamenting that [p]ro se cases

6    linger far too long in the pleading stage" due to repeating cycle of amendment and motions to

7    dismiss).  To end that cycle, the court will not entertain any further motions to dismiss.  The court

8    therefore sees no utility in requiring plaintiffs to amend the complaint to add their date of claim

9    discovery and reasons for delayed discovery.  The CDCR defendants will be able to raise anew

10   their GCA-presentation contentions at summary judgment if the evidence permits a good faith

11   argument on those grounds.

12                    b.   The Fifth Cause of Action Should be Dismissed for Failure to Plead the

13                         Elements of Supervisory Negligence

14        Although the Fifth Cause of Action should not be dismissed for GCA noncompliance, it is

15   subject to dismissal on the merits because the 4AC fails to plead the elements of negligent

16   supervision against the sole named defendant, Dr. C. Smith.

17        The Fifth Cause of Action is labeled as a claim of "Negligent Supervision, Training,

18   Hiring, and Retention," and defendants address each of those types of negligence in their motion.

19   (4AC at 124; ECF No. 179.2 at 22-23.)  However, plaintiffs oppose dismissal solely on the

20   grounds that the 4AC alleges that Dr. Smith inadequately supervised Dr. Rudas—based on being

21   twice presented with Dr. Rudas' incomplete request for services form.  (ECF No. 184 at 9.)

22   Those allegations are not sufficient to infer that Dr. Smith knew or should have known Dr. Rudas

23   had a propensity for misdiagnosing patients or recommending unnecessary treatments, so as to

24   require greater supervision.  See Z.V. v. Cty. of Riverside, 238 Cal. App. 4th 889, 902 (4th Dist.

25   2015) ("To establish negligent supervision, a plaintiff must show that a person in a supervisorial

26   position over the actor had prior knowledge of the actor's propensity to do the bad act."); Juarez

27   v. Boy Scouts of America, Inc., 81 Cal. App. 4th 377, 395 (1st Dist. 2000) ("[T]here can be no

28   liability for negligent supervision in the absence of knowledge by the principal that the agent or

                                              20

1    servant was a person who could not be trusted to act properly without being supervised." (cleaned

2    up)), <u>disapproved on other grounds by</u> <u>Brown v. USA Taekwondo</u>, 11 Cal. 5th 204, 222 n.9

3    (2021).  They merely show that Dr. Smith knew or should have known that Dr. Rudas on one

4    occasion failed to fully complete a referral form.

5           The court has not identified, and plaintiffs call no attention to, any allegations that

6    Dr. Smith was involved with the hiring or retention of Dr. Rudas (or any other CDCR doctor) or

7    that he inadequately trained them.  <u>See</u> <u>C.A. v. William S. Hart Union High School Dist.</u>, 53

8    Cal.4th 861, 878 (2012) (no liability for negligent hiring or retention for "employee who did not

9    actually make the hiring or retention decision" or influence a decisionmaker).  Therefore, the

10   Fifth Cause of Action should be dismissed for failure to state a claim.

11          The undersigned further recommends that this claim be dismissed with prejudice.

12   Although the court did not previously discuss the standards for pleading claims of negligent

13   supervision, defendants' prior briefing on their motion to dismiss the Third Amended Complaint

14   ("3AC")—which was denied as moot when the court granted leave to file the present 4AC—

15   notified plaintiffs of these standards.  (ECF No. 140.1 at 20-23.)  In granting leave to file the

16   present 4AC, the court expressly permitted plaintiffs to "alter or add to the allegations [], should

17   they wish to take into consideration the arguments raised in the currently pending motions to

18   dismiss the 3AC . . . ."  (ECF No. 156 at 36.)  Plaintiffs' failure to amend the 4AC to address

19   these deficiencies indicates that further leave to amend would be futile.  And unlike the delayed

20   discovery issue, there is no indication from plaintiffs' briefing that these substantive pleading

21   defects could be cured by further amendment.  Furthermore, as expressed above, the time has

22   come to stop the cycle of claim amendment so that this case can move forward.

23          Accordingly, the court should dismiss with prejudice the Fifth Cause of Action.

24                         c.   The Seventh Cause of Action Should Proceed

25          The 4AC's Seventh Cause of Action asserts survivorship claims of general negligence in

26   the medical care provided to William by Drs. Ashe, DeNigris, Rudas, and C. Smith.  (4AC at

27   129.)  Aside from the GCA presentation argument rejected (at least for now) above, the CDCR

28   doctors' (Ashe, Rudas, and Smith) only other argument for dismissal of these claims is that the

21

1   4AC fails to plead any legally cognizable damages recoverable by plaintiffs—as William's

2   successors in interest.[12]  (ECF No. 179.2 at 30-31.)  See Lattimore v. Dickey, 239 Cal. App. 4th

3   959, 968 (6th Dist. 2015) (elements of medical negligence claim are duty, breach, proximate

4   causation, and "resulting loss or damage").

5        Indeed, there are only minimal allegations of what economic harm, if any, William

6   suffered as a result of the 2018 cirrhosis diagnosis and endoscopy.  (4AC ¶ 796, alleging that

7   "[u]nlike a few years earlier when his psychosis was controlled, William was unable to work as a

8   porter, or make income that came with his prison job, due to his mental state," which was

9   worsened by the false diagnosis and endoscopy.)  See Cal. Code Civ. Proc. § 377.34 (limiting

10  damages available to successors in interest to pre-death economic damages of "lost wages,

11  medical expenses, and any other pecuniary losses incurred before death" and punitive or

12  exemplary damages); Cty. of L.A. v. Superior Court, 21 Cal. 4th 292, 304 (1999); see also

13  California v. Altus Fin. S.A., 540 F.3d 992, 1001 (9th Cir. 2008) (there must be an award of

14  compensatory damages, even if nominal, to recover punitive damages) (citing Mother Cobb's

15  Chicken Turnovers, Inc. v. Fox, 10 Cal. 2d 203 (1937)).

16       However, the court liberally construes the 4AC to sufficiently identify pre-death economic

17  damages so as to notify defendants of the basis of the medical negligence claims.  Factual issues

18  of causation and proof of lost wages can be resolved at summary judgment.  Accordingly, the

19  undersigned recommends denying the CDCR defendants' motion to dismiss the Seventh Cause of

20  Action.

21                    *5.  Wrongful Death*

22       The 4AC's Sixth Cause of Action asserts personal wrongful death claims under Cal. Code

23  Civ. Proc. § 377.60 et seq. against all defendants.  (4AC at 125-28.)  A subset of the CDCR

24  defendants move to dismiss this cause of action based on various theories which the court will

25  address in turn.[13]  (ECF No. 179.2 at 24-30.)

26

27

28

---

[12] Dr. DeNigris does not move to dismiss the medical negligence claim asserted against him.
[13] Dr. DeNigris does not move to dismiss the wrongful death claim asserted against him.

1    California Code of Civil Procedure § 377.60 gives plaintiffs like William's parents

2    standing to bring "[a] cause of action for the death of a person caused by the wrongful act or

3    neglect of another."  Thus, "[t]he elements of the cause of action for wrongful death are the tort

4    (negligence or other wrongful act), the resulting death, and the damages, consisting of the

5    pecuniary loss suffered by the heirs."  Quiroz v. Seventh Ave. Ctr., 140 Cal. App. 4th 1256,

6    1263-64 (6th Dist. 2006).  The elements of the tort of negligence are "a legal duty to use due care,

7    a breach of such legal duty, and the breach as the proximate or legal cause of the resulting

8    injury."  Vasilenko v. Grace Family Church, 3 Cal. 5th 1077, 1083 (2017).

9         The court previously dismissed with leave to amend the wrongful death claims against all

10    of the moving CDCR defendants because the element of causation was insufficiently alleged.

11    (ECF No. 85 at 31-34.)  The moving CDCR defendants argue that the 4AC still does not cure this

12    deficiency.  (ECF No. 179.2 at 24-28.)  The court disagrees.

13         As to the CDCR endoscopy doctors, Ashe, Rudas, and C. Smith, the court finds that—for

14    the same reasons discussed with the Fourteenth Amendment claim against Dr. DeNigris—the

15    4AC adequately alleges that the false cirrhosis diagnosis and referral for an unnecessary

16    endoscopy contributed to William's death.  (4AC ¶¶ 597, 790-96.)  See Thompson, 851 F.3d at

17    922 n.12; Exxon, 517 U.S. at 840-41.

18         As to the moving defendants who were publicly appointed CDCR officials, CDCR

19    leaders, or supervisors at MCSP during the relevant period, the court's previous dismissal of the

20    wrongful death claims against these individuals was based on the 2AC's failure to include any

21    substantive allegations of their wrongful conduct—beyond simply describing their leadership

22    positions in the opening Parties identification section.  (ECF No. 85 at 32-34.)  The new

23    allegations of the 4AC cited by both sides now identify multiple ways in which each of the

24    leadership and supervisory defendants failed to correct known system-wide policy violations that

25    directly affected William's mental health.  Although the specifics remain sparse, and the causal

26    connection tenuous for some, the undersigned finds the allegations sufficient to proceed to

27    discovery which may or may not prove plaintiffs' allegations.  This recommendation is also based

28    in part on the fact that plaintiffs' parallel Eighth Amendment supervisory liability claims (now

1    asserted against all of the leadership and supervisory defendants named in the wrongful death

2    claims) remain unchallenged—likely as a result of the court's initial determination that these

3    causes of action were sufficiently pleaded against five of the same defendants in the First

4    Amended Complaint.  (ECF No. 41 at 10-11.)  Thus, proceeding to the proof stage on the

5    wrongful death claims does not appear to broaden the scope of litigation already required by the

6    Eighth Amendment supervisory liability claims (the Second and Third Causes of Action).

7         Finally, as to defendant Adam Asman, one of the floor officers on duty the day of

8    William's death, defendants do not argue lack of causation but rather assert that Asman is

9    immune from the wrongful death claim under California Government Code § 845.6.[14]  (ECF

10   No. 179.2 at 28-30.)

11        Defendant Asman first raised this § 845.6 immunity argument in opposition to plaintiffs'

12   motion for leave to file the present 4AC, arguing that amendment of the wrongful death claim

13   against him would be futile.  (ECF No. 148 at 7-9.)  The court rejected the futility argument.

14   (ECF No. 156 at 23-28.)  The court took pains to outline the applicable (and rather complex)

15   immunity analysis, expressing both (A) a concern that California law treats statutory immunities

16   like § 845.6 as affirmative defenses, which plaintiffs need not plead around, and (B) ambivalence

17   as to whether officers can claim immunity under § 845.6 when they "had reason to know of [the

18   decedent's urgent health] condition because of their obligation to perform timely safety-checks."

19   Medina v. Cty. of Los Angeles, No.19-CV-3808 (GHW), 2020 WL 3964793, at *16 (C.D. Cal.

20   Mar. 9, 2020).  (ECF No. 156 at 25-28.)

21        Defendants' current argument for dismissing the wrongful death claim against Asman,

22   however, addresses neither of these concerns.  (ECF No. 179.2 at 29-30, arguing only that

23   ─────────────────

24   [14] Section 845.6 provides in relevant part:

25        Neither a public entity nor a public employee is liable for injury proximately
         caused by the failure of the employee to furnish or obtain medical care for a

26        prisoner in his custody;  but, except as otherwise provided by Sections 855.8 and
         856, a public employee, and the public entity where the employee is acting within

27        the scope of his employment, is liable if the employee knows or has reason to
         know that the prisoner is in need of immediate medical care and he fails to take

28        reasonable action to summon such medical care.

                                          24

observing water flowing out of cell did not provide actual or constructive knowledge that William was in immediate medical need.)  Accordingly, the undersigned is not presently persuaded that this claim should be dismissed under § 845.6.  For these reasons, the undersigned recommends denying the CDCR defendants' motion to dismiss the Sixth Cause of Action.

### 6.   *State-Law Claims Against Dr. DeNigris*

The last claims to address on these motions to dismiss are the three state-law claims that Dr. DeNigris challenges:  the Eighth, Ninth, and Tenth Causes of Action asserting violations of the Bane Act, medical battery, and assault against Dr. DeNigris only—based on the allegedly unnecessary endoscopy.  (4AC at 129-32; ECF No. 181.1 at 11-15.)  Dr. DeNigris also moves to dismiss the prayer for punitive damages from certain claims; and he seeks dismissal of all claims against him as a sanction for violating the court's prior orders regarding punitive damages requests.  (ECF No. 181.1 at 15-17.)

#### a.   Bane Act Violation

The 4AC's Eighth Cause of Action reasserts a survivorship claim against Dr. DeNigris for violating California Civil Code § 52.1 ("the Bane Act"), which imposes liability on a person who "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise" of an individual's constitutional rights.  Cal. Civ. Code § 52.1(b).

The court previously dismissed the Bane Act cause of action from the 2AC with leave to amend.  (ECF No. 85 at 35.)  That dismissal was based on the 2AC's failure to adequately plead a claim of deliberate indifference and a failure to allege that Dr. DeNigris separately threatened, intimidated, or coerced William to undergo the endoscopy, especially given the allegations that plaintiff gave informed consent for the procedure.  (Id. at 12, 35 citing Allen v. City of Sacramento, 234 Cal. App. 4th 41, 67 (3d Dist. 2015) (Bane Act claim requires "(1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion"), modified on denial of reh'g (Mar. 6, 2015).)

Dr. DeNigris argues that the 4AC still fails to plausibly allege that he coerced William into undergoing the endoscopy and therefore fails to state a claim under the Bane Act.  (ECF

25

1   No. 181.1 at 12.)  As plaintiffs point out, "nothing in the text of the Bane Act requires that the

2   coercion element be separate from the underlying constitutional or statutory violation."  Scalia v.

3   Cty. of Kern, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) (discussing Cornell v. City & Cty. of

4   San Francisco, 17 Cal. App. 5th 766 (1st Dist. 2017), as modified (Nov. 17, 2017)); see Reese v.

5   Cty of Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018) (noting same).

6          Having found that plaintiffs now state a viable deliberate indifference claim against

7   Dr. DeNigris, the undersigned also concludes that plaintiffs state a colorable claim against him

8   under the Bane Act.  See Scalia, 308 F. Supp. 3d at 1084 (concluding that because plaintiff

9   "adequately pleaded a claim for deliberate indifference, which requires alleging reckless

10  disregard," plaintiff had "therefore adequately alleged that [the defendant] acted with the requisite

11  specific intent under the Bane Act"); M.H. v. Cty. of Alameda, 90 F. Supp. 3d 889, 899 (N.D.

12  Cal. 2013) ("Because deliberate indifference claims necessarily require more than 'mere

13  negligence,' a prisoner who successfully proves that [state actors] acted or failed to act with

14  deliberate indifference to his medical needs in violation of his constitutional rights . . . adequately

15  states a claim for relief under the Bane Act."); Brown v. Cty. of Mariposa, No. 1:18-cv-01541-

16  LJO-SAB, 2019 WL 1993990, at *12 (E.D. Cal. May 6, 2019) (denying motion to dismiss Bane

17  Act claim as to those defendants against whom deliberate indifference was adequately pleaded).

18         Therefore, Dr. DeNigris' motion to dismiss the Eighth Cause of Action should be denied.

19                     b.   Medical Battery and Assault

20         The 4AC's Ninth and Tenth Causes of Action bring survivorship claims against

21  Dr. DeNigris for medical battery and assault.  (4AC at 130-131.)  The court previously dismissed

22  both causes of action from the 2AC with leave to amend.  (ECF No. 85 at 35-38.)  As to assault,

23  the court found that the 2AC failed to allege that Dr. DeNigris put William in fear that

24  Dr. DeNigris was about to cause him immediate bodily injury.  (Id. at 35-36.)

25                          i.   Assault

26         Under California law, civil assault is a demonstration of intent to inflict immediate injury

27  on the person of another then present.  See Lowry v. Standard Oil Co. of Cal., 63 Cal. App. 2d 1,

28

                                             26

1    6-7 (2d Dist. 1944).  As noted in the findings and recommendations on the 2AC, a classic

2    example of an assault is the pointing of a gun at another in a threatening manner.  See id. at 7.

3         Plaintiffs point the court to a single additional allegation in the 4AC that "William feared

4    for his personal safety from the risks and pain of the EGD but agreed to it solely due to his greater

5    fear of an untrue risk of bleeding to his throat if he refused the EGD."  (ECF No. 185, quoting

6    4AC ¶ 883 (emphasis omitted).)  This allegation does not cure the previously explained defect.

7    There is still no suggestion that Dr. DeNigris performed the endoscopy with an "intent . . . to

8    inflict immediate injury" on William.  Lowry, 63 Cal. App. 2d at 6.  At most, the 4AC alleges that

9    Dr. DeNigris performed a sedated procedure that, like all such procedures, carried a risk of

10   possible injury from complications.  The allegation that William was essentially deceived into

11   consenting to the procedure, though relevant to the battery claim, does not bolster the assault

12   claim.

13        Because plaintiffs have already had the chance to amend their assault claim, the

14   undersigned recommends dismissing with prejudice the Tenth Cause of Action.

15                              *ii.  Battery*

16        Unlike the tort of assault, "battery requires no showing of 'scienter' or any intent to do

17   wrong—only an intent to cause the harmful unconsented touching," in this case the endoscopy.

18   Freedman v. Superior Court, 214 Cal. App. 3d 734, 739-40 (4th Dist. 1989) (citing Rest. 2d Torts

19   (1965) § 13).  To state a claim for civil battery the plaintiff must allege that "(1) defendant

20   intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's

21   person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused

22   injury, damage, loss or harm to plaintiff."  Brown v. Ransweiler, 171 Cal. App. 4th 516, 526-27

23   (4th Dist. 2009).  In the medical context, battery "occurs when a doctor performs a procedure

24   without obtaining any consent."  Saxena v. Goffney, 159 Cal. App. 4th 316, 324 (4th Dist. 2008).

25        In dismissing the battery claim from the 2AC, the court agreed with plaintiffs that "a

26   doctor's fraudulent misrepresentations about the therapeutic nature of a proposed procedure can

27   vitiate a patient's consent," under California case law.  (ECF No. 85 at 37, discussing Rains v.

28   Superior Court, 150 Cal. App. 3d 933, 938 (2d Dist. 1984).)  The court found that plaintiffs'

27

1    claims here were "on par with the battery claim accepted as sufficient to defeat a motion to

2    dismiss in Rains."  (Id.)  Rains admittedly dealt with an extreme scenario where psychiatric

3    patients agreed to be physically beaten after defendants fraudulently represented to them that this

4    "sluggo therapy" would have a therapeutic benefit.  150 Cal. App. 3d at 936-42.  However, the

5    Court of Appeal did not limit its holding to equally appalling facts when it observed that "[i]f a

6    physician, for the sole secret purpose of generating a fee, intentionally misrepresented to a patient

7    that an unneeded operation was necessary, it is beyond question that the consent so obtained

8    would be legally ineffective."  Id. at 941.

9         The court continues to view this as "precisely the scenario presented" in the 4AC.  (See

10   ECF No. 85 at 37.)  Therefore, it rejects Dr. DeNigris' attempt in this motion to distinguish Rains

11   simply because of its extreme facts.  Although the "offensive touching" in Rains involved actual

12   violence, the insertion of a scope down one's esophagus still qualifies as a touching that is

13   offensive if not consented to.

14        The only problem the court identified with the 2AC's battery claim was that, as with the

15   deliberate indifference claim, plaintiffs failed to allege that Dr. DeNigris knew there was no

16   medical purpose for the endoscopy when he performed it.  (Id. at 37-38.)  Because the court has

17   found that the 4AC now adequately pleads this knowledge for purposes of the deliberate

18   indifference claim, the court likewise finds it adequately pleads lack of consent—and thereby

19   provides the previously missing element of the battery claim against Dr. DeNigris.[15]

20        Therefore, Dr. DeNigris' motion to dismiss the Ninth Cause of Action (for battery) should

21   be denied; whereas, the Tenth Cause of Action (for assault) should be dismissed with prejudice.

22   ////

23   ////

24   

25   [15] As with the deliberate indifference claim, discovery may show (A) that Dr. DeNigris did not
     know William did not have cirrhosis before performing the endoscopy, or (B) that the endoscopy

26   was medically indicated, even without a cirrhosis diagnosis.  The undersigned simply finds that
     the 4AC now contains sufficient factual allegations to infer that Dr. DeNigris presented William

27   with the informed consent forms on the date of the procedure, knowing that there was no
     therapeutic benefit to the endoscopy.

28

1

### c. Requests for Punitive Damages

2  Dr. DeNigris' final set of arguments on this motion challenges the 4AC's inclusion of

3  requests for punitive damages in all five of the causes of action he moves to dismiss here:  the

4  § 1983 claims for deliberate indifference and deprivation of familial relations, as well as the state-

5  law claims for violation of the Bane Act, medical battery, and assault.  (ECF No. 181.1 at 15-17.)

6  Dr. DeNigris' entire argument for dismissing the punitive damages requests is based on

7  California Civil Procedure Code § 425.13, a state court rule requiring plaintiffs to obtain leave of

8  court to seek punitive damages "arising out of the professional negligence of a health care

9  provider."  (Id. at 15.)

10  The court previously held that, in the absence of Ninth Circuit guidance, § 425.13 is a

11  substantive rule that applies in federal court[16]; and it dismissed without prejudice plaintiffs'

12  request for punitive damages within their medical negligence claim against Dr. DeNigris.  (ECF

13  No. 85 at 38-42.)  In a later order on January 7, 2021, the court also explained that to obtain leave

14  to include a punitive damages claim (within a medical negligence cause of action), plaintiffs

15  would have to file a separate "section 425.13 motion to amend."  (ECF No. 126.)  Plaintiffs have

16  not filed a § 425.13 motion to amend to add a punitive damages claim in any of their present

17  causes of action.

18  On that basis, Dr. DeNigris now seeks dismissal of the punitive damages claims from all

19  five causes of action challenged in this motion—and he also seeks total dismissal of all claims

20  against him as a sanction for violating the court's January 7th order.  (ECF No. 181.1 at 15-17.)

21  See Fed. R. Civ. P. 41(b) (dismissal for failure to comply with court order).  However,

22  Dr. DeNigris' limited briefing on this subject overlooks two key issues.

23  First, while § 425.13 applies in federal court, its application is necessarily limited to state-

24  law causes of action.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938); Allen v. Woodford,

25  _____

26  [16] The court maintains this view, notwithstanding the fact that other courts within this district (and across the Ninth Circuit) continue to reach differing opinions on the applicability of § 425.13 in

27  federal court.  Thus, the court rejects plaintiffs' argument that § 425.13 should not apply in this case.  (See ECF No. 184 at 9-10, citing Mollica v. Cty. of Sacramento, No. 2:19-CV-02017-KJM-

28  DB, 2021 WL 2853863, at *5 (E.D. Cal. July 8, 2021).)

1  No. 1:05-CV-01104-OWW, 2006 WL 1748587, at *20-22 (E.D. Cal. June 26, 2006) (holding

2  § 425.13 applicable to substantive state-law claims, and noting plaintiff was not seeking punitive

3  damages under federal statutes).  Punitive damages for violations of § 1983 are subject to a

4  different standard, and Dr. DeNigris makes no argument why plaintiffs' requests for punitive

5  damages in their two federal § 1983 claims should be dismissed based on a state statute.  See

6  Elliot v. Reddy, No. 2:10-CV-2980-MCE-KJN, 2013 WL 3283345, at *13 (E.D. Cal. June 27,

7  2013) (noting that although plaintiff conceded dismissal of punitive damages under § 425.13, he

8  remained entitled to seek "the full range of common law remedies pursuant to his Section 1983

9  claims").

10       Second, Dr. DeNigris does not explain why § 425.13's rules for claims arising out of

11  "professional negligence" should apply to plaintiffs' intentional tort claims for coercion (under

12  the Bane Act), medical battery, and assault.  Dr. DeNigris simply says these claims "are all based

13  on allegations that [he] provided negligent care and treatment . . . because he performed the

14  endoscopy without valid consent."  (ECF No. 181.1 at 15.)  Nevertheless, the court's brief

15  independent research confirms that § 425.13 does apply to these claims.

16       The California Supreme Court has explained that "identifying a cause of action as an

17  'intentional tort' as opposed to 'negligence' does not itself remove the claim from the

18  requirements of section 425.13(a)."  Cent. Pathology Serv. Med. Clinic, Inc. v. Superior Ct., 3

19  Cal. 4th 181, 192 (1992).  Instead, the rule is that "any claim for punitive damages in an action

20  against a health care provider [must] be subject to [§ 425.13] if the injury that is the basis for the

21  claim was caused by conduct that was directly related to the rendition of professional services."

22  Id. at 192-93 (holding claims for fraud and intentional infliction of emotional distress subject to

23  § 425.13 because they "emanate[d] from the manner in which defendants performed and

24  communicated the results of medical tests, a matter that is an ordinary and usual part of medical

25  professional services").

26       Here, plaintiffs' claims under the Bane Act and claims for medical battery and assault

27  arise from "the manner in which [Dr. DeNigris] performed and communicated" the endoscopy

28  and its necessity.  Id. at 193.  Therefore, to seek punitive damages on those three claims, plaintiffs

1    had to comply with § 425.13—which they did not.  Plaintiffs' motion for leave to file the present

2    4AC did not constitute the special "section 425.13 motion to amend" required under California

3    law, the mechanics of which were spelled out in the court's January 7th order.  (ECF No. 126 at

4    2-3, citing cases and explaining requirement of summary-judgment-like motion specific to

5    punitive damages request, with supporting affidavits.)

6        Still, the undersigned concludes that the inclusion of punitive damages requests in these

7    non-negligence-based causes of action was not a knowing violation of the court's January 7th

8    order, so the drastic sanction of total dismissal is not warranted.

9        Accordingly, the court should grant Dr. DeNigris' motion to dismiss the requests for

10   punitive damages contained in the Eighth, Ninth, and Tenth Causes of Action (for Bane Act,

11   battery, and assault),[17] and such dismissal should be with prejudice.  However, the punitive

12   damages requests should not be dismissed from the First or Fourth Causes of Action (for § 1983

13   constitutional violations).

14       Having resolved the motions to dismiss, the court turns next to plaintiffs' co-pending

15   motion to strike.

16   **MOTION TO STRIKE**

17       Defendants Dr. Kuich and Warden Lizarraga, who are jointly represented by a different

18   attorney than the other defendants, filed an answer to the 4AC.  (ECF No. 178.)  (All subsequent

19   references to "defendants" in this section refer to defendants Kuich and Lizarraga, unless

20   otherwise specified.)  Plaintiffs move to strike the answer in its entirety, or to strike or deem

21   admitted the numerous allegations at issue.  (ECF No. 182.)

22       **A. Legal Standard**

23       Federal Rule of Civil Procedure 12(f) states that a district court "may strike from a

24   pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

25   "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that arise

26   from litigating spurious issues by dispensing with those issues prior to trial."  Whittlestone, Inc.

27   ───────────────

28   [17] As discussed above, the undersigned also recommends total dismissal of the Tenth Cause of
     Action for assault.

1    v. Handi-Craft Co., 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation omitted).

2         In "short and plain terms," an answer must admit or deny each of the material allegations

3    raised in the complaint. Fed R. Civ. P. 8(b)(1). Denials must "fairly respond to the substance of

4    the allegation." Fed. R. Civ. P. 8(b)(2). Parties are also permitted to plead lack of sufficient

5    knowledge or information, which is treated as a denial of the allegation addressed. Fed. R. Civ.

6    P. 8(b)(5).

7         Motions to strike are generally disfavored and are rarely granted in the absence of

8    prejudice to the moving party. See Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1261 (4th ed.);

9    Harris v. Chipotle Mexican Grill, Inc., 303 F.R.D. 625, 628 (E.D. Cal. 2014). As a general

10   matter, "even when technically appropriate and well-founded, Rule 12(f) motions are not granted

11   in the absence of a showing of prejudice to the moving party." Greene v. Solano Cty. Jail,

12   No. CIV-S-04-0917-WBS-DAD-P, 2004 WL 7334559, at *1 (E.D. Cal. Nov. 15, 2004).

13   However, prejudice is not an "absolute prerequisite" for a Rule 12(f) motion, and granting a

14   motion to strike may be proper if it will eliminate delay, confusion of the issues, or remove

15   unnecessary clutter from the case. Mollica v. Cty. of Sacramento, No. 2:19-CV-02017-KJM-DB,

16   2021 WL 2853863, at *2 (E.D. Cal. July 8, 2021).

17        If there is doubt as to whether the challenged matter may raise an issue of fact or law, the

18   motion to strike should be denied, leaving the sufficiency of the allegations to be tested on the

19   merits. See PAE Gov't Servs., Inc. v. MPRI, Inc., 514 F.3d 856, 859 n.3 (9th Cir. 2007)

20   ("[A]bsent a finding of bad faith, factual allegations in the complaint (or answer) must be tested

21   through the normal mechanisms for adjudicating the merits.").

22        **B.  Discussion**

23        The undersigned recommends granting in part and denying in part plaintiffs' motion to

24   strike. The recommendation to deny much of the motion is not for lack of foundation[18]—but

25   _____
     [18] Indeed, plaintiffs' moving papers are so "polished" and well-reasoned that defendants accused

26   them of being "ghostwritten" by an attorney despite plaintiffs proceeding pro se. (ECF No. 196.)
     The court denied defendants' rather unprecedented ex parte application for issuance of an order

27   requiring plaintiffs to disclose any attorney participation. (ECF No. 197.) Plaintiffs maintain that
     they are and have always been litigating this case pro se, and that their skill in presenting their

28   arguments is due to their great motivation to seek justice for the death of their son and to reform

1  rather due to a general aversion to striking without practical utility.  While there is no absolute

2  requirement that movants show how they will be prejudiced by leaving the challenged pleadings

3  unaltered, lack of prejudice remains a permissible factor for the court to consider in exercising its

4  discretion on a Rule 12(f) motion.  Accordingly, the court does not recommend striking the

5  answer in its entirety or striking many of the challenged denials; however, the court does

6  recommend striking many of the affirmative defenses either as legally redundant or because they

7  prejudice plaintiffs by posing a significant risk of expanding the length and scope of the litigation

8  without adequate notice of their factual basis.

9                        *1.  Defenses, Admissions, and Denials*

10          Initially, for all the polish of plaintiffs' moving papers throughout this litigation, the

11  operative complaint itself has become undeniably unwieldy over the course of many amendments.

12  The 4AC spans 133 pages comprising 892 paragraphs, with an additional 705 pages of attached

13  exhibits.  This is not to say it is unworkable; the court acknowledges plaintiffs' concerted effort to

14  provide organized section headings and to break their allegations into discrete paragraphs for

15  easier responses.  However, the volume of the allegations—and the fact that a large number quote

16  at length from prior court proceedings and third-party reports—does bear on the court's

17  willingness to wade through answering pleadings in detail.  Both of the answers currently

18  submitted (the other being from defendant Officer Bradley) exceed 70 pages, and the court

19  expects the forthcoming answers to hit a similar length.

20          While the court will not countenance responses that prejudice plaintiffs in their litigation

21  of the case, neither will it further delay the litigation or increase litigation costs by requiring

22  perfection for the sake of perfection.

23                  a.  Lizarraga's Job Duties (Paragraphs 80 & 82)

24          Of the numerous responses challenged in this motion, the court finds only a handful

25  sufficiently ambiguous or evasive to be stricken (with leave to amend).  Paragraphs 80 and 82 of

26

27  CDCR mental healthcare.  (ECF No. 198.)  The court takes note of the mutual complaints
regarding communications between plaintiffs and defense counsel Terhorst; and the court

28  admonishes all parties to display courtesy and professionalism in their communications.

the answer are among those that should be stricken.  4AC paragraphs 80 and 82 identify Warden

Lizarraga as a defendant and describe his duties as warden:

> 80.  Joe A. LIZARRAGA was at all times mentioned herein the
> Warden of MCSP.  Warden LIZARRAGA was acting under color of
> state law.  As Warden of MCSP, Defendant LIZARRAGA was
> legally responsible for oversight of operations at MCSP,
> implementation of CDCR policy and procedures, staff training,
> safety and security of prisoners housed at MCSP, and the
> supervis[ion] of all other individual Defendants employed at MCSP.

> 82.  Warden LIZARRAGA was responsible for the custody and
> treatment of all inmates and for the training and discipline of all
> employees under his charge.  Warden LIZARRAGA was also
> responsible for establishing such operational plans and procedures as
> required by MCSP to provide for the custody and treatment of
> inmates at MCSP.

(4AC at 15.)  Defendants' response to both paragraphs is:

> In response to the allegations at 4thAC paragraph 80 [and 82]
> Answering Defendants admit that Joe Lizarraga is the former
> Warden at MCSP and performed all the regular administrative and
> supervisory duties of a warden. Answering Defendants deny the
> remaining allegations at 4thAC paragraph 80 [and 82].

(ECF No. 178 at 9.)

Defendants' response that Warden Lizarraga "performed all the regular administrative and

supervisory duties of a warden" does not "fairly respond to the substance of the allegation[s]" in

paragraphs 80 and 82.  See Fed R. Civ. P. 8(b)(2).  It leaves unclear which of the many specific

duties plaintiffs ascribe to Warden Lizarraga are the "regular administrative and supervisory

duties of a warden."  Because defendants then deny the "remaining allegations," plaintiffs cannot

tell which of the duties defendants are denying that Lizarraga owed.

In their opposition, defendants argue that these responses are proper because (1) "these

were not accurate descriptions of [Lizarraga's] job duties as warden," (2) Warden Lizarraga was

not "acting under color of state law," and (3) he was not "legally responsible" for the duties

alleged because of various legal doctrines.  (ECF No. 189 at 9.)  The first reason is, of course, an

acceptable basis for denying a complaint's allegation.  However, as explained above, the answer

must reasonably convey which of the alleged job duties defendants are admitting and which they

are denying.  Second, the allegation that Lizarraga was acting under color of state law is a legal

1  conclusion to which no response is required, though defendants are free to deny it if that allows

2  them to better address the rest of the allegations.  See Khepera-Bey v. Santander Consumer USA,

3  Inc., No. CIV. WDQ-11-1269, 2012 WL 1965444, at *5 (D. Md. May 30, 2012) ("No response is

4  required to legal conclusions in a complaint; a defendant is only required to respond to factual

5  allegations." (internal quotation omitted).)  Third, although plaintiffs mix assertions of law and

6  fact by referring to Warden Lizarraga's "legal" responsibilities in paragraph 80, the court should

7  require that defendants nevertheless answer the factual allegations reasonably inferable from that

8  paragraph—that Warden Lizarraga's job duties included "oversight of operations at MCSP,

9  implementation of CDCR policy and procedures, staff training, safety and security of prisoners

10  housed at MCSP, and the supervis[ion] of all other individual Defendants employed at MCSP."

11  (4AC ¶ 80.)  Paragraph 82 does not even allege that Warden Lizarraga was "legally responsible"

12  for anything, simply listing additional asserted duties.  Therefore, both responses should be

13  answered more clearly.  Defendants' objections that Warden Lizarraga is not "legally

14  responsible" based on lack of *respondeat superior* § 1983 liability, qualified immunity, and the

15  Eleventh Amendment are better raised as affirmative defenses, or in a motion for summary

16  judgment—not as a basis for denying plaintiffs' factual allegations of the warden's job duties.

17       Accordingly, paragraphs 80 and 82 of defendants' answer should be STRICKEN.

18  Defendants should be granted leave to amend their answer to re-plead these paragraphs in

19  conformance with this order.  Failure to do so by the deadline set below would result in the

20  factual allegations within 4AC paragraphs 80 and 82 being deemed admitted.

21                    b.   Allegations Describing or Quoting Attached Exhibits

22       Most of plaintiffs' motion to strike is based on defendants' responses to the 4AC's

23  numerous allegations that describe or quote other court proceedings and external investigations

24  and reports regarding mental healthcare in the CDCR.  By defendants' count, the 4AC contains

25  over 60 mentions and at least 20 extensive quotations of such materials—often with citation to a

26  source attached as one of the many exhibits to the 4AC.

27       In their answer, defendants took the approach of admitting that the various decisions,

28  orders, and reports were issued but that the cited materials "speak for themselves and Answering

1    Defendants lack sufficient knowledge or information to form a belief about the truth of the

2    remaining allegations at [the relevant paragraph] and, on that basis, denies them." (See, e.g., ECF

3    No. 178 ¶¶ 97, 98, 100-102.)  Plaintiffs identify over one hundred responses asserting insufficient

4    knowledge, substantively addressing in their motion a selection of these responses.  (ECF No. 182

5    at 6-12.)  Plaintiffs argue that defendants cannot possibly lack sufficient knowledge to admit or

6    deny these allegations because they are "easily verifiable" from defendants' own discovery

7    disclosures, plaintiffs' disclosures, and the exhibits attached to the 4AC.  (Id. at 9-12.)

8         "Normally, a party may not assert a lack of knowledge or information if the necessary

9    facts or data involved are within his knowledge or easily brought within his knowledge, a matter

10   of general knowledge in the community, or a matter of public record."  Wright & Miller, 5 Fed.

11   Prac. & Proc. Civ. § 1262 (4th ed.) (footnotes omitted).  "However, if knowledge of a fact cannot

12   be ascertained within the time the party is given to answer with a modest expenditure of effort, a

13   denial of knowledge or information is appropriate; the pleader is not compelled to make an

14   exhaustive or burdensome search in order to determine the truth or falsity of his opponent's

15   allegations."  Id.

16        Without debating how burdensome it would be for defendants to confirm the accuracy of

17   plaintiffs' quoted sources, or the necessity of checking the sources' authenticity or currentness for

18   purposes of answering, the court simply concludes that there would be no benefit in this case to

19   defendants admitting allegations that consist of quotations from other sources.  If and when one

20   of those sources plays a part in the litigation, there can be no dispute that the document "says

21   what it says."  Sebunya v. Holder, No. 2:12-CV-67-GZS, 2012 WL 5993160, at *3-5 (D. Me.

22   Nov. 30, 2012) (denying motion to strike responses to block quotation).  Although courts have

23   come out different ways on the propriety of responses stating that "the document speaks for

24   itself," the undersigned finds that in this case, there would be no benefit to forcing these

25   defendants to amend their responses.  The same goes for the responses to the 4AC's numerous

26   allegations recounting the procedural history and orders issued in prior CDCR cases, and

27   descriptions of OIG and Internal Affairs investigations.  When push comes to shove, the public

28   record of these cases and investigatory reports will speak for itself.  Although defendants' tactic

36

1    of responsive pleading is not ideal, the undersigned fails to see how it will increase the scope of

2    discovery or cost of litigation in this case.[19]

3                           c.   Denials of Facts Elsewhere Admitted

4          Plaintiffs' final challenge to the answer's responsive allegations is that defendants

5    impermissibly deny factual allegations that are corroborated by defendant Kuich's testimony in

6    the separate well-known Coleman lawsuit and by investigatory reports on defendant Lizarraga's

7    workplace misconduct—both of which are attached as exhibits to the 4AC.  (ECF No. 182 at 12-

8    16.)

9          As to the allegations regarding Warden Lizarraga's workplace misconduct, the court

10   declines to strike the responses to the challenged paragraphs (185, 189, and 192) because those

11   paragraphs of the 4AC simply quote or describe the contents of OIG and Internal Affairs reports

12   attached as exhibits.  For the reasons discussed above, the undersigned sees no utility in forcing

13   defendants to check and admit the contents of these documents.

14         However, the court should strike the responses to some of the identified paragraphs of the

15   4AC pertaining to Dr. Kuich's professional role—that is, paragraphs 48, 121, and 122.

16   According to the 4AC, Dr. Kuich is a "former staff psychiatrist, former senior psychiatrist

17   specialist, and former Chief Psychiatrist of Telepsychiatry" for the CDCR.  (4AC ¶ 47.)

18   Paragraph 48 then goes into further detail of his role at CDCR:

19                48. Defendant Dr. KUICH did policy work, helped with
                  credentialing and helped with mental health staffing of CDCR
20                institutions including MCSP.  Dr. KUICH took the lead for
                  psychiatry in assisting with the electronic health record.  Defendant
21                KUICH reported directly to Dr. Michael Golding.  Defendant
                  KUICH is sued in his individual capacity.
22
     Defendants provide the same partial admission for both paragraphs 47 and 48:
23
                  48. In response to the allegations at 4thAC paragraph 48
24                Answering Defendants admit that Dr. Kuich is the former Chief
                  Psychiatrist for Telepsychiatry for CDCR and played a leading role
25

26   [19] Plaintiffs also challenge a handful of responses that allege lack of knowledge as to subjects that
     plaintiffs say are proved by defendants' own disclosures.  (ECF No. 182 at 10-11.)  As plaintiffs
27   acknowledge, the court has no way of knowing at this point the contents of the parties'
     disclosures and the court therefore declines to strike responses on the basis that they may be
28   contrary to materials produced in discovery.

                                                    37

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

in assisting with electronic health records. Answering Defendants deny the remaining allegations at 4thAC paragraph 47 [sic].

(ECF No. 178 at 6.)  This partial admission and remaining denial has the effect of denying that Dr. Kuich (a) did policy work, (b) helped with credentialing, (c) helped with mental health staffing of CDCR institution, (d) reported directly to Dr. Golding, and (e) is sued in his individual capacity.

As detailed in plaintiffs' motion, each of the factual allegations (that is, all but the capacity of suit) is corroborated by Dr. Kuich's sworn testimony in his September 19, 2019 deposition in the Coleman suit—the entirety of which is attached as an exhibit to the 4AC (ECF No. 173 at 365-666, Ex. F).  (See ECF No. 182 at 13-14.)  Despite being confronted with this direct support for the allegations in paragraph 48, defendants double down on their denials by arguing that Dr. Kuich's testimony was from a "wholly unrelated case" and that their responses "were to state that Plaintiffs' allegations about Kuich were unclear or ambiguous about the time periods involved."  (ECF No. 189 at 17.)  Neither argument is well taken.

The Coleman class action on the provision of mental healthcare in the state prison system is directly related to this suit, which primarily claims the unconstitutional levels of such care led to William's death.  Regardless of whether Dr. Kuich ever personally encountered William, his testimony about his role within the CDCR during the time that William was incarcerated certainly bears on the systemic failures that plaintiffs identify as contributing to his death.  Moreover, defendants' responses in no way attempt to distinguish between roles that Dr. Kuich played at different time periods.  They simply deny that he ever held a role in the activities plaintiffs allege.  Presented with evidence clearly to the contrary (and attached to the complaint), the court should not accept the present response to paragraph 48 of the 4AC.  Defendants would be welcome to specify in their amended response the time periods during which they believe Dr. Kuich was responsible for the various duties alleged.  As to the allegation that Dr. Kuich is sued in his individual capacity, no response is required as this is not an "allegation[] asserted against" Dr. Kuich that he must admit or deny for purposes of Rule 8(b)(1)(B).  See Sebunya, 2012 WL 5993160, at *3; Fed. R. Civ. P. 8(b)(1)(B).

Similarly, deeper into the 4AC, plaintiffs allege that Dr. Kuich:

- "was involved in deploying both telepsychiatrists and non-telepsychiatrists to CDCR institutions" (¶ 121);
- "was exquisitely aware [of] how individual CDCR institutions, including MCSP, performed psychiatric care" (¶ 122); and
- "had to triage psychiatric resources for CDCR institutions and did not provide enough psychiatric resources to MCSP to reach a vacancy rate of less than 10%" (¶ 123).

Defendants flatly deny the allegations contained in paragraphs 121-123. (ECF No. 178 at 14.)

As detailed in plaintiffs' motion, 4AC paragraphs 121 and 122 are essentially verbatim reflections of questions posed to and answers given by Dr. Kuich at the same Coleman deposition. (See ECF No. 182 at 14-15.) Again, defendants give no compelling reason to allow their denials to stand in the face of this attached deposition testimony. 4AC paragraph 123 is only partially supported by the cited portions of Dr. Kuich's testimony, however. Therefore, the court should not strike the response to paragraph 123.

Accordingly, the court should STRIKE with leave to amend defendants' responses to paragraphs 48, 121, and 122. If defendants are still able to deny these paragraphs' allegations in good faith, their amended responses should explain the grounds for their denial—for instance, the different time periods during which Dr. Kuich performed the relevant duties alleged, or other distinctions they believe significant in framing their denial or partial denial. Failure to amend these responses by the deadline set below would result in the factual allegations within 4AC paragraphs 48, 121, and 122 being deemed admitted.

## 2. *Affirmative Defenses*

Plaintiffs also move to strike from the answer all but a handful of defendants' nineteen affirmative defenses: numbers 1-13 and 17-19. (ECF Nos. 182 at 16-19, 194 at 7.) Plaintiffs move to strike certain affirmative defenses as legally improper and others as insufficiently pled for lack of supporting facts.

////

39

a. Affirmative Defenses as Denials

"A defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense." Zivkovic v. S. California Edison Co., 302 F.3d 1080, 1088 (9th Cir. 2002). In other words, a defense that points out a defect in a plaintiff's prima facie case, or "merely negates an element that [the plaintiff is] required to prove" is not an affirmative defense. Id. "While courts rarely grant Rule 12(f) motions to strike affirmative defenses, if an affirmative defense is a negative defense and should instead be included as a denial in the answer, the motion to strike will be granted." Sherwin-Williams Co. v. Courtesy Oldsmobile-Cadillac, Inc., No. 1:15-CV-01137-MJS-HC, 2016 WL 615335, at *2 (E.D. Cal. Feb. 16, 2016) (citing Barnes v. AT & T Pension Ben. Plan-Nonbargained Program, 718 F. Supp. 2d 1167, 1173 (N.D. Cal. 2010)); see Whittlestone, 618 F.3d at 973–74 (noting that allegations are properly stricken as redundant if they appear elsewhere in a pleading).

Because it is difficult to find prejudice in the mislabeling of a denial as an affirmative defense, courts are split on whether it is appropriate to strike affirmative defenses that are in fact denials—or to let them remain, with the knowledge that they are actually denials. Compare G & G Closed Cir. Events LLC v. Almeda, No. CV-18-00672-PHX-ESW, 2018 WL 4539974, at *2 (D. Ariz. Sept. 21, 2018) (agreeing with Wright & Miller and sister district cases that denials improperly pled as affirmative defenses should not be stricken for that reason alone), with Garcia v. Mickey Fine Enterprises, Inc., No. EDCV 21-1056 JGB (SHKx), 2022 WL 2168886, at *2 (C.D. Cal. Jan. 7, 2022) (striking purported affirmative defenses without leave to amend); Sherwin-Williams, 2016 WL 615335, at *8; and cases cited therein.

Because it is necessary to strike many other affirmative defenses as insufficiently pled (as explained in the next section), the court opts to take this opportunity to remove several denials from the list of affirmative defenses as well, in the interest of reducing clutter and confusion for pro se plaintiffs. See Barnes, 718 F. Supp. 2d at 1174 (striking as redundant affirmative defenses that merely rebut plaintiff's claims "to simplify and streamline the litigation").

**Affirmative Defense 1** is a blatant denial, as it explicitly asserts that the 4AC generally "fails to state a claim on which relief can be granted." (ECF No. 178 at 73.) Defendants offer no

40

argument to maintain this as an "affirmative defense," and Affirmative Defense 1 should be STRICKEN without leave to amend.  See Landmark Equity Fund, II, LLC v. Arias, No. 1:15-CV-00202-JLT, 2015 WL 4224176, at *4 (E.D. Cal. July 10, 2015) (citing cases holding that "[f]ailure to state a claim is an assertion of a defect in Plaintiff's prima facie case, not an affirmative defense.").

Affirmative Defense 7, which alleges that plaintiffs are not entitled to any form of damages because defendants did not act with malicious intent, is also a denial.  (ECF No. 178 at 74.)  It seeks to negate an element of plaintiffs' claims, and defendants provide no argument to maintain this as an affirmative defense.  Accordingly, Affirmative Defense 7 should be STRICKEN without leave to amend.

Affirmative Defense 8 is less easily categorized.  It alleges:

> Plaintiffs have suffered no injury due to Answering Defendants' conduct, actions or omissions. To the extent Plaintiffs suffered any injury or damage, such injury or damage were the result of Plaintiffs' and inmate William Schmitz' own negligence, deliberate actions and they are thereby precluded from seeking the relief requested.

(ECF No. 178 at 74.)  If construed as alleging a lack of any injury, it is a denial.  See Garcia, 2022 WL 2168886, at *5 ("Courts have generally adopted [the] position that an affirmative defense alleging "no damage or injury" is not an affirmative defense because it merely points to a defect in the plaintiff's case." (cleaned up)).  However, this paragraph reads more like an assertion of contributory negligence, which the Federal Rules expressly recognize as an affirmative defense. See Fed. R. Civ. P. 8(c)(1) (listing "contributory negligence" as affirmative defense that must be stated in responsive pleading).  Accordingly, plaintiffs' motion to strike should be DENIED as to Affirmative Defense 8.

Affirmative Defense 12 alleges that plaintiffs' claims are "barred in whole or in part by the culpable conduct and/or the negligent and/or culpable conduct of others, and accordingly, Plaintiffs are entitled to no relief of any kind against Answering Defendants."  (ECF No. 178 at 75.)  Defendants argue that this is a proper affirmative defense because Rule 8(c) lists "injury by fellow servant" as an affirmative defense.  With no citation to cases supporting this argument, the undersigned follows the case law to the contrary.  See Joe Hand Promotions, Inc. v. Garcia,

41

1   No. 1:11-CV-02030 LJO DLB, 2012 WL 1413940, at *3 (E.D. Cal. Apr. 23, 2012) (affirmative

2   defense stating that "any damages to Plaintiff were not caused by Defendant, but were the result

3   of Plaintiff's own actions or breaches, or the acts of third parties" is not an affirmative defense

4   but an attack on the prima facie case), report and recommendation adopted, 2012 WL 1720244

5   (E.D. Cal. May 15, 2012).  Accordingly, Affirmative Defense 12 should be STRICKEN without

6   leave to amend.

7        **Affirmative Defense 17** alleges that the 4AC's "minimal, vague and generalized claims"

8   against defendants fail to meet the heightened pleading requirements of California Government

9   Code § 951.  (ECF No. 178 at 75.)  This is an argument regarding the sufficiency of the

10  pleadings, to be raised on a motion to dismiss or for more definite statement.  It is not an

11  affirmative defense, and defendants do not argue to the contrary.  See Garcia, 2022 WL 2168886,

12  at *6 (assertion that complaint is vague is not a proper affirmative defense).  Accordingly,

13  Affirmative Defense 17 should be STRICKEN without leave to amend.

14       Finally, **Affirmative Defense 19**, which reserves the right to assert additional affirmative

15  defenses, is not itself an affirmative defense.  Landmark Equity Fund, II, 2015 WL 4224176, at

16  *8.  Should defendants discover new affirmative defenses during this litigation, they may move to

17  amend the answer under Fed. R. Civ. P. 15.  Accordingly, Affirmative Defense 19 should be

18  STRICKEN without leave to amend.

19       Purported Affirmative Defenses 1, 7, 12, 17, and 19 should be stricken from defendants'

20  answer without leave to amend.  The legal theories contained therein remain available for

21  defendants to rely upon to try to show that plaintiffs are not entitled to relief.  See Sherwin-

22  Williams, 2016 WL 615335, at *8.

23                      b.   Insufficiently Pled Affirmative Defenses

24       "An affirmative defense must give fair notice of the defense pled."  Gomez v. J. Jacobo

25  Farm Lab. Contractor, Inc., 188 F. Supp. 3d 986, 991 (E.D. Cal. 2016) (citing Wyshak v. City

26  Nat'l Bank, 607 F.2d 824, 827 (9th Cir. 1979) (per curiam)).  "Although 'fair notice' is a low bar

27  that does not require great detail, it does require a defendant to provide 'some factual basis' for its

28

1  affirmative defenses." Id. at 992 (internal citations omitted).  "Simply referring to a doctrine or

2  statute is insufficient to afford fair notice." Id.

3      Defendants argue that "[a]n answer is not the place for argument of the merits and

4  presentation of the facts or law supporting each defense."  (ECF No. 189 at 18.)  This is true, but

5  only up to a point.  While a court may not weigh the merits of defenses on a motion to strike,

6  answering defendants must still provide some general facts to establish the grounds of the

7  affirmative defenses they choose to put forth.  See Gomez, 188 F. Supp. 3d at 992 ("Fair notice

8  requires that the defendant state the nature and grounds for the affirmative defense." (cleaned

9  up)).  They need not plead the elements of each defense asserted (except for defenses sounding in

10  fraud governed by Rule 9(b)), but defendants must give some factual grounding for the doctrines

11  asserted as affirmative defenses in all but the most obvious contexts.

12      All but two of the remaining affirmative defenses challenged here should be stricken—

13  with leave to amend—for failure to provide fair notice of the nature of the defense pleaded.

14  **Affirmative Defenses 2** (statute of limitations), **4** (Eleventh Amendment), **5** (good faith),

15  **6** (claim and issue preclusion), **10** (mitigation of damages), **11** (waiver, estoppel, unclean hands,

16  and laches), and **13** (privilege and/or justification) are all "fact-barren" general assertions of legal

17  doctrines.  One or two, such as the invocation of Eleventh Amendment immunity, might

18  inherently give plaintiffs some idea of how they would apply to this case; but most provide no

19  starting point for plaintiffs to determine whether and how to investigate their factual basis in

20  discovery.  Indeed, it is not even clear whether defendants are truly asserting some of these

21  affirmative defenses because they include the phrase "to the extent that . . . ."  (See, e.g.,

22  Affirmative Defense 6, alleging "To the extent that Plaintiffs or persons in privity with Plaintiffs

23  have previously litigated the issues raised in this action, the claims and action are barred by the

24  doctrines of res judicata and collateral estoppel.")

25      These vague and general assertions of legal doctrine, devoid of any facts whatsoever,

26  should be stricken so as not to prejudice plaintiffs by requiring additional discovery into

27  potentially unnecessary avenues without any guideposts by which to assess the affirmative

28  defenses.  Defendants cite a D.C. Circuit case for the proposition that a statute of limitations

defense is "sufficiently raised for purposes of Rule 8 by its <u>bare assertion</u>."  (ECF No. 189 at 21, quoting <u>Daingerfield Island Protective Soc. v. Babbitt</u>, 40 F.3d 442, 444–45 (D.C. Cir. 1994).) The Ninth Circuit has not adopted such a rule.  To the contrary, our Court of Appeals has only held a bare assertion of a limitations defense adequate in a case where there was but a single statute of limitations at play, and the specific statute was cited in a brief provided to the plaintiff before the defense was asserted.  <u>See Wyshak v. City Nat'l Bank</u>, 607 F.2d 824, 827 (9th Cir. 1979) (per curiam).  Here, the 4AC contains many claims governed by various statutes of limitation, and there is no indication that plaintiffs have received any clues as to which the defendants might invoke.   <u>See Garcia</u>, 2022 WL 2168886, at *2 (distinguishing <u>Daingerfield</u> on similar grounds, and rejecting bare assertion of limitations defense).

　　　　None of defendants' other arguments in opposition fare much better.  The undersigned notes that this is merely a recommendation to strike the above-listed affirmative defenses with leave to plead some factual basis—not to strike the defenses as legally insufficient.  The undersigned further notes that, contrary to plaintiffs' argument, Affirmative Defense 5—asserting that defendants "acted in good faith"—is allowable as an affirmative defense.  However, like the others listed in this section, it is insufficiently pled at present.  <u>See Sherwin-Williams</u>, 2016 WL 615335, at *7 (requiring additional detail for "good faith" affirmative defense).

　　　　Should defendants amend these defenses, they shall separate each distinct defense to avoid the confusion of combining the unique (if sometimes overlapping) equitable doctrines of "waiver, estoppel, unclean hands, laches."  They must also clarify the meaning of their 13th affirmative defense that recovery "is barred because Defendant's conduct was privileged and/or justified," if they choose to maintain that defense.

c.   <u>Adequate Affirmative Defenses</u>

　　　　The court is unpersuaded by plaintiffs' arguments to strike the final three challenged affirmative defenses, numbers 3, 9, and 18.  **Affirmative Defense 3** is clearly asserting the well-known defense of qualified immunity—not asserting "ignorance of the law" as a defense to liability.  **Affirmative Defense 9**, raising failure to exhaust administrative remedies under the Prison Litigation Reform Act, provides fair notice by its bare assertion. See <u>Estrada v.</u>

44

Vanderpoel, No. 1:16-CV-00673-DAD-EPG-PC, 2017 WL 2806353, at *2 (E.D. Cal. June 29, 2017) ("Plaintiff has fair notice of the exhaustion defense because it applies to every civil rights case filed by a prisoner."), report and recommendation adopted, 2017 WL 4758843 (E.D. Cal. Oct. 20, 2017).[20] **Affirmative Defense 18** alleges immunity from state-law claims under California Government Code § 820.2 (discretionary acts) and § 820.8 (no vicarious liability). Given the volume of conduct ascribed to defendants Kuich and Lizarraga scattered across the 4AC, and the number of other defendants more directly connected to William's care, the undersigned does not recommend requiring factual support for this affirmative defense because the burden would far outweigh the benefit to plaintiffs.

### *3. Conclusion on Motion to Strike*

For the above reasons, the undersigned recommends granting in part plaintiffs' motion to strike by STRIKING with leave to amend paragraphs 48, 80, 82, 121, 122; STRIKING with leave to amend Affirmative Defenses 2, 4, 5, 6, 10, 11, and 13; and STRIKING WITH PREJUDICE Affirmative Defenses 1, 7, 12, 17, and 19. The motion should be denied in all other respects.

## SUMMARY OF SURVIVING CLAIMS

Should the district court adopt these findings and recommendations, the following claims would go forward on plaintiffs' 4AC:

1. The First Cause of Action for deliberate indifference against defendants Andaluz, Branman, J. Johnson, R. Johnson, Ramkumar, Robinson, and M. Smith;

2. The Second and Third Causes of Action for supervisory liability under § 1983 against all defendants named in those causes of action in the 4AC;

3. The Fourth Cause of Action for deprivation of familial relationship against defendants Adams, Andaluz, Branman, Brizendine, Brockenborough, Ceballos, DeNigris, Diaz, Gipson, Heatley, J. Johnson, R. Johnson, Kernan, Kuich, Leidner, Lizarraga, Ponciano, Ramkumar, Rekart, Robinson, M. Smith, Tebrock, and Toche;

---

[20] The court leaves for another day the legal question—not raised by either side—of whether and how the PLRA applies to claims filed by the estate of an inmate.

4. The Sixth Cause of Action for wrongful death against all defendants named in the 4AC, except the CDCR;

5. The Seventh Cause of Action for medical negligence against defendants Ashe, DeNigris, Rudas, and C. Smith;

6. The Eighth Cause of Action for violation of California Civil Code § 52.1 (Bane Act) against defendant DeNigris, without a claim for punitive damages; and

7. The Ninth Cause of Action for medical battery against defendant DeNigris, without a claim for punitive damages.

**CONCLUSION**

For the reasons set forth above, IT IS HEREBY RECOMMENDED that:

1. Defendants' motions to dismiss (ECF Nos. 179 & 181) be GRANTED IN PART, as follows:

    a. The motion to dismiss all claims against the CDCR be GRANTED, and the CDCR be dismissed from this action;

    b. The motion to dismiss the First Cause of Action for deliberate indifference against defendants Ashe and C. Smith be GRANTED, and those claims be dismissed with prejudice;

    c. The motion to dismiss the First Cause of Action against defendant DeNigris be DENIED;

    d. The motion to dismiss the Fourth Cause of Action for deprivation of familial relationship against defendants Ashe and C. Smith be GRANTED, and those claims be dismissed with prejudice;

    e. The motion to dismiss the Fourth Cause of Action against defendant DeNigris be DENIED;

////

////

////

1        f.    The motion to dismiss the Fifth Cause of Action (asserted against defendant

2             C. Smith alone) be GRANTED, and that cause of action dismissed with prejudice;

3        g.    The motion to dismiss the Sixth Cause of Action for wrongful death against all

4             moving CDCR defendants (Adams, Ashe, Asman, Brizendine, Brockenborough,

5             Ceballos, Diaz, Gipson Heatley, Kernan, Leidner, Ponciano, Rekart, Rudas, C.

6             Smith, Tebrock, and Toche) be DENIED;

7        h.    The motion to dismiss the Seventh Cause of Action for medical negligence against

8             defendants Ashe, Rudas, and C. Smith be DENIED;

9        i.    The motion to dismiss the Eighth Cause of Action for violation of California Civil

10             Code § 52.1 (Bane Act) be DENIED;

11        j.    The motion to dismiss the Ninth Cause of Action for medical battery be DENIED;

12        k.    The motion to dismiss the Tenth Cause of Action for assault (asserted against

13             defendant DeNigris alone) be GRANTED, and that cause of action be dismissed

14             with prejudice;

15        l.    The motion to dismiss the punitive damages claims against defendant DeNigris

16             from the Eighth, Ninth, and Tenth Causes of Action be GRANTED, and those

17             damages claims be dismissed with prejudice; and

18        m.  The motion to dismiss the punitive damages claims against defendant DeNigris

19             from the First and Fourth Causes of Action be DENIED.

20    2.  All defendants who have yet to answer the 4AC should be ordered to file an answer within

21       thirty (30) days of the date of the adoption of these findings and recommendations.

22    3.  Plaintiffs' motion to strike the answer filed by defendants Kuich and Lizarraga (ECF

23       No. 182) should be GRANTED IN PART, as follows:

24        a.    Paragraphs 48, 80, 82, 121, 122 of the answer should be stricken with leave to

25             amend;

26        b.    Affirmative Defenses 2, 4, 5, 6, 10, 11, and 13 should be stricken with leave to

27             amend; and

28    *////*

c.  Affirmative Defenses 1, 7, 12, 17, and 19 should be stricken with prejudice.

d.  Plaintiffs' motion should be denied in all other respects.

4.  Defendants Kuich and Lizarraga should be ordered to file any amended answer within thirty (30) days of the date of the adoption of these findings and recommendations.

a.  Failure to do so would result in the corresponding factual allegations of the 4AC being deemed admitted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served on all parties and filed with the court within fourteen (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

Dated:  June 28, 2022

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

19.schm.195

48