THOMAS J. SCHMITZ
DIANNE MALLIA
404 Atkinson St,
Roseville, CA 95678
(707) 694-8158
tsfoot49@gmail.com
deedamallia@gmail.com
PRO SE

FILED

AUG 28 2023
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

**THOMAS SCHMITZ, et al.,**

**Plaintiffs,**

**vs.**

**A ASMAN, et al.,**

**Defendants.**

**NO. 2:20-cv00195-DJC-CKD**

**PLAINTIFFS' OPPOSITION TO DEFENDANT STEPHEN DENIGRIS, M.D.'S MOTION FOR PARTIALLY SUMMARY JUDGMENT**

**COMPLAINT FILED: 1/27/2020**
**DATE: September 20, 2023**
**COURTROOM: 24, 8th floor**
**TIME: 10:00 a.m.**
**TRIAL DATE: TBD**
**JUDGE ASSIGNED: Honorable Carolyn K. Delaney**

DATE: August 28, 2023

## I.

## Introduction

On May 4, 2018, Defendant Stephen DeNigris was a physician contracted with CDCR that performed a fraudulent, sedated endoscopic procedure on a severely mentally ill man, William Schmitz, in the absence of a valid medical indication. Under threat of perjury, Defendant DeNigris has altered his reasoning in a blatant effort to retroactively establish an explanation for performing the endoscopy (EGD). Defendant DeNigris's hail mary attempt to abandon his initial claimed reasoning, after seeing Plaintiffs' evidence destroying the believability of his initial claimed reasoning, does not fool Plaintiffs and should not fool the court. Defendant DeNigris must be hoping that Plaintiffs forgot about their discussions with his attorney and his original interrogatory answers. Defendant DeNigris must be hoping that the court will only superficially review the actual evidence or that the court will blindly heed to the declaration of an expert witness even though it directly conflicts with Defendant DeNigris's own discovery! Defendant DeNigris should not be rewarded for his deception.

Although discovery is not fully complete, there already is enough evidence to defeat this Motion and allow the court to find that any potential future motion for partial summary judgment would be futile against these claims. Finally, Pro se Plaintiffs request the court to apply appropriate sanctions for the perjury[1] including ruling in Plaintiffs favor as to all claims against Defendant DeNigris. Defendant DeNigris has lost all credibility making any further discovery responses by him meaningless.

## II.

## FACTS [2]

[1] Pro Se Plaintiffs understand this is a serious accusation and are 100% convinced that Defendant DeNigris has committed perjury.

[2] Pro se Plaintiffs have included our response and current supporting evidence in the "SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT" filed by Defendant DeNigris. Plaintiffs' responses include additional information to the content of this opposition, yet do not include all information that may be relevant to the case outside of this motion.

"Decedent did not have end stage liver disease"[3]

"He had chronic Hepatitis C and was being screened prior to starting antiviral therapy"

"Therefore, if varices were present, they would need treatment before beginning the antiviral therapy."

"I do not contend that there was another indication for the endoscopy. It was common practice to check for varices prior to initiating Hepatitis C antiviral therapy."

These are all excerpts from Defendant Stephen DeNigris, M.D., PH.D.'s original responses and objections to Plaintiff's First set of interrogatories relating to jurisdictional discovery that he declared under penalty of perjury under the laws of the State of California on the 29th Day of December 2020, at 51 West Haven Way, Petaluma, Ca, 94952 (1530 PST) (Exhibit D)[4]

Plaintiff's interrogatories to Defendant DeNigris did not mention anything about William starting hepatitis treatment. Rather these original interrogatory responses, **Defendant DeNigris specifically brings up the hepatitis treatment as the reason he performed the endoscopy** just as his attorney had already explained to plaintiffs. **Defendant Dr. DeNigris claimed that William did not have cirrhosis and that it was common practice to undergo an endoscopy prior to initiating hepatitis treatment.**

## III.

## LEGAL STANDARDS

Pro Se Plaintiffs are doing their best to comply with all legal requirements and certainly do not have the legal writing expertise of the attorneys representing Defendants. However, the facts are the facts no matter how inarticulately presented by Pro Se plaintiffs. The court must decide on the facts and closely review the change in Defendant DeNigris's statements pertaining to the most vital facts in the case against him.

---

3 End stage liver disease (ESLD) is equivalent to "cirrhosis" and used interchangeable in this motion and all other prior filings by Plaintiffs.

4 Notably, the "evidence" submitted with Defendant DeNigris's Motion does not include these original answers. It also seems like Dr. Arenson may not have even reviewed these original answers that contradict his opinions.

**a. Summary Judgment Standard**

*Alsadi v. Intel Corp.*, No. CV-16-03738-PHX-DGC, at *26 (D. Ariz. Sep. 30, 2019) ("Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The evidence must be viewed in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), and all justifiable inferences are drawn in that party's favor because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions," *Anderson*, 477 U.S. at 255.")

**b. Expert Report**

Fed. R. Civ. P. 26 ("**(B)***Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-prepared and signed by the witness-if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain: **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;**(ii)** the facts or data considered by the witness in forming them;**(iii)** any exhibits that will be used to summarize or support them;**(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;**(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and **(vi)** a statement of the compensation to be paid for the study and testimony in the case.")

////

////

////

c. **Judicial notice**

The Court ***on its own***[5] may take judicial notice of its own records in this case, the records of other courts, facts that are generally known within its jurisdiction, and from sources whose accuracy cannot reasonably be questioned. See *Driver v. Dept. of the Treasury IRS*, 2:22-cv-02229 DB P, at *3 (E.D. Cal. Mar. 28, 2023) ("*MCIC Indem. Co. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986) (A court may take judicial notice of its own records and the records of other courts).") see *Artino v. Home Depot U.S., Inc.*, 1:22-cv-01588-JLT-HBK, at *2-3 (E.D. Cal. Mar. 24, 2023) ("*See Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Federal Rule of Evidence 201 permits a court to take judicial notice of facts that are "not subject to reasonable dispute" because they are either "generally known within the trial court's territorial jurisdiction," or they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The Court may take judicial notice on its own or at the request of any party. *Id.* 201(c).")

**d. Perjury**

*See Arnold v. Cnty. of El Dorado*, No. 2:10-cv-3119 KJM GGH PS, at *7-8 (E.D. Cal. Aug. 8, 2012) ("Perjury is defined in federal criminal law as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111 (1993) (summarizing the elements of 18 U.S.C. § 1621). Clearly, committing perjury is acting in "bad faith." "Dismissal is an appropriate sanction for falsifying a deposition." .... [T]he court's inherent powers[] can be called upon to redress such mendacity." Combs v. Rockwell Inter. Corp., 927 F.2d 486, 488 (9th Cir. 1991). "Falsifying evidence is grounds for the imposition of the sanction of dismissal." Id. There need be no look at the merits of a lawsuit if

[5] Pro se plaintiffs have not included the prior filings and court orders, but they are certainly available to the court. Notably, Plaintiffs stand by all the 4AC allegations against Defendant DeNigris and the court can see how strong the allegations **are when based on the fact that Defendant DeNigris knew William did not have cirrhosis as Defendant DeNigris originally claimed**. Plaintiffs also particularly direct to ECF 125, filed 1/4/2021, which includes many of the same factual allegations as the 4AC alongside exhibits to support the allegations against Defendant DeNigris and allowed Defendant DeNigris to see the evidence backing up plaintiffs' allegations.

material, substantial perjury is found. Id at 489. As stated in Valley Engineers Inc. v Electric Engineering Co., 158 F.3d at 1058: "There is no point to a lawsuit, if it merely applies law to lies. True facts must be the foundation for any just result." While perjury should not be confused with inconsistencies in a party's deposition and trial testimony which may "provide fertile ground for vigorous impeachment but do not support perjury findings," Montano v. City of Chicago, 535 F.3d 558, 564 (7th Cir. 2008), when a party falsely testifies to a fact material to the substance of a litigation, such is anathema to the function of the courts. Perjury is much more than simply a "gotcha," harmful in effect only for the reason that one got caught. Litigation is not a game in which perjury warrants a five yard penalty for a minor untruth, fifteen yards if the perjury was really serious. Rather, perjury on any material fact strikes at the core of the judicial function and warrants a dismissal of one's right to participate at all in the truth seeking process. If one can be punished for perjury with up to five years imprisonment, 18 U.S.C. § 1621, it should not seem out of place that a civil action might be dismissed for the same conduct.")

## IV. ARGUMENT

### A. **Defendant Dr. DeNigris has committed perjury**

On November 5, 2020, Plaintiffs met with Defendant Dr. DeNigris's attorney Vanessa Raven. **At that time, attorney Raven told Plaintiffs that Defendant Dr. DeNigris knew William did not have cirrhosis but performed the endoscopy because William was scheduled to start hepatitis medication.** She encouraged Plaintiffs to entirely drop Dr. DeNigris from the case as it was standard procedure to screen with an endoscopy prior to starting hepatitis treatment.

Prior to dismissing Defendant DeNigris, as they did with Defendant Dr. Michael Golding, Pro se Plaintiffs wanted to confirm the reasoning directly from Defendant Dr. DeNigris and to verify this was, in fact, a valid reason to screen William with an endoscopy.

Sure enough, Defendant DeNigris's original under oath interrogatory responses confirmed what attorney Nygaard had explained. Defendant DeNigris declared under penalty of perjury that William did not have cirrhosis and that the purpose of the endoscopy was to screen

him prior to starting hepatitis treatment as he claimed it was common practice to check for varices prior to initiating Hepatitis C antiviral therapy.[6] (Exhibit D at 5)

Plaintiffs realized that this was not valid once they could find absolutely no corroborating **medical information to support Defendant DeNigris's initial claimed reasoning**. In fact, Defendant DeNigris's own original discovery responses were the nexus for the expanded allegations in the 4AC against him compared to the prior amended complaints.[7]

***Several years later,*** Defendant DeNigris has changed his claimed reasoning for the endoscopy. This change only occurred after reviewing the evidence that Plaintiffs have against him and the courts findings on motions. It is not credible that Defendant DeNigris did not understand the original interrogatories or the responses he provided. There is no believable explanation for the change other than a willful attempt to provide false testimony.

On March 8, 2023, Defendant DeNigris amended his response solely to interrogatory No 4. There is no reasonable explanation for this change of original answer that does not consist of perjury. If Defendant Dr. DeNigris is being truthful now then **he would have originally responded to the interrogatories that he performed the endoscopy to screen for esophageal varices because he thought William had cirrhosis.** He either was lying in the original response and/or lying now.

Looking at Dr. DeNigris's other original interrogatory responses, ***which were not included in this motion***[8], provides even further evidence of deceit. Specifically, in response to Interrogatory No. 5 Defendant DeNigris includes "It was common practice to check for varices prior to initiating Hepatitis C antiviral therapy." (Exhibit D at 5)

---

[6] Plaintiffs' assumption now is that Defendant Dr. DeNigris believed that pro se plaintiffs would simply take his word as a medical doctor and that since William was actually about to begin hepatitis treatment this reasoning for an endoscopy would fool laymen.

[7] **Plaintiffs and the court have subsequently spent much time and resources based on Defendant DeNigris's original responses.** These include all of the following:
Information related to these responses in the 4AC (ECF 173)
Motion to partially dismiss 4AC (ECF 181) opposition (ECF 185) reply (ECF. 192) and Findings (ECF 200)
Motion to allow Punitive damages (ECF 125)
Motion for judgment on the pleadings (ECF 227) opposition (ECF 234) reply (ECF 236) and Findings (ECF 253)
This current motion for partial summary judgment, opposition, likely reply and Findings of the court.

[8] It also seems to pro se Plainitffs that the lack of inclusion means Dr Arenson may not have seen them either? If he did see them, it casts further doubt on any of Dr. Arenson's opinions.

**B. Expert Witness**

In addition to changing his claimed reasoning for performing the endoscopy on William, the majority of Defendant DeNigris's motion is reliance on Dr. Arenson's opinions. Pro Se plaintiffs do not believe that, prior to this motion, they were ever notified of Dr. Arenson as a potential expert witness which seems to be a violation of the prescheduling order (ECF 286) and Federal Rule of Civil Procedure 26(a)(2) and that the report submitted by Dr. Arenson does not comply with Fed. R. Civ. P. 26 (B).

Pro Se Plaintiffs have not had an opportunity to evaluate the report's opinions and the information the opinions were based in depth nor to have a rebuttal expert respond to the report. Further, the court's pretrial scheduling order specifically states:

> The parties shall disclose any expert witnesses in accordance with the specifications of Federal Rule of Civil Procedure 26(a)(2) no later than **September 30, 2024**. Any rebuttal expert disclosures shall be made in accordance with the specifications of Federal Rule of Civil Procedure 26(a)(2) no later than **October 30, 2024**. Expert disclosures shall be filed with the Court and served upon all other parties. All expert discovery shall be completed (see fn. 3) by **February 28, 2025**. The same procedures for fact–discovery disputes apply to expert–discovery disputes. (ECF 286 at 4)

At the very minimum, Plaintiffs should be allowed the timeline above for rebuttal expert disclosures. However, enough facts already exist as discussed in this opposition to invalidate many of Dr. Arenson's opinions without the need of a rebuttal expert and the motion should be denied at this time. Further, the court's opinion on the issues raised in the motion and opposition would be beneficial for all parties in focusing resources on what still needs to be proven against Defendant DeNigris given ***his perjury of vital facts***. Clearly Defendant Dr. DeNigris has lost all credibility. Knowing that any further discovery responses by him are meaningless, it puts Pro Se plaintiffs in position of simply wasting more of Plaintiffs' and the court's time and resources trying to attain information that in no way can be trusted.

Plaintiffs expect that Defendant Dr. DeNigris will reply to this opposition with illogical reasoning to avoid admitting to perjury. **The court should not be fooled and hold Defendant DeNigris responsible for his deception.**

**B. There is a Triable Issue of Material Fact That Defendant Dr. DeNigris Did Act with Deliberate Indifference**

**a. Plaintiffs Have Stated A Valid Cause Of Action Against Dr. DeNigris For Deliberate Indifference To Serious Medical Needs, Health And Safety**

Defendant DeNigris has not presented "undisputed evidence" that he "provided excellent medical treatment to [William Schmitz] as a proceduralist in alignment with the request from Decendent's primary care provider" as claimed. (ECF 291-1 at 12) Rather, the evidence overwhelmingly supports Plaintiff's position that Defendant DeNigris was deliberately indifferent to William's serious medical needs as alleged in the 4AC.

**1. Evidence of Substandard Care** [9]

In brief, Defendant DeNigris now claims he performed the endoscopy upon the request, direction, and referral from Defendant Robert Rudas, MD. (Exhibit B at 11) Defendant Rudas claims he ordered the endoscopy because William was on the ESLD registry. (Exhibit C at 4) However, Defendant Rudas took no part in the William's placement on the ESLD registry and lacks the information and knowledge to identify who placed William on the ESLD registry and when he was placed on the registry. [10] (Exhibit U at 3) Dr. Ashe was William's primary care provider and, as opined by Dr. Arenson, on March 8, 2018, she "believed [William Schmitz] did not have cirrhosis but did not inform [William] of this opinion or cancel the pending endoscopy."

[9] An ongoing major and insurmountable problem to truly get to the depths of unconstitutional care our son was individually subjected to by CDCR's decades long systemic unconstitutional care to the mentally ill, is the inability of Defendants to produce all pertinent medical documents that should be in CDCR's possession. Plaintiffs have been patiently waiting for years now and Pro Se Plaintiffs are hampered until all documents are produced.

[10] **The fact that Defendant Dr. Rudas cannot even figure this basic information from the medical system speaks volumes about the poor medical record keeping within CDCR.**

(ECF 291-5 at 4) **So none of the Doctors have taken responsibility for diagnosing William with ESLD or how he even knows how he ended up on the ESLD registry. None of these doctors took William off the registry despite no evidence of ESLD.**

At this point, **Plaintiffs do not think any of the defendants will claim William actually met the requirements to be placed on the ESLD registry** as he did not have labs, physical exam findings or imaging findings indicative of ESLD.  However, in an abundance of caution, Plaintiffs will provide evidence how William never had any evidence of end stage liver disease requiring an endoscopy. First, only about 20% of individual with hepatitis C progress to cirrhosis. (exhibit A) Plaintiffs include the CCHCS Care Guide for Hepatitis C from both January 2017 (Exhibit P) and September 2020 (Exhibit O). A review of these guides will show no need for endoscopy in a person with hepatitis unless they have cirrhosis. Even just a brief review of the summary on the first page will provide the needed information. The first page of both versions include an "alert box" in the top right corner. The box highlights "CIRRHOTICS" and states "Screen for hepatocellular carcinoma and varices". William did not have cirrhosis and no reason to screen for varices. Page 5 of the January 2017 guideline and page 4 of the 2020 guideline shows the treatment selection for patients with chronic Hepatitis C that was based on FIB4 score. William's FIB4 score was < 1.45 showing he was unlikely to have significant liver fibrosis. (Exhibit Q at 1) In addition, William's Patient summary does not include cirrhosis on his medical problem list. (Exhibit Q at 2)

Despite not having evidence of end stage liver disease, William was subjected to an endoscopy. Dr. Denigris claims to have completed services provided to William Schmitz on May 4, 2018 that met the criteria for CPT codes 43235 and 99205 with modifier 25. (Exhibit B at 13-14)

Dr. Arenson opines that Dr. DeNigris appropriately reviewed William's relevant medical documents. (ECF 291-5 at 507) However, other than the referral form, Dr. Arenson provide no identification of the specific "relevant medical documents" Dr. DeNigris "appropriately reviewed". (291-5 at 508). There were very few initial medical records from prior to Defendant DeNigris's visit disclosed by Defendant DeNigris.One is a patient summary dated a few days

prior to the Dr DeNigris appointment with William **and the others were printed a few days prior to Defendant DeNigris appointment and contain the info about William undergoing evaluation for hepatitis treatment, absence of ESLD diagnosis, labs that indicate no cirrhosis, imaging that indicates no cirrhosis, and liver ultrasound that indicates no cirrhosis. Specifically,** these few initial medical documents were a patient summary for William Schmitz **dated 4/30/2018 just 4 days prior to the endoscopy** (Exhibit Q at 2), Outpatient Progress note for William Schmitz dated March 8, 2018 authored by Dr. Ashe and **printed on 5/1/2018 just three days prior to the endoscopy** (Exhibit Q at 3-5) Outpatient Progress note for William Schmitz dated April 16, 2018 authored by Dr. Ashe and **printed on 5/1/2018** (Exhibit Q at 6-8) and finally recent labs and imaging also printed on **5/1/2018** (Exhibit Q at 9-13).

These certainly seem like the relevant documents to plaintiffs and will the trier of fact will easily decide these are part of the relevant documents Defendant DeNigris reviewed. These few initial medical documents disclosed by Defendant DeNigris and show no diagnosis of cirrhosis, the laboratory values, exam findings, and imaging that provide no evidence of end stage liver disease. Further, as discussed *supra*, the codes Dr. DeNigris swore are accurate of the encounter entails even a more extensive history and physical than is typical for an endoscopy pre-operative examination.

**2. Evidence that Defendant DeNigris Deliberately performed the endoscopy knowing William had no medical indication.**

Defendant DeNigris is listed on the American Society for Gastrointestinal Endoscopy (ASGE) website. (https://www.asge.org) (Exhibit E) The ASGE physician members "have highly specialized training in endoscopic procedures…" (Exhibit F) It is therefore reasonable to believe he knows the indications for endoscopies.

As discussed *supra* and shown by his original responses, Defendant DeNigris knew William did not have cirrhosis.[11] Defendant DeNigris swore under oath to performing the endoscopy because William was starting treatment for hepatitis and that William did not have cirrhosis. Performing an endoscopy because someone is starting hepatitis treatment is not a valid medical reason. (Exibit N) As a gastro-enterologist that performs endoscopies Defendant DeNigris knows this fact. In both the the motion for punitive damages, ECF 125, and the 4AC, Plaintiffs included many allegations that are easily verifiable, showing how unbelievable the reasoning initially claimed by Defendant DeNigris was for performing the endoscopy on William.

After being presented with this evidence, Defendant DeNigris now years later has changed his explanation. This change in answer does not absolve him of performing the endoscopy without a medical indication allowing him to have the multiple claims against him to be dismissed. **Rather the perjury only strengthens Plaintiffs' argument that Defendant DeNigris is dishonest and knowingly performed the endoscopy on our mentally ill son contributing to his worsening mental state and ultimately death.**

### 3. Red herring of Liver biopsy

Defendant DeNigris amended his interrogatory response to number 4 after reviewing the 4AC and explains that he cannot state with certainty whether or not William had cirrhosis since a liver biopsy had not been performed. (ECF 291-5 at 450) Then in his amended part b response to 4 which is "If your contention is William Schmitz did not have end stage liver disease, explain the reasoning for why he would have portal hypertension and a need for an endoscopy to screen for esophageal varices", Defendant DeNigris tries to explain William required the endoscopy because a biopsy is invasive and carries more risk than an endoscopy. (ECF 291-5 at 450-451)

---

[11] Plaintiffs are basing this on Defendant Dr. DeNigris's original interrogatory answers not the reasoning given years later.

**This is a ridiculous response and attempt to fool the plaintiffs and the court.** The court must not just take Defendant Dr. DeNigris or his expert's word without actually evaluating if these responses actually make sense.

**There was never a medical indication to choose between a biopsy or an endoscopy and this statement is completely out of place and serves only to confuse. A no risk option is not performing any procedure when not medically indicated.** As discussed *supra*, the determination of whether or not someone should be evaluated further is well-described in the CCHCS hepatitis care guides and William did not require it. (EXHIBITS O and P)

### 4. Risks of an Endoscopy

Dr. Arenson's opinion on the safety of an endoscopy that is **the exact quote[12] from a response by Defendant DeNigris[13]** and does not convincingly override the many specific risks that are identified on the consent form signed by William and Defendant DeNigris. The court

---

[12] Except Dr. Arenson corrects the typo of Defendant DeNigris changing "EDG" to "EGD"

[13] Arenson's Declaration paragraph 25 on page 8 compared to DEFENDANT DENIGRIS' RESPONSE TO PLAINTIFFS REQUEST FOR ADMISSIONS, SET ONE request for admission number 3 both state:

"there are extremely rare complications during the performance of a diagnostic endoscopy that are further substantially reduced in the presence of a dedicated anesthetist. The estimated complication rates for diagnostic endoscopies are less than 0.0002% (less than 2/10,000), according to a Mayo Clinic Report in 2004 (Mayo Clinic Proceedings 2004; 79 (10):1264). These complications were related to anesthesia, and there were no deaths. In the 14 years between this publication and Decedent's EDG, there have been substantial improvement in endoscope technology, anesthesia options, and the wide-spread use of dedicated anesthetists, making EDG even safer with complications rates likely even lower. The likelihood of such risks during the performance of a diagnostic endoscopy performed by gastroenterologist in the United States in 2018 would be akin to being struck by lightning." (ECF 291-5 at 462 and ECF 291-5 at 511)

Both Defendant DeNigris and Defendant Arenson choose this single center study from 2004. The stats cited are not correct as less than 0.0002% is not equivalent to less than 2/10,000. Further, according to the abstract for this study, 5 of the patients suffered perforations. The numbers do not add up. Regardless, there are several recent studies on EGDs on larger populations that will provide more accurate complications rates. Selectively choosing a single site study from 2004 and then saying complications must be less today because of improvements- instead of looking at the available more recent larger studies is self-serving and evidence of bias. Regardless, enough evidence already exists as stated in the 4AC and now with evidence to support, that plaintiffs do not want to detract from the court focusing on the fundamental issues discussed within this opposition.

already found that the 4AC allegations sufficient that proceeding with the EGD in the absence of a known medical reason presented excessive risks to William's health. (ECF 200 at 15) Below are exact allegations from the 4AC now followed by the information supporting the allegation in parenthesis.

735. William was given Propofol as the anesthesia medication. (ECF 291-5 at 424)

736. As a physician, Defendant Dr. DENIGRIS knows that risks of Propofol include death. (ECF 291-5 at 463)

737. On 5/4/2018 Defendant Dr. DENIGRIS signed an informed consent form for endoscopy that states he was the "Physician explaining procedure, risks, complications, and alternatives" to William. (ECF 291-5 at 427)

738. On 5/4/2018 William signed the same informed consent form for Endoscopy. (ECF 291-5 at 427)

739. The Informed consent for Endoscopy signed by both Defendant Dr. DENIGRIS and William on 5/4/2018 includes all of the following:

"**Principal Risks and Complications of Gastrointestinal Endoscopy**...all of the following complications are possible. 1. **Perforation**: Passage of the instrument may result in an injury to the gastrointestinal tract wall with possible leakage of gastrointestinal contents into the body cavity...2. **Bleeding**...may require transfusions, repeat endoscopy to stop the bleeding or possible a surgical operation. 3. **Medication phlebitis**: Medications used for sedation may irritate the vein in which they are injected...Discomfort in the area may persist for several weeks to several months. 4. **Other Risks include but are not limited to...** Drug reactions,...Instrument failure and death..." (ECF 291-5 at 427)

740. On 5/4/2018, William signed the Consent for Anesthesia Services which included all of the following:

"I acknowledge that my doctor has explained to me that I will have the procedure...It has been explained to me that all forms of anesthesia involve some risk...**unexpected severe complications with anesthesia** can occur and include the remote possibility of infection, bleeding, drug reactions, blood clots, loss of sensation, loss of limb function, **paralysis**, stroke,

heart attack, **or death**..." (emphasis added) (ECF 291-5 at 428)

741. The same form explained the "expected results" of William receiving the "Monitored Anesthesia Care (with sedation)" was "Reduced anxiety and pain, partial or total amnesia." (ECF 291-5 at 428)

**5. Evidence of Fraudulent Billing**

a. **New evidence supportive of Fraudulent Billing**

Defendant DeNigris's own expert witness, Dr. Arenson, opines that Defendant DeNigris **did not** complete a Comprehensive History & Physical. (ECF 291-5 at 507-508 paragraph 17) **If Dr. Arenson's opinion is correct, medical billing fraud, known as upcoding, was committed!**[14]

In complete contrast of the arguments made in his motion and Dr. Arenson's opinion, Defendant DeNigris has sworn that the CPT codes 43235 and 99204 with modifier 25 that were submitted for his services performed for William Schmitz were an accurate representation of the services he provided to William Schmitz on 5/4/2018. [15] (EXHIBIT B at 13-14)

**b. Evidence of Billing Fraud alleged in the 4AC and now with evidence support**

In addition to Dr. Arenson's opinion, below are exact allegations from 4AC paragraphs now followed by the information supporting the allegation in parenthesis.

770. Current Procedural Terminology (CPT) codes of 43235 and 99204 with modifier 25 were submitted for services provided to William on 5/4/2018. (ECF 291-5 at 415)

771. The services documented in the medical notes by Dr. DENIGRIS should have only been coded for the endoscopy (43235), which always includes the pre-operative evaluation

---

[14] Dr. Arenson's. opinion is consistent with Plaintiffs arguments of fraudulently billing as discussed in ECF 125.

[15] Specifically, the pertinent portion of Interrogatory No. 6 "You have disclosed the billing documentation for the services provided by you to William Thomas Schmitz on 5/4/2018, the CPT codes submitted were 43235 and 99204 with modifier 25. (a) Do you believe this is an accurate representation of the services you provided?" To which Defendant DeNigris responded "Yes". Further, in response to request for Admission 20, "Admit that services provided to William Schmitz on May 4, 2018 did not meet the criteria for Current Procedural Terminology (CPT) codes 43235 and 99204 with modifier 25"
Defendant DeNigris denies. (EXHIBIT B at 13-14)

in its allowance. (Exhibit M )

772. However, a separate Comprehensive History & Exam (99204) was also coded with modifier 25. (ECF 291-5 at 415)

773. Very notable is the Modifier 25. **The "25" is typed into a separate box, indicating it was specifically and intentionally added.** (ECF 291-5 at 415)

774. Modifier 25 claims a significant and separate Evaluation and Management service was completed and for which the physician should be paid. (Exhibit M)

776. For the Endoscopy Code (43235) the charge was $1,000.00 and for the Comprehensive History and Physical (99204 with modifier 25) the charge was $340.00. The payments actually made were $491.80 for the endoscopy and $307.82 for the separate comprehensive history and physical. (ECF 291-5 at 415)

777. A comprehensive History & Exam is 99204 and typical takes 45 minutes. So to code 99204 it would typical be 45 minute history and exam that was "significant and separate" from the EGD. (Exhibit M)

778. The Center for Medicare and Medicaid Services has a "Global Surgery Booklet" targeted to physicians. The booklet specifically highlights in a note on page 7 of 19 "**Note:** The initial evaluation for minor surgical procedures and endoscopies is always included in the global surgery package. Visits by the same physician on the same day as a minor surgery or endoscopy are included in the global package, unless a significant, separately identifiable service is also performed. Modifier "-25" is used to bill a separately identifiable evaluation and management (E/M) service by the same physician on the same day of the procedure." (Exhibit L)

780. In fact, the U.S. Department of Health & Human Services Office of the Inspector General has a booklet to educate new physicians on "Avoiding Medicare and Medicaid Fraud and Abuse" It specifically discusses upcoding and misuse of Modifier 25. **"When you submit a claim for services performed for a Medicare or Medicaid beneficiary, you are filing a bill with the Federal Government and certifying that you have earned the payment requested and complied with the billing requirements.** If you knew or should have known the submitted claim was false, then the attempt to collect unearned money constitutes a violation. A common

type of false claim is 'upcoding,' which refers to using billing codes that reflect a more serious illness than actually existed…improper claims include: billing separately for services already included in a global fee"(emphasis added) (Exhibit K at 4)

781. Further, in its own "CAUTION BOX" the pamphlet warns "Another example of upcoding related to E&M codes is **misuse of Modifier 25.** Modifier 25 allows additional payment for a separate E&M service rendered on the same day as the procedure. Upcoding occurs if a provider uses Modifier 25 to claim payment for an E&M service when the patient care rendered was not significant, was not separately identifiable, and was not above and beyond the care usually associated with the procedure." (emphasis added) (Exhibit K at 4)

782. **Defendant Dr. DENIGRIS was responsible for billing codes submitted for the medical care he provided to William.** (Exhibit K at 2)

783. **A physician is not able to avoid legal responsibility for billing codes by claiming someone else submitted the codes.** (Exhibit K at 2)

784. **Defendant Dr. DENIGRIS actions were in violation of the California False Claims Act.**[16] (Exhibit K and Exhibit H)

785. Although an independent contractor paid by the day, Defendant Dr. DENIGRIS still had financial motivation to commit fraud by both performing a medical procedure in the absence of a medical indication and overbilling.

786. Defendant Dr. DENIGRIS was paid a minimum contracted rate of $3,250 per day since May1, 2014. This amount is equivalent a weekly rate of a minimum of $16,250 per week **and a minimum of $845,000 per year** (assuming a 5 day work week). (291-5 at 434 and 445)

787. Given this lucrative amount of money, there was clearly motivation for Defendant Dr. DENIGRIS to avoid jeopardizing his contract by cancelling procedures. The procedure only took 4 minutes, from 10:00-10:04 AM. (ECF 291-5 at 431) **The odds were extremely low anyone would ever look into his indications for the EGD on a vulnerable mentally ill**

---

[16] Plaintiffs do not allege Defendant Dr. DENGIRIS or his company have already been found to violate the act, but that his overbilling for a standard endoscopy procedure does violate the act. ***Plaintiffs also do not know if this coding was isolated to William's EGD or to every single procedure done by Dr. DeNigris on CDCR inmates.***

**inmate with paranoid schizophrenia like William.**

**6. Evidence of worsening mental state**

Below are some of the allegations from the 4AC now followed by the information supporting the allegation in parenthesis. [17]

683. Liver failure was a diagnosis that William feared as his own cousin had died from liver failure. (Exhibit Q at 14)

684. In fact, per Defendant BRANMAN's medical note, William reflected on his own mental illness and incarceration and thought how his situation could be worse if he suffered like his cousin. In thinking about his own life, "I guess it could be worse" as his "cousin just died of liver failure." (Exhibit Q at 14)

525. On September 14, 2018, William requested an evaluation with his primary clinician Defendant BRANMAN. (EXHIBIT Q at 15)

527. Defendant BRANMAN writes "I note [William's] intense presentation and he reports not sleeping for the past 24 hours and expecting another 2-3 days of mania. He uses the Vistaril PRN 'but it won't put [William] to sleep.' He states that only Ativan, when prescribed prior to his incarceration was effective in knocking him out during the manic phase. 'None of the other medications worked.' He admits to enjoying the mania, but not the aftermath. He denies current psychotic symptoms, but expects [Auditory Hallucinations]." Per Defendant BRANMAN, William states "You know, I get paranoid especially when I get manic and I can't sleep for 2 or 3 days. Then the voices come back." Defendant BRANMAN notes William's "pressured speech, intense eye contact, clenched teeth, nervous laughter and extreme anxiety regarding loss of the dorm exclusion." (EXHIBIT Q at 15)

669. Just as William's mental health providers were providing unconstitutional care, his medical providers were doing the same. Over the last year of his life, William became increasingly paranoid and told family members he had cirrhosis. William was worried about bleeding to death and the effect medicines could have on him and worsening his liver. William's

[17] In the interest of trying to keep this opposition as succinct as possible Pro Se Plaintiffs do not include all of the 4AC and evidence at this time.

family repeatedly reassured him that he did not have cirrhosis and that he should continue to take his medications as prescribed by his doctors. His family knew there was no way William had cirrhosis as he only developed Hepatitis C in the past few years. (ECF 291-5 at 405, Exhibit R, S, and T)

**B. There is a Triable Issue of Material Fact Defendant Dr. DeNigris Did Contribute to the Deprivation of Familial Relationship**

"Official conduct that 'shocks the conscience' in depriving [family members] of [a liberty interest in the companionship and society of a family member] is cognizable as a violation of due process." *Wilkenson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010).* "'Deliberate indifference' may suffice to shock the conscience." *Id.*

Plaintiff's factual allegations suffice to state valid claims for deliberate indifference claims against Defendant DeNigris, which contributed to William's worsening mental state and death. Therefore, Plaintiffs state valid Fourteenth Amendment claims against this Defendant.

**C. There is a Triable Issue of Material Fact Defendant Dr. DeNigris Did Violate Civil Code §52.1**

Defendant DeNigris has not provided any uncontested facts to lessen the strength of Plaintiffs allegations in the 4AC and the court has already found that "Having found that plaintiffs now state a viable deliberate indifference claim against Dr. DeNigris, the undersigned also concludes that plaintiffs state a colorable claim against him under the Bane Act." (ECF 200 at 26)

b. **There is a Triable Issue of Material Fact that Defendant Dr. DeNigris Did Commit Medical Battery**

Defendant DeNigris has not provided any uncontested facts to lessen the strength of Plaintiffs allegations in the 4AC. The court has already found that plaintiffs alleged a lack of consent as Defendant knew there was no medical purpose for the endoscopy as meeting the pleading requirements for battery.

c. **Plaintiffs Can Meet the Requisite Burden to Support a Finding of Punitive Damages**

Defendant DeNigris has not provided any uncontested facts to lessen the strength of Plaintiffs allegations in the 4AC. The court has already found that the 4AC pleads sufficient factual matter, accepted as true, to state a claim to relief for punitive damages that is plausible on its face. (ECF 253 at 4)

**Conclusion**

Plaintiffs respectfully request the court to deny the motion to partially dismiss for all causes of actions Defendant DeNigris. Further, the court should sanction Defendant DeNigris for perjury by ruling in favor of Plaintiffs in all causes of action against Defendant DeNigris.

Dated: August 28, 2023

Respectfully submitted,

Thomas J. Schmitz

Dianne Mallia



ONE MINUTE CONSULT

BRIEF ANSWERS TO SPECIFIC CLINICAL QUESTIONS

# Q: How often should patients with hepatitis C be screened for esophageal varices?

**CHRISTOPHER ENTWISLE, MD**
Division of Gastroenterology and Liver Diseases, George Washington University; Center for Liver Diseases, Inova Fairfax Hospital, Falls Church, VA

**ZOBAIR M. YOUNOSSI, MD, MPH**
Director, Center for Liver Diseases, Medical Director, Liver Transplant Program, and Medical Director, Inova Research Center, Inova Fairfax Hospital, Falls Church, VA

A: Patients with hepatitis C should be initially evaluated for cirrhosis: if it is not present, there is no need to screen for esophageal varices. A patient with cirrhosis should be screened promptly with upper endoscopy. If no varices are found, endoscopy should be repeated every 2 years. The finding of small varices requires repeat endoscopy annually.[1]

## HEPATITIS C INFECTION AND CIRRHOSIS

Millions of Americans are chronically infected with the hepatitis C virus, a disease associated with significant morbidity and mortality. Natural history studies suggest hepatitis C infection progresses to cirrhosis in 20% of cases,[2] making it the most common cause of cirrhosis in the United States.

Cirrhosis almost unavoidably leads to the potentially devastating complications of portal hypertension, which include ascites, hepatic encephalopathy, and the formation of esophageal varices.

If no varices are present, repeat endoscopy every 2 years

## VARICES CAN DEVELOP RAPIDLY AND BE DANGEROUS

Cirrhosis caused by any chronic liver disease is the main cause of varices related to portal hypertension. Bleeding from varices is the most common cause of death from cirrhosis (> 30% of deaths). Large esophageal varices should be identified as early as possible so that primary prophylactic strategies can be offered.

Patients with cirrhosis have a 50% chance of having varices at the time of diagnosis. Those with no varices on initial endoscopy develop them at a rate of 5% to 20% annually. For those found to have small varices on endoscopy, about 5% to 15% progress to having large varices each year.[3]

The risk of hemorrhage increases with the size of varices, as well as the severity of hepatic dysfunction as determined by the Child-Pugh classification.

Merkel et al,[4] in a randomized, placebo-controlled study in 161 patients with cirrhosis and small esophageal varices, found that the nonselective beta-blocker nadolol inhibited the growth of esophageal varices and reduced the risk of bleeding. These findings should be confirmed in large trials. Nevertheless, nonselective beta-blockers are the preferred treatment for patients with medium-sized or large varices that have not yet bled.

## ENDOSCOPY IS STILL THE BEST TEST

Endoscopy is the standard screening test for identifying varices. A less-invasive method would be preferable: several studies have looked for potential noninvasive markers, including low blood platelet counts, dilated portal veins as seen on ultrasonography, low blood albumin levels, the presence of telangiectasias, and increased spleen size.[5,6] Although several independent predictors have been identified, no algorithm has been developed to more narrowly select patients for endoscopic testing.

New technology, such as wireless capsule endoscopy, and other less-invasive methods have shown promise in identifying esophageal varices, but their role remains unproven. ■

Downloaded from www.ccjm.org on January 2, 2021. For personal use only. All other uses require permission.



## REFERENCES

1. **de Franchis R.** Updating consensus in portal hypertension: report of the Baveno III consensus workshop on definitions, methodology and therapeutic strategies in portal hypertension. J Hepatol 2000; 33:846–852.
2. **Liang TJ, Rehermann B, Seeff LB, Hoofnagle JH.** Pathogenesis, natural history, treatment, and prevention of hepatitis C. Ann Intern Med 2000; 132:296–305.
3. **Garcia N Jr, Sanyal AJ.** Portal hypertension. Clin Liver Dis 2001; 5:509–540.
4. **Merkel C, Marin R, Angeli P, et al; Gruppo Triveneto per l'Ipertensione Portale.** A placebo-controlled clinical trial of nadolol in the prophylaxis of growth of small esophageal varices in cirrhosis. Gastroenterology 2004; 127:476–484.
5. **Madhotra R, Mulcahy HE, Willner I, Reuben A.** Prediction of esophageal varices in patients with cirrhosis. J Clin Gastroenterol 2002; 34:81–85.
6. **Garcia-Tsao G, Escorsell A, Zakko W, et al.** Predicting the presence of significant portal hypertension and varices in compensated cirrhotic patients [abstract]. Hepatology 1997; 26:360A.

*ADDRESS: Zobair M. Younossi, MD, MPH, Center for Liver Diseases, Inova Fairfax Hospital, 3300 Gallows Road, Falls Church, VA 22042; e-mail zobair.younossi@inova.com.*

Downloaded from www.ccjm.org on January 2, 2021. For personal use only. All other uses require permission.

Ex. 3 1/22

BRUCE E. SALENKO, Bar No. 106267
TIFFANY C. SALA, Bar No. 325733
LOW McKINLEY & SALENKO, LLP
2150 River Plaza Drive, Suite 250
Sacramento, CA 95833
Telephone: (916) 231-2400
Facsimile: (916) 231-2399

Attorneys for Defendant
STEPHEN DENIGRIS, M.D., PH.D.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ON BEHALF OF ESTATE OF WILLIAM SCHMITZ, DECEASED, BY AND THROUGH THOMAS J. SCHMITZ AND DIANNE MALLIA, AS SUCCESSORS IN INTEREST; THOMAS SCHMITZ, INDIVIDUALLY; AND DIANNE MALLIA, INDIVIDUALLY,

Plaintiff(s),

vs.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR); CDCR CORRECTIONAL OFFICER ADAM ASMAN; CDCR CORRECTIONAL OFFICER ERIK BRADLEY; CDCR CORRECTIONAL OFFICER DAVID BRUNKHORST; CDCR PHYSICIAN AND SURGEON ALEX ANDALUZ, M.D.; CDCR PHYSICIAN AND SURGEON MARIANNA KATE ASHE, M.D.; CDCR PHYSICIAN AND SURGEON JEVON JOHNSON; CDCR PHYSICIAN AND SURGEON ROBERT JOHNSON; CDCR PHYSICIAN AND SURGEON SUJATHA RAMKUMAR, MD; CDCR PHYSICIAN AND SURGEON MICHAEL

Case No.: 2:20-cv-195-DAD-CKD

**DEFENDANT STEPHEN DENIGRIS, M.D., PH.D.'S RESPONSE TO PLAINTIFF MALLIA'S REQUESTS FOR ADMISSION, SET ONE**

**Judge:** **The Honorable Carolyn K. Delaney**
**Trial Date:** **Not Scheduled**
**Action Filed:** **January 27, 2020**

2/22

SMITH, MD; CDCR PHYSICIAN AND SURGEON CHRISTOPHER SMITH; CDCR CLINICAL PSYCHOLOGY INTERN REBECCA ROBINSON; CDCR LICENSED CLINICAL SOCIAL WORKER VIOLKA WANIE; MULE CREEK STATE PRISON CHIEF MEDICAL EXECUTIVE SCOTT A. HEATLEY, M.D.; MENTAL HEALTH ADMINISTRATOR OF QUALITY MANAGEMENT DR. LAURA CEBALLOS; DEPUTY DIRECTOR OF CDCR'S STATEWIDE MENTAL HEALTH PROGRAM KATHERINE TEBROCK; MULE CREEK STATE PRISON CHIEF EXECUTIVE OFFICER (MEDICAL) RAINBOW BROCKENBOROUGH; MULE CREEK STATE PRISON WARDEN AND CHIEF EXECUTIVE OFFICER JOE A LIZARRAGA; CDCR PHYSICIAN AND SURGEON ROBERT RUDAS, MD; PHYSICIAN AND SURGEON STEPHEN DENIGRIS, MD, PHD; STATEWIDE CHIEF PSYCHIATRIST FOR CDCR MICHAEL GOLDING, M.D.; CDCR SENIOR PSYCHIATRIST SPECIALIST JACOB ADAMS; CDCR SECRETARY SCOTT KERNAN; CDCR SECRETARY RALPH DIAZ; CDCR CHIEF PSYCHIATRIST OF TELEPSYCHIATRY KEVIN KUICH; CDCR DIRECTOR OF THE DIVISION OF ADULT INSTITUTIONS CONNIE GIBSON; CDCR UNDERSECRETARY OF HEALTH CARE SERVICES DIANE TOCHE; CDCR ASSISTANT DEPUTY DIRECTOR OF THE STATEWIDE MENTAL HEALTH PROGRAM BRITTANY BRIZENDINE; CDCR ASSOCIATE DIRECTOR OF STATEWIDE PLANNING AND POLICY ANGELA PONCIANO; CDCR CHIEF PSYCHOLOGIST OF QUALITY MANAGEMENT JOHN REKART; CDCR SENIOR PSYCHOLOGIST SPECIALIST DAVID LEIDNER; AND DOES 1 THROUGH 30,

Defendants.

3/22

PROPOUNDED TO: Defendant STEPHEN DENIGRIS, M.D., PH.D.

PROPOUNDED BY: Plaintiff DIANNE MALLIA, Individually

SET NUMBER: One

Defendant STEPHEN DENIGRIS, M.D., PH.D. ("Responding Party"), pursuant to Federal Rules of Civil Procedure 36, hereby responds to Plaintiff DIANNE MALLIA, Individually's Requests for Admission, Set One as follows:

Responding party has not fully completed his investigation of the facts relating to this case, has not fully completed his discovery in this action, and has not completed his preparation for trial. All responses contained herein are based only upon such information and documents that are presently available to and specifically known to this responding party and disclose only those contentions that presently occur to such responding party. It is anticipated that further discovery, independent investigation, legal research, and analysis will supply additional facts, add meaning to the known facts, and establish entirely new factual conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and variation from the contentions herein set forth.

The following responses are given without prejudice to responding party's right to produce evidence of any subsequently discovered fact or facts that this responding party may later recall. Responding party accordingly reserves the right, although declines the obligation, to change any and all answers herein as additional facts are ascertained, analysis is made, legal research is completed, and contentions are made. The responses contained herein are made in a good faith effort to supply as much factual information and specification of legal contentions as is presently known but should in no way be to the prejudice of this responding party in relation to further discovery, research or analysis.

///

///

4/22

**RESPONSE TO REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**

Admit that all documents disclosed by YOU are true and accurate copies of the original documents.

**RESPONSE TO REQUEST NO. 1:**

Objection is made on grounds that Dr. DeNigris is not the duly authorized Custodian of Records and is not authorized to certify the records, pursuant to Federal Rules of Civil Procedure 44. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort, diligent inquiry, and good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits.

**REQUEST FOR ADMISSION NO. 2:**

Admit that YOU had an active medical license from the California Medical Board on May 4, 2018.

**RESPONSE TO REQUEST NO. 2:**

Admit.

**REQUEST FOR ADMISSION NO. 3:**

Admit that there are risks to an endoscopy.

**RESPONSE TO REQUEST NO. 3:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "risks." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this

good faith investigation, Dr. DeNigris admits there are extremely rare complications during the performance of a diagnostic endoscopy that are further substantially reduced in the presence of a dedicated anesthetist. The estimated complication rates for diagnostic endoscopies are less than 0.0002% (less than 2/10,000), according to a Mayo Clinic Report in 2004 (Mayo Clinic Proceedings 2004; 79 (10):1264). These complications were related to anesthesia, and there were no deaths. In the 14 years between this publication and Decedent's EDG, there have been substantial improvement in endoscope technology, anesthesia options, and the wide-spread use of dedicated anesthetists, making EDG even safer with complications rates likely even lower. The likelihood of such risks during the performance of a diagnostic endoscopy performed by gastroenterologist in the United States in 2018 would be akin to being struck by lightning.

**REQUEST FOR ADMISSION NO. 4:**

Admit that there is a risk of death to an endoscopy.

**RESPONSE TO REQUEST NO. 4:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "risk." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits there are extremely rare complications during the performance of a diagnostic endoscopy that are severely minimized in the presence of a dedicated anesthetist.

**REQUEST FOR ADMISSION NO. 5:**

Admit there is a risk of death from the use of Propofol.

///

**RESPONSE TO REQUEST NO. 5:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "risk." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits there is a risk of death from Propofol but such risk in a generally healthy, young individual (ASA I or II) under the care of a dedicated anesthetist while undergoing a brief endoscopy would be exceedingly low, akin to being struck by lightning.

**REQUEST FOR ADMISSION NO. 6:**

Admit Propofol was given to William Schmitz on May 4, 2018.

**RESPONSE TO REQUEST NO. 6:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "given to." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry based on the information he knows or can readily obtain. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits Propofol 100 mg IVF was administered to Decedent by a dedicated anesthetist.

**REQUEST FOR ADMISSION NO. 7:**

Admit that no esophageal varices were ligated during the endoscopy performed on William Schmitz May 4, 2018.

**RESPONSE TO REQUEST NO. 7:**

Admit.

///

**REQUEST FOR ADMISSION NO. 8:**

Admit that YOU reviewed the Patient summary for William Schmitz (Bates number DEN000043) prior to performing the endoscopy on William Schmitz on May 4, 2018.

**RESPONSE TO REQUEST NO. 8:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "reviewed" and "patient summary." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "review" is subjective and incapable of precise measurement as to detail, description, and depth. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits he reviewed relevant documents to the procedure, including Decedent's Health Care Services Physician Request for Services and referral form.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the Patient summary for William Schmitz (Bates number DEN000043) lists under the "mental Health Problem List" the diagnoses of "Schizoaffective discover, bipolar type" and "Paranoid type schizophrenia, unspecified [295.30]" and "Schizoaffective disorder, unspecified [295.70]"

**RESPONSE TO REQUEST NO. 9:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "patient summary." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, looking at the form in present time, Dr. DeNigris admits.

8|22

**REQUEST FOR ADMISSION NO. 10:**

Admit William was referred for an endoscopy for 'ESOPHAGEAL VARICES SURVEILLANCE" due to a principal diagnosis of 'CIRROSIS/ESLD".

**RESPONSE TO REQUEST NO. 10:**

Objection is made on grounds the request is overbroad and vague and ambiguous. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits Decedent's Health Care Services Physician Request for Services lists ROUTINE EGD—ESOPHAGEAL VARICES SURVEILLANCE as the requested service for PATIENT WITH CIRRHOSIS/ESLD. PER REGISTRTY PROTOCOL PATIENT IS DUE FOR ESOPHAGEAL VARICES FOLLOW-UP/SURVEILLANCE.

**REQUEST FOR ADMISSION NO. 11:**

Admit that YOU should have received William Schmitz's medical chart prior to the endoscopy being performed on May 4, 2018 including documents "Patient Summary" (DEN000043), Outpatient Progress Note" (DEN000045-DEN000051(, lab results (DEN000053-000055) and an Ultrasound Abdomen report (DEN000057).

**RESPONSE TO REQUEST NO. 11:**

Objection is made on grounds the request is overbroad, vague and ambiguous, and not relevant as to "should have received," as it is opinion-based and devoid of context. Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is

insufficient to enable him to admit or deny. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris is unable to admit or deny due to the subjectivity of the request and insufficient context.

**REQUEST FOR ADMISSION NO. 12:**

Admit that YOU did review William Schmitz's chart prior to the endoscopy being performed on May 4, 2018 including documents "Patient Summary" (DEN000043), Outpatient Progress Note" (DEN000045-DEN000051), lab results (DEN000053-000055) and an Ultrasound Abdomen report (DEN000057).

**RESPONSE TO REQUEST NO. 12:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "review," "chart," "patient summary," "outpatient progress note," "lab results," and "ultrasound abdomen report." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "review" is subjective and incapable of precise measurement as to detail, description, and depth. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits he reviewed relevant documents to the procedure, including Decedent's Health Care Services Physician Request for Services and referral form.

**REQUEST FOR ADMISSION NO. 13:**

Admit that William did not have cirrhosis on May 4, 2018.

///

///

Exhibit 13

**RESPONSE TO REQUEST NO. 13:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "did not have cirrhosis on May 4, 2018." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "did not have" misstates the pertinent facts and medical record in this case. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris cannot state with certainty whether or not Decedent has cirrhosis at the time of the endoscopy, since a liver biopsy had not been performed. Dr. DeNigris admits Decedent likely did not have cirrhosis on May 4, 2018, due to the absence of potentially associated findings including varices (as noted during endoscopy). Decedent's Health Care Services Physician Request for Services lists ROUTINE EGD—ESOPHAGEAL VARICES SURVEILLANCE as the requested service for PATIENT WITH CIRRHOSIS/ESLD. PER REGISTRTY PROTOCOL PATIENT IS DUE FOR ESOPHAGEAL VARICES FOLLOW-UP/SURVEILLANCE.

**REQUEST FOR ADMISSION NO. 14:**

Admit that you knew William did not have cirrhosis on May 4, 2018.

**RESPONSE TO REQUEST NO. 14:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "knew" and "did not have." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort based on the information he knows or can readily obtain. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits in hindsight Decedent likely did not have cirrhosis on May 4, 2018 but denies knowing this

Exhibit B 11/22

information on May 4, 2018 at the time of the endoscopy. Decedent's Health Care Services Physician Request for Services lists ROUTINE EGD—ESOPHAGEAL VARICES SURVEILLANCE as the requested service for PATIENT WITH CIRRHOSIS/ESLD. PER REGISTRTY PROTOCOL PATIENT IS DUE FOR ESOPHAGEAL VARICES FOLLOW-UP/SURVEILLANCE.

**REQUEST FOR ADMISSION NO. 15:**

Admit that it was not common practice to screen for esophageal varices prior to starting antiviral therapy for Hepatitis C on May 4, 2018.

**RESPONSE TO REQUEST NO. 15:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "common practice." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "common practice" is subjective as to who, where, and for what reasons, and Dr. DeNigris is not the author of any pertinent guidelines. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits he was a proceduralist who performed Decedent's endoscopy on May 4, 2018, upon the request, direction, and referral from Robert Rudas, M.D. Decedent consented to the procedure, including the use of general anesthesia, and there were no complications.

**REQUEST FOR ADMISSION NO. 16:**

Admit there was no valid medical reason to perform an endoscopy on William Schmitz on May 4, 2018.

Exhibit B 12/22

**RESPONSE TO REQUEST NO. 16:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "no valid medical reason." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "no valid medical reason" is subjective and incapable of precise measurement as to detail, description, and depth. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits he was a proceduralist who performed Decedent's endoscopy on May 4, 2018, upon the request, direction, and referral from Robert Rudas, M.D. Decedent consented to the procedure, including the use of general anesthesia, and there were no complications.

**REQUEST FOR ADMISSION NO. 17:**

Admit that on May 4, 2018, YOU recommended an endoscopy for William Schmitz in three years.

**RESPONSE TO REQUEST NO. 17:**

Admit.

**REQUEST FOR ADMISSION NO. 18:**

Admit there was no indication to screen William in three years with an endoscopy.

**RESPONSE TO REQUEST NO. 18:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "no indication." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections,

B 13/22

Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "no indication" is subjective and incapable of precise measurement as to detail, description, and depth. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits he was a proceduralist who performed Decedent's endoscopy on May 4, 2018, upon the request, direction, and referral from Robert Rudas, M.D. Decedent consented to the procedure, including the use of general anesthesia, and there were no complications.

**REQUEST FOR ADMISSION NO. 19:**

Admit that YOU were responsible for the billing codes submitted for the medical services provided to William Schmitz on May 4, 2018.

**RESPONSE TO REQUEST NO. 19:**

Objection is made on grounds the request is overbroad and vague and ambiguous as to "responsible," "billing codes submitted," and "medical services provided." Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits he records and tracks billing codes for the services he provides for a patient.

**REQUEST FOR ADMISSION NO. 20:**

Admit that services provided to William Schmitz on May 4, 2018 did not meet the criteria for Current Procedural Terminology (CPT) codes 43235 and 99204 with modifier 25.

///

///

**RESPONSE TO REQUEST NO. 20:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "the criteria." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "the criteria" is vague, ambiguous, and incapable of precise measurement as to detail, description, and depth. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris denies.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the amount of work performed for the endoscopy on William Schmitz on May 4, 2018 was consistent with the level of effort normally performed for an endoscopy.

**RESPONSE TO REQUEST NO. 21:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "level of effort." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "level of effort" is subjective and incapable of precise measurement. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits he was a proceduralist who performed Decedent's endoscopy on May 4, 2018, upon the request, direction, and referral from

///

Robert Rudas, M.D. Decedent consented to the procedure, including the use of general anesthesia, and there were no complications.

**REQUEST FOR ADMISSION NO. 22:**

Admit that cirrhosis is a serious medical diagnosis.

**RESPONSE TO REQUEST NO. 22:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "serious medical diagnosis." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "serious medical diagnosis" is subjective and incapable of precise measurement. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits cirrhosis can be a serious medical diagnosis depending on a variety of clinical markers, including severity, classification, stage, and symptoms.

**REQUEST FOR ADMISSION NO. 23:**

Admit that cirrhosis can be fatal.

**RESPONSE TO REQUEST NO. 23:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "can be fatal." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "can be fatal" is case-specific and incapable of generalization. Dr. DeNigris has made a good faith

investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits cirrhosis can be fatal in some individuals depending on a variety of clinical markers, including severity, classification, stage, and symptoms.

**REQUEST FOR ADMISSION NO. 24:**

Admit that the liver is the primary site of drug metabolism.

**RESPONSE TO REQUEST NO. 24:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "primary site." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because "primary site" is case-specific and incapable of generalization. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits the liver is one location for drug metabolism.

**REQUEST FOR ADMISSION NO. 25:**

Admit that many medications [sic] must be avoided or dosed differently in patients with cirrhosis than patients without cirrhosis.

**RESPONSE TO REQUEST NO. 25:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "many medications," "avoided," and "dosed differently." Further objection is made to the extent the request calls for a legal conclusion and premature expert opinion. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable

effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because the hypothetical calls for a case-specific expert opinion and incapable of generalization. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions. Under this good faith investigation, Dr. DeNigris admits medications are administered differently in all patients based on specific medical presentations and diagnoses.

**REQUEST FOR ADMISSION NO. 26:**

Admit that medical records of William Schmitz dated after May 4, 2018 describe William Schmitz had auditory hallucinations, paranoia and a disorganized thought process.

**RESPONSE TO REQUEST NO. 26:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "medical records of William Schmitz [sic] dated after May 4, 2018." Further objection is made to the extent the request is not restricted to time period. Subject to and without waiver of said objections, Defendant responds: Dr. DeNigris has made a reasonable effort and diligent inquiry, and the information he knows or can readily obtain is insufficient to enable him to admit or deny because he lacks sufficient information with respect to the stated time period. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions.

**REQUEST FOR ADMISSION NO. 27:**

Admit YOU received financial reimbursement for your work at Mule Creek State Prison on May 4, 2018.

**RESPONSE TO REQUEST NO. 27:**

Objection is made on grounds the request is overbroad, speculative, and vague and ambiguous as to "financial reimbursement." Subject to and without waiver of said objections,

Exhibit B 8/22

Defendant responds: On May 4, 2018, Dr. DeNigris admits he was paid his customary fee in accordance with his billing contract. Dr. DeNigris has made a good faith investigation of sources reasonably available to him in formulating responses to request for admissions.

Dated: March 8, 2023

**LOW McKINLEY & SALENKO, LLP**

By ______________________
BRUCE E. SALENKO

Exhibit B
19/22

# VERIFICATION TO FOLLOW

Case Name: Schmitz v. DeNigris
Case No.: 2:20-cv-195-DAD-CKD

**PROOF OF SERVICE**
(CCP 1013; CRC 3.1300, 10.503)

I, Jennifer Chastain, declare:

I am over the age of eighteen years and not a party to the within cause; am employed in the County of Sacramento, California; and my business address is 2150 River Plaza Dr., Ste. 250, Sacramento, CA 95833.

On March 8, 2023, I served the within DEFENDANT STEPHEN DENIGRIS, M.D., PH.D.'S RESPONSE TO PLAINTIFF MALLIA'S REQUEST FOR ADMISSIONS, SET ONE, which was produced on recycled paper, on the parties in said cause by:

| | |
|---|---|
| **XX** | **BY MAIL:** I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. |
| **XX** | **BY ELECTRONIC SERVICE:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed below. No electronic message or other indication that the transmission was unsuccessful was received within a reasonable time after the transmission. |

***VIA MAIL AND E-SERVICE***

Thomas J. Schmitz
404 Atkinson St.
Roseville, CA 95678
Phone: (707) 694-8158
Email: tsfoot49@gmail.com
Plaintiff Pro Se

21/22

Dianne Mallia
404 Atkinson St.
Roseville, CA 95678
Phone: (707) 694-8158
Email: deedamallia@gmail.com
Plaintiff Pro Se

***VIA EMAIL ONLY***

Jennifer Nygaard
California Department of Justice
1515 Clay Street, 20th Floor
Oakland, CA 94612
Phone: (510) 879-0802 | Fax: (510) 622-2270
E-mail: Jennifer.Nygaard@doj.ca.gov
Attorneys for Defendant Erik Bradley

Michael A. Terhorst, Sr.
Beeson Terhorst, LLP
510 Bercut Dive, Suite V
Sacramento, CA 95811-0111
Phone: (707) 301-7504
E-mail: michael@beesonterhorst.com
Attorneys for Defendants Joe A. Lizarraga and Kevin Kuich

Maria Zhurnalova-Juppunov
McNamara Ambacher, Wheeler, Hirsig & Gray LLP
3480 Buskirk Avenue, Suite 250
Pleasant Hill, CA 94523
Phone: (925) 939-5330
Email: maria.zhurnalova-juppunov@mcnamaralaw.com
Attorneys for Defendants Adam Asman, et al.

Peter J. Hirsig
McNamara, Ambacher, Wheeler, Hirsig & Gray LLP
639 Kentucky Street
Fairfield, CA 94533
Phone: (707) 427-3998 | Fax: (707) 427-0268
Email: Peter.Hirsig@mcnamaralaw.com
Attorneys for Defendants Adam Asman, et al.

///

///

///

Exhibit B

22/22

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on March 8, 2023, at Sacramento, California.

Jennifer Chastain

Exhibit C
1/6

PETER J. HIRSIG (State Bar No. 197993)
peter.hirsig@mcnamaralaw.com
MARIA ZHURNALOVA-JUPPUNOV (State Bar No. 319004)
maria.zhurnalova-juppunov@mcnamaralaw.com
DANIEL R. MAYER (State Bar No. 300077)
daniel.mayer@mcnamaralaw.com
McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
3480 Buskirk Avenue, Suite 250
Pleasant Hill, CA 94523
Telephone: (925) 939-5330
Facsimile: (925) 939-0203

Attorneys for Defendants
ADAMS, ANDALUZ, ASHE, ASMAN, BRANMAN, BRIZENDINE, BROCKENBOROGH, CEBALLOS, HEATLEY, J. JOHNSON, R. JOHNSON, LEIDNER, PONCIANO, RAMKUMAR, REKART, ROBINSON, RUDAS, M. SMITH, C. SMITH, TIEBROCK, TOCHE, WAINE, and CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR)

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Estate of WILLIAM SCHMITZ, deceased, by and through THOMAS J. SCHMITZ and DIANNE MALLIA, as Successors in Interest; THOMAS SCHMITZ, Individually; and DIANNE MALLIA, Individually,

Plaintiffs,

vs.

ADAM ASMAN,

Defendants.

Case No. 2:20-CV-00195-JAM-CKD

**DEFENDANT ROBERT RUDAS, M.D.'S SECOND AMENDED RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS, SET ONE**

Action Filed: 7/16/2020

PROPOUNDING PARTY: Plaintiff DIANNE MALLIA, individually

RESPONDING PARTY: Defendant ROBERT RUDAS, M.D.

SET NUMBER: ONE (Nos. 1-37)

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility and any and

Exhibit C 2/6

all other objections and grounds that would require the exclusion of any statements herein, if any requests were asked for, or if any statement contained herein were made by a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Responding party is responding to all of the requests to the extent that information has become known to his. However, responding party's discovery, investigation, and preparation for trial of this matter has not been completed as of the date of these responses and, therefore, responding party does not purport to state anything more than information currently known and discovered by his.

Responding party reserves the right to continue discovery and investigation in this matter regarding facts, witnesses and supporting data. Consequently, to the extent that the requests herein ask for "all facts" or the names of "all persons" or the identity of "all documents," etc., they are responded to fully and so far as information is currently available to responding party; and responding party is not precluded from presenting at trial information discovered after the date of these responses.

This Preliminary Statement is incorporated into each and every response set forth below.

**RESPONSES**

**REQUEST FOR ADMISSION NO. 3:**

Admit that there are risks to an endoscopy.

**RESPONSE TO REQUEST TO ADMISSION NO. 3:**

Objections. The request for admission is overboard and vague as to "risks." The request for admission is irrelevant to any claims or defenses in this action, because there is no claim or evidence that William Schmitz suffered any disclosed or unclosed risk of endoscopy. Defendant further objects that the request for admission calls for an expert opinion and is not tethered to the facts of this case. The request calls for expert information discoverable only under the statutes and local rules governing expert disclosure. Without waiving and subject to these objections, defendant responds as follows: Dr. Rudas admits that generally most procedures carry some risks of different magnitude and probability. Dr. Rudas has never performed an endoscopy, has not consented

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Exhibit C 3/6

patients regarding endoscopy, did not perform endoscopy on William Schmitz, and did not have informed consent discussion with William schmitz, thus Dr. Rudas lacks sufficient information to admit or deny this request.

**REQUEST FOR ADMISSION NO. 4:**

Admit there is a risk of death to an endoscopy.

**RESPONSE TO REQUEST TO ADMISSION NO. 4:**

Objections. The request for admission is overboard and vague as to "risk." The request for admission is irrelevant to any claims or defenses in this action, because there is no claim or evidence that William Schmitz suffered any disclosed or unclosed risk of endoscopy, or died from complications of endoscopy. Defendant further objects that the request for admission calls for premature disclosure of expert opinion and is not tethered to the facts of this case. The request calls for expert information discoverable only under the statutes and local rules governing expert disclosure. Without waiving and subject to these objections, defendant responds as follows: Dr. Rudas admits that generally most procedures carry some risks of different magnitude and probability. Dr. Rudas has never performed an endoscopy, has not consented patients regarding endoscopy, did not perform endoscopy on William Schmitz, and did not have informed consent discussion with William Schmitz, thus Dr. Rudas lacks sufficient information to admit or deny this request.

**REQUEST FOR ADMISSION NO. 8:**

Admit that esophageal varices can bleed and lead to death.

**RESPONSE TO REQUEST TO ADMISSION NO. 8:**

Objections. The request for admission is overboard, vague, and compound. Defendant further objects that the request for admission calls for premature disclosure of expert opinion. The request also calls for expert information discoverable only under the statutes and local rules governing expert disclosure. It also calls for speculation and is an incomplete hypothetical. Without waiving and subject to these objections, defendant responds as follows: Dr. Rudas admits that if untreated esophageal varices may bleed and in certain circumstances loss of blood may lead to death.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Exhibit C
4/6

**REQUEST FOR ADMISSION NO. 13:**

Admit that William Schmitz did not have cirrhosis when YOU referred him for an endoscopy.

**RESPONSE TO REQUEST TO ADMISSION NO. 13:**

Objections. The request for admission is vague and ambiguous as to the time frame of the opinion sought. The request calls for a premature disclosure of expert opinion. The request calls for speculation. The request calls for expert information discoverable only under the statutes and local rules governing expert disclosure. Questions asking treating physician to review medical records, inducing progress notes not authored by them, and offer a retrospective opinion on their own care and treatment or that of another provider are improper, since these treating physicians have not been designated as experts. (See *County of L.A. v. Superior Court* (1990) 224 Cal.App.3d 1446, 1455, ["the present expert opinions of a party physician concerning the care given are irrelevant unless the physician is designated as an expert witness."]). Without waiving and subject to these objections, defendant responds as follows: Dr. Rudas referred William Schmitz for an endoscopy based on information and belief that William Schmitz was on the ESLD/cirrhosis registry and denies that at the time he made the referral he was of the opinion that William Schmitz did not have cirrhosis.

Dated: August 11, 2023

MCNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP

By: /s/ Maria Zhurnalova-Juppunov
Peter J. Hirsig
Maria Zhurnalova-Juppunov
Daniel R. Mayer
Attorneys for Defendants
ADAMS, ANDALUZ, ASHE, ASMAN, BRANMAN, BRIZENDINE, BROCKENBOROGH, CEBALLOS, HEATLEY, J. JOHNSON, R. JOHNSON, LEIDNER, PONCIANO, RAMKUMAR, REKART, ROBINSON, RUDAS, M. SMITH, C. SMITH, TIEBROCK, TOCHE, WAINE, and CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR)

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Exhibit C
5/6

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

## CERTIFICATE OF SERVICE VIA E-MAIL

I hereby declare that I am a citizen of the United States, am over the age of eighteen years, and not a party to the within action. My electronic notification address is: tami.martin@mcnamaralaw.com.

On this date, I electronically served the foregoing **DEFENDANT ROBERT RUDAS, M.D.'S SECOND AMENDED RESPONSES TO PLAINTIFFS' REQUEST FOR ADMISSIONS, SET ONE** based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**Attorneys For Plaintiff Pro Per:**

Dianne Mallia
404 Atkinson Street
Roseville, CA 95678

E-Mail: deedamallia@gmail.com

**Attorneys For Plaintiff in Pro Per:**

Thomas J. Schmitz
404 Atkinson Street
Roseville, CA 95678

E-Mail: tsfoot49@gmail.com

**Attorneys for Defendant Stephen Denigris:**

**Tiffany Cenzianne Sala**
Low McKinley & Salenko, LLP
2150 River Plaza Dr. Suite 250
Sacramento, CA 95833
(916) 231-2400

Email: tcs@lmblaw.net
jc@lmblaw.net
bes@lmblaw.net

**Attorneys for Defendants Eric Bradley, David Brunkhorst,**

Jennifer Nygaard
California Dept. of Justice
Office of the Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Phone: 510-879-0802
Fax: 510-622-2270
E-Mail: jennifer.nygaard@doj.ca.gov
jay.goldman@doj.ca.gov
lucille.santos@doj.ca.gov

**Attorney for Defendants Kevin Kuich, Joe A. Lizarraga**

Michael A. Terhorst, Sr.
Beeson Terhorst LLP
510 Bercut Drive, Suite V
Sacramento, CA 95811
Phone: 707-301-7504

E-Mail: michael@beesonterhorst.com
Jeff@beesonterhorst.com
mercedes@beesonterhorst.com

Exhibit C
6/6

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on August 11, 2023 at Pleasant Hill, California.

/s/ Tami Martin
Tami Martin

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

Exhibit D

7

BRUCE E. SALENKO, Bar No. 106267
VANESSA N. RAVEN, Bar No. 294276
SPENCER B. PAVELCHIK, Bar No. 309312
LOW McKINLEY & SALENKO, LLP
2150 River Plaza Drive, Suite 250
Sacramento, CA 95833
Telephone: (916) 231-2400
Facsimile: (916) 231-2399

Attorneys for Defendant STEPHEN DENIGRIS, M.D., PH.D.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| ON BEHALF OF ESTATE OF WILLIAM SCHMITZ, DECEASED, BY AND THROUGH THOMAS J. SCHMITZ, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR); et al.<br><br>Defendants. | Case No.: 2:20-cv-195-JAM-CKD<br><br>**DEFENDANT STEPHEN DENIGRIS, M.D., PH.D.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES RELATING TO JURISDICTIONAL DISCOVERY**<br><br>**Judge: The Honorable Carolyn K. Delaney**<br>**Trial Date: Not Scheduled**<br>**Action Filed: January 27, 2020** |

PROPOUNDED TO: Defendant STEPHEN DENIGRIS, M.D., PH.D.

PROPOUNDED BY: Plaintiffs ON BEHALF OF ESTATE OF WILLIAM SCHMITZ, DECEASED, BY AND THROUGH THOMAS J. SCHMITZ AND DIANNE MALLIA, AS SUCCESSORS IN INTEREST; THOMAS SCHMITZ, INDIVIDUALLY; AND DIANNE MALLIA, INDIVIDUALLY

SET NUMBER: ONE

///

Exhibit D 2/7

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Stephen DeNigris, M.D., Ph.D. states his Responses and Objections to Plaintiffs' First Set of Interrogatories Relating to Jurisdictional Discovery ("Interrogatories") as follows:

**RESPONSES AND OBJECTIONS**

**INTERROGATORY NO. 1:**

Do you contend that you complied with the accepted standards of practice and care in the service rendered to decedent, William Thomas Schmitz? If No, explain how you did not meet the accepted standards of practice and care.

**RESPONSE TO INTERROGATORY NO. 1:**

Objection. This request is vague, ambiguous, overbroad, and calls for a legal conclusion and expert opinion. Without waiving said objections: Yes.

**INTERROGATORY NO. 2:**

Esophageal varices develop when blood flow from the liver backs up, which is most commonly secondarily to severe liver scarring (cirrhosis). As the blood backs up, it causes increased pressure in the large vein (portal vein) that drains into the liver. This is called portal hypertension. The portal hypertension causes the blood to seek other pathways such as veins in the esophagus. These esophageal veins are thin and are called esophageal varices when they balloon from the increase in blood.

Do you agree with this explanation? If not, explain in detail why you disagree.

**RESPONSE TO INTERROGATORY NO. 2:**

Objection. This request calls for an expert opinion. Without waiving said objection: Based on my skills, training, and experience, yes. These thin veins are at increased risk of rupturing and internal hemorrhage. Therefore, if varices were present, they would need treatment before beginning the antiviral therapy.

Exhibit D 3/7

**INTERROGATORY NO. 3:**

On May 4, 2108, you performed an endoscopy on William Thomas Schmitz to screen for esophageal varices. In the procedure note dated 05/04/2018 and disclosed with BATES number DEN000003, it states "The procedure, indications, preparation and potential complications were explained to the patient..." Describe the details that you explained to decedent William Thomas Schmitz about "the procedure, indications, preparation, and potential complications". If you cannot remember the specific explanations to William Thomas Schmitz then detail your typical explanation for the "procedure, indications, and potential complications" for a similar patient undergoing an endoscopy to screen for esophageal varices.

**RESPONSE TO INTERROGATORY NO. 3:**

In my custom and practice, my discussion with patients regarding the procedure, indications, and potential complications for an endoscopy includes: reviewing the technique of the endoscopy, explaining a camera will transmit images for monitoring, that I will place a bite block to protect your teeth, and you will be turned on your left side. I discuss that monitoring will include the possibility of biopsy and/or therapeutic intervention. I discuss that it is a safe procedure and your blood pressure, heart rate, and oxygen levels will be monitored. I verify that the patient has an empty stomach and has not eaten. I verify they have read and understand the consent form, and ask whether they have any questions. After discussing that the patient has transportation home, which did not apply in decedent's case, I ask the patient if they have any questions or concerns that were not addressed earlier, and if they would like anything I've explained in greater detail. I inform my patients I will discuss the findings with them when they wake up after the procedure.

///

///

///

Exhibit D
4/7

**INTERROGATORY NO. 4:**

You disclosed several medical record documents including laboratory values from 3/16/2018 (DEN000053 and DEN000055) and a primary care note from Dr. Marianna Ashe from 4/16/2018, which includes an abdominal ultrasound note (DEN 000049 and DEN000051).

    a. Explain in detail reasoning for why William Thomas Schmitz did or did not have end stage liver disease.

    b. If your contention is William Schmitz did not have end stage liver disease, explain the reasoning for why he would have portal hypertension and a need for an endoscopy to screen for esophageal varices.

**RESPONSE TO INTERROGATORY NO. 4:**

Objection. This request is vague, ambiguous, overbroad, compound, calls for an expert opinion, assumes facts not supported by the medical record, and is conclusory. Without waiving said objections:

    a. Decedent did not have end stage liver disease. Based on the April 10, 2018 abdominal ultrasound, there was no ultrasonic graphic evidence of liver disease.

    b. Based on the results from the endoscopy, decedent did not have portal hypertension. He had chronic Hepatitis C and was being screened prior to starting potential antiviral therapy.

**INTERROGATORY NO. 5**

If you contend you performed the endoscopy for some indication than to screen for esophageal varices, explain the indication.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendant objects to this interrogatory on the ground that it is vague, ambiguous, overbroad, and calls for an expert opinion. Without waiving said objections: I do not contend that there was

Exhibit D
5/7

another indication for the endoscopy. It was common practice to check for varices prior to initiating Hepatitis C antiviral therapy.

**INTERROGATORY NO. 6:**

You have disclosed the billing documentation for the services provided by you to William Thomas Schmitz on 5/4/2018, the CPT codes submitted were 43235 and 99204 with modifier 25.

(a) Do you believe this is an accurate representation of the services you provided?

(b) If yes, explain how the services meet the criteria for each submitted code.

(c) If no, why do you disagree with the codes submitted?

(d) If no, what CPT code or codes would accurately represent the services you provided?

**RESPONSE TO INTERROGATORY NO. 6:**

Objection. This request is compound, overbroad, and unduly burdensome. Additionally, Defendant lacks personal knowledge as he did not do the coding. Without waiving said objections:

(a). Yes.

(b). 43235 is a code for a diagnostic endoscopy. 99204 is a code for a patient encounter with a physician, and the modifier 25 means the encounter was the same day of the procedure.

(c). N/A.

(d). N/A.

Dated: December 29, 2020

**LOW McKINLEY & SALENKO, LLP**

By: */s/ Spencer B. Pavelchik*
SPENCER B. PAVELCHIK
Attorneys for Defendant Stephen DeNigris, M.D., Ph.D.

Exhibit D

6|7

Case Name: Schmitz v. DeNigris
Case No.: 2:20-cv-195-JAM-CKD

**PROOF OF SERVICE**
(CCP 1013; CRC 3.1300, 10.503)

I, DeeAnne Bagley, declare:

I am over the age of eighteen years and not a party to the within cause; am employed in the County of Sacramento, California; and my business address is 2150 River Plaza Dr., Ste. 250, Sacramento, CA 95833.

On December 29, 2020, I served the within **DEFENDANT STEPHEN DENIGRIS, M.D., PH.D.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES RELATING TO JURISDICTIONAL DISCOVERY**, which was produced on recycled paper, on the parties in said cause by:

| | |
|---|---|
| **XX** | **BY MAIL:** I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. |

Thomas J. Schmitz
1753 Woodleaf Circle
Roseville, CA 95747
Counsel for Plaintiff Pro Se

Dianne Mallia
1753 Woodleaf Circle
Roseville, CA 95747
Counsel for Plaintiff Pro Se

Jennifer Nygaard
California Department of Justice
1515 Clay Street, 20th Floor
Oakland, CA 94612
Counsel for Defendants

Michael A. Terhorst
Beeson Terhorst, LLP
510 Bercut Dr., Suite V
Sacramento, CA 95811-0111
Counsel for Defendant Joe A. Lizarraga

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on December 29, 2020, at Sacramento, California.

DeeAnne Bagley

Exhibit D

7/7

# SCHMITZ V. DENIGRIS

## *VERIFICATION*

The undersigned hereby asserts as follows:

I am a party to the above entitled proceeding. The matters contained in the foregoing document are true of my own knowledge, except as to the matters therein stated on information and belief, and as to those matters I believe them to be true.

I have read the foregoing **DEFENDANT STEPHEN DENIGRIS, M.D., PH.D.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES RELATING TO JURISDICTIONAL DISCOVERY** and know its contents. I am informed and believe that the matters stated therein are true, and on that ground, I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed on the 29th day of December, 2020, at 51 West Haven Way, Petaluma, CA, 94952 (1530 PST)

[signature] MD PhD

Stephen DeNigris, M.D., Ph.D.



Exhibit E

ASGE
American Society for Gastrointestinal Endoscopy

ABOUT ASGE | CAREER CENTER | SHOP | CONTACT US | DONATE | MEMBER / ACCOUNT LOG IN

MEMBERSHIP | EDUCATION | RESOURCES | FOR PATIENTS | PRACTICE SUPPORT | ASGE GUIDELINES

Home /

# Find a Doctor Results

Last Name
denigris

Country
Select a country

City

Postal Code

Radius
Select Radius

Search

**Stephen J. Denigris, MD, PhD**
51 West Haven Way
Petaluma, CA 94952
United States
Phone: (707) 318-4325

Professional Perspective Webinar
Pancreatic Cyst Dilemmas:
From Guidelines to Molecular Markers

Play Excerpts
PANCRAGEN
PANDNA

About ASGE | Newsroom | Career Center | Shop | Contact Us

MEMBERSHIP
Why Join
Renew Your Membership
Find a Colleague
Special Interest Groups
Master of ASGE
Fellows of ASGE
Join ABE
Crystal Awards 2020

EDUCATION
Event Calendar
GI Leap: Online Learning
Clinical
Practice Management
Education for Fellows
International

PUBLICATIONS
GIE Journal
VideoGIE
Journal Scan
SCOPE Newsletter

FOR PATIENTS
Value of Colonoscopy
Screen4coloncancer.org
Prevent Heartburn Cancer
Conditions
Procedures and Treatments
Videos
Find a Doctor

PRACTICE SUPPORT
Advocacy
Coding & Reimbursement
Operations Management
Regulatory Compliance
Quality and Safety
Quality Improvement Programs
GI Operations Benchmarking
Intro to GI

ASGE GUIDELINES

Privacy Policy | Terms of Use

3300 Woodcreek Dr., Downers Grove IL 60515
Phone: (630) 573-0600 | Fax: (630) 963-8332 | Email: info@asge.org

© 2020 ASGE. All Rights Reserved.

Web Design and Development by Matrix Group International, Inc.

Exhibit F

ASGE
American Society for Gastrointestinal Endoscopy

ABOUT ASGE CAREER CENTER SHOP CONTACT US DONATE MEMBER / ACCOUNT LOG IN

MEMBERSHIP EDUCATION RESOURCES FOR PATIENTS PRACTICE SUPPORT ASGE GUIDELINES

Home /

# About ASGE

## Mission Statement of the American Society for Gastrointestinal Endoscopy

"To be the leader in advancing patient care and digestive health by promoting excellence and innovation in endoscopy."

**Racism, Social Injustice and our pledge to lead change.**

Read more >

### Newsroom

Dec 16 — Final Push to Stop Medicare Physician Payment Cuts

Dec 09 — ASCs and hospitals will receive a payment increase in 2021

Dec 09 — Take A 10 Minute Survey to Advance Our Understanding of GI Workforce Diversity

### ASGE Key Facts

- Founded in 1941
- Dedicated to advancing patient care and digestive health
- Promotes excellence and innovation in gastrointestinal endoscopy
- More than 15,000 members worldwide
- Provides the highest standards for endoscopic training and practice
- Foremost resource for endoscopic education
- Recognizes distinguished contributions to endoscopy
- Fosters endoscopic research

### About ASGE Members

ASGE physicians have highly specialized training in endoscopic procedures of the digestive tract, including upper gastrointestinal (GI) endoscopy, flexible sigmoidoscopy, colonoscopy, endoscopic retrograde cholangiopancreatography (ERCP) and endoscopic ultrasound (EUS). ASGE is the only medical society that requires documentation of specific training in GI endoscopic procedures

Professional Perspective Webinar
Pancreatic Cyst Dilemmas:
Play Excerpts
PANCRAGEN
PANDNA

About ASGE | Newsroom | Career Center | Shop | Contact Us
MEMBERSHIP
EDUCATION
PUBLICATIONS
FOR PATIENTS
PRACTICE SUPPORT
ASGE GUIDELINES


Exhibit H
1/8

California LEGISLATIVE INFORMATION

Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites

Code: Select Code Section: Search

Up^ Add To My Favorites

**GOVERNMENT CODE - GOV**

**TITLE 2. GOVERNMENT OF THE STATE OF CALIFORNIA [8000 - 22980]** *( Title 2 enacted by Stats. 1943, Ch. 134. )*

**DIVISION 3. EXECUTIVE DEPARTMENT [11000 - 15986]** *( Division 3 added by Stats. 1945, Ch. 111. )*

**PART 2. CONSTITUTIONAL OFFICERS [12001 - 12790]** *( Part 2 added by Stats. 1945, Ch. 111. )*

**CHAPTER 6. Attorney General [12500 - 12661]** *( Chapter 6 added by Stats. 1945, Ch. 111. )*

**ARTICLE 9. False Claims Actions [12650 - 12656]** *( Article 9 added by Stats. 1987, Ch. 1420, Sec. 1. )*

**12650.** (a) This article shall be known and may be cited as the False Claims Act.

(b) For purposes of this article:

(1) "Claim" means any request or demand, whether under a contract or otherwise, for money, property, or services, and whether or not the state or a political subdivision has title to the money, property, or services that meets either of the following conditions:

(A) Is presented to an officer, employee, or agent of the state or of a political subdivision.

(B) Is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions:

(i) Provides or has provided any portion of the money, property, or service requested or demanded.

(ii) Reimburses the contractor, grantee, or other recipient for any portion of the money, property, or service that is requested or demanded.

(2) "Claim" does not include requests or demands for money, property, or services that the state or a political subdivision has paid to an individual as compensation for employment with the state or political subdivision or as an income subsidy with no restrictions on that individual's use of the money, property, or services.

(3) "Knowing" and "knowingly" mean that a person, with respect to information, does any of the following:

(A) Has actual knowledge of the information.

(B) Acts in deliberate ignorance of the truth or falsity of the information.

(C) Acts in reckless disregard of the truth or falsity of the information.

Proof of specific intent to defraud is not required.

(4) "Material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money, property, or services.

(5) "Obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

(6) "Political subdivision" includes any city, city and county, county, tax or assessment district, or other legally authorized local governmental entity with jurisdictional boundaries.

(7) "Political subdivision funds" means funds that are the subject of a claim.

(8) "Prosecuting authority" refers to the county counsel, city attorney, or other local government official charged with investigating, filing, and conducting civil legal proceedings on behalf of, or in the name of, a particular political subdivision.

(9) "Person" includes any natural person, corporation, firm, association, organization, partnership, limited liability

company, business, or trust.

(10) "State funds" mean funds that are the subject of a claim.

*(Amended by Stats. 2012, Ch. 647, Sec. 1. (AB 2492) Effective January 1, 2013.)*

**12651.** (a) Any person who commits any of the following enumerated acts in this subdivision shall have violated this article and shall be liable to the state or to the political subdivision for three times the amount of damages that the state or political subdivision sustains because of the act of that person. A person who commits any of the following enumerated acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and shall be liable to the state or political subdivision for a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101-410 Section 5, 104 Stat. 891, note following 28 U.S.C. Section 2461.

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval.

(2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.

(3) Conspires to commit a violation of this subdivision.

(4) Has possession, custody, or control of public property or money used or to be used by the state or by any political subdivision and knowingly delivers or causes to be delivered less than all of that property.

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the state or by any political subdivision and knowingly makes or delivers a receipt that falsely represents the property used or to be used.

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property.

(7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

(8) Is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

(b) Notwithstanding subdivision (a), the court may assess not less than two times and not more than three times the amount of damages which the state or the political subdivision sustains because of the act of the person described in that subdivision, and no civil penalty, if the court finds all of the following:

(1) The person committing the violation furnished officials of the state or of the political subdivision responsible for investigating false claims violations with all information known to that person about the violation within 30 days after the date on which the person first obtained the information.

(2) The person fully cooperated with any investigation by the state or a political subdivision of the violation.

(3) At the time the person furnished the state or the political subdivision with information about the violation, no criminal prosecution, civil action, or administrative action had commenced with respect to the violation, and the person did not have actual knowledge of the existence of an investigation into the violation.

(c) Liability under this section shall be joint and several for any act committed by two or more persons.

(d) This section does not apply to any controversy involving an amount of less than five hundred dollars ($500) in value. For purposes of this subdivision, "controversy" means any one or more false claims submitted by the same person in violation of this article.

(e) This section does not apply to claims, records, or statements made pursuant to Division 3.6 (commencing with Section 810) of Title 1 or to workers' compensation claims filed pursuant to Division 4 (commencing with Section 3200) of the Labor Code.

(f) This section does not apply to claims, records, or statements made under the Revenue and Taxation Code.

(g) This section does not apply to claims, records, or statements for the assets of a person that have been transferred to the Commissioner of Insurance, pursuant to Section 1011 of the Insurance Code.

**12652.** (a) (1) The Attorney General shall diligently investigate violations under Section 12651 involving state funds. If the Attorney General finds that a person has violated or is violating Section 12651, the Attorney General may bring a civil action under this section against that person.

(2) If the Attorney General brings a civil action under this subdivision on a claim involving political subdivision funds as well as state funds, the Attorney General shall, on the same date that the complaint is filed in this action, serve by mail with "return receipt requested" a copy of the complaint on the appropriate prosecuting authority.

(3) The prosecuting authority shall have the right to intervene in an action brought by the Attorney General under this subdivision within 60 days after receipt of the complaint pursuant to paragraph (2). The court may permit intervention thereafter upon a showing that all of the requirements of Section 387 of the Code of Civil Procedure have been met.

(b) (1) The prosecuting authority of a political subdivision shall diligently investigate violations under Section 12651 involving political subdivision funds. If the prosecuting authority finds that a person has violated or is violating Section 12651, the prosecuting authority may bring a civil action under this section against that person.

(2) If the prosecuting authority brings a civil action under this section on a claim involving state funds as well as political subdivision funds, the prosecuting authority shall, on the same date that the complaint is filed in this action, serve a copy of the complaint on the Attorney General.

(3) Within 60 days after receiving the complaint pursuant to paragraph (2), the Attorney General shall do either of the following:

(A) Notify the court that it intends to proceed with the action, in which case the Attorney General shall assume primary responsibility for conducting the action and the prosecuting authority shall have the right to continue as a party.

(B) Notify the court that it declines to proceed with the action, in which case the prosecuting authority shall have the right to conduct the action.

(c) (1) A person may bring a civil action for a violation of this article for the person and either for the State of California in the name of the state, if any state funds are involved, or for a political subdivision in the name of the political subdivision, if political subdivision funds are exclusively involved. The person bringing the action shall be referred to as the qui tam plaintiff. Once filed, the action may be dismissed only with the written consent of the court and the Attorney General or prosecuting authority of a political subdivision, or both, as appropriate under the allegations of the civil action, taking into account the best interests of the parties involved and the public purposes behind this act. No claim for any violation of Section 12651 may be waived or released by any private person, except if the action is part of a court approved settlement of a false claim civil action brought under this section. Nothing in this paragraph shall be construed to limit the ability of the state or political subdivision to decline to pursue any claim brought under this section.

(2) A complaint filed by a private person under this subdivision shall be filed in superior court in camera and may remain under seal for up to 60 days. No service shall be made on the defendant until after the complaint is unsealed.

(3) On the same day as the complaint is filed pursuant to paragraph (2), the qui tam plaintiff shall serve by mail with "return receipt requested" the Attorney General with a copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses.

(4) Within 60 days after receiving a complaint and written disclosure of material evidence and information alleging violations that involve state funds but not political subdivision funds, the Attorney General may elect to intervene and proceed with the action.

(5) The Attorney General may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal pursuant to paragraph (2). The motion may be supported by affidavits or other submissions in camera.

(6) Before the expiration of the 60-day period or any extensions obtained under paragraph (5), the Attorney General shall do either of the following:

(A) Notify the court that it intends to proceed with the action, in which case the action shall be conducted by the Attorney General and the seal shall be lifted.

H 4/8

(B) Notify the court that it declines to proceed with the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.

(7) (A) Within 15 days after receiving a complaint alleging violations that exclusively involve political subdivision funds, the Attorney General shall forward copies of the complaint and written disclosure of material evidence and information to the appropriate prosecuting authority for disposition, and shall notify the qui tam plaintiff of the transfer.

(B) Within 45 days after the Attorney General forwards the complaint and written disclosure pursuant to subparagraph (A), the prosecuting authority may elect to intervene and proceed with the action.

(C) The prosecuting authority may, for good cause shown, move for extensions of the time during which the complaint remains under seal. The motion may be supported by affidavits or other submissions in camera.

(D) Before the expiration of the 45-day period or any extensions obtained under subparagraph (C), the prosecuting authority shall do either of the following:

(i) Notify the court that it intends to proceed with the action, in which case the action shall be conducted by the prosecuting authority and the seal shall be lifted.

(ii) Notify the court that it declines to proceed with the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.

(8) (A) Within 15 days after receiving a complaint alleging violations that involve both state and political subdivision funds, the Attorney General shall forward copies of the complaint and written disclosure to the appropriate prosecuting authority, and shall coordinate its review and investigation with those of the prosecuting authority.

(B) Within 60 days after receiving a complaint and written disclosure of material evidence and information alleging violations that involve both state and political subdivision funds, the Attorney General or the prosecuting authority, or both, may elect to intervene and proceed with the action.

(C) The Attorney General or the prosecuting authority, or both, may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). The motion may be supported by affidavits or other submissions in camera.

(D) Before the expiration of the 60-day period or any extensions obtained under subparagraph (C), the Attorney General shall do one of the following:

(i) Notify the court that it intends to proceed with the action, in which case the action shall be conducted by the Attorney General and the seal shall be lifted.

(ii) Notify the court that it declines to proceed with the action but that the prosecuting authority of the political subdivision involved intends to proceed with the action, in which case the seal shall be lifted and the action shall be conducted by the prosecuting authority.

(iii) Notify the court that both it and the prosecuting authority decline to proceed with the action, in which case the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action.

(E) If the Attorney General proceeds with the action pursuant to clause (i) of subparagraph (D), the prosecuting authority of the political subdivision shall be permitted to intervene in the action within 60 days after the Attorney General notifies the court of its intentions. The court may authorize intervention thereafter upon a showing that all the requirements of Section 387 of the Code of Civil Procedure have been met.

(9) The defendant shall not be required to respond to any complaint filed under this section until 30 days after the complaint is unsealed and served upon the defendant pursuant to Section 583.210 of the Code of Civil Procedure.

(10) When a person brings an action under this subdivision, no other person may bring a related action based on the facts underlying the pending action.

(d) (1) No court shall have jurisdiction over an action brought under subdivision (c) against a Member of the State Senate or Assembly, a member of the state judiciary, an elected official in the executive branch of the state, or a member of the governing body of any political subdivision if the action is based on evidence or information known to the state or political subdivision when the action was brought.

(2) A person may not bring an action under subdivision (c) that is based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the state or political subdivision is already a party.

(3) (A) The court shall dismiss an action or claim under this section, unless opposed by the Attorney General or prosecuting authority of a political subdivision, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed in any of the following:

(i) A criminal, civil, or administrative hearing in which the state or prosecuting authority of a political subdivision or their agents are a party.

(ii) A report, hearing, audit, or investigation of the Legislature, the state, or governing body of a political subdivision.

(iii) The news media.

(B) Subparagraph (A) shall not apply if the action is brought by the Attorney General or prosecuting authority of a political subdivision, or the person bringing the action is an original source of the information.

(C) For purposes of subparagraph (B), "original source" means an individual who either:

(i) Prior to a public disclosure under subparagraph (A), has voluntarily disclosed to the state or political subdivision the information on which allegations or transactions in a claim are based.

(ii) Has knowledge that is independent of, and materially adds to, the publicly disclosed allegations or transactions, and has voluntarily provided the information to the state or political subdivision before filing an action under this section.

(4) In all actions brought under subdivision (c), except for those in which the complaint alleges one or more violations under Section 12651 involving claims related to California's Medicaid Program, as defined by the Medi-Cal Act (Chapter 7 (commencing with Section 14000) of Part 3 of Division 9 of the Welfare and Institutions Code) a court shall not have jurisdiction over an action based upon information discovered by a present or former employee of the state or a political subdivision during the course of his or her employment unless that employee first, in good faith, exhausted existing internal procedures for reporting and seeking recovery of the falsely claimed sums through official channels and unless the state or political subdivision failed to act on the information provided within a reasonable period of time.

(e) (1) If the state or political subdivision proceeds with the action, it shall have the primary responsibility for prosecuting the action. The qui tam plaintiff shall have the right to continue as a full party to the action.

(2) (A) The state or political subdivision may seek to dismiss the action for good cause notwithstanding the objections of the qui tam plaintiff if the qui tam plaintiff has been notified by the state or political subdivision of the filing of the motion and the court has provided the qui tam plaintiff with an opportunity to oppose the motion and present evidence at a hearing.

(B) The state or political subdivision may settle the action with the defendant notwithstanding the objections of the qui tam plaintiff if the court determines, after a hearing providing the qui tam plaintiff an opportunity to present evidence, that the proposed settlement is fair, adequate, and reasonable under all of the circumstances.

(f) (1) If the state or political subdivision elects not to proceed, the qui tam plaintiff shall have the same right to conduct the action as the Attorney General or prosecuting authority would have had if it had chosen to proceed under subdivision (c). If the state or political subdivision so requests, and at its expense, the state or political subdivision shall be served with copies of all pleadings filed in the action and supplied with copies of all deposition transcripts.

(2) (A) Upon timely application, the court shall permit the state or political subdivision to intervene in an action with which it had initially declined to proceed if the interest of the state or political subdivision in recovery of the property or funds involved is not being adequately represented by the qui tam plaintiff.

(B) If the state or political subdivision is allowed to intervene under paragraph (A), the qui tam plaintiff shall retain principal responsibility for the action and the recovery of the parties shall be determined as if the state or political subdivision had elected not to proceed.

(g) (1) (A) If the Attorney General initiates an action pursuant to subdivision (a) or assumes control of an action initiated by a prosecuting authority pursuant to subparagraph (A) of paragraph (3) of subdivision (b), the office of the Attorney General shall receive a fixed 33 percent of the proceeds of the action or settlement of the claim, which shall be used to support its ongoing investigation and prosecution of false claims.

(B) If a prosecuting authority initiates and conducts an action pursuant to subdivision (b), the office of the prosecuting authority shall receive a fixed 33 percent of the proceeds of the action or settlement of the claim, which shall be used to support its ongoing investigation and prosecution of false claims.

H 6/8

(C) If a prosecuting authority intervenes in an action initiated by the Attorney General pursuant to paragraph (3) of subdivision (a) or remains a party to an action assumed by the Attorney General pursuant to subparagraph (A) of paragraph (3) of subdivision (b), the court may award the office of the prosecuting authority a portion of the Attorney General's fixed 33 percent of the recovery under subparagraph (A), taking into account the prosecuting authority's role in investigating and conducting the action.

(2) If the state or political subdivision proceeds with an action brought by a qui tam plaintiff under subdivision (c), the qui tam plaintiff shall, subject to paragraphs (4) and (5), receive at least 15 percent but not more than 33 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the qui tam plaintiff substantially contributed to the prosecution of the action. When it conducts the action, the Attorney General's office or the office of the prosecuting authority of the political subdivision shall receive a fixed 33 percent of the proceeds of the action or settlement of the claim, which shall be used to support its ongoing investigation and prosecution of false claims made against the state or political subdivision. When both the Attorney General and a prosecuting authority are involved in a qui tam action pursuant to subparagraph (C) of paragraph (6) of subdivision (c), the court at its discretion may award the prosecuting authority a portion of the Attorney General's fixed 33 percent of the recovery, taking into account the prosecuting authority's contribution to investigating and conducting the action.

(3) If the state or political subdivision does not proceed with an action under subdivision (c), the qui tam plaintiff shall, subject to paragraphs (4) and (5), receive an amount that the court decides is reasonable for collecting the civil penalty and damages on behalf of the government. The amount shall be not less than 25 percent and not more than 50 percent of the proceeds of the action or settlement and shall be paid out of these proceeds.

(4) If the action is one provided for under paragraph (4) of subdivision (d), the present or former employee of the state or political subdivision is not entitled to any minimum guaranteed recovery from the proceeds. The court, however, may award the qui tam plaintiff those sums from the proceeds as it considers appropriate, but in no case more than 33 percent of the proceeds if the state or political subdivision goes forth with the action or 50 percent if the state or political subdivision declines to go forth, taking into account the significance of the information, the role of the qui tam plaintiff in advancing the case to litigation, and the scope of, and response to, the employee's attempts to report and gain recovery of the falsely claimed funds through official channels.

(5) Whether or not the state or political subdivision proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of Section 12651 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action that the person would otherwise receive under this subdivision, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. The court, however, shall not award the qui tam plaintiff more than 33 percent of the proceeds if the state or political subdivision goes forth with the action or 50 percent if the state or political subdivision declines to go forth, taking into account the significance of the information, the role of the qui tam plaintiff in advancing the case to litigation, the scope of the person's involvement in the fraudulent activity, the person's attempts to avoid or resist the activity, and all other circumstances surrounding the activity.

(6) The portion of the recovery not distributed pursuant to paragraphs (1) to (5), inclusive, shall revert to the state if the underlying false claims involved state funds exclusively and to the political subdivision if the underlying false claims involved political subdivision funds exclusively. If the violation involved both state and political subdivision funds, the court shall make an apportionment between the state and political subdivision based on their relative share of the funds falsely claimed.

(7) For purposes of this section, "proceeds" include civil penalties as well as double or treble damages as provided in Section 12651.

(8) If the state, political subdivision, or the qui tam plaintiff prevails in or settles any action under subdivision (c), the qui tam plaintiff shall receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable costs and attorney's fees. All expenses, costs, and fees shall be awarded against the defendant and under no circumstances shall they be the responsibility of the state or political subdivision.

(9) (A) If the state or political subdivision does not proceed with the action and the qui tam plaintiff conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses against the party that proceeded with the action if the defendant prevails in the action and the court finds that the claim was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

(B) If the state or political subdivision proceeds with the action, the court may award the defendant its

reasonable attorney's fees and expenses against the state or political subdivision that proceeded with the action if the defendant prevails in the action and the court finds that the claim was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

(h) The court may stay an act of discovery of the person initiating the action for a period of not more than 60 days if the Attorney General or local prosecuting authority show that the act of discovery would interfere with an investigation or a prosecution of a criminal or civil matter arising out of the same facts, regardless of whether the Attorney General or local prosecuting authority proceeds with the action. This showing shall be conducted in camera. The court may extend the 60-day period upon a further showing in camera that the Attorney General or local prosecuting authority has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

(i) Upon a showing by the Attorney General or local prosecuting authority that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Attorney General's or local prosecuting authority's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, including the following:

(1) Limiting the number of witnesses the person may call.

(2) Limiting the length of the testimony of the witnesses.

(3) Limiting the person's cross-examination of witnesses.

(4) Otherwise limiting the participation by the person in the litigation.

(j) The False Claims Act Fund is hereby created in the State Treasury. Proceeds from the action or settlement of the claim by the Attorney General pursuant to this article shall be deposited into this fund. Moneys in this fund, upon appropriation by the Legislature, shall be used by the Attorney General to support the ongoing investigation and prosecution of false claims in furtherance of this article.

*(Amended by Stats. 2012, Ch. 647, Sec. 3. (AB 2492) Effective January 1, 2013.)*

**12652.5.** Notwithstanding any other provision of law, the University of California shall be considered a political subdivision, and the General Counsel of the University of California shall be considered a prosecuting authority for the purposes of this article, and shall have the right to intervene in an action brought by the Attorney General or a private party or investigate and bring an action, subject to Section 12652, if it is determined that the claim involves the University of California.

*(Added by Stats. 1996, Ch. 652, Sec. 1. Effective January 1, 1997.)*

**12653.** (a) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this article.

(b) Relief under this section shall include reinstatement with the same seniority status that the employee, contractor, or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, and where appropriate, punitive damages. The defendant shall also be required to pay litigation costs and reasonable attorneys' fees. An action under this section may be brought in the appropriate superior court of the state.

(c) A civil action under this section shall not be brought more than three years after the date when the retaliation occurred.

*(Repealed and added by Stats. 2012, Ch. 647, Sec. 5. (AB 2492) Effective January 1, 2013.)*

**12654.** (a) A civil action under Section 12652 shall not be filed more than six years after the date on which the violation of Section 12651 is committed, or more than three years after the date when facts material to the right of action are known or reasonably should have been known by the Attorney General or prosecuting authority with jurisdiction to act under this article, but in no event more than 10 years after the date on which the violation is committed, whichever of the aforementioned occurs last.

Exhibit H 8/8

(b) A civil action under Section 12652 may be brought for activity prior to January 1, 1988, if the limitations period set in subdivision (a) has not lapsed.

(c) In any action brought under Section 12652, the state, the political subdivision, or the qui tam plaintiff shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.

(d) Notwithstanding any other provision of law, a guilty verdict rendered in a criminal proceeding charging false statements or fraud, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, except for a plea of nolo contendere made prior to January 1, 1988, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subdivision (a), (b), or (c) of Section 12652.

(e) Subdivision (b) of Section 47 of the Civil Code shall not be applicable to any claim subject to this article.

*(Amended by Stats. 2012, Ch. 647, Sec. 6. (AB 2492) Effective January 1, 2013.)*

**12654.5.** For statute of limitations purposes as provided herein, any pleading filed by the Attorney General or prosecuting authority pursuant to this article shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the state or political subdivision arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

*(Added by Stats. 2012, Ch. 647, Sec. 7. (AB 2492) Effective January 1, 2013.)*

**12655.** (a) The provisions of this article are not exclusive, and the remedies provided for in this article shall be in addition to any other remedies provided for in any other law or available under common law.

(b) If any provision of this article or the application thereof to any person or circumstance is held to be unconstitutional, the remainder of the article and the application of the provision to other persons or circumstances shall not be affected thereby.

(c) This article shall be liberally construed and applied to promote the public interest.

*(Added by Stats. 1987, Ch. 1420, Sec. 1.)*

**12656.** (a) If a violation of this article is alleged or the application or construction of this article is in issue in any proceeding in the Supreme Court of California, a state court of appeal, or the appellate division of a superior court, the person or political subdivision that commenced that proceeding shall serve a copy of the notice or petition initiating the proceeding, and a copy of each paper, including briefs, that the person or political subdivision files in the proceeding within three days of the filing, on the Attorney General, directed to the attention of the False Claims Section in Sacramento, California.

(b) Timely compliance with the three-day time period is a jurisdictional prerequisite to the entry of judgment, order, or decision construing or applying this article by the court in which the proceeding occurs, except that within that three-day period or thereafter, the time for compliance may be extended by the court for good cause.

(c) The court shall extend the time period within which the Attorney General is permitted to respond to an action subject to this section by at least the same period of time granted for good cause pursuant to subdivision (b) to the person or political subdivision that commenced the proceeding.

*(Added by Stats. 2001, Ch. 69, Sec. 1. Effective January 1, 2002.)*

Exhibit 15

1/5

# A Roadmap for New Physicians

## Avoiding Medicare and Medicaid Fraud and Abuse

U.S. Department of Health & Human Services
Office of Inspector General

# Fraud and Abuse Laws

The five most important Federal fraud and abuse laws that apply to physicians are the False Claims Act (FCA), the Anti-Kickback Statute (AKS), the Physician Self-Referral Law (Stark law), the Exclusion Authorities, and the Civil Monetary Penalties Law (CMPL). Government agencies, including the Department of Justice, the Department of Health & Human Services Office of Inspector General (OIG), and the Centers for Medicare & Medicaid Services (CMS), are charged with enforcing these laws. As you begin your career, it is crucial to understand these laws not only because following them is the right thing to do, but also because violating them could result in criminal penalties, civil fines, exclusion from the Federal health care programs, or loss of your medical license from your State medical board.

## False Claims Act [31 U.S.C. §§ 3729–3733]

The civil FCA protects the Government from being overcharged or sold shoddy goods or services. **It is illegal to submit claims for payment to Medicare or Medicaid that you know or should know are false or fraudulent.** Filing false claims may result in fines of up to three times the programs' loss plus $11,000 per claim filed. Under the civil FCA, each instance of an item or a service billed to Medicare or Medicaid counts as a claim, so fines can add up quickly. The fact that a claim results from a kickback or is made in violation of the Stark law also may render it false or fraudulent, creating liability under the civil FCA as well as the AKS or Stark law.

Under the civil FCA, no specific intent to defraud is required. The civil FCA defines "knowing" to include not only actual knowledge but also instances in which the person acted in deliberate ignorance or reckless disregard of the truth or falsity of the information. Further, the civil FCA contains a whistleblower provision that allows a private individual to file a lawsuit on behalf of the United States and entitles that whistleblower to a percentage of any recoveries. Whistleblowers could be current or ex-business partners, hospital or office staff, patients, or competitors.

There also is a criminal FCA (18 U.S.C. § 287). Criminal penalties for submitting false claims include imprisonment and criminal fines. Physicians have gone to prison for submitting false health care claims. OIG also may impose administrative civil monetary penalties for false or fraudulent claims, as discussed below.

315

# I. Physician Relationships With Payers

During residency, you probably are not focused on who pays for your patients' care. Once you start practicing, it is important to understand who the payers are. The U.S. health care system relies heavily on third-party payers, and, therefore, your patients often are not the ones who pay most of their medical bills. Third-party payers include commercial insurers and the Federal and State governments. **When the Federal Government covers items or services rendered to Medicare and Medicaid beneficiaries, the Federal fraud and abuse laws apply.** Many States also have adopted similar laws that apply to your provision of care under State-financed programs and to private-pay patients. Consequently, you should recognize that the issues discussed here may apply to your care of all insured patients.

## Accurate Coding and Billing

Payers trust you, as a physician, to provide necessary, cost-effective, and quality care. You exert significant influence over what services your patients receive, you control the documentation describing what services they actually received, and your documentation serves as the basis for bills sent to insurers for services you provided. The Government's payment of claims is generally based solely on your representations in the claims documents.

Because the Government invests so much trust in physicians on the front end, Congress provided powerful criminal, civil, and administrative enforcement tools for instances when unscrupulous providers abuse that trust. The Government has broad capabilities to audit claims and investigate providers when it has a reason to suspect fraud. Suspicion of fraud and abuse may be raised by irregular billing patterns or reports from others, including your staff, competitors, and patients.

K-415

**When you submit a claim for services performed for a Medicare or Medicaid beneficiary, you are filing a bill with the Federal Government and certifying that you have earned the payment requested and complied with the billing requirements.** If you knew or should have known that the submitted claim was false, then the attempt to collect unearned money constitutes a violation. A common type of false claim is "upcoding," which refers to using billing codes that reflect a more severe illness than actually existed or a more expensive treatment than was provided. Additional examples of improper claims include:

- billing for services that you did not actually render;
- billing for services that were not medically necessary;
- billing for services that were performed by an improperly supervised or unqualified employee;
- billing for services that were performed by an employee who has been excluded from participation in the Federal health care programs;
- billing for services of such low quality that they are virtually worthless; and
- billing separately for services already included in a global fee, like billing for an evaluation and management service the day after surgery.

CAUTION CAUTION CAUTION CAUTION CAUTION CAUTION CAUTION

**Upcoding**

Medicare pays for many physician services using Evaluation and Management (commonly referred to as "E&M") codes. New patient visits generally require more time than follow-up visits for established patients, and therefore E&M codes for new patients command higher reimbursement rates than E&M codes for established patients. An example of upcoding is an instance when you provide a follow-up office visit or follow-up inpatient consultation but bill using a higher level E&M code as if you had provided a comprehensive new patient office visit or an initial inpatient consultation.

Another example of upcoding related to E&M codes is misuse of Modifier 25. Modifier 25 allows additional payment for a separate E&M service rendered on the same day as a procedure. Upcoding occurs if a provider uses Modifier 25 to claim payment for an E&M service when the patient care rendered was not significant, was not separately identifiable, and was not above and beyond the care usually associated with the procedure.

CAUTION CAUTION CAUTION CAUTION CAUTION CAUTION CAUTION

 ## Physician Documentation

Physicians should maintain accurate and complete medical records and documentation of the services they provide. Physicians also should ensure that the claims they submit for payment are supported by the documentation. The Medicare and Medicaid programs may review beneficiaries' medical records. **Good documentation practice helps ensure that your patients receive appropriate care from you and other providers who may rely on your records for patients' past medical histories.** It also helps you address challenges raised against the integrity of your bills. You may have heard the saying regarding malpractice litigation: "If you didn't document it, it's the same as if you didn't do it." The same can be said for Medicare and Medicaid billing.

For more information on physician documentation, see CMS's Documentation Guidelines for Evaluation and Management Services available at http://www.cms.gov/MLNEdWebGuide/25_EMDOC.asp.

## Enrolling as a Medicare and Medicaid Provider With CMS

CMS is the Federal agency that administers the Medicare program and monitors the Medicaid programs run by each State. To obtain reimbursement from the Government for services provided to Federal health care program beneficiaries, you must:

1. **Obtain a National Provider Identifier (NPI).** An NPI is a unique health identifier for health care providers. You may apply for your NPI at https://nppes.cms.hhs.gov/NPPES/Welcome.do.
2. **Complete the appropriate Medicare Enrollment Application.** During the enrollment process, CMS collects information to ensure that you are qualified and eligible to enroll in the Medicare Program. Information about Medicare provider enrollment is available at http://www.cms.gov/MedicareProviderSupEnroll/.
3. **Complete your State-specific Medicaid Enrollment Application.** Information about Medicaid provider enrollment is available from your State Medicaid agency.

Once you become a Medicare and/or Medicaid provider, you are responsible for ensuring that claims submitted under your number are true and correct.

mln BOOKLET

PRINT-FRIENDLY VERSION

KNOWLEDGE • RESOURCES • TRAINING

# Global Surgery Booklet

**Target Audience:** Physicians

The Hyperlink Table at the end of this document provides the complete URL for each hyperlink.





## DEFINITION OF A GLOBAL SURGICAL PACKAGE

This booklet is designed to provide education on the components of a global surgery package. It includes information about billing and payment rules for surgeries, endoscopies, and global surgical packages that are split between two or more physicians.

Medicare established a national definition of a global surgical package to ensure that Medicare Administrative Contractors (MACs) make payments for the same services consistently across all jurisdictions.

This policy helps prevent Medicare payments for services that are more or less comprehensive than intended. In addition to the global policy, uniform payment policies and claims processing requirements have been established for other surgical issues, including bilateral and multiple surgeries, co-surgeons, and team surgeons. The information that follows describes the components of a global surgical package and billing and payment rules for surgeries, endoscopies, and global surgical packages that are split between two or more physicians.

The global surgical package, also called global surgery, includes all the necessary services normally furnished by a surgeon before, during, and after a procedure. Medicare payment for a surgical procedure includes the pre-operative, intra-operative, and post-operative services routinely performed by the surgeon or by members of the same group with the same specialty. Physicians in the same group practice who are in the same specialty must bill and be paid as though they were a single physician.

For more information, refer to the Medicare Claims Processing Manual, Chapter 12, Sections 40 and 40.1.

## FREQUENTLY ASKED QUESTIONS:

### Is the global surgery payment restricted to hospital inpatient settings?

Global surgery applies in any setting, including an inpatient hospital, outpatient hospital, Ambulatory Surgical Center (ASC), and physician's office. When a surgeon visits a patient in an intensive care or critical care unit, Medicare includes these visits in the global surgical package.

For more information, refer to the Medicare Claims Processing Manual, Chapter 12, Sections 40 and 40.1.

### How is Global Surgery classified?

There are three types of global surgical packages based on the number of post-operative days.

### 0-Day Post-operative Period (endoscopies and some minor procedures).

- No pre-operative period
- No post-operative days
- Visit on day of procedure is generally not payable as a separate service



**Note:** The initial evaluation for minor surgical procedures and endoscopies is always included in the global surgery package. Visits by the same physician on the same day as a minor surgery or endoscopy are included in the global package, unless a significant, separately identifiable service is also performed. Modifier "-25" is used to bill a separately identifiable evaluation and management (E/M) service by the same physician on the same day of the procedure.

- Services of other physicians related to the surgery, except where the surgeon and the other physician(s) agree on the transfer of care. This agreement may be in the form of a letter or an annotation in the discharge summary, hospital record, or ASC record.
- Visits unrelated to the diagnosis for which the surgical procedure is performed, unless the visits occur due to complications of the surgery
- Treatment for the underlying condition or an added course of treatment which is not part of normal recovery from surgery
- Diagnostic tests and procedures, including diagnostic radiological procedures
- Clearly distinct surgical procedures that occur during the post-operative period which are not re-operations or treatment for complications

**Note:** A new post-operative period begins with the subsequent procedure. This includes procedures done in two or more parts for which the decision to stage the procedure is made prospectively or at the time of the first procedure.

- Treatment for post-operative complications requiring a return trip to the Operating Room (OR). An OR, for this purpose, is defined as a place of service specifically equipped and staffed for the sole purpose of performing procedures. The term includes a cardiac catheterization suite, a laser suite, and an endoscopy suite. It does not include a patient's room, a minor treatment room, a recovery room, or an intensive care unit (unless the patient's condition was so critical there would be insufficient time for transportation to an OR).
- If a less extensive procedure fails, and a more extensive procedure is required, the second procedure is payable separately.
- Immunosuppressive therapy for organ transplants
- Critical care services (CPT codes 99291 and 99292) unrelated to the surgery where a seriously injured or burned patient is critically ill and requires constant attendance of the physician.



### How are minor procedures and endoscopies handled?

Minor procedures and endoscopies have post-operative periods of 10 days or zero days (indicated by 010 and 000, respectively).

For 10-day post-operative period procedures, Medicare does not allow separate payment for post-operative visits or services within 10 days of the surgery that are related to recovery from the procedure. If a diagnostic biopsy with a 10-day global period precedes a major surgery on the same day or in the 10-day period, the major surgery is payable separately. Services by other physicians are generally not included in the global fee for minor procedures.

For zero day post-operative period procedures, post-operative visits beyond the day of the procedure are not included in the payment amount for the surgery. Post-operative visits are separately billable and payable. For more information, refer to the Medicare Claims Processing Manual, Chapter 12, 40.1.

## GLOBAL SURGERY CODING AND BILLING GUIDELINES

### Physicians Who Furnish the Entire Global Package

Physicians who furnish the surgery and furnish all of the usual pre-and post-operative care may bill for the global package by entering the appropriate CPT code for the surgical procedure only. Separate billing is not allowed for visits or other services that are included in the global package.

When different physicians in a group practice participate in the care of the patient, the group practice bills for the entire global package if the physicians reassign benefits to the group. The physician who performs the surgery is reported as the performing physician.

For more information, refer to the Medicare Claims Processing Manual, Chapter 12, Sections 40.2 and 40.4.

### Physicians Who Furnish Part of a Global Surgical Package

More than one physician may furnish services included in the global surgical package. It is possible that the physician who performs the surgical procedure does not furnish the follow-up care. Payment for the post-operative, post-discharge care is split among two or more physicians where the physicians agree on the transfer of care.

When more than one physician furnishes services that are included in the global surgical package, the sum of the amount approved for all physicians may not exceed what would have been paid if a single physician provided all services, except where stated policies allow for higher payment. For instance, when the surgeon furnishes only the surgery and a physician other than the surgeon furnishes pre-operative and post-operative inpatient care, the resulting combined payment may not exceed the global allowed amount.

The surgeon and the physician furnishing the post-operative care must keep a copy of the written transfer agreement in the beneficiary's medical record. Where a transfer of care does not occur, the services of



conditions of a patient. For more information, refer to the Medicare Claims Processing Manual, Chapter 12, Sections 40.2 and 40.4.

## PRE-OPERATIVE PERIOD BILLING

### E/M Service Resulting in the Initial Decision to Perform Surgery

E/M services on the day before major surgery or on the day of major surgery that result in the initial decision to perform the surgery are not included in the global surgery payment for the major surgery. Therefore, these services may be billed and paid separately.

In addition to the CPT E/M code, modifier "-57" (Decision for surgery) is used to identify a visit that results in the initial decision to perform surgery.

The modifier "-57" is not used with minor surgeries because the global period for minor surgeries does not include the day prior to the surgery. When the decision to perform the minor procedure is typically done immediately before the service, it is considered a routine pre-operative service and a visit or consultation is not billed in addition to the procedure. MACs may not pay for an E/M service billed with the CPT modifier "-57" if it was provided on the day of, or the day before, a procedure with a 000- or 010-day global surgical period.

## DAY OF PROCEDURE BILLING

### Significant, Separately Identifiable E/M Service by the Same Physician on the Same Day of the Procedure

Modifier "-25" (Significant, separately identifiable E/M service by the same physician on the same day of the procedure), indicates that the patient's condition required a significant, separately identifiable E/M service beyond the usual pre-operative and post-operative care associated with the procedure or service.

- Use modifier "-25" with the appropriate level of E/M service.
- Use modifiers "-24" (Unrelated E/M service by the same physician during a post-operative period) and "-25" when a significant, separately identifiable E/M service on the day of a procedure falls within the post-operative period of another unrelated procedure.

Different diagnoses are not required for reporting the E/M service on the same date as the procedure or other service. Both the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified non-physician practitioner in the patient's medical record to support the claim for these services, even though the documentation is not required to be submitted with the claim. For more information, refer to the Medicare Claims Processing Manual, Chapter 12, Sections 30.6.6.



Exhibit M

1/9

# Medicare Claims Processing Manual
## Chapter 12 - Physicians/Nonphysician Practitioners

**Table of Contents**
***(Rev. 4339, 07-25-19)***

**Transmittals for Chapter 12**

10 - General

20 - Medicare Physicians Fee Schedule (MPFS)

20.1 - Method for Computing Fee Schedule Amount

20.2 - Relative Value Units (RVUs)

20.3 - Bundled Services/Supplies

20.4 - Summary of Adjustments to Fee Schedule Computations

20.4.1 - Participating Versus Nonparticipating Differential

20.4.2 - Site of Service Payment Differential

20.4.3 - Assistant at Surgery Services

20.4.4 - Supplies

20.4.5 - Allowable Adjustments

20.4.6 - Payment Due to Unusual Circumstances (Modifiers "-22" and "-52")

20.4.7 - Technical Component Payment Reduction for X-Rays and Other Imaging Services

20.5 - No Adjustments in Fee Schedule Amounts

20.6- Update Factor for Fee Schedule Services

20.7 - Comparability of Payment Provision of Delegation of Authority by CMS to Railroad Retirement Board

20.8 - Payment for Teleradiology Physician Services Purchased by Indian Health Services (IHS) Providers and Physicians

30 - Correct Coding Policy

30.1 - Digestive System (Codes 40000 - 49999)

30.2 - Urinary and Male Genital Systems (Codes 50010 - 55899)

30.3 - Audiology Sevices

30.4 - Cardiovascular System (Codes 92950-93799)

Exhibit 19A
2/9

patient specified in the CPT code definitions. The start and end times of the visit shall be documented in the medical record along with the date of service.

**E. Use of the Codes**

Prolonged services codes can be billed only if the total duration of the physician or qualified NPP direct face-to-face service (including the visit) equals or exceeds the threshold time for the evaluation and management service the physician or qualified NPP provided (typical/average time associated with the CPT E/M code plus 30 minutes). If the total duration of direct face-to-face time does not equal or exceed the threshold time for the level of evaluation and management service the physician or qualified NPP provided, the physician or qualified NPP may not bill for prolonged services.

**F. Threshold Times for Codes 99354 and 99355 (Office or Other Outpatient Setting)**

If the total direct face-to-face time equals or exceeds the threshold time for code 99354, but is less than the threshold time for code 99355, the physician should bill the evaluation and management visit code and code 99354. No more than one unit of 99354 is acceptable. If the total direct face-to-face time equals or exceeds the threshold time for code 99355 by no more than 29 minutes, the physician should bill the visit code 99354 and one unit of code 99355. One additional unit of code 99355 is billed for each additional increment of 30 minutes extended duration. A/B MACs (B) use the following threshold times to determine if the prolonged services codes 99354 and/or 99355 can be billed with the office or other outpatient settings including domiciliary, rest home, or custodial care services and home services codes.

**Threshold Time for Prolonged Visit Codes 99354 and/or 99355 Billed with Office/Outpatient**

| Code | Typical Time for Code | Threshold Time to Bill Code 99354 | Threshold Time to Bill Codes 99354 and 99355 |
|---|---|---|---|
| 99201 | 10 | 40 | 85 |
| 99202 | 20 | 50 | 95 |
| 99203 | 30 | 60 | 105 |
| 99204 | 45 | 75 | 120 |
| 99205 | 60 | 90 | 135 |
| 99212 | 10 | 40 | 85 |
| 99213 | 15 | 45 | 90 |
| 99214 | 25 | 55 | 100 |
| 99215 | 40 | 70 | 115 |
| 99324 | 20 | 50 | 95 |

3|9

during the inpatient stay in which the surgery occurred is compensated through the global surgical payment.

**B. CPT Modifier "-25" - Significant Evaluation and Management Service by Same Physician on Date of Global Procedure**

Medicare requires that Current Procedural Terminology (CPT) modifier -25 should only be used on claims for evaluation and management (E/M) services, and only when these services are provided by the same physician (or same qualified nonphysician practitioner) to the same patient on the same day as another procedure or other service. A/B MACs (B) pay for an E/M service provided on the day of a procedure with a global fee period if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure. Different diagnoses are not required for reporting the E/M service on the same date as the procedure or other service. Modifier -25 is added to the E/M code on the claim.

Both the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or qualified nonphysician practitioner in the patient's medical record to support the claim for these services, even though the documentation is not required to be submitted with the claim.

If the physician bills the service with the CPT modifier "-25," A/B MACs (B) pay for the service in addition to the global fee without any other requirement for documentation unless one of the following conditions is met:

- When inpatient dialysis services are billed (CPT codes 90935, 90945, 90947, and 93937), the physician must document that the service was unrelated to the dialysis and could not be performed during the dialysis procedure;
- When preoperative critical care codes are being billed on the date of the procedure, the diagnosis must support that the service is unrelated to the performance of the procedure; or
- When an A/B MAC (B) has conducted a specific medical review process and determined, after reviewing the data, that an individual or a group has high use of modifier "-25" compared to other physicians, has done a case-by-case review of the records to verify that the use of modifier was inappropriate, and has educated the individual or group, the A/B MAC (B) may impose prepayment screens or documentation requirements for that provider or group. When a A/B MAC (B) has completed a review and determined that a high usage rate of modifier "-57," the A/B MAC (B) must complete a case-by-case review of the records. Based upon this review, the A/B MAC (B) will educate providers regarding the appropriate use of modifier "-57." If high usage rates continue, the A/B MAC (B) may impose prepayment screens or documentation requirements for that provider or group.

A/B MACs (B) may not permit the use of CPT modifier "-25" to generate payment for multiple evaluation and management services on the same day by the same physician, notwithstanding the CPT definition of the modifier.

**C. CPT Modifier "-57" - Decision for Surgery Made Within Global Surgical Period**

M 4/9

documentation is delivered to the PMD supplier within 30 days after the face-to-face examination.

Effective October 25, 2005, G0372 will be used to recognize additional physician services and resources required to establish and document the need for the PMD and will be added to the Medicare physician fee schedule.

## 30.6.16 - Case Management Services (Codes 99362 and 99371 - 99373)

**(Rev. 1, 10-01-03)**
**B3-15512**

**A. Team Conferences**

Team conferences (codes 99361-99362) may not be paid separately. Payment for these services is included in the payment for the services to which they relate.

**B. Telephone Calls**

Telephone calls (codes 99371-99373) may not be paid separately. Payment for telephone calls is included in payment for billable services (e.g., visit, surgery, diagnostic procedure results).

## *30.6.17 – Physician Management Associated with Superficial Radiation Treatment*

***(Rev.4339, Issued: 07-25-19, Effective: 01-01-19, Implementation: 08-27-19)***

*Evaluation and management codes for levels I through III (99211, 99212, and 99213) may be billed with modifier 25 when performed for the purpose of reporting physician work associated with radiation therapy planning, radiation treatment device construction, and radiation treatment management when performed on the same date of service as superficial radiation treatment delivery. See chapter 13, section 70.2, of this manual for information regarding services bundled into treatment management codes.*

## 40 - Surgeons and Global Surgery

**(Rev. 1, 10-01-03)**
**B3-4820**

A national definition of a global surgical package has been established to ensure that payment is made consistently for the same services across all A/B MAC (B) jurisdictions, thus preventing Medicare payments for services that are more or less comprehensive than intended. The national global surgery policy became effective for surgeries performed on and after January 1, 1992.

The instructions that follow describe the components of a global surgical package and payment rules for minor surgeries, endoscopies and global surgical packages that are split

M 5/9

between two or more physicians. In addition, billing, mandatory edits, claims review, adjudication, and postpayment instructions are included.

In addition to the global policy, uniform payment policies and claims processing requirements have been established for other surgical issues, including bilateral and multiple surgeries, co-surgeons, and team surgeries.

## 40.1 - Definition of a Global Surgical Package

**(Rev. 1, 10-01-03)**
**B3-4821, B3-15900.2**

Field 16 of the Medicare Fee Schedule Data Base (MFSDB) provides the postoperative periods that apply to each surgical procedure. The payment rules for surgical procedures apply to codes with entries of 000, 010, 090, and, sometimes, YYY.

Codes with "090" in Field 16 are major surgeries. Codes with "000" or "010" are either minor surgical procedures or endoscopies.

Codes with "YYY" are A/B MAC (B)-priced codes, for which A/B MACs (B) determine the global period (the global period for these codes will be 0, 10, or 90 days). Note that not all A/B MAC (B)-priced codes have a "YYY" global surgical indicator; sometimes the global period is specified.

While codes with "ZZZ" are surgical codes, they are add-on codes that are always billed with another service. There is no postoperative work included in the fee schedule payment for the "ZZZ" codes. Payment is made for both the primary and the add-on codes, and the global period assigned is applied to the primary code.

**A. Components of a Global Surgical Package**
**B3-15011, B3-4820-4831**

A/B MACs (B) apply the national definition of a global surgical package to all procedures with the appropriate entry in Field 16 of the MFSDB.

The Medicare approved amount for these procedures includes payment for the following services related to the surgery when furnished by the physician who performs the surgery. The services included in the global surgical package may be furnished in any setting, e.g., in hospitals, ASCs, physicians' offices. Visits to a patient in an intensive care or critical care unit are also included if made by the surgeon. However, critical care services (99291 and 99292) are payable separately in some situations.

- Preoperative Visits - Preoperative visits after the decision is made to operate beginning with the day before the day of surgery for major procedures and the day of surgery for minor procedures;
- Intra-operative Services - Intra-operative services that are normally a usual and necessary part of a surgical procedure;
- Complications Following Surgery - All additional medical or surgical services required of the surgeon during the postoperative period of the surgery because of complications which do not require additional trips to the operating room;

M 6/9

- Postoperative Visits - Follow-up visits during the postoperative period of the surgery that are related to recovery from the surgery;
- Postsurgical Pain Management - By the surgeon;
- Supplies - Except for those identified as exclusions; and
- Miscellaneous Services - Items such as dressing changes; local incisional care; removal of operative pack; removal of cutaneous sutures and staples, lines, wires, tubes, drains, casts, and splints; insertion, irrigation and removal of urinary catheters, routine peripheral intravenous lines, nasogastric and rectal tubes; and changes and removal of tracheostomy tubes.

**B. Services Not Included in the Global Surgical Package**

A/B MACs (B) do not include the services listed below in the payment amount for a procedure with the appropriate indicator in Field 16 of the MFSDB. These services may be paid for separately.

- The initial consultation or evaluation of the problem by the surgeon to determine the need for surgery. Please note that this policy only applies to major surgical procedures. The initial evaluation is always included in the allowance for a minor surgical procedure;
- Services of other physicians except where the surgeon and the other physician(s) agree on the transfer of care. This agreement may be in the form of a letter or an annotation in the discharge summary, hospital record, or ASC record;
- Visits unrelated to the diagnosis for which the surgical procedure is performed, unless the visits occur due to complications of the surgery;
- Treatment for the underlying condition or an added course of treatment which is not part of normal recovery from surgery;
- Diagnostic tests and procedures, including diagnostic radiological procedures;
- Clearly distinct surgical procedures during the postoperative period which are not re-operations or treatment for complications. (A new postoperative period begins with the subsequent procedure.) This includes procedures done in two or more parts for which the decision to stage the procedure is made prospectively or at the time of the first procedure. Examples of this are procedures to diagnose and treat epilepsy (codes 61533, 61534-61536, 61539, 61541, and 61543) which may be performed in succession within 90 days of each other;
- Treatment for postoperative complications which requires a return trip to the operating room (OR). An OR for this purpose is defined as a place of service specifically equipped and staffed for the sole purpose of performing procedures. The term includes a cardiac catheterization suite, a laser suite, and an endoscopy suite. It does not include a patient's room, a minor treatment room, a recovery room, or an intensive care unit (unless the patient's condition was so critical there would be insufficient time for transportation to an OR);

- If a less extensive procedure fails, and a more extensive procedure is required, the second procedure is payable separately;
- For certain services performed in a physician's office, separate payment can no longer be made for a surgical tray (code A4550). This code is now a Status B and is no longer a separately payable service on or after January 1, 2002. However, splints and casting supplies are payable separately under the reasonable charge payment methodology;
- Immunosuppressive therapy for organ transplants; and
- Critical care services (codes 99291 and 99292) unrelated to the surgery where a seriously injured or burned patient is critically ill and requires constant attendance of the physician.

**C. Minor Surgeries and Endoscopies**

Visits by the same physician on the same day as a minor surgery or endoscopy are included in the payment for the procedure, unless a significant, separately identifiable service is also performed. For example, a visit on the same day could be properly billed in addition to suturing a scalp wound if a full neurological examination is made for a patient with head trauma. Billing for a visit would not be appropriate if the physician only identified the need for sutures and confirmed allergy and immunization status.

A postoperative period of 10 days applies to some minor surgeries. The postoperative period for these procedures is indicated in Field 16 of the MFSDB. If the Field 16 entry is 010, A/B MACs (B) do not allow separate payment for postoperative visits or services within 10 days of the surgery that are related to recovery from the procedure. If a diagnostic biopsy with a 10-day global period precedes a major surgery on the same day or in the 10-day period, the major surgery is payable separately. Services by other physicians are not included in the global fee for a minor procedures except as otherwise excluded. If the Field 16 entry is 000, postoperative visits beyond the day of the procedure are not included in the payment amount for the surgery. Separate payment is made in this instance.

**D. Physicians Furnishing Less Than the Full Global Package**

**B3-4820-4831**

There are occasions when more than one physician provides services included in the global surgical package. It may be the case that the physician who performs the surgical procedure does not furnish the follow-up care. Payment for the postoperative, post-discharge care is split between two or more physicians where the physicians agree on the transfer of care.

When more than one physician furnishes services that are included in the global surgical package, the sum of the amount approved for all physicians may not exceed what would have been paid if a single physician provides all services (except where stated policies, e.g., the surgeon performs only the surgery and a physician other than the surgeon provides preoperative and postoperative inpatient care, result in payment that is higher than the global allowed amount).

Modifier "-58" was established to facilitate billing of staged or related surgical procedures done during the postoperative period of the first procedure. This modifier is not used to report the treatment of a problem that requires a return to the operating room.

The physician may need to indicate that the performance of a procedure or service during the postoperative period was:

a. Planned prospectively or at the time of the original procedure;
b. More extensive than the original procedure; or
c. For therapy following a diagnostic surgical procedure.

These circumstances may be reported by adding modifier "-58" to the staged procedure. A new postoperative period begins when the next procedure in the series is billed.

**7. Unrelated Procedures or Visits During the Postoperative Period**

Two CPT modifiers were established to simplify billing for visits and other procedures which are furnished during the postoperative period of a surgical procedure, but which are not included in the payment for the surgical procedure.

**Modifier "-79":** Reports an unrelated procedure by the same physician during a postoperative period. The physician may need to indicate that the performance of a procedure or service during a postoperative period was unrelated to the original procedure.

A new postoperative period begins when the unrelated procedure is billed.

**Modifier "-24":** Reports an unrelated evaluation and management service by same physician during a postoperative period. The physician may need to indicate that an evaluation and management service was performed during the postoperative period of an unrelated procedure. This circumstance is reported by adding the modifier "-24" to the appropriate level of evaluation and management service.

Services submitted with the "-24" modifier must be sufficiently documented to establish that the visit was unrelated to the surgery. A diagnosis code that clearly indicates that the reason for the encounter was unrelated to the surgery is acceptable documentation.

A physician who is responsible for postoperative care and has reported and been paid using modifier "-55" also uses modifier "-24" to report any unrelated visits.

**8. Significant Evaluation and Management on the Day of a Procedure**

Modifier "-25" is used to facilitate billing of evaluation and management services on the day of a procedure for which separate payment may be made.

It is used to report a significant, separately identifiable evaluation and management service by same physician on the day of a procedure. The physician may need to indicate



Exhibit M

that on the day a procedure or service that is identified with a CPT code was performed, the patient's condition required a significant, separately identifiable evaluation and management service above and beyond the usual preoperative and postoperative care associated with the procedure or service that was performed. This circumstance may be reported by adding the modifier "-25" to the appropriate level of evaluation and management service.

Claims containing evaluation and management codes with modifier "-25" are not subject to prepayment review except in the following situations:

- Effective January 1, 1995, all evaluation and management services provided on the same day as inpatient dialysis are denied without review with the exception of CPT Codes 99221-9223, 99251-99255, and 99238. These codes may be billed with modifier "-25" and reviewed for possible allowance if the evaluation and management service is unrelated to the treatment of ESRD and was not, and could not, have been provided during the dialysis treatment;

- When preoperative critical care codes are being billed for within a global surgical period; and

  - When A/B MACs (B) have conducted a specific medical review process and determined, after reviewing the data, that an individual or group have high statistics in terms of the use of modifier "-25," have done a case-by-case review of the records to verify that the use of modifier "-25" was inappropriate, and have educated the individual or group as to the proper use of this modifier.

**9. Critical Care**

Critical care services provided during a global surgical period for a seriously injured or burned patient are not considered related to a surgical procedure and may be paid separately under the following circumstances.

Preoperative and postoperative critical care may be paid in addition to a global fee if:

- The patient is critically ill and requires the constant attendance of the physician; and

- The critical care is above and beyond, and, in most instances, unrelated to the specific anatomic injury or general surgical procedure performed.

Such patients are potentially unstable or have conditions that could pose a significant threat to life or risk of prolonged impairment.

Modifier -24 (post-operative) or -25 (same day pre-operative) is used to indicate that the critical care service is unrelated to the procedure.



Exhibit N 1/5

# Appropriate use of GI endoscopy

*This is one of a series of position statements discussing the use of GI endoscopy in common clinical situations. The Standards of Practice Committee of the American Society for Gastrointestinal Endoscopy (ASGE) prepared this text. Position statements are based on a critical review of the available data and expert consensus at the time the document was drafted. Further controlled clinical studies may be needed to clarify aspects of this document, which may be revised as necessary to account for changes in technology, new data, or other aspects of clinical practice.*

*This guideline is intended to be an educational device to provide information that may assist endoscopists in providing care to patients. This position statement is not a rule and should not be construed as establishing a legal standard of care or as encouraging, advocating, requiring, or discouraging any particular treatment. Clinical decisions in any particular case involve a complex analysis of the patient's condition and available courses of action. Therefore, clinical considerations may lead an endoscopist to take a course of action that varies from this position statement.*

Progress in endoscopic technology has advanced the practice of medicine as it relates to the gastrointestinal (GI) tract. Direct examination of the mucosal surface provides far greater information than that gained by 2-dimensional scans and x-rays. Further, endoscopic diagnosis and treatment of conditions have now supplanted many surgical procedures. Ongoing technical improvements and innovations continue to extend potential endoscopic therapies. The ASGE has continually promoted safe and responsible endoscopic practice. It is critical that endoscopists receive thorough training in the cognitive aspects of GI diseases as well as in the technical aspects of endoscopy. Extensive nonendoscopic training is necessary to provide the endoscopist with the depth of experience and knowledge necessary to recognize what has been seen and to formulate an appropriate plan for the patient's subsequent care. The following information has been prepared for use by national and local procedure review committees to assist them in defining standards of endoscopic practice. This information should also be helpful to primary care physicians when deciding how best to evaluate their patients and may serve as a resource for quality guidelines.

Copyright © 2012 by the American Society for Gastrointestinal Endoscopy
0016-5107/$36.00
doi:10.1016/j.gie.2012.01.011

## DEFINITION OF GI ENDOSCOPIC PROCEDURES

Esophagogastroduodenoscopy (EGD) affords an excellent view of mucosal surfaces of the esophagus, stomach, and proximal duodenum. Colonoscopy allows examination of the entire colon and rectum and frequently the terminal ileum. Standard diagnostic functions include inspection, biopsy, photography, and videorecording. Diagnostic observations are made concerning focal benign or malignant lesions, diffuse mucosal changes, luminal obstruction, motility, and extrinsic compression by contiguous structures. Common therapeutic endoscopic procedures include polypectomy, dilation of strictures, stent placement, removal of foreign bodies, gastrostomy, treatment of GI bleeding with injection, banding, coagulation, sclerotherapy, and endoscopic therapy of intestinal metaplasia.

Flexible sigmoidoscopy (FS) uses a flexible instrument to examine the rectum, sigmoid, and a variable length of more proximal colon. Diagnostic and therapeutic interventions include biopsy, hemostasis, hemorrhoidal banding, and stent placement.

Endoscopic retrograde cholangiopancreatography (ERCP) uses endoscopy to identify the major and minor papillae. The biliary and pancreatic ductal systems are cannulated and opacified with contrast material to provide diagnostic information. Other diagnostic tools may be used in conjunction with ERCP including brush cytology, biopsy, intraductal ultrasound (US), cholangioscopy, and pancreatoscopy. Therapeutic maneuvers performed during ERCP include endoscopic sphincterotomy with or without stent placement, removal of choledocholithiasis, and other ancillary techniques for the treatment of pancreatic and biliary duct disease.

Endoscopic ultrasound (EUS) is a technique whereby an US transducer is incorporated into the tip of the endoscope or a probe is passed through the channel of the endoscope. This provides high-resolution images of the GI wall and adjacent structures. Instruments can be passed under US guidance to obtain tissue samples and perform therapy.

Enteroscopy allows the visualization of a greater extent of the small bowel than EGD. Several types of enteroscopes are available: the push enteroscope, which allows tissue sampling and therapy, and deep enteroscopy (eg, balloon-assisted or spiral overtube–assisted enteroscopy),

which achieves much deeper small-bowel examination than standard push enteroscopy.

Video capsule endoscopy provides the capability to visualize the GI tract by transmitting images wirelessly from a disposable capsule to a data recorder worn by the patient. Specialized capsules for imaging the esophagus and small intestine are currently approved by the U.S. Food and Drug Administration (FDA).

Natural orifice transluminal endoscopic surgery (NOTES) is an investigational surgical procedure that allows transluminal access of endoscopes to extraluminal structures. A variety of novel procedures have been described, although a discussion of NOTES is beyond the scope of this guideline.

## GENERAL INDICATIONS STATEMENTS

The indications and relative contraindications for doing each of the endoscopic procedures are listed in the following. These guidelines are based on a critical review of available information and broad clinical consensus. Clinical considerations may justify a course of action at variance with these recommendations.

GI endoscopy is generally indicated:

1. If a change in management is probable based on results of endoscopy.
2. After an empirical trial of therapy for a suspected benign digestive disorder has been unsuccessful.
3. As the initial method of evaluation as an alternative to radiographic studies.
4. When a primary therapeutic procedure is contemplated.

GI endoscopy is generally not indicated:

1. When the results will not contribute to a management choice.
2. For periodic follow-up of healed benign disease unless surveillance of a premalignant condition is warranted.

GI endoscopy is generally contraindicated:

1. When the risks to patient health or life are judged to outweigh the most favorable benefits of the procedure.
2. When adequate patient cooperation or consent cannot be obtained.
3. When a perforated viscus is known or suspected.

## SPECIFIC INDICATIONS STATEMENTS

### EGD

EGD is generally indicated for evaluating:

A. Upper abdominal symptoms that persist despite an appropriate trial of therapy.
B. Upper abdominal symptoms associated with other symptoms or signs suggesting structural disease (eg, anorexia and weight loss) or new-onset symptoms in patients older than 50 years of age.
C. Dysphagia or odynophagia.
D. Esophageal reflux symptoms that persist or recur despite appropriate therapy.
E. Persistent vomiting of unknown cause.
F. Other diseases in which the presence of upper GI pathology might modify other planned management. Examples include patients who have a history of ulcer or GI bleeding who are scheduled for organ transplantation, long-term anticoagulation or nonsteroidal anti-inflammatory drug therapy for arthritis and those with cancer of the head and neck.
G. Familial adenomatous polyposis syndromes.
H. For confirmation and specific histologic diagnosis of radiologically demonstrated lesions:
   1. Suspected neoplastic lesion.
   2. Gastric or esophageal ulcer.
   3. Upper tract stricture or obstruction.
I. GI bleeding:
   1. In patients with active or recent bleeding.
   2. For presumed chronic blood loss and for iron deficiency anemia when the clinical situation suggests an upper GI source or when colonoscopy does not provide an explanation.
J. When sampling of tissue or fluid is indicated.
K. Selected patients with suspected portal hypertension to document or treat esophageal varices.
L. To assess acute injury after caustic ingestion.
M. To assess diarrhea in patients suspected of having small-bowel disease (eg, celiac disease).
N. Treatment of bleeding lesions such as ulcers, tumors, vascular abnormalities (eg, electrocoagulation, heater probe, laser photocoagulation, or injection therapy).
O. Removal of foreign bodies.
P. Removal of selected lesions.
Q. Placement of feeding or drainage tubes (eg, peroral, percutaneous endoscopic gastrostomy, percutaneous endoscopic jejunostomy).
R. Dilation and stenting of stenotic lesions (eg, with transendoscopic balloon dilators or dilation systems using guidewires).
S. Management of achalasia (eg, botulinum toxin, balloon dilation).
T. Palliative treatment of stenosing neoplasms (eg, laser, multipolar electrocoagulation, stent placement).
U. Endoscopic therapy of intestinal metaplasia.
V. Intraoperative evaluation of anatomic reconstructions typical of modern foregut surgery (eg, evaluation of anastomotic leak and patency, fundoplication formation, pouch configuration during bariatric surgery).
W. Management of operative complications (eg, dilation of anastomotic strictures, stenting of anastomotic disruption, fistula, or leak in selected circumstances).

EGD is generally not indicated for evaluating:

A. Symptoms that are considered functional in origin (there are exceptions in which an endoscopic exami-



nation may be done once to rule out organic disease, especially if symptoms are unresponsive to therapy or symptoms recur that are different in nature from the original symptoms).

B. Metastatic adenocarcinoma of unknown primary site when the results will not alter management.
C. Radiographic findings of:
   1. Asymptomatic or uncomplicated sliding hiatal hernia.
   2. Uncomplicated duodenal ulcer that has responded to therapy.
   3. Deformed duodenal bulb when symptoms are absent or respond adequately to ulcer therapy.

Sequential or periodic EGD may be indicated for:

A. Surveillance for malignancy in patients with premalignant conditions (eg, Barrett's esophagus, polyposis syndromes, gastric adenomas, tylosis, or previous caustic ingestion).

Sequential or periodic EGD is generally not indicated for:

A. Surveillance for malignancy in patients with gastric atrophy, pernicious anemia, fundic gland or hyperplastic polyps, gastric intestinal metaplasia, or previous gastric operations for benign disease.
B. Surveillance of healed benign disease, such as esophagitis and gastric or duodenal ulcer.

## Colonoscopy

Colonoscopy is generally indicated in the following circumstances:

A. Evaluation of an abnormality on barium enema or other imaging study that is likely to be clinically significant, such as a filling defect and stricture.
B. Evaluation of unexplained GI bleeding:
   1. Hematochezia.
   2. Melena after an upper GI source has been excluded.
   3. Presence of fecal occult blood.
C. Unexplained iron deficiency anemia.
D. Screening and surveillance for colonic neoplasia:
   1. Screening of asymptomatic, average-risk patients for colonic neoplasia.
   2. Examination to evaluate the entire colon for synchronous cancer or neoplastic polyps in a patient with treatable cancer or neoplastic polyp.
   3. Colonoscopy to remove synchronous neoplastic lesions at or around the time of curative resection of cancer followed by colonoscopy at 1 year and, if normal, then 3 years, and, if normal, then 5 years thereafter to detect metachronous cancer.
   4. Surveillance of patients with neoplastic polyps.
   5. Surveillance of patients with a significant family history of colorectal neoplasia.
E. For dysplasia and cancer surveillance in select patients with long-standing ulcerative or Crohn's colitis.
   For evaluation of patients with chronic inflammatory bowel disease of the colon, if more precise diagnosis or determination of the extent of activity of disease will influence management.
F. Clinically significant diarrhea of unexplained origin.
G. Intraoperative identification of a lesion not apparent at surgery (eg, polypectomy site, location of a bleeding site).
H. Treatment of bleeding from such lesions as vascular malformation, ulceration, neoplasia, and polypectomy site.
I. Intraoperative evaluation of anastomotic reconstructions typical of surgery to treat diseases of the colon and rectum (eg, evaluation for anastomotic leak and patency, bleeding, pouch formation).
J. As an adjunct to minimally invasive surgery for the treatment of diseases of the colon and rectum.
K. Management or evaluation of operative complications (eg, dilation of anastomotic strictures).
L. Foreign body removal.
M. Excision or ablation of lesions.
N. Decompression of acute megacolon or sigmoid volvulus.
O. Balloon dilation of stenotic lesions (eg, anastomotic strictures).
P. Palliative treatment of stenosing or bleeding neoplasms (eg, laser, electrocoagulation, stenting).
Q. Marking a neoplasm for localization.

Colonoscopy is generally not indicated in the following circumstances:

A. Chronic, stable, irritable bowel syndrome or chronic abdominal pain; there are unusual exceptions in which colonoscopy may be done once to rule out disease, especially if symptoms are unresponsive to therapy.
B. Acute diarrhea.
C. Metastatic adenocarcinoma of unknown primary site in the absence of colonic signs or symptoms when it will not influence management.
D. Routine follow-up of inflammatory bowel disease (except for cancer surveillance in chronic ulcerative colitis and Crohn's colitis).
E. GI bleeding or melena with a demonstrated upper GI source.

Colonoscopy is generally contraindicated in:

A. Fulminant colitis.
B. Documented acute diverticulitis.

## FS

FS is generally indicated for:

A. Screening of asymptomatic, average-risk patients at risk of colonic neoplasia.

B. Evaluation and treatment of suspected distal colonic disease when there is no indication for colonoscopy.
C. Evaluation of the colon in conjunction with a barium enema.
D. Evaluation for anastomotic recurrence in rectosigmoid carcinoma.
E. Screening of patients with a family history of familial adenomatous polyposis.
F. Stent placement.
G. Removal of foreign bodies.
H. Evaluation and treatment of anorectal disorders (eg, banding of hemorrhoids).
I. Surveillance of the rectum after subtotal colectomy (eg, in familial adenomatous polyposis and ulcerative colitis).
J. Evaluation for pouchitis.
K. To obtain rectal and distal colon biopsy specimens in the evaluation of systemic diseases or infections (eg, cytomegalovirus, graft-versus-host disease, and amyloidosis).

FS is generally not indicated:

A. When colonoscopy is indicated.

FS is generally contraindicated for:

A. Documented acute diverticulitis.

## ERCP

ERCP is generally indicated in:

A. The jaundiced patient suspected of having biliary obstruction (appropriate therapeutic maneuvers should be performed during the procedure).
B. The patient without jaundice whose clinical and biochemical or imaging data suggest pancreatic duct or biliary tract disease.
C. Evaluation of signs or symptoms suggesting pancreatic malignancy when results of direct imaging (eg, EUS, US, computed tomography [CT], magnetic resonance imaging [MRI]) are equivocal or normal.
D. Evaluation of pancreatitis of unknown etiology.
E. Preoperative evaluation of the patient with chronic pancreatitis and/or pseudocyst.
F. Evaluation of the sphincter of Oddi by manometry. Empirical biliary sphincterotomy without sphincter of Oddi manometry is not recommended in patients with suspected type III sphincter of Oddi dysfunction.
G. Endoscopic sphincterotomy:
    1. Choledocholithiasis.
    2. Papillary stenosis or sphincter of Oddi dysfunction.
    3. To facilitate placement of biliary stents or dilation of biliary strictures.
    4. Sump syndrome.
    5. Choledochocele involving the major papilla.
    6. Ampullary carcinoma in patients who are not candidates for surgery.

7. Facilitate access to the pancreatic duct.
H. Stent placement across benign or malignant strictures, fistulae, postoperative bile leak, or in high-risk patients with large unremovable common duct stones.
I. Dilation of ductal strictures.
J. Balloon dilation of the papilla.
K. Nasobiliary drain placement.
L. Pancreatic pseudocyst drainage in appropriate cases.
M. Tissue sampling from pancreatic or bile ducts.
N. Ampullectomy of adenomatous neoplasms of the major papilla.
O. Therapy of disorders of the biliary and pancreatic ducts.
P. Faciliation of cholangioscopy and/or pancreatoscopy.

ERCP is generally not indicated in:

A. Evaluation of abdominal pain of obscure origin in the absence of objective findings that suggest biliary or pancreatic disease. Magnetic resonance cholangiopancreatography and EUS are safe diagnostic procedures that can obviate the need for ERCP.
B. Evaluation of suspected gallbladder disease without evidence of bile duct disease.
C. As further evaluation of proven pancreatic malignancy unless management will be altered.

## EUS

EUS is generally indicated for:

A. Staging tumors of the GI tract, pancreas, bile ducts, and mediastinum, including lung cancer.
B. Evaluating abnormalities of the GI tract wall or adjacent structures.
C. Tissue sampling of lesions within, or adjacent to, the wall of the GI tract.
D. Evaluation of abnormalities of the pancreas, including masses, pseudocysts, cysts, and chronic pancreatitis.
E. Evaluation of abnormalities of the biliary tree.
F. Placement of fiducials into tumors within or adjacent to the wall of the GI tract.
G. Treatment of symptomatic pseudocysts by creating an enteral-cyst communication.
H. Drug delivery (eg, celiac plexus neurolysis).
I. Providing access into the bile ducts or pancreatic duct, either independently or as an adjunct to ERCP.
J. Evaluation for chronic pancreatitis.
K. Evaluation of acute pancreatitis of unknown etiology.
L. Evaluation for perianal and perirectal disorders (anal sphincter injuries, fistulae, abscesses).
M. Evaluation of patients at increased risk of pancreatic cancer.

EUS is generally not indicated for:

A. Staging of tumors shown to be metastatic by other imaging methods (unless the results are the basis for therapeutic decisions).

## Enteroscopy

Enteroscopy is generally indicated for:

A. Evaluation of the source of GI bleeding not identified by EGD or colonoscopy.
B. Evaluation of an abnormal radiographic imaging study of the small bowel.
C. Localization of known or suspected small-bowel lesions.
D. Therapy of small-bowel lesions beyond the reach of a standard endoscope.
E. Tissue sampling from the small bowel.
F. Surveillance in patients with polyposis syndromes that involve the small bowel, such as familial adenomatous polyposis and Peutz-Jeghers syndrome.
G. Foreign body retrieval.
H. To facilitate ERCP in patients with postsurgical anatomy.
I. For tube placement in the small bowel (eg, feeding jejunostomy).
J. Dilation of strictures.
K. Evaluation after small-bowel transplantation.

Enteroscopy is generally not indicated:

A. When the source of GI bleeding has been identified by EGD or colonoscopy.

## Video Capsule Endoscopy

Capsule endoscopy is generally indicated for:

A. Evaluation of obscure GI bleeding in a patient in whom upper and lower endoscopy have not identified a cause.
B. Evaluation of iron deficiency anemia in a patient in whom upper and lower endoscopy have not identified a cause.
C. Evaluation of the small bowel in patients with known or suspected Crohn's disease.
D. Screening and surveillance of the small bowel in patients with inherited polyposis syndromes.
E. Suspected small intestinal tumors.
F. Suspected or refractory malabsorptive syndromes (eg, celiac disease).
G. Visualization of the esophagus:

1. Screening for Barrett's esophagus.
2. Screening for varices.

Capsule endoscopy should be used with caution when:

A. A cardiac pacemaker or implantable defibrillator is in place.
B. A GI tract obstruction, fistula, or stricture (benign or malignant) is known or suspected.
C. A swallowing disorder is present.
D. The patient is pregnant.

## DISCLOSURE

*The following authors disclosed financial relationships relevant to this publication: G. Anton Decker, Facet Biotechnology; John A. Evans, Cook Medical; Robert Fanelli, Ethicon, RTI Biologics, New Wave Surgical Corp.; Rajeev Jain, Barrx.*

*Abbreviations: CT, computed tomography; ERCP, endoscopic retrograde cholangiopancreatography; EUS, endoscopic ultrasound; FDA, Food and Drug Administration; FS, flexible sigmoidoscopy; GI, gastrointestinal; MRI, magnetic resonance imaging; US, ultrasound.*

Prepared by:
ASGE STANDARDS OF PRACTICE COMMITTEE
Dayna S. Early, MD
Tamir Ben-Menachem, MD
G. Anton Decker, MD
John A. Evans, MD
Robert D. Fanelli, MD, SAGES Representative
Deborah A. Fisher, MD, MHS
Norio Fukami, MD
Joo Ha Hwang, MD, PhD
Rajeev Jain, MD
Terry L. Jue, MD
Khalid M. Khan, MD, NASPHAGAN Representative
Phyllis M. Malpas, MA, RN, CGRN SGNA Representative
John T. Maple, DO
Ravi S. Sharaf, MD
Jason A. Dominitz, MD, MHS (Prior Chair)
Brooks D. Cash, MD (Chair)

A consensus statement from the American Society for Gastrointestinal Endoscopy. Initially prepared by the Committee on Endoscopic Utilization. Revised by the Standards of Practice Committee and approved by the Governing Board.

exhibit O 1/16

# CCHCS Care Guide: Hepatitis C

Case 2:20-cv-00195-DJC-CKD Document 301 Filed 08/28/23 Page 92 of 168

## GOALS

- Identify Hepatitis C (HCV) infected patients.
- Monitor all HCV patients for signs of cirrhosis.
- Use the most appropriate HCV treatment regimen based on AASLD/IDSA* guidelines.
- Monitor the patients on treatment and stop treatment when indicated (futility rules).
- The goal of HCV antiviral treatment is to achieve a sustained virologic response (SVR) - cure.
- Complete pretreatment labs and imaging with a FibroScan (if FIB-4 is ≥1.45 and <3.25) and/or Liver Ultrasound (if F4 cirrhosis) within 180 days of establishing diagnosis of chronic HCV.
- Initiate HCV treatment within 90 days of completing the pretreatment evaluation or as soon as possible based on operational considerations and the patient's parole date.
- Annual retesting for HCV is recommended for all patients with a history of HCV that was treated or self-cleared by checking a HCV viral load.*
- Consider periodic sexual health screening and risk reduction counseling and education for all patients identified with active HCV as part of their overall health due to the risk of acquiring HCV through sexual contact.

## ALERTS

**HCV TREATMENT**

- HCV treatment requires submission of an electronic HCV Treatment Selection Review Request (TSR) within the Electronic Health Record System (EHRS) for appropriate regimen selection.
- Do not initiate HCV treatment without an appropriate regimen selection from the Headquarters (HQ) HCV Central Treatment Team.

**CIRRHOTICS**

- Screen for hepatocellular carcinoma and varices – **patients require continued screening even after HCV treatment.**
- Identify and manage decompensated cirrhosis.

*Consider periodic retesting of all other patients if they have a history of injection or inhalation drug use or symptoms/signs of acute hepatitis (right upper quadrant abdominal pain, nausea, vomiting, jaundice, or transaminitis) by checking an HCV Antibody with reflex to viral load and genotype.

## TREATMENT

**Patient Selection**

- AASLD/IDSA** recommends treatment for all patients with chronic HCV infection, except those with life expectancies < 12 months that cannot be remediated by treating HCV, by liver transplantation, or by other directed therapy.
  - Unless there is a medical contraindication, all patients with chronic HCV are treatment candidates if they desire treatment and are willing to adhere to a medication and monitoring plan.

**Treatment**

- The recommended medication regimen depends on genotype and many clinical factors including the presence or absence of cirrhosis, co-infection with Human Immunodeficiency Virus (HIV) or Hepatitis B Virus (HBV), other comorbidities, and any history of prior treatment.
- The Food and Drug Administration (FDA) is approving new medications frequently and treatment regimens are changing rapidly as the new agents are being released. For this reason, all patients should be referred to the HQ HCV Central Treatment Team for selection of the most appropriate treatment regimen by submitting an HCV TSR (See page 7).

## MONITORING

**All chronic HCV infected patients:**

- **Annual clinical assessment:** Consider labs including CBC, CMP, PT/INR every 12 months to assess progression of liver disease. Determine FIB-4 (see page 4) annually. Calculate the Child-Turcotte-Pugh (CTP) score (see page 6) as indicated.
- **Vaccines:** Offer and document Hepatitis A Virus (HAV), HBV, and pneumococcal (PPSV23 once 19-64 years and all > 65 years, consider PCV13 also for > 65 years if immunocompetent but comorbid conditions present, or smokers; followed by a second PPSV23 one year later. See CDC website for complete guidance). Encourage an annual influenza vaccination.
- All patients with acute and chronic HCV should be evaluated for underlying co-morbid substance use disorder (See CCHCS Substance Use Disorder Care Guide).

**HCV patients receiving antiviral therapy:**

- See page 7 regarding intervals for CBC, CMP, and HCV viral load.
- Clinic visits are recommended as clinically indicated during treatment. At each visit, ensure medication adherence, and monitor for adverse events and potential drug-drug interactions with newly prescribed medications.
- Education and monitoring of HCV treatments should be managed using the Complete Care Model. The patients receiving HCV treatment are listed on the Daily Care Team Huddle Report, and these patients are to receive education, care coordination, and follow up from the primary care team Licensed Vocational Nurses (LVNs), Registered Nurses (RNs), Primary Care Providers, and Case Managers.

**Chronic HCV infected patients with cirrhosis:**

[Metavir score F4 (liver stiffness kPa ≥ 12.0 or Liver Stiffness Score F4 on Fibroscan)]:

- Liver ultrasound every 6 months to screen for hepatocellular carcinoma (HCC). **Continue HCC screening after HCV treatment.**
- See the CCHCS Advanced Liver Disease Care Guide.
- **Patients with Chronic HCV but without cirrhosis do not require a baseline ultrasound or HCC screening.**
- Annual rescreening of the patients successfully treated for HCV is recommended with an HCV viral load (Hepatitis C RNA, Quant, PCR 35645).

## TABLE OF CONTENTS

| | |
|---|---|
| SCREENING FOR HEPATITIS C | PAGE 2 |
| ACUTE HCV | PAGE 3 |
| CHRONIC HCV: PATIENT SELECTION | PAGE 4 |
| HCV TX PRIORITIZATION | PAGE 5 |
| HCV TX EXCLUSION CRITERIA | PAGE 5 |
| ADVANCED LIVER DISEASE/CIRRHOSIS | PAGE 6 |
| SPECIAL POPULATIONS | PAGE 6 |
| SELECTION OF HCV TX REGIMEN | PAGE 7 |
| MEDICATIONS: DIRECT ACTING | PAGE 8-11 |
| MEDICATIONS: HCV AGENTS-OTHER | PAGE 12 |
| MEDICATIONS: COLONY STIMULATING | PAGE 12 |
| MANAGEMENT OF SIDE EFFECTS | PAGE 13 |
| DRUG-DRUG INTERACTIONS | PAGE 14 |
| PATIENT EDUCATION | PAGE PE-1 |
| PATIENT EDUCATION (SPANISH) | PAGE PE-2 |

**American Association for the Study of Liver Diseases, Infectious Diseases Society of America

Information contained in the Care Guide is not a substitute for a health care professional's clinical judgment. Evaluation and treatment should be tailored to the individual patient and the clinical circumstances. Furthermore, using this information will not guarantee a specific outcome for each patient. Refer to "Disclaimer Regarding Care Guides" for further clarification. https://cchcs.ca.gov/clinical-resources/

# SCREENING FOR HEPATITIS C

**Who to Screen**

**All patients, especially:**

- Anyone who wants screening
- History of injection drug use or tattoos
- Other risk factors
- Clinical findings of liver disease

**Order HCV Antibody Test with reflex to HCV RNA, PCR with reflex to genotype 94345**
If Hepatitis C Antibody is reactive, Hepatitis C Viral Load Polymerase Chain Reaction (PCR) will automatically be performed and if this is positive, an HCV genotype will also be performed.

What are the lab results?

HCV antibody **NEGATIVE**
Normal liver enzymes

No HCV infection - educate the patient on risks of infection

HCV antibody **NEGATIVE**
Liver enzymes **ELEVATED**

Rule out: **Early acute HCV (see page 3)** OR **Chronic HCV in immunosuppressed patient (e.g., HIV)**

- Consider checking the HCV viral load if not already done
- Ensure newly diagnosed cases of acute HCV are reported to the local health department*
- Screen annually for HCV with the HCV antibody test with reflex to HCV RNA, PCR with reflex to genotype 94345

HCV antibody **POSITIVE**
HCV viral load **NEGATIVE**

**Resolved or Treated HCV** OR
**Acute HCV with transient viral clearing** OR
**False positive HCV Ab**

- Consider rechecking the HCV viral load in 6-12 months to confirm that the patient is not chronically infected
- Rescreen annually for HCV reinfection by checking an HCV viral load

HCV antibody **POSITIVE**
HCV viral load **POSITIVE**

**Chronic HCV**

- Assess for treatment (see page 4)

*The institution should ensure a process to report acute Hepatitis C infections to the local health department via a Confidential Morbidity Report (CMR) at: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Public-Health-Reporting.aspx. In many institutions the public health nurses do the reporting. Please refer to the HCDOM Public Health Disease Reporting (3.8.1).*

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

## Acute HCV: Diagnosis, Evaluation, and Treatment

### Definition

- Positive HCV viral load with negative HCV antibody, OR
- Documented change in HCV antibody from negative to positive within a 6 month time period, OR
- A new (within the last 3 months) positive HCV antibody accompanied by:
  - A new elevation of ALT (defined as at least 5 times prior baseline level obtained within the last 24 months), or
  - An increase of ALT to more than 5 times > normal ALT levels if no baseline labs in last 24 months, and
  - No other concomitant conditions to explain the rise in liver enzymes.

### Evaluation

- The majority of patients are asymptomatic. Clinical presentation may include jaundice, dark urine, fatigue, and/or right upper quadrant abdominal pain.
- "Time Zero" is the date of the first signs and symptoms of acute hepatitis or first lab abnormalities. If none of these are present, the most recent date of IV drug use or tattooing can be used to determine the interval for HCV lab surveillance.

**LAB EVALUATION of Acute HCV:**

| | CBC | CMP | PT/INR | HCV viral load | HIV test |
|---|---|---|---|---|---|
| **Baseline: Time Zero** | ✓ | ✓ | ✓ | ✓ | ✓ |
| **Week 8 to 12** | | ✓ | | ✓ | |
| **Week 16** | | ✓ | | ✓* | |

**If the HCV viral load at week 8 to 12 is negative, order an additional HCV viral load to confirm that the patient cleared the acute infection. Repeat the HCV viral load every 4-6 weeks until 2 negative HCV viral loads are obtained. Rescreen for HCV annually thereafter.*

**INTERPRETATION of Diagnostic Studies:**

| HCV antibody | HCV antibody signal: cut off | HCV viral load | Alanine aminotransferase (ALT) | Interpretation |
|---|---|---|---|---|
| Negative | Low | Negative | Normal | HCV negative |
| | | Positive | High | Acute HCV |
| Positive | Low | Negative | Normal | False positive HCV Antibody |
| | | Negative | High | Early acute HCV |
| | | Positive | High | Acute HCV |
| Positive | High | (New) Positive | High | Acute re-infection |
| | | Positive | Normal | Chronic HCV |
| | | Negative | Any | Treated or cleared HCV |

- Consult the HCV warmline: CDCR CPHCS HCV Questions@cdcr.ca.gov if the diagnosis (acute or chronic) is uncertain.
- Counsel the patient regarding risk reduction.

### Treatment

- Approximately 20% of the patients with acute HCV will clear their infection without treatment within 3-6 months of the initial exposure. Newer recommendations highlight early treatment during the acute phase to decrease the risk of transmission. Consideration will be made to treat the patients at high risk of transmission during the acute phase. Please submit a TSR for evaluation to determine the best treatment course for these patients. All patients should be assessed for underlying substance use disorder (see the CCHCS Care Guide: Substance Use Disorder)
- Provide patient education to the patients who spontaneously clear HCV to include the risk of reinfection with high risk exposures.

# CHRONIC HCV: PATIENT PRETREATMENT EVALUATION

***FIB-4 CALCULATION**
FIB-4 =
[Age(y) x AST(U/L)] / [PLT($10^9$/L) x ALT(U/L)$^{1/2}$][1]

****DECOMPENSATED CIRRHOSIS**
A patient has decompensated cirrhosis if they have one or more of the following:
- Esophageal variceal hemorrhage
- Ascites
- Hepatic encephalopathy
- Spontaneous bacterial peritonitis
- Hepatopulmonary/or hepatorenal disease
- CTP score of ≥ 7 (CTP ≥ 6 if HIV/HCV co-infected) (See page 6)

**FIBROSCAN™** uses transient elastography to measure liver stiffness.[2] The shear wave velocity has been correlated with stages of fibrosis in HCV patients in the following manner:

| FibroScan result (kPa) | ≤ 7.0 | > 7.0 | ≥ 9.5 | ≥ 12.0 |
|---|---|---|---|---|
| Equivalent stage of fibrosis (HCV) | F0-F1 | F2 | F3 | F4 |

A FibroScan is only recommended prior to HCV treatment (not during or after HCV treatment) to determine the patient's degree of liver fibrosis if the FIB-4 is consistently between 1.45 and 3.25.
If the patient has not yet received HCV Treatment, an updated FibroScan is recommended every 2-3 years to monitor their liver fibrosis progression and stage their degree of fibrosis when they are ready for treatment.

**LIVER BIOPSY**
- Used infrequently due to non-invasive alternatives and some issues with sampling and observer variability.
- If done, adequate biopsy defined as 15 mm in length with a minimum of 6-8 portal tracts seen.
- Biopsy not required for the patients with FIB-4 < 1.45 or ≥ 3.25 unless clinical condition is unclear.

[1]Vallet-Pichard, A et al, FIB-4: an Inexpensive and Accurate Marker of Fibrosis in HCV Infection. Comparison with Liver Biopsy and FibroTest. Hepatology 2007;46:32-36.
[2]Ziol, M et al, Noninvasive Assessment of Liver Fibrosis by Measurement of Stiffness in Patients With Chronic Hepatitis C. Hepatology 2005; 48-54.

D 516

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

## HCV Patient Risk Stratification

| Risk Group | Clinical Examples |
|---|---|
| 1* (Highest) | • Any previous FibroScan or liver biopsy demonstrating stage 3 or 4 fibrosis (≥ 9.5 kPa)<br>• Cirrhosis otherwise diagnosed<br>• Diagnosis of decompensated cirrhosis (see page 4)<br>• Diagnosis of hepatocellular carcinoma (see exclusion criteria below)<br>• HIV co-infection and any previous FibroScan or liver biopsy demonstrating greater than stage 1 fibrosis (> 7.0 kPa)<br>• Liver Transplantation (consult with transplant and HCV specialists required)<br>• Women of childbearing age who wish to get pregnant in the next 12 months<br>• Serious extra-hepatic manifestations of HCV (e.g., leukocytoclastic vasculitis, membranoproliferative glomerulonephritis, or symptomatic cryoglobulinemia) |
| 2 (Medium) | • Any previous FibroScan or liver biopsy demonstrating stage 2 fibrosis (> 7.0 kPa)<br>• Age > 50 years old<br>• HIV or HBV co-infection<br>• Patients with diabetes<br>• HCV genotype 3<br>• Body mass index > 30 kg/m$^2$<br>• GFR < 30<br>• Does not meet any priority group 1 criteria |
| 3 (Lowest) | • Any previous FibroScan or liver biopsy demonstrating stage 0-1 fibrosis (≤ 7.0 kPa)<br>• Does not meet any priority group 1 or 2 criteria |

**Risk Group 1 patients will be treated by highly experienced primary care providers, HCV champions, or the HQ HCV Central Treatment Team.*

## HCV Treatment Exclusion Criteria

### Treatment Exclusion Criteria

**Release Date Exclusion**

| Clinical History | Minimum # of Months* |
|---|---|
| Not cirrhotic | 5 |
| Decompensated cirrhotic and/or previous Direct Acting Agents (DAA) treatment failure | 8 |

**Patients will be excluded from treatment consideration in CCHCS if they will be released before the evaluation and course of treatment can be completed. The minimum # of months noted above shows the minimum number of months of incarceration needed to complete HCV therapy based on the patient factors.* ***More time may be required in some cases.***

**Exclusion Criteria: HCV Treatment (all)**

- Life expectancy < 12 months that cannot be remediated by treating HCV, by transplantation, or by other directed therapy
- Inability to cooperate with treatment
- Inability to give informed consent
- Pregnancy or inability to practice contraception

**Exclusion Criteria: DAA**

- On a medication contraindicated for use with DAA and unable to substitute
- Allergy to DAA
- Allergy to Ribavirin (RBV) (if regimen requires RBV)

**Exclusion Criteria: RBV**

- Poorly controlled or unstable cardiopulmonary disease
- Anemia; hemoglobin < 11 g/dl or hematocrit < 33%
- Allergy to RBV
- Inability to practice contraception during and for 6 months after treatment completion (teratogen)

6/16

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

## Cirrhosis

For persons with cirrhosis (Metavir stage F4), the severity of liver dysfunction can be estimated using the CTP. Variations in the timing and subjectivity inherent in the scoring (e.g., in grading ascites or encephalopathy) are the major limitations of CTP scoring.

| CTP Points | | | |
|---|---|---|---|
| **Number of points** | **1** | **2** | **3** |
| **Encephalopathy*** | None | Grade 1-2 | Grade 3-4 (or chronic) |
| **Ascites** | None | Mild/Moderate (diuretic-responsive) | Severe (diuretic-refractory) |
| **Bilirubin (mg/dl)** OR | < 2 | 2-3 | > 3 |
| **Modified total bilirubin§** | < 4 | 4-7 | > 7 |
| **Albumin (g/dl)** | > 3.5 | 2.8-3.5 | < 2.8 |
| **INR** | < 1.7 | 1.7-2.3 | > 2.3 |

| CTP Cirrhosis Scoring[1,2,3] | | | |
|---|---|---|---|
| **Class** | **Points** | **One year survival (%)** | **Two year survival (%)** |
| A | 5-6 | 95 | 90 |
| B | 7-9 | 80 | 70 |
| C | 10-15 | 45 | 38 |

| *Encephalopathy Grading | |
|---|---|
| Grade 1 | mild confusion, anxiety, restlessness, fine tremor, slowed coordination |
| Grade 2 | drowsiness, disorientation, asterixis |
| Grade 3 | somnolent but arousable, marked confusion, incomprehensible speech, incontinence, hyperventilation |
| Grade 4 | coma, decerebrate posturing, flaccidity |

§Modified total bilirubin used to score the patients who have Gilbert's syndrome or who are taking atazanavir or indinavir

[1] Child C.G., Turcotte J.G., The Liver and Portal Hypertension. *Philadelphia, WB Saunders Co.* 1964

[2] Pugh R.N., Murray-Lyon I.M., Dawson J.L., et al., Transection of the oesophagus for bleeding oesophageal varices. *Br J Surg*. 1973; 60:646

[3] Trey C., Burns D.G., Saunders S.J., Treatment of hepatic coma by exchange blood transfusion. *NEJM*, 1966; 274:473

## Special Populations

**HBV Co-Infection** (requires co-management by a CCHCS HCV specialist)

- Persons with HBV/HCV co-infection and detectable viremia of both viruses are at increased risk for disease progression, decompensated liver disease, and the development of HCC.
- During HCV treatment, cases of HBV reactivation have been reported, in some cases resulting in fulminant hepatitis, hepatic failure, and death.
- Screening for HBV infection and viremia is required prior to starting HCV treatment. If HBV infection is noted, treatment for HBV viremia may be recommended; otherwise, monthly HBV viral loads are recommended during HCV treatment.

**HIV Co-Infection**

- Note multiple interactions exist with HCV and HIV medications. Do not adjust HIV medications without HIV specialist input.

**Renal Impairment**

- No dosage adjustment is required for any GFR. Specific HCV treatment recommendations exist for the patients on dialysis or with GFR < 30 mL/min.

**Pregnancy**

- RBV is a known teratogen and cannot be used in pregnancy. Also, extreme care must be taken to avoid pregnancy during therapy and for 6 months after completion of therapy in both female patients and in female partners of male patients who are, or have recently taken RBV therapy.

**Transplant** (requires co-management by a CCHCS HCV specialist)

- Specific HCV treatment recommendations exist for patients with a kidney or liver transplant.

O 7/16

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

## Selection of HCV Treatment Regimen

Chronic HCV treatment is advancing more rapidly than CCHCS Care Guide revision cycles. In order to avoid the publication of outdated HCV treatment regimens in this Hepatitis C Care Guide, the provider is referred to *HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C*; www.hcvguidelines.org (AASLD/ IDSA) for information regarding the most up to date specific recommended treatment regimens. Treatment protocol selection depends on HCV genotype, whether the patient is treatment naïve or treatment experienced, and additional clinical factors.

**All patients requesting treatment should be referred by submitting a TSR in EHRS** for selection of the most appropriate treatment regimen by the HQ HCV Central Treatment Team. The TSR can be found in EHRS under AdHoc forms in the Case Management folder—HCV Treatment Selection Review Request. CCHCS's goal is to initiate HCV treatment within 90 days of completing the pretreatment evaluation (labs and/or imaging if indicated, see page 4.)

| Lab Studies | | βHCG | CBC | CMP | PT/ INR | HCV viral load | HCV Genotype | HIV test | HBV serology[4] |
|---|---|---|---|---|---|---|---|---|---|
| Pretreatment | Within past 12 months | | | | | ✓ | ✓ | ✓ | ✓ |
| | Within past 3 months | | ✓ | ✓ | ✓ | | | | |
| | Within past 1 month | ✓[1] | | | | | | | |
| During Treatment | Week 2 | | ✓[2] | | | | | | |
| | Week 4 | | ✓ | ✓ | | ✓ | | | |
| | Week 8 | | ✓[2] | ✓[3] | | | | | |
| | Week 12 | | ✓[2] | | | | | | |
| End of treatment | | | ✓[2] | | | | | | |
| After treatment | 12 weeks after treatment ends | | | | | ✓ | | | |

1 Recommended for women of child bearing age.
2 Obtain CBC at treatment week 2, 4, 8, 12, 16 (if applicable) if taking RBV.
3 Obtain CMP at treatment week 8 if taking the 12 week regimen of elbasvir/grazoprevir.
4 If HBV surface antigen and HBV surface antibody are negative but HBV core antibody is positive, obtain an HBV viral load.
Note: Updated AASLD/IDSA Guidelines have minimized the requirements for pretreatment and on-treatment lab evaluation which may be incorporated into future CCHCS HCV Care Guide updates in low risk patients Statewide. In these low risk patients, pretreatment lab timeframes may be extended after clinical review by the HCV Central Team.

## Interpretation of HCV Treatment—During Treatment

| Rx week | Result | Action/Interpretation |
|---|---|---|
| Any week | ALT: > 10 fold increase | **Stop treatment,** clinical evaluation recommended |
| | ALT increase but < 10 fold; with increased bilirubin, alkaline phosphatase or INR and/or symptomatic (weakness, nausea, vomiting, jaundice) | |
| | ALT increase but < 10 fold and asymptomatic | Recheck ALT in 2 weeks |
| Week 4 | HCV VL*: if > 15 detected, repeat VL | If > 15 detected at week 4, repeat VL at week 6 |
| Week 6 | HCV VL: 1 log increase from week 4 | **Stop treatment** |
| | HCV VL: < 1 log increase from week 4 | Continue treatment |
| 12 weeks post Rx | HCV VL: Detectable | Treatment failure or reinfection |
| | HCV VL: Undetectable | SVR=Cure. Annual VL testing recommended. |

VL *= viral load

## Resistance to Direct Acting Oral Agents

HCV is an approximately 9.5 kilobase RNA virus that replicates at a rate of billions of copies daily. Many of these viral copies are not functional due to errors during replication. However, the rate of replication allows for drug-resistant virus to develop when a patient is taking an HCV combination that is suboptimal or if the patient is not adherent with medication.

**HCV RNA Viral Structure**

*Replication Complex*

*Structural proteins* | *Non-structural proteins*

| C | E1 | E2 | p7 | NS3 | NS4A | NS4B | NS5A | NS5B |
|---|---|---|---|---|---|---|---|---|

| HCV Medication Class | NS3/4A Protease Inhibitors | NS5A Inhibitors | NS5B Polymerase Inhibitors Nucleotide | NS5B [illegible] |
|---|---|---|---|---|
| **Medications** | Glecaprevir, Grazoprevir, Voxilaprevir | Daclatasvir, Elbasvir, Ledipasvir, Pibrentasvir, Velpatasvir | Sofosbuvir | Dasabuvir |

An area of the HCV virus conferring resistance to a particular medication is called a resistance associated substitution (RAS). An RAS' name identifies the amino acid position where the substitution took place, the amino acid that is normally coded for (preceding the amino acid position), and the amino acid that is now being coded for. Multiple letters following the amino acid position indicate a mixed virus with more than one resistant variant present.

The presence of RAS impacts HCV treatment depending on the patient genotype, the level of liver fibrosis, and if the patient is treatment experienced or naïve. RAS can remain present for weeks to months. Some RAS confer cross class resistance, while others only affect specific members of a medication class. Resistance can be overcome in some cases with the addition of ribavirin or additional agents and/or the extension of treatment duration.

**Testing for Resistance**

The most common drug resistant virus develops as a result of NS3 or NS5A failures; NS5B failures are rarely seen in clinical settings. There are commercially available assays to detect RAS in genotype 1 NS3/4a, NS5A and NS5B and in genotype 3 NS5A regions. RAS testing is to be ordered in only specific instances; see hcvguidelines.org for more information. RAS testing is not recommended prior to retreatment of DAA failures. It is required prior to treatment with elbasvir/grazoprevir [Zepatier®] in patients with Genotype 1 or 1a infection.

9/16

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

## HCV Medication Comparison Overview

| Medication | Genotype | Pills/Day | Duration (treatment naïve, no cirrhosis) | Resistance Testing Required? (treatment naïve, no cirrhosis) |
|---|---|---|---|---|
| Ledipasvir/ Sofosbuvir [Harvoni®] | 1, 4, 5, 6 | 1 | 8, 12 weeks | No |
| Sofosbuvir/ Velpatasvir [Epclusa®] | 1, 2, 3, 4, 5, 6 | 1 | 12 weeks | No |
| Glecaprevir/ Pibrentasvir [Mavyret®] | 1, 2, 3, 4, 5, 6 | 3 pills once/day | 8 weeks | No |
| Elbasvir/ Grazoprevir [Zepatier®] | 1, 4 | 1 | 12, 16 weeks | If Genotype 1A **and going to use Zepatier,** then resistance testing is required (Hepatitis C Viral RNA Geno 1 NS5a Drug Resist-92447) |

0 10/16

SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT

## Medications

- **WARNING: Risk of Hepatitis B virus reactivation in patients co-infected with HCV and HBV.** Test all patients for evidence of current or prior HBV infection before initiating HCV treatment.
- If treatment interruption occurs or is anticipated, contact the HCV warmline immediately.
- Multiple drug-drug interactions may occur. Consult the pharmacy or HCV warmline prior to initiating new medications during the HCV treatment course (see page 14).

### Direct Acting Oral Agents

| Medication | Dosing | Adverse Effects/Interactions* |
|---|---|---|
| **Elbasvir/grazoprevir [Zepatier®]**<br><br>Tablet: 50/100 mg<br><br>Elbasvir NS5a inhibitor<br>Grazoprevir NS3 / 4a protease inhibitor | *Activity in genotype 1 and 4*<br><br>**Dose:** One tablet once daily with or without food<br><br>**Renal dosing:**<br>• No dose adjustment required including hemodialysis patients<br><br>**Hepatic impairment:**<br>• Contraindicated in patients with moderate to severe hepatic impairment (CTP B or C) | • If GT1a, then resistance testing (Hepatitis C Viral RNA Geno 1 NS5a Drug Resist-92447) is required prior to treatment and cannot use if elbasvir resistance is predicted.<br>• ALT elevations > 5x upper limit of normal (ULN) at or after 8 weeks of treatment<br>  ➢ Perform hepatic lab testing prior to therapy, at treatment week 8, and as clinically indicated. Perform additional hepatic lab testing at week 12 if on 16 weeks of therapy<br>  ➢ Discontinue if ALT persistently > 10x ULN;<br>  ➢ Consider d/c if ALT elevation is accompanied by signs/symptoms of liver inflammation or increasing conjugated bilirubin, alkaline phosphatase, or INR<br>• Fatigue<br>• Headache<br>• Nausea<br>• Contraindicated with nafcillin, oral ketoconazole, bosentan, rifampin, tacrolimus, etravirine, cobicistat, modafinil, carbamazepine, oxcarbazepine<br>• Caution with statins: not to exceed 20 mg atorvastatin or 10 mg rosuvastatin<br>• Caution with warfarin, close monitoring of the INR is recommended |
| **Glecaprevir/Pibrentasvir [Mavyret®]**<br><br>Tablet: 100/40 mg<br><br>Glecaprevir NS3 protease inhibitor<br>Pibrentasvir NS5a inhibitor | *Activity in all genotypes*<br><br>**Dose:** Three tablets orally once daily with food<br><br>**Renal dosing:**<br>• No adjustments needed<br><br>**Hepatic impairment:**<br>• Not recommended in patients with moderate hepatic impairment (CTP B)<br>• Contraindicated in patients with severe hepatic impairment (CTP C) | • Fatigue<br>• Headache<br>• Contraindicated with atazanavir, rifampin, carbamazepine, efavirenz, ethinyl estradiol, darunavir, lopinavir/ritonavir, atorvastatin, lovastatin, simvastatin<br>• Caution with digoxin, dabigatran, cyclosporine, pravastatin (pravastatin dose 50%), rosuvastatin (not to exceed rosuvastatin 10 mg)<br>• Caution with warfarin, close monitoring of the INR is recommended |

**Bold = Formulary**

*See prescribing information for complete description of adverse effects and drug interactions.

## Medications continued

- **WARNING: Risk of Hepatitis B virus reactivation in patients co-infected with HCV and HBV.** Test all patients for evidence of current or prior HBV infection before initiating HCV treatment.
- If treatment interruption occurs or is anticipated, contact the HCV warmline as soon as possible.
- Multiple drug-drug interactions may occur. Consult the pharmacy or HCV warmline prior to initiating new medications during the HCV treatment course (see page 14).

### Direct Acting Oral Agents Continued

| Medication | Dosing | Adverse Effects/Interactions* |
|---|---|---|
| **Ledipasvir/sofosbuvir (HAR) [Harvoni®]**<br><br>Tablet: 90/400 mg<br><br>Ledipasvir NS5A inhibitor<br>Sofosbuvir NS5B inhibitor | *Activity in genotype 1, 4, 5, 6*<br><br>**Dose:** One tablet once daily with or without food<br><br>**Renal dosing:**<br>• No dose adjustment required including hemodialysis patients | • Fatigue<br>• Headache<br>• Nausea<br>• Significant drug-drug interaction with acid lowering agents<br>• Bradycardia when administered with amiodarone (not recommended)<br>• Contraindicated with certain P-gp inducers (e.g., carbamazepine, phenytoin, phenobarbital, oxcarbazepine, rifampin, rifabutin, rifapentine, tipranavir, topotecan)<br>• Caution with digoxin, statins, tenofovir DF<br>• Caution with warfarin, close monitoring of the INR is recommended |
| **Sofosbuvir/Velpatasvir [Epclusa®]**<br><br>Tablet: 400/100 mg<br><br>Sofosbuvir NS5B inhibitor<br>Velpatasvir NS5A inhibitor | *Activity in all genotypes*<br><br>**Dose:** One tablet once daily with or without food<br><br>**Renal dosing:**<br>• No dose adjustment required including hemodialysis patients | • Fatigue<br>• Headache<br>• Significant drug-drug interaction with acid lowering agents.<br>• Bradycardia when administered with amiodarone (not recommended)<br>• Contraindicated with certain P-gp inducers (e.g., carbamazepine, phenytoin, phenobarbital, oxcarbazepine, rifampin, rifabutin, rifapentine, efavirenz, tipranavir, topotecan)<br>• Caution with digoxin, statins, tenofovir DF<br>• Caution with warfarin, close monitoring of the INR is recommended |
| **Sofosbuvir/Velpatasvir/ Voxilaprevir [Vosevi®]**<br><br>Tablet: 400/100/100 mg<br><br>Sofosbuvir NS5B inhibitor<br>Velpatasvir NS5A inhibitor<br>Voxilaprevir NS3/4A protease inhibitor | *Activity in all genotypes*<br><br>**Dose:** One tablet once daily with food<br><br>**Renal dosing:**<br>• No dose adjustment required including hemodialysis patients<br><br>**Hepatic impairment:**<br>• Not recommended for patients with moderate to severe hepatic impairment (CTP B and C) | • Fatigue<br>• Headache<br>• Diarrhea<br>• Nausea<br>• Significant drug-drug interaction with acid lowering agents<br>• Bradycardia when administered with amiodarone (not recommended)<br>• Contraindicated with certain P-gp inducers (e.g., carbamazepine, phenytoin, phenobarbital, oxcarbazepine, rifampin, rifabutin, rifapentine, atazanavir, lopinavir, tipranavir, efavirenz, topotecan)<br>• Caution with statins, cyclosporine, digoxin<br>• Caution with warfarin, close monitoring of the INR is recommended |

**Bold = Formulary**

*See prescribing information for complete description of adverse effects and drug interactions.

SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT

## Medications continued

### HCV Agents—Other

| Medication | Dosing | Adverse Effects/Interactions* |
|---|---|---|
| **Ribavirin (RBV)**<br><br>**Tablet**/capsule: 200 mg | *Activity in all genotypes*<br><br>**Dose:** Based on body weight (total daily dose, divided two times a day)<br>< 75 kg: 1000 mg<br>> 75 kg: 1200 mg<br><br>**Renal dosing:**<br>CrCl 30-50 ml/min: Alternating doses, 200 mg and 400 mg every other day<br>CrCl < 30 ml/min: 200 mg daily<br>HD: 200 mg daily | **Anemia:**<br>• The primary clinical toxicity of RBV is hemolytic anemia (See anemia management, page 13).<br>• After about 2 weeks of RBV treatment, approximately 10% develop severe anemia; this may result in worsening of cardiac disease and has led to fatal and nonfatal myocardial infarctions.<br>**Teratogenicity (Pregnancy):**<br>• Due to the risk of fetal malformations and fetal death with RBV, a negative pregnancy test is required before treatment consideration.<br>• Women of childbearing potential must use 2 forms of effective contraception during treatment and for 6 months after treatment.<br>• Men whose female partners are pregnant or may become pregnant must use barrier contraception during treatment and for 6 months after treatment.<br>• Histamine-like side effects: nasal stuffiness, itching, skin irritation, asthma-like syndrome. |

### Colony Stimulating Factors (epoetin alfa)

| Medication | Dosing | Adverse Effects/Interactions* |
|---|---|---|
| **Epoetin alfa**<br><br>10,000 units/ml, 20,000 units/ml, 40,000 units/ml 4,000 units/ml, 3,000 units/ml, 2,000 units/ml | **Usual Dose:**<br>• 50-100 units/kg subQ, (IV preferred if dialysis) three times weekly<br>or<br>• 150-300 units/kg subQ once weekly (maximum 40,000 units weekly)<br><br>Titrate to maintain Hgb 10-12 g/dl<br><br>• Frequent Hgb monitoring is required<br>• Avoid increase of Hgb > 1g/dl over a two week period | • Epoetin alfa does not have a U.S. FDA indication for the treatment of RBV associated anemia although it is commonly used for this complication of treatment.<br>• Epoetin alfa is associated with significant toxicities, including pure red cell aplasia and cardiovascular risks such as thromboembolic events and strokes.<br>• Use with caution in the patients with malignancies, hypertension (HTN), cardiovascular disease, hypercoagulable conditions, sickle cell disorders and seizures.<br>• "FDA Drug Safety Communication: Erythropoiesis-Stimulating Agents (ESAs): Epogen® states:<br>• Health care professionals who prescribe epoetin alfa to patients with anemia from causes other than cancer chemotherapy are required to provide a copy of the Medication Guide to each patient. Please see http://www.fda.gov/downloads/Drugs/Drugsafety/ucm088988.pdf for a copy of this medication guide.<br>• Patients need to know about increase risks of CV related conditions, stroke, death.<br>• Prior to the initiation of epoetin for the correction of anemia in the patient receiving HCV treatment, a consultation with the CCHCS HCV warmline is *strongly recommended at:* CDCR CPHCS HCV Questions@cdcr.ca.gov. |

**Bold = Formulary**

*See prescribing information for complete description of adverse effects and drug interactions.

Case 2:20-cv-00195-DJC-CKD Document 301 Filed 08/28/23 Page 104 of 168

## Management of Side Effects of HCV Treatment with Ribavirin

### Anemia (Consider Consultation with HCV Warmline at CDCR CPHCS HCV Questions@cdcr.ca.gov)

| Hemoglobin g/dl | Action |
|---|---|
| < 10 g/dl in patients with no history of cardiac disease | • Decrease RBV to 600 mg/day*<br>• Recheck Hgb weekly |
| ≥ 2 g/dl decrease during any 4 week period and history of stable cardiovascular disease | • Decrease RBV to 600 mg/day*<br>• Recheck Hgb weekly |
| Hgb 8.6-9.0 g/dl | • RBV dose reduction to 600 mg/day if not already done<br>• Weekly Hgb monitoring<br>• Consider epoetin alfa if the dose has been reduced to 600 mg/day for at least two weeks with continued drop in Hgb<br>  ▪ Careful review with patient of risks/benefits of epoetin alfa versus stopping HCV treatment.** § Provide the epoetin alfa medication guide (see page 13)<br>• Symptomatic anemia: discontinue HCV treatment** § |
| Hgb 8.0-8.5 g/dl | • RBV dose reduction to 600 mg/day if not already done<br>• Weekly Hgb monitoring<br>• Careful review with patient of risks/benefits of epoetin alfa vs. stopping HCV treatment** §<br>• If considered clinically stable to continue HCV treatment and if the patient agrees, provide epoetin alfa medication guide (see page 12)<br>• Symptomatic anemia: Consider inpatient management and RBC transfusion and consider discontinuing HCV treatment** § |
| Hgb 7.5-7.9 g/dl | • Review with patient the risks of anemia and stopping HCV treatment vs. the risk of continuing HCV treatment and epoetin alfa.** § Provide epoetin alfa medication guide to patients starting epoetin alfa (see page 12).<br>• Stop RBV (If on DAA, discontinue medication and contact the HCV warmline)<br>• Weekly CBC monitoring<br>• Symptomatic anemia: Discontinue HCV treatment** § and consider inpatient management and RBC transfusion |
| Hgb < 7.5 g/dl or symptomatic anemia | • Terminate HCV treatment§ |

***If RBV dose is reduced for anemia:**
- Once Hgb has increased to > 10.0 g/dl, increase the ribavirin dose by 200 mg/day at two week intervals until the initial dose is reached.

****If RBV is temporarily stopped due to anemia:**
- Recheck Hgb within two weeks and at two week intervals until stable.
- If Hgb is > 10.0 g/dl, restart RBV at a dose of 600 mg/day if patient's weight < 75 kg; 800 mg/day if the patient's weight is ≥ 75 kg.
- If hemoglobin remains > 10.0 g/dl, increase dose by 200 mg/day at two week intervals until the initial dose is reached.

§ **Consultation with the CCHCS HCV warmline is *strongly* recommended prior to stopping HCV Treatment CDCR CPHCS HCV Questions@cdcr.ca.gov.**

## Drug-Drug Interactions

Multiple drug-drug interactions exist between the direct acting HCV medications and other medication classes including, but not limited to, certain antimicrobials, analgesics, antiarrhythmics, oral contraceptives, anxiolytics, lipid lowering agents, acid lowering agents, antiretrovirals, herbal preparations, corticosteroids, and anticonvulsants and specific medications such as rifampin, salmeterol, and warfarin.

The HCV Central Treatment Team at HQ will use the patient's current medication list when choosing the appropriate HCV treatment regimen for that patient. If the patient requires an addition of any medication during their HCV treatment course, the prescribing provider will need to address possible drug-drug interactions prior to prescribing.

For more information on drug-drug interactions:

- **Contact the HCV warmline at CDCR CPHCS HCV Questions@cdcr.ca.gov**
- **http://www.hep-druginteractions.org**

**Using the Drug-Drug Interaction Tool on Lifeline:**

1. Go to Lifeline (http://lifeline/Pages/Home.aspx).
2. Under Divisions/Programs, select Quality Management.
3. Under External Links, select Quality Management Portal.
4. Under Care Team Tools, select All Care Team Tools.
5. Under Pharmacy/Medication Management, select Drug-Drug Interaction Checker.

Or select the hyperlink below:
http://cphcspfdccdww01/Reports/Pages/Report.aspx?ItemPath=/QM/Tools/DrugDrugInterationSearch

# PATIENT EDUCATION/SELF MANAGEMENT

## WHAT YOU SHOULD KNOW: HEPATITIS C VIRUS

### WHAT IS HEPATITIS C?

- Hepatitis C is a virus that causes swelling and irritation of the liver.
- The liver helps with digestion and filters waste products out of the blood.
- Hepatitis C can cause serious damage to the liver.
- Hepatitis C has no vaccine, but you can be vaccinated for hepatitis A and B to prevent more damage to your liver.

### HOW DO YOU GET HEPATITIS C?

You can get hepatitis C from:

- Dirty needles (tattoos or piercing)
- Snorting drugs with infected equipment
- Sharing needles to inject drugs
- Unprotected sex (rarely)
- A blood transfusion if you got one in the USA before 1992 (All blood now tested for hepatitis C before transfusion)

### HOW DO YOU KNOW IF YOU HAVE HEPATITIS C?

- Most people who have hepatitis C look and feel fine.
- You can have hepatitis C for a long time and not know it.
- Usually hepatitis C is found by doing blood tests.
- If hepatitis C damages the liver, it can cause scarring. This is called cirrhosis (sir-oh-sis).
- Your health care provider may order more tests to see how much liver damage you have.
- Some people with hepatitis C can have:
  - Fatigue
  - Stomach pain
  - Joint pain
  - Night sweats
  - Loss of appetite or nausea

### WHAT CAN YOU DO TO TAKE CARE OF YOURSELF?

- Get vaccinated for hepatitis A and B. Get yearly vaccinations for pneumonia and the flu.
- Do not drink alcohol or use illegal drugs - these will damage your liver more.
- Do not take a lot of medications like acetaminophen (Tylenol®) and ibuprofen (Motrin®). Talk to your health care provider about all medications, including over-the-counter medications, vitamins, and herbs to be sure they will not damage your liver. Ask your health care provider before you take any pain medicine.
- Do not get tattoos in prison because of the risk of new infection with hepatitis C, hepatitis B, or HIV.
- Do not share your toothbrush, razor, or other personal items.
- Eat a healthy diet and try to lose weight if you are overweight.
- Drink plenty of water.
- Get plenty of rest and regular exercise.
- Quit smoking cigarettes.
- Follow your health care provider's instructions about medications for hepatitis C treatment.
- See your health care provider regularly.

### CAN HEPATITIS C BE CURED?

- For many years hepatitis C treatment was difficult and took up to 12 months – the treatment is better now and many patients can be cured of hepatitis C (but if they continue to inject drugs or do other risky things, they can get it again).
- Hepatitis C treatment is not an emergency. The liver damage/scar tissue happens over many years, and some people never get much damage or scarring.
- What specific hepatitis C treatment to use, how long the treatment needs to be given, and how soon a person should be treated all depend on many things which are different for each person. You should discuss your case with your health care provider.
- You can get re-infected if you are exposed to the hepatitis C virus again. Successful treatment does not provide protection from repeat infections.

Case 2:20-cv-00195-DJC-CKD Document 301 Filed 08/28/23 Page 107 of 168

# EDUCACIÓN PARA EL PACIENTE/CONTROL PERSONAL DEL CASO

## LO QUÉ DEBE SABER: HEPATITIS C

### ¿QUÉ ES LA HEPATITIS C?

- La hepatitis C es un virus que produce inflamación e irritación del hígado.
- El hígado ayuda a la digestion y filtra los productos de desecho fuera de la sangre.
- La hepatitis C puede causar daños serios al hígado.
- No existe vacuna para prevenir la hepatitis C, pero usted puede vacunarse contra la hepatitis A y B para evitar dañar más su hígado.

### ¿CÓMO SE PUEDE CONTRAER LA HEPATITIS C?

La hepatitis C se puede contraer de las siguientes maneras:

- Agujas contaminadas (tatuajes o perforaciones).
- Inhalar drogas usando un equipo infectado.
- Compartir agujas para inyectarse drogas.
- Practicar sexo sin protección (raras veces).
- Mediante transfusion de sangre si se realizó en EE.UU. antes de 1992. (Actualmente, toda transfusion de sangre es sometida a la prueba de la hepatitis C antes de realizarse.)

### ¿CÓMO SABER SI USTED SUFRE DE LA HEPATITIS C?

- La mayoría de las personas enfermas lucen y se sienten sanas.
- Se puede sufrir de la hepatitis C por un tiempo largo y no saberlo.
- Usualmente se puede detectar la hepatitis C mediante un examen de sangre.
- Si la hepatitis C daña el hígado, puede producer cicatrices. Esto se conoce como cirrosis.
- Su medico puede indicarle otros exámenes para verificar el daño que tiene su hígado.
- Algunas personas que sufren de la hepatitis C presetan:
  - Fatiga
  - Dolor estomacal
  - Dolor en las articulaciones
  - Sudoración nocturna
  - Pérdida del apetito o náuseas

### ¿QUÉ PUEDE HACER USTED PARA CUIDARSE?

- Hágase vacunar contra la hepatitis A y B. Vacúnese anualmente contra la neumonía y la gripe.
- No consuma alcohol ni use drogas ilícitas - estas producirán más daño al hígado.

- No ingiera gran cantidad de medicamentos como el paracetamol (Tylenol®) y el ibuprofeno (Motrin®). Consulte con su medico acerca de todos los medicamentos, incluyendo los medicamentos de venta sin prescripción, vitaminas y hierbas para evitar dañar el hígado. Consulte con su médico antes de ingerir cualquier medicamento analgésico.
- No se realice tatuajes en la prisión para evitar enfermedades de transmisión sanguínea.
- No comparta su cepillo de dientes, rasuradora u otros objetos personales.
- Trate de adelgazar si tiene sobrepeso.

- Mantenga una dieta sana.
- Ingiera abundante cantidad de agua.
- Tenga mucho descanso y realice ejercicio con regularidad.

- Abandone el hábito de fumar cigarrillos.
- Siga las instrucciones de su médico acerca de los medicamentos para tratar la hepatitis C.
- Consulte con regularidad con su médico.

### ¿SE PUEDE CURAR LA HEPATITIS C?

- Durante muchos años el tratamiento de la hepatitis C era muy difícil y tomaba hasta 12 meses – el tratamiento es mejor ahora y muchos pacientes pueden ser curados de la hepatitis C (pero si continúan inyectándose drogas o haciendo otras cosas riesgosas, pueden volver a contagiarse).
- El tratamiento de la hepatitis C no es una emergencia. El daño al hígado o los tejidos de cicatriz que se forman toman muchos años para realizarse, y algunas personas nunca tienen mucho daño o muchas cicatrices
- El tratamiento específico que debe ser usado contra la hepatitis C, cuánto tiempo debe durar el tratamiento y qué tan pronto una persona debe tratarse depende de muchos factores y estos varían en cada persona. Discuta su caso con su médico.
- Puede volver a infectarse si vuelve a estar expuesto al virus de la hepatitis C. Un tratamiento que tiene éxito no protege contra las infecciones recurrentes del VHC.

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

Exhibit P 1/14

## GOALS

- Identify Hepatitis C Virus (HCV) infected patients
- Monitor HCV patients on treatment per guidelines
- Stop treatment when indicated (futility rules)
- Monitor all HCV patients for signs of cirrhosis
- Manage End Stage Liver Disease (ESLD)

## ALERTS

**HCV TREATMENT**

- HCV treatment **for all genotypes** requires approval from the Headquarters CCHCS HCV Oversight Committee
- Closely monitor hemoglobin, platelets, and ANC during treatment
- **Do not use any agent as monotherapy**

**CIRRHOTICS**

- Screen for hepatocellular carcinoma and varices
- Identify decompensated cirrhosis (evidenced by encephalopathy, ascites, variceal hemorrhage, spontaneous bacterial peritonitis, hepatopulmonary or hepatorenal disease or a Child-Pugh score of ≥ 7)

## TREATMENT OPTIONS

**PATIENT SELECTION**: Who to treat?

In CCHCS, treatment eligibility is based on estimated disease severity.

- Every patient with chronic HCV does **not** need treatment.
- Only 10-20% of people with chronic HCV develop severe liver disease; only 1- 5% will die from complications of liver disease. There is no single test that can absolutely predict who will progress to severe liver disease.
- Treatment in CCHCS is deferred for those with minimal liver disease or low likelihood of significant liver disease (see page 5). HCV status and treatment eligibility will be reassessed at least annually.
- **All genotypes** now require treatment preapproval through the HQ CCHCS HCV Oversight Committee.

HCV evaluation and treatment is generally not initiated in reception centers. When indicated, HCV treatment will begin after the patient has transferred to a mainline institution.

Patients deferred for any of the new HCV treatments according to the criteria outlined in this care guide may not receive the older pegylated interferon / ribavirin regimen as an alternative to no treatment.

**TREATMENT**

The recommended medication regimen depends on genotype and other factors. These regimens are changing rapidly as many new agents are being released for treatment of HCV (see page 6).

## MONITORING

### ALL CHRONIC HCV INFECTED PATIENTS:

- Annual clinical assessment: Consider labs including platelets (Plt), INR, albumin, AST/ALT, and total bilirubin every 6-12 months to assess progression of liver disease, determine FIB4 or Child-Pugh score (see page 3) as indicated.
- Vaccines: Offer and document HAV, HBV, and pneumococcal vaccination. Encourage annual influenza vaccination.

### HCV PATIENTS RECEIVING ANTIVIRAL THERAPY:

- See HCV treatment tracking flowsheets[1] regarding intervals for CBC, creatinine, LFT, TSH, high sensitivity HCV viral load (VL).
- Assess for depression and other side effects at each visit.
- Follow up as clinically indicated, usually every 1-4 weeks during active treatment.

### CHRONIC HCV INFECTED PATIENTS WITH CIRRHOSIS

- Ultrasound every 6 months with clinically diagnosed or biopsy proven cirrhosis to screen for hepatocellular carcinoma.
- Monitor Child-Pugh score (see page 3) as indicated. See CCHCS ESLD Care Guide.

[1]All HCV Care Guide related forms are available on CCHCS Lifeline at: Lifeline homepage→ IMSP&P→ Forms tab: (HCV Form Numbers: CDCR 7413-7416)

Table of Contents

***Information contained in the Care Guide is not a substitute for a health care professional's clinical judgment. Evaluation and treatment should be tailored to the individual patient and the clinical circumstances. Furthermore, using this information will not guarantee a specific outcome for each patient. Refer to "Disclaimer Regarding Care Guides" for further clarification.***

## DIAGNOSIS OF HEPATITIS C

Exhibit D
2/14

All HCV forms are available on CCHCS Lifeline at:
http://lifeline/PolicyandAdministration/PolicyandRiskManagement/IMSPP/Pages/Resources.aspx

## EXCLUSION CRITERIA

### Release Date Exclusion

| Clinical history | Min. # of Months* |
|---|---|
| Not cirrhotic | 5 |
| Cirrhotic | 8 |

### Other Exclusion Criteria

- Poorly controlled cardiopulmonary, cerebrovascular, or thyroid disease, blood dyscrasias, seizures, cancer, diabetes mellitus (hemoglobin A1C > 8.5)
- HIV infection with CD4 count < 200 cells/ml or undergoing treatment for opportunistic infection
- Kidney, lung, heart transplant
- Anemia, hemoglobin < 11 g/dl or hematocrit < 33%
- Allergy to ribavirin
- Inability to cooperate with treatment
- Inability to give informed consent
- Ongoing illicit drug or alcohol use
- Pregnancy or inability to practice contraception

### Interferon Exclusion Criteria

- WBC < 1,500 cells/µl or Platelets < 75,000/µl
- History of decompensated cirrhosis, evidenced by:
  - variceal hemorrhage (esophageal varices with no history of variceal hemorrhage are not a contraindication)
  - ascites
  - hepatic encephalopathy
  - spontaneous bacterial peritonitis
  - hepatopulmonary disease
  - hepatorenal disease
  - Child-Pugh score of ≥ 7
  
  (Child-Pugh ≥ 6 if HIV/HCV coinfected)
- Severe or acute autoimmune disease (recommend consultation)
- Poorly controlled depression
- Serious suicidal behavior in the past 12 months

*Patients will be excluded from treatment consideration in CCHCS if they will be released before the evaluation and course of treatment can be completed. The 'months' noted above show the minimum number of months of incarceration needed to be eligible for consideration of HCV therapy based on genotype and other patient factors. More time may be required in some cases.

## DIAGNOSTIC CRITERIA

X 3/14

| FROM PAGE 2 | HCV AB | HCV RNA VIRAL LOAD | DIAGNOSIS | COMMENT |
|---|---|---|---|---|
| A | Pos | Pos | • Chronic HCV (80% of those initially infected) | • Order HCV genotype if no prior result available<br>• Assess for treatment eligibility |
| B | Pos | Neg | • Resolved HCV (up to 20% of those infected)<br>• Acute HCV with transient viral clearing (see page 4)<br>• False positive HCV Ab | • Consider rechecking high sensitivity VL at 6-12 months to confirm that patient is not chronically infected |
| C | Neg | Pos | • Early acute HCV (see page 4)<br>• Chronic HCV in immunosuppressed patient (e.g., HIV)<br>• False positive viral load | • If acute HCV, consider consultation with HCV specialist at: CDCR CPHCS HCV QUESTIONS @cdcr.ca.gov and see Acute HCV Diagnosis, Evaluation, and Treatment (see page 4) |

## CHILD-PUGH SCORING

Child-Pugh is a tool used to help assess prognosis in patients with liver disease.
Variations in the timing and subjectivity inherent in the scoring (e.g., in grading ascites or encephalopathy) are its major limitations.

**CHILD-PUGH POINTS**

| | 1 | 2 | 3 |
|---|---|---|---|
| Encephalopathy[t] | None | Grade 1-2 | Grade 3-4 (or chronic) |
| Ascites | None | Mild/Moderate (diuretic-responsive) | Severe (diuretic-refractory) |
| Bilirubin (mg/dl)[§] | < 2 | 2-3 | > 3 |
| Albumin (g/dl) | > 3.5 | 2.8-3.5 | < 2.8 |
| PT (seconds prolonged) | < 4 | 4-6 | > 6 |
| INR | < 1.7 | 1.7-2.3 | > 2.3 |

**CHILD-PUGH CIRRHOSIS SCORING[1,2,3]**

| Class | Points | One year survival (%) | Two year survival (%) |
|---|---|---|---|
| Class A | 5-6 | 95 | 90 |
| Class B | 7-9 | 80 | 70 |
| Class C | 10-15 | 45 | 38 |

[t] Encephalopathy:
grade 1: mild confusion, anxiety, restlessness, fine tremor, slowed coordination
grade 2: drowsiness, disorientation, asterixis
grade 3: somnolent but arousable, marked confusion, incomprehensible speech, incontinence, hyperventilation
grade 4: coma, decerebrate posturing, flaccidity

[§] modified total bilirubin used to score patients who have Gilbert's syndrome or who are taking atazanavir or indinavir

1. Child CG, Turcotte JG. The Liver and Portal Hypertension. *Philadelphia, WB Saunders Co.* 1964.
2. Pugh RN, Murray-Lyon IM, Dawson JL, et. al. Transection of the oesophagus for bleeding oesophageal varices. *Br J Surg.* 1973; 60:646.
3. Trey C, Burns DG, Saunders SJ. Treatment of hepatic coma by exchange blood transfusion. *NEJM.* 1966; 274:473.

# ACUTE HCV: DIAGNOSIS, EVALUATION, AND TREATMENT

P 4/14

## DEFINITION

- Positive HCV viral load with negative HCV antibody, OR
- Documented change in HCV antibody from negative to positive within a 6 month time period, OR
- A new (within the last 3 months) positive HCV antibody accompanied by:
  - A new elevation of ALT (defined as at least 5x prior baseline level obtained within the last 24 months), or
  - An increase of ALT to more than 5 times > normal ALT levels if no baseline labs in last 24 months, and
  - No other concomitant conditions to explain the rise in liver enzymes.

## EVALUATION

- The majority of patients are asymptomatic. Clinical presentation may include jaundice, dark urine, fatigue, and/or right upper quadrant abdominal pain.
- "Time Zero" is date of first signs and symptoms of acute hepatitis, or first lab abnormalities or, if none of the above are present, most recent date of IV drug use or tattooing can be used to determine waiting time to see if HCV will spontaneously resolve.
- Obtain baseline labs: quantitative HCV VL, HIV antibody, CBC, complete metabolic panel (CMP), TSH, and PT/INR.
- Confirm that HCV hasn't resolved spontaneously: recheck quantitative HCV viral load 8-10 weeks after the first identified seroconversion. If HCV VL is negative, confirm that virus has cleared by rechecking HCV VL in 4 weeks. If HCV VL is detectable at any recheck, the patient is considered to have chronic HCV. (see page 1 regarding monitoring of chronic HCV).
- Consult the HCV warmline at CDCR CPHCS HCV Questions@cdcr.ca.gov if the diagnosis (acute or chronic) is uncertain.
- Counsel patient regarding risk reduction.

## TREATMENT

- Given the natural course of HCV infection, and the high cure rate with current HCV treatment, there is no clear benefit to treating acute HCV in the majority of cases. Rare cases of fulminant hepatic failure may benefit from acute HCV treatment; contact the HCV warmline for urgent consultation regarding these cases.
- For all other acute HCV cases, follow serial labs to establish a diagnosis as above. If chronic HCV diagnosis is confirmed, consider work up and staging for treatment when baseline labs have normalized (6-12 months post acute seroconversion).



CHRONIC HCV: PATIENT SELECTION FOR TREATMENT

Has the patient had a previous liver biopsy or FibroScan™?
no
yes
Fibrosis Stage 0, 1, 2 or FibroScan™ <9.5 : how old is this study?
Fibrosis stage
≥ 2 (HIV+ only), or
< 5 years (< 3 y if HIV+): calculate FIB4
> 5 years (> 3 y if HIV+)
FIB4 <3.25: Defer treatment. Clinically reassess annually; include FIB4. Repeat biopsy or FibroScan™ is not indicated.
FIB4 >3.25 Repeat biopsy or FibroScan™ is not indicated. See FIB4 >3.25 below.
Send CDCR 7413-2 HCV Treatment Authorization: Initial Form to CDCR CPHCS HCV Questions@cdcr.ca.gov
Calculate FIB4*
FIB4 <1.45: unlikely to have significant fibrosis
FIB4 ≥1.45 and ≤3.25
FIB4 >3.25: high likelihood of advanced disease: Does the patient have compensated cirrhosis?
Defer treatment. Clinically reassess annually; include FIB4. FibroScan™ is not indicated.
Treatment declined: reassess annually; include FIB4. FibroScan™ is not indicated.
Treatment desired: biopsy or equivalent staging method (e.g., FibroScan™) required.
yes
no
Fibrosis Stage 0 - 1 FibroScan™ ≤7.0
Fibrosis Stage 2 FibroScan™ >7.0 and <9.5
Fibrosis Stage 2-3 or 3 FibroScan™ ≥9.5 and <12
Fibrosis Stage 4; FibroScan™ ≥12: Does patient have compensated cirrhosis?
Decompensated
yes
no
HIV neg
HIV pos
Defer treatment. Clinically reassess annually; include FIB4. Fibroscan™ is not indicated.
Send Treatment Authorization form CDCR 7413-2 to: CDCR CPHCS HCV Questions@cdcr.ca.gov
Treatment is authorized—go to page 6
Treatment is denied/deferred - as per instructions on the Treatment Authorization form CDCR 7413-2

**$^*$FIB4 = [Age(y) x AST(U/L)] / [PLT($10^9$/L) x ALT(U/L)$^{1/2}$]**
FIB4 <1.45 - unlikely to have significant fibrosis;
FIB4 1.45 to 3.25 - FIB4 in this range is not an accurate predictor of fibrosis stage, biopsy or equivalent staging method required.
*Vallet-Pichard, A et al, FIB-4: an Inexpensive and Accurate Marker of Fibrosis in HCV Infection. Comparison with Liver Biopsy and FibroTest. Hepatology 2007;46:32-36.*

**FIBROSCAN™** uses transient elastography to measure liver stiffness. The shear wave velocity has been correlated with stages of fibrosis in HCV patients in the following manner:

| **FibroScan result (kpa)** | ≤7.0 | >7.0 | ≥9.5 | ≥12.0 |
|---|---|---|---|---|
| **Equivalent stage of fibrosis (HCV)** | F0-F1 | F2 | F3 | F4 |

If indicated and if treatment is being considered, repeat FibroScan every 5 years if HIV negative, every 3 years if HIV positive.
Repeat FibrosSan is not necessary if: prior FibroScan within 5 years (3 years if HIV positive); if prior FibroScan ≥9.5; if prior liver biopsy stage 3 or 4 fibrosis; if clinically cirrhotic; if current FIB4 <1.45 or >3.25.
*Ziol, M et al, Noninvasive Assessment of Liver Fibrosis by Measurement of Stiffness in Patients With Chronic Hepatitis C. Hepatology 2005; 48-54.*

**LIVER BIOPSY**
- Adequate biopsy defined as 15 mm in length with a minimum of 6-8 portal tracts seen.
- If indicated and if treatment is being considered, repeat biopsy if stage ≤2 every 5 years if HIV negative, every 3 years if HIV positive. Liver biopsy is not necessary if prior biopsy stage 3 or 4 fibrosis, or if clinically cirrhotic.
- Biopsy not required for patients with FIB4 <1.45 or >3.25 unless clinical condition is unclear.

## CHRONIC HCV TREATMENT

P 6/14

Chronic HCV treatment is advancing more rapidly than CCHCS Care Guide revision cycles. In order to avoid the publication of outdated HCV treatment regimens in this Hepatitis C Care Guide, the provider is referred to the CCHCS Hepatitis C warmline (CDCR CPHCS HCV Questions@cdcr.ca.gov) or www.hcvguidelines.org (American Association for the Study of Liver Diseases/ Infectious Diseases Society of America/ International Antiviral Society USA) for information regarding specific recommended treatment regimens for each HCV genotype and associated clinical condition[s]. Treatment protocols are available for each HCV genotype both for initial HCV treatment as well as for chronic HCV patients requiring retreatment.

**NOTE: Evaluation by HQ CCHCS HCV Oversight Committee is required before initiating HCV therapy.**
Email questions to CDCR CPHCS HCV Questions@cdcr.ca.gov

| LAB EVALUATION (obtain from Quest) | | CBC | CMP | PT/INR | HCV viral load | HIV test | TSH* |
|---|---|---|---|---|---|---|---|
| Pre-treatment | Within past 12 months | | | | ✓ | ✓ | ✓ |
| | Within past 3 months | ✓ | ✓ | ✓ | | | |
| During Treatment | Week 2 | ✓ | ✓ | | | | |
| | Week 4 | ✓ | ✓ | | ✓ | | |
| | Week 12 | ✓** | ✓** | | ✓** | | ✓** |
| End of treatment | | ✓ | ✓ | | ✓ | | |
| After treatment | 3 months after treatment ends | | | | ✓ | | |

*If pegylated interferon treatment is considered
**Obtain these labs every 4 weeks until end of treatment

## MONITORING DURING TREATMENT AND STOPPING (FUTILITY) RULES

| Rx week | Result | Direct acting agents | Pegylated interferon/ ribavirin only |
|---|---|---|---|
| Week 4 | ALT: >10 fold increase | **Stop treatment** | **Stop treatment** |
| | HCV VL: detectable | Check HCV VL at week 6 | n/a |
| Week 6 | HCV VL: 1 log increase from week 4 | **Stop treatment** | n/a |
| | HCV VL: not undetectable but <1 log increase from week 4 | Continue treatment | n/a |
| Week 12 | HCV VL: < 2 log decrease | n/a | **Stop treatment** |
| | HCV VL: >2 log decrease | n/a | Check HCV VL at week 24 |
| Week 24 | HCV VL: detectable | n/a | **Stop treatment** |
| | HCV VL: undetectable | n/a | Continue treatment |

# MEDICATIONS

**DIRECT ACTING ORAL AGENTS**

- **Do not prescribe any single agent as monotherapy**. If treatment interruption occurs or is anticipated, contact the HCV warmline ASAP.
- Multiple drug-drug interactions may occur. Consult pharmacy or HCV warmline prior to initiating new medications during HCV treatment course (see page 12).

| MEDICATION | DOSING | ADVERSE EFFECTS/INTERACTIONS* |
|---|---|---|
| Daclatasvir<br>[Daklinza]<br><br>Tablet: 30 mg, 60 mg<br><br>NS5A inhibitor | *Activity in genotype 1,2,3,4*<br>Dose:<br>• 60 mg daily in combination with sofosbuvir<br>• 30 mg daily with strong CYP3A inhibitors<br>• 90 mg daily with moderate CYP3A inducers<br>Strong CYP3A inducers contraindicated (phenytoin, rifampin, carbamazepine)<br><br>Renal dosing:<br>No dose adjustment required | • Bradycardia when administered with sofosbuvir and amiodarone (not recommended)<br>• Headache<br>• Fatigue |
| Dasabuvir<br>Tablet: 250 mg<br>Ombitasvir/paritapravir/ritonavir<br>Tablet: 12.5/75/50 mg<br>[drug combination co-packaged as Viekira Pak® for HCV]<br><br>Dasabuvir: NS5B polymerase inhibitor<br>Ombitasvir: NS5A inhibitor<br>Paritaprevir: NS3/4A protease inhibitor<br>Ritonavir: CYP3A inhibitor | *Activity in genotype 1*<br>Dose: Combination of two ombitasvir/paritapravir/ritonavir twice daily with one dasabuvir twice daily<br><br>Renal dosing:<br>• No dose adjustment required<br>• Limited data in hemodialysis patients | • ALT elevations >5x upper limit of normal (ULN) within first 4 weeks of treatment<br>➢ d/c if ALT persistently >10x ULN;<br>➢ consider d/c if ALT elevation is accompanied by signs/symptoms of liver inflammation or increasing conjugated bilirubin, alkaline phosphatase, or INR<br>• Contains ritonavir; HIV patients must be on suppressive HIV regimen to prevent development of HIV resistant mutations<br>• Fatigue<br>• Nausea<br>• Pruritis and skin reactions including rash<br>• Insomnia |
| **Ledipasvir/sofosbuvir (HAR)**<br>[Harvoni®]<br>90/400 mg tablet<br><br>NS5A/NS5B inhibitor | Dose: one tablet once daily with or without food<br><br>Renal dosing:<br>eGFR<30 or HD: safety and efficacy has not been established | • Fatigue<br>• Headache<br>• Nausea<br>• Significant drug-drug interaction with acid lowering agents. |
| Ombitasvir/paritapravir/ritonavir<br>[TECHNIVIE]<br><br>Tablet:12.5/75/50 mg<br><br>Ombitasvir: NS5A inhibitor<br>Paritaprevir: NS3/4A protease inhibitor<br>Ritonavir: CYP3A inhibitor | *Activity in genotype 4*<br>Dose: two ombitasvir/paritapravir/ritonavir twice daily with ribavirin<br><br>Renal dosing:<br>• No dose adjustment required<br>• Limited data in hemodialysis patients | • Contains ritonavir; HIV patients must be on suppressive HIV regimen to prevent development of HIV resistant mutations<br>• Fatigue<br>• Nausea<br>• Pruritis and skin reactions including rash<br>• Insomnia |

**Bold = Formulary** *See prescribing information for complete description of adverse effects and drug interactions.

P 8/14

## MEDICATIONS

**DIRECT ACTING ORAL AGENTS**

- **Do not prescribe any single agent as monotherapy.** If treatment interruption occurs or is anticipated, contact the HCV warmline ASAP.
- Multiple drug-drug interactions may occur. Consult pharmacy or HCV warmline prior to initiating new medications during HCV treatment course (see page 12).

| MEDICATION | DOSING | ADVERSE EFFECTS/INTERACTIONS* |
|---|---|---|
| SIMEPREVIR (SMV) [OLYSIO®]<br><br>Capsule: 150 mg<br><br>NS3/4A Protease Inhibitor | *Activity in genotypes 1 and 4*<br>Dose: one 150 mg capsule once daily with food<br><br>Renal dosing:<br>• No dose adjustment required<br>• Limited data in hemodialysis patients | • Nausea and myalgia<br>• Photosensitivity: wear protective clothing and protect skin from sun. Discontinue if serious photosensitivity is noted<br>• Rash: if severe, treatment should be discontinued<br>• Do not use in patients who have previously failed boceprevir or telaprevir |
| **SOFOSBUVIR (SOF) [SOVALDI®]**<br><br>Tablet: 400 mg<br><br>NS5B Polymerase Inhibitor | *Activity in all genotypes*<br>Dose: one tablet once daily with or without food<br><br>Renal dosing:<br>CrCl < 30 ml/min and HD: Limited data available | • Fatigue<br>• Headache<br>• Monotherapy is contraindicated: Do not use SOF without the rest of the HCV combination as HCV resistance will develop |
| **HCV AGENTS—OTHER** | | |
| **PEGYLATED INTERFERON (PEG) [PEGASYS®]**<br>***Alfa 2a-given by subQ injection*** | *Activity in all genotypes*<br>Usual Dose: 180 mcg subQ once weekly<br><br>Renal dosing:<br>CrCl < 30 ml/min: 135 mcg once weekly<br>HD: 135 mcg once weekly | • Flu-like symptoms: fever, chills, headache, myalgia, fatigue, nausea, and anorexia. Symptoms are usually worse right after the weekly injection and can be reduced by taking analgesic medications an hour or two before each injection<br>• Depression and related symptoms: anxiety, irritability, insomnia, confusion, and difficulty with concentration and memory are common during treatment<br>• While less common, other psychiatric side effects include aggressive behavior, psychosis, hallucinations, and mania; a few cases of suicide have been reported<br>• Neutropenia and thrombocytopenia: See page 11 for management<br>• Additional side effects: colitis, pancreatitis, vision problems, pruritus, hair loss, and injection site reactions<br>• Warnings: Pegylated interferon should not be used in those with the following conditions:<br>➢ kidney, lung, or heart transplants<br>➢ known hypersensitivity to pegylated interferon components<br>➢ decompensated cirrhosis<br>➢ autoimmune hepatitis<br>➢ uncontrolled major depression<br>• Pegylated interferon should be used with caution, preferably by a specialist, in people with heart and thyroid problems, pulmonary disorders, and other autoimmune diseases |

**Bold = Formulary** *See prescribing information for complete description of adverse effects and drug interactions.

Exhibit P 9/14

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

## MEDICATIONS

### HCV AGENTS—OTHER

| MEDICATION | DOSING | ADVERSE EFFECTS/INTERACTIONS* |
|---|---|---|
| **RIBAVIRIN (RBV)**<br><br>Tablet/capsule: 200 mg | *Activity in all genotypes*<br>Dose: Based on body weight (total daily dose, divided two times a day)<br><75 kg: 1000 mg<br>>75 kg: 1200 mg<br><br>Renal dosing:<br>CrCl 30-50 ml/min: Alternating doses, 200 mg and 400 mg every other day<br>CrCl < 30 ml/min: 200 mg daily<br>HD: 200 mg daily | Anemia:<br>• The primary clinical toxicity of ribavirin is hemolytic anemia (See anemia management, page 10)<br>• After about 2 weeks of ribavirin treatment, approximately 10% develop severe anemia; this may result in worsening of cardiac disease and has led to fatal and nonfatal myocardial infarctions<br>Teratogenicity (Pregnancy):<br>• Due to the risk of fetal malformations and fetal death with ribavirin, a negative pregnancy test is required before treatment consideration<br>• Women of childbearing potential must use 2 forms of effective contraception during treatment and for 6 months after treatment<br>• Men whose female partners are pregnant or may become pregnant must use barrier contraception during treatment and for 6 months after treatment<br>Histamine-like side effects: nasal stuffiness, itching, skin irritation, asthma-like syndrome |
| **COLONY STIMULATING FACTORS (EPOETIN ALFA AND FILGRASTIM)** | | |
| **EPOETIN ALFA**<br><br>10,000 units/ml, 20,000 units/ml, 40,000 units/ml, 4,000 units/ml, 3,000 units/ml, 2,000 units/ml | Usual Dose:<br>• 50-100 units/kg subQ, (IV preferred if dialysis) three times weekly<br>or<br>• 150-300 units/kg subQ once weekly (maximum 40,000 units weekly)<br><br>Titrate to maintain Hgb 10-12 g/dl | • Epoetin alfa does not have a U.S. Food and Drug Administration (FDA) indication for the treatment of ribavirin associated anemia although it is commonly used for this complication of treatment<br>• Epoetin alfa is associated with significant toxicities, including pure red cell aplasia and cardiovascular risks such as thromboembolic events and strokes<br>• Use with caution in patients with malignancies, hypertension, cardiovascular disease, hypercoagulable conditions, sickle cell disorders and seizures<br>• Health care professionals who prescribe epoetin alfa to patients with anemia from causes other than cancer chemotherapy are required to provide a copy of the *Medication Guide* to each patient. Please see http://www.fda.gov/downloads/Drugs/Drugsafety/ucm088988.pdf for a copy of this medication guide<br>• Prior to the initiation of epoetin for the correction of anemia in the patient receiving HCV treatment, a consultation with the CCHCS HCV warmline is *strongly* recommended at CDCR CPHCS HCV Questions@cdcr.ca.gov<br>• Frequent Hgb monitoring is required<br>• Avoid increase of Hgb > 1g/dl over a two week period |

**Bold = Formulary** *See prescribing information for complete description of adverse effects and drug interactions.

Case 2:20-cv-00195-DJC-CKD Document 301 Filed 08/28/23 Page 117 of 168

## MANAGEMENT OF SIDE EFFECTS OF HEP C TREATMENT

**ANEMIA - CONSIDER CONSULTATION WITH HCV WARMLINE AT CDCR CPHCS HCV QUESTIONS@CDCR.CA.GOV**

| HEMOGLOBIN g/dl | ACTION |
|---|---|
| < 10 g/dl in patients with no history of cardiac disease | • Decrease ribavirin (RBV) to 600 mg/day*<br>• Recheck Hgb weekly |
| ≥ 2 g/dl decrease during any 4 week period and history of stable cardiovascular disease | • Decrease RBV to 600 mg/day*<br>• Recheck Hgb weekly |
| Hgb 8.6-9.0 g/dl | • RBV dose reduction to 600 mg/day if not already done<br>• Weekly Hgb monitoring<br>• Consider epoetin alfa if the dose has been reduced to 600 mg/day for at least two weeks with continued drop in Hgb<br>∘ Careful review with patient of risks/benefits of epoetin alfa vs. stopping HCV treatment.** † Provide the epoetin alfa medication guide (see page 12)<br>• Symptomatic anemia: discontinue HCV treatment** † |
| Hgb 8.0-8.5 g/dl | • RBV dose reduction to 600 mg/day if not already done<br>• Weekly Hgb monitoring<br>• Careful review with patient of risks/benefits of epoetin alfa vs. stopping HCV treatment** †<br>• If considered clinically stable to continue HCV treatment and if the patient agrees, provide epoetin alfa medication guide (see page 12)<br>• Symptomatic anemia: Consider inpatient management and RBC transfusion and consider discontinuing HCV treatment** † |
| Hgb 7.5-7.9 g/dl | • Review with patient the risks of anemia and stopping HCV treatment vs. the risk of continuing HCV treatment and epoetin alfa.** † Provide epoetin alfa medication guide to patients starting epoetin alfa (see page 12).<br>• Stop RBV (If on DAA, discontinue medication and contact the HCV warmline)<br>• Weekly CBC monitoring<br>• Symptomatic anemia: Discontinue HCV treatment** † and consider inpatient management and RBC transfusion |
| Hgb < 7.5 g/dl or symptomatic anemia | • Terminate HCV treatment† |

*If RBV dose is reduced for anemia:
- Once Hgb has increased to > 10.0 g/dl, increase the ribavirin dose by 200 mg/day at two week intervals until the initial dose is reached

**If RBV is temporarily stopped due to anemia:
- Recheck Hgb within two weeks and at two week intervals until stable
- If Hgb is > 10.0 g/dl, restart RBV at a dose of 600 mg/day if patient's weight < 75 kg; 800 mg/day if patient's weight ≥ 75 kg
- If hemoglobin remains > 10.0 g/dl, increase dose by 200 mg/day at two week intervals until the initial dose is reached

§ If the patient is taking protease or polymerase inhibitor, urgent consultation with the CCHCS HCV warmline is *strongly* recommended prior to stopping PEG or RBV as resistance can develop rapidly CDCR CPHCS HCV Questions@cdcr.ca.gov

† If genotype 1, and treatment is discontinued, submit CDCR 7413-4, HCV Treatment Referral: End of Treatment Evaluation to CDCR CPHCS HCV Questions@cdcr.ca.gov

## MANAGEMENT OF SIDE EFFECTS OF HEP C TREATMENT CONTINUED

**THROMBOCYTOPENIA (IF ON PEGYLATED INTERFERON)**
*CONSIDER CONSULTATION WITH HCV WARMLINE AT CDCR CPHCS HCV QUESTIONS@CDCR.CA.GOV*

| PLATELET COUNT | ACTION |
|---|---|
| < 50,000 /µl | • Decrease PEG to 135 mcg/week |
| < 25,0000 /µl | • Discontinue PEG§ † |

**LEUKOPENIA/NEUTROPENIA -**
*CONSIDER CONSULTATION WITH HCV WARMLINE AT CDCR CPHCS HCV QUESTIONS@CDCR.CA.GOV*

| COUNT | ACTION |
|---|---|
| WBC < 1000 cells/µl | • Discontinue PEG§ † |
| ANC < 750 cells /µl | • Decrease PEG to 135 mcg/week |
| ANC < 500 cells/µl | • Consider filgrastim [granulocyte colony stimulating factor-GCSF] (see dosing, page 9) if asymptomatic and:<br>◦ ANC < 500 cells/µl and<br>➢ HIV positive<br>➢ cirrhotic<br>➢ age > 55<br>◦ ANC < 400 cells/µl and<br>➢ HIV negative<br>➢ not cirrhotic<br>➢ age < 55<br>• Monitor patient weekly to assess for signs of infection, provide education regarding warning signs of acute illness or fever and weekly WBCs.<br>• Stop HCV treatment if:<br>◦ Patient presents with a neutropenic fever, acute illness or infection. Emergent evaluation recommended.<br>◦ ANC drops to < 250 cells/µl<br>◦ ANC declines from prefilgrastim nadir after two or more weekly doses of filgrastim<br>• If ANC rises to over 750 cells/µl, reduce weekly dose of filgrastim by 50%<br>◦ If subsequent weekly ANC is > 750 cells/µl, discontinue filgrastim<br>◦ If subsequent weekly ANC is < 750 cells/µl, increase filgrastim to original dose<br>• If ANC increases to > 2000 cells/µl, discontinue filgrastim |

§ If the patient is taking direct acting agents, urgent consultation with the CDCR CCHCS HCV warmline is *strongly* recommended prior to stopping PEG or RBV as resistance can develop rapidly. CDCR CPHCS HCV Questions@cdcr.ca.gov

† If treatment is discontinued, submit CDCR 7413-4 HCV Treatment Referral: End of Treatment Evaluation to CDCR CPHCS HCV Questions@cdcr.ca.gov

| SUMMARY | DECISION SUPPORT | PATIENT EDUCATION/SELF MANAGEMENT |
|---|---|---|

**Summary of "FDA Drug Safety Communication: Erythropoiesis-Stimulating Agents (ESAs): Epogen® and Aranesp®" as it pertains to the use of Epogen® (epoetin alfa) for Hepatitis C patients who have become anemic from HCV treatment.**

**Safety Announcement**
The FDA said in a safety announcement dated 02/16/2010, that it is requiring all ESAs to be prescribed and used under a risk management program to ensure the safe use of these drugs. Epogen®, which we may prescribe to our hepatitis C patients who have become anemic due to their use of ribavirin or interferon, is an ESA.

According to the safety announcement, studies have shown that ESAs can increase the risk of heart attack, heart failure, stroke, and blood clots in patients who use these drugs for conditions other than cancer.

This announcement was primarily focused on cancer patients and oncologists.

The announcement said that **health care professionals** who prescribe ESAs to patients who have anemia from causes other than cancer chemotherapy **are**:

- Required to provide a copy of the *Medication Guide* to each patient or his/her representative when an ESA is dispensed.
- Not required to enroll in the ESA APPRISE Oncology program.

The announcement added that **patients** with chronic kidney failure, including those on dialysis and those not on dialysis, who are using ESAs **should**:

- Know that the use of ESAs can increase the risk for stroke, heart attack, heart failure, blood clots, and death.
- Read the *Medication Guide* to understand the benefits and risks of using an ESA (which can be found at http://www.fda.gov/downloads/Drugs/Drugsafety/ucm088988.pdf).
- Get blood tests while using ESAs. The test results help guide the course of therapy and lower the risks of using these drugs. A patient's health care professional should make them aware of how often to have blood tests.
- Talk with their health care professional about any questions they have about the risks and benefits of using ESAs.

## DRUG-DRUG INTERACTIONS

Multiple drug-drug interactions exist between the direct acting HCV medications and other medication classes, including, but not limited to, certain antimicrobials, analgesics, antiarrhythmics, oral contraceptives, anxiolytics, lipid lowering agents, acid lowering agents, antiretrovirals, herbal preparations, corticosteroids, and anticonvulsants and specific medications such as rifampin, salmeterol, and warfarin.

For more information on drug-drug interactions:

- **Contact the HCV warmline at CDCR CPHCS HCV Questions@cdcr.ca.gov**
- **http://www.hep-druginteractions.org**

# PATIENT EDUCATION/SELF MANAGEMENT

## WHAT YOU SHOULD KNOW: HEPATITIS C VIRUS

### WHAT IS HEPATITIS C?

- Hepatitis C is a virus that causes swelling and irritation of the liver.
- The liver helps with digestion and filters waste products out of the blood.
- Hepatitis C can cause serious damage to the liver.
- There is no vaccination for hepatitis C, but you can be vaccinated for hepatitis A and B to prevent more damage to your liver.

### HOW DO YOU GET HEPATITIS C?

You can get hepatitis C from:

- Dirty needles (tattoos or piercing)
- Snorting drugs with infected equipment
- Sharing needles to inject drugs
- Unprotected sex (rarely)
- A blood transfusion if you got one in the United States before 1992 (All blood is now tested for hepatitis C before it is used for transfusion)

### HOW DO YOU KNOW IF YOU HAVE HEPATITIS C?

- Most people who have hepatitis C look and feel fine.
- You can have hepatitis C for a long time and not know it.
- Usually hepatitis C is found by doing blood tests.
- If hepatitis C damages the liver, it can cause scarring. This is called cirrhosis (sir-oh-sis).
- Your health care provider may order more tests to see how much liver damage you have.

- Some people with hepatitis C can have:
  - Fatigue
  - Stomach pain
  - Joint pain
  - Night sweats
  - Loss of appetite or nausea

### WHAT CAN YOU DO TO TAKE CARE OF YOURSELF?

- Get vaccinated for hepatitis A and B. Get yearly vaccinations for pneumonia and the flu.
- Do not drink alcohol or use illegal drugs - these will damage your liver more.
- Do not take a lot of medications like acetaminophen (Tylenol®) and ibuprofen (Motrin®).Talk to your health care provider about all medications, including over-the-counter medications, vitamins, and herbs to be sure they will not damage your liver. Ask your health care provider before you take any pain medicine.
- Do not get tattoos in prison to avoid blood borne infections.
- Do not share your toothbrush, razor, or other personal items.
- Try to lose weight if you are overweight.
- Eat a healthy diet.
- Drink plenty of water.
- Get plenty of rest and regular exercise.
- Quit smoking cigarettes.
- Follow your health care provider's instructions about medications for hepatitis C treatment.
- See your health care provider regularly.

### DOES EVERYONE WITH HEPATITIS C NEED TREATMENT?

- Most people with hepatitis C do not need treatment.
- A few people may develop severe liver damage and can die from problems with hepatitis C.
- Who needs treatment depends on many things and these are different for each person. You should discuss your case with your health care provider.

# EDUCACIÓN DEL PACIENTE/MANEJO PERSONAL

## QUÉ DEBE USTED SABER: HEPATITIS C

### ¿QUÉ ES LA HEPATITIS C?

- La hepatitis C es un virus que produce inflamación e irritación del hígado.
- El hígado ayuda a la digestion y filtra los productos de desecho fuera de la sangre.
- La hepatitis C puede causar daños serios al hígado.
- No existe vacuna para prevenir la hepatitis C, pero usted puede vacunarse contra la hepatitis A y B para evitar dañar más su hígado.

### ¿CÓMO SE PUEDE CONTRAER LA HEPATITIS C?

La hepatitis C se puede contraer de las siguientes maneras:

- Agujas contaminadas (tatuajes o perforaciones).
- Inhalar drogas usando un equipo infectado.
- Compartir agujas para inyectarse drogas.
- Practicar sexo sin protección (raras veces).
- Mediante transfusion de sangre si se realizó en EE.UU. antes de 1992. (Actualmente, toda transfusion de sangre es sometida a la prueba de hepatitis C antes de realizarse.)

### ¿CÓMO SABER SI USTED SUFRE DE HEPATITIS C?

- La mayoría de las personas enfermas lucen y se sienten sanas.
- Se puede sufrir de hepatitis C por un tiempo largo y no saberlo.
- Usualmente se puede detectar la hepatitis C mediante un examen de sangre.
- Si la hepatitis C daña el hígado, puede producer cicatrices. Esto se conoce como cirrosis.
- Su medico puede indicarle otros exámenes para verificar el daño que tiene su hígado.
- Algunas personas que sufren de hepatitis C presetan:
  - Fatiga
  - Dolor estomacal
  - Dolor en las articulaciones
  - Sudoración nocturna
  - Pérdida del apetito o náuseas

### ¿QUÉ PUEDE HACER USTED PARA CUIDARSE?

- Hágase vacunar contra la hepatitis A y B. Vacúnese anualmente contra la neumonía y la gripe.
- No consuma alcohol ni use drogas ilícitas - estas producirán más daño al hígado.
- No ingiera gran cantidad de medicamentos como el acetaminofén (Tylenol®) y Motrin®. Consulte con su medico acerca de todos los medicamentos, incluyendo los medicamentos de venta sin prescripción, vitaminas y hierbas para evitar dañar el hígado. Consulte con su médico antes de ingerir cualquier medicamento analgésico.
- No se realice tatuajes en la prisión para evitar enfermedades de transmisión sanguínea.
- No comparta su cepillo dental, rasuradora u otros objetos personales.
- Trate de adelgazar si tiene sobrepeso.
- Mantenga una dieta sana.
- Ingiera abundante cantidad de agua.
- Tenga mucho descanso y realice ejercicio con regularidad.
- Abandone el hábito de fumar cigarrillos.
- Siga las instrucciones de su médico acerca de los medicamentos para tratar la hepatitis C.
- Consulte con regularidad con su médico.

### ¿TODA PERSONA QUE SUFRE DE HEPATITIS C NECESITA TRATAMIENTO?

- La mayoría de las personas que sufren de hepatitis C no requieren tratamiento.
- Solo pocas personas pueden desarrollar serios problemas del hígado y morir debido a complicaciones causadas por la hepatitis C.
- La necesidad de tratamiento depende de muchos factores y estos varían en cada persona. Discuta su caso con su médico.



Exhibit Q

Flowsheet Print Request

Patient: SCHMITZ, WILLIAM THOMAS
MRN: G35384

Date Range: 11/01/16 12:26 PDT - 06/01/18 12:26 PDT

Printed by: Figueroa, Mercy RN
Printed on: 05/01/18 12:26 PDT

| Event Date | Event | Result | Ref. Range | Status |
|---|---|---|---|---|
| | Basophils | 0.7 * | | |
| | Blasts | DNR | | |
| | Nucleated RBC | DNR | | |
| | CBC Comment | DNR | | |
| | Sodium Lvl | 140 * | (135-146 - ) | |
| | Potassium Level | 3.7 * | (3.5-5.3 - ) | |
| | Chloride | 106 * | (98-110 - ) | |
| | CO2 | 22 * | (20-31 - ) | |
| | BUN | 12 * | (7-25 - ) | |
| | Creatinine | 0.94 * | (0.60-1.35 - ) | |
| | Glucose Level | 87 * | (65-99 - ) | |
| | Calcium Lvl | 9.6 * | (8.6-10.3 - ) | |
| | Albumin Lvl | 5.0 * | (3.6-5.1 - ) | |
| | Total Protein | 7.9 * | (6.1-8.1 - ) | |
| | Alk Phos | 73 * | (40-115 - ) | |
| | AST | 35 * | (10-40 - ) | |
| | ALT | 74 * (H) | (9-46 - ) | |
| | Bili Total | 0.6 * | (0.2-1.2 - ) | |
| | Globulin Lvl | 2.9 * | (1.9-3.7 - ) | |
| | Alb/Glob Ratio | 1.7 * | (1.0-2.5 - ) | |
| | GFR non-AA | 105 * | (> OR = 60 - ) | |
| | GFR AA | 121 * | (> OR = 60 - ) | |
| | BUN/Creat Ratio | NOT APPLICABLE * | (6-22 - ) | |
| | Hep A Ab | REACTIVE * | (NON-REACTIVE - ) | |
| | Hep B Core Ab | NON-REACTIVE * | (NON-REACTIVE - ) | |
| | Hep Bs Ab | <5 * (L) | (> OR = 10 - ) | |
| | HCV Genotype | 4a/4c/4d * | | |
| | HCV RNA Qn PCR | 4.85 * (H) | | |
| | HCV RNA, RT PCR (IU/mL) | 71300 * (H) | | |
| 03/16/18 8:00 PDT | Sodium Lvl | 140 * | (135-146 - ) | |
| | Potassium Level | 4.0 * | (3.5-5.3 - ) | |
| | Chloride | 106 * | (98-110 - ) | |
| | CO2 | 23 * | (20-31 - ) | |
| | BUN | 12 * | (7-25 - ) | |
| | Creatinine | 0.95 * | (0.60-1.35 - ) | |
| | Glucose Level | 87 * | (65-99 - ) | |
| | Calcium Lvl | 9.5 * | (8.6-10.3 - ) | |
| | GFR non-AA | 103 * | (> OR = 60 - ) | |
| | GFR AA | 120 * | (> OR = 60 - ) | |
| | BUN/Creat Ratio | NOT APPLICABLE * | (6-22 - ) | |

Exhibit Q

* ALLERGY

2

# Patient Summary

| CDCR: | G35384 | Institution: | MCSP | Complex Care: | - | EHRS Data: | ✓ |
|---|---|---|---|---|---|---|---|
| PID: | 11632099 | Arrival Date: | 07/14/2014 | Clinical Risk: | MED | Allergies: | - |
| Name: | Schmitz | EPRD: | - | Mental Health: | CCCMS | POLST: | - |
| Birth Date: | 06/11/1982 | Cell Bed: | B 008 1105001U | Dental Code: | 2 | Adv. Directive: | - |
| Height: | 5ft 7in | Care Team: | B Yard MD2 | TB Status: | No LTBI/TB | PC2604: | - |
| Weight: | 177 lbs | Housing: | SNY | Cocci: | Restricted 2 | MSF Eligible: | - |

## Scheduling & Access to Care

### Effective Communication / ADA

Effective Communication Required: -

Mobility: - Hearing: - Vision: - Speech: - DKD: -

DD Status: NCF TABE: 12.9 Learning Disability: N

Primary Language: English

Primary Method: -

Alternate Method: -

Last Accommodations: Staff Assistance

### Appointments

Chronic Care Program: ✓

**Scheduled / To Be Scheduled Appointments (One of Each Type)**

| [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|
| 05/03/18 | 05/03/18 | PC LVN | Follow Up LVN |
| 05/04/18 | 05/09/18 | Specialty Services | Onsite Specialty |

*Total Scheduled / To Be Scheduled Appointments:* 2

**High Priority Specialty Appointments (Last 2)**

*No High Priority Appointments Found*

*Total Specialty Appointments Last 6 Months:* 2

## Medication Management

RxCt: 4 PolyRx Review: - PC2602: - Naltrexone: -

**Drug Interactions**

Level 2: Hydroxyzine/QT Prolonging Agents
Level 2: Paliperidone/QT Prolonging Agents
Level 3: Hydroxyzine/Possible QT Prolonging Agents

Known Allergies: EHRS: No Known Medication Allergies, MAXOR: codeine ✗

**Recently Expired Medications**

*No Recently Expired Prescriptions Found*

**Current Medication Profile**

| [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|
| HYDROXYZINE PAMOATE | 05/31/18 | | NA/DOT |
| CHLORPROMAZINE HCL | 05/31/18 | ✓ | NA/DOT |
| TOPIRAMATE | 06/02/18 | ✓ ✓ | NA/DOT |
| PALIPERIDONE | 06/08/18 | ✓ ✓ | NA/DOT |

## Additional Patient Reports

Rx Profile | Drug Check | Risk Profile | Alerts

## Care Management

### Recent Higher Level of Care Events

**Community Hospitalizations (Last 2)**

*No Hospitalizations Found*

*Total Hospitalizations Last 6 Months:* 0

**Mental Health Higher Level of Care Events (Last 2)**

*No Higher Level Of Care Events Found*

*Total MH HLOC Events Last 6 Months:* 0

Last SRE: 04/11/18 Acute Risk: Moderate Chronic Risk: Moderate

History of Suicide Attempts: - History of Self Harm: -

### Electronic Medical Classification Chrono

Date: 03/28/18 Medical Risk: Medium Medical Hold: Consider

Level of Care: OP Nursing Acuity: Level 1

Proximity to Consult: Infrequent Basic Consultation

Functional Capacity: Full Duty

Specialized Services: -

Institutional-Environmental: Restricted-Cocci Area 2

Medical Hold Consideration: InterQual Specialty Request, Upcoming Specialty Appointment

### Durable Medical Equipment

1845 Date: - 7410 Date: - 7536 Receipts: 0

DME/Medical Supplies: -

## Disease Management & Prevention

### Problems

**Chronic Conditions (QM)**

CVD-HTN, HCV

**Medical Problem List**

EHRS: Arachnoid cyst
EHRS: Chronic headache disorder
EHRS: Hypertensive disorder
EHRS: Viral hepatitis type C
PHIP: Benign essential hypertension, HTN [401.1]
PHIP: Headache [R51]
PHIP: Other conditions of brain [348.89]

**Mental Health Problem List**

EHRS: Schizoaffective disorder, bipolar type
MHTS: Paranoid type schizophrenia, unspecified [295.30]
MHTS: Schizoaffective disorder, unspecified [295.70]

### Preventive Care / Disease Screening

| [illegible] | [illegible] | [illegible] | [illegible] | |
|---|---|---|---|---|
| Influenza | 10/18/16 | Completed | Hep B | |
| Pneumovax | - | - | Colon Cancer | - |
| Prevnar | - | - | Breast Cancer | - |
| TDAP/Tetanus | - | - | Cervical Cancer | - |
| Cocci Skin | - | - | HIV | |
| Varicella | - | - | HCV | |
| Hep A | - | - | Dental Exam | |

*The patient summary is not a substitute for information in the medical record.*

*4/30/2018 11:03:23 AM*

*Data Last Refreshed: 4/30/2018 9:55:55 AM*

View Definitions | View User Guide

*Click for update notes -> Patient Summary Guide*

Exhibit Q 3

Outpatient Progress Note

SCHMITZ, WILLIAM THOMAS - G35384

**Chief Complaint**
170 -180 DAY CCP , F/U LABS

**History of Present Illness**
35yo M here for chronic care:
Chronic headaches: no acute changes, on topamax.
Arachnoid cysts seen by Neurosurgery: recommended MRV brain and ophthalmology consult--both are pending.
HCV: The patient denies any significant fever, chills, sweats, abdominal pain, nausea, vomiting, diarrhea, weight gain, or significant abdominal / lower extremity swelling. The patient also denies any increasing confusion, yellowing of the skin or eyes, or dark urine. Has abd u/s ordered. Does not have a known history of cirrhosis. Wanting to be treated for HCV.

**Review of Systems**
CONSTITUTIONAL: Negative for fever, chills or night sweats. Negative for recent weight gain or loss.
DERMATOLOGIC: Denies rash or unusual lesions.
HEENT: Denies visual problems or hearing changes.
RESPIRATORY: Denies cough, shortness of breath, congestion, dyspnea on exertion, wheezing or hemoptysis.
CARDIOVASCULAR: Denies chest pain, palpitations, or lower extremity edema.
GASTROINTESTINAL: Denies nausea, vomiting, diarrhea, abdominal pain, hematochezia or jaundice.
GENITOURINARY: no urinary complaints.
NEUROLOGIC: Denies focal weakness or numbness. + headaches
HEMATOLOGIC: Denies recent bruising or bleeding.

**Physical Exam**

Vitals & Measurements
**T:** 36.5 °C (Tympanic) **HR:** 80 (Peripheral) **RR:** 18 **BP:** 135/89 **SpO2:** 98%
**WT:** 78.5 kg **WT:** 78.5 kg (Wt dosing)

**General:** Well appearing, in no distress.

**Skin:** No rash, prominent lesions, ulcers, or masses.

**Eyes:** Conjunctiva clear, sclera non-icteric. EOM intact, PERRLA

**Neck:** Supple, without lesions or adenopathy, no masses, thyroid non-enlarged and non-tender.

**Heart:** Regular rate and rhythm, without murmurs, rubs, or gallops. No clicks.

**Lungs:** Clear to auscultation bilat. No rhonchi, rales, or wheezes.

**Abdomen:** Soft/NT/ND

**Extremities:** No C/C/E. Peripheral pulses intact.

**Neurologic:** A/O'd x's 3. CN 2-12 grossly intact. No focal deficits.

**Problem List/Past Medical History**
Ongoing
- Chronic headaches
- HCV (hepatitis C virus)
- Hypertension
- Intracranial arachnoid cyst
- Schizoaffective disorder, bipolar type

Historical
- No qualifying data

**Medications**
Inpatient
- HYDROXYZINE PAM 50 MG CAP UD, 50 mg, 1 cap, Oral, qPM
- Invega, 9 mg, 1 tab, Oral, qPM
- THORAZINE 100MG TABLET, 100 mg, 1 tab, Oral, Once a day at bedtime, PRN
- topiramate, 200 mg, 1 tab, Oral, qPM

Home
- No active home medications

**Allergies**
No Known Medication Allergies

**Immunizations**
flu utd.

**Health Maintenance**
reviewed chart

**Lab Results**
6/30/17 Chol 179, HDL 62, Trig 73, LDL 102, CMP wnl except ALT 55, CBC wnl, INR 1.0, TSH 0.40, hga1c 4.9

**Diagnostic Results**
8/7/15 brain MRI: stable left middle cranial fossa arachnoid cyst measuring approximately 4.2 x 3.0 cm, with mild mass effect on the temporal lobe.

| | |
|---|---|
| Result type: | Outpatient Progress Note |
| Result date: | March 08, 2018 12:58 PST |
| Result status: | Auth (Verified) |
| Result title: | Office Visit Note |
| Performed by: | Ashe, Marianna P&S on March 08, 2018 13:02 PST |
| Verified by: | Ashe, Marianna P&S on March 08, 2018 13:02 PST |
| Encounter info: | 10000002711632099G35384, MCSP, Institutional Encounter, 07/14/14 - |

Exhibit G 4

DEN000046

Exhibit Q5

**Assessment/Plan**

1. HCV (hepatitis C virus)
stable/asymptomatic. Genotype 4a,4c. Referred to HCV clinic for possible treatment for HCV. Updated labs ordered. Healthy diet, exercise and healthy lifestyle choices were encouraged. Yearly flu vaccine encouraged. Avoid all tattoos, all illicit substances, and all needle use especially during incarceration. Patient was advised to place a 7362 if any concerns arise prior to scheduled followup visits.
Ordered: CBC with Diff
Comprehensive Metabolic Panel
Consult to Hepatitis C (HCV)
Hepatitis A Antibody
Hepatitis B Core Antibody, Total, with Reflex to IgM - 37676
Hepatitis B Surface Antibody, Quantitative - 8475
Hepatitis C RNA, Quant, Real-Time PCR Reflex to Genotype - 11348

2. Headache
chronic headaches, at baseline. Continue on Topamax. Neurologically intact.

3. Intracranial arachnoid cyst
awaiting MRV brain and ophthalmology consult. Has f/u with Neurosurg pending completion of MRV and ophthalmology evaluation.

4. Hypertension
reasonably controlled generally. Not on medications currently. Recommend low salt diet, regular exercise.

Orders:
7362 RN Initial Visit (Asymptomatic)

**Completed Action List:**

* Perform by Ashe, Marianna P&S on March 08, 2018 13:02 PST
* Sign by Ashe, Marianna P&S on March 08, 2018 13:02 PST
* VERIFY by Ashe, Marianna P&S on March 08, 2018 13:02 PST

| | |
|---|---|
| Result type: | Outpatient Progress Note |
| Result date: | March 08, 2018 12:58 PST |
| Result status: | Auth (Verified) |
| Result title: | Office Visit Note |
| Performed by: | Ashe, Marianna P&S on March 08, 2018 13:02 PST |
| Verified by: | Ashe, Marianna P&S on March 08, 2018 13:02 PST |
| Encounter info: | 10000002711632099G35384, MCSP, Institutional Encounter, 07/14/14 - |

Printed by: Figueroa, Mercy RN
Printed on: 5/1/2018 12:29 PDT

Outpatient Progress Note

SCHMITZ, WILLIAM THOMAS - G35384

exhibit Q 6

**Chief Complaint**
F/U US 04/10, MED RETURN OPTHALMOLOGY CONSULT 04/02/18

**History of Present Illness**
35yo M here for f/u u/s and ophthalmology appt.
Patient was seen by ophthalmology on 4/2/18 for evaluation of chronic headaches as recommended by Neurosurgery. Patient had 20/30 vision in each eye with normal eye pressures. Patient had normal retina in each eye and optic nerves were entirely normal. Patient had only mild cataracts and required no treatment. No further follow-up was needed.
Patient had an MRV of the brain on 3/29/18 showing that the dural sinuses and deep cerebral veins are patent and the arachnoid cyst within the left middle cranial fossa is stable.
Patient denies any acute changes.
HCV: being seen by HCV Clinic for evaluation for treatment. Had liver u/s completed. The patient denies any significant fever, chills, sweats, abdominal pain, nausea, vomiting, diarrhea, weight gain, or significant abdominal / lower extremity swelling. The patient also denies any increasing confusion, yellowing of the skin or eyes, or dark urine.

**Review of Systems**
CONSTITUTIONAL: Negative for fever, chills or night sweats. Negative for recent weight gain or loss.
DERMATOLOGIC: Denies rash.
GASTROINTESTINAL: Denies nausea, vomiting, diarrhea, abdominal pain, hematochezia or jaundice.
NEUROLOGIC: Denies focal weakness or numbness. + frequent headaches.
HEMATOLOGIC: Denies recent bruising or bleeding.

**Physical Exam**

Vitals & Measurements
**T:** 36.6 °C (Tympanic) **HR:** 81 (Peripheral) **RR:** 18 **BP:** 117/76 **SpO2:** 99%
**WT:** 80.3 kg **WT:** 80.3 kg (Wt dosing)

**General:** Well appearing, in no distress. Normal gait. Sits/stands with ease.
**Eyes:** Conjunctiva clear, sclera non-icteric.
**Heart:** Regular rate and rhythm
**Lungs:** clear, unlabored
**Extremities:** No C/C/E.
**Neurologic:** A/O'd x's 3. CN 2-12 grossly intact. No focal deficits.

**Problem List/Past Medical History**
Ongoing
- Chronic headaches
- HCV (hepatitis C virus)
- Hypertension
- Intracranial arachnoid cyst
- Schizoaffective disorder, bipolar type

Historical
- No qualifying data

**Medications**
Inpatient
- HYDROXYZINE PAM 50 MG CAP UD, 50 mg, 1 cap, Oral, qPM
- Invega, 9 mg, 1 tab, Oral, qPM
- THORAZINE 100MG TABLET, 100 mg, 1 tab, Oral, Once a day at bedtime, PRN
- topiramate, 200 mg, 1 tab, Oral, qPM

Home
- No active home medications

**Allergies**
No Known Medication Allergies

**Diagnostic Results**
Service Date: 03/29/2018

EXAMINATION: MR venogram of the brain. CLINICAL HISTORY: Headache. COMPARISON: 8/7/2015. TECHNIQUE: A 2-D time-of-flight MR venogram of the brain was performed. 3-D and MIP reformations were obtained. FINDINGS: The dural sinuses and deep cerebral veins are patent. A large, stable arachnoid cyst is present anteriorly within the left middle cranial fossa. The brain is otherwise grossly unremarkable. IMPRESSION: 1. The dural sinuses and deep cerebral veins are patent. 2. Stable arachnoid cyst within the left middle cranial fossa.
[1]

Service Date: 04/10/2018

EXAMINATION: ABDOMINAL

| | |
|---|---|
| Result type: | Outpatient Progress Note |
| Result date: | April 16, 2018 15:15 PDT |
| Result status: | Auth (Verified) |
| Result title: | Office Visit Note |
| Performed by: | Ashe, Marianna P&S on April 16, 2018 15:18 PDT |
| Verified by: | Ashe, Marianna P&S on April 16, 2018 15:18 PDT |
| Encounter info: | 10000002711632099G35384, MCSP, Institutional Encounter, 07/14/14 - |

exhibit Q 7

DEN000050

Exhibit Q

Outpatient Progress Note

SCHMITZ, WILLIAM THOMAS - G35384

**Assessment/Plan**

1. Headache
   chronic, frequent. No acute changes. Reviewed MRV brain and ophthalmology consult with patient. Has f/u with Neurosurgery ordered. Precautions given.
2. Intracranial arachnoid cyst
   unchanged per recent imaging. Has f/u with Neurosurgery ordered.
3. HCV (hepatitis C virus)
   asymptomatic. Reviewed liver u/s with patient. Undergoing evaluation for HCV treatment. Healthy diet, exercise and healthy lifestyle choices were encouraged. Yearly flu vaccine encouraged. Avoid all tattoos, all illicit substances, and all needle use especially during incarceration. Patient was advised to place a 7362 if any concerns arise prior to scheduled followup visits.

ULTRASOUND CLINICAL HISTORY: Hepatitis. COMPARISON: 11/16/2015 FINDINGS: Transverse and longitudinal images of the abdomen were obtained. The liver is diffusely echogenic, consistent with fatty infiltration. No focal mass is seen. The spleen appears normal in size, shape, and echogenicity. The gallbladder is within normal limits. There is no evidence of cholelithiasis. The common bile duct is within normal limits at 4 mm. The visualized portion of the pancreas is unremarkable. The right and left kidneys measure approximately 10.5 and 11.0 cm in greatest longitudinal length, respectively. Both kidneys appear normal in echogenicity. No mass, hydronephrosis, calculus, or cortical thinning is seen. The visualized portions of the aorta and inferior vena cava are within normal limits. No free fluid is seen within the abdomen. IMPRESSION: 1. Fatty liver. No hepatic mass is identified. If there is strong clinical concern for hepatocellular carcinoma, a triphasic CT scan of the liver would be recommended for further evaluation.
[2]

[1] MRV BRAIN W/-W/O CONTRAST; 03/29/2018 00:00 PDT
[2] US ABDOMEN CMPLT; 04/10/2018 00:00 PDT

**Completed Action List:**

* Perform by Ashe, Marianna P&S on April 16, 2018 15:18 PDT
* Sign by Ashe, Marianna P&S on April 16, 2018 15:18 PDT
* VERIFY by Ashe, Marianna P&S on April 16, 2018 15:18 PDT

| | |
|---|---|
| Result type: | Outpatient Progress Note |
| Result date: | April 16, 2018 15:15 PDT |
| Result status: | Auth (Verified) |
| Result title: | Office Visit Note |
| Performed by: | Ashe, Marianna P&S on April 16, 2018 15:18 PDT |
| Verified by: | Ashe, Marianna P&S on April 16, 2018 15:18 PDT |
| Encounter info: | 10000002711632099G35384, MCSP, Institutional Encounter, 07/14/14 - |

Printed by: Figueroa, Mercy RN
Printed on: 5/1/2018 12:28 PDT

DEN000051

Exhibit Q
9

Flowsheet Print Request

Patient: SCHMITZ, WILLIAM THOMAS
MRN: G35384
Date Range: 11/01/16 12:26 PDT - 06/01/18 12:26 PDT

Printed by: Figueroa, Mercy RN
Printed on: 05/01/18 12:26 PDT

| Event Date | Event | Result | Ref. Range | Status |
|---|---|---|---|---|
| 03/09/18 6:30 PST | U Amph 1000 ng/mL | NEGATIVE * | | |
| | U Amph Scr | DNR | | |
| | U Methamp Scr | DNR | | |
| | U Barb Scr | NEGATIVE * | | |
| | U Benzodia Scr | NEGATIVE * | | |
| | U Cocaine Metab | NEGATIVE * | | |
| | U Cannab Scr | NEGATIVE * | | |
| | U Methadone Scr | NEGATIVE * | | |
| | U Methaqual Scr | NEGATIVE * | | |
| | U Opiate Scr | NEGATIVE * | | |
| | U Morphine Scr | DNR | | |
| | U Phencyclidine | NEGATIVE * | | |
| | U Propoxyphene | NEGATIVE * | | |
| | U Ethanol | NEGATIVE * | | |
| | U Note 1 | DNR | | |
| | U Note 2 | See Note * | | |
| | U Codeine Lvl | DNR | | |
| | U Hydrocodone | DNR | | |
| | U Hydromorph | DNR | | |
| 03/16/18 7:25 PDT | WBC | 10.0 * | (3.8-10.8 - ) | |
| | RBC | 5.05 * | (4.20-5.80 - ) | |
| | Hgb | 16.0 * | (13.2-17.1 - ) | |
| | Hct | 45.9 * | (38.5-50.0 - ) | |
| | MCV | 90.9 * | (80.0-100.0 - ) | |
| | MCH | 31.7 * | (27.0-33.0 - ) | |
| | MCHC | 34.9 * | (32.0-36.0 - ) | |
| | RDW | 13.0 * | (11.0-15.0 - ) | |
| | Platelet | 290 * | (140-400 - ) | |
| | MPV | 10.9 * | (7.5-12.5 - ) | |
| | Absolute Neutrophil | 3970 * | (1500-7800 - ) | |
| | Absolute Band Neutrophils | DNR | | |
| | Absolute Metamyelocytes | DNR | | |
| | Absolute Myelocytes | DNR | | |
| | Absolute Promyelocytes | DNR | | |
| | Absolute Lymphocytes | 4580 * (H) | (850-3900 - ) | |
| | Absolute Monocytes | 1290 * (H) | (200-950 - ) | |
| | Absolute Eosinophils | 90 * | (15-500 - ) | |
| | Absolute Basophils | 70 * | (0-200 - ) | |
| | Absolute Blasts | DNR | | |
| | Absolute Nucleated RBC | DNR | | |
| | Neutrophils | 39.7 * | | |
| | Band Neutrophils | DNR | | |
| | Metamyelocytes | DNR | | |
| | Myelocytes | DNR | | |
| | Promyelocytes | DNR | | |
| | Lymphocytes | 45.8 * | | |
| | Reactive Lymphocytes | DNR | | |
| | Monocytes | 12.9 * | | |
| | Eosinophils | 0.9 * | | |

Q-10

DEN000054

Flowsheet Print Request

Patient: SCHMITZ, WILLIAM THOMAS
MRN: G35384

Date Range: 11/01/16 12:26 PDT - 06/01/18 12:26 PDT

Printed by: Figueroa, Mercy RN
Printed on: 05/01/18 12:26 PDT

| Event Date | Event | Result | Ref. Range | Status |
|---|---|---|---|---|
| | Basophils | 0.7 * | | |
| | Blasts | DNR | | |
| | Nucleated RBC | DNR | | |
| | CBC Comment | DNR | | |
| | Sodium Lvl | 140 * | (135-146 - ) | |
| | Potassium Level | 3.7 * | (3.5-5.3 - ) | |
| | Chloride | 106 * | (98-110 - ) | |
| | CO2 | 22 * | (20-31 - ) | |
| | BUN | 12 * | (7-25 - ) | |
| | Creatinine | 0.94 * | (0.60-1.35 - ) | |
| | Glucose Level | 87 * | (65-99 - ) | |
| | Calcium Lvl | 9.6 * | (8.6-10.3 - ) | |
| | Albumin Lvl | 5.0 * | (3.6-5.1 - ) | |
| | Total Protein | 7.9 * | (6.1-8.1 - ) | |
| | Alk Phos | 73 * | (40-115 - ) | |
| | AST | 35 * | (10-40 - ) | |
| | ALT | 74 * (H) | (9-46 - ) | |
| | Bili Total | 0.6 * | (0.2-1.2 - ) | |
| | Globulin Lvl | 2.9 * | (1.9-3.7 - ) | |
| | Alb/Glob Ratio | 1.7 * | (1.0-2.5 - ) | |
| | GFR non-AA | 105 * | (> OR = 60 - ) | |
| | GFR AA | 121 * | (> OR = 60 - ) | |
| | BUN/Creat Ratio | NOT APPLICABLE * | (6-22 - ) | |
| | Hep A Ab | REACTIVE * | (NON-REACTIVE - ) | |
| | Hep B Core Ab | NON-REACTIVE * | (NON-REACTIVE - ) | |
| | Hep Bs Ab | <5 * (L) | (> OR = 10 - ) | |
| | HCV Genotype | 4a/4c/4d * | | |
| | HCV RNA Qn PCR | 4.85 * (H) | | |
| | HCV RNA, RT PCR (IU/mL) | 71300 * (H) | | |
| 03/16/18 8:00 PDT | Sodium Lvl | 140 * | (135-146 - ) | |
| | Potassium Level | 4.0 * | (3.5-5.3 - ) | |
| | Chloride | 106 * | (98-110 - ) | |
| | CO2 | 23 * | (20-31 - ) | |
| | BUN | 12 * | (7-25 - ) | |
| | Creatinine | 0.95 * | (0.60-1.35 - ) | |
| | Glucose Level | 87 * | (65-99 - ) | |
| | Calcium Lvl | 9.5 * | (8.6-10.3 - ) | |
| | GFR non-AA | 103 * | (> OR = 60 - ) | |
| | GFR AA | 120 * | (> OR = 60 - ) | |
| | BUN/Creat Ratio | NOT APPLICABLE * | (6-22 - ) | |

Q - 12

DEN000056

US Abdomen Complete
* Final Report *

SCHMITZ, WILLIAM THOMAS - G35384

# * Final Report *

**REPORT**

PATIENT NAME: WILLIAM SCHMITZ
MRN: 11632099
DOB: 06/11/1982
ACCOUNT: 10000002711632099G35384
ORDERING PHYSICIAN: R. Rudas
Service Date: 04/10/2018

EXAMINATION: ABDOMINAL ULTRASOUND CLINICAL HISTORY: Hepatitis. COMPARISON: 11/16/2015 FINDINGS: Transverse and longitudinal images of the abdomen were obtained. The liver is diffusely echogenic, consistent with fatty infiltration. No focal mass is seen. The spleen appears normal in size, shape, and echogenicity. The gallbladder is within normal limits. There is no evidence of cholelithiasis. The common bile duct is within normal limits at 4 mm. The visualized portion of the pancreas is unremarkable. The right and left kidneys measure approximately 10.5 and 11.0 cm in greatest longitudinal length, respectively. Both kidneys appear normal in echogenicity. No mass, hydronephrosis, calculus, or cortical thinning is seen. The visualized portions of the aorta and inferior vena cava are within normal limits. No free fluid is seen within the abdomen. IMPRESSION: 1. Fatty liver. No hepatic mass is identified. If there is strong clinical concern for hepatocellular carcinoma, a triphasic CT scan of the liver would be recommended for further evaluation.

**IMAGE**
This document has an image

**Completed Action List:**
* VERIFY by on April 10, 2018 00:00 PDT
* Order by Rudas, Robert P&S on April 10, 2018 08:20 PDT
* Endorse by Rudas, Robert P&S on April 11, 2018 08:49 PDT

| | |
|---|---|
| Result type: | US Abdomen Complete |
| Result date: | April 10, 2018 00:00 PDT |
| Result status: | Auth (Verified) |
| Result title: | US ABDOMEN CMPLT |
| Performed by: | DGoller -UNKNOWN, PERSONNEL on April 10, 2018 00:00 PDT |
| Cosigned by: | DGoller -UNKNOWN, PERSONNEL |
| Verified by: | DGoller -UNKNOWN, PERSONNEL on April 10, 2018 00:00 PDT |
| Encounter info: | 10000002711632099G35384, MCSP, Institutional Encounter, 07/14/14 - |
| Contributor system: | FUJI |

Printed by: Figueroa, Mercy RN
Printed on: 5/1/2018 12:26 PDT

exhibit Q 14

Patient Name: SCHMITZ, WILLIAM THOMAS
Date of Birth: 6/11/1982

MRN: G35384
FIN: HX11632099

* Auth (Verified) *

State of California

Department of Corrections & Rehabilitation

Institution: Mule Creek State Prison

Prior Page Number: ______________

| Date: 9-6-11 | Staff: Branman, LCSW Reason for Visit: CM CONTACT |
|---|---|
| Time: 945 | Housing: B6 102U Release Date: 2045 Current Diagnosis: 295.70 |
| CONTACT: | ☒ Case Manager ☐ IDTT ☐ Psychiatrist ☐ Individual ☐ Other |
| | ☒ Out of Cell ☐ Cell Front Completed? Yes ☐ Reason not Completed: |
| REFERRED BY: | ☒ MH Custody ☐ Medical ☐ Emergency ☐ Inmate Request ☐ Other: _____ |
| **Subjective:** | CM contact. PI informs me that an inmate in his building died after two days of having his requests for medical attention were ignored. "I saw them take him out in a wheel chair." PI reports, "My cousin just died of liver failure. I didn't even know he was sick. I guess it could be worse." PI reflects on his own life leading to discussion of his guilt associated with the crime. PI continues to lack any recall of the murder though he knows that it began with an argument in a bar when words were said about his current girlfriend. PI had been camping and shooting with friends. He went to his truck to retrieve his handgun and shot the victim in the head. "I remember what his mother said to me; "When you shot my son in the head, you shot me in the heart. She said she didn't hate me though because she understood that I have a mental illness." PI concludes, "I never talked about it this much, except with my lawyer. I wish I could go back and stay home that day." Discussed mania and lack of sleep. Reviewed symptoms of mania and depression via the DSM; "that's exactly what it's like." |
| **Objective:** | Mood euthymic, but tired. PI believes he will sleep when he returns to the cell; "I'm done." PI expects depressive sxs per the Bipolar cycle. Ongoing AH including frequently hearing the voice of his victim's mother. ADLs WNL. Managing with lockdown adequately. Weekend family visits continue. |
| **Assessment:** | Axis I: 295.70 Schizoaffective Disorder, Bipolar Type<br>304.80 Polysubstance Dependence, institutional remission<br>Axis II: Deferred<br>Axis III: None Reported<br>Axis IV: Long sentence<br>Axis V: GAF: 45 |
| **Plan:** | Continue EOP on B yard. PI to begin reading, Houses of Healing. |
| **Education:** | Psychoeducation |
| | **Eric Branman, LCSW**<br>**Licensed Clinical Social Worker** Signature: [signature], LCSW |

| INTERDISCIPLINARY PROGRESS NOTES<br>CDCR 7230 MH<br>Confidential Client/Patient Information<br>State of California Department of Corrections and Rehabilitation | Last Name: Schmitz First Name: William MI:<br>CDC# G35384 DOB: 6/11/82 |
|---|---|

Exhibit Q
15

**MCSP - Mule Creek State Prison**

Patient: **SCHMITZ, WILLIAM THOMAS**
DOB/Age/Sex: 6/11/1982 / 37 years / Male CDCR: G35384

## *Mental Health Documentation*

| | |
|---|---|
| Document Type: | MHPC Progress Note |
| Document Subject: | MH PC Note |
| Service Date/Time: | 9/14/2018 11:05 PDT |
| Result Status: | Auth (Verified) |
| Perform Information: | Branman,Eric Social Worker (9/14/2018 11:17 PDT) |
| Sign Information: | Branman,Eric Social Worker (9/14/2018 11:17 PDT) |
| Authentication Information: | Branman,Eric Social Worker (9/14/2018 11:17 PDT) |

**Inmate's Program and Level of Care**
GP Level II CCCMS
Psych over-ride with dorm exclusion written 3/15/18 by Dr. Robinson, PsyD to expire in 1yr.
19 pts, Medium A custody

**New Issues/Complaints**
Presenting Problem MH

04/26/18 09:11:00
Hallucinations, mania, depression, and mood swings.

Signed By: Robinson, Rebecca Post-Doc Intern

**Current Status of Illness**
PI entering manic phase

**Mental Status**
PI presents with pressured speech, intense eye contact, clenched teeth, nervous laughter and extreme anxiety regarding the future loss of the dorm exclusion. He reports not sleeping x 24hrs with expectation of ongoing mania/insomnia with eventual AH and paranoia. (PI has exhibited this pattern for several years and knows himself well.) He is clean, appropriately dressed and eating adequately. He remains in frequent contact with numerous family members.

**Mental Health Assessments**
Bipolar I, MRE Manic

**Assessment/Progress Towards Discharge**
1. HCV (hepatitis C virus)
2. Chronic headaches
3. Intracranial arachnoid cyst
Health examination of prisoner
Neck muscle strain
Routine health maintenance
Shoulder pain

**Plan/Disposition**
Continue CCCMS. F/U in 30 days

**Subjective/History of Present Illness**
PC contact per PI request of this PC earlier this week. "I've got a lot going on. Family stuff. My brother is getting divorced and my sister had an abortion. I think she did the right thing for her." PI then shares distress regarding the possibility of loosing the dorm restriction chrono. Reviewed prior chronos written by EOP clinicians. PI reports being assaulted the day he arrived to MCIP Level II dorm by a man who thought he had stolen from him when both of them were on B yard. He adds that he was going to find his way to the MHCB, even prior to the assault, as he did not believe he could tolerate the dorm housing. "You know, I get paranoid, especially when I get manic and I can sleep for 2 or 3 days. Then the voices come back." I note his intense presentation and he reports not sleeping for the past 24hrs and expecting another 2-3 days of mania. He uses the Vistaril PRN "but it won't put me to sleep." He states that only Ativan, when prescribed prior to his incarceration was effective in knocking him out during a manic phase. "None of the other medications worked." He admits to enjoying the mania, but not the aftermath. He denies current psychotic symptoms, but expects AH. We also discussed the YEPD and expectation of going to the board in 9 yrs. Discussed the steps he must take to prepare for the board and become a good candidate for release; i.e. accepting dorm placement, vocational training, completing his education (BS), self-help groups, etc. "I'll do it eventually. I'm on the waiting list for the CBT program."

Legend: c=Corrected, @=Abnormal, C=Critical, L=Low, H=High, f=Result Comment, i=Interp Data, *=Performing Lab

Report Request ID: 28161524 Print Date/Time: 4/2/2020 11:05 PDT

**WARNING:** **This report contains confidential, proprietary, and/or legally privileged information intended for the recipient only.**

I, Joseph W. Schmitz, declare:

1. I have been an officer in the United States Navy since 2001.
2. I am a Board-Certified Ophthalmologist.
3. I have been licensed to practice medicine in the State of California since 2006.
4. I am the older brother of William Thomas Schmitz.
5. I have read the Fourth Amended complaint filed On behalf of Estate of William Schmitz, deceased, by and through Thomas J. Schmitz, individually; and Dianne Mallia Individiually vs. Asman, et al.
6. I affirm the truth of all allegations that mention my name within the complaint.
7. My brother William Thomas Schmitz told me he had liver failure and did not want to die like our cousin "Coco", the nickname of our cousin Michael who died of liver failure. I tried to explain to William that there was not enough time for him to develop liver failure and that the medicine was going to cure his liver disease.
8. William asked me why they were doing tests for liver failure. I tried to explain that the testing was not for liver failure just for his hepatitis and that he had very early disease. I assumed that the tests were just part of his hepatitis evaluation.
9. William told me he was worried that his psychiatric medicines were hurting his liver. I told him to the psychiatric medicines were important and that his doctors would make sure they were safe for him to take.
10. My brother Thomas F. Schmitz asked me if William had liver failure and I explained to him that William did not and that liver failure from hepatitis takes many years.
11. The last time I saw my William, he appeared significantly thinner, excessively talkative and anxious.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 26th of August in Chula Vista, California.

Joseph W Schmitz
Joseph W. Schmitz, MD
Commander United States Navy

Exhibit S

I, Rose Swift, declare:

1. I am the older sister of William Thomas Schmitz, who died at Mule Creek State Prison.

2. I have read the Fourth Amended complaint filed On behalf of Estate of William Schmitz, deceased, by and through Thomas J. Schmitz, individually; and Dianne MalliaIndividiually vs. Asman, et al.

3. I affirm the truth of all allegations that mention my name within the complaint.

4. My brother William Thomas Schmitz anxiously expressed to me that he was dying of liver failure and he was going to bleed to death unless he did the tests the prison was making him do. He was devastated that our older brother, Dr. Joseph W. Schmitz and our father, Dr. Thomas J. Schmitz would withhold this information from him. He was considering not talking to my father or brother anymore over this.

5. I physically observed that William appeared distressed, anxious, and teary-eyed when telling me he had liver failure and this information was being withheld.

6. I encouraged William to have faith in our family and not jump to conclusions because there was no way our father or brother would withhold something so important from either or us.

7. I asked my older brother, Dr. Joseph W. Schmitz, about William's medical prognosis and was assured that he did not have liver failure.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 27th day of August in 2023.

Rose Swift

Rose Swift

Exhibit T 1/1

I, THOMAS F. SCHMITZ, declare:

1. I am currently an active duty officer in the United States Navy and have been since my my graduation from the United States Naval Academy in 2006.
2. I have served as Navy pilot and a Foreign Affair Officer assisting the interests of the United States government.
3. I have a top secret security clearance.
4. I am the younger brother of William Thomas Schmitz who died at Mule Creek State Prison.
5. My brother, William Thomas Schmitz, told me he had liver failure.
6. I observed that William appeared distressed when telling me he had liver failure.
7. I asked my other brother, Dr. Joseph Schmitz, if William had liver failure and my brother, Joseph, explained that William could not have liver failure based on the length of time he had the liver infection.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 26th Day of August, 2023 in Frederick, Maryland.

Thomas F. Schmitz
Commander United States Navy

Exhibit U
1/8

PETER J. HIRSIG (State Bar No. 197993)
peter.hirsig@mcnamaralaw.com
MARIA ZHURNALOVA-JUPPUNOV (State Bar No. 319004)
maria.zhurnalova-juppunov@mcnamaralaw.com
DANIEL R. MAYER (State Bar No. 300077)
daniel.mayer@mcnamaralaw.com
McNAMARA, AMBACHER, WHEELER,
HIRSIG & GRAY LLP
639 Kentucky Avenue
Fairfield, CA 94523
Telephone: (707)

Attorneys for Defendants
ADAMS, ANDALUZ, ASHE, ASMAN, BRANMAN, BRIZENDINE, BROCKENBOROGH, CEBALLOS, HEATLEY, J. JOHNSON, R. JOHNSON, LEIDNER, PONCIANO, RAMKUMAR, REKART, ROBINSON, RUDAS, M. SMITH, C. SMITH, TIEBROCK, TOCHE, WAINE

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Estate of WILLIAM SCHMITZ, deceased, by and through THOMAS J. SCHMITZ and DIANNE MALLIA, as Successors in Interest; THOMAS SCHMITZ, Individually; and DIANNE MALLIA, Individually,

Plaintiffs,

vs.

ASMAN et al,

Defendants.

Case No. 2:20-CV-00195-JAM-CKD

**DEFENDANT ROBERT RUDAS, M.D.'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE**

Action Filed: 7/16/2020

PROPOUNDING PARTY: Plaintiff DIANNE MALLIA, individually

RESPONDING PARTY: Defendant ROBERT RUDAS

SET NUMBER: ONE (Nos. 1-9)

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility and any and all other objections and grounds that would require the exclusion of any statements herein, if any

exhibit 2 | 8

requests were asked for, or if any statement contained herein were made by a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Responding party is responding to all of the requests to the extent that information has become known to him. However, responding party's discovery, investigation, and preparation for trial of this matter has not been completed as of the date of these responses and, therefore, responding party does not purport to state anything more than information currently known and discovered by him.

Responding party reserves the right to continue discovery and investigation in this matter regarding facts, witnesses and supporting data. Consequently, to the extent that the requests herein ask for "all facts" or the names of "all persons" or the identity of "all documents," etc., they are responded to fully and so far as information is currently available to responding party; and responding party is not precluded from presenting at trial information discovered after the date of these responses.

This Preliminary Statement is incorporated into each and every response set forth below.

**RESPONSES**

**INTERROGATORY NO. 1:**

Describe including date, time and context all COMMUNICATIONS between YOU and William Schmitz.

**RESPONSE TO INTERROGATORY NO. 1:**

Objection. The interrogatories is overbroad and seeks information that is irrelevant and disproportionate to the needs of the case. Vague and unclear about "context." Subject to and without waving said objection, Defendant responds: Defendant does not have an independent recollection of communications and refers plaintiff to the medical records of William Schmitz produced in this litigation which are equally available to plaintiffs.

///

///

///

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

**INTERROGATORY NO. 2:**

Describe including date, time and context all medical treatment YOU provided William Schmitz.

**RESPONSE TO INTERROGATORY NO. 2:**

Objection. The interrogatory is overbroad and seeks information that is irrelevant and disproportionate to the needs of the case. Vague and ambiguous as to "context." Subject to and without waving said objection, Defendant responds: Defendant does not have an independent recollection of dates and times and refers plaintiff to the medical records of William Schmitz produced in this litigation which are equally available to plaintiffs.

**INTERROGATORY NO. 3:**

Identify all documents relating to William Schmitz's placement on the End Stage Liver disease (ESLD) registry.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant did not place and took no part in the placement of Williams Schmitz on the ESLD registry. Defendant identifies the ELSD registry as a relevant document. Discovery is continuing and defendant reserves the right to supplement his answer.

**INTERROGATORY NO. 4:**

Identify who placed William Schmitz on the ESLD registry.

**RESPONSE TO INTERROGATORY NO. 4:**

Defendant lacks information and knowledge to enable him to respond to this interrogatory.

**INTERROGATORY NO. 5:**

Identify when William Schmitz was placed on the ESLD registry.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendant lacks information and knowledge to enable him to respond to this interrogatory.

///

///

///

///

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

exhibit U|418

**INTERROGATORY NO. 6:**

Identify all documents relating to YOUR professional relationship with WILLIAM SCHMITZ.

**RESPONSE TO INTERROGATORY NO. 6:**

Defendant identifies the medical records of William Schmitz.

**INTERROGATORY NO. 7:**

Identify when William Schmitz was removed from the ESLD registry.

**RESPONSE TO INTERROGATORY NO. 7:**

Defendants lacks information and knowledge to enable him to respond to this interrogatory.

**INTERROGATORY NO. 8:**

Identify all documents relating to the use of CDCR form 7243 "HEALTH CARE SERVICES PHYSICIAN REQUEST FOR SERVICES" (An Example of the form is BATES Number DEN000031).

**RESPONSE TO INTERROGATORY NO. 8:**

Objection. The interrogatory is vague and ambiguous and unintelligible as phrased. Defendant is unable to respond to the interrogatory so phrased.

**INTERROGATORY NO. 8 (Misnumbered):**

Identify all "Records" YOU were referring to when YOU documented "Records show he has advanced liver disease/cirrhosis…" as documented by YOU in Bates Number DEF007832 on 2/9/2018.

**RESPONSE TO INTERROGATORY NO. 8 (Misnumbered):**

Defendant's note identified in the interrogatory refers to the ESLD registry.

**INTERROGATORY NO. 9:**

Identify all documents relating to the use of the "Correspondence" section in the electronic medical record. (Example of the section is Bates number DEF007887).

///

///

///

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

exhibit U 5/8

**RESPONSE TO INTERROGATORY NO. 9:**

Objection. The interrogatory is vague and ambiguous and unintelligible as phrased. Subject to and without waving said objection, Defendant responds: Defendant refers plaintiff to the medical records of William Schmitz produced in this litigation which are equally available to plaintiffs.

Dated: August 17, 2023

McNamara, Ambacher, Wheeler, Hirsig & Gray LLP

By: ______________________
Peter J. Hirsig
Maria Zhurnalova-Juppunov
Daniel R. Mayer
Attorneys for Defendants
ADAMS, ANDALUZ, ASHE, ASMAN, BRANMAN, BRIZENDINE, BROCKENBOROGH, CEBALLOS, HEATLEY, J. JOHNSON, R. JOHNSON, LEIDNER, PONCIANO, RAMKUMAR, REKART, ROBINSON, RUDAS, M. SMITH, C. SMITH, TIEBROCK, TOCHE, and WAINE

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

Exhibit (F)

6/8

## VERIFICATION

I, the undersigned, declare that:

I am a Defendant in the above-entitled action; I have read the foregoing **DEFENDANT ROBERT RUDAS, M.D.'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGAOTRIES, SET ONE** and know the contents thereof; the same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 14, 2023 at Ione, California.
(Date) (City/State)

ROBERT RUDAS, M.D.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

# CERTIFICATE OF SERVICE VIA E-MAIL

I hereby declare that I am a citizen of the United States, am over the age of eighteen years, and not a party to the within action. My electronic notification address is: tami.martin@mcnamaralaw.com.

On this date, I electronically served the foregoing **DEFENDANT ROBERT RUDAS, M.D.' RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE** based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**Attorneys For Plaintiff Pro Per:**

Dianne Mallia
404 Atkinson Street
Roseville, CA 95678

E-Mail: deedamallia@gmail.com

**Attorneys For Plaintiff in Pro Per:**

Thomas J. Schmitz
404 Atkinson Street
Roseville, CA 95678

E-Mail: tsfoot49@gmail.com

**Attorneys for Defendant Stephen Denigris:**

**Tiffany Cenzianne Sala**
Low McKinley & Salenko, LLP
2150 River Plaza Dr. Suite 250
Sacramento, CA 95833
(916) 231-2400

Email: tcs@lmblaw.net
jc@lmblaw.net
bes@lmblaw.net

**Attorneys for Defendants Eric Bradley, David Brunkhorst,**

Jennifer Nygaard
California Dept. of Justice
Office of the Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
Phone: 510-879-0802
Fax: 510-622-2270
E-Mail: jennifer.nygaard@doj.ca.gov
jay.goldman@doj.ca.gov
lucille.santos@doj.ca.gov

**Attorney for Defendants Kevin Kuich, Joe A. Lizarraga**

Michael A. Terhorst, Sr.
Beeson Terhorst LLP
510 Bercut Drive, Suite V
Sacramento, CA 95811
Phone: 707-301-7504

E-Mail: michael@beesonterhorst.com
Jeff@beesonterhorst.com
mercedes@beesonterhorst.com

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

Exhibit U 8/8

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
639 KENTUCKY AVENUE, FAIRFIELD, CA 94533-5530
TELEPHONE: (707) 427-3998

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on August 17, 2023 at Pleasant Hill, California.

Tami Martin

Tami Martin

Exhibit V
1/19

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1. On February 9, 2018, Robert Rudas, M.D. filed out a "Physician Request for Services" form, CDC 7243, for Decedent to undergo an upper endoscopy. The medical necessity cited by Dr. Rudas was "patient with cirrhosis/esld. Per registry protocol patient is due for esophageal varices follow-up/surveillance." Dr. Rudas requested an "on-site" contracting medical provider to complete the procedure by May 9, 2018. He left the "summary of preliminary or diagnostic work-up" section blank.<br><br>**<u>Supporting Evidence</u>**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pg. 1, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | Admit |
| 2. Christopher Smith, M.D., the prison's Chief Medical Officer Executive, approved the procedure on February 12, 2018, indicating the EGD referral was appropriate.<br><br>**<u>Supporting Evidence</u>**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pg. 1, *attached to Defendant's Compendium of Evidence as Exhibit "E"* and pertinent portions of Decedent William Schmitz's medical records from Mule Creek | Admit that Christopher Smith approved the procedure. Do not agree referral was appropriate<br><br>Supporting evidence - see opposition with cited evidence particularly section on " Evidence of Substandard Care" at 9-11 |

[1] The facts as stated herein are undisputed solely for the purposes of this Motion for Partial Summary Judgment and do not establish any admissions or concede the true of any fact that may be disputed at the time of trial.

| | |
|---|---|
| Prison, pg. 1, *attached to Defendant's Compendium of Evidence as Exhibit "C."* | |
| 3. On March 8, 2018, Decedent saw his primary care physician, Marianna Ashe, M.D, in follow up for headaches and Hepatitis C. Dr. Ashe believed Decedent did not have cirrhosis but did not inform him of this opinion or cancel the pending EGD.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pgs. 2–4, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | Admit |
| 4. On March 14, 2018, Rory Sanders, RN, a prison-affiliated health care provider, saw Decedent for the purpose of educating him about his upcoming endoscopy. Dr. Rudas instructed, "Explain to patient that an EGD has been scheduled for him. Records show he has advanced liver disease/cirrhosis that puts him at risk for bleeding from the veins in his esophagus (esophageal varices). With an EGD the veins can be treated."<br><br>**Supporting Evidence**<br>Pertinent portions of Decedent William Schmitz's medical records from Mule Creek Prison, pgs. 2–4, *attached to Defendant's Compendium of Evidence as Exhibit "C."* | Admit |
| 5. On March 16, 2018, Dr. Smith approved the consultation request for a second time, confirming the EGD referral was appropriate.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pg. 1, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | Admit it was approved again but do not agree it was appropriate<br><br>Supporting evidence - see opposition with cited evidence particularly section on " Evidence of Substandard Care" at 9-11 |
| 6. An April 10, 2018 abdominal ultrasound indicated Decedent had no apparent ultrasonographic evidence of liver disease. The radiologist's impressions were: "Fatty liver. No hepatic mass is | Admit |

| | |
|---|---|
| identified. If there is strong clinical concern for hepatocellular carcinoma, a triphasic CT scan of the liver would be recommended for further evaluation."<br><br>**Supporting Evidence**<br>Pertinent portions of Decedent William Schmitz's medical records from Mule Creek Prison, pgs. 5–6, *attached to Defendant's Compendium of Evidence as Exhibit "C."* | |
| 7. There was no liver biopsy performed to confirm these findings.<br><br>**Supporting Evidence**<br>Pertinent portions of Decedent William Schmitz's medical records from Mule Creek Prison, pgs. 5–6, *attached to Defendant's Compendium of Evidence as Exhibit "C."* | Admit. However this is completely irrelevant. A liver biopsy is simply brought up to detract and to introduce a more invasive procedure to an endoscopy· A liver biopsy was never indicated in William and the endoscopy was not chosen as a safer alternative to a liver biopsy .<br><br>Supporting evidence - see opposition **3.Red herring of Liver biopsy** |
| 8. On May 4, 2018, Decedent underwent his scheduled endoscopy, performed by Defendant. Anesthesia with Propofol was provided by a certified nurse anesthetist. Defendant's report states he explained the procedure, indications, and potential complications to Decedent prior to the endoscopy.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pgs. 5–7, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | . As William had no physical exam, lab or imaging finding indicative of cirrhosis there was no adequate medical indication. As a gastoenterologist that performs endoscopy Defendant DeNgris must know the indications for an endoscopy·<br>Defendant DeNigris originally claimed it was due to William being checked for varices prior to Hepatitis C anitviral therapy. Defendant DeNigris then changed his explanation years later after being confronted with allegations and evidence proving the absurdity of his claimed reasoning.<br>**Supporting evidence -** see opposition with cited evidence particularly section"Evidence that Defendant DeNigris Deliberately performed the endoscopy knowing William had no medical indication". |
| 9. Decedent indicated his understanding and provided informed, written consent.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pgs. 8–9, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | see answer 8 above. |
| 10. Prior to the procedure, Defendant reviewed Decedent's relevant medical documents, including Decedent's Health Care Services Physician Request for Services and referral form.<br><br>**Supporting Evidence** | Admit, however the "relevant medical documents" claimed to have been reviewed by Defendant DeNigris are not fully identified. **Supporting evidence** - see opposition with cited evidence |

exhibit V
4/14

| | |
|---|---|
| Pertinent portions of Defendant Stephen DeNigris, M.D.'s responses to Plaintiff's Request for Admissions, Set One, Nos. 8, 12, *attached to Defendant's Compendium of Evidence as Exhibit "H."* | |
| 11. Decedent consented to the administration of anesthesia, and during the procedure, Decedent received Propofol and was monitored by a dedicated anesthetist, Frank Cardoza, CRNA. Decedent's vital signs remained stable throughout the procedure. Defendant placed Decedent in the left lateral decubitus position, introduced the endoscope through Decedent's mouth, and advanced the scope under direct visualization until it reached the second part of the duodenum. There were no complications, and Decedent tolerated the procedure well.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pgs. 10–12, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | William had pain from the procedure. His mental state was worsened by the procedure and cirrhosis diagnosis.<br><br>Supporting evidence - see opposition with cited evidence |
| 12. Defendant indicated the procedure was not difficult. Decedent was awake and breathing spontaneously upon completion of the procedure.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pgs. 10–12, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | Admit |
| 13. Following the procedure, Defendant noted he found no endoscopic evidence of portal hypertension or esophago-gastric varices. Defendant completed the "Physician Request for Services Form" by hand, writing there was "No endoscopic evidence of portal hypertension" and "specifically; No esophago-gastric varices" or other findings. | Admit |

5/18

| | |
|---|---|
| **Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pg. 1, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | |
| 14. There are no post-operative issues documented in the records, and Decedent was discharged in stable condition. The plan was for Decedent to continue his current medical regime and diet, follow up with his primary care physician, and follow up with another EGD in three years.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Initial Disclosures, pgs. 3–4, *attached to Defendant's Compendium of Evidence as Exhibit "D."* | William had pain from the procedure. His mental state was worsened by the procedure and cirrhosis diagnosis.<br><br>Supporting evidence - see opposition with cited evidence |
| 15. Beyond notifying his employer, Secure MD, of the completion of 11 endoscopy cases on May 4, 2018, Defendant was not directly involved in the billing process for any services provided. Pursuant to the contract between Defendant and Secure Pros, Secure Pros "will bill, collect and retain all revenues received from billing and collection functions related to Services provided by Physician pursuant to this Agreement."<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pgs. 13–23, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | Defendant DeNigris is legally responsible for billing.<br>Supporting evidence - see opposition with particularly section on "Evidence of Fraudulent Billing" at 15-17 |
| 16. As noted in Defendant's billing records, Defendant properly submitted Current Procedural Terminology (CPT) task code 43235 to Secure MD, indicating he performed a diagnostic gastrointestinal endoscopy. Defendant did not complete a Comprehensive History & Physical, and there is no evidence in the record that he submitted billing code 99204 | Agree however Defendant DeNigris Interrogatory No. 6 response is that the CPT codes 43235 and 99204 with modifier 25 is an accurate representation of the services he provided to William.<br>**Supporting evidence** - see opposition with particularly section on "Evidence of Fraudulent Billing" at 15-17 |

| | |
|---|---|
| with modifier 25 or any other cognitive service charge.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Initial Disclosures, pgs. 1–2, *attached to Defendant's Compendium of Evidence as Exhibit "D."* | |
| 17. Rather, a screenshot from the Secure Pro system indicates this code was added after Defendant's involvement.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Initial Disclosures, pg. 2, *attached to Defendant's Compendium of Evidence as Exhibit "D."* | Unclear as to the term "involvement" Defendant DeNigris is legally responsible for billing. **Supporting evidence** - see opposition with particularly section on "Evidence of Fraudulent Billing" at 15-17 |
| 18. In accordance with his contract, Defendant was not involved in the final code selection process or factors considered by Secure Pros when assigning final billing codes for services performed.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, pgs. 13–23, *attached to Defendant's Compendium of Evidence as Exhibit "E."* | Defendant DeNigris is legally responsible for billing.<br><br>Defendant DeNigris Interrogatory No. 6 response is that the CPT codes 43235 and 99204 with modifier 25 is an accurate representation of the services he provided to William. .<br><br>In response to request for Admission 20, "Admit that services provided to William Schmitz on May 4, 2018 did not meet the criteria for Current Procedural Terminology (CPT) codes 43235 and 99204 with modifier 25" Defendant DeNigris denies.<br><br>Supporting evidence - see opposition with particularly section on "Evidence of Fraudulent Billing" at 15-17 |
| 19. On May 5, 2018, Defendant submitted an invoice to Secure MD noting simply that he completed 11 cases (procedures) on May 4, 2018 at Mule Creek State Prison and requesting his $3,250 per diem for that day (in addition to travel expenses).<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, Set Two, pg. 1, *attached to Defendant's Compendium of Evidence as Exhibit "F."* | ADMIT |
| 20. On December 21, 2018, Dr. Ashe ordered a fibroscan, but it was not completed prior to Decedent's death. | ADMIT |

| | |
|---|---|
| **Supporting Evidence**<br>Pertinent portions of Decedent William Schmitz's medical records from Mule Creek Prison, pgs. 7–10, *attached to Defendant's Compendium of Evidence as Exhibit "C."* | |
| 21. Decedent expired on January 21, 2019, or 262 days following his endoscopy. According to autopsy and prison records, Decedent was found dead on his cell toilet with evidence of anal trauma strongly suggesting he had been attempting to retrieve something from his rectum prior to his death. Autopsy findings showed massive amounts of methamphetamine in his blood (10 to 245 times above the toxic range) and 2 packs of methamphetamine in his stomach, one of which had lost the rubber band that prevents leakage and was smaller than the other, suggesting some loss of content. There is reference on page 4 of the Amador County Sheriff's Report to the fact that Decedent "had a history of smuggling drugs into the prison and abusing drugs." The death certificate indicates Decedent suffered from a "massive overdose of methamphetamine" after a "leakage or rupture of bindle(s) of methamphetamine ingested for purposes of drug smuggling." The final autopsy report concludes Decedent's death was directly related to an ACCIDENTAL overdose of methamphetamine, due to leakage or rupture of bindles of ingested methamphetamine.<br><br>**Supporting Evidence**<br>Decedent William Schmitz's Death Certificate, State of California, County of Amador, *attached to Defendant's Compendium of Evidence as Exhibit "I"* and Coroner's Autopsy Report of Decedent William Schmitz, *attached to Defendant's Compendium of Evidence as Exhibit "J."* | Plaintiffs contest the facts contained in the COUNTY SHERIFF'S REPORT report Although none of this is pertinent to the current motion and an obvious attempt to bias the court in making a decision on this motion. Discovery from defendants only shows one Rules Violation report for attempting to inject his own antipsychotic.<br><br>There is plenty of evidence of Wiliam's mania and psychosis were worsened by the end stage liver diagnosis and subjecting him to medical procedures.<br>**Supporting evidence** - see opposition with particularly section on " Evidence of worsening mental state" at 18-19 |
| 22. Board-certified Gastroenterologist David Arenson, M.D. evaluated the care and treatment provided to Decedent by | |

| | |
|---|---|
| Defendant surrounding the claims brought on behalf of Plaintiffs Dianna Mallia, Thomas Schmitz, and the Estate of William Schmitz. Dr. Arenson has reviewed the relevant medical records and allegations. Based on his review of those records, as well as his skills, education, training, and experience, it is Dr. Arenson's opinion the medical care and treatment provided to Decedent by Defendant at all times complied with the applicable standard of care, and no evidence of substandard care exists. Defendant was a proceduralist contracted to perform endoscopic procedures at Mule Creek State Prison when requested by the prison medical personnel. He appropriately and competently performed Decedent's endoscopy at the request of and upon referral from Dr. Rudas. Defendant acted in accordance with that request and the "Physician Request for Services" form completed by Dr. Rudas. The medical necessity cited by Dr. Rudas was "patient with cirrhosis/esld. Per registry protocol patient is due for esophageal varices follow-up/surveillance." Thus, in accordance with the direction and referral from Dr. Rudas, Defendant acted as a proceduralist and appropriately obtained Decedent's informed consent, performed the requested procedure, and provided appropriate follow-up instructions upon completion of the procedure.<br><br>**Supporting Evidence**<br>Declaration of David Arenson, M.D., ¶ 20, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | Incorporate all answers above and deny.<br><br>Pro Se Plaintiffs for the first time learned of expert witness David Arenson M.D. and his report at the time of this motion. Plaintiffs have not had time to validate his credentials or fully evaluate his opinions and what specific documents he reviewed and based his opinions. The discovery timeline ordered by the court expert witness oppositions is in the future. Plaintiffs contest several of Dr. Arenson as discussed in the opposition.<br><br>Supporting evidence - see opposition with cited evidence throughout which all pertinent to Defendant Arenson Opinions |
| 23. Specifically, it is Dr. Arenson's opinion Defendant provided appropriate pre-operative care in compliance with the standard of care. Prior to the endoscopy, Defendant explained the procedure, indications, preparation, and potential | See answer to 22 |

Exhibit V 9/18

| | |
|---|---|
| complications to Decedent. Decedent indicated his understanding and provided his informed, written consent to the procedure and administration of anesthesia, in compliance with the applicable standard of care.<br><br>**<u>Supporting Evidence</u>**<br>Declaration of David Arenson, M.D., ¶ 21, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | |
| 24. Further, Dr. Arenson opines Defendant appropriately reviewed Decedent's relevant medical documents prior to Decedent's endoscopy, including Decedent's Health Care Services Physician Request for Services and referral form. As a proceduralist, it was entirely reasonable for Defendant to focus his review of Decedent's medical chart on records that were directly relevant to the upcoming procedure and act in accordance with the request, direction, and referral from Dr. Rudas and the prison medical staff. It is entirely appropriate for the proceduralist to rely on information provided by the referring physician, and the standard of care does not require a proceduralist to engage in a thorough review of a patient's entire medical chart to independently confirm the veracity of the referral information prior to performing a simple, brief, and remarkably safe diagnostic endoscopy. Although an April 10, 2018 abdominal ultrasound indicated Decedent had no ultrasonographic evidence of liver disease, a simple abdominal ultrasound is incapable of identifying the degree of fibrosis or the presence or absence of cirrhosis within the liver with any degree of confidence. It is Dr. Arenson's opinion Defendant at all times complied with the applicable standard of care, and the standard of care did not require anything further from Defendant. | Deny, incorporate all answers above and dispute.<br><br>Dr. Arenson vaguely describes "relevant medical documents" but does not identify what documents Dr. DeNigris reviewed. He completely ignores Dr. DeNigris own initial sworn interrogatory responses. However, it is unclear if Dr. Arenson was even given these answers to for the formation of his opinions.<br><br>Dr. Arenson then brings up liver biopsy as if that was potentially indicated in a case like William's. William had no lab findings, physical exam findings, or imaging findings to warrant further investigation of cirrhosis.<br><br>Supporting evidence - see opposition with cited evidence |

Exhibit V 10/18

| | |
|---|---|
| **Supporting Evidence**<br>Declaration of David Arenson, M.D., ¶ 22, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | |
| 25. Additionally, it is Dr. Arenson's opinion Defendant's pre-operative management of Decedent fully complied with the applicable standard of care in all respects, and no evidence of substandard care exists. Given his role as a proceduralist, it was within the standard of care for Defendant to carry out the requested procedure, and he did not breach the applicable standard of care.<br><br>**Supporting Evidence**<br>Declaration of David Arenson, M.D., ¶ 23, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | See answer to 22 |
| 26. It is also Dr. Arenson's opinion the surgical procedure itself complied with the applicable standard of care, and no evidence of substandard care exists. Defendant performed Decedent's endoscopy on May 4, 2018. Decedent consented to the use of general anesthesia, which was administered by a dedicated anesthetist under Defendant's direction. The procedure was not difficult, and there were no complications. Decedent tolerated the procedure well.<br><br>**Supporting Evidence**<br>Declaration of David Arenson, M.D., ¶ 24, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | See answer to 22 |
| 27. Defendant appropriately reported to Secure MD that he had completed 11 diagnostic endoscopies on May 4, 2018 and claimed his standard per diem rate of $3,250 for the services he rendered that day. He did not claim any other services and was not involved in generating any other charges. This was entirely reasonable and in compliance with the applicable standard of care. | See answer to 22 |

| | |
|---|---|
| **<u>Supporting Evidence</u>**<br>Declaration of David Arenson, M.D., ¶ 24, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | |
| 28. While there are extremely rare complications during the performance of a diagnostic endoscopy, these risks are further substantially reduced in the presence of a dedicated anesthetist. The estimated complication rates for a diagnostic endoscopy is less than 0.0002% (less than 2/10,000 cases), according to a Mayo Clinic Report in 2004 (*Mayo Clinic Proceedings 2004; 79 (10):1264*). In fact, these complications were mostly related to sedation and anesthesia, and there were no deaths. In the 14 years between this publication and Decedent's EGD, there has been substantial improvements in endoscope technology, anesthesia options, and the wide-spread use of dedicated anesthetists, making an EGD even safer with complications rates likely even lower. The likelihood of suffering a serious complication during the performance of a diagnostic endoscopy performed by a properly trained and experienced gastroenterologist in the United States in 2018 would be akin to being struck by lightning.<br><br>**<u>Supporting Evidence</u>**<br>Declaration of David Arenson, M.D., ¶ 25, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | See answer 22 in addition<br><br>Dr. Arenson opinion which exactly copies Defendant DeNigris Answer does establish a minimal risk of the endoscopy. Unfortunately for William and his mental state William was informed not of how easy and safe the procedure with the chance of suffering a serious complication being "akin to being stuck by lightning"<br><br>Rather William a severely mentally ill man whose cousin died of end stage liver disease was counseled on all of the serious risks including death |
| 29. Dr. Arenson opines Defendant also provided appropriate post-operative follow-up. There are no post-operative issues documented in the records, and Decedent was discharged in stable condition. The plan was for Decedent to continue his current medical regime and diet, follow up with his primary care provider, and follow up with another EGD in three years. Given Defendant's | Incorporate all answers above .<br>Dr. Arenson opinion that Dr. DeNigris thought William had cirrhosis is contrary to Defendant DeNigris own original answers !<br><br>Supporting evidence - see opposition with cited evidence |

| | |
|---|---|
| belief that Decedent had cirrhosis, coupled with his endoscopy findings revealing no apparent portal hypertension or esophago-gastric varices, three years was an appropriate time frame to propose for Decedent's follow up to further monitor and manage his cirrhosis. Accordingly, it is Dr. Arenson's opinion Defendant complied with the applicable standard of care at all times.<br><br>**Supporting Evidence**<br>Declaration of David Arenson, M.D., ¶ 26, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | |
| 30. It is Dr. Arenson's opinion the applicable standard of care was met at all times by Defendant during his involvement in Decedent William Schmitz's care and treatment, and no evidence of substandard care, deliberate indifference, or financial motivation exists.<br><br>**Supporting Evidence**<br>Declaration of David Arenson, M.D., ¶ 27, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | Deny and Incorporate all answers above and particularly relevant are answers 22<br>Further, he is it outside his expertise to opine on deliberate indifference<br>ample evidence of substandard care and financial motivation exists<br><br>Supporting evidence - see opposition with cited evidence |

**ISSUE #2: There is No Triable Issue of Material Fact Defendant Dr. DeNigris Did Not Have the Sufficient Culpable State of Mind to Act with Deliberate Indifference.**

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Defendant incorporates facts 1 through 30 as though fully set forth herein. | Incorporate all answers as above |
| 31. Defendant was a proceduralist who performed Decedent's endoscopy at the request, direction, and referral from Dr. Rudas. Defendant acted in accordance with that request and the "Physician Request for Services" form completed by Dr. Rudas. The medical necessity | Defendant DeNigris did this because of "starting hepatitis treatment" only now says it was cirrhosis.<br>PLaintiffs believe that his initial answers are more true. in addition Defendant DeNIgris likely only had a few documents.... and all of the motion for damages stuff.... |

Exhibit V
13/18

| | |
|---|---|
| cited by Dr. Rudas was "patient with cirrhosis/esld. Per registry protocol patient is due for esophageal varices follow-up/surveillance." Defendant appropriately obtained Decedent's informed consent, performed the requested procedure, and provided appropriate follow-up care upon completion of the procedure. Thus, because Defendant acted in reliance of Dr. Rudas' request, which according to Dr. Arenson was within the standard of care for a proceduralist performing a brief diagnostic endoscopy, there is no evidence Defendant had the culpability sufficient to support a finding of deliberate indifference.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D.'s responses to Plaintiff's Request for Admissions, Set One, Nos. 15, 16, 18, 21, *attached to Defendant's Compendium of Evidence as Exhibit "H"* and SSUMF 1, 9, 23–26. | |
| 32. Defendant previously stated that he did not know Decedent did not have cirrhosis. In response to Plaintiffs' Special Interrogatories, Set One, Defendant stated, in pertinent part:<br><br>Q: You disclosed several medical record documents including laboratory values from 3/16/2018 (DEN000053 and DEN000055) and a primary care note from Dr. Marianna Ashe from 4/16/2018, which includes an abdominal ultrasound note (DEN 000049 and DEN000051).<br><br>a. Explain in detail reasoning for why William Thomas Schmitz did or did not have end stage liver disease.<br>. . .<br><br>A: Objection. This request is vague, ambiguous, overbroad, compound, calls for an improper and premature expert | |

Exhibit V
19/18

| | |
|---|---|
| opinion, assumes facts not supported by the medical record, and is conclusory. Subject to and without waiving said objections, Defendant responds:<br><br>a. Dr. DeNigris has made a reasonable effort, diligent inquiry, and good faith investigation of sources reasonably available to him in formulating a response to this interrogatory. Under this good faith investigation, Dr. DeNigris cannot state with certainty whether or not Decedent had cirrhosis at the time of the endoscopy, since a liver biopsy had not been performed. Dr. DeNigris admits Decedent likely did not have cirrhosis on May 4, 2018, due to the absence of potentially associated findings including varices (as noted during endoscopy). An abdominal ultrasound is incapable of identifying the degree of fibrosis or the presence or absence of cirrhosis within the liver to any degree of certainty whatsoever. Indirect evidence suggestive of portal hypertension can be seen on ultrasound (enlargement of the portal vein diameter and spleen) but these findings are not specific nor absolutely sensitive (i.e. cirrhosis and advanced fibrosis can be present without these findings seen on ultrasound) . . .<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s responses to Plaintiff's Special Interrogatories, Set One, *attached to Defendant's Compendium of Evidence as Exhibit "G."* | Deny Incorporate all answers as above |
| 33. There is no evidence Defendant "knew of" and "disregarded an excessive risk" to Decedent's health or safety by performing the scheduled procedure. According to Defendant, he proceeded with a "very low risk option:"<br><br>Q: You disclosed several medical record documents including laboratory values | |

Exhibit V 15/18

| | |
|---|---|
| from 3/16/2018 (DEN000053 and DEN000055) and a primary care note from Dr. Marianna Ashe from 4/16/2018, which includes an abdominal ultrasound note (DEN 000049 and DEN000051).<br>. . .<br>b. If your contention is William Schmitz did not have end stage liver disease, explain the reasoning for why he would have portal hypertension and a need for an endoscopy to screen for esophageal varices.<br><br>A: Objection. This request is vague, ambiguous, overbroad, compound, calls for an improper and premature expert opinion, assumes facts not supported by the medical record, and is conclusory. Subject to and without waiving said objections, Defendant responds:<br>. . .<br>b. Cirrhosis and fibrosis can only be determined with certainty through a liver biopsy, which is invasive and carries significant risks that are substantially greater than an EGD. Determining the presence or absence of portal hypertension with certainty requires measurement of the portal and hepatic vein pressures. This requires an invasive procedure with significant risks. An EGD to identify esophageal varices provides a very low-risk option for identifying indirect evidence of portal hypertension (esophageal varices) and allows for prophylactic variceal ablation at the same time if present.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s responses to Plaintiff's Special Interrogatories, Set One, *attached to Defendant's Compendium of Evidence as Exhibit "G."* | Deny Incorporate all answers as above |

Exhibit V
918

| | |
|---|---|
| 34. There is no evidence Defendant specifically performed the endoscopy knowing the EGD was not medically indicated and "in conscious disregard of an excessive risk" to Decedent's health.<br><br>**Supporting Evidence**<br>Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s responses to Plaintiff's Special Interrogatories, Set One, *attached to Defendant's Compendium of Evidence as Exhibit "G."* | Deny -Incorporate all answers above |

**ISSUE #3:** **There is No Triable Issue of Material Fact Defendant Dr. DeNigris Did Not Cause or Contribute to the Deprivation of Familial Relationship.**

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Defendant incorporates facts 1 through 34 as though fully set forth herein. | Incorporate all answers as above |
| 35. There is no evidence of deliberate indifferent conduct that would "shock the conscience" sufficient to support a cause of action for deprivation of a familial relationship.<br><br>**Supporting Evidence**<br>See Declaration of David Arenson, M.D., *attached to Defendant's Compendium of Evidence as Exhibit "K"*; pertinent portions of Defendant Stephen DeNigris, M.D.'s responses to Plaintiff's Request for Admissions, Set One, *attached to Defendant's Compendium of Evidence as Exhibit "H"* and SSUMF 1, 9, 25, 26; and pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s responses to Plaintiff's Special Interrogatories, Set One, *attached to Defendant's Compendium of Evidence as Exhibit "G."* | Deny,<br><br>Arenson is not a legal expert and declaration should have no bearing<br><br>incorporate all answers above |

**ISSUE #4:** **There is No Triable Issue of Material Fact Defendant Dr. DeNigris Did Not Violate Civil Code §52.1.**

Exhibit V 17/18

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Defendant incorporates facts 1 through 35 as though fully set forth herein. | |
| 36. There are no allegations pled that Defendant separately threatened, intimidated, or coerced Decedent to undergo the endoscopy. In fact, Decedent consented to the procedure.<br><br>**<u>Supporting Evidence</u>**<br>See Pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s Supplemental Disclosures, *attached to Defendant's Compendium of Evidence as Exhibit "E"*; Declaration of David Arenson, M.D., *attached to Defendant's Compendium of Evidence as Exhibit "K"*; pertinent portions of Defendant Stephen DeNigris, M.D.'s responses to Plaintiff's Request for Admissions, Set One, *attached to Defendant's Compendium of Evidence as Exhibit "H"* and SSUMF 1, 9, 25, 26; and pertinent portions of Defendant Stephen DeNigris, M.D., Ph.D.'s responses to Plaintiff's Special Interrogatories, Set One, *attached to Defendant's Compendium of Evidence as Exhibit "G."* | Deny incorporate all answers above |
| 37. Again, it is Dr. Arenson's opinion Defendant provided appropriate pre-operative care in compliance with the standard of care. Prior to the endoscopy, Defendant explained the procedure, indications, preparation, and potential complications to Decedent. Decedent indicated his understanding and provided his informed, written consent to the procedure and administration of anesthesia, in compliance with the applicable standard of care. Specifically, Decedent consented to the use of general anesthesia, Propofol 100 mg IVF, which was administered by a dedicated anesthetist under Defendant's direction. The procedure was not difficult, and there were no complications. According to Dr. | Deny incorporate all answers above |

Exhibit ✓ 18/18

| | |
|---|---|
| Arenson, this was entirely reasonable and in compliance with the applicable standard of care.<br><br>**Supporting Evidence**<br>Declaration of David Arenson, M.D., ¶¶ 21–24, 27, *attached to Defendant's Compendium of Evidence as Exhibit "K."* | |

**ISSUE #5: There is No Triable Issue of Material Fact Defendant Dr. DeNigris Did Not Commit Medical Battery.**

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Defendant incorporates facts 1 through 37 as though fully set forth herein. | incorporate all answers above |

**ISSUE #6: Plaintiffs Cannot Meet the Requisite Burden to Support a Finding of Punitive Damages.**

| MOVING PARTY'S UNDISPUTED MATERIAL FACTS AND SUPPORTING EVIDENCE | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| Defendant incorporates facts 1 through 37 as though fully set forth herein. | incorporate all answers above |

Plaintiffs response to SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT



1/3

AFFIDAVIT OF THOMAS J. SCHMITZ, D.P.M.

The undersigned hereby assert the following:

The following exhibits are included with PLAINTIFFS' OPPOSITION TO DEFENDANT STEPHEN DENIGRIS, M.D.'S MOTION FOR PARTIALLY SUMMARY JUDGMENT

Some exhibits, as annotated, were printed from websites and I personally confirmed are accurate representations of their websites as of the dates listed. Exhibit letters and page number were handwritten additions to each exhibit for identification.

Exhibit A- "How often should patients with hepatitis C be screened for esophageal varices?" 1- minute clinical consult. Downloaded on January 2, 2021
https://www.ccjm.org/content/ccjom/73/8/758.full.pdf

Exhibit B- DEFENDANT STEPHEN DENIGRIS, M.D., PH.D.'S RESPONSE TO PLAINTIFF MALLIA'S REQUESTS FOR ADMISSION, SET ONE

Exhibit C - DEFENDANT ROBERT RUDAS, M.D.'S SECOND AMENDED RESPONSES TO Interest; THOMAS SCHMITZ, PLAINTIFF'S REQUEST FOR ADMISSIONS, SET ONE

Exhibit D- Defendant Stephen DeNigris, M.D., Ph.D.'s responses and objections to plaintiff's first set of interrogatories relating to Jurisdictional Discovery.

Exhibit E - American Society for Gastrointestinal Endoscopy website doctor search for "Denigris" Downloaded on January 2, 2021
https://www.asge.org/find-a-doctor-results?startRow=0&LastName=denigris

Exhibit F -American Society for Gastrointestinal Endoscopy website section "About ASGE"
Downloaded on January 2, 2021
https://www.asge.org/home/about-asge

Exhibit H – California Law False Claims Actions[12650-12656]

Exhibit K - Select pages from U.S. Department of Health & Human Services Office of the Inspector General has a booklet "Avoiding Medicare and Medicaid Fraud and Abuse" Downloaded on January 2, 2021 https://oig.hhs.gov/compliance/physicianeducation/roadmap_web_version.pdf

Exhibit L – Select pages from the Centers for Medical and Medicaid Services "Global Surgery Booklet" ICN 907166

Exhibit M – Select pages from the Medicare Claims Processing Manual (Rev. 4339) with selected sections highlighted/underlined

Exhibit N - American Society for Gastrointestinal Endoscopy "Appropriate use of GI endoscopy" http://dx.doi.org/10.1016/j.gie.2012.01.011

Exhibit O – CCHCS Care Guide: Hepatitis C September 2020 https://cchcs.ca.gov/wp-content/uploads/sites/60/CG/HCV-CareGuide.pdf Downloaded on January 3, 2020

Exhibit P – CCHCS Care Guide: Hepatitis C January 2017

Exhibit Q- Discovery documents received from Defendant Dr. DeNigris as represented by Bates numbers beginning with "DEN" and other Defendants beginning with "DEF"

Exhibit R- Affidavit Joseph W. Schmitz

Exhibit S- Affidavit Rose D. Swift

Exhibit T- Affidavit Thomas F. Schmitz

Exhibit U- DEFENDANT ROBERT RUDAS, M.D.'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE

Exhibit V- Plaintiffs' response to Defendant DeNigris Statement of Undisputed Facts

Exhibit W- This Declaration

Exhibit W 3/3

I declare under penalty of perjury that the foregoing is true and correct. Executed on the 27th Day of August.

Thomas J. Schmitz, DPM

Affidavit of Thomas J. Schmitz, D.P.M