1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JENNY S. YELIN – 273601
THOMAS NOLAN – 169692
MICHAEL S. NUNEZ – 280535
AMY XU – 330707
CARA E. TRAPANI – 313411
MARC J. SHINN-KRANTZ – 312968
ALEXANDER GOURSE – 321631
GINGER JACKSON-GLEICH – 324454
ADRIENNE PON HARROLD – 326640
MAYA E. CAMPBELL – 345180
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

11

12                 UNITED STATES DISTRICT COURT

13               EASTERN DISTRICT OF CALIFORNIA

14

15  RALPH COLEMAN, et al.,

16            Plaintiffs,

17       v.

18  GAVIN NEWSOM, et al.,

19            Defendants.

20

Case No. 2:90-CV-00520-KJM-DB

**ANNOTATED DEPOSITION
TRANSCRIPT OF DR. PAUL
BURTON**

Judge:   Hon. Kimberly J. Mueller

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[4370475.1]

1      Defendants' general objection to all of Plaintiffs' designations can be found at ECF
2  No. 7992 at 1-2 and ECF No. 7955 at 1-5.  Plaintiffs' response to this general objection
   can be found at ECF No. 7948 at 2-4 and ECF No. 7959 at 2-9.

3      Deposition designations and objections thereto are indicated as follows:

4  Color 1 (yellow):      Deposition testimony Plaintiffs designate, including Defendants'
                          objections stated within the section of the transcript designated.
5

6  Color 2 (green):       Deposition testimony Defendants counter-designate.  Plaintiffs do not
                          object to Defendants' counter-designations.

7  Color 3 (pink):        Plaintiffs' designations that Defendants stipulate can be admitted for
                          all purposes
8

9  The unhighlighted portion of the deposition are not designated by either party.

10

11                                     Respectfully submitted,

12  DATED:  October 5, 2023            ROSEN BIEN GALVAN & GRUNFELD LLP

13                                     By:  /s/ Adrienne Pon Harrold

14                                          Adrienne Pon Harrold

15                                     Attorneys for Plaintiffs

16

17  DATED:  October 5, 2023            HANSON BRIDGETT LLP

18                                     By:  /s/ Samantha D. Wolff

19                                          PAUL B. MELLO

20                                          SAMANTHA D. WOLFF

21                                     Attorneys for Defendants

22

23

24

25

26

27

28

Deposition of

# Paul Burton, M.D.

August 28, 2023

Coleman

vs.

Newsom



www.aptusCR.com | 866.999.8310

1          UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA

3

      RALPH COLEMAN, et al.,
4
               Plaintiffs,
5                                    CASE NO.
        vs.                          2:90-CV-00520-KJM-
6                                    DB
      GAVIN NEWSOM, et al.,
7
               Defendants.
8      _____

9

10

11

12

13

14        REMOTE DEPOSITION OF PAUL BURTON, M.D.

15            Monday, August 28, 2023

16

17

18

19

20

21

22

23   Reported by:
     Layli Phillips
24   RPR, CRR, CSR No. 14402

25   Job No. 10126078

**Paul Burton, M.D.**

```
 1            UNITED STATES DISTRICT COURT

 2          EASTERN DISTRICT OF CALIFORNIA

 3

     RALPH COLEMAN, et al.,
 4
                 Plaintiffs,
 5                                    CASE NO.
        vs.                           2:90-CV-00520-KJM-
 6                                    DB
     GAVIN NEWSOM, et al.,
 7
                 Defendants.
 8    _____

 9

10

11

12

13

14         Remote Deposition of PAUL BURTON, M.D., taken

15   on behalf of Plaintiffs, beginning at 10:19 a.m. and

16   ending at 1:40 p.m., on Monday, August 28, 2023,

17   appearing remotely via Zoom before Layli Phillips, RPR,

18   CRR, Certified Shorthand Reporter No. 14402.

19

20

21

22

23

24

25
```

www.aptusCR.com

**Paul Burton, M.D.**

```
 1   REMOTE APPEARANCES:

 2

     For the Plaintiffs:
 3        ROSEN, BIEN, GALVAN & GRUNFELD LLP
          BY:  ADRIENNE HARROLD, ESQ.
 4             JENNY S. YELIN, ESQ.
          101 Mission Street, Sixth Floor
 5        San Francisco, California 94105
          (415) 433-6830
 6        aharrold@rbgg.com
          jyelin@rbgg.com
 7

 8   For the Defendants:
          HANSON BRIDGETT LLP
 9        BY:  DAVID C. CASARRUBIAS, ESQ.
          425 Market Street, 26th Floor
10        San Francisco, California 94105
          (415) 995-5893
11        dcasarrubias@hansonbridgett.com

12

13   ALSO PRESENT: VINCENT TAISAGUE, Aptus monitor
                    NICHOLAS O. WEBBER, ESQ., CDCR Office of
14                    Legal Affairs

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3  WITNESS                              EXAMINATION

 4  PAUL BURTON, M.D.

 5       By Ms. Harrold                          6

 6

 7

 8

 9                  E X H I B I T S

10  Plaintiffs'                              PAGE

11   Exhibit 1     Defendants' Monthly Mental      26

12                 Health Staffing Vacancy Reports

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       P R O C E E D I N G S

2                            10:19 a.m.

3                            --oOo--

4            THE REPORTER:  Good morning.  My name is Layli

5    Phillips.  I am a California Certified Shorthand

6    Reporter, CSR number 14402.

7            Please note it is imperative that everyone

8    speak clearly and one at a time.  Overlapping speakers

9    are not discernible over the phone and cannot be

10   reported.

11           Beginning with the noticing party, will counsel

12   please introduce themselves and state whom they

13   represent.

14           MS. HARROLD:  My name is Adrienne Harrold.  I

15   represent the plaintiff class in Coleman v. Newsom, and

16   I'm an attorney at the law firm Rosen, Bien, Galvan &

17   Grunfeld.

18           MR. CASARRUBIAS:  Good morning, everyone.  I'm

19   David Casarrubias.  I represent CDCR and the defendants

20   in this case, and I am with Hanson Bridgett.

21           MR. WEBBER:  Nick Webber.  I represent

22   California Department of Corrections and Rehabilitation.

23           (Witness sworn.)

24           THE REPORTER:  Please proceed.

25   //

**Paul Burton, M.D.**

```
 1                      PAUL BURTON, M.D.

 2          the deponent herein, called as a witness, after

 3   having been first remotely duly sworn, was examined and

 4   testified as follows:

 5                      EXAMINATION

 6   BY MS. HARROLD:

 7      Q. Great.  So as I mentioned, but I'll say it

 8   again because we're now on the record, my name is

 9   Adrienne Harrold.  I'm an attorney for the plaintiff

10   class in Coleman v. Newsom.

11          I understand you're very busy, Dr. Burton, so

12   thank you so much for taking the time to speak with us

13   today, and I'll try to keep it brief.  I know we're

14   delayed with some technical difficulties, so I'll just

15   jump right in.

16          Can you start by saying and spelling your first

17   and last name for the record.

18      A. Yes.  My name is Paul Burton, M.D., P-a-u-l,

19   last name B-u-r-t-o-n.

20      Q. Thank you.

21          And I'm going to start by going through some

22   ground rules for the deposition today, and I'll ask that

23   you acknowledge and understand each of them.  Some

24   Ms. Phillips already mentioned.  First it's important

25   you answer verbally.  Only one person should speak at a
```

**Page 6**

Paul Burton, M.D.

1    time and if you nod or shake your head that the court

2    reporter won't be able to record that.  Do you

3    understand?

4         A. I do, yes.

5         Q. And your counsel for CDCR may make objections

6    to the form of my questions.  You should respond to the

7    question anyways unless counsel instruct you not to

8    answer.  Do you understand?

9         A. Yes, I do.

10        Q. And if I ask you a question you don't

11   understand, please let me know, and I'll rephrase it or

12   make every effort to help you understand it.  Will you

13   do that?

14        A. Yes, I will.

15        Q. And if at any time you need to correct or

16   clarify a previous answer you gave, just let me know,

17   and you'll absolutely have the opportunity to do so.

18   Understood?

19        A. Understood.

20        Q. And today you've taken an oath to testify under

21   penalty of perjury.  It has the same effect as if you

22   were in a court of law.  Do you understand that?

23        A. I do, yes.

24        Q. And is there any reason that you cannot provide

25   your best testimony today:  Medication or poor sleep?

**Paul Burton, M.D.**

1          A. Not that I'm aware of, no.

2          Q. Is there any reason you can think of as to why

3    you won't be able to answer my questions truthfully and

4    fully?

5          A. No.

6          Q. Great.

7               And lastly, we'll try to take breaks at least

8    once an hour, but if you need to take breaks sooner than

9    that, just let me know, and we can accommodate that.

10               If I have already asked a question when you ask

11   to take a break, please answer my question, and then

12   we'll break after that.

13               Does that make sense?

14          A. Yes, it does.

15          Q. Great.

16               So I would like to learn a little bit more

17   about your background.  For the record, can you please

18   state your current employer.

19          A. My current employer is the California

20   Department of Corrections and Rehabilitation,

21   specifically at San Quentin State Prison.

22          Q. And we can use the acronym CDCR, right?

23          A. (Nodding head.)

24          Q. Can you verbally say yes?

25          A. Yes.  I'm happy using the CDCR acronym.

**Paul Burton, M.D.**

1      Q. Great.   Thank you.

2          And what is your position?

3      A. My current position is chief psychiatrist at

4  San Quentin.

5      Q. Are you the chief psychiatrist for both the

6  outpatient and inpatient PIP side of the institution?

7      A. I was for many years.   Beginning in 2022, they

8  created a second chief psychiatrist position.   I believe

9  technically, I am the chief psychiatrist on the PIP pay

10 line, although at San Quentin we do things a little

11 differently, and both chiefs are involved in inpatient

12 and outpatient psychiatric services.

13         MS. HARROLD:   Okay.   And, Ms. Phillips, PIP is

14 an acronym, P-I-P.

15 BY MS. HARROLD:

16     Q. Can you explain a bit more about -- so to make

17 sure I understand, you do have some -- you don't

18 currently have a role in the outpatient side?

19     A. I'm involved in outpatient psychiatric services

20 on a daily basis.

21     Q. You are.

22         And is there a second chief psychiatrist right

23 now?

24     A. There is.   We have someone in an acting chief

25 psychiatrist position.

**Paul Burton, M.D.**

1       Q. And who is that?

2       A. Her name is Gundeep Sekhon, M.D.

3       Q. Great.

4          Would you mind --

5       A. She is a --

6       Q. Sorry.  Go ahead.

7       A. She is a staff psychiatrist at San Quentin who

8    is currently in an acting out-of-class chief position.

9       Q. Okay.  You used the term out of class.  What

10   does that mean?

11      A. That means someone has been appointed into the

12   supervisory promotional position on a temporary basis

13   while the official interviewing process is ongoing, so

14   it's meant to be a temporary assignment pending the

15   permanent fill.

16      Q. And how often does that happen that someone

17   might work out of class in a mental health position in

18   San Quentin?

19         MR. CASARRUBIAS:  Objection.  Lacks foundation.

20   BY MS. HARROLD:

21      Q. You can answer the question if you understand

22   it.

23      A. There are a variety of different mental health

24   positions.  Was there one in particular you were

25   interested in?

**Page 10**

Paul Burton, M.D.

```
 1        Q. Perhaps in psychiatry?
 2        A. It's quite rare that we've had to do an
 3   out-of-class position for a psychiatric classification.
 4        Q. And going back to your background, how many
 5   years have you been with CDCR?
 6        A. I have worked at San Quentin for the last
 7   14 years, the last 12 of which I've been in a variety of
 8   different civil service classifications.
 9        Q. And how long have you been chief psychiatrist?
10        A. Since December 2014, so just under nine years.
11        Q. And you described you've held other positions
12   in CDCR.  Can you please describe them and the years of
13   each to the best that you remember?
14        A. Most definitely.  In 2001, I rotated at
15   San Quentin as a medical student for the summer.
16             In 2009, for one year, I was a UCSF forensic
17   psychiatry fellow rotating at San Quentin two days a
18   week for one year.
19             In -- from 2010 to 2011, I was a registry locum
20   tenens psychiatrist providing clinical services at
21   San Quentin State Prison.
22             Beginning in 2011, I began my civil service
23   employment with CDCR as a staff psychiatrist providing
24   treatment services via telepsychiatry, inpatient
25   psychiatry, and the condemned or death row psychiatric
```

**Paul Burton, M.D.**

Coleman vs.
Newsom

1  program that was available at that time.

2         I remained in that staff psychiatrist

3  classification until 2013, at which time I was promoted

4  to senior psychiatrist supervisor.

5         I remained in that position for 14 months until

6  the conclusion of 2014, December 2014, when I was

7  promoted to chief psychiatrist, and I remained in a

8  chief psychiatrist classification since that time.

9         **Q. Thank you.**

10        **You use the term registry.  What does that**

11 **mean?**

12        A. Registry is like locum tenens, temporary help.

13 These are psychiatrists who are not employed by the

14 department but who are employed by a third-party and

15 provide psychiatric services, not as employees but as

16 temporary help while civil service classifications are

17 in the process of being filled.

18        **Q. And what professional licenses do you hold, and**

19 **when were they granted?**

20        A. I am currently licensed to practice medicine in

21 the State of California continuously since 2008.

22        I am board certified in psychiatry since 2010

23 and board certified in forensic psychiatry since 2011.

24        I also have federal DEA registration since

25 approximately 2008 or 2009.

**Paul Burton, M.D.**

1      Q. And what degrees do you hold, and when did you

2   obtain them?

3      A. I received my Bachelor's Degree in Science in

4   2004 -- strike that, in 2000.

5           I received my medical degree in 2004.

6           And I completed my psychiatry residency in 2009

7   and my forensic psychiatry fellowship in 2010.

8      Q. And can you please describe what universities

9   or schools you were at for those?

10      A. Certainly.  I did my undergraduate degree at

11   the University of Florida.

12           I went to medical school at the University of

13   California, San Francisco.

14           I did my psychiatry internship, residency, and

15   chief residency at New York University.

16           I returned to the University of California,

17   San Francisco, for my forensic psychiatry fellowship.

18      Q. And did you work anywhere before CDCR?

19      A. Through my training, I worked in a variety of

20   different health care organizations at the city, county,

21   state, federal, and private level.  But immediately

22   concluding my fellowship training in 2010, I became

23   registry of San Quentin and have been there ever since.

24      Q. And have you ever been in -- held a private

25   practice?

1    A. I have.  I used to have a forensic psychiatry

2    practice based out of San Francisco between 2010 and

3    2015.  In 2015, I decided to close that practice to

4    focus on work at San Quentin as well as non-work, family

5    affairs.

6    **Q. And are you a member of any labor union?**

7    A. I am.  I pay dues to ACSS, which is a

8    supervisory union for California supervisors.

9         And I still pay dues, therefore, I believe I am

10   a member of UAPD, Union of American Physicians and

11   Dentists.

12   **Q. Do you know whether those unions have current**

13   **MOUs with CDCR?**

14        MR. CASARRUBIAS:  Objection.  Lacks foundation,

15   and calls for speculation.

16   BY MS. HARROLD:

17   **Q. You can answer the question if you understand**

18   **it.**

19        A. The UAPD Bargaining Unit 16 MOU expired at the

20   end of June, and it is my understanding there is no

21   current MOU, that that process is being actively

22   negotiated at a statewide level.

23   **Q. And do you know if there's a current MOU for**

24   **ACSS?**

25        MR. CASARRUBIAS:  Objection.  Lacks foundation,

**Paul Burton, M.D.**

1   and calls for speculation.

2   BY MS. HARROLD:

3       **Q. You can answer.**

4       A. I don't know.

5       **Q. Great.**

6       **I will ask a couple of questions to better**

7   **understand your role.  What does it mean to be chief**

8   **psychiatrist?**

9       A. Essentially to be a chief psychiatrist means to

10  run a psychiatric program in which one supervises a team

11  of physicians who provide direct patient care to the

12  patients we are entrusted with, but also who helps

13  ensure that policy, procedure, and practice are

14  conducive to the application and implementation of the

15  care that is recommended by the physicians that that

16  individual supervises.

17      **Q. You mentioned that there's another chief**

18  **psychiatrist in an acting position.  Can you describe**

19  **more the division of responsibilities between you and**

20  **that individual?**

21      A. Yeah.  It's somewhat fluid.  For many years, we

22  had one chief psychiatrist at San Quentin and one senior

23  psychiatrist who reported to the chief.

24      Beginning in January 2022, a year and a half

25  ago, the senior position was upgraded to a chief

Paul Burton, M.D.

 1  psychiatrist position, and since that time, there have

 2  been three individuals in the other chief position:   One

 3  permanent and two temporary.   And I found that working

 4  collaboratively with that individual and providing

 5  support for all functions within the prison, inpatient

 6  and outpatient, tends to be a superior form of

 7  structuring administration than siloing services into

 8  one side or the other.

 9          So it's an evolving process.   It depends on the

10  individuals involved but, so far, we are three for three

11  with developing a collaborative and team-oriented

12  approach to all psychiatric services that are provided

13  at San Quentin.

14      **Q. I appreciate you explaining, if I'm**

15  **understanding it correctly, that it's a bit fluid and**

16  **it's not truly siloed.**

17          **Are -- do you and this other individual have**

18  **different primary responsibilities?**

19          A. Yes.   If one wanted to view it through the lens

20  of specialization, knowing that we are able to also

21  engage in other activities, my specialization would be

22  over inpatient services, and I'm the medical director of

23  our 50-bed inpatient unit, and the other individual's

24  specialization would be to focus more on outpatient

25  services, although in reality, we're constantly

Paul Burton, M.D.

1    collaborating and communicating and troubleshooting in

2    person on a regular hour-by-hour basis.

3        Q. Were you involved in the decision to create two

4    chief roles in 2022?

5            MR. CASARRUBIAS:   Objection.   Lacks foundation.

6    BY MS. HARROLD:

7        Q. You can answer the question.

8        A. It was certainly not my decision, no.

9        Q. Were you in any -- were you in any

10   conversations about why the decision was made?

11           MR. CASARRUBIAS:   Objection.   Asked and

12   answered.

13       A. Not in 2022.   I believe I was given a heads-up

14   several months prior, but it was more of a notification

15   than a conversation that this would be happening at some

16   point in the future.

17       Q. And who gave you that heads up?

18       A. Dr. Mehta.

19       Q. And who -- can you please describe who he is?

20       A. Dr. Mehta is the deputy director of statewide

21   mental health in CDCR.

22       Q. And in the heads-up conversation, did he

23   explain any reason for creating the second role?

24           MR. CASARRUBIAS:   Objection.   Calls for

25   hearsay.

Defendants object to 17:22 - 18:10 as Inadmissible hearsay; in the alternative, Defendants move to strike the answer as non-responsive since none of the statements were attributed to Dr. Mehta.

Plaintiffs respond that this testimony is not hearsay because it was a statement made by someone working for CDCR on a subject within the scope of their employment per FRE 801(d)(2)(D); as to Defendants' alternative argument, the answer is responsive because it is most naturally read as to what Dr. Mehta explained in his conversation with Dr. Burton several months prior to the creation of two chief roles in 2022. See 17:3-23.

**Paul Burton, M.D.**

BY MS. HARROLD:

**Q. You can answer the question if you understand it.**

A. To the best of my recollection, I believe they wanted to come up with a uniform statewide system that applied to the three large PIPs that were involved in the 2017 lift and shift and to come up with a similar administrative structure for those three facilities and the two smaller PIPs that existed prior to lift and shift.

**Q. Thank you.**

**Who do you report to?**

A. I currently report to the San Quentin chief executive officer.   Her name is Rhonda Litt.

**Q. And who reports to you?**

A. Currently, I have staff psychiatrists who all work on site at San Quentin who report to me, and I have one newly created limited-term SSA position, support staff person, who reports to me.

**Q. What is -- did you say the acronym was SSA?**

A. Correct, staff services analyst, I believe.

**Q. And what is that role?**

A. The primary function of the SSA at San Quentin is to serve as the medication court administrator, so essentially that is like the clerk of the court for

**Paul Burton, M.D.**

1   Penal Code 2602 court hearings, Penal Code 2604 court

2   hearings, and ECT court hearings.  She also has other

3   duties, but that is the majority of her responsibility.

4         **Q. And you said it's newly created.  When was it**

5   **created?**

6         A. It was created on paper in 2022.  It was just

7   filled in reality earlier this year in 2023, and it was

8   created at the level of San Quentin.

9         **Q. And is that a permanent role?**

10        A. It is a limited-term position, so from a human

11  resources perspective, it's not permanently funded, but

12  our current CEO has been creative with creating

13  positions out of existing support staff vacancies to

14  assist in some of the challenges San Quentin has had

15  with the recruitment and retention of support staff.

16        **Q. And who would you say reports to the acting**

17  **chief psychiatrist role for over outpatient services?**

18        A. Other staff psychiatrists.

19        **Q. Does anyone else report to you other than this**

20  **SSA and psychiatrists?**

21        A. No.

22        **Q. In your role, do you ever work with**

23  **psychologists?**

24        A. On a daily basis, yes.

25        **Q. And clinical social workers?**

**Paul Burton, M.D.**

1       A. Yes, regularly.

2       **Q. What about recreational therapists?**

3       A. Yes, regularly.

4       **Q. Are you involved in the hiring of psychiatrists**

5   **at San Quentin?**

6       A. Yes, I am.

7       **Q. And what are your responsibilities as to**

8   **hiring?**

9       A. As the chief psychiatrist for staff

10   psychiatrist interviews, I am on the interview panel

11   often with the other chief or senior psychiatrist.  We

12   ultimately make decisions whether or not to pursue

13   employment with candidates who are interested in working

14   at San Quentin following the interview, review of

15   collateral materials, checking of references, et cetera.

16         Upon our recommendation, the panel would submit

17   the packet to the CEO who is also the hiring authority

18   for health care at San Quentin, and a formal offer would

19   be extended, and once they begin their employment, we

20   are responsible for most of the onboarding as well as

21   the administrative and clinical supervision necessary to

22   thrive within a correctional environment.

23       **Q. You mentioned you're on an interview panel with**

24   **the other chief and a senior psychiatrist; is that**

25   **right?**

Paul Burton, M.D.

 1          A. Up until 2022, it was a senior psychiatrist

 2   with the classification upgrade, that senior position

 3   becoming a chief in 2022.   That's when it was two chief

 4   psychiatrists.

 5          Q. I see.

 6             Is anyone else on the panel?

 7          A. From time to time, we've had our psychology

 8   colleagues sit in, but typically it is -- it involves

 9   the two psychiatrists in leadership positions that sit

10   on the interview panel for staff psychiatry applicants.

11          **Q. And were you involved in the hiring of the SSA?**

12          A. I was, yes.   I was one of several panel

13   members.

14          **Q. And are you involved in the hiring of any other**

15   **nonpsychiatry mental health staff at San Quentin?**

16          A. Yes, but not on a consistent basis.

17          **Q. Can you describe that a bit more?**

18          A. So over my near ten years of experience in a

19   supervisory classification at San Quentin, in addition

20   to the psychiatry interviews that were just described, I

21   have occasionally sat in on nursing supervisor interview

22   panels, various quality management position interview

23   panels.   I've sat in occasionally on support staff

24   interview panels once or twice a year, but nothing on a

25   consistent basis.

**Paul Burton, M.D.**

1       Q. Have you ever sat in or been involved in in any

2    way the hiring of psychologists at San Quentin?

3       A. There was one occasion approximately five to

4    six years ago in which I was a panel member for several

5    vacant senior psychologist supervisor positions at the

6    time, so, yes, I do have that experience, but it is not

7    a -- not a regular event.

8       Q. Great.

9          What about clinical social workers?

10      A. I don't recall at this time being on a clinical

11   social worker panel in the past.

12      Q. And lastly, recreational therapists?

13      A. Not that I can recall.

14      Q. Do you know who does the hiring for, say,

15   psychologists at San Quentin?

16      A. Yes.  In addition to the hiring authority CEO

17   ultimately being responsible for that process, typically

18   the decision lies with the chief of mental health at

19   San Quentin.

20      Q. And do you have meetings with the chief of

21   mental health?

22      A. Yes, I do, on a regular basis.

23      Q. And in any of those meetings, do they -- does

24   this person talk about staffing?

25      A. Yes.

**Paul Burton, M.D.**

1    Q. Does this person talk about efforts to fill
2    vacancies in any of these meetings?

3    A. On occasion, yes.

4    Q. Great.

5    And in your role, do you see data about
6    vacancies at San Quentin in mental health positions?

7    A. I -- I do.   I tend to focus on the psychiatrist
8    data since that's my primary responsibility.

9    Q. And what data do you regularly come into
10   contact with?

11   A. There's a variety of different sources.   Every
12   once in a while, a few times a year, there may be a
13   statewide data sheet that is sent out that talks about
14   vacancies at all of the different facilities including
15   San Quentin.   So I've glanced at that from time to time.

16   Typically San Quentin doesn't have too many
17   psychiatrist vacancies, but it is helpful to get a sense
18   of what other facilities are going through.

19   On a every two- to four-week basis, we have a
20   meeting with human resources as well as the central
21   hiring unit to discuss current vacancies specifically at
22   San Quentin.   And in that process, all health care
23   classifications, including those under primary care,
24   nursing, psychology, social work, psychiatry, are
25   reviewed to get a status update on not only recruitment

**Paul Burton, M.D.**

1    efforts but updates on where the individual is at in the

2    hiring process.

3          **Q. I hope to ask a couple questions to better**

4    **understand those meetings.   You mentioned HR.   Is that**

5    **HR at San Quentin?**

6          A. Yes, HR at San Quentin, regional HR, and, on

7    occasion, headquarters HR.

8          **Q. And you mentioned central hiring.   Is that also**

9    **at a headquarters level, or what level is it at?**

10         A. Central hiring is centralized.   It's at a

11    headquarters level.

12         **Q. And who else attends these meetings?**

13         A. Typically, all of the various chiefs over

14    health care divisions at San Quentin State Prison attend

15    the meeting alongside the San Quentin health care CEO

16    and a variety of HR representatives.

17         **Q. So is this meeting you're describing focused**

18    **just on San Quentin, or does it have other institutional**

19    **leadership from different institutions?**

20         A. It is focused exclusively on San Quentin.

21         **Q. And do you happen to know whether other**

22    **institutions have similar meetings?**

23         MR. CASARRUBIAS:   Objection.   Lacks foundation,

24    and calls for speculation.

25         A. I don't know.

**Paul Burton, M.D.**

1      Q. How long have these meetings been happening?

2      A. In its current form, the meetings have been

3  happening for approximately two years.

4      Q. And does the chief of mental health join these

5  meetings, the chief of mental health at San Quentin?

6      A. Yes.

7      Q. And what is that person's name?

8      A. Rachel Chen.

9      Q. Great.

10         So I have some questions to better understand

11  the status of vacancies in mental health positions at

12  San Quentin.  I'll likely pull up an exhibit so we can

13  look at some numbers, but just to start with some

14  questions, focusing on psychiatry positions, so chief

15  psychiatrist, to make sure I understand, you say there's

16  currently yourself, a chief psychiatrist, and one acting

17  psychiatrist, correct?

18      A. That is correct, yes.

19      Q. And you don't have other duties outside of your

20  role as chief psychiatrist?  I can clarify the question.

21         MR. CASARRUBIAS:  Objection.  Vague.  Yeah.

22  BY MS. HARROLD:

23      Q. You're not in any acting position yourself?

24      A. I am not, no.

25      Q. Okay.  Great.

1          So I'd like to pull up an exhibit now.  I -- so

2     I'll drop it in the chat so you can pull it up on your

3     end, too.  But what we found most helpful in looking at

4     exhibits remotely in depositions is if my colleague

5     Jenny actually pulls it up on her screen to screen

6     share.

7          So I just dropped it in.  This is Docket Number

8     7898 in the Coleman case.

9          MR. CASARRUBIAS:  Can we briefly go off the

10    record?

11         MS. HARROLD:  Yes.  Do you want to take a break

12    now?

13         MR. CASARRUBIAS:  Well, just to say -- are we

14    off the record?

15         THE REPORTER:  Off the record.

16         (Whereupon, discussion was held off the

17           record.)

18         (Whereupon Deposition Exhibit No. 1 was marked

19           for identification.)

20    BY MS. HARROLD:

21       Q. So this is going to be marked as Exhibit 1.

22    You can see that it's called Defendants' Monthly Mental

23    Health Staffing Vacancy Reports, correct?

24       A. Yes, I can see that.

25       Q. Have you ever seen this document before?

Paul Burton, M.D.

1         A. Not to my knowledge.

2         Q. Have you seen a document that looks like this

3    before?

4         A. Yes.

5         Q. Where do you recognize it from?

6         A. In my regular course of duties over the last

7    ten-plus years in CDCR administration, I've seen a

8    variety of legal documents as related to Coleman class

9    action litigation.  This looks similar to those, at

10   least based on the named parties.

11        Q. So this is a public filing that the Coleman

12   defendants made to the court at the -- each month on the

13   last day of the month that shows the staffing vacancies

14   for the mental health positions the month prior.  This

15   was the June report.  At the top, you'll see it's called

16   Document 7898.  Can you see that?

17        A. I can see that, yes.

18        Q. And that it was filed July 31st, 2023; you can

19   see that?

20        A. Yes.

21        Q. Great.

22          MS. HARROLD:  So, Jenny, if you can flip to

23   Page 5 of this PDF.

24   BY MS. HARROLD:

25        Q. Dr. Burton, do you see at the top, it says

Paul Burton, M.D.

1  Allocated and Filled Psychiatry Positions?

2       A. I see that, yes.

3       Q. Okay.  So bear with me.  We'll try to look at

4  these very small numbers.  On the left-hand side under

5  Sites, do you see the abbreviation for San Quentin, SQ?

6       A. I do.  The font is a little small, but I can

7  make out SQ.

8       Q. Great.

9          MS. HARROLD:  Jenny, are you able to highlight

10  that row, San Quentin?  It might help us keep track of

11  the numbers as we zoom in.

12         Great.

13  BY MS. HARROLD:

14       Q. So over on the left, you'll see second from the

15  left that number one, right?

16       A. Yes, I see that.

17       Q. Okay.  Now if we scroll to the top, do you see

18  that number represents the number of chief psychiatrist

19  roles allocated in June 2023 at San Quentin?

20          MR. CASARRUBIAS:  Objection.  That's not a

21  question.

22  BY MS. HARROLD:

23       Q. Let me rephrase.

24          Do you see -- I'll let Jenny highlight.

25          We can do it the opposite way.  If you scroll

1  to the top, do you see where it says Allocated

2  June 2023?

3       A. Yes, I do.

4       Q. And that first column is chief psychiatrist's

5  role?

6       A. It says Chief PsyT, I see that, yes.

7       Q. Great.

8           Now if we scroll down to San Quentin, do you

9  see the number one?

10          MR. CASARRUBIAS:  I'll just make an objection

11 that this line of questioning lacks foundation.  The

12 witness said he didn't recognize this document.

13      A. I do see 1.00.

14      Q. Great.

15          So this report is saying that for June 2023,

16 there is one chief psychiatrist position allocated; is

17 that right?

18          MR. CASARRUBIAS:  Objection.  Lacks foundation,

19 and calls for speculation.

20      A. Under the Chief PsyT location, it has one

21 listed in that row.

22      Q. And then if we look to the right at the

23 positions as they are filled -- Jenny, you can scroll

24 maybe to the top so we can see the column -- so now

25 we're looking at filled positions.  And do you see the

1  chief psychiatrist role that Jenny is circling around?

2          MR. CASARRUBIAS:  Objection.  Lacks foundation.

3  Calls for speculation.

4  BY MS. HARROLD:

5          Q. Dr. Burton, do you see that it says chief

6  psych?

7          A. Yes, Chief PsyT, I see that, yes.

8          Q. Great.

9              And if we scroll down to San Quentin, you see

10  that it says zero there?

11          MR. CASARRUBIAS:  Same objections.

12          A. I see, yeah, 0.00 in that cell on the

13  spreadsheet.

14          Q. Okay.  So thank you for bearing with me as we

15  try to look at this.

16              So this report seems to be saying that for

17  June 2023, there was only one chief psychiatrist role

18  allocated at San Quentin, correct?

19          MR. CASARRUBIAS:  Objection.  Lacks foundation.

20  Calls for speculation.  It's best evidence rule.  The

21  document speaks for itself.

22  BY MS. HARROLD:

23          Q. You can answer, Dr. Burton, if you understand

24  the question.

25          A. It's hard to -- to say.  I have noticed a trend

1  where sometimes PIP staffing allocations are included in

2  separate documents than institutional staffing

3  allocations, so I would need to know the scope of this

4  document to answer your question.

5      **Q. Thank you.  That's helpful context to know.**

6      **The -- in your understanding, it says -- when**

7  **it says zero filled positions, would someone in an**

8  **acting role show up in this data?**

9      MR. CASARRUBIAS:  Objection.  Lacks foundation.

10  Calls for speculation.  Best evidence rule.  The

11  document speaks for itself.

12      A. Usually not.  It's my understanding that the

13  position would need to be permanently filled.

14      **Q. And you mentioned there's someone currently in**

15  **that role who is working out of class.  Do you happen to**

16  **know whether that someone working out of class would**

17  **show up in the fill rate for their actual**

18  **classification?**

19      MR. CASARRUBIAS:  Objection.  Lacks foundation,

20  and calls for speculation.

21      A. I'm not exactly sure how headquarters mental

22  health and HR would classify that person.

23      **Q. And I'll -- I want to look at just one more**

24  **role in this exhibit for right now, and that is of line**

25  **staff psychiatrist.  Before we look at any numbers,**

1    Dr. Burton, what is the status of vacancies for line

2    staff psychiatrists?

3            MR. CASARRUBIAS:  Objection.  Lacks foundation.

4    BY MS. HARROLD:

5        Q. Let me go ahead and ask an additional question,

6    then.

7            Dr. Burton, do you know how many line staff

8    psychiatrists you currently manage?

9        A. I do, yes.

10        Q. Do you know if there are any vacancies?

11        A. Yes, I do.

12        Q. And how many vacancies are there, if any?

13        A. Currently for the entire institution of

14    San Quentin, so that includes both the inpatient and

15    outpatient side, we have 4.0 current vacancies as of

16    today.

17        Q. Thank you.

18            And to help me understand the numbers as they

19    appear in this exhibit -- Jenny, can you scroll up to

20    where it shows the allocated number of positions for

21    line staff psychiatrists -- so we're talking about

22    the -- and thank you again for bearing with me.  The

23    third column from the right, staff psychiatrists, if you

24    scroll down to San Quentin, you see that the number is

25    7.8 allocated positions, correct, that that's what it

1  says on this document?

2          MR. CASARRUBIAS:  Objection.  Lacks foundation.

3       A. That's what it says in that cell, yes, 7.80.

4       **Q. And is that consistent with your understanding**

5  **of the allocated positions for psychiatrists on both the**

6  **outpatient and inpatient side in San Quentin?**

7          MR. CASARRUBIAS:  Objection.  Lacks foundation.

8  Assumes facts.

9       A. No, it is not.  In my estimation, prior to the

10  July 1st staffing revise, this only includes nonPIP

11  staff psychiatrist positions.

12         **Q. Of the nonPIP staff psychiatrist positions, is**

13  **7.8 consistent with your understanding of how many**

14  **positions are allocated at San Quentin?**

15         MR. CASARRUBIAS:  Objection.  Lacks foundation.

16  Calls for speculation.

17      A. It was prior to the July 2023 staffing

18  revision.

19         MS. HARROLD:  And, Jenny, if you could scroll

20  to the right so we can see the number of filled

21  positions, I think unfortunately you'll have to again go

22  to the top so we can see what the -- what these columns

23  are.

24  BY MS. HARROLD:

25      **Q. So these are the filled roles again.  We have**

1  Site Staff Psychiatrists, Site Registry, Telepsych.  Do

2  you see those three columns?

3      A. I do, yes.

4      Q. And if we scroll down to San Quentin --

5          MR. CASARRUBIAS:  I'll just object to the

6  continued use of the this document.  The witness stated

7  that he didn't know what it was.

8  BY MS. HARROLD:

9      Q. Dr. Burton, do you see that there are five

10  staff psychiatrists filled --

11          MR. CASARRUBIAS:  Objection --

12  BY MS. HARROLD:

13      Q. -- in this document?

14          MR. CASARRUBIAS:  Objection.  Lacks foundation.

15  Calls for speculation.

16      A. I see 5.00 in that document cell.

17      Q. And do you see 1.35 in the document cell next

18  to it for Site Registry?

19          MR. CASARRUBIAS:  Same objections.

20      A. I do, yes, 1.35.

21      Q. And zero Telepsych next to it?

22          MR. CASARRUBIAS:  Same objections.

23      A. I do see that, 0.00.

24      Q. Great.

25          And then just a couple rows over, 6.35, total

**Paul Burton, M.D.**

1   positions filled; do you see that?

2          MR. CASARRUBIAS:  Same objections.

3      A. I see the number 6.35.  I haven't seen the

4   title of this column.

5      **Q. Thank you for that reminder.**

6          MS. HARROLD:  Jenny, can you go up?

7   BY MS. HARROLD:

8      **Q. So now we're talking about the aggregate total,**

9   **Line Staff Total and the Line Staff Total percent**

10  **filled; do you see that?**

11         MR. CASARRUBIAS:  Objection.  Assumes facts not

12  in evidence.  Lacks foundation.  Calls for speculation.

13     A. I see those two column titles.

14     **Q. Great.**

15         **And if we can go down, do you see 6.35 Line**

16  **Staff Total?**

17         MR. CASARRUBIAS:  Same objections.

18     A. I see 6.35, yes.

19     **Q. And the 81 percent?**

20         MR. CASARRUBIAS:  Same objections.

21     A. I see 81 percent.

22     **Q. Are those numbers consistent with your**

23  **understanding of the fill rate for psychiatry positions**

24  **at San Quentin on the outpatient side?**

25         MR. CASARRUBIAS:  Lacks foundation.  Calls for

**Page 35**

1 speculation.  Assumes facts not in evidence.

2 BY MS. HARROLD:

**3**      **Q. You can answer, Dr. Burton.**

4      A. They seem relatively consistent with last

5 fiscal year's nonPIP staffing allocation out of

6 headquarters, knowing that in the field at San Quentin,

7 we don't divide PIP from nonPIP staffing.  It's more of

8 a hybrid model, but if one was to look at last year's

9 through a limited institutional side lens, this doesn't

10 seem completely off base.

**11**      **Q. And to the best of your knowledge, were any of**

**12** **these outpatient psychiatrists out on leave in -- at any**

**13** **point in 2023?**

14      MR. CASARRUBIAS:  Objection.  Lacks foundation.

15 Calls for speculation.

16      A. Yeah.  We found one of the keys to retaining

17 good doctors is to give them vacation once in a while,

18 so most of them have been on vacation for a minute.

**19**      **Q. Have any of them had leave longer than, say,**

**20** **three months?**

21      MR. CASARRUBIAS:  Objection.  Can you restate

22 the question?  You kind of broke up there.

23 BY MS. HARROLD:

**24**      **Q. Right.**

**25**      **For the psychiatrists on the outpatient side,**

**Paul Burton, M.D.**

1  have any of them been on leave for longer than three

2  months in 2023 thus far?

3       MR. CASARRUBIAS:  Objection.  Lacks foundation,

4  and calls for speculation.

5       A. Not to my knowledge.

6       MS. HARROLD:  Great.

7       So I see we're at the top of the hour, and I

8  promised breaks.  Let's go ahead and take ten minutes

9  now for a break if that works for you all.

10      MR. CASARRUBIAS:  Fine.

11      MS. HARROLD:  Great.  So let's return at 11:12.

12      (Whereupon, a short break was taken.)

13      MS. HARROLD:  Okay.  So we're back after a

14  short break.  On the record.

15 BY MS. HARROLD:

16      Q. Dr. Burton, you understand you're still under

17 oath, correct?

18      A. I understand, yes.

19      Q. Great.

20      So I wanted to return to just three things you

21 mentioned before we move on in our questions.  You

22 mentioned a July 2023 staff revision.  Can you please

23 describe that in more detail?

24      A. Yes.  Every January and July, for the years

25 that I've been in a supervisory position, we have a

Paul Burton, M.D.

1    staffing revision that is emailed out to all of the

2    prisons.   It's based on the Coleman class member patient

3    population, and based on the number of patients that we

4    have, it is determined rather formulaically how many

5    mental health clinical positions we are given, so this

6    July 2023, as has been the case for previous Julys, we

7    received a revised staffing allocation.

8         Q. And who do you receive this email from?

9         A. We receive it from mental health headquarters.

10        Q. And how did it change staffing at San Quentin?

11        MR. CASARRUBIAS:   Objection.   Assumes facts not

12   in evidence.

13   BY MS. HARROLD:

14        Q. Did it change staffing in mental health roles

15   in San Quentin, the July 2023 revision?

16        A. Yes, it did.

17        Q. And how did it change?

18        A. San Quentin received more positions

19   specifically in the clinical realm.   For psychiatry,

20   staff psychiatrist position specifically, we gained in

21   total between inpatient and outpatient 1.5 new staff

22   psychiatrist positions.

23        Q. Thank you.

24        You also mentioned a hybrid model for the

25   psychiatrists at San Quentin.   Can you explain that?

**Paul Burton, M.D.**

1    A. Yes.   San Quentin has had a near decade

2    experience with providing high quality PIP treatment to

3    the condemned or death row population, and one of the

4    keys to success that we found with this rather unique

5    population is to provide, when clinically appropriate,

6    continuity of care between outpatient and inpatient

7    mental health levels of care.

8         What I mean by that is you may have a patient

9    who is at an EOP level of care and has good rapport with

10   their EOP treating psychiatrist.   That individual may

11   have an exacerbation of their underlying psychiatric

12   illness and need a short-term crisis bed hospitalization

13   or a longer-term PIP hospitalization.   And having

14   continuity of care options allows the treating

15   psychiatrist who has rapport with the patient and who

16   knows the patient and the reason for the hospitalization

17   have the option of providing that individual with

18   inpatient care after he or she admits them to the

19   hospital.

20         So some of our psychiatrists choose to provide

21   services at San Quentin, both within the CCCMS at EOP

22   levels of care and the crisis bed into PIP inpatient

23   levels of care.   So in that sense, there is a hybrid

24   between inpatient and outpatient, and the same

25   individual staff psychiatrists can provide care in both

**Paul Burton, M.D.**

```
 1   areas within the same day.
 2        Q. And in your experience managing the
 3   psychiatrists, how often does this happen that someone
 4   will be -- may follow someone from the outpatient side
 5   to the inpatient side?
 6        A. Based on our current mental health mission as
 7   defined by headquarters, for PIP, we are only permitted
 8   to internally admit our condemned population, so for
 9   that level of care continuity, it's only psychiatrists
10   who work within the condemned team.  We currently have
11   three total staff psychiatrists who provide inpatient
12   and outpatient services on a regular basis as part of
13   their standard duties.
14        Q. And since you have been chief psychiatrist, has
15   San Quentin always had this hybrid model?
16        A. In one form or another, yes, since I've been
17   chief psychiatrist.
18        Q. Great.
19        And you mentioned that the interview panel that
20   you are on makes recommendations to the CEO of
21   San Quentin; is that right?
22        A. Correct.
23        Q. Great.  Just wanted to clarify that point
24   before moving on.
25        And is it true -- switching gears a little bit
```

Paul Burton, M.D.

Defendants object to 40:25 - 41:18 as Lacks foundation; irrelevant; calls for speculation.

Plaintiffs respond that foundation is established because he oversees psychiatrists including their support staff (see 9:3-20, 11:9-10, 15:7-17:2, 18:15-19:3); it is relevant because MAs are a classification at issue in these proceedings and goes to whether Defendants have taken all reasonable steps, including allocating MAs for on site psychiatrists (see 43:16-50:1, 50:5-53-4); and is rationally based on the witness's experience and, again, foundation was laid.

1    to talk about other roles in mental health staffing in

2    San Quentin, is it true that there is zero medical

3    assistants at San Quentin?

4            MR. CASARRUBIAS:   Objection.   Lacks foundation.

5        A. There are no current medical assistants who

6    work with psychiatry at San Quentin.   I am not sure on

7    the actual numbers of medical assistants that work with

8    our primary care colleagues.

9        Q. And was it -- whose decision was it to not

10   allocate mental medical assistant roles at San Quentin

11   for psychiatrists?

12           MR. CASARRUBIAS:   Objection.   Lacks foundation,

13   and assumes facts not in evidence.

14   BY MS. HARROLD:

15       Q. You can answer the question if you understand

16   it.

17       A. I'm not sure who ultimately made that call, but

18   it was made at a level well above that of San Quentin.

19       Q. In your tenure as chief psychiatrist, have

20   there ever been medical assistants for psychiatrists at

21   San Quentin?

22       A. Yes, there have been.

23       Q. When was that?

24       A. Several years ago.   To the best of my

25   recollection, approximately 2015 to 2016, around that

**Page 41**

Paul Burton, M.D.

Defendants object to 42:16 - 43:11 as Inadmissible hearsay; lacks foundation; irrelevant. The witness clarified at 43:12-14 that his entire response was based on unidentified third party hearsay.

Plaintiffs respond that foundation is established because he has worked with MAs before and is familiar with their duties (see 42:2-15); and is relevant because MAs are a classification at issue in these proceedings and the testimony goes to whether Defendants have taken all reasonable steps, including allocating MAs for on site psychiatrists (see 43:16-50:1, 50:5-53-4). The witness clarified at 43:12-14 only that his response as to 43:7-11 was based on conversations with colleagues, and this is not hearsay because it was a statement made by someone working for CDCR on a subject within the scope of their employment per FRE 801(d)(2) (D). Furthermore, lack of foundation objection was not asserted and thus is waived per FRCP 32(d).

1    time.

2        Q. Have you ever worked with medical assistants?

3        A. If I could clarify my previous response first.

4        Q. Yes.

5        A. And there was a one-year period during the

6    COVID pandemic in which we had medical assistants also

7    working at San Quentin between 2020 and 2021 working

8    with psychiatry.

9        Q. Thank you for the clarification.

10       My next question is have you worked with

11   medical assistants in the past?

12       A. Yes, I have.

13       Q. And are you familiar with what types of duties

14   they perform in helping psychiatrists?

15       A. Yes.

16       Q. And what are those duties?

17       A. Well, in the ideal world, a medical assistant

18   would assist treating psychiatrists with checking in

19   patients, with reviewing some basic information about

20   the patient's presentation prior to meeting with the

21   psychiatrist.  A medical assistant could obtain vital

22   signs.  Any outstanding orders that are within the scope

23   of a medical assistant could be looked at as part of the

24   prep for the physician appointments.

25       In addition, medical assistants have the

**Paul Burton, M.D.**

1  capability to review a variety of outstanding clinical

2  measures that may need to be looked at by the physician,

3  whether it's an upcoming lab test or a medication

4  consent form, and really to not only prep the patient,

5  but to prep the chart and the provider to really improve

6  the efficiency of the psychiatric clinical appointment.

7          In addition, it's my understanding currently

8  for psychiatry statewide, medical assistants are

9  primarily used not for those purposes, but as

10  telepresenters for those psychiatrists who practice

11  telepsychiatry.

12          **Q. And how do you know that?**

13          A. Because I talk with a lot of my colleagues, and

14  they tell me.

15          **Q. Great.**

16          **Do you have any concerns about there being zero**

17  **medical assistants at San Quentin for psychiatrists**

18  **currently?**

19          A. I do, yes.

20          **Q. And what are those concerns?**

21          A. I think for the good of the patient, in the

22  name of high quality patient care, in the name of

23  improving efficiencies, and for ongoing retention of

24  physicians, it's important for them to have some degree

25  of support within clinical environments, and in the

**Paul Burton, M.D.**

1   absence of that, a lot of the duties that in most health

2   care organizations don't require a physician to perform

3   by default in our system fall to the physician because

4   there's really not that support needed or not that

5   support present, so there's no one else to do it.

6       **Q. Can you explain more about why you think it**

7   **would help with retention?**

8          MR. CASARRUBIAS:  Objection -- go ahead.

9       A. Yeah.  It's pretty simple, in my opinion.  Most

10  people within their line of employment, whatever it is,

11  enjoy having a little help from time to time.  It's

12  important to have a team that one works with.

13         There's a lot of activity that needs to occur

14  within a health care organization.  Typically physicians

15  are most interested in coming up with diagnoses and

16  crafting treatment plans that are associated with that

17  diagnosis that are structured to best help ameliorate

18  the symptoms that the patient may be having, so the

19  physician comes up with the idea and puts in the orders,

20  and other people execute those orders.

21         And within an organization that doesn't have as

22  much support, a lot of the reasons why people become

23  psychiatrists and physicians, but that activity can get

24  overshadowed by some of the busywork that typically is

25  handled by other support staff allocations in other

**Page 44**

1    health care organizations.

2        Q. Have you ever told the person you report to

3    about your concerns?

4        A. Yes.

5        Q. What have you said?

6        A. I've advocated for psychiatrists within our

7    system to have some degree of support staff allocation.

8    I think it's -- it's good -- it's good for the

9    organization, it's good for the docs, and it's good for

10   the patients.

11       Q. Who did you express those concerns to?

12       A. I've expressed them to a variety of different

13   chief executive officers over the years.  I've expressed

14   it to regional psychiatrists and headquarters

15   psychiatrists.  I've expressed it in larger group

16   forums, such as, leadership meetings, meetings that were

17   attended by psychology and psychiatry chiefs from all

18   over the state.  Turns out there's a lot of people that

19   agree with me.

20       Q. And when was the last time you expressed the

21   concern?

22       A. I can't recall a specific date, but

23   approximately at the San Quentin level, six months ago

24   or so.

25       Q. And who did you express it to in that instance?

Defendants object to 45:5-24 as Inadmissible hearsay.

Plaintiffs respond that this is not hearsay because it is the witness's own statements made on a subject within the scope of the witness's employment at CDCR per FRE 801(d)(2)(D).

Page 45

1          MR. CASARRUBIAS:   Objection.   Calls for

2    speculation.

3          A. The lack of support staff at the local level,

4    expressed to the CEO and chief of mental health at

5    San Quentin.

6          **Q. And did the CEO and chief of mental health**

7    **respond to your concerns?**

8          A. They understand it.   They don't disagree with

9    it.   They are very supportive of it as well.   I believe

10   at the local institutional level, without more

11   systemwide change coming out of statewide staffing

12   allocations, there is some degree of hesitancy to make

13   local changes without headquarters' approval.

14         **Q. And has anyone at headquarters ever responded**

15   **to your concerns about the lack of medical assistants?**

16         MR. CASARRUBIAS:   Objection.   Assumes facts.

17         A. There's been a variety of conversations over a

18   variety of different support staff positions, both

19   clinical and administrative, over the last four years

20   with individuals that work at headquarters primarily.

21         **Q. Have any of those conversations been about**

22   **medical assistants?**

23         A. Yes.   Some of them have included medical

24   assistants.

25         **Q. And in those conversations, have you expressed**

Defendants object to 46:6-20 as Inadmissible hearsay.

Plaintiffs respond that this testimony is not hearsay because it concerns statements made by people working for CDCR on subjects within the scope of their employment per FRE 801(d)(2)(D).

Paul Burton, M.D.

Defendants object to 46:25 - 47:23 as Inadmissible hearsay; irrelevant; lacks foundation; lacks personal knowledge.

Plaintiffs respond that these Plaintiffs respond that this testimony is not hearsay because it concerns statements made by someone working for CDCR on a subject within the scope of their employment per FRE 801(d)(2)(D); is relevant because it goes to whether Defendants have taken all reasonable steps, including whether to provide MAs for on-site psychiatrists; and is based on his personal experience. Furthermore, objections based on lack of foundation and personal knowledge were not asserted and thus are waived per FRCP 32(d).

1    your concerns?

2         A. Yes, I have.

3         Q. And how has headquarters responded to those

4    concerns, if at all?

5         A. Well, headquarters is a rather large

6    organization.  There's different levels within

7    headquarters.  I think on one hand, there's individuals

8    who work for headquarters that have taken an active role

9    in trying to look at actually allocating support staff

10   to psychiatrists in the field.  They put time and effort

11   into various proposals that have been funneled up the

12   headquarters chain of command.

13        At higher levels, I believe, as one would

14   expect, there's stricter scrutiny of the proposals that

15   are being put forth, and some constructive criticisms

16   and feedback has been given about such proposals.

17        So to my knowledge, no one has said, no, you

18   can't do it.  There's just an awareness that it perhaps

19   is something that could be looked into, but as of right

20   now, there's really been no change from a medical

21   assistant or clinical support staff physician at a

22   headquarters level.  I'm not sure exactly where they are

23   at with the variety of proposals that they may have.

24        Q. And who -- who made these proposals, to your

25   knowledge?

**Paul Burton, M.D.**

1      A. There was a group of chief psychiatrists, such

2  as, myself, my peers that work at other prisons, so

3  institutional or on-site PIP chief psychiatrists who

4  work in prisons with patients, who have had a series of

5  meetings with regional psychiatrists and, as a result of

6  those meetings, various written proposals may have -- I

7  believe have been sent up to other psychiatrists within

8  our collective chain of command, including the statewide

9  chief psychiatrist and deputy director of mental health.

10      **Q. Who were the regional psychiatrists in these**

11  **meetings?**

12      A. Al Bunn is the regional psychiatrist for

13  Northern California.

14      **Q. And who were the other chiefs in this working**

15  **group?**

16      A. Myself, Dr. Villamor, Dr. Ozbayrak, Dr. Boz,

17  Dr. Rizzotto when he was the chief, Dr. Sekhon who is

18  the current acting chief, Dr. Lidge, Dr. Bagul who is

19  technically a senior psychiatrist but was present for

20  the meetings, and until her retirement, Dr. Huq.

21      **Q. And what institutions were they from?**

22      A. San Quentin, Solano, both sides of CMF, the PIP

23  side and the institutional side, Folsom, CSP Sac, Mule

24  Creek.  I believe that is it.

25      **Q. And you mentioned you've had multiple**

Paul Burton, M.D.

Coleman vs.
Newsom

Defendants object to 48:25 - 49:18 as Inadmissible hearsay; irrevelant.

Plaintiffs respond that this testimony is not hearsay because it concerns statements made by someone working for CDCR on a subject within the scope of their employment per FRE 801(d)(2)(D), as made clear by 49:19-50:4; and is relevant because it goes to whether Defendants have taken all reasonable steps, including whether to provide MAs for on-site psychiatrists.

1    **conversations with headquarters about medical assistant**

2    **staffing, correct?**

3         MR. CASARRUBIAS:   Objection.   Mischaracterizes

4    the witness's prior testimony.

5    BY MS. HARROLD:

6         **Q. You can answer, including if you need to**

7    **clarify my recap.**

8         A. Yeah.   In 2015 and 2016, we were the site of an

9    MA pilot for psychiatrists and clinical support, so

10   there were a lot of conversations at that time, and at

11   least at the level of San Quentin, that pilot proved to

12   be rather helpful for the psychiatrists, but certainly a

13   lot of conversations back then about starting a new

14   program.

15        And more recently, there have been some

16   conversations about various types of clinical support

17   for psychiatrists, including but not limited to medical

18   assistants.

19        **Q. To the best of your recollection, who were the**

20   **people at headquarters you had these conversations with?**

21        A. Primarily with, as mentioned, Al Bunn.   He is

22   kind of the regional psychiatrist so the liaison with

23   the upper echelon of mental health headquarters.   But I

24   believe in one or two meetings, up to a couple, Michael

25   Golding and Amar Mehta were present for some of those

**Page 49**

Paul Burton, M.D.

Defendants object to 50:5 - 50-21 as Inadmissible hearsay; irrelevant; lacks foundation.

Plaintiffs respond that this testimony is not hearsay because it concerns a statement made by someone working for CDCR on a subject within the scope of their employment; is relevant because it goes to whether Defendants have taken all reasonable steps, including whether to provide MAs for on-site psychiatrists; and foundation is established because he was the Chief Psychiatrist at that time (see 11:9-10) and he was aware of the pilot program (see 49:8-14 ). Furthermore, lack of foundation objection was not asserted and thus is waived per FRCP 32(d).

1    conversations.

2        Q. What is Dr. Golding's role?

3        A. Dr. Golding is the statewide chief psychiatrist

4    for CDCR.

5        Q. Could you please describe a bit more about this

6    2015 to 2016 pilot program for medical assistants?

7        A. Yes.  At that time, Dr. Golding reached out to

8    myself and described a program that he and others at

9    headquarters were trying to get up and off the ground to

10   demonstrate that there was a need for primarily

11   outpatient clinic psychiatrists to have some degree of

12   clinical support, and there was a new pilot with

13   registry medical assistants.  They were not civil

14   service classifications yet at that point.  And with

15   these registry medical assistants, Dr. Golding wanted to

16   try it out at San Quentin to see if it improved staff

17   morale, to see if it assisted with various productivity

18   measures that are tracked on various dashboards, and

19   also just to work out some of the kinks to come up with

20   an overall flow for how it would work within the CDCR

21   mental health program.

22       Q. And why did you say it was helpful to have

23   medical assistants as part of that pilot?

24       A. The feedback I received from the psychiatrists

25   who were working on a daily basis with the medical

Paul Burton, M.D.

Defendants object
to 50:22 - 51:9 as
Inadmissible
hearsay; irrelevant;
lacks foundation.

Plaintiffs respond
that this testimony
is not hearsay
because it concerns
statements made by
someone working
for CDCR on a
subject within the
scope of their
employment; is
relevant because it
goes to whether
Defendants have
taken all reasonable
steps, including
whether to provide
MAs for on-site
psychiatrists; and
foundation is
established because
the witness was the
Chief Psychiatrist
at that time
managing the staff
psychiatrists (see
11:9-10, 18:15-19),
and he is
expanding on his
previous answer.
Furthermore, lack
of foundation
objection was not
asserted and thus is
waived per FRCP
32(d).

1    assistants was that it was really helpful to have

2    someone assist them with their daily duties.   They were

3    more efficient.   They were able to focus in on the

4    aspects of care delivery that were of interest to most

5    physicians.   A lot of the busywork was taken off of

6    their plate, and a lot of their productivity measures

7    improved as a result, so they had less people, like me

8    and headquarters, bugging them to improve their

9    productivity measures.

10       Q. And can you help me understand what some of

11   those productivity measures are?

12       A. Yes.   For psychiatrists, there are a variety of

13   clinically themed measures that ensure the safe

14   prescription and administration of psychiatric

15   medications.   For the most part, they are consistent

16   with the standard of care, so we fully get behind them.

17       These would include various blood tests that

18   need to be reviewed on a regular basis to ensure there's

19   no insidious side effect that's occurring from a

20   psychiatric prescription.   Sometimes it may include an

21   EKG, tests.   There can be other types of very specific

22   physical exam tests that get recorded on specific forms

23   that get tracked.   There's also a consent forms for

24   psychiatric medications.

25       In total, if one were to add all of these up

**Paul Burton, M.D.**

1   for the different psychiatric prescriptions that are

2   commonly prescribed and tracked by the -- by the

3   headquarters division, it's over 30 different diagnostic

4   monitoring measures that get reviewed on a -- at least a

5   monthly basis.

6            In addition to those types of clinical tests,

7   certainly we want to stay on top of when appointments

8   are due, so medical assistants can really help structure

9   the due dates for psychiatrist appointments.

10           For example, we should see EOP patients every

11   30 days and CCCMS patients prescribed psychiatric

12   medications every 90 days.  And a variety of tools are

13   now available via the quality management system that

14   were not in place in 2015, so technology has helped with

15   that process to some degree.

16           But having a trusted medical assistant

17   colleague who stays on top of your caseload with you

18   allows the physician to spend less time on organizing

19   the overall flow of the clinic and more time with the

20   patient in order to treat their mental illness.

21       **Q. Thank you.**

22           **And did having medical assistants during this**

23   **pilot program help with morale for the psychiatrists?**

24       A. In my opinion, yes.  I received a lot of

25   feedback, most of it positive, about the medical

Paul Burton, M.D.

1   assistant pilot, and a lot of the feedback had to do

2   with the specific medical assistant who was assigned to

3   the psychiatrist, and some were better fits for that

4   position than others.

5          Q. You mentioned that having medical assistants,

6   in your opinion, is also positive for patient care.  Can

7   you describe that a bit more?

8          MR. CASARRUBIAS:  Objection.  Misstates the

9   witness's prior testimony.

10  BY MS. HARROLD:

11         Q. Let me take a step back, then.

12         Dr. Burton, do you think having medical

13  assistants, let's say, as part of this pilot helped

14  improve patient care?

15         MR. CASARRUBIAS:  Objection.  Calls for

16  speculation.

17  BY MS. HARROLD:

18         Q. You can answer the question if you understand

19  it.

20         A. Yes.  I think indirectly and, to some degree,

21  directly it improved the quality of patient care.

22         Q. What are some ways that it was improved, that

23  patient care was improved directly?

24         A. Directly, it was much easier to obtain simple

25  measures like vital signs.  One wouldn't have to order

**Paul Burton, M.D.**

1  the vital signs and then wait for the results.  The

2  vital signs could be obtained instantaneously, so a lot

3  of times physicians like timely data such as that, so it

4  was -- some of the barriers to obtaining that

5  information were removed.

6          Indirectly, as related to my previous

7  statements, it really helped the physician psychiatrists

8  focus in on the diagnostic assessment as well as the

9  crafting of the treatment plan and remove some of the

10  busywork from their plate so they could really focus in

11  on the aspects of practicing medicine that they enjoy

12  that is the actual practice of psychiatry.

13      **Q. And to make sure I understand, during the pilot**

14  **program, do you think patients were seen more**

15  **frequently?**

16          MR. CASARRUBIAS:  Objection.  Lacks foundation,

17  and calls for speculation.

18      A. I don't recall.  That certainly wasn't a focus

19  of -- of the pilot.

20      Q. Great.

21          **So I'll ask a couple of questions to better**

22  **understand the hiring process.  You spoke about that in**

23  **the beginning, but following up, do you have any role in**

24  **selecting which applicants to interview for San Quentin**

25  **psychiatry roles?**

**Paul Burton, M.D.**

1          A. Somewhat, and this has changed over the years,

2    but the central hiring unit, C-H-U or CHU, will on

3    occasion let us know that there is an applicant that may

4    be interested in working at San Quentin.  They will

5    forward their CV to -- to us.  We'll have an opportunity

6    to review, and they will ask us whether we are

7    interested in interviewing the individual.

8          **Q. Can you see all applicants who apply to the**

9    **open vacancies in San Quentin for psychiatry?**

10          MR. CASARRUBIAS:  Objection.  Lacks foundation.

11          A. Yeah.  It's difficult for me to answer that

12    question because I only see who they send to me.  I'm

13    not sure if there's other individuals who apply that

14    they don't send to me.

15          **Q. Do you have a sense of how far along they are**

16    **in the process when an applicant is sent to you?**

17          MR. CASARRUBIAS:  Objection.  Lacks foundation.

18    BY MS. HARROLD:

19          **Q. You can answer, Dr. Burton.**

20          A. Sure.  It's preinterview, so pretty early on in

21    the process.  The first step would be an interview, and

22    after that, based on the quality of the interview and

23    the reference checks, an offer may or may not be given

24    to the individual.  Then there's a series of steps

25    should that offer be accepted.

Paul Burton, M.D.

1      Q. Let's take that one at a time.  Going back to
2  you receiving applications, how -- in your tenure as
3  chief psychiatrist, generally how often does
4  headquarters send you candidates for interview?
5      A. The way it typically works is San Quentin
6  psychiatry identifies an applicant.  We connect them
7  with headquarters, and then headquarters formally sends
8  them back to us.
9         We found the greatest recruiter, the most
10  successful recruiter of psychiatrists, tends to be other
11  psychiatrists.  When you practice in an area like the
12  San Francisco Bay Area, which has no shortage of
13  psychiatrists, the current psychiatrists or the
14  professional networks that exist with psychiatrists are
15  a great source of recruitment.
16         In regards to when the central hiring unit
17  sends us an application, we typically would receive, if
18  we are recruiting for positions -- and there have been
19  years when we've had no vacancies, so we haven't needed
20  to recruit and, therefore, we don't get much attention
21  from the central hiring unit -- but if we have
22  vacancies, approximately a half a dozen a year, maybe
23  one on average every two to three months.
24      Q. What proportion of applicants come through this
25  network you're describing at San Quentin?

**Paul Burton, M.D.**

1          MR. CASARRUBIAS:   Objection.   Lacks foundation.

2          A. You mean just doctors telling doctors

3    San Quentin is a great place to work at?

4          **Q. That's correct.**

5          A. Somewhere between a third and a half.

6          **Q. And is it -- what are the channels through**

7    **which doctors tell other doctors that San Quentin is a**

8    **great place to work at?**

9          MR. CASARRUBIAS:   Lacks foundation.   Calls for

10   speculation.

11         A. It's hard to specifically state, and it's

12   multifactorial.   Like a lot of professional groups and

13   professions that are out there, there's a variety of --

14   of associations and meetings to discuss the state of the

15   profession, so I know there's a variety of psychiatric

16   societies that meet within Northern California.   There's

17   a variety of professional conferences that occur.   And a

18   lot of psychiatrists when attending these psychiatric

19   focused conferences use that opportunity to network with

20   colleagues.

21         We've -- at San Quentin, we have close

22   affiliations with a variety of educational centers,

23   academic medical centers, so we have spread the word

24   through medical schools, psychiatry residencies, and

25   psychiatry fellowships through trainees that work and

**Paul Burton, M.D.**

1    train and learn at San Quentin.

2         We've also hosted a number of psychiatric

3    groups at San Quentin for tours of San Quentin and to

4    meet with current psychiatrists in an effort to

5    destigmatize what it's like to practice correctional

6    psychiatry and really to -- to improve the network and

7    to break down the barriers between the prison community

8    and the community at large.

9         So it's quite multifactorial, and sometimes it

10   takes efforts like that in order to recruit not any old

11   psychiatrists, but high quality psychiatrists who thrive

12   within the CDCR.

13   **Q. And to ask about one of those factors a bit**

14   **more, you mentioned these tours that occur at**

15   **San Quentin.  How often do they happen, in your**

16   **experience?**

17        A. Usually about two to three a year.  We've had

18   two already this calendar year with a couple different

19   training programs in the Bay Area.  We've also hosted a

20   group of Australian psychiatrists and DSH psychiatrists,

21   really just to network, to show them what it's like to

22   practice, and to let them know that not only is it not

23   bad to work within CDCR, it's actually quite fulfilling

24   and interesting, a lot of fun, and an opportunity to

25   really give back and help a population that's in

Paul Burton, M.D.

```
 1  desperate need of treatment right now.
 2       Q. And through these multiple avenues of
 3  recruitment you just mentioned, do you feel like they've
 4  improved recruitment at San Quentin for psychiatrists?
 5       A. Absolutely.
 6       Q. And are any of them relatively newer
 7  initiatives?
 8            MR. CASARRUBIAS:  Objection.  Vague as to
 9  "relatively newer."
10  BY MS. HARROLD:
11       Q. I can clarify.
12       Have any of these efforts you described
13  meaningfully changed in the last two years?
14       A. I wouldn't say they have meaningfully changed.
15  They have expanded.  So we've seen either former
16  trainees at San Quentin or former tour attendees who
17  have since gone on to graduate five, ten years later,
18  they remember this experience.  Now they themselves are
19  in leadership roles in their health care organizations,
20  and they would like their trainees, the next generation,
21  to experience what they experienced.
22       So we've had new training programs express
23  interest to either have educational electives or to tour
24  San Quentin based on us doing this for a while and
25  previous generations now wanting to continue that
```

1  experience with the trainees that they are now

2  interested with, so more of an expansion than a change.

3  **Q. And you mentioned San Quentin's in the Bay**

4  **Area.  How does being in the Bay Area assist recruiting**

5  **for San Quentin psychiatrists, if at all?**

6  MR. CASARRUBIAS:  Objection.  Lacks foundation.

7  A. It's a big question.  In general, I believe

8  relative to a lot of communities in which prisons are

9  located, the Bay Area has a significantly higher number

10  of psychiatrists who already live here, whether it's

11  San Francisco, Marin County, or the East Bay.  That's an

12  area that is overrepresented with psychiatrists in

13  general.

14  Secondarily, if the individual does not yet

15  live in the Bay Area or in California, San Francisco and

16  the surrounding area is an easier place to market as a

17  location to relocate to if you're not from the area.

18  So I think in general, it's just a deeper pool.

19  **Q. Do any of your staff cite -- say the commute**

20  **length as a factor for them working at San Quentin?**

21  MR. CASARRUBIAS:  Objection.  Assumes facts not

22  in evidence.

23  A. I haven't heard anyone mention that recently,

24  no.

25  **Q. Are there any disadvantages for recruitment of**

1   psychiatrists at San Quentin being in the Bay Area?

2          MR. CASARRUBIAS:  Objection.  Lacks foundation,

3   and calls for speculation.

4       A. Could you repeat the question?

5          MS. HARROLD:  Yes.

6          Ms. Phillips, do you mind repeating the

7   question.

8          (Whereupon, record was read as requested.)

9       A. There's more competition.  There's more

10  employers that are seeking out psychiatrists, so there's

11  more of a supply, and there's more of a demand.

12         The only other drawback is because the Bay Area

13  has a higher cost of living, that is taken into account

14  by anyone who is living or considering living in the Bay

15  Area, and it also makes it more challenging, not to

16  recruit psychiatrists, in my experience, but in the

17  support staff who help psychiatrists, because of their

18  salaries, they may not be able to afford to live within

19  the Bay Area so may have really long commutes, which

20  ultimately decreases the amount of time they may be

21  willing to tolerate the commute and thus work at

22  San Quentin.

23      Q. Does CDCR pay psychiatrists at San Quentin at a

24  higher rate than psychiatrists in other institutions due

25  to the higher cost of living?

Defendants object
to 61:23 - 62:9 as
lacks foundation.

Plaintiffs respond
that foundation
was laid because
he was the Chief
Psychiatrist at
that time
managing the
staff psychiatrists
(see 11:9-10,
18:15-19), and is
responsible for
hiring for this role
(see 20:4-22).  He
also later further
establishes that he
is familiar with
their
compensation
(see 79:13-80:4).

**Coleman vs. Newsom**

**Paul Burton, M.D.**

1    MR. CASARRUBIAS:  Objection.  Lacks foundation.

2    A. When you say "other institutions," do you mean

3  other CDCR institutions?

4    **Q. That's right.**

5    A. No, they do not.  It's a flat rate.

6    **Q. To make sure I understand, there's no**

7  **cost-of-living adjustment for psychiatrists?**

8    MR. CASARRUBIAS:  Objection.  Lacks foundation.

9    A. No, there is not.

10    **Q. Thank you.**

11    **Have you ever recruited any psychiatrists to**

12  **work at San Quentin?**

13    A. Yes.

14    **Q. What's -- once someone is interested, you**

15  **mentioned referral to headquarters about an applicant;**

16  **is that right?**

17    A. Yes, the central hiring unit at headquarters,

18  yes.

19    **Q. Right, the CHU as you mentioned.**

20    A. Right.

21    **Q. Okay.  I understand.**

22    **What -- what does the CHU do, then, with that**

23  **referral that you make?**

24    MR. CASARRUBIAS:  Objection.  Lacks foundation,

25  and calls for speculation.

Defendants object to 62:22 - 63:3 as Lacks foundation; speculative; lacks personal knowledge.

Plaintiffs respond that foundation was laid, it was not speculative, and he had personal knowledge for the same reasons: The witness's testimony established his responsibilities in hiring, experience working closely with the central hiring unit for years, familiarity with the steps in the hiring process, and experience recruiting psychiatrists into positions (see 20:4-22, 23:19-25:6, 55:20-59:1). Furthermore, a lack of personal knowledge objection was not asserted and thus is waived per FRCP 32(d).

**Page 62**

1        A. Typically they'll thank me, and they will reach
2    out to the applicant and start the formal discussion
3    about applying for a CDCR staff psychiatrist position.
4        **Q. And in your experience, is there any delay in**
5    **them doing what you just said and getting it started?**
6        A. There's a significant degree of variability.
7    Sometimes there is minimal delay.  Sometimes there is
8    excessive delay.  It's highly inconsistent.
9        **Q. And can you explain what "excessive delay"**
10   **means to you?**
11       A. I was contacted on New Year's Eve 2022 from an
12   applicant that trained at San Quentin.  She expressed
13   interest at the conclusion of her training of pursuing
14   full-time civil service employment.
15        Connected that individual same day with the
16   central hiring unit.  I believe a series of weeks went
17   by -- I can't recall exactly how long -- somewhere in
18   the two- to four-week realm where the CHU unit didn't
19   reach out to that applicant, so with a series of
20   reminders from myself and the applicant herself,
21   eventually the CHU unit reached out, and the formal
22   process was initiated.
23       **Q. Did that applicant ultimately join?**
24       A. She did.  Well, let me clarify that.  She is
25   starting this Friday, September 1st, but she has

1  accepted an offer, and we look forward to her starting

2  later this week.

3      Q. Great.

4          And you mentioned that the interview panel

5  makes a recommendation to the CEO when you want to make

6  an offer; is that correct?

7          MR. CASARRUBIAS:  Objection.  Mischaracterizes

8  the witness's prior testimony.

9      A. Yes.  Let me clarify.  The interview panel

10  would make a recommendation ultimately to the central

11  hiring unit whether to extend an offer or not.

12          If the offer is accepted by the applicant, then

13  the entire process of human resources vetting the

14  applicant comes into play.  That includes such steps as

15  professional credentialing, gate clearances, a variety

16  of other human resources documents.

17          After that entire package is completed and the

18  individual who accepted the offer is fully credentialed,

19  you know, they are really licensed by the State of

20  California, they are -- they are truly psychiatrists and

21  they still want to work for us and we still want them to

22  work for us, then ultimately the CEO would approve that

23  final process after it's all said and done, and a

24  position would be allocated, and the person would start

25  and have hopefully a thriving career.

Paul Burton, M.D.

```
 1       Q. Thanks.
 2           I realized I have one more question about that
 3  June 2022 applicant who will now start on Friday you
 4  mentioned.
 5           MR. CASARRUBIAS:  Objection -- okay.
 6           MS. HARROLD:  Sorry.  Counsel, did you have an
 7  objection?
 8           MR. CASARRUBIAS:  I thought you were done, and
 9  I didn't hear a question, so I just objected on the
10  grounds that that wasn't a question, but --
11           MS. HARROLD:  You're right.  That wasn't a
12  question but laying the groundwork for my question.
13  I'll do so.
14  BY MS. HARROLD:
15       Q. Dr. Burton, do you know when the candidate that
16  you mentioned was actually given a formal offer?
17       A. The candidate that is starting this week?
18       Q. That's correct.
19       A. I don't recall.  It was, I believe, towards the
20  end of the fiscal year 2022-'23, so likely in the
21  spring, the early summer of last fiscal year.
22       Q. And who has final say as to offering an
23  employment offer for psychiatrists at San Quentin?
24           MR. CASARRUBIAS:  Objection.  Lacks foundation,
25  and asked and answered.
```

**Paul Burton, M.D.**

1    BY MS. HARROLD:

2          **Q. You can answer.**

3          A. Ultimately on the hiring paperwork, the final

4    signature rests with the CEO of health care at

5    San Quentin.

6          **Q. And so for this applicant you described, it**

7    **took several months to go through the whole process to**

8    **that point of getting the CEO's signature, is that**

9    **correct, for an offer?**

10          MR. CASARRUBIAS:   Objection.   Calls for

11    speculation.

12          A. It took several months.   This applicant wasn't

13    able to start until July 2023, so I think there wasn't

14    major incentive to fast-track this one knowing that she

15    couldn't start until the new fiscal year anyway, but it

16    did take several months from date of first contact to

17    final CEO signature.

18          **Q. Great.**

19          **So I understand that applicant, perhaps there**

20    **was no urgency around her.   More generally, how -- how**

21    **long does it typically take between a recommendation to**

22    **hire someone from the interview panel to when an offer**

23    **is made?**

24          MR. CASARRUBIAS:   Objection.   Lacks foundation,

25    and calls for speculation.   Vague and ambiguous.

**Paul Burton, M.D.**

1    A. So more recently, we have noticed that that lag

2    time has decreased.  I just interviewed -- was part of

3    an interview panel two weeks ago, and the central hiring

4    unit extended an offer quite quickly, within a day or

5    two, after we made that preliminary recommendation.

6         As I said, there's been inconsistency over the

7    years, so right now things are very quick.  In the past,

8    it has taken considerably longer for the central health

9    unit to acknowledge receipt of our recommendation to

10   extend an offer, so it may require two or three

11   follow-up emails, but fortunately that has improved

12   recently.

13   **Q. To make sure I understand, you've sent**

14   **follow-up -- in the past, you've had to send follow-up**

15   **emails to CHU about applicants to ensure an offer has**

16   **gone out?**

17        A. Yes, for an offer to go out, and then all of

18   the steps after the fact required, in the past, a

19   significant degree of hand-holding just to make sure

20   balls were not dropped.

21   **Q. And what are some causes -- you mentioned**

22   **there's inconsistency for how long it takes for an offer**

23   **to be made.  What are some causes for possible delays?**

24        MR. CASARRUBIAS:  Objection.  Lacks foundation.

25   Calls for speculation, and it's vague as to time.

Paul Burton, M.D.

```
 1  BY MS. HARROLD:
 2        Q. In your tenure as chief psychiatrist.
 3            MR. CASARRUBIAS:  Objection.  Overbroad.
 4        A. Yeah.  I'm not sure what the actual reason is.
 5  I have asked CHU and their bosses that question in the
 6  past.  And I've been told that ironically sometimes the
 7  central hiring unit is understaffed, and they themselves
 8  have difficulty recruiting or retaining people for the
 9  central hiring unit, so that's the response I've been
10  getting, I've received in the past, that they just don't
11  have enough people to help.
12            MS. HARROLD:  Great.
13            So we're at the top of the hour.  Let's go
14  ahead and take another ten-minute break, returning maybe
15  at 12:10 if that works for you all.
16            (Whereupon, a short break was taken.)
17  BY MS. HARROLD:
18        Q. So, Dr. Burton, you understand you're still
19  under oath, correct?
20        A. Correct.
21        Q. I want to ask just a few more questions about
22  the hiring process.  What are the steps someone needs to
23  take between when an offer is made and they officially
24  join?
25            MR. CASARRUBIAS:  Objection.  Lacks foundation.
```

Page 68

**Paul Burton, M.D.**

1      A. There are a variety of steps.  In my opinion,

2  the most important includes credentialing to ensure that

3  someone is a physician in good standing with all the

4  necessary prerequisites to practice psychiatry within

5  the Department of Corrections, to verify the minimum

6  qualifications listed on the CV are, in fact, true; it's

7  a rather extensive process that is handled by another

8  centralized agency, the credentialing and verifications

9  unit.

10      In addition to that critical step, there is a

11  fingerprinting and gate clearance process just to make

12  sure that the basic requirements from a criminal record

13  perspective are met for someone who is seeking out

14  employment within the Department of Corrections.

15      There is a physical exam requirement or

16  attestation to various similar facts.

17      It is government work, so there's a packet of

18  forms and materials to review, some specific to working

19  in a prison, some specific to employment by the State of

20  California.  My HR and personnel colleagues would really

21  have the expertise on all of those various forms.

22      And there also needs to be some degree of

23  negotiation of an actual start date, which typically is

24  done with the CHU unit being the liaison between the

25  applicant and the chief psychiatrist.

Case 2:90-cv-00520-KJM-DB   Document 7999   Filed 10/05/23   Page 73 of 143
Paul Burton, M.D.

Coleman vs.
Newsom

```
 1            Those are the big ticket items that I am aware
 2    of.
 3         Q. Thank you.
 4            And how long does that whole process generally
 5    take?
 6            MR. CASARRUBIAS:   Objection.   Lacks foundation.
 7         A. It can be quite variable.   In my experience,
 8    usually the rate limiting step tends to be the start
 9    date that the applicant wants to select.   Most
10    psychiatrists are gainfully employed when they are
11    seeking out other jobs, and when psychiatrists are
12    gainfully employed, they have a caseload of existing
13    patients with their current employer, and they typically
14    like to provide a significant amount of time so that
15    their current employer, their current team, has time to
16    find their current patients new psychiatrists.   They
17    don't want to leave their employer or their patients in
18    the lurch, so I found that a lot of times the
19    psychiatrists that we've hired have requested start
20    dates several months down the road simply to assist with
21    a smooth transition from one group of patients to
22    another.
23         Q. You mentioned there's variance in how long it
24    takes.   Can you give your best estimate to what that
25    variance is?
```

Paul Burton, M.D.

1    A. Usually in the three- to seven-month range.

2    Q. And do you think there's anything CDCR can do

3    to help move those start dates up sooner?

4         MR. CASARRUBIAS:   Objection.   Lacks foundation,

5    and calls for speculation.

6    A. Well, I guess that would -- that would depend

7    on -- on the reason for the start dates being pushed

8    back.

9         I think there's a variety of onboarding

10   incentives that perhaps could be looked at.   I think

11   cleaning up some inefficiencies within the state

12   bureaucratic process itself might help in some

13   situations.   Those would be the two main areas.

14   Q. And do you have any particular inefficiencies

15   in mind when you say that?

16   A. I think in particular, if there was consistent

17   and timely responsiveness from the central hiring unit

18   towards interested applicants and the prisons that seek

19   to hire them, that would most likely lead to some

20   improvements in the overall time to actually have one

21   start.

22   Q. Can you help me understand that a little bit --

23   sorry.   I didn't mean to interrupt.

24        MR. CASARRUBIAS:   Objection.   Vague.

25   //

---

Defendants object to 71:2-21 as Lacks foundation; speculative; lacks personal knowledge.

Plaintiffs respond that foundation was laid, it was not speculative, and he had personal knowledge for the same reasons: The witness's testimony established his responsibilities in hiring, experience working closely with the central hiring unit for years, familiarity with the steps in the hiring process, and experience recruiting psychiatrists into positions (see 20:4-22, 23:19-25:6, 55:20-59:1). Furthermore, a lack of personal knowledge objection was not asserted and thus is waived per FRCP 32(d).

**Paul Burton, M.D.**

1    BY MS. HARROLD:

2        **Q. Let me --**

3        A. Understand what?

4        **Q. Can you help me understand, Dr. Burton, what**

5    **you mean by responsiveness, say, towards applicants?**

6        A. As mentioned previously, there's variability in

7    responsiveness from the CHU unit.  Sometimes the

8    response is instantaneous, near instantaneous.  Other

9    times it can take several weeks.  So consistently having

10   really good responsiveness, I think, is of utmost

11   importance when someone is considering applying for

12   employment with CDCR as a psychiatrist.

13       **Q. And can you please describe what you mean by**

14   **perhaps a lack of responsiveness when it comes to CHU**

15   **interacting with the institution?**

16       A. Quite simply, sometimes you will send emails

17   and you won't get a response within days, maybe a week.

18   You send a second email, a reminder.  You start to cc

19   the various CHU supervisors, and eventually you will get

20   a response, but it historically -- again, it's changed

21   recently -- historically, that has been one way in which

22   one greases the wheels of bureaucracy to get the central

23   hiring unit to get in touch with them.

24       Our current CEO has also started to invite the

25   central hiring unit to these regular meetings that I

Paul Burton, M.D.

 1   previously mentioned for San Quentin hires that involve

 2   the human resources department in an effort to ensure

 3   that the CHU unit is on top of but also in sync with

 4   other necessary aspects of our human resources

 5   department.

 6        Q. Can you please describe a bit more about what's

 7   discussed in those meetings?

 8        A. Quite simply, the meetings go over all current

 9   civil service health care vacancies to include

10   psychiatry, psychology, nurses, primary care docs,

11   laboratory techs, radiology techs, you name it, all

12   health care divisions, and for each vacancy, we go

13   through line by line and discuss where we are at, either

14   in the recruitment process if no one has expressed

15   interest or the hiring process if someone is about to

16   interview or has interviewed, really just to keep

17   various aspects of our local and centralized HR

18   bureaucracy on the same page to minimize unnecessary

19   delays.

20        Q. In your experience, having these meetings, are

21   these meetings helpful in improving recruitment to

22   San Quentin?

23        A. I don't think they've harmed it.  On occasion

24   it's been helpful.  Other times it may have had a

25   neutral effect on the process depending on who actually

1   attends the meetings.

2        Q. And are the candidates that HR sends you to

3   possibly interview of high quality?

4        MR. CASARRUBIAS:  Objection.  Lacks foundation.

5        A. I guess it would depend on one's definition of

6   high quality.  They are all psychiatrists.

7        Q. Right.  Are -- let me clarify.

8        Are the candidates that headquarters sends you

9   generally a good fit for the role?

10       MR. CASARRUBIAS:  Objection.  Vague as to "good

11   fit."

12       A. Yeah.  You can only tell so much from a CV.

13   That's why we have the interview process.  And there's

14   mutual exchange of information to really determine if

15   it'll be a good fit.  We have had some -- some excellent

16   fits come out of that process.

17       Q. And in your experience, what proportion of

18   people you interview get an offer?

19       A. We're talking specifically about staff

20   psychiatrist positions?

21       Q. Yes.

22       A. I would guesstimate about 60 percent of

23   psychiatrists who interview are given an offer, about 3

24   of every 5.

25       Q. And what are some reasons you would not give

Paul Burton, M.D.

1   someone an offer?

2       A. Well, sometimes it seems as if they may not be

3   good fits for the correctional environment.  Sometimes

4   they are using the interview as an exploratory method to

5   learn more about what it's like to work in prison.

6   Sometimes it might become clear that it's not exactly

7   what they thought it would be and it just wouldn't be a

8   good fit, so that's actually a win at that early stage

9   because it's important to have someone who can

10   appreciate the complexities of a correctional

11   environment.  It is not for all psychiatrists.

12        Sometimes there could be issues that come up

13   with a reference check, former employers give poor

14   references.  That may come up.

15        Other times it may be someone who just based on

16   the answers to the interview questions themselves,

17   perhaps some red flags are raised, and the interviewing

18   panel agrees that based on the answers to the questions,

19   either it wouldn't be a good fit or there might be some

20   issues just with quality of care.  You know, interviews

21   only tell you so much.  But you typically draw the

22   inferences that you can from that limited data.

23       Q. Thank you.

24        And have you ever had concerns about the

25   general quality of candidates headquarters sends you?

Paul Burton, M.D.

1          MR. CASARRUBIAS:  Objection.  Vague as to
2   "concerns."
3          A. Not at San Quentin.  As mentioned, a lot of
4   times we're the ones that tee them up for headquarters
5   to give back to us, so usually, usually not.
6          Q. Great.
7             I would like to ask more questions about
8   recruitment.  You -- we previously discussed the hybrid
9   model for psychiatrists at San Quentin.  In your
10  experience, does that hybrid model of allowing --
11  possibly allowing an individual, a psychiatrist, to
12  follow a patient from the outpatient to the inpatient
13  side help with retention?
14         A. Retention, not recruitment; is that right?
15         Q. That's right.  Let's start with retention.
16         A. Yeah.  I think it does.
17         Q. In what ways?
18         A. Giving employees, in this case staff
19  psychiatrists, some agency and control over their
20  clinical duties goes a really long way.  So although
21  ultimately the decision to make team assignments rests
22  with myself and my co-chief psychiatrist, we tend to
23  involve the entire team of psychiatrists in such
24  decisions.  We have a weekly meeting in which a variety
25  of issues are brought up, including, when indicated,

**Paul Burton, M.D.**

1  caseload assignments and team assignments.  We know as a

2  collective group all of the teams and all of the

3  patients have to be seen.  They have to be treated.

4  They have to be covered.  But rather than the

5  traditional top-down approach, we try to involve the

6  entire team in coming up with solutions.

7          And a lot of those solutions include the

8  various team matter -- team members' preferences for

9  what practice environment they would like to practice in

10  at this stage in their career, and we've seen

11  preferences change over the years.  You may have had a

12  CCCMS caseload for three or four years, and you've loved

13  it, but you're at that point in your career where you're

14  ready for a change.  Rather than having to seek out a

15  new employer and leave California Department of

16  Corrections, at San Quentin, we can offer you a

17  completely different treatment environment while still

18  working for San Quentin and CDCR, so maybe you switch

19  from outpatient CCC to a hybrid CCCMS with a little PIP

20  or exclusively PIP, so it's nice to give team members

21  options.  It's also nice to give them a sense of control

22  and, thus far, we've been very successful as a team with

23  the two chiefs at the helm in granting people their

24  preferences and requests while also ensuring that all

25  the patients are able to be seen in a timely manner.

Coleman vs.
Newsom

**Paul Burton, M.D.**

1      Q. And does this hybrid model help with
2   recruitment at all?
3      A. I believe so.  Different psychiatrists have
4   different career interests.  Some love inpatient, some
5   not so much, and a lot of people like variety.  So
6   letting people know about this approach that we have at
7   San Quentin is something that I believe does assist
8   with -- with recruitment.
9      Q. And what are you basing that belief on?
10      MR. CASARRUBIAS:  Objection.  Calls for
11   speculation.
12      A. We've had a pretty good success rate of having
13   people that we are actively pursuing for employment
14   actually accepting our offers, and that's, of course,
15   based on a whole host of reasons, with that specific one
16   being one of many considerations.
17      Q. What are some of the other considerations?
18      MR. CASARRUBIAS:  Objection.  Lacks foundation,
19   and calls for speculation.
20      A. Well, you name it.  Commute time, what the
21   public schools are like in Marin County, salary,
22   benefits, what they've heard from their peers and
23   colleagues.  We'll frequently take applicants that we're
24   interested in on tours of San Quentin so they can
25   actually see it and meet the peers that they'll be

**Paul Burton, M.D.**

1    working with so they can hear directly from folks doing

2    a hundred percent clinical work what it's like.

3           A lot of physicians in the community are tired

4    of dealing with managed care and insurance companies.

5    You don't have to worry about that within CDCR, which is

6    nice.  There's different challenges, but certainly that

7    entire piece of the American health care system is

8    removed, and that can be quite refreshing to someone who

9    has been in that alternate system for an extended period

10   of time.

11          A lot of different choices and decisions go

12   into that.

13        **Q. You mentioned salary.  Do you know the typical**

14   **salary range for psychiatrists who work at San Quentin?**

15        A. I do.  I have a ballpark estimation of what it

16   is.

17        **Q. What is it?**

18          MR. CASARRUBIAS:  Objection.  Calls for

19   speculation.

20        A. Sure.  I could google it right now and give you

21   a definitive answer, but off the top of my head, absent

22   any pay differentials or things of that sort, I think it

23   caps out in the 330, 340 range for staff psychiatrist.

24          There's a range or a scale.  And a lot of

25   psychiatrists nowadays are pursuing hiring above the

**Page 79**

Paul Burton, M.D.

1   minimum, H-A-Ms or HAMs, so they actually can start at
2   the highest range of the salary their first year rather
3   than having to wait a few years to get to that highest
4   pay range within the applicable scales.
5        Q. Can you describe a bit more about HAM, hiring
6   above the minimum?
7        A. Sure.  What would you like to know?
8        Q. When did you first hear about it?
9        A. I first heard about that several years ago,
10  approximately 2016 or so.  It's been a while since I
11  first heard about it.
12       Q. And have you ever worked with an applicant in
13  the HAM process?
14       A. I have, yes.
15       Q. How does the process work?
16       A. So it's evolved significantly over the years.
17  Initially, the chief psychiatrist played a pretty
18  hands-on role in that if an applicant requested a HAM,
19  there was a form that I would complete that talked about
20  extraordinary qualifications that the applicant had,
21  recruitment difficulties, their salary at their current
22  or most recent employer, and I've had various CEOs who
23  have, in addition to that form, requested that a memo be
24  submitted by the chief psychiatrist at the prison just
25  spelling out the reasons why we think a HAM may be

**Page 80**

1   indicated for that specific applicant.

2         That was several years ago.   Nowadays, the

3   process is pretty hands off from a chief psychiatrist

4   perspective.   The applicant discusses such matters

5   directly with the CHU unit, and the CHU unit takes it

6   from there, so I no longer fill out forms or write

7   memos.   I no longer have that discussion with the CEO.

8   The HAM process has been taken away from the local chief

9   psychiatrist, which I have no -- I have no issue with.

10         I believe the CHU unit is more -- or I

11   should -- let me restate that.   I believe nowadays the

12   system is much more willing to give out HAMs than it was

13   initially when you really had to prove someone was

14   worthy of it.   Nowadays it's almost to be expected that

15   if the applicant raises a HAM question, to some degree,

16   it will likely be granted.

17        **Q. And to make sure I understand, when you say it**

18   **will be granted, what does that mean in terms of their**

19   **salary?**

20         A. It means that their starting salary, although

21   still within the acceptable pay scale, will start a

22   couple steps higher than the first step on that pay

23   scale.

24        **Q. And in your experience, has anyone requested a**

25   **HAM and had that not been granted?**

**Paul Burton, M.D.**

1          A. Staff psychiatrists specifically?

**2          Q. Yes.**

3          A. Recently, no.  All recent requests, to my

4    knowledge, have been granted.

5             In the early days, there may have been some HAM

6    requests that were not ultimately approved.  But we're

7    going back several years, probably about six, seven

8    years.

**9          Q. And has the HAM process improved recruitment?**

10          MR. CASARRUBIAS:  Vague as to the position

11    you're talking about.

12          MS. HARROLD:  For psychiatrists at San Quentin.

13          A. It's hard to say.  You know, at baseline, we

14    were pretty good with recruitment.  We're still pretty

15    good.  I don't know if it's had a significant impact.  I

16    think the absence of a HAM would likely impede our

17    recruitment efforts just given that psychiatrist

18    salaries amongst our competitors have significantly

19    increased, but it's hard to say the degree to which HAMs

20    have helped.

**21          Q. You think it would be easier to fill psychiatry**

**22    positions at San Quentin if the salaries were higher?**

23          MR. CASARRUBIAS:  Objection.  Calls for

24    speculation.

25          A. Yes.  I don't think that's unique to

Paul Burton, M.D.

1   psychiatrists.   I think in American society, the more

2   you pay people, the more people will want to work there.

3        Q. How much more do you think psychiatrists should

4   be paid to improve recruitment, to the best of your

5   knowledge?

6        MR. CASARRUBIAS:   Objection.   Lacks foundation,

7   and calls for speculation.

8   BY MS. HARROLD:

9        Q. If you can answer, please do.

10       A. That's tough for me to answer.   Relatively more

11   than they are getting now would certainly help.   But I'm

12   not sure where that sweet spot is.

13       Q. You mentioned that the salary of competitors

14   have increased; is that right?

15       A. That's what -- that's what I'm told, and that's

16   what I see from a variety of headhunter emails that I as

17   a psychiatrist receive on a regular basis.

18       Q. And of -- to the best of your knowledge, what

19   is that differential between the psychiatry roles at

20   San Quentin and that of competitors?

21       A. Not exactly sure.   I wouldn't feel confident

22   enough to give you an actual figure.   The sense I get

23   from psychiatrists is that the rest of the field has

24   caught up to CDCR.   CDCR used to pay way more than a lot

25   of our competitors.   It's a correctional environment.

Defendants object to 83:18 - 84:8 as Lacks foundation; speculative; lacks personal knowledge.

Plaintiffs respond that foundation was laid, it was not speculative, and he had personal knowledge for the same reasons: his testimony established his responsibilities in hiring, experience working closely with the central hiring unit for years, familiarity with the steps in the hiring process, experience recruiting psychiatrists into positions, and familiarity with their compensation (see 20:4-22, 23:19-25:6, 55:20-59:1, 79:13-80:4). Furthermore, objections for lack of personal knowledge, lack of foundation, and speculation were not asserted and thus are all waived per FRCP 32(d).

Paul Burton, M.D.

1   It's not for everyone.   There may be challenges to

2   recruiting to a prison compared to a community clinic.

3   But the -- with the rest of the field catching up to

4   CDCR, CDCR now has that stigma to deal with without the

5   additional financial incentives to perhaps offset some

6   of those concerns that psychiatrists who are not

7   accustomed to practicing within a prison environment may

8   hold.

9        Q. Do you have a sense of when that catch-up

10   occurred?

11        A. Not -- not really, not really.

12        Q. Do you think it would be easier to fill

13   positions, the psychiatry positions, in CDCR if CDCR

14   offered bonuses?

15        MR. CASARRUBIAS:  Objection.  Lacks foundation,

16   and calls for speculation.

17        A. I guess it would depend on the bonus.

18        Q. Would it be easier to fill positions if CDCR

19   offered any other type of benefit?

20        MR. CASARRUBIAS:  Same objections.

21        A. I guess it would depend on the benefit perhaps.

22        Q. Are there any benefits you can think of that

23   would be helpful for recruitment?

24        MR. CASARRUBIAS:  Objection.  Lacks foundation,

25   and calls for speculation.

Defendants object to 84:22 - 86:2 as Lacks foundation; speculative; lacks personal knowledge.

Plaintiffs respond that foundation was laid, it was not speculative, and he had personal knowledge for the same reasons: The witness's testimony established his responsibilities in hiring, experience working closely with the central hiring unit for years, familiarity with the steps in the hiring process, experience recruiting psychiatrists into positions, and familiarity with their compensation (see 20:4-22, 23:19-25:6, 55:20-59:1, 79:13-80:4). Furthermore, a lack of personal knowledge objection was not asserted and thus is waived per FRCP 32(d).

1      A. The primary one that is brought up on a
2  semi-regular basis has to do with the pension reform
3  that occurred several years ago, the PEPRA Act.  This is
4  for all State of California employees.  But it capped
5  the amount of salary that can be considered in a state
6  pension at approximately one-third the salary of a staff
7  psychiatrist, so effectively that reduces one's pension
8  payment by two-thirds.
9         And, you know, there's a lot of exciting things
10  that get mentioned on the recruitment trail, and I think
11  salaries are what gets people's attention.  Pensions
12  aren't usually highlighted in bright lights.  But for
13  people who are in the know, although new staff
14  psychiatrists still have a pension and they can vest in
15  five years, having that ultimate pension payout be a
16  third of what it once was for people who entered the
17  system earlier is something that I am consistently
18  reminded of amongst staff who have started since the
19  PEPRA reform took effect for all of California.
20         It's my understanding there were some
21  classifications that were exempt from PEPRA, including
22  state judges, but physicians and psychiatrists within
23  CDCR were not exempt, so they are subject to the PEPRA
24  cap, so that's one benefit that could be looked at and,
25  if marketed and advertised correctly, could potentially

Paul Burton, M.D.

1   help with the recruitment of new psychiatrists to civil

2   service within CDCR.

3       Q. Who has brought up this concern about the PEPRA

4   cap to you?

5           MR. CASARRUBIAS:  Objection.  Lacks foundation.

6       A. Psychiatrists who have started since those

7   changes went into effect.  It's not a -- it's not a

8   secret.  Amongst physicians who pay attention to such

9   matters, it's -- the pension just isn't what it used to

10  be.

11          It's been brought up to various labor groups,

12  unions, et cetera.  It's my understanding, though,

13  because it's part of more global California changes, not

14  specific to any classification or any one department,

15  it's really hard to change it since it's a State of

16  California change rather than a Department of

17  Corrections change.

18      Q. And could CDCR change anything about working

19  conditions to help with recruitment of psychiatrists at

20  San Quentin?

21          MR. CASARRUBIAS:  Objection.  Lacks foundation.

22  Calls for speculation.

23      A. Yeah.  I think if more clinical support

24  services were offered, that could certainly help with

25  recruitment and retention.  That would be along the

Defendants object to 86:18 - 87:20 as Lacks foundation; speculative; lacks personal knowledge.

Plaintiffs respond that foundation was laid, it was not speculative, and he had personal knowledge for the same reasons: The witness's testimony established his responsibilities in hiring, experience working closely with the central hiring unit for years, familiarity with the steps in the hiring process, experience recruiting psychiatrists into positions, and familiarity with their compensation (see 20:4-22, 23:19-25:6, 55:20-59:1, 79:13-80:4). Furthermore, a lack of personal knowledge objection was not asserted and thus is waived per FRCP 32(d).

**Paul Burton, M.D.**

1  lines of having medical assistants assist psychiatrists.

2         In addition, ensuring that psychiatrists have

3  agency in the Department of Corrections is -- is going

4  to be important.  It's a bit of a culture shock even for

5  other -- for correctional psychiatrists that come from

6  other organizations.  Once they start at San Quentin,

7  they have to habituate to the role that physicians have

8  within the California Department of Corrections.

9         Typically in most health care organizations,

10  physicians are expected to have a seat at the table, and

11  within the CDCR, although there's been some improvements

12  in recent years, psychiatrists historically -- and less

13  so now, but it still persists to this day -- have been

14  somewhat marginalized from the decision-making table at

15  multiple levels of our organization, so I think should

16  that change, should more of the decisions in our

17  organization be made by or at least be contributed to by

18  physicians, and if that was marketed well and if the

19  buzz got out about that, that would certainly help with

20  the recruitment of on-site psychiatrists.

21      **Q. To what do you attribute the recent improvement**

22  **in agency for psychiatrists?**

23         MS. HARROLD:  Objection.  Misstates prior

24  testimony.

25  //

1  BY MS. HARROLD:

2      **Q. And please clarify if I misstated you in any**

3  **way.**

4      A. Sure.  Could you reframe the question?

5          (Reporter interrupts for clarification of the

6            record.)

7  BY MS. HARROLD:

8      **Q. Yeah.  To make sure I understand, there's been**

9  **at least some recent improvement in how psychiatrists at**

10 **San Quentin have had some agency; is that right?**

11         MR. CASARRUBIAS:  Vague as to "agency."

12     A. Yes.  There's been improvement in those regards

13 at San Quentin.

14     **Q. And what do you attribute that improvement to?**

15         MR. CASARRUBIAS:  Objection.  Calls for

16 speculation.

17     A. There was a process started in 2017 that

18 ultimately gave psychiatrists working within prison more

19 of a leadership responsibility and position.  That

20 process kind of sputtered out of the gates.

21         It appears that in direct response to the 2018

22 Golding whistleblower report, that process was

23 accelerated and catalyzed to the point where in 2019,

24 chief psychiatrists ultimately were promoted, if you

25 will, and then directly reported to the chief executive

1   officer, thereby for the first time in the mental health

2   service delivery system's history ensured that

3   psychiatrists had a seat at the executive table or

4   health care executives at prisons.

5            Since 2020, there was a psychiatrist assigned

6   to the deputy director chair, and having psychiatrists

7   in leadership positions, I believe, has led to the

8   creation of additional psychiatry leadership positions,

9   such as, a newly created assistant deputy director of

10  psychiatry position, these regional psychiatry positions

11  in all four regions, so that at least creates, at a

12  durable and systematic level, spots to ensure that

13  physicians have a seat at the CDCR mental health care

14  table.

15           It's still in process, this cultural evolution.

16  There's still a tremendous amount of work to do; even

17  though the org chart may indicate one thing, the culture

18  may have not caught up to the org chart.  But I am

19  pleased and confident that with the people who are

20  psychiatrists who now hold these, in some cases, newly

21  created leadership positions, I'm confident that with

22  additional time and ongoing efforts, further necessary

23  changes will happen in the future.

24           Q. What else could CDCR do to recruit people to

25  fill vacant psychiatry roles in San Quentin?

Defendants object to 89:24 - 91:8 as Lacks foundation; speculative; lacks personal knowledge.

Plaintiffs respond that foundation was laid, it was not speculative, and he had personal knowledge for the same reasons: The witness's testimony established his responsibilities in hiring, experience working closely with the central hiring unit for years, familiarity with the steps in the hiring process, and experience recruiting psychiatrists into positions (see 20:4-22, 23:19-25:6, 55:20-59:1, 79:13-80:4). Furthermore, a lack of personal knowledge objection was not asserted and thus is waived per FRCP 32(d).

**Paul Burton, M.D.**

1          MR. CASARRUBIAS:  Objection.  Lacks foundation,

2     and calls for speculation.

3          A. Well, we found our educational programs to be

4     highly effective recruitment tools.  These are our

5     relationships with medical students, psychiatry

6     residencies, and psychiatry fellowships and, in recent

7     years, there's been a tremendous amount of support from

8     CDCR for maintaining these types of educational

9     contracts and relationships, so ongoing support would

10    certainly assist with -- with future recruitment

11    efforts.

12         **Q. And what do you mean by "ongoing support"?**

13         A. Some of these relationships involved the

14    exchange of dollars via contracts, so ongoing financial

15    support, ongoing administrative support.

16              There would be additional benefit if positions

17    potentially could be created to assist with structuring

18    the training programs.  Right now, the training programs

19    are added to the regular job duties that chief

20    psychiatrists and staff psychiatrists have, but quality

21    training programs require some time to be effective, and

22    there haven't been any additional allocations or

23    positions.  It's basically just been taken out of what

24    we're already given, so there's potentially some room to

25    further expand psychiatry training programs, but you get

**Paul Burton, M.D.**

1   to a point where you can only expand so much before you

2   need additional positions to really oversee the quality

3   of the curriculum and the ongoing discussions with the

4   educational partners and their trainees.

5            So that might be something that could help at

6   San Quentin:   New positions to oversee educational

7   electives to assist in the morale of existing staff, but

8   also to assist with future recruitment efforts.

9        **Q. Have you ever suggested the creation of these**

10  **new positions to anyone in CDCR?**

11       A. I have.

12       **Q. On what occasions?**

13       A. I've had conversations with a variety of

14  different folks, I believe regional, statewide, deputy

15  directors, and I think most people agree it's a great

16  idea.

17       **Q. And you mentioned contracts that maybe are --**

18  **are with educational institutions; is that right?**

19       A. That's correct, yes.

20       **Q. Can you describe that a bit more?   What are**

21  **these contracts?**

22       A. The contracts for educational programs can

23  largely be divided into zero dollar contracts or

24  contracts with dollars attached to them.   And we

25  currently have a zero dollar contract with residency

**Paul Burton, M.D.**

1  training programs.  That essentially means the trainees

2  can come to San Quentin to learn, but the CDCR does not

3  pay their residency for their time.

4         Also because the minimum qualifications, the

5  credentialing process for psychiatrists are rather

6  strict within CDCR, technically a psychiatry resident

7  who already is licensed to practice medicine, but

8  because they haven't completed their psychiatry

9  residency yet, they are not meeting the minimum

10  qualifications for a staff psychiatrist and, therefore,

11  they cannot provide treatment to patients within CDCR,

12  so because they technically can't provide treatment, no

13  dollars are exchanged.  It's more of an experience, an

14  introduction to correctional health care for them to

15  have at a critical point in their professional

16  development to see if perhaps they would like to pursue

17  it after their residency is completed and they are

18  eligible for staff psychiatrist minimum qualifications.

19         That's in contrast to the fellows or

20  fellowships.  In the health care system, after one has

21  completed their psychiatry residency, meaning they are a

22  full-fledged psychiatrist, they have already

23  specialized, they have the opportunity to subspecialize

24  into a fellowship, so those individuals typically meet

25  the minimum qualifications for staff psychiatry but are

**Paul Burton, M.D.**

1   seeking out additional training to specialize further.

2           So for those individuals, since they meet the

3   minimum qualifications for staff psychiatrists and they

4   typically are highly desirable since they are being

5   subspecialized, in my experience, there's been dollars

6   exchanged per contracts in which the Department of

7   Corrections pays the university on an hour-by-hour basis

8   to have the trainees not only come to the prison, but to

9   provide necessary treatment or clinical services to the

10  patients that we treat.

11      **Q. Do you think there's anything else CDCR can be**

12  **doing to help recruit people?**

13          MR. CASARRUBIAS:  Objection.  Lacks foundation.

14  Calls for speculation.  And it also calls for a

15  narrative.

16      A. You know, I think we covered -- covered the

17  main areas.

18      **Q. Great.**

19          **I hope to ask a couple more questions about**

20  **retention.  In your tenure as chief psychiatrist, what's**

21  **the typical turnover for the psychiatrists you manage?**

22      A. Yeah.  You know, I crunched the numbers about a

23  year and a half ago.  We had a presentation, and at that

24  time, it was just under ten years.  The average

25  psychiatrist at San Quentin had worked there for

1  9.7 years, just shy of a decade.

2          At the end of last year, we had a variety of

3  promotions.  A couple of our psychiatrists started to

4  work for CDCR headquarters.  One promoted to DSH

5  headquarters.  One retired after a celebrated 28-year

6  career at CDCR.  A lot of happy departures, but

7  departures nonetheless.

8          So although I haven't crunched the numbers, our

9  average retention rate has likely dropped with those

10  individuals departing, and this year, we've been in the

11  process of recruiting new psychiatrists, the next

12  generation.  So although I don't have a number, it's now

13  substantially less than the ten-year decade-long mark

14  that we were able to quote a year and a half ago.

15          MS. HARROLD:  Great.

16          Let's go ahead and take another break now.

17  Would it be helpful for you all to have it be a little

18  bit of a longer break this time?

19          MR. CASARRUBIAS:  Yeah.  Can we go off the

20  record?

21          MS. HARROLD:  Yes.

22          (Whereupon, a lunch break was taken.)

23  BY MS. HARROLD:

24     **Q. Dr. Burton, you understand you're still under**

25  **oath, correct?**

**Paul Burton, M.D.**                                              Coleman vs.
                                                                   Newsom

1          A. I do, yes.

2          **Q. Do you conduct any exit interviews with**

3   **psychiatrists leaving San Quentin?**

4              MR. CASARRUBIAS:    Objection.    Lacks foundation.

5          A. I do, yes.

6          **Q. How often?**

7          A. I try to do it after each or immediately prior

8   to each psychiatrist leaving.

9          **Q. And what questions do you typically ask?**

10         A. Pretty standard ones; what did they like about

11  San Quentin, what did they not like going forward, what

12  could we do to improve things at San Quentin so more

13  psychiatrists choose to work and stay there.   I ask for

14  feedback on myself, on leadership, on administration,

15  questions like that.

16         **Q. And what complaints have you heard?**

17             MR. CASARRUBIAS:    Objection.    Assumes facts not

18  in evidence.

19         A. The themes that have come up over the last few

20  years, at least at San Quentin, tend to have to do with

21  a lack of available treatment space or office space.

22  That's one of the side effects of being well staffed.

23  You may not have enough offices for those staff once you

24  fill all those vacancies.

25             In addition, the lack of support that

Defendants object to 95:16 - 96:13 as Inadmissible hearsay; leading; assumes facts not in evidence.

Plaintiffs respond that this testimony is not hearsay because it concerns a statement made by someone working for CDCR on a subject within the scope of their employment per FRE 801(d)(2)(D); and the question was not leading or assuming facts not in evidence because witness testified that he asked staff what they did not like (complaints) (see 97:9-15). Furthermore, a leading objection was not asserted and thus is waived per FRCP 32(d).

1   psychiatrists receive, both clinically as well as

2   administratively, from support staff, but also within

3   the greater culture of CDCR, gets brought up

4   consistently as something that is highlighted by

5   departing staff psychiatrists.

6           They know that's of interest to me, so they, I

7   believe, feel pretty comfortable bringing that up, and

8   they know I'm actively trying to work on it.   But

9   nonetheless, that culture of marginalizing psychiatrists

10  and physicians within the mental health service delivery

11  system still persists to this day, and pretty much most,

12  if not all, of the psychiatrists that work at

13  San Quentin tangibly feel that.

14      Q. You've -- you mentioned clinically and

15  administratively.   Can you describe what you mean by

16  clinically?

17      A. Clinically would be the support staff that we

18  mentioned earlier, for example, having additional

19  medical assistants provide the staff psychiatrists with

20  support to run their clinical duties.

21      Q. And what do you mean by administratively?

22      A. With the absence of a recent addition, no

23  support staff, administrative support staff, report to

24  the chief psychiatrists at San Quentin.

25          There are many dozens of equivalent type staff

1   who report to the leaders of the psychology division.

2   There are some that report to nursing leaders, primary

3   care leaders, but psychiatry effectively doesn't have

4   direct chain-of-command supervisory oversight over the

5   staff that are involved in the scheduling of psychiatry

6   appointments, the crunching of various quality

7   management data.

8          A lot of times the psychiatrists or the

9   psychiatry team will have an idea for quality

10  improvement, not to make the dashboard look any better,

11  but things that will actually improve the quality of

12  care our patients receive.  It just becomes a lot more

13  challenging to implement ideas such as those when there

14  are limited administrative support staff that are freed

15  up to assist with such ideas.

16         Ultimately the psychiatrists know that if they

17  want those ideas implemented, they have to do it

18  themselves, which actually can be good for fostering

19  team cohesion, but in all reality, because we are busy

20  physicians who are already working pretty hard, it's

21  hard to take on a lot of these administrative projects

22  without the support that most other chiefs within CDCR

23  and CCHCS have.

24  Q. In your experience as chief psychologist --

25  chief psychiatrist, excuse me, have you ever had more

Paul Burton, M.D.

1   administrative support directly reporting to you?

2        A. No.  I have one person currently who directly

3   reports to me, and that is, from an org chart direct

4   reporting perspective, the first time it has ever

5   happened.

6        **Q. And that person's the SSA you mentioned before,**

7   **correct?**

8        A. That's correct, yes.

9        **Q. Another theme you mentioned was the lack of**

10  **available treatment space.  What's lacking with**

11  **treatment space?**

12       A. As we stand here right now, it's pretty good.

13  Every psychiatrist has enough rooms to see their

14  patients.  Not all treatment space is created equal.

15  Some of it is a little more cramped, less square footage

16  than others.  Some of the offices have windows.  Some do

17  not.  So although the space itself may be available,

18  it's less likely to be desirable treatment space.

19            Whereas and we've in the past had to have

20  psychiatrists share offices with other psychiatrists and

21  other health care disciplines, as of right now, some of

22  that has dissipated simply because we have a few more

23  vacancies right now than we typically have.  But once we

24  are full again, we expect some of those similar space

25  crunch issues to, once again, come up in different parts

Paul Burton, M.D.

1   of the prison.

2      Q. And when you are fully staffed, how do you

3   manage the space issue?

4      A. It's a lot of discussion with my colleagues,

5   the chief of mental health.  Usually we're able to work

6   something out.  We have an informal space committee for

7   all of the different mental health disciplines, and a

8   lot of compromises are made, but we're typically able to

9   resolve a lot of these issues at that level.

10         There's been an expansion of demand for space

11   from nonmental health disciplines, those that are under

12   the Plata case, nursing and primary care in particular,

13   so we certainly discuss space considerations with them.

14         Ultimately it's the CEO who makes space

15   decisions at the San Quentin level.  It is something

16   that is of limited supply at San Quentin.

17      Q. Have you raised any concerns about the limited

18   supply with anyone in CDCR?

19      A. Yeah, I have.  My colleagues have.  It came up

20   during the June Coleman offices Special Master audit.

21   It came up during a recent Falcon audit.

22         I think anyone who actually walks the grounds

23   would agree.  Space is limited.  It's a fact, not an

24   opinion.

25      Q. Have you expressed that concern to anyone in

Paul Burton, M.D.

1  headquarters within the last two years?

2      A. You know, I've been pretty successful at

3  negotiating and navigating the psychiatrist specific

4  issues at the local level, so I'm usually able to get

5  what we need through discussions with the chief of

6  mental health, the chief medical executive, and the CEO.

7      Of course, my team is significantly smaller

8  than some of my colleagues, such as, psychology and

9  nursing, so I believe they have had more issues to

10  contend with and have raised the issue more frequently

11  than I might have above the level of San Quentin.

12      Q. And going back for a moment to the issue you

13  raised about the chief psychiatrist not having

14  administrative support reporting directly to you

15  generally, is it your understanding that's also an issue

16  at other institutions?

17      MR. CASARRUBIAS:  Objection.  Lacks foundation.

18  Calls for speculation.  Also assumes facts not in

19  evidence.

20      A. Yeah.  I've spoken directly with chief

21  psychiatrists at multiple other prisons, and they echo

22  those concerns.  It's not institution specific.  It's

23  baked into the CDCR culture.

24      Q. And you and I talked a bit about medical

25  assistants before.  When it comes to this issue of

Defendants object to 100:12 -23 as Inadmissible hearsay; lacks foundation; assumes facts not in evidence.

Plaintiffs respond that this testimony is not hearsay because it concerns a statement made by someone working for CDCR on a subject within the scope of their employment per FRE 801(d)(2)(D); and does not lack foundation or assume facts because it is following up on the witness's testimony at 95:25-96:5, 96:21-97:23.

**Paul Burton, M.D.**

1 **administrative staff reporting directly to you that**

2 **could help with, say, scheduling, have you raised that**

3 **concern with headquarters?**

4 A. Yes.

5 **Q. And what has the response been like?**

6 MR. CASARRUBIAS:  Objection.  Calls for

7 hearsay.

8 A. It depends who at headquarters you speak with

9 and what level they are at.  Some people have put forth

10 proposals to remedy the situation.  I think a lot of

11 people acknowledge it as an issue.

12 Typically, the dance that is played is

13 headquarters says the local CEO has got to figure it

14 out, and the local CEO says headquarters has got to

15 figure it out.  So you're kind of stuck between the two

16 parents, and while each entity thinks the other one

17 should address it, nothing changes.

18 So to say it has been frustrating over the last

19 multiple years would be an understatement for those of

20 us who are chief psychiatrists within the prison.

21 **Q. And you mentioned proposals.  Who created those**

22 **proposals?**

23 A. Again, the regional psychiatrist for Region 1,

24 Al Bunn, has created written proposals that are sent up

25 his chain of command at headquarters, and similar to the

1  clinical support, I believe constructive criticisms have

2  been given, yet there is general support for that

3  concept, just no -- no tangible results as of yet.

4      **Q. So going back to the themes you've learned in**

5  **these exit interviews, are there any others?**

6          MR. CASARRUBIAS:   Objection.   Calls for a

7  narrative.

8          A. Yeah.   You know, I think most of the docs, the

9  psychiatrists, who are leaving San Quentin are doing so

10  in good standing.   So there's a lot of positive stuff

11  that's brought up, too.   They -- they enjoy the

12  collegiality amongst the psychiatrists.   We don't try to

13  play a heavy hand from a supervisor perspective.   I

14  believe they appreciate that.

15          Most of the psychiatrists that work there, it's

16  not just a job.   It's also a mission.   So there's mixed

17  feelings with them leaving it because they truly enjoy

18  their job.   And, as mentioned, there's been promotions

19  and retirements after many years of service.   So there's

20  been a lot of happy endings, if you will.   So typically

21  there's more positive feedback than constructive

22  criticisms or negative feedback, so that also comes up

23  in -- in our discussion.

24          There's a little frustration with our

25  electronic medical record system, but nowadays that's

1   par for the course.  A lot of physicians don't enjoy

2   their EMR system, whether they work in corrections or on

3   the outside.

4       Q. Do people ever complain about salary in these

5   exit interviews?

6           MR. CASARRUBIAS:  Objection.  Lacks foundation.

7       A. I can't recall anyone complaining about that in

8   an exit interview.

9       Q. Have you heard complaints in other contexts

10  from your staff about salary?

11      A. Well, there's been a lot of discussion about

12  salaries in 2023.  Some of that discussion likely

13  involves complaints or not being satisfied with the

14  salary.

15          However, a lot of those discussions are likely

16  influenced significantly by ongoing labor union

17  negotiations and stalled efforts, and it's my

18  understanding that pay increases, salary increases, are

19  central to those stalled efforts.  So right now, it's a

20  rather intense, one could probably say polarizing,

21  topic.

22          Fortunately, as a chief psychiatrist at a

23  prison, they give us no authority over what we pay our

24  staff.  These are statewide decisions, so I'm

25  comfortably immune from ultimately making that decision,

1  so I can offer my staff with support as the statewide

2  process plays itself out.

3          And I believe the clinical positions that have

4  lower salaries from psychiatrists, psychologists and

5  social workers in particular, I probably heard more

6  complaining from them than I have from the

7  psychiatrists.  But everyone is keyed into this hot

8  topic right now.

9      **Q. And in the past year, have you had any**

10  **psychiatrists leave San Quentin who didn't receive a**

11  **promotion or were retired?**

12          MR. CASARRUBIAS:  Objection.  Compound.

13      A. We can take that one by one.  So that were

14  promoted in the last year, it's -- let me think back.

15  Give me a second.

16      **Q. Let me clarify my question to save your time.**

17      A. Okay.

18      **Q. Has anyone in the past year left CDCR of the**

19  **psychiatrists you manage and who didn't retire?**

20          MR. CASARRUBIAS:  Objection.  Still compound

21  and vague.

22  BY MS. HARROLD:

23      **Q. You can answer the question if you understand,**

24  **Dr. Burton.  If not, I'm happy to further clarify.**

25      A. So just to clarify, the only psychiatrists

1  you're interested in are those who did not retire and

2  did not leave CDCR, whoever is left after we exclude

3  those two groups?

4       **Q. My apologies.  I probably asked it unclear.**

5       **Has anyone left -- have any psychiatrists left**

6  **San Quentin to work for a different company or**

7  **organization in the last year?**

8       A. Yes.  We have had one.

9       **Q. And where did they go?**

10       A. They continued with State of California, but

11  they promoted to the Department of State Hospitals.

12       **Q. Thank you.**

13       **Are you responsible for managing the day to day**

14  **of the psychiatrists' work schedule?**

15       A. It would depend on what you mean by work

16  schedule.  Could you clarify that question?

17       **Q. Yeah.**

18       **Are you in charge of the typical schedule a**

19  **psychiatrist would keep, a daily schedule?**

20       A. Yeah.  Ultimately I'm responsible for when they

21  start work and when they end work.

22       In regards to the daily schedule of patients,

23  their patient line or the caseload patients they are

24  seeing that day, I typically would not review or approve

25  each day of patients.  We would trust the psychiatrist

1  to manage that, unless they had any challenges or

2  difficulty with that, and then we would certainly offer

3  assistance.

4      Q. Thank you.

5          And when a psychiatrist leaves, what do you do

6  as a manager to address their remaining caseload?

7          MR. CASARRUBIAS:  Objection.  Lacks foundation.

8      A. Well, in addition to pretty intensive

9  recruitment efforts, the caseload would be divided up

10 amongst the remaining psychiatrists, and we've had

11 pretty good results from getting temporary registry

12 psychiatrist support, and the registry psychiatrists

13 who, again, don't work for the department but are

14 contracted to provide temporary psychiatric services,

15 once they are on-boarded, they would also assist in

16 managing the clinical needs of the patients on the

17 departed psychiatrist's caseload.

18     Q. Did CDCR implement a 15 percent pay increase

19 for mental health staff working in the PIPs in 2022?

20         MR. CASARRUBIAS:  Objection.  Lacks foundation.

21 Calls for speculation, and it's also outside the scope

22 of the deposition, so the deposition is limited to

23 outpatient care.

24 BY MS. HARROLD:

25     Q. This is relevant, Dr. Burton.  If you remember

Paul Burton, M.D.

Coleman vs.
Newsom

1       the question, you can answer it.

2           A. Yes.

3           Q. And this applied to San Quentin's PIP?

4           MR. CASARRUBIAS:   Same objections.

5           A. Yes, it did.

6           Q. Have you lost anyone from the -- lost any

7       psychiatrists from the outpatient side who moved over to

8       the PIP side because of this -- this change?

9           A. No.  San Quentin tends to be rather -- rather

10      adaptive, so we've been able to take that change in

11      stride and haven't lost any psychiatrists.  If

12      psychiatrists wanted to work inpatient, we gave them the

13      opportunity to do so.  If they no longer wanted to work

14      inpatient or wanted to continue to be exclusively

15      outpatient, we gave them the opportunity to do so.  It

16      has not been a major issue at San Quentin.

17          Q. Are there things San Quentin has done to help

18      retain staff that you think other institutions could be

19      doing?

20          MR. CASARRUBIAS:   Objection.  Calls for a

21      narrative.

22          A. Yeah.  I think the psychiatrists know that I

23      have their best interest in mind, that I will fight for

24      them and their interest and their patients, and people

25      appreciate that; I've got their back; I trust them; they

Defendants object to 107:17 - 109:11 as Lacks foundation; speculative.

Plaintiffs respond that this neither lacks foundation nor is speculative because it is based on the witness's experience managing psychiatrists and his exit interviews (see 17:6-16, 20:12-19, 97:2-15). Furthermore, objections for lack of foundation and calling for speculation were not asserted and thus are waived per FRCP 32(d).

Page 107

 1   trust me because we're all in this for one primary

 2   objective, and that is to provide outstanding

 3   psychiatric care to a population that definitely needs

 4   it.   That's been our overarching mission, and we have

 5   been able to hire like-minded individuals, so having

 6   everyone on the same page and working hard for the same

 7   reason makes a big difference within a environment as

 8   unique as California prison.

 9           I think because our recruitment efforts have

10   yielded more results than other facilities, our

11   caseloads are quite reasonable, relatively speaking.  We

12   do not typically have to have one psychiatrist with two

13   or three caseloads.   They have the caseload that was

14   designed by the program guide, and when people are not

15   overworked, they typically get more fulfillment out of

16   their work, they are happier, they have a little bit

17   left in the tank at the end of the day, there's better

18   work/life balance, and the morale is good, and all those

19   things usually lead to better retention.

20           In addition, San Quentin tends to be, from a

21   square footage perspective, rather condensed.   A lot of

22   the doctors work in the same building or a quick walk

23   from one building to another, so we're allowed to have a

24   lot of in-person team meetings.   We don't outsource any

25   of our psychiatric care to telepsychiatry.   It's really

Defendants object to 109:12 - 110:16 as Inadmissible hearsay; lacks foundation; speculative; overbroad.  The witness clarified at 109:24 that his response was based on what he's heard from unidentified third party hearsay.

Plaintiffs respond that this neither lacks foundation or is speculative because it is based on his experience managing psychiatrists and his exit interviews (see 17:6-16, 20:12-19, 97:2-15); is limited to his experience; and is not hearsay because it concerns a statement made by someone working for CDCR on a subject within their scope of employment per FRE 801(d)(2)(D). Furthermore, counsel did not assert objections for lack of foundation or calling for speculation as to 109:20 – 110:16 and thus those objections are waived as to those portions of the testimony per FRCP 32(d).

1    an under-one-roof perspective, and that helps with team

2    building and team morale.  When you realize your

3    teammates work in the same area as you, they go through

4    the good, the bad, and the ugly alongside you, it really

5    helps just to have people in close proximity because

6    there's intangibles in any working environment.  There's

7    the work, but then there's the collegiality that can

8    form in between the lines of the work within the work

9    environment, and I think we do a pretty good job at

10   fostering that level of collegiality at San Quentin.

11   I'm not sure how they are doing at other prisons.

12       Q.  **In your experience as chief psychiatrist,**

13   **whenever staffing levels are lower for mental health**

14   **positions, does that have any impact on patient care?**

15       MR. CASARRUBIAS:  Objection.  Lacks foundation.

16   Calls for speculation.

17       A.  And could you clarify, when you say "mental

18   health positions," is that psychiatry, other positions,

19   or all of the above?

20       Q.  **Let's start with all of the above.**

21       MR. CASARRUBIAS:  Objection.  Overbroad.

22       A.  Yeah.  I think although at San Quentin it's

23   relatively minimized compared to other prisons, from

24   what I've heard, yeah, when you have fewer

25   psychologists, social workers, and psychologists, it --

**Paul Burton, M.D.**

1   it can directly impact patient care in a negative way.

2   **Q. In what type of negative ways?**

3   A. Clinical sessions are shorter in duration.

4   Perhaps patients aren't seen as frequently as they might

5   be; you know, still within program guide requirements,

6   but there's -- there's a lot of gray area between 1 day

7   and 90 days for a CCCMS patient, for example.

8   If there's fewer psychologists and social

9   workers, their paperwork burden may go up significantly,

10  so they are doing more charting than they are patient

11  time, direct patient care.  That can influence a variety

12  of things, such as, morale.  And whether it's an

13  inpatient unit or an outpatient clinic, it's important

14  to improve staff morale.  That -- that can directly

15  impact the quality of care that's received.  Happy

16  doctors typically lead to healthier patients.

17  MS. HARROLD:  Well, Dr. Burton, I have no

18  further questions right now.  Thank you so much again

19  for taking the time out of your busy schedule to be

20  here.

21  Unless Ms. Phillips needs any clarification, I

22  think we can wrap up for today.

23  THE WITNESS:  Thank you.

24  THE REPORTER:  Would you like a copy?

25  MR. CASARRUBIAS:  Yes.

Paul Burton, M.D.                                              Coleman vs.
                                                                   Newsom

1   MS. YELIN:   We do want a copy as well.

2    (The deposition adjourned at 1:40 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Paul Burton, M.D.

Coleman vs.
Newsom

1    I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand,

8    which was thereafter transcribed by me; that the

9    foregoing is a true record of the testimony given.

10    Further, that if the foregoing pertains to

11    the original transcript of a deposition in a federal

12    case, before completion of the proceedings, review of

13    the transcript [ X ] was [ ] was not requested.

14    I further certify I am neither financially

15    interested in the action nor a relative or employee of

16    any attorney or party to this action.

17    IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19

20

21    Dated:  August 28, 2023

22

23

24    _____
       Layli Phillips
25       RPR, CRR, CSR No. 14402

1  DECLARATION UNDER PENALTY OF PERJURY

2  Case Name: Coleman vs. Newsom

3  Date of Deposition: 08/28/2023

4  Job No.: 10126078

5

6  I, PAUL BURTON, M.D., hereby certify

7  under penalty of perjury under the laws of the State of

8  **California**_____ that the foregoing is true and correct.

9  Executed this **6th**____ day of

10  **September**_____, 2023, at **San Quentin, CA**_____.

11

12

13  _____

14  PAUL BURTON, M.D.

15

16  NOTARIZATION (If Required)

17  State of _____

18  County of _____

19  Subscribed and sworn to (or affirmed) before me on

20  this _____ day of _____, 20__,

21  by_____,     proved to me on the

22  basis of satisfactory evidence to be the person

23  who appeared before me.

24  Signature: _____ (Seal)

25

Paul Burton, M.D.

```
 1    DEPOSITION ERRATA SHEET

 2    Case Name: Coleman vs. Newsom
      Name of Witness: Paul Burton, M.D.
 3    Date of Deposition: 08/28/2023
      Job No.: 10126078
 4    Reason Codes:  1. To clarify the record.
                     2. To conform to the facts.
 5                   3. To correct transcription errors.

 6    Page  39   Line  21   Reason  3

 7    From  CCCMS at EOP        to  CCCMS to EOP

 8    Page  44   Line  23   Reason  1

 9    From  physicians, but that   to  strike "but": physicians, that

10    Page  47   Line  21   Reason  1

11    From  physician           to  position

12    Page  51   Line  21   Reason  1

13    From  EKG, tests.         to  EKG test.

14    Page  95   Line  11   Reason  1

15    From  not like going forward,   to  not like, going forward

16    Page  99   Line  20   Reason  3

17    From  offices             to  Office of

18    Page  ____  Line  ____  Reason  ____

19    From  _____    to  _____

20    Page  ____  Line  ____  Reason  ____

21    From  _____    to  _____

22    Page  ____  Line  ____  Reason  ____

23    From  _____    to  _____

24    Page  ____  Line  ____  Reason  ____

25    From  _____    to  _____
```

**Page 114**

Paul Burton, M.D.

```
 1    DEPOSITION ERRATA SHEET

 2    Page _____ Line _____ Reason _____

 3    From _____ to _____

 4    Page _____ Line _____ Reason _____

 5    From _____ to _____

 6    Page _____ Line _____ Reason _____

 7    From _____ to _____

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    PB ____ Subject to the above changes, I certify that the
             transcript is true and correct
23    _____ No changes have been made. I certify that the
             transcript  is true and correct.

24            _____

25            PAUL BURTON, M.D.
```

Paul Burton, M.D.

---

**-**

**--ooo--** 5:3

---

**0**

**0.00** 30:12 34:23

---

**1**

**1** 26:18,21 101:23
 110:6

**1.00** 29:13

**1.35** 34:17,20

**1.5** 38:21

**10:19** 5:2

**11:12** 37:11

**12** 11:7

**12:10** 68:15

**14** 11:7 12:5

**14402** 5:6

**15** 106:18

**16** 14:19

**1:40** 111:2

**1st** 33:10 63:25

---

**2**

**2000** 13:4

**2001** 11:14

**2004** 13:4,5

**2008** 12:21,25

**2009** 11:16 12:25
 13:6

**2010** 11:19 12:22

---

13:7,22 14:2

**2011** 11:19,22 12:23

**2013** 12:3

**2014** 11:10 12:6

**2015** 14:3 41:25 49:8
 50:6 52:14

**2016** 41:25 49:8 50:6
 80:10

**2017** 18:7 88:17

**2018** 88:21

**2019** 88:23

**2020** 42:7 89:5

**2021** 42:7

**2022** 9:7 15:24 17:4,
 13 19:6 21:1,3 63:11
 65:3 106:19

**2022-'23** 65:20

**2023** 19:7 27:18
 28:19 29:2,15 30:17
 33:17 36:13 37:2,22
 38:6,15 66:13
 103:12

**2602** 19:1

**2604** 19:1

**28-year** 94:5

---

**3**

**3** 74:23

**30** 52:3,11

**31st** 27:18

**330** 79:23

**340** 79:23

---

**4**

**4.0** 32:15

---

**5**

**5** 27:23 74:24

**5.00** 34:16

**50-bed** 16:23

---

**6**

**6.35** 34:25 35:3,15,18

**60** 74:22

---

**7**

**7.8** 32:25 33:13

**7.80** 33:3

**7898** 26:8 27:16

---

**8**

**81** 35:19,21

---

**9**

**9.7** 94:1

**90** 52:12 110:7

---

**A**

**a.m.** 5:2

**abbreviation** 28:5

**able** 7:2 8:3 16:20
 28:9 51:3 61:18
 66:13 77:25 94:14
 99:5,8 100:4 107:10
 108:5

**absence** 44:1 82:16
 96:22

---

**absent** 79:21

**absolutely** 7:17 59:5

**academic** 57:23

**accelerated** 88:23

**acceptable** 81:21

**accepted** 55:25 64:1,
 12,18

**accepting** 78:14

**accommodate** 8:9

**account** 61:13

**accustomed** 84:7

**acknowledge** 6:23
 67:9 101:11

**acronym** 8:22,25
 9:14 18:20

**ACSS** 14:7,24

**Act** 85:3

**acting** 9:24 10:8
 15:18 19:16 25:16,
 23 31:8 48:18

**action** 27:9

**active** 47:8

**actively** 14:21 78:13
 96:8

**activities** 16:21

**activity** 44:13,23

**actual** 31:17 41:7
 54:12 68:4 69:23
 83:22

**adaptive** 107:10

**add** 51:25

**added** 90:19

**addition** 21:19 22:16
 42:25 43:7 52:6
 69:10 80:23 87:2
 95:25 96:22 106:8

---

108:20

**additional** 32:5 84:5 89:8,22 90:16,22 91:2 93:1 96:18

**address** 101:17 106:6

**adjourned** 111:2

**adjustment** 62:7

**administration** 16:7 27:7 51:14 95:14

**administrative** 18:8 20:21 46:19 90:15 96:23 97:14,21 98:1 100:14 101:1

**administratively** 96:2,15,21

**administrator** 18:24

**admit** 40:8

**admits** 39:18

**Adrienne** 5:14 6:9

**advertised** 85:25

**advocated** 45:6

**affairs** 14:5

**affiliations** 57:22

**afford** 61:18

**agency** 69:8 76:19 87:3,22 88:10,11

**aggregate** 35:8

**ago** 15:25 22:4 41:24 45:23 67:3 80:9 81:2 85:3 93:23 94:14

**agree** 45:19 91:15 99:23

**agrees** 75:18

**ahead** 10:6 32:5 37:8 44:8 68:14 94:16

**AI** 48:12 49:21 101:24

**allocate** 41:10

**allocated** 28:1,19 29:1,16 30:18 32:20, 25 33:5,14 64:24

**allocating** 47:9

**allocation** 36:5 38:7 45:7

**allocations** 31:1,3 44:25 46:12 90:22

**allowed** 108:23

**allowing** 76:10,11

**allows** 39:14 52:18

**alongside** 24:15 109:4

**alternate** 79:9

**Amar** 49:25

**ambiguous** 66:25

**ameliorate** 44:17

**American** 14:10 79:7 83:1

**amount** 61:20 70:14 85:5 89:16 90:7

**analyst** 18:21

**answer** 6:25 7:8,16 8:3,11 10:21 14:17 15:3 17:7 18:2 30:23 31:4 36:3 41:15 49:6 53:18 55:11,19 66:2 79:21 83:9,10 104:23 107:1

**answered** 17:12 65:25

**answers** 75:16,18

**anyway** 66:15

**anyways** 7:7

**apologies** 105:4

**appear** 32:19

**appears** 88:21

**applicable** 80:4

**applicant** 55:3,16 56:6 62:15 63:2,12, 19,20,23 64:12,14 65:3 66:6,12,19 69:25 70:9 80:12,18, 20 81:1,4,15

**applicants** 21:10 54:24 55:8 56:24 67:15 71:18 72:5 78:23

**application** 15:14 56:17

**applications** 56:2

**applied** 18:6 107:3

**apply** 55:8,13

**applying** 63:3 72:11

**appointed** 10:11

**appointment** 43:6

**appointments** 42:24 52:7,9 97:6

**appreciate** 16:14 75:10 102:14 107:25

**approach** 16:12 77:5 78:6

**appropriate** 39:5

**approval** 46:13

**approve** 64:22 105:24

**approved** 82:6

**approximately** 12:25 22:3 25:3 41:25 45:23 56:22 80:10 85:6

**area** 56:11,12 58:19

60:4,9,12,15,16,17 61:1,12,15,19 109:3 110:6

**areas** 40:1 71:13 93:17

**asked** 8:10 17:11 65:25 68:5 105:4

**aspects** 51:4 54:11 73:4,17

**assessment** 54:8

**assigned** 53:2 89:5

**assignment** 10:14

**assignments** 76:21 77:1

**assist** 19:14 42:18 51:2 60:4 70:20 78:7 87:1 90:10,17 91:7,8 97:15 106:15

**assistance** 106:3

**assistant** 41:10 42:17,21,23 47:21 49:1 52:16 53:1,2 89:9

**assistants** 41:3,5,7, 20 42:2,6,11,25 43:8,17 46:15,22,24 49:18 50:6,13,15,23 51:1 52:8,22 53:5,13 87:1 96:19 100:25

**assisted** 50:17

**associated** 44:16

**associations** 57:14

**assumes** 33:8 35:11 36:1 38:11 41:13 46:16 60:21 95:17 100:18

**attached** 91:24

**attend** 24:14

**Paul Burton, M.D.**

attended 45:17

attendees 59:16

attending 57:18

attends 24:12 74:1

attention 56:20 85:11 86:8

attestation 69:16

attorney 5:16 6:9

attribute 87:21 88:14

audit 99:20,21

Australian 58:20

authority 20:17 22:16 103:23

available 12:1 52:13 95:21 98:10,17

avenues 59:2

average 56:23 93:24 94:9

aware 8:1 70:1

awareness 47:18

---

**B**

B-U-R-T-O-N 6:19

Bachelor's 13:3

back 11:4 37:13 49:13 53:11 56:1,8 58:25 71:8 76:5 82:7 100:12 102:4 104:14 107:25

background 8:17 11:4

bad 58:23 109:4

Bagul 48:18

baked 100:23

balance 108:18

ballpark 79:15

balls 67:20

Bargaining 14:19

barriers 54:4 58:7

base 36:10

based 14:2 27:10 38:2,3 40:6 55:22 59:24 75:15,18 78:15

baseline 82:13

basic 42:19 69:12

basically 90:23

basing 78:9

basis 9:20 10:12 17:2 19:24 21:16,25 22:22 23:19 40:12 50:25 51:18 52:5 83:17 85:2 93:7

Bay 56:12 58:19 60:3, 4,9,11,15 61:1,12, 14,19

bear 28:3

bearing 30:14 32:22

becoming 21:3

bed 39:12,22

began 11:22

beginning 5:11 9:7 11:22 15:24 54:23

belief 78:9

believe 9:8 14:9 17:13 18:4,21 46:9 47:13 48:7,24 49:24 60:7 63:16 65:19 78:3,7 81:10,11 89:7 91:14 96:7 100:9 102:1,14 104:3

benefit 84:19,21

85:24 90:16

benefits 78:22 84:22

best 7:25 11:13 18:4 30:20 31:10 36:11 41:24 44:17 49:19 70:24 83:4,18 107:23

better 15:6 24:3 25:10 53:3 54:21 97:10 108:17,19

Bien 5:16

big 60:7 70:1 108:7

bit 8:16 9:16 16:15 21:17 40:25 50:5 53:7 58:13 71:22 73:6 80:5 87:4 91:20 94:18 100:24 108:16

blood 51:17

board 12:22,23

bonus 84:17

bonuses 84:14

bosses 68:5

Boz 48:16

break 8:11,12 26:11 37:9,12,14 58:7 68:14,16 94:16,18, 22

breaks 8:7,8 37:8

Bridgett 5:20

brief 6:13

briefly 26:9

bright 85:12

bringing 96:7

broke 36:22

brought 76:25 85:1 86:3,11 96:3 102:11

bugging 51:8

building 108:22,23 109:2

Bunn 48:12 49:21 101:24

burden 110:9

bureaucracy 72:22 73:18

bureaucratic 71:12

Burton 6:1,11,18 27:25 30:5,23 32:1,7 34:9 36:3 37:16 53:12 55:19 65:15 68:18 72:4 94:24 104:24 106:25 110:17

busy 6:11 97:19 110:19

busywork 44:24 51:5 54:10

buzz 87:19

---

**C**

C-H-U 55:2

calendar 58:18

California 5:5,22 8:19 12:21 13:13,16 14:8 48:13 57:16 60:15 64:20 69:20 77:15 85:4,19 86:13,16 87:8 105:10 108:8

call 41:17

called 6:2 26:22 27:15

calls 14:15 15:1 17:24 24:24 29:19 30:3,20 31:10,20 33:16 34:15 35:12,

---

25 36:15 37:4 46:1
53:15 54:17 57:9
61:3 62:25 66:10,25
67:25 71:5 78:10,19
79:18 82:23 83:7
84:16,25 86:22
88:15 90:2 93:14
100:18 101:6 102:6
106:21 107:20
109:16

**candidate** 65:15,17

**candidates** 20:13
56:4 74:2,8 75:25

**cap** 85:24 86:4

**capability** 43:1

**capped** 85:4

**caps** 79:23

**care** 13:20 15:11,15
20:18 23:22,23
24:14,15 39:6,7,9,
14,18,22,23,25 40:9
41:8 43:22 44:2,14
45:1 51:4,16 53:6,
14,21,23 59:19 66:4
73:9,10,12 75:20
79:4,7 87:9 89:4,13
92:14,20 97:3,12
98:21 99:12 106:23
108:3,25 109:14
110:1,11,15

**career** 64:25 77:10,13
78:4 94:6

**Casarrubias** 5:18,19
10:19 14:14,25 17:5,
11,24 24:23 25:21
26:9,13 28:20 29:10,
18 30:2,11,19 31:9,
19 32:3 33:2,7,15
34:5,11,14,19,22
35:2,11,17,20,25
36:14,21 37:3,10
38:11 41:4,12 44:8

46:1,16 49:3 53:8,15
54:16 55:10,17 57:1,
9 59:8 60:6,21 61:2
62:1,8,24 64:7 65:5,
8,24 66:10,24 67:24
68:3,25 70:6 71:4,24
74:4,10 76:1 78:10,
18 79:18 82:10,23
83:6 84:15,20,24
86:5,21 88:11,15
90:1 93:13 94:19
95:4,17 100:17
101:6 102:6 103:6
104:12,20 106:7,20
107:4,20 109:15,21
110:25

**case** 5:20 26:8 38:6
76:18 99:12

**caseload** 52:17 70:12
77:1,12 105:23
106:6,9,17 108:13

**caseloads** 108:11,13

**cases** 89:20

**catalyzed** 88:23

**catch-up** 84:9

**catching** 84:3

**caught** 83:24 89:18

**causes** 67:21,23

**cc** 72:18

**CCC** 77:19

**CCCMS** 39:21 52:11
77:12,19 110:7

**CCHCS** 97:23

**CDCR** 5:19 7:5 8:22,
25 11:5,12,23 13:18
14:13 17:21 27:7
50:4,20 58:12,23
61:23 62:3 63:3 71:2
72:12 77:18 79:5
83:24 84:4,13,18

85:23 86:2,18 87:11
89:13,24 90:8 91:10
92:2,6,11 93:11
94:4,6 96:3 97:22
99:18 100:23 104:18
105:2 106:18

**celebrated** 94:5

**cell** 30:12 33:3 34:16,
17

**centers** 57:22,23

**central** 23:20 24:8,10
55:2 56:16,21 62:17
63:16 64:10 67:3,8
68:7,9 71:17 72:22,
25 103:19

**centralized** 24:10
69:8 73:17

**CEO** 19:12 20:17
22:16 24:15 40:20
46:4,6 64:5,22 66:4,
17 72:24 81:7 99:14
100:6 101:13,14

**CEO's** 66:8

**CEOS** 80:22

**certainly** 13:10 17:8
49:12 52:7 54:18
79:6 83:11 86:24
87:19 90:10 99:13
106:2

**certified** 5:5 12:22,23

**cetera** 20:15 86:12

**chain** 47:12 48:8
101:25

**chain-of-command**
97:4

**chair** 89:6

**challenges** 19:14
79:6 84:1 106:1

**challenging** 61:15

97:13

**change** 38:10,14,17
46:11 47:20 60:2
77:11,14 86:15,16,
17,18 87:16 107:8,
10

**changed** 55:1 59:13,
14 72:20

**changes** 46:13 86:7,
13 89:23 101:17

**channels** 57:6

**charge** 105:18

**chart** 43:5 89:17,18
98:3

**charting** 110:10

**chat** 26:2

**check** 75:13

**checking** 20:15 42:18

**checks** 55:23

**Chen** 25:8

**chief** 9:3,5,8,9,22,24
10:8 11:9 12:7,8
13:15 15:7,9,17,22,
23,25 16:2 17:4
18:13 19:17 20:9,11,
24 21:3 22:18,20
25:4,5,14,16,20
28:18 29:4,6,16,20
30:1,5,7,17 40:14,17
41:19 45:13 46:4,6
48:1,3,9,17,18 50:3
56:3 68:2 69:25
80:17,24 81:3,8
88:24,25 90:19
93:20 96:24 97:24,
25 99:5 100:5,6,13,
20 101:20 103:22
109:12

**chiefs** 9:11 24:13
45:17 48:14 77:23

97:22

**choices** 79:11

**choose** 39:20 95:13

**CHU** 55:2 62:19,22 63:18,21 67:15 68:5 69:24 72:7,14,19 73:3 81:5,10

**circling** 30:1

**cite** 60:19

**city** 13:20

**civil** 11:8,22 12:16 50:13 63:14 73:9 86:1

**clarification** 42:9 88:5 110:21

**clarify** 7:16 25:20 40:23 42:3 49:7 59:11 63:24 64:9 74:7 88:2 104:16,24, 25 105:16 109:17

**class** 5:15 6:10 10:9, 17 27:8 31:15,16 38:2

**classification** 11:3 12:3,8 21:2,19 31:18 86:14

**classifications** 11:8 12:16 23:23 50:14 85:21

**classify** 31:22

**cleaning** 71:11

**clear** 75:6

**clearance** 69:11

**clearances** 64:15

**clearly** 5:8

**clerk** 18:25

**clinic** 50:11 52:19

84:2 110:13

**clinical** 11:20 19:25 20:21 22:9,10 38:5, 19 43:1,6,25 46:19 47:21 49:9,16 50:12 52:6 76:20 79:2 86:23 93:9 96:20 102:1 104:3 106:16 110:3

**clinically** 39:5 51:13 96:1,14,16,17

**close** 14:3 57:21 109:5

**CMF** 48:22

**co-chief** 76:22

**Code** 19:1

**cohesion** 97:19

**Coleman** 5:15 6:10 26:8 27:8,11 38:2 99:20

**collaborating** 17:1

**collaborative** 16:11

**collaboratively** 16:4

**collateral** 20:15

**colleague** 26:4 52:17

**colleagues** 21:8 41:8 43:13 57:20 69:20 78:23 99:4,19 100:8

**collective** 48:8 77:2

**collegiality** 102:12 109:7,10

**column** 29:4,24 32:23 35:4,13

**columns** 33:22 34:2

**come** 18:5,7 23:9 50:19 56:24 74:16 75:12,14 87:5 92:2 93:8 95:19 98:25

**comes** 44:19 64:14 72:14 100:25 102:22

**comfortable** 96:7

**comfortably** 103:25

**coming** 44:15 46:11 77:6

**command** 47:12 48:8 101:25

**committee** 99:6

**commonly** 52:2

**communicating** 17:1

**communities** 60:8

**community** 58:7,8 79:3 84:2

**commute** 60:19 61:21 78:20

**commutes** 61:19

**companies** 79:4

**company** 105:6

**compared** 84:2 109:23

**competition** 61:9

**competitors** 82:18 83:13,20,25

**complain** 103:4

**complaining** 103:7 104:6

**complaints** 95:16 103:9,13

**complete** 80:19

**completed** 13:6 64:17 92:8,17,21

**completely** 36:10 77:17

**complexities** 75:10

**compound** 104:12,20

**compromises** 99:8

**concept** 102:3

**concern** 45:21 86:3 99:25 101:3

**concerns** 43:16,20 45:3,11 46:7,15 47:1,4 75:24 76:2 84:6 99:17 100:22

**concluding** 13:22

**conclusion** 12:6 63:13

**condemned** 11:25 39:3 40:8,10

**condensed** 108:21

**conditions** 86:19

**conducive** 15:14

**conduct** 95:2

**conferences** 57:17, 19

**confident** 83:21 89:19,21

**connect** 56:6

**Connected** 63:15

**consent** 43:4 51:23

**considerably** 67:8

**considerations** 78:16,17 99:13

**considered** 85:5

**considering** 61:14 72:11

**consistent** 21:16,25 33:4,13 35:22 36:4 51:15 71:16

**consistently** 72:9 85:17 96:4

Index: choices–consistently

constantly 16:25

constructive 47:15
102:1,21

contact 23:10 66:16

contacted 63:11

contend 100:10

context 31:5

contexts 103:9

continue 59:25
107:14

continued 34:6
105:10

continuity 39:6,14
40:9

continuously 12:21

contract 91:25

contracted 106:14

contracts 90:9,14
91:17,21,22,23,24
93:6

contrast 92:19

contributed 87:17

control 76:19 77:21

conversation 17:15,
22

conversations 17:10
46:17,21,25 49:1,10,
13,16,20 50:1 91:13

copy 110:24 111:1

correct 7:15 18:21
25:17,18 26:23
30:18 32:25 37:17
40:22 49:2 57:4 64:6
65:18 66:9 68:19,20
91:19 94:25 98:7,8

correctional 20:22
58:5 75:3,10 83:25

87:5 92:14

corrections 5:22 8:20
69:5,14 77:16 86:17
87:3,8 93:7 103:2

correctly 16:15 85:25

cost 61:13,25

cost-of-living 62:7

counsel 5:11 7:5,7
65:6

county 13:20 60:11
78:21

couple 15:6 24:3
34:25 49:24 54:21
58:18 81:22 93:19
94:3

course 27:6 78:14
100:7 103:1

court 7:1,22 18:24,25
19:1,2 27:12

covered 77:4 93:16

COVID 42:6

crafting 44:16 54:9

cramped 98:15

create 17:3

created 9:8 18:18
19:4,5,6,8 89:9,21
90:17 98:14 101:21,
24

creates 89:11

creating 17:23 19:12

creation 89:8 91:9

creative 19:12

credentialed 64:18

credentialing 64:15
69:2,8 92:5

Creek 48:24

criminal 69:12

crisis 39:12,22

critical 69:10 92:15

criticisms 47:15
102:1,22

crunch 98:25

crunched 93:22 94:8

crunching 97:6

CSP 48:23

CSR 5:6

cultural 89:15

culture 87:4 89:17
96:3,9 100:23

current 8:18,19 9:3
14:12,21,23 19:12
23:21 25:2 32:15
40:6 41:5 48:18
56:13 58:4 70:13,15,
16 72:24 73:8 80:21

currently 9:18 10:8
12:20 18:13,16
25:16 31:14 32:8,13
40:10 43:7,18 91:25
98:2

curriculum 91:3

CV 55:5 69:6 74:12

___

**D**

___

daily 9:20 19:24
50:25 51:2 105:19,
22

dance 101:12

dashboard 97:10

dashboards 50:18

data 23:5,8,9,13 31:8
54:3 75:22 97:7

date 45:22 66:16
69:23 70:9

dates 52:9 70:20
71:3,7

David 5:19

day 27:13 40:1 63:15
67:4 87:13 96:11
105:13,24,25 108:17
110:6

days 11:17 52:11,12
72:17 82:5 110:7

DEA 12:24

deal 84:4

dealing 79:4

death 11:25 39:3

decade 39:1 94:1

decade-long 94:13

December 11:10 12:6

decided 14:3

decision 17:3,8,10
22:18 41:9 76:21
103:25

decision-making
87:14

decisions 20:12
76:24 79:11 87:16
99:15 103:24

decreased 67:2

decreases 61:20

deeper 60:18

default 44:3

defendants 5:19
27:12

Defendants' 26:22

defined 40:7

definitely 11:14 108:3

Index: constantly–definitely

definition 74:5

definitive 79:21

degree 13:3,5,10
43:24 45:7 46:12
50:11 52:15 53:20
63:6 67:19 69:22
81:15 82:19

degrees 13:1

delay 63:4,7,8,9

delayed 6:14

delays 67:23 73:19

delivery 51:4 89:2
96:10

demand 61:11 99:10

demonstrate 50:10

Dentists 14:11

departed 106:17

departing 94:10 96:5

department 5:22 8:20
12:14 69:5,14 73:2,5
77:15 86:14,16 87:3,
8 93:6 105:11
106:13

departures 94:6,7

depend 71:6 74:5
84:17,21 105:15

depending 73:25

depends 16:9 101:8

deponent 6:2

deposition 6:22
26:18 106:22 111:2

depositions 26:4

deputy 17:20 48:9
89:6,9 91:14

describe 11:12 13:8
15:18 17:19 21:17
37:23 50:5 53:7

72:13 73:6 80:5
91:20 96:15

described 11:11
21:20 50:8 59:12
66:6

describing 24:17
56:25

designed 108:14

desirable 93:4 98:18

desperate 59:1

destigmatize 58:5

detail 37:23

determine 74:14

determined 38:4

developing 16:11

development 92:16

diagnoses 44:15

diagnosis 44:17

diagnostic 52:3 54:8

difference 108:7

different 10:23 11:8
13:20 16:18 23:11,
14 24:19 45:12
46:18 47:6 52:1,3
58:18 77:17 78:3,4
79:6,11 91:14 98:25
99:7 105:6

differential 83:19

differentials 79:22

differently 9:11

difficult 55:11

difficulties 6:14
80:21

difficulty 68:8 106:2

direct 15:11 88:21
97:4 98:3 110:11

directly 53:21,23,24
79:1 81:5 88:25
98:1,2 100:14,20
101:1 110:1,14

director 16:22 17:20
48:9 89:6,9

directors 91:15

disadvantages 60:25

disagree 46:8

discernible 5:9

disciplines 98:21
99:7,11

discuss 23:21 57:14
73:13 99:13

discussed 73:7 76:8

discusses 81:4

discussion 26:16
63:2 81:7 99:4
102:23 103:11,12

discussions 91:3
100:5 103:15

dissipated 98:22

divide 36:7

divided 91:23 106:9

division 15:19 52:3
97:1

divisions 24:14 73:12

Docket 26:7

docs 45:9 73:10
102:8

doctors 36:17 57:2,7
108:22 110:16

document 26:25
27:2,16 29:12 30:21
31:4,11 33:1 34:6,
13,16,17

documents 27:8 31:2

64:16

doing 59:24 63:5 79:1
93:12 102:9 107:19
109:11 110:10

dollar 91:23,25

dollars 90:14 91:24
92:13 93:5

dozen 56:22

dozens 96:25

Dr 6:11 17:18,20
27:25 30:5,23 32:1,7
34:9 36:3 37:16
48:16,17,18,20 50:2,
3,7,15 53:12 55:19
65:15 68:18 72:4
94:24 104:24 106:25
110:17

draw 75:21

drawback 61:12

drop 26:2

dropped 26:7 67:20
94:9

DSH 58:20 94:4

due 52:8,9 61:24

dues 14:7,9

duly 6:3

durable 89:12

duration 110:3

duties 19:3 25:19
27:6 40:13 42:13,16
44:1 51:2 76:20
90:19 96:20

E

earlier 19:7 85:17
96:18

**early** 55:20 65:21 75:8 82:5

**easier** 53:24 60:16 82:21 84:12,18

**East** 60:11

**echelon** 49:23

**echo** 100:21

**ECT** 19:2

**educational** 57:22 59:23 90:3,8 91:4,6, 18,22

**effect** 7:21 51:19 73:25 85:19 86:7

**effective** 90:4,21

**effectively** 85:7 97:3

**effects** 95:22

**efficiencies** 43:23

**efficiency** 43:6

**efficient** 51:3

**effort** 7:12 47:10 58:4 73:2

**efforts** 23:1 24:1 58:10 59:12 82:17 89:22 90:11 91:8 103:17,19 106:9 108:9

**either** 59:15,23 73:13 75:19

**EKG** 51:21

**electives** 59:23 91:7

**electronic** 102:25

**eligible** 92:18

**email** 38:8 72:18

**emailed** 38:1

**emails** 67:11,15 72:16 83:16

**employed** 12:13,14 70:10,12

**employees** 12:15 76:18 85:4

**employer** 8:18,19 70:13,15,17 77:15 80:22

**employers** 61:10 75:13

**employment** 11:23 20:13,19 44:10 63:14 65:23 69:14, 19 72:12 78:13

**EMR** 103:2

**endings** 102:20

**engage** 16:21

**enjoy** 44:11 54:11 102:11,17 103:1

**ensure** 15:13 51:13, 18 67:15 69:2 73:2 89:12

**ensured** 89:2

**ensuring** 77:24 87:2

**entered** 85:16

**entire** 32:13 64:13,17 76:23 77:6 79:7

**entity** 101:16

**entrusted** 15:12

**environment** 20:22 75:3,11 77:9,17 83:25 84:7 108:7 109:6,9

**environments** 43:25

**EOP** 39:9,10,21 52:10

**equal** 98:14

**equivalent** 96:25

**essentially** 15:9

18:25 92:1

**estimate** 70:24

**estimation** 33:9 79:15

**et** 20:15 86:12

**Eve** 63:11

**event** 22:7

**eventually** 63:21 72:19

**evidence** 30:20 31:10 35:12 36:1 38:12 41:13 60:22 95:18 100:19

**evolution** 89:15

**evolved** 80:16

**evolving** 16:9

**exacerbation** 39:11

**exactly** 31:21 47:22 63:17 75:6 83:21

**exam** 51:22 69:15

**EXAMINATION** 6:5

**examined** 6:3

**example** 52:10 96:18 110:7

**excellent** 74:15

**excessive** 63:8,9

**exchange** 74:14 90:14

**exchanged** 92:13 93:6

**exciting** 85:9

**exclude** 105:2

**exclusively** 24:20 77:20 107:14

**excuse** 97:25

**execute** 44:20

**executive** 18:14 45:13 88:25 89:3 100:6

**executives** 89:4

**exempt** 85:21,23

**exhibit** 25:12 26:1,18, 21 31:24 32:19

**exhibits** 26:4

**exist** 56:14

**existed** 18:9

**existing** 19:13 70:12 91:7

**exit** 95:2 102:5 103:5, 8

**expand** 90:25 91:1

**expanded** 59:15

**expansion** 60:2 99:10

**expect** 47:14 98:24

**expected** 81:14 87:10

**experience** 21:18 22:6 39:2 40:2 58:16 59:18,21 60:1 61:16 63:4 70:7 73:20 74:17 76:10 81:24 92:13 93:5 97:24 109:12

**experienced** 59:21

**expertise** 69:21

**expired** 14:19

**explain** 9:16 17:23 38:25 44:6 63:9

**explaining** 16:14

**exploratory** 75:4

**express** 45:11,25 59:22

Paul Burton, M.D.

**expressed** 45:12,13, 15,20 46:4,25 63:12 73:14 99:25

**extend** 64:11 67:10

**extended** 20:19 67:4 79:9

**extensive** 69:7

**extraordinary** 80:20

---

**F**

**facilities** 18:8 23:14, 18 108:10

**fact** 67:18 69:6 99:23

**factor** 60:20

**factors** 58:13

**facts** 33:8 35:11 36:1 38:11 41:13 46:16 60:21 69:16 95:17 100:18

**Falcon** 99:21

**fall** 44:3

**familiar** 42:13

**family** 14:4

**far** 16:10 37:2 55:15 77:22

**fast-track** 66:14

**federal** 12:24 13:21

**feedback** 47:16 50:24 52:25 53:1 95:14 102:21,22

**feel** 59:3 83:21 96:7, 13

**feelings** 102:17

**fellow** 11:17

**fellows** 92:19

**fellowship** 13:7,17,22 92:24

**fellowships** 57:25 90:6 92:20

**fewer** 109:24 110:8

**field** 36:6 47:10 83:23 84:3

**fight** 107:23

**figure** 83:22 101:13, 15

**filed** 27:18

**filing** 27:11

**fill** 10:15 23:1 31:17 35:23 81:6 82:21 84:12,18 89:25 95:24

**filled** 12:17 19:7 28:1 29:23,25 31:7,13 33:20,25 34:10 35:1, 10

**final** 64:23 65:22 66:3,17

**financial** 84:5 90:14

**find** 70:16

**Fine** 37:10

**fingerprinting** 69:11

**firm** 5:16

**first** 6:3,16,24 29:4 42:3 55:21 66:16 80:2,8,9,11 81:22 89:1 98:4

**fiscal** 36:5 65:20,21 66:15

**fit** 74:9,11,15 75:8,19

**fits** 53:3 74:16 75:3

**five** 22:3 34:9 59:17 85:15

**flags** 75:17

**flat** 62:5

**flip** 27:22

**Florida** 13:11

**flow** 50:20 52:19

**fluid** 15:21 16:15

**focus** 14:4 16:24 23:7 51:3 54:8,10,18

**focused** 24:17,20 57:19

**focusing** 25:14

**folks** 79:1 91:14

**follow** 40:4 76:12

**follow-up** 67:11,14

**following** 20:14 54:23

**follows** 6:4

**Folsom** 48:23

**font** 28:6

**footage** 98:15 108:21

**forensic** 11:16 12:23 13:7,17 14:1

**form** 7:6 16:6 25:2 40:16 43:4 80:19,23 109:8

**formal** 20:18 63:2,21 65:16

**formally** 56:7

**former** 59:15,16 75:13

**forms** 51:22,23 69:18,21 81:6

**formulaically** 38:4

**forth** 47:15 101:9

**fortunately** 67:11 103:22

**forums** 45:16

**forward** 55:5 64:1 95:11

**fostering** 97:18 109:10

**found** 16:3 26:3 36:16 39:4 56:9 70:18 90:3

**foundation** 10:19 14:14,25 17:5 24:23 29:11,18 30:2,19 31:9,19 32:3 33:2,7, 15 34:14 35:12,25 36:14 37:3 41:4,12 54:16 55:10,17 57:1, 9 60:6 61:2 62:1,8, 24 65:24 66:24 67:24 68:25 70:6 71:4 74:4 78:18 83:6 84:15,24 86:5,21 90:1 93:13 95:4 100:17 103:6 106:7, 20 109:15

**four** 46:19 77:12 89:11

**four-week** 23:19 63:18

**Francisco** 13:13,17 14:2 56:12 60:11,15

**freed** 97:14

**frequently** 54:15 78:23 100:10 110:4

**Friday** 63:25 65:3

**frustrating** 101:18

**frustration** 102:24

**fulfilling** 58:23

**fulfillment** 108:15

**full** 98:24

**full-fledged** 92:22

**full-time** 63:14

**fully** 8:4 51:16 64:18 99:2

**fun** 58:24

**function** 18:23

**functions** 16:5

**funded** 19:11

**funneled** 47:11

**further** 89:22 90:25 93:1 104:24 110:18

**future** 17:16 89:23 90:10 91:8

—————————

**G**

—————————

**gained** 38:20

**gainfully** 70:10,12

**Galvan** 5:16

**gate** 64:15 69:11

**gates** 88:20

**gears** 40:25

**general** 60:7,13,18 75:25 102:2

**generally** 56:3 66:20 70:4 74:9 100:15

**generation** 59:20 94:12

**generations** 59:25

**getting** 63:5 66:8 68:10 83:11 106:11

**give** 36:17 58:25 70:24 74:25 75:13 76:5 77:20,21 79:20 81:12 83:22 103:23 104:15

**given** 17:13 38:5 47:16 55:23 65:16

74:23 82:17 90:24 102:2

**Giving** 76:18

**glanced** 23:15

**global** 86:13

**go** 10:6 26:9 32:5 33:21 35:6,15 37:8 44:8 66:7 67:17 68:13 73:8,12 79:11 94:16,19 105:9 109:3 110:9

**goes** 76:20

**going** 6:21 11:4 23:18 26:21 56:1 82:7 87:3 95:11 100:12 102:4

**Golding** 49:25 50:3,7, 15 88:22

**Golding's** 50:2

**good** 5:4,18 36:17 39:9 43:21 45:8,9 69:3 72:10 74:9,10, 15 75:3,8,19 78:12 82:14,15 97:18 98:12 102:10 106:11 108:18 109:4,9

**google** 79:20

**government** 69:17

**graduate** 59:17

**granted** 12:19 81:16, 18,25 82:4

**granting** 77:23

**gray** 110:6

**greases** 72:22

**great** 6:7 8:6,15 9:1 10:3 15:5 22:8 23:4 25:9,25 27:21 28:8, 12 29:7,14 30:8 34:24 35:14 37:6,11, 19 40:18,23 43:15

54:20 56:15 57:3,8 64:3 66:18 68:12 76:6 91:15 93:18 94:15

**greater** 96:3

**greatest** 56:9

**ground** 6:22 50:9

**grounds** 65:10 99:22

**groundwork** 65:12

**group** 45:15 48:1,15 58:20 70:21 77:2

**groups** 57:12 58:3 86:11 105:3

**Grunfeld** 5:17

**guess** 71:6 74:5 84:17,21

**guesstimate** 74:22

**guide** 108:14 110:5

**Gundeep** 10:2

—————————

**H**

—————————

**H-A-MS** 80:1

**habituate** 87:7

**half** 15:24 56:22 57:5 93:23 94:14

**HAM** 80:5,13,18,25 81:8,15,25 82:5,9,16

**HAMS** 80:1 81:12 82:19

**hand** 47:7 102:13

**hand-holding** 67:19

**handled** 44:25 69:7

**hands** 81:3

**hands-on** 80:18

**Hanson** 5:20

**happen** 10:16 24:21 31:15 40:3 58:15 89:23

**happened** 98:5

**happening** 17:15 25:1,3

**happier** 108:16

**happy** 8:25 94:6 102:20 104:24 110:15

**hard** 30:25 57:11 82:13,19 86:15 97:20,21 108:6

**harmed** 73:23

**Harrold** 5:14 6:6,9 9:13,15 10:20 14:16 15:2 17:6 18:1 25:22 26:11,20 27:22,24 28:9,13,22 30:4,22 32:4 33:19,24 34:8, 12 35:6,7 36:2,23 37:6,11,13,15 38:13 41:14 49:5 53:10,17 55:18 59:10 61:5 65:6,11,14 66:1 68:1,12,17 72:1 82:12 83:8 87:23 88:1,7 94:15,21,23 104:22 106:24 110:17

**head** 7:1 8:23 79:21

**headhunter** 83:16

**headquarters** 24:7,9, 11 31:21 36:6 38:9 40:7 45:14 46:14,20 47:3,5,7,8,12,22 49:1,20,23 50:9 51:8 52:3 56:4,7 62:15,17 74:8 75:25 76:4 94:4,5 100:1 101:3, 8,13,14,25

headquarters' 46:13

heads 17:17

heads-up 17:13,22

health 10:17,23 13:20
17:21 20:18 21:15
22:18,21 23:6,22
24:14,15 25:4,5,11
26:23 27:14 31:22
38:5,9,14 39:7 40:6
41:1 44:1,14 45:1
46:4,6 48:9 49:23
50:21 59:19 66:4
67:8 73:9,12 79:7
87:9 89:1,4,13
92:14,20 96:10
98:21 99:5,7,11
100:6 106:19
109:13,18

healthier 110:16

hear 65:9 79:1 80:8

heard 60:23 78:22
80:9,11 95:16 103:9
104:5 109:24

hearings 19:1,2

hearsay 17:25 101:7

heavy 102:13

held 11:11 13:24
26:16

helm 77:23

help 7:12 12:12,16
28:10 32:18 44:7,11,
17 51:10 52:8,23
58:25 61:17 68:11
71:3,12,22 72:4
76:13 78:1 83:11
86:1,19,24 87:19
91:5 93:12 101:2
107:17

helped 52:14 53:13
54:7 82:20

helpful 23:17 26:3
31:5 49:12 50:22
51:1 73:21,24 84:23
94:17

helping 42:14

helps 15:12 109:1,5

hesitancy 46:12

high 39:2 43:22 58:11
74:3,6

higher 47:13 60:9
61:13,24,25 81:22
82:22

highest 80:2,3

highlight 28:9,24

highlighted 85:12
96:4

highly 63:8 90:4 93:4

hire 66:22 71:19
108:5

hired 70:19

hires 73:1

hiring 20:4,8,17
21:11,14 22:2,14,16
23:21 24:2,8,10
54:22 55:2 56:16,21
62:17 63:16 64:11
66:3 67:3 68:7,9,22
71:17 72:23,25
73:15 79:25 80:5

historically 72:20,21
87:12

history 89:2

hold 12:18 13:1 84:8
89:20

hope 24:3 93:19

hopefully 64:25

hospital 39:19

hospitalization
39:12,13,16

Hospitals 105:11

host 78:15

hosted 58:2,19

hot 104:7

hour 8:8 37:7 68:13

hour-by-hour 17:2
93:7

HR 24:4,5,6,7,16
31:22 69:20 73:17
74:2

human 19:10 23:20
64:13,16 73:2,4

hundred 79:2

Huq 48:20

hybrid 36:8 38:24
39:23 40:15 76:8,10
77:19 78:1

---

**I**

idea 44:19 91:16 97:9

ideal 42:17

ideas 97:13,15,17

identification 26:19

identifies 56:6

illness 39:12 52:20

immediately 13:21
95:7

immune 103:25

impact 82:15 109:14
110:1,15

impede 82:16

imperative 5:7

implement 97:13

106:18

implementation
15:14

implemented 97:17

importance 72:11

important 6:24 43:24
44:12 69:2 75:9 87:4
110:13

improve 43:5 51:8
53:14 58:6 83:4
95:12 97:11 110:14

improved 50:16 51:7
53:21,22,23 59:4
67:11 82:9

improvement 87:21
88:9,12,14 97:10

improvements 71:20
87:11

improving 43:23
73:21

in-person 108:24

incentive 66:14

incentives 71:10 84:5

include 51:17,20 73:9
77:7

included 31:1 46:23

includes 32:14 33:10
64:14 69:2

including 23:14,23
48:8 49:6,17 76:25
85:21

inconsistency 67:6,
22

inconsistent 63:8

increase 106:18

increased 82:19
83:14

Index: headquarters'–increased

increases 103:18

indicate 89:17

indicated 76:25 81:1

indirectly 53:20 54:6

individual 15:16,20 16:4,17 24:1 39:10, 17,25 55:7,24 60:14 63:15 64:18 76:11

individual's 16:23

individuals 16:2,10 46:20 47:7 55:13 92:24 93:2 94:10 108:5

inefficiencies 71:11, 14

inferences 75:22

influence 110:11

influenced 103:16

informal 99:6

information 42:19 54:5 74:14

initially 80:17 81:13

initiated 63:22

initiatives 59:7

inpatient 9:6,11 11:24 16:5,22,23 32:14 33:6 38:21 39:6,18,22,24 40:5, 11 76:12 78:4 107:12,14 110:13

insidious 51:19

instance 45:25

instantaneous 72:8

instantaneously 54:2

institution 9:6 32:13 72:15 100:22

institutional 24:18 31:2 36:9 46:10 48:3,23

institutions 24:19,22 48:21 61:24 62:2,3 91:18 100:16 107:18

instruct 7:7

insurance 79:4

intangibles 109:6

intense 103:20

intensive 106:8

interacting 72:15

interest 51:4 59:23 63:13 73:15 96:6 107:23,24

interested 10:25 20:13 44:15 55:4,7 60:2 62:14 71:18 78:24 105:1

interesting 58:24

interests 78:4

internally 40:8

internship 13:14

interrupt 71:23

interrupts 88:5

interview 20:10,14,23 21:10,21,22,24 40:19 54:24 55:21, 22 56:4 64:4,9 66:22 67:3 73:16 74:3,13, 18,23 75:4,16 103:8

interviewed 67:2 73:16

interviewing 10:13 55:7 75:17

interviews 20:10 21:20 75:20 95:2 102:5 103:5

introduce 5:12

introduction 92:14

invite 72:24

involve 73:1 76:23 77:5

involved 9:11,19 16:10 17:3 18:6 20:4 21:11,14 22:1 90:13 97:5

involves 21:8 103:13

ironically 68:6

issue 81:9 99:3 100:10,12,15,25 101:11 107:16

issues 75:12,20 76:25 98:25 99:9 100:4,9

it'll 74:15

items 70:1

___

J

January 15:24 37:24

Jenny 26:5 27:22 28:9,24 29:23 30:1 32:19 33:19 35:6

job 90:19 102:16,18 109:9

jobs 70:11

join 25:4 63:23 68:24

judges 85:22

July 27:18 33:10,17 37:22,24 38:6,15 66:13

Julys 38:6

jump 6:15

June 14:20 27:15

28:19 29:2,15 30:17 65:3 99:20

___

K

keep 6:13 28:10 73:16 105:19

keyed 104:7

keys 36:16 39:4

kind 36:22 49:22 88:20 101:15

kinks 50:19

know 6:13 7:11,16 8:9 14:12,23 15:4 22:14 24:21,25 31:3, 5,16 32:7,10 34:7 43:12 55:3 57:15 58:22 64:19 65:15 75:20 77:1 78:6 79:13 80:7 82:13,15 85:9,13 93:16,22 96:6,8 97:16 100:2 102:8 107:22 110:5

knowing 16:20 36:6 66:14

knowledge 27:1 36:11 37:5 47:17,25 82:4 83:5,18

knows 39:16

___

L

lab 43:3

labor 14:6 86:11 103:16

laboratory 73:11

lack 46:3,15 72:14 95:21,25 98:9

lacking 98:10

**lacks** 10:19 14:14,25 17:5 24:23 29:11,18 30:2,19 31:9,19 32:3 33:2,7,15 34:14 35:12,25 36:14 37:3 41:4,12 54:16 55:10, 17 57:1,9 60:6 61:2 62:1,8,24 65:24 66:24 67:24 68:25 70:6 71:4 74:4 78:18 83:6 84:15,24 86:5, 21 90:1 93:13 95:4 100:17 103:6 106:7, 20 109:15

**lag** 67:1

**large** 18:6 47:5 58:8

**largely** 91:23

**larger** 45:15

**lastly** 8:7 22:12

**law** 5:16 7:22

**laying** 65:12

**Layli** 5:4

**lead** 71:19 108:19 110:16

**leaders** 97:1,2,3

**leadership** 21:9 24:19 45:16 59:19 88:19 89:7,8,21 95:14

**learn** 8:16 58:1 75:5 92:2

**learned** 102:4

**leave** 36:12,19 37:1 70:17 77:15 104:10 105:2

**leaves** 106:5

**leaving** 95:3,8 102:9, 17

**led** 89:7

**left** 28:14,15 104:18 105:2,5 108:17

**left-hand** 28:4

**legal** 27:8

**length** 60:20

**lens** 16:19 36:9

**let's** 37:8,11 53:13 56:1 68:13 76:15 94:16 109:20

**letting** 78:6

**level** 13:21 14:22 19:8 24:9,11 39:9 40:9 41:18 45:23 46:3,10 47:22 49:11 89:12 99:9,15 100:4, 11 101:9 109:10

**levels** 39:7,22,23 47:6,13 87:15 109:13

**liaison** 49:22 69:24

**licensed** 12:20 64:19 92:7

**licenses** 12:18

**Lidge** 48:18

**lies** 22:18

**lift** 18:7,9

**lights** 85:12

**like-minded** 108:5

**limited** 36:9 49:17 75:22 97:14 99:16, 17,23 106:22

**limited-term** 18:18 19:10

**limiting** 70:8

**line** 9:10 29:11 31:24 32:1,7,21 35:9,15

**led** 44:10 73:13 105:23

**lines** 87:1 109:8

**listed** 29:21 69:6

**litigation** 27:9

**Litt** 18:14

**little** 8:16 9:10 28:6 40:25 44:11 71:22 77:19 94:17 98:15 102:24 108:16

**live** 60:10,15 61:18

**living** 61:13,14,25

**local** 46:3,10,13 73:17 81:8 100:4 101:13,14

**located** 60:9

**location** 29:20 60:17

**locum** 11:19 12:12

**long** 11:9 25:1 61:19 63:17 66:21 67:22 70:4,23 76:20

**longer** 36:19 37:1 67:8 81:6,7 94:18 107:13

**longer-term** 39:13

**look** 25:13 28:3 29:22 30:15 31:23,25 36:8 47:9 64:1 97:10

**looked** 42:23 43:2 47:19 71:10 85:24

**looking** 26:3 29:25

**looks** 27:2,9

**lost** 107:6,11

**lot** 43:13 44:1,13,22 45:18 49:10,13 51:5, 6 52:24 53:1 54:2 57:12,18 58:24 60:8 70:18 76:3 77:7 78:5

**led** 79:3,11,24 83:24 85:9 94:6 97:8,12,21 99:4,8,9 101:10 102:10,20 103:1,11, 15 108:21,24 110:6

**love** 78:4

**loved** 77:12

**lower** 104:4 109:13

**lunch** 94:22

**lurch** 70:18

---

**M**

**M.D.** 6:1,18 10:2

**MA** 49:9

**main** 71:13 93:17

**maintaining** 90:8

**major** 66:14 107:16

**majority** 19:3

**making** 103:25

**manage** 32:8 93:21 99:3 104:19 106:1

**managed** 79:4

**management** 21:22 52:13 97:7

**manager** 106:6

**managing** 40:2 105:13 106:16

**manner** 77:25

**marginalized** 87:14

**marginalizing** 96:9

**Marin** 60:11 78:21

**mark** 94:13

**marked** 26:18,21

**market** 60:16

marketed 85:25 87:18

Master 99:20

materials 20:15 69:18

matter 77:8

matters 81:4 86:9

mean 10:10 12:11 15:7 39:8 57:2 62:2 71:23 72:5,13 81:18 90:12 96:15,21 105:15

meaning 92:21

meaningfully 59:13, 14

means 10:11 15:9 63:10 81:20 92:1

meant 10:14

measures 43:2 50:18 51:6,9,11,13 52:4 53:25

medical 11:15 13:5, 12 16:22 41:2,5,7, 10,20 42:2,6,11,17, 21,23,25 43:8,17 46:15,22,23 47:20 49:1,17 50:6,13,15, 23,25 52:8,16,22,25 53:2,5,12 57:23,24 87:1 90:5 96:19 100:6,24 102:25

medication 7:25 18:24 43:3

medications 51:15, 24 52:12

medicine 12:20 54:11 92:7

meet 57:16 58:4 78:25 92:24 93:2

meeting 23:20 24:15,

17 42:20 76:24 92:9

meetings 22:20,23 23:2 24:4,12,22 25:1,2,5 45:16 48:5, 6,11,20 49:24 57:14 72:25 73:7,8,20,21 74:1 108:24

Mehta 17:18,20 49:25

member 14:6,10 22:4 38:2

members 21:13 77:20

members' 77:8

memo 80:23

memos 81:7

mental 10:17,23 17:21 21:15 22:18, 21 23:6 25:4,5,11 26:22 27:14 31:21 38:5,9,14 39:7 40:6 41:1,10 46:4,6 48:9 49:23 50:21 52:20 89:1,13 96:10 99:5,7 100:6 106:19 109:13,17

mention 60:23

mentioned 6:7,24 15:17 20:23 24:4,8 31:14 37:21,22 38:24 40:19 48:25 49:21 53:5 58:14 59:3 60:3 62:15,19 64:4 65:4,16 67:21 70:23 72:6 73:1 76:3 79:13 83:13 85:10 91:17 96:14,18 98:6, 9 101:21 102:18

met 69:13

method 75:4

Michael 49:24

mind 10:4 61:6 71:15 107:23

minimal 63:7

minimize 73:18

minimized 109:23

minimum 69:5 80:1,6 92:4,9,18,25 93:3

minute 36:18

minutes 37:8

Mischaracterizes 49:3 64:7

mission 40:6 102:16 108:4

misstated 88:2

Misstates 53:8 87:23

mixed 102:16

model 36:8 38:24 40:15 76:9,10 78:1

moment 100:12

monitoring 52:4

month 27:12,13,14

monthly 26:22 52:5

months 12:5 17:14 36:20 37:2 45:23 56:23 66:7,12,16 70:20

morale 50:17 52:23 91:7 108:18 109:2 110:12,14

morning 5:4,18

MOU 14:19,21,23

MOUS 14:13

move 37:21 71:3

moved 107:7

moving 40:24

Mule 48:23

multifactorial 57:12 58:9

multiple 48:25 59:2 87:15 100:21 101:19

mutual 74:14

---

### N

name 5:4,14 6:8,17, 18,19 10:2 18:14 25:7 43:22 73:11 78:20

named 27:10

narrative 93:15 102:7 107:21

navigating 100:3

near 21:18 39:1 72:8

necessary 20:21 69:4 73:4 89:22 93:9

need 7:15 8:8 31:3,13 39:12 43:2 49:6 50:10 51:18 59:1 91:2 100:5

needed 44:4 56:19

needs 44:13 68:22 69:22 106:16 108:3 110:21

negative 102:22 110:1,2

negotiated 14:22

negotiating 100:3

negotiation 69:23

negotiations 103:17

network 56:25 57:19 58:6,21

networks 56:14

neutral 73:25

new 13:15 38:21 49:13 50:12 59:22 63:11 66:15 70:16 77:15 85:13 86:1 91:6,10 94:11

newer 59:6,9

newly 18:18 19:4 89:9,20

Newsom 5:15 6:10

nice 77:20,21 79:6

Nick 5:21

nine 11:10

nod 7:1

nodding 8:23

non-work 14:4

nonmental 99:11

nonpip 33:10,12 36:5,7

nonpsychiatry 21:15

Northern 48:13 57:16

note 5:7

noticed 30:25 67:1

noticing 5:11

notification 17:14

nowadays 79:25 81:2,11,14 102:25

number 5:6 26:7 28:15,18 29:9 32:20, 24 33:20 35:3 38:3 58:2 60:9 94:12

numbers 25:13 28:4, 11 31:25 32:18 35:22 41:7 93:22 94:8

nurses 73:10

nursing 21:21 23:24 97:2 99:12 100:9

—————

**O**

oath 7:20 37:17 68:19 94:25

object 34:5

objected 65:9

objection 10:19 14:14,25 17:5,11,24 24:23 25:21 28:20 29:10,18 30:2,19 31:9,19 32:3 33:2,7, 15 34:11,14 35:11 36:14,21 37:3 38:11 41:4,12 44:8 46:1,16 49:3 53:8,15 54:16 55:10,17 57:1 59:8 60:6,21 61:2 62:1,8, 24 64:7 65:5,7,24 66:10,24 67:24 68:3, 25 70:6 71:4,24 74:4,10 76:1 78:10, 18 79:18 82:23 83:6 84:15,24 86:5,21 87:23 88:15 90:1 93:13 95:4,17 100:17 101:6 102:6 103:6 104:12,20 106:7,20 107:20 109:15,21

objections 7:5 30:11 34:19,22 35:2,17,20 84:20 107:4

objective 108:2

obtain 13:2 42:21 53:24

obtained 54:2

obtaining 54:4

occasion 22:3 23:3

24:7 55:3 73:23

occasionally 21:21, 23

occasions 91:12

occur 44:13 57:17 58:14

occurred 84:10 85:3

occurring 51:19

offer 20:18 55:23,25 64:1,6,11,12,18 65:16,23 66:9,22 67:4,10,15,17,22 68:23 74:18,23 75:1 77:16 104:1 106:2

offered 84:14,19 86:24

offering 65:22

offers 78:14

office 95:21

officer 18:14 89:1

officers 45:13

offices 95:23 98:16, 20 99:20

official 10:13

officially 68:23

offset 84:5

okay 9:13 10:9 25:25 28:3,17 30:14 37:13 62:21 65:5 104:17

old 58:10

on-boarded 106:15

on-site 48:3 87:20

onboarding 20:20 71:9

once 8:8 20:19 21:24 23:12 36:17 62:14 85:16 87:6 95:23

98:23,25 106:15

one's 74:5 85:7

one-third 85:6

one-year 42:5

ones 76:4 95:10

ongoing 10:13 43:23 89:22 90:9,12,14,15 91:3 103:16

open 55:9

opinion 44:9 52:24 53:6 69:1 99:24

opportunity 7:17 55:5 57:19 58:24 92:23 107:13,15

opposite 28:25

option 39:17

options 39:14 77:21

order 52:20 53:25 58:10

orders 42:22 44:19, 20

org 89:17,18 98:3

organization 44:14, 21 45:9 47:6 87:15, 17 105:7

organizations 13:20 44:2 45:1 59:19 87:6,9

organizing 52:18

out-of-class 10:8 11:3

outpatient 9:6,12,18, 19 16:6,24 19:17 32:15 33:6 35:24 36:12,25 38:21 39:6, 24 40:4,12 50:11 76:12 77:19 106:23 107:7,15 110:13

Paul Burton, M.D.

**outside** 25:19 103:3 106:21

**outsource** 108:24

**outstanding** 42:22 43:1 108:2

**overall** 50:20 52:19 71:20

**overarching** 108:4

**Overbroad** 68:3 109:21

**Overlapping** 5:8

**overrepresented** 60:12

**oversee** 91:2,6

**overshadowed** 44:24

**oversight** 97:4

**overworked** 108:15

**Ozbayrak** 48:16

**P**

**P-A-U-L** 6:18

**P-I-P** 9:14

**p.m.** 111:2

**package** 64:17

**packet** 20:17 69:17

**page** 27:23 73:18 108:6

**paid** 83:4

**pandemic** 42:6

**panel** 20:10,16,23 21:6,10,12 22:4,11 40:19 64:4,9 66:22 67:3 75:18

**panels** 21:22,23,24

**paper** 19:6

**paperwork** 66:3 110:9

**par** 103:1

**parents** 101:16

**part** 40:12 42:23 50:23 51:15 53:13 67:2 86:13

**particular** 10:24 71:14,16 99:12 104:5

**parties** 27:10

**partners** 91:4

**parts** 98:25

**party** 5:11

**patient** 15:11 38:2 39:8,15,16 43:4,21, 22 44:18 52:20 53:6, 14,21,23 76:12 105:23 109:14 110:1,7,10,11

**patient's** 42:20

**patients** 15:12 38:3 42:19 45:10 48:4 52:10,11 54:14 70:13,16,17,21 77:3, 25 92:11 93:10 97:12 98:14 105:22, 23,25 106:16 107:24 110:4,16

**Paul** 6:1,18

**pay** 9:9 14:7,9 61:23 79:22 80:4 81:21,22 83:2,24 86:8 92:3 103:18,23 106:18

**payment** 85:8

**payout** 85:15

**pays** 93:7

**PDF** 27:23

**peers** 48:2 78:22,25

**Penal** 19:1

**penalty** 7:21

**pending** 10:14

**pension** 85:2,6,7,14, 15 86:9

**Pensions** 85:11

**people** 44:10,20,22 45:18 49:20 51:7 68:8,11 74:18 77:23 78:5,6,13 83:2 85:13,16 89:19,24 91:15 93:12 101:9, 11 103:4 107:24 108:14 109:5

**people's** 85:11

**PEPRA** 85:3,19,21,23 86:3

**percent** 35:9,19,21 74:22 79:2 106:18

**perform** 42:14 44:2

**period** 42:5 79:9

**perjury** 7:21

**permanent** 10:15 16:3 19:9

**permanently** 19:11 31:13

**permitted** 40:7

**persists** 87:13 96:11

**person** 6:25 17:2 18:19 22:24 23:1 31:22 45:2 64:24 98:2

**person's** 25:7 98:6

**personnel** 69:20

**perspective** 19:11 69:13 81:4 98:4

102:13 108:21 109:1

**Phillips** 5:5 6:24 9:13 61:6 110:21

**phone** 5:9

**physical** 51:22 69:15

**physician** 42:24 43:2 44:2,3,19 47:21 52:18 54:7 69:3

**physicians** 14:10 15:11,15 43:24 44:14,23 51:5 54:3 79:3 85:22 86:8 87:7,10,18 89:13 96:10 97:20 103:1

**piece** 79:7

**pilot** 49:9,11 50:6,12, 23 52:23 53:1,13 54:13,19

**PIP** 9:6,9,13 31:1 36:7 39:2,13,22 40:7 48:3,22 77:19,20 107:3,8

**PIPS** 18:6,9 106:19

**place** 52:14 57:3,8 60:16

**plaintiff** 5:15 6:9

**plan** 54:9

**plans** 44:16

**Plata** 99:12

**plate** 51:6 54:10

**play** 64:14 102:13

**played** 80:17 101:12

**plays** 104:2

**please** 5:7,12,24 7:11 8:11,17 11:12 13:8 17:19 37:22 50:5 72:13 73:6 83:9 88:2

pleased 89:19

point 17:16 36:13
40:23 50:14 66:8
77:13 88:23 91:1
92:15

polarizing 103:20

policy 15:13

pool 60:18

poor 7:25 75:13

population 38:3 39:3,
5 40:8 58:25 108:3

position 9:2,3,8,25
10:8,12,17 11:3 12:5
15:18,25 16:1,2
18:18 19:10 21:2,22
25:23 29:16 31:13
37:25 38:20 53:4
63:3 64:24 82:10
88:19 89:10

positions 10:24
11:11 19:13 21:9
22:5 23:6 25:11,14
27:14 28:1 29:23,25
31:7 32:20,25 33:5,
11,12,14,21 35:1,23
38:5,18,22 46:18
56:18 74:20 82:22
84:13,18 89:7,8,10,
21 90:16,23 91:2,6,
10 104:3 109:14,18

positive 52:25 53:6
102:10,21

possible 67:23

possibly 74:3 76:11

potentially 85:25
90:17,24

practice 12:20 13:25
14:2,3 15:13 43:10
54:12 56:11 58:5,22
69:4 77:9 92:7

practicing 54:11 84:7

preferences 77:8,11,
24

preinterview 55:20

preliminary 67:5

prep 42:24 43:4,5

prerequisites 69:4

prescribed 52:2,11

prescription 51:14,20

prescriptions 52:1

present 44:5 48:19
49:25

presentation 42:20
93:23

pretty 44:9 55:20
78:12 80:17 81:3
82:14 95:10 96:7,11
97:20 98:12 100:2
106:8,11 109:9

previous 7:16 38:6
42:3 54:6 59:25

previously 72:6 73:1
76:8

primarily 43:9 46:20
49:21 50:10

primary 16:18 18:23
23:8,23 41:8 73:10
85:1 97:2 99:12
108:1

prior 17:14 18:9
27:14 33:9,17 42:20
49:4 53:9 64:8 87:23
95:7

prison 8:21 11:21
16:5 24:14 58:7
69:19 75:5 80:24
84:2,7 88:18 93:8
99:1 101:20 103:23
108:8

prisons 38:2 48:2,4
60:8 71:18 89:4
100:21 109:11,23

private 13:21,24

probably 82:7 103:20
104:5 105:4

procedure 15:13

proceed 5:24

process 10:13 12:17
14:21 16:9 22:17
23:22 24:2 52:15
54:22 55:16,21
63:22 64:13,23 66:7
68:22 69:7,11 70:4
71:12 73:14,15,25
74:13,16 80:13,15
81:3,8 82:9 88:17,
20,22 89:15 92:5
94:11 104:2

productivity 50:17
51:6,9,11

profession 57:15

professional 12:18
56:14 57:12,17
64:15 92:15

professions 57:13

program 12:1 15:10
49:14 50:6,8,21
52:23 54:14 108:14
110:5

programs 58:19
59:22 90:3,18,21,25
91:22 92:1

projects 97:21

promised 37:8

promoted 12:3,7
88:24 94:4 104:14
105:11

promotion 104:11

promotional 10:12

promotions 94:3
102:18

proportion 56:24
74:17

proposals 47:11,14,
16,23,24 48:6
101:10,21,22,24

prove 81:13

proved 49:11

provide 7:24 12:15
15:11 39:5,20,25
40:11 70:14 92:11,
12 93:9 96:19
106:14 108:2

provided 16:12

provider 43:5

providing 11:20,23
16:4 39:2,17

proximity 109:5

psych 30:6

psychiatric 9:12,19
11:3,25 12:15 15:10
16:12 39:11 43:6
51:14,20,24 52:1,11
57:15,18 58:2
106:14 108:3,25

psychiatrist 9:3,5,8,
9,22,25 10:7 11:9,
20,23 12:2,4,7,8
15:8,9,18,22,23 16:1
19:17 20:9,10,11,24
21:1 23:7,17 25:15,
16,17,20 28:18
29:16 30:1,17 31:25
33:11,12 38:20,22
39:10,15 40:14,17
41:19 42:21 48:9,12,
19 49:22 50:3 52:9
53:3 56:3 63:3 68:2

69:25 72:12 74:20
76:11,22 79:23
80:17,24 81:3,9
82:17 83:17 85:7
89:5 92:10,18,22
93:20,25 95:8 97:25
98:13 100:3,13
101:23 103:22
105:19,25 106:5,12
108:12 109:12

**psychiatrist's** 29:4
106:17

**psychiatrists** 12:13
18:16 19:18,20 20:4
21:4,9 32:2,8,21,23
33:5 34:1,10 36:12,
25 38:25 39:20,25
40:3,9,11 41:11,20
42:14,18 43:10,17
44:23 45:6,14,15
47:10 48:1,3,5,7,10
49:9,12,17 50:11,24
51:12 52:23 54:7
56:10,11,13,14
57:18 58:4,11,20
59:4 60:5,10,12
61:1,10,16,17,23,24
62:7,11 64:20 65:23
70:10,11,16,19 74:6,
23 75:11 76:9,19,23
78:3 79:14,25 82:1,
12 83:1,3,23 84:6
85:14,22 86:1,6,19
87:1,2,5,12,20,22
88:9,18,24 89:3,6,20
90:20 92:5 93:3,21
94:3,11 95:3,13
96:1,5,9,12,19,24
97:8,16 98:20
100:21 101:20
102:9,12,15 104:4,7,
10,19,25 105:5
106:10,12 107:7,11,
12,22

**psychiatrists'** 105:14

**psychiatry** 11:1,17,
25 12:22,23 13:6,7,
14,17 14:1 21:10,20
23:24 25:14 28:1
35:23 38:19 41:6
42:8 43:8 45:17
54:12,25 55:9 56:6
57:24,25 58:6 69:4
73:10 82:21 83:19
84:13 89:8,10,25
90:5,6,25 92:6,8,21,
25 97:3,5,9 109:18

**psychologist** 22:5
97:24

**psychologists** 19:23
22:2,15 104:4
109:25 110:8

**psychology** 21:7
23:24 45:17 73:10
97:1 100:8

**Psyt** 29:6,20 30:7

**public** 27:11 78:21

**pull** 25:12 26:1,2

**pulls** 26:5

**purposes** 43:9

**pursue** 20:12 92:16

**pursuing** 63:13 78:13
79:25

**pushed** 71:7

**put** 47:10,15 101:9

**puts** 44:19

---

**Q**

**qualifications** 69:6
80:20 92:4,10,18,25
93:3

**quality** 21:22 39:2

43:22 52:13 53:21
55:22 58:11 74:3,6
75:20,25 90:20 91:2
97:6,9,11 110:15

**Quentin** 8:21 9:4,10
10:7,18 11:6,15,17,
21 13:23 14:4 15:22
16:13 18:13,17,23
19:8,14 20:5,14,18
21:15,19 22:2,15,19
23:6,15,16,22 24:5,
6,14,15,18,20 25:5,
12 28:5,10,19 29:8
30:9,18 32:14,24
33:6,14 34:4 35:24
36:6 38:10,15,18,25
39:1,21 40:15,21
41:2,3,6,10,18,21
42:7 43:17 45:23
46:5 48:22 49:11
50:16 54:24 55:4,9
56:5,25 57:3,7,21
58:1,3,15 59:4,16,24
60:5,20 61:1,22,23
62:12 63:12 65:23
66:5 73:1,22 76:3,9
77:16,18 78:7,24
79:14 82:12,22
83:20 86:20 87:6
88:10,13 89:25 91:6
92:2 93:25 95:3,11,
12,20 96:13,24
99:15,16 100:11
102:9 104:10 105:6
107:9,16,17 108:20
109:10,22

**Quentin's** 60:3 107:3

**question** 7:7,10 8:10,
11 10:21 14:17 17:7
18:2 25:20 28:21
30:24 31:4 32:5
36:22 41:15 42:10
53:18 55:12 60:7
61:4,7 65:2,9,10,12

68:5 81:15 88:4
104:16,23 105:16
107:1

**questioning** 29:11

**questions** 7:6 8:3
15:6 24:3 25:10,14
37:21 54:21 68:21
75:16,18 76:7 93:19
95:9,15 110:18

**quick** 67:7 108:22

**quickly** 67:4

**quite** 11:2 58:9,23
67:4 70:7 72:16 73:8
79:8 108:11

**quote** 94:14

---

**R**

**Rachel** 25:8

**radiology** 73:11

**raised** 75:17 99:17
100:10,13 101:2

**raises** 81:15

**range** 71:1 79:14,23,
24 80:2,4

**rapport** 39:9,15

**rare** 11:2

**rate** 31:17 35:23
61:24 62:5 70:8
78:12 94:9

**reach** 63:1,19

**reached** 50:7 63:21

**read** 61:8

**ready** 77:14

**reality** 16:25 19:7
97:19

**realize** 109:2

realized 65:2

really 43:4,5 44:4
47:20 51:1 52:8
54:7,10 58:6,21,25
61:19 64:19 69:20
72:10 73:16 74:14
76:20 81:13 84:11
86:15 91:2 108:25
109:4

realm 38:19 63:18

reason 7:24 8:2 17:23
39:16 68:4 71:7
108:7

reasonable 108:11

reasons 44:22 74:25
78:15 80:25

recall 22:10,13 45:22
54:18 63:17 65:19
103:7

recap 49:7

receipt 67:9

receive 38:8,9 56:17
83:17 96:1 97:12
104:10

received 13:3,5 38:7,
18 50:24 52:24
68:10 110:15

receiving 56:2

recognize 27:5 29:12

recollection 18:4
41:25 49:19

recommendation
20:16 64:5,10 66:21
67:5,9

recommendations
40:20

recommended 15:15

record 6:8,17 7:2
8:17 26:10,14,15,17

37:14 61:8 69:12
88:6 94:20 102:25

recorded 51:22

recreational 20:2
22:12

recruit 56:20 58:10
61:16 89:24 93:12

recruited 62:11

recruiter 56:9,10

recruiting 56:18 60:4
68:8 84:2 94:11

recruitment 19:15
23:25 56:15 59:3,4
60:25 73:14,21 76:8,
14 78:2,8 80:21
82:9,14,17 83:4
84:23 85:10 86:1,19,
25 87:20 90:4,10
91:8 106:9 108:9

red 75:17

reduces 85:7

reference 55:23
75:13

references 20:15
75:14

referral 62:15,23

reform 85:2,19

reframe 88:4

refreshing 79:8

regards 56:16 88:12
105:22

Region 101:23

regional 24:6 45:14
48:5,10,12 49:22
89:10 91:14 101:23

regions 89:11

registration 12:24

registry 11:19 12:10,
12 13:23 34:1,18
50:13,15 106:11,12

regular 17:2 22:7,22
27:6 40:12 51:18
72:25 83:17 90:19

regularly 20:1,3 23:9

Rehabilitation 5:22
8:20

related 27:8 54:6

relationships 90:5,9,
13

relative 60:8

relatively 36:4 59:6,9
83:10 108:11 109:23

relevant 106:25

relocate 60:17

remained 12:2,5,7

remaining 106:6,10

remedy 101:10

remember 11:13
59:18 106:25

reminded 85:18

reminder 35:5 72:18

reminders 63:20

remotely 6:3 26:4

remove 54:9

removed 54:5 79:8

repeat 61:4

repeating 61:6

rephrase 7:11 28:23

report 18:12,13,17
19:19 27:15 29:15
30:16 45:2 88:22
96:23 97:1,2

reported 5:10 15:23
88:25

reporter 5:4,6,24 7:2
26:15 88:5 110:24

reporting 98:1,4
100:14 101:1

reports 18:15,19
19:16 26:23 98:3

represent 5:13,15,19,
21

representatives
24:16

represents 28:18

requested 61:8 70:19
80:18,23 81:24

requests 77:24 82:3,
6

require 44:2 67:10
90:21

required 67:18

requirement 69:15

requirements 69:12
110:5

residencies 57:24
90:6

residency 13:6,14,15
91:25 92:3,9,17,21

resident 92:6

resolve 99:9

resources 19:11
23:20 64:13,16 73:2,
4

respond 7:6 46:7

responded 46:14
47:3

response 42:3 68:9
72:8,17,20 88:21

101:5

**responsibilities**
15:19 16:18 20:7

**responsibility** 19:3
23:8 88:19

**responsible** 20:20
22:17 105:13,20

**responsiveness**
71:17 72:5,7,10,14

**rest** 83:23 84:3

**restate** 36:21 81:11

**rests** 66:4 76:21

**result** 48:5 51:7

**results** 54:1 102:3
106:11 108:10

**retain** 107:18

**retaining** 36:16 68:8

**retention** 19:15 43:23
44:7 76:13,14,15
86:25 93:20 94:9
108:19

**retire** 104:19 105:1

**retired** 94:5 104:11

**retirement** 48:20

**retirements** 102:19

**return** 37:11,20

**returned** 13:16

**returning** 68:14

**review** 20:14 43:1
55:6 69:18 105:24

**reviewed** 23:25 51:18
52:4

**reviewing** 42:19

**revise** 33:10

**revised** 38:7

**revision** 33:18 37:22
38:1,15

**Rhonda** 18:14

**right** 6:15 8:22 9:22
20:25 28:15 29:17,
22 31:24 32:23
33:20 36:24 40:21
47:19 59:1 62:4,16,
19,20 65:11 67:7
74:7 76:14,15 79:20
83:14 88:10 90:18
91:18 98:12,21,23
103:19 104:8 110:18

**Rizzotto** 48:17

**road** 70:20

**role** 9:18 15:7 17:23
18:22 19:9,17,22
23:5 25:20 29:5
30:1,17 31:8,15,24
47:8 50:2 54:23 74:9
80:18 87:7

**roles** 17:4 28:19
33:25 38:14 41:1,10
54:25 59:19 83:19
89:25

**room** 90:24

**rooms** 98:13

**Rosen** 5:16

**rotated** 11:14

**rotating** 11:17

**row** 11:25 28:10
29:21 39:3

**rows** 34:25

**rule** 30:20 31:10

**rules** 6:22

**run** 15:10 96:20

**S**

**Sac** 48:23

**safe** 51:13

**salaries** 61:18 82:18,
22 85:11 103:12
104:4

**salary** 78:21 79:13,14
80:2,21 81:19,20
83:13 85:5,6 103:4,
10,14,18

**San** 8:21 9:4,10 10:7,
18 11:6,15,17,21
13:13,17,23 14:2,4
15:22 16:13 18:13,
17,23 19:8,14 20:5,
14,18 21:15,19 22:2,
15,19 23:6,15,16,22
24:5,6,14,15,18,20
25:5,12 28:5,10,19
29:8 30:9,18 32:14,
24 33:6,14 34:4
35:24 36:6 38:10,15,
18,25 39:1,21 40:15,
21 41:2,3,6,10,18,21
42:7 43:17 45:23
46:5 48:22 49:11
50:16 54:24 55:4,9
56:5,12,25 57:3,7,21
58:1,3,15 59:4,16,24
60:3,5,11,15,20
61:1,22,23 62:12
63:12 65:23 66:5
73:1,22 76:3,9
77:16,18 78:7,24
79:14 82:12,22
83:20 86:20 87:6
88:10,13 89:25 91:6
92:2 93:25 95:3,11,
12,20 96:13,24
99:15,16 100:11
102:9 104:10 105:6
107:3,9,16,17

108:20 109:10,22

**sat** 21:21,23 22:1

**satisfied** 103:13

**save** 104:16

**saying** 6:16 29:15
30:16

**says** 27:25 29:1,6
30:5,10 31:6,7 33:1,
3 101:13,14

**scale** 79:24 81:21,23

**scales** 80:4

**schedule** 105:14,16,
18,19,22 110:19

**scheduling** 97:5
101:2

**school** 13:12

**schools** 13:9 57:24
78:21

**Science** 13:3

**scope** 31:3 42:22
106:21

**screen** 26:5

**scroll** 28:17,25 29:8,
23 30:9 32:19,24
33:19 34:4

**scrutiny** 47:14

**seat** 87:10 89:3,13

**second** 9:8,22 17:23
28:14 72:18 104:15

**Secondarily** 60:14

**secret** 86:8

**see** 21:5 23:5 26:22,
24 27:15,16,17,19,
25 28:2,5,14,16,17,
24 29:1,6,9,13,24,25
30:5,7,9,12 32:24
33:20,22 34:2,9,16,

17,23 35:1,3,10,13, 15,18,21 37:7 50:16, 17 52:10 55:8,12 78:25 83:16 92:16 98:13

**seeing** 105:24

**seek** 71:18 77:14

**seeking** 61:10 69:13 70:11 93:1

**seen** 26:25 27:2,7 35:3 54:14 59:15 77:3,10,25 110:4

**Sekhon** 10:2 48:17

**select** 70:9

**selecting** 54:24

**semi-regular** 85:2

**send** 55:12,14 56:4 67:14 72:16,18

**sends** 56:7,17 74:2,8 75:25

**senior** 12:4 15:22,25 20:11,24 21:1,2 22:5 48:19

**sense** 8:13 23:17 39:23 55:15 77:21 83:22 84:9

**sent** 23:13 48:7 55:16 67:13 101:24

**separate** 31:2

**September** 63:25

**series** 48:4 55:24 63:16,19

**serve** 18:24

**service** 11:8,22 12:16 50:14 63:14 73:9 86:2 89:2 96:10 102:19

**services** 9:12,19 11:20,24 12:15 16:7, 12,22,25 18:21 19:17 39:21 40:12 86:24 93:9 106:14

**sessions** 110:3

**seven** 82:7

**seven-month** 71:1

**shake** 7:1

**share** 26:6 98:20

**sheet** 23:13

**shift** 18:7,10

**shock** 87:4

**short** 37:12,14 68:16

**short-term** 39:12

**shortage** 56:12

**shorter** 110:3

**Shorthand** 5:5

**show** 31:8,17 58:21

**shows** 27:13 32:20

**shy** 94:1

**side** 9:6,18 16:8 28:4 32:15 33:6 35:24 36:9,25 40:4,5 48:23 51:19 76:13 95:22 107:7,8

**sides** 48:22

**signature** 66:4,8,17

**significant** 63:6 67:19 70:14 82:15

**significantly** 60:9 80:16 82:18 100:7 103:16 110:9

**signs** 42:22 53:25 54:1,2

**siloed** 16:16

**siloing** 16:7

**similar** 18:7 24:22 27:9 69:16 98:24 101:25

**simple** 44:9 53:24

**simply** 70:20 72:16 73:8 98:22

**sit** 21:8,9

**site** 18:17 34:1,18 49:8

**Sites** 28:5

**situation** 101:10

**situations** 71:13

**six** 22:4 45:23 82:7

**sleep** 7:25

**small** 28:4,6

**smaller** 18:9 100:7

**smooth** 70:21

**social** 19:25 22:9,11 23:24 104:5 109:25 110:8

**societies** 57:16

**society** 83:1

**Solano** 48:22

**solutions** 77:6,7

**somewhat** 15:21 55:1 87:14

**sooner** 8:8 71:3

**sorry** 10:6 65:6 71:23

**sort** 79:22

**source** 56:15

**sources** 23:11

**space** 95:21 98:10, 11,14,17,18,24 99:3, 6,10,13,14,23

**speak** 5:8 6:12,25 101:8

**speakers** 5:8

**speaking** 108:11

**speaks** 30:21 31:11

**Special** 99:20

**specialization** 16:20, 21,24

**specialize** 93:1

**specialized** 92:23

**specific** 45:22 51:21, 22 53:2 69:18,19 78:15 81:1 86:14 100:3,22

**specifically** 8:21 23:21 38:19,20 57:11 74:19 82:1

**speculation** 14:15 15:1 24:24 29:19 30:3,20 31:10,20 33:16 34:15 35:12 36:1,15 37:4 46:2 53:16 54:17 57:10 61:3 62:25 66:11,25 67:25 71:5 78:11,19 79:19 82:24 83:7 84:16,25 86:22 88:16 90:2 93:14 100:18 106:21 109:16

**spelling** 6:16 80:25

**spend** 52:18

**spoke** 54:22

**spoken** 100:20

**spot** 83:12

**spots** 89:12

**spread** 57:23

**spreadsheet** 30:13

**spring** 65:21

**sputtered** 88:20

**SQ** 28:5,7

**square** 98:15 108:21

**SSA** 18:18,20,23 19:20 21:11 98:6

**staff** 10:7 11:23 12:2 18:16,19,21 19:13, 15,18 20:9 21:10,15, 23 31:25 32:2,7,21, 23 33:11,12 34:1,10 35:9,16 37:22 38:20, 21 39:25 40:11 44:25 45:7 46:3,18 47:9,21 50:16 60:19 61:17 63:3 74:19 76:18 79:23 82:1 85:6,13,18 90:20 91:7 92:10,18,25 93:3 95:23 96:2,5, 17,19,23,25 97:5,14 101:1 103:10,24 104:1 106:19 107:18 110:14

**staffed** 95:22 99:2

**staffing** 22:24 26:23 27:13 31:1,2 33:10, 17 36:5,7 38:1,7,10, 14 41:1 46:11 49:2 109:13

**stage** 75:8 77:10

**stalled** 103:17,19

**stand** 98:12

**standard** 40:13 51:16 95:10

**standing** 69:3 102:10

**start** 6:16,21 25:13 63:2 64:24 65:3 66:13,15 69:23 70:8, 19 71:3,7,21 72:18

76:15 80:1 81:21 87:6 105:21 109:20

**started** 63:5 72:24 85:18 86:6 88:17 94:3

**starting** 49:13 63:25 64:1 65:17 81:20

**state** 5:12 8:18,21 11:21 12:21 13:21 24:14 45:18 57:11, 14 64:19 69:19 71:11 85:4,5,22 86:15 105:10,11

**stated** 34:6

**statements** 54:7

**statewide** 14:22 17:20 18:5 23:13 43:8 46:11 48:8 50:3 91:14 103:24 104:1

**status** 23:25 25:11 32:1

**stay** 52:7 95:13

**stays** 52:17

**step** 53:11 55:21 69:10 70:8 81:22

**steps** 55:24 64:14 67:18 68:22 69:1 81:22

**stigma** 84:4

**strict** 92:6

**stricter** 47:14

**stride** 107:11

**strike** 13:4

**structure** 18:8 52:8

**structured** 44:17

**structuring** 16:7 90:17

**stuck** 101:15

**student** 11:15

**students** 90:5

**stuff** 102:10

**subject** 85:23

**submit** 20:16

**submitted** 80:24

**subspecialize** 92:23

**subspecialized** 93:5

**substantially** 94:13

**success** 39:4 78:12

**successful** 56:10 77:22 100:2

**suggested** 91:9

**summer** 11:15 65:21

**superior** 16:6

**supervises** 15:10,16

**supervision** 20:21

**supervisor** 12:4 21:21 22:5 102:13

**supervisors** 14:8 72:19

**supervisory** 10:12 14:8 21:19 37:25 97:4

**supply** 61:11 99:16, 18

**support** 16:5 18:18 19:13,15 21:23 43:25 44:4,5,22,25 45:7 46:3,18 47:9,21 49:9,16 50:12 61:17 86:23 90:7,9,12,15 95:25 96:2,17,20,23 97:14,22 98:1 100:14 102:1,2 104:1 106:12

**supportive** 46:9

**sure** 9:17 25:15 31:21 41:6,17 47:22 54:13 55:13,20 62:6 67:13, 19 68:4 69:12 79:20 80:7 81:17 83:12,21 88:4,8 109:11

**surrounding** 60:16

**sweet** 83:12

**switch** 77:18

**switching** 40:25

**sworn** 5:23 6:3

**symptoms** 44:18

**sync** 73:3

**system** 18:5 44:3 45:7 52:13 79:7,9 81:12 85:17 92:20 96:11 102:25 103:2

**system's** 89:2

**systematic** 89:12

**systemwide** 46:11

---

**T**

**table** 87:10,14 89:3, 14

**take** 8:7,8,11 26:11 37:8 53:11 56:1 66:16,21 68:14,23 70:5 72:9 78:23 94:16 97:21 104:13 107:10

**taken** 7:20 37:12 47:8 51:5 61:13 67:8 68:16 81:8 90:23 94:22

**takes** 58:10 67:22 70:24 81:5

talk 22:24 23:1 41:1
43:13

talked 80:19 100:24

talking 32:21 35:8
74:19 82:11

talks 23:13

tangible 102:3

tangibly 96:13

tank 108:17

team 15:10 40:10
44:12 70:15 76:21,
23 77:1,6,8,20,22
97:9,19 100:7
108:24 109:1,2

team-oriented 16:11

teammates 109:3

teams 77:2

technical 6:14

technically 9:9 48:19
92:6,12

technology 52:14

techs 73:11

tee 76:4

telepresenters 43:10

Telepsych 34:1,21

telepsychiatry 11:24
43:11 108:25

tell 43:14 57:7 74:12
75:21

telling 57:2

temporary 10:12,14
12:12,16 16:3
106:11,14

ten 21:18 37:8 59:17
93:24

ten-minute 68:14

ten-plus 27:7

ten-year 94:13

tend 23:7 76:22 95:20

tends 16:6 56:10 70:8
107:9 108:20

tenens 11:20 12:12

tenure 41:19 56:2
68:2 93:20

term 10:9 12:10

terms 81:18

test 43:3

testified 6:4

testify 7:20

testimony 7:25 49:4
53:9 64:8 87:24

tests 51:17,21,22
52:6

thank 6:12,20 9:1
12:9 18:11 30:14
31:5 32:17,22 35:5
38:23 42:9 52:21
62:10 63:1 70:3
75:23 105:12 106:4
110:18,23

Thanks 65:1

theme 98:9

themed 51:13

themes 95:19 102:4

therapists 20:2 22:12

thing 89:17

things 9:10 37:20
67:7 79:22 85:9
95:12 97:11 107:17
108:19 110:12

think 8:2 33:21 43:21
44:6 45:8 47:7
53:12,20 54:14

60:18 66:13 71:2,9,
10,16 72:10 73:23
76:16 79:22 80:25
82:16,21,25 83:1,3
84:12,22 85:10
86:23 87:15 91:15
93:11,16 99:22
101:10 102:8 104:14
107:18,22 108:9
109:9,22 110:22

thinks 101:16

third 32:23 57:5
85:16

third-party 12:14

thought 65:8 75:7

three 16:2,10 18:6,8
34:2 36:20 37:1,20
40:11 56:23 58:17
67:10 77:12 108:13

three- 71:1

thrive 20:22 58:11

thriving 64:25

ticket 70:1

time 5:8 6:12 7:1,15
12:1,3,8 16:1 21:7
22:6,10 23:15 42:1
44:11 45:20 47:10
49:10 50:7 52:18,19
56:1 61:20 67:2,25
70:14,15 71:20
78:20 79:10 89:1,22
90:21 92:3 93:24
94:18 98:4 104:16
110:11,19

timely 54:3 71:17
77:25

times 23:12 54:3
70:18 72:9 73:24
75:15 76:4 97:8

tired 79:3

title 35:4

titles 35:13

today 6:13,22 7:20,25
32:16 110:22

told 45:2 68:6 83:15

tolerate 61:21

tools 52:12 90:4

top 27:15,25 28:17
29:1,24 33:22 37:7
52:7,17 68:13 73:3
79:21

top-down 77:5

topic 103:21 104:8

total 34:25 35:8,9,16
38:21 40:11 51:25

touch 72:23

tough 83:10

tour 59:16,23

tours 58:3,14 78:24

track 28:10

tracked 50:18 51:23
52:2

traditional 77:5

trail 85:10

train 58:1

trained 63:12

trainees 57:25 59:16,
20 60:1 91:4 92:1
93:8

training 13:19,22
58:19 59:22 63:13
90:18,21,25 92:1
93:1

transition 70:21

treat 52:20 93:10

**Paul Burton, M.D.**

Coleman vs.
Newsom

**treated** 77:3

**treating** 39:10,14
42:18

**treatment** 11:24 39:2
44:16 54:9 59:1
77:17 92:11,12 93:9
95:21 98:10,11,14,
18

**tremendous** 89:16
90:7

**trend** 30:25

**troubleshooting** 17:1

**true** 40:25 41:2 69:6

**truly** 16:16 64:20
102:17

**trust** 105:25 107:25
108:1

**trusted** 52:16

**truthfully** 8:3

**try** 6:13 8:7 28:3
30:15 50:16 77:5
95:7 102:12

**trying** 47:9 50:9 96:8

**turnover** 93:21

**Turns** 45:18

**twice** 21:24

**two** 11:17 16:3 17:3
18:9 21:3,9 25:3
35:13 49:24 56:23
58:17,18 59:13 67:3,
5,10 71:13 77:23
100:1 101:15 105:3
108:12

**two-** 23:19 63:18

**two-thirds** 85:8

**type** 84:19 96:25
110:2

**types** 42:13 49:16
51:21 52:6 90:8

**typical** 79:13 93:21
105:18

**typically** 21:8 22:17
23:16 24:13 44:14,
24 56:5,17 63:1
66:21 69:23 70:13
75:21 87:9 92:24
93:4 95:9 98:23 99:8
101:12 102:20
105:24 108:12,15
110:16

**U**

**UAPD** 14:10,19

**UCSF** 11:16

**ugly** 109:4

**ultimate** 85:15

**ultimately** 20:12
22:17 41:17 61:20
63:23 64:10,22 66:3
76:21 82:6 88:18,24
97:16 99:14 103:25
105:20

**unclear** 105:4

**under-one-roof** 109:1

**undergraduate** 13:10

**underlying** 39:11

**understaffed** 68:7

**understand** 6:11,23
7:3,8,11,12,22 9:17
10:21 14:17 15:7
18:2 24:4 25:10,15
30:23 32:18 37:16,
18 41:15 46:8 51:10
53:18 54:13,22 62:6,
21 66:19 67:13
68:18 71:22 72:3,4

81:17 88:8 94:24
104:23

**understanding** 14:20
16:15 31:6,12 33:4,
13 35:23 43:7 85:20
86:12 100:15 103:18

**understatement**
101:19

**Understood** 7:18,19

**unfortunately** 33:21

**uniform** 18:5

**union** 14:6,8,10
103:16

**unions** 14:12 86:12

**unique** 39:4 82:25
108:8

**unit** 14:19 16:23
23:21 55:2 56:16,21
62:17 63:16,18,21
64:11 67:4,9 68:7,9
69:9,24 71:17 72:7,
23,25 73:3 81:5,10
110:13

**universities** 13:8

**university** 13:11,12,
15,16 93:7

**unnecessary** 73:18

**upcoming** 43:3

**update** 23:25

**updates** 24:1

**upgrade** 21:2

**upgraded** 15:25

**upper** 49:23

**urgency** 66:20

**use** 8:22 12:10 34:6
57:19

**usually** 31:12 58:17

70:8 71:1 76:5 85:12
99:5 100:4 108:19

**utmost** 72:10

**V**

**vacancies** 19:13
23:2,6,14,17,21
25:11 27:13 32:1,10,
12,15 55:9 56:19,22
73:9 95:24 98:23

**vacancy** 26:23 73:12

**vacant** 22:5 89:25

**vacation** 36:17,18

**vague** 25:21 59:8
66:25 67:25 71:24
74:10 76:1 82:10
88:11 104:21

**variability** 63:6 72:6

**variable** 70:7

**variance** 70:23,25

**variety** 10:23 11:7
13:19 23:11 24:16
27:8 43:1 45:12
46:17,18 47:23
51:12 52:12 57:13,
15,17,22 64:15 69:1
71:9 76:24 78:5
83:16 91:13 94:2
110:11

**various** 21:22 24:13
47:11 48:6 49:16
50:17,18 51:17
69:16,21 72:19
73:17 77:8 80:22
86:11 97:6

**verbally** 6:25 8:24

**verifications** 69:8

**verify** 69:5

**Paul Burton, M.D.**

**vest** 85:14

**vetting** 64:13

**view** 16:19

**Villamor** 48:16

**vital** 42:21 53:25 54:1,2

---

**W**

**wait** 54:1 80:3

**walk** 108:22

**walks** 99:22

**want** 26:11 31:23 52:7 64:5,21 68:21 70:17 83:2 97:17 111:1

**wanted** 16:19 18:5 37:20 40:23 50:15 107:12,13,14

**wanting** 59:25

**wants** 70:9

**wasn't** 54:18 65:10, 11 66:12,13

**way** 22:2 28:25 56:5 72:21 76:20 83:24 88:3 110:1

**ways** 53:22 76:17 110:2

**we'll** 8:7,12 28:3 55:5 78:23

**we're** 6:8,13 16:25 29:25 32:21 35:8 37:7,13 68:13 74:19 76:4 78:23 82:6,14 90:24 99:5,8 108:1, 23

**we've** 11:2 21:7 56:19 57:21 58:2,17,19

59:15,22 70:19 77:10,22 78:12 94:10 98:19 106:10 107:10

**Webber** 5:21

**week** 11:18 64:2 65:17 72:17

**weekly** 76:24

**weeks** 63:16 67:3 72:9

**went** 13:12 63:16 86:7

**wheels** 72:22

**whistleblower** 88:22

**willing** 61:21 81:12

**win** 75:8

**windows** 98:16

**witness** 5:23 6:2 29:12 34:6 110:23

**witness's** 49:4 53:9 64:8

**word** 57:23

**work** 10:17 13:18 14:4 18:17 19:22 23:24 40:10 41:6,7 46:20 47:8 48:2,4 50:19,20 57:3,8,25 58:23 61:21 62:12 64:21,22 69:17 75:5 79:2,14 80:15 83:2 89:16 94:4 95:13 96:8,12 99:5 102:15 103:2 105:6,14,15, 21 106:13 107:12,13 108:16,22 109:3,7,8

**work/life** 108:18

**worked** 11:6 13:19 42:2,10 80:12 93:25

**worker** 22:11

**workers** 19:25 22:9 104:5 109:25 110:9

**working** 16:3 20:13 31:15,16 42:7 48:14 50:25 55:4 60:20 69:18 77:18 79:1 86:18 88:18 97:20 106:19 108:6 109:6

**works** 37:9 44:12 56:5 68:15

**world** 42:17

**worry** 79:5

**worthy** 81:14

**wouldn't** 53:25 59:14 75:7,19 83:21

**wrap** 110:22

**write** 81:6

**written** 48:6 101:24

---

**Y**

**yeah** 15:21 25:21 30:12 36:16 44:9 49:8 55:11 68:4 74:12 76:16 86:23 88:8 93:22 94:19 99:19 100:20 102:8 105:17,20 107:22 109:22,24

**year** 11:16,18 15:24 19:7 21:24 23:12 56:22 58:17,18 65:20,21 66:15 80:2 93:23 94:2,10,14 104:9,14,18 105:7

**year's** 36:5,8 63:11

**years** 9:7 11:5,7,10, 12 15:21 21:18 22:4 25:3 27:7 37:24

41:24 45:13 46:19 55:1 56:19 59:13,17 67:7 77:11,12 80:3, 9,16 81:2 82:7,8 85:3,15 87:12 90:7 93:24 94:1 95:20 100:1 101:19 102:19

**YELIN** 111:1

**yielded** 108:10

**York** 13:15

---

**Z**

**zero** 30:10 31:7 34:21 41:2 43:16 91:23,25

**zoom** 28:11